# EXHIBIT B



# JUAN FERNANDEZ-BARQUIN, ESQ.
## CLERK OF THE COURT AND COMPTROLLER
## OF MIAMI-DADE COUNTY

<u>Contact Us</u>    <u>My Account</u>    <u>My Desk</u>    

# CIVIL, FAMILY AND PROBATE COURTS ONLINE SYSTEM

◄◄ BACK

**SERGIO SALANI VS AT&T MOBILITY, LLC**

| | | | |
|---|---|---|---|
| Local Case Number: | 2022-047421-SP-25 | Filing Date: | 12/30/2022 |
| State Case Number: | 132022SC047421000025 | Judicial Section: | CG 01 - Coral Gables 01 - Judge Perez Santiago, Jorge |
| Consolidated Case No.: | N/A | Court Location: | 3100 Ponce de Leon Boulevard, Coral Gables, FL 33134 |
| Case Status: | OPEN | Case Type: | SP Contract and Indebtedness (Up to $5,000) |

⊞ **Related Cases**                                                      Total Of Related Cases: 0

👥 **Parties**                                                                Total Of Parties: 2

⚒ **Hearing Details**                                                  Total Of Hearings: 2

🔊 **Dockets**                                                               Total Of Dockets: 67

| | Number | Date | Book/Page | Docket Entry | Event Type | Comments |
|---|---|---|---|---|---|---|
| 📄 | 65 | 01/22/2025 | | Letter of Correspondence | Event | **REJECTION LETTER** |
| 📄 | 64 | 01/17/2025 | | Amended Statement of Claim | Event | |
| 📄 | 63 | 01/15/2025 | | Motion for Protective Order | Event | |
| 📄 | 62 | 01/15/2025 | | Order Denying Motion | Event | **FOR RECONSIDERATION** |
| 📄 | 61 | 01/14/2025 | | Response to Request for Admissions | Event | |
| 📄 | 60 | 01/09/2025 | | Motion for Rehearing | Event | |

| | Number | Date | Book/Page | Docket Entry | Event Type | Comments |
|---|---|---|---|---|---|---|
| 📄 | 59 | 01/06/2025 | | Notice of Taking Deposition | Event | |
| 📄 | 58 | 01/06/2025 | | Order: | Event | **GRANTING MOTION FOR EXTENSION OF TIME** |
| 📄 | 57 | 01/06/2025 | | Agreed Order | Event | **GRANTING PLAINTIFFS MOTION FOR EXTENSION OF TIME TO F AMENDED PLEADING** |
| 📄 | 56 | 12/20/2024 | | Motion for Extension of Time | Event | |
| 📄 | 55 | 12/18/2024 | | Motion for Extension of Time | Event | |
| 📄 | 54 | 12/13/2024 | | Request for Admissions | Event | |
| 📄 | 53 | 12/13/2024 | | Notice of Taking Deposition | Event | |
| 📄 | 52 | 12/13/2024 | | Order: | Event | **GRANTING DISMISSAL WITH PREJUDICE OF COUNTS 1-4 AND GRANTING LEAVE TO AMEND COMPLAINT TO STATE DATA BRE CLAIMS** |
| 📄 | 51 | 12/12/2024 | | Notice of Filing: | Event | **SUPPLEMENTAL AUTHORITY** |
| 📄 | 50 | 12/11/2024 | | Notice of Filing: | Event | **COURT ORDER** |
| 📄 | 49 | 12/09/2024 | | Request for Production | Event | |
| 📄 | 48 | 12/09/2024 | | Motion for Default | Event | |
| 📄 | 47 | 12/05/2024 | | Notice of Filing: | Event | **UNOPPOSED ORDER GRANTING PLAINTIFFS MOTION FOR LEAV TO FILE SECOND AMENDED STATEMENT OF CLAIM** |
| 📄 | 46 | 11/22/2024 | | Notice of Filing: | Event | **CERTIFICATE OF SERVICE** |
| 📄 | 45 | 11/07/2024 | | Notice of Filing: | Event | **SUPPLEMENTAL AUTHORITY IN SUPPORT OF MOTION FOR LEA TO AMEND** |
| 📄 | 44 | 10/31/2024 | | Notice of Filing: | Event | **SUPPLEMENTAL AUTHORITY** |
| 📄 | 43 | 10/31/2024 | | Notice of Filing: | Event | **MOTION FOR RECONSIDERATION AND** |
| 📄 | 42 | 10/23/2024 | | Notice of Filing: | Event | **COURT ORDER** |
| 📄 | 41 | 10/04/2024 | | Memorandum of Disposition | Event | |
| | | 10/04/2024 | | Special Sets | Hearing | **MOTION TO DISMISS** |

| | Number | Date | Book/Page | Docket Entry | Event Type | Comments |
|---|---|---|---|---|---|---|
| | 40 | 10/02/2024 | | Reply | Event | |
| | 39 | 10/02/2024 | | Notice of Filing: | Event | **PLAINTIFF'S MOTION FOR LEAVE TO AMEND** |
| | 38 | 09/26/2024 | | Notice of Hearing- | Event | |
| | 37 | 09/06/2024 | | Notice of Hearing- | Event | **10/04/2024 1030AM** |
| | 36 | 08/22/2024 | | Notice of Filing: | Event | **SUPPLEMENTAL AUTHORITY IN SUPPORT** |
| | 35 | 08/20/2024 | | Notice of Cancellation of Hearing | Event | **AUGUST 21, 2024 AT 9:30 A.M.** |
| | 34 | 08/14/2024 | | Response to Motion | Event | |
| | 33 | 06/27/2024 | | Notice of Hearing- | Event | |
| | 32 | 06/17/2024 | | Motion for Leave | Event | **TO FILE SECOND AMENDED STATEMENT OF CLAIM** |
| | 31 | 05/31/2024 | | Motion to Dismiss | Event | |
| | 30 | 05/23/2024 | | Response to Request for Production | Event | |
| | 29 | 05/20/2024 | | Motion for Extension of Time | Event | |
| | 28 | 05/08/2024 | | Request for Production | Event | |
| | 27 | 05/07/2024 | | Request for Production | Event | |
| | 26 | 04/30/2024 | | Letter of Correspondence | Event | **REJECTION LETTER** |
| | 25 | 04/29/2024 | | Amended Statement of Claim | Event | |
| | 23 | 04/05/2024 | | Agreed Order | Event | **ON DEFENDANTS MOTION TO DISMISS** |
| | 22 | 02/27/2024 | | Notice of Hearing- | Event | **4/08/2024 930AM** |
| | 21 | 02/12/2024 | | Motion to Dismiss | Event | |

| | Number | Date | Book/Page | Docket Entry | Event Type | Comments |
|---|---|---|---|---|---|---|
| 📄 | 20 | 01/31/2024 | | Amended Statement of Claim | Event | |
| 📄 | 19 | 01/12/2024 | | Notice of Filing: | Event | |
| 📄 | 18 | 01/11/2024 | | Agreed Order | Event | |
| 📄 | 17 | 01/11/2024 | | Notice of Cancellation of Hearing | Event | |
| 📄 | 16 | 12/13/2023 | | Notice of Hearing- | Event | **JANUARY 16, 2024, AT 9:30** |
| 📄 | 15 | 10/10/2023 | | Motion for Extension of Time | Event | |
| 📄 | 14 | 09/22/2023 | | Memorandum of Disposition | Event | |
| | | 09/22/2023 | | Small Claims Pre-Trial Conference | Hearing | |
| 📄 | 13 | 09/20/2023 | | Stipulated Waiver for Appearance at Pre-Trial | Event | |
| 📄 | 12 | 09/20/2023 | | Notice of Appearance | Event | |
| 📄 | 11 | 09/20/2023 | | Agreed Order | Event | **APPROVING JOINT STIPULATION AND WAIVER OF PRETRIAL CONFERENCE** |
| 📄 | 10 | 08/18/2023 | | Notice: | Event | **PLAINTIFF** |
| | 9 | 08/09/2023 | | Receipt: | Event | **RECEIPT#:2530003 AMT PAID:$10.00 COMMENT: ALLOCATION CODE QUANTITY UNIT AMOUNT 2139-SUMMONS ISSUE FEE 1 $10.00 $10.00 TENDER TYPE:CHECK TENDER AMT:$40.00 RECEIPT DATE:08/09/2023 REGISTER#:253 CASHIER:STACENA** |
| | | 08/08/2023 | | SP Pre Trial Summons Issued | Service | |
| 📄 | 8 | 08/08/2023 | | Pre Trial Summons | Event | Parties: AT&T Mobility LLC |
| | 7 | 08/08/2023 | | SP Pretrial New Date | Event | Parties: AT&T Mobility LLC |
| 📄 | 6 | 07/14/2023 | | Motion for Extension of Time | Event | |
| 📄 | 5 | 07/14/2023 | | Notice of Activity | Event | |
| 📄 | 4 | 07/03/2023 | | FWOP Notice | Event | |

| | Number | Date | Book/Page | Docket Entry | Event Type | Comments |
|---|---|---|---|---|---|---|
| | 3 | 12/31/2022 | | Receipt: | Event | RECEIPT#:3030829 AMT PAID:$55.00 NAME:UDELL, MAURY L 20 S. BAYSHORE DRIVE, SUITE 770 MIAMI FL 33133-5413 COMMEN ALLOCATION CODE QUANTITY UNIT AMOUNT 2100-COUNTY FILING FEE 1 $55.00 $55.00 TENDER TYPE:EFILINGS TENDER AMT:$55.00 RECEIPT DATE:12/31/2022 REGISTER#:303 CASHIER:EFILINGUSER |
|  | 2 | 12/30/2022 | | Statement of Claim | Event | $99.99 |
| | 1 | 12/30/2022 | | Civil Cover Sheet - Claim Amount | Event | |

◀◀ BACK

**Please be advised:**

The Clerk's Office makes every effort to ensure the accuracy of the following information; however it makes no warranties or representations whatsoever regarding completeness, accuracy, or timeliness of such information and data. Information on this website has been posted with the intent that it be readily available for pe and public non-commercial (educational) use and to provide the public with direct online access to information in the Miami-Dade Clerk's Office information syst Other than making limited copies of this website's content, you may not reproduce, retransmit, redistribute, upload or post any part of this website, including the contents thereof, in any form or by any means, or store it in any information storage and retrieval system, without prior written permission from the Miami-Dade Office.

If you are interested in obtaining permission to reproduce, retransmit or store any part of this website beyond that which you may use for personal use, as define above, visit our Web API Services. You can review the complete Miami-Dade County Disclaimer.

### General

Online Case Home

Civil / Family Courts Information

Login

### Help and Support

Clerk's Home

Privacy Statement

ADA Notice

Disclaimer

Contact Us

About Us



Juan Fernandez-Barquin, Esq.
Clerk of the Court and Comptroller
of Miami-Dade County

73 W. Flagler Street
Miami, Florida 33130

305-275-1155

©2025 Clerk of the Court & Comptroller of Miami-Dade County. All rights reserved.

**FORM 1.997. CIVIL COVER SHEET**

The civil cover sheet and the information contained in it neither replace nor supplement the filing and service of pleadings or other documents as required by law. This form must be filed by the plaintiff or petitioner with the Clerk of Court for the purpose of reporting uniform data pursuant to section 25.075, Florida Statutes. (See instructions for completion.)

### I. CASE STYLE

IN THE CIRCUIT/COUNTY COURT OF THE <u>ELEVENTH</u> JUDICIAL CIRCUIT,
IN AND FOR <u>MIAMI-DADE</u> COUNTY, FLORIDA

<u>Sergio Salani</u>
Plaintiff

Case # _____
Judge _____

vs.

<u>AT&T Mobility, LLC</u>
Defendant

### II. AMOUNT OF CLAIM

Please indicate the estimated amount of the claim, rounded to the nearest dollar. The estimated amount of the claim is requested for data collection and clerical processing purposes only. The amount of the claim shall not be used for any other purpose.

☒ $8,000 or less
☐ $8,001 - $30,000
☐ $30,001- $50,000
☐ $50,001- $75,000
☐ $75,001 - $100,000
☐ over $100,000.00

### III. TYPE OF CASE (If the case fits more than one type of case, select the most definitive category.) If the most descriptive label is a subcategory (is indented under a broader category), place an x on both the main category and subcategory lines.

**CIRCUIT CIVIL**

☐ Condominium
☐ Contracts and indebtedness
☐ Eminent domain
☐ Auto negligence
☐ Negligence—other
       ☐ Business governance
       ☐ Business torts
       ☐ Environmental/Toxic tort
       ☐ Third party indemnification
       ☐ Construction defect
       ☐ Mass tort
       ☐ Negligent security
       ☐ Nursing home negligence
       ☐ Premises liability—commercial
       ☐ Premises liability—residential
☐ Products liability
☐ Real Property/Mortgage foreclosure
       ☐ Commercial foreclosure
       ☐ Homestead residential foreclosure
       ☐ Non-homestead residential foreclosure
       ☐ Other real property actions

☐ Professional malpractice
       ☐ Malpractice—business
       ☐ Malpractice—medical
       ☐ Malpractice—other professional
☐ Other
       ☐ Antitrust/Trade regulation
       ☐ Business transactions
       ☐ Constitutional challenge—statute or ordinance
       ☐ Constitutional challenge—proposed amendment
       ☐ Corporate trusts
       ☐ Discrimination—employment or other
       ☐ Insurance claims
       ☐ Intellectual property
       ☐ Libel/Slander
       ☐ Shareholder derivative action
       ☐ Securities litigation
       ☐ Trade secrets
       ☐ Trust litigation

**COUNTY CIVIL**

☒ Small Claims up to $8,000
☐ Civil
☐ Real property/Mortgage foreclosure

☐ Replevins
☐ Evictions
    ☐ Residential Evictions
    ☐ Non-residential Evictions
☐ Other civil (non-monetary)

**COMPLEX BUSINESS COURT**

This action is appropriate for assignment to Complex Business Court as delineated and mandated by the Administrative Order.  Yes ☐ No ☒

**IV.    REMEDIES SOUGHT** (check all that apply):
☒ Monetary;
☐ Nonmonetary declaratory or injunctive relief;
☐ Punitive

**V.    NUMBER OF CAUSES OF ACTION:** [  ]
(Specify)

   1

**VI.    IS THIS CASE A CLASS ACTION LAWSUIT?**
    ☐ yes
    ☒ no

**VII.    HAS NOTICE OF ANY KNOWN RELATED CASE BEEN FILED?**
    ☒ no
    ☐ yes If "yes," list all related cases by name, case number, and court.

**VIII.    IS JURY TRIAL DEMANDED IN COMPLAINT?**
    ☐ yes
    ☒ no

**IX.    DOES THIS CASE INVOLVE ALLEGATIONS OF SEXUAL ABUSE?**
    ☐ yes
    ☒ no

I CERTIFY that the information I have provided in this cover sheet is accurate to the best of my knowledge and belief, and that I have read and will comply with the requirements of Florida Rule of Judicial Administration 2.425.

Signature: s/ Maury L Udell          Fla. Bar # 121673
    Attorney or party              (Bar # if attorney)

Maury L Udell             12/30/2022
  (type or print name)           Date

Filing # 165879502 E-Filed 12/30/2022 12:05:31 PM

IN THE COUNTY COURT IN AND FOR MIAMI-DADE COUNTY, FLORIDA

| DIVISION | STATEMENT OF CLAIM | CASE NUMBER |
|---|---|---|
| ☒ CIVIL<br>☐ DISTRICTS<br>☐ OTHER | (File in duplicate Plus One for Each Defendant) | _____<br><br>SECTION NO. |
| **PLAINTIFF**<br><br>**Sergio Salani** | **VS. DEFENDANT(S)**<br><br>**AT&T MOBILITY, LLC** | **CLOCK IN** |

| The Plaintiff sues the Defendant for the following reasons (As marked (x) below): | Address:<br>**CT CORPORATION SYSTEM**<br>**1200 SOUTH PINE ISLAND ROAD**<br>**PLANTATION, FL 33324** | Phone Number: |
|---|---|---|

☐ Good, wares and merchandise sold by plaintiff, to defendant;
☐ Work done and materials furnished by plaintiff, to defendant;
☐ Money lent by plaintiff to the defendant which is due and payable;
☐ Money due to plaintiff upon accounts stated and agreed to between them;
☐ On a written instrument, copy of which is attached hereto;
☐ Rent for certain premises in Miami-Dade County, Florida, Viz;
☒ Other (Explain)
☐ Any additional facts in connection with any of the above:

**(USE ADDITIONAL SHEET IF NECESSARY)**

Breach of contract for good faith and fair dealing, violation of 501.204, Fla. Stat. FDUTPA, bogus administrative fee application, injunctive relief, including attorney's fees and costs pursuant to 501.2105, Fla. Stat.

Where Plaintiff demands judgement in the sum of $99.00 and for injunctive relief together with court costs and any further costs which the Court may assess.

The Plaintiff, **Sergio Salani** says the foregoing is a just and true statement of the amount owed by defendant to plaintiff, exclusive of all lawful setoffs, and that defendant has no lawful defenses which would preclude the collection of said amount.

Affiant states that the defendant(s) is/are not in the military service of the United States.

| Attorney / Plaintiff<br>Maury L. Udell | Signature | Attorney's Bar No.<br>121673 |
|---|---|---|

| Address for Attorney / Plaintiff<br>Beighley, Myrick, Udell & Lynne, P.A.<br>2601 S. Bayshore Drive, Suite 770, FL 33133 | Telephone No.<br><br>305-349-3930 |
|---|---|

The forgoing instrument was acknowledged before me this _30_ day of _December_, 20_22_ by _Maury L. Udell, Esq._, _who is personally known to me_ or who has produced _N/A_ as identification and did ☒ / did not ☐ take an oath. SWORN TO AND SUBSCRIBED BEFORE ME this _30_ day of _December_, 20_22_.

| **HARVEY RUVIN**<br>**CLERK OF THE COURTS** | By:<br>_____<br>DEPUTY CLERK | Notary Public,<br>State of Florida<br>My Commission Expires: | BETTY LOPEZ<br>Notary Public - State of Florida<br>Commission # HH 087277<br>My Comm. Expires Jan 31, 2025<br>Bonded through National Notary Assn. |
|---|---|---|---|

| SERVICE OF PROCESS | FILING FEE AMOUNT | RECEIPT NUMBER |
|---|---|---|
| ☒ PROCESS SERVER<br>☐ SHERIFF<br>☐ MAIL | $55.00 | |

NOTE: If the claim is based upon a written document, a copy, or the material part thereof, shall be attached to the statement of claim.

## INSTRUCTION SHEET
### IMPORTANT

YOU MUST advise the Clerk, in writing, of any change in your mailing address.

If you are the DEFENDANT and fail to appear on the designed date, in person or by an attorney, a judgement may be entered against you.

Plaintiff(s) will not be entitled to a default or judgement in the absence of an affidavit regarding the defendant's military status in compliance with applicable law. This form, if sworn to, will meet the above requirements.

If you are a PLAINTIFF and fail to appear on the designated date, in person or by an attorney, this case may be dismissed for Want of Prosecution.

Any claim of the Defendant against the Plaintiff, arising out of the same transaction or occurrence which is the subject matter of plaintiff's claim, shall be filed not less than 5 days prior to the appearance date, or within such times as the Court designates. When a counterclaim or set-off exceeds the jurisdiction of the Court, it shall be filed in writing before or at the pretrial hearing, and the action shall then be transferred to the Court having jurisdiction thereof. As evidence of good faith, the counter-claimant shall deposit a sum sufficient to pay the filing fee in the Court to which the case is to be transferred with his counterclaim.

FAILURE TO MAKE THE DEPOSIT WAIVES THE RIGHT TO TRANSFER.

TRIAL BY JURY may be had upon written demand by Plaintiff made at the commencement of the action or by any defendant within 5 days after service of the notice to appear or at the Pretrial Conference. If the demand is not made, the right to trial by jury is waived.

If at any time in the proceedings a settlement is reached between the parties, this office should be notified in writing by the Plaintiff.

If you have any questions regarding procedures, this office will assist you. This office cannot furnish legal advice to you. Please consult your attorney for legal advice.

---

### CAUTION

A copy of any paper that you file at any time with the Clerk or Judge **MUST** be sent by you to each attorney appearing the case, if any, or to all parties not represented by an attorney. You must set forth the date and to whom you sent the copy (or copies) of the paper filed, which would be followed by your signature.

---

## AMERICANS WITH DISABILITIES ACT OF 1990
### ADA NOTICE

**"If you are a person with a disability who needs any accommodation in order to participate in this proceeding, you are entitled, at no cost to you, to the provision of certain assistance. Please contact the Eleventh Judicial Circuit Court's ADA Coordinator, Lawson E. Thomas Courthouse Center, 175 NW 1st Ave., Suite 2702, Miami, FL 33128, Telephone (305) 3497175; TDD (305) 349-7174, Fax (305) 349-7355 at least 7 days before your scheduled court appearance, or immediately upon receiving this notification in the time before the scheduled appearance is less than 7 days; if you are hearing or voice impaired, call 711."**

**IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA**

**COUNTY CIVIL DIVISION**

**CASE NO.: 2022-047421-SP-25**
**SECTION:  CG01**

**Sergio Salani**
**Plaintiff(s),**

**vs.**

**AT&T Mobility, LLC**
**Defendant(s)**

_____/

<u>**ZOOM/VIRTUAL**</u>
<u>**NOTICE OF LACK OF PROSECUTION AND ORDER TO APPEAR FOR HEARING**</u>

<u>**Notice of Lack of Prosecution**</u>: Notice is hereby provided, pursuant to Florida Small Claims Rule 7.110, that the Court intends to dismiss the above-styled action because it appears that there has been no record activity for the last six (6) months and no stay has been issued or approved by the court.

<u>**Order to Appear**</u>:  The parties are ordered to appear on <u>08-23-2023 at 2:00 PM</u> for a hearing on the Court's motion to dismiss the above-styled cause for lack of prosecution, in Room Virtual Courtroom, before the undersigned Judge.

Virtual Court is held remotely on the Zoom platform. You will receive an email from the Court with the information you need to connect to your event by video or phone if you are on the E-Filing Portal service list.  If you do not receive an email, check the judge's webpage for the Zoom link to their virtual courtroom or further instructions. You may also register for text notification via link https://cmap.jud11.flcourts.org/ebench/textNotificationsRegistration.jsp.

**To prevent the dismissal of the above-styled cause, the party opposing the dismissal** <u>**must appear**</u> **AND** <u>**affirmatively establish at least one of the following**</u>:

1. There had been record activity within six (6) months prior to service of this Notice and Order to Appear; or

2. A stay of the action was in effect within the six (6) months prior to service of this Notice and Order to Appear; or

3. The Court issued a stay of the action prior to the hearing on the Notice and Order to Appear; or

4. At least five (5) days before the hearing, the party opposing the dismissal established good cause, in writing, for the action to remain pending.

The failure of the party opposing the dismissal to appear at the hearing <u>and</u> **establish** the existence of at least one of the above, shall constitute an abandonment of any justified defense, and the above-styled action shall be dismissed for lack of prosecution on the date of the hearing, set forth above.

All parties served with this order are directed to assist by examining the service list at the bottom of this order immediately upon receipt.  After review, if it appears that any party to the case is not listed as having been served with this order,  a copy of this order shall immediately be served upon that party by email or by mailing to a physical address, by the party who received the order.  No notice of service or filing shall be filed in the court file and the act of service shall not constitute record activity for purposes of lack of prosecution under Florida Rule of Civil Procedure 1.420.

If a default has been entered, or if Plaintiff has filed for a default final judgment, Plaintiff shall file all necessary default paperwork (affidavit of indebtedness, affidavit of costs, affidavit of payments, etc.) along with an updated non-military affidavit with the clerk's office and submit a Default Final Judgment order via courtMAP no later than two (2) days before the hearing.

IT IS THE RESPONSIBILITY OF THE SCHEDULER TO PROVIDE TIMELY NOTICE OF THE ZOOM MEETING DETAILS TO ANY PARTY NOT REGISTERED ON THE E-FILING SERVICE PORTAL.

**DONE AND ORDERED** in Chambers, at Miami-Dade County, Florida, on this **3rd day of July, 2023** .

2022-047421-SP-25 07-03-2023 11:34 PM

2022-047421-SP-25 07-03-2023 11:34 PM

**Linda Melendez**
COUNTY COURT JUDGE

**If you are a person with a disability who needs any accommodation in order to participate in this proceeding, you are entitled, at no cost to you, to the provision of certain assistance. Please contact Aliean Simpkins, the Eleventh Judicial Circuit Court's ADA Coordinator, Lawson E. Thomas Courthouse Center, 175 NW 1st Ave., Suite 2400, Miami, FL 33128, Telephone (305) 349-7175; TDD (305) 349-7174, Fax (305) 349-7355, Email: ADA@jud11.flcourts.org at least seven (7) days before your scheduled court appearance, or immediately upon receiving this notification if the time before the scheduled appearance is less than seven (7) days; if you are hearing or voice impaired, call 711.**

Copies Furnished to:
Electronically Served

Maury L. Udell, notice66@bmulaw.com
Maury L. Udell, blopez@bmulaw.com

IN THE COUNTY COURT OF THE 11TH JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA

Sergio Salani,

     Plaintiff,

v.

AT&T Mobility, LLC,

     Defendant.

_____/

CASE NO.: 2022-047421-SP-25

BAR NO.: 121673

**PLAINTIFF'S NOTICE OF GOOD CAUSE**

     Plaintiff, Sergio Salani, by and through the undersigned counsel, hereby files this notice of good cause in the above referenced case and states as follows:

1. On July 3, 2023, a Notice of Lack of Prosecution and Order to Appear for Hearing was served for this case, scheduled to be heard on September 14, 2023.

2. This case was filed in December 2022 along with a series of other cases against AT&T which are in front of the Court.

3. Plaintiff has been unable to serve its complaint because Plaintiff has not received the notice to appear from the Court clerk despite repeated attempts in addition to requesting that the clerk set the pre-trial conference.

4. Thus, there is good cause as to why this case should remain open.

5. Plaintiff has filed a motion to extend time to serve the complaint as a result of the clerk's failure to issue the pre-trial summons/notice to appear.

Wherefore, Plaintiff respectfully requests to the Court order that the case remain open and instruct the clerk to set the pre-trial conference and any other relief the Court deems just and proper.

**Beighley, Myrick, Udell, Lynne & Zeichman PA**
*Attorneys for Plaintiff*
2601 S. Bayshore Drive, Suite 770
Miami, FL 33133
(305) 349-3930 – Phone

By:      /s/ *Maury L. Udell*
          Maury L. Udell, Esquire
          mudell@bmulaw.com
          Fla. Bar 121673

IN THE COUNTY COURT OF THE 11TH
JUDICIAL CIRCUIT IN AND FOR MIAMI-
DADE COUNTY, FLORIDA

Sergio Salani,

      Plaintiff,

                            CASE NO.: 2022-047421-SP-25

v.

                            BAR NO.: 121673

AT&T Mobility, LLC,

      Defendant.

_____/

**PLAINTIFF'S MOTION FOR EXTENSION OF TIME TO SERVE COMPLAINT**

    Plaintiff, Sergio Salani, by and through undersigned counsel, hereby files this
Motion for Extension of Time to Serve Complaint and in support states as follows:

1. Plaintiff filed its Complaint on December 30, 2022 against Defendant AT&T
   Mobility, LLC.

2. Plaintiff has been unable to serve its complaint because Plaintiff has not
   received the notice to appear from the Court clerk despite repeated attempts in
   addition to requesting that the clerk set the pre-trial conference.

3. Pursuant to Fla. R. Civ. P. 1.070(j), Plaintiff must serve its complaint on
   Defendants within one hundred and twenty (120) days from the date the case
   is filed *unless* Plaintiff can show good cause as to why the Court should extend
   the time of service.

    WHEREFORE, Plaintiff, Sergio Salani, respectfully requests the Court grant the
motion herein and any other relief the Court deems just and proper.

**Beighley, Myrick, Udell, Lynne & Zeichman PA**
*Attorneys for Plaintiff*
2601 S. Bayshore Drive, Suite 770
Miami, FL 33133
(305) 349-3930 – Phone

By:   /s/ *Maury L. Udell*
       Maury L. Udell, Esquire
       mudell@bmulaw.com
       Fla. Bar 121673

# IN THE COUNTY COURT IN AND FOR MIAMI-DADE COUNTY, FLORIDA

| DIVISION | SUMMONS/NOTICE TO APPEAR FOR | CASE NUMBER |
|---|---|---|
| ☐ DISTRICT COURTS <br> ☐ OTHER | **PRETRIAL CONFERENCE DISTRICT COURT** <br> (File in Quadruplicate) | 2022-047421-SP-25 |

| PLAINTIFF(S) <br><br> Sergio Salani | VS.  DEFENDANT(S) <br><br> AT&T MOBILITY, LLC | CLOCK IN |
|---|---|---|

DEFENDANT(S) TO BE SERVED AT:

CT CORPORATION SYSTEM
1200 SOUTH PINE ISLAND ROAD
PLANTATION, FL 33324

STATE OF FLORIDA
NOTICE TO PLAINTIFF(S) AND DEFENDANT(S)
YOU ARE HEREBY NOTIFIED to appear in person or by attorney at the location indicated below:

☐ HIALEAH DISTRICT COURT ☐ NORTH DADE JUSTICE CENTER ☒ CORAL GABLES DISTRICT COURT
☐ CALEB CENTER NORTH ☐ MIAMI-BEACH DISTRICT ☐ SOUTH DADE JUSTICE CENTER

**(Addresses for court locations are printed on the back of this form)**
on ___SEP 2 2 2023___, 20___, _9:30 A_.M., in courtroom _1-3_ before a Judge of this Court
Section # ___01___.

## IMPORTANT – READ CAREFULLY

**THE CASE WILL NOT BE TRIED AT THE PRETRIAL CONFERENCE, BUT MAY BE MEDIATED AT THAT TIME.
DO NOT BRING WITNESS(ES). YOU MUST APPEAR IN PERSON OR BY ATTORNEY.
WHOEVER APPEARS FOR A PARTY MUST HAVE FULL AUTHORITY TO SETTLE FOR ALL AMOUNTS FROM
ZERO TO THE AMOUNT OF CLAIM WITHOUT FURTHER CONSULTATION. FAILURE TO COMPLY MAY RESULT
IN THE IMPOSITION OF SANCTIONS, INCLUDING COSTS, ATTORNEY FEES, ENTRY FOR JUDGEMENT,
DISMISSAL.**

The defendant(s) must appear in court on the date specified in order to avoid a default judgement. The plaintiff(s) must appear to
avoid having the case dismissed for lack of prosecution. A written MOTION or ANSWER to the court by the plaintiff(s) or the
defendant(s) shall not excuse the personal appearance of the parties or their attorney in the PRETRIAL CONFERENCE/MEDIATION.
The date and time of the pretrial conference CANNOT be rescheduled without good cause and prior court approval.

A corporation may be represented at any stage of the trial court proceedings by an officer of the corporation or any employee
authorized in writing by any officer of the corporation. Written authorization must be brought to the Pretrial Conference/Mediation.

The purpose of the pretrial conference is to record your appearance, to determine if you admit all or part of the claim, to enable the
court to determine the nature of the case, and to set the case for trial if the case cannot be resolved at the pretrial conference. You or
your attorney should be prepared to confer with the court and to explain briefly the nature of your dispute, state what efforts have been
made to settle the dispute, exhibit any documents necessary to prove the case, state the names and addresses of your witnesses, stipulate
to the facts that will require no proof and will expedite the trial, and estimate how long it will take to try the case.

## MEDIATION

Mediation may take place during the time scheduled for the pretrial conference. Mediation is a process whereby an impartial and neutral
third person called a mediator acts to encourage and facilitate the resolution of a dispute between two or more parties, without prescribing
what the resolution should be. It is an informal and nonadversarial process with the objective of helping the disputing partied reach a
mutually acceptable and voluntary agreement.

In mediation, decision making rests with the parties. Negotiations in court mediation are primarily conducted by the parties. Counsel
for each party may participate. However, presence of counsel is not required. If a full agreement is not reached at mediation, the

remaining issues of the case will be set for trial. Mediation communications are confidential and privileged except where disclosures are required or permitted by law.

If you admit to the claim, but desire additional time to pay, you must come and state the circumstances to the court. The court may approve a payment plan and may withhold judgement or executions or levy.

**RIGHT TO VENUE.** THE LAW GIVES THE PERSON OR COMPANY WHO HAS SUED YOU THE RIGHT TO FILE IN ANY ONE OF SERVERAL PLACES AS LISTED BELOW. HOWEVER, IF YOU HAVE BEEN SUED IN ANY PLACE OTHER THAN ONE OF THESE PLACES, YOU, AS THE DEFENDANT(S), HAVE THE RIGHT TO REQUEST THAT THE CASE BE MOVED TO A PROPER LOCATION OR VENUE. A PROPER LOCATION OR VENUE MAY BE ONE OF THE FOLLOWING:

1. WHERE THE CONTRACT WAS ENTERED INTO;
2. IF THE SUIT IS ON UNSECURED PROMISSORY NOTE, WHERE THE NOTE WAS SIGNED OR WHERE THE MAKER RESIDES;
3. IF THE SUIT IS TO RECOVER PROPERTY OR TO FORECLOSE A LEIN, WHERE THE PROPERTY IS LOCATED;
4. WHERE THE EVENT GIVING RISE TO THE SUIT OCCURRED;
5. WHERE ANY ONE OR MORE OF THE DEFENDANTS SUED RESIDE;
6. ANY LOCATION AGREED TO IN A CONTRACT.
7. IN ANY ACTION FOR MONEY DUE, IF THERE IS NO AGREEMENT AS TO WHERE SUIT MAY BE FILED, WHERE PAYMENT IS TO BE MADE.

If you, as the defendant(s) believe the plaintiff(s) has/have not sued in one of these correct places, you must appear on our court date and orally request a transfer or you must file a WRITTEN request for transfer in affidavit form (sworn to under oath) with the court 7 days prior to your first court date and send a copy to the plaintiff(s) or plaintiff('s)(s') attorney, if any

**A COPY OF THE STATEMENT OF CLAIM SHALL BE SERVED WITH THIS SUMMONS**

### MIAMI-DADE COUNTY DISTRICT COURT FACILITIES

Hialeah District Court (21)
11 East 6th Street
Hialeah, FL 33010

North Dade Justice Center (23)
Room 100
15555 Biscayne Blvd.
Miami, FL 33160

Coral Gables District (25)
3100 Ponce De Leon Blvd.
Coral Gables, FL 33134

Joseph Caleb Center Court (20)
5400 NW 22nd Avenue
Suite #103
Miami, FL 33142

Miami Beach District (24)
Room 200
1130 Washington Avenue
Miami, FL 33139

South Dade Justice Center (26)
Room 1200
10710 S.W. 211 Street
Cutler Ridge, FL 33189

| Filed by: Maury L. Udell, Esq. Address: Beighley, Myrick, Udell, Lynne & Zeichman P.A. 2601 S. Bayshore Drive, Suite 770 Miami, FL 33133 Phone: 305-349-3930 | COPY: ☐ MAILED  ☒ HAND-DELIVERED TO: ☐ PLAINTIFF  ☒ ATTORNEY SERVED BY: ☐ MAIL  ☐ SHERIFF ☒ PROCESS SERVER |
| --- | --- |
| **JUAN FERNANDEZ-BARQUIN CLERK OF THE COURT** | By: _Stacena Johnson_  DEPUTY CLERK | DATE  AUG 0 8 2023 |

### AMERICANS WITH DISABILITIES ACT OF 1990

**IN THE COUNTY COURT IN AND FOR MIAMI-DADE COUNTY, FLORIDA**

### ADA NOTICE

**"If you are a person with a disability who needs any accommodation in order to participate in this proceeding, you are entitled, at no cost to you, to the provision of certain assistance. Please contact the Eleventh Judicial Circuit Court's ADA Coordinator, Lawson E. Thomas Courthouse Center, 175 NW 1st Ave., Suite 2702, Miami, FL 33128, Telephone (305) 349-7175; TDD (305) 349-7174, Fax (305) 349-7355 at least 7 days before your scheduled court appearance, or immediately upon receiving this notification in the time before the scheduled appearance is less than 7 days; if you are hearing or voice impaired, call 711."**

IN THE COUNTY COURT OF THE 11TH
JUDICIAL CIRCUIT IN AND FOR MIAMI-
DADE COUNTY, FLORIDA

Sergio Salani,

      Plaintiff,

v.

AT&T Mobility, LLC,

      Defendant.

_____/

CASE NO.: 2022-047421-SP-25

BAR NO.: 121673

## PLAINTIFF'S NOTICE OF GOOD CAUSE

      Plaintiff, Sergio Salani, by and through the undersigned counsel, hereby files this notice of good cause in the above referenced case and states as follows:

1. On July 3, 2023, a Notice of Lack of Prosecution and Order to Appear for Hearing was served for this case, scheduled to be heard on August 23, 2023.

2. This case was filed in December 2022 along with a series of other cases against AT&T which are in front of the Court.

3. Plaintiff had been unable to serve its complaint because Plaintiff had not received the Summons/Notice to Appear from the Court's clerk despite repeated attempts in addition to requesting that the clerk set the pre-trial conference.

4. On August 15, 2023 Plaintiff received the Summons/Notice to Appear via US Mail and the pre-trial conference is now scheduled to take place on September 22, 2023 at 9:30 a.m.

5. Thus, there is good cause as to why this case should remain open.

Wherefore, Plaintiff respectfully requests to the Court order that the case remain open and instruct the clerk to set the pre-trial conference and any other relief the Court deems just and proper.

Dated this 18th day of August, 2023

**Beighley, Myrick, Udell, Lynne & Zeichman PA**
*Attorneys for Plaintiff*
2601 S. Bayshore Drive, Suite 770
Miami, FL 33133
(305) 349-3930 – Phone

By:      /s/ *Maury L. Udell*
Maury L. Udell, Esquire
mudell@bmulaw.com
Fla. Bar 121673

Case 1:25-cv-20381-RAR   Document 1-2   Entered on FLSD Docket 01/27/2025   Page 24 of 1553

**IN THE COUNTY COURT OF THE ELEVENTH JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA**

CASE NO: <u>2022-047421-SP-25</u>
SECTION: <u>CG01</u>
JUDGE: <u>Jorge A Perez Santiago</u>

**Sergio Salani**

Plaintiff(s) / Petitioner(s)

vs.

**AT&T Mobility, LLC**

Defendant(s) / Respondent(s)

_____/

## <u>AGREED ORDER APPROVING JOINT STIPULATION AND WAIVER OF PRETRIAL CONFERENCE</u>

Filing # 182281729 - Joint Stipulation and Waiver of Pretrial Conference

THIS CAUSE having come before this Court, noting agreement of counsel, and being otherwise fully advised in the premises, it is hereby ORDERED AND ADJUDGED:

1. The Florida Rules of Civil Procedure are invoked.

2. Plaintiff shall have twenty (20) days from the date of this Order to file an Amended Statement of Claim.

3. Defendant shall have twenty (20) days from the filing of Plaintiff's Amended Statement of Claim to respond thereto.

4. The parties are excused from attending the September 22, 2023 Pretrial Conference.

**DONE** and **ORDERED** in Chambers at Miami-Dade County, Florida on this <u>20th day of September, 2023</u>.

2022-047421-SP-25 09-20-2023 9:12 PM

<u>2022-047421-SP-25 09-20-2023 9:12 PM</u>
Hon. Jorge A Perez Santiago

**COUNTY COURT JUDGE**
Electronically Signed

---

<span style="color:red">No Further Judicial Action Required on **THIS MOTION**</span>

<span style="color:red">CLERK TO **RECLOSE** CASE IF POST JUDGMENT</span>

---

**Electronically Served:**
Alicia Thomsen, athomsen@daypitney.com
Andrew R. Ingalls, aingalls@daypitney.com
Andrew R. Ingalls, brodriguez@daypitney.com
Evelyn Davila, edavila@daypitney.com
Jessica Solorzano, jsolorzano@daypitney.com
Manuel A. Garcia-Linares, mgarcialinares@daypitney.com
Manuel A. Garcia-Linares, athomsen@daypitney.com
Maury L. Udell, notice66@bmulaw.com
Maury L. Udell, blopez@bmulaw.com

**Physically Served:**

IN THE COUNTY COURT OF THE ELEVENTH JUDICIAL CIRCUIT, IN AND FOR MIAMI-DADE COUNTY, FLORIDA

CASE NO. 2022-047421-SP 25

SERGIO SALANI,

      Plaintiff,

v.

AT&T MOBILITY LLC,

      Defendant.

_____/

## NOTICE OF APPEARANCE

THE CLERK of the above-styled Court will please enter the Appearances of MANUEL A. GARCIA-LINARES, ANDREW R. INGALLS and GEORGIA A. THOMPSON of the law firm of DAY PITNEY LLP, in this matter as counsel for Defendant, AT&T MOBILITY LLC. Copies of all future correspondence, pleadings, notices and orders should be sent to the undersigned counsel at the address written below.

Dated: September 20, 2023       Respectfully submitted,

      By: */s/ Manuel A. Garcia-Linares*
          Manuel A. Garcia-Linares, Esq.
          Florida Bar No. 985252
          mgarcialinares@daypitney.com
          athomsen@daypitney.com
          Andrew R. Ingalls, Esq.
          Florida Bar No. 112558
          aingalls@daypitney.com
          athomsen@daypitney.com
          Georgia A. Thompson, Esq.
          Florida Bar No. 100181
          gthompson@daypitney.com
          lmiller@daypitney.com
          **DAY PITNEY LLP**
          396 Alhambra Circle
          North Tower – 14th Floor
          Miami, FL 33134
          Telephone: (305) 373-4000
          Facsimile: (305) 373-4099
          *Counsel for Defendant AT&T Mobility LLC*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY certify that on September 20, 2023, I electronically filed the foregoing document with the Clerk of the Court via e-portal and served: **Maury L. Udell, Esq.**, BEIGHLEY, MYRICK, UDELL, LYNNE & ZEICHMAN, P.A., 2601 South Bayshore Drive, Suite 770, Miami, Florida 33133, Emails: mudell@bmulaw.com and notice66@bmulaw.com, *Counsel for Plaintiff.*

By: */s/ Manuel A. Garcia-Linares*
Manuel A. Garcia-Linares, Esq.

116774100.1

Case 1:25-cv-20381-RAR   Document 1-2   Entered on FLSD Docket 01/27/2025   Page 28 of 1553

IN THE COUNTY COURT OF THE ELEVENTH JUDICIAL CIRCUIT, IN AND FOR MIAMI-DADE COUNTY, FLORIDA

SERGIO SALANI,

*Plaintiff,*

v.

AT&T MOBILITY LLC,

*Defendant.*

_____/

CASE NO. 2022-047421-SP-25

### <u>JOINT STIPULATION AND WAIVER OF PRETRIAL CONFERENCE</u>

IT IS HEREBY STIPULATED TO AND AGREED BETWEEN the parties that pursuant to Small Claims Rule 7.090(e), the parties, both represented by counsel, agree to waive appearance at the Initial Pre-Trial Conference scheduled for September 22, 2023 at 9:30 a.m. and stipulate to the following:

1. The Florida Rules of Civil Procedure are hereby invoked.

2. Plaintiff shall have twenty (20) days from the date of entry of this Court's Order Approving Joint Stipulation to file an Amended Statement of Claim.

3. Defendant shall have twenty (20) days from the date Plaintiff files the Amended Statement of Claim to respond thereto.

Dated: September 20, 2023

Respectfully submitted,

<table>
<tr>
<td>

**BEIGHLEY, MYRICK, UDELL, LYNNE & ZEICHMAN, P.A.**

By: _/s/_____
    Maury L. Udell, Esq.
    mudell@bmulaw.com
    blopez@bmulaw.com
    notice66@bmulaw.com
    2601 South Bayshore Drive
    Suite 770
    Miami, Florida 33133
    Telephone: (305) 349-3930
    *Counsel for Plaintiff*

</td>
<td>

**DAY PITNEY LLP**

By: _/s/ Manuel A. Garcia-Linares_____
    Manuel A. Garcia-Linares, Esq.
    Florida Bar No. 985252
    mgarcialinares@daypitney.com
    athomsen@daypitney.com
    Andrew R. Ingalls, Esq.
    Florida Bar No. 112558
    aingalls@daypitney.com
    athomsen@daypitney.com
    396 Alhambra Circle, 14th Floor
    Miami, Florida 33134
    Telephone: (305) 373-4000
    *Counsel for Defendant*

</td>
</tr>
</table>

IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT IN AND FOR DADE COUNTY, FLORIDA

| DIVISION<br>☐ CIVIL<br>☐ OTHER | **MEMO OF DISPOSITION** | **CASE NUMBER**<br>2022-047421-SP-25<br>Section No. CG01 |
|---|---|---|

| PLAINTIFF(S)<br>Sergio Salani | VS. DEFENDANT(S)<br>AT&T Mobility, LLC | NR   CLOCK-IN |
|---|---|---|

| PLAINTIFF ATTORNEY(S)<br>Udell, Maury L | DEFENDANT ATTORNEY(S)<br>No Known Name | DATE OF HEARING<br>09/22/2023 -<br>9:30 AM | TYPE<br>Small Claims<br>Pre-Trial<br>Conference |
|---|---|---|---|

**MOTIONS**

TYPE OF MOTION_____
COURT RULING ON MOTION:

☐ GRANTED  ☐ DENIED  ☐ WITHHELD

COMMENTS: *NEXT 7/14/23*
_____
_____

**CALENDAR DIRECTIONS**

CASE CONTINUED:
☐ NOTICE OF SERVICE PROCESS

☐ PENDING SERVICE                    ☐ PENDING SETTLEMENT

☐ SET CASE FOR _____ ESTIMATED TIME REQUIRED _____

☐ MEDIATION                    ☐ NON JURY TRIAL
                               ☐ JURY TRIAL

☑ STIPULATED WAIVER FOR APPEARANCE AT PRE-TRIAL *9/20/23*
☑ ORDER INVOKING RULES OF CIVIL PROCEDURE *9/20/23*
☐ MOTION TO INVOKE THE RULES OF CIVIL PROCEDURE

**DISPOSITIONS**

☐ DEFAULT  ☐ FINAL JUDGMENT  ☐ DEFAULT JUDGMENT  ☐ SUMMARY JUDGMENT  ☐ AGREED JUDGMENT

☐ ORDER OF DISMISSAL          AMOUNT OF JUDGMENT          JUDGMENT FOR THE PLAINTIFF

   ☐ WITHOUT PREJUDICE  PRINCIPAL $ _____ INTEREST $ _____  ☐ STIPULATION FOR PAYMENT AND ORDER OF DISMISSAL

   ☐ WITH PREJUDICE     COURT COSTS $ _____ ATTORNEY FEES $ _____

   ☐ VOLUNTARY DISMISSAL

**CONDITION OF DISPOSITION**

☐ EXECUTION OF JUDGMENT WITHHELD     ☐ ORDER WITHHOLDING JUDGMENT     ☐ PLAINTIFF TO SUBMIT PROOF
PENDING PAYMENT BY DEFENDANT OF THE ABOVE JUDGMENT AT A RATE OF
$ _____ PER _____, COMMENCING _____
                              WEEK/MONTH                                      DATE
SWORN TESTIMONY TAKEN IN COURT: _____
JUDGMENT OR ORDER TO BE PREPARED BY:  ☐ PLAINTIFF     ☐ DEFENDANT     ☐ COURT
☐ DEFENDANT TO FILE ANSWER IN _____ DAYS
☐ A DEFAULT IS HEREBY ENTERED AGAINST _____
              FOR FAILURE TO APPEAR AT PRETRIAL AS REQUIRED BY LAW
              By:_____
                    DEPUTY CLERK

**Juan Fernandez-Barquin**
**Clerk of the Court and Comptroller**

_____
COURT REPORTER

_____
JUDGE

IN THE COUNTY COURT OF THE 11TH JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA

Sergio Salani,

      Plaintiff,

v.

AT&T Mobility, LLC,

      Defendant

_____/

CASE NO. 2022-047421-SP-25

FLA. BAR NO.: 121673

**PLAINITFF'S MOTION FOR EXTENSION OF TIME TO FILE AMENDED PLEADING**

COMES NOW, the Plaintiff, Sergio Salani, by and through undersigned counsel, hereby files this Motion for Extension of Time to File Amended Pleading and in support states as follows:

1. On September 20, 2023, this Court entered an Order directing Plaintiff to file an amended pleading.

2. Although plaintiff has been working diligently to comply with the Court's order, due to personal and professional commitments, Plaintiff's counsel needs additional time.

3. This Motion is made in good faith and not for purposes of delay.

WHEREFORE, Plaintiff, Sergio Salani, respectfully requests the Court grant the motion herein and any other relief the Court deems just and proper.

## <u>CERTIFICATE OF SERVICE</u>

WE HEREBY CERTIFY that a true and correct copy of the foregoing was served via e-mail this October 10, 2023 to Manuel A. Garcia-Linares, Esquire (mgarcialinares@daypitney.com) brodriguez@daypitney.com, jsolorzano@daypitney.com edavila@daypitney.com) Andrew R. Ingalls, Esquire (aingalls@daypitney.com) Day Pitney LLP, 396 Alhambra Circle, North Tower - 14th Floor, Miami, Florida 33134.

**Beighley, Myrick, Udell, Lynne & Zeichman PA**
*Attorneys for Plaintiff*
2601 S. Bayshore Drive
Suite 770
Miami, FL 33133
(305) 349-3930 – Phone

By:      /s/ *Maury L. Udell*
         Maury L. Udell, Esquire
         mudell@bmulaw.com
         Fla. Bar 121673

Case 1:25-cv-20381-RAR   Document 1-2   Entered on FLSD Docket 01/27/2025   Page 32 of 1553

IN THE COUNTY COURT OF THE
ELEVENTH JUDICIAL CIRCUIT, IN AND
FOR MIAMI-DADE COUNTY, FLORIDA

SERGIO SALANI,                                    CASE NO. 2022-047421-SP 25

      Plaintiff,

v.

AT&T MOBILITY LLC,

      Defendant.

_____/

## DEFENDANT'S NOTICE OF HEARING
### (Motion Calendar)

**YOU ARE HEREBY NOTIFIED** that the undersigned will call up for hearing before The

Honorable Jorge Perez Santiago, at the Coral Gables Branch Court, 3100 Ponce de Leon Boulevard,

Courtroom CG 1-6, Coral Gables, Florida 33134, via Zoom platform, on **Tuesday, January 16,**

**2024, at 9:30 a.m.,** or as soon thereafter as can be heard:

- **[DE 15 – Filing No. 183675376] Plaintiff's** *Motion for Extension of Time to File Amended Pleading* **dated October 10, 2023**

Dated: December 13, 2023          Respectfully submitted,

                        By: */s/ Manuel A. Garcia-Linares*_____
                             Manuel A. Garcia-Linares, Esq.
                             Florida Bar No. 985252
                             mgarcialinares@daypitney.com
                             athomsen@daypitney.com
                             Andrew R. Ingalls, Esq.
                             Florida Bar No. 112558
                             aingalls@daypitney.com
                             athomsen@daypitney.com
                             **DAY PITNEY LLP**
                             396 Alhambra Circle
                             North Tower – 14th Floor
                             Miami, Florida 33134
                             Telephone: (305) 373-4000
                             Facsimile: (305) 373-4099
                             *Counsel for Defendant AT&T Mobility LLC*

## CERTIFICATE OF SERVICE

I HEREBY certify that on December 13, 2023, I electronically filed the foregoing document

with the Clerk of the Court via e-portal and served: **Maury L. Udell, Esq.**, BEIGHLEY, MYRICK,

UDELL, LYNNE & ZEICHMAN, P.A., 2601 South Bayshore Drive, Suite 770, Miami, Florida 33133,

Emails: mudell@bmulaw.com and notice66@bmulaw.com, *Counsel for Plaintiff.*


By: */s/ Manuel A. Garcia-Linares*
Manuel A. Garcia-Linares, Esq.

Filing # 189375652 E-Filed 01/11/2024 01:14:06 PM

IN THE COUNTY COURT OF THE
ELEVENTH JUDICIAL CIRCUIT, IN AND
FOR MIAMI-DADE COUNTY, FLORIDA

SERGIO SALANI,                                    CASE NO.  2022-047421-SP 25

       Plaintiff,

v.

AT&T MOBILITY LLC,

       Defendant.

_____/

### DEFENDANT'S NOTICE OF CANCELLATION

**YOU ARE HEREBY NOTIFIED** that the hearing set to be called up before The

Honorable Jorge Perez Santiago, at the Coral Gables Branch Court, 3100 Ponce de Leon Boulevard,

Courtroom CG 1-6, Coral Gables, Florida  33134, on **Tuesday, January 16, 2024, at 9:30 a.m.,** via

Zoom platform, on Plaintiff's *Motion for Extension of Time to File Amended Pleading* dated October 10,

2023 [DE 15 - Filing No. 183675376], is hereby **CANCELLED** and the parties are uploading an

agreed order for this Court's consideration.

Dated:  January 11, 2024                          Respectfully submitted,

                                            By: */s/ Manuel A. Garcia-Linares*_____
                                                Manuel A. Garcia-Linares, Esq.
                                                  Florida Bar No. 985252
                                                mgarcialinares@daypitney.com
                                                athomsen@daypitney.com
                                                Andrew R. Ingalls, Esq.
                                                  Florida Bar No. 112558
                                                aingalls@daypitney.com
                                                athomsen@daypitney.com
                                                  **DAY PITNEY LLP**
                                                  396 Alhambra Circle
                                                  North Tower – 14th Floor
                                                  Miami, Florida 33134
                                                  Telephone: (305) 373-4000
                                                  Facsimile:  (305) 373-4099
                                                  *Counsel for Defendant AT&T Mobility LLC*

117729505.1

## CERTIFICATE OF SERVICE

I HEREBY certify that on January 11, 2024, I electronically filed the foregoing document with the Clerk of the Court via e-portal and served: **Maury L. Udell, Esq.**, BEIGHLEY, MYRICK, UDELL, LYNNE & ZEICHMAN, P.A., 2601 South Bayshore Drive, Suite 770, Miami, Florida 33133, Emails: mudell@bmulaw.com and notice66@bmulaw.com, *Counsel for Plaintiff*.

By: */s/ Manuel A. Garcia-Linares*
Manuel A. Garcia-Linares, Esq.

117729505.1

**IN THE COUNTY COURT OF THE ELEVENTH JUDICIAL
CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA**

CASE NO: 2022-047421-SP-25
SECTION: CG01
JUDGE: Jorge A Perez Santiago

**Sergio Salani**

Plaintiff(s) / Petitioner(s)

vs.

**AT&T Mobility, LLC**

Defendant(s) / Respondent(s)

_____/

**<u>AGREED ORDER ON PLAINTIFF'S MOTION FOR EXTENSION OF TIME TO FILE
AMENDED PLEADING</u>**

[DE 15 - Filing No. 183675376 - Plaintiff's Motion for Extension of Time to File Amended Pleading efiled October 10, 2023]

　　　**THIS MATTER** came before the Court on Plaintiff's *Motion for Extension of Time to File Amended Pleading* dated October 10, 2023 (the "Motion for Extension"), and the Court, after having reviewed the Motion and been fully advised in the premises, hereby finds as follows:

1. Plaintiff's Motion for Extension is hereby GRANTED.

2. Plaintiff shall have an additional twenty (20) days from the date of this Order in which to file an amended pleading. No further extensions will be granted.

**DONE** and **ORDERED** in Chambers at Miami-Dade County, Florida on this <u>11th day of January, 2024</u>.

2022-047421-SP-25 01-11-2024 10:52 PI

<u>2022-047421-SP-25 01-11-2024 10:52 PM</u>
Hon. Jorge A Perez Santiago

**COUNTY COURT JUDGE**
Electronically Signed

No Further Judicial Action Required on **THIS MOTION**

CLERK TO **RECLOSE** CASE IF POST JUDGMENT

**Electronically Served:**
Alicia Thomsen, athomsen@daypitney.com
Andrew R. Ingalls, aingalls@daypitney.com
Andrew R. Ingalls, brodriguez@daypitney.com
Evelyn Davila, edavila@daypitney.com
Jessica Solorzano, jsolorzano@daypitney.com
Manuel A. Garcia-Linares, mgarcialinares@daypitney.com
Manuel A. Garcia-Linares, athomsen@daypitney.com
Maury L. Udell, notice66@bmulaw.com
Maury L. Udell, blopez@bmulaw.com

**Physically Served:**

IN THE COUNTY COURT OF THE 11TH JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA

Sergio Salani,

CASE NO.: 2022-047421-SP-25

    Plaintiff,

BAR NO.: 121673

v.

AT&T Mobility, LLC,

    Defendant.

_____/

## PLAINITFF'S NOTICE OF FILING

Plaintiff, Sergio Salani, by and through undersigned counsel, hereby gives notice of filing Class Action Settlement Documents of Verizon Wireless Administrative Fee Claims, Docket No. MID-L-6360-23 (N.J. Super. Ct.).

## CERTIFICATE OF SERVICE

WE HEREBY CERTIFY that a true and correct copy of the foregoing was served via e-mail this this January 12, 2024 to Manuel A. Garcia-Linares, Esquire (mgarcialinares@daypitney.com                          brodriguez@daypitney.com, jsolorzano@daypitney.com  edavila@daypitney.com) Andrew R. Ingalls, Esquire (aingalls@daypitney.com) Day Pitney LLP, 396 Alhambra Circle, North Tower - 14th Floor, Miami, Florida 33134.

**Beighley, Myrick, Udell, Lynne & Zeichman PA**
*Attorneys for Plaintiff*
2601 S. Bayshore Drive, Suite 770
Miami, FL 33133
(305) 349-3930 – Phone

By:    */s/ Maury L. Udell*_____
        Maury L. Udell, Esquire
        mudell@bmulaw.com
        Fla. Bar 121673

FILED

December 15, 2023

ANA C. VISCOMI, J.S.C.

**DeNITTIS OSEFCHEN PRINCE, P.C.**
Stephen P. DeNittis, Esq. (031981997)
Joseph A. Osefchen, Esq. (024751992)
Shane T. Prince, Esq. (022412002)
525 Route 73 North, Suite 410
Marlton, New Jersey 08053
(856) 797-9951

**CRIDEN & LOVE, P.A.**
Michael E. Criden, Esq.*
Lindsey C. Grossman, Esq.
7301 SW 57th Court, Suite 515
South Miami, FL 33143
(305) 357-9000

**Attorneys for Plaintiffs and the Proposed Class**

**HATTIS & LUKACS**
Daniel M. Hattis, Esq.*
Paul Karl Lukacs, Esq.
11711 SE 8th Street, Suite 120
Bellevue, WA 98005
(425) 233-8650

**\* Pro Hac Vice Application**
To Be Submitted

| | |
|---|---|
| DEAN ESPOSITO, JEFFREY ACHEY, MARILYN ACHEY, JUSTIN ANDERSON, DEIDRE ASBJORN, GREGORY BURLAK, CARLA CHIORAZZO, JUDITH CHIORAZZO, JOHN CONWAY, ADAM DEMARCO, JAMES FISHER, ALLISON GILLINGHAM, LORRAINE GILLINGHAM, DOREE GORDON, DONNA HARTMAN, PATRICIA JUSTICE, DAVID KELLY, CHRISTINA MANFREDO, JUDITH OELENSCHLAGER, DANIEL PATINO, JAMES PRATE, MICHAEL SCHEUFELE, RUSSELL SEWEKOW, DEBORAH STROYEK, LINDA TEER, CHRISTINE TRAPPE, BRENDA TRIPICCHIO, TERESA MACCLELLAND, KAREN UMBERGER, SCOTT WILLITS, MICHAEL BRANOM, MOLLY BROWN, MICHAEL CARNEY, TIM FRASCH, PATRICIA GAGAN, ANNA GUTIERREZ, LINDA JENKINS, AUGUSTUS JOHNSON, WILLIAM KAUPELIS, MARILYN KAYE, JANETTE LISNER, WILLIAM ERIC LOUGH, DAVID MASSARO, LOUISE MONSOUR, DARLEEN PEREZ, GABRIELLE POZZUOLI, VALERIE REED, BRUCE SCHRAMM, KERRY SHOWALTER, JOHN ST. JARRE, GLORIA STERN, EDNA TOY, TERESA TOY, VANESSA WEST, MARY BOWMAN, ART CAPRI, DEBRA CASEY, KARYN CHALLENDER. TYSON COHRON, CINTIA CORSI, ANDI ELLIS, LAURIE FRANTZ, ASHLEY GARRISON, ANGELA GREEN, CARLOS GUTIERREZ, JAMES HOLLING, KAREN HUDSON, JERRY HUNT, JENNIFER HURTT, JOYCE JONES, LYNN KIRALY, MICHELLE LACUESTA, JASON MCCONVILLE, JOSE NICOT, SANDRA OSHIRO, LESLIE OWENS, JON SANTOS, TERRY SEXTON, KATHLEEN WRIGHT, PAMELA M. ALLEN, SAMANTHA ALBAITIS, CYDNI ARTERBURY, LISA BAKER, BRIANA | SUPERIOR COURT OF NEW JERSEY MIDDLESEX COUNTY LAW DIVISION<br><br>DOCKET NO. MID-L-6360-23<br><br>**ORDER GRANTING PRELIMINARY APPROVAL OF CLASS SETTLEMENT AGREEMENT AND DIRECTING DISSEMINATION OF CLASS NOTICE** |

| | |
|---|---|
| BELL, CHRISTINE BELLAVIA, KIMBERLY BLAIR, LEANOR BLAND-MULLINS, CAROLINE BONHAM, TAMMY BURKE, ANNMARIE CALDWELL, SHAUNA CAVALLARO, SANTOS COLON, ERIKA CONLEY, KENDRA CONOVER, DYLAN CORBIN, LAURA CURRY, SHAKERA DYER, JANE FREY, RUSSELL FROM, ANGEL GAINES, ASHTIN GAMBLIN, ERICKA GARDNER, ANN GRAFF, JAMES HENSLEY, SAREL HINES, ALEXANDER KEELER, ADAM KELLER, BILLIE KENDRICK, KRISTA KIRBY, JAN LOMBARD, MARC LOWREY, JILL MAILHOIT, AARON MAXA, KELLY MOORE, LINDSEY MORAN, DAVID MOYERS, JENNIFER OCAMPO-NEUBAUER, KEISHA ODOM, ANGEL PACHECHO, HEATHER RAY, SUSAN SCOTT, LORI SNYDER, MISTY SUTTON, KATHRYN TAYLOR, ANTHONY VALLECORSA, CLAIRE WHITE, KRISTOPHER WILLARD, ALVIN WILSON, and BRAD YOUNG, on behalf of themselves and all others similarly situated, | |
| Plaintiffs, | |
| v. | |
| CELLCO PARTNERSHIP d/b/a VERIZON WIRELESS, | |
| Defendant. | |

Before the Court is the Motion for Preliminary Approval of Class Settlement Agreement and for Direction of Class Notice Pursuant to N.J. Ct. R. R. 4:32-2 ("Motion"), filed by Plaintiffs. Plaintiffs and Defendant Cellco Partnership d/b/a Verizon Wireless ("Verizon") have entered into a Class Settlement Agreement, dated November 10, 2023 ("Settlement Agreement"). Having thoroughly reviewed the Settlement Agreement, including the proposed forms of class notice and other exhibits thereto, the Motion, and the papers and arguments in connection therewith, and good cause appearing, it is on this 15th day of December, 2023, the Court hereby ORDERS as follows:

1.      Capitalized terms not otherwise defined herein have the meanings set forth in the Settlement Agreement.

2.      This Court has subject matter jurisdiction over this matter, and has personal jurisdiction over the Parties and the Settlement Class Members.  Venue is proper in this Court.

3.      The Motion is GRANTED.

4.      The Court hereby preliminarily approves the Settlement Agreement and the terms embodied therein pursuant to N.J. Ct. R. R. 4:32-2.  The Court finds that it will likely be able to approve the Settlement Agreement under N.J. Ct. R. R. 4:32-2 and to certify the Settlement Class for purposes of judgment on the proposed Settlement.  The Court preliminarily finds that the Settlement Agreement is fair, reasonable, and adequate as to the Settlement Class Members under the relevant considerations.  The Court finds that Plaintiffs and proposed Settlement Class Counsel have adequately represented, and will continue to adequately represent, the Settlement Class.  The Court further finds that the Settlement Agreement is the product of arms' length negotiations by the Parties through an experienced mediator, Hon. Jay C. Gandhi (ret.) of JAMS, and comes after significant litigation—including significant litigation regarding Verizon's motions to compel arbitration of Plaintiffs' claims and to stay the respective litigations, resulting in multiple rounds of briefing and appeals to date—and significant investigation and discovery. The Court preliminarily finds that the relief provided—a non-reversionary common settlement fund of $100 million—is adequate taking into account, *inter alia*, the costs, risks, and delay of trial and appeal for all Parties, the legal issues presented in this Action, the interests of the proposed Settlement Class, and the proposed method of distributing payments to the Settlement Class (i.e., direct payments by checks and electronic payments).  The Court preliminarily finds that the Settlement Agreement treats the Settlement Class Members equitably relative to each other, and that the proposed allocation of settlement funds to Settlement Class Members is reasonable and equitable.  Under the terms of the Settlement Agreement, all Settlement Class

Members are eligible to submit claims for settlement payments via a simple claim form.  The

Court will fully assess any request for attorneys' fees and litigation expenses after receiving a

motion from Settlement Class Counsel supporting such request.   At this stage, the Court finds

that the plan to request fees and litigation expenses to be paid from the common settlement fund

creates no reason not to direct notice to the Settlement Class; should this Court find any aspect of

the requested attorneys' fees or expenses unsupported or unwarranted, such funds will not revert

to Verizon.

5.      The Court hereby provisionally certifies, for settlement purposes only, a

"Settlement Class," pursuant to N.J. Ct. R. R. 4:32-1(b)(3) and 4:32-2, consisting of:

> All current and former individual consumer account holders in the United States
> (based on account holders' last known billing address) who received postpaid
> wireless or data services from Verizon and who were charged and paid an
> Administrative Charge and/or an Administrative and Telco Recovery Charge
> between January 1, 2016 and November 8, 2023.

> Excluded from the Settlement Class are any Judges presiding over this Action and
> any members of their families, and Verizon and affiliated entities and individuals
> and their respective officers and directors.

> Also excluded from the Settlement Class are those persons who submit a timely
> and valid request for exclusion in accordance with the procedures set forth in the
> Settlement Agreement and in this Court's Preliminary Approval Order.

6.      The Court finds that, for settlement purposes only, the Settlement Class, as

defined above, meets the requirements for class certification under N.J. Ct. R. R. 4:32-1—

namely, that (1) the Settlement Class Members are sufficiently numerous such that joinder is

impracticable; (2) there are common questions of law and fact; (3) Plaintiffs' claims are typical

of those of the Settlement Class Members; (4) Plaintiffs and Settlement Class Counsel have

adequately represented, and will continue to adequately represent the interests of the Settlement

Class Members; and (5) for purposes of settlement only, the Settlement Class meets the

predominance and superiority requirements of N.J. Ct. R. R. 4:32-1(b)(3).

7.       Certification of the Settlement Class and appointment of the Settlement Class Representatives and Settlement Class Counsel shall be solely for settlement purposes and without prejudice to the Parties in the event the Settlement Agreement is not finally approved by this Court or otherwise does not take effect.  If the Settlement does not occur for any reason, certification of the Settlement Class and any Settlement Class Representative or Settlement Class Counsel appointments, including this Order, shall be deemed void and vacated.  The Parties reserve all rights and defenses as they existed prior to the execution of the Settlement Agreement and this Order in the event the Settlement Agreement is not finally approved by this Court or otherwise does not take effect.

8.       The Court hereby appoints Plaintiffs in the caption set forth above as Settlement Class Representatives to represent the Settlement Class.

9.       The Court hereby appoints the following attorneys as Settlement Class Counsel for the Settlement Class:

**DeNITTIS OSEFCHEN PRINCE, P.C.**
Stephen P. DeNittis, Esq.
Joseph A. Osefchen, Esq.
Shane T. Prince, Esq.
525 Route 73 North, Suite 410
Marlton, NJ 08053
Telephone: (856) 797-9951
Facsimile: (856) 797-9978
Email: sdenittis@denittislaw.com
Email: josefchen@denittislaw.com
Email: sprince@denittislaw.com

**HATTIS & LUKACS**
Daniel M. Hattis, Esq.
Paul Karl Lukacs, Esq.
11711 SE 8th Street, Suite 120
Bellevue, WA 98005
Telephone: (425) 233-8650
Facsimile: (425) 412-7171

Email: dan@hattislaw.com
Email: pkl@hattislaw.com

10.     The Court hereby appoints Angeion Group as Settlement Administrator and directs Angeion Group to carry out all duties and responsibilities of the Settlement Administrator as specified in the Settlement Agreement and herein.

Notice Program

11.     Pursuant to N.J. Ct. R. R. 4:32-2(b), the Court approves the proposed Notice program set forth at Section VI of the Settlement Agreement, including the form and content of the proposed forms of class notice attached as Exhibits A-E to the Settlement Agreement.  The Court finds that the proposed Notice program meets the requirements of Due Process under the U.S. Constitution and N.J. Ct. R. R. 4:32-2; and that such Notice program, which includes individual direct notice to Settlement Class Members via email or mail,  reminder notices, and the establishment of a Settlement Website and Toll-Free Number is the best notice practicable under the circumstances and shall constitute due and sufficient notice to all persons entitled thereto.  The Court further finds that the proposed form and content of the forms of the Notice are adequate and will give the Settlement Class Members sufficient information to enable them to make informed decisions as to the Settlement Class, the right to object or opt out, and the proposed Settlement and its terms.  The Court finds that the Notice clearly and concisely states in plain, easily understood language, inter alia: (i) the nature of the Action; (ii) the definition of the Settlement Class; (iii) the class claims and issues; (iv) that a Settlement Class Member may enter an appearance through an attorney if the member so desires; (v) that the Court will exclude from the Settlement Class any member who timely and validly requests exclusion; (vi) the time and manner for requesting exclusion; and (vii) the binding effect of a class judgment on Settlement Class Members under N.J. Ct. R. R. 4:32-1 and 4:32-2.

12.     The Court directs the Settlement Administrator and the Parties to implement the Notice program as set forth in the Settlement Agreement.

<u>Claims Procedure</u>

13.     The Court approves the form and content of the proposed Claim Form, in the form attached as Exhibit E to the Settlement Agreement, approves the Claims Process set forth in the Settlement Agreement for Settlement Class Members to submit Claims, and directs the Parties and the Settlement Administrator to implement the Claims Process.

<u>Opt-Out and Objection Procedures</u>

14.     Settlement Class Members may exclude themselves from the Settlement Class by mailing to the Settlement Administrator, at the address provided in the Website Notice, a request for exclusion that is postmarked no later than thirty-five days after the Notice Date (the "Exclusion Deadline"). To be effective, the request for exclusion must include (1) the Settlement Class Member's full name, telephone number, mailing address, and email address; (2) a clear statement that the Settlement Class Member wishes to be excluded from the Settlement Class; (3) the name of this Action: "*Esposito et al.  v. Cellco Partnership d/b/a Verizon Wireless*"; and (4) the Settlement Class Member's original signature.  In addition, for the request for exclusion to be effective, the sender's mailing address as reflected in the request for exclusion and on the mailing envelope itself must match the mailing address associated with the Settlement Class Member's Verizon account.  Requests for exclusion furthermore must be made on an individual basis; "mass," "class," or other purported group opt outs are not effective.  Any Settlement Class Member who submits a timely and valid request for exclusion is foreclosed from objecting to the Settlement or to Settlement Class Counsel's motion for attorneys' fees, costs, and service awards.  If a Settlement Class Member submits both a timely and valid request for exclusion and

an objection, the Settlement Class Member shall be treated as if they had only submitted a request for exclusion.  The Settlement Administrator shall promptly after receipt provide copies of any requests for exclusion, including any related correspondence, to Settlement Class Counsel and Verizon's Counsel.  Any Settlement Class Member who does not submit a timely and valid request for exclusion as set forth in this paragraph and in the Settlement Agreement shall be bound by all subsequent proceedings, orders, and judgments in this Action, including, but not limited to, the Release as defined in the Settlement Agreement, regardless of whether the Settlement Class Member has any pending claims or causes of action against Verizon.

15.    Any Settlement Class Member who does not submit a timely and valid request for exclusion shall have the right to object to the proposed Settlement and/or to Settlement Class Counsel's motion for attorneys' fees, costs, or service awards, only by complying with the objection provisions set forth herein and in the Settlement Agreement.  Settlement Class Members who object shall remain Settlement Class Members and shall be subject to the Release set forth in this Settlement Agreement if this Settlement is approved by the Court and becomes effective.  To be considered valid, an objection must be in writing, must be filed with the Court or mailed to the Court at the address listed in the Website Notice, postmarked/filed no later than 25 days before the Fairness Hearing (the "Objection Deadline"), and must include the following: (1) the name of this Action: "*Esposito et al. v. Cellco Partnership d/b/a Verizon Wireless*"; (2) the full name, mailing address, telephone number, and email address of the objector; (3) the objector's original signature; (4) a description of the specific reasons for the objection; (5) the name, address, bar number and telephone number of counsel for the objector, if the objector is represented by an attorney; and (6) state whether the objector intends to appear at the Fairness Hearing either in person or through counsel.  Any Settlement Class Member who does not timely

submit an objection in accordance with this section shall waive the right to object or to be heard at the Fairness Hearing and shall be forever barred from making any objection to the proposed Settlement or to Settlement Class Counsel's motion for attorneys' fees, costs, and service awards. Any Settlement Class Member who objects to the Settlement shall nevertheless be eligible for all benefits of the Settlement if it is approved and becomes final. The Settlement Administrator shall promptly after receipt provide copies of any objections, including any related correspondence, to Settlement Class Counsel and Verizon's Counsel.

Fairness Hearing

16.     The Court will hold a Fairness Hearing on **March 22, 2024 at 10:00 a.m.** at the Superior Court of New Jersey, Middlesex County located at 56 Paterson Street, New Brunswick, New Jersey. The purposes of the Fairness Hearing will be to: (i) determine whether the proposed Settlement Agreement should be finally approved by the Court as fair, reasonable, adequate, and in the best interests of the Settlement Class; (ii) determine whether judgment should be entered pursuant to the Settlement Agreement, dismissing the Action with prejudice and releasing all Released Claims; (iii) determine whether the Settlement Class should be finally certified; (iv) rule on Settlement Class Counsel's motion for attorneys' fees, costs, and service awards; (v) consider any properly filed objections; and (vi) consider any other matters necessary in connection with the final approval of the Settlement Agreement.

17.     By no later than fifteen days after the Notice Date, Plaintiffs and Settlement Class Counsel shall file their: (a) motion for final approval of the Settlement Agreement, requesting entry of the Final Order and Judgment, substantially in the form of Exhibit G to the Settlement Agreement; and (b) motion for attorneys' fees, costs, and service awards. Promptly after they are filed, these document(s) shall be posted on the Settlement Website.

18.     By no later than twenty-one days before the Fairness Hearing, the Settlement

Administrator shall file with the Court (or provide to Settlement Class Counsel for filing with the

Court) copies of any objections received by the Settlement Administrator.

19.     By no later than fourteen days before the Fairness Hearing, the Parties shall file

any responses to any Settlement Class Member objections, and any reply papers in support of the

motion for final approval of the Settlement and/or in support of Settlement Class Counsel's

motion for attorneys' fees, costs, and service awards.

20.     The Court may, in its discretion, modify the date and/or time of the Fairness

Hearing, and may order that this hearing be held remotely or telephonically.  In the event the

Court changes the date, time, and/or the format of the Fairness Hearing, the Parties shall ensure

that the updated information is posted on the Settlement Website.

21.     Only Settlement Class Members who have submitted timely and valid objections,

in accordance with the requirements of this Preliminary Approval Order, may be heard at the

Fairness Hearing.

22.     If the Settlement Agreement, including any amendment made in accordance

therewith, is not approved by the Court or shall not become effective for any reason whatsoever,

the Settlement Agreement and any actions taken or to be taken in connection therewith

(including this Preliminary Approval Order and any judgment entered herein), shall be

terminated and shall become null and void and of no further force and effect except for (i) any

obligations to pay for any expense incurred in connection with Notice and administration as set

forth in the Settlement Agreement, and (ii) any other obligations or provisions that are expressly

designated in the Settlement Agreement to survive the termination of the Settlement Agreement,

including the Parties' agreement to cooperate in asking the Court to set a reasonable schedule for

the resumption of this Action and any parallel litigations brought by the Plaintiffs or Settlement

Class Counsel against Verizon, as well as any pending or stayed appeals including the New

Jersey Supreme Court appeal in *Achey v. Cellco Partnership*, Dkt. No. 088253 (N.J.) and Ninth

Circuit appeal in *MacClelland v. Cellco Partnership*, 22-16020 (9th Cir.), as described in

Sections X.E and XII.B of the Settlement Agreement.

23.     Other than such proceedings as may be necessary to carry out the terms and

conditions of the Settlement Agreement, all proceedings in the Action are hereby stayed and

suspended until further order of this Court.

24.     Pending final determination of whether the Settlement Agreement should be

finally approved, Plaintiffs and all Settlement Class Members are barred and enjoined from

filing, commencing, prosecuting, or enforcing any action against Verizon or the other Released

Parties insofar as such action asserts Released Claims, directly or indirectly, in any judicial,

administrative, arbitral, or other forum.  This bar and injunction is necessary to protect and

effectuate the Settlement Agreement and this Preliminary Approval Order, and this Court's

authority to effectuate the Settlement, and is ordered in aid of this Court's jurisdiction.

25.     This Preliminary Approval Order, the Settlement Agreement, and all negotiations,

statements, agreements, and proceedings relating to the Settlement, or any matters arising in

connection with settlement negotiations, proceedings, or agreements, shall not constitute, be

described as, construed as, offered or received against Verizon or the other Released Parties as

evidence or an admission of: (a) the truth of any fact alleged by Plaintiffs in the Action; (b) that

any person suffered compensable harm or is entitled to any relief with respect to the matters

asserted in this Action; (c) any liability, negligence, fault, or wrongdoing by Verizon or the

Released Parties, including any of its affiliates, agents, representatives, vendors, or any other

person or entity acting on its behalf; (d) that this Action or any other action was or may be properly certified as a class action for litigation, non-settlement purposes; (e) the arbitrability of the Action as to Plaintiffs and Settlement Class Members; or (f) the enforceability of any applicable contractual or statutory limitations period to limit any relief.

26.     The Court retains jurisdiction over this Action to consider all further matters arising out of or connected with the Settlement, including enforcement of the Release provided for in the Settlement Agreement.

27.     The Parties are directed to take all necessary and appropriate steps to establish the means necessary to implement the Settlement Agreement according to its terms should it be finally approved.

28.     The Court may, for good cause, extend any of the deadlines set forth in this Preliminary Approval Order without further notice to Settlement Class Members.  Without further order of the Court, the Parties may agree to make non-material modifications in implementing the Settlement that are not inconsistent with this Preliminary Approval Order.

IT IS SO ORDERED.

Date:   _December 15, 2023__

_/s/ Ana C. Viscomi_____

Hon. Ana C. Viscomi, J.S.C.

(X) Unopposed   ( ) Opposed

The court has reviewed this application for preliminary approval of the class action settlement agreement and dissemination of class notice and grants same for substantially the reasons set forth in the application and pleadings submitted by class counsel for plaintiff class and defendant. Although the court received correspondence initially from an attorney not plenary admitted to practice in New Jersey and not admitted by pro hac vice application, and later received correspondence from a New Jersey attorney indicating an intervenor motion would be filed in order to object to this motion for preliminary approval, there is no basis for adjourning this motion. Counsel may seek to intervene and otherwise object in accordance with the terms of this Order.

| | |
|---|---|
| DEAN ESPOSITO, JEFFREY ACHEY, MARILYN ACHEY, JUSTIN ANDERSON, DEIDRE ASBJORN, GREGORY BURLAK, CARLA CHIORAZZO, JUDITH CHIORAZZO, JOHN CONWAY, ADAM DEMARCO, JAMES FISHER, ALLISON GILLINGHAM, LORRAINE GILLINGHAM, DOREE GORDON, DONNA HARTMAN, PATRICIA JUSTICE, DAVID KELLY, CHRISTINA MANFREDO, JUDITH OELENSCHLAGER, DANIEL PATINO, JAMES PRATE, MICHAEL SCHEUFELE, RUSSELL SEWEKOW, DEBORAH STROYEK, LINDA TEER, CHRISTINE TRAPPE, BRENDA TRIPICCHIO, TERESA MACCLELLAND, KAREN UMBERGER, SCOTT WILLITS, MICHAEL BRANOM, MOLLY BROWN, MICHAEL CARNEY, TIM FRASCH, PATRICIA GAGAN, ANNA GUTIERREZ, LINDA JENKINS, AUGUSTUS JOHNSON, WILLIAM KAUPELIS, MARILYN KAYE, JANETTE LISNER, WILLIAM ERIC LOUGH, DAVID MASSARO, LOUISE MONSOUR, DARLEEN PEREZ, GABRIELLE POZZUOLI, VALERIE REED, BRUCE SCHRAMM, KERRY SHOWALTER, JOHN ST. JARRE, GLORIA STERN, EDNA TOY, TERESA TOY, VANESSA WEST, MARY BOWMAN, ART CAPRI, DEBRA CASEY, KARYN CHALLENDER. TYSON COHRON, CINTIA CORSI, ANDI ELLIS, LAURIE FRANTZ, ASHLEY GARRISON, ANGELA GREEN, CARLOS GUTIERREZ, JAMES HOLLING, KAREN HUDSON, JERRY HUNT, JENNIFER HURTT, JOYCE JONES, LYNN KIRALY, MICHELLE LACUESTA, JASON MCCONVILLE, JOSE NICOT, SANDRA OSHIRO, LESLIE OWENS, JON SANTOS, TERRY SEXTON, KATHLEEN WRIGHT, PAMELA M. ALLEN, SAMANTHA ALBAITIS, CYDNI ARTERBURY, LISA BAKER, BRIANA BELL, CHRISTINE BELLAVIA, KIMBERLY BLAIR, LEANOR BLAND-MULLINS, CAROLINE BONHAM, TAMMY BURKE, ANNMARIE CALDWELL, SHAUNA CAVALLARO, SANTOS COLON, ERIKA CONLEY, KENDRA CONOVER, DYLAN CORBIN, LAURA CURRY, SHAKERA DYER, JANE FREY, RUSSELL FROM, ANGEL GAINES, ASHTIN GAMBLIN, ERICKA GARDNER, ANN GRAFF, JAMES HENSLEY, SAREL HINES, ALEXANDER KEELER, ADAM KELLER, BILLIE KENDRICK, KRISTA KIRBY, JAN LOMBARD, MARC LOWREY, JILL MAILHOIT, AARON MAXA, KELLY MOORE, LINDSEY MORAN, DAVID MOYERS, JENNIFER OCAMPO-NEUBAUER, KEISHA ODOM, ANGEL PACHECHO, HEATHER RAY, SUSAN SCOTT, | SUPERIOR COURT OF NEW JERSEY MIDDLESEX COUNTY LAW DIVISION<br><br>DOCKET NO. MID-L-<br><br>**CLASS ACTION SETTLEMENT AGREEMENT** |

| | |
|---|---|
| LORI SNYDER, MISTY SUTTON, KATHRYN TAYLOR, ANTHONY VALLECORSA, CLAIRE WHITE, KRISTOPHER WILLARD, ALVIN WILSON, and BRAD YOUNG, on behalf of themselves and all others similarly situated, Plaintiffs, v. CELLCO PARTNERSHIP d/b/a VERIZON WIRELESS, Defendant. | |

This Class Settlement Agreement ("Settlement Agreement") dated November 8, 2023 is entered into by and between all named Plaintiffs set forth in the caption above (collectively, "Plaintiffs") on behalf of themselves and the Settlement Class (as defined below), and Defendant Cellco Partnership d/b/a Verizon Wireless ("Verizon" and collectively with Plaintiffs, the "Parties"). This Settlement Agreement is conditioned upon and subject to approval of the Court as required by New Jersey Rules of Court Rule 4:32-2. Settlement Class Counsel (as defined below) and the Parties stipulate and agree that, in consideration of the promises and covenants set forth in this Settlement Agreement and upon the Effective Date (as defined below), this Action (as defined below) and all Released Claims (as defined below) shall be finally and fully settled, compromised, and released, on the following terms and conditions:

## I.     **<u>RECITALS</u>**

**A.**     Plaintiffs' counsel previously initiated four putative class actions asserting individual state and nationwide class claims (the "Putative Class Cases") against Verizon, captioned:  (1) *MacClelland, et al. v. Cellco Partnership d/b/a Verizon Wireless, et al*., 21-cv-08592 (N.D. Cal.); (2) *Corsi, et al. v. Cellco Partnership d/b/a Verizon Wireless, et al.*, 22-cv-04621 (D.N.J.); (3) *Allen, et al. v. Cellco Partnership d/b/a Verizon Wireless, et al.*, 23-cv-01138

(D.N.J.); and (4) *Achey, et al. v. Cellco Partnership d/b/a Verizon Wireless, et al.*, MID-L-000160-22 (N.J. Super.).

      **B.**     Each of the Putative Class Cases asserts claims on behalf of Plaintiffs and others who had Verizon post-paid wireless service plans and were charged and paid an administrative charge (the "Administrative Charge") within the applicable statutes of limitations.  In those actions, Plaintiffs allege, as they do here, that Verizon's representations and advertisements regarding the price of its post-paid wireless service plans were misleading because the prices did not include the Administrative Charge, and that Verizon implemented and charged the Administrative Charge in a deceptive and unfair manner.  Among other relief, in the Putative Class Cases, Plaintiffs seek injunctive relief and damages on behalf of themselves and the proposed classes, mirroring the relief sought here.

      **C.**     While none has yet reached a merits or class certification determination, the Putative Class Cases already have been extensively litigated.  In each case, Verizon moved to compel arbitration of Plaintiffs' claims and to stay the respective litigations, resulting in multiple rounds of briefing and appeals to date.  The current procedural posture of each of the Putative Class Cases is summarized below:

-    **MacClelland (N.D. Cal.)**: On July 1, 2022, the court denied Verizon's motion to compel arbitration; Verizon has appealed to the Ninth Circuit, which has scheduled argument for November 14, 2023.  *See MacClelland v. Cellco P'ship*, 609 F. Supp. 3d 1024, 1028 (N.D. Cal. 2022), *appeal filed*, 22-16020 (9th Cir.).

-    **Corsi (D.N.J.)**: On June 2, 2023, the court denied without prejudice Verizon's motion to compel arbitration and ordered the parties to conduct limited discovery on the issue of arbitrability.  *See Corsi v. Cellco P'ship*, 2023 WL 3775320, at *3 (D.N.J. June 2, 2023).

On October 13, 2023, the parties submitted stipulated facts to the court that would permit the court to resolve Verizon's motion.

- ***Allen (D.N.J.)***:  Given the court's Order in *Corsi* (before the same district judge), Verizon withdrew its then-pending motion to compel arbitration.  On August 11, 2023, the *Allen* plaintiffs filed an amended complaint adding additional plaintiffs from different states, and asserting deceptive trade practices claims based on those states' consumer protection statutes.  On October 13, 2023, the parties submitted stipulated facts to the court that would permit the court to resolve a motion by Verizon to compel arbitration.

- ***Achey (N.J. Super.)***: On July 15, 2022, the court severed a limitation on damages in Verizon's customer agreement, but enforced the remainder of the agreement and compelled arbitration.  On May 1, 2023, the New Jersey Appellate Division reversed in part and deemed the arbitration agreement unenforceable.  *See Achey v. Cellco P'ship*, 475 N.J. Super. 446, 450 (N.J. App. Div. 2023).  On June 1, 2023, Verizon petitioned the New Jersey Supreme Court for certification and review of the Appellate Division's order.  *See Achey v. Cellco P'ship*, Dkt. No. 088253 (N.J.).  On September 11, 2023, the New Jersey Supreme Court accepted the appeal.

    **D.**    On August 23, 2023, the Parties and their counsel participated in a full-day mediation with mediator Hon. Jay C. Gandhi (ret.) of JAMS in an effort to settle all the Putative Class Cases.

    **E.**    Following the mediation, after further, extensive arms-length negotiations, the Parties reached an agreement in principle to settle on the terms and conditions embodied in this Settlement Agreement.

**F.**     This action (the "Action") joins all the named Plaintiffs and claims asserted on behalf of the Plaintiffs in the Putative Class Cases, and the putative classes they seek to represent, in a single, consolidated proceeding.

**G.**     Settlement Class Counsel have performed substantial work in the prosecution of the claims of the Plaintiffs and the Settlement Class Members.  Settlement Class Counsel have conducted extensive factual and legal research into the claims and various potential defenses in this matter, and have engaged in substantial motion practice.  Settlement Class Counsel have conducted an extensive investigation regarding Verizon's practices, including reviewing approximately 80,000 documents produced by Verizon.  Settlement Class Counsel believe that the proposed settlement of this Action, as set forth herein, is fair, reasonable, and adequate, and in the best interests of the proposed Settlement Class and that this Settlement Agreement should be approved by the Court under New Jersey Rules of Court Rule 4:32-2.

**H.**     Based upon their review, investigation, and evaluation of the facts and law relating to the matters alleged in the pleadings, Plaintiffs and Settlement Class Counsel, on behalf of the proposed Settlement Class, have agreed to settle this Action pursuant to the provisions of this Settlement Agreement, after considering, among other things: (1) the substantial benefits to the Settlement Class Members under the terms of this Settlement Agreement; (2) the risks, costs, and uncertainty of protracted litigation, especially in complex actions such as this, as well as the difficulties and delays inherent in such litigation; and (3) the desirability of consummating this Settlement Agreement promptly in order to provide expeditious and effective relief to the Settlement Class Members.

**I.**     Verizon has denied and expressly continues to deny any wrongdoing or liability whatsoever and does not admit or concede any actual or potential fault, wrongdoing, or liability in

connection with any facts or claims that have been alleged against it in this Action or any violation of any law or duty, including but not limited to, those alleged in the Action.  Verizon contends that it has acted properly at all times and also denies that Plaintiffs and Settlement Class Members are entitled to any form of damages or other relief based on the conduct alleged in the Action.  Verizon has maintained and continues to maintain that it has meritorious defenses to all causes of action alleged in the Action; that it was and is prepared to vigorously defend against the claims related to the Action; that the claims against it are meritless; and that it has valid and enforceable rights to compel arbitration as to Plaintiffs and Settlement Class Members and/or to enforce any applicable contractual or statutory limitations period to limit any relief, all of which are expressly reserved. Verizon has maintained and continues to maintain that:  the Administrative Charge is lawful, justified, fully supported by underlying expenses, and appropriate, including as a charge to help defray certain expenses Verizon incurs, including, but not limited to, charges for interconnection and charges associated with cell site rents and maintenance; and that Verizon's disclosures respecting the implementation, amount, and nature of the Administrative Charge, including for every increase of the Administrative Charge, have been lawful, accurate, and robust.  Verizon contends that Plaintiffs are not entitled to any relief respecting the Administrative Charge, including any form of injunctive relief that precludes Verizon from charging or increasing the Administrative Charge or requires Verizon to modify any of its disclosures and practices respecting the Administrative Charge.  Verizon further denies that this Action meets the requisites for certification as a class action under state or federal law, other than in relation to a settlement class as described in this Settlement Agreement.  Verizon further states that it currently charges the Administrative Charge, expects to continue to charge the Administrative Charge, and might increase the Administrative Charge from time to time in the future.

**J.**     Verizon considers it desirable to resolve this Action on the terms stated herein, in order to avoid further expense, inconvenience, and interference with its business operations, and to dispose of burdensome litigation.   Therefore, Verizon has determined that the settlement of this Action on the terms set forth herein is in its best interests.

**K.**     This Settlement Agreement reflects a compromise between the Parties, and shall in no event be construed as or deemed an admission or concession by any Party of the truth of any of the pleadings in this Action, or of any fault on the part of Verizon, and all such allegations or the validity of any purported claim or defense asserted, are expressly denied by Verizon.   Nothing in this Settlement Agreement shall constitute an admission of liability or be used as evidence of liability, by or against any Party hereto.

**L.**     Nothing in the Recitals in this Section I shall affect the scope of the Release granted in this Settlement Agreement.

## II.     DEFINITIONS

**A.**     As used in this Settlement Agreement, including the exhibits attached hereto, the following terms have the following meanings, unless this Settlement Agreement specifically provides otherwise:

**1.**     "Accountholder(s)" means the person(s) on the Verizon post-paid wireless account financially responsible for the account.

**2.**     "Action" means the above-captioned action, *Esposito et al. v. Cellco Partnership d/b/a Verizon Wireless*, Docket No. MID-L-  (N.J. Sup. Ct.).

**3.**     "Administrative Costs" means and includes: the reasonable costs and expenses of the Settlement Administrator associated with disseminating Notice to the Settlement Class, disseminating Settlement Payments to Settlement Class Members, implementing the Claim

Process, and carrying out their other responsibilities consistent with the terms of this Settlement Agreement.

4.      "Claim(s)" means a claim for a Settlement Payment submitted in compliance with the procedures described in Section IV.D.1. of this Settlement Agreement.

5.      "Claim Deadline" means ninety days following the Notice Date.

6.      "Claim Form" means the document substantially in the form attached as **Exhibit E** to this Settlement Agreement.

7.      "Claim Process" means the process for submitting and reviewing Claims as described in Section IV.D.1. of this Settlement Agreement.

8.      "Customer Data" means the best data and information reasonably available to Verizon regarding the accounts within the Settlement Class definition, to be provided by Verizon to the Settlement Administrator for the Settlement Administrator's use in disseminating Notice, processing Claims, and disseminating Settlement Payments.   The Customer Data shall include the following information, to the extent it is reasonably accessible and available to Verizon, for each account within the Settlement Class: (1) account number or other unique identifying number for the account; (2) the name(s) of the Accountholder(s) for the account; (3) the last-known mailing address for the account; (4) the last known email address for the account; (5) the service start and end dates for the account; and (6) the mobile telephone numbers that have been associated with the account.

9.      "Court" means the Superior Court of New Jersey, Middlesex County, Law Division.

10.      "Effective Date" means the date on which all of the following events have occurred: (a) the Court has entered a final judgment approving this Settlement Agreement and

dismissing this Action; and (b) either: (i) the time to appeal from the Court's final judgment approving this Settlement Agreement, including the Court's ruling on attorneys' fees, costs, and service awards, has expired and no appeal has been taken; or (ii) if a timely appeal of the Court's final judgment approving this Settlement Agreement is taken and if the final judgment (other than as to attorneys' fees, costs, or service awards) has not been reversed in any way, the date on which the final judgment and/or ruling on attorneys' fees, costs, and service awards are no longer subject to further direct appellate review.

11.     "Email Notice" means the notice of the terms of the proposed Settlement that shall be provided to Accountholders for certain accounts in the Settlement Class, in the manner contemplated by Section VI.B herein.   The Email Notice shall be substantially in the form attached as **Exhibit A** hereto.

12.     "Fairness Hearing" means the hearing at or after which the Court shall make a final decision regarding whether to finally approve this Settlement Agreement as fair, reasonable, and adequate.

13.     "Final Order and Judgment" means the Court's order, substantially in the form attached to this Settlement Agreement as **Exhibit G** , finally approving this Settlement Agreement and dismissing all claims and defenses in this Action with prejudice, as described in Section X.B of this Settlement Agreement.

14.     "Net Distributable Funds" means the Settlement Fund minus the following: Administrative Costs; any attorneys' fees and costs for Settlement Class Counsel awarded by the Court; and any service awards for Plaintiffs awarded by the Court.

15.     "Notice" means the notice of the proposed Settlement Agreement contemplated by Section VI of this Settlement Agreement, and shall include the Settlement

Website, the Website Notice, Email Notice, and Postcard Notice, as well as the Reminder Email Notice.

16.     "Notice Date" means thirty days following the entry of the Preliminary Approval Order.

17.     "Parties" means Plaintiffs and Verizon, collectively, as each of those terms is defined in this Settlement Agreement.

18.     "Plaintiffs" means the plaintiffs listed in the caption of this Settlement Agreement as well as listed on the signature page herein.

19.     "Postcard Notice" means the notice of the terms of the proposed Settlement that shall be provided to Accountholders for certain accounts in the Settlement Class, in the manner contemplated by Section VI.C herein.  The Postcard Notice shall be substantially in the form attached as **Exhibit B** hereto.

20.     "Preliminary Approval Order" means the order to be entered by the Court preliminarily approving this Settlement Agreement, as outlined in Section X.A of this Settlement Agreement, and that is substantially in the form attached as **Exhibit F** to this Settlement Agreement.

21.     "Release" means the release and waiver set forth in Section IX of this Settlement Agreement.

22.     "Released Parties" means Cellco Partnership d/b/a Verizon Wireless and Verizon Communications Inc. and their present and former parents, subsidiaries, divisions, affiliates, predecessors, successors, assigns, attorneys, and insurers, including all of their insurers' affiliates, predecessors, successors, assigns and reinsurers, and the respective agents, servants, attorneys, employees, officers, directors, shareholders and representatives of the foregoing.

9

23.     "Releasing Parties" means Plaintiffs and the Settlement Class Members, including, only to the extent they may have a right to a claim on behalf of a Plaintiff or a Settlement Class Member, each of their respective spouses, executors, representatives, heirs, predecessors, successors, bankruptcy trustees, guardians, wards, joint tenants, tenants in common, tenants by the entirety, co-borrowers, agents, attorneys and assigns, and all others of those who claim through them or who assert claims on their behalf; and, with respect to any business entities, members, officers, directors, shareholders, employees, independent contractors, agents, successors, assigns, representatives, and all other persons acting or purporting to act on behalf of such business entity.

24.     "Reminder Email Notice" means the reminder notice to be emailed to Settlement Class Accounts that were sent the Email Notice, reminding them of the Claim Deadline, as contemplated by Section VI.F herein.   The Reminder Email Notice shall be substantially in the form attached as **Exhibit D** hereto.

25.     "Settlement" or "Settlement Agreement" means this Settlement Agreement, including the exhibits attached hereto.

26.     "Settlement Administrator" means Angeion Group, subject to Court approval.

27.     "Settlement Fund" means the total cash consideration of one hundred million dollars ($100,000,000.00) to be paid by Verizon under the Settlement Agreement.

28.     "Settlement Class" means:

All current and former individual consumer account holders in the United States (based on account holders' last known billing address) who received postpaid wireless or data services from Verizon and who were charged and paid an Administrative Charge and/or an Administrative and Telco Recovery Charge between January 1, 2016 and the date of the Settlement Agreement.

29.     "Settlement Class Account(s)" means accounts within the Settlement Class definition.[1]

30.     "Settlement Class Counsel" means:   Stephen P. DeNittis, Joseph A. Osefchen and Shane T. Prince of DeNittis Osefchen Prince, P.C., and Daniel M. Hattis and Paul Karl Lukacs of Hattis & Lukacs.

31.     "Settlement Class Member" means any person who is within the Settlement Class definition and who does not submit a timely and valid request for exclusion pursuant to Section VII of this Settlement Agreement.

32.     "Verizon's Counsel" means Shon Morgan of Quinn Emanuel Urquhart & Sullivan, LLP and Jeffrey S. Jacobson of Faegre Drinker Biddle & Reath LLP.

33.     "Website Notice" means the notice of the terms of the proposed Settlement that shall be provided in the manner contemplated by Section VI.D herein and that shall appear on the Settlement Website.   The Website Notice shall be substantially in the form attached as **Exhibit C** hereto.

34.     "Valid Claimant(s)" means and includes Settlement Class Accounts for which a timely and valid Claim is submitted, as determined by the Settlement Administrator.

B.     Other capitalized terms used in this Settlement Agreement but not defined in this Section shall have the meanings ascribed to them elsewhere in this Settlement Agreement.

## III.   CERTIFICATION OF THE SETTLEMENT CLASS

A.     Only for the purposes of settlement and the proceedings contemplated herein for effectuating the Settlement, Plaintiffs shall move the Court to provisionally certify the Settlement Class (as defined herein) pursuant to New Jersey Rules of Court Rule 4:32-2.

---

[1]  According to Verizon's records there are approximately 58,657,088 Settlement Class Accounts.

**B.**      For the purposes of settlement only, Plaintiffs shall move for the appointment of Plaintiffs as Settlement Class Representatives and for the appointment of the following attorneys as Settlement Class Counsel: Stephen P. DeNittis, Joseph A. Osefchen and Shane T. Prince of DeNittis Osefchen Prince, P.C., and Daniel M. Hattis and Paul Karl Lukacs of Hattis & Lukacs.

**C.**      Verizon does not oppose certification of the Settlement Class, or the appointments of the Settlement Class Representatives and Settlement Class Counsel, for purposes of settlement only.   If the Effective Date of the Settlement does not occur for any reason, certification of the Settlement Class, and any Settlement Class Representative or Settlement Class Counsel appointments, shall be deemed void and vacated; any preliminary or final order certifying a class for settlement purposes shall be deemed void and vacated; nothing related to the Settlement or negotiations shall be admissible in connection with a contested class certification motion, or otherwise; and each Party shall retain all of their respective rights as they existed prior to execution of this Settlement Agreement.    By entering into this Settlement Agreement, Verizon does not waive its right to challenge or contest the maintenance of any claim, request for relief, or lawsuit against it as being frivolous or lacking a substantial basis in fact or law or to oppose certification of any class other than the Settlement Class in connection with the settlement memorialized in this Settlement Agreement.

## IV.   <u>**SETTLEMENT RELIEF**</u>

**A.**      <u>Settlement Fund.</u>   In consideration for the complete and final settlement of this Action, the Release, and other promises and covenants set forth in this Settlement Agreement, and subject to the other terms and conditions herein, Verizon will pay the Settlement Fund one hundred million dollars ($100,000,000.00).   The Settlement Fund will be paid by Verizon on a non-reversionary basis, and will cover the following:  all Settlement Payments to the Settlement Class

as set forth in Section IV.D of this Settlement Agreement; Administrative Costs; any attorneys' fees and costs for Settlement Class Counsel awarded by the Court; any service awards for Plaintiffs awarded by the Court; and any other costs and expenses that this Settlement Agreement provides will be paid from the Settlement Fund.   In no event shall Verizon be required to pay more than one hundred million dollars ($100,000,000.00) under this Settlement Agreement, and neither Settlement Class Counsel nor any named Plaintiff shall seek any other relief (including additional attorneys' fees or costs) beyond that contemplated in this Settlement Agreement.   Other than payment of this Settlement Fund, Verizon shall have no other monetary obligation under this Settlement Agreement.

**B.**     Revised Consumer Disclosures.  Within ninety days of the Effective Date, Verizon will amend its Verizon Wireless Customer Agreement to include the revised Administrative Charge disclosures reflected in **Exhibit H**, which revised disclosures were jointly prepared and agreed-upon by Verizon and Plaintiffs.

**C.**     Establishment and Funding of the Settlement Fund Account.

**1.**     Within twenty days following entry of the Preliminary Approval Order, Verizon shall transfer by wire into an account held by an FDIC-insured financial institution and administered by the Settlement Administrator (the "Settlement Fund Account"), funds equal to fifty percent (50%) of the Settlement Fund (i.e., $50,000,000.00).  Verizon shall transfer to the Settlement Fund Account funds equal to the remaining fifty percent (50%) of the Settlement Fund (i.e., $50,000,000.00) within ten days after the Effective Date.  Any escrow agreement in connection with the Settlement Fund Account shall prohibit the distribution of any funds from the Settlement Fund Account absent a court order and the consent of Settlement Class Counsel and Verizon's Counsel that a distribution is authorized by that court order.   The Settlement Fund

Account shall be maintained by the Settlement Administrator as a Court-approved Qualified Settlement Fund pursuant to Section 1-468B-1 *et seq.* of the Treasury Regulations promulgated under Section 468B of the Internal Revenue Code of 1986, as amended.   All taxes (including any estimated taxes, and any interest or penalties relating to them) arising with respect to the income earned by or in connection with the Settlement Fund Account, including any taxes or tax detriments that may be imposed upon Settlement Class Counsel, Verizon, or Verizon's Counsel with respect to income earned by the Settlement Fund Account for any period during which the Settlement Fund Account does not qualify as a Qualified Settlement Fund for purposes of federal or state income taxes or otherwise, shall be paid out of the Settlement Fund Account.  Plaintiffs, Settlement Class Counsel, Verizon, and Verizon's Counsel, shall have no liability or responsibility for any taxes arising with respect to the Settlement Fund Account.   Any bank fees associated with the Settlement Fund Account shall be paid by the Settlement Administrator from the Settlement Fund Account.

    **D.**   <u>Distribution of Net Distributable Funds to the Settlement Class</u>.   The Net Distributable Funds (i.e., the Settlement Fund minus the following:  Administrative Costs; any attorneys' fees and costs for Settlement Class Counsel awarded by the Court; and any service awards for Plaintiffs awarded by the Court) shall be distributed to the Accountholders for Valid Claimants, pursuant to the terms set forth in this Settlement Agreement, including the terms regarding the disbursement of residual funds.   Each Settlement Class Account that does not timely and validly request exclusion from the Settlement Class is eligible to submit a Claim for a Settlement Payment.

    **1.**   <u>Claim Process.</u>

a.     Accountholders for Settlement Class Accounts may submit Claims for a Settlement Payment, by submitting a Claim Form on or before the Claim Deadline.  The Claim Form shall be substantially in the form attached as **Exhibit E** to this Settlement Agreement. Claim Forms may be submitted electronically via the Settlement Website or by mail.  For Claim Forms submitted by mail, the Claim Form shall be considered timely if postmarked on or before the Claim Deadline.  The Email Notice, Postcard Notice, and Website Notice shall identify both the Claim Deadline and the webpage address, on the Settlement Website, where Claim Forms may be submitted electronically, and the Email Notice and Postcard Notice shall include unique personal identification numbers to facilitate the submission of Claims.   The Email Notice shall also include a hyperlink to the webpage address, on the Settlement Website, where Claim Forms may be submitted electronically.

b.     The Settlement Administrator shall review and process Claims.

c.     Those Settlement Class Accounts for which a timely and valid Claim is submitted, as determined by the Settlement Administrator, shall be deemed "Valid Claimants" and shall be issued Settlement Payments as described further herein.   Only one valid Claim may be submitted for each Settlement Class Account.

d.     Settlement Class Accounts that timely and validly request exclusion from the Settlement Class shall not be eligible for a Settlement Payment.   All other Settlement Class Accounts shall be eligible to submit Claims for Settlement Payments.

e.     The Settlement Administrator shall conduct reasonable audit(s) to ensure the integrity of the Claim Process, including that appropriate controls are in place to prevent fraud.

   f.  Beginning no later than two weeks following the Notice Date and continuing until the processing of Claims is completed, the Settlement Administrator shall provide weekly updates to Settlement Class Counsel and Verizon's Counsel regarding Claim submissions and regarding its review and processing of Claims.  The Settlement Administrator's weekly updates to Settlement Class Counsel shall not include any personally identifiable information about Verizon customers, such as account numbers, the name(s) of Accountholder(s) or subscribers, email addresses, or contact information.

   **2.**  <u>Calculation of Final Settlement Payment Amount</u>.  The Settlement Payment amount shall be calculated as follows:

   a.  The "Settlement Payment" shall be a minimum of fifteen dollars ($15.00) for each Valid Claimant account.  In addition to the minimum payment of fifteen dollars ($15.00), each Valid Claimant account shall be entitled to an additional one dollar ($1.00) for each month such Valid Claimant account received postpaid wireless or data services from Verizon and was charged and paid an Administrative Charge and/or an Administrative and Telco Recovery Charge between January 1, 2016 and the date of the Settlement Agreement, up to a maximum of one hundred dollars ($100.00).

   b.  Each Valid Claimant account, as determined by the Settlement Administrator, will be issued a Settlement Payment, in accordance with this Section IV.D.2.

   c.  In the event the aggregate Settlement Payments across all Valid Claimant accounts exceed the Net Distributable Funds, the Settlement Payment issued to each Valid Claimant account will be reduced on a *pro rata* basis, as determined by the Settlement Administrator.

d.      In the event the aggregate Settlement Payments across all Valid Claimant accounts do not exceed the Net Distributable Funds, the Settlement Payment issued to each Valid Claimant account will be increased on a *pro rata* basis, as determined by the Settlement Administrator, up to a maximum of one hundred dollars ($100.00).

**3.**      Creation of Payment List and Distribution of Settlement Payments

a.      The Settlement Payee List.   By no later than seven (7) days following the Effective Date, the Settlement Administrator—using the Customer Data, the timely and valid requests for exclusion from the Settlement Class, and the timely and valid Claims submitted—shall (i) provide to Verizon's Counsel a "Settlement Payee List" that includes, for each Valid Claimant account, the following information: the account number or other unique identifying number for the account as indicated in the Customer Data; and the name(s) of the Accountholder(s) on the account as indicated in the Customer Data, and (ii) provide to Settlement Class Counsel the total number of Valid Claimants on the Settlement Payee List.

b.      Determination of Net Distributable Funds.  By no later than twenty-eight (28) days following the Effective Date, the Settlement Administrator shall determine the amount of Net Distributable Funds (and provide that information to Settlement Class Counsel and Verizon's Counsel), by deducting from the Settlement Fund: (i) the amount of any Court-approved attorneys' fees and costs award for Settlement Class Counsel; (ii) the amount of any Court-approved service awards for Plaintiffs; (iii) the Administrative Costs (including both costs already incurred and a prediction of future costs necessary to effectuate this Settlement Agreement), but shall not include any Administrative Costs associated with distribution of the Residual Funds as contemplated by Section IV.D.4 herein; and (iv) the amount of any and all other costs, expenses, and other payments (other than the Settlement Payments) not specifically enumerated in subsections

17

(i) through (iii) of this Section IV.D.3.b that are expressly contemplated as being paid from the Settlement Fund under this Settlement Agreement.

        c.    <u>The Payment List</u>.  By no later than twenty-eight (28) days following the Effective Date, the Settlement Administrator shall (i) create and provide to Verizon's Counsel a "Payment List," as a supplement to the Settlement Payee List, that includes all of the information on the Settlement Payee List and adds the following for each account on the Settlement Payee List: the Settlement Payment amount for the account, as calculated pursuant to Section IV.D.2 herein, and (ii) provide to Settlement Class Counsel the Settlement Payment amounts on the Payment List, the total number of accounts to receive the Settlement Payment amounts, and the total amount of all payments on the Payment List.

        d.    <u>Payments To Valid Claimants</u>.  Within seventy-five (75) days following the Effective Date (hereinafter, the "Payment Date"), the Settlement Administrator shall mail checks via first class U.S. Mail postage pre-paid, or provide an electronic payment, at the Valid Claimant's election, to each Valid Claimant account on the Payment List, drawn from the Settlement Fund Account in the Settlement Payment amounts indicated for them in the Payment List. Settlement Payment checks or electronic payments, as applicable, shall be made out to the Accountholder(s) on the Valid Claimant accounts, as indicated in the Payment List.   Settlement Payment checks shall be sent to the mailing addresses indicated in the corresponding Claim Forms. Settlement Payments made electronically shall be sent to the payment account indicated in the corresponding Claim Forms.   The initial mailed Settlement Payment checks to Valid Claimant accounts shall be valid for a period of one-hundred-twenty days.

        e.    <u>Undeliverable Settlement Payment Checks</u>.  For any mailed Settlement Payment checks that are returned undeliverable with forwarding address information,

the Settlement Administrator shall re-mail the check to the new address indicated.   For any mailed

Settlement Payment checks that are returned undeliverable without forwarding address information,

the Settlement Administrator shall conduct an industry standard "skip trace" to try to identify

updated address information and re-mail checks to the extent an updated address is identified.

       **4.**   <u>Residual Funds</u>.  For any Settlement Payment funds which remain in the

Settlement Fund Account one year after the Payment Date—consisting of checks that were

successfully delivered but not timely negotiated, and checks or electronic payments deemed

undeliverable by the Settlement Administrator (collectively, "Residual Funds")—such Residual

Funds shall be treated as unclaimed property of the corresponding Accountholder(s), subject to

applicable state unclaimed property procedures; provided that any Administrative Costs of the

Settlement Administrator in connection with the distribution of the Residual Funds pursuant to this

Section IV.D.4 shall be paid from the Residual Funds, shall not increase Verizon's contribution to

the Settlement Fund or change any obligation by Verizon under this Settlement Agreement, and

shall reduce *pro rata* the respective unclaimed property amounts for the Accountholder(s) with

uncashed or undeliverable Settlement Payment checks.  Any monies remaining in the Settlement

Fund Account after (1) distribution to those Settlement Class Members who filed valid Claims for

a Settlement Payment on or before the Claim Deadline; (2) payment of any Administrative Costs

of the Settlement Administrator; (3) the payment of any Court-awarded attorneys' fees and costs

to Settlement Class Counsel; (4) the payment of any Court-awarded service awards to Plaintiffs;

and (5) the treatment of any Residual Funds as unclaimed property of the corresponding

Accountholder(s) subject to applicable state unclaimed property procedures as provided herein,

shall be sent to cy pres, with a recipient to be mutually agreed upon by the parties and identified

before final approval of the Settlement.  Nothing contained in this Section IV.D.4 shall impose any

obligations on Verizon, and the Settlement Administrator shall be responsible for performing any and all obligations that may be required by any state's unclaimed property laws and procedures in connection with any Residual Funds, or any cy pres distribution.

## V.   **THE SETTLEMENT ADMINISTRATOR**

A.   The duties of the Settlement Administrator, in addition to any other responsibilities that are described in this Settlement Agreement, shall include:

1.   Providing Notice to Settlement Class Members as set forth in this Settlement Agreement;

2.   Receiving and processing Claims pursuant to the Claims Process described in this Settlement Agreement, and providing updates to Settlement Class Counsel and Verizon's Counsel regarding the Claims and Claims Process, as provided in this Settlement Agreement;

3.   Establishing and maintaining the Settlement Website;

4.   Establishing and maintaining the Toll-Free Number;

5.   Responding to inquiries from Settlement Class Members;

6.   Keeping a clear and careful record of all communications with Settlement Class Members and all administration expenses;

7.   Establishing and maintaining a post office box for requests for exclusion, objections, and other correspondence from Settlement Class Members;

8.   Establishing and maintaining an email address for other correspondence from Settlement Class Members;

9.   Processing and determining the validity of any requests for exclusion by Settlement Class Members;

10.     Receiving any objections mailed by Settlement Class Members to the Settlement Administrator;

11.     Providing copies to Settlement Class Counsel and Verizon's Counsel of all requests for exclusion, objections, and other correspondence received from Settlement Class Members;

12.     Providing interim reports on request, and, within ten (10) days after the Exclusion Deadline (as defined in Section VII.A herein), a final report to Settlement Class Counsel and Verizon's Counsel summarizing the number of requests for exclusion received during that period, the total number of requests for exclusion received to date, the names and addresses of persons in the Settlement Class who submitted a request for exclusion, and any other pertinent information requested by Settlement Class Counsel or Verizon's Counsel;

13.     In advance of the Fairness Hearing, preparing an affidavit, to submit to the Court, affirming its compliance with the Notice and settlement administration provisions of this Settlement Agreement, and identifying any persons in the Settlement Class who submitted timely and valid requests for exclusion;

14.     Preparing the Settlement Payee List and Payment List as provided in this Settlement Agreement;

15.     Processing and transmitting distributions from the Settlement Fund and Settlement Fund Account as provided in this Settlement Agreement;

16.     Paying any invoices, expenses, taxes, fees, and other costs associated with administration of this Settlement as contemplated by this Settlement Agreement or required by law; and

17.     Performing any other settlement administration-related functions reasonably necessary to effectuate this Settlement Agreement, with the consent of both Settlement Class Counsel and Verizon's Counsel, or as approved by the Court.

## VI.     NOTICE PROGRAM

A.     <u>Customer Data</u>.   By no later than five days following entry of the Preliminary Approval Order, Verizon shall provide the Customer Data to the Settlement Administrator.

B.     <u>Email Notice</u>.  By no later than the Notice Date, the Settlement Administrator shall email the Email Notice to each Settlement Class Account for which an email address is included in the Customer Data.   The Email Notice shall be substantially in the form attached as **Exhibit A** to this Settlement Agreement.   The Email Notices shall be sent to the email addresses listed in the Customer Data for such accounts.    The Email Notices shall be sent with the sender title "Verizon Class Action Settlement Administrator" and the subject line "Notice of Verizon Class Action Settlement."    Should Settlement Class Members contact Verizon Customer Services representatives regarding the Email or Postcard Notices, Verizon Customer Services should be prepared to direct Settlement Class Members to the Class Action Settlement website.

C.     <u>Mail Notice</u>.

1.     For any Settlement Class Account where there is no email address included in the Customer Data: by no later than the Notice Date, the Settlement Administrator shall: (a) update the mailing address listed in the Customer Data for such account through the National Change of Address Database; and (b) mail the Postcard Notice to them, via first class U.S. mail, postage pre-paid, at their address as updated.   The Postcard Notice shall be substantially in the form attached as **Exhibit B** to this Settlement Agreement.

2.      For any Settlement Class Account where the Settlement Administrator sent Email Notice but received notice that the Email Notice was not received (i.e., a "bounce-back"): by no later than ten (10) days following the Notice Date, the Settlement Administrator shall:  (a) update the mailing address listed in the Customer Data for such account through National Change of Address Database; and (b) mail the Postcard Notice to them, via first class U.S. mail, postage pre-paid, at their address as updated.  The Postcard Notice shall be substantially in the form attached as **Exhibit B** to this Settlement Agreement.

3.      For any mailed Postcard Notices that are returned with forwarding address information, the Settlement Administrator shall promptly re-mail the Postcard Notice to the new address indicated.  For any mailed Postcard Notices that are returned as undeliverable without a forwarding address, the Settlement Administrator shall conduct an industry standard "skip trace" to try to identify a more current address and re-mail the Postcard Notice to the extent an updated address is identified.

D.      <u>Settlement Website</u>.  The Settlement Administrator shall establish and maintain an Internet website, at the URL www.VerizonAdministrativeChargeSettlement.com ("Settlement Website") where Settlement Class Members can obtain further information about the terms of this Settlement Agreement, their rights, important dates and deadlines, and related information. Settlement Class Members shall also be able to submit Claim Forms electronically via the Settlement Website.  The Settlement Website shall include, in PDF format, the Complaint in this Action, this Settlement Agreement, the long-form Website Notice substantially in the form attached as **Exhibit C** to this Settlement Agreement, the Preliminary Approval Order entered by the Court, Settlement Class Counsel's fee and cost application (after it is filed), and other case documents as agreed upon by the Parties and/or required by the Court, and shall be operational

and live before the first Postcard Notice or Email Notice is disseminated.   The Settlement Website shall be optimized for display on mobile phones.   The Settlement Website shall remain operational until at least one year after the Payment Date or such other later date as the Parties may agree.

      **E.**    <u>Toll-Free Number</u>.   The Settlement Administrator shall establish and maintain a toll-free telephone number ("Toll-Free Number") where Settlement Class Members can obtain further information about the Settlement Agreement and their rights.   The Toll-Free Number shall be operational and live by no later than one day before the first Postcard Notice or Email Notice is disseminated, and shall remain operational until at least one year after the Payment Date or such other later date as the Parties may agree.  The Toll-Free Number will not utilize a live, in-person operator, but rather will provide automated responses containing information about the Settlement Agreement.

      **F.**    <u>Reminder Email Notice</u>.  No later than fourteen (14) days after the Notice Date, the Settlement Administrator shall email a Reminder Email Notice, substantially in the form attached as **Exhibit D** to this Settlement Agreement, to each Settlement Class Account that was sent the Email Notice.   Depending on the volume of Claim Form submissions and in consultation with the Parties, prior to the Claim Deadline, the Settlement Administrator may cause a second reminder email notice to be sent to Settlement Class Accounts that were sent the Reminder Email Notice or to a portion of them that have not yet submitted a Claim Form.

## VII.   <u>REQUESTS FOR EXCLUSION</u>

      **A.**    Settlement Class Members may exclude themselves from the Settlement Class by mailing to the Settlement Administrator, at the address provided in the Website Notice, a request for exclusion that is postmarked no later than thirty-five days after the Notice Date (the "Exclusion Deadline").  To be effective, the request for exclusion must include (1) the Settlement Class

Member's full name, telephone number, mailing address, and email address; (2) a clear statement that the Settlement Class Member wishes to be excluded from the Settlement Class; (3) the name of this Action: "*Esposito et al.   v. Cellco Partnership d/b/a Verizon Wireless*"; and (4) the Settlement Class Member's original signature.   In addition, for the request for exclusion to be effective, the sender's mailing address as reflected in the request for exclusion and on the mailing envelope itself must match the mailing address associated with the Settlement Class Member's Verizon account.  Requests for exclusion furthermore must be made on an individual basis; "mass," "class," or other purported group opt outs are not effective.   Any Settlement Class Member who submits a timely and valid request for exclusion is foreclosed from objecting to the Settlement or to Settlement Class Counsel's motion for attorneys' fees, costs, and service  awards.   If a Settlement Class Member submits both a timely and valid request for exclusion and an objection, the Settlement Class Member shall be treated as if they had only submitted a request for exclusion.

B.     The Settlement Administrator shall promptly after receipt provide copies of any requests for exclusion, including any related correspondence, to Settlement Class Counsel and Verizon's Counsel.

C.     By no later than fourteen (14) days before the Fairness Hearing, the Settlement Administrator shall file with the Court (or provide to Settlement Class Counsel for filing with the Court) a declaration confirming that the Notice program set forth in Section VI has been implemented and providing a complete and final list of persons in the Settlement Class who submitted timely and valid requests for exclusion.

D.     Any Settlement Class Member who does not submit a timely and valid request for exclusion as provided in Section VII shall be bound by all subsequent proceedings, orders, and

judgments in this Action, including, but not limited to, the Release, regardless of whether the Settlement Class Member has any pending claims or causes of action against Verizon.

## VIII.  **OBJECTIONS**

A.      Any Settlement Class Member who does not submit a timely and valid request for exclusion shall have the right to object to the proposed Settlement and/or to Settlement Class Counsel's motion for attorneys' fees, costs, or service awards, only by complying with the objection provisions set forth in this Section VIII.   Settlement Class Members who object shall remain Settlement Class Members and shall be subject to the Release set forth in this Settlement Agreement if this Settlement is approved by the Court and becomes effective.   To be considered valid, an objection must be in writing, must be filed with the Court or mailed to the Court at the address listed in the Website Notice, postmarked/filed no later than twenty-five (25) days before the Fairness Hearing (the "Objection Deadline"), and must include the following: (1) the name of this Action: "*Esposito  v. Cellco Partnership d/b/a Verizon Wireless*"; (2) the full name, mailing address, telephone number, and email address of the objector; (3) the objector's original signature; (4) a description of the specific reasons for the objection; (5) the name, address, bar number and telephone number of counsel for the objector, if the objector is represented by an attorney; and (6) state whether the objector intends to appear at the Fairness Hearing either in person or through counsel.   Any Settlement Class Member who does not timely submit an objection in accordance with this section shall waive the right to object or to be heard at the Fairness Hearing and shall be forever barred from making any objection to the proposed Settlement or to Settlement Class Counsel's motion for attorneys' fees, costs, and service awards.  Any Settlement Class Member who objects to the Settlement shall nevertheless be eligible for all benefits of the Settlement if it is approved and becomes final.

**B.**     The Settlement Administrator shall promptly after receipt provide copies of any objections, including any related correspondence, to Settlement Class Counsel and Verizon's Counsel.

**C.**     By no later than twenty-one (21) days before the Fairness Hearing, the Settlement Administrator shall file with the Court (or provide to Settlement Class Counsel for filing with the Court) copies of any objections received by the Settlement Administrator.

## IX.    <u>**RELEASE AND WAIVER**</u>

**A.**     The Parties agree to the following release and waiver, which shall take effect upon the Effective Date.

**B.**     In consideration for the Settlement benefits described in this Settlement Agreement, Releasing Parties will fully, finally, and forever release, relinquish, acquit, and discharge the Released Parties from, and shall not now or hereafter institute, maintain, or assert on their own behalf, on behalf of the Settlement Class, or on behalf of any other person or entity, any and all manner of claims, requests for relief, actions, causes of action, suits, rights, debts, sums of money, payments, obligations, reckonings, contracts, agreements, executions, promises, damages, liens, judgments, and demands of whatever kind, type or nature whatsoever, both at law and in equity, whether past, present, mature or not yet mature, known or unknown, suspected or unsuspected, contingent or non-contingent, whether based on federal, state, or local law, statute, ordinance, regulation, code, contract, common law, or any other source, or any other claim that Releasing Parties ever had, now have, may have, or hereafter can, shall, or may ever have against the Released Parties, that were or reasonably could have been alleged in this Action or in any other court, tribunal, arbitration, commission, agency, or before any governmental and/or administrative body, or any other adjudicatory body, arising from or relating to the Administrative Charge,

including, without limitation, any such claims or requests for relief: (1) alleged in this Action; (2) for rescission, declaratory relief, injunctive relief, or any other equitable relief of any kind; (3) for violations of any state's deceptive, unlawful, and/or unfair business and/or trade practices, false, misleading or fraudulent advertising, consumer fraud, and/or consumer protection statutes; (4) for violations of the Uniform Commercial Code, any breaches of express, implied, and/or any other warranties, any similar federal, state, or local statutes, codes; or (5) for damages, costs, expenses, extra-contractual damages, compensatory damages, exemplary damages, special damages, penalties, punitive damages, damage multipliers, disgorgement, interest, unjust enrichment, restitution, attorneys' fees, costs, or any other monetary relief of any kind (together, the "Released Claims").

      **C.**     Plaintiffs, Settlement Class Counsel, Verizon, and Verizon's Counsel also agree to release each other from any and all claims relating in any way to any Party's or counsel's conduct in this Action, including but not limited to any claims of abuse of process, malicious prosecution, or any other claims arising out of the institution, prosecution, assertion or resolution of this Action. The list of claims released by this Section IX.C includes, but is not limited to, claims for attorneys' fees, costs of suit, or sanctions of any kind except as otherwise expressly set forth in Section XI.

      **D.**     Plaintiffs, on behalf of themselves and each Settlement Class Member, fully understand that the facts upon which this Settlement Agreement is executed may be found hereafter to be other than or different from the facts now believed by Plaintiffs, the Settlement Class Members and Settlement Class Counsel to be true and expressly accept and assume the risk of such possible differences in facts and agree that the Settlement Agreement shall remain effective notwithstanding any such difference in facts.

E.       Upon the occurrence of the Effective Date, Plaintiffs and each and every other Settlement Class Member hereby expressly waive and relinquish the provisions, rights, and benefits of Section 1542 of the California Civil Code, or any comparable provision or principle under the laws of any other state.  Section 1542 provides:

> **A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY.**

Plaintiffs and each and every other Settlement Class Member also expressly waive and relinquish any and all provisions, rights and benefits of any similar, comparable, or equivalent state, federal, or other law, rule, regulation, or common law or equity.  Plaintiffs and each Settlement Class Member may hereafter discover facts other than, different from, or in addition to those that he or she knows or believes to be true with respect to the Released Claims, but Plaintiffs and each Settlement Class Member hereby expressly waive and fully, finally and forever settle, release and discharge any known or unknown, suspected or unsuspected, contingent or non-contingent Released Claims, whether or not concealed or hidden, and without regard to the subsequent discovery or existence of such other, different or additional facts.   The Plaintiffs acknowledge, and the Settlement Class Members shall be deemed by operation of the Final Order and Judgment to have acknowledged, that the waivers in this Section IX were separately bargained for and are a material element of this Settlement Agreement.

F.       The Parties acknowledge that the Release set forth herein may be raised as a complete defense to and will preclude any action or proceeding based on the claims released by and through this Settlement Agreement.

**G.**     Nothing in this Release shall preclude any action to enforce the terms of this Settlement Agreement, including participation in any of the processes detailed herein.

## X.     PRELIMINARY AND FINAL SETTLEMENT APPROVAL

**A.**     Preliminary Approval.  Promptly upon full execution of this Settlement Agreement, Plaintiffs shall move the Court for entry of the Preliminary Approval Order substantially in the form of **Exhibit F** to this Settlement Agreement, for the purposes of, among other things: (1) preliminarily approving the settlement memorialized in this Settlement Agreement such that Notice should be provided in accordance with the terms of this Settlement Agreement; (2) finding that the requirements for provisional certification of the Settlement Class have been satisfied; (3) certifying the Settlement Class as defined herein; (4) setting a date for a Fairness Hearing; (5) approving the proposed Notice program described in Section VI herein (including the proposed forms and methods of notice), and directing dissemination of Notice to the Settlement Class in accordance with the terms of this Settlement Agreement; (6) determining that the Notice program, as set forth in this Settlement Agreement, complies with all legal requirements, including but not limited to the Due Process Clause of the United States Constitution; (7) approving the proposed Claim Form and Claims Process, and directing that the Claim Process be implemented pursuant to the terms of this Settlement Agreement; (8) providing that any objections by any Settlement Class Member to this Settlement Agreement, the entry of the Final Order and Judgment, or to Settlement Class Counsel's request for attorneys' fees, costs, or service awards, shall be heard and any papers submitted in support of said objections shall be considered by the Court at the Fairness Hearing only if, on or before the date(s) specified in the Notice and Preliminary Approval Order, such objector submits to the Court a written objection, and otherwise complies with the requirements for objections set forth in Section VIII of this Settlement Agreement; (9) establishing dates by

30

which Settlement Class Counsel shall file and serve all papers in support of final approval of the Settlement and in support of their application for attorneys' fees, costs, and service awards, and by which the Parties shall file and serve all papers in response to any objections; (10) providing that all Settlement Class Members who do not submit timely and valid requests for exclusion will be bound by the Final Order and Judgment; (11) approving the procedure for persons in the Settlement Class to request exclusion from the Settlement Class described in Section VII, and directing that requests for exclusion be submitted pursuant to the terms of this Settlement Agreement; (12) directing the Parties, pursuant to the terms and conditions of this Settlement Agreement, to take all necessary and appropriate steps to establish the means necessary to implement the Settlement; (13) setting deadlines consistent with this Settlement Agreement for dissemination of Notice, requesting exclusion from the Settlement Class or objecting to the Settlement, and filing papers in connection with the Fairness Hearing; (14) appointing the Settlement Class Representatives and Settlement Class Counsel; (15) approving the appointment of the Settlement Administrator; and (16) enjoining the litigation or prosecution of all claims that will be released by the Settlement.

    **B.**    <u>Final Order and Judgment</u>.  By no later than fifteen (15) days following the Notice Date, Plaintiffs and Settlement Class Counsel shall file a motion for final approval of the Settlement, requesting entry of the Final Order and Judgment substantially in the form of **Exhibit G** to this Settlement Agreement, which shall specifically include provisions: (1) stating that the Court has personal jurisdiction over all Settlement Class Members, has subject matter jurisdiction over the claims asserted in this Action, and that venue is proper; (2) finally approving the Settlement pursuant to New Jersey Rules of Court Rule 4:32-2, and directing the Parties and Settlement Administrator to implement the Settlement pursuant to its terms, including distributing Settlement Payments to Settlement Class Members and making such other disbursements from the

31

Settlement Fund and Settlement Fund Account as provided by the Settlement Agreement; (3) finding that the Notice as distributed was the best notice practicable and fully satisfied the requirements of due process and New Jersey Rules of Court Rule 4:32-2; (4) finally certifying the Settlement Class pursuant to New Jersey Rules of Court Rule 4:32-2; (5) confirming that Plaintiffs, the Settlement Class Members, and all other Releasing Parties have released all Released Claims and are permanently barred and enjoined from asserting, commencing, prosecuting, or continuing any of the Released Claims against the Released Parties; (6) retaining jurisdiction relating to the administration, consummation, validity, enforcement, and interpretation of this Settlement Agreement, the Final Order and Judgment, and any separate Order regarding Settlement Class Counsel's motion for attorneys' fees, costs, and/or service awards, and for any other necessary purpose; and (7) entering a judgment that dismisses all claims and defenses in this Action with prejudice, without costs to any Party, except as provided in this Settlement Agreement, and subject to the Court's continuing jurisdiction over the Parties and the Settlement Fund for the purpose of enforcement of the terms of this Settlement Agreement.

C.      Responses to Objections.  By no later than fourteen (14) days before the Fairness Hearing, the Parties shall file any responses to any Settlement Class Member objections, and any reply papers in support of the motion for final approval of the Settlement and/or in support of Settlement Class Counsel's motion for attorneys' fees, costs, and service awards.

D.      Actions Following the Effective Date.  By no later than seven (7) days following the Effective Date, Plaintiffs and Settlement Class Counsel shall dismiss with prejudice any parallel litigations and arbitrations brought by the Plaintiffs or Settlement Class Counsel against Verizon, including *MacClelland, et al. v. Cellco Partnership d/b/a Verizon Wireless, et al.*, 21-cv-08592 (N.D. Cal.); *Corsi, et al. v. Cellco Partnership d/b/a Verizon Wireless, et al.*, 22-cv-04621

(D.N.J.); *Allen, et al. v. Cellco Partnership d/b/a Verizon Wireless, et al.*, 23-cv-01138 (D.N.J.); *Achey et al. v. Cellco Partnership d/b/a Verizon Wireless, et al.*, Dkt. No. MID-L-000160-22 (N.J. Super.); and any arbitrations filed with the American Arbitration Association.

**E.**     Effect of Agreement if Settlement is Not Approved.  This Settlement Agreement is entered into only for the purpose of settlement.  If the Settlement is not approved, or is terminated, cancelled, or fails to become effective for any reason, including without limitation in the event the Final Order and Judgment is reversed or vacated following any appeal taken therefrom, then this Settlement shall be *void ab initio*, shall have no force or effect, and shall impose no obligations on the Parties.  The intent of the previous sentence is that, in the event that a necessary approval is denied, the Parties will revert to their positions immediately prior to the date this Settlement Agreement was executed, and this Action, and any parallel litigations and arbitrations brought by the Plaintiffs or Settlement Class Counsel against Verizon, including in *MacClelland, et al. v. Cellco Partnership d/b/a Verizon Wireless, et al.*, 21-cv-08592 (N.D. Cal.);  *Corsi, et al. v. Cellco Partnership d/b/a Verizon Wireless, et al.*, 22-cv-04621 (D.N.J.); *Allen, et al. v. Cellco Partnership d/b/a Verizon Wireless, et al.*, 23-cv-01138 (D.N.J.); *Achey et al. v. Cellco Partnership d/b/a Verizon Wireless, et al.*, Dkt. No. MID-L-000160-22 (N.J. Super.); and any arbitrations filed with the American Arbitration Association, will resume without prejudice to any Party. The Parties further agree to cooperate in asking the Court to set a reasonable schedule for the resumption of this Action and any parallel litigations brought by the Plaintiffs or Settlement Class Counsel against Verizon, as well as any pending or stayed appeals including the New Jersey Supreme Court appeal in *Achey v. Cellco Partnership*, Dkt. No. 088253 (N.J.) and the Ninth Circuit appeal in *MacClelland v. Cellco Partnership*, 22-16020 (9th Cir.).  In the event of such a reversion, the

Parties agree that the proposed or actual certification of the Settlement Class will be deemed void and will not be urged or considered as a factor in any further proceeding.

## XI.   ATTORNEYS' FEES,  COSTS, AND SERVICE AWARDS

A.      No later than fifteen (15) days following the Notice Date Settlement Class Counsel shall file a motion with the Court (which Verizon has agreed not to oppose) requesting an award of attorneys' fees not to exceed thirty-three million three hundred thousand dollars ($33,300,000.00) (i.e., 33.30% of the Settlement Fund), plus reimbursement of their litigation costs (i.e., litigation expenses), with any such amounts awarded payable from the Settlement Fund. Such motion shall be posted on the Settlement Website promptly after the motion has been filed with the Court.

B.      Settlement Class Counsel's entitlement to attorneys' fees and costs will be determined by the Court.   The Settlement shall not be conditioned on Court approval of an award of attorneys' fees and costs.   In the event the Court declines any request or awards less than the amounts sought, but otherwise approves the Settlement, the remaining provisions of this Settlement Agreement will continue to be effective and enforceable by the Parties.

C.      Any attorneys' fees and costs awarded by the Court to Settlement Class Counsel shall be paid from the Settlement Fund and shall not increase Verizon's contribution to the Settlement Fund or change any obligation by Verizon under this Settlement Agreement.

D.      Settlement Class Counsel shall have the sole and absolute discretion to allocate any attorneys' fees and costs awarded by the Court.   Verizon shall have no liability or other responsibility for allocation of any such fees and costs awarded.

E.      Settlement Class Counsel shall be entitled to full payment of the attorneys' fees and costs awarded by the Court within ten (10) business days of the Court's entry of the Final Order

34

and Judgment and any order granting attorneys' fees and costs, notwithstanding any appeal, upon execution of a Stipulated Undertaking, attached as **Exhibit I** hereto ("Stipulated Undertaking"), requiring repayment of fees and costs by Settlement Class Counsel should the Final Order and Judgment be reversed or materially modified or the award of attorneys' fees and costs be reversed or reduced on appeal.

F.     No later than fifteen (15) days following the Notice Date, Settlement Class Counsel shall file a motion with the Court requesting payment from the Settlement Fund to Plaintiffs of service awards not to exceed $3,500.00 for each Plaintiff.  Any motion for service awards will be based on Plaintiffs' time, effort, and commitment in this Action, and will not be based or conditioned upon Plaintiffs' support for the Settlement.   Any such motion shall be posted on the Settlement Website promptly after the motion has been filed with the Court.

G.     Plaintiffs' entitlement to service awards, if any, will be determined by the Court. The Settlement shall not be conditioned on Court approval of service awards for the Plaintiffs.  In the event the Court declines any request for service awards or awards less than the amount sought, but otherwise approves the Settlement contemplated by this Settlement Agreement, the remaining provisions of this Settlement Agreement will continue to be effective and enforceable by the Parties, including the Release set forth in this Settlement Agreement.

H.     Any service awards for Plaintiffs awarded by the Court shall be paid from the Settlement Fund and shall not increase Verizon's contribution to the Settlement Fund or change any obligation by Verizon under this Settlement Agreement.

I.     To the extent awarded by the Court, Verizon shall pay the service awards to the Plaintiffs, through Settlement Class Counsel, within ten (10) business days of the Court's entry of the Final Order and Judgment and any order awarding Plaintiff service awards, notwithstanding

any appeal, upon execution of the Stipulated Undertaking, requiring repayment of such service awards by Settlement Class Counsel should the Final Order and Judgment or the award of Plaintiff service awards be reversed or materially modified on appeal. Verizon shall have no liability to the Plaintiffs arising from any claim regarding payment of any award of the Plaintiff service awards, so long as Verizon complies with its obligations under this Agreement.

## XII.   ADDITIONAL PROVISIONS

A.   <u>No Admission of Liability or Wrongdoing</u>. Verizon expressly disclaims and denies any wrongdoing or liability whatsoever and expressly incorporates Section I.I of the Recitals. This Settlement, and any and all negotiations, statements, documents, and/or proceedings in connection with this Settlement, shall not be construed or deemed to be relevant to or evidence of Verizon's admission or concession of, or related to, (1) the truth of any fact alleged by Plaintiffs in this Action; (2) that any person suffered compensable harm or is entitled to any relief, including legal, injunctive, or any other equitable relief, with respect to the matters asserted in this Action; (3) any liability, negligence, fault, or wrongdoing by Verizon or the Released Parties, including any of its affiliates, agents, representatives, vendors, or any other person or entity acting on its behalf; (4) that the Action or any other action was or may be properly certified as a class action for litigation, non-settlement purposes; (5) the arbitrability of the Action as to Plaintiffs and Settlement Class Members; or (6) the enforceability of any applicable contractual or statutory limitations period to limit any relief. Verizon may file this Settlement Agreement in any action or proceeding that may be brought against it in order to support a defense or counterclaim based on principles of res judicata, collateral estoppel, release, good faith settlement, judgment bar or reduction, or any other theory of claim preclusion or issue preclusion or similar defense or counterclaim.

**B.**      Termination.  This Settlement may be terminated by either Plaintiffs or Verizon by serving on counsel for the opposing party and filing with the Court a written notice of termination within ten (10) days (or such longer time as may be agreed between Settlement Class Counsel and Verizon) after any of the following occurrences:

**1.**      the Court rejects, materially modifies, or materially amends or changes the Settlement (with the exception of any provision of the Settlement relating to Settlement Class Counsel's attorneys' fees or expenses or Plaintiff service awards);

**2.**      the Court declines to enter without material change the material terms in the proposed Preliminary Approval Order or the Final Order and Judgment;

**3.**      an appellate court reverses the Final Order and Judgment, and the Settlement is not reinstated and finally approved without material change by the Court on remand; or

**4.**      the Effective Date does not otherwise occur.

In the event of a termination pursuant to this Section XII.B, this Settlement Agreement shall become null and void ab initio without prejudice to the status quo ante rights, positions and privileges of the Parties, except as otherwise expressly provided herein.  In the event of any such termination, the Parties will bear their own costs and fees with regard to their efforts to implement the Settlement Agreement.  In the event of a termination pursuant to this Section XII.B, this Settlement Agreement shall have no force or effect and the Parties will return to the status quo ante in this Action and in any parallel litigations and arbitrations brought by the Plaintiffs or Settlement Class Counsel against Verizon, including in *MacClelland, et al. v. Cellco Partnership d/b/a Verizon Wireless, et al.*, 21-cv-08592 (N.D. Cal.); *Corsi, et al. v. Cellco Partnership d/b/a Verizon Wireless, et al.*, 22-cv-04621 (D.N.J.); *Allen, et al. v. Cellco Partnership d/b/a Verizon*

*Wireless, et al.*, 23-cv-01138 (D.N.J.); *Achey et al. v. Cellco Partnership d/b/a Verizon Wireless, et al.*, Dkt. No. MID-L-000160-22 (N.J. Super.); and in any arbitrations filed with the American Arbitration Association, as it existed prior to the date of this Settlement Agreement.  The Parties will also be prohibited from using this Settlement and any settlement or mediation communications in connection with discovery or as evidence in this Action or in any other action, arbitration, or other proceeding of any kind.  The Parties further agree to cooperate in asking the Court to set a reasonable schedule for the resumption of this Action and any parallel litigations brought by the Plaintiffs or Settlement Class Counsel against Verizon, as well as any pending or stayed appeals including the New Jersey Supreme Court appeal in *Achey v. Cellco Partnership*, Dkt. No. 088253 (N.J.) and the Ninth Circuit appeal in *MacClelland v. Cellco Partnership*, 22-16020 (9th Cir.).

     **C.**     <u>Public Statements and Non-Disparagement</u>.   No press release or press communication concerning the Settlement shall be initiated by any Party or counsel.   The Parties and their counsel may respond as appropriate to any Settlement Class Member inquiries and any media inquiries that they receive regarding the Settlement.   In responding to any media inquiries, neither Party shall disparage the other Party in any such communications or public statements.

     **D.**     <u>Confidentiality</u>.  It is agreed that until the filing of the motion for preliminary settlement approval, the Settlement Agreement and its terms shall be confidential and shall not be disclosed to any person unless required by applicable disclosure laws, required to be disclosed to auditors or attorneys, or agreed to by the Parties.   All agreements made and orders entered during the course of this Action relating to the confidentiality of information shall survive this Settlement Agreement.

     **E.**     <u>Fair, Adequate and Reasonable Settlement</u>.  The Parties believe this Settlement is a fair, adequate, and reasonable settlement of this Action and have arrived at this Settlement through

arms-length negotiations, taking into account all relevant factors, present and potential.  This Settlement was reached after hard-fought, arms-length negotiations that included a full-day mediation conducted by Hon. Jay C. Gandhi of JAMS.

     **F.**    <u>Voluntary Agreement</u>.  This Settlement Agreement is executed voluntarily and without duress or undue influence on the part of or on behalf of the Parties, or of any other person, firm or entity.

     **G.**    <u>Binding On Successors</u>.  This Settlement Agreement shall bind and inure to the benefit of the respective successors, assigns, legatees, heirs, and personal representatives of each of the Parties.

     **H.**    <u>Parties Represented by Counsel</u>.  The Parties hereby acknowledge that they have been represented in negotiations for and in the preparation of this Settlement Agreement by independent counsel of their own choosing, that they have read this Settlement Agreement and have had it fully explained to them by such counsel, and that they are fully aware of the contents of this Settlement Agreement and of its legal effect.

     **I.**    <u>Authorization</u>.  Each Party warrants and represents that there are no liens or claims of lien or assignments in law or equity or otherwise of or against any of the claims or causes of action released herein and, further, that each Party is fully entitled and duly authorized to give this complete and final release and discharge.

     **J.**    <u>Construction and Interpretation</u>.  Neither the Parties nor any of the Parties' respective attorneys shall be deemed the drafter of this Settlement Agreement for purposes of interpreting any provision hereof in any judicial or other proceeding that may arise between or among them.

**K.**   <u>Headings</u>.  The various headings used in this Settlement Agreement are solely for the convenience of the Parties and shall not be used to interpret this Settlement Agreement.

**L.**   <u>Exhibits</u>.  The exhibits to this Settlement Agreement are integral parts of the Settlement Agreement and Settlement and are hereby incorporated and made a part of this Settlement Agreement.

**M.**   <u>Effect of Weekends and Holidays</u>.   If any date or deadline in this Settlement Agreement falls on a Saturday, Sunday, or federal holiday, the next business day following the date or deadline shall be the operative date.

**N.**   <u>Merger and Integration</u>.  This Settlement Agreement contains an entire, complete, and integrated statement of each and every term and condition agreed to by and among the Parties, and is not subject to any term or condition not provided for herein.   In entering into this Settlement Agreement, no Party has made or relied on any warranty or representation not specifically set forth herein.

**O.**   <u>No Waiver</u>.  There shall be no waiver of any term or condition absent an express writing to that effect by the Party to be charged with that waiver.   No waiver of any term or condition in this Settlement Agreement by any Party shall be construed as a waiver of a subsequent breach or failure of the same term or condition, or waiver of any other term or condition of this Settlement Agreement.

**P.**   <u>Modifications and Amendments</u>.   No amendment, change or modification of this Settlement Agreement or any part thereof shall be valid unless in writing signed by the Parties.

**Q.**   <u>Governing Law</u>.  This Settlement Agreement shall be governed by and interpreted in accordance with the laws of the State of New Jersey, without regard to its conflict of law principles.

**R.** <u>Further Assurances</u>. Each of the Parties hereto shall execute and deliver any and all additional papers, documents and other assurances and shall do any and all acts or things reasonably necessary to obtain approval of this Settlement and in connection with the performance of its obligations hereunder to carry out the express intent of the Parties hereto. The Parties and their counsel undertake to implement the terms of this Settlement Agreement in good faith, and to use good faith in resolving any disputes that may arise in the implementation of the terms of this Settlement Agreement.

**S.** <u>Execution Date</u>. This Settlement Agreement shall be deemed executed upon the date set forth in the preamble above.

**T.** <u>Continuing Jurisdiction</u>. The Parties to this Settlement Agreement stipulate that the Court shall retain personal and subject matter jurisdiction over the implementation and enforcement of this Settlement Agreement, the Preliminary Approval Order, the Final Order and Judgment, and any separate order regarding Settlement Class Counsel attorneys' fees and expenses and/or Plaintiff service awards.

**U.** <u>Counterparts</u>. This Settlement Agreement may be executed in counterparts, each of which shall constitute an original, but all of which together shall constitute one and the same instrument. The several signature pages may be collected and annexed to one or more documents to form a complete counterpart. Photocopies of executed copies of this Settlement Agreement may be treated as originals.

**V.** <u>Notices</u>. Notices to counsel for the Parties required under this Settlement Agreement shall be sent by email and first-class mail to:

<u>For Plaintiffs</u>:

**DeNITTIS OSEFCHEN PRINCE, P.C.**
Stephen P. DeNittis, Esq.

41

Joseph A. Osefchen, Esq.
Shane T. Prince, Esq.
525 Route 73 North, Suite 410
Marlton, NJ 08053
Telephone: (856) 797-9951
Facsimile: (856) 797-9978
Email: sdenittis@denittislaw.com
Email: josefchen@denittislaw.com
Email: sprince@denittislaw.com

**HATTIS & LUKACS**
Daniel M. Hattis, Esq.
Paul Karl Lukacs, Esq.
11711 SE 8th Street, Suite 120
Bellevue, WA 98005
Telephone: (425) 233-8650
Facsimile: (425) 412-7171
Email: dan@hattislaw.com
Email: pkl@hattislaw.com

For Verizon:

**FAEGRE DRINKER BIDDLE & REATH LLP**
Jeffrey S. Jacobson (NJ ID No.000772011)
600 Campus Drive
Florham Park, NJ 07932
Tel. (973) 549-7000
Email: jeffrey.jacobson@faegredrinker.com

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
Shon Morgan
865 South Figueroa Street, 10th Floor
Los Angeles, CA 90017
Tel. (213) 443-3000
Email: shonmorgan@quinnemanuel.com

Agreed to on the date indicated below.

APPROVED AND AGREED TO BY DEFENDANT CELLCO PARTNERSHIP d/b/a VERIZON WIRELESS:

Dated: _11/9/23_

By: _Andrew K Shen_

Title: _Chief Litigation Counsel_

APPROVED AND AGREED TO BY VERIZON'S COUNSEL:

Dated: _11/9/23_

Shon Morgan
Quinn Emanuel Urquhart & Sullivan, LLP

APPROVED AND AGREED TO BY SETTLEMENT CLASS COUNSEL, who are also expressly authorized to sign on behalf of the Plaintiffs:

Dated: _____

Stephen P. DeNittis
DeNittis Osefchen Prince, P.C.

Dated: _11/8/2023_

Daniel M. Hattis
Hattis & Lukacs

APPROVED AND AGREED TO BY THE PLAINTIFFS
All named Plaintiffs are to provide signatures on or before final approval of the Settlement to receive the proposed $3,500.00 service award.

Dated: 2023-11-09 | 03:54:37 PST

Plaintiff Jeffrey Achey

Dated: 2023-11-09 | 07:53:28 PST

Plaintiff Marilyn Achey

Dated: 2023-11-09 | 14:16:22 PST

Plaintiff Pamela M. Allen

Dated: 2023-11-08 | 22:17:14 PST

Plaintiff Samantha Albaitis

Dated: 2023-11-09 | 05:55:59 PST

Plaintiff Justin Anderson

Dated: 2023-11-09 | 14:30:19 PST

Plaintiff Cydni Arterbury

Dated: 2023-11-09 | 04:35:19 PST

Plaintiff Deidre Asbjorn

Dated: 2023-11-09 | 04:48:15 PST

Plaintiff Lisa Baker

Dated: 2023-11-09 | 07:08:29 PST

Plaintiff Briana Bell

Dated: 2023-11-08 | 22:44:20 PST

Plaintiff Christine Bellavia

Dated: ___2023-11-09 | 20:38:22 PST___

*Kimberly Blair*
_____
Plaintiff Kimberly Blair

Dated: ___2023-11-09 | 04:52:49 PST___

*Leanor Bland Mullins*
_____
Plaintiff Leanor Bland-Mullins

Dated: ___2023-11-09 | 00:49:48 PST___

*Caroline Bonham*
_____
Plaintiff Caroline Bonham

Dated: ___2023-11-09 | 10:00:10 PST___

*Mary F Bowman*
_____
Plaintiff Mary Bowman

Dated: ___2023-11-09 | 14:09:33 PST___

*Mike Branom*
_____
Plaintiff Michael Branom

Dated: ___2023-11-08 | 22:33:37 PST___

*Molly Brown*
_____
Plaintiff Molly Brown

Dated: ___2023-11-09 | 03:19:36 PST___

*A Burke*
_____
Plaintiff Tammy Burke

Dated: ___2023-11-09 | 06:32:07 PST___

*GREG BURLAK*
_____
Plaintiff Gregory Burlak

Dated: ___2023-11-09 | 02:01:22 PST___

*Ann Marie Caldwell*
_____
Plaintiff Annmarie Caldwell

Dated: ___2023-11-09 | 14:00:50 PST___

*Art Capri*
_____
Plaintiff Art Capri

Dated: 2023-11-08 | 22:29:05 PST

Plaintiff Michael Carney

Dated: 2023-11-08 | 22:21:40 PST

Plaintiff Debra Casey

Dated: 2023-11-12 | 15:05:10 PST

Plaintiff Shauna Cavallaro

Dated: 2023-11-09 | 09:00:36 PST

Plaintiff Karyn Challender

Dated: 2023-11-09 | 04:53:41 PST

Plaintiff Carla Chiorazzo

Dated: 2023-11-09 | 14:32:23 PST

Plaintiff Judith Chiorazzo

Dated: 2023-11-09 | 07:42:17 PST

Plaintiff Tyson Cohron

Dated: 2023-11-09 | 08:07:08 PST

Plaintiff Santos Colon

Dated: 2023-11-09 | 07:37:25 PST

Plaintiff Erika Conley

Dated: 2023-11-08 | 23:01:01 PST

Plaintiff Kendra Conover

Dated: 2023-11-13 | 08:55:26 PST

_____
Plaintiff John Conway

Dated: 2023-11-09 | 06:07:19 PST

_____
Plaintiff Dylan Corbin

Dated: 2023-11-09 | 03:03:25 PST

_____
Plaintiff Cintia Corsi

Dated: 2023-11-08 | 22:26:57 PST

_____
Plaintiff Laura Curry

Dated: 2023-11-13 | 10:35:08 PST

_____
Plaintiff Adam DeMarco

Dated: 2023-11-09 | 05:11:23 PST

_____
Plaintiff Shakera Dyer

Dated: 2023-11-09 | 09:37:56 PST

_____
Plaintiff Andi Ellis

Dated: 2023-11-08 | 22:40:08 PST

_____
Plaintiff Dean Esposito

Dated: 2023-11-14 | 05:49:35 PST

_____
Plaintiff James Fisher

Dated: 2023-11-09 | 08:22:08 PST

_____
Plaintiff Laurie Frantz

Dated: 2023-11-09 | 16:25:24 PST

_Tim Frasch_
Plaintiff Tim Frasch

Dated: 2023-11-09 | 06:57:00 PST

_Jane Frey_
Plaintiff Jane Frey

Dated: 2023-11-09 | 06:05:54 PST

_Russell From_
Plaintiff Russell From

Dated: 2023-11-09 | 05:56:35 PST

_Patricia Gagan_
Plaintiff Patricia Gagan

Dated: 2023-11-09 | 06:59:17 PST

Plaintiff Angel Gaines

Dated: 2023-11-09 | 14:16:42 PST

_Ashtin Gamblin_
Plaintiff Ashtin Gamblin

Dated: 2023-11-09 | 10:15:32 PST

_Ericka Gardner_
Plaintiff Ericka Gardner

Dated: 2023-11-11 | 13:33:35 PST

_Ashley Garrison_
Plaintiff Ashley Garrison

Dated: 2023-11-09 | 15:06:08 PST

_Allison Gillingham_
Plaintiff Allison Gillingham

Dated: 2023-11-09 | 15:12:59 PST

_Lorraine Gillingham_
Plaintiff Lorraine Gillingham

Dated: 2023-11-09 | 04:28:41 PST

Plaintiff Doree Gordon

Dated: 2023-11-09 | 08:03:06 PST

Plaintiff Ann Graff

Dated: 2023-11-08 | 23:04:51 PST

Plaintiff Angela Green

Dated: 2023-11-09 | 07:31:19 PST

Plaintiff Anna Gutierrez

Dated: 2023-11-09 | 08:14:19 PST

Plaintiff Carlos Gutierrez

Dated: 2023-11-10 | 04:46:07 PST

Plaintiff Donna Hartman

Dated: 2023-11-10 | 12:54:44 PST

Plaintiff James Hensley

Dated: 2023-11-09 | 03:50:42 PST

Plaintiff Sarel Hines

Dated: 2023-11-08 | 23:00:59 PST

Plaintiff James Holling

Dated: 2023-11-09 | 05:00:27 PST

Plaintiff Karen Hudson

Dated: 2023-11-09 | 06:29:14 PST

_____
Plaintiff Jerry Hunt

Dated: 2023-11-09 | 04:50:29 PST

_____
Plaintiff Jennifer Hurtt

Dated: 2023-11-09 | 14:19:37 PST

_____
Plaintiff Linda Jenkins

Dated: 2023-11-08 | 23:20:15 PST

_____
Plaintiff Augustus Johnson

Dated: 2023-11-09 | 18:38:11 PST

_____
Plaintiff Joyce Jones

Dated: 2023-11-09 | 05:27:05 PST

_____
Plaintiff Patricia Justice

Dated: 2023-11-09 | 01:51:53 PST

_____
Plaintiff William Kaupelis

Dated: 2023-11-08 | 22:28:54 PST

_____
Plaintiff Marilyn Kaye

Dated: 2023-11-08 | 22:32:27 PST

_____
Plaintiff Alexander Keeler

Dated: 2023-11-09 | 14:06:37 PST

_____
Plaintiff Adam Keller

Dated: _2023-11-12 | 06:01:21 PST_

_____
Plaintiff David Kelly

Dated: _2023-11-09 | 16:53:44 PST_

_____
Plaintiff Billie Kendrick

Dated: _2023-11-10 | 04:31:51 PST_

_____
Plaintiff Lynn Kiraly

Dated: _2023-11-09 | 22:00:12 PST_

_____
Plaintiff Krista Kirby

Dated: _2023-11-09 | 08:44:38 PST_

_____
Plaintiff Michelle Lacuesta

Dated: _____

_____
Plaintiff Janette Lisner

Dated: _2023-11-09 | 03:07:29 PST_

_____
Plaintiff Jan Lombard

Dated: _2023-11-10 | 08:57:57 PST_

_____
Plaintiff William Eric Lough

Dated: _2023-11-09 | 01:30:44 PST_

_____
Plaintiff Marc Lowrey

Dated: _2023-11-09 | 09:19:15 PST_

_____
Plaintiff Teresa MacClelland

Dated: 2023-11-09 | 10:28:03 PST

Plaintiff Jill Mailhoit

Dated: 2023-11-09 | 06:03:50 PST

Plaintiff Christina Manfredo

Dated: 2023-11-09 | 08:39:37 PST

Plaintiff David Massaro

Dated: 2023-11-09 | 02:50:44 PST

Plaintiff Aaron Maxa

Dated: 2023-11-09 | 07:04:35 PST

Plaintiff Jason McConville

Dated: 2023-11-09 | 10:46:35 PST

Plaintiff Louise Monsour

Dated: 2023-11-09 | 07:40:51 PST

Plaintiff Kelly Moore

Dated: 2023-11-09 | 05:02:01 PST

Plaintiff Lindsey Moran

Dated: 2023-11-09 | 10:24:49 PST

Plaintiff David Moyers

Dated: 2023-11-09 | 14:08:33 PST

Plaintiff Jose Nicot

52

Dated: 2023-11-09 | 04:14:24 PST

Plaintiff Jennifer Ocampo-Neubauer

Dated: 2023-11-09 | 03:11:54 PST

Plaintiff Keisha Odom

Dated: 2023-11-09 | 14:36:10 PST

Plaintiff Judith Oelenschlager

Dated: 2023-11-09 | 12:27:12 PST

Plaintiff Sandra Oshiro

Dated: 2023-11-09 | 08:10:38 PST

Plaintiff Leslie Owens

Dated: 2023-11-09 | 00:38:42 PST

Plaintiff Angel Pachecho

Dated: 2023-11-09 | 05:08:31 PST

Plaintiff Daniel Patino

Dated: 2023-11-09 | 06:20:31 PST

Plaintiff Darleen Perez

Dated: 2023-11-09 | 00:42:44 PST

Plaintiff Gabrielle Pozzuoli

Dated: 2023-11-09 | 05:39:49 PST

Plaintiff James Prate

Dated: _____2023-11-09 | 03:48:42 PST_____

_____

Plaintiff Heather Ray

Dated: _____2023-11-09 | 16:46:58 PST_____

_____

Plaintiff Valerie Reed

Dated: _____2023-11-09 | 03:23:03 PST_____

_____

Plaintiff Jon Santos

Dated: _____2023-11-09 | 06:40:12 PST_____

_____

Plaintiff Michael Scheufele

Dated: _____2023-11-10 | 06:53:05 PST_____

_____

Plaintiff Bruce Schramm

Dated: _____2023-11-09 | 06:31:20 PST_____

_____

Plaintiff Susan Scott

Dated: _____2023-11-09 | 14:20:52 PST_____

_____

Plaintiff Russell Sewekow

Dated: _____2023-11-14 | 12:25:26 PST_____

_____

Plaintiff Terry Sexton

Dated: _____2023-11-09 | 04:10:48 PST_____

_____

Plaintiff Kerry Showalter

Dated: _____2023-11-09 | 01:29:01 PST_____

_____

Plaintiff Lori Snyder

Dated: _2023-11-09_ | _10:47:54_ PST

Plaintiff John St. Jarre

Dated: _2023-11-09_ | _14:05:14_ PST

Plaintiff Gloria Stern

Dated: _2023-11-09_ | _08:34:26_ PST

Plaintiff Deborah Stroyek

Dated: _2023-11-10_ | _02:58:46_ PST

Plaintiff Misty Sutton

Dated: _2023-11-09_ | _02:33:33_ PST

Plaintiff Kathryn Taylor

Dated: _2023-11-13_ | _20:21:12_ PST

Plaintiff Linda Teer

Dated: _2023-11-09_ | _19:38:18_ PST

Plaintiff Edna Toy

Dated: _2023-11-10_ | _00:56:16_ PST

Plaintiff Teresa Toy

Dated: _2023-11-09_ | _14:47:10_ PST

Plaintiff Christine Trappe

Dated: _2023-11-09_ | _06:15:44_ PST

Plaintiff Brenda Tripicchio

Dated: _2023-11-09 | 05:58:28 PST_

Plaintiff Karen Umberger

Dated: _2023-11-09 | 14:02:22 PST_

Plaintiff Anthony Vallecorsa

Dated: _2023-11-09 | 10:09:40 PST_

Plaintiff Vanessa West

Dated: _2023-11-09 | 11:19:37 PST_

Plaintiff Claire White

Dated: _2023-11-10 | 04:48:27 PST_

Plaintiff Kristopher Willard

Dated: _2023-11-09 | 07:33:18 PST_

Plaintiff Scott Willits

Dated: _2023-11-09 | 02:21:00 PST_

Plaintiff Alvin Wilson

Dated: _2023-11-09 | 13:16:17 PST_

Plaintiff Kathleen Wright

Dated: _2023-11-09 | 05:32:40 PST_

Plaintiff Brad Young

Exhibit A

To:      [Class Member Email Address]
From:    Verizon Class Action Settlement Administrator
Subject: Notice of Verizon Class Action Settlement

---

**Notice ID:** <<Notice ID>>
**Confirmation Code:** <<Confirmation Code>>

## VERIZON CLASS ACTION SETTLEMENT

*A court authorized this notice. This is not a solicitation from a lawyer.*
*You are not being sued.*

***Para ver este aviso en español, visite***
***www.VerizonAdministrativeChargeSettlement.com.***

---

**\*\*YOU MAY BE ENTITLED TO A PAYMENT OF UP TO $100.00 IF YOU FILE A CLAIM\*\***

**\*You must file a claim by [DATE] to receive a payment\***

**To file a claim click here.**

---

**Read this notice or visit www.VerizonAdministrativeChargeSettlement.com or call toll-free (844) 689-0186 for more information.**

**What is this notice about?** A proposed settlement has been reached in a class action lawsuit. The lawsuit claimed that Cellco Partnership d/b/a Verizon Wireless ("Verizon") charged a monthly Administrative Charge and/or Administrative and Telco Recovery Charge (collectively, "Administrative Charge") on Verizon post-paid individual consumer wireless accounts that was unfair and not adequately disclosed. Verizon has denied and continues to deny that it did anything wrong and that the lawsuit has any merit. Verizon states that it will continue to charge the Administrative Charge and that it has the right to increase the Administrative

Charge. The settlement, if approved, resolves the lawsuit and provides benefits to Settlement Class Members who file a claim.

**Who is included?**  The "Settlement Class" includes consumers residing in the United States (based on account holders' last known billing address) who received postpaid wireless or data services from Verizon and who were charged and paid an Administrative Charge between January 1, 2016 and the date of the Settlement Agreement.  You are receiving this notice because Verizon's records indicate that you are in the Settlement Class.

**What can I get?**  Under the proposed settlement, Verizon will pay $100 million to create a settlement fund. If the settlement is approved and becomes final, payments will be made to eligible account holders.  **You must file a claim to receive a payment (see below).**  If you file a claim by the deadline, your settlement payment may be up to $100.00 for your account, but the final amount may be lower depending on how long you were a Verizon subscriber and how many Settlement Class Members file valid claims.

**How do I get a payment?**   **You must file a claim by [DATE] to receive a settlement payment**. **You can file a claim online by clicking here, or you can download a claim form at www.VerizonAdministrativeChargeSettlement.com, fill it out, and submit it by mail.**  Payments will be issued to valid claimants by mailed check or electronic payment.

**What are my options?**  You can (1) file a claim for a payment from the settlement, and, if the settlement becomes final and you are in the Settlement Class, you will give up the right to sue Verizon about the issues in this lawsuit; (2) do nothing, thereby receiving no payment, and, if the settlement becomes final, you will give up the right to sue Verizon about the issues in this lawsuit; or (3) exclude yourself from the Settlement Class by opting out, thereby receiving no payment, and you will retain any right you may have to sue Verizon about the issues in this lawsuit. To exclude yourself, you must mail a signed request for exclusion containing the information described at www.VerizonAdministrativeChargeSettlement.com, postmarked by **[DATE]**,  to:  Verizon Administrative Charge Settlement, Attn: Exclusions, P.O. Box 58220, Philadelphia, PA 19102.

If you do not exclude yourself, and the Court approves the settlement, you will be bound by the Court's orders and judgments and will release your claims relating to this lawsuit. If you do not exclude yourself, you can object to or comment on the settlement and/or Settlement Class Counsel's request for attorneys' fees, expenses, and service awards for the plaintiffs who brought this case on behalf of the Settlement Class.  To object, you must submit a signed, written objection containing

the information described at www.VerizonAdministrativeChargeSettlement.com to the Court by **[DATE]**. Visit www.VerizonAdministrativeChargeSettlement.com for more information.

**What happens next?** The Court will hold a hearing, currently scheduled for **[DATE, TIME]**, at the Superior Court of the State of New Jersey, located at [ADDRESS] to decide whether to approve the settlement, attorneys' fees and expenses for the attorneys representing the Settlement Class (up to $33.3 million plus expenses, to be paid from the $100 million settlement fund), and service awards of up to $3,500 to each of the plaintiffs who brought this case on behalf of the Settlement Class. You or your attorney may ask permission to speak at the hearing at your own cost. The date and time of this hearing may change without further notice, and/or the Court could order that this hearing be held remotely or telephonically. Check www.VerizonAdministrativeChargeSettlement.com for updates.

**Who represents me?** The Court has appointed DeNittis Osefchen Prince, P.C. and Hattis & Lukacs to represent the Settlement Class. Together, these lawyers are called Settlement Class Counsel. You do not need to pay these lawyers out of your pocket; instead, these lawyers will apply for compensation out of the settlement fund. If you want to be represented by your own lawyer, you may hire one at your own expense.

**How do I get more information?** For more information, including to view copies of case documents, the full settlement agreement, the complaint in the lawsuit, and Settlement Class Counsel's fee application (once it is filed), visit www.VerizonAdministrativeChargeSettlement.com. You can also call (844) 689-0186 or email info@VerizonAdministrativeChargeSettlement.com.

**PLEASE DO NOT CONTACT THE COURT**

*Unsubscribe*

Exhibit B

...360-23   11/29/2023 1:15:43 PM   Pg 7 of 13   Trans ID: LCV20...

...31-RAR   Document 1-2   Entered on FLSD Docket 01/27/2...

1553

Verizon Administrative Charge Settlement
c/o Settlement Administrator
1650 Arch Street, Suite 2210
Philadelphia, PA 19103

«ScanString»

Postal Service: Please do not mark barcode

Notice ID: «Notice ID»
Confirmation Code: «Confirmation Code»
«FirstName» «LastName»
«Address1»
«Address2»
«City», «StateCd» «Zip»
«CountryCd»

---

**LEGAL NOTICE**
**BY ORDER OF THE SUPERIOR COURT**
**OF THE STATE OF NEW JERSEY**

*A court authorized this notice. This is **not** a solicitation from a lawyer.*

**\*\*YOU MAY BE ENTITLED TO A PAYMENT OF UP TO $100.00 IF YOU FILE A CLAIM\*\***

**\*You must file a claim by [DATE] to receive a payment\***

To file a claim or to get more information, visit www.VerizonAdministrativeChargeSettlement.com.

Questions? Call (844) 689-0186.

*Para ver este aviso en español, visite* www.VerizonAdministrativeChargeSettlement.com.

**What is this notice about?** A proposed settlement has been reached in a class action lawsuit. The lawsuit claimed that Cellco Partnership d/b/a Verizon Wireless ("Verizon") charged a monthly Administrative Charge and/or Administrative and Telco Recovery Charge (collectively, "Administrative Charge") on Verizon post-paid individual consumer wireless accounts that was unfair and not adequately disclosed. Verizon has denied and continues to deny that it did anything wrong and that the lawsuit has any merit. Verizon states that it will continue to charge the Administrative Charge and that it has the right to increase the Administrative Charge. The settlement, if approved, resolves the lawsuit and provides benefits to Settlement Class Members who file a claim.

**Who is included?** The "Settlement Class" includes consumers residing in the United States (based on account holders' last known billing address) who received postpaid wireless or data services from Verizon and who were charged and paid an Administrative Charge between January 1, 2016 and the date of the Settlement Agreement. You are receiving this notice because Verizon's records indicate that you are in the Settlement Class.

**What can I get?** Under the proposed settlement, Verizon will pay $100 million to create a settlement fund. If the settlement is approved and becomes final, payments will be made to eligible account holders. You must file a claim to receive a payment (see below). If you file a claim by the deadline, your settlement payment may be up to $100.00 for your account, but the final amount may be lower depending on how long you were a Verizon subscriber and how many Settlement Class Members file valid claims.

**How do I get a payment?** You must file a claim by <mark>DATE</mark> to receive a settlement payment. You can file a claim online by clicking here, or you can download a claim form at www.VerizonAdministrativeChargeSettlement.com, fill it out, and submit it by mail. Payments will be issued to valid claimants by mailed check or electronic payment.

**What are my options?** You can (1) file a claim for a payment from the settlement, and, if the settlement becomes final and you are in the Settlement Class, you will give up the right to sue Verizon about the issues in this lawsuit; (2) do nothing, thereby receiving no payment, and, if the settlement becomes final, you will give up the right to sue Verizon about the issues in this lawsuit; or (3) exclude yourself from the Settlement Class by opting out, thereby receiving no payment, and you will retain any right you may have to sue Verizon about the issues in this lawsuit. To exclude yourself, you must mail a signed request for exclusion containing the information described at www.VerizonAdministrativeChargeSettlement.com, postmarked by <mark>DATE</mark>, to: Verizon Administrative Charge Settlement, Attn: Exclusions, P.O. Box 58220, Philadelphia, PA 19102. If you do not exclude yourself, and the Court approves the settlement, you will be bound by the Court's orders and judgments and will release your claims relating to this lawsuit. If you do not exclude yourself, you can object to or comment on the settlement and/or Settlement Class Counsel's request for attorneys' fees, expenses, and service awards for the plaintiffs who brought this case on behalf of the Settlement Class. To object, you must submit a signed, written objection containing the information described www.VerizonAdministrativeChargeSettlement.com to the Court by <mark>DATE</mark>. Visit www.VerizonAdministrativeChargeSettlement.com for more information.

**What happens next?** The Court will hold a hearing, currently scheduled for <mark>DATE, TIME</mark>, at the Superior Court of the State of New Jersey, located at <mark>ADDRESS</mark> to decide whether to approve the settlement, attorneys' fees and expenses for the attorneys representing the Settlement Class (up to $33.5 million plus expenses, to be paid from the $100 million settlement fund), and service awards of up to $3,500 to each of the plaintiffs who brought this case on behalf of the Settlement Class. You or your attorney may ask permission to speak at the hearing at your own cost. The date and time of this hearing may change without further notice, and/or the Court could order that this hearing be held remotely or telephonically. Check www.VerizonAdministrativeChargeSettlement.com for updates.

**Who represents me?** The Court has appointed DeNittis Osefchen Prince, P.C. and Hattis & Lukacs to represent the Settlement Class. Together, these lawyers are called Settlement Class Counsel. You do not need to pay these lawyers out of your pocket; instead, these lawyers will apply for compensation out of the settlement fund. If you want to be represented by your own lawyer, you may hire one at your own expense.

**How do I get more information?** For more information, including to view copies of case documents, the full settlement agreement, the complaint in the lawsuit, and Settlement Class Counsel's fee application (once it is filed), visit www.VerizonAdministrativeChargeSettlement.com. You can also call (844) 681-0186.

**PLEASE DO NOT CONTACT THE COURT**

Exhibit C

**Superior Court of the State of New Jersey**

# If you have or had a Verizon post-paid wireless plan <u>YOU MAY BE ENTITLED TO A PAYMENT</u> from a class action settlement.

*A court authorized this notice.  It is not a solicitation from a lawyer.  You are not being sued. Please do not contact the Court.  Your legal rights are affected whether you act or don't act.*
***Read this notice carefully***.

## OVERVIEW

- Verizon customers claimed in a class action lawsuit that Verizon has charged its post-paid individual consumer wireless service account holders a monthly Administrative Charge and/or Administrative and Telco Recovery Charge (collectively, "Administrative Charge") that was unfair and not adequately disclosed.  Verizon has denied and continues to deny that it did anything wrong and that the lawsuit has any merit.  The customers and Verizon have reached a proposed settlement to resolve the lawsuit on a class action basis, as described below.

- If you received a notice about this settlement by email or mail, you are in the Settlement Class according to Verizon's records and are eligible to file a claim for a payment from the settlement.

- **<u>IMPORTANT</u>: You must file a claim by [DATE] to receive a payment from the settlement.  Click here to file a claim.**  (Read below or see Questions 6-7 for details)

- Your legal rights are affected, and you have a choice to make.  Your options are explained here.

| YOUR LEGAL RIGHTS AND OPTIONS | |
|---|---|
| **FILE A CLAIM** | File a claim by [DATE] to receive a payment.  See Questions 6-7. |
| **DO NOTHING** | Receive no payment and give up the right to sue Verizon about the issues in this lawsuit. |

| **OPT-OUT** | Receive no payment from the settlement and retain any right you may have to sue Verizon about the issues in this lawsuit.  To opt-out, you must mail a signed request for exclusion by **[DATE]**.  See Question 11 for details. |
|---|---|
| **OBJECT OR COMMENT ON THE SETTLEMENT** | Object or comment on the settlement by **[DATE]**.  See Question 12 for details.  If you object or comment, you can still file a claim and receive a payment. |

- Questions?  Read below, or visit www.VerizonAdministrativeChargeSettlement.com or call [TOLL-FREE NUMBER] for more information.

# Information about the Lawsuit and Class

## 1. What is this lawsuit about?

The class action lawsuit concerns Verizon customers in the U.S. who purchased post-paid wireless plans from Verizon and were charged an Administrative Charge. Plaintiffs alleged, generally, that Verizon's representations and advertisements regarding the price of its post-paid wireless service plans were misleading because the prices did not include the Administrative Charge, and that Verizon implemented, charged, and increased the Administrative Charge in a deceptive and unfair manner. The complaint in this case is available at www.VerizonAdministrativeChargeSettlement.com.

Plaintiffs and Verizon have now agreed to a settlement to resolve this lawsuit, as described below. The Court has not decided whether Plaintiffs' claims and/or Verizon's defenses are valid. By agreeing to the settlement, neither Verizon nor Plaintiffs make any admissions regarding any liability by Verizon or the merits of the allegations, claims, or defenses in this case. Verizon has denied and continues to deny that it did anything wrong or that the lawsuit has any merit. Verizon states that it will continue to charge the Administrative Charge and contends that it has the right to increase the Administrative Charge. As part of this settlement, Verizon will amend its Customer Agreement to include revised Administrative Charge disclosures.

The Superior Court of the State of New Jersey is overseeing this lawsuit. The lawsuit is known as *Esposito et al. v. Cellco Partnership d/b/a Verizon Wireless*, Docket No. MID-.

## 2. Why is this a class action?

In a class action, one or more people sue on behalf of themselves and other people with similar claims. All of these people together make up the Settlement Class and are Settlement Class Members. One court resolves the issues for all Settlement Class Members, except for those who exclude themselves from the Settlement Class.

## 3. Who is in the Settlement Class?

The "Settlement Class" in this case is defined as:

All current and former individual consumer account holders in the United States (based on account holders' last known billing address) who received postpaid wireless or data services from Verizon and who were charged and paid an Administrative Charge and/or an Administrative and Telco Recovery Charge between January 1, 2016 and the date of the Settlement Agreement.

Excluded from the Settlement Class are any Judges presiding over this Action and any members of their families, and Verizon and affiliated entities and individuals and their respective officers and directors. Also excluded from the Settlement Class are those persons who submit a timely and valid request for exclusion in accordance with the procedures set forth in the

Settlement Agreement.

If you received a notice of this settlement by mail or email, you are in the Settlement Class according to Verizon's records.

People in the Settlement Class are called "Settlement Class Members."

# Information about the Settlement and About Filing a Claim for a Payment

### 4.  What are the terms of the proposed settlement?

The complete terms of the proposed settlement are set forth in the Settlement Agreement, which is available at www.VerizonAdministrativeChargeSettlement.com.  This notice provides only a summary of the terms of the settlement.  The settlement benefits and other terms are summarized below.

### 5.  What are the benefits of the proposed settlement?

If the settlement is approved and becomes final, Verizon will pay $100 million into a Settlement Fund.  This money will be used to: (1) make settlement payments to Settlement Class Members, as described at Questions 5-9 below; (2) pay the costs of distributing notice and settlement checks and electronic payments to Settlement Class Members and other costs of administering the settlement; and (3) pay court-awarded attorneys' fees and expenses of the attorneys appointed by the Court to represent the Class ("Settlement Class Counsel") and any service awards granted to the Plaintiffs.  As explained below, if you file a claim by the deadline and are eligible for a payment, your payment may be up to $100.00 for your account, but the final amount may be lower depending on how long you were a Verizon subscriber and how many Settlement Class Members file valid claims.  Also as part of this settlement, Verizon will amend its Customer Agreement to include revised Administrative Charge disclosures.

### 6.  How do I get a payment?

You need to file a claim by [DATE] to receive a settlement payment.

### 7.  How do I file a claim for a payment?

File Online:  To file a claim online, click here or visit www.VerizonAdministrativeChargeSettlement.com.

File By Mail:  If you prefer, you can also print a paper claim form, available at www.VerizonAdministrativeChargeSettlement.com, fill it out, and mail it to the address listed on the form.  Or, if you received notice of this settlement by mail you can fill out the claim form that is attached to that notice and mail it to the address listed on the form.  **The deadline to file a claim online or by mail is [DATE].**  The Settlement Administrator will review all claims and determine eligibility.

### 8. How much will the payments be?

If you file a valid claim by the deadline and are eligible for a payment, your payment may be up to $100.00 for your account, but the final amount may be lower depending on how long you were a Verizon subscriber and how many Settlement Class Members file valid claims. Specifically, there will be an initial minimum allocated amount of $15.00 for your account plus $1.00 for each month your account received postpaid wireless or data services from Verizon and was charged and paid an Administrative Charge and/or an Administrative and Telco Recovery Charge between January 1, 2016 and the date of the Settlement Agreement, up to a maximum initial allocated amount of $100.00. If the Settlement Fund is not sufficient to pay all the filed valid claims after deducting any Court-approved amounts for the cost of settlement administration, attorneys' fees and costs, and incentive awards to the class representatives, then the payments made to the Settlement Class Members who filed valid claims will be decreased from the initial allocated amount on a pro-rata basis. **You must submit a claim by the deadline to receive a payment.**

### 9. How and when will payments be sent?

Settlement payments will be issued to valid claimants after the settlement is approved and becomes final, by check or electronic payment.

For any settlement payment checks that are uncashed or deemed undeliverable by the Settlement Administrator, those amounts will be treated as unclaimed property of the corresponding Settlement Class Member, subject to applicable state unclaimed property procedures (the additional administrative costs of such unclaimed property will be deducted from the unclaimed property amounts on a *pro rata* basis).

# Your other rights and options

### 10. What happens if I do nothing?

If you do nothing, you will not receive any settlement payment.  **You must file a claim by [DATE] to receive a payment.**

If you do nothing, you will give up any right you may have to sue Verizon about the issues in this lawsuit.  You will also be legally bound by all of the orders that the Court issues and judgments the Court makes in this class action.

### 11. How do I exclude myself (opt out) from the Settlement Class?

To exclude yourself from the Settlement Class, you must mail a signed request for exclusion to:  [SETTLEMENT ADMINISTRATOR ADDRESS]

To be effective, your request for exclusion must be postmarked no later than [DATE], and must include the following information:

(a)  your full name, telephone number, mailing address, and email address;

(b) a clear statement that you wish to be excluded from the Settlement Class;

(c) the name of this lawsuit: "*Esposito et al. v. Cellco Partnership d/b/a Verizon Wireless*"; and

(d) your original signature.

In addition, for your request for exclusion to be effective, the mailing address as reflected in the request for exclusion and on the mailing envelope itself must match the mailing address associated with your Verizon account.

## 12. How do I object or comment?

If you have not excluded yourself from the Settlement Class, you can comment on or object to the settlement, Settlement Class Counsel's request for attorneys' fees and litigation expenses, and/or the request for service awards for the Plaintiffs who brought this lawsuit. To object or comment, you must send a signed, written objection/comment including the following:

(a) the name of this lawsuit: "*Esposito et al. v. Cellco Partnership d/b/a Verizon Wireless*";

(b) your full name, mailing address, telephone number, and email address;

(c) your original signature;

(d) a description of the specific reasons for the objection;

(e) the name, address, bar number and telephone number of your attorney if you are represented by an attorney; and

(f) a statement about whether or not you intend to appear at the Fairness Hearing either in person or through an attorney.

To be considered by the Court, your comment or objection must be in writing and filed with the Court or mailed to the Clerk of Court at the following address, filed/postmarked no later than [**DATE**]:

| THE COURT |
|---|
| Superior Court of New Jersey<br>Middlesex County<br>Clerk of Court<br>56 Paterson St.<br>New Brunswick, New Jersey 08903-0964 |

Note that you can ask the Court to deny approval of the settlement by filing an objection, but you cannot ask the Court to order a different settlement; the Court can only approve or reject the settlement. If the Court denies approval, no settlement payments will be sent out and the lawsuit will continue. If you would like to request that the Court deny approval, you must object. You have the right to consult with your own attorney, at your own expense, before deciding how best to proceed.

### 13.  What claims will be released by this Settlement?

If you are in the Settlement Class definition and do not exclude yourself from the Settlement Class, and the settlement is approved and becomes final, the settlement will be legally binding on you and you will be bound by all judgments entered in the case.  In exchange for the settlement benefits, you will release all claims against Verizon and its affiliates listed in the Settlement Agreement about the issues in this lawsuit. The Settlement Agreement, available at www.VerizonAdministrativeChargeSettlement.com, describes the claims you are releasing (giving up) by staying in the Settlement Class (called "Released Claims").

### 14.  Do I have a lawyer in this class action?

Yes.  The Court has appointed the following attorneys and law firms to represent the Settlement Class Members.  Together, these lawyers are called "Settlement Class Counsel":

**DeNITTIS OSEFCHEN PRINCE, P.C.**
Stephen P. DeNittis, Esq.
Joseph A. Osefchen, Esq.
Shane T. Prince, Esq.
525 Route 73 North, Suite 410
Marlton, NJ 08053

**HATTIS & LUKACS**
Daniel M. Hattis, Esq.
Paul Karl Lukacs, Esq.
11711 SE 8th Street, Suite 120
Bellevue, WA 98005

You do not have to pay Settlement Class Counsel for their time or expenses incurred in this case out of your pocket.  Instead, Settlement Class Counsel will petition the Court for an award of their fees and expenses; any amount awarded to Settlement Class Counsel will be paid from the Settlement Fund.

The Court has also appointed Plaintiffs—whose names are set forth in the caption of the settlement agreement, available at www.VerizonAdministrativeChargeSettlement.com—as class representatives to represent the Settlement Class.

### 15.  How will the lawyers be paid?

Settlement Class Counsel (see Question 14) will file a motion on or before [DATE] asking the Court to award them attorneys' fees of up to $33.3 million (which is 33.30% of the $100 million Settlement Fund) plus reimbursement of their litigation expenses.  The attorneys' fees and expenses awarded by the Court will be the only payment to Settlement Class Counsel for their efforts in achieving the settlement and for their risk in undertaking this representation on a wholly contingent basis.  In addition, Settlement Class Counsel will ask the Court on or before [DATE] to award each of the Plaintiffs representing the Settlement Class a service award of up

to $3,500 to compensate them for their efforts and commitment on behalf of the Settlement Class in this lawsuit.

The Court will determine the amount of attorneys' fees, expenses, and service awards to award. Settlement Class Counsel's application for attorneys' fees, expenses, and service awards will be available at www.VerizonAdministrativeChargeSettlement.com when it is filed.

### 16.  Should I hire my own lawyer for this case?

You do not need to hire your own lawyer because Settlement Class Counsel represents you and the other members of the Settlement Class already. However, you have the right to hire your own lawyer. If you want your own lawyer separate from Settlement Class Counsel, you will have to pay that lawyer.

# The Court's Fairness Hearing

### 17.  When and where will the Court decide whether to approve the settlement?

The Court will hold a Fairness Hearing, currently scheduled for [__:__] a.m. on [DATE], in the New Jersey Superior Court, located at 56 Paterson St., New Brunswick, New Jersey 08903-0964.  The hearing may be moved to a different date or time without additional notice and/or may be held remotely or telephonically.  Please check www.VerizonAdministrativeChargeSettlement.com for updates or changes.

At the Fairness Hearing, the Court will consider whether the settlement should be approved as fair, reasonable and adequate.  The Court will also consider Settlement Class Counsel's application for attorneys' fees, expenses, and service awards.  If there are timely objections, the Court will consider them.  After the hearing, the Court will decide whether to approve the settlement.  We do not know how long these decisions will take.

### 18.  Do I have to come to the hearing?

No.  Settlement Class Counsel will answer questions the Court may have.  But, you are welcome to come at your own expense.  If you submit an objection, you do not have to come to the Court to talk about it.  So long as you submitted your written objection on time, the Court will consider it.  You may also pay your own lawyer to attend, but it is not necessary.

### 19.  May I speak at the hearing?

You may ask the Court for permission to speak at the Fairness Hearing.  You cannot speak at the hearing if you exclude yourself from the Settlement Class.

# Getting more information

### 20.  Where can I get more information?

More information can be found at  www.VerizonAdministrativeChargeSettlement.com.

That website includes important case deadlines, links to case documents including the full Settlement Agreement, the complaint in this lawsuit, and other information about the lawsuit and the settlement.  You can also get more information by calling [TOLL-FREE NUMBER].

**PLEASE DO NOT CONTACT THE COURT**

Exhibit D

To:    [Class Member Email Address]
From:   Verizon Class Action Settlement Administrator
Subject:  Reminder Notice – Verizon Class Action Settlement

---

**Notice ID:** <<Notice ID>>
**Confirmation Code:** <<Confirmation Code>>

## VERIZON CLASS ACTION SETTLEMENT

*A court authorized this notice. This is not a solicitation from a lawyer.*
*You are not being sued.*

<div style="border:1px solid black">

**\*\*REMINDER: YOU MAY BE ENTITLED TO A PAYMENT OF UP TO $100.00 IF YOU FILE A CLAIM\*\***

</div>

**DON'T MISS OUT**
**FILE YOUR CLAIM BY [DATE] TO RECEIVE A PAYMENT.**

We are writing to remind you that you are eligible to file a claim for a payment as part of a class action settlement regarding Verizon's Administrative Charge charged on its post-paid wireless service plans.

**To receive a payment, you must file a claim by [DATE].  The process is easy and can be completed online.  You can file your claim by clicking this link:**

**[CLAIM LINK]**

For more information about the settlement, visit
www.VerizonAdministrativeChargeSettlement.com or call toll-free (844) 689-0186.

*Unsubscribe*

Exhibit E

<table>
<tr><td>

**Your claim form must be submitted online or postmarked by: [DEADLINE]**

</td><td>

### SUPERIOR COURT OF NEW JERSEY
### MIDDLESEX COUNTY LAW DIVISION

*Esposito et al. v. Cellco Partnership d/b/a Verizon Wireless*
Docket No. MID-L-

### <u>CLAIM FORM</u>

</td><td>

**VAC**

</td></tr>
</table>

To be eligible for a settlement payment, you must complete and file this Claim Form.  You can either:

    (1) <u>File Online</u>:  File online at www.VerizonAdministrativeChargeSettlement.com; or

    (2) <u>File by Mail</u>:  Fill out, sign, and return this form to:  Verizon Administrative Charge Settlement, c/o Settlement Administrator, 1650 Arch Street, Suite 2210, Philadelphia, PA 19103

You must file a claim to receive a settlement payment.  <u>THE DEADLINE TO FILE A CLAIM IS</u> [DATE].

---

### I.  PROVIDE YOUR CONTACT INFORMATION

Provide your name and contact information below. It is your responsibility to notify the Settlement Administrator of any changes to your contact information that occur after you submit your Claim Form.

**First Name**       **Last Name**

**Street Address**

**City**      **State**      **Zip Code**

**Email Address**      **Verizon Wireless Phone Number**      **Verizon Wireless Account No.** *(if known)*

If you received a notice about this Settlement via email or mail, provide the following information:

**Notice ID**      **Confirmation Code**

---

### II.  CHOOSE FORM OF PAYMENT

Please select from **<u>one</u>** of the following payment options:

☐ **PayPal** – Enter your PayPal email address: _____

☐ **Venmo -** Enter the mobile number associated with your Venmo account: __ __ __ - __ __ __ - __ __ __ __

☐ **Zelle -** Enter the mobile number or email address associated with your Zelle account:

Mobile Number: __ __ - __ __ - __ __ __ __  or Email Address: _____

☐ **Virtual Prepaid Card -** Enter your email address: _____

☐ **Physical Check -** Payment will be mailed to the address provided in Section I above.

1

<table>
<tr><td>

**Your claim form must be submitted online or postmarked by:**
**[DEADLINE]**

</td><td>

**SUPERIOR COURT OF NEW JERSEY**
**MIDDLESEX COUNTY LAW DIVISION**

*Esposito et al. v. Cellco Partnership d/b/a Verizon Wireless*
Docket No. MID-L-

<u>**CLAIM FORM**</u>

</td><td>

**VAC**

</td></tr>
</table>

**Your Settlement Payment** may be up to $100.00 for your Verizon account, but the final amount may be lower depending on how long you were a Verizon subscriber and how many Settlement Class Members file valid claims. Specifically, there will be an initial minimum allocated amount of $15.00 for your account plus $1.00 for each month your account received postpaid wireless or data services from Verizon and was charged and paid an Administrative Charge and/or an Administrative and Telco Recovery Charge between January 1, 2016 and the date of the Settlement Agreement, up to a maximum initial allocated amount of $100.00. If the Settlement Fund is not sufficient to pay all the filed valid claims after deducting any Court-approved amounts for the cost of settlement administration, attorneys' fees and costs, and incentive awards to the class representatives, then the payments made to the Settlement Class Members who filed valid claims will be decreased from the initial allocated amount on a pro-rata basis.

| **III.  SIGN THE FORM** |
|---|

By signing below and submitting this Claim Form, I hereby swear under penalty of perjury that I am the person identified in Section I and the information provided in this Claim Form is true and correct, this is the only Claim Form that I have submitted, and nobody has submitted another claim in connection with this Settlement on my behalf.

_____           Date: _____
Your signature                                                    MM          DD          YYYY

_____
Your name

2

Exhibit F

| | |
|---|---|
| DEAN ESPOSITO, JEFFREY ACHEY, MARILYN ACHEY, JUSTIN ANDERSON, DEIDRE ASBJORN, GREGORY BURLAK, CARLA CHIORAZZO, JUDITH CHIORAZZO, JOHN CONWAY, ADAM DEMARCO, JAMES FISHER, ALLISON GILLINGHAM, LORRAINE GILLINGHAM, DOREE GORDON, DONNA HARTMAN, PATRICIA JUSTICE, DAVID KELLY, CHRISTINA MANFREDO, JUDITH OELENSCHLAGER, DANIEL PATINO, JAMES PRATE, MICHAEL SCHEUFELE, RUSSELL SEWEKOW, DEBORAH STROYEK, LINDA TEER, CHRISTINE TRAPPE, BRENDA TRIPICCHIO, TERESA MACCLELLAND, KAREN UMBERGER, SCOTT WILLITS, MICHAEL BRANOM, MOLLY BROWN, MICHAEL CARNEY, TIM FRASCH, PATRICIA GAGAN, ANNA GUTIERREZ, LINDA JENKINS, AUGUSTUS JOHNSON, WILLIAM KAUPELIS, MARILYN KAYE, JANETTE LISNER, WILLIAM ERIC LOUGH, DAVID MASSARO, LOUISE MONSOUR, DARLEEN PEREZ, GABRIELLE POZZUOLI, VALERIE REED, BRUCE SCHRAMM, KERRY SHOWALTER, JOHN ST. JARRE, GLORIA STERN, EDNA TOY, TERESA TOY, VANESSA WEST, MARY BOWMAN, ART CAPRI, DEBRA CASEY, KARYN CHALLENDER. TYSON COHRON, CINTIA CORSI, ANDI ELLIS, LAURIE FRANTZ, ASHLEY GARRISON, ANGELA GREEN, CARLOS GUTIERREZ, JAMES HOLLING, KAREN HUDSON, JERRY HUNT, JENNIFER HURTT, JOYCE JONES, LYNN KIRALY, MICHELLE LACUESTA, JASON MCCONVILLE, JOSE NICOT, SANDRA OSHIRO, LESLIE OWENS, JON SANTOS, TERRY SEXTON, KATHLEEN WRIGHT, PAMELA M. ALLEN, SAMANTHA ALBAITIS, CYDNI ARTERBURY, LISA BAKER, BRIANA BELL, CHRISTINE BELLAVIA, KIMBERLY BLAIR, LEANOR BLAND-MULLINS, CAROLINE BONHAM, TAMMY BURKE, ANNMARIE CALDWELL, SHAUNA CAVALLARO, SANTOS COLON, ERIKA CONLEY, KENDRA CONOVER, DYLAN CORBIN, LAURA CURRY, SHAKERA DYER, JANE FREY, RUSSELL FROM, ANGEL GAINES, ASHTIN GAMBLIN, ERICKA GARDNER, ANN GRAFF, JAMES HENSLEY, SAREL HINES, ALEXANDER KEELER, ADAM KELLER, BILLIE KENDRICK, KRISTA KIRBY, JAN LOMBARD, MARC LOWREY, JILL MAILHOIT, AARON MAXA, KELLY MOORE, LINDSEY MORAN, DAVID MOYERS, JENNIFER OCAMPO-NEUBAUER, KEISHA ODOM, ANGEL PACHECHO, HEATHER RAY, SUSAN SCOTT, | SUPERIOR COURT OF NEW JERSEY MIDDLESEX COUNTY LAW DIVISION<br><br>DOCKET NO. MID-L-<br><br>**[PROPOSED] ORDER GRANTING PRELIMINARY APPROVAL OF CLASS SETTLEMENT AGREEMENT AND DIRECTING DISSEMINATION OF CLASS NOTICE** |

| LORI SNYDER, MISTY SUTTON, KATHRYN TAYLOR, ANTHONY VALLECORSA, CLAIRE WHITE, KRISTOPHER WILLARD, ALVIN WILSON, and BRAD YOUNG, on behalf of themselves and all others similarly situated, | |
|---|---|
| Plaintiffs, | |
| v. | |
| CELLCO PARTNERSHIP d/b/a VERIZON WIRELESS, | |
| Defendant. | |

Before the Court is the Motion for Preliminary Approval of Class Settlement Agreement and for Direction of Class Notice Pursuant to N.J. Ct. R. R. 4:32-2 ("Motion"), filed by Plaintiffs. Plaintiffs and Defendant Cellco Partnership d/b/a Verizon Wireless ("Verizon") have entered into a Class Settlement Agreement, dated [DATE] ("Settlement Agreement"). Having thoroughly reviewed the Settlement Agreement, including the proposed forms of class notice and other exhibits thereto, the Motion, and the papers and arguments in connection therewith, and good cause appearing, the Court hereby ORDERS as follows:

1. Capitalized terms not otherwise defined herein have the meanings set forth in the Settlement Agreement.

2. This Court has subject matter jurisdiction over this matter, and has personal jurisdiction over the Parties and the Settlement Class Members. Venue is proper in this Court.

3. The Motion is GRANTED.

4. The Court hereby preliminarily approves the Settlement Agreement and the terms embodied therein pursuant to N.J. Ct. R. R. 4:32-2. The Court finds that it will likely be able to approve the Settlement Agreement under N.J. Ct. R. R. 4:32-2 and to certify the Settlement Class for purposes of judgment on the proposed Settlement. The Court preliminarily finds that the Settlement Agreement is fair, reasonable, and adequate as to the Settlement Class Members

under the relevant considerations. The Court finds that Plaintiffs and proposed Settlement Class Counsel have adequately represented, and will continue to adequately represent, the Settlement Class. The Court further finds that the Settlement Agreement is the product of arms' length negotiations by the Parties through an experienced mediator, Hon. Jay C. Gandhi (ret.) of JAMS, and comes after significant litigation—including significant litigation regarding Verizon's motions to compel arbitration of Plaintiffs' claims and to stay the respective litigations, resulting in multiple rounds of briefing and appeals to date—and significant investigation and discovery. The Court preliminarily finds that the relief provided—a non-reversionary common settlement fund of $100 million—is adequate taking into account, *inter alia*, the costs, risks, and delay of trial and appeal for all Parties, the legal issues presented in this Action, the interests of the proposed Settlement Class, and the proposed method of distributing payments to the Settlement Class (i.e., direct payments by checks and electronic payments). The Court preliminarily finds that the Settlement Agreement treats the Settlement Class Members equitably relative to each other, and that the proposed allocation of settlement funds to Settlement Class Members is reasonable and equitable. Under the terms of the Settlement Agreement, all Settlement Class Members are eligible to submit claims for settlement payments via a simple claim form. The Court will fully assess any request for attorneys' fees and litigation expenses after receiving a motion from Settlement Class Counsel supporting such request. At this stage, the Court finds that the plan to request fees and litigation expenses to be paid from the common settlement fund creates no reason not to direct notice to the Settlement Class; should this Court find any aspect of the requested attorneys' fees or expenses unsupported or unwarranted, such funds will not revert to Verizon.

5. The Court hereby provisionally certifies, for settlement purposes only, a

"Settlement Class," pursuant to N.J. Ct. R. R. 4:32-1(b)(3) and 4:32-2, consisting of:

> All current and former individual consumer account holders in the United States (based on account holders' last known billing address) who received postpaid wireless or data services from Verizon and who were charged and paid an Administrative Charge and/or an Administrative and Telco Recovery Charge between January 1, 2016 and the date of the Settlement Agreement.

> Excluded from the Settlement Class are any Judges presiding over this Action and any members of their families, and Verizon and affiliated entities and individuals and their respective officers and directors.

> Also excluded from the Settlement Class are those persons who submit a timely and valid request for exclusion in accordance with the procedures set forth in the Settlement Agreement and in this Court's Preliminary Approval Order.

6. The Court finds that, for settlement purposes only, the Settlement Class, as defined above, meets the requirements for class certification under N.J. Ct. R. R. 4:32-1—namely, that (1) the Settlement Class Members are sufficiently numerous such that joinder is impracticable; (2) there are common questions of law and fact; (3) Plaintiffs' claims are typical of those of the Settlement Class Members; (4) Plaintiffs and Settlement Class Counsel have adequately represented, and will continue to adequately represent the interests of the Settlement Class Members; and (5) for purposes of settlement only, the Settlement Class meets the predominance and superiority requirements of N.J. Ct. R. R. 4:32-1(b)(3).

7. Certification of the Settlement Class and appointment of the Settlement Class Representatives and Settlement Class Counsel shall be solely for settlement purposes and without prejudice to the Parties in the event the Settlement Agreement is not finally approved by this Court or otherwise does not take effect. If the Settlement does not occur for any reason, certification of the Settlement Class and any Settlement Class Representative or Settlement Class Counsel appointments, including this Order, shall be deemed void and vacated. The Parties reserve all rights and defenses as they existed prior to the execution of the Settlement Agreement

and this Order in the event the Settlement Agreement is not finally approved by this Court or otherwise does not take effect.

8.      The Court hereby appoints Plaintiffs in the caption set forth above as Settlement Class Representatives to represent the Settlement Class.

9.      The Court hereby appoints the following attorneys as Settlement Class Counsel for the Settlement Class:

**DeNITTIS OSEFCHEN PRINCE, P.C.**
Stephen P. DeNittis, Esq.
Joseph A. Osefchen, Esq.
Shane T. Prince, Esq.
525 Route 73 North, Suite 410
Marlton, NJ 08053
Telephone: (856) 797-9951
Facsimile: (856) 797-9978
Email: sdenittis@denittislaw.com
Email: josefchen@denittislaw.com
Email: sprince@denittislaw.com

**HATTIS & LUKACS**
Daniel M. Hattis, Esq.
Paul Karl Lukacs, Esq.
11711 SE 8th Street, Suite 120
Bellevue, WA 98005
Telephone: (425) 233-8650
Facsimile: (425) 412-7171
Email: dan@hattislaw.com
Email: pkl@hattislaw.com

10.      The Court hereby appoints Angeion Group as Settlement Administrator and directs Angeion Group to carry out all duties and responsibilities of the Settlement Administrator as specified in the Settlement Agreement and herein.

Notice Program

11.      Pursuant to N.J. Ct. R. R. 4:32-2(b), the Court approves the proposed Notice program set forth at Section VI of the Settlement Agreement, including the form and content of the proposed forms of class notice attached as Exhibits A-E to the Settlement Agreement.  The

Court finds that the proposed Notice program meets the requirements of Due Process under the U.S. Constitution and N.J. Ct. R. R. 4:32-2; and that such Notice program, which includes individual direct notice to Settlement Class Members via email or mail,  reminder notices, and the establishment of a Settlement Website and Toll-Free Number is the best notice practicable under the circumstances and shall constitute due and sufficient notice to all persons entitled thereto.  The Court further finds that the proposed form and content of the forms of the Notice are adequate and will give the Settlement Class Members sufficient information to enable them to make informed decisions as to the Settlement Class, the right to object or opt out, and the proposed Settlement and its terms.  The Court finds that the Notice clearly and concisely states in plain, easily understood language, inter alia: (i) the nature of the Action; (ii) the definition of the Settlement Class; (iii) the class claims and issues; (iv) that a Settlement Class Member may enter an appearance through an attorney if the member so desires; (v) that the Court will exclude from the Settlement Class any member who timely and validly requests exclusion; (vi) the time and manner for requesting exclusion; and (vii) the binding effect of a class judgment on Settlement Class Members under N.J. Ct. R. R. 4:32-1 and 4:32-2.

12.     The Court directs the Settlement Administrator and the Parties to implement the Notice program as set forth in the Settlement Agreement.

Claims Procedure

13.     The Court approves the form and content of the proposed Claim Form, in the form attached as Exhibit E to the Settlement Agreement, approves the Claims Process set forth in the Settlement Agreement for Settlement Class Members to submit Claims, and directs the Parties and the Settlement Administrator to implement the Claims Process.

Opt-Out and Objection Procedures

14.     Settlement Class Members may exclude themselves from the Settlement Class by mailing to the Settlement Administrator, at the address provided in the Website Notice, a request for exclusion that is postmarked no later than thirty-five days after the Notice Date (the "Exclusion Deadline"). To be effective, the request for exclusion must include (1) the Settlement Class Member's full name, telephone number, mailing address, and email address; (2) a clear statement that the Settlement Class Member wishes to be excluded from the Settlement Class; (3) the name of this Action: "*Esposito et al.  v. Cellco Partnership d/b/a Verizon Wireless*"; and (4) the Settlement Class Member's original signature.  In addition, for the request for exclusion to be effective, the sender's mailing address as reflected in the request for exclusion and on the mailing envelope itself must match the mailing address associated with the Settlement Class Member's Verizon account.  Requests for exclusion furthermore must be made on an individual basis; "mass," "class," or other purported group opt outs are not effective.  Any Settlement Class Member who submits a timely and valid request for exclusion is foreclosed from objecting to the Settlement or to Settlement Class Counsel's motion for attorneys' fees, costs, and service awards.  If a Settlement Class Member submits both a timely and valid request for exclusion and an objection, the Settlement Class Member shall be treated as if they had only submitted a request for exclusion.  The Settlement Administrator shall promptly after receipt provide copies of any requests for exclusion, including any related correspondence, to Settlement Class Counsel and Verizon's Counsel.  Any Settlement Class Member who does not submit a timely and valid request for exclusion as set forth in this paragraph and in the Settlement Agreement shall be bound by all subsequent proceedings, orders, and judgments in this Action, including, but not limited to, the Release as defined in the Settlement Agreement, regardless of whether the Settlement Class Member has any pending claims or causes of action against Verizon.

15.     Any Settlement Class Member who does not submit a timely and valid request for exclusion shall have the right to object to the proposed Settlement and/or to Settlement Class Counsel's motion for attorneys' fees, costs, or service awards, only by complying with the objection provisions set forth herein and in the Settlement Agreement.  Settlement Class Members who object shall remain Settlement Class Members and shall be subject to the Release set forth in this Settlement Agreement if this Settlement is approved by the Court and becomes effective.  To be considered valid, an objection must be in writing, must be filed with the Court or mailed to the Court at the address listed in the Website Notice, postmarked/filed no later than 25 days before the Fairness Hearing (the "Objection Deadline"), and must include the following: (1) the name of this Action: "*Esposito et al. v. Cellco Partnership d/b/a Verizon Wireless*"; (2) the full name, mailing address, telephone number, and email address of the objector; (3) the objector's original signature; (4) a description of the specific reasons for the objection; (5) the name, address, bar number and telephone number of counsel for the objector, if the objector is represented by an attorney; and (6) state whether the objector intends to appear at the Fairness Hearing either in person or through counsel.  Any Settlement Class Member who does not timely submit an objection in accordance with this section shall waive the right to object or to be heard at the Fairness Hearing and shall be forever barred from making any objection to the proposed Settlement or to Settlement Class Counsel's motion for attorneys' fees, costs, and service awards.  Any Settlement Class Member who objects to the Settlement shall nevertheless be eligible for all benefits of the Settlement if it is approved and becomes final.  The Settlement Administrator shall promptly after receipt provide copies of any objections, including any related correspondence, to Settlement Class Counsel and Verizon's Counsel.

Fairness Hearing

16.     The Court will hold a Fairness Hearing on [DATE] at the Superior Court of New Jersey, Middlesex County located at 56 Paterson Street, New Brunswick, New Jersey. The purposes of the Fairness Hearing will be to: (i) determine whether the proposed Settlement Agreement should be finally approved by the Court as fair, reasonable, adequate, and in the best interests of the Settlement Class; (ii) determine whether judgment should be entered pursuant to the Settlement Agreement, dismissing the Action with prejudice and releasing all Released Claims; (iii) determine whether the Settlement Class should be finally certified; (iv) rule on Settlement Class Counsel's motion for attorneys' fees, costs, and service awards; (v) consider any properly filed objections; and (vi) consider any other matters necessary in connection with the final approval of the Settlement Agreement.

17.     By no later than fifteen days after the Notice Date, Plaintiffs and Settlement Class Counsel shall file their: (a) motion for final approval of the Settlement Agreement, requesting entry of the Final Order and Judgment, substantially in the form of Exhibit G to the Settlement Agreement; and (b) motion for attorneys' fees, costs, and service awards.  Promptly after they are filed, these document(s) shall be posted on the Settlement Website.

18.     By no later than twenty-one days before the Fairness Hearing, the Settlement Administrator shall file with the Court (or provide to Settlement Class Counsel for filing with the Court) copies of any objections received by the Settlement Administrator.

19.     By no later than fourteen days before the Fairness Hearing, the Parties shall file any responses to any Settlement Class Member objections, and any reply papers in support of the motion for final approval of the Settlement and/or in support of Settlement Class Counsel's motion for attorneys' fees, costs, and service awards.

20.     The Court may, in its discretion, modify the date and/or time of the Fairness

Hearing, and may order that this hearing be held remotely or telephonically.  In the event the Court changes the date, time, and/or the format of the Fairness Hearing, the Parties shall ensure that the updated information is posted on the Settlement Website.

21.     Only Settlement Class Members who have submitted timely and valid objections, in accordance with the requirements of this Preliminary Approval Order, may be heard at the Fairness Hearing.

22.     If the Settlement Agreement, including any amendment made in accordance therewith, is not approved by the Court or shall not become effective for any reason whatsoever, the Settlement Agreement and any actions taken or to be taken in connection therewith (including this Preliminary Approval Order and any judgment entered herein), shall be terminated and shall become null and void and of no further force and effect except for (i) any obligations to pay for any expense incurred in connection with Notice and administration as set forth in the Settlement Agreement, and (ii) any other obligations or provisions that are expressly designated in the Settlement Agreement to survive the termination of the Settlement Agreement, including the Parties' agreement to cooperate in asking the Court to set a reasonable schedule for the resumption of this Action and any parallel litigations brought by the Plaintiffs or Settlement Class Counsel against Verizon, as well as any pending or stayed appeals including the New Jersey Supreme Court appeal in *Achey v. Cellco Partnership*, Dkt. No. 088253 (N.J.) and Ninth Circuit appeal in *MacClelland v. Cellco Partnership*, 22-16020 (9th Cir.), as described in Sections X.E and XII.B of the Settlement Agreement.

23.     Other than such proceedings as may be necessary to carry out the terms and conditions of the Settlement Agreement, all proceedings in the Action are hereby stayed and suspended until further order of this Court.

24.     Pending final determination of whether the Settlement Agreement should be finally approved, Plaintiffs and all Settlement Class Members are barred and enjoined from filing, commencing, prosecuting, or enforcing any action against Verizon or the other Released Parties insofar as such action asserts Released Claims, directly or indirectly, in any judicial, administrative, arbitral, or other forum.  This bar and injunction is necessary to protect and effectuate the Settlement Agreement and this Preliminary Approval Order, and this Court's authority to effectuate the Settlement, and is ordered in aid of this Court's jurisdiction.

25.     This Preliminary Approval Order, the Settlement Agreement, and all negotiations, statements, agreements, and proceedings relating to the Settlement, or any matters arising in connection with settlement negotiations, proceedings, or agreements, shall not constitute, be described as, construed as, offered or received against Verizon or the other Released Parties as evidence or an admission of: (a) the truth of any fact alleged by Plaintiffs in the Action; (b) that any person suffered compensable harm or is entitled to any relief with respect to the matters asserted in this Action; (c) any liability, negligence, fault, or wrongdoing by Verizon or the Released Parties, including any of its affiliates, agents, representatives, vendors, or any other person or entity acting on its behalf; (d) that this Action or any other action was or may be properly certified as a class action for litigation, non-settlement purposes; (e) the arbitrability of the Action as to Plaintiffs and Settlement Class Members; or (f) the enforceability of any applicable contractual or statutory limitations period to limit any relief.

26.     The Court retains jurisdiction over this Action to consider all further matters arising out of or connected with the Settlement, including enforcement of the Release provided for in the Settlement Agreement.

27.     The Parties are directed to take all necessary and appropriate steps to establish the

means necessary to implement the Settlement Agreement according to its terms should it be finally approved.

28.     The Court may, for good cause, extend any of the deadlines set forth in this Preliminary Approval Order without further notice to Settlement Class Members.  Without further order of the Court, the Parties may agree to make non-material modifications in implementing the Settlement that are not inconsistent with this Preliminary Approval Order.

IT IS SO ORDERED.

Date:  _____

_____

Exhibit G

| | |
|---|---|
| DEAN ESPOSITO, JEFFREY ACHEY, MARILYN ACHEY, JUSTIN ANDERSON, DEIDRE ASBJORN, GREGORY BURLAK, CARLA CHIORAZZO, JUDITH CHIORAZZO, JOHN CONWAY, ADAM DEMARCO, JAMES FISHER, ALLISON GILLINGHAM, LORRAINE GILLINGHAM, DOREE GORDON, DONNA HARTMAN, PATRICIA JUSTICE, DAVID KELLY, CHRISTINA MANFREDO, JUDITH OELENSCHLAGER, DANIEL PATINO, JAMES PRATE, MICHAEL SCHEUFELE, RUSSELL SEWEKOW, DEBORAH STROYEK, LINDA TEER, CHRISTINE TRAPPE, BRENDA TRIPICCHIO, TERESA MACCLELLAND, KAREN UMBERGER, SCOTT WILLITS, MICHAEL BRANOM, MOLLY BROWN, MICHAEL CARNEY, TIM FRASCH, PATRICIA GAGAN, ANNA GUTIERREZ, LINDA JENKINS, AUGUSTUS JOHNSON, WILLIAM KAUPELIS, MARILYN KAYE, JANETTE LISNER, WILLIAM ERIC LOUGH, DAVID MASSARO, LOUISE MONSOUR, DARLEEN PEREZ, GABRIELLE POZZUOLI, VALERIE REED, BRUCE SCHRAMM, KERRY SHOWALTER, JOHN ST. JARRE, GLORIA STERN, EDNA TOY, TERESA TOY, VANESSA WEST, MARY BOWMAN, ART CAPRI, DEBRA CASEY, KARYN CHALLENDER. TYSON COHRON, CINTIA CORSI, ANDI ELLIS, LAURIE FRANTZ, ASHLEY GARRISON, ANGELA GREEN, CARLOS GUTIERREZ, JAMES HOLLING, KAREN HUDSON, JERRY HUNT, JENNIFER HURTT, JOYCE JONES, LYNN KIRALY, MICHELLE LACUESTA, JASON MCCONVILLE, JOSE NICOT, SANDRA OSHIRO, LESLIE OWENS, JON SANTOS, TERRY SEXTON, KATHLEEN WRIGHT, PAMELA M. ALLEN, SAMANTHA ALBAITIS, CYDNI ARTERBURY, LISA BAKER, BRIANA BELL, CHRISTINE BELLAVIA, KIMBERLY BLAIR, LEANOR BLAND-MULLINS, CAROLINE BONHAM, TAMMY BURKE, ANNMARIE CALDWELL, SHAUNA CAVALLARO, SANTOS COLON, ERIKA CONLEY, KENDRA CONOVER, DYLAN CORBIN, LAURA CURRY, SHAKERA DYER, JANE FREY, RUSSELL FROM, ANGEL GAINES, ASHTIN GAMBLIN, ERICKA GARDNER, ANN GRAFF, JAMES HENSLEY, SAREL HINES, ALEXANDER KEELER, ADAM KELLER, BILLIE KENDRICK, KRISTA KIRBY, JAN LOMBARD, MARC LOWREY, JILL MAILHOIT, AARON MAXA, KELLY MOORE, LINDSEY MORAN, DAVID MOYERS, JENNIFER OCAMPO-NEUBAUER, KEISHA ODOM, ANGEL PACHECHO, HEATHER RAY, SUSAN SCOTT, | SUPERIOR COURT OF NEW JERSEY MIDDLESEX COUNTY LAW DIVISION<br><br>DOCKET NO. MID-L-<br><br>**[PROPOSED] FINAL ORDER AND JUDGMENT** |

| LORI SNYDER, MISTY SUTTON, KATHRYN TAYLOR, ANTHONY VALLECORSA, CLAIRE WHITE, KRISTOPHER WILLARD, ALVIN WILSON, and BRAD YOUNG, on behalf of themselves and all others similarly situated, | |
|---|---|
| Plaintiffs, | |
| v. | |
| CELLCO PARTNERSHIP d/b/a VERIZON WIRELESS, | |
| Defendant. | |

This matter came before the Court for hearing on [DATE], pursuant to the Court's Preliminary Approval Order dated [DATE], and on the motion ("Motion") for final approval of the Settlement Agreement, dated [DATE] entered into by the Parties (the "Settlement Agreement"), as well as Settlement Class Counsel's motion for an award of attorneys' fees, costs, and service awards.  Due and adequate notice having been given to the Settlement Class Members of the proposed Settlement and the pending motions, as directed by the Court's Preliminary Approval Order, and upon consideration of all papers filed and proceedings had herein, and good cause appearing, the Court hereby ORDERS as follows:

1.      Capitalized terms not otherwise defined herein have the meanings set forth in the Settlement Agreement.

2.      This Court has subject matter jurisdiction over this matter and has personal jurisdiction over the Parties and the Settlement Class Members.  Venue is proper in this Court.

3.      The "Settlement Class" for purposes of this Final Order and Judgment means:

All current and former individual consumer account holders in the United States (based on account holders' last known billing address) who received postpaid wireless or data services from Verizon and who were charged and paid an Administrative Charge and/or an Administrative and Telco Recovery Charge between January 1, 2016 and the date of the Settlement Agreement.

Excluded from the Settlement Class are any Judges presiding over this Action and any members of their families, and Verizon and affiliated entities and individuals and their respective officers and directors.

Also excluded from the Settlement Class are those persons who submit a timely and valid request for exclusion in accordance with the procedures set forth in the Settlement Agreement and in this Court's Preliminary Approval Order.

4.      The Court finds that the Notice program for disseminating notice to the Settlement Class, provided for in the Settlement Agreement and previously approved and directed by the Court, has been implemented by the Settlement Administrator and the Parties.  The Court finds that such Notice program, including the approved forms of notice: (a) constituted the best notice that is practicable under the circumstances; (b) included direct individual notice to all Settlement Class Members who could be identified through reasonable effort, as well as appropriate reminder notices; (c) constituted notice that was reasonably calculated, under the circumstances, to apprise Settlement Class Members of the nature of this Action, the definition of the Settlement Class certified, the class claims and issues, the opportunity to enter an appearance through an attorney if the member so desires; the opportunity, the time, and manner for requesting exclusion from the Settlement Class, and the binding effect of a class judgment; (d) constituted due, adequate and sufficient notice to all persons entitled to notice; and (e) met all applicable requirements of N.J. Ct. R. R. 4:32-1 and 4:32-2, Due Process under the U.S. Constitution, and any other applicable law.

5.      The Court hereby finds that all persons who fall within the definition of the Settlement Class have been adequately provided with an opportunity to exclude themselves from the Settlement Class by submitting a request for exclusion in conformance with the terms of the Settlement Agreement and this Court's Preliminary Approval Order.   All persons who submitted timely and valid requests for exclusion are not bound by this Final Order and Judgment.   A list of those persons who submitted timely and valid requests for exclusion is on file at Dkt.___.   All other persons who fall within the definition of the Settlement Class are Settlement Class Members and part of the Settlement Class, and shall be bound by this Final Order and Judgment and the Settlement Agreement.

6.      The Court finds and reaffirms that this Action is properly maintained as a class

action, for settlement purposes only, pursuant to N.J. Ct. R. R. 4:32-1(b)(3) and 4:32-2, as set forth in the Court's Preliminary Approval Order.

7.　　[Findings regarding class certification]

8.　　The Court reaffirms its appointment of Plaintiffs set forth in the caption herein as Settlement Class Representatives to represent the Settlement Class, and reaffirms its appointment of Settlement Class Counsel to represent the Settlement Class.

9.　　The Court finds that the Settlement Agreement warrants final approval pursuant to N.J. Ct. R. R. 4:32-2 because, the Court finds, the Settlement Agreement is fair, reasonable, and adequate and is in the best interest of the Settlement Class, after weighing the relevant considerations.　First, the Court finds that Plaintiffs and Settlement Class Counsel have adequately represented the Settlement Class, and will continue to do so through settlement implementation.　Second, the proposed Settlement Agreement was reached as a result of arms-length negotiations through an experienced mediator, Hon. Jay C. Gandhi (ret.) of JAMS, and comes after significant litigation, investigation, and discovery.　Third, the Court finds that the relief proposed to be provided for the Settlement Class is fair, reasonable, and adequate, taking into account, *inter alia*: (i) the costs, risks, and delay of trial and appeal for all Parties; (ii) the legal issues presented in this Action; (iii) the interests of Settlement Class Members; (iv) the effectiveness of the proposed method of distributing relief to the Settlement Class (via mailed checks or electronic payments); and (v) the terms of the requested award of attorneys' fees, costs, and service awards.　Fourth, the Court finds that the Settlement Agreement treats Settlement Class Members equitably relative to each other, and that the proposed allocation of settlement funds to Settlement Class Members is reasonable and equitable.　Under the terms of the Settlement Agreement, all Settlement Class Members were eligible to submit a claim for payment via a simple claim form.

10.　　In granting final approval of the Settlement Agreement, the Court has also considered the factors that courts in New Jersey consider in evaluating proposed class settlements. *See, e.g.*, *Girsh v. Jepson*, 521 F.2d 153, 157 (3d Cir. 1975) and *Sutter v. Horizon*

*Blue Cross Blue Shield of New Jersey*, 2012 WL 2813813, at *3–4 (N.J. Super. Ct. App. Div. July 11, 2012).

11.      [Address *Girsh v. Jepson*, 521 F.2d 153, 157 (3d Cir. 1975) and *Sutter v. Horizon Blue Cross* factors].

12.      [Address any objections].  All timely objections submitted by Settlement Class Members have been fully considered by the Court and are overruled.

13.      The Motion is hereby GRANTED, and the Settlement Agreement and its terms are hereby found to be and APPROVED as fair, reasonable, and adequate and in the best interest of the Settlement Class.   The Parties and Settlement Administrator are directed to consummate and implement the Settlement Agreement in accordance with its terms, including distributing settlement payments to the Settlement Class Members and other disbursements from the Settlement Consideration as provided by the Settlement Agreement.

14.      This Action is hereby dismissed with prejudice and without costs to any Party, other than as specified in the Settlement Agreement, this Final Order and Judgment, and any order(s) by this Court regarding Settlement Class Counsel's motion for attorneys' fees, costs, and service awards.

15.      In consideration of the benefits provided under the Settlement Agreement, and for other good and valuable consideration set forth in the Settlement Agreement, each of the Settlement Class Members and Releasing Parties shall, by operation of this Final Order and Judgment, have fully, finally, and forever released, relinquished, acquitted, and discharged all Released Claims against all Released Parties in accordance with Section IX of the Settlement Agreement, the terms of which section are incorporated herein by reference.   The terms of the Settlement Agreement, which are incorporated by reference into this Order, shall have res judicata and other preclusive effects as to the Released Claims as against the Releasing Parties. The Released Parties may file the Settlement Agreement and/or this Order in any other litigation to support a defense or counterclaim based on principles of res judicata, collateral estoppel, release, good-faith settlement, judgment bar or reduction, or any similar defense or counterclaim.

16.     All Settlement Class Members and Releasing Parties have covenanted not to sue any Released Party with respect to any Released Claim and shall be permanently barred and enjoined from instituting, commencing, prosecuting, continuing, maintaining, or asserting, directly or indirectly, any Released Claim against any Released Party in any judicial, administrative, arbitral, or other forum.   This permanent bar and injunction is necessary to protect and effectuate the Settlement Agreement and this Order, and this Court's authority to effectuate the Settlement, and is ordered in aid of this Court's jurisdiction and to protect its judgments.  Notwithstanding the foregoing, nothing in this Order and Judgment shall preclude an action to enforce the terms of the Settlement Agreement.

17.     Pursuant to the terms of the Settlement Agreement, Plaintiffs, Settlement Class Counsel, Verizon, and Verizon's Counsel have, and shall be deemed to have, released each other from any and all claims and requests for relief relating in any way to any Party or counsel's conduct in this Action, including but not limited to any claims of abuse of process, malicious prosecution, or any other claims or requests for relief arising out of the institution, prosecution, assertion or resolution of this Action, including claims for attorneys' fees, costs of suit, or sanctions of any kind except as otherwise expressly set forth in the Settlement Agreement.

18.     This Final Judgment and Order is the final, appealable judgment in the Action as to all Released Claims.

19.     Without affecting the finality of this Final Order and Judgment in any way, this Court retains jurisdiction over (a) implementation of the Settlement Agreement and the terms of the Settlement Agreement; (b) Settlement Class Counsel's motion for attorneys' fees, costs, and service awards; (c) distribution of the settlement consideration, Settlement Class Counsel attorneys' fees and expenses, and any Plaintiff service awards; and (d) all other proceedings related to the implementation, interpretation, validity, administration, consummation, and enforcement of the terms of the Settlement Agreement.   The time to appeal from this Final Order and Judgment shall commence upon its entry.

20.     In the event that the Settlement Agreement Effective Date does not occur, this

Final Order and Judgment shall be rendered null and void and shall be vacated, nunc pro tunc, as set forth in the Court's Preliminary Approval Order, except insofar as expressly provided to the contrary in the Settlement Agreement, and without prejudice to the status quo ante rights of Plaintiffs, Settlement Class Members, and Verizon.

21.     This Final Order and Judgment, the Preliminary Approval Order, the Settlement Agreement, and all negotiations, statements, agreements, and proceedings relating to the Settlement Agreement, or any matters arising in connection with settlement negotiations, proceedings, or agreements shall not constitute, be described as, construed as, offered or received against Verizon or the other Released Parties as evidence or an admission of: (a) the truth of any fact alleged by Plaintiffs in the Action; (b) that any person suffered compensable harm or is entitled to any relief with respect to the matters asserted in this Action; (c) any liability, negligence, fault, or wrongdoing by Verizon or the Released Parties, including any of its affiliates, agents, representatives, vendors, or any other person or entity acting on its behalf; (d) that this Action or any other action was or may be properly certified as a class action for litigation, non-settlement purposes; (e) the arbitrability of the Action as to Plaintiffs and Settlement Class Members; or (f) the enforceability of any applicable contractual or statutory limitations period to limit any relief.

22.     [To the extent this Order does not address Settlement Class Counsel's motion for attorneys' fees, costs and service awards, such motion will be addressed in a separate order or further addressed herein.]

23.     The Court finds that there is no just reason for delay and expressly directs this Final Order and Judgment and immediate entry by the Clerk of the Court.

IT IS SO ORDERED.

Date: _____

                                    _____

Exhibit H

Pursuant to Settlement Agreement Section IV.B., within ninety days of the Effective Date, Verizon shall implement the following revisions to its My Verizon Wireless Customer Agreement to include the following language:

> In addition to the cost of your plan or any features to which you may subscribe, our charges may also include an Administrative and Telco Recovery Charge, in addition to the other fees described in this Agreement.

> The Administrative and Telco Recovery Charge isn't a tax, it isn't required by law, is not necessarily related to anything the government does, and it is kept by us in whole or in part.

> The amount of the Administrative and Telco Recovery Charge and what it pays for may change over time.

Exhibit I

## UNDERTAKING TO REPAY ATTORNEYS' FEES, COSTS, AND SERVICE AWARDS

Pursuant to Section XI of the Settlement Agreement[1] executed on [DATE] between and among Plaintiffs and Verizon, Settlement Class Counsel shall be entitled to full payment of the attorneys' fees, costs, and named Plaintiff service awards awarded by the Court within ten (10) business days of the Court's entry of the Final Order and Judgment and any order granting attorneys' fees, costs, and service awards, notwithstanding any appeal. Provided, however, that, should the Final Order and Judgment be reversed or materially modified or the award of attorneys' fees, costs, or service awards be reversed or reduced on appeal, Settlement Class Counsel hereby agree to reimburse the Settlement Fund for any amounts not approved by the Court or following any appeal. Settlement Class Counsel shall reimburse the Settlement Fund in accordance with Section XI of the Settlement Agreement and this undertaking within fourteen (14) days of any such reversal, material modification, or reduction of any attorneys' fees and costs paid to Settlement Class Counsel or service awards paid to the named Plaintiffs.


Dated: _____


_____
Stephen P. DeNittis
DeNittis Osefchen Prince, P.C.



Dated: _____


_____
Daniel M. Hattis
Hattis & Lukacs

---

[1]   All capitalized terms have the meaning as defined in the Settlement Agreement.

**DeNITTIS OSEFCHEN PRINCE, P.C.**
**Stephen P. DeNittis, Esq. (031981997)**
**Joseph A. Osefchen, Esq. (024751992)**
**Shane T. Prince, Esq. (022412002)**
**525 Route 73 North, Suite 410**
**Marlton, New Jersey 08053**
**(856) 797-9951**

**CRIDEN & LOVE, P.A.**
**Michael E. Criden, Esq.\***
**Lindsey C. Grossman, Esq.\***
**7301 SW 57th Court, Suite 515**
**South Miami, FL 33143**
**(305) 357-9000**

**HATTIS & LUKACS**
**Daniel M. Hattis, Esq.\***
**Paul Karl Lukacs, Esq.\***
**11711 SE 8th Street, Suite 120**
**Bellevue, WA 98005**
**(425) 233-8650**

**\* Pro Hac Vice Application**
  **To Be Submitted**

**Attorneys for Plaintiffs and the Proposed Classes**

| | |
|---|---|
| DEAN ESPOSITO, JEFFREY ACHEY, MARILYN ACHEY, JUSTIN ANDERSON, DEIDRE ASBJORN, GREGORY BURLAK, CARLA CHIORAZZO, JUDITH CHIORAZZO, JOHN CONWAY, ADAM DEMARCO, JAMES FISHER, ALLISON GILLINGHAM, LORRAINE GILLINGHAM, DOREE GORDON, DONNA HARTMAN, PATRICIA JUSTICE, DAVID KELLY, CHRISTINA MANFREDO, JUDITH OELENSCHLAGER, DANIEL PATINO, JAMES PRATE, MICHAEL SCHEUFELE, RUSSELL SEWEKOW, DEBORAH STROYEK, LINDA TEER, CHRISTINE TRAPPE, BRENDA TRIPICCHIO, TERESA MACCLELLAND, KAREN UMBERGER, SCOTT WILLITS, MICHAEL BRANOM, MOLLY BROWN, MICHAEL CARNEY, TIM FRASCH, PATRICIA GAGAN, ANNA GUTIERREZ, LINDA JENKINS, AUGUSTUS JOHNSON, WILLIAM KAUPELIS, MARILYN KAYE, JANETTE LISNER, WILLIAM ERIC LOUGH, DAVID MASSARO, LOUISE MONSOUR, DARLEEN PEREZ, GABRIELLE POZZUOLI, VALERIE REED, BRUCE SCHRAMM, KERRY SHOWALTER, JOHN ST. JARRE, GLORIA STERN, EDNA TOY, TERESA TOY, VANESSA WEST, MARY BOWMAN, ART CAPRI, DEBRA CASEY, KARYN CHALLENDER. TYSON COHRON, CINTIA CORSI, ANDI ELLIS, LAURIE FRANTZ, ASHLEY GARRISON, ANGELA GREEN, CARLOS GUTIERREZ, JAMES HOLLING, KAREN HUDSON, JERRY HUNT, JENNIFER HURTT, JOYCE JONES, LYNN KIRALY, MICHELLE LACUESTA, JASON MCCONVILLE, JOSE NICOT, SANDRA OSHIRO, LESLIE OWENS, JON SANTOS, TERRY SEXTON, KATHLEEN WRIGHT, PAMELA M. ALLEN, SAMANTHA ALBAITIS, CYDNI ARTERBURY, LISA BAKER, BRIANA | SUPERIOR COURT OF NEW JERSEY MIDDLESEX COUNTY LAW DIVISION

DOCKET NO. **CLASS ACTION COMPLAINT** |

| | |
|---|---|
| BELL, CHRISTINE BELLAVIA, KIMBERLY BLAIR, LEANOR BLAND-MULLINS, CAROLINE BONHAM, TAMMY BURKE, ANNMARIE CALDWELL, SHAUNA CAVALLARO, SANTOS COLON, ERIKA CONLEY, KENDRA CONOVER, DYLAN CORBIN, LAURA CURRY, SHAKERA DYER, JANE FREY, RUSSELL FROM, ANGEL GAINES, ASHTIN GAMBLIN, ERICKA GARDNER, ANN GRAFF, JAMES HENSLEY, SAREL HINES, ALEXANDER KEELER, ADAM KELLER, BILLIE KENDRICK, KRISTA KIRBY, JAN LOMBARD, MARC LOWREY, JILL MAILHOIT, AARON MAXA, KELLY MOORE, LINDSEY MORAN, DAVID MOYERS, JENNIFER OCAMPO-NEUBAUER, KEISHA ODOM, ANGEL PACHECHO, HEATHER RAY, SUSAN SCOTT, LORI SNYDER, MISTY SUTTON, KATHRYN TAYLOR, ANTHONY VALLECORSA, CLAIRE WHITE, KRISTOPHER WILLARD, ALVIN WILSON, and BRAD YOUNG, on behalf of themselves and all others similarly situated, | |
| Plaintiffs, | |
| v. | |
| CELLCO PARTNERSHIP d/b/a VERIZON WIRELESS, | |
| Defendant. | |

Plaintiffs Dean Esposito, Jeffrey Achey, Marilyn Achey, Justin Anderson, Deidre Asbjorn, Gregory Burlak, Carla Chiorazzo, Judith Chiorazzo, John Conway, Adam DeMarco, Dean Esposito, James Fisher, Allison Gillingham, Lorraine Gillingham, Doree Gordon, Donna Hartman, Patricia Justice, David Kelly, Christina Manfredo, Judith Oelenschlager, Daniel Patino, James Prate, Michael Scheufele, Russell Sewekow, Deborah Stroyek, Linda Teer, Christine Trappe, Brenda Tripicchio, Teresa MacClelland, Karen Umberger, Scott Willits, Michael Branom, Molly Brown, Michael Carney, Tim Frasch, Patricia Gagan, Anna Gutierrez, Linda Jenkins, Augustus Johnson, William Kaupelis, Marilyn Kaye, Janette Lisner, William Eric Lough, David Massaro, Louise Monsour, Darleen Perez, Gabrielle Pozzuoli, Valerie Reed, Bruce Schramm, Kerry Showalter, John St. Jarre, Gloria Stern, Edna Toy, Teresa Toy, Vanessa

2

West, Mary Bowman, Art Capri, Debra Casey, Karyn Challender, Dyson Cohron, Cintia Corsi,

Andi Ellis, Laurie Frantz, Ashley Garrison, Angela Green, Carlos Gutierrez, James Holling,

Karen Hudson, Jerry Hunt, Jennifer Hurtt, Joyce Jones, Lynn Kiraly, Michelle Lacuesta, Jason

McConville, Jose Nicot, Sandra Oshiro, Leslie Owens, Jon Santos, Terry Sexton, Kathleen

Wright, Pamela M. Allen, Samantha Albaitis, Cydni Arterbury, Lisa Baker, Briana Bell,

Christine Bellavia, Kimberly Blair, Leanor Bland-Mullins, Caroline Bonham, Tammy Burke,

Annmarie Caldwell, Shauna Cavallaro, Santos Colon, Erika Conley, Kendra Conover, Dylan

Corbin, Laura Curry, Shakera Dyer, Jane Frey, Russell From, Angel Gaines, Ashtin Gamblin,

Ericka Gardner, Ann Graff, James Hensley, Sarel Hines, Alexander Keeler, Adam Keller, Billie

Kendrick, Krista Kirby, Jan Lombard, Marc Lowrey, Jill Mailhoit, Aaron Maxa, Kelly Moore,

Lindsey Moran, David Moyers, Jennifer Ocampo-Neubauer, Keisha Odom, Angel Pachecho,

Heather Ray, Susan Scott, Lori Snyder, Misty Sutton, Kathryn Taylor, Anthony Vallecorsa,

Claire White, Kristopher Willard, Alvin Wilson, and Brad Young, individually and on behalf of

all others similarly situated, allege as follows, on personal knowledge and investigation of their

counsel, against Defendant Cellco Partnership d/b/a Verizon Wireless ("Defendant").

## I.     **INTRODUCTION**

1.     This is a proposed class action brought on behalf of current and former Verizon

Wireless subscribers challenging a deceptive fee scheme perpetrated by Defendant against

Verizon Wireless customers.

2.     The bases for the class claims are set forth in greater detail herein, but arise from

Verizon's sign-up policies and practices which deceive customers by prominently advertising

certain monthly rates for Verizon post-paid wireless service plans.  After customers sign up,

however, Verizon uniformly charges them higher monthly rates than it advertised and promised by adding what Verizon calls an "Administrative Charge"[1] to the bill.

3.      The Administrative Charge is not disclosed to customers either before or when they agree to purchase wireless service from Verizon, and in fact the Administrative Charge is never adequately or honestly disclosed to customers.  Nor do Verizon customers ever agree to— or even have the opportunity to accept or reject—the Administrative Charge, which is unilaterally imposed by Verizon without its customers' consent.

4.      Verizon utilizes the Administrative Charge to unlawfully charge its customers more per month for Verizon wireless services without having to advertise the higher monthly rates.

5.      Verizon first began adding the Administrative Charge into all of its post-paid wireless customers' bills in 2005, initially at a rate of $0.40 per month for each phone line on its customers' service plans.  Since then, Verizon has repeatedly increased the amount of the Administrative Charge on a regular basis.  The most recent increase occurred on June 23, 2022, when Verizon increased the Administrative Charge by 70% from $1.95 to the current rate of $3.30 per line. The current amount of the Administrative Charge is $3.30 per line per month—a more than 8X increase from the original amount of the Charge.

6.      The first time Verizon customers can possibly learn about the existence of the Administrative Charge, or the amount of the Charge, is on the customer bills, which they begin receiving only _after_ they have signed up for wireless service and are financially committed to their purchase and cannot cancel without penalty.

---

[1] On June 23, 2022, Verizon changed the name of the Administrative Charge to the "Administrative and Telco Recovery Charge." This Complaint will refer to the charge as the "Administrative Charge."

7.      Verizon then omits or misrepresents the so-called Administrative Charge on its customer bills to further its scheme.  Verizon's paper bills fail to mention the Administrative Charge at all, stating instead that a customer should "[c]heck your online bill for all surcharges, taxes and gov fees."  Then on the online bill, Verizon omits the Administrative Charge from the "Monthly charges" section, where it actually belongs, and instead puts it in the "Surcharges" section, where it is lumped together with various government charges, taxes, and fees.  Even worse, for years, Verizon explicitly and falsely stated on its monthly bills that the Administrative Charge is a surcharge imposed on subscribers to "cover the costs that are billed to us by federal, state or local governments."  Thus, Verizon's monthly bills have served to further Verizon's deceptive scheme and keep customers from realizing they are being overcharged.

8.      Notably, on a support page on its website, Verizon gives a <u>different</u> definition of the Administrative Charge, claiming that the Charge is tied to various operating costs of Verizon including telephone company interconnect charges and network facility and service fees—all of which are basic costs of providing wireless service, and which a reasonable consumer would expect to be included in the advertised price for any wireless service plan.

9.      But this is yet another misrepresentation by Verizon, as the Administrative Charge is <u>not</u>, in fact, tied to Verizon's costs such as interconnect charges and network facility fees. Verizon does not adjust the amount of the Administrative Charge based on changes to Verizon's costs.  Rather, Verizon unilaterally sets and increases the amount of the Administrative Charge based on its internal revenue targets.  This is corroborated by the fact that Verizon has more than tripled the amount of the monthly, per-line Administrative Charge since 2015 (from $0.95 to $3.30 per month per line), while during that same time period Verizon's costs have actually decreased significantly (like interconnection costs).  Verizon simply uses the

Administrative Charge as a lever to increase its revenues and profits—including when Verizon increased the Charge by 70% in June 2022.

10.     Meanwhile, Verizon's misrepresentations on its bills that the Administrative Charge is imposed on subscribers to recover the costs billed to Verizon by the government were false statements of material fact intended to discourage customers who discovered the Administrative Charge from questioning or objecting to the Charge.

11.     In all events, Verizon should clearly and accurately state the true monthly prices for its post-paid wireless service plans in its price representations and advertising.  Verizon has failed to do so, and continues to fail to do so, choosing instead to deceptively increase its monthly rates—and by extension, its revenue and profit—by imposing an extra-contractual, undisclosed Administrative Charge that is never agreed to by its customers, in contravention of the laws applicable to the relationship between Verizon and the class members.

12.     Plaintiffs, through this action, seek injunctive, declaratory, monetary, and statutory relief for themselves and the proposed classes to obtain redress and to end Verizon's unlawful policy of charging this deceptive, undisclosed additional Charge.

13.     To be clear, Plaintiffs are not seeking to regulate the existence or amount of Verizon's Administrative Charge.  Rather, Plaintiffs merely seek to compel Verizon to include notice of the existence and the amount of the Administrative Charge in the wireless service plan prices that Verizon advertises to Class members and the general public, to honestly and adequately disclose the Administrative Charge and its true nature and basis in Verizon's customer bills and in communications with Class members at or before the time the wireless services contract is created, and to reimburse Class members for any and all undisclosed (or inadequately disclosed) extra-contractual fees they were forced to pay.

14.     Verizon is primarily engaged in the business of selling services. Each cause of action brought by Plaintiffs against Verizon in this Complaint arises from and is limited to statements or conduct by Verizon that consist of representations of fact about Verizon's business operations or services that is or was made for the purpose of obtaining approval for, promoting, or securing sales of or commercial transactions in, Verizon's services or the statement is or was made in the course of delivering Verizon's services. Each cause of action brought by Plaintiffs against Verizon in this Complaint arises from and is limited to statements or conduct by Verizon for which the intended audience is an actual or potential buyer or customer, or a person likely to repeat the statements to, or otherwise influence, an actual or potential buyer or customer.

## II.    **THE PARTIES**

15.     Plaintiff Dean Esposito is a citizen and resident of Haddonfield, New Jersey, and was a customer of Verizon's wireless service during the class period.  Like every other class member, Plaintiff Esposito has been victimized by the same uniform policies described in detail herein, in that he signed up for Verizon's wireless service in the manner described herein, received or was directed to the same uniformly-worded documents and/or websites described herein, received a Verizon bill which imposed the same undisclosed Administrative Charge in the same uniform language as described herein, and paid the Administrative Charge complained of herein.

16.     Plaintiff Jeffrey Achey is a citizen and resident of Mount Holly, New Jersey, and was a customer of Verizon's wireless service during the class period.  Like every other class member, Plaintiff Jeffrey Achey has been victimized by the same uniform policies described in detail herein, in that he signed up for Verizon's wireless service in the manner described herein, received or was directed to the same uniformly-worded documents and/or websites described

herein, received a Verizon bill which imposed the same undisclosed Administrative Charge in the same uniform language as described herein, and paid the Administrative Charge complained of herein.

17.     Plaintiff Marilyn Achey is a citizen and resident of Mount Holly, New Jersey, and was a customer of Verizon's wireless service during the class period.  Like every other class member, Plaintiff Marilyn Achey has been victimized by the same uniform policies described in detail herein, in that she signed up for Verizon's wireless service in the manner described herein, received or was directed to the same uniformly-worded documents and/or websites described herein, received a Verizon bill which imposed the same undisclosed Administrative Charge in the same uniform language as described herein, and paid the Administrative Charge complained of herein.

18.     Plaintiff Justin Anderson is a citizen and resident of Southampton, New Jersey, and was a customer of Verizon's wireless service during the class period.  Like every other class member, Plaintiff Anderson has been victimized by the same uniform policies described in detail herein, in that he signed up for Verizon's wireless service in the manner described herein, received or was directed to the same uniformly-worded documents and/or websites described herein, received a Verizon bill which imposed the same undisclosed Administrative Charge in the same uniform language as described herein, and paid the Administrative Charge complained of herein.

19.     Plaintiff Deidre Asbjorn is a citizen and resident of Toms River, New Jersey, and was a customer of Verizon's wireless service during the class period.  Like every other class member, Plaintiff Asbjorn has been victimized by the same uniform policies described in detail herein, in that she signed up for Verizon's wireless service in the manner described herein,

received or was directed to the same uniformly-worded documents and/or websites described herein, received a Verizon bill which imposed the same undisclosed Administrative Charge in the same uniform language as described herein, and paid the Administrative Charge complained of herein.

20.     Plaintiff Gregory Burlak is a citizen and resident of Edison, New Jersey, and was a customer of Verizon's wireless service during the class period.  Like every other class member, Plaintiff Burlak has been victimized by the same uniform policies described in detail herein, in that he signed up for Verizon's wireless service in the manner described herein, received or was directed to the same uniformly-worded documents and/or websites described herein, received a Verizon bill which imposed the same undisclosed Administrative Charge in the same uniform language as described herein, and paid the Administrative Charge complained of herein.

21.     Plaintiff Carla Chiorazzo is a citizen and resident of Marlton, New Jersey, and was a customer of Verizon's wireless service during the class period.  Like every other class member, Plaintiff Carla Chiorazzo has been victimized by the same uniform policies described in detail herein, in that she signed up for Verizon's wireless service in the manner described herein, received or was directed to the same uniformly-worded documents and/or websites described herein, received a Verizon bill which imposed the same undisclosed Administrative Charge in the same uniform language as described herein, and paid the Administrative Charge complained of herein.

22.     Plaintiff Judith Chiorazzo is a citizen and resident of Marlton, New Jersey, and was a customer of Verizon's wireless service during the class period.  Like every other class member, Plaintiff Judith Chiorazzo has been victimized by the same uniform policies described in detail herein, in that she signed up for Verizon's wireless service in the manner described

herein, received or was directed to the same uniformly-worded documents and/or websites described herein, received a Verizon bill which imposed the same undisclosed Administrative Charge in the same uniform language as described herein, and paid the Administrative Charge complained of herein.

23.     Plaintiff John Conway is a citizen and resident of Manahawkin, New Jersey, and was a customer of Verizon's wireless service during the class period.  Like every other class member, Plaintiff Conway has been victimized by the same uniform policies described in detail herein, in that he signed up for Verizon's wireless service in the manner described herein, received or was directed to the same uniformly-worded documents and/or websites described herein, received a Verizon bill which imposed the same undisclosed Administrative Charge in the same uniform language as described herein, and paid the Administrative Charge complained of herein.

24.     Plaintiff Adam DeMarco is a citizen and resident of Northfield, New Jersey, and was a customer of Verizon's wireless service during the class period.  Like every other class member, Plaintiff DeMarco has been victimized by the same uniform policies described in detail herein, in that he signed up for Verizon's wireless service in the manner described herein, received or was directed to the same uniformly-worded documents and/or websites described herein, received a Verizon bill which imposed the same undisclosed Administrative Charge in the same uniform language as described herein, and paid the Administrative Charge complained of herein.

25.     Plaintiff James Fisher is a citizen and resident of Cherry Hill, New Jersey, and was a customer of Verizon's wireless service during the class period.  Like every other class member, Plaintiff Fisher has been victimized by the same uniform policies described in detail

herein, in that he signed up for Verizon's wireless service in the manner described herein, received or was directed to the same uniformly-worded documents and/or websites described herein, received a Verizon bill which imposed the same undisclosed Administrative Charge in the same uniform language as described herein, and paid the Administrative Charge complained of herein.

26.     Plaintiff Allison Gillingham is a citizen and resident of Deptford, New Jersey, and was a customer of Verizon's wireless service during the class period.  Like every other class member, Plaintiff Allison Gillingham has been victimized by the same uniform policies described in detail herein, in that she signed up for Verizon's wireless service in the manner described herein, received or was directed to the same uniformly-worded documents and/or websites described herein, received a Verizon bill which imposed the same undisclosed Administrative Charge in the same uniform language as described herein, and paid the Administrative Charge complained of herein.

27.     Plaintiff Lorraine Gillingham is a citizen and resident of Deptford, New Jersey, and was a customer of Verizon's wireless service during the class period.  Like every other class member, Plaintiff Lorraine Gillingham has been victimized by the same uniform policies described in detail herein, in that she signed up for Verizon's wireless service in the manner described herein, received or was directed to the same uniformly-worded documents and/or websites described herein, received a Verizon bill which imposed the same undisclosed Administrative Charge in the same uniform language as described herein, and paid the Administrative Charge complained of herein.

28.     Plaintiff Doree Gordon is a citizen and resident of Point Pleasant Boro, New Jersey, and was a customer of Verizon's wireless service during the class period.  Like every

other class member, Plaintiff Gordon has been victimized by the same uniform policies described in detail herein, in that she signed up for Verizon's wireless service in the manner described herein, received or was directed to the same uniformly-worded documents and/or websites described herein, received a Verizon bill which imposed the same undisclosed Administrative Charge in the same uniform language as described herein, and paid the Administrative Charge complained of herein.

29.     Plaintiff Donna Hartman is a citizen and resident of Hammonton, New Jersey, and was a customer of Verizon's wireless service during the class period.  Like every other class member, Plaintiff Hartman has been victimized by the same uniform policies described in detail herein, in that she signed up for Verizon's wireless service in the manner described herein, received or was directed to the same uniformly-worded documents and/or websites described herein, received a Verizon bill which imposed the same undisclosed Administrative Charge in the same uniform language as described herein, and paid the Administrative Charge complained of herein.

30.     Plaintiff Patricia Justice is a citizen and resident of Berlin, New Jersey, and was a customer of Verizon's wireless service during the class period.  Like every other class member, Plaintiff Justice has been victimized by the same uniform policies described in detail herein, in that she signed up for Verizon's wireless service in the manner described herein, received or was directed to the same uniformly-worded documents and/or websites described herein, received a Verizon bill which imposed the same undisclosed Administrative Charge in the same uniform language as described herein, and paid the Administrative Charge complained of herein.

31.     Plaintiff David Kelly is a citizen and resident of Browns Mills, New Jersey, and was a customer of Verizon's wireless service during the class period.  Like every other class

member, Plaintiff Kelly has been victimized by the same uniform policies described in detail

herein, in that he signed up for Verizon's wireless service in the manner described herein,

received or was directed to the same uniformly-worded documents and/or websites described

herein, received a Verizon bill which imposed the same undisclosed Administrative Charge in

the same uniform language as described herein, and paid the Administrative Charge complained

of herein.

      32.    Plaintiff Christina Manfredo is a citizen and resident of Marlton, New Jersey, and

was a customer of Verizon's wireless service during the class period.  Like every other class

member, Plaintiff Manfredo has been victimized by the same uniform policies described in detail

herein, in that she signed up for Verizon's wireless service in the manner described herein,

received or was directed to the same uniformly-worded documents and/or websites described

herein, received a Verizon bill which imposed the same undisclosed Administrative Charge in

the same uniform language as described herein, and paid the Administrative Charge complained

of herein.

      33.    Plaintiff Judith Oelenschlager is a citizen and resident of Medford Lakes, New

Jersey, and was a customer of Verizon's wireless service during the class period.  Like every

other class member, Plaintiff Oelenschlager has been victimized by the same uniform policies

described in detail herein, in that she signed up for Verizon's wireless service in the manner

described herein, received or was directed to the same uniformly-worded documents and/or

websites described herein, received a Verizon bill which imposed the same undisclosed

Administrative Charge in the same uniform language as described herein, and paid the

Administrative Charge complained of herein.

34.     Plaintiff Daniel Patino is a citizen and resident of Somerset, New Jersey, and was a customer of Verizon's wireless service during the class period.  Like every other class member, Plaintiff Patino has been victimized by the same uniform policies described in detail herein, in that he signed up for Verizon's wireless service in the manner described herein, received or was directed to the same uniformly-worded documents and/or websites described herein, received a Verizon bill which imposed the same undisclosed Administrative Charge in the same uniform language as described herein, and paid the Administrative Charge complained of herein.

35.     Plaintiff James Prate is a citizen and resident of Stratford, New Jersey, and was a customer of Verizon's wireless service during the class period.  Like every other class member, Plaintiff Prate has been victimized by the same uniform policies described in detail herein, in that he signed up for Verizon's wireless service in the manner described herein, received or was directed to the same uniformly-worded documents and/or websites described herein, received a Verizon bill which imposed the same undisclosed Administrative Charge in the same uniform language as described herein, and paid the Administrative Charge complained of herein.

36.     Plaintiff Michael Scheufele is a citizen and resident of West Berlin, New Jersey, and was a customer of Verizon's wireless service during the class period.  Like every other class member, Plaintiff Scheufele has been victimized by the same uniform policies described in detail herein, in that he signed up for Verizon's wireless service in the manner described herein, received or was directed to the same uniformly-worded documents and/or websites described herein, received a Verizon bill which imposed the same undisclosed Administrative Charge in the same uniform language as described herein, and paid the Administrative Charge complained of herein.

37.     Plaintiff Russell Sewekow is a citizen and resident of Medford Lakes, New Jersey, and was a customer of Verizon's wireless service during the class period.  Like every other class member, Plaintiff Sewekow has been victimized by the same uniform policies described in detail herein, in that he signed up for Verizon's wireless service in the manner described herein, received or was directed to the same uniformly-worded documents and/or websites described herein, received a Verizon bill which imposed the same undisclosed Administrative Charge in the same uniform language as described herein, and paid the Administrative Charge complained of herein.

38.     Plaintiff Deborah Stroyek is a citizen and resident of Glassboro, New Jersey, and was a customer of Verizon's wireless service during the class period.  Like every other class member, Plaintiff Stroyek has been victimized by the same uniform policies described in detail herein, in that she signed up for Verizon's wireless service in the manner described herein, received or was directed to the same uniformly-worded documents and/or websites described herein, received a Verizon bill which imposed the same undisclosed Administrative Charge in the same uniform language as described herein, and paid the Administrative Charge complained of herein.

39.     Plaintiff Lynda Teer is a citizen and resident of Collingswood, New Jersey, and was a customer of Verizon's wireless service during the class period.  Like every other class member, Plaintiff Teer has been victimized by the same uniform policies described in detail herein, in that she signed up for Verizon's wireless service in the manner described herein, received or was directed to the same uniformly-worded documents and/or websites described herein, received a Verizon bill which imposed the same undisclosed Administrative Charge in

the same uniform language as described herein, and paid the Administrative Charge complained of herein.

40.     Plaintiff Christine Trappe is a citizen and resident of Eastampton, New Jersey, and was a customer of Verizon's wireless service during the class period.  Like every other class member, Plaintiff Trappe has been victimized by the same uniform policies described in detail herein, in that she signed up for Verizon's wireless service in the manner described herein, received or was directed to the same uniformly-worded documents and/or websites described herein, received a Verizon bill which imposed the same undisclosed Administrative Charge in the same uniform language as described herein, and paid the Administrative Charge complained of herein.

41.     Plaintiff Brenda Tripicchio is a citizen and resident of Moorestown, New Jersey, and was a customer of Verizon's wireless service during the class period.  Like every other class member, Plaintiff Tripicchio has been victimized by the same uniform policies described in detail herein, in that she signed up for Verizon's wireless service in the manner described herein, received or was directed to the same uniformly-worded documents and/or websites described herein, received a Verizon bill which imposed the same undisclosed Administrative Charge in the same uniform language as described herein, and paid the Administrative Charge complained of herein.

42.     Plaintiff Teresa MacClelland is a citizen and resident of Eureka, California, and was a customer of Verizon's wireless service during the class period.  Like every other Class member, Plaintiff MacClelland has been victimized by the same uniform policies described in detail herein, in that she signed up for Verizon's wireless service in the manner described herein, received or was directed to the same uniformly-worded documents and/or websites described

herein, received a Verizon bill which imposed the same undisclosed Administrative Charge in the same uniform language as described herein, and paid the Administrative Charge complained of herein.

43.      Plaintiff Karen Umberger is a citizen and resident of Eureka, California, and was a customer of Verizon's wireless service during the class period.  Like every other Class member, Plaintiff Umberger has been victimized by the same uniform policies described in detail herein, in that she signed up for Verizon's wireless service in the manner described herein, received or was directed to the same uniformly-worded documents and/or websites described herein, received a Verizon bill which imposed the same undisclosed Administrative Charge in the same uniform language as described herein, and paid the Administrative Charge complained of herein.

44.      Plaintiff Scott Willits is a citizen and resident of Eureka, California, and was a customer of Verizon's wireless service during the class period.  Like every other Class member, Plaintiff Willits has been victimized by the same uniform policies described in detail herein, in that he signed up for Verizon's wireless service in the manner described herein, received or was directed to the same uniformly-worded documents and/or websites described herein, received a Verizon bill which imposed the same undisclosed Administrative Charge in the same uniform language as described herein, and paid the Administrative Charge complained of herein.

45.      Plaintiff Michael Branom is a citizen and resident of Pasadena, California, and was a customer of Verizon's wireless service during the class period.  Like every other Class member, Plaintiff Branom has been victimized by the same uniform policies described in detail herein, in that he signed up for Verizon's wireless service in the manner described herein, received or was directed to the same uniformly-worded documents and/or websites described

herein, received a Verizon bill which imposed the same undisclosed Administrative Charge in the same uniform language as described herein, and paid the Administrative Charge complained of herein.

46.     Plaintiff Molly Brown is a citizen and resident of Novato, California, and was a customer of Verizon's wireless service during the class period.  Like every other Class member, Plaintiff Brown has been victimized by the same uniform policies described in detail herein, in that she signed up for Verizon's wireless service in the manner described herein, received or was directed to the same uniformly-worded documents and/or websites described herein, received a Verizon bill which imposed the same undisclosed Administrative Charge in the same uniform language as described herein, and paid the Administrative Charge complained of herein.

47.     Plaintiff Michael Carney is a citizen and resident of Los Angeles, California, and was a customer of Verizon's wireless service during the class period.  Like every other Class member, Plaintiff Carney has been victimized by the same uniform policies described in detail herein, in that he signed up for Verizon's wireless service in the manner described herein, received or was directed to the same uniformly-worded documents and/or websites described herein, received a Verizon bill which imposed the same undisclosed Administrative Charge in the same uniform language as described herein, and paid the Administrative Charge complained of herein.

48.     Plaintiff Tim Frasch is a citizen and resident of Gilroy, California, and was a customer of Verizon's wireless service during the class period.  Like every other Class member, Plaintiff Frasch has been victimized by the same uniform policies described in detail herein, in that he signed up for Verizon's wireless service in the manner described herein, received or was directed to the same uniformly-worded documents and/or websites described herein, received a

Verizon bill which imposed the same undisclosed Administrative Charge in the same uniform

language as described herein, and paid the Administrative Charge complained of herein.

49.     Plaintiff Patricia Gagan is a citizen and resident of Los Angeles, California, and

was a customer of Verizon's wireless service during the class period.  Like every other Class

member, Plaintiff Gagan has been victimized by the same uniform policies described in detail

herein, in that she signed up for Verizon's wireless service in the manner described herein,

received or was directed to the same uniformly-worded documents and/or websites described

herein, received a Verizon bill which imposed the same undisclosed Administrative Charge in

the same uniform language as described herein, and paid the Administrative Charge complained

of herein.

50.     Plaintiff Anna Gutierrez is a citizen and resident of Whittier, California, and was

a customer of Verizon's wireless service during the class period.  Like every other Class

member, Plaintiff Anna Gutierrez has been victimized by the same uniform policies described in

detail herein, in that she signed up for Verizon's wireless service in the manner described herein,

received or was directed to the same uniformly-worded documents and/or websites described

herein, received a Verizon bill which imposed the same undisclosed Administrative Charge in

the same uniform language as described herein, and paid the Administrative Charge complained

of herein.

51.     Plaintiff Linda Jenkins is a citizen and resident of Valencia, California, and was a

customer of Verizon's wireless service during the class period.  Like every other Class member,

Plaintiff Jenkins has been victimized by the same uniform policies described in detail herein, in

that she signed up for Verizon's wireless service in the manner described herein, received or was

directed to the same uniformly-worded documents and/or websites described herein, received a

Verizon bill which imposed the same undisclosed Administrative Charge in the same uniform language as described herein, and paid the Administrative Charge complained of herein.

52.     Plaintiff Augustus Johnson is a citizen and resident of Eureka, California, and was a customer of Verizon's wireless service during the class period.  Like every other Class member, Plaintiff Johnson has been victimized by the same uniform policies described in detail herein, in that he signed up for Verizon's wireless service in the manner described herein, received or was directed to the same uniformly-worded documents and/or websites described herein, received a Verizon bill which imposed the same undisclosed Administrative Charge in the same uniform language as described herein, and paid the Administrative Charge complained of herein.

53.     Plaintiff William Kaupelis is a citizen and resident of Placentia, California, and was a customer of Verizon's wireless service during the class period.  Like every other Class member, Plaintiff Kaupelis has been victimized by the same uniform policies described in detail herein, in that he signed up for Verizon's wireless service in the manner described herein, received or was directed to the same uniformly-worded documents and/or websites described herein, received a Verizon bill which imposed the same undisclosed Administrative Charge in the same uniform language as described herein, and paid the Administrative Charge complained of herein.

54.     Plaintiff Marilyn Kaye is a citizen and resident of Chatsworth, California, and was a customer of Verizon's wireless service during the class period.  Like every other Class member, Plaintiff Kaye has been victimized by the same uniform policies described in detail herein, in that she signed up for Verizon's wireless service in the manner described herein, received or was directed to the same uniformly-worded documents and/or websites described

herein, received a Verizon bill which imposed the same undisclosed Administrative Charge in the same uniform language as described herein, and paid the Administrative Charge complained of herein.

55.     Plaintiff Janette Lisner is a citizen and resident of Tarzana, California, and was a customer of Verizon's wireless service during the class period.  Like every other Class member, Plaintiff Lisner has been victimized by the same uniform policies described in detail herein, in that she signed up for Verizon's wireless service in the manner described herein, received or was directed to the same uniformly-worded documents and/or websites described herein, received a Verizon bill which imposed the same undisclosed Administrative Charge in the same uniform language as described herein, and paid the Administrative Charge complained of herein.

56.     Plaintiff William Eric Lough is a citizen and resident of Wildomar, California, and was a customer of Verizon's wireless service during the class period.  Like every other Class member, Plaintiff Lough has been victimized by the same uniform policies described in detail herein, in that he signed up for Verizon's wireless service in the manner described herein, received or was directed to the same uniformly-worded documents and/or websites described herein, received a Verizon bill which imposed the same undisclosed Administrative Charge in the same uniform language as described herein, and paid the Administrative Charge complained of herein.

57.     Plaintiff David Massaro is a citizen and resident of Yucaipa, California, and was a customer of Verizon's wireless service during the class period.  Like every other Class member, Plaintiff Massaro has been victimized by the same uniform policies described in detail herein, in that he signed up for Verizon's wireless service in the manner described herein, received or was directed to the same uniformly-worded documents and/or websites described herein, received a

Verizon bill which imposed the same undisclosed Administrative Charge in the same uniform

language as described herein, and paid the Administrative Charge complained of herein.

58.    Plaintiff Louise Monsour is a citizen and resident of Eureka, California, and was a

customer of Verizon's wireless service during the class period.  Like every other Class member,

Plaintiff Monsour has been victimized by the same uniform policies described in detail herein, in

that she signed up for Verizon's wireless service in the manner described herein, received or was

directed to the same uniformly-worded documents and/or websites described herein, received a

Verizon bill which imposed the same undisclosed Administrative Charge in the same uniform

language as described herein, and paid the Administrative Charge complained of herein.

59.    Plaintiff Darleen Perez is a citizen and resident of Long Beach, California, and

was a customer of Verizon's wireless service during the class period.  Like every other Class

member, Plaintiff Perez has been victimized by the same uniform policies described in detail

herein, in that she signed up for Verizon's wireless service in the manner described herein,

received or was directed to the same uniformly-worded documents and/or websites described

herein, received a Verizon bill which imposed the same undisclosed Administrative Charge in

the same uniform language as described herein, and paid the Administrative Charge complained

of herein.

60.    Plaintiff Gabrielle Pozzuoli is a citizen and resident of Woodland Hills,

California, and was a customer of Verizon's wireless service during the class period.  Like every

other Class member, Plaintiff Pozzuoli has been victimized by the same uniform policies

described in detail herein, in that she signed up for Verizon's wireless service in the manner

described herein, received or was directed to the same uniformly-worded documents and/or

websites described herein, received a Verizon bill which imposed the same undisclosed

Administrative Charge in the same uniform language as described herein, and paid the Administrative Charge complained of herein.

61.     Plaintiff Valerie Reed is a citizen and resident of Eureka, California, and was a customer of Verizon's wireless service during the class period.  Like every other Class member, Plaintiff Reed has been victimized by the same uniform policies described in detail herein, in that she signed up for Verizon's wireless service in the manner described herein, received or was directed to the same uniformly-worded documents and/or websites described herein, received a Verizon bill which imposed the same undisclosed Administrative Charge in the same uniform language as described herein, and paid the Administrative Charge complained of herein.

62.     Plaintiff Bruce Schramm is a citizen and resident of Tarzana, California, and was a customer of Verizon's wireless service during the class period.  Like every other Class member, Plaintiff Schramm has been victimized by the same uniform policies described in detail herein, in that he signed up for Verizon's wireless service in the manner described herein, received or was directed to the same uniformly-worded documents and/or websites described herein, received a Verizon bill which imposed the same undisclosed Administrative Charge in the same uniform language as described herein, and paid the Administrative Charge complained of herein.

63.     Plaintiff Kerry Showalter is a citizen and resident of Newbury Park, California, and was a customer of Verizon's wireless service during the class period.  Like every other Class member, Plaintiff Showalter has been victimized by the same uniform policies described in detail herein, in that she signed up for Verizon's wireless service in the manner described herein, received or was directed to the same uniformly-worded documents and/or websites described herein, received a Verizon bill which imposed the same undisclosed Administrative Charge in

23

the same uniform language as described herein, and paid the Administrative Charge complained of herein.

64.     Plaintiff John St. Jarre is a citizen and resident of Wildomar, California, and was a customer of Verizon's wireless service during the class period.  Like every other Class member, Plaintiff St. Jarre has been victimized by the same uniform policies described in detail herein, in that he signed up for Verizon's wireless service in the manner described herein, received or was directed to the same uniformly-worded documents and/or websites described herein, received a Verizon bill which imposed the same undisclosed Administrative Charge in the same uniform language as described herein, and paid the Administrative Charge complained of herein.

65.     Plaintiff Gloria Stern is a citizen and resident of Temecula, California, and was a customer of Verizon's wireless service during the class period.  Like every other Class member, Plaintiff Stern has been victimized by the same uniform policies described in detail herein, in that she signed up for Verizon's wireless service in the manner described herein, received or was directed to the same uniformly-worded documents and/or websites described herein, received a Verizon bill which imposed the same undisclosed Administrative Charge in the same uniform language as described herein, and paid the Administrative Charge complained of herein.

66.     Plaintiff Edna Toy is a citizen and resident of Sacramento, California, and was a customer of Verizon's wireless service during the class period.  Like every other Class member, Plaintiff Edna Toy has been victimized by the same uniform policies described in detail herein, in that she signed up for Verizon's wireless service in the manner described herein, received or was directed to the same uniformly-worded documents and/or websites described herein, received a Verizon bill which imposed the same undisclosed Administrative Charge in the same uniform language as described herein, and paid the Administrative Charge complained of herein.

67.     Plaintiff Teresa Toy is a citizen and resident of San Bruno, California, and was a customer of Verizon's wireless service during the class period.  Like every other Class member, Plaintiff Teresa Toy has been victimized by the same uniform policies described in detail herein, in that she signed up for Verizon's wireless service in the manner described herein, received or was directed to the same uniformly-worded documents and/or websites described herein, received a Verizon bill which imposed the same undisclosed Administrative Charge in the same uniform language as described herein, and paid the Administrative Charge complained of herein.

68.     Plaintiff Vanessa West is a citizen and resident of Woodland Hills, California, and was a customer of Verizon's wireless service during the class period.  Like every other Class member, Plaintiff West has been victimized by the same uniform policies described in detail herein, in that she signed up for Verizon's wireless service in the manner described herein, received or was directed to the same uniformly-worded documents and/or websites described herein, received a Verizon bill which imposed the same undisclosed Administrative Charge in the same uniform language as described herein, and paid the Administrative Charge complained of herein.

69.     Plaintiff Mary Bowman is a citizen and resident of Graham, Washington, and was a customer of Verizon's wireless service during the class period.  Like every other Class member, Plaintiff Bowman has been victimized by the same uniform policies described in detail herein, in that she signed up for Verizon's wireless service in the manner described herein, received or was directed to the same uniformly-worded documents and/or websites described herein, received a Verizon bill which imposed the same undisclosed Administrative Charge in the same uniform language as described herein, and paid the Administrative Charge complained of herein.

25

70.     Plaintiff Art Capri is a citizen and resident of Fort Myers, Florida, and was a customer of Verizon's wireless service during the class period. Like every other Class member, Plaintiff Capri has been victimized by the same uniform policies described in detail herein, in that he signed up for Verizon's wireless service in the manner described herein, received or was directed to the same uniformly-worded documents and/or websites described herein, received a Verizon bill which imposed the same undisclosed Administrative Charge in the same uniform language as described herein, and paid the Administrative Charge complained of herein.

71.     Plaintiff Debra Casey is a citizen and resident of Honolulu, Hawaii, and was a customer of Verizon's wireless service during the class period.  Like every other Class member, Plaintiff Casey has been victimized by the same uniform policies described in detail herein, in that she signed up for Verizon's wireless service in the manner described herein, received or was directed to the same uniformly-worded documents and/or websites described herein, received a Verizon bill which imposed the same undisclosed Administrative Charge in the same uniform language as described herein, and paid the Administrative Charge complained of herein.

72.     Plaintiff Karyn Challender is a citizen and resident of Rainier, Washington, and was a customer of Verizon's wireless service during the class period.  Like every other Class member, Plaintiff Challender has been victimized by the same uniform policies described in detail herein, in that she signed up for Verizon's wireless service in the manner described herein, received or was directed to the same uniformly-worded documents and/or websites described herein, received a Verizon bill which imposed the same undisclosed Administrative Charge in the same uniform language as described herein, and paid the Administrative Charge complained of herein.

73.      Plaintiff Tyson Cohron is a citizen and resident of Troutdale, Oregon, and was a customer of Verizon's wireless service during the class period.  Like every other Class member, Plaintiff Cohron has been victimized by the same uniform policies described in detail herein, in that he signed up for Verizon's wireless service in the manner described herein, received or was directed to the same uniformly-worded documents and/or websites described herein, received a Verizon bill which imposed the same undisclosed Administrative Charge in the same uniform language as described herein, and paid the Administrative Charge complained of herein.

74.      Plaintiff Cintia Corsi is a citizen and resident of New Rochelle, New York, and was a customer of Verizon's wireless service during the class period.  Like every other Class member, Plaintiff Corsi has been victimized by the same uniform policies described in detail herein, in that she signed up for Verizon's wireless service in the manner described herein, received or was directed to the same uniformly-worded documents and/or websites described herein, received a Verizon bill which imposed the same undisclosed Administrative Charge in the same uniform language as described herein, and paid the Administrative Charge complained of herein.

75.      Plaintiff Andi Ellis is a citizen and resident of Selah, Washington, and was a customer of Verizon's wireless service during the class period.  Like every other Class member, Plaintiff Ellis has been victimized by the same uniform policies described in detail herein, in that she signed up for Verizon's wireless service in the manner described herein, received or was directed to the same uniformly-worded documents and/or websites described herein, received a Verizon bill which imposed the same undisclosed Administrative Charge in the same uniform language as described herein, and paid the Administrative Charge complained of herein.

76.      Plaintiff Laurie Frantz is a citizen and resident of Santa Fe, New Mexico, and was

a customer of Verizon's wireless service during the class period.  Like every other Class member, Plaintiff Frantz has been victimized by the same uniform policies described in detail herein, in that she signed up for Verizon's wireless service in the manner described herein, received or was directed to the same uniformly-worded documents and/or websites described herein, received a Verizon bill which imposed the same undisclosed Administrative Charge in the same uniform language as described herein, and paid the Administrative Charge complained of herein.

77.     Plaintiff Ashley Garrison is a citizen and resident of Bellingham, Washington, and was a customer of Verizon's wireless service during the class period.  Like every other Class member, Plaintiff Garrison has been victimized by the same uniform policies described in detail herein, in that she signed up for Verizon's wireless service in the manner described herein, received or was directed to the same uniformly-worded documents and/or websites described herein, received a Verizon bill which imposed the same undisclosed Administrative Charge in the same uniform language as described herein, and paid the Administrative Charge complained of herein.

78.     Plaintiff Angela Green is a citizen and resident of Enterprise, Oregon, and was a customer of Verizon's wireless service during the class period.  Like every other Class member, Plaintiff Green has been victimized by the same uniform policies described in detail herein, in that she signed up for Verizon's wireless service in the manner described herein, received or was directed to the same uniformly-worded documents and/or websites described herein, received a Verizon bill which imposed the same undisclosed Administrative Charge in the same uniform language as described herein, and paid the Administrative Charge complained of herein.

79.     Plaintiff Carlos Gutierrez is a citizen and resident of Artesia, New Mexico, and

was a customer of Verizon's wireless service during the class period.  Like every other Class

member, Plaintiff Gutierrez has been victimized by the same uniform policies described in detail

herein, in that he signed up for Verizon's wireless service in the manner described herein,

received or was directed to the same uniformly-worded documents and/or websites described

herein, received a Verizon bill which imposed the same undisclosed Administrative Charge in

the same uniform language as described herein, and paid the Administrative Charge complained

of herein.

80.     Plaintiff James Holling is a citizen and resident of Raton, New Mexico, and was a

customer of Verizon's wireless service during the class period.  Like every other Class member,

Plaintiff Holling has been victimized by the same uniform policies described in detail herein, in

that he signed up for Verizon's wireless service in the manner described herein, received or was

directed to the same uniformly-worded documents and/or websites described herein, received a

Verizon bill which imposed the same undisclosed Administrative Charge in the same uniform

language as described herein, and paid the Administrative Charge complained of herein.

81.     Plaintiff Karen Hudson is a citizen and resident of Albuquerque, New Mexico,

and was a customer of Verizon's wireless service during the class period.  Like every other Class

member, Plaintiff Hudson has been victimized by the same uniform policies described in detail

herein, in that she signed up for Verizon's wireless service in the manner described herein,

received or was directed to the same uniformly-worded documents and/or websites described

herein, received a Verizon bill which imposed the same undisclosed Administrative Charge in

the same uniform language as described herein, and paid the Administrative Charge complained

of herein.

82.     Plaintiff Jerry Hunt is a citizen and resident of Kapolei, Hawaii, and was a customer of Verizon's wireless service during the class period.  Like every other Class member, Plaintiff Hunt has been victimized by the same uniform policies described in detail herein, in that he signed up for Verizon's wireless service in the manner described herein, received or was directed to the same uniformly-worded documents and/or websites described herein, received a Verizon bill which imposed the same undisclosed Administrative Charge in the same uniform language as described herein, and paid the Administrative Charge complained of herein.

83.     Plaintiff Jennifer Hurtt is a citizen and resident of St. Petersburg, Florida, and was a customer of Verizon's wireless service during the class period. Like every other Class member, Plaintiff Hurtt has been victimized by the same uniform policies described in detail herein, in that she signed up for Verizon's wireless service in the manner described herein, received or was directed to the same uniformly-worded documents and/or websites described herein, received a Verizon bill which imposed the same undisclosed Administrative Charge in the same uniform language as described herein, and paid the Administrative Charge complained of herein.

84.     Plaintiff Joyce Jones is a citizen and resident of East Wenatchee, Washington, and was a customer of Verizon's wireless service during the class period.  Like every other Class member, Plaintiff Jones has been victimized by the same uniform policies described in detail herein, in that she signed up for Verizon's wireless service in the manner described herein, received or was directed to the same uniformly-worded documents and/or websites described herein, received a Verizon bill which imposed the same undisclosed Administrative Charge in the same uniform language as described herein, and paid the Administrative Charge complained of herein.

85.     Plaintiff Lynn Kiraly is a citizen and resident of Huntington, New York, and was

a customer of Verizon's wireless service during the class period. Like every other Class member, Plaintiff Kiraly has been victimized by the same uniform policies described in detail herein, in that she signed up for Verizon's wireless service in the manner described herein, received or was directed to the same uniformly-worded documents and/or websites described herein, received a Verizon bill which imposed the same undisclosed Administrative Charge in the same uniform language as described herein, and paid the Administrative Charge complained of herein.

86.     Plaintiff Michelle Lacuesta is a citizen and resident of Aiea, Hawaii, and was a customer of Verizon's wireless service during the class period. Like every other Class member, Plaintiff Lacuesta has been victimized by the same uniform policies described in detail herein, in that she signed up for Verizon's wireless service in the manner described herein, received or was directed to the same uniformly-worded documents and/or websites described herein, received a Verizon bill which imposed the same undisclosed Administrative Charge in the same uniform language as described herein, and paid the Administrative Charge complained of herein.

87.     Plaintiff Jason McConville is a citizen and resident of Pasco, Washington, and was a customer of Verizon's wireless service during the class period. Like every other Class member, Plaintiff McConville has been victimized by the same uniform policies described in detail herein, in that he signed up for Verizon's wireless service in the manner described herein, received or was directed to the same uniformly-worded documents and/or websites described herein, received a Verizon bill which imposed the same undisclosed Administrative Charge in the same uniform language as described herein, and paid the Administrative Charge complained of herein.

88.     Plaintiff Jose Nicot is a citizen and resident of Bronx, New York, and was a customer of Verizon's wireless service during the class period.  Like every other Class member, Plaintiff Nicot has been victimized by the same uniform policies described in detail herein, in that he signed up for Verizon's wireless service in the manner described herein, received or was directed to the same uniformly-worded documents and/or websites described herein, received a Verizon bill which imposed the same undisclosed Administrative Charge in the same uniform language as described herein, and paid the Administrative Charge complained of herein.

89.     Plaintiff Sandra Oshiro is a citizen and resident of Honolulu, Hawaii, and was a customer of Verizon's wireless service during the class period.  Like every other Class member, Plaintiff Oshiro has been victimized by the same uniform policies described in detail herein, in that she signed up for Verizon's wireless service in the manner described herein, received or was directed to the same uniformly-worded documents and/or websites described herein, received a Verizon bill which imposed the same undisclosed Administrative Charge in the same uniform language as described herein, and paid the Administrative Charge complained of herein.

90.     Plaintiff Leslie Owens is a citizen and resident of Tohatchi, New Mexico, and was a customer of Verizon's wireless service during the class period.  Like every other Class member, Plaintiff Owens has been victimized by the same uniform policies described in detail herein, in that she signed up for Verizon's wireless service in the manner described herein, received or was directed to the same uniformly-worded documents and/or websites described herein, received a Verizon bill which imposed the same undisclosed Administrative Charge in the same uniform language as described herein, and paid the Administrative Charge complained of herein.

91.     Plaintiff Jon Santos is a citizen and resident of Oakland Park, Florida, and was a customer of Verizon's wireless service during the class period.  Like every other Class member, Plaintiff Santos has been victimized by the same uniform policies described in detail herein, in that he signed up for Verizon's wireless service in the manner described herein, received or was directed to the same uniformly-worded documents and/or websites described herein, received a Verizon bill which imposed the same undisclosed Administrative Charge in the same uniform language as described herein, and paid the Administrative Charge complained of herein.

92.     Plaintiff Terry Sexton is a citizen and resident of Gulf Breeze, Florida, and was a customer of Verizon's wireless service during the class period. Like every other Class member, Plaintiff Sexton has been victimized by the same uniform policies described in detail herein, in that she signed up for Verizon's wireless service in the manner described herein, received or was directed to the same uniformly-worded documents and/or websites described herein, received a Verizon bill which imposed the same undisclosed Administrative Charge in the same uniform language as described herein, and paid the Administrative Charge complained of herein.

93.     Plaintiff Kathleen Wright is a citizen and resident of Quilcene, Washington, and was a customer of Verizon's wireless service during the class period.  Like every other Class member, Plaintiff Wright has been victimized by the same uniform policies described in detail herein, in that she signed up for Verizon's wireless service in the manner described herein, received or was directed to the same uniformly-worded documents and/or websites described herein, received a Verizon bill which imposed the same undisclosed Administrative Charge in the same uniform language as described herein, and paid the Administrative Charge complained of herein.

94.     Plaintiff Pamela M. Allen is a citizen and resident of Rockingham, North

Carolina, and was a customer of Verizon's wireless service during the class period.  Like every

other Class member, Plaintiff Allen has been victimized by the same uniform policies described

in detail herein, in that she signed up for Verizon's wireless service in the manner described

herein, received or was directed to the same uniformly-worded documents and/or websites

described herein, received a Verizon bill which imposed the same undisclosed Administrative

Charge in the same uniform language as described herein, and paid the Administrative Charge

complained of herein.

95.     Plaintiff Samantha Albaitis is a citizen and resident of New Britain, Connecticut,

and was a customer of Verizon's wireless service during the class period.  Like every other Class

member, Plaintiff Albaitis has been victimized by the same uniform policies described in detail

herein, in that she signed up for Verizon's wireless service in the manner described herein,

received or was directed to the same uniformly-worded documents and/or websites described

herein, received a Verizon bill which imposed the same undisclosed Administrative Charge in

the same uniform language as described herein, and paid the Administrative Charge complained

of herein.

96.     Plaintiff Cydni Arterbury is a citizen and resident of Benton, Arkansas, and was a

customer of Verizon's wireless service during the class period.  Like every other Class member,

Plaintiff Arterbury has been victimized by the same uniform policies described in detail herein,

in that she signed up for Verizon's wireless service in the manner described herein, received or

was directed to the same uniformly-worded documents and/or websites described herein,

received a Verizon bill which imposed the same undisclosed Administrative Charge in the same

uniform language as described herein, and paid the Administrative Charge complained of herein.

97.     Plaintiff Lisa Baker is a citizen and resident of Indianapolis, Indiana, and was a

customer of Verizon's wireless service during the class period.  Like every other Class member, Plaintiff Baker has been victimized by the same uniform policies described in detail herein, in that she signed up for Verizon's wireless service in the manner described herein, received or was directed to the same uniformly-worded documents and/or websites described herein, received a Verizon bill which imposed the same undisclosed Administrative Charge in the same uniform language as described herein, and paid the Administrative Charge complained of herein.

98.     Plaintiff Briana Bell is a citizen and resident of Dallas, Texas, and was a customer of Verizon's wireless service during the class period.  Like every other Class member, Plaintiff Bell has been victimized by the same uniform policies described in detail herein, in that she signed up for Verizon's wireless service in the manner described herein, received or was directed to the same uniformly-worded documents and/or websites described herein, received a Verizon bill which imposed the same undisclosed Administrative Charge in the same uniform language as described herein, and paid the Administrative Charge complained of herein.

99.     Plaintiff Christine Bellavia is a citizen and resident of Lincoln, Nebraska, and was a customer of Verizon's wireless service during the class period.  Like every other Class member, Plaintiff Bellavia has been victimized by the same uniform policies described in detail herein, in that she signed up for Verizon's wireless service in the manner described herein, received or was directed to the same uniformly-worded documents and/or websites described herein, received a Verizon bill which imposed the same undisclosed Administrative Charge in the same uniform language as described herein, and paid the Administrative Charge complained of herein.

100.    Plaintiff Kimberly Blair is a citizen and resident of Howell, Michigan, and was a customer of Verizon's wireless service during the class period.  Like every other Class member,

Plaintiff Blair has been victimized by the same uniform policies described in detail herein, in that she signed up for Verizon's wireless service in the manner described herein, received or was directed to the same uniformly-worded documents and/or websites described herein, received a Verizon bill which imposed the same undisclosed Administrative Charge in the same uniform language as described herein, and paid the Administrative Charge complained of herein.

101.     Plaintiff Leanor Bland-Mullins is a citizen and resident of Clarksville, Tennessee, and was a customer of Verizon's wireless service during the class period.  Like every other Class member, Plaintiff Bland-Mullins has been victimized by the same uniform policies described in detail herein, in that she signed up for Verizon's wireless service in the manner described herein, received or was directed to the same uniformly-worded documents and/or websites described herein, received a Verizon bill which imposed the same undisclosed Administrative Charge in the same uniform language as described herein, and paid the Administrative Charge complained of herein.

102.     Plaintiff Caroline Bonham is a citizen and resident of Casa Grande, Arizona, and was a customer of Verizon's wireless service during the class period.  Like every other Class member, Plaintiff Bonham has been victimized by the same uniform policies described in detail herein, in that she signed up for Verizon's wireless service in the manner described herein, received or was directed to the same uniformly-worded documents and/or websites described herein, received a Verizon bill which imposed the same undisclosed Administrative Charge in the same uniform language as described herein, and paid the Administrative Charge complained of herein

103.     Plaintiff Tammy Burke is a citizen and resident of Stokesdale, North Carolina, and was a customer of Verizon's wireless service during the class period.  Like every other Class

member, Plaintiff Burke has been victimized by the same uniform policies described in detail herein, in that she signed up for Verizon's wireless service in the manner described herein, received or was directed to the same uniformly-worded documents and/or websites described herein, received a Verizon bill which imposed the same undisclosed Administrative Charge in the same uniform language as described herein, and paid the Administrative Charge complained of herein.

104.    Plaintiff Annmarie Caldwell is a citizen and resident of Smyrna, Delaware, and was a customer of Verizon's wireless service during the class period.  Like every other Class member, Plaintiff Caldwell has been victimized by the same uniform policies described in detail herein, in that she signed up for Verizon's wireless service in the manner described herein, received or was directed to the same uniformly-worded documents and/or websites described herein, received a Verizon bill which imposed the same undisclosed Administrative Charge in the same uniform language as described herein, and paid the Administrative Charge complained of herein.

105.    Plaintiff Shauna Cavallaro is a citizen and resident of Diamond, Ohio, and was a customer of Verizon's wireless service during the class period.  Like every other Class member, Plaintiff Cavallaro has been victimized by the same uniform policies described in detail herein, in that she signed up for Verizon's wireless service in the manner described herein, received or was directed to the same uniformly-worded documents and/or websites described herein, received a Verizon bill which imposed the same undisclosed Administrative Charge in the same uniform language as described herein, and paid the Administrative Charge complained of herein.

106.    Plaintiff Santos Colon is a citizen and resident of Mission, South Dakota, and was a customer of Verizon's wireless service during the class period.  Like every other Class

member, Plaintiff Colon has been victimized by the same uniform policies described in detail

herein, in that he signed up for Verizon's wireless service in the manner described herein,

received or was directed to the same uniformly-worded documents and/or websites described

herein, received a Verizon bill which imposed the same undisclosed Administrative Charge in

the same uniform language as described herein, and paid the Administrative Charge complained

of herein.

107.    Plaintiff Erika Conley is a citizen and resident of Portland, Michigan, and was a

customer of Verizon's wireless service during the class period.  Like every other Class member,

Plaintiff Conley has been victimized by the same uniform policies described in detail herein, in

that she signed up for Verizon's wireless service in the manner described herein, received or was

directed to the same uniformly-worded documents and/or websites described herein, received a

Verizon bill which imposed the same undisclosed Administrative Charge in the same uniform

language as described herein, and paid the Administrative Charge complained of herein.

108.    Plaintiff Kendra Conover is a citizen and resident of Shelbyville, Indiana, and was

a customer of Verizon's wireless service during the class period.  Like every other Class

member, Plaintiff Conover has been victimized by the same uniform policies described in detail

herein, in that she signed up for Verizon's wireless service in the manner described herein,

received or was directed to the same uniformly-worded documents and/or websites described

herein, received a Verizon bill which imposed the same undisclosed Administrative Charge in

the same uniform language as described herein, and paid the Administrative Charge complained

of herein.

109.    Plaintiff Dylan Corbin is a citizen and resident of Villa Park, Illinois, and was a

customer of Verizon's wireless service during the class period. Like every other Class member,

Plaintiff Corbin has been victimized by the same uniform policies described in detail herein, in that Plaintiff Corbin signed up for Verizon's wireless service in the manner described herein, received or was directed to the same uniformly-worded documents and/or websites described herein, received a Verizon bill which imposed the same undisclosed Administrative Charge in the same uniform language as described herein, and paid the Administrative Charge complained of herein.

110.    Plaintiff Laura Curry is a citizen and resident of Leesburg, Ohio, and was a customer of Verizon's wireless service during the class period.  Like every other Class member, Plaintiff Curry has been victimized by the same uniform policies described in detail herein, in that she signed up for Verizon's wireless service in the manner described herein, received or was directed to the same uniformly-worded documents and/or websites described herein, received a Verizon bill which imposed the same undisclosed Administrative Charge in the same uniform language as described herein, and paid the Administrative Charge complained of herein.

111.    Plaintiff Shakera Dyer is a citizen and resident of Canton, Georgia, and was a customer of Verizon's wireless service during the class period.  Like every other Class member, Plaintiff Dyer has been victimized by the same uniform policies described in detail herein, in that she signed up for Verizon's wireless service in the manner described herein, received or was directed to the same uniformly-worded documents and/or websites described herein, received a Verizon bill which imposed the same undisclosed Administrative Charge in the same uniform language as described herein, and paid the Administrative Charge complained of herein.

112.    Plaintiff Jane Frey is a citizen and resident of Hebron, Kentucky, and was a customer of Verizon's wireless service during the class period.  Like every other Class member, Plaintiff Frey has been victimized by the same uniform policies described in detail herein, in that

she signed up for Verizon's wireless service in the manner described herein, received or was directed to the same uniformly-worded documents and/or websites described herein, received a Verizon bill which imposed the same undisclosed Administrative Charge in the same uniform language as described herein, and paid the Administrative Charge complained of herein.

113.    Plaintiff Russell From is a citizen and resident of Middleton, Wisconsin, and was a customer of Verizon's wireless service during the class period.  Like every other Class member, Plaintiff From has been victimized by the same uniform policies described in detail herein, in that he signed up for Verizon's wireless service in the manner described herein, received or was directed to the same uniformly-worded documents and/or websites described herein, received a Verizon bill which imposed the same undisclosed Administrative Charge in the same uniform language as described herein, and paid the Administrative Charge complained of herein.

114.    Plaintiff Angel Gaines is a citizen and resident of Las Vegas, Nevada, and was a customer of Verizon's wireless service during the class period.  Like every other Class member, Plaintiff Gaines has been victimized by the same uniform policies described in detail herein, in that she signed up for Verizon's wireless service in the manner described herein, received or was directed to the same uniformly-worded documents and/or websites described herein, received a Verizon bill which imposed the same undisclosed Administrative Charge in the same uniform language as described herein, and paid the Administrative Charge complained of herein.

115.    Plaintiff Ashtin Gamblin is a citizen and resident of Colorado Springs, Colorado, and was a customer of Verizon's wireless service during the class period.  Like every other Class member, Plaintiff Gamblin has been victimized by the same uniform policies described in detail herein, in that she signed up for Verizon's wireless service in the manner described herein,

received or was directed to the same uniformly-worded documents and/or websites described herein, received a Verizon bill which imposed the same undisclosed Administrative Charge in the same uniform language as described herein, and paid the Administrative Charge complained of herein.

116.    Plaintiff Ericka Gardner is a citizen and resident of West Bloomfield, Michigan, and was a customer of Verizon's wireless service during the class period.  Like every other Class member, Plaintiff Gardner has been victimized by the same uniform policies described in detail herein, in that she signed up for Verizon's wireless service in the manner described herein, received or was directed to the same uniformly-worded documents and/or websites described herein, received a Verizon bill which imposed the same undisclosed Administrative Charge in the same uniform language as described herein, and paid the Administrative Charge complained of herein.

117.    Plaintiff Ann Graff is a citizen and resident of Pearl River, Louisiana, and was a customer of Verizon's wireless service during the class period.  Like every other Class member, Plaintiff Graff has been victimized by the same uniform policies described in detail herein, in that she signed up for Verizon's wireless service in the manner described herein, received or was directed to the same uniformly-worded documents and/or websites described herein, received a Verizon bill which imposed the same undisclosed Administrative Charge in the same uniform language as described herein, and paid the Administrative Charge complained of herein.

118.    Plaintiff James Hensley is a citizen and resident of Asheville, North Carolina, and was a customer of Verizon's wireless service during the class period.  Like every other Class member, Plaintiff Hensley has been victimized by the same uniform policies described in detail herein, in that he signed up for Verizon's wireless service in the manner described herein,

received or was directed to the same uniformly-worded documents and/or websites described herein, received a Verizon bill which imposed the same undisclosed Administrative Charge in the same uniform language as described herein, and paid the Administrative Charge complained of herein.

119.    Plaintiff Sarel Hines is a citizen and resident of Washington, District of Columbia, and was a customer of Verizon's wireless service during the class period.  Like every other Class member, Plaintiff Hines has been victimized by the same uniform policies described in detail herein, in that she signed up for Verizon's wireless service in the manner described herein, received or was directed to the same uniformly-worded documents and/or websites described herein, received a Verizon bill which imposed the same undisclosed Administrative Charge in the same uniform language as described herein, and paid the Administrative Charge complained of herein.

120.    Plaintiff Alexander Keeler is a citizen and resident of West Fargo, North Dakota, and was a customer of Verizon's wireless service during the class period.  Like every other Class member, Plaintiff Keeler has been victimized by the same uniform policies described in detail herein, in that he signed up for Verizon's wireless service in the manner described herein, received or was directed to the same uniformly-worded documents and/or websites described herein, received a Verizon bill which imposed the same undisclosed Administrative Charge in the same uniform language as described herein, and paid the Administrative Charge complained of herein.

121.    Plaintiff Adam Keller is a citizen and resident of Norwood, Massachusetts, and was a customer of Verizon's wireless service during the class period.  Like every other Class member, Plaintiff Keller has been victimized by the same uniform policies described in detail

herein, in that he signed up for Verizon's wireless service in the manner described herein, received or was directed to the same uniformly-worded documents and/or websites described herein, received a Verizon bill which imposed the same undisclosed Administrative Charge in the same uniform language as described herein, and paid the Administrative Charge complained of herein.

122.    Plaintiff Billie Kendrick is a citizen and resident of Phenix City, Alabama, and was a customer of Verizon's wireless service during the class period.  Like every other Class member, Plaintiff Kendrick has been victimized by the same uniform policies described in detail herein, in that Plaintiff signed up for Verizon's wireless service in the manner described herein, received or was directed to the same uniformly-worded documents and/or websites described herein, received a Verizon bill which imposed the same undisclosed Administrative Charge in the same uniform language as described herein, and paid the Administrative Charge complained of herein.

123.    Plaintiff Krista Kirby is a citizen and resident of Chisago City, Minnesota, and was a customer of Verizon's wireless service during the class period.  Like every other Class member, Plaintiff Kirby has been victimized by the same uniform policies described in detail herein, in that she signed up for Verizon's wireless service in the manner described herein, received or was directed to the same uniformly-worded documents and/or websites described herein, received a Verizon bill which imposed the same undisclosed Administrative Charge in the same uniform language as described herein, and paid the Administrative Charge complained of herein.

124.    Plaintiff Jan Lombard is a citizen and resident of East Sandwich, Massachusetts, and was a customer of Verizon's wireless service during the class period.  Like every other Class

member, Plaintiff Lombard has been victimized by the same uniform policies described in detail

herein, in that she signed up for Verizon's wireless service in the manner described herein,

received or was directed to the same uniformly-worded documents and/or websites described

herein, received a Verizon bill which imposed the same undisclosed Administrative Charge in

the same uniform language as described herein, and paid the Administrative Charge complained

of herein.

125.    Plaintiff Marc Lowrey is a citizen and resident of Topeka, Kansas, and was a

customer of Verizon's wireless service during the class period.  Like every other Class member,

Plaintiff Lowrey has been victimized by the same uniform policies described in detail herein, in

that he signed up for Verizon's wireless service in the manner described herein, received or was

directed to the same uniformly-worded documents and/or websites described herein, received a

Verizon bill which imposed the same undisclosed Administrative Charge in the same uniform

language as described herein, and paid the Administrative Charge complained of herein.

126.    Plaintiff Jill Mailhoit is a citizen and resident of Sanbornville, New Hampshire,

and was a customer of Verizon's wireless service during the class period.  Like every other Class

member, Plaintiff Mailhoit has been victimized by the same uniform policies described in detail

herein, in that she signed up for Verizon's wireless service in the manner described herein,

received or was directed to the same uniformly-worded documents and/or websites described

herein, received a Verizon bill which imposed the same undisclosed Administrative Charge in

the same uniform language as described herein, and paid the Administrative Charge complained

of herein.

127.    Plaintiff Aaron Maxa is a citizen and resident of Pittsburgh, Pennsylvania, and

was a customer of Verizon's wireless service during the class period.  From 2006 through July

2022, Plaintiff Maxa was a resident of, and was a customer of Verizon in, Falls Church, Virginia.
Plaintiff Maxa moved to Pittsburgh, Pennsylvania in July 2022 and continued his Verizon
service there. Like every other Class member, Plaintiff Maxa has been victimized by the same
uniform policies described in detail herein, in that he signed up for Verizon's wireless service in
the manner described herein, received or was directed to the same uniformly-worded documents
and/or websites described herein, received a Verizon bill which imposed the same undisclosed
Administrative Charge in the same uniform language as described herein, and paid the
Administrative Charge complained of herein.

128.    Plaintiff Kelly Moore is a citizen and resident of Layton, Utah, and was a
customer of Verizon's wireless service during the class period.  Like every other Class member,
Plaintiff Moore has been victimized by the same uniform policies described in detail herein, in
that she signed up for Verizon's wireless service in the manner described herein, received or was
directed to the same uniformly-worded documents and/or websites described herein, received a
Verizon bill which imposed the same undisclosed Administrative Charge in the same uniform
language as described herein, and paid the Administrative Charge complained of herein.

129.    Plaintiff Lindsey Moran is a citizen and resident of Virginia Beach, Virginia, and
was a customer of Verizon's wireless service during the class period.  Like every other Class
member, Plaintiff Moran has been victimized by the same uniform policies described in detail
herein, in that she signed up for Verizon's wireless service in the manner described herein,
received or was directed to the same uniformly-worded documents and/or websites described
herein, received a Verizon bill which imposed the same undisclosed Administrative Charge in
the same uniform language as described herein, and paid the Administrative Charge complained
of herein.

130.    Plaintiff David Moyers is a citizen and resident of Conway, Missouri, and was a customer of Verizon's wireless service during the class period.  Like every other Class member, Plaintiff Moyers has been victimized by the same uniform policies described in detail herein, in that he signed up for Verizon's wireless service in the manner described herein, received or was directed to the same uniformly-worded documents and/or websites described herein, received a Verizon bill which imposed the same undisclosed Administrative Charge in the same uniform language as described herein, and paid the Administrative Charge complained of herein.

131.    Plaintiff Jennifer Ocampo-Neubauer is a citizen and resident of Taneytown, Maryland, and was a customer of Verizon's wireless service during the class period.  Like every other Class member, Plaintiff Ocampo-Neubauer has been victimized by the same uniform policies described in detail herein, in that she signed up for Verizon's wireless service in the manner described herein, received or was directed to the same uniformly-worded documents and/or websites described herein, received a Verizon bill which imposed the same undisclosed Administrative Charge in the same uniform language as described herein, and paid the Administrative Charge complained of herein.

132.    Plaintiff Keisha Odom is a citizen and resident of Pearl, Mississippi, and was a customer of Verizon's wireless service during the class period.  Like every other Class member, Plaintiff Odom has been victimized by the same uniform policies described in detail herein, in that she signed up for Verizon's wireless service in the manner described herein, received or was directed to the same uniformly-worded documents and/or websites described herein, received a Verizon bill which imposed the same undisclosed Administrative Charge in the same uniform language as described herein, and paid the Administrative Charge complained of herein.

133.    Plaintiff Angel Pachecho is a citizen and resident of Chicago, Illinois, and was a customer of Verizon's wireless service during the class period.  Like every other Class member, Plaintiff Pachecho has been victimized by the same uniform policies described in detail herein, in that Plaintiff signed up for Verizon's wireless service in the manner described herein, received or was directed to the same uniformly-worded documents and/or websites described herein, received a Verizon bill which imposed the same undisclosed Administrative Charge in the same uniform language as described herein, and paid the Administrative Charge complained of herein.

134.    Plaintiff Heather Ray is a citizen and resident of Proctor, West Virginia, and was a customer of Verizon's wireless service during the class period.  Like every other Class member, Plaintiff Ray has been victimized by the same uniform policies described in detail herein, in that she signed up for Verizon's wireless service in the manner described herein, received or was directed to the same uniformly-worded documents and/or websites described herein, received a Verizon bill which imposed the same undisclosed Administrative Charge in the same uniform language as described herein, and paid the Administrative Charge complained of herein.

135.    Plaintiff Susan Scott is a citizen and resident of West Des Moines, Iowa, and was a customer of Verizon's wireless service during the class period.  Like every other Class member, Plaintiff Scott has been victimized by the same uniform policies described in detail herein, in that she signed up for Verizon's wireless service in the manner described herein, received or was directed to the same uniformly-worded documents and/or websites described herein, received a Verizon bill which imposed the same undisclosed Administrative Charge in the same uniform language as described herein, and paid the Administrative Charge complained of herein.

136.     Plaintiff Lori Snyder is a citizen and resident of Covington, Ohio, and was a customer of Verizon's wireless service during the class period.  Like every other Class member, Plaintiff Snyder has been victimized by the same uniform policies described in detail herein, in that she signed up for Verizon's wireless service in the manner described herein, received or was directed to the same uniformly-worded documents and/or websites described herein, received a Verizon bill which imposed the same undisclosed Administrative Charge in the same uniform language as described herein, and paid the Administrative Charge complained of herein.

137.     Plaintiff Misty Sutton is a citizen and resident of Bangor, Maine, and was a customer of Verizon's wireless service during the class period.  Like every other Class member, Plaintiff Sutton has been victimized by the same uniform policies described in detail herein, in that she signed up for Verizon's wireless service in the manner described herein, received or was directed to the same uniformly-worded documents and/or websites described herein, received a Verizon bill which imposed the same undisclosed Administrative Charge in the same uniform language as described herein, and paid the Administrative Charge complained of herein.

138.     Plaintiff Kathryn Taylor is a citizen and resident of Chicago, Illinois, and was a customer of Verizon's wireless service during the class period.  Like every other Class member, Plaintiff Taylor has been victimized by the same uniform policies described in detail herein, in that she signed up for Verizon's wireless service in the manner described herein, received or was directed to the same uniformly-worded documents and/or websites described herein, received a Verizon bill which imposed the same undisclosed Administrative Charge in the same uniform language as described herein, and paid the Administrative Charge complained of herein.

139.     Plaintiff Anthony Vallecorsa is a citizen and resident of Pittsburgh, Pennsylvania, and was a customer of Verizon's wireless service during the class period.  Like every other Class

member, Plaintiff Vallecorsa has been victimized by the same uniform policies described in detail herein, in that he signed up for Verizon's wireless service in the manner described herein, received or was directed to the same uniformly-worded documents and/or websites described herein, received a Verizon bill which imposed the same undisclosed Administrative Charge in the same uniform language as described herein, and paid the Administrative Charge complained of herein.

140.    Plaintiff Claire White is a citizen and resident of Thayne, Wyoming, and was a customer of Verizon's wireless service during the class period.  Like every other Class member, Plaintiff White has been victimized by the same uniform policies described in detail herein, in that she signed up for Verizon's wireless service in the manner described herein, received or was directed to the same uniformly-worded documents and/or websites described herein, received a Verizon bill which imposed the same undisclosed Administrative Charge in the same uniform language as described herein, and paid the Administrative Charge complained of herein.

141.    Plaintiff Kristopher Willard is a citizen and resident of Pawnee, Oklahoma, and was a customer of Verizon's wireless service during the class period.  Like every other Class member, Plaintiff Willard has been victimized by the same uniform policies described in detail herein, in that he signed up for Verizon's wireless service in the manner described herein, received or was directed to the same uniformly-worded documents and/or websites described herein, received a Verizon bill which imposed the same undisclosed Administrative Charge in the same uniform language as described herein, and paid the Administrative Charge complained of herein.

142.    Plaintiff Alvin Wilson is a citizen and resident of Lyman, South Carolina, and was a customer of Verizon's wireless service during the class period.  Like every other Class

member, Plaintiff Wilson has been victimized by the same uniform policies described in detail

herein, in that he signed up for Verizon's wireless service in the manner described herein,

received or was directed to the same uniformly-worded documents and/or websites described

herein, received a Verizon bill which imposed the same undisclosed Administrative Charge in

the same uniform language as described herein, and paid the Administrative Charge complained

of herein.

143.    Plaintiff Brad Young is a citizen and resident of Altoona, Pennsylvania, and was a

customer of Verizon's wireless service during the class period.  Like every other Class member,

Plaintiff Young has been victimized by the same uniform policies described in detail herein, in

that he signed up for Verizon's wireless service in the manner described herein, received or was

directed to the same uniformly-worded documents and/or websites described herein, received a

Verizon bill which imposed the same undisclosed Administrative Charge in the same uniform

language as described herein, and paid the Administrative Charge complained of herein.

144.    Defendant Cellco Partnership d/b/a Verizon Wireless is a general partnership

formed under the laws of Delaware, with its headquarters in Basking Ridge, New Jersey. Thus,

Defendant Cellco Partnership d/b/a Verizon Wireless is a citizen of Delaware and New Jersey.

## III.    JURISDICTION AND VENUE

145.    Jurisdiction over this matter in the New Jersey Superior Court is proper because

claims raised in this matter arise under New Jersey law and because Defendant is a citizen of

New Jersey.

146.    This matter is properly venued in Middlesex County, New Jersey because

Plaintiff Gregory Burlak is a citizen and resident of Middlesex County, New Jersey; the

complained-of Administrative Charge was imposed by Verizon on Plaintiff Burlak in Middlesex

County, New Jersey; and Verizon regularly conducts business in Middlesex County, New Jersey.

## IV.   FACTUAL ALLEGATIONS OF VERIZON'S DECEPTIVE ADMINISTRATIVE CHARGE SCHEME

147.    Verizon falsely advertises its wireless services at lower monthly rates than it actually charges customers by not disclosing, and not including in the advertised price, a so-called "Administrative Charge" which Verizon imposes each month on every line purchased by its post-paid wireless service customers.

148.    The Administrative Charge is not disclosed to customers either before or when they agree to purchase wireless service from Verizon, and in fact the Administrative Charge is never adequately or honestly disclosed to customers.  Nor do Verizon customers ever agree to— or even have the opportunity to accept or reject—the Administrative Charge.

149.    Verizon continues to perpetrate this deceptive fee scheme even after the customer signs up.  Verizon made affirmative misrepresentations on its bills that the Administrative Charge is to recover the costs billed to Verizon by the government.

### A.    The Administrative Charge.

150.    The Administrative Charge is a uniform, per-line flat charge that Verizon adds to the monthly bills of all Verizon post-paid wireless service customers in the United States, including customers in all fifty states nationwide and the District of Columbia.  Verizon imposes, increases, and sets the amount of the Administrative Charge at its sole discretion, without the consent of its customers.

151.    Verizon first began imposing the Administrative Charge in September 2005, at an initial rate of $0.40 per line per month.  The Charge was added to the bills of all post-paid wireless customers, including customers who had signed up for Verizon wireless services well before the Administrative Charge even existed.  Such customers were never given the

opportunity to accept or reject Verizon's Administrative Charge.  Indeed, no Verizon customer has ever been given the opportunity to accept or reject the Administrative Charge, or any of Verizon's periodic increases thereof.

152.   Verizon increased the Administrative Charge to $0.70 per month per line starting in March 2007.  Until December 2015, the Administrative Charge remained under a dollar per month per line.  In December 2015, Verizon raised the Administrative Charge from $0.95 to $1.23 per month per line.  Verizon increased the Administrative Charge to $1.78 per line per month starting in August 2019.  Verizon then raised the Administrative Charge to the rate of $1.95 per line per month starting in August 2020.  Thereafter, on June 23, 2022, Verizon increased the Administrative Charge by another 70% from $1.95 to $3.30 per line per month.[2] The current amount of the Administrative Charge is $3.30 per line per month—a more than 8X increase from the original amount of the Charge.

153.   Verizon not only charges the Administrative Charge to each and every one of its post-paid customers on a monthly basis, but it also charges a separate monthly Administrative Charge for each and every phone line purchased by these customers.  Thus, if a customer has a Verizon family plan with, e.g., five lines, that customer will be charged five Administrative Charges per month by Verizon (i.e., one Administrative Charge of $3.30 every month for each line purchased, for a total of $16.50 in Administrative Charges per month for five lines). Consequently, such a customer must pay Verizon at least $16.50 more per month—or $198 more per year—than the advertised and agreed-to price for Verizon wireless service.

---

[2] On June 23, 2022, at the same time that Verizon increased the Administrative Charge by 70% to $3.30 per line per month, Verizon changed the name of the Charge to the "Administrative and Telco Recovery Charge." This Complaint will refer to the charge as the "Administrative Charge."

B.  **Verizon Fails to Disclose the Administrative Charge to Customers When They Sign Up.**

154.   At all relevant times, Verizon has aggressively advertised its post-paid wireless service plans through pervasive marketing directed at the consuming public throughout the United States, including via high-profile television, radio, and online advertisements, and on its website and through materials at its numerous corporate-owned retail stores and the stores of third party retailers (e.g., Costco, Best Buy, the Apple Store, and independent "Verizon Authorized Retailers") where customers can sign up for Verizon Wireless services.

155.   In all of these locations and through all of these channels, Verizon consistently and prominently advertises particular monthly prices for its post-paid wireless service plans, without disclosing or including the Administrative Charge in the advertised price.  Neither the existence nor amount of the Administrative Charge (let alone its true nature or basis) is disclosed to customers prior to or at the time they sign up for Verizon's service plans.

156.   By way of example only, Verizon ran three broad-scale national television advertisements in 2019, 2020, and 2021 that promoted the price for its post-paid wireless service plans as $35 per line per month when purchasing four lines.[3]  This monthly rate was prominently featured in the advertisements.  There was no asterisk next to the advertised price, and the only disclosure language was the phrase "Plus taxes and fees" below the monthly rate.  The advertisements did not mention the Administrative Charge or what the additional "fees" were or their amounts.  Nor were the viewers directed anywhere to learn about the additional "fees."

157.   As another example, Verizon ran similar broad-scale national television advertisements in 2017 and 2018 that promoted the price for its post-paid wireless service plans

---

[3] The 2021 ad can be viewed at: https://www.youtube.com/watch?v=O9Bh4EJPOKA.
The 2020 ad can be viewed at: https://www.youtube.com/watch?v=LFP9zmeS75I.
The 2019 ad can be viewed at: https://www.youtube.com/watch?v=jGBgLCFFVQA.

as $40 per month per line when purchasing four lines.[4]  These ads, too, had no asterisk next to the advertised price, and the only disclosure language was the phrase "Plus taxes and fees" below the monthly rate.  The advertisements did not mention the Administrative Charge or what the additional "fees" were or their amounts.  Nor were the viewers directed anywhere to learn about the additional "fees."

158.    As another example, below (**Figure 1**) is a photo taken of advertising signage in a Verizon Wireless store in Bellevue, Washington on June 26, 2022:

**Figure 1**: Signage in Verizon Wireless Store in Bellevue, WA (June 26, 2022)



---

[4] The 2018 ad can be viewed at: https://www.ispot.tv/ad/dogb/verizon-unlimited-plans-huge-news-ft-thomas-middleditch.
The 2017 ad can be viewed at: https://www.youtube.com/watch?v=4lIGIXfLfjo.

The signage (which was the sole printed advertisement describing plans or plan prices in the Verizon store) prominently lists the prices for each of the 4 featured consumer wireless plans. To the right of the prominent pricing (e.g., "$90," "$80," "$70") is tiny text stating "Per line per month. Plus taxes & fees, With Auto Pay." Notably, **nowhere** on the sign—not even in the stream of miniscule text across the bottom of the sign—is the existence of, let alone the amount of, the Administrative Charge mentioned or disclosed (at the time of the photograph was taken the Administrative Charge was $3.30 per line per month).

159.    The phrase "Plus taxes and fees" does not constitute an adequate disclosure of the Administrative Charge by Verizon, and is understood by the reasonable consumer to refer to legitimate taxes and government-related fees passed on by Verizon to its customers. (Meanwhile, on the customer bill, Verizon labels the Administrative Charge as a "Surcharge" next to government-related surcharges, and not as a "fee".)  Moreover, the Administrative Charge is, in fact, simply a disguised double-charge for the service itself.

### 1.    Verizon Fails to Disclose the Administrative Charge in Retail Stores.

160.    As has been the case for years, when a consumer shops for a wireless service plan at a Verizon corporate-owned store, the consumer is presented with the advertised and quoted monthly service plan prices, and nothing is disclosed to the consumer about the existence of the Administrative Charge.  The Administrative Charge is not mentioned or disclosed in any signage or advertisements anywhere in the store (see **Figure 1** above). Verizon stores use a uniform sales process in which a sales representative utilizes a proprietary sales application on an in-store iPad. Verizon does not disclose the Administrative Charge underline during this in-store sign-up process.  Verizon agents only tell customers the monthly plan price during this process (e.g., the "$80/month Unlimited plan"), and never mention the monthly $3.30 per-line so-called

"Administrative Charge."

161.     In fact, the first time consumers can possibly learn about the existence of the Administrative Charge, or its amount, is on the full online PDF version of their online monthly bill <u>after</u> signing up for Verizon wireless service—but consumers are not provided access to the online bill until at least one week after they sign up for the service and are already financially committed to their purchase.

162.     Customers may also sign up for Verizon wireless service plans at certain authorized third-party retail stores such as Best Buy, Apple, Walmart, Costco, and independently-owned "Verizon Authorized Retailers."  The customer experience in these stores is, in all material respects pertinent to this action, the same as in Verizon corporate-owned stores.  Thus, if a consumer shops for a Verizon wireless service plan at a third-party retailer, the consumer is presented with only the advertised and quoted monthly service plan prices, and nothing is disclosed to the customer about the Administrative Charge.  At these stores, like at the Verizon corporate-owned stores, the customer purchase process is conducted through a tablet or other electronic display, the relevant content of which is determined by Verizon and does not include a disclosure of the Administrative Charge.  The pricing information and disclosures which are provided to customers in third-party stores are provided to the third-party retailers by Verizon.

> **2.     Verizon Fails to Disclose the Administrative Charge in Telesales or Online Chat Sales.**

163.     Likewise, Verizon sales and customer service agents have been trained for years, as a matter of uniform company policy, to present consumers with the advertised monthly prices for its service plans without disclosing the Administrative Charge (just like in Verizon's online, television and print advertising).

### 3.   Verizon Fails to Disclose the Administrative Charge on Its Website Advertising.

164.    Likewise, for years, Verizon's consumer website has advertised its post-paid wireless service plans by prominently featuring flat monthly prices for its service plans which do not include or disclose the Administrative Charge or its amount.

165.    For example, in October 2021, Verizon's website listed five post-paid wireless plan options under its post-paid "Unlimited" plans, and a configurator which showed different prices per line for each plan depending on how many lines (between one and four) the consumer selected.  See the screenshot of the Verizon website taken on October 31, 2021 at **Figure 2** below:

**<u>Figure 2</u>: Advertising on Verizon's Website (October 31, 2021)**



166.    Each of these options is presented as having a flat rate per month.  The price does not have an asterisk, and the only disclosure language is below the price, stating: "Plus taxes & fees."  Customers could click a link directly under those advertised prices to sign up for those services.  Neither the existence nor the amount of the Administrative Charge (which at that time was in fact an additional $1.95 per month per line, <u>e.g.</u>, $7.80 per month for four lines) was

disclosed, even though Verizon fully intended to charge the Administrative Charge and knew its exact amount.

167.    Again, the "Plus taxes and fees" language does not constitute an adequate disclosure because a reasonable consumer would understand "taxes and fees" to mean legitimate taxes and government-related fees passed on by Verizon to its customers (as opposed to a disguised double-charge for the wireless service itself).  In fact, throughout the order process and on the final order page, Verizon displayed a line item charge called "Taxes and government fees," which line item could be expanded (by clicking a "+" sign) to display a list of the component (and legitimate) taxes and government fees.  Thus, a reasonable consumer would assume and understand that those were the taxes and fees to which the phrase "Plus taxes & fees" in Verizon's ads referred.  (Notably, on the online customer bill itself, Verizon labels the Administrative Charge not as a "fee," but rather as a "Surcharge.")  Meanwhile, throughout the online purchase process, Verizon had no line item which contained or included the Administrative Charge, and Verizon never included the amount of the Administrative Charge in the presented and quoted monthly "Total" price.

### C.    Verizon Continues to Deceive Customers After They Sign Up.

168.    Verizon continues to deceive customers about the Administrative Charge and the true monthly price of its wireless services even after the customers have signed up.

169.    The first time Verizon customers can possibly learn about the existence of the Administrative Charge, or its amount, is on the full PDF version of their monthly bill, which they can only view online, and which they can only access after they sign up for Verizon's wireless service and cannot cancel without paying a penalty.

170.    For those customers who receive a mailed paper bill, Verizon provides no notice whatsoever about the amount of the Administrative Charge. The paper bill does not contain a line item or listed amount for the Administrative Charge; the mailed paper bill appears to be an abridged version of the full online PDF version of the bill.

171.    Indeed, Verizon's paper bills fail to mention the Administrative Charge at all, stating instead that a customer should "[c]heck your online bill for all surcharges, taxes and gov fees."  Nowhere on the paper bill is there a line item for the Administrative Charge or any information regarding its amount.

172.    The large majority of Verizon customers are signed up for electronic billing and/or Auto Pay (automatic payment), as Verizon strongly encourages. For those customers, Verizon gives notification by email or text message of only the total monthly charge, without listing or disclosing the existence of the Administrative Charge. Only if those customers created an online My Verizon profile to connect to their customer account could the customer login and get access to the full PDF version of the bill.

173.    Even if a customer created a My Verizon profile and took actions to view the electronic version of the bill on the My Verizon app or website, the My Verizon billing center is further designed to hide the Administrative Charge. The default view for the Verizon bill on the My Verizon app or website includes only the total monthly charge, and does not include any more detail or line items.

174.    If the customer desired to view the full detailed version of the bill (which is accessible only online, and only as a PDF), the customer would need to figure out how to navigate to and download and view the PDF file of the bill in the My Verizon app or website.

175.    For those customers who find and view the full PDF version of the bill, Verizon

misrepresents its plan prices and the nature of the Administrative Charge on the bill. On the full PDF bill, Verizon excludes the Administrative Charge from the "Monthly charges" section, where it logically belongs, and instead puts the Administrative Charge in the "Surcharges" section where Verizon lumps it together with government charges. Even worse, for years, Verizon explicitly and falsely stated that the Administrative Charge is a **"surcharge"** imposed on subscribers to **"cover the costs that are billed to us by federal, state or local governments."**

176.    Thus, Verizon's customer bills do not constitute an adequate disclosure, even belatedly.  Instead, Verizon's bills further its fraudulent scheme and keep customers from realizing they are being overcharged.

177.    Below (**Figure 3**) is an excerpt from the second page of Plaintiff Shauna Cavallaro's full PDF bill from November 2020, where Verizon declares that **"Surcharges"** (which is how Verizon labels the Administrative Charge) are to **"cover the costs that are billed to us by federal, state or local governments…"**.  A red box is added to the bill image below to highlight the relevant text:

**Figure 3**: **Plaintiff Shauna Cavallaro's Verizon Bill page 2 (November 2020)**



178.     Below (**Figure 4**) is an excerpt from the third page of Plaintiff Cavallaro's same November 2020 full PDF bill, where Verizon labels the so-called **"Administrative Charge"** as being a **"Surcharge,"** i.e., as a charge imposed on subscribers to recover costs billed to Verizon by the government.  The Administrative Charge charged by Verizon on Ms. Cavallaro's bill is highlighted in a red box below, under the section of the bill entitled **"Surcharges"**:

**Figure 4: Plaintiff Shauna Cavallaro's Verizon Bill page 3 (November 2020)**

179.    As reflected above, Verizon excludes the Administrative Charge from the "Monthly charges and credits" section of the online full PDF bill.  Verizon instead disguises the invented Administrative Charge by putting it in the "Surcharges" section where it is lumped together with true government costs billed to Verizon such as the "Federal Universal Service Charge," the "OH [Ohio] Tax Recovery Surcharge," and the "OH Reg Fee."

180.    Verizon's labeling and description of the Administrative Charge as a "Surcharge" imposed on subscribers to "cover the costs that are billed to us by federal, state or local governments" is a false statement of material fact.

181.    Notably, on a support page on its website, Verizon gives a <u>different</u> definition of the Administrative Charge, claiming it is charged to "defray" "charges we, or our agents, pay local telephone companies for delivering calls from our customers to their customers" (<u>i.e.</u>, interconnect charges) and "fees and assessments on our network facilities and services."  But interconnect charges and network facility and service fees are among the basic costs of providing wireless service, which a reasonable consumer would expect to be included in the advertised price for a wireless service plan.

182.    Indeed, prior to September 2005 (when Verizon began charging the Administrative Charge to its customers), interconnect charges and network facility and service fees were <u>included</u> in Verizon's advertised price for its wireless service plans.

183.    Moreover, the Administrative Charge that Verizon chooses to impose is <u>not</u>, in fact, tied to Verizon's costs such as interconnect charges and network facility and service fees. Verizon does not adjust the amount of the Administrative Charge based on changes to Verizon's <u>costs</u>.  Rather, Verizon sets and increases the amount of the Administrative Charge based on company-wide <u>operating income targets</u> set by Verizon senior management.  This is

corroborated by the fact that Verizon has more than tripled the amount of the monthly Administrative Charge since 2015 (from $0.95 to $3.30 per line), while during that same time period, Verizon's costs have actually significantly <u>decreased</u> (like interconnection costs).

184.    Thus, by Verizon's own design, the monthly customer bills (whether printed or electronic) serve to further Verizon's scheme and keep customers from realizing they are being overcharged.

185.    And, because Verizon has increased the Administrative Charge by a small amount each time ($1.35 or less each time), if a customer noticed that the bill total was slightly higher than the previous month, the customer would reasonably assume that the increase was a result of legitimate taxes and other government-related charges, which customers understand can vary month-to-month.

**D.    <u>Customers Could Not Cancel Without Penalty.</u>**

186.    Even if a customer noticed the Administrative Charge on his or her very first bill, and then the customer also somehow discovered that the charge in fact was not a legitimate government pass-through fee (contrary to Verizon's false statement on the bill that it is a cost "billed to us by federal, state or local governments"), the customer was discouraged or prevented from backing out of his or her service plan due to Verizon's own stated and posted policies and penalties.

187.    First, when customers sign up they pay a one-time activation fee of $35.00 that is refundable for only three days—well before they ever receive access to their first monthly bill, which does not occur until more than a week after they sign up.

188.    Second, customers who signed up for a two-year service commitment (the majority of customers until at least 2016) were charged an early termination fee of up to $350 if

they cancelled their service more than 14 days after purchase.  (Again, customers cannot even receive notice of or view their first customer bill until at least a week after signing up.)  And even if a person managed to cancel his or her service within the 14-day period (which required returning all purchased equipment in that time period), the customer <u>still</u> was required to pay for his or her service through the date of cancellation.

189.   Third, since approximately 2013, Verizon has offered installment plans to pay for new devices that are tied to customers' service plans.  Instead of a one-year or two-year service commitment, many Verizon wireless customers today ostensibly have a month-to-month service plan but sign a 36-month installment agreement with Verizon under which customers pay for their mobile phone (<u>i.e.</u>, the device) in monthly installments.  For example, a customer would pay, for a $1,000 phone, an equipment "installment" charge of $27.78 on each monthly Verizon bill for 36 months.  <u>If a customer cancelled his or her service plan any time before the installment plan was paid off, the full outstanding balance of the device would immediately become due in a single balloon payment</u>.  Even if the customer noticed the Administrative Charge on one of the first monthly statements (despite Verizon's efforts to disguise it and falsely describe it as a government cost), and the customer then demanded to cancel her service, Verizon would demand that the customer immediately pay the entire remaining balance on the device all at once.  (If the customer returned the device within the 30-day return deadline, the customer would still have to pay the restocking fee mentioned below).  In this way, the installment plan balloon payment is similar to an early termination fee, creating a large immediate cost to cancelling the Verizon service plan once customers learn the actual monthly prices of their plans are higher than advertised.

190.    Fourth, wireless devices purchased from Verizon by customers can only be returned to Verizon within the first 30 days after purchase.  If customers return a device within 30 days of purchase, they still must pay a $50 restocking fee.  If they wait longer than 30 days, it is too late, and they are on the hook for the full purchase price of the device.

191.    The activation fee, early termination fee, installment balloon payment, and restocking fee described above all function as ways to penalize and deter customers from cancelling their Verizon wireless service after signing up, and Verizon's policies (including the cancellation/return periods and how they relate to the timing of the customer bill) are deliberately and knowingly designed by Verizon to lock customers in if they ever deduce that they are being charged more per month than advertised.

192.    Because the initial amount of the Administrative Charge was less than a dollar, and because each of the subsequent increases to the Administrative Charge has been $1.35 or less, Verizon knows that its customers are unlikely to notice the increased charge on the total price of their monthly bills.  Further, given that taxes and other government-related charges can already vary by small amounts from month to month, Verizon knows that customers reasonably expect small changes in the total amount billed each month and will not be able to tell that Verizon imposed or increased the Administrative Charge simply by comparing the total amount billed that month to the total billed in the prior month or months.

193.    Each time that Verizon has increased the Administrative Charge, Verizon has not identified or disclosed on the first bill containing the increase that the Administrative Charge is higher than it was in the previous month.  Even a customer who noticed the higher total charge and who then examined the full PDF version of the bill would have no notice that Verizon had increased the amount of the Administrative Charge.

194.    The only place Verizon mentions to existing customers that it plans to increase the Administrative Charge is on the full PDF version of the monthly customer bill prior to the month it is actually raised.  Even then, each time the Administrative Charge was increased, Verizon buried that inadequate "disclosure" at the very end of the bill, among a mix of information and notices unrelated to price increases.

195.    For example, when Verizon increased the Administrative Charge to $1.95 per month in August 2020, Verizon hid its only mention of the upcoming increase at the very end of the full PDF version of the July 2020 bill—i.e., the bill that was issued the month before the actual increase.  This sole mention was buried eleven paragraphs into a seldom-read section at the tail-end of the bill entitled "Additional Information."  The first ten paragraphs of this section were standard, form paragraphs found in nearly every monthly bill covering arcane topics like "Customer Proprietary Network Information (CPNI)" and other topics irrelevant to most customers like "Bankruptcy Information."  Likewise, when Verizon increased the Administrative Charge to $3.30 per month in July 2022, Verizon hid the only mention of the upcoming increase at the very end of the full PDF version of the prior June 2022 bill in the same seldom-read "Additional Information" section after several paragraphs of text about the same "Customer Proprietary Network Information (CPNI)."  Neither the title of this section nor its first several paragraphs would alert customers that a price increase would be announced below.

196.    Even if customers noticed that Verizon imposed or increased the Administrative Charge, they would have to pay penalties, as described above, if they wished to cancel their Verizon service.  Indeed, Verizon has drafted its contractual terms regarding cancellation fees and the like so that there are no exceptions, meaning these cancellation fees and similar costs would apply no matter how high Verizon chose to unilaterally increase the Administrative

Charge.

197.    Further, as described above in Section IV.C. (at ¶¶ 168–185), Verizon has designed its monthly customer bills (both paper and electronic) to further Verizon's scheme and to keep customers from realizing they are being overcharged.

198.    Regardless, Verizon should be disclosing the existence and amount of the Administrative Charge as part of the advertised monthly price for its service plans, which as discussed herein it has never done and still does not do.  Verizon's failure to do so, in and of itself, constitutes an unfair, deceptive, and unconscionable business practice that is actionable under the claims pled herein.

199.    Again, Plaintiffs are not seeking to regulate the existence or amount of the Administrative Charge.  Rather, Plaintiffs merely seek to compel Verizon to include the existence and amount of the Administrative Charge in the wireless service plan prices it advertises to potential and existing customers, to honestly and adequately disclose the Administrative Charge and its true nature and basis in Verizon's customer bills and in communications with Class members, and to reimburse Class members for any and all Administrative Charges which were in fact double-charges for service that they were forced and fooled into paying under false pretenses and without their consent.

V.    **PLAINTIFFS' FACTUAL ALLEGATIONS**

200.    All Plaintiffs are current wireless customers of Verizon, or were during the relevant class period.

201.    When Plaintiffs purchased their wireless service plans, Verizon prominently advertised and quoted to them that their plans would cost a particular monthly price.  Verizon did not adequately disclose to Plaintiffs, at any time before or when they signed up, that Verizon

would charge them an Administrative Charge which was in fact an additional discretionary double-charge for the service itself.

202.    Despite this, Verizon has charged each Plaintiff an Administrative Charge of up to $3.30 per line per month via their monthly bill.

203.    Indeed, Verizon continues to charge each Plaintiff an Administrative Charge of $3.30 per line per month on their monthly bills.

204.    Verizon never adequately disclosed the Administrative Charge to Plaintiffs in any form or fashion, and Plaintiffs never agreed to pay the Administrative Charge to Verizon.  In fact, Plaintiffs were not aware of the existence and true nature of the Administrative Charge until well after they signed up for service, if at all.

205.    Specifically, Verizon never provided Plaintiffs with adequate notice that they would be (or were being) charged the Administrative Charge—neither at sign-up, when purchasing a new phone, on Plaintiffs' monthly bills, on Verizon's website, nor otherwise. Further, Verizon did not provide Plaintiffs with any information regarding the true nature or basis of the Administrative Charge, and never provided Plaintiffs with any opportunity to agree or object to the Charge.  In fact, no Plaintiff ever agreed to pay the Administrative Charge to Verizon.

206.    Moreover, Verizon affirmatively misrepresented the true nature of the Administrative Charge on Plaintiffs' monthly bills, as described herein. (See Section IV.C. at ¶¶ 168–185, above.)

207.    Over the years, Verizon has routinely increased the amount of the Administrative Charge that it charged to Plaintiffs.  Yet Verizon never adequately disclosed to Plaintiffs at any time that the Administrative Charge would or might increase, never provided Plaintiffs with

adequate notice of such increase, and never provided Plaintiffs with any opportunity to agree or object to the increase.  In fact, no Plaintiff ever agreed to an increase of the Administrative Charge.

208.    Because the Administrative Charge was not included in the quoted and promised price for Plaintiffs' wireless plans, and then was disguised and misrepresented in the customer bills, Verizon has for years unilaterally been charging Plaintiffs more each month than what Plaintiffs agreed and contracted to pay.

209.    Plaintiffs did not expect (and were never told) that Verizon would actually charge them a so-called Administrative Charge on top of the advertised service plan price, or that the true price of the services they had agreed to purchase would include an additional Administrative Charge for each phone line which Verizon could and would unilaterally increase at its desire. That information was material to Plaintiffs.  Had Plaintiffs known that information, they would not have been willing to pay as much for their wireless plans and would have acted differently.

210.    Plaintiffs have a legal right to rely now, and in the future, on the truthfulness and accuracy of Verizon's representations and advertisements regarding its wireless service plan prices.  Plaintiffs believe that they were given the services that Verizon promised them—just not at the prices that Verizon promised and advertised to them, and that Plaintiffs agreed to pay.

211.    Plaintiffs remain Verizon post-paid wireless customers as of this filing and/or intend to sign up for Verizon wireless services in the future.  Plaintiffs cannot cancel their Verizon wireless service without paying significant penalties.  Plaintiffs will continue their Verizon service, and will sign up for Verizon post-paid wireless service and purchase phones from Verizon in the future.  However, Plaintiffs want to be confident that the advertised and quoted prices for Verizon's service plans are the true and full prices for those services (i.e., that

the prices include all applicable discretionary monthly service charges such as the Administrative Charge), and that all discretionary charges like the Administrative Charge are adequately disclosed.  And, if Verizon introduces any new or invented discretionary monthly service charge (like it did with the Administrative Charge), Plaintiffs want to be confident that Verizon will include the amount of that service charge in the advertised and quoted service plan price, and that such price is included in the plan price <u>before</u> Plaintiffs and other class members sign up for Verizon's services.  Plaintiffs will be harmed if, in the future, they are left to guess as to whether Verizon's representations are accurate and whether there are omissions and misrepresentations of material facts regarding the wireless service plans being advertised and represented to them.

## VI.    <u>CLASS ALLEGATIONS</u>

212.    Plaintiffs bring this lawsuit as a class action pursuant to N.J. Ct. Rule 4:32, seeking damages, statutory penalties, and injunctive relief under on behalf of themselves and all members of the following proposed classes.

213.    All Plaintiffs seek certification of the following Nationwide Class:

**All individual consumer account holders in the United States who currently subscribe or formerly subscribed to a post-paid wireless service plan from Verizon and were charged and paid what Verizon labeled an "Administrative Charge" or "Administrative and Telco Recovery Charge" within the applicable statutes of limitations.**

214.    Plaintiff Kendrick seeks certification of the following Alabama Sub-Class:

**All individual consumer account holders in Alabama who currently subscribe or formerly subscribed to a post-paid wireless service plan from Verizon and were charged and paid what Verizon labeled an "Administrative Charge" or "Administrative and Telco Recovery Charge" within the applicable statutes of limitations.**

215.    Plaintiff Bonham seeks certification of the following Arizona Sub-Class:

**All individual consumer account holders in Arizona who currently subscribe or formerly subscribed to a post-paid wireless service plan**

**from Verizon and were charged and paid what Verizon labeled an "Administrative Charge" or "Administrative and Telco Recovery Charge" within the applicable statutes of limitations.**

216. Plaintiff Arterbury seeks certification of the following Arkansas Sub-Class:

**All individual consumer account holders in Arkansas who currently subscribe or formerly subscribed to a post-paid wireless service plan from Verizon and were charged and paid what Verizon labeled an "Administrative Charge" or "Administrative and Telco Recovery Charge" within the applicable statutes of limitations.**

217. Plaintiffs MacClelland, Umberger, Willits, Branom, Brown, Carney, Frasch, Gagan, Anna Gutierrez, Jenkins, Johnson, Kaupelis, Kaye, Lisner, Lough, Massaro, Monsour, Perez, Pozzuoli, Reed, Schramm, Showalter, St. Jarre, Stern, Edna Toy, Teresa Toy, and West seek certification of the following California Sub-Class:

**All individual consumer account holders in California who currently subscribe or formerly subscribed to a post-paid wireless service plan from Verizon and were charged and paid what Verizon labeled an "Administrative Charge" or "Administrative and Telco Recovery Charge" within the applicable statutes of limitations.**

218. Plaintiff Gamblin seeks certification of the following Colorado Sub-Class:

**All individual consumer account holders in Colorado who currently subscribe or formerly subscribed to a post-paid wireless service plan from Verizon and were charged and paid what Verizon labeled an "Administrative Charge" or "Administrative and Telco Recovery Charge" within the applicable statutes of limitations.**

219. Plaintiff Albaitis seeks certification of the following Connecticut Sub-Class:

**All individual consumer account holders in Connecticut who currently subscribe or formerly subscribed to a post-paid wireless service plan from Verizon and were charged and paid what Verizon labeled an "Administrative Charge" or "Administrative and Telco Recovery Charge" within the applicable statutes of limitations.**

220.    Plaintiff Caldwell seeks certification of the following Delaware Sub-Class:

**All individual consumer account holders in Delaware who currently subscribe or formerly subscribed to a post-paid wireless service plan from Verizon and were charged and paid what Verizon labeled an "Administrative Charge" or "Administrative and Telco Recovery Charge" within the applicable statutes of limitations.**

221.    Plaintiff Hines seeks certification of the following District of Columbia Sub-

Class:

**All individual consumer account holders in the District of Columbia who currently subscribe or formerly subscribed to a post-paid wireless service plan from Verizon and were charged and paid what Verizon labeled an "Administrative Charge" or "Administrative and Telco Recovery Charge" within the applicable statutes of limitations.**

222.    Plaintiffs Capri, Hurtt, Santos, and Sexton seek certification of the following

Florida Sub-Class:

**All individual consumer account holders in Florida who currently subscribe or formerly subscribed to a post-paid wireless service plan from Verizon and were charged and paid what Verizon labeled an "Administrative Charge" or "Administrative and Telco Recovery Charge" within the applicable statutes of limitations.**

223.    Plaintiff Dyer seeks certification of the following Georgia Sub-Class:

**All individual consumer account holders in Georgia who currently subscribe or formerly subscribed to a post-paid wireless service plan from Verizon and were charged and paid what Verizon labeled an "Administrative Charge" or "Administrative and Telco Recovery Charge" within the applicable statutes of limitations.**

224.    Plaintiffs Casey, Hunt, Lacuesta, and Oshiro seek certification of the following

Hawaii Sub-Class:

**All individual consumer account holders in Hawaii who currently subscribe or formerly subscribed to a post-paid wireless service plan from Verizon and were charged and paid what Verizon labeled an "Administrative Charge" or "Administrative and Telco Recovery Charge" within the applicable statutes of limitations.**

225.    Plaintiffs Corbin, Pachecho, and Taylor seek certification of the following Illinois

Sub-Class:

> **All individual consumer account holders in Illinois who currently subscribe or formerly subscribed to a post-paid wireless service plan from Verizon and were charged and paid what Verizon labeled an "Administrative Charge" or "Administrative and Telco Recovery Charge" within the applicable statutes of limitations.**

226.    Plaintiffs Baker and Conover seek certification of the following Indiana Sub-

Class:

> **All individual consumer account holders in Indiana who currently subscribe or formerly subscribed to a post-paid wireless service plan from Verizon and were charged and paid what Verizon labeled an "Administrative Charge" or "Administrative and Telco Recovery Charge" within the applicable statutes of limitations.**

227.    Plaintiff Scott seeks certification of the following Iowa Sub-Class:

> **All individual consumer account holders in Iowa who currently subscribe or formerly subscribed to a post-paid wireless service plan from Verizon and were charged and paid what Verizon labeled an "Administrative Charge" or "Administrative and Telco Recovery Charge" within the applicable statutes of limitations.**

228.    Plaintiff Lowrey seeks certification of the following Kansas Sub-Class:

> **All individual consumer account holders in Kansas who currently subscribe or formerly subscribed to a post-paid wireless service plan from Verizon and were charged and paid what Verizon labeled an "Administrative Charge" or "Administrative and Telco Recovery Charge" within the applicable statutes of limitations.**

229.    Plaintiff Frey seeks certification of the following Kentucky Sub-Class:

> **All individual consumer account holders in Kentucky who currently subscribe or formerly subscribed to a post-paid wireless service plan from Verizon and were charged and paid what Verizon labeled an "Administrative Charge" or "Administrative and Telco Recovery Charge" within the applicable statutes of limitations.**

230.    Plaintiff Graff seeks certification of the following Louisiana Sub-Class:

**All individual consumer account holders in Louisiana who currently subscribe or formerly subscribed to a post-paid wireless service plan from Verizon and were charged and paid what Verizon labeled an "Administrative Charge" or "Administrative and Telco Recovery Charge" within the applicable statutes of limitations.**

231.    Plaintiff Sutton seeks certification of the following Maine Sub-Class:

**All individual consumer account holders in Maine who currently subscribe or formerly subscribed to a post-paid wireless service plan from Verizon and were charged and paid what Verizon labeled an "Administrative Charge" or "Administrative and Telco Recovery Charge" within the applicable statutes of limitations.**

232.    Plaintiff Ocampo-Neubauer seeks certification of the following Maryland Sub-

Class:

**All individual consumer account holders in Maryland who currently subscribe or formerly subscribed to a post-paid wireless service plan from Verizon and were charged and paid what Verizon labeled an "Administrative Charge" or "Administrative and Telco Recovery Charge" within the applicable statutes of limitations.**

233.    Plaintiffs Keller and Lombard seek certification of the following Massachusetts

Sub-Class:

**All individual consumer account holders in Massachusetts who currently subscribe or formerly subscribed to a post-paid wireless service plan from Verizon and were charged and paid what Verizon labeled an "Administrative Charge" or "Administrative and Telco Recovery Charge" within the applicable statutes of limitations.**

234.    Plaintiffs Blair, Conley, and Gardner seek certification of the following Michigan

Sub-Class:

**All individual consumer account holders in Michigan who currently subscribe or formerly subscribed to a post-paid wireless service plan from Verizon and were charged and paid what Verizon labeled an "Administrative Charge" or "Administrative and Telco Recovery Charge" within the applicable statutes of limitations.**

235.    Plaintiff Kirby seeks certification of the following Minnesota Sub-Class:

**All individual consumer account holders in Minnesota who currently subscribe or formerly subscribed to a post-paid wireless service plan from Verizon and were charged and paid what Verizon labeled an "Administrative Charge" or "Administrative and Telco Recovery Charge" within the applicable statutes of limitations.**

236.    Plaintiff Odom seeks certification of the following Mississippi Sub-Class:

**All individual consumer account holders in Mississippi who currently subscribe or formerly subscribed to a post-paid wireless service plan from Verizon and were charged and paid what Verizon labeled an "Administrative Charge" or "Administrative and Telco Recovery Charge" within the applicable statutes of limitations.**

237.    Plaintiff Moyers seeks certification of the following Missouri Sub-Class:

**All individual consumer account holders in Missouri who currently subscribe or formerly subscribed to a post-paid wireless service plan from Verizon and were charged and paid what Verizon labeled an "Administrative Charge" or "Administrative and Telco Recovery Charge" within the applicable statutes of limitations.**

238.    Plaintiff Bellavia seeks certification of the following Nebraska Sub-Class:

**All individual consumer account holders in Nebraska who currently subscribe or formerly subscribed to a post-paid wireless service plan from Verizon and were charged and paid what Verizon labeled an "Administrative Charge" or "Administrative and Telco Recovery Charge" within the applicable statutes of limitations.**

239.    Plaintiff Gaines seeks certification of the following Nevada Sub-Class:

**All individual consumer account holders in Nevada who currently subscribe or formerly subscribed to a post-paid wireless service plan from Verizon and were charged and paid what Verizon labeled an "Administrative Charge" or "Administrative and Telco Recovery Charge" within the applicable statutes of limitations.**

240.    Plaintiff Mailhoit seeks certification of the following New Hampshire Sub-Class:

**All individual consumer account holders in New Hampshire who currently subscribe or formerly subscribed to a post-paid wireless service plan from Verizon and were charged and paid what Verizon**

labeled an "Administrative Charge" or "Administrative and Telco Recovery Charge" within the applicable statutes of limitations.

241.     Plaintiffs Dean Esposito, Jeffrey Achey, Marilyn Achey, Anderson, Asbjorn, Burlak, Carla Chiorazzo, Judith Chiorazzo, Conway, DeMarco, Fisher, Allison Gillingham, Lorraine Gillingham, Gordon, Hartman, Justice, Kelly, Manfredo, Oelenschlager, Patino, Prate, Scheufele, Sewekow, Stroyek, Teer, Trappe, and Tripicchio seek certification of the following New Jersey Sub-Class:

> All individual consumer account holders in New Jersey who currently subscribe or formerly subscribed to a post-paid wireless service plan from Verizon and were charged and paid what Verizon labeled an "Administrative Charge" or "Administrative and Telco Recovery Charge" within the applicable statutes of limitations.

242.     Plaintiffs Frantz, Carlos Gutierrez, Holling, Hudson, and Owens seek certification of the following New Mexico Sub-Class:

> All individual consumer account holders in New Mexico who currently subscribe or formerly subscribed to a post-paid wireless service plan from Verizon and were charged and paid what Verizon labeled an "Administrative Charge" or "Administrative and Telco Recovery Charge" within the applicable statutes of limitations.

243.     Plaintiffs Corsi, Kiraly, and Nicot seek certification of the following New York Sub-Class:

> All individual consumer account holders in New York who currently subscribe or formerly subscribed to a post-paid wireless service plan from Verizon and were charged and paid what Verizon labeled an "Administrative Charge" or "Administrative and Telco Recovery Charge" within the applicable statutes of limitations.

244.     Plaintiffs Allen, Burke, and Hensley seek certification of the following North Carolina Sub-Class:

> All individual consumer account holders in North Carolina who currently subscribe or formerly subscribed to a post-paid wireless service plan from Verizon and were charged and paid what Verizon

labeled an "Administrative Charge" or "Administrative and Telco Recovery Charge" within the applicable statutes of limitations.

245.    Plaintiff Keeler seeks certification of the following North Dakota Sub-Class:

**All individual consumer account holders in North Dakota who currently subscribe or formerly subscribed to a post-paid wireless service plan from Verizon and were charged and paid what Verizon labeled an "Administrative Charge" or "Administrative and Telco Recovery Charge" within the applicable statutes of limitations.**

246.    Plaintiffs Cavallaro, Curry, and Snyder seek certification of the following Ohio

Sub-Class:

**All individual consumer account holders in Ohio who currently subscribe or formerly subscribed to a post-paid wireless service plan from Verizon and were charged and paid what Verizon labeled an "Administrative Charge" or "Administrative and Telco Recovery Charge" within the applicable statutes of limitations.**

247.    Plaintiff Willard seeks certification of the following Oklahoma Sub-Class:

**All individual consumer account holders in Oklahoma who currently subscribe or formerly subscribed to a post-paid wireless service plan from Verizon and were charged and paid what Verizon labeled an "Administrative Charge" or "Administrative and Telco Recovery Charge" within the applicable statutes of limitations.**

248.    Plaintiffs Cohron and Green seek certification of the following Oregon Sub-Class:

**All individual consumer account holders in Oregon who currently subscribe or formerly subscribed to a post-paid wireless service plan from Verizon and were charged and paid what Verizon labeled an "Administrative Charge" or "Administrative and Telco Recovery Charge" within the applicable statutes of limitations.**

249.    Plaintiffs Vallecorsa and Young seek certification of the following Pennsylvania

Sub-Class:

**All individual consumer account holders in Pennsylvania who currently subscribe or formerly subscribed to a post-paid wireless service plan from Verizon and were charged and paid what Verizon labeled an "Administrative Charge" or "Administrative and Telco Recovery Charge" within the applicable statutes of limitations.**

250.     Plaintiff Wilson seeks certification of the following South Carolina Sub-Class:

**All individual consumer account holders in South Carolina who currently subscribe or formerly subscribed to a post-paid wireless service plan from Verizon and were charged and paid what Verizon labeled an "Administrative Charge" or "Administrative and Telco Recovery Charge" within the applicable statutes of limitations.**

251.     Plaintiff Colon seeks certification of the following South Dakota Sub-Class:

**All individual consumer account holders in South Dakota who currently subscribe or formerly subscribed to a post-paid wireless service plan from Verizon and were charged and paid what Verizon labeled an "Administrative Charge" or "Administrative and Telco Recovery Charge" within the applicable statutes of limitations.**

252.     Plaintiff Bland-Mullins seeks certification of the following Tennessee Sub-Class:

**All individual consumer account holders in Tennessee who currently subscribe or formerly subscribed to a post-paid wireless service plan from Verizon and were charged and paid what Verizon labeled an "Administrative Charge" or "Administrative and Telco Recovery Charge" within the applicable statutes of limitations.**

253.     Plaintiff Bell seeks certification of the following Texas Sub-Class:

**All individual consumer account holders in Texas who currently subscribe or formerly subscribed to a post-paid wireless service plan from Verizon and were charged and paid what Verizon labeled an "Administrative Charge" or "Administrative and Telco Recovery Charge" within the applicable statutes of limitations.**

254.     Plaintiff Moore seeks certification of the following Utah Sub-Class:

**All individual consumer account holders in Utah who currently subscribe or formerly subscribed to a post-paid wireless service plan from Verizon and were charged and paid what Verizon labeled an "Administrative Charge" or "Administrative and Telco Recovery Charge" within the applicable statutes of limitations.**

255.    Plaintiffs Moran and Maxa seek certification of the following Virginia Sub-Class:

**All individual consumer account holders in Virginia who currently subscribe or formerly subscribed to a post-paid wireless service plan from Verizon and were charged and paid what Verizon labeled an "Administrative Charge" or "Administrative and Telco Recovery Charge" within the applicable statutes of limitations.**

256.    Plaintiffs Bowman, Challender, Ellis, Garrison, Jones, McConville, and Wright

seek certification of the following Washington Sub-Class:

**All individual consumer account holders in the State of Washington who currently subscribe or formerly subscribed to a post-paid wireless service plan from Verizon and were charged and paid what Verizon labeled an "Administrative Charge" or "Administrative and Telco Recovery Charge" within the applicable statutes of limitations.**

257.    Plaintiff Ray seeks certification of the following West Virginia Sub-Class:

**All individual consumer account holders in West Virginia who currently subscribe or formerly subscribed to a post-paid wireless service plan from Verizon and were charged and paid what Verizon labeled an "Administrative Charge" or "Administrative and Telco Recovery Charge" within the applicable statutes of limitations.**

258.    Plaintiff From seeks certification of the following Wisconsin Sub-Class:

**All individual consumer account holders in Wisconsin who currently subscribe or formerly subscribed to a post-paid wireless service plan from Verizon and were charged and paid what Verizon labeled an "Administrative Charge" or "Administrative and Telco Recovery Charge" within the applicable statutes of limitations.**

259.    Plaintiff White seeks certification of the following Wyoming Sub-Class:

**All individual consumer account holders in Wyoming who currently subscribe or formerly subscribed to a post-paid wireless service plan from Verizon and were charged and paid what Verizon labeled an "Administrative Charge" or "Administrative and Telco Recovery Charge" within the applicable statutes of limitations.**

260.    This Court should apply the discovery rule to extend any applicable limitations

period (and the corresponding Class periods) to the date on which Verizon first began charging

the Administrative Charge (which, based on the investigation of Plaintiffs' counsel, is September 2005). The nature of Verizon's misconduct was non-obvious and intentionally concealed from its subscribers. Verizon even designed its monthly customer bills to further its scheme and to prevent customers from realizing they were being overcharged. As a result of Verizon's intentional misconduct, omissions, and affirmative misrepresentations throughout the customer lifecycle, neither Plaintiffs nor the members of the classes could have, through the use of reasonable diligence, learned of the accrual of their claims against Verizon at an earlier time.

261.    Specifically excluded from the proposed classes are Verizon and any entities in which Verizon has a controlling interest, Verizon's agents and employees, the bench officers to whom this civil action is assigned, and the members of each bench officer's staff and immediate family.

262.    Plaintiffs reserve the right to redefine the Class and Sub-Classes prior to class certification.

263.    **Numerosity**.  The members of each Class and Sub-Class are so numerous that joinder of all members would be impracticable. While Plaintiffs do not know the exact number of class members prior to discovery, upon information and belief, there are at least fifty million members in the Nationwide Class and at least 10,000 members in each state Sub-Class. The exact number and identities of Class and Sub-Class members are contained in Verizon's records and can be easily ascertained from those records.

264.    **Commonality and Predominance**.  All claims in this action arise exclusively from the uniform policies and procedures of Defendant as outlined herein.  This action involves multiple common questions which are capable of generating class-wide answers that will drive the resolution of this case.  These common questions predominate over any questions affecting

individual Class and Sub-Class members, if any.  These common questions include, but are not limited to, the following:

   a.  Whether Verizon employs a uniform policy of charging the Administrative Charge to members of the proposed classes;

   b.  Whether Verizon adequately and accurately disclosed the existence of the Administrative Charge, its nature or basis, or its amount, to Plaintiffs and the classes prior to their purchase of Verizon's wireless service;

   c.  Whether Verizon ever adequately and accurately disclosed the existence of the Administrative Charge, its nature or basis, or its amount, to Plaintiffs and the classes;

   d.  What is the nature or purpose of the Administrative Charge;

   e.  Whether Verizon's descriptions of the Administrative Charge are false and/or misleading;

   f.  Whether and to what extent the Administrative Charge is a surcharge imposed on subscribers to "cover the costs that are billed to us by federal, state or local governments;"

   g.  Whether the Administrative Charge and the true price of Verizon's post-paid wireless services are material information, such that a reasonable consumer would find that information important to the consumer's purchase decision;

   h.  Whether Verizon must include the amount of the Administrative Charge in the advertised and quoted service plan price;

   i.  Whether Verizon must disclose the existence or amount of the Administrative Charge when signing up consumers for its wireless service plans;

j.      Whether Verizon must include the amount of the Administrative Charge in the total monthly service price quoted to consumers during the sign-up process for its wireless service plans;

k.      Whether Verizon's policy and practice of advertising and quoting the monthly prices of its wireless service plans without including the amount of the Administrative Charge is false, deceptive, or misleading;

l.      Whether it was deceptive or unfair for Verizon not to disclose, or to inadequately or inaccurately disclose, the Administrative Charge, its dollar amount, or the fact that Verizon could choose to raise its amount at any time, as part of the advertised and promised price of its wireless services;

m.      Whether a reasonable consumer is likely to be deceived by Verizon's conduct and omissions alleged herein;

n.      Whether Verizon has violated the implied covenant of good faith and fair dealing, implied in its contracts with Plaintiffs and the classes, by imposing and increasing the Administrative Charge, and by disguising and misrepresenting the nature of the charge on customer bills; and

o.      Whether Plaintiffs and the classes are entitled to an order enjoining Verizon from engaging in the misconduct alleged herein.

265.   **Typicality**.  Plaintiffs, like all Class and Sub-Class members, are current or former subscribers of Verizon's wireless service plans who were charged higher monthly rates than quoted at the time of subscription and/or whose rates have been surreptitiously increased by Verizon's unilateral imposition and systematic raising of the Administrative Charge.  Their claims all arise from the same course of conduct by Verizon, are based on the same legal

theories, and face the same potential defenses.  Plaintiffs' claims are typical of all class

members' claims.  Plaintiffs are each a member of the Class and Sub-Class they seek to

represent.  All claims of Plaintiffs and the classes arise from the same course of conduct, policy

and procedures as outlined herein.

266.   **Adequacy**. Plaintiffs and their counsel will fairly and adequately protect class

members' interests.  Plaintiffs seek the same relief for themselves as for every other class

member, have no interests antagonistic to class members' interests, and are committed to

representing the best interests of the classes.  Moreover, Plaintiffs have retained counsel with

considerable experience and success in prosecuting complex class action and consumer

protection cases.

267.   **Superiority**. A class action is superior to all other available methods for fairly

and efficiently adjudicating this controversy.  Each class member's interests are small compared

to the burden and expense required to litigate each of his or her claims individually, so it would

be impractical and would not make economic sense for class members to seek individual redress

for Verizon's conduct.  Individual litigation would add administrative burden on the courts,

increasing the delay and expense to all parties and to the court system.  Individual litigation

would also create the potential for inconsistent or contradictory judgments regarding the same

uniform conduct by Verizon.  A single adjudication would create economies of scale and

comprehensive supervision by a single judge.  Moreover, Plaintiffs do not anticipate any

difficulties in managing a class action trial in this case.

268.   By its conduct and omissions alleged herein, Verizon has acted and refused to act

on grounds that apply generally to the classes, such that final injunctive relief and/or declaratory

relief is appropriate respecting each class as a whole.

269.     Without the proposed class action, Verizon will likely retain the benefits of its wrongdoing and will continue the complained-of practices, which will result in further damages to Plaintiffs and class members.

## COUNT I

### Unjust Enrichment

### By All Plaintiffs on Behalf of the Nationwide Class

270.     Plaintiffs repeat and incorporate by reference all preceding paragraphs as if fully set forth herein.

271.     All Plaintiffs bring this claim on behalf of themselves and the Nationwide Class.

272.     By the acts alleged herein, Plaintiffs and the Nationwide Class members have conferred substantial benefits on Defendant and Defendant has knowingly and willingly accepted and enjoyed these benefits.

273.     Defendant either knew or should have known that the payments rendered by Plaintiffs and the Nationwide Class members were given and received with the expectation that the services would be provided at the price represented and warranted.  Despite this, Defendant demanded amounts from Plaintiffs and Nationwide Class members which were higher than what Defendant previously quoted and promised, and Defendant disguised and/or misrepresented the nature of those extra charges on the customer bills.

274.     For Defendant to retain the benefit of the excess payments under these circumstances is inequitable.

275.     Defendant, through deliberate misrepresentations or omissions in connection with the advertising, marketing, promotion, and sale of their wireless service plans, reaped benefits, which resulted in Defendant's wrongful receipt of profits.

276.     Equity demands disgorgement of Defendant's ill-gotten gains.  Defendant will be unjustly enriched unless Defendant is ordered to disgorge those profits for the benefit of Plaintiffs and the Nationwide Class members.

277.     As a direct and proximate result of Defendant's wrongful conduct and unjust enrichment, Plaintiffs and the Nationwide Class members are entitled to the institution of and restitution from a constructive trust disgorging all profits, benefits, and other compensation obtained by Defendant through this inequitable conduct.

## COUNT II

### Breach of Implied Covenant of Good Faith and Fair Dealing

### By All Plaintiffs on Behalf of the Nationwide Class

278.     Plaintiffs repeat and incorporate by reference all preceding paragraphs as if fully set forth herein.

279.     All Plaintiffs bring this claim on behalf of themselves and the Nationwide Class.

280.     By operation of law, there existed an implied contract for the sale of services between Defendant and each Plaintiff and Nationwide Class member who purchased the wireless services described herein.

281.     By operation of law, there existed an implied duty of good faith and fair dealing in each such contract.

282.     Verizon has violated the covenant of good faith and fair dealing by its conduct alleged herein.

283.     Verizon has abused any discretion it purportedly had under any applicable contract to impose or increase the Administrative Charge. For example:

a.     Verizon imposed and has increased the Administrative Charge as a covert way to increase customers' monthly rates without having to advertise such higher rates;

b.     Verizon has increased the Administrative Charge to extract additional cash from existing subscribers;

c.     Verizon omits the Administrative Charge and its amount from the mailed paper version of the bill;

d.     On the full PDF version of the bill (which is only available online), Verizon lists the Administrative Charge next to actual government costs; and

e.     On the full PDF version of the bill (which is only available online), Verizon falsely described the Administrative Charge as a surcharge imposed to cover costs billed to Verizon by the government.

284.    Verizon meanwhile utilizes the activation fee, early termination fee, installment balloon payment, and restocking fee as ways to penalize and discourage customers from freely cancelling their services if they learn that Verizon has charged them more than promised for its services via imposition of, and/or increases to, the Administrative Charge. And Verizon's policies (including the cancellation/return periods and how they relate to the timing of the customer bill) are deliberately and knowingly designed by Verizon to lock customers in if and when they deduce that they are being charged more per month than promised.

285.    Verizon's imposition and increasing of the Administrative Charges defied customers' reasonable expectations, was objectively unreasonable, and frustrated the basic terms of the parties' agreement. Verizon's conduct and actions alleged herein were done in bad faith.

286.    Verizon's conduct described herein has had the effect, and the purpose, of denying Plaintiffs and Nationwide Class members the full benefit of their bargains with Verizon.

287.     Plaintiffs and the Nationwide Class members have performed all, or substantially all, of the obligations imposed on them under any applicable agreements with Verizon. There is no legitimate excuse or defense for Verizon's conduct.

288.     Any attempts by Verizon to defend its overcharging through reliance on supposed contractual provisions will be without merit. Any such provisions are either inapplicable or are unenforceable because they are void, illusory, lacking in mutuality, are invalid exculpatory clauses, violate public policy, are procedurally and substantively unconscionable, and are unenforceable in light of the deceptive and hidden nature of Verizon's misconduct, among other reasons. Any such provisions, if any, would not excuse Verizon's abuses of discretion or otherwise preclude Plaintiffs and the Nationwide Class from recovering for breaches of the covenant of good faith and fair dealing.

289.     Plaintiffs and members of the Nationwide Class sustained damages as a result of Verizon's breaches of the covenant of good faith and fair dealing.

## COUNT III

## <u>Consumer Fraud</u>

### By All Plaintiffs on Behalf of the Nationwide Class

290.     Plaintiffs repeat and incorporate by reference all preceding paragraphs as if fully set forth herein.

291.     All Plaintiffs bring this claim on behalf of themselves and the Nationwide Class for violations of the following consumer fraud statutes:

a.      the Alabama Deceptive Trade Practices Act, Ala. Code 1975, § 8–19–1, *et seq.*;

b.      the Alaska Unfair Trade Practices and Consumer Protection Act, AS §

45.50.471, *et seq.*;

      c.     the Arizona Consumer Fraud Act, A.R.S §§ 44-1521, *et seq.*;

      d.     the Arkansas Deceptive Trade Practices Act, Ark. Code §§ 4-88-101, *et seq.*;

      e.     the California Consumers Legal Remedies Act ("CLRA"), Cal. Civ. Code § 1750, *et seq.*; California False Advertising Law ("FAL"), Cal. Bus. & Prof. Code § 17500, *et seq.*; and California Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200, *et seq.*

      f.     the Colorado Consumer Protection Act, C.R.S.A. §6-1-101, *et seq.*;

      g.     the Connecticut Unfair Trade Practices Act, C.G.S.A. § 42-110, *et seq.*;

      h.     the Delaware Consumer Fraud Act, 6 Del. C. § 2513, *et seq.*;

      i.     the D.C. Consumer Protection Procedures Act, DC Code § 28-3901, *et seq.*;

      j.     the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), Fla. Stat. § 501.201, *et seq.*;

      k.     the Georgia Fair Business Practices Act, OCGA § 10-1-390, *et seq.*;

      l.     the Hawaii Deceptive Practices Act, Haw. Rev. Stat. Ann. § 480-1, *et seq.*;

      m.     the Idaho Consumer Protection Act, I.C. § 48-601, *et seq.*;

      n.     the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 501/1, *et seq.*;

      o.     the Indiana Deceptive Consumer Sales Act, IN ST § 24-5-0.5-2, *et seq.*;

      p.     The Iowa Private Right of Action for Consumer Frauds Act, Iowa Code Ann. § 714H.1, *et seq.*;

      q.     the Kansas Consumer Protection Act, K.S.A. § 50-623, *et seq.*;

r.      the Kentucky Consumer Protection Act, KRS 367.110, *et seq.*;

s.      the Louisiana Unfair Trade Practices and Consumer Protection Law, LSA-R.S. 51:1401, *et seq.*;

t.      the Maine Unfair Trade Practices Act, 5 M.R.S.A. § 205-A, *et seq.*;

u.      the Maryland Consumer Protection Act, MD Code, Commercial Law, § 13-301, *et seq.*;

v.      the Massachusetts Regulation of Business Practices for Consumers Protection Act, M.G.L.A. 93A, *et seq.*;

w.      the Michigan Consumer Protection Act, M.C.L.A. 445.901, *et seq.*;

x.      the Minnesota Prevention of Consumer Fraud Act, Minn. Stat. § 325F.68, *et seq.*;

y.      the Mississippi Consumer Protection Act, Miss. Code Ann. § 75-24-1, *et seq.*;

z.      the Missouri Merchandising Practices Act, V.A.M.S. § 407, *et seq.*;

aa.     the Montana Unfair Trade Practices and Consumer Protection Act of 1973, Mont. Code Ann. § 30-14-101, *et seq.*;

bb.     the Nebraska Consumer Protection Act, Neb. Rev. St. §§ 59-1601, *et seq.*;

cc.     the Nevada Deceptive Trade Practices Act, N.R.S. 41.600, *et seq.*;

dd.     the New Hampshire Regulation of Business Practices for Consumer Protection, N.H. Rev. Stat. § 358-A:1, *et seq.*;

ee.     the New Jersey Consumer Fraud Act, N.J.S.A. § 56:8-1, *et seq.*; the New Jersey Truth in Consumer, Contract, Warranty and Notice Act, N.J.S.A. § 56:12-14, *et seq.*; and the New Jersey Uniform Declaratory Judgments Act, N.J.S.A. § 2A:16-51, *et seq.*

ff.     the New Mexico Unfair Practices Act, N.M. Stat. Ann. § 57-12-1, *et seq.* and False Advertising Act, N.M. Stat. Ann. § 57-15-1, *et seq.*;

gg.     the New York General Business Law §§ 349 and 350;

hh.     the North Carolina Unfair and Deceptive Trade Practices Act, N.C. Gen Stat. § 75-1.1, *et seq.*;

ii.     the North Dakota Consumer Fraud Act, N.D. Cent. Code Chapter 51-15, *et seq.*;

jj.     the Ohio Consumer Sales Practices Act, R.C. 1345.01, *et seq.*;

kk.     the Oklahoma Consumer Protection Act, 15 O.S.2001, §§ 751, *et seq.*;

ll.     the Oregon Unlawful Trade Practices Act, O.R.S. § 646.605, *et seq.*;

mm.     the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 P.S. § 201-1, *et seq.*;

nn.     the Rhode Island Deceptive Trade Practices Act, G.L.1956 § 6-13.1-5.2(B), *et seq.*;

oo.     the South Carolina Unfair Trade Practices Act, SC Code 1976, §§ 39-5-10, *et seq.*;

pp.     the South Dakota Deceptive Trade Practices and Consumer Protection Act, SDCL § 37-24-1, *et seq.*;

qq.     the Tennessee Consumer Protection Act, T.C.A. § 47-18-101, *et seq.*;

rr.     the Texas Deceptive Trade Practices-Consumer Protection Act, V.T.C.A., Bus. & C. § 17.41, *et seq.*;

ss.     the Utah Consumer Sales Practices Act, UT ST § 13-11-1, *et seq.*;

tt.     the Vermont Consumer Fraud Act, 9 V.S.A. § 2451, *et seq.*;

uu.     the Virginia Consumer Protection Act of 1977, VA ST § 59.1-196, *et seq.*;

vv.     the Washington Consumer Protection Act, RCW Chapter 19.86;

ww.     the West Virginia Consumer Credit and Protection Act, W.Va. Code § 46A-1-101, *et seq.*;

xx.     the Wisconsin Deceptive Trade Practices Act, WIS. STAT. § 100.18, *et seq.*; and

yy.     the Wyoming Consumer Protection Act, WY ST § 40-12-101, *et seq.*

292.    By the acts and omissions alleged herein, Defendant has violated and continues to violate the above-cited consumer fraud statutes, causing damage to Plaintiffs and the members of the Nationwide Class.

293.    Plaintiffs and each member of the Nationwide Class reasonably relied on Defendant's acts and omissions alleged herein, specifically including Defendant's material misrepresentations, false advertisements, and deceptive policies and practices, and would not have purchased services and/or equipment from Defendant, or would have acted differently, had they known the truth about Defendant's policies and practices.

294.    Plaintiffs have provided notice on behalf of themselves and the Class to the extent required by the above-cited consumer fraud statutes.

295.    As a result of Defendant's violations, Plaintiffs and each Nationwide Class member have suffered damages and are therefore entitled to recover actual, statutory, and/or punitive damages, as well as attorneys' fees and costs, pursuant to the above consumer fraud statutes.  Pursuant to these statutes, Plaintiffs and the Nationwide Class are also entitled to an injunction to halt Defendant's unlawful practices described herein.

## COUNT IV

### Violations of the Alabama Deceptive Trade Practices Act
### (Ala. Code §§ 8-19, *et seq.*)

### By Plaintiff Kendrick on Behalf of the Alabama Sub-Class

296.    Plaintiffs repeat and incorporate by reference all preceding paragraphs as if fully set forth herein.

297.    Plaintiff Kendrick brings this claim on behalf of Plaintiff Kendrick and the Alabama Sub-Class under the Alabama Deceptive Trade Practices Act (Ala. Code §§ 8-19, *et seq.*).

298.    Verizon's material misrepresentations, omissions, and failures to disclose as alleged herein were deceptive acts or practices in violation of the Alabama Deceptive Trade Practices Act (Ala. Code §§ 8-19, *et seq.*).

299.    Verizon engaged in specific deceptive trade practices declared unlawful by the Alabama Deceptive Trade Practices Act, including:

a.    Verizon represented that its wireless service plans had characteristics that they did not have (Ala. Code § 8-19-5(5));

b.    Verizon advertised its wireless service plans with an intent not to sell them as advertised (Ala. Code § 8-19-5(9)); and

c.    Verizon engaged in other unconscionable, false, misleading, or deceptive acts or practices in the conduct of trade or commerce (Ala. Code § 8-19-5(27)).

300.    A person who violates the Act and causes monetary damage to another person is liable to that person for actual damages or $100, whichever is greater.  Ala. Code § 8-19-10(a)(1).  The Act also expressly allows treble damages, Ala. Code § 8-19-10(a)(2), and also

provides mandatory attorneys' fees in any successful action where damages are recovered, or injunctive relief is obtained, Ala. Code § 8-19-10(a)(3).

301.    Plaintiff Kendrick has provided notice on behalf of Plaintiff Kendrick and the Alabama Sub-Class to the extent required by the Act in a letter to Verizon dated May 27, 2022. Verizon did not respond to the notice.

302.    By the acts and omissions alleged herein, Defendant has violated and continues to violate the Alabama Deceptive Trade Practices Act (Ala. Code §§ 8-19, *et seq.*), causing damage to Plaintiff Kendrick and the Alabama Sub-Class.

303.    As a result of Defendant's violations, Plaintiff and each Alabama Sub-Class member has suffered damages and is therefore entitled to recover their actual damages or $100 per person, whichever is greater, as well as treble damages, attorneys' fees and costs and an injunction to halt Defendant's unlawful practices described herein.

## COUNT V

### Violation of Arizona Consumer Fraud Act, Ariz. Rev. Stat. §§ 44-1521, *et seq.*

### By Plaintiff Bonham on Behalf of the Arizona Sub-Class

304.    Plaintiffs repeat and incorporate by reference all preceding paragraphs as if fully set forth herein.

305.    Plaintiff Bonham brings this claim on behalf of herself and the Arizona Sub-Class under the Arizona Consumer Fraud Act, Ariz. Rev. Stat. §§ 44-1521, *et seq.*

306.    Verizon's material misrepresentations, omissions, and failures to disclose described herein were unfair or deceptive trade practices in violation of the Arizona Consumer Fraud Act, Ariz. Rev. Stat. §§ 44-1521, *et seq.*

307.    Ariz. Rev. Stat. § 44-1522(A) provides:

> The act, use or employment by any person of any deception, deceptive or unfair act or practice, fraud, false pretense, false promise, misrepresentation, or concealment, suppression or omission of any material fact with intent that others rely on such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice.

308.    The Arizona Supreme Court has held that the Act creates an implied private right of action for damages, including punitive damages.  See Sellinger v. Freeway Mobile Home Sales, Inc., 521 P.2d 1119, 1122 (1974)

309.    By the acts and omissions alleged herein, Defendant has violated and continues to violate Ariz. Rev. Stat. § 44-1522(A) and the Arizona Consumer Fraud Act, causing damage to Plaintiff Bonham and the Arizona Sub-Class.

310.    As a result of Defendant's violations, Plaintiff and each Arizona Sub-Class member has suffered damages and is therefore entitled to recover actual, statutory, and/or punitive damages.  Pursuant to the statute, Plaintiff and the Arizona Sub-Class are also entitled to an injunction to halt Defendant's unlawful practices described herein.

### COUNT VI

### Violations of the Arkansas Deceptive Trade Practices Act (Ark. Code §§ 4-88-101, *et seq.*)

### By Plaintiff Arterbury on Behalf of the Arkansas Sub-Class

311.    Plaintiffs repeat and incorporate by reference all preceding paragraphs as if fully set forth herein.

312.    Plaintiff Arterbury brings this claim on behalf of herself and the Arkansas Sub-Class under the Arkansas Deceptive Trade Practices Act (Ark. Code §§ 4-88-101, *et seq.*).

313. Verizon's material misrepresentations, omissions, and failures to disclose as alleged herein were deceptive or unconscionable trade practices in violation of the Arkansas Deceptive Trade Practices Act (Ark. Code §§ 4-88-101, *et seq.*).

314. Verizon engaged in specific deceptive or unconscionable trade practices declared unlawful by the Arkansas Deceptive Trade Practices Act, including:

a. Verizon knowingly represented that its wireless service plans had characteristics that they did not have (Ark. Code § 4-88-107(a)(1));

b. Verizon advertised its wireless service plans with an intent not to sell them as advertised (Ark. Code § 4-88-107(a)(3)); and

c. Verizon engaged in unconscionable, false, or deceptive acts or practices in business, commerce, or trade (Ark. Code § 4-88-107(a)(10)).

315. Under the Act, "[a] person who suffers an actual financial loss as a result of his or her reliance on the use of a practice declared unlawful by this chapter may bring an action to recover his or her actual financial loss proximately caused by the offense or violation." Ark. Code Ann. § 4-88-113(f)(1)(A).

316. Plaintiff Arterbury and each member of the Arkansas Sub-Class reasonably relied on Defendant's material misrepresentations, false advertisements, and deceptive policies and practices, and would not have purchased services and/or equipment from Defendant, or would have acted differently, had they known the truth about Defendant's policies and practices.

317. By the acts and omissions alleged herein, Defendant has violated the Arkansas Deceptive Trade Practices Act (Ark. Code §§ 4-88-101, *et seq.*), causing damage to Plaintiff Arterbury and the members of the Arkansas Sub-Class.

318.     As a result of Defendant's violations, Plaintiff and each Arkansas Sub-Class member has suffered damages and is therefore entitled to recover actual, statutory, and/or punitive damages, as well as attorneys' fees and costs and an injunction to halt Defendant's unlawful practices described herein.

## COUNT VII

### Violation of the Consumers Legal Remedies Act ("CLRA"), California Civil Code § 1750, *et seq.*

**By Plaintiffs MacClelland, Umberger, Willits, Branom, Brown, Carney, Frasch, Gagan, Gutierrez, Jenkins, Johnson, Kaupelis, Kaye, Lisner, Lough, Massaro, Monsour, Perez, Pozzuoli, Reed, Schramm, Showalter, St. Jarre, Stern, Edna Toy, Teresa Toy, and West on Behalf of the California Sub-Class**

319.     Plaintiffs reallege and incorporate by reference all paragraphs previously alleged herein.

320.     Plaintiffs MacClelland, Umberger, Willits, Branom, Brown, Carney, Frasch, Gagan, Gutierrez, Jenkins, Johnson, Kaupelis, Kaye, Lisner, Lough, Massaro, Monsour, Perez, Pozzuoli, Reed, Schramm, Showalter, St. Jarre, Stern, Edna Toy, Teresa Toy, and West each bring this claim in his or her individual capacity, in his or her capacity as a private attorney general seeking the imposition of public injunctive relief to protect the general public, and as a representative of the California Sub-Class, under the California Consumers Legal Remedies Act ("CLRA") (Cal. Civ. Code § 1750, *et seq.*).

321.     Defendant is a "person," as defined by Cal. Civ. Code § 1761(c).

322.     Plaintiffs and the California Sub-Class members are each "consumers," as defined by Cal. Civ. Code §1761(d).

323.     The wireless service plans that Verizon marketed and sold are "services," as defined as defined by Cal. Civ. Code § 1761(b).

324.    The purchases of Verizon's wireless service plans by Plaintiffs and California Sub-Class members are "transactions," as defined by Cal. Civ. Code § 1761(e).

325.    Plaintiffs and California Sub-Class members purchased Verizon's wireless service plans for personal, family, and/or household purposes, as meant by Cal. Civ. Code § 1761(d).

326.    Venue is proper under Cal. Civil Code § 1780(d) because Defendant does business throughout New Jersey, reside in and/or are citizens of New Jersey, and/or have their principle places of business in New Jersey.

327.    The unlawful methods, acts or practices alleged herein to have been undertaken by Verizon were all committed intentionally and knowingly. The unlawful methods, acts or practices alleged herein to have been undertaken by Verizon did not result from a bona fide error notwithstanding the use of reasonable procedures adopted to avoid such error.

328.    Verizon intentionally deceived Plaintiffs and the California Sub-Class, and continues to deceive the general public, by:

   a.    Misrepresenting the prices of Verizon's wireless service plans by advertising or quoting prices that do not include the monthly Administrative Charge;

   b.    Inventing a bogus "Administrative Charge" out of whole cloth, when in fact the Administrative Charge is a disguised double-charge for the wireless service promised in the plan;

   c.    Determining and setting the amount of, and increases to, the Administrative Charge based on Verizon's revenue targets or desires, and not on changes to Verizon's costs;

      d.      Misrepresenting the nature of the Administrative Charge, including by stating or indicating that the Administrative Charge is a tax, pass-through government cost, government or regulatory fee, or charge over which Verizon has no control;

      e.      Misrepresenting the nature of the Administrative Charge on the customer bill by stating it is a surcharge to "cover the costs that are billed to us by federal, state or local governments"; and

      f.      Failing to adequately or accurately disclose the existence of the Administrative Charge, its nature, or its amount.

329.      Verizon's conduct alleged herein has violated the CLRA in multiple respects, including, but not limited to, the following:

      a.      Verizon represented that its wireless service plans had characteristics that they did not have (Cal. Civ. Code § 1770(a)(5));

      b.      Verizon advertised its wireless service plans with an intent not to sell them as advertised (Cal. Civ. Code § 1770(a)(9));

      c.      Verizon misrepresented that its wireless service plans were supplied in accordance with previous representations when they were not (Cal. Civ. Code § 1770(a)(16)); and

      d.      Verizon inserted unconscionable provisions in its consumer agreements, including, but not limited to, an arbitration clause which waives the right to seek public injunctive relief in any forum, in violation of California law (Cal. Civ. Code § 1770(a)(19)).

330.      With respect to any omissions, Verizon at all relevant times had a duty to disclose the information in question because, *inter alia*: (a) Verizon had exclusive knowledge of material information that was not known to Plaintiffs and Class members; (b) Verizon concealed material

information from Plaintiffs and California Sub-Class members; and (c) Verizon made partial representations, including regarding the supposed monthly rate of its wireless service plans, which were false and misleading absent the omitted information.

331.    Verizon's misrepresentations deceive and have a tendency to deceive the general public.

332.    Verizon's misrepresentations are material, in that a reasonable person would attach importance to the information and would be induced to act on the information in making purchase decisions.

333.    Plaintiffs and California Sub-Class members reasonably relied on Verizon's material misrepresentations, and would not have purchased, or would have paid less money for, Verizon's wireless services had they known the truth.

334.    As a direct and proximate result of Verizon's violations of the CLRA, Plaintiffs and California Sub-Class members have been damaged and have lost money or property in the amount of the Administrative Charges they have been charged and paid. Moreover, Verizon continues to charge Plaintiffs and California Sub-Class members the Administrative Charge and may continue to increase its service prices via increases to the Administrative Charge.

335.    Verizon's conduct alleged herein caused substantial injury to Plaintiffs, California Sub-Class members, and the general public.

336.    Verizon's conduct is ongoing and is likely to continue and recur absent a permanent injunction. Accordingly, Plaintiffs seek an order enjoining Verizon from committing such practices.

337.    Plaintiffs lack an adequate remedy at law to prevent Verizon's continued unlawful practices. Plaintiffs will be harmed in the future by their inability to rely on the truthfulness and

accuracy of Verizon's representations and advertisements regarding its wireless service plan prices. Plaintiffs desire and intend to sign up for different Verizon post-paid wireless service plans and Verizon device installment plans in the future.

338.   Monetary damages are not an adequate remedy at law for future harm for many reasons.  **First**, damages are not an adequate remedy for *future* harm because they will not prevent Verizon from continuing its unlawful conduct. **Second**, damages for *future* harm cannot be calculated with certainty and thus cannot be awarded. For example, it is impossible to know: (1) how many phone lines Plaintiffs may want or need in the future (including for phones, computer tablets, or automobile hot spots); (2) what Verizon's future per-line Administrative Charge will be (given that Verizon has repeatedly increased the Administrative Charge such that it has thus far doubled since 2015); or (3) how many months Plaintiffs would continue to subscribe to Verizon but for the unlawful conduct. Because these factors are unknown, damages are impossible to calculate and cannot be awarded for future harm. **Third,** injunctive relief is necessary (and monetary damages do not provide a plain, adequate and complete remedy) because, without forward-looking injunctive relief enjoining the unlawful practices, the courts would be flooded with future lawsuits by the general public, the California Sub-Class members, and the Plaintiffs for future violations of the law by Verizon.

339.   Plaintiffs, on behalf of themselves and as private attorneys general, seek public injunctive relief under the CLRA to protect the general public from Verizon's false advertisements and omissions.

340.   In accordance with California Civil Code § 1782(a), Plaintiffs, through counsel, served Verizon with notice of its CLRA violations by USPS certified mail, return receipt requested, on November 3, 2021.  Verizon refused to give any correction or remedy whatsoever

to Plaintiffs for their CLRA violations.  Accordingly, pursuant to Sections 1780 and 1782(b) of the CLRA, Plaintiffs and the California Sub-Class are entitled to recover actual damages, punitive damages, attorneys' fees and costs, and any other relief the Court deems proper for Verizon's CLRA violations.

<div align="center">

**COUNT VIII**

**Violation of California's False Advertising Law,
California Business and Professions Code § 17500, *et seq.*

By Plaintiffs MacClelland, Umberger, Willits, Branom, Brown, Carney, Frasch, Gagan, Gutierrez, Jenkins, Johnson, Kaupelis, Kaye, Lisner, Lough, Massaro, Monsour, Perez, Pozzuoli, Reed, Schramm, Showalter, St. Jarre, Stern, Edna Toy, Teresa Toy, and West on Behalf of the California Sub-Class**

</div>

341.    Plaintiffs reallege and incorporate by reference all paragraphs previously alleged herein.

342.    Plaintiffs MacClelland, Umberger, Willits, Branom, Brown, Carney, Frasch, Gagan, Gutierrez, Jenkins, Johnson, Kaupelis, Kaye, Lisner, Lough, Massaro, Monsour, Perez, Pozzuoli, Reed, Schramm, Showalter, St. Jarre, Stern, Edna Toy, Teresa Toy, and West each bring this claim in his or her individual capacity, in his or her capacity as a private attorney general seeking the imposition of public injunctive relief to protect the general public, and as a representative of the California Sub-Class, under the California False Advertising Law ("FAL") (Cal. Bus. & Profs. Code § 17500, *et seq.*).

343.    By its conduct alleged herein, Verizon has committed acts of untrue and misleading advertising, as defined by and in violation of California Business & Professions Code § 17500, *et seq.*, also known as California's False Advertising Law ("FAL"). These acts include but are not limited to:

a.    Misrepresenting the prices of Verizon's wireless service plans by advertising or quoting prices that do not include the monthly Administrative Charge;

<div align="center">102</div>

b.      Misrepresenting the nature of the Administrative Charge, including by stating or indicating that the Administrative Charge is a tax, pass-through government cost, government or regulatory fee, or charge over which Verizon has no control; and

c.      Failing to adequately or accurately disclosed the existence of the Administrative Charge, its nature, or its amount.

344.    Verizon committed such violations of the FAL with actual knowledge that its advertising was misleading, or Verizon, in the exercise of reasonable care, should have known that its advertising was misleading.

345.    Verizon's misrepresentations deceive and have a tendency to deceive the general public.

346.    Verizon intentionally deceived Plaintiffs and California Sub-Class members, and continues to deceive the public.

347.    Verizon's misrepresentations are material, in that a reasonable person would attach importance to the information and would be induced to act on the information in making purchase decisions.

348.    Plaintiffs and California Sub-Class members reasonably relied on Verizon's material misrepresentations, and would not have purchased, or would have paid less money for, Verizon's wireless services had they known the truth.

349.    By its conduct and omissions alleged herein, Verizon received more money from Plaintiffs and California Sub-Class members than it should have received, including the excess Administrative Charges that Verizon charged Plaintiffs and the California Sub-Class on top of the advertised prices for the service plans, and that money is subject to restitution.

350.    By its conduct and omissions alleged herein, Verizon caused the demand for its

post-paid wireless service plans to be artificially increased and caused all customers of those

plans, including Plaintiffs and the California Sub-Class, to pay premiums to Verizon.

351.    As a direct and proximate result of Verizon's violations of the FAL, Plaintiffs and

California Sub-Class members have been harmed and lost money.

352.    Verizon's conduct has caused substantial injury to Plaintiffs, California Sub-Class

members, and the general public.

353.    Verizon's conduct is ongoing and is likely to continue and recur absent a

permanent injunction. Accordingly, Plaintiffs seek an order enjoining Verizon from committing

such practices.

354.    Plaintiffs lack an adequate remedy at law to prevent Verizon's continued unlawful

practices. Plaintiffs will be harmed in the future by their inability to rely on the truthfulness and

accuracy of Verizon's representations and advertisements regarding its wireless service plan

prices. Plaintiffs desire and intend to sign up for different Verizon post-paid wireless service

plans and Verizon device installment plans in the future.

355.    Monetary damages are not an adequate remedy at law, as described in Paragraph

344 above.

356.    Plaintiffs, on behalf of themselves and as private attorneys general, seek public

injunctive relief under the FAL to protect the general public from Verizon's false advertising—

including enjoining Verizon from: (1) advertising or quoting a wireless service plan price if that

price does not include any applicable monthly service charges such as the Administrative

Charge, and (2) misrepresenting the nature of the Administrative Charge, including by stating or

indicating that the Administrative Charge is a tax, pass-through government cost, government or

regulatory fee, or charge over which Verizon has no control.

357.     Plaintiffs further seek an order granting restitution to Plaintiffs and California

Sub-Class members in an amount to be proven at trial. Plaintiffs further seek an award of

attorneys' fees and costs under Cal. Code Civ. Proc. § 1021.5.

## COUNT IX

### Violation of California's Unfair Competition Law, California Business and Professions Code § 17200, *et seq.*

**By Plaintiffs MacClelland, Umberger, and Willits, Branom, Brown, Carney, Frasch, Gagan, Gutierrez, Jenkins, Johnson, Kaupelis, Kaye, Lisner, Lough, Massaro, Monsour, Perez, Pozzuoli, Reed, Schramm, Showalter, St. Jarre, Stern, Edna Toy, Teresa Toy, and West Behalf of the California Sub-Class**

358.     Plaintiffs reallege and incorporate by reference all paragraphs previously alleged

herein.

359.     Plaintiffs MacClelland, Umberger, Willits, Branom, Brown, Carney, Frasch,

Gagan, Gutierrez, Jenkins, Johnson, Kaupelis, Kaye, Lisner, Lough, Massaro, Monsour, Perez,

Pozzuoli, Reed, Schramm, Showalter, St. Jarre, Stern, Edna Toy, Teresa Toy, and West each

bring this claim in his or her individual capacity, in his or her capacity as a private attorney

general seeking the imposition of public injunctive relief to protect the general public, and as a

representative of the California Sub-Class, under the California Unfair Competition Law

("UCL") (Cal. Bus. & Profs. Code § 17200, *et seq.*).

360.     California Business & Professions Code § 17200, *et seq.*, also known as

California's Unfair Competition Law (UCL), prohibits any unfair, unlawful, or fraudulent

business practice.

361.     Verizon has violated the UCL by engaging in the following ***unlawful*** business

acts and practices:

       a.     Making material misrepresentations in violation of Cal. Civ. Code §§

1770(a)(5), (9) and (16) (the CLRA);

b.      Inserting unconscionable provisions in its consumer agreements in violation of Cal. Civ. Code § 1770(a)(19) (the CLRA), including, but not limited to, an arbitration clause which waives the right to seek public injunctive relief in any forum in violation of California law;

c.      Making material misrepresentations in violation of Cal. Bus. & Prof. Code § 17500 *et seq.* (the FAL); and

d.      Engaging in deceit in violation of Cal Civ. Code §§ 1709–1710.

362.    Verizon has violated the UCL by engaging in the following ***unfair*** and ***fraudulent*** business acts and practices:

a.      Misrepresenting the prices of Verizon's wireless service plans by advertising or quoting prices that do not include the monthly Administrative Charge;

b.      Inventing a bogus "Administrative Charge" out of whole cloth, when in fact the Administrative Charge is a disguised double-charge for the wireless service promised in the plan;

c.      Determining and setting the amount of, and increases to, the Administrative Charge based on Verizon's revenue targets or desires, and not on changes to Verizon's costs;

d.      Misrepresenting the nature of the Administrative Charge, including by stating or indicating that the Administrative Charge is a tax, pass-through government cost, government or regulatory fee, or charge over which Verizon has no control;

e.      Misrepresenting the nature of the Administrative Charge on the customer bill by stating it is a surcharge to "cover the costs that are billed to us by federal, state or local

governments"; and

    f.  Failing to adequately or accurately disclose the existence of the

Administrative Charge, its nature, or its amount.

   363.  Verizon's misrepresentations were likely to mislead reasonable consumers.

   364.  Verizon's misrepresentations deceive and have a tendency to deceive the general

public.

   365.  Verizon's misrepresentations are material, in that a reasonable person would

attach importance to the information and would be induced to act on the information in making

purchase decisions.

   366.  Verizon intentionally deceived Plaintiffs and California Sub-Class members, and

continues to deceive the public.

   367.  Plaintiffs and California Sub-Class members reasonably relied on Verizon's

material misrepresentations, and would not have purchased, or would have paid less money for,

Verizon's wireless services had they known the truth.

   368.  By its conduct alleged herein, Verizon received more money from Plaintiffs and

California Sub-Class members than it should have received, including the excess Administrative

Charges that Verizon charged Plaintiffs and the California Sub-Class on top of the advertised

prices for the service plans, and that money is subject to restitution.

   369.  As a direct and proximate result of Verizon's unfair, unlawful, and fraudulent

conduct, Plaintiffs and California Sub-Class members lost money.

   370.  Verizon's conduct alleged herein is immoral, unethical, oppressive, unscrupulous,

unconscionable, and substantially injurious to Plaintiffs, California Sub-Class members, and the

general public. Perpetrating a years-long scheme of misleading and overcharging customers is

immoral, unethical, and unscrupulous. Moreover, Verizon's conduct is oppressive and substantially injurious to consumers. By its conduct alleged herein, Verizon has improperly extracted hundreds of millions of dollars from the California Sub-Class. There is no utility to Verizon's conduct, and even if there were any utility, it would be significantly outweighed by the gravity of the harm to consumers caused by Verizon's conduct alleged herein.

371.    Verizon's conduct is ongoing and is likely to continue and recur absent a permanent injunction. Accordingly, Plaintiffs seek an order enjoining Verizon from committing such practices.

372.    Plaintiffs lack an adequate remedy at law to prevent Verizon's continued unlawful practices. Plaintiffs will be harmed in the future by their inability to rely on the truthfulness and accuracy of Verizon's representations and advertisements regarding its wireless service plan prices. Plaintiffs desire and intend to sign up for different Verizon post-paid wireless service plans and Verizon device installment plans in the future.

373.    Monetary damages are not an adequate remedy at law, as described in Paragraph 344 above.

374.    Plaintiffs, on behalf of themselves and as private attorneys general, seek public injunctive relief under the UCL to protect the general public from Verizon's false advertisements and misrepresentations.

375.    Plaintiffs further seek an order granting restitution to Plaintiffs and California Sub-Class members in an amount to be proven at trial. Plaintiffs further seek an award of attorneys' fees and costs under Cal. Code Civ. Proc. § 1021.5.

<div align="center">

**COUNT X**

**Violations of the Colorado Consumer Protection Act,**
**Colo. Rev. Stat. Ann. §§ 6-1-101, *et seq*.**

**By Plaintiff Gamblin on Behalf of the Colorado Sub-Class**

</div>

376.    Plaintiffs repeat and incorporate by reference all preceding paragraphs as if fully set forth herein.

377.    Plaintiff Gamblin brings this claim on behalf of herself and the Colorado Sub-Class under the Colorado Consumer Protection Act, Colo. Rev. Stat. Ann. §§ 6-1-101, *et seq*.

378.    Verizon's material misrepresentations, omissions, and failures to disclose described herein were unfair or deceptive trade practices in violation of the Colorado Consumer Protection Act, Colo. Rev. Stat. Ann. §§ 6-1-101, *et seq*.

379.    Verizon engaged in specific deceptive trade practices declared unlawful by the Colorado Consumer Protection Act, including, *inter alia*:

a.    Verizon knowingly or recklessly represented that its wireless service plans had characteristics that they did not have (Colo. Rev. Stat. Ann. § 6-1-105(1)(e));

b.    Verizon advertised its wireless service plans with an intent not to sell them as advertised (Colo. Rev. Stat. Ann. § 6-1-105(1)(i));

c.    Verizon made false or misleading statements of fact concerning the prices of its wireless service plans (Colo. Rev. Stat. Ann. § 6-1-105(1)(l));

d.    Verizon failed to disclose material information concerning the prices of its wireless service plans which was known by Verizon at the time of sale, and which was intended to induce the consumer to enter into a transaction (Colo. Rev. Stat. Ann. § 6-1-105(1)(u)); and

e.    Verizon knowingly or recklessly engaged in unfair, unconscionable, deceptive, deliberately misleading, false, or fraudulent acts or practices (Colo. Rev. Stat. Ann. §

6-1-105(1)(kkk)).

380.    The Act allows a person who has been injured as a result of a deceptive trade

practice to recover actual damages or $500, whichever is greater. Colo. Rev. Stat. Ann. § 6-1-

113(2)(a).  The Act also expressly allows treble damages, Colo. Rev. Stat. Ann. § 6-1-

113(2)(a)(III), and provides for mandatory attorneys' fees in any successful action.  Colo. Rev.

Stat. Ann. § 6-1-113(2)(b).

381.    By the acts and omissions alleged herein, Defendant has violated the Colorado

Consumer Protection Act, Colo. Rev. Stat. Ann. §§ 6-1-101, *et seq*., causing damage to Plaintiff

Gamblin and the members of the Colorado Sub-Class.

382.    As a result of Defendant's violations, Plaintiff Gamblin and each member of the

Colorado Sub-Class have suffered damages and are therefore entitled to recover damages or

$500 per person (whichever is greater).  Plaintiff Gamblin and each member of the Colorado

Sub-Class are also entitled to treble damages and attorneys' fees and costs.  Plaintiff Gamblin

and the members of the Colorado Sub-Class are also entitled to an injunction to halt Defendant's

unlawful practices.

## COUNT XI

### Violation of the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. §§ 42-110a, *et seq*.

### By Plaintiff Albaitis on Behalf of the Connecticut Sub-Class

383.    Plaintiffs repeat and incorporate by reference all preceding paragraphs as if fully

set forth herein.

384.    Plaintiff Albaitis brings this claim on behalf of herself and the Connecticut Sub-

Class under the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. §§ 42-110a, *et seq*.

385.    The Act prohibits a person from engaging "in unfair methods of competition and

unfair or deceptive acts or practices in the conduct of any trade or commerce." Conn. Gen. Stat. § 42-110b(a).

386.    Specifically, Conn. Gen. Stat. § 42-110g(a) provides:

> Any person who suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment of a method, act or practice prohibited by section 42-110b, may bring an action in the judicial district in which the plaintiff or defendant resides or has his principal place of business or is doing business, to recover actual damages. Proof of public interest or public injury shall not be required in any action brought under this section.

387.    The Act expressly permits punitive damages in addition to actual damages and equitable relief. Conn. Gen. Stat. § 42-110g(a).

388.    By the acts and omissions alleged herein, Defendant has violated the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. §§ 42-110a, *et seq*., causing damage to Plaintiff Albaitis and the members of the Connecticut Sub-Class.

389.    As a result of Defendant's violations, Plaintiff Albaitis and each Connecticut Sub-Class member has suffered damages and is therefore entitled to recover actual, statutory, treble and/or punitive damages, as well as attorneys' fees and costs.  Pursuant to the statute, Plaintiff Albaitis and the Connecticut Sub-Class are also entitled to an injunction to halt Defendant's unlawful practices described herein.

**COUNT XII**

**Violation of the Delaware Consumer Fraud Act (Del. Code Ann. tit. 6, §§ 2511, *et seq*.) and the Delaware Deceptive Trade Practices Act (Del. Code Ann. tit. 6, §§ 2531, *et seq*.)**

**By Plaintiff Caldwell on Behalf of the Delaware Sub-Class**

390.    Plaintiffs repeat and incorporate by reference all preceding paragraphs as if fully set forth herein.

391.    Plaintiff Caldwell brings this claim on behalf of herself and the Delaware Sub-

Class under the Delaware Consumer Fraud Act (Del. Code Ann. tit. 6, §§ 2511, *et seq*.) and the

Delaware Deceptive Trade Practices Act (Del. Code Ann. tit. 6, §§ 2531, *et seq*.).

392.    Verizon's material misrepresentations, omissions, and failures to disclose were

unlawful practices in violation of section 2513(a) of the Delaware Consumer Fraud Act, which

provides:

> The act, use, or employment by any person of any deception, fraud, false
> pretense, false promise, misrepresentation, unfair practice, or the
> concealment, suppression, or omission of any material fact with intent that
> others rely upon such concealment, suppression, or omission, in connection
> with the sale, lease, receipt, or advertisement of any merchandise, whether
> or not any person has in fact been misled, deceived, or damaged thereby, is
> an unlawful practice.

393.    Additionally, Verizon engaged in specific deceptive trade practices declared

unlawful by the Delaware Deceptive Trade Practices Act, including:

    a.    Verizon represented that its wireless service plans had characteristics that

they did not have (Del. Code Ann. tit. 6, § 2532(a)(5));

    b.    Verizon advertised its wireless service plans with an intent not to sell them

as advertised (Del. Code Ann. tit. 6, § 2532 (a)(9)); and

    c.    Verizon engaged in conduct that created a likelihood of confusion or of

misunderstanding (Del. Code Ann. tit. 6, § 2532(a)(12)).

394.    The Delaware Consumer Fraud Act allows "any victim of a violation" of the Act

to bring an action to recover actual damages. Del. Code Ann. tit. 6, § 2525(a). A person may also

obtain an injunction to permanently enjoin the unlawful act or practice. Del. Code Ann. tit. 6, §

2523. Additionally, the Delaware Deceptive Trade Practices Act provides <u>mandatory treble

damages</u>. Del. Code Ann. tit. 6, § 2533(c).

395.    By the acts and omissions alleged herein, Defendant has violated the Delaware

Consumer Fraud Act (Del. Code Ann. tit. 6, §§ 2511, *et seq*.) and the Delaware Deceptive Trade

Practices Act (Del. Code Ann. tit. 6, §§ 2531, *et seq*.), causing damage to Plaintiff Caldwell and the members of the Delaware Sub-Class.

396.    As a result of Defendant's violations, Plaintiff Caldwell and each Delaware Sub-Class member has suffered damages and is therefore entitled to recover actual, statutory, treble and/or punitive damages, as well as attorneys' fees and costs.  Pursuant to the statute, Plaintiff Caldwell and the Delaware Sub-Class are also entitled to an injunction to halt Defendant's unlawful practices described herein.

## COUNT XIII

### Violation of the District of Columbia Consumer Protection Procedures Act, D.C. Code §§ 28-3901, *et seq*.

### By Plaintiff Hines on Behalf of the District of Columbia Sub-Class

397.    Plaintiffs repeat and incorporate by reference all preceding paragraphs as if fully set forth herein.

398.    Plaintiff Hines brings this claim on behalf of herself and the District of Columbia Sub-Class under the District of Columbia Consumer Protection Procedures Act, D.C. Code §§ 28-3901, *et seq*.

399.    The Act prohibits unfair or deceptive trade practices and "establishes an enforceable right to truthful information from merchants about consumer goods and services that are or would be purchased, leased, or received in the District of Columbia." D.C. Code § 28-3901(c).

400.    Verizon engaged in specific deceptive trade practices declared unlawful by the Act, including:

      a.    Verizon misrepresented material facts concerning its wireless service plans which had a tendency to mislead (D.C. Code § 28-3904(e));

b.      Verizon failed to state material facts concerning its wireless service plans where such failures tended to mislead (D.C. Code § 28-3904(f));

c.      Verizon advertised its wireless service plans with an intent not to sell them as advertised (D.C. Code § 28-3904(h)); and

d.      Verizon represented that its wireless service plans were supplied in accordance with a previous representation when they were not (D.C. Code § 28-3904(u)).

401.    The District of Columbia Consumer Protection Procedures Act allows any consumer "to bring an action seeking relief from the use of a trade practice in violation of a law of the District." D.C. Code § 28-3905(k)(1)(A). The Act provides for the recovery of actual damages and for an injunction to stop the use of the unlawful trade practice.

402.    Additionally, the Act provides for the recovery of treble damages, or $1,500 per violation, whichever is greater. D.C. Code § 28-3905(k)(2)(A). The Act also provides for punitive damages. D.C. Code § 28-3905(k)(2)(C). The Act provides for the recovery of reasonable attorney's fees. D.C. Code § 28-3905(k)(2)(B).

403.    By the acts and omissions alleged herein, Defendant has violated the District of Columbia Consumer Protection Procedures Act, D.C. Code §§ 28-3901, *et seq*., causing damage to Plaintiff Hines and the members of the District of Columbia Sub-Class.

404.    As a result of Defendant's violations, Plaintiff Hines and each District of Columbia Sub-Class member has suffered damages and is therefore entitled to recover actual, treble, and punitive damages, or $1,500 per person in statutory damages per violation if greater, as well as attorneys' fees and costs.  Pursuant to the statute, Plaintiff Hines and the District of Columbia Sub-Class are also entitled to an injunction to halt Defendant's unlawful practices described herein.

## COUNT XIV

### Violation of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), Fla. Stat. §§ 501.201, *et seq*.

### By Plaintiffs Capri, Hurtt, Santos, and Sexton on Behalf of the Florida Class

405.    Plaintiffs incorporate by reference all previous paragraphs of this Complaint as if fully set forth herein.

406.    Plaintiffs Art Capri, Jennifer Hurtt, Jon Santos, and Terry Sexton ("Florida Plaintiffs") bring this claim on behalf of themselves and the Florida Sub-Class.

407.    Florida Plaintiffs are each "consumers" within the meaning of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), Fla. Stat. § 501.203(7)

408.    Defendant engaged in "trade or commerce" within the meaning of Fla. Stat. § 501.203(8).

409.    FDUTPA prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce…." Fla. Stat. § 501.204(1). Defendant participated in unfair and deceptive trade practices that violated FDUTPA as described herein.

410.    Defendant has engaged, and continue to engage, in a course of conduct designed to mislead consumers. Defendant's practice of misrepresenting the price of its wireless service plans as well as the nature of the Administrative Charge is unfair and deceptive. Defendant's practice of failing to notify consumers about the Administrative Charge prior to signing up, and then disguising and misrepresenting the nature of the Administrative Charge on the bill, is also deceptive.

411.    A reasonable person entering into a wireless service contract would likely be misled into believing that there are no additional charges (such as the Administrative Charge) for

providing service above and beyond the advertised service price. And, even if a reasonable person became aware of the existence of the Administrative Charge after entering into a wireless service contract with Defendant, said reasonable person would believe, based on the misrepresentations by Defendant, that the Administrative Charge is a legitimate surcharge remitted to the government or somehow tied to legitimate operating costs. However, that is not the case.

412.    As a result of Defendant's deceptive and unfair trade practices, Florida Plaintiffs and the Florida Sub-Class have suffered damages.

413.    Florida Plaintiffs and the Florida Sub-Class are entitled to injunctive relief under Fla. Stat. § 501.211(1) and to recover their actual damages under Fla. Stat. § 501.211(2), attorneys' fees under Fla. Stat. § 501.2105(1), and any other just and proper relief available under the FDUTPA.

## COUNT XV

### Violation of the Georgia Fair Business Practices Act, Ga. Code §§ 10-1- 390, *et seq.*

### By Plaintiff Dyer on Behalf of the Georgia Sub-Class

414.    Plaintiffs repeat and incorporate by reference all preceding paragraphs as if fully set forth herein.

415.    Plaintiff Dyer brings this claim on behalf of herself and the Georgia Sub-Class under the Georgia Fair Business Practices Act, Ga. Code §§ 10-1- 390, *et seq.*

416.    Verizon's material misrepresentations, omissions, and failures to disclose described herein were unfair or deceptive practices in violation of the Georgia Fair Business Practices Act, Ga. Code §§ 10-1- 390, *et seq.*

417.    Verizon engaged in specific unfair or deceptive acts or practices declared

unlawful by the Georgia Fair Business Practices Act, including, *inter alia*:

       a.      Verizon represented that its wireless service plans had characteristics that they did not have (Ga. Code § 10-1-393(b)(5)); and

       b.      Verizon advertised its wireless service plans with an intent not to sell them as advertised (Ga. Code § 10-1-393(b)(9)).

418.    The Georgia Fair Business Practices Act allows any person who has suffered "injury or damages" as a result of a violation of the Act to bring an action to seek injunctive relief and to recover his or her general and exemplary damages.  Ga. Code § 10-1-399(a).  The Act also expressly allows treble damages.  Ga. Code § 10-1-399(c).

419.    Plaintiff Dyer has provided notice on behalf of herself and the Georgia Sub-Class as required by Ga. Code § 10-1-399(b) in a letter to Verizon dated May 27, 2022. Verizon did not respond to the notice.

420.    By the acts and omissions alleged herein, Defendant has violated the Georgia Fair Business Practices Act, Ga. Code §§ 10-1- 390, *et seq.*, causing damage to Plaintiff Dyer and the members of the Georgia Sub-Class.

421.    As a result of Defendant's violations, Plaintiff Dyer and each Georgia Sub-Class member has suffered damages and is therefore entitled to recover actual, statutory, treble and/or punitive damages, as well as attorneys' fees and costs.  Pursuant to the statute, Plaintiff Dyer and the Georgia Sub-Class are also entitled to an injunction to halt Defendant's unlawful practices described herein.

## COUNT XVI

**Violation of the Hawaii Deceptive Practices Act, Haw. Rev. Stat. Ann. §§ 480-1, et seq.**

**By Plaintiffs Casey, Lacuesta, Hunt, and Oshiro on Behalf of the Hawaii Class**

422.     Plaintiffs incorporate by reference all previous paragraphs of this Complaint as if fully set forth herein.

423.     Plaintiffs Debra Casey, Michelle Lacuesta, Jerry Hunt, and Sandra Oshiro bring this claim on behalf of themselves and the Hawaii Sub-Class.

424.     HRS §480-2 declares that "Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are unlawful" and further provides that "No showing that the proceeding or suit would be in the public interest is necessary in any action brought under this section." (citation omitted).

425.     HRS § 480-13(b) (1993) provides that:

"Any consumer who is injured by any unfair or deceptive act or practice forbidden or declared unlawful by section 480-2:

(1)  May sue for damages sustained by the consumer, and, if the judgment is for the plaintiff, the plaintiff shall be awarded a sum not less than $1,000 or threefold damages by the plaintiff sustained, whichever sum is the greater, and reasonable attorney's fees together with the costs of suit . . . ; and

(2)  May bring proceedings to enjoin the unlawful practices, and if the decree is for the plaintiff, the plaintiff shall be awarded reasonable attorney's fees together with the cost of suit.

426.     HRS chapter 480 defines the term "consumer" in relevant part to mean "a natural person who, primarily for personal, family, or household purposes, purchases, attempts to purchase, or is solicited to purchase goods or services[.]" HRS § 480-1 (1993) (emphasis added).

427.     Thus, the plain language of the statute reflects that the legislature intended not only to protect persons who actually purchased goods or services as a result of unfair or

deceptive acts and practices, but also those who attempted or were solicited to do so.

428.    Accordingly, by the plain language of the entire statute, no actual purchase is necessary as a prerequisite to a consumer recovering damages under HRS § 480-13, based on injuries stemming from violations of HRS § 480-2.

429.    Moreover, the $1,000 assured minimum recovery manifests a legislative intent to do more than simply prevent unjust enrichment at the expense of consumers who purchased relatively inexpensive goods. Rather, HRS chapter 480's paramount purpose was to "encourage those who have been victimized by persons engaging in unfair or deceptive acts or practices to prosecute their claim," thereby affording "an additional deterrent to those who would practice unfair and deceptive business acts." Sen. Stand. Comm. Rep. No. 600, in 1969 Senate Journal, at 1111; Hse. Stand. Comm. Rep. No. 661, in 1969 House Journal, at 882-883.

430.    Thus, the Hawaii legislature sought to protect all "consumers" adversely affected by unfair or deceptive acts or practices.  It therefore follows that the $1,000 assured minimum recovery was intended to be available to all consumers, including each member of the Hawaii Sub-Class, who could demonstrate damages.

431.    The foregoing statutory construction is consistent with HRS chapter 480's function as a mechanism for abating practices that potentially injure consumers in general. See Kukui Nuts of Hawaii v. R. Baird & Co., Inc., 7 Haw. App. 598, 610, 789 P.2d 501, 510 (1990); Beerman v. Toro Manufacturing Corp., 1 Haw. App. 111, 117, 615 P.2d 749, 754 (1980).

432.    Thus, if a consumer can establish a resulting injury, HRS § 480-13(b)(1) entitles him or her to the greater of $1,000 or treble damages.

433.    By the acts alleged herein, Defendant has engaged in "Unfair methods of competition and unfair or deceptive acts or practices" in the sale of services primarily for

personal, family, or household purposes to Plaintiffs Casey, Lacuesta, Hunt, and Oshiro and the members of the Hawaii Sub-Class.

434.    Moreover, this matter is in the public interest.

435.    By the acts alleged herein, Plaintiffs Casey, Lacuesta, Hunt, and Oshiro and the members of the Hawaii Sub-Class have been damaged by these unfair and deceptive practices and therefore seek actual damages, the greater of treble damages or $1,000 per person, an injunction to bar these practices, and reasonable attorney's fees.

## COUNT XVII

### Violation of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 Ill. Comp. Stat. Ann. 505/1, *et seq*., and the Illinois Uniform Deceptive Trade Practices Act, 815 Ill. Comp. Stat. Ann. 510/1, *et seq*.

### By Plaintiffs Corbin, Pachecho and Taylor on Behalf of the Illinois Sub-Class

436.    Plaintiffs repeat and incorporate by reference all preceding paragraphs as if fully set forth herein.

437.    Plaintiffs Corbin, Pachecho and Taylor bring this claim on behalf of themselves and the Illinois Sub-Class under the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 Ill. Comp. Stat. Ann. 505/1, *et seq.*, and the Illinois Uniform Deceptive Trade Practices Act, 815 Ill. Comp. Stat. Ann. 510/1, *et seq.*

438.    Verizon's material misrepresentations, omissions, and failures to disclose described herein were deceptive acts or practices in violation of section 505/2 of the Illinois Consumer Fraud and Deceptive Business Practices Act, which provides:

> Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, or the

use or employment of any practice described in Section 2 of the "Uniform
Deceptive Trade Practices Act", approved August 5, 1965, in the conduct of
any trade or commerce are hereby declared unlawful whether any person
has in fact been misled, deceived or damaged thereby.

439.     Additionally, Verizon engaged in specific deceptive trade practices declared

unlawful by the Illinois Uniform Deceptive Trade Practices Act, including, *inter alia*:

a.     Verizon represented that its wireless service plans had characteristics that

they did not have (815 Ill. Comp. Stat. Ann. 510/2(a)(5));

b.     Verizon advertised its wireless service plans with an intent not to sell them

as advertised (815 Ill. Comp. Stat. Ann. 510/2(a)(9)); and

c.     Verizon engaged in conduct that created a likelihood of confusion or of

misunderstanding (815 Ill. Comp. Stat. Ann. 510/2(a)(12)).

440.     The Illinois Consumer Fraud and Deceptive Business Practices Act allows any

person who has suffered actual damage as a result of a violation of the Act to bring an action to

recover actual damages. 815 Ill. Comp. Stat. Ann. 505/10a(a). A person may also obtain an

injunction to permanently enjoin the unlawful trade practices. 815 Ill. Comp. Stat. Ann. 510/3.

441.     By the acts and omissions alleged herein, Defendant has violated Illinois

Consumer Fraud and Deceptive Business Practices Act, 815 Ill. Comp. Stat. Ann. 505/1, *et seq.*,

and the Illinois Uniform Deceptive Trade Practices Act, 815 Ill. Comp. Stat. Ann. 510/1, *et seq.*,

causing damage to Plaintiffs Corbin, Pachecho and Taylor and the members of the Illinois Sub-

Class.

442.     As a result of Defendant's violations, Plaintiffs Corbin, Pachecho and Taylor and

each Illinois Sub-Class member has suffered damages and is therefore entitled to recover actual,

statutory, treble and/or punitive damages, as well as attorneys' fees and costs.  Pursuant to the

statute, Plaintiffs Corbin, Pachecho and Taylor and the Illinois Sub-Class are also entitled to an injunction to halt Defendant's unlawful practices described herein.

<div align="center">

**COUNT XVIII**

**Violation of the Indiana Deceptive Consumer Sales Act,**
**Ind. Code Ann. §§ 24-5-0.5-1, *et seq*.**

**By Plaintiffs Baker and Conover on Behalf of the Indiana Sub-Class**

</div>

443.     Plaintiffs repeat and incorporate by reference all preceding paragraphs as if fully set forth herein.

444.     Plaintiffs Baker and Conover bring this claim on behalf of themselves and the Indiana Sub-Class under the Indiana Deceptive Consumer Sales Act, Ind. Code Ann. §§ 24-5-0.5-1, *et seq*.

445.     Verizon's material misrepresentations, omissions, and failures to disclose described herein were unfair, abusive, or deceptive acts or practices in violation of the Indiana Deceptive Consumer Sales Act, Ind. Code Ann. §§ 24-5-0.5-1, *et seq*.

446.     Section 24-5-0.5-3(a) of the Indiana Deceptive Consumer Sales Act states that a "supplier may not commit an unfair, abusive, or deceptive act, omission, or practice in connection with a consumer transaction."

447.     The Act allows a person who has relied upon an uncured or incurable deceptive act to "bring an action for the damages actually suffered as a consumer as a result of the deceptive act or five hundred dollars ($500), whichever is greater." Ind. Code Ann. § 24-5-0.5-4(a).

448.     The Act also expressly allows treble damages.  Ind. Code Ann. § 24-5-0.5-4(a). And, where the person is an elder (age 60 or older), treble damages are permitted as a matter of right.  Ind. Code Ann. § 24-5-0.5-4(i).

449.     Plaintiffs Baker and Conover and each member of the Indiana Sub-Class reasonably relied on Defendant's material misrepresentations, false advertisements, and deceptive policies and practices, and would not have purchased services and/or equipment from Defendant, or would have acted differently, had they known the truth about Defendant's policies and practices.

450.     Plaintiffs Baker and Conover have provided notice on behalf of themselves and the Indiana Sub-Class as required by Ind. Code Ann. § 24-5-0.5-5 in a letter to Verizon dated May 27, 2022.  Verizon did not respond to the notice.  Nevertheless, Plaintiffs specifically allege that notice is not required because Defendant's conduct constitutes "incurable deceptive acts," in that they were done by a supplier as part of a scheme, artifice, or device with intent to defraud or mislead.  Ind. Code Ann. § 24-5-0.5-2(8).

451.     By the acts and omissions alleged herein, Defendant has violated the Indiana Deceptive Consumer Sales Act, Ind. Code Ann. §§ 24-5-0.5-1, *et seq*., causing damage to Plaintiffs Baker and Conover and the members of the Indiana Sub-Class.

452.     As a result of Defendant's violations, Plaintiffs Baker and Conover and each member of the Indiana Sub-Class have suffered damages and are therefore entitled to recover damages or $500 per person (whichever is greater).  Plaintiffs Baker and Conover and each member of the Indiana Sub-Class are also entitled to treble damages and attorneys' fees and costs.  Plaintiffs Baker and Conover and the members of the Indiana Sub-Class are also entitled to an injunction to halt Defendant's unlawful practices.

## COUNT XIX

### Violation of the Iowa Private Right of Action for Consumer Frauds Act, Iowa Code §§ 714H.1, *et seq.*

### By Plaintiff Scott on Behalf of the Iowa Sub-Class

453.    Plaintiffs repeat and incorporate by reference all preceding paragraphs as if fully set forth herein.

454.    Plaintiff Scott brings this claim on behalf of herself and the Iowa Sub-Class under the Iowa Private Right of Action for Consumer Frauds Act, Iowa Code §§ 714H.1, *et seq.*

455.    Iowa Code § 714H.3(1) provides:

> A person shall not engage in a practice or act the person knows or reasonably should know is an unfair practice, deception, fraud, false pretense, or false promise, or the misrepresentation, concealment, suppression, or omission of a material fact, with the intent that others rely upon the unfair practice, deception, fraud, false pretense, false promise, misrepresentation, concealment, suppression, or omission in connection with the advertisement, sale, or lease of consumer merchandise, or the solicitation of contributions for charitable purposes.

456.    The Act allows "[a] consumer who suffers an ascertainable loss of money or property as the result of a prohibited practice or act in violation of this chapter" to bring an action to recover actual damages and equitable relief, including injunctive relief "necessary to protect the public from further violations." Iowa Code § 714H.5(1).

457.    The Act also expressly allows treble damages. Iowa Code § 714H.5(4).

458.    Additionally, Iowa Code Ann. § 714D.3 provides: "The act, use, or employment by a person of deception or an unfair practice in connection with the lease, sale, or advertisement of a telecommunications service or the solicitation of authority to provide or execute a change of a telecommunications service is an unlawful practice."

459.    By the acts and omissions alleged herein, Defendant has violated the Iowa Private Right of Action for Consumer Frauds Act, Iowa Code §§ 714H.1, *et seq.*, as well as Iowa Code

Ann. § 714D.3, causing damage to Plaintiff Scott and the members of the Iowa Sub-Class.

460.    As a result of Defendant's violations, Plaintiff Scott and each Iowa Sub-Class member has suffered damages and is therefore entitled to recover actual, statutory, treble and/or punitive damages, as well as attorneys' fees and costs.  Pursuant to the statute, Plaintiff Scott and the Iowa Sub-Class are also entitled to an injunction to halt Defendant's unlawful practices described herein.

## COUNT XX

### Violation of the Kansas Unfair Trade and Consumer Protection Act
### (Kan. Stat. §§ 50-623, *et seq.*)

**By Plaintiff Lowrey on Behalf of the Kansas Sub-Class**

461.    Plaintiffs repeat and incorporate by reference all preceding paragraphs as if fully set forth herein.

462.    Plaintiff Lowrey brings this claim on behalf of himself and the Kansas Sub-Class under the Kansas Unfair Trade and Consumer Protection Act (Kan. Stat. §§ 50-623, *et seq.*).

463.    Verizon's material misrepresentations, omissions, and failures to disclose alleged herein were false, misleading, or deceptive acts or practices in violation of the Kansas Unfair Trade and Consumer Protection Act (Kan. Stat. §§ 50-623, *et seq.*).

464.    Verizon engaged in specific deceptive acts or practices declared unlawful by the Kansas Unfair Trade and Consumer Protection Act, including:

a.    Verizon knowingly made representations that its wireless service plans had characteristics that they did not have (Kan. Stat. § 50-626(b)(1)(A));

b.    Verizon willfully made false or ambiguous oral or written representations as to material facts regarding its wireless service plans (Kan. Stat. § 50-626(b)(2)); and

c.    Verizon willfully failed to state material facts, or willfully concealed,

suppressed or omitted material facts regarding its wireless service plans (Kan. Stat. § 50-626(b)(3)).

465.    The Act allows a person who has been "aggrieved by a violation of this act" to recover actual damages or a civil penalty of $10,000, whichever is greater. Kan. Stat. § 50-634(b). The Act also permits a person to obtain declaratory and injunctive relief. Kan. Stat. § 50-634(a).  Additionally, when a consumer is an elder (age 60 or older), the Act allows the person to recover an additional $10,000 civil penalty. Kan. Stat. Ann. § 50-677.

466.    By the acts and omissions alleged herein, Defendant has violated the Kansas Unfair Trade and Consumer Protection Act (Kan. Stat. §§ 50-623, *et seq*.), causing damage to Plaintiff Lowrey and the members of the Kansas Sub-Class.

467.    As a result of Defendant's violations, Plaintiff Lowrey and each Kansas Sub-Class member has suffered damages and is therefore entitled to recover actual and/or punitive damages, or statutory damages in the form of a $10,000 civil penalty if greater, as well as attorneys' fees and costs.  Pursuant to the statute, Plaintiff Lowrey and the Kansas Sub-Class are also entitled to an injunction to halt Defendant's unlawful practices described herein.

## COUNT XXI

### Violation of the Kentucky Consumer Protection Act, Ky. Rev. Stat. Ann. §§ 367.110, *et seq*.

#### By Plaintiff Frey on Behalf of the Kentucky Sub-Class

468.    Plaintiffs repeat and incorporate by reference all preceding paragraphs as if fully set forth herein.

469.    Plaintiff Frey brings this claim on behalf of herself and the Kentucky Sub-Class under the Kentucky Consumer Protection Act, Ky. Rev. Stat. Ann. §§ 367.110, *et seq*.

470.    The Act prohibits the use of "[u]nfair, false, misleading, or deceptive acts or

practices in the conduct of any trade or commerce." Ky. Rev. Stat. Ann. § 367.170(1).

471.    The Act allows a person who "suffers any ascertainable loss of money or

property, real or personal, as the result of the use or employment by another person of a method,

act or practice declared unlawful" to bring an action to recover actual damages and equitable

relief. Ky. Rev. Stat. Ann. § 367.220(1).

472.    The Act also expressly permits punitive damages. Ky. Rev. Stat. Ann. §

367.220(1).

473.    By the acts and omissions alleged herein, Defendant has violated the Kentucky

Consumer Protection Act, Ky. Rev. Stat. Ann. §§ 367.110, *et seq*., causing damage to Plaintiff

Frey and the members of the Kentucky Sub-Class.

474.    As a result of Defendant's violations, Plaintiff Frey and each Kentucky Sub-Class

member has suffered damages and is therefore entitled to recover actual, statutory, treble and/or

punitive damages, as well as attorneys' fees and costs.  Pursuant to the statute, Plaintiff Frey and

the Kentucky Sub-Class are also entitled to an injunction to halt Defendant's unlawful practices

described herein.

### COUNT XXII

### Violation of the Louisiana Unfair Trade Practices and Consumer Protection Law, La. Stat. Ann. §§ 51:1401, *et seq.*

### By Plaintiff Graff on Behalf of the Louisiana Sub-Class

475.    Plaintiffs repeat and incorporate by reference all preceding paragraphs as if fully

set forth herein.

476.    Plaintiff Graff brings this claim on behalf of herself and the Louisiana Sub-Class

under the Louisiana Unfair Trade Practices and Consumer Protection Law, La. Stat. Ann. §§

51:1401, *et seq.*

477.    The Law prohibits the use of "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." La. Stat. Ann. § 51:1405(A).

478.    The Law permits a person "who suffers any ascertainable loss of money or movable property" as a result of an unfair or deceptive act or practice declared unlawful to recover actual damages. La. Stat. Ann. § 51:1409(A).

479.    By the acts and omissions alleged herein, Defendant has violated the Louisiana Unfair Trade Practices and Consumer Protection Law, La. Stat. Ann. §§ 51:1401, *et seq.*, causing damage to Plaintiff Graff and the members of the Louisiana Sub-Class.

480.    As a result of Defendant's violations, Plaintiff Graff and each Louisiana Sub-Class member has suffered damages and is therefore entitled to recover actual, statutory, treble and/or punitive damages, as well as attorneys' fees and costs and an injunction to halt Defendant's unlawful practices described herein.

## COUNT XXIII

### Violation of the Maine Unfair Trade Practices Act, Me. Stat. tit. 5 §§ 205, *et seq.*

### By Plaintiff Sutton on Behalf of the Maine Sub-Class

481.    Plaintiffs repeat and incorporate by reference all preceding paragraphs as if fully set forth herein.

482.    Plaintiff Sutton brings this claim on behalf of herself and the Maine Sub-Class under the Maine Unfair Trade Practices Act, Me. Stat. tit. 5 §§ 205, *et seq*.

483.    Verizon's material misrepresentations, omissions, and failures to disclose were "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of ... trade or commerce." Me. Stat. tit. 5 § 207.

484.     The Act allows a person who "suffers any loss of money or property, real or personal, as a result of the use or employment by another person of a method, act or practice declared unlawful" to bring an action to recover actual damages, restitution, and other equitable relief, including injunctive relief. Me. Stat. tit. 5 § 213(1).

485.     The Act also provides mandatory attorneys' fees to a plaintiff in any successful action. Me. Stat. tit. 5 § 213(2).

486.     Plaintiff Sutton has provided notice on behalf of herself and the Maine Sub-Class to the extent required by the Act in a letter to Verizon dated May 27, 2022. Verizon did not respond to the notice.

487.     By the acts and omissions alleged herein, Defendant has violated the Maine Unfair Trade Practices Act, Me. Stat. tit. 5 §§ 205, *et seq*., causing damage to Plaintiff Sutton and the members of the Maine Sub-Class.

488.     As a result of Defendant's violations, Plaintiff Sutton and each Maine Sub-Class member has suffered damages and is therefore entitled to recover actual, statutory, treble and/or punitive damages, as well as attorneys' fees and costs.  Pursuant to the statute, Plaintiff Sutton and the Maine Sub-Class are also entitled to an injunction to halt Defendant's unlawful practices described herein.

## COUNT XXIV

### Violation of the Maryland Unfair or Deceptive Trade Practices Act, Md. Code Ann., Com. Law §§ 13-301, *et seq*.

### By Plaintiff Ocampo-Neubauer on Behalf of the Maryland Sub-Class

489.     Plaintiffs repeat and incorporate by reference all preceding paragraphs as if fully set forth herein.

490.     Plaintiff Ocampo-Neubauer brings this claim on behalf of herself and the

Maryland Sub-Class under the Maryland Unfair or Deceptive Trade Practices Act, Md. Code Ann., Com. Law §§ 13-301, *et seq*.

491.    Verizon's material misrepresentations, omissions, and failures to disclose described herein were unfair, abusive, or deceptive trade practices in violation of the Maryland Unfair or Deceptive Trade Practices Act, Md. Code Ann., Com. Law §§ 13-301, *et seq*.

492.    Verizon engaged in specific unfair, abusive, or deceptive trade practices declared unlawful by the Maryland Unfair or Deceptive Trade Practices Act, including, *inter alia*:

a.    Verizon represented that its wireless service plans had characteristics that they did not have (Md. Code Ann., Com. Law § 13-301(2)(i));

b.    Verizon failed to state material facts concerning the prices of its wireless service plans, which deceived or had a tendency to deceive (Md. Code Ann., Com. Law § 13-301(3);

c.    Verizon advertised its wireless service plans with an intent not to sell them as advertised (Md. Code Ann., Com. Law § 13-301(5)(i)); and

d.    Verizon used or employed deception, fraud, misrepresentation, or knowingly concealed, suppressed, or omitted material facts with intent that a consumer rely on the same in connection with the promotion or sale of its wireless service plans (Md. Code Ann., Com. Law § 13-301(9)(i)).

493.    The Act allows a person to bring an action to recover damages for any injury or loss sustained as a result of a prohibited practice. Md. Code Ann., Com. Law § 13-408(a).

494.    By the acts and omissions alleged herein, Defendant has violated the Maryland Unfair or Deceptive Trade Practices Act, Md. Code Ann., Com. Law §§ 13-301, *et seq*., causing damage to Plaintiff Ocampo-Neubauer and the members of the Maryland Sub-Class.

495.    As a result of Defendant's violations, Plaintiff Ocampo-Neubauer and each Maryland Sub-Class member has suffered damages and is therefore entitled to recover actual, statutory, treble and/or punitive damages, as well as attorneys' fees and costs.  Pursuant to the statute, Plaintiff Ocampo-Neubauer and the Maryland Sub-Class are also entitled to an injunction to halt Defendant's unlawful practices described herein.

## COUNT XXV

**Violation of the Massachusetts Unfair and Deceptive Business Practices Act,
Mass. Gen. Laws, Ch. 93A, §§ 1, *et seq*.**

**By Plaintiffs Keller and Lombard on Behalf of the Massachusetts Sub-Class**

496.    Plaintiffs repeat and incorporate by reference all preceding paragraphs as if fully set forth herein.

497.    Plaintiffs Keller and Lombard bring this claim on behalf of themselves and the Massachusetts Sub-Class under the Massachusetts Unfair and Deceptive Business Practices Act, Mass. Gen. Laws, Ch. 93A, §§ 1, *et seq*.

498.    Verizon's material misrepresentations, omissions, and failures to disclose described herein were unfair, abusive, or deceptive trade practices in violation of the Massachusetts Unfair and Deceptive Business Practices Act, Mass. Gen. Laws, Ch. 93A, §§ 1, *et seq*.

499.    The Act prohibits the use of "unfair or deceptive acts or practices in the conduct of any trade or commerce."  Mass. Gen. Laws, Ch. 93A, § 2.

500.    The Act allows a person "who has been injured by another person's use or employment of any method, act or practice declared to be unlawful" to bring an action for damages and equitable relief, including injunctive relief. Mass. Gen. Laws, Ch. 93A, § 9(1).

501.    The Act also expressly allows treble damages. Mass. Gen. Laws, Ch. 93A, § 9(3).

The Act also provides mandatory attorneys' fees to a plaintiff in any successful action. Mass. Gen. Laws Ann. ch. 93A, § 9(4).

502. Plaintiffs Keller and Lombard have provided notice on behalf of themselves and the class to the extent required by the Act in a letter to Verizon dated May 27, 2022. Verizon did not respond to the notice.

503. By the acts and omissions alleged herein, Defendant has violated the Massachusetts Unfair and Deceptive Business Practices Act, Mass. Gen. Laws, Ch. 93A, §§ 1, *et seq*., causing damage to Plaintiffs Keller and Lombard and the members of the Massachusetts Sub-Class.

504. As a result of Defendant's violations, Plaintiffs Keller and Lombard and each Massachusetts Sub-Class member has suffered damages and is therefore entitled to recover actual, statutory, treble and/or punitive damages, as well as attorneys' fees and costs. Pursuant to the statute, Plaintiffs Keller and Lombard and the Massachusetts Sub-Class are also entitled to an injunction to halt Defendant's unlawful practices described herein.

## COUNT XXVI

### Violation of the Michigan Consumer Protection Act, Mich. Comp. Laws Ann. §§ 445.901, *et seq*.

**By Plaintiffs Blair, Conley, and Gardner on Behalf of the Michigan Sub-Class**

505. Plaintiffs repeat and incorporate by reference all preceding paragraphs as if fully set forth herein.

506. Plaintiffs Blair, Conley, and Gardner bring this claim on behalf of themselves and the Michigan Sub-Class under the Michigan Consumer Protection Act, Mich. Comp. Laws Ann. §§ 445.901, *et seq*.

507. Verizon's material misrepresentations, omissions, and failures to disclose

described herein were unfair, unconscionable, or deceptive acts or practices in violation of the

Michigan Consumer Protection Act, Mich. Comp. Laws Ann. §§ 445.901, *et seq*.

508.     Verizon engaged in specific unfair, unconscionable, or deceptive acts or practices

declared unlawful by the Michigan Consumer Protection Act, including, *inter alia*:

a.     Verizon represented that its wireless service plans had characteristics that

they did not have (Mich. Comp. Laws Ann. § 445.903(1)(c));

b.     Verizon advertised its wireless service plans with an intent not to sell them

as advertised (Mich. Comp. Laws Ann. § 445.903(1)(g));

c.     Verizon failed to reveal material facts concerning the prices of its wireless

service plans, which had a tendency to mislead or deceive (Mich. Comp. Laws Ann. §

445.903(1)(s));

d.     Verizon made representations of fact or statements of fact material to the

selling of its wireless service plans such that a person would reasonably believe the represented

or suggested state of affairs was something other than it actually was (Mich. Comp. Laws Ann. §

445.903(1)(bb)); and

e.     Verizon failed to reveal facts that were material to the selling of its

wireless service plans in light of representations of fact made in a positive manner (Mich. Comp.

Laws Ann. § 445.903(1)(cc)).

509.     The Act allows a person who has suffered a loss as a result of a violation of the

Act to recover actual damages or $250, whichever is greater. Mich. Comp. Laws Ann. §

445.911(2).

510.     The Act also allows a person to obtain a declaratory judgment that an act or

practice is unlawful under the Act, and to obtain injunctive relief to permanently enjoin the

unlawful act or practice. Mich. Comp. Laws Ann. § 445.911(1).

511.    By the acts and omissions alleged herein, Defendant has violated the Michigan

Consumer Protection Act, Mich. Comp. Laws Ann. §§ 445.901, *et seq*., causing damage to

Plaintiffs Blair, Conley, and Gardner and the members of the Michigan Sub-Class.

512.    As a result of Defendant's violations, Plaintiffs Blair, Conley, and Gardner and

each member of the Michigan Sub-Class have suffered damages and are therefore entitled to

recover their actual damages or $250 per person (whichever is greater).  Plaintiffs Blair, Conley,

and Gardner and each member of the Michigan Sub-Class are also entitled to treble and/or

punitive damages and attorneys' fees and costs.  Plaintiffs Blair, Conley, and Gardner and the

members of the Michigan Sub-Class are also entitled to declaratory and injunctive relief to halt

Defendant's unlawful practices.

## COUNT XXVII

### Violation of the Minnesota False Statement in Advertisement Act, Minn. Stat. Ann. § 325F.67, and the Minnesota Prevention of Consumer Fraud Act, Minn. Stat. Ann. § 325F.69

### By Plaintiff Kirby on Behalf of the Minnesota Sub-Class

513.    Plaintiffs repeat and incorporate by reference all preceding paragraphs as if fully

set forth herein.

514.    Plaintiff Kirby brings this claim on behalf of herself and the Minnesota Sub-Class

under the Minnesota False Statement in Advertisement Act, Minn. Stat. Ann. § 325F.67, and the

Minnesota Prevention of Consumer Fraud Act, Minn. Stat. Ann. § 325F.69.

515.    Verizon's material misrepresentations, omissions, and failures to disclose

described herein were unfair, unconscionable, or deceptive acts or practices in violation of the

Minnesota Sub-Class under the Minnesota False Statement in Advertisement Act, Minn. Stat.

Ann. § 325F.67, and the Minnesota Prevention of Consumer Fraud Act, Minn. Stat. Ann. §

325F.69.

516.     The Minnesota False Statement in Advertisement Act prohibits the making of any

advertisement that contains any material assertion, representation, or statement of fact which is

untrue, deceptive, or misleading.  Minn. Stat. Ann. § 325F.67.

517.     The Minnesota Prevention of Consumer Fraud Act prohibits the use of any

"fraud, false pretense, false promise, misrepresentation, misleading statement or deceptive

practice, with the intent that others rely thereon in connection with the sale of any merchandise,

whether or not any person has in fact been misled, deceived, or damaged." Minn. Stat. Ann. §

325F.69.

518.     A person who has been injured by a violation of either act may bring an action to

recover damages and any other equitable relief. Minn. Stat. Ann. § 8.31(3a).

519.     By the acts and omissions alleged herein, Defendant has violated the Minnesota

False Statement in Advertisement Act, Minn. Stat. Ann. § 325F.67, and the Minnesota

Prevention of Consumer Fraud Act, Minn. Stat. Ann. § 325F.69, causing damage to Plaintiff

Kirby and the members of the Minnesota Sub-Class.

520.     As a result of Defendant's violations, Plaintiff Kirby and each Minnesota Sub-

Class member has suffered damages and is therefore entitled to recover actual, statutory, treble

and/or punitive damages, as well as attorneys' fees and costs.  Pursuant to the statute, Plaintiff

Kirby and the Minnesota Sub-Class are also entitled to an injunction to halt Defendant' unlawful

practices described herein.

## COUNT XXVIII

### Violation of the Mississippi Consumer Protection Act
### (Miss. Code. Ann. §§ 75-24-1, *et seq*.)

### By Plaintiff Odom on Behalf of the Mississippi Sub-Class

521.    Plaintiffs repeat and incorporate by reference all preceding paragraphs as if fully set forth herein.

522.    Plaintiff Odom brings this claim on behalf of herself and the Mississippi Sub-Class under the Mississippi Consumer Protection Act (Miss. Code. Ann. §§ 75-24-1, *et seq*.).

523.    Verizon's material misrepresentations, omissions, and failures to disclose as alleged herein were unfair or deceptive trade practices in violation of the Mississippi Consumer Protection Act (Miss. Code. Ann. §§ 75-24-1, *et seq*.).

524.    Verizon engaged in specific unfair or deceptive trade practices declared unlawful by the Mississippi Consumer Protection Act, including:

a.    Verizon represented that its wireless service plans had characteristics that they did not have (Miss. Code. Ann. § 75-24-5(2)(e)); and

b.    Verizon advertised its wireless service plans with an intent not to sell them as advertised (Miss. Code. Ann. § 75-24-5(2)(i)).

525.    The Act allows any person who "suffers any ascertainable loss of money or property" as a result of a prohibited act or practice to bring an action to recover actual damages. Miss. Code. Ann. § 75-24-15(1). The Act also permits a person to obtain any form of equitable relief, including restitution, as may be necessary to restore to the person any monies or property which was acquired by means of a prohibited act or practice. Miss. Code. Ann. § 75-24-11.

526.     Plaintiff Odom has provided notice on behalf of herself and the Mississippi Sub-Class to the extent required by the Act in a letter to Verizon dated May 27, 2022. Verizon did not respond to the notice.

527.     By the acts and omissions alleged herein, Defendant has violated the Mississippi Consumer Protection Act (Miss. Code. Ann. §§ 75-24-1, *et seq*.), causing damage to Plaintiff Odom and the members of the Mississippi Sub-Class.

528.     As a result of Defendant's violations, Plaintiff Odom and each Mississippi Sub-Class member has suffered damages and is therefore entitled to recover actual, statutory, treble and/or punitive damages, as well as attorneys' fees and costs.  Pursuant to the statute, Plaintiff Odom and the Mississippi Sub-Class are also entitled to an injunction to halt Defendant's unlawful practices described herein.

## COUNT XXIX

### Violation of the Missouri Merchandising Practices Act, Mo. Rev. Stat. §§ 407.010, *et seq*.

### By Plaintiff Moyers on Behalf of the Missouri Sub-Class

529.     Plaintiffs repeat and incorporate by reference all preceding paragraphs as if fully set forth herein.

530.     Plaintiff Moyers brings this claim on behalf of himself and the Missouri Sub-Class under the Missouri Merchandising Practices Act, Mo. Rev. Stat. §§ 407.010, *et seq*.

531.     The Act broadly declares unlawful "[t]he act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce." Mo. Rev. Stat. § 407.020(1).

532.    The Act allows a person who "suffers an ascertainable loss of money or property, real or personal, as a result of the use or employment by another person of a method, act or practice declared unlawful" to bring an action to recover actual damages. Mo. Rev. Stat. § 407.025(1)(1). The Act also permits injunctive relief. Mo. Rev. Stat. § 407.025(2)(3).

533.    The Act also expressly permits punitive damages. Mo. Rev. Stat. § 407.025(2)(1). There is no cap on punitive damages, and Missouri courts have awarded 111:1 ratio and 75:1 ratio before. *See Smith v. New Plaza Pontiac Co.,* 677 S.W.2d 941 (Mo.App.1984) ($400 in actual and $30,000 in punitive damages, a 75–to–1 ratio, for making misrepresentations about the condition of a used car); *Est. of Overbey v. Chad Franklin Nat'l Auto Sales N., LLC*, 361 S.W.3d 364, 374 (Mo. 2012) (the court reaffirmed $500,000 punitive damages on a $4,500 actual damages. ($500k is statutory cap); this is a 111:1 ratio).

534.    By the acts and omissions alleged herein, Defendant has violated the Missouri Merchandising Practices Act, Mo. Rev. Stat. §§ 407.010, *et seq*., causing damage to Plaintiff Moyers and the members of the Missouri Sub-Class.

535.    As a result of Defendant's violations, Plaintiff Moyers and each Missouri Sub-Class member has suffered damages and is therefore entitled to recover actual, statutory, treble and/or punitive damages, as well as attorneys' fees and costs and an injunction to halt Defendant's unlawful practices described herein.

### COUNT XXX

### Violation of the Nebraska Consumer Protection Act, Neb. Rev. Stat. §§ 59-1601, *et seq*.

### By Plaintiff Bellavia on Behalf of the Nebraska Sub-Class

536.    Plaintiffs repeat and incorporate by reference all preceding paragraphs as if fully set forth herein.

138

537.     Plaintiff Bellavia brings this claim on behalf of herself and the Nebraska Sub-Class under the Nebraska Consumer Protection Act, Neb. Rev. Stat. §§ 59-1601, *et seq*.

538.     The Act declares unlawful "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Neb. Rev. Stat. § 59-1602.

539.     The Act allows a person who has been injured in his or her business or property by a violation of the Act to bring an action to enjoin further violations and to recover actual damages. Neb. Rev. Stat. § 59-1609. Damages may potentially be increased up to $1,000. *Id.*

540.     By the acts and omissions alleged herein, Defendant has violated the Nebraska Consumer Protection Act, Neb. Rev. Stat. §§ 59-1601, *et seq*., causing damage to Plaintiff Bellavia and the members of the Nebraska Sub-Class.

541.     As a result of Defendant's violations, Plaintiff Bellavia and each Nebraska Sub-Class member has suffered damages and is therefore entitled to recover actual, statutory, treble and/or punitive damages up to $1,000 per person, as well as attorneys' fees and costs.  Pursuant to the statute, Plaintiff Bellavia and the Nebraska Sub-Class are also entitled to an injunction to halt Defendant's unlawful practices described herein.

## COUNT XXXI

### Violation of the Nevada Deceptive Trade Practices Act
### (Nev. Rev. Stat. §§ 598.0903, *et seq*.)

### By Plaintiff Gaines on Behalf of the Nevada Sub-Class

542.     Plaintiffs repeat and incorporate by reference all preceding paragraphs as if fully set forth herein.

543.     Plaintiff Gaines brings this claim on behalf of herself and the Nevada Sub-Class under the Nevada Deceptive Trade Practices Act (Nev. Rev. Stat. §§ 598.0903, *et seq*.).

544. Verizon engaged in specific deceptive trade practices declared unlawful by the Nevada Deceptive Trade Practices Act, including:

a. Verizon knowingly made representations that its wireless service plans had characteristics that they did not have (Nev. Rev. Stat. § 598.0915(5));

b. Verizon advertised its wireless service plans with an intent not to sell them as advertised (Nev. Rev. Stat. § 598.0915(9));

c. Verizon made false or misleading statements of fact concerning the prices of its wireless service plans (Nev. Rev. Stat. § 598.0915(13)); and

d. Verizon knowingly made false representations in transactions related to its wireless service plans (Nev. Rev. Stat. § 598.0915(15)).

545. An action may be brought by any person who is a victim of a deceptive trade practice to obtain damages and equitable relief. *See* Nev. Rev. Stat. § 41.600; Nev. Rev. Stat. § 598.0993. Additionally, when the person is an elder (age 60 or older), the Act also expressly allows the recovery of punitive damages. Nev. Rev. Stat. § 598.0977.

546. The Act further provides mandatory attorneys' fees to a prevailing consumer. Nev. Rev. Stat. § 41.600(3)(c).

547. By the acts and omissions alleged herein, Defendant has violated the Nevada Deceptive Trade Practices Act (Nev. Rev. Stat. §§ 598.0903, *et seq*.), causing damage to Plaintiff Gaines and the members of the Nevada Sub-Class.

548. As a result of Defendant's violations, Plaintiff Gaines and each Nevada Sub-Class member has suffered damages and is therefore entitled to recover actual, statutory, treble and/or punitive damages, as well as attorneys' fees and costs. Pursuant to the statute, Plaintiff Gaines

and the Nevada Sub-Class are also entitled to an injunction to halt Defendant's unlawful practices described herein.

## COUNT XXXII

### Violation of the New Hampshire Consumer Protection Act
### (N.H. Rev. Stat. Ann. §§ 358-A:1, *et seq*.)

**By Plaintiff Mailhoit on Behalf of the New Hampshire Sub-Class**

549.    Plaintiffs repeat and incorporate by reference all preceding paragraphs as if fully set forth herein.

550.    Plaintiff Mailhoit brings this claim on behalf of herself and the New Hampshire Sub-Class under the New Hampshire Consumer Protection Act (N.H. Rev. Stat. Ann. §§ 358-A:1, *et seq*.).

551.    Verizon's material misrepresentations, omissions, and failures to disclose as alleged herein were unfair or deceptive acts or practices in violation of the New Hampshire Consumer Protection Act (N.H. Rev. Stat. Ann. §§ 358-A:1, *et seq*.).

552.    Verizon engaged in specific unfair or deceptive acts or practices declared unlawful by the New Hampshire Consumer Protection Act, including:

a.      Verizon made representations that its wireless service plans had characteristics that they did not have (N.H. Rev. Stat. Ann. § 358-A:2(V)); and

b.      Verizon advertised its wireless service plans with an intent not to sell them as advertised (N.H. Rev. Stat. Ann. § 358-A:2(IX)).

553.    The Act allows any person "injured by another's use of any method, act or practice declared unlawful" to bring an action to recover actual damages or $1,000, whichever is greater, as well as any equitable relief, including an injunction. N.H. Rev. Stat. Ann. § 358-A:10(I).

554.   The Act also expressly requires damages to be increased by at least 2 times, and as much as 3 times, where the use of the act or practice was a willful or knowing violation of the Act. N.H. Rev. Stat. Ann. § 358-A:10(I).

555.   The Act also provides mandatory attorneys' fees to a prevailing plaintiff. N.H. Rev. Stat. Ann. § 358-A:10(I).

556.   By the acts and omissions alleged herein, Defendant has violated the New Hampshire Consumer Protection Act (N.H. Rev. Stat. Ann. §§ 358-A:1, *et seq.*), causing damage to Plaintiff Mailhoit and the members of the New Hampshire Sub-Class.

557.   As a result of Defendant's violations, Plaintiff Mailhoit and each New Hampshire Sub-Class member has suffered damages and is therefore entitled to recover actual, statutory, double, treble and/or punitive damages, or $1,000 per person if greater, as well as attorneys' fees and costs.  Pursuant to the statute, Plaintiff Mailhoit and the New Hampshire Sub-Class are also entitled to an injunction to halt Defendant's unlawful practices described herein.

## COUNT XXXIII

### Violation of the New Jersey Consumer Fraud Act, N.J.S.A. § 56:8-1, *et seq.*

**By All Plaintiffs on Behalf of the Nationwide Class, and by Plaintiffs Dean Esposito, Jeffrey Achey, Marilyn Achey, Anderson, Asbjorn, Burlak, Carla Chiorazzo, Judith Chiorazzo, Conway, DeMarco James Fisher, Allison Gillingham, Lorraine Gillingham, Gordon, Hartman, Justice, Kelly, Manfredo, Oelenschlager, Patino, Prate, Scheufele, Sewekow, Stroyek, Teer, Trappe, and Tripicchio on behalf of the New Jersey Sub-Class**

558.   Plaintiffs incorporate by reference all previous paragraphs of this Complaint as if fully set forth herein.

559.   Verizon's representations with regard to the pricing and nature of its wireless service plans on its website, in media including internet, television, radio and print, and by Verizon's sales and customer service agents are "advertisements" within the meaning of N.J.S.A. § 56:8-1(a).

560.    Verizon's wireless service is "merchandise" within the meaning of N.J.S.A. § 56:8-1(c).

561.    Defendant is a "person" within the meaning of N.J.S.A. § 56:8-1(d).

562.    The New Jersey Consumer Fraud Act, N.J.S.A. § 56:8-1, et seq. (the "CFA"), was enacted to protect consumers against sharp and unconscionable commercial practices by persons engaged in the sale of goods or services. See Marascio v. Campanella, 689 A.2d 852, 857 (N.J. Ct. App. 1997).

563.    The CFA is a remedial statute which the New Jersey Supreme Court has repeatedly held must be construed liberally in favor of the consumer to accomplish its deterrent and protective purposes. See Furst v. Einstein Moomjy, Inc., 860 A.2d 435, 441 (N.J. 2004) ("The [CFA] is remedial legislation that we construe liberally to accomplish its broad purpose of safeguarding the public.").

564.    Indeed, "[t]he available legislative history demonstrates that the [CFA] was intended to be one of the strongest consumer protection laws in the nation." New Mea Const. Corp. v. Harper, 497 A.2d 534, 543 (N.J. Ct. App. 1985).

565.    For this reason, the "history of the [CFA] is one of constant expansion of consumer protection." Kavky v. Herbalife Int'l of Am., 820 A.2d 677, 681-82 (N.J. Ct. App. 2003).

566.    The CFA was intended to protect consumers "by eliminating sharp practices and dealings in the marketing of merchandise and real estate." Lemelledo v. Beneficial Mgmt. Corp., 696 A.2d 546, 550 (N.J. 1997).

567.    Specifically, N.J.S.A. § 56:8-2 prohibits "unlawful practices" which are defined as:

> The act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission … whether or not any person has in fact been misled, deceived or damaged thereby …

568.     The catch-all term "unconscionable commercial practice" was added to the CFA by amendment in 1971 to ensure that the CFA covered, inter alia, "incomplete disclosures." Skeer v. EMK Motors, Inc., 455 A.2d 508, 512 (N.J. Ct. App. 1982).

569.     In describing what constitutes an "unconscionable commercial practice," the New Jersey Supreme Court has noted that it is an amorphous concept designed to establish a broad business ethic. See Cox v. Sears Roebuck & Co., 647 A.2d 454, 462 (N.J. 1994).

570.     In order to state a cause of action under the CFA, a plaintiff does not need to show reliance by the consumer.  See Varacallo v. Massachusetts Mut. Life Ins. Co., 752 A.2d 807 (N.J. App. Div. 2000); Gennari v. Weichert Co. Realtors, 691 A.2d 350 (N.J. 1997) (holding that reliance is not required in suits under the NJCFA because liability results from "misrepresentations whether 'any person has in fact been misled, deceived or damaged thereby").

571.     As stated by the New Jersey Supreme Court in Lee v. Carter-Reed Co., L.L.C., 4 A.3d 561, 580 (N.J. 2010): "It bears repeating that the [NJCFA] does not require proof of reliance, but only a causal connection between the unlawful practice and ascertainable loss."

572.     It is also not required that an affirmative statement be literally false in order to be considered deceptive and misleading under the CFA. Even a statement which is literally true can be misleading and deceptive in violation of the CFA. See Smajlaj v. Campbell Soup Co., 782 F. Supp. 2d 84, 98 (D.N.J. 2011) (upholding a NJCFA claim where the defendant argued its written

statement was literally true, holding "the fact that the labels were literally true does not mean they cannot be misleading to the average consumer.").

573. A CFA violation also does not require that the merchant be aware of the falsity of the statement or that the merchant act with an intent to deceive. See Gennari v. Weichert Co. Realtors, 691 A.2d 350, 365 (N.J. 1997):

> One who makes an affirmative misrepresentation is liable even in the absence of knowledge of the falsity of the misrepresentation, negligence, or the intent to deceive… An intent to deceive is not a prerequisite to the imposition of liability.

574. Nor is it a defense to a CFA claim that the merchant acted in good faith. See Cox v. Sears Roebuck & Co., 647 A.2d 454, 461 (N.J. 1994) ("the Act [CFA] is designed to protect the public even when a merchant acts in good faith.").

575. In the case at bar, Verizon's policy of promising specific monthly rates for its wireless services but later charging an additional undisclosed, inadequately disclosed and/or inaccurately described monthly Administrative Charge to its customers, as described herein, is a deceptive, misleading, and/or unconscionable commercial practice in the sale of goods in violation of N.J.S.A. § 56:8-2 for the reasons set forth herein.

576. This policy involves, inter alia, both misleading affirmative statements and the knowing omission of material facts.

577. First, Verizon's practice of advertising its wireless services for a specific monthly rate – a price to which its customers agree, but which does not reflect the actual monthly rate that Verizon ultimately charges its customers because it does not include the Administrative Charge – is an affirmative misleading and deceptive statement in the sale of goods or services in violation of N.J.S.A. § 56:8-2. Verizon's practice of categorizing and describing the Administrative Charge as a pass-through fee or a surcharge intended to cover costs billed to Verizon by federal,

state or local governments is also an affirmative misleading and deceptive statement in violation of N.J.S.A. § 56:8-2.

578.    Second, Verizon failed to disclose, or failed to adequately disclose, the Administrative Charge to its customers before they agreed to purchase Verizon's wireless services, and Verizon continued to fail to disclose or adequately disclose the Charge, inter alia, by omitting the Charge from its paper bills, by intentionally falsely describing the Charge as a surcharge or pass-through fee, by lumping the Charge with various government-related charges on its online bills, by referring on the bill to the false description of the Charge on the Verizon website, by obscuring and failing to disclose the true nature of the Charge, and by having a policy of customer service and sales agents falsely telling customers that the Charge was a tax or other government-related charge.  Verizon has never explained to its customers the truth about the Administrative Charge—that the actual reason Verizon charges the Administrative Charge is that it is a surreptitious way to charge more for Verizon's services than the advertised and promised price for those services, the price to which its customers agreed.  Thus, Verizon's policy also involves knowing omissions of material fact in the sale of goods in violation of N.J.S.A. § 56:8-2.

579.    Moreover, Verizon routinely unilaterally increased the Administrative Charge without providing adequate notice of said increase, and without providing its customers with an opportunity to approve or object to the increase or opt out of its services, which actions also involve knowing omissions of material fact in the sale of goods in violation of N.J.S.A. § 56:8-2.

580.    Verizon's deceptive policies described herein also violate N.J.S.A. § 56:8-2.2, as Verizon advertised its wireless services as part of a plan or scheme not to sell the services at the advertised price.

581.    Plaintiffs and the Class and Sub-Class members reasonably and justifiably expected Verizon to comply with applicable law, but Verizon failed to do so.

582.    As a direct and proximate result of these unlawful actions by Verizon, Plaintiffs and the Class and Sub-Class have been injured and have suffered an ascertainable loss of money.

583.    Specifically, Plaintiffs and each Class and Sub-Class member have been charged the undisclosed, extra-contractual, and bogus Administrative Charge by Verizon on a monthly basis for each line on their wireless plans for years, and for years have been forced to pay those monthly Charges to Verizon without having ever agreed to said Charges or knowing the true nature of the Charge.  These payments constitute an ascertainable loss by Plaintiffs and the Class and Sub-Class.

584.    Pursuant to N.J.S.A. § 56:8-19, Plaintiffs seek, inter alia, actual damages, treble damages, and injunctive relief for themselves and the Nationwide Class and New Jersey Sub-Class.

## COUNT XXXIV

### Violation of the New Jersey Truth in Consumer Contract, Warranty and Notice Act, N.J.S.A. § 56:12-14, *et seq.*

**By All Plaintiffs on Behalf of the Nationwide Class, and by Plaintiffs Dean Esposito, Jeffrey Achey, Marilyn Achey, Anderson, Asbjorn, Burlak, Carla Chiorazzo, Judith Chiorazzo, Conway, DeMarco, Fisher, Allison Gillingham, Lorraine Gillingham, Gordon, Hartman, Justice, Kelly, Manfredo, Oelenschlager, Patino, Prate, Scheufele, Sewekow, Stroyek, Teer, Trappe, and Tripicchio on behalf of the New Jersey Sub-Class**

585.    Plaintiffs incorporate by reference all previous paragraphs of this Complaint as if fully set forth herein.

586.    Plaintiffs and the Class and Sub-Class members are "consumers" within the meaning of N.J.S.A. § 56:12-15.

587.    Defendant is a "seller" within the meaning of N.J.S.A. § 56:12-15.

588.    Verizon's wireless service is a "service which is primarily for personal, family or household purposes" within the meaning of N.J.S.A. § 56:12-15.

589.    The advertisements and representations on Verizon's website, various advertisements, and monthly bills are consumer "notices," "signs" and/or "warranties" within the meaning of N.J.S.A. § 56:12-15.

590.    By the acts alleged herein, Verizon has violated N.J.S.A. § 56:12-15 because, in the course of its business, Verizon has offered, displayed and presented written consumer notices, signs and warranties to Plaintiffs and the Class and Sub-Class which contained provisions that violated their clearly established legal rights under state law, within the meaning of N.J.S.A. § 56:12-15.

591.    The clearly established rights of Plaintiffs and the Class and Sub-Class under state law include the right not to be subjected to unconscionable commercial practices and false written affirmative statements of fact in the sale of goods or services, as described herein, which acts are prohibited by the CFA, N.J.S.A. § 56:8-2.

592.    Plaintiffs and each Class and Sub-Class member are aggrieved consumers for the reasons set forth herein, and specifically because, inter alia, each was charged the monthly Administrative Charge by Verizon and paid those Charges to Verizon, and each Plaintiff and Class and Sub-Class member suffered an ascertainable loss under the CFA as described above.

593.    Pursuant to N.J.S.A. § 56:12-17, Plaintiffs seeks a statutory penalty of $100 for each Nationwide Class and New Jersey Sub-Class member, as well as actual damages and attorneys' fees and costs.  See N.J.S.A. § 56:12-17, providing that a seller who violates the TCCWNA: "shall be liable to the aggrieved consumer for a civil penalty of not less than $100.00 or for actual damages, or both at the election of the consumer, together with reasonable

attorney's fees and court costs." See also United Consumer Fin. Servs. Co. v. Carbo, 410 N.J.

Super. 280, 310 (App. Div. 2009), affirming the trial judge's decision to award the $100

statutory penalty to each class member under N.J.S.A. § 56:12-17 of TCCWNA, stating:

> [T]he $100 civil penalty is not unreasonably disproportionate when viewed in that context, whether it is considered with respect to an individual consumer or the 16,845 consumers whose contracts included the prohibited fee. We note that when assessing the constitutional reasonableness of punitive damage awards, courts are directed to consider and give "substantial deference" to judgments made by the Legislature in fixing civil penalties. Nothing about the facts of this case or the numerosity of this class warrants a more searching evaluation of the reasonableness of awarding the civil penalty selected by the Legislature to each member of this class. (citation omitted).

## COUNT XXXV

**Violation of the New Jersey Uniform Declaratory Judgments Act, N.J.S.A. 2A:16-51, *et seq*.**

**By All Plaintiffs on Behalf of the Nationwide Class, and by Plaintiffs Dean Esposito, Jeffrey Achey, Marilyn Achey, Anderson, Asbjorn, Burlak, Carla Chiorazzo, Judith Chiorazzo, Conway, DeMarco, Fisher, Allison Gillingham, Lorraine Gillingham, Gordon, Hartman, Justice, Kelly, Manfredo, Oelenschlager, Patino, Prate, Scheufele, Sewekow, Stroyek, Teer, Trappe, and Tripicchio on behalf of the New Jersey Sub-Class**

594.    Plaintiffs incorporate by reference all previous paragraphs of this Complaint as if set forth fully herein.

595.    Pursuant to the New Jersey Declaratory Judgments Act, N.J.S.A. § 2A:16-51, et seq., Plaintiffs and the Nationwide Class and New Jersey Sub-Class need, and are entitled to, an order for injunctive and declaratory relief:

a.    Declaring that Verizon's policy of charging a deceptive and inadequately disclosed Administrative Charge is a violation of New Jersey law;

b.    Enjoining Verizon from continuing to charge the Administrative Charge to New Jersey consumers without adequately disclosing to and obtaining the consent of such consumers;

c.      Ordering Verizon to hold in constructive trust all Administrative Charge payments received from the Class; and

d.      Ordering Verizon to perform an accounting of all such Administrative Charge payments.

596.    Plaintiffs and the Class and Sub-Class members have a significant interest in this matter in that each has been or will be subjected to the unlawful policies alleged herein.

597.    Verizon continuing to engage in the policies alleged herein.

598.    Plaintiffs are each a current customers and subscribers to Verizon wireless services, and are currently being charged the unlawful Administrative Charge on a monthly basis.

599.    Based on the foregoing, a justifiable controversy is presented in this case, rendering declaratory judgment and injunctive relief appropriate.

<div align="center">

**COUNT XXXVI**

**<u>Violation of the New Mexico Unfair Practices Act, N.M. Stat. Ann. §§ 57-12-1, et seq</u>.**

**By Plaintiffs Frantz, Carlos Gutierrez, Holling, Hudson, and Owens on Behalf of the New Mexico Sub-Class**

</div>

600.    Plaintiffs reallege and incorporate by reference all paragraphs previously alleged.

601.    Plaintiffs Laurie Frantz, Carlos Gutierrez, James Holling, Karen Hudson, and Leslie Owens plead this count in their individual capacities and as putative class representatives on behalf of all other similarly situated citizens of New Mexico.

602.    Verizon's material misrepresentations, omissions, and failures to disclose as alleged herein were unfair or deceptive trade practices in violation of the New Mexico Unfair Practices Act, N.M. Stat. Ann. §§ 57-12-1, <u>et</u> <u>seq</u>.

603.    The Act broadly declares unlawful all **"[u]nfair or deceptive trade practices**

**and unconscionable trade practices in the conduct of any trade or commerce."** N.M. Stat. Ann. § 57-12-3.

604.    Additionally, Verizon engaged in specific unfair or deceptive trade practices declared unlawful by the New Mexico Unfair Practices Act, including:

a.    Verizon made representations that its wireless service plans had characteristics that they did not have (N.M. Stat. Ann § 57-12-2(D)(5));

b.    Verizon made false or misleading statements of fact concerning the prices of its wireless service plans (N.M. Stat. Ann. § 57-12-2(D)(11)); and

c.    Verizon made ambiguous statements as to material facts regarding its wireless service plans and/or failed to state material facts regarding its wireless service plans which deceived or had a tendency to deceive (N.M. Stat. Ann § 57-12-2(D)(14)).

605.    The New Mexico Unfair Practices Act allows a person who has suffered "any loss of money or property, real or personal, as a result of any employment by another person of a method, act or practice declared unlawful by the Unfair Practices Act" to bring an action to recover actual damages or $100, whichever is greater. N.M. Stat. Ann. § 57-12-10(B).

606.    The Act also allows a person to obtain an injunction to permanently enjoin the unlawful practice without needing to show proof of monetary damage, loss of profits, or intent to deceive. N.M. Stat. Ann. § 57-12-10(A).

607.    The Act also expressly allows for the increase of damages "up to three times actual damages or $300, whichever is greater." N.M. Stat. Ann. § 57-12-10(B).

608.    The Act also provides mandatory attorney's fees to a prevailing plaintiff. N.M. Stat. Ann. § 57-12-10(C).

609.     As a result of the practices, actions, and omissions alleged herein, Plaintiffs
Frantz, Gutierrez, Holling, Hudson, and Owens and the members of the New Mexico Sub-Class
have suffered a loss of money as a result of Defendant's employment of unlawful practices under
the New Mexico Unfair Practices Act and seek an award of actual damages or $100 per person
(whichever is greater), three times actual damages or $300 per person (whichever is greater), an
injunction to halt the unlawful practices, and attorney's fees and costs.

## COUNT XXXVII

**Violation of the New Mexico False Advertising Act, N.M. Stat. Ann. §§ 57-15-1, et seq.**

**By Plaintiffs Frantz, Carlos Gutierrez, Holling, Hudson, and Owens on Behalf of the New Mexico Sub-Class and For the Benefit of the General Public**

610.     Plaintiffs reallege and incorporate by reference all paragraphs previously alleged.

611.     Plaintiffs Laurie Frantz, Carlos Gutierrez, James Holling, Karen Hudson, and
Leslie Owens plead this count in their individual capacities, as putative class representatives on
behalf of all other similarly situated citizens of New Mexico, and for the benefit of the general
public.

612.     By its conduct alleged herein, Verizon has committed acts of false advertising, as
defined by and in violation of New Mexico's False Advertising Act, N.M. Stat. Ann. §§ 57-15-1,
et seq. The Act defines false advertising as follows:

> The term false advertising means advertising, including labeling, which is
> misleading in any material respect; and in determining whether any
> advertising is misleading, there shall be taken into account (among other
> things) not only representations made by statement, word, design, device,
> sound or any combination thereof, but also the extent to which the
> advertising fails to reveal facts material in the light of such representations
> with respect to the commodity to which the advertising relates under the
> conditions prescribed in said advertisement, or under such conditions as are
> customary or usual.

N.M. Stat. Ann. § 57-15-2.

613.    Verizon violated New Mexico's False Advertising Act by its actions including but not limited to:

a.    Misrepresenting the prices of Verizon's wireless service plans and concealing the true prices of its wireless service plans in its advertising;

b.    Misrepresenting the prices of Verizon's wireless service plans by advertising or quoting prices in its advertising that do not include the monthly Administrative Charge; and

c.    Failing to disclose the existence or amount of the Administrative Charge in its advertising when consumers sign up for Verizon's wireless service plans.

614.    The Act allows a person to obtain an injunction to bring an action to permanently enjoin the unlawful practices. "... [A] private citizen may bring an action ... against any person to restrain and prevent any violation of this act. Any proceeding initiated under this section by a private citizen shall be initiated on his behalf and all others similarly situated." N.M. Stat. Ann. § 57-15-5(A).

615.    Plaintiffs Laurie Frantz, Carlos Gutierrez, James Holling, Karen Hudson, and Leslie Owens seek a public injunction under the False Advertising Act to restrain and prevent further violations of the Act. Specifically, Plaintiffs seek a permanent public injunction against Verizon as follows: (1) enjoin Verizon from falsely advertising the prices of its wireless service plans to the New Mexico Sub-Class and to the general public; (2) enjoin Verizon from advertising or quoting a wireless service plan price to the New Mexico Sub-Class and to the general public if that price does not include applicable discretionary monthly service fees or charges such as the Administrative Charge; and (3) enjoin Verizon from representing or stating to the New Mexico Sub-Class or to the general public that the Administrative Charge is a tax, a

charge imposed to recover costs billed to Verizon by the government, a pass-through government cost, a government or regulatory fee, or a charge over which Verizon has no control.

## COUNT XXXVIII

### Violation of New York General Business Law § 349

**By Plaintiffs Corsi, Kiraly, and Nicot on Behalf of the New York Sub-Class**

616.     Plaintiffs repeat and incorporate by reference all preceding paragraphs as if fully set forth herein.

617.     Plaintiffs Cintia Corsi, Lynn Kiraly, and Jose Nicot bring this claim on behalf of themselves and the New York Sub-Class under New York General Business Law § 349, which prohibits deceptive acts or practices in the conduct of any business, trade, or commerce.

618.     In its sale of services throughout the State of New York, Defendant conducts business and trade within the meaning and intendment of New York General Business Law § 349.

619.     Plaintiffs Corsi, Kiraly, and Nicot and the members of the New York Sub-Class are consumers who purchased services from Defendant for their personal use.

620.     By the acts and omissions alleged herein, Defendant has engaged in deceptive and misleading practices designed to sell services at a price higher than was advertised and promised and to extract additional cash from existing subscribers.

621.     By reason of this conduct, Defendant has engaged and continue to engage in deceptive conduct in violation of the New York General Business Law § 349.

622.     Defendant's actions are the direct, foreseeable, and proximate cause of the damages that Plaintiffs Corsi, Kiraly, and Nicot and the members of the New York Sub-Class have sustained from having paid for and consumed Defendant's services.

623.    As a result of Defendant's violations, Plaintiffs Corsi, Kiraly, and Nicot and the members of the New York Sub-Class have suffered damages and are entitled to recover those damages or $50, whichever is greater. Plaintiffs Corsi, Kiraly, and Nicot and the members of the New York Sub-Class are also entitled to treble damages up to $1,000 because Defendant willfully and knowingly violated New York General Business Law § 349.  Plaintiffs Corsi, Kiraly, and Nicot and the members of the New York Sub-Class are also entitled to an injunction to halt the unlawful practices and to reasonable attorney's fees from Defendant.

## COUNT XXXIX

## Violations of New York General Business Law § 350

### By Plaintiffs Corsi, Kiraly, and Nicot on Behalf of the New York Sub-Class

624.    Plaintiffs repeat and incorporate by reference all preceding paragraphs as if fully set forth herein.

625.    Plaintiffs Cintia Corsi, Lynn Kiraly, and Jose Nicot bring this claim on behalf of themselves and the New York Sub-Class under New York General Business Law § 350, which prohibits false advertising in the conduct of any business, trade, or commerce.

626.    Verizon's material misrepresentations, omissions, and failures to disclose as described herein also constituted false advertising in violation N.Y. Gen. Bus. Law § 350, which broadly declares unlawful all **"[f]alse advertising in the conduct of any business, trade or commerce or in the furnishing of any service in this state."**

627.    Section 350-e allows any person who has been injured by any violation of section 350 or section 350-a to bring an action to recover actual damages or $500, whichever is greater, as well as to obtain an injunction to enjoin the unlawful false advertising. N.Y. Gen. Bus. Law § 350-e(3).

628.     By the acts and omissions alleged herein, Defendant has directly violated New York General Business Law § 350, causing damage to Plaintiffs Corsi, Kiraly, and Nicot and the members of the New York Sub-Class.

629.     As a result of Defendant's violations, Plaintiffs Corsi, Kiraly, and Nicot and each member of the New York Sub-Class have suffered damages and are therefore entitled to recover damages or $500 per person (whichever is greater). Plaintiffs Corsi, Kiraly, and Nicot and each member of the New York Sub-Class are also entitled to treble damages up to $10,000 because Defendant willfully and knowingly violated New York General Business Law § 350.  Plaintiffs Corsi, Kiraly, and Nicot and the members of the New York Sub-Class are also entitled to an injunction to halt the unlawful practices, and to reasonable attorney's fees from Defendant.

### COUNT XL

### <u>Violation of the North Carolina Monopolies, Trusts, and Consumer Protection Act, N.C. Gen. Stat. §§ 75-1, *et seq*.</u>

**By Plaintiffs Allen, Burke, and Hensley on Behalf of the North Carolina Sub-Class**

630.     Plaintiffs repeat and incorporate by reference all preceding paragraphs as if fully set forth herein.

631.     Plaintiffs Allen, Burke, and Hensley bring this claim on behalf of themselves and the North Carolina Sub-Class under the North Carolina Monopolies, Trusts, and Consumer Protection Act, N.C. Gen. Stat. §§ 75-1, *et seq*.

632.     Verizon's material misrepresentations, omissions, and failures to disclose described herein were unfair, unconscionable, or deceptive acts or practices in violation of the North Carolina Monopolies, Trusts, and Consumer Protection Act, N.C. Gen. Stat. §§ 75-1, *et seq*.

633.    The Act declares unlawful "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce." N.C. Gen. Stat. § 75-1.1(a).

634.    The Act allows a person who has been injured by an act or practice declared unlawful to bring an action to recover mandatory treble damages. N.C. Gen. Stat. § 75-16.

635.    By the acts and omissions alleged herein, Defendant has violated the North Carolina Monopolies, Trusts, and Consumer Protection Act, N.C. Gen. Stat. §§ 75-1, *et seq*., causing damage to Plaintiffs Allen, Burke, and Hensley and the members of the North Carolina Sub-Class.

636.    As a result of Defendant's violations, Plaintiffs Allen, Burke, and Hensley and each North Carolina Sub-Class member has suffered damages and is therefore entitled to recover actual, statutory, treble and/or punitive damages, as well as attorneys' fees and costs.  Pursuant to the statute, Plaintiffs Allen, Burke, and Hensley and the North Carolina Sub-Class are also entitled to an injunction to halt Defendant's unlawful practices described herein.

### COUNT XLI

**Violation of the North Dakota Unlawful Sales or Advertising Practices Act (N.D. Cent. Code Ann. §§ 51-15-01, *et seq*.) and the North Dakota False Advertising Act (N.D. Cent. Code Ann. §§ 51-12-01, *et seq*.).**

**By Plaintiff Keeler on Behalf of the North Dakota Sub-Class**

637.    Plaintiffs repeat and incorporate by reference all preceding paragraphs as if fully set forth herein.

638.    Plaintiff Keeler brings this claim on behalf of himself and the North Dakota Sub-Class under the North Dakota Unlawful Sales or Advertising Practices Act (N.D. Cent. Code

Ann. §§ 51-15-01, *et seq.*) and the North Dakota False Advertising Act (N.D. Cent. Code Ann. §§ 51-12-01, *et seq.*).

639.    Verizon's material misrepresentations, omissions, and failures to disclose as described herein were deceptive acts or practices in violation of section 51-15-02 of the North Dakota Unlawful Sales or Advertising Practices Act, which provides:

> The act, use, or employment by any person of any deceptive act or practice, fraud, false pretense, false promise, or misrepresentation, with the intent that others rely thereon in connection with the sale or advertisement of any merchandise, whether or not any person has in fact been misled, deceived, or damaged thereby, is declared to be an unlawful practice.

640.    Additionally, Verizon's material misrepresentations, omissions, and failures to disclose as described herein constituted false advertising in violation of section 51-12-08 of the North Dakota False Advertising Act, which provides:

> It is unlawful for any person with intent, directly or indirectly, to dispose of real or personal property or to perform services, professional or otherwise, or anything of any nature whatsoever or to induce the public to enter into any obligation relating thereto, to make or disseminate or cause to be made or disseminated before the public in this state, in any newspaper or other publication, or any advertising device, or by public outcry or proclamation, or in any other manner or means whatever, any statement, concerning such real or personal property or services, professional or otherwise or concerning any circumstance or matter of fact connected with the proposed performance or disposition thereof, which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading.

641.    The North Dakota Unlawful Sales or Advertising Practices Act allows a person to bring "any claim of relief" against any person who has acquired "any moneys or property by means of any practice declared to be unlawful" by the Act. N.D. Cent. Code Ann. § 51-15-09.

642.    The Act also expressly allows treble damages, N.D. Cent. Code Ann. § 51-15-09, and attorneys' fees are <u>mandatory</u> if the defendant knowingly committed the conduct. *Id.*

643.    The North Dakota False Advertising Act allows "any person acting for the interests of itself, its members, or the general public" to bring an action to enjoin the unlawful false advertising. N.D. Cent. Code Ann. § 51-12-14.

644.    By the acts and omissions alleged herein, Defendant has violated the North Dakota Unlawful Sales or Advertising Practices Act (N.D. Cent. Code Ann. §§ 51-15-01, *et seq.*) and the North Dakota False Advertising Act (N.D. Cent. Code Ann. §§ 51-12-01, *et seq.*), causing damage to Plaintiff Keeler and the members of the North Dakota Sub-Class.

645.    As a result of Defendant's violations, Plaintiff Keeler and each North Dakota Sub-Class member has suffered damages and is therefore entitled to recover actual, statutory, treble and/or punitive damages, as well as attorneys' fees and costs.  Pursuant to the statute, Plaintiff Keeler and the North Dakota Sub-Class are also entitled to an injunction to halt Defendant's unlawful practices described herein.

## COUNT XLII

### Violation of the Ohio Unfair, Deceptive, or Unconscionable Acts or Practices Act, Ohio Rev. Code §§ 1345.01, *et seq.*

### By Plaintiffs Cavallaro, Curry, and Snyder on Behalf of the Ohio Sub-Class

646.    Plaintiffs repeat and incorporate by reference all preceding paragraphs as if fully set forth herein.

647.    Plaintiffs Cavallaro, Curry, and Snyder bring this claim on behalf of themselves and the Ohio Sub-Class under the Ohio Unfair, Deceptive, or Unconscionable Acts or Practices Act, Ohio Rev. Code §§ 1345.01, *et seq.*

648.    Verizon's material misrepresentations, omissions, and failures to disclose described herein were unfair or deceptive acts or practices in violation of the Ohio Unfair, Deceptive, or Unconscionable Acts or Practices Act, Ohio Rev. Code §§ 1345.01, *et seq.*

649.    Verizon engaged in specific unfair or deceptive trade practices declared unlawful

by the Ohio Unfair, Deceptive, or Unconscionable Acts or Practices Act, including, *inter alia*:

        a.      Verizon made representations that its wireless service plans had

characteristics that they did not have (Ohio Rev. Code § 1345.02(B)(1)); and

        b.      Verizon did not provide its wireless service plans in accordance with

previous representations it made (Ohio Rev. Code § 1345.02(B)(5)).

650.    Where there is a violation of the Act, a person is allowed to bring an action to

recover "actual economic damages plus an amount not exceeding five thousand dollars in

noneconomic damages." Ohio Rev. Code § 1345.09(A). "Actual economic damages" includes all

damages for "direct, incidental, or consequential pecuniary losses" resulting from a violation of

the Act. Ohio Rev. Code § 1345.09(G).

651.    A person may also seek all other appropriate relief, including declaratory and

injunctive relief. Ohio Rev. Code § 1345.09(D).

652.    By the acts and omissions alleged herein, Defendant has violated the Ohio Unfair,

Deceptive, or Unconscionable Acts or Practices Act, Ohio Rev. Code §§ 1345.01, *et seq*.,

causing damage to Plaintiffs Cavallaro, Curry, and Snyder and the members of the Ohio Sub-

Class.

653.    As a result of Defendant's violations, Plaintiffs Cavallaro, Curry, and Snyder and

each Ohio Sub-Class member has suffered damages and is therefore entitled to recover actual,

statutory, treble and/or punitive damages, as well as attorneys' fees and costs.  Pursuant to the

statute, Plaintiffs Cavallaro, Curry, and Snyder and the Ohio Sub-Class are also entitled to an

injunction to halt Defendant's unlawful practices described herein.

## COUNT XLIII

### Violation of the Oklahoma Consumer Protection Act
### (Okla. Stat. Ann. tit. 15, §§ 751, *et seq.*)

### By Plaintiff Willard on Behalf of the Oklahoma Sub-Class

654.    Plaintiffs repeat and incorporate by reference all preceding paragraphs as if fully set forth herein.

655.    Plaintiff Willard brings this claim on behalf of himself and the Oklahoma Sub-Class under the Oklahoma Consumer Protection Act (Okla. Stat. Ann. tit. 15, §§ 751, *et seq.*).

656.    Verizon's material misrepresentations, omissions, and failures to disclose described herein were unlawful trade practices in violation of the Oklahoma Consumer Protection Act (Okla. Stat. Ann. tit. 15, §§ 751, *et seq.*).

657.    Verizon engaged in specific trade practices declared unlawful by the Oklahoma Consumer Protection Act, including:

    a.    Verizon knowingly made representations that its wireless service plans had characteristics that they did not have (Okla. Stat. Ann. tit. 15, § 753(5));

    b.    Verizon knowingly advertised its wireless service plans with an intent not to sell them as advertised (Okla. Stat. Ann. tit. 15, § 753(8));

    c.    Verizon knowingly made false or misleading statements of fact concerning the prices of its wireless service plans (Okla. Stat. Ann. tit. 15, § 753(11)); and

    d.    Verizon committed unfair or deceptive trade practices as defined in § 752 (Okla. Stat. Ann. tit. 15, § 753(20)).

658.    Where there is a violation of the Act, "the violator [is] liable to the aggrieved consumer for the payment of actual damages sustained by the customer and costs of litigation including reasonable attorney's fees." Okla. Stat. Ann. tit. 15, § 761.1(A).

659.     By the acts and omissions alleged herein, Defendant has violated the Oklahoma Consumer Protection Act (Okla. Stat. Ann. tit. 15, §§ 751, *et seq.*), causing damage to Plaintiff Willard and the members of the Oklahoma Sub-Class.

660.     As a result of Defendant's violations, Plaintiff Willard and each Oklahoma Sub-Class member has suffered damages and is therefore entitled to recover actual, statutory, treble and/or punitive damages, as well as attorneys' fees and costs, as well as an injunction to halt Defendant's unlawful practices described herein.

## COUNT XLIV

### Violation of the Oregon Unlawful Trade Practices Act, ORS §646.605 et seq.

### By Plaintiffs Cohron and Green on Behalf of the Oregon Sub-Class

661.     Plaintiffs reallege and incorporate by reference all paragraphs previously alleged.

662.     Plaintiffs Tyson Cohron and Angela Green plead this count in their individual capacities and as putative class representatives serving on behalf of all other similarly situated citizens of Oregon.

663.     The Oregon Unfair Trade Practices Act (the "UTPA"), ORS § 646.605 et seq., is Oregon's principal consumer protection statute. As the Supreme Court of Oregon has explained:

> The civil action authorized by ORS 646.638 is designed to encourage private enforcement of the prescribed standards of trade and commerce in aid of the act's public policies as much as to provide relief to the injured party. This is apparent from the section itself. It allows recovery of actual damages or $200, whichever is greater, plus punitive damages, costs, and attorney fees. . . . The evident purpose is to encourage private actions when the financial injury is too small to justify the expense of an ordinary lawsuit . . . the legislature was concerned as much with devising sanctions for the prescribed standards of trade and commerce as with remedying private losses, and that such losses therefore should be viewed broadly. The private loss indeed may be so small that the common law likely would reject it as grounds for relief, yet it will support an action under the statute.

Weigel v. Ron Tonkin Chevrolet Co., 298 Or. 127, 134–36, 690 P.2d 488, 493–94 (1984).

664. A private plaintiff may also seek an injunction "as may be necessary to ensure cessation of unlawful trade practices." ORS 646.636.

665. Defendant is a "person," as defined by ORS 646.605(4).

666. Defendant is engaged in "trade" and "commerce" in Oregon by offering services for sale that directly or indirectly affect the people of Oregon, as defined by ORS 646.605(8), which services are or may be obtained primarily for personal, family or household purposes.

667. As outlined herein, Verizon's material misrepresentations, omissions, and failures to disclose were unlawful trade practices in violation of the Oregon Unlawful Trade Practices Act (ORS §§ 646.605, et seq.).

668. Specifically, Verizon engaged in specific trade practices declared unlawful by the Oregon Unlawful Trade Practices Act, including:

a. Verizon represented that its wireless service plans had characteristics that they did not have (ORS § 646.608(1)(e));

b. Verizon advertised its wireless service plans with an intent not to sell them as advertised (ORS § 646.608(1)(i));

c. Verizon made false or misleading representations of fact concerning the offering price of its wireless service plans (ORS § 646.608(1)(s)); and

d. Verizon engaged in unfair or deceptive conduct in trade or commerce (ORS § 646.608(1)(u)).

669. As alleged herein, Plaintiffs Cohron and Green and the members of the Oregon Sub-Class have "suffer[ed] an ascertainable loss of money or property, real or personal, as a result of another person's willful use or employment of a method, act or practice declared unlawful" and Plaintiffs Cohron and Green and each member of the Oregon Sub-Class is

therefore empowered to bring to bring an action to recover actual damages or $200, whichever is greater, as well as any other equitable relief. ORS § 646.638(1).

670.    ORS 646.636 allows Plaintiffs Cohron and Green and the Oregon Sub-Class to obtain an injunction "as may be necessary to ensure cessation of unlawful trade practices." ORS § 646.636.

671.    Defendant's unlawful methods, acts and practices pleaded herein were "willful violations" of ORS 646.608 because Defendant knew or should have known that its conduct was a violation, as defined by ORS 646.605(10).

672.    Defendant's representations as alleged herein were "advertisements" as defined by ORS 646.881(1).

673.    Defendant engaged in other unfair or deceptive conduct in trade or commerce, as described herein. ORS 646.608(1)(u).

674.    With respect to omissions, Defendant at all relevant times had a duty to disclose the relevant material information in question because, inter alia: (a) Defendant had exclusive knowledge of material information that was not known to Plaintiffs Cohron and Green and the Oregon Sub-Class; (b) Defendant concealed material information from Plaintiffs Cohron and Green and the Oregon Sub-Class; and/or (c) Defendant made partial representations which were false and misleading absent the omitted information.

675.    Defendant's misrepresentations and nondisclosures deceive and have a tendency to deceive a reasonable consumer and the general public.

676.    Defendant's misrepresentations and nondisclosures are material, in that they relate to the price of the services being sold and thus a reasonable person would attach importance to the information and would be induced to act on the information in making purchase decisions.

677.    As a result of the misconduct by Defendant alleged herein, Plaintiffs Cohron and Green and the Oregon Sub-Class members paid more than they otherwise would have paid for the services they purchased from Defendant.

678.    Plaintiffs Cohron and Green seek, on behalf of themselves and the Oregon Sub-Class: (1) the greater of statutory damages of $200 or actual damages; (2) punitive damages; (3) appropriate equitable relief and/or restitution; and (4) attorney's fees and costs. ORS 646.638(3); ORS 646.638(8).

679.    The unlawful acts and omissions pled herein were, are, and continue to be part of a pattern or generalized course of conduct. Defendant's conduct is ongoing and is likely to continue and recur absent a permanent injunction. Accordingly, Plaintiffs Cohron and Green seek an order enjoining Defendant from committing such unlawful practices. ORS 646.638(1); ORS 646.638(8)(c); ORS 646.636.

680.    The balance of the equities favors the entry of permanent injunctive relief against Defendant. Plaintiffs Cohron and Green, the Oregon Sub-Class members and the general public will be irreparably harmed absent the entry of permanent injunctive relief against Defendant. Plaintiffs Cohron and Green, the Oregon Sub-Class members and the general public lack an adequate remedy at law. A permanent injunction against Defendant is in the public interest.

681.    Defendant's unlawful behavior is ongoing as of the date of the filing of this Complaint. If not enjoined by order of this Court, Defendant will or may continue to injure Plaintiffs Cohron and Green and Oregon consumers through the misconduct alleged herein. Absent the entry of a permanent injunction, Defendant's unlawful behavior will not cease and, in the unlikely event that it voluntarily ceases, it is capable of repetition and is likely to reoccur.

682.    Defendant's conduct has caused substantial injury to the general public. Plaintiffs Cohron and Green individually seek public injunctive relief to protect the general public by putting an end to Defendant's misconduct as alleged herein.

683.    Plaintiffs Cohron and Green brought action against Verizon "within one year after the discovery of the unlawful method, act or practice." ORS 646.6.

## COUNT XLV

### Violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 Pa. Stat. Ann. §§ 201-1, *et seq.*

#### By Plaintiffs Vallecorsa and Young on Behalf of the Pennsylvania Sub-Class

684.    Plaintiffs repeat and incorporate by reference all preceding paragraphs as if fully set forth herein.

685.    Plaintiffs Vallecorsa and Young bring this claim on behalf of themselves and the Pennsylvania Sub-Class under the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 Pa. Stat. Ann. §§ 201-1, *et seq*.

686.    Verizon's material misrepresentations, omissions, and failures to disclose described herein were unfair or deceptive acts or practices in violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 Pa. Stat. Ann. §§ 201-1, *et seq*.

687.    Verizon engaged in specific unfair or deceptive acts or practices declared unlawful by the Pennsylvania Unfair Trade Practices and Consumer Protection Law, including, *inter alia*:

     a.    Verizon represented that its wireless service plans had characteristics that they did not have (73 Pa. Stat. Ann. § 201-2(4)(v));

     b.    Verizon advertised its wireless service plans with an intent not to sell them as advertised (73 Pa. Stat. Ann. § 201-2(4)(ix)); and

c.      Verizon engaged in fraudulent or deceptive conduct which created a

likelihood of confusion or of misunderstanding (73 Pa. Stat. Ann. § 201-2(4)(xxi)).

688.    The Act allows a person who "suffers any ascertainable loss of money or

property, real or personal, as a result of the use or employment by any person of a method, act or

practice declared unlawful" to bring an action to recover actual damages or $100, whichever is

greater, as well as any other equitable relief. 73 Pa. Stat. Ann. § 201-9.2(a).

689.    The Act also expressly allows treble damages. 73 Pa. Stat. Ann. § 201-9.2(a).

690.    Plaintiffs Vallecorsa and Young and each member of the Pennsylvania Sub-Class

reasonably relied on Defendant's material misrepresentations, false advertisements, and

deceptive policies and practices, and would not have purchased services and/or equipment from

Defendant, or would have acted differently, had they known the truth about Defendant's policies

and practices.

691.    By the acts and omissions alleged herein, Defendant has violated the

Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 Pa. Stat. Ann. §§ 201-1,

*et seq*., causing damage to Plaintiffs Vallecorsa and Young and the members of the Pennsylvania

Sub-Class.

692.    As a result of Defendant's violations, Plaintiffs Vallecorsa and Young and each

member of the Pennsylvania Sub-Class have suffered damages and are therefore entitled to

recover damages or $100 per person (whichever is greater).  Plaintiffs Vallecorsa and Young and

each member of the Pennsylvania Sub-Class are also entitled to treble and/or punitive damages

and attorneys' fees and costs.  Plaintiffs Vallecorsa and Young and the members of the

Pennsylvania Sub-Class are also entitled to declaratory and injunctive relief to halt Defendant's

unlawful practices.

## COUNT XLVI

### Violation of the South Carolina Unfair Trade Practices Act, S.C. Code Ann. §§ 39-5-10, *et seq*.

### By Plaintiff Wilson on Behalf of the South Carolina Sub-Class

693.    Plaintiffs repeat and incorporate by reference all preceding paragraphs as if fully set forth herein.

694.    Plaintiff Wilson brings this claim on behalf of himself and the South Carolina Sub-Class under the South Carolina Unfair Trade Practices Act, S.C. Code Ann. §§ 39-5-10, *et seq*.

695.    The Act declares unlawful all "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." S.C. Code Ann. § 39-5-20(a).

696.    The Act allows a person who "suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment by another person of an unfair or deceptive method, act or practice declared unlawful" to bring an action to recover actual damages. S.C. Code Ann. § 39-5-140(a).

697.    The Act also expressly allows treble damages. S.C. Code Ann. § 39-5-140(a).

698.    By the acts and omissions alleged herein, Defendant has violated the South Carolina Unfair Trade Practices Act, S.C. Code Ann. §§ 39-5-10, *et seq*., causing damage to Plaintiff Wilson and the members of the South Carolina Sub-Class.

699.    As a result of Defendant's violations, Plaintiff Wilson and each South Carolina Sub-Class member has suffered damages and is therefore entitled to recover actual, statutory, treble and/or punitive damages, as well as attorneys' fees and costs and an injunction to halt Defendant's unlawful practices described herein.

## COUNT XLVII

### Violation of the South Dakota Deceptive Trade Practices and Consumer Protection Act (S.D. Codified Laws §§ 37-24-1, *et seq.*)

### By Plaintiff Colon on Behalf of the South Dakota Sub-Class

700.    Plaintiffs repeat and incorporate by reference all preceding paragraphs as if fully set forth herein.

701.    Plaintiff Colon brings this claim on behalf of himself and the South Dakota Sub-Class under the South Dakota Deceptive Trade Practices and Consumer Protection Act (S.D. Codified Laws §§ 37-24-1, *et seq.*).

702.    Verizon's material misrepresentations, omissions, and failures to disclose described herein were deceptive acts or practices in violation of the South Dakota Deceptive Trade Practices and Consumer Protection Act (S.D. Codified Laws §§ 37-24-1, *et seq.*).

703.    Under the Act, it is a deceptive act or practice for any person to "[k]nowingly act, use, or employ any deceptive act or practice, fraud, false pretense, false promises, or misrepresentation or to conceal, suppress, or omit any material fact in connection with the sale or advertisement of any merchandise, regardless of whether any person has in fact been misled, deceived, or damaged thereby." S.D. Codified Laws § 37-24-6(1).

704.    The Act allows any person "who claims to have been adversely affected by any act or a practice declared to be unlawful" to bring an action to recover actual damages suffered as a result of such act or practice. S.D. Codified Laws § 37-24-31. The Act also allows for any equitable relief necessary to restore to a person any moneys or property that was acquired by means of any act or practice declared unlawful. S.D. Codified Laws § 37-24-29.

705.    By the acts and omissions alleged herein, Defendant has violated the South Dakota Deceptive Trade Practices and Consumer Protection Act (S.D. Codified Laws §§ 37-24-

1, *et seq.*), causing damage to Plaintiff Colon and the members of the South Dakota Sub-Class.

706.    As a result of Defendant's violations, Plaintiff Colon and each South Dakota Sub-Class member has suffered damages and is therefore entitled to recover actual, statutory, treble and/or punitive damages, as well as attorneys' fees and costs.   Pursuant to the statute, Plaintiff Colon and the South Dakota Sub-Class are also entitled to an injunction to halt Defendant's unlawful practices described herein.

### COUNT XLVIII

**Violation of the Tennessee Consumer Protection Act of 1977**
**(Tenn. Code Ann. §§ 47-18-101, *et seq.*)**

**By Plaintiff Bland-Mullins on Behalf of the Tennessee Sub-Class**

707.    Plaintiffs repeat and incorporate by reference all preceding paragraphs as if fully set forth herein.

708.    Plaintiff Bland-Mullins brings this claim on behalf of herself and the Tennessee Sub-Class under the Tennessee Consumer Protection Act of 1977 (Tenn. Code Ann. §§ 47-18-101, *et seq.*).

709.    Verizon's material misrepresentations, omissions, and failures to disclose described herein were unfair or deceptive acts or practices in violation of the Tennessee Consumer Protection Act of 1977 (Tenn. Code Ann. §§ 47-18-101, *et seq.*).

710.    Verizon engaged in specific unfair or deceptive acts or practices declared unlawful by the Tennessee Consumer Protection Act of 1977, including:

a.    Verizon made representations that its wireless service plans had characteristics that they did not have (Tenn. Code Ann. § 47-18-104(b)(5)); and

b.    Verizon advertised its wireless service plans with an intent not to sell them as advertised (Tenn. Code Ann. § 47-18-104(b)(9)).

711.    The Act allows a person who has suffered an ascertainable loss of money or property as a result of an act or practice declared unlawful to bring an action to recover actual damages. Tenn. Code Ann. § 47-18-109(a)(1). The Act also allows a person to obtain a declaratory judgment that the act or practice violates the Act and to enjoin the unlawful act or practice. Tenn. Code Ann. § 47-18-109(b).

712.    The Act also expressly allows treble damages. Tenn. Code Ann. § 47-18-109(a)(3).

713.    By the acts and omissions alleged herein, Defendant has violated the Tennessee Consumer Protection Act of 1977 (Tenn. Code Ann. §§ 47-18-101, *et seq*.), causing damage to Plaintiff Bland-Mullins and the members of the Tennessee Sub-Class.

714.    As a result of Defendant's violations, Plaintiff Bland-Mullins and each Tennessee Sub-Class member has suffered damages and is therefore entitled to recover actual, statutory, treble and/or punitive damages, as well as attorneys' fees and costs.  Pursuant to the statute, Plaintiff Bland-Mullins and the Tennessee Sub-Class are also entitled to an injunction to halt Defendant's unlawful practices described herein.

## COUNT XLIX

### Violation of the Texas Deceptive Trade Practices-Consumer Protection Act, Tex. Bus. & Com. Code §§ 17.41, *et seq*.

### By Plaintiff Bell on Behalf of the Texas Sub-Class

715.    Plaintiffs repeat and incorporate by reference all preceding paragraphs as if fully set forth herein.

716.    Plaintiff Bell brings this claim on behalf of herself and the Texas Sub-Class under the Texas Deceptive Trade Practices-Consumer Protection Act, Tex. Bus. & Com. Code §§ 17.41, *et seq*.

717.     Verizon's material misrepresentations, omissions, and failures to disclose described herein were false, misleading, or deceptive acts or practices in violation of the Texas Deceptive Trade Practices-Consumer Protection Act, Tex. Bus. & Com. Code §§ 17.41, *et seq*.

718.     Verizon violated specific provisions of the Texas Deceptive Trade Practices-Consumer Protection Act, including, *inter alia*:

a.     Verizon represented that its wireless service plans had characteristics that they did not have (Tex. Bus. & Com. Code § 17.46(b)(5));

b.     Verizon advertised its wireless service plans with an intent not to sell them as advertised (Tex. Bus. & Com. Code § 17.46(b)(9));

c.     Verizon failed to disclose information concerning its wireless service plans which was known at the time of transaction with the intent to induce the consumer into a transaction into which the consumer would not have entered had the information been disclosed (Tex. Bus. & Com. Code § 17.46(b)(24)); and

d.     Verizon committed unconscionable actions or an unconscionable course of actions (Tex. Bus. & Com. Code § 17.50(a)(3)).

719.     The Act allows a person who has suffered economic damages as a result of an unlawful act to recover economic damages. Tex. Bus. & Com. Code § 17.50(a), (b)(1). The Act also allows a person to obtain any other equitable relief necessary to restore to the person any money or property which may have been acquired by the unlawful acts. Tex. Bus. & Com. Code § 17.50(b)(3).

720.     The Act further allows a person to obtain an order enjoining the unlawful acts. Tex. Bus. & Com. Code § 17.50(b)(2).

721.     The Act also expressly allows treble damages. Tex. Bus. & Com. Code

§ 17.50(b)(1). The Act also provides mandatory attorneys' fees to a prevailing consumer. Tex. Bus. & Com. Code § 17.50(d).

722.  Plaintiff Bell has provided notice on behalf of herself and the Texas Sub-Class to the extent required by the Act in a letter to Verizon dated May 27, 2022. Verizon did not respond to the notice.

723.  By the acts and omissions alleged herein, Defendant has violated the Texas Deceptive Trade Practices-Consumer Protection Act, Tex. Bus. & Com. Code §§ 17.41, *et seq.*, causing damage to Plaintiff Bell and the members of the Texas Sub-Class.

724.  As a result of Defendant's violations, Plaintiff Bell and each Texas Sub-Class member has suffered damages and is therefore entitled to recover actual, statutory, treble and/or punitive damages, as well as attorneys' fees and costs.  Pursuant to the statute, Plaintiff Bell and the Texas Sub-Class are also entitled to an injunction to halt Defendant's unlawful practices described herein.

## COUNT L

### Violation of the Utah Consumer Sales Practices Act
### (Utah Code Ann. §§ 13-11-1, *et seq.*)

### By Plaintiff Moore on Behalf of the Utah Sub-Class

725.  Plaintiffs repeat and incorporate by reference all preceding paragraphs as if fully set forth herein.

726.  Plaintiff Moore brings this claim on behalf of herself and the Utah Sub-Class under the Utah Consumer Sales Practices Act (Utah Code Ann. §§ 13-11-1, *et seq.*),

727.  Verizon's material misrepresentations, omissions, and failures to disclose described herein were deceptive acts or practices in violation of the Utah Consumer Sales Practices Act (Utah Code Ann. §§ 13-11-1, *et seq.*).

728.    Verizon engaged in specific deceptive acts or practices declared unlawful by the Utah Consumer Sales Practices Act, including:

a.    Verizon knowingly or intentionally indicated that its wireless service plans had characteristics that they did not have (Utah Code Ann. § 13-11-4(2)(a));

b.    Verizon knowingly or intentionally indicated that its wireless service plans were supplied in accordance with previous representations when they were not (Utah Code Ann. § 13-11-4(2)(e)); and

c.    Verizon committed unconscionable acts or practices in connection with consumer transactions (Utah Code Ann. § 13-11-5(1)).

729.    The Act allows a person who has suffered a loss as a result of a violation of the Act to bring an action to recover actual damages or $2,000, whichever is greater, plus costs. Utah Code Ann. § 13-11-19(2). The Act also allows a person to obtain a declaratory judgment that the act or practice violates the Act and to enjoin the unlawful act or practice. Utah Code Ann. § 13-11-19(1)(a), (b).

730.    By the acts and omissions alleged herein, Defendant has violated the Utah Consumer Sales Practices Act (Utah Code Ann. §§ 13-11-1, *et seq*.), causing damage to Plaintiff Moore and the members of the Utah Sub-Class.

731.    As a result of Defendant's violations, Plaintiff Moore and each Utah Sub-Class member has suffered damages and is therefore entitled to recover their actual damages or $2,000 per person, whichever is greater, as well as attorneys' fees and costs.  Pursuant to the statute, Plaintiff Moore and the Utah Sub-Class are also entitled to an injunction to halt Defendant's unlawful practices described herein.

## COUNT LI

### Violation of the Virginia Consumer Protection Act, Va. Code Ann. §§ 59.1-196, *et seq*.

### By Plaintiffs Maxa and Moran on Behalf of the Virginia Sub-Class

732.     Plaintiffs repeat and incorporate by reference all preceding paragraphs as if fully set forth herein.

733.     Plaintiffs Maxa and Moran bring this claim on behalf of themselves and the Virginia Sub-Class under the Virginia Consumer Protection Act, Va. Code Ann. §§ 59.1-196, *et seq*.

734.     Verizon's material misrepresentations, omissions, and failures to disclose described herein were fraudulent acts or practices in violation of the Virginia Consumer Protection Act, Va. Code Ann. §§ 59.1-196, *et seq*.

735.     Verizon engaged in specific fraudulent acts or practices declared unlawful by the Virginia Consumer Protection Act, including, *inter alia*:

a.     Verizon represented that its wireless service plans had characteristics that they did not have (Va. Code Ann. § 59.1-200(A)(5));

b.     Verizon advertised its wireless service plans with an intent not to sell them as advertised or with an intent not to sell at the price or upon the terms advertised (Va. Code Ann. § 59.1-200(A)(8)); and

c.     Verizon used deception, fraud, false pretense, false promises, or misrepresentations in connection with consumer transactions (Va. Code Ann. § 59.1-200(A)(14)).

736.     The Act allows any person who "suffers loss as the result of a violation of this chapter" to bring "an action to recover actual damages, or $500, whichever is greater." Va. Code

Ann. § 59.1-204(A).

737.     The Act also authorizes injunctive relief to permanently enjoin the unlawful act or practice. *See* Va. Code Ann. §§ 59.1-203, 59.1-205.

738.     The Act also expressly allows for the increase of damages "to an amount not exceeding three times the actual damages sustained, or $1,000, whichever is greater." Va. Code Ann. § 59.1-204(A).

739.     Plaintiffs Maxa and Moran have provided notice on behalf of themselves and the Virginia Sub-Class to the extent required by the Act in a letter to Verizon dated May 27, 2022. Verizon did not respond to the notice.

740.     By the acts and omissions alleged herein, Defendant has violated the Virginia Consumer Protection Act, Va. Code Ann. §§ 59.1-196, *et seq*., causing damage to Plaintiffs Maxa and Moran and the members of the Virginia Sub-Class.

741.     As a result of Defendant's violations, Plaintiffs Maxa and Moran and each member of the Virginia Sub-Class have suffered damages and are therefore entitled to recover damages or $500 per person (whichever is greater).  Plaintiffs Maxa and Moran and each member of the Virginia Sub-Class are also entitled to treble and/or punitive damages, or $1,000 per person if greater, and attorneys' fees and costs.  Plaintiffs Maxa and Moran and the members of the Virginia Sub-Class are also entitled to declaratory and injunctive relief to halt Defendant's unlawful practices.

## COUNT LII

### Violation of the Washington Consumer Protection Act (RCW Chapter 19.86)

### By Plaintiffs Bowman, Challender, Ellis, Garrison, Jones, McConville, and Wright on Behalf of the Washington Sub-Class

742. Plaintiffs reallege and incorporate by reference all paragraphs previously alleged herein.

743. Plaintiffs Mary Bowman, Karyn Challender, Andi Ellis, Ashley Garrison, Joyce Jones, Jason McConville, and Kathleen Wright bring this claim in their individual capacities, in their capacities as private attorney generals under the laws of the State of Washington seeking the imposition of public injunctive relief, and on behalf of the Washington Sub-Class.

744. The Washington Consumer Protection Act (the "CPA"), RCW 19.86, was first enacted in 1961 and is the State of Washington's principal consumer protection statute.

745. The CPA broadly declares unlawful all "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." RCW 19.86.020.

746. The CPA allows any person "who is injured in his or his business or property by a violation of RCW 19.86.020" to bring an action "to enjoin further violations, to recover the actual damages sustained by him or her, or both, together with the costs of the suit, including a reasonable attorney's fee." RCW 19.86.090.

747. The CPA also expressly allows treble damages. RCW 19.86.090.

748. The CPA "replaces the now largely discarded standard of caveat emptor with a standard of fair and honest dealing." Washington Pattern Jury Instruction Civil No. 310.00 (Consumer Protection Act—Introduction).

749. The CPA's primary substantive provision declares unfair methods of competition and unfair or deceptive acts or practices to be unlawful. RCW 19.86.020. "Private rights of

action may now be maintained for recovery of actual damages, costs, and a reasonable attorney's fee. RCW 19.86.090. A private plaintiff may be eligible for treble damages . . . Private consumers may obtain injunctive relief, even if the injunction would not directly affect the individual's own rights. RCW 19.86.090." Washington Pattern Jury Instruction Civil No. 310.00 (Consumer Protection Act—Introduction).

750.    The acts and omissions of Verizon as alleged herein constitute unfair methods of competition and/or unfair or deceptive acts or practices which directly or indirectly affect the people of the State of Washington and which have injured Plaintiffs Bowman, Challender, Ellis, Garrison, Jones, McConville, and Wright and the members of the Washington Sub-Class in their business or property and which were the cause of said injury.

751.    Verizon engaged in the conduct of trade or commerce. For example, and without limitation, Verizon engaged in the sale of services and engaged in commerce directly or indirectly affecting the people of the State of Washington.

752.    As a direct, substantial and/or proximate result of these violations, Plaintiffs Bowman, Challender, Ellis, Garrison, Jones, McConville, and Wright and the members of the Washington Sub-Class suffered injury to business or property.

753.    Plaintiffs Bowman, Challender, Ellis, Garrison, Jones, McConville, and Wright and the members of the Washington Sub-Class paid more than they otherwise would have paid for the services they purchased from Verizon and they bought more than they otherwise would have bought from Defendant.

754.    Defendant's deceptive fee scheme fraudulently increased demand from consumers, enabling Defendant to charge higher prices than it otherwise could have charged.

755.    The acts and/or omissions of each defendant pled herein are injurious to the public interest because said acts and/or omissions: violate a statute that incorporates RCW Chapter 19.86, violate a statute that contains a specific legislative declaration of public interest impact, injures other persons, had the capacity to injure other persons, and/or has the capacity to injure other persons.

756.    The unlawful acts and omissions pleaded herein were committed in the course of Defendant's business. The unlawful acts and omissions pled herein were, are, and continue to be part of a pattern or generalized course of conduct.

757.    The unlawful acts and omissions pleaded herein were repeatedly committed prior to the acts involving Plaintiffs Bowman, Challender, Ellis, Garrison, Jones, McConville, and Wright. There is a real and substantial potential for repetition of Defendant's conduct after the acts involving Plaintiffs Bowman, Challender, Ellis, Garrison, Jones, McConville, and Wright.

758.    The acts and omissions of Defendant pleaded herein were, and are not, reasonable in relation to the development and preservation of business.

759.    The balance of the equities favors the entry of permanent injunctive relief against Defendant. Plaintiffs Bowman, Challender, Ellis, Garrison, Jones, McConville, and Wright, the members of the Washington Sub-Class and the general public will be irreparably harmed absent the entry of permanent injunctive relief against Defendant. Plaintiffs Bowman, Challender, Ellis, Garrison, Jones, McConville, and Wright, the members of the Washington Sub-Class, and the general public lack an adequate remedy at law. A permanent injunction against Defendant is in the public interest. Defendant's unlawful behavior is ongoing as of the date of the filing of this pleading; absent the entry of a permanent injunction, Defendant's unlawful behavior will not cease and, in the unlikely event that it voluntarily ceases, is likely to reoccur.

**COUNT LIII**

**Violation of the West Virginia Consumer Credit and Protection Act**
**(W. Va. Code Ann. §§ 46A-1-101, *et seq*.)**

**By Plaintiff Ray on Behalf of the West Virginia Sub-Class**

760.    Plaintiffs repeat and incorporate by reference all preceding paragraphs as if fully set forth herein.

761.    Plaintiff Ray brings this claim on behalf of herself and the West Virginia Sub-Class under the West Virginia Consumer Credit and Protection Act (W. Va. Code Ann. §§ 46A-1-101, *et seq*.)

762.    Verizon's material misrepresentations, omissions, and failures to disclose described herein were unfair or deceptive acts or practices in violation of the West Virginia Consumer Credit and Protection Act (W. Va. Code Ann. §§ 46A-1-101, *et seq*.), which broadly declares unlawful all "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." W. Va. Code Ann. § 46A-6-104.

763.    Additionally, Verizon engaged in specific unfair or deceptive acts or practices declared unlawful by the West Virginia Consumer Credit and Protection Act, including:

a.    Verizon represented that its wireless service plans had characteristics that they did not have (W. Va. Code Ann. § 46A-6-102(7)(E));

b.    Verizon advertised its wireless service plans with an intent not to sell them as advertised (W. Va. Code Ann. § 46A-6-102(7)(I));

c.    Verizon engaged in conduct that created a likelihood of confusion or of misunderstanding (W. Va. Code Ann. § 46A-6-102(7)(L)); and

d.    Verizon used or employed deception, fraud, misrepresentation, or knowingly concealed, suppressed, or omitted material facts with intent that others rely upon the

concealment, suppression, or omission in connection with the sale or advertisement of its wireless service plans, whether or not a person has in fact been misled, deceived, or damaged (W. Va. Code Ann. § 46A-6-102(7)(M)).

764.    The Act allows any person who "suffers an ascertainable loss of money or property, real or personal, as a result of the use or employment by another person of a method, act, or practice prohibited or declared to be unlawful" by the Act to bring an action to recover actual damages or $200, whichever is greater, as well as any equitable relief. W. Va. Code Ann. § 46A-6-106(a).

765.    Plaintiff Ray has provided notice on behalf of herself and the West Virginia Sub-Class to the extent required by the Act in a letter to Verizon dated May 27, 2022. Verizon did not respond to the notice.

766.    By the acts and omissions alleged herein, Defendant has violated the West Virginia Consumer Credit and Protection Act (W. Va. Code Ann. §§ 46A-1-101, *et seq*.), causing damage to Plaintiff Ray and the members of the West Virginia Sub-Class.

767.    As a result of Defendant's violations, Plaintiff Ray and each West Virginia Sub-Class member has suffered damages and is therefore entitled to recover their actual damages or $200 per person, whichever is greater, as well as attorneys' fees and costs.  Pursuant to the statute, Plaintiff Ray and the West Virginia Sub-Class are also entitled to an injunction to halt Defendant's unlawful practices described herein.

## COUNT LIV

### Violation of the Wisconsin Deceptive Trade Practices Act, Wis. Stat. Ann. § 100.18, *et seq.*

### By Plaintiff From on Behalf of the Wisconsin Sub-Class

768.     Plaintiffs repeat and incorporate by reference all preceding paragraphs as if fully set forth herein.

769.     Plaintiff From brings this claim on behalf of himself and the Wisconsin Sub-Class under the Wisconsin Deceptive Trade Practices Act, Wis. Stat. Ann. § 100.18, *et seq.*

770.     Verizon's material misrepresentations, omissions, and failures to disclose described herein violated the Wisconsin Deceptive Trade Practices Act, Wis. Stat. Ann. § 100.18(1), which provides:

> No person, firm, corporation or association, or agent or employee thereof, with intent to sell, distribute, increase the consumption of or in any wise dispose of any real estate, merchandise, securities, employment, service, or anything offered by such person, firm, corporation or association, or agent or employee thereof, directly or indirectly, to the public for sale, hire, use or other distribution, or with intent to induce the public in any manner to enter into any contract or obligation relating to the purchase, sale, hire, use or lease of any real estate, merchandise, securities, employment or service, shall make, publish, disseminate, circulate, or place before the public, or cause, directly or indirectly, to be made, published, disseminated, circulated, or placed before the public, in this state, in a newspaper, magazine or other publication, or in the form of a book, notice, handbill, poster, bill, circular, pamphlet, letter, sign, placard, card, label, or over any radio or television station, or in any other way similar or dissimilar to the foregoing, an advertisement, announcement, statement or representation of any kind to the public relating to such purchase, sale, hire, use or lease of such real estate, merchandise, securities, service or employment or to the terms or conditions thereof, which advertisement, announcement, statement or representation contains any assertion, representation or statement of fact which is untrue, deceptive or misleading.

771.     Section 100.18 allows any person who has suffered pecuniary loss because of a violation of the section to bring an action and "shall recover such pecuniary loss, together with costs, including reasonable attorney fees." Wis. Stat. Ann. § 100.18(11)(b)(2).

772.    Additionally, Verizon's material misrepresentations, omissions, and failures to disclose violated Wis. Stat. Ann. § 100.207(2), which provides:

> A person may not make in any manner any statement or representation with regard to the provision of telecommunications service, including the rates, terms or conditions for telecommunications service, which is false, misleading or deceptive, or which omits to state material information with respect to the provision of telecommunications service that is necessary to make the statement not false, misleading or deceptive.

773.    Section 100.207 allows any person who has been "adversely affected" by another person's failure to comply with the section to bring "a claim for appropriate relief, including damages, injunctive or declaratory relief, specific performance and rescission." Wis. Stat. Ann. § 100.207(6)(a)(1). Additionally, a violation of section 100.207 constitutes fraudulent representations in violation of section 100.18(1). Wis. Stat. Ann. § 100.207(6)(f).

774.    By the acts and omissions alleged herein, Defendant has violated the Wisconsin Deceptive Trade Practices Act, Wis. Stat. Ann. § 100.18, *et seq*., causing damage to Plaintiff From and the members of the Wisconsin Sub-Class.

775.    As a result of Defendant's violations, Plaintiff From and each Wisconsin Sub-Class member has suffered damages and is therefore entitled to recover actual, statutory, treble and/or punitive damages, as well as attorneys' fees and costs.  Pursuant to the statute, Plaintiff From and the Wisconsin Sub-Class are also entitled to an injunction to halt Defendant's unlawful practices described herein.

### COUNT LV

### Violation of the Wyoming Consumer Protection Act
### (Wyo. Stat. Ann. §§ 40-12-101, *et seq*.)

### By Plaintiff White on Behalf of the Wyoming Sub-Class

776.    Plaintiffs repeat and incorporate by reference all preceding paragraphs as if fully set forth herein.

777.     Plaintiff White brings this claim on behalf of herself and the Wyoming Sub-Class under the Wyoming Consumer Protection Act (Wyo. Stat. Ann. §§ 40-12-101, *et seq*.).

778.     Verizon's material misrepresentations, omissions, and failures to disclose described herein were deceptive trade practices in violation of the Wyoming Consumer Protection Act (Wyo. Stat. Ann. §§ 40-12-101, *et seq*.).

779.     Verizon engaged in specific deceptive trade practices declared unlawful by the Wyoming Consumer Protection Act, including:

a.     Verizon knowingly represented that its wireless service plans were supplied in accordance with a previous representation, when it in fact they were not (Wyo. Stat. § 40-12-105(a)(v));

b.     Verizon knowingly made false or misleading statements of fact concerning the prices of its wireless service plans (Wyo. Stat. § 40-12-105(a)(vii));

c.     Verizon knowingly advertised its wireless service plans with an intent not to sell them as advertised (Wyo. Stat. § 40-12-105(a)(x)); and

d.     Verizon knowingly engaged in unfair or deceptive acts or practices (Wyo. Stat. § 40-12-105(a)(xv)).

780.     The Act allows any person who has relied upon an uncured unlawful deceptive trade practice to bring an action to recover actual damages suffered as a result of the unlawful deceptive trade practice. Wyo. Stat. § 40-12-108(a).

781.     Plaintiff White and each member of the Wyoming Sub-Class reasonably relied on Defendant's material misrepresentations, false advertisements, and deceptive policies and practices, and would not have purchased services and/or equipment from Defendant, or would have acted differently, had they known the truth about Defendant's policies and practices.

782.    Plaintiff White has provided notice on behalf of herself and the Wyoming Sub-Class to the extent required by the Act in a letter to Verizon dated May 27, 2022. Verizon did not respond to the notice.

783.    By the acts and omissions alleged herein, Defendant has violated the Wyoming Consumer Protection Act (Wyo. Stat. Ann. §§ 40-12-101, *et seq*.), causing damage to Plaintiff White and the members of the Wyoming Sub-Class.

784.    As a result of Defendant's violations, Plaintiff White and each Wyoming Sub-Class member has suffered damages and is therefore entitled to recover actual, statutory, treble and/or punitive damages, as well as attorneys' fees and costs.  Pursuant to the statute, Plaintiff White and the Wyoming Sub-Class are also entitled to an injunction to halt Defendant's unlawful practices described herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs Dean Esposito, Jeffrey Achey, Marilyn Achey, Justin Anderson, Deidre Asbjorn, Gregory Burlak, Carla Chiorazzo, Judith Chiorazzo, John Conway, Adam DeMarco, James Fisher, Allison Gillingham, Lorraine Gillingham, Doree Gordon, Donna Hartman, Patricia Justice, David Kelly, Christina Manfredo, Judith Oelenschlager, Daniel Patino, James Prate, Michael Scheufele, Russell Sewekow, Deborah Stroyek, Linda Teer, Christine Trappe, Brenda Tripicchio, Teresa MacClelland, Karen Umberger, Scott Willits, Michael Branom, Molly Brown, Michael Carney, Tim Frasch, Patricia Gagan, Anna Gutierrez, Linda Jenkins, Augustus Johnson, William Kaupelis, Marilyn Kaye, Janette Lisner, William Eric Lough, David Massaro, Louise Monsour, Darleen Perez, Gabrielle Pozzuoli, Valerie Reed, Bruce Schramm, Kerry Showalter, John St. Jarre, Gloria Stern, Edna Toy, Teresa Toy, Vanessa West, Mary Bowman, Art Capri, Debra Casey, Karyn Challender, Dyson Cohron, Cintia Corsi,

Andi Ellis, Laurie Frantz, Ashley Garrison, Angela Green, Carlos Gutierrez, James Holling, Karen Hudson, Jerry Hunt, Jennifer Hurtt, Joyce Jones, Lynn Kiraly, Michelle Lacuesta, Jason McConville, Jose Nicot, Sandra Oshiro, Leslie Owens, Jon Santos, Terry Sexton, Kathleen Wright, Pamela M. Allen, Samantha Albaitis, Cydni Arterbury, Lisa Baker, Briana Bell, Christine Bellavia, Kimberly Blair, Leanor Bland-Mullins, Caroline Bonham, Tammy Burke, Annmarie Caldwell, Shauna Cavallaro, Santos Colon, Erika Conley, Kendra Conover, Dylan Corbin, Laura Curry, Shakera Dyer, Jane Frey, Russell From, Angel Gaines, Ashtin Gamblin, Ericka Gardner, Ann Graff, James Hensley, Sarel Hines, Alexander Keeler, Adam Keller, Billie Kendrick, Krista Kirby, Jan Lombard, Marc Lowrey, Jill Mailhoit, Aaron Maxa, Kelly Moore, Lindsey Moran, David Moyers, Jennifer Ocampo-Neubauer, Keisha Odom, Angel Pachecho, Heather Ray, Susan Scott, Lori Snyder, Misty Sutton, Kathryn Taylor, Anthony Vallecorsa, Claire White, Kristopher Willard, Alvin Wilson, and Brad Young, on behalf of themselves and proposed Class and Sub-Classes, ask this Court to:

A.      Certify the case as a class action and appoint Plaintiffs and their counsel to represent the Nationwide Class and Sub-Classes;

B.      Declare that Defendant is financially responsible for notifying all Class and Sub-Class members of Defendant's deceptive and unconscionable business practices alleged herein;

C.      Declare that Defendant's conduct alleged herein violates the laws cited above;

D.      Permanently enjoin Defendant from engaging in the misconduct alleged herein;

E.      Retain jurisdiction to monitor Defendant's compliance with the permanent injunctive relief;

F.      Order that the discovery rule applies to extend any applicable limitations periods (and the corresponding class periods) for the Class and Sub-Classes to the date on which Verizon

first began charging the Administrative Charge;

      G.     Order disgorgement and/or restitution, including, without limitation, disgorgement of all revenues, profits and/or unjust enrichment that Verizon obtained, directly or indirectly, from Plaintiffs and class members as a result of the unlawful conduct alleged herein;

      H.     Order Defendant to hold in constructive trust all Administrative Charge payments received from the Class and Sub-Classes;

      I.     Order Defendant to perform an accounting of all such Administrative Charge payments;

      J.     Enter judgment in favor of Plaintiffs and the classes for damages suffered as a result of the conduct alleged herein;

      K.     Order Defendant to pay punitive, exemplary, treble, and/or statutory damages to the classes under the laws outlined herein;

      L.     Order Defendant to pay attorneys' fees and costs to the extent allowed by law;

      M.     Order Defendant to pay pre-judgment and post-judgment interest to the extent allowed by law; and

      N.     Grant such other and further legal and equitable relief as the Court deems just and proper.

## JURY TRIAL DEMAND

      PLEASE TAKE NOTICE that the Plaintiffs hereby demand a trial by jury on all issues so triable.

Dated:  November 10, 2023      By: _____

                                 DeNITTIS OSEFCHEN PRINCE, P.C.
                                 Stephen P. DeNittis, Esq.
                                 Joseph A. Osefchen, Esq.

Shane T. Prince, Esq.
525 Route 73 North, Suite 410
Marlton, NJ 08053
Telephone: (856) 797-9951
Facsimile: (856) 797-9978
Email: sdenittis@denittislaw.com
Email: josefchen@denittislaw.com
Email: sprince@denittislaw.com

HATTIS & LUKACS
Daniel M. Hattis, Esq.*
Paul Karl Lukacs, Esq.*
11711 SE 8th Street, Suite 120
Bellevue, WA 98005
Telephone: (425) 233-8650
Facsimile: (425) 412-7171
Email: dan@hattislaw.com
Email: pkl@hattislaw.com

CRIDEN & LOVE, P.A.
Michael E. Criden, Esq. *
Lindsey C. Grossman, Esq. *
7301 SW 57th Court, Suite 515
South Miami, FL 33143
Telephone: (305) 357-9000
Facsimile: (305) 357-9050
Email: mcriden@cridenlove.com
Email: lgrossman@cridenlove.com

* Pro Hac Vice Application To Be Submitted

*Attorneys for Plaintiffs and the Proposed Classes*

**CERTIFICATION PURSUANT TO RULE 4:5-1**

To the best of Plaintiffs' knowledge, the matter in controversy is related to a matter previously

filed and pending entitled <u>Achey et al. v. Cellco Partnership d/b/a Verizon Wireless et al.,</u>

Docket No. MID-L-160-22.  No arbitration proceeding is pending or contemplated. There are no

other parties known to Plaintiffs at this time who should be joined in this action.

**CERTIFICATION PURSUANT TO N.J.S.A. 56:8-1, et seq.**

The undersigned hereby certify that a copy of this complaint has been forwarded to the

Attorney General of the State of New Jersey.

**DESIGNATION OF TRIAL COUNSEL**

Pursuant to Rule 4:25-4, Stephen P. DeNittis is designated as trial counsel.


Dated:  November 10, 2023          By: _____

DeNITTIS OSEFCHEN PRINCE, P.C.
Stephen P. DeNittis, Esq.
Joseph A. Osefchen, Esq.
Shane T. Prince, Esq.
525 Route 73 North, Suite 410
Marlton, NJ 08053
Telephone: (856) 797-9951
Facsimile: (856) 797-9978
Email: sdenittis@denittislaw.com
Email: josefchen@denittislaw.com
Email: sprince@denittislaw.com

HATTIS & LUKACS
Daniel M. Hattis, Esq.*
Paul Karl Lukacs, Esq.*
11711 SE 8th Street, Suite 120
Bellevue, WA 98005
Telephone: (425) 233-8650
Facsimile: (425) 412-7171
Email: dan@hattislaw.com
Email: pkl@hattislaw.com

CRIDEN & LOVE, P.A.
Michael E. Criden, Esq. *
Lindsey C. Grossman, Esq. *
7301 SW 57th Court, Suite 515
South Miami, FL 33143
Telephone: (305) 357-9000
Facsimile: (305) 357-9050
Email: mcriden@cridenlove.com
Email: lgrossman@cridenlove.com

* Pro Hac Vice Application To Be Submitted

*Attorneys for Plaintiffs and the Proposed Classes*

# Civil Case Information Statement

**Case Details: MIDDLESEX | Civil Part Docket# L-006360-23**

**Case Type:** TORT-OTHER

**Document Type:** Complaint with Jury Demand

**Jury Demand:** YES - 12 JURORS

**Is this a professional malpractice case?**  NO

**Related cases pending:** YES

**If yes, list docket numbers:** Achey v. Cellco Partnership d/b/a Verizon Wireless, Docket No. MID-L-160-22

**Do you anticipate adding any parties (arising out of same transaction or occurrence)?** NO

**Does this case involve claims related to COVID-19?** NO

**Are sexual abuse claims alleged by: Dean Esposito?** NO

**Are sexual abuse claims alleged by: Jeffrey Achey?** NO

**Are sexual abuse claims alleged by: Marilyn Achey?** NO

**Are sexual abuse claims alleged by: Justin Anderson?** NO

**Are sexual abuse claims alleged by: Deidre Asbjorn?** NO

**Are sexual abuse claims alleged by: Gregory Burlak?** NO

**Are sexual abuse claims alleged by: Carla Chiorazzo?** NO

**Are sexual abuse claims alleged by: Judith Chiorazzo?** NO

**Are sexual abuse claims alleged by: John Conway?** NO

**Are sexual abuse claims alleged by: Adam DeMarco?** NO

**Are sexual abuse claims alleged by: James Fisher?** NO

**Are sexual abuse claims alleged by: Allison Gillingham?** NO

**Are sexual abuse claims alleged by: Lorraine Gillingham?** NO

**Are sexual abuse claims alleged by: Doree Gordon?** NO

Are sexual abuse claims alleged by: Donna Hartman? NO

Are sexual abuse claims alleged by: Patricia Justice? NO

Are sexual abuse claims alleged by: David Kelly? NO

Are sexual abuse claims alleged by: Christina Manfredo? NO

Are sexual abuse claims alleged by: Judith Oelenschlager? NO

Are sexual abuse claims alleged by: Daniel Patino? NO

Are sexual abuse claims alleged by: James Prate? NO

Are sexual abuse claims alleged by: Michael Scheufele? NO

Are sexual abuse claims alleged by: Russell Sewekow? NO

Are sexual abuse claims alleged by: Deborah Stroyek? NO

Are sexual abuse claims alleged by: Linder Teer? NO

Are sexual abuse claims alleged by: Christine Trappe? NO

Are sexual abuse claims alleged by: Brenda Tripicchio? NO

Are sexual abuse claims alleged by: Teresa MacClelland? NO

Are sexual abuse claims alleged by: Karen Umberger? NO

Are sexual abuse claims alleged by: Scott Willits? NO

Are sexual abuse claims alleged by: Michael Branom? NO

Are sexual abuse claims alleged by: Molly Brown? NO

Are sexual abuse claims alleged by: Michael Carney? NO

Are sexual abuse claims alleged by: Tim Frasch? NO

Are sexual abuse claims alleged by: Patricia Gagan? NO

Are sexual abuse claims alleged by: Anna Gutierrez? NO

Are sexual abuse claims alleged by: Linda Jenkins? NO

Are sexual abuse claims alleged by: Augustus Johnson? NO

Are sexual abuse claims alleged by: William Kaupelis? NO

Are sexual abuse claims alleged by: Marilyn Kaye? NO

Are sexual abuse claims alleged by: Janette Lisner? NO

Are sexual abuse claims alleged by: William E Lough? NO

Are sexual abuse claims alleged by: David Massaro? NO

Are sexual abuse claims alleged by: Louise Monsour? NO

Are sexual abuse claims alleged by: Darleen Perez? NO

Are sexual abuse claims alleged by: Gabrielle Pozzuoli? NO

Are sexual abuse claims alleged by: Valerie Reed? NO

Are sexual abuse claims alleged by: Bruce Schramm? NO

Are sexual abuse claims alleged by: Kerry Showalter? NO

Are sexual abuse claims alleged by: John St. Jarre? NO

Are sexual abuse claims alleged by: Gloria Stern? NO

Are sexual abuse claims alleged by: Edna Toy? NO

Are sexual abuse claims alleged by: Teresa Toy? NO

Are sexual abuse claims alleged by: Vanessa West? NO

Are sexual abuse claims alleged by: Mary Bowman? NO

Are sexual abuse claims alleged by: Art Capri? NO

Are sexual abuse claims alleged by: Debra Casey? NO

Are sexual abuse claims alleged by: Karyn Challender? NO

Are sexual abuse claims alleged by: Tyson Cohron? NO

Are sexual abuse claims alleged by: Cintia Corsi? NO

Are sexual abuse claims alleged by: Andi Ellis? NO

Are sexual abuse claims alleged by: Laurie Frantz? NO

Are sexual abuse claims alleged by: Ashley Garrison? NO

Are sexual abuse claims alleged by: Angela Green? NO

Are sexual abuse claims alleged by: Carlos Gutierrez? NO

Are sexual abuse claims alleged by: James Holling? NO

Are sexual abuse claims alleged by: Karen Hudson? NO

Are sexual abuse claims alleged by: Jerry Hunt? NO

Are sexual abuse claims alleged by: Jennifer Hurtt? NO

Are sexual abuse claims alleged by: Joyce Jones? NO

Are sexual abuse claims alleged by: Lynn Kiraly? NO

Are sexual abuse claims alleged by: Michelle Lacuesta? NO

Are sexual abuse claims alleged by: Jason McConville? NO

Are sexual abuse claims alleged by: Jose Nicot? NO

Are sexual abuse claims alleged by: Sandra Oshiro? NO

Are sexual abuse claims alleged by: Leslie Owens? NO

Are sexual abuse claims alleged by: Jon Santos? NO

Are sexual abuse claims alleged by: Terry Sexton? NO

Are sexual abuse claims alleged by: Kathleen Wright? NO

Are sexual abuse claims alleged by: Pamela M Allen? NO

Are sexual abuse claims alleged by: Samantha Albaitis? NO

Are sexual abuse claims alleged by: Cydni Arterbury? NO

Are sexual abuse claims alleged by: Lisa Baker? NO

Are sexual abuse claims alleged by: Briana Bell? NO

Are sexual abuse claims alleged by: Christine Bellavia? NO

Are sexual abuse claims alleged by: Kimberly Blair? NO

Are sexual abuse claims alleged by: Leanor Bland-Mullins? NO

Are sexual abuse claims alleged by: Caroline Bonham? NO

Are sexual abuse claims alleged by: Tammy Burke? NO

Are sexual abuse claims alleged by: Annmarie Caldwell? NO

Are sexual abuse claims alleged by: Shauna Cavallaro? NO

Are sexual abuse claims alleged by: Santos Colon? NO

Are sexual abuse claims alleged by: Erika Conley? NO

Are sexual abuse claims alleged by: Kendra Conover? NO

Are sexual abuse claims alleged by: Dylan Corbin? NO

Are sexual abuse claims alleged by: Laura Curry? NO

Are sexual abuse claims alleged by: Shakera Dyer? NO

Are sexual abuse claims alleged by: Jane Frey? NO

Are sexual abuse claims alleged by: Russell From? NO

Are sexual abuse claims alleged by: Angel Gaines? NO

Are sexual abuse claims alleged by: Ashtin Gamblin? NO

Are sexual abuse claims alleged by: Ericka Gardner? NO

Are sexual abuse claims alleged by: Ann Graff? NO

Are sexual abuse claims alleged by: James Hensley? NO

Are sexual abuse claims alleged by: Sarel Hines? NO

Are sexual abuse claims alleged by: Alexander Keeler? NO

Are sexual abuse claims alleged by: Adam Keller? NO

Are sexual abuse claims alleged by: Billie Kendrick? NO

Are sexual abuse claims alleged by: Krista Kirby? NO

Are sexual abuse claims alleged by: Jan Lombard? NO

Are sexual abuse claims alleged by: Marc Lowrey? NO

Are sexual abuse claims alleged by: Jill Mailhoit? NO

Are sexual abuse claims alleged by: Aaron Maxa? NO

Are sexual abuse claims alleged by: Kelly Moore? NO

Are sexual abuse claims alleged by: Lindsey Moran? NO

Are sexual abuse claims alleged by: David Moyers? NO

Are sexual abuse claims alleged by: Jennifer Ocampo-Neubauer? NO

Are sexual abuse claims alleged by: Keisha Odom? NO

Are sexual abuse claims alleged by: Angel Pachecho? NO

Are sexual abuse claims alleged by: Heather Ray? NO

Are sexual abuse claims alleged by: Susan Scott? NO

Are sexual abuse claims alleged by: Lori Snyder? NO

**Case Caption:** ESPOSITO DEAN  VS CELLCO PARTNERSHIP

**Case Initiation Date:** 11/10/2023

**Attorney Name:** STEPHEN P DE NITTIS

**Firm Name:** DE NITTIS OSEFCHEN AND PRINCE PC

**Address:** 5 GREENTREE CENTRE 525 ROUTE 73 NORTH STE 410

MARLTON NJ 08053

**Phone:** 8567979951

**Name of Party:** PLAINTIFF : Esposito, Dean

**Name of Defendant's Primary Insurance Company**

(if known): Unknown

**Are sexual abuse claims alleged by: Misty Sutton? NO**

**Are sexual abuse claims alleged by: Kathryn Taylor? NO**

**Are sexual abuse claims alleged by: Anthony Vallecorsa? NO**

**Are sexual abuse claims alleged by: Claire White? NO**

**Are sexual abuse claims alleged by: Kristophe Willard? NO**

**Are sexual abuse claims alleged by: Alvin Wilson? NO**

**Are sexual abuse claims alleged by: Brad Young? NO**

---

**THE INFORMATION PROVIDED ON THIS FORM CANNOT BE INTRODUCED INTO EVIDENCE**

CASE CHARACTERISTICS FOR PURPOSES OF DETERMINING IF CASE IS APPROPRIATE FOR MEDIATION

**Do parties have a current, past, or recurrent relationship?** NO

**If yes, is that relationship:**

**Does the statute governing this case provide for payment of fees by the losing party?** YES

**Use this space to alert the court to any special case characteristics that may warrant individual management or accelerated disposition:**

**Do you or your client need any disability accommodations?** NO
    **If yes, please identify the requested accommodation:**

**Will an interpreter be needed?** NO
    **If yes, for what language:**

**Please check off each applicable category: Putative Class Action?** YES  **Title 59?** NO  **Consumer Fraud?** YES

I certify that confidential personal identifiers have been redacted from documents now submitted to the court, and will be redacted from all documents submitted in the future in accordance with *Rule* 1:38-7(b)

11/10/2023                                                          /s/ STEPHEN P DE NITTIS
Dated                                                              Signed

IN THE COUNTY COURT IN AND FOR MIAMI-DADE COUNTY, FLORIDA

| DIVISION | AMENDED STATEMENT OF CLAIM | CASE NUMBER |
|---|---|---|
| ☒ CIVIL <br> ☐ DISTRICTS <br> ☐ OTHER | (File in duplicate Plus One for Each Defendant) | 2022-047421-SP-25 |
| PLAINTIFF | VS. DEFENDANT(S) | CLOCK IN |
| Sergio Salani | AT&T MOBILITY, LLC | |

| The Plaintiff sues the Defendant for the following reasons (As marked (x) below): | Address: <br> **CT CORPORATION SYSTEM** <br> **1200 SOUTH PINE ISLAND ROAD** <br> **PLANTATION, FL 33324** | Phone Number: |
|---|---|---|

☐ Good, wares and merchandise sold by plaintiff, to defendant;
☐ Work done and materials furnished by plaintiff, to defendant;
☐ Money lent by plaintiff to the defendant which is due and payable;
☐ Money due to plaintiff upon accounts stated and agreed to between them;
☐ On a written instrument, copy of which is attached hereto;
☐ Rent for certain premises in Miami-Dade County, Florida, Viz;
☒ Other (Explain)
☐ Any additional facts in connection with any of the above:

### (USE ADDITIONAL SHEET IF NECESSARY)

Plaintiff is an AT&T Customer with phone number: XXX-XX9-8349 filing a claim for violation of 501.204, Fla. Stat, FDUTPA, bogus administrative fee application, injunctive relief, including attorney's fees and costs pursuant to 501.2105, Fla. Stat . Plaintiff has complied with all conditions precedent to the filing of this action.

Where Plaintiff demands judgement in the sum of $99.00 and for injunctive relief together with court costs and any further costs which the Court may assess.

The Plaintiff, **Sergio Salani** says the foregoing is a just and true statement of the amount owed by defendant to plaintiff, exclusive of all lawful setoffs, and that defendant has no lawful defenses which would preclude the collection of said amount.

Affiant states that the defendant(s) is/are not in the military service of the United States.

| Attorney / Plaintiff <br> Maury L. Udell | Signature | Attorney's Bar No. <br> 121673 |
|---|---|---|

| Address for Attorney / Plaintiff <br> Beighley, Myrick, Udell, Lynne & Zeichman P.A. <br> 2601 S. Bayshore Drive, Suite 770, FL 33133 | Telephone No. <br> 305-349-3930 |
|---|---|

The forgoing instrument was acknowledged before me this _____ day of _____, 20_____ by Maury L. Udell, Esq., *who is personally known to me* or who has produced N/A_____ as identification and did ☒ / did not ☐ take an oath.
SWORN TO AND SUBSCRIBED BEFORE ME this _____ day of _____, 20___.

| | | Notary Public, <br> State of Florida _____ <br> My Commission Expires: |
|---|---|---|
| SERVICE OF PROCESS | FILING FEE AMOUNT | RECEIPT NUMBER |

| ☒ PROCESS SERVER | $55.00 | |
| ☐ SHERIFF | | |
| ☐ MAIL | | |

NOTE: If the claim is based upon a written document, a copy, or the material part thereof, shall be attached to the statement of claim.

## INSTRUCTION SHEET
## IMPORTANT

YOU MUST advise the Clerk, in writing, of any change in your mailing address.

If you are the DEFENDANT and fail to appear on the designed date, in person or by an attorney, a judgement may be entered against you.

Plaintiff(s) will not be entitled to a default or judgement in the absence of an affidavit regarding the defendant's military status in compliance with applicable law. This form, if sworn to, will meet the above requirements.

If you are a PLAINTIFF and fail to appear on the designated date, in person or by an attorney, this case may be dismissed for Want of Prosecution.

Any claim of the Defendant against the Plaintiff, arising out of the same transaction or occurrence which is the subject matter of plaintiff's claim, shall be filed not less than 5 days prior to the appearance date, or within such times as the Court designates. When a counterclaim or set-off exceeds the jurisdiction of the Court, it shall be filed in writing before or at the pretrial hearing, and the action shall then be transferred to the Court having jurisdiction thereof. As evidence of good faith, the counter-claimant shall deposit a sum sufficient to pay the filing fee in the Court to which the case is to be transferred with his counterclaim.

FAILURE TO MAKE THE DEPOSIT WAIVES THE RIGHT TO TRANSFER.

TRIAL BY JURY may be had upon written demand by Plaintiff made at the commencement of the action or by any defendant within 5 days after service of the notice to appear or at the Pretrial Conference. If the demand is not made, the right to trial by jury is waived.

If at any time in the proceedings a settlement is reached between the parties, this office should be notified in writing by the Plaintiff.

If you have any questions regarding procedures, this office will assist you. This office cannot furnish legal advice to you. Please consult your attorney for legal advice.

---

### CAUTION

A copy of any paper that you file at any time with the Clerk or Judge **MUST** be sent by you to each attorney appearing the case, if any, or to all parties not represented by an attorney. You must set forth the date and to whom you sent the copy (or copies) of the paper filed, which would be followed by your signature.

---

## AMERICANS WITH DISABILITIES ACT OF 1990
## ADA NOTICE

**"If you are a person with a disability who needs any accommodation in order to participate in this proceeding, you are entitled, at no cost to you, to the provision of certain assistance. Please contact the Eleventh Judicial Circuit Court's ADA Coordinator, Lawson E. Thomas Courthouse Center, 175 NW 1st Ave., Suite 2702, Miami, FL 33128, Telephone (305) 3497175; TDD (305) 349-7174, Fax (305) 349-7355 at least 7 days before your scheduled court appearance, or immediately upon receiving this notification in the time before the scheduled appearance is less than 7 days; if you are hearing or voice impaired, call 711."**

IN THE COUNTY COURT OF THE
ELEVENTH JUDICIAL CIRCUIT, IN AND
FOR MIAMI-DADE COUNTY, FLORIDA

CASE NO. 2022-047421-SP-25

SERGIO SALANI,

      Plaintiff,

v.

AT&T MOBILITY LLC,

      Defendant.

_____/

## AT&T MOBILITY LLC'S MOTION TO DISMISS

Defendant, AT&T Mobility LLC ("AT&T"), pursuant to Florida Rule of Civil Procedure 1.140, respectfully moves the Court for an order dismissing Plaintiff's *Amended Statement of Claim* dated January 31, 2024, as insufficiently pled.[1]  In support, AT&T states as follows:

1.      Plaintiff's lawyers have filed nearly two-hundred identical cases against AT&T in the small claims division of the County Court in Miami-Dade County that, like Plaintiff's Statement of Claim filed December 30, 2022, all assert the same or similar claims:

> Breach of contract for good faith and fair dealing, violation of 501.204, Fla. Stat., FDUPTA, bogus administrative fee application, injunctive relief, including attorney's fees and costs pursuant to 501.2105 Fla. Stat.

2.      The Court entered an Agreed Order Approving Joint Stipulation and Waiver of Pretrial Conference on September 20, 2023, invoking the Florida Rules of Civil Procedure and providing Plaintiff twenty days to file an Amended Statement of Claim.

---

[1] AT&T reserves the right to respond to any Amended Complaint through any method provided by the Florida Rules of Civil Procedure.

3.      On October 10, 2023, Plaintiff filed a Motion for Extension of Time requesting an indefinite extension to file the Amended Statement of Claim. The Court entered its Agreed Order on Plaintiff's Motion for Extension of Time to File Amended Pleading on January 11, 2024, providing a January 31, 2024 deadline for amendment.

4.      While Plaintiff's Amended Statement of Claim provides the redacted phone number for Plaintiff, it is deficient under the Rules of Procedure as it, among other things: (i) fails to set forth any facts specific to Plaintiff; (ii) fails to identify when AT&T's supposed breach of contract and FDUPTA violations occurred; (iii) fails to attach the contract between Mr. Salani and AT&T that both defines and authorizes AT&T to charge the monthly administrative fee as required by Rule 1.130(a), stating: "All contracts, accounts, or documents upon which action may be brought . . . **shall be incorporated in or attached to the pleading**." (emphasis added); and, (iv) fails to state the nature and extent of the alleged damages.

5.      All of this omitted information is material to claims asserted by Plaintiff and is necessary for AT&T to understand and respond to the Amended Statement of Claim. Further, due to privacy concerns, AT&T cannot produce any documents or information related to Mr. Salani's AT&T account (if any) without any proof of authorization to access Mr. Salani's account information.

6.      Florida Rule of Civil Procedure 1.110(b), requires, at a minimum, that a complaint plead "a short and plain statement of the ultimate facts showing that the pleader is entitled to relief." *Id.* "The complaint must set out the elements and the facts that support them so that the court and the defendant can clearly determine what is being alleged." *Barrett v. City of Margate*, 743 So. 2d 1160, 1162 (Fla. 4th DCA 1999). "The contents of a pleading should not just meet the minimum requirements for that type of pleading. They should clearly and adequately inform the judge, the opposing party and the jury (in cases where the pleadings may be read to the jury) of the position of

the pleader." *K.R. Exch. Servs., Inc. v. Fuerst, Humphrey, Ittleman, PL*, 48 So. 3d 889, 893 n.5 (Fla. 3d DCA 2010) (citation omitted).

7.       Plaintiff's Amended Statement of Claim falls woefully short of Rule 1.110(b), failing to even plead the basic elements of its breach of contract and Florida's Deceptive and Unfair Trade Practices Act claims.  *See DNA Sports Performance Lab, Inc. v. Club Atlantis Condo. Ass'n, Inc.*, 219 So. 3d 107, 109 (Fla. 3d DCA 2017) ("The elements of a cause of action for breach of contract are: (1) the existence of a contract, (2) a breach of the contract, and (4) damages that resulted from the breach."); *Kia Motors Am. Corp. v. Butler*, 985 So. 2d 1133, 1140 (Fla 3rd DCA 2008) ("[I]t is well recognized in this state that a claim for damages under FDUTPA has three elements: (1) a deceptive act or unfair practice; (2) causation; and (3) actual damages.") (citations omitted).

8.       As a result, Plaintiff's Amended Statement of Claim is so vague and ambiguous that AT&T cannot reasonably be required to file a responsive pleading.  Plaintiff should be ordered to file a second amended pleading that provides, at a minimum:

- The identity of the applicable AT&T customer, including the customer's full account number, name, and billing address;

- Each instance, including the date or relative time period, of AT&T's supposed breach of contract and FDUPTA violations;

- Attaches all contracts relied upon including any Customer Agreement between Mr. Salani and AT&T as well as any contract assigning a claim to Plaintiff; and,

- The nature and extent of the alleged damages.

Without this rudimentary information, AT&T is unable to either identify Mr. Salani's AT&T account (if any) or determine the validity of Plaintiff's claims or its potential defenses.

WHEREFORE, AT&T respectfully requests that the Court order Plaintiff to file a Second Amended Statement of Claim that includes the foregoing information within ten days, and for any other relief it may deem proper.

118100151.1

Dated: February 12, 2024

Respectfully submitted,

By: */s/ Manuel A. Garcia-Linares*
      Manuel A. Garcia-Linares, Esq.
      Florida Bar No. 985252
      mgarcialinares@daypitney.com
      athomsen@daypitney.com
      Andrew R. Ingalls, Esq.
      Florida Bar No. 112558
      aingalls@daypitney.com
      athomsen@daypitney.com
      **DAY PITNEY LLP**
      396 Alhambra Circle
      North Tower – 14th Floor
      Miami, Florida 33134
      Telephone: (305) 373-4000
      Facsimile:   (305) 373-4099
      *Counsel for Defendant AT&T Mobility LLC*

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on February 12, 2024, I electronically filed the foregoing document with the Clerk of the Court via e-portal and served: **Maury L. Udell, Esq.**, Beighley, Myrick, Udell, Lynn & Zeichman, P.A., 2601 South Bayshore Drive, Suite 770, Miami, Florida 33133, Emails: mudell@bmulaw.com and notice66@bmulaw.com, *Counsel for Plaintiff.*

By: */s/ Manuel A. Garcia-Linares*
      Manuel A. Garcia-Linares, Esq.

-4-

**IN THE COUNTY COURT OF THE ELEVENTH JUDICIAL
CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA**

**COUNTY CIVIL DIVISION**

CASE NO.: 2022-047421-SP-25
SECTION:          CG01

**Sergio Salani**
**Plaintiff(s),**

**vs.**

**AT&T Mobility, LLC**
**Defendant(s)**

_____/

**LIVE/IN-PERSON**
**NOTICE OF SPECIAL SET HEARING**
**Defendant's Motion to Dismiss**

      **YOU ARE HEREBY NOTIFIED** that, a Special Set hearing on the above cause is scheduled for _____**1 hr**_____ on ____**04-08-2024 at 9:30 AM**____ in Room ___**1-2**___ at the _____**Coral Gables Branch Courthouse**_____, _____**3100 Ponce de Leon, Coral Gables, FL 33134**_____.

CERTIFICATE OF SERVICE

A true and correct copy of the above notice was delivered to the parties below on _____**02-27-2024**_____.

**If you are a person with a disability who needs any accommodation in order to participate in this proceeding, you are entitled, at no cost to you, to the provision of certain assistance. Please contact Aliean Simpkins, the Eleventh Judicial Circuit Court's ADA Coordinator, Lawson E. Thomas Courthouse Center, 175 NW 1st Ave., Suite 2400, Miami, FL 33128, Telephone (305) 349-7175; TDD (305) 349-7174, Fax (305) 349-7355, Email: ADA@jud11.flcourts.org at least seven (7) days before your scheduled court appearance, or immediately upon receiving this notification if the time before the scheduled appearance is less than seven (7) days; if you are hearing or voice impaired, call 711.**

Copies Furnished to:

Electronically Served

Manuel A. Garcia-Linares, mgarcialinares@daypitney.com
Manuel A. Garcia-Linares, athomsen@daypitney.com
Andrew R. Ingalls, aingalls@daypitney.com
Andrew R. Ingalls, brodriguez@daypitney.com
Evelyn Davila, edavila@daypitney.com
Maury L. Udell, notice66@bmulaw.com
Maury L. Udell, blopez@bmulaw.com
Jessica Solorzano, jsolorzano@daypitney.com

**IN THE COUNTY COURT OF THE ELEVENTH JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA**

CASE NO: 2022-047421-SP-25
SECTION: CG01
JUDGE: Jorge A Perez Santiago

**Sergio Salani**

Plaintiff(s) / Petitioner(s)

vs.

**AT&T Mobility, LLC**

Defendant(s) / Respondent(s)

_____/

## AGREED ORDER ON DEFENDANT'S MOTION TO DISMISS

[DE 21 - Filing # 191793396 - E-Filed 02/12/2024 - AT&T Mobility LLC's *Motion to Dismiss*]

      **THIS MATTER** came before the Court on Defendant AT&T Mobility LLC's *Motion to Dismiss* dated February 12, 2024 [DE 21], and the Court, upon agreement of the parties and after having reviewed the Motion, hereby finds as follows:

1. Defendant's Motion to Dismiss is **GRANTED**. Plaintiff's counsel shall have thirty (30) days from the date of entry of this Order to file a Second Amended Complaint.

2. Defendant shall have twenty (20) days from the filing of Plaintiff's Seconded Amended Complaint to respond thereto.

3. Within 20 days after the response to Plaintiff's Second Amended Complaint, the parties shall contact the Court to schedule a case management conference.

**DONE** and **ORDERED** in Chambers at Miami-Dade County, Florida on this 5th day of April, 2024.

2022-047421-SP-25 04-05-2024 12:58 PI

2022-047421-SP-25 04-05-2024 12:58 PM
Hon. Jorge A Perez Santiago

**COUNTY COURT JUDGE**
Electronically Signed

No Further Judicial Action Required on **THIS MOTION**

CLERK TO **RECLOSE** CASE IF POST JUDGMENT

**Electronically Served:**
Alicia Thomsen, athomsen@daypitney.com
Andrew R. Ingalls, aingalls@daypitney.com
Andrew R. Ingalls, brodriguez@daypitney.com
Evelyn Davila, edavila@daypitney.com
Jessica Solorzano, jsolorzano@daypitney.com
Manuel A. Garcia-Linares, mgarcialinares@daypitney.com
Manuel A. Garcia-Linares, athomsen@daypitney.com
Maury L. Udell, notice66@bmulaw.com
Maury L. Udell, blopez@bmulaw.com

**Physically Served:**

Case 1:25-cv-20381-RAR   Document 1-2   Entered on FLSD Docket 01/27/2025   Page 363 of 1553

IN THE COUNTY COURT OF THE 11TH JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA

Sergio Salani,

       Plaintiff,

v.

AT&T Mobility, LLC,

       Defendant.

_____/

CASE NO.: 2022-047421-SP-25

BAR NO.: 121673

**AMENDED STATEMENT OF CLAIM**

     Plaintiff, Sergio Salani, through its undersigned counsel, hereby files this Amended Statement of Claim against Defendant, AT&T, Mobility, LLC ("AT&T MOBILITY, LLC"), and further alleges as follows:

**GENERAL ALLEGATIONS**

1. This is an action against AT&T for damages for $8,000, exclusive of interest, attorney's fees, and costs.

2. At all material times, Plaintiff was a customer of AT&T, XXX-XX9-8349.

3. AT&T MOBILITY, LLC is a foreign limited liability company licensed and doing business in Miami-Dade County, Florida subject to the general and specific jurisdiction of this Court.

4. Venue is proper in Miami-Dade County, Florida.

5. Plaintiff has complied with all statutory and/or contractual conditions precedent to filing this action. Plaintiff is the title holder to any claim against AT&T MOBILITY, LLC and has an interest in the subject matter of this claim. Plaintiff's claim is not preempted by any federal statute.

6. According to court filings made by AT&T MOBILITY, LLC in federal court, it is a nongovernmental limited liability company that has no parent company, but its members are BellSouth Mobile Data, Inc.; SBC Long Distance, LLC; and SBC Tower Holdings LLC. Those entities (and thus AT&T MOBILITY, LLC) are all indirectly wholly owned by AT&T Inc., which is the only publicly held company with a 10 percent or greater ownership stake in them.

7. AT&T, Inc. reports its consolidated business results, and breaks out selected disclosures for its major operating segments. Their segments are strategic business units that offer different products and services over various technology platforms and/or in different geographies that are managed accordingly. They analyze the operating segments based on segment contribution, which consists of operating income, excluding acquisition-related costs and other significant items, and equity in net income (loss) of affiliates for investments managed within each operating segment.

8. There are four reportable segments of AT&T, Inc.: (1) Communications, (2) Warner Media, (3) Latin America and (4) Xandr. AT&T MOBILITY, LLC is a major retailer of smartphones and provider of wireless broadband internet access service for smartphones.

9. Smartphone owners use mobile data for, including but not limited to, sending and receiving email, using GPS navigation, watching and streaming video, and browsing the internet. AT&T MOBILITY, LLC is a major retailer of smartphones and provider of wireless broadband internet access service for smartphones ("mobile data"). Smartphone owners use mobile data for, including but not limited to, sending and receiving email, using GPS navigation, watching and streaming video, and browsing the internet.

10. AT&T MOBILITY, LLC's place in AT&T Inc corporate structure can be identified as follows:



11. The Communications segment provides wireless and wireline telecom, video and broadband services to consumers located in the U.S. or in U.S. territories and businesses globally. Communications services and products are marketed under the AT&T, Cricket, AT&T PREPAID and DIRECTV brand names. The Communications segment provided approximately 84% of 2018 segment operating revenues and 84% of our 2018 total segment contribution. This segment contains the Mobility, Entertainment Group and Business Wireline business units.

12. Within Communications is the Mobility business unit that provides nationwide wireless services to consumers and wholesale and resale wireless subscribers located in the United States or U.S. territories by utilizing our network to provide voice and data services, including high-speed internet over wireless devices. They classify subscribers as either postpaid, prepaid, connected device or reseller. As of December 31, 2018, they served 153 million Mobility subscribers, including 77 million postpaid, 17 million prepaid, 8 million reseller and 51 million connected devices. Their Mobility business unit revenue includes (2) reported categories: Wireless Services, and Equipment.

13. AT&T MOBILITY, LLC offers a range of nationwide wireless voice and data communications services in a variety of pricing plans to meet the communications needs of targeted customer categories. Their wireless services also include advertising revenues generated from the subscriber relationships. They offer plans that include features allowing for the sharing of voice, text and data across multiple devices, which attracts subscribers from other providers and minimize subscriber churn. The churn rate, also known as the rate of attrition or customer churn, is the rate at which customers stop doing business with an entity within a given time period.

14. Customers in the "connected device" category (e.g., users of session-based tablets, monitoring devices and automobile systems) generally purchase those devices from third-party suppliers that buy data access supported by our network. They also offer nationwide wireless voice and data communications to certain customers who prefer to pay in advance. These services are offered under the Cricket and AT&T PREPAID brands and are typically monthly prepaid services.

15. AT&T MOBILITY, LLC sells a wide variety of handsets, wirelessly enabled computers (e.g., tablets and notebooks) and wireless data cards manufactured by various suppliers for use with our voice and data services. They also sell accessories, such as carrying cases and hands-free devices. They sell through their own company-owned stores, agents and third-party retail stores. Like other wireless service providers, they have historically provided postpaid contract subscribers substantial equipment subsidies to initiate, renew or upgrade service.

16. AT&T MOBILITY, LLC prominently advertises particular flat monthly amounts for its post-paid wireless service plans. Then, after customers sign up, AT&T MOBILITY, LLC actually charges higher monthly amount for service and for terms of usage than the customers were promised and agreed to pay. AT&T MOBILITY, LLC covertly increases the actual overall price by padding all post-paid wireless customers' bills each month, including Plaintiff's bills, with a bogus so-called Administrative Fee   (currently $1.99 every month for each phone line) on top of the advertised price.  AT&T MOBILITY, LLC has stated that it charges the administrative fee because it is a "standard administrative fee" across the wireless industry. However, in 2017, T-Mobile eliminated the "administrative charges". Moreover, prepaid carriers like MetroPCS and AT&T's subsidiary Cricket Wireless *do not charge administrative fees.*

17. The Administrative Fee is not properly disclosed to customers before or when they sign up, and in fact it is never adequately and honestly disclosed.

18. The so-called Administrative Fee is not, in fact, a bona fide administrative fee, but rather is simply a means for AT&T MOBILITY, LLC to charge more per month for the term of usage itself without having to advertise the higher overall price as a scheme to increase

revenue.  AT&T Mobility, LLC's previous in court public admissions (filed by its corporate counsel, Patricia Cruz, Esq.) to the conduct alleged in this case (data throttling) via its filing of its "consent to payment for conduct for the claims asserted or which could have been asserted" in the cases of Erin Young v. AT&T Mobility, LLC, Case No. 2019-2027-SP-26, EFiling#87601121 or Tamara Crespo v. AT&T Mobility, LLC, Case No. 2019-2026-SP26, E-Filing#87600869 both of which alleged AT&T's violation of FDUTPA for illegal data throttling and bogus administrative fee, is further evidence of AT&T Mobility, LLC's illegal, immoral and unethical conduct.

19. Making matters worse, AT&T MOBILITY, LLC deliberately confuse Plaintiff and misleadingly suggests that the Administrative Fee is akin to a tax or another standard government pass-through fee, when in fact it is simply a way for AT&T MOBILITY, LLC to advertise and promise lower amounts than it actually charges.

20. The administrative fee is not, in fact, tied to the costs that AT&T MOBILITY, LLC's incurs.  This is corroborated by the fact that AT&T has repeatedly increased the amount of the monthly Administrative Fee since the fee was first imposed, while during that same time period the stated "costs" for (i.e., interconnect charges and cell site rental charges) have actually *decreased* according to AT&T's own financial statements and public filings with the Securities and Exchange Commission.

21. AT&T MOBILITY, LLC's cell site rental and maintenance costs or interconnectivity costs, which AT&T MOBILITY, LLC's financial statements show have gone down at the same time AT&T MOBILITY, LLC has significantly increased the amount of the administrative fee as a term of usage.

22. Thus, by AT&T MOBILITY, LLC's own design, AT&T MOBILITY, LLC's scheme is to keep customers from realizing they are being deceived and thus overcharged for the term of

usage. Such a deceptive practice is AT&T's misrepresentation of why a fee is being charged and where the money for the fee is being transferred to, if anywhere.

23. AT&T MOBILITY, LLC imposed and has increased the Administrative Fee as a covert way to increase the amount AT&T can charge as a term of usage without having to specifically advertise such higher amounts to use the service. AT&T MOBILITY, LLC increased the Administrative Fee in large part to fund unrelated corporate liabilities of its parent company AT&T Inc., including to pay down the debt incurred in connection with the acquisition of Time Warner Inc. in 2018.

24. In all events, AT&T MOBILITY, LLC should clearly disclose the Administrative Fee and should clearly and accurately state the true monthly prices and applicable costs of AT&T Mobility, LLC for its terms of usage and the correct amount to charge.

25. Since the Administrative Fee was first introduced in 2013, AT&T MOBILITY, LLC has increased the amount of the fee three times, including twice over a three-month period in 2018. The current amount that AT&T MOBILITY, LLC charges all post-paid wireless customers for this fee is $1.99 per line every month, i.e., more than 200% more than the original amount of the fee, including Plaintiff's bill.

26. AT&T MOBILITY, LLC has used this Administrative Fee scheme to improperly squeeze consumers for **hundreds of millions of dollars** in additional revenue without disclosing the actual "increased costs" in any financial filing available to any customer, including Plaintiff.

27. In essence, AT&T MOBILITY, LLC introduced the bogus Administrative Fee as a way to covertly increase the actual monthly price customers are charged for their service, and then has continued to use the Administrative Fee and unilateral increases thereto as a

lever by which AT&T MOBILITY, LLC continues to ratchet up the price without the customer realizing and after the customer is already committed.

28. The Administrative Fee is part of a design to profit AT&T MOBILITY, LLC rather than pay for what it has determined is an increase in actual costs of AT&T MOBILITY, LLC. Thus, the practice of applying the administrative fee to Plaintiff's bill is in and of itself is unfair and deceptive.

29. This scheme has enabled, and continues to enable, AT&T MOBILITY, LLC to effectively increase its amount charged without having to publicly announce those higher amounts, and allows AT&T MOBILITY, LLC to entice more customers by misrepresenting the costs customers would pay both in absolute terms and relative to other wireless providers in the industry.

30. The Third District Court of Appeal authored the case of *Advance Mold Servs. v. Universal N. Am. Ins. Co.*, 2023 Fla. App. LEXIS 8638 (Fla. 3d DCA Dec. 20, 2023). In *Advance Mold Servs.*, the defendant moved to dismiss an assignee's breach of insurance contract action, contending that a fee designated on an estimate as "Hazardous Waste/Mold Cleaning-Supervisory/Admin-per hour" constituted a statutorily prohibited "**administrative fee**." **The plaintiff asserted that the fee was used to pay a supervisor and not as a clerical fee associated with administering the contract. This court held that a question of fact existed, precluding dismissal of complaint, as to whether the fee constituted an "administrative fee."**

### <u>COUNT I - FRAUD</u>

31. Plaintiff re-alleges, restates, and incorporates the allegations contained in paragraphs one (1) through thirty (30) above, and further alleges as follows:

32.     AT&T MOBILITY, LLC's representations on its bills to Plaintiff regarding the

administrative fee charged on the account were false statements of material fact.  AT&T MOBILITY, LLC's representation that the  Administrative Fee is a charge assessed by AT&T MOBILITY,LLC that helps defray a portion of certain expenses AT&T MOBILITY, LLC incurs, including but not limited to: (a) charges AT&T MOBILITY, LLC or its agents pay to interconnect with other carriers to deliver calls from AT&T MOBILITY, LLC customers to their customers; and (b) charges associated with cell site rents and maintenance" are false.

33. AT&T MOBILITY, LLC knew or should have known that the representations all identified above were false as AT&T MOBILITY, LLC's cost in interconnect charges and cell site charges actually decreased.

34. AT&T MOBILITY, LLC intended that the representations above caused Plaintiff to continue as a customer with AT&T MOBILITY, LLC and otherwise pay the administrative fee to maintain an account with AT&T MOBILITY, LLC.

35. Plaintiff has suffered damages in justifiable reliance on the representations above including but not limited to the payment for bogus administrative fees on a monthly basis.

WHEREFORE, Plaintiff respectfully requests that this Court grant judgment in its favor and against AT&T MOBILITY, LLC for compensatory damages, nominal damages, interest, court costs, and any other relief the Court deems just and proper.

## COUNT II - DAMAGES UNDER THE FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT

36. Plaintiff re-alleges, restates, and incorporates the allegations contained in paragraphs one (1) through thirty (30) above, and further alleges as follows:

37. Plaintiff, at all material times, was a consumer, as defined under the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), § 501.201, *et seq.*, Fla. Stat.

38. AT&T MOBILITY, LLC, at all material times, was engaged in trade or commerce, as defined under the FDUTPA and is not otherwise exempt.

39. In the advertising, sale, and renewal of mobile data and wireless plans and acceptance of payments, AT&T MOBILITY, LLC has represented, directly or indirectly, expressly or by implication, to customers that it would be charged a certain amount for terms of usage. AT&T MOBILITY, LLC has since added an "Administrative Fee" to Plaintiff's bill which is unfair and deceptive as it is not what it's being used for.  The administrative fee is a textbook pass through-fee.

40. Since the Administrative Fee was first imposed in 2013, AT&T MOBILITY, LLC has unilaterally increased the monthly amount of the fee three times. AT&T MOBILITY, LLC increased the Administrative Fee to $0.76 per month per phone line starting in June 2016. Then, in 2018, the increases because larger and more frequent (around the same time AT&T MOBILITY, LLC's parent company incurred significant debt in acquiring Time Warner Inc.).

41. AT&T MOBILITY, LLC raised the Administrative Fee to $1.26 per month per phone line starting in April 2018, and then again to $1.99 per month per phone line starting in June 2018, which is the current monthly fee as of this filing. Thus, between March 2018 and June 2018 alone, AT&T MOBILITY, LLC increased the Administrative Fee a whopping 162% increase in just three months.

42.        AT&T MOBILITY, LLC's representations to Plaintiff regarding the administrative fee charged are deceptive and in fact misrepresent the truth.  AT&T MOBILITY, LLC's representation that the Administrative Fee is a charge assessed by AT&T MOBILITY, LLC that helps defray a portion of certain expenses AT&T MOBILITY, LLC incurs, including but not limited to: (a) charges AT&T MOBILITY, LLC or its agents pay to interconnect with other carriers

to deliver calls from AT&T MOBILITY, LLC customers to their customers; and (b) charges associated with cell site rents and maintenance is false.  The administrative fee is instead a scheme to funnel direct profit to AT&T MOBILITY, LLC rather than pay for any identifiable increase in costs.

43. AT&T MOBILITY, LLC knew or should have known that the representations regarding the administrative fee are false as AT&T MOBILITY, LLC's cost in interconnect charges and cell site charges actually decreased based on its own SEC federal filings.  AT&T MOBILITY, LLC knew that the monthly administrative fee was inflated, and not the result of good faith financial practices but instead designed to raise profit for the company without a specific actual change in price for the term of usage. Such a practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers, including Plaintiff.

44. AT&T MOBILITY, LLC's knowingly unfair or deceptive trade practices of assessing and collecting a bogus administrative fee are the proximate cause of Plaintiff's 's actual damages.

45. AT&T MOBILITY, LLC's unfair and deceptive trade practice is not a result of a bona fide error or mistake but instead a conscious decision by AT&T MOBILITY, LLC.

46. Plaintiff has retained the undersigned to represent it in this action and pay a reasonable fee for said legal services.

WHEREFORE, Plaintiff respectfully requests that this Court grant judgment in its favor and against AT&T MOBILITY, LLC for damages, interest, court costs, attorney's fees pursuant to §501.2105, Florida Statutes, and any other relief the Court deems just and proper.

**COUNT III – ACTION FOR DECLARATORY AND/OR INJUNCTIVE RELIEF UNDER FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT ("FDUTPA") –**

47. Plaintiff re-alleges, restates, and incorporates the allegations contained in paragraphs one (1) through thirty (30) above, and further alleges as follows:

48. Under the FDUTPA, without regard to any other remedy or relief to which a person is entitled, anyone aggrieved by a violation of this part may bring an action to obtain a declaratory judgment that an act or practice violates this part and to enjoin a person who has violated, is violating, or is otherwise likely to violate 501.201 et. seq.  See Fla. Stat. §501.211(1).  Plaintiff is an aggrieved consumer whose rights have been, are being, or will be adversely affected, by AT&T MOBILITY, LLC.'s violation of FDUTPA--meaning an unfair or deceptive practice which is injurious to consumers, including Plaintiff.

49. Pursuant to AT&T MOBILITY, LLC's above-described acts or practices of placing a bogus administrative fee on Plaintiff's account, AT&T MOBILITY, LLC violated the FDUTPA. The Administrative Fee is part of a design to profit AT&T MOBILITY, LLC rather than pay for what it has determined is an increased in cost of AT&T MOBILITY, LLC. Thus, the practice of applying the administrative fee to Plaintiff's bill is in and of itself is unfair and deceptive.

50. Plaintiff seeks a declaratory judgment that AT&T MOBILITY, LLC's acts or practices have violated the FDUTPA.

51. Plaintiff seeks to determine whether the FDUTPA prohibits AT&T MOBILITY, LLC from continuing to apply the bogus administrative fee which is likely to occur in the future.

52. There is a bona fide dispute between the parties. Plaintiff has a justiciable question as to the existence or non-existence of some right, status, immunity, power, or privilege, or some fact upon which their claim  may depend.

53. Plaintiff is in doubt as to the right of AT&T MOBILITY, LLC to continue to charge an unlawful

fee which violates FDUTPA.

54. There is a bona fide, actual, and present need for the declaration.

55. Plaintiff has retained the undersigned to represent it in this action and pay a reasonable fee for said legal services.

WHEREFORE, Plaintiff respectfully requests that this Court grant declaratory judgment and/or injunctive relief in its favor and against AT&T MOBILITY, LLC, court costs, attorney's fees pursuant to Section 501.2105, Florida Statutes, and any other relief the Court deems just and proper.

## COUNT IV – UNJUST ENRICHMENT

56. Plaintiff re-alleges, restates, and incorporates the allegations contained in paragraphs one (1) through seven (7), twenty-five (25) through twenty-eight (28) above, and further alleges as follows:

57. Defendant assessed improper increased charges of $1.99/month administrative fee on Plaintiff's account.  It is not a tax or charge which the government requires AT&T to collect from its customers.  This charge is subject to change from time to time as AT&T's costs change which is improperly labeled.

58. In June of 2018, Defendant increased its "administrative fee" to $1.99/per, per month with no specific reason or allegation that AT&T's costs had changed.

59. Defendant knew the monthly administrative fee was inflated and not the result of good faith financial practices and not actual costs of AT&T Mobility, LLC. Defendant had knowledge of payments by Plaintiff and voluntarily accepted and retained the benefit conferred on it.

60. AT&T MOBILITY, LLC's unfair and deceptive trade practice is not a result of a bona fide

error or mistake but instead a conscious decision by AT&T MOBILITY, LLC.

61. Under the circumstances, it would be inequitable for Defendant to retain the benefit and thus as a result of the bogus administrative fee, Plaintiff suffered damages.

62. Plaintiff has retained the undersigned to represent it in this action and pay a reasonable fee for said legal services.

       WHEREFORE, Plaintiff demands judgment against Defendant for compensatory damages, interest, court costs and any other relief the Court deems just and proper.

## CERTIFICATE OF SERVICE

       WE HEREBY CERTIFY that a true and correct copy of the foregoing was served via e-mail this this April 29, 2024: to Manuel A. Garcia-Linares, Esquire mgarcialinares@daypitney.com   jsolorzano@daypitney.com   edavila@daypitney.com Andrew R. Ingalls, Esquire (aingalls@daypitney.com) Day Pitney LLP, 396 Alhambra Circle, North Tower - 14th Floor, Miami, Florida 33134.

       **Beighley, Myrick, Udell, Lynne & Zeichman PA**
*Attorneys for Plaintiff*
2601 S. Bayshore Drive, Suite 770
Miami, FL 33133
(305) 349-3930 – Phone

By:   */s/ Maury L. Udell*
      Maury L. Udell, Esquire
      mudell@bmulaw.com
      Fla. Bar 121673



**JUAN FERNANDEZ-BARQUIN**
**CLERK OF THE COURT AND COMPTROLLER**
**OF THE CIRCUIT AND COUNTY COURTS**
**Miami-Dade County, Florida**

DISTRICT COURTS DIVISION

Re: REJECTION LETTER

Date: **April 30, 2024**

Case #: **2022-047421-SP-25**

Dear Mr. (Mrs.) (Ms.) Maury L. Udell, Esquire

Our office would like to provide your prompt and efficient service, however, we regret we must return your document(s)
For the following reasons:

☐ ENCLOSED CHECK IS NOT SIGNED

☐ NO FILING FEE ENCLOSED

☐ COMPLAINT IS NOT SIGNED

☐ INCORRECT SUMMONS

☐ ADDITIONAL FILING FEE OF $ 245.00 IS REQUIRED- PAYABLE TO: CLERK OF COURTS

☐ DOCUMENT MUST BE NOTARIZED

☐ NEED AN ORIGINAL COMPLAINT AND _____ COPIES

☐ EACH PRE-TRIAL MUST BE FILLED OUT (FRONT AND BACK)

☐ RECORDING FEE NOT PAID

☐ OTHER

TO ENSURE PROMPT HANDLING OF THIS MATTER, PLEASE MAIL THE CORRECTED DOCUMENTS TO
THE ADDRESS SHOWN ABOVE AND TO THE ATTENTION OF THE UNDERSIGNED DEPUTY CLERK.

Sincerely,

JUAN FERNANDEZ-BARQUIN,
CLERK OF THE COURT AND COMPTROLLER
CIRCUIT AND COUNTY COURTS

By: _____
Deputy Clerk

☐ **Joseph Caleb Center (20)**
   5400 NW 22nd Avenue, Suite # 103
   Miami, Florida 33142

☐ **Miami Beach District Court (24)**
   1130 Washington Avenue, Suite # 200
   Miami Beach, Florida 33139

☐ Hialeah District Court (21)
   11 E. 6th Street, Suite # 100
   Hialeah, Florida 33010

☒ **Coral Gables District Court (25)**
   3100 Ponce de Leon Blvd., Suite # 100
   Coral Gables, Florida 33134

☐ **North Dade Justice Center (23)**
   15555 Biscayne Boulevard., Suite # 100
   Miami, Florida 33160

☐ South Dade Justice Center (26)
   10710 SW 211th St, Suite # 1200
   Miami, Florida 33189

Central Depository - Civil Division – Clerk of the Board – Code Enforcement – Comptroller/Auditor – County Recorder – Criminal
Division - District Courts Division – Family Courts Division – Human Resources / Administrative Services – Juvenile Division
Marriage License – Parking Violations – Records / Archives Management – Technical Services Division – Traffic Division

CLK/CT. 239 Rev. 08/14                                                                Clerk's web address: www.miami-dadeclek.com

IN THE COUNTY COURT OF THE 11TH
JUDICIAL CIRCUIT IN AND FOR
MIAMI-DADE COUNTY, FLORIDA

Sergio Salani,

      Plaintiff,

v.

AT&T Mobility, LLC,

      Defendant.

_____/

CASE NO.: 2022-047421-SP-25

BAR NO.: 121673

## **PLAINTIFF'S REQUEST FOR PRODUCTION RELATED TO DATA BREACH**

**PURSUANT** to Rules 1.280 and 1.350 of the Florida Rules of Civil Procedure, Plaintiff, propounds to the Defendant AT&T Mobility, LLC this Request for Production Related to Data Breach as follows, to be answered in writing within thirty (30) days after service hereof. Plaintiff requests that Defendant produce a copy of the documents requested below in native format, within thirty (30) days from the date of service hereof, at to produce for inspection and copying the following items in accordance with the following Definitions and Instructions and in the time and manner required by the Florida Rules of Civil Procedure:

## **DEFINITIONS**

For purposes of this Request for Production, the following definitions apply:

A. "You" and "Your" shall refer to the parties to whom this Request for Production of Documents is directed, including their predecessors, successors, employees, agents, servants, subsidiaries, parent companies, affiliated companies and other persons acting or purporting to act on their behalf.

B. "Person" means any natural individual in any capacity whatsoever or any entity or organization, including divisions, departments, and other units herein, and shall include, but not be limited to, public or private corporations, partnerships, joint ventures,

voluntary or unincorporated associations, organization, proprietorships, trusts, estates, governmental agencies, commissions, bureaus, or departments, and the agents, servants, and employees of same. All references to any Person includes his/her/its employees, agents, servants, subsidiaries, parent companies, affiliated companies and any other person or entity acting or purporting to act on behalf or under his/her/its control.

C. "Materials" shall mean all "Documents," "Writings" and "Communications" as those terms are defined herein.

D. "Documents(s)" or "Writing(s)" shall include every record of every type, and is used in the broadest sense to include any medium (including all electronically stored information) upon which intelligence or information can be recorded and further includes, but is not limited to, all originals, non-identical copies and drafts of the following items, whether printed, handwritten, typed, recorded, or stored on any electro-magnetic storage device, or reproduced by hand, including without limitation correspondence, memoranda, e-mails, including all metadata which accompanies each e-mail, invoices, receipts, records, ledger cards or other accounting records, vouchers, checks, shop orders, diaries, handwritten notes, calendars, instructions, summaries of personal conversations or interviews, minutes or records of meetings or conferences, transcripts, opinions or reports of consultants, projections, drafts, contracts, agreements, confirmations, statistical statements, studies, telegrams, telexes, books, notes, reports, logs, diaries, tape recordings, video cassettes and data compilations from which information can be obtained, charts, photographs, notebooks, drawings, plans, printed materials of any kind, charts and interoffice communications, and any other writing of whatever description, including but not limited to any information contained in any computer, or represented by a computer program, signed or unsigned, regardless of whether approved, signed, sent, received, redrafted, or executed, study, work paper, handwritten note, draft, demand, chart, paper, print, laboratory record, drawing sketch, diagram, form, graph, index, list, tape, photograph, microfilm, data sheet, data processing card, or any other written, recorded, transcribed, punched, taped, filmed, or graphic matter, however produced and reproduced. Documents include all electronic copies of the foregoing.

E. "Documents" also includes but is not limited to any electronically stored data on magnetic or optical storage media as an "active" file or files (readily readable by one or more computer applications or forensics software); any "deleted" but recoverable electronic files on said media; any electronic file fragments (files that have been deleted and partially overwritten with new data); and slack (data fragments stored randomly from random access memory on a hard drive during the normal operation of a computer [RAM slack] or residual data left on the hard drive after new data has overwritten some but not all of previously stored data).

F. "Communication" means any oral or written statement, dialogue, colloquy, discussion or conversation, and also means any transfer of thoughts or ideas between persons by means of documents and includes any transfer of data from one location to

another by electronic or similar means, including but not limited to text (SMS) message or electronic mail.

G.     "Evidencing" means having a tendency to show, prove or disprove.

H.     The words "and" and "or" as used herein shall be construed either disjunctively or conjunctively as required by the context to bring within the scope of these Requests any answer that might be deemed outside their scope by another construction.

I.     "Control" means in your possession, custody or control or under your direction, and includes in the possession, custody or control of those under the direction of you or your employees, subordinates, counsel, accountant, consultant, expert, parent or affiliated corporation, and any person purporting to act on your behalf.

J.     "Related to" or "relating to" shall mean directly or indirectly, refer to, reflect, describe, pertain to, arise out of or in connection with, or in any way legally, logically, or factually be connected with the matter discussed.

K.     "Including" shall mean including but not limited to.

## <u>INSTRUCTIONS</u>

Compliance with these Requests is to be made in accordance with the following:

1.     If you at any time had possession, custody or control of a document called for under this request and if such document has been lost, destroyed, purged, or is not presently in your possession, custody or control, you shall describe the document, the date of its loss, destruction, purge, or separation from possession, custody or control and the circumstances surrounding its loss, destruction, purge, or separation from possession, custody or control.

2.     If you assert that any document called for by this request is protected against disclosure as a "work product" or by privilege of any kind whatsoever, you shall provide the following information with respect to such document:

a.     The name and capacity of the person or persons who prepared the document;

b.     The name and capacity of all addressees or recipients of the original or copies thereof;

c.     The date, if any, borne by the document

d.     A brief description of its subject matter and physical size;

e.      The source of the factual information from which such document was prepared; and

f.      The nature of the privilege claimed.

3.      All documents produced pursuant hereto are to be produced in native format, and as they are kept in the usual course of business or shall be organized and labeled (without permanently marking the item produced) so as to correspond with the categories of each numbered request hereof.

4.      When appropriate, the singular form of a word should be interpreted in the plural as may be necessary to bring within the scope hereof any documents which might otherwise be construed to be outside the scope hereof.

## DOCUMENTS TO BE PRODUCED

1.  Any and all notices of data breach sent to Plaintiff in the last five (5) years. An exemplar is attached hereto as Exhibit "A".

## CERTIFICATE OF SERVICE

WE HEREBY CERTIFY that a true and correct copy of the foregoing was served via e-mail this this May 07, 2024: all counsel of record

**Beighley, Myrick, Udell, Lynne & Zeichman PA**
*Attorneys for Plaintiff*
2601 S. Bayshore Drive, Suite 770
Miami, FL 33133
(305) 349-3930 – Phone

By:     _/s/ *Maury L. Udell*_____
Maury L. Udell, Esquire
mudell@bmulaw.com
Fla. Bar 121673

IN THE COUNTY COURT OF THE 11TH JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA

Sergio Salani,

CASE NO.: 2022-047421-SP-25

     Plaintiff,

BAR NO.: 121673

v.

AT&T Mobility, LLC,

     Defendant.

_____/

## PLAINTIFF'S AMENDED[1] REQUEST FOR PRODUCTION RELATED TO DATA BREACH

**PURSUANT** to Rules 1.280 and 1.350 of the Florida Rules of Civil Procedure, Plaintiff, propounds to the Defendant AT&T Mobility, LLC this Request for Production Related to Data Breach as follows, to be answered in writing within thirty (30) days after service hereof.  Plaintiff requests that Defendant produce a copy of the documents requested below in native format, within thirty (30) days from the date of service hereof, at to produce for inspection and copying the following items in accordance with the following Definitions and Instructions and in the time and manner required by the Florida Rules of Civil Procedure:

## DEFINITIONS

For purposes of this Request for Production, the following definitions apply:

A.     "You" and "Your" shall refer to the parties to whom this Request for Production of Documents is directed, including their predecessors, successors, employees, agents, servants, subsidiaries, parent companies, affiliated companies and other persons acting or purporting to act on their behalf.

B.     "Person" means any natural individual in any capacity whatsoever or any

---

[1] Amended to include attachment.

entity or organization, including divisions, departments, and other units herein, and shall include, but not be limited to, public or private corporations, partnerships, joint ventures, voluntary or unincorporated associations, organization, proprietorships, trusts, estates, governmental agencies, commissions, bureaus, or departments, and the agents, servants, and employees of same.  All references to any Person includes his/her/its employees, agents, servants, subsidiaries, parent companies, affiliated companies and any other person or entity acting or purporting to act on behalf or under his/her/its control.

C.      "Materials" shall mean all "Documents," "Writings" and "Communications" as those terms are defined herein.

D.      "Documents(s)" or "Writing(s)" shall include every record of every type, and is used in the broadest sense to include any medium (including all electronically stored information) upon which intelligence or information can be recorded and further includes, but is not limited to, all originals, non-identical copies and drafts of the following items, whether printed, handwritten, typed, recorded, or stored on any electro-magnetic storage device, or reproduced by hand, including without limitation correspondence, memoranda, e-mails, including all metadata which accompanies each e-mail, invoices, receipts, records, ledger cards or other accounting records, vouchers, checks, shop orders, diaries, handwritten notes, calendars, instructions, summaries of personal conversations or interviews, minutes or records of meetings or conferences, transcripts, opinions or reports of consultants, projections, drafts, contracts, agreements, confirmations, statistical statements, studies, telegrams, telexes, books, notes, reports, logs, diaries, tape recordings, video cassettes and data compilations from which information can be obtained, charts, photographs, notebooks, drawings, plans, printed materials of any kind, charts and interoffice communications, and any other writing of whatever description, including but not limited to any information contained in any computer, or represented by a computer program, signed or unsigned, regardless of whether approved, signed, sent, received, redrafted, or executed, study, work paper, handwritten note, draft, demand, chart, paper, print, laboratory record, drawing sketch, diagram, form, graph, index, list, tape, photograph, microfilm, data sheet, data processing card, or any other written, recorded, transcribed, punched, taped, filmed, or graphic matter, however produced and reproduced.  Documents include all electronic copies of the foregoing.

E.      "Documents" also includes but is not limited to any electronically stored data on magnetic or optical storage media as an "active" file or files (readily readable by one or more computer applications or forensics software); any "deleted" but recoverable electronic files on said media; any electronic file fragments (files that have been deleted and partially overwritten with new data); and slack (data fragments stored randomly from random access memory on a hard drive during the normal operation of a computer [RAM slack] or residual data left on the hard drive after new data has overwritten some but not all of previously stored data).

F.      "Communication" means any oral or written statement, dialogue, colloquy, discussion or conversation, and also means any transfer of thoughts or ideas between persons by means of documents and includes any transfer of data from one location to

another by electronic or similar means, including but not limited to text (SMS) message or electronic mail.

G.      "Evidencing" means having a tendency to show, prove or disprove.

H.      The words "and" and "or" as used herein shall be construed either disjunctively or conjunctively as required by the context to bring within the scope of these Requests any answer that might be deemed outside their scope by another construction.

I.      "Control" means in your possession, custody or control or under your direction, and includes in the possession, custody or control of those under the direction of you or your employees, subordinates, counsel, accountant, consultant, expert, parent or affiliated corporation, and any person purporting to act on your behalf.

J.      "Related to" or "relating to" shall mean directly or indirectly, refer to, reflect, describe, pertain to, arise out of or in connection with, or in any way legally, logically, or factually be connected with the matter discussed.

K.      "Including" shall mean including but not limited to.

## INSTRUCTIONS

Compliance with these Requests is to be made in accordance with the following:

1.      If you at any time had possession, custody or control of a document called for under this request and if such document has been lost, destroyed, purged, or is not presently in your possession, custody or control, you shall describe the document, the date of its loss, destruction, purge, or separation from possession, custody or control and the circumstances surrounding its loss, destruction, purge, or separation from possession, custody or control.

2.      If you assert that any document called for by this request is protected against disclosure as a "work product" or by privilege of any kind whatsoever, you shall provide the following information with respect to such document:

a.      The name and capacity of the person or persons who prepared the document;

b.      The name and capacity of all addressees or recipients of the original or copies thereof;

c.      The date, if any, borne by the document

d.      A brief description of its subject matter and physical size;

e.      The source of the factual information from which such document was prepared; and

f.      The nature of the privilege claimed.

3.      All documents produced pursuant hereto are to be produced in native format, and as they are kept in the usual course of business or shall be organized and labeled (without permanently marking the item produced) so as to correspond with the categories of each numbered request hereof.

4.      When appropriate, the singular form of a word should be interpreted in the plural as may be necessary to bring within the scope hereof any documents which might otherwise be construed to be outside the scope hereof.

## <u>DOCUMENTS TO BE PRODUCED</u>

1.  Any and all notices of data breach sent to Plaintiff in the last five (5) years. An exemplar is attached hereto as Exhibit "A".

## <u>CERTIFICATE OF SERVICE</u>

WE HEREBY CERTIFY that a true and correct copy of the foregoing was served via e-mail this this May 08, 2024: all counsel of record

**Beighley, Myrick, Udell, Lynne & Zeichman PA**
*Attorneys for Plaintiff*
2601 S. Bayshore Drive, Suite 770
Miami, FL 33133
(305) 349-3930 – Phone

By:      _/s/ *Maury L. Udell*_____
Maury L. Udell, Esquire
mudell@bmulaw.com
Fla. Bar 121673

# EXHIBIT "A"

**AT&T**

# NOTICE OF DATA BREACH

April 25, 2024

Hello,

At AT&T, we take the security of your data very seriously. We're writing to inform you that AT&T has determined that some of your personal information was compromised. To help protect your identity, we're offering you one year of complimentary credit monitoring, identity theft detection and resolution services provided by Experian's® IdentityWorks℠. **While this service is free, you must follow the enclosed instructions to enroll if you haven't already taken action based on our previous communication.**

**What happened?** On March 26, 2024, we determined that AT&T customer information was included in a dataset released on the dark web on March 17, 2024.

**What information was involved?** The information varied by individual and account, but may have included full name, email address, mailing address, phone number, social security number, date of birth, AT&T account number and AT&T passcode. To the best of our knowledge, personal financial information and call history were not included. Based on our investigation to date, the data appears to be from June 2019 or earlier.

**What is AT&T doing to help?** We're offering you the complimentary credit monitoring, identity theft detection and resolution services described above. We've also launched a robust investigation supported by internal and external cybersecurity experts, and we are regularly reviewing and updating the measures we take to protect your information.

**What can you do?**

**Stay vigilant.** We recommend that you review the enclosed Information About Identity Theft Protection and encourage you to remain vigilant by monitoring your personal accounts and credit reports for any suspicious activity.

**Watch out for suspicious calls or emails.** We also recommend that you remain alert for unsolicited communications seeking your personal information. You should be cautious about entering your username and password on links provided through emails, even if it looks like the company's website. The safest route is to go directly to the company's website to log in.

IN THE COUNTY COURT OF THE
ELEVENTH JUDICIAL CIRCUIT, IN AND
FOR MIAMI-DADE COUNTY, FLORIDA

SERGIO SALANI,                                   CASE NO. 2022-047421-SP-25

      Plaintiff,

v.

AT&T MOBILITY LLC,

      Defendant.

_____/

### DEFENDANT AT&T MOBILITY LLC'S MOTION FOR EXTENSION OF TIME TO RESPOND TO PLAINTIFF'S SECOND AMENDED STATEMENT OF CLAIM

Defendant, AT&T Mobility LLC ("AT&T"), by and through undersigned counsel, moves this Court for the entry of an Order extending the time within which AT&T must respond to Plaintiff's *Second Amended Statement of Claim* dated April 29, 2024 (the "Second Amended Statement of Claim"), and in support, states as follows:

1.      On January 31, 2024, Plaintiff filed the Amended Statement of Claim.

2.      On February 12, 2024, AT&T filed its *Motion to Dismiss*. On April 5, 2024, this Court entered an *Agreed Order on Defendant's Motion to Dismiss*, ordering Plaintiff to file a second amended complaint within 20 days from the date of the Order and for AT&T to serve its answer within 20 days from the date of filing of the second amended complaint.

3.      On April 29, 2024, Plaintiff filed the *Second Amended Statement of Claim*, making AT&T's response to the Second Amended Statement of Claim due on May 20, 2024. This deadline has not expired and, therefore, this Motion is timely.

4.      Due to professional obligations requiring both undersigned counsel and AT&T's in-house counsel to travel extensively outside of Miami, AT&T respectfully requests the entry of an

Order extending the time within which to respond to the Second Amended Statement of Claim through and including May 31, 2024.

5.      This motion is made in good faith and not for purposes of delaying litigation and no party will be prejudiced if the extension is granted.

6.      AT&T reserves the right to assert any and all objections to the Second Amended Statement of Claim.

**WHEREFORE**, Defendant, AT&T MOBILITY LLC, respectfully requests that this Court enter an Order: (i) granting this Motion; (ii) extending the time within which to respond to Plaintiff's *Second Amended Statement of Claim* as described herein; and, (iii) granting such other relief as this Court deems just and proper.

Dated:  May 20, 2024                      Respectfully submitted,

By: */s/ Manuel A. Garcia-Linares*
         Manuel A. Garcia-Linares, Esq.
         Florida Bar No. 985252
         mgarcialinares@daypitney.com
         athomsen@daypitney.com
         Andrew R. Ingalls, Esq.
         Florida Bar No. 112558
         aingalls@daypitney.com
         athomsen@daypitney.com
         **DAY PITNEY LLP**
         396 Alhambra Circle
         North Tower – 14th Floor
         Miami, Florida  33134
         Telephone: (305) 373-4000
         Facsimile:   (305) 373-4099
         *Counsel for Defendant AT&T Mobility LLC*

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on May 20, 2024, I electronically filed the foregoing document with the Clerk of the Court via e-portal and served: **Maury L. Udell, Esq.**, BEIGHLEY, MYRICK, UDELL, LYNNE & ZEICHMAN, P.A., 2601 South Bayshore Drive, Suite 770, Miami, Florida  33133, Emails: mudell@bmulaw.com and notice66@bmulaw.com, *Counsel for Plaintiff.*

By: */s/ Manuel A. Garcia-Linares*
         Manuel A. Garcia-Linares, Esq.

Case 1:25-cv-20381-RAR   Document 1-2   Entered on FLSD Docket 01/27/2025   Page 390 of 1553

IN THE COUNTY COURT OF THE
ELEVENTH JUDICIAL CIRCUIT, IN AND
FOR MIAMI-DADE COUNTY, FLORIDA

SERGIO SALANI,                                     CASE NO.  2022-047421-SP-25

     *Plaintiff,*

v.

AT&T MOBILITY LLC,

     *Defendant.*

_____/

### DEFENDANT AT&T MOBILITY LLC'S RESPONSE TO PLAINTIFF'S AMENDED REQUEST FOR PRODUCTION RELATED TO DATA BREACH

Defendant, AT&T Mobility LLC ("AT&T"), by and through undersigned counsel and pursuant to Fla. R. Civ. P. 1.350, responds to Plaintiff's *Amended Request for Production Related to Data Breach* dated May 8, 2024, as follows:

### RESPONSE

1.      **Any and all notices of data breach sent to Plaintiff in the last five (5) years.  An exemplar is attached hereto as Exhibit "A."**

**OBJECTION:** This request is overbroad and seeks irrelevant information because it is not limited to any period of time relevant to the issues in this case, such as the governing limitations period. Additionally, this request seeks irrelevant information that does not appear to be reasonably calculated to lead to the discovery of admissible evidence as it has no relation whatsoever to Plaintiff's administrative fee claims. The request also seeks documents already in the possession, custody, or control of the requesting party, if they exist.

Dated:  May 23, 2024

Respectfully submitted,

*/s/ Manuel A. Garcia-Linares*
Manuel A. Garcia-Linares, Esq.
Florida Bar No. 985252
mgarcialinares@daypitney.com
athomsen@daypitney.com
Andrew R. Ingalls, Esq.
Florida Bar No. 112558
aingalls@daypitney.com
athomsen@daypitney.com
**DAY PITNEY LLP**
396 Alhambra Circle
North Tower,  14th Floor
Miami, Florida 33134
Telephone: (305) 373-4000
Facsimile:   (305) 351-8437
*Counsel for Defendant AT&T Mobility LLC*

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on May 23, 2024, I electronically filed the foregoing document with the Clerk of the Court via e-portal and served a true and correct copy via electronic mail: **Maury L. Udell, Esq.**, BEIGHLEY, MYRICK, UDELL, LYNNE & ZEICHMAN, P.A., 2601 South Bayshore Drive, Suite 770, Miami, Florida 33133, Emails: mudell@bmulaw.com and notice66@bmulaw.com, *Counsel for Plaintiff*.

By:  */s/ Manuel A. Garcia-Linares*
Manuel A. Garcia-Linares, Esq.

IN THE COUNTY COURT OF THE
ELEVENTH JUDICIAL CIRCUIT, IN AND
FOR MIAMI-DADE COUNTY, FLORIDA

SERGIO SALANI,                           CASE NO. 2022-047421-SP-25

    *Plaintiff,*

v.

AT&T MOBILITY LLC,

    *Defendant.*

_____/

## AT&T MOBILITY LLC'S MOTION TO DISMISS THE
## SECOND AMENDED STATEMENT OF CLAIM WITH PREJUDICE

Pursuant to Florida Rule of Civil Procedure 1.140(b), Defendant AT&T Mobility LLC

("AT&T") moves to dismiss with prejudice Plaintiff Michael Richard's ("Plaintiff") Second Amended

Statement of Claim[1] ("Amended Complaint").[2]

## **INTRODUCTION**

This case is one of hundreds of copy-and-paste lawsuits brought by the same law firm against

AT&T. Plaintiff's Amended Complaint asserts claims for:

Count I:    Fraud;

Count II:    Damages under the Florida Deceptive and Unfair Trade Practices Act
                  ("FDUTPA");

Count III:   Declaratory Relief under FDUTPA.; and,

Count IV:   Unjust enrichment.

These counts center on allegations that AT&T improperly charged Plaintiff a $1.99 administrative fee

without adequately disclosing its existence and then did not apply the administrative fee as it

_____

[1] While the operative complaint is titled "Amended Statement of Claim," it is actually the second time
that Plaintiff has amended their complaint.

[2] By agreed order, the Court invoked the Florida Rules of Civil Procedure on September 20, 2023.

represented it would—*i.e.*, AT&T allegedly said it would use the administrative fee to recoup certain costs but used it for something else instead. Am. Compl. ¶¶ 16-29. While the Amended Complaint specifically references and incorporates the Consumer Service Agreement as the basis for Plaintiff's claims, this document is not attached to the Complaint. *See, e.g., id.* ¶ 15 (referring to the parties' contractual relationship (*i.e.*, Consumer Service Agreement)); ¶¶ 19, 20, 42 (alleging that AT&T "misleadingly suggests" in its description of the administrative fee [found in the Consumer Service Agreement] that the administrative fee is "tied to the costs of AT&T" for "interconnect charges and cell site rental charges"). And, as explained below, the underlying consumer agreement defeats all of the claims in the Amended Complaint.

Despite Plaintiff's efforts to plead around this controlling document, dismissal is warranted—either because of the failure to attach the Consumer Service Agreement and billing statement underlying Plaintiff's claims, or because the Consumer Service Agreement disproves Plaintiff's claims. In sum, multiple grounds independently support dismissal:

- **Failure to State a Cause of Action**: All Counts are defeated by the Consumer Service Agreement, which Plaintiff relies on, and thereby incorporates, into the Amended Complaint.

- **Failure to Attach Necessary Exhibit**: Alternatively, the Amended Complaint should be dismissed because Plaintiff failed to attach the Consumer Service Agreement and AT&T billing statement as required by Fla. R. Civ. P. 1.130.

- **Preemption**: Plaintiff's challenge to the fairness or the very existence, amount, or reasonableness of the allegedly "bogus" administrative fee or any increases are rate issues that can solely be regulated by the federal government and is therefore preempted by section 332(c)(3)(A) of the Federal Communications Act.

- **Failure to Plead with Particularity**: Counts I for Fraud and Counts II, & III under FDUTPA should also be dismissed because they are not pled with the requisite particularity necessary for claims sounding in fraud under Fla. R. Civ. P. 1.120(b).

## SUMMARY OF PLAINTIFF'S ALLEGATIONS

This small claims case began when Plaintiff sued AT&T for $99 alleging FDUTPA violations and breach of contract under the written agreement between AT&T and Plaintiff. The original pleading alleged:

> Breach of contract for good faith and fair dealing, violation of 501.204, Fla. Stat., FDUTPA, bogus administrative fee application, injunctive relief, including attorney's fees and costs pursuant to 501.2105, Fla. Stat.

*See* Statement of Claim. Plaintiff and other alleged customers represented by the same law firm have had over 100 similar claims dismissed. Indeed, seven separate judges have agreed that these claims failed as a matter of law on a number of grounds, including that the claims were defeated by the plain language of the contract between AT&T and its customers incorporated by reference into the complaints.[3] A copy of the Consumer Service Agreement, the applicable contract in this case, is attached as **Exhibit 2**.[4]

---

[3] Specifically, Judge Murray granted AT&T's Motion for Judgment on the Pleadings in 84 separate cases brought against AT&T by the same counsel representing Plaintiff in this case. Judge Murray announced his ruling orally on the record at the end of the hearings. *See Small vs. AT&T Mobility LLC*, Case No. 2019-001003-SP-20 (Miami-Dade Cty. Ct.), DE 100 (hearing transcript filed 1/29/2021). To avoid entry of judgment against them, all 84 plaintiffs dismissed their cases before a written judgment could be issued. Furthermore, Judge Ihekwaba entered orders in five different cases dismissing claims asserted here *with prejudice*; Judge Gonzalez-Paulson entered orders in five cases dismissing the same claims asserted here *with prejudice* (these orders are currently on appeal before the Third DCA); Judge Silver entered a series of orders dismissing nearly all of the same claims asserted here, the majority *with prejudice*; Judge Singer Stein entered a series of orders dismissing similar claims as asserted here, some *with prejudice*; Judge Lehr dismissed identical claims filed in six cases also brought by Plaintiff's counsel against AT&T, some *with prejudice*, finding they failed as a matter of law; and Judge Moore entered an order dismissing claims asserted here, with leave to replead. Judge Marino Pedraza, Judge Gonzalez Meyer, and Judge Harris denied AT&T's Motions to Dismiss in their entirety. AT&T is awaiting ruling from Judge Harris on its motion for reconsideration. Examples from each set of orders are attached as **Composite Exhibit 1.**

[4] The result would be the same under the prior version of the agreement—the Wireless Customer Agreement—as demonstrated by the orders in Exhibit 1. A copy of the Wireless Customer Agreement is attached as **Exhibit 3**.

Plaintiff's counsel responded to these dismissals in its surviving cases by dropping its breach of contract claims and filing amended complaints trying to plead around the Consumer Service Agreement. Plaintiff admits that they are a customer of AT&T (Am. Compl. ¶¶ 2, 17, 26), who was offered a plan for wireless cellular and data services with specified terms (*see id.* ¶¶ 13, 16, 24), accepted and signed up for that plan (*see id.* ¶¶ 16-17), and received bills and paid for that plan (*see id.* ¶¶ 16, 25, 28, 32, 39). The fact that Plaintiff received monthly AT&T bills means that they are one of the "postpaid contract subscribers" referenced by the Amended Complaint.[5] *Id.* at ¶ 15.

Moreover, the Amended Complaint's assertion that AT&T engaged in fraud, violated FDUTPA, and was unjustly enriched hinges on the allegation that AT&T failed to abide by the "representations" that it made to Plaintiff in the Consumer Service Agreement, quoting the contract's administrative fee definition. *Compare* Consumer Service Agreement § 2.15.1 *with* Am. Compl. ¶ 42. These allegations, even in the light most favorable to Plaintiff, establish that a contract exists between AT&T and Plaintiff and allege that AT&T is supposedly liable for not honoring its terms. Under these alleged facts, the written contract between AT&T and Plaintiff is incorporated into the Amended Complaint and considered part of it for purposes of ruling on AT&T's motion to dismiss. *See infra*, Section I.A., p. 5.

According to Plaintiff, AT&T allegedly charged an administrative fee that was higher than customers "were promised and agreed to pay." Am. Compl. ¶ 16; *see also id.* ¶¶ 23, 29. Further, Plaintiff alleges that AT&T did not adequately describe or disclose the administrative fee. *Id.* ¶¶ 17, 22. Plaintiff also asserts several irrelevant allegations stating how it speculates that AT&T applied the monies collected from the administrative fee. *Id.* ¶¶ 21, 42. Plaintiff claims the fee is "bogus" and should be

---

[5] *See* Danielle D'Onfro, *Error-Resilient Consumer Contracts*, 71 Duke L.J. 541, 547 (2021) (explaining that telecom customers enter into "postpaid contracts" when: "The consumer incurs an obligation at Time 1 and receives a bill at Time 2.").

included as part of the advertised sales price of wireless service. *Id.* ¶¶ 16-18, 22, 27. They further allege that AT&T imposed and increased the administrative fee "as a covert way to increase the amount AT&T can charge as a term of usage without having to specifically advertise such higher amounts to use the service," and that the fee is part of the "true monthly prices." *Id.* ¶¶ 23-24. Plaintiff further claims that the amount of the fee is too high for an administrative charge. *See id.* ¶¶ 20-21, 42.

## LEGAL STANDARD

A complaint should be dismissed with prejudice where an amendment cannot cure its legal defects and where, even accepting all well-pled facts as true, the complaint fails to state a cause of action. *Ins. Concepts & Design, Inc. v. Healthplan Servs., Inc.*, 785 So. 2d 1232, 1233 (Fla. 4th DCA 2001). Where, as here, "the terms of a legal document are impliedly incorporated by reference into the complaint, the trial court may consider the contents of the document in ruling on a motion to dismiss." *Air Quality Assessors of Florida v. S.-Owners Ins. Co.*, 354 So. 3d 569, 571 (Fla. 1st DCA 2022) (quoting *One Call Prop. Servs. Inc. v. Security First Ins. Co.*, 165 So. 3d 749, 752 (Fla. 4th DCA 2015)); *Von Dyck v. Gavin*, 350 So. 3d 842, 845 (Fla. 1st DCA 2022); *Tower Radiology v. Direct Gen. Ins. Co.*, 348 So. 3d 1147 (Fla. 4th DCA 2022); *Veal v. Voyager Prop. & Cas. Ins. Co.*, 51 So. 3d 1246, 1249 (Fla. 2d DCA 2011). "When a party refers to a document in the complaint, the trial court may use that document to assess the nature of the claims alleged in the complaint." *Glen Garron, LLC v. Buchwald*, 210 So. 3d 229, 233 (Fla. 5th DCA 2017). Here, the face of the Amended Complaint shows that Plaintiff fails to state a cause of action.

## ARGUMENT

I.   **Plaintiff fails to state a cause of action.**

A.   **The Consumer Service Agreement is incorporated into the Amended Complaint.**

Plaintiff admits in the Amended Complaint that a contract—the Consumer Service Agreement—governed the business relationship between themself and AT&T. Although all

reasonable inferences must be drawn in favor of the non-moving party on a motion to dismiss, a pleader's allegations are not binding on the trial court where, as here, they are contradicted by exhibits attached to or incorporated in the complaint. *Skupin v. Hemisphere Media Group, Inc.*, 314 So. 3d 353, 356 (Fla. 3d DCA 2020) (considering information contained at hyperlinks referenced in the complaint). "It is well settled that the court must consider an exhibit attached to the complaint together with the complaint's allegations, and that the exhibit controls when its language is inconsistent with the complaint's allegations." *K.R. Exch. Services, Inc. v. Fuerst, Humphrey, Ittleman, PL*, 48 So. 3d 889, 894 (Fla. 3d DCA 2010).

The First DCA considered a similar situation in *Von Dyck*, when a client sued his lawyers for legal malpractice. 350 So. 3d at 843. One count was based upon an asset purchase agreement. *Id.* Although the agreement was not attached to the plaintiff's complaint, as here, there were numerous references to the agreement in the complaint, and the plaintiff relied on the agreement for one of its arguments. *Id.* Accordingly, the trial court found it was proper to consider the agreement in granting the defendant's motion to dismiss, and the First DCA affirmed. *Id.*; *see Air Quality Assessors of Fla.*, 354 So. 3d at 573 (holding legal document impliedly incorporated by reference into the amended statement of claim was properly considered by the trial court on a motion to dismiss and by appellate court on review of the trial court order dismissing the case). Here, the Consumer Service Agreement is properly considered in ruling on AT&T's motion to dismiss because Plaintiff incorporated the Consumer Service Agreement into the Amended Complaint by quoting the contract (Am. Compl. ¶ 42) and alleging that they are a "postpaid contract subscriber[]." *Id.* at ¶ 15.

**B.    Plaintiff's Fraud and FDUTPA allegations are contradicted by the Consumer Service Agreement.**

Plaintiff must allege four elements to state a claim for fraud: "(1) a false statement concerning a specific material fact; (2) the maker's knowledge that the representation is false; (3) an intention that the representation induces another's reliance; and (4) consequent injury by the other party acting in

reliance on the representation." *Lopez-Infante v. Union Cent. Life Ins. Co.*, 809 So. 2d 13, 15 (Fla. 3d DCA 2002). They must allege three elements to state a claim for damages under FDUTPA: (1) a deceptive act or unfair practice; (2) causation; and (3) actual damages. *Caribbean Cruise Line, Inc. v. Better Bus. Bureau of Palm Beach Cty., Inc.*, 169 So. 3d 164, 167 (Fla. 4th DCA 2015).

Here, Plaintiff has attempted to state causes of action for fraud and FDUTPA damages by alleging misrepresentations made by AT&T. Florida law is clear that "[a] party cannot recover for alleged false misrepresentations that are adequately dealt with or expressly contradicted in a later written contract." *TRG Night Hawk Ltd. v. Registry Dev. Corp.*, 17 So. 3d 782, 784 (Fla. 2d DCA 2009); *see also Taylor Woodrow Homes Fla., Inc. v. 4/46-A Corp.*, 850 So. 2d 536, 542 (Fla. 5th DCA 2003). "Courts routinely dismiss FDUTPA claims where those claims are directly and fully rebutted by express evidence in a governing written contract." *Sol. Z v. Alma Lasers, Inc.*, No. 11-CV-21396-CIV, 2013 WL 12246356, at *5 (S.D. Fla. Jan. 22, 2013). Because Plaintiff's fraud and FDUTPA counts are premised on purported misrepresentations, which are refuted by the contract they rely upon, they fail as a matter of law. *See Ginsburg v. Lennar Fla. Holdings, Inc.*, 645 So. 2d 490, 494 (Fla. 3d DCA 1994) ("[W]here the allegations of the complaint are contradicted by the exhibits, the plain meaning of the exhibits will control.").

    i.   <u>The Consumer Service Agreement contradicts Plaintiff's allegations about the administrative fee.</u>

Plaintiff's administrative fee claims are premised upon an alleged misrepresentation by omission. According to Plaintiff, AT&T allegedly did not disclose the administrative fee or that it could be increased. As already determined by Judge Silver, Judge Lehr, Judge Murray, Judge Gonzalez-Paulson, Judge Singer Stein, Judge Moore, and Judge Ihekwaba, these allegations fail because they are contradicted by the plain and unambiguous terms of the Consumer Service Agreement, which clearly and conspicuously gave notice of the administrative fee and authorized AT&T to charge and change the administrative fee.

On the second page of the Consumer Service Agreement, AT&T described the charges for its services. In bold lettering, Section 1.17.2 of the Consumer Service Agreement is titled "**Changes to Agreement.**"   In Section 1.17.2, Plaintiff agreed that AT&T may make changes to the agreement from time to time and that those changes may include changes to fees.

> **1.17.2 Changes to Agreement:**
>
> We may add, modify, or delete any terms, conditions, rates, or **fees** for any AT&T Service at any time.

Consumer Service Agreement § 1.17.2 (emphasis added to paragraph).

Section 2.15 of the Consumer Service Agreement titled "**2.15 Charges, Fees, Billing, and Payment**" states that AT&T's customers are responsible to pay for the services they receive and specifies the types of charges customers may expect to see on their monthly bills. Section 2.15.1 expressly states that customers are required to pay an administrative fee.

> **2.15.1 Charges:**
>
> You are responsible for all charges incurred on your Account.
>
> <div align="center">***</div>
>
> Additional charges may include, but are not limited to:
>
> <div align="center">***</div>
>
> **AT&T Monthly Fees** include but are not limited to the following: an AT&T **Administrative Fee** charged to help AT&T recover a portion of certain expenses AT&T incurs, **including but not limited to**: (a) charges AT&T or its agents pay to interconnect with other carriers to deliver calls from AT&T customers to their customers, and (b) charges associated with cell site rents and maintenance . . . . These and other AT&T Fees are not taxes or charges which the government requires AT&T to collect from its customers. The amounts we charge may change. See att.com/mobilityfees for more info.

*Id.* § 2.15.1 (emphasis added to third excerpt).

The case of *Berry v. Budget Rent A Car Systems, Inc.* is squarely on point and fatal to Plaintiff's FDUTPA claims. 497 F. Supp. 2d 1361 (S.D. Fla. 2007). In *Berry*, the plaintiff alleged that a defendant

violated FDUTPA by charging a $3.00 "cost recovery fee" in addition to the daily car rental rate, and that the fee grossly exceeded the actual cost of vehicle registration and licensing that was already included in the daily rental rate. *Id.* at 1363-64. In dismissing the plaintiff's FDUTPA claim *with prejudice*, the *Berry* court first explained that "the simple fact of the [cost recovery fee], and its itemization as a separate charge, is not unfair or deceptive because it was clearly disclosed at the time of the rental." *Id.* at 1367. This is the precise claim made by Plaintiff. As was the case in *Berry*, Plaintiff cannot complain that they were deceived when AT&T expressly disclosed its right to charge an administrative fee and never represented that it would "pass through" AT&T and be paid to a third party. *Id.*; *see Maor v. Dollar Thrifty Auto. Grp., Inc.*, No. 15-22959-CIV, 2018 WL 4698512, at *8 (S.D. Fla. Sept. 30, 2018) ("Plaintiff is unable to satisfy the first element of his FDUTPA claim. . . . it is undisputed that the $15 administrative fee was disclosed prior to entering the rental contract. . . . [T]he term 'administrative fee' would not deceive a reasonably objective consumer or imply that the fee was a 'pass-through fee;' and it cannot be found to be evidence of deception.").

Further, even as alleged by Plaintiff,[6] the Consumer Service Agreement states: "the Administrative Fee is a charge assessed by AT&T MOBILITY, LLC that helps defray **a portion** of certain expenses AT&T MOBILITY, LLC incurs, **including but not limited to**: (a) charges AT&T MOBILITY, LLC or its agents pay to interconnect with other carriers to deliver calls from AT&T MOBILITY, LLC customers to their customers; and (b) charges associated with cell site rents and maintenance. . . ." *Compare* Am. Compl. at ¶ 42 (emphasis added) *with* Consumer Service Agreement § 2.15.1. Therefore, even if Plaintiff's allegations were true (and they are not), and the administrative fee did not defray *those particular expenses*, the Amended Complaint would still fail because Plaintiff does not and cannot allege (1) that the fee did not defray a portion of those two categories of expenses,

---

[6] AT&T assumes that Plaintiff's allegations are true only for the purpose of this motion.

among others, (2) that AT&T is limited to using the administrative fee for those two categories of expenses based on its disclosure, or (3) that AT&T ever represented to Plaintiff that the administrative fee is directly tied to the rise or fall of AT&T's interconnect and cell site rental charges. *See Maor*, 2018 WL 4698512, at *5 ("The terms of the rental contract do not restrict how Defendants may put the administrative fee to use or specify on what the fee is based. Defendants' conduct was strictly compliant with the terms of the contract, and Plaintiff was charged the precise amount he agreed to under the contract. There can be no breach.").

> ii. <u>Given that the Consumer Service Agreement defeats Plaintiff's allegations of deception, there is no basis for Plaintiff to request declaratory or injunctive relief regarding the administrative fee.</u>

As established above, the Consumer Service Agreement clearly and honestly disclosed the administrative fee. Furthermore, the Consumer Service Agreement does "not restrict how [AT&T] may put the administrative fee to use . . . ." *See id.* Under these circumstances, a person cannot be "aggrieved" because there is no violation of FDUTPA. *See* § 501.211(1), Fla. Stat. Consequently, there is nothing for the Court to enjoin and no basis for Plaintiff to seek a declaratory judgment or injunctive relief.

Accordingly, Plaintiff's fraud and FDUTPA claims (Counts I, II & III) must be dismissed, *with prejudice.*[7]

---

[7] The Amended Complaint's reliance on *Advance Mold Servs., Inc. v. Universal N. Am. Ins. Co.*, No. 3D23-0240, 2023 WL 8793260 (Fla. 3d DCA Dec. 20, 2023) is misplaced. *See* Am. Compl. ¶ 37. *Advanced Mold* dealt with Fla. Stat. § 627.7152(2)(b)'s prohibition of assigning agreement containing an administrative fee. *Id.* at *1. The Third DCA found that the trial court improperly adjudicated an issue of fact when it granted the defendant's Motion to Dismiss based on the trial court's finding that the underlying contract's "fee was for a supervisor at the jobsite and not a clerical fee associated with administering the Assignment Agreement." *Id.* Here, AT&T has established that Plaintiff's fraud and FDUTPA claims are rebutted by the contract that they rely upon and is not seeking to adjudicate any factual issues. *See Sol. Z*, 2013 WL 12246356, at *5 ("Courts routinely dismiss FDUTPA claims where those claims are directly and fully rebutted by express evidence in a governing written contract.").

C.   **Count IV for Unjust Enrichment is barred because it duplicates Counts I, II, & III and concerns the same subject matter as the Consumer Service Agreement.**

A claim for unjust enrichment cannot survive a motion to dismiss where an express contract covers the same subject matter alleged in the unjust enrichment claim. *Sterling Breeze Owners' Ass'n, Inc. v. New Sterling Resorts, LLC*, 255 So. 3d 434, 437 (Fla. 1st DCA 2018), *reh'g denied* (Oct. 16, 2018) ("[A] plaintiff cannot pursue a quasi-contract claim for unjust enrichment if an express contract exists concerning the same subject matter.") (citation and internal quotation marks omitted). Here, Plaintiff's count for unjust enrichment fails because the misrepresentations alleged in the Amended Complaint are covered and contradicted by the Consumer Service Agreement, and such allegations, as detailed above, fail to state a claim. *Compare* Consumer Service Agreement §§ 1.17.2, 2.15.1 *with* Am. Compl. ¶¶ 57-59. For all the reasons stated above in Section I.B., the unjust enrichment claim fails.

II.   **Alternatively, the Amended Complaint should be dismissed because Plaintiff failed to attach the Consumer Service Agreement.**

Florida Rule of Civil Procedure 1.130(a) provides, in pertinent part, that "[a]ll . . . documents on which action may be brought or defense made, or a copy thereof or a copy of the portions thereof material to the pleadings, must be incorporated in or attached to the pleading." At minimum, if the Court does not consider the Consumer Service Agreement, it should dismiss the case without prejudice and require Plaintiff to amend for a third time and attach the governing contract and billing statement that it quotes, which Plaintiff alleges give rise to their cause of action because they were misleading or deceptive. Am. Compl. ¶ 32 ("AT&T MOBILITY, LLC's representations on its bills to Plaintiff regarding the administrative fee charged on the account were false statements of material fact."); ¶ 42 (quoting the Consumer Service Agreement); *see Safeco Ins. Co. of Am. v. Ware*, 401 So. 2d 1129, 1130 (Fla. 4th DCA 1981) ("In the case of a complaint based on a written instrument it does not state a cause of action until the instrument or an adequate portion thereof is attached to or incorporated in the pleading in question.").

III. **Most of the Amended Complaint's allegations are preempted by the Federal Communications Act's provision governing the rates charged for cell phone service.**

The Amended Complaint seeks damages under Florida state law because AT&T allegedly charges the administrative fee as a back-door method of increasing the price customers pay, thereby increasing company profits. The heart of these allegations is that it is unfair and unreasonable for AT&T to charge a separate fee instead of rolling that amount into the advertised rates charged for cell phone service.

But the Federal Communications Act prohibits states from regulating rates charged by commercial mobile service providers such as AT&T. The Act provides that "no State or local government shall have any authority to regulate the entry of or **the rates charged** by any commercial mobile service or any private mobile service, except that this paragraph shall not prohibit a State from regulating the other terms and conditions of commercial mobile services." 47 U.S.C. § 332(c)(3)(A) (emphasis added); *see also id.* § 332(d)(1) (defining "commercial mobile service"). Under this provision, "rates charged" by wireless carriers, such as AT&T, fall under the exclusive jurisdiction of the Federal Communications Commission (FCC), *see id.* §§ 151-152, though states may regulate the presentation of such charges on a customer's bill. *Nat'l Ass'n of State Utility Consumer Advocates v. FCC ("NASUCA")*, 457 F.3d 1238, 1254 (11th Cir.), *opinion modified on denial of reh'g*, 468 F.3d 1272 (11th Cir. 2006).

The fundamental nature of Plaintiff's claims is a challenge to the existence of the administrative fee as an unfair way to increase the amounts—or rates—charged for cell service. This is preempted.

A. **The legal standard for deciding whether a claim relates to "rates charged" and is preempted.**

Under the governing preemption statute, states do not have the power to decide challenges to the rates carriers charge their customers for mobile service. While the statute itself does not define "rates" courts have interpreted the term "rates" to carry its "ordinary, contemporary, [and] common

meaning" as "[t]he **amount of a charge** or payment…having relation to some other amount or basis of calculation," "[a]n **amount paid or charged** for a good or service," or "a charge per unit of a public-service commodity." *NASUCA*, 457 F.3d at 1254; *see Peck v. Cingular Wireless, LLC*, 535 F.3d 1053, 1057 (9th Cir. 2008) (a "rate" affects "how much businesses may charge for their goods or services.").

The Federal Communications Act mandates that rates are left to be determined by market forces, unless they are unjust or unreasonable. *See* 47 U.S.C. § 201(b); *Gilmore v. Sw. Bell Mobile Sys.*, 156 F. Supp. 2d 916, 923 (N.D. Ill. 2001). Federal courts have held that in determining whether Section 332 preempts a claim, "[t]he key inquiry is 'the nature of the claims . . . and what the effect of granting the relief requested would be.'" *In re Apple iPhone 3G Prods. Liab. Litig.*, 728 F. Supp. 2d 1065, 1071 (N.D. Cal. 2010) (quoting *Bastien v. AT&T Wireless Servs., Inc.*, 205 F.3d 983, 989 (7th Cir. 2000)). If, to resolve the claim, the court must decide **if the amount charged is "unreasonable, unjust, or otherwise inappropriate**," that claim is preempted and subject to the FCC's primary jurisdiction. *Gilmore*, 156 F. Supp. at 923 (emphasis added); 47 U.S.C. § 201(b); 47 U.S.C. 332(c)(3). In other words, if AT&T charges an unjust or unreasonable administrative fee, the remedy will come from the federal government and not from a Florida state court, Florida statute, or Florida common law. 47 U.S.C. §§ 201-08 (providing for proceedings before the FCC or in federal court).

**B.     The Amended Complaint challenges the "rate charged" in a number of ways.**

The Amended Complaint challenges the **amount charged** by AT&T for cell service as bogus, unfair, unjust, and otherwise inappropriate, referencing and challenging the "amount" charged at least fifteen times. *See* Am. Compl. ¶¶ 16, 20-21, 23, 24, 25, 29, 39-40. Plaintiff alleges that the administrative fee is "bogus" and should be included as part of the advertised sales price of wireless service. *Id.* ¶¶ 16, 18. It says AT&T uses the fee to "ratchet up the price" of cell phone service and to "effectively increase [AT&T's] amount charged" as a "design to profit" the company in a way that's "unfair." *Id.*

¶¶ 16, 26-29. It alleges that AT&T "covertly increases the actual overall price by padding all post-paid wireless customers' bills" as a means to "charge more per month for the term of usage itself"[8] without having to advertise such "higher overall price," and it is part of the "true monthly prices." *See id.* ¶¶ 16-18, 22-29. Plaintiff further suggests that the amount of the fee is too high for an administrative charge. *See id.* ¶¶ 25, 40. Because these allegations directly attack "how much [AT&T] may charge for their goods or services," the Amended Complaint directly relates to AT&T's rates, thus placing the issue of whether Plaintiff's claims are preempted by the FCA before this Court. *Peck*, 535 F.3d at 1057.

"[T]he effect of granting [the Amended Complaint's] relief requested" is equally as clear. *In re Apple iPhone*, 728 F. Supp. 2d at 1071 (quoting *Bastien*, 205 F.3d at 989). Plaintiff not only seeks a judgment determining that the administrative is "bogus," Am. Compl. ¶ 27, but explicitly requests this Court to "determine whether the FDUTPA **prohibits AT&T MOBILITY, LLC from continuing to apply the bogus administrative fee** . . . ." Am. Compl. ¶ 51 (emphasis added). This subject matter is not something that state courts are permitted to adjudicate. Because the FCA precludes state law claims challenging the rates charged by a commercial mobile service, any remedy for charging a bogus amount lies with the FCC or in federal court.

## C.     Any allegation that the administrative fee is bogus, unreasonable, or an unfair way to charge higher prices for cell service is a challenge to "rates charged."

*Gilmore* is instructive. There, a Southwestern Bell customer challenged the "Corporate Account Administration Fee," alleging breach of contract, unjust enrichment, and fraud. *Gilmore,* 156 F. Supp. 2d at 919. The plaintiff alleged that no significant administrative or other services were provided for the fee, the monthly bills did not explain what services were provided for the fee, the fee was imposed "for the sole purpose of enabling [defendant] to generate more revenue without appearing to raise its

---

[8] This version of the complaint replaces the term "rates" with "term of usage," but the substance of the allegations are exactly the same. No artful pleading can save the Amended Complaint from dismissal.

rates for cellular service," and the plaintiff was "deceived, in effect, into paying a fee at rates higher than the rates for which they contracted." *Id.*

The court held that these state law claims were effectively a challenge to the sufficiency of services received for the fee, which is a rate issue that is preempted under 47 U.S.C. 332(c)(3)(A). *Id.* at 924. It held that whether an amount charged to customers "is unreasonable, unjust, or otherwise inappropriate" is an issue for the FCC or federal courts. *Id.* at 923; 47 U.S.C. § 201(b); 47 U.S.C. § 332(c)(3). Further, allegations that the fee was unconscionable and that the defendant did not act in good faith were allegations that the fee was unjust and/or unreasonable, and they therefore constituted a challenge to the appropriateness of the fee within the purview of 47 U.S.C. § 201(b)). *Id.* at 924. Thus, the claims, which effectively challenged the sufficiency of services received for the fee— including the claim for unjust enrichment—were preempted, as they each fell within the purview of FCA preemption. *Id.* at 925.

Like *Gilmore*, Plaintiff challenges the administrative fee as "bogus," unreasonable, and "designed to raise profit," and otherwise disputes AT&T's ability to charge or increase the administrative fee. Am. Compl. ¶¶ 16-18, 20, 22-25, 40-42. As these claims attack AT&T's "rates," they are preempted by Section 332(c)(3)(A) of the Federal Communications Act.

## D. Dismissal is the proper remedy for claims relating to topics preempted by federal law.

Dismissal is warranted where allegations relate to issues that are preempted by federal law. In *La Ley Recovery Sys.-OB, Inc. v. United Healthcare Ins. Co.*, 193 So. 3d 16 (Fla. 3d DCA 2016), for example, the plaintiff alleged that the defendant failed to pay insurance claims that it previously indicated were covered. *Id.* at 17-18. The trial court granted the defendant's motion to dismiss based in part on its conclusion that the plaintiff's claims were preempted by ERISA. *Id.* at 18. The Third DCA affirmed the trial court's dismissal, stating: "[A] review of [plaintiff's] amended complaint clearly reflects that

the state-law claims 'relate to' an ERISA-governed plan . . . . Accordingly, we conclude that the trial

court properly determined that [plaintiff's] state-law claims are defensively preempted." *Id.* at 19.

As in *La Ley*, a review of the Amended Complaint "clearly reflects that the state-law claims

'relate to'" the rates charged by AT&T for its services. *Id.* Therefore, the preemption issue is ripe for

adjudication at this stage of the proceedings, and those claims must be dismissed. 47 U.S.C. §

332(c)(3)(A).

**IV.    Plaintiff's fraud and FDUTPA counts also fail as a matter of law because they are not pled with the requisite particularity necessary for a claim sounding in fraud under Fla. R. Civ. P. 1.120(b).**

Florida Rule of Civil Procedure 1.110(b) requires, at a minimum, that a complaint plead "a

short and plain statement of the ultimate facts showing that the pleader is entitled to relief." Generally,

"[t]he complaint must set out the elements and the facts that support them so that the court and the

defendant can clearly determine what is being alleged." *Barrett v. City of Margate*, 743 So. 2d 1160, 1162

(Fla. 4th DCA 1999). However, where fraud is alleged, Florida Rule of Civil Procedure 1.120(b)

mandates that "the circumstances constituting the fraud . . . shall be stated with such particularity as

the circumstances may permit."

Although a FDUTPA claim need not allege fraud or misrepresentations, where, as here, a

plaintiff chooses to plead such allegations, the FDUTPA count is subject to the rules governing fraud.

*See Toca v. Tutco*, LLC, 430 F. Supp. 3d 1313, 1328 (S.D. Fla. 2020) (FDUTPA claim alleging fraudulent

business practices is subject to pleading standard for fraud); *USA Nutraceuticals Grp., Inc. v. BPI Sports,*

*LLC*, No. 15-CIV-80352, 2016 WL 4254257, at *3 (S.D. Fla. Feb. 16, 2016); *Koch v. Royal Wine Merchs.,*

*Ltd.*, 847 F. Supp. 2d 1370, 1380 (S.D. Fla. 2012). Courts in Florida have regularly held that FDUTPA

claims sound in fraud and must be pled with particularity under Rule 1.120(b) or its federal

counterpart, Federal Rule of Civil Procedure 9(b). *Cedars Healthcare Grp., Ltd. v. Mehta*, 16 So. 3d 914,

917 (Fla. 3d DCA 2009); *Librizzi v. Ocwen Loan Servicing, LLC*, 120 F. Supp. 3d 1368, 1381 (S.D. Fla.

2015). As such, they must "be pled with particularity and must specifically identify misrepresentations

or omissions of fact, as well as time, place or manner in which they were made." *Mehta*, 16 So. 3d at 917. Conclusory assertions disguised as fact do not meet this high standard. *See Myers v. Myers*, 652 So. 2d 1214, 1215 (Fla. 5th DCA 1995) ("Allegations contained in a pleading are insufficient if they are too general, vague or conclusory."). Failure to allege a specific element of fraud is fatal to a complaint. *Strack v. Fred Rawn Const., Inc.*, 908 So. 2d 563, 565 (Fla. 4th DCA 2005).

Although they were not required to do so to state a FDUTPA claim, Plaintiff has expressly pled deliberate misrepresentations, which is the definition of a cause of action sounding in fraud. *See Alvarez v. State*, 800 So. 2d 237, 238 (Fla. 3d DCA 2001) ("Fraud is a deception deliberately practiced in order to secure . . . gain.") (quotations omitted); *Douglas v. Ogle*, 85 So. 243, 244 (Fla. 1920) ("The distinguishing element of actual fraud . . . is always untruth between the two parties to the transaction, so that actual fraud may be reduced to misrepresentation and concealment.") (quotations omitted). Plaintiff has pled precisely that:

> 16. . . . Then, after customers sign up, AT&T MOBILITY, LLC actually charge higher monthly amount for service and for terms of usage than the customers were promised and agreed to pay. AT&T MOBILITY, LLC **covertly** increases the actual overall price . . .
>
> 17. The Administrative Fee is . . . **never adequately** and **honestly disclosed**.
>
> 22. Thus by AT&T MOBILITY, LLC's own design, AT&T MOBILITY, LLC's **scheme** is to **keep customers from realizing** they are being **deceived** . . . .
>
> 42. AT&T MOBILITY, LLC's representations to Plaintiff regarding the administrative fee charged are **deceptive** and in fact **misrepresent the truth** . . . . The administrative fee is instead a **scheme** to funnel direct profit to AT&T . . . .
>
> 45. AT&T MOBILITY, LLC's unfair and deceptive trade practice is not a result of a bona fide error or mistake but instead a **conscious decision** by AT&T MOBILITY, LLC.

Am. Compl. ¶¶ 16-17, 22, 42, 45 (emphases added). Plaintiff alleges that AT&T knowingly, intentionally, and fraudulently deceived them regarding the administrative fee, describing AT&T's

conduct as "immoral," "unethical," "oppressive," and "unscrupulous." *Id.* ¶¶ 18, 43. Plaintiff also claims in a conclusory fashion that these supposed misrepresentations were the proximate cause of their damages. *Id.* ¶ 44. Accordingly, the heightened Rule 1.120(b) pleading standard applies.

The Amended Complaint does not come close to Florida's heightened pleading standard. While Plaintiff generally asserts they are an AT&T customer that was allegedly deceived regarding AT&T's administrative fee, the Amended Complaint does not include a single fact or allegation specific to Plaintiff. Indeed, there is nothing regarding Plaintiff's individual interactions with AT&T, or the time, place, and manner of the alleged fraudulent and deceptive conduct. *See Mehta*, 16 So. 3d at 917; *USA Nutraceuticals Grp., Inc.*, 2016 WL 4254257, at *3 (complaints sounding in fraud must state the "who, what, when, where, and how" of the alleged misconduct); *Meridian Tr. Co. v. Batista*, No. 17-23051, 2018 WL 4760277, at *5 (S.D. Fla. Sept. 30, 2018) (holding "broad-brush characterization[s] . . . insufficient where particular reliance on particular statements or documents is required."); *Gayou v. Celebrity Cruises, Inc.*, No. 11-23359-CIV, 2012 WL 2049431, at *7 (S.D. Fla. June 5, 2012) (dismissing false advertising claim for failing to "particularly identify the timing of any of the alleged misrepresentations"). At a minimum, if Plaintiff believes that AT&T made a misrepresentation to them, then they must affirmatively allege specific allegations regarding how, when, and where AT&T represented the administrative fee was a pass-through fee, or any other clear allegation of misrepresentation. *Id.*

Instead, the Amended Complaint asserts the same basic claims that its counsel has filed in the 200+ companion cases. Mass-produced allegations fall woefully short of the particularity and specificity required by Florida law. *See Dominguez v. Banana Republic*, 1:19-cv-10171-GHW (S.D.N.Y. Apr. 23, 2020) (commenting that the "greatest asset of copy-and-paste litigation can also be its greatest weakness" where complaint "failed to allege any nonconclusory facts of a real or immediate threat of injury" that would warrant injunctive relief); *Mendez v. Apple Inc.*, No. 18 CIV. 7550 (LAP), 2019 WL 2611168, at *4 (S.D.N.Y. Mar. 28, 2019) ("There is nothing inherently wrong with filing duplicative

lawsuits . . . if the harms to be remedied do exist and are indeed identical. But those who live by the photocopier shall die by the photocopier.").

The Amended Complaint's conclusory copy-and-paste allegations fail to satisfy Florida Rule of Civil Procedure 1.120(b), and the claims, therefore, fail as a matter of law. *See Mehta*, 16 So. 3d at 917 (dismissing complaint where "plaintiffs broadly alleged intentional fraud, [but] failed to plead fraud with particularity."); Ex. 1, Ihekwaba Order at 10-11 (finding that "Plaintiff fail[ed] to plead the fraud claims with particularity as is required by Florida law"); Ex. 1, Gonzalez-Paulsen Order at 14 (same).

## **CONCLUSION**

For these reasons, AT&T respectfully requests that the Court dismiss the Amended Complaint with prejudice and grant it such other and further relief the Court deems just and proper.


Dated:  May 31, 2024                           Respectfully submitted,

By:  */s/ Manuel A. Garcia-Linares*
        Manuel A. Garcia-Linares, Esq.
        Florida Bar No. 985252
        mgarcialinares@daypitney.com
        athomsen@daypitney.com
        Andrew R. Ingalls, Esq.
        Florida Bar No. 112558
        aingalls@daypitney.com
        athomsen@daypitney.com
        **DAY PITNEY LLP**
        396 Alhambra Circle
        North Tower – 14th Floor
        Miami, Florida  33134
        Telephone: (305) 373-4000
        Facsimile:  (305) 373-4099
        *Counsel for Defendant AT&T Mobility LLC*

## <u>CERTIFICATE OF SERVICE</u>

**I HEREBY CERTIFY** that on May 31, 2024, I electronically filed the foregoing document with the Clerk of the Court via e-portal and served: **Maury L. Udell, Esq.**, BEIGHLEY, MYRICK, UDELL, LYNNE & ZEICHMAN, P.A., 2601 South Bayshore Drive, Suite 770, Miami, Florida 33133, Emails: mudell@bmulaw.com and notice66@bmulaw.com, *Counsel for Plaintiff*.

By: */s/ Manuel A. Garcia-Linares*
Manuel A. Garcia-Linares, Esq.

# COMPOSITE EXHIBIT 1

| IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT IN AND FOR DADE COUNTY, FLORIDA | | |
|---|---|---|

**DIVISION**
☐ CIVIL
☐ OTHER

**MEMO OF DISPOSITION**

**CASE NUMBER**
2019-000864-SP-20
Section No. CL01

**PLAINTIFF(S)**
David Adams

**VS. DEFENDANT(S)**
AT&T Mobility LLC

**FILED**
CLOCK-IN
JAN 2 8 2021
CLERK

**PLAINTIFF ATTORNEY(S)**
Udell, Maury L

**DEFENDANT ATTORNEY(S)**
Garcia-Linares, Manuel A., ESQ

**DATE OF HEARING**
01/28/2021 - 1:30 PM

**TYPE**
Special Sets

---

**MOTIONS**

TYPE OF
MOTION For Judgement On Pleadings
COURT RULING ON MOTION:

☑ GRANTED   ☐ DENIED   ☐ WITHHELD

COMMENTS:
_____
_____
_____

**CALENDAR DIRECTIONS**

CASE CONTINUED:
☐ NOTICE OF SERVICE PROCESS
☐ PENDING SERVICE          ☐ PENDING SETTLEMENT
☐ SET CASE FOR _____   ESTIMATED TIME REQUIRED _____
☐ MEDIATION               ☐ NON JURY TRIAL
                          ☐ JURY TRIAL
☐ STIPULATED WAIVER FOR APPEARANCE AT PRE-TRIAL
☐ ORDER INVOKING RULES OF CIVIL PROCEDURE
☐ MOTION TO INVOKE THE RULES OF CIVIL PROCEDURE

---

**DISPOSITIONS**

☐ DEFAULT   ☐ FINAL JUDGMENT   ☐ DEFAULT JUDGMENT   ☐ SUMMARY JUDGMENT   ☐ AGREED JUDGMENT

☐ ORDER OF DISMISSAL          **AMOUNT OF JUDGMENT**          **JUDGMENT FOR THE PLAINTIFF**
  ☐ WITHOUT PREJUDICE   PRINCIPAL $ _____   INTEREST $ _____   ☐ STIPULATION FOR PAYMENT AND ORDER OF DISMISSAL
  ☐ WITH PREJUDICE      COURT COSTS $ _____   ATTORNEY FEES $ _____
  ☐ VOLUNTARY DISMISSAL

---

**CONDITION OF DISPOSITION**

☐ EXECUTION OF JUDGMENT WITHHELD   ☐ ORDER WITHHOLDING JUDGMENT   ☐ PLAINTIFF TO SUBMIT PROOF
PENDING PAYMENT BY DEFENDANT OF THE ABOVE JUDGMENT AT A RATE OF
$ _____ PER _____, COMMENCING _____
                        WEEK/MONTH              DATE
SWORN TESTIMONY TAKEN IN COURT: _____
JUDGMENT OR ORDER TO BE PREPARED BY:   ☐ PLAINTIFF   ☐ DEFENDANT   ☐ COURT
☐ DEFENDANT TO FILE ANSWER IN _____ DAYS
☐ A DEFAULT IS HEREBY ENTERED AGAINST _____
FOR FAILURE TO APPEAR AT PRETRIAL AS REQUIRED BY LAW

**HARVEY RUVIN**
**CLERK OF COURTS**

By: PRISCILLA JONES
DEPUTY CLERK

Sonnia Martinez
COURT REPORTER

GORDON C. MURRAY, SR
County Court Judge
JUDGE

Co. Fernando 3 assoc.

# IN THE COUNTY COURT OF THE ELEVENTH JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA

CASE NO: 2019-017806-SP-23

JUDGE: Chiaka Ihekwaba

**Johan Duluc**

    Plaintiff(s)

vs.

**AT&T Mobility (LLC)**

    Defendant(s)

_____/



## ORDER ON DEFENDANT'S MOTION TO DISMISS

On November 4, 2022, and November 10, 2022, this Court heard Defendant AT&T Mobility, LLC's Motion to Dismiss Plaintiff's Second Amended Complaint. After considering the motion, Plaintiff's response, the second amended complaint, all relevant pleadings, the arguments of counsel, and being otherwise duly advised in the premises, the Court hereby GRANTS AT&T's Motion for the reasons and in the manner set forth below.

I. Background.

Plaintiff filed a Second Amended Complaint on September 23, 2022 (the "Amended Complaint"), asserting six claims against AT&T, these are as follows:

Count (1) Fraud.

Count (2) Damages under the Florida Deceptive and Unfair Trade Practices Act § 501.201, et seq., Fla. Stat. ("FDUTPA").

Count (3) Declaratory and Injunctive relief under "FDUTPA".

Count (4) Breach of Contract/Good Faith and Fair Dealing.

Count (5) Unjust Enrichment,

and

Count (6) Pure Bill of Discovery.

Counts 1, 2, and 4 are based on allegations that AT&T charged Plaintiff a "bogus" Administrative Fee and "throttled" Plaintiff's unlimited data account and Counts 3 and 5 are based on the

1

Administrative Fee alone. Count 6 alleges that AT&T may have provided Plaintiff's geolocation data to third-party aggregators and location-based service providers without Plaintiff's consent.

While the Amended Complaint specifically references, incorporates, and quotes from the Wireless Customer Agreement, AT&T's website, and AT&T billing statements as the bases for Plaintiff's claims, none of those documents are attached to the Complaint despite being produced to Plaintiff by AT&T in April 2020. (Am. Compl. ¶¶ 23-24, 41, 51, 53-54, 57, 78-80 (Agreement); ¶¶ 44, 60, 78, 84 (AT&T's website), ¶¶ 27, 31, 44, 60 (billing statements)).

AT&T filed a Motion to Dismiss ("Motion") on October 10, 2022, attaching copies of the Wireless Customer Agreement alongside Plaintiff's signatures to its Motion to Dismiss as Exhibit 3. These documents were produced to Plaintiff in April 2020. AT&T noted that Plaintiff's Amended Complaint is almost entirely composed of claims copy-and-pasted from other lawsuits and is identical to over one hundred other cases pending before courts in this jurisdiction filed by counsel for Plaintiff. None of the allegations in the Amended Complaint allege facts specific to Plaintiff. Plaintiff responded to AT&T's Motion on October 31, 2022, and the Court heard the Motion on November 4, 2022, and November 10, 2022. The Court grants the Motion to Dismiss as to Counts 3, 5 & 6 with prejudice and Counts 1, 2 & 4 without prejudice for the following reasons.

## II.    Motion to Dismiss Standard

The standard for determining whether a motion to dismiss should be granted is whether, based on the well-pleaded allegations and incorporated attachments, the movant is entitled to judgment as a matter of law. Golden Gate Homes, LC v. Levey, 59 So. 3d 275, 280 (Fla. 3d DCA 2011). In cases where it is apparent that a pleading cannot be amended to state a cause of action, or where an amendment would be futile, dismissal with prejudice is appropriate. Central Florida Investments, Inc. v. Charles Levin Timeshares, 659 So. 2d 492 (Fla. 5th DCA 1995).

"As a general rule, when considering a motion to dismiss, a trial court is limited to the allegations within the four corners of the complaint and any attachments. However, there are several exceptions to this general rule." Steiner Transocean Ltd. v. Efremova, 109 So. 3d 871, 873 (Fla. 3d DCA 2013). One of these exceptions to the four-corner rule is the incorporation by reference doctrine, stating that "[w]hen a party refers to a document in the complaint, the trial court may use that document to assess the nature of the claims alleged in the complaint." Glen Garron, LLC v. Buchwald, 210 So. 3d 229, 233 (Fla. 5th DCA 2017)[1]; see also Brodeur v.

---

[1] While Buchwald involved a motion for judgment on the pleadings, "a motion for judgment on the pleadings is governed by the same legal test as a motion to dismiss for failure to state a cause of action" Urribari v. 52 SW 5th CT WHSE, LLC, 266 So.3d 1257, 1262 (Fla. 4th DCA 2019)

Miami-Dade Cnty., 81 So. 3d 491, 492 n.1. (Fla. 3d DCA 2012) ("Ordinarily the trial court's determination, and our review, of a motion to dismiss are confined to the face of the complaint and those documents referred to within the complaint.") (emphasis added); One Call Prop. Servs., Inc. v. Security First Ins. Co., 165 So. 3d 749, 752 (Fla. 4th DCA 2015) ("[W]here the terms of a legal document are impliedly incorporated by reference into the complaint, the trial court may consider the contents of the document in ruling on a motion to dismiss."). Where an exhibit attached to a complaint contradicts the allegations in the complaint, the exhibits control and may form the basis for a motion to dismiss. See Fladell v. Palm Beach Cty. Canvassing Bd., 772 So. 2d 1240, 1242 (Fla. 2000).

Here, the Amended Complaint specifically references, incorporates, and quotes from the Wireless Customer Agreement, AT&T's website, and AT&T billing statements as the bases for Plaintiff's claims. (Am. Compl. ¶¶ 23-24, 41, 51, 53-54, 57, 78-80 (Agreement); ¶¶ 44, 60, 78, 84 (AT&T's website), ¶¶ 27, 31, 44, 60 (billing statements)).

Under Florida Rule of Civil Procedure 1.130(a), Plaintiff had the duty to attach or incorporate the underlying Agreement, billing statements, and website language onto its complaint. Fla. R. Civ. P. 1.130(a) ("All . . . contracts, accounts, or documents on which action may be brought [or copies of their material portions] . . . must be incorporated in or attached to the pleading."). Plaintiff contends that it did not attach the Agreement because "it is under the exclusive control of AT&T," Am. Compl. ¶¶ 41 and 53[2]. Thus, Plaintiff apparently filed this lawsuit alleging, among other things, that "AT&T has breached the express terms of the wireless agreement" without knowing what the Agreement says.

AT&T's Motion to Dismiss attaches copies of Wireless Customer Agreement alongside Plaintiff's signatures, a portion of the AT&T website defining the Administrative Fee, and a recent AT&T billing statement. See Def.'s Mot. to Dismiss Exs. 3-5. Because the Amended Complaint specifically references, incorporates, and quotes from these documents, AT&T argued that they are within the four corners of the Amended Complaint and can be considered by the Court in ruling on the underlying motion. See Buchwald, 210 So. 3d at 233 ("When a party refers to a document in the complaint, the trial court may use that document to assess the nature of the claims alleged in the complaint"); Von Dyck v. Gavin, 350 So. 3d 842, 844–45 (Fla. 1st DCA 2022) ("We also note that the trial court did not err when it considered the APA when analyzing the merits of Appellees' motion to dismiss . . . .The APA was not attached to the complaint but numerous references were made to the APA in the complaint, and Appellant raised the APA as the basis for one of its arguments.").

---

[2] Plaintiff's counsel has previously abandoned this assertion in a similar hearing in front of Judge Lehr, where it was undisputed that the Agreement is available on AT&T's website. See AT&T's Mot. Dismiss Hr'g Tr., 28:24-25; 49:18-20; 50:15-16, Ann Green v. AT&T Mobility, Case No. 2019-16864-SP-23 (July 22, 2020).

At the hearing, however, Plaintiff argued that AT&T had the burden to prove up the documents (which the Plaintiff failed to attach to the Amended Complaint) and took the position that AT&T was required to authenticate the Agreement before this Court could consider it. The Court does not find Plaintiff's arguments persuasive. The Court could not consider any such "authentication" via affidavit as Plaintiff suggests at this stage of the proceedings[3]. Requiring AT&T to cure Plaintiff's deficiency under heightened evidentiary requirements would not only ignore Rule 1.130(a), but do away with the incorporation by reference doctrine, and turn this Motion to Dismiss into a summary judgment motion. No legal authority supporting such a proposition has been cited or provided to the Court. The federal and summary judgment cases upon which Plaintiff relies do not apply here. Plaintiff's attempt to base their claims on the express language of the Agreement—while precluding consideration of that same Agreement at this stage of the proceedings—would cause unnecessary delay, require needless discovery, and is not well taken[4].

A court's duty to accept the facts in the complaint as true does not require the court to ignore specific factual details of the pleading in favor of general or conclusory allegations. Griffin Indus. v. Irvin, 496 F.3d 1189 (11th Cir. 2007). Thus, this Court does not find merit in Plaintiff's assertion that AT&T must authenticate the Agreement for this Court to properly consider it when Plaintiff incorporated the Agreement by reference.

Because the Amended Complaint specifically references, incorporates, and quotes from these documents, they are within the four corners of the Amended Complaint and will be considered by the Court in ruling on the underlying motion. See Buchwald, 210 So. 3d at 233; One Call Prop. Servs., Inc., 165 So. 3d at 752.

III. Counts 1-5

Plaintiff's claims for fraud, FDUTPA damages, FDUTPA declaratory and injunctive relief, good faith and fair dealing, and unjust enrichment are based upon two separate factual theories: "bogus" administrative fees and "throttling," the practice of slowing data speeds when mobile phone users meet certain data usage thresholds. Most of these claims are ripe for dismissal

---

[3] ] In addition, AT&T filed copies of the WCA authenticated by declaration to its § 57.105 Sanctions Motion for Raising a Legally Deficient "Administrative Fee" Claim filed February 5, 2021. See D.E. 92

[4] Further, Plaintiff does not contest the veracity or accuracy of the exhibits. And the Amended Complaint does not rely on any specific version of the Wireless Customer Agreement, but hinges on the more general proposition that "AT&T MOBILITY, LLC's wireless customer agreements do not state that an unlimited mobile data plan customer's use of more than a specified amount of data is a prohibited activity." Am. Compl. ¶ 23.

4

because they are facially negated by documents relied on and incorporated into the Amended Complaint and contain other pleading deficiencies and errors of law, some of which cannot be cured through amendment.

In Florida, "[a] party cannot recover for alleged false misrepresentations that are adequately dealt with or expressly contradicted in a later written contract." TRG Night Hawk Ltd. v. Registry Dev. Corp., 17 So. 3d 782, 784 (Fla. 2d DCA 2009); see also GVK Int'l Bus. Grp., Inc. v. Levkovitz, No. 3D19- 1119, 2020 WL 4197407, at *2 (Fla. 3d DCA July 22, 2020); Taylor Woodrow Homes Fla., Inc. v. 4/46-A Corp., 850 So. 2d 536, 542 (Fla. 5th DCA 2003). "To hold otherwise is to invite contracting parties to make agreements of the kind in suit and then avoid them by simply taking the stand and swearing that they relied on some other statement." TRG Night Hawk Ltd., 17 So. 3d at 784.

A.      Plaintiff's Administrative Fee allegations in Counts 1-5.

Plaintiff alleges that AT&T has wrongfully charged a $1.99 monthly Administrative Fee. Plaintiff asserts that the fee is "bogus" for three reasons: (1) AT&T failed to adequately disclose the existence of the Administrative Fee; (2) the Administrative Fee is deceptively defined and applied; and, (3) the Administrative Fee is an illegal "pass-through" fee.

AT&T counters that these allegations are belied by the Amended Complaint and the documents it is based on. The Court finds AT&T's arguments persuasive. Plaintiff pursued this lawsuit without ever consulting the Agreement upon which the allegations are based. Had Plaintiff conducted such a review, it would have been clear that the Agreement, website, and billing statements facially negate Plaintiff's allegations.

1.      Disclosure of the Administrative Fee.

Plaintiff alleges that AT&T did not adequately disclose the existence of the Administrative Fee when they signed up for AT&T's services and thereafter tried to conceal the fee by burying the line-item charge in the billing statement. Am. Compl. ¶¶ 27-28. In response, AT&T argues that the Wireless Customer Agreement, website and billing statements expressly disclose the administrative fee and AT&T's right to make changes to charges billed to customers[5]. For example, section 1.4 of the Agreement states: "Charges include, without limitation, airtime, roaming, recurring monthly service, activation, administrative, and late payment charges . . .

---

[5]As noted, Plaintiff takes no issue with the authenticity of AT&T's website or billing statements introduced into the record by AT&T, and this Court finds Plaintiff incorporated them by reference in the Amended Complaint. See, e.g., Am. Compl. ¶¶ 27, 31, 44, 60, 78, 84.

5

whether assessed directly upon you or upon AT&T." Mot. to Dismiss, Ex. 3 § 1.4. The Wireless Customer Agreement also reserves the right for AT&T to "make changes to this Agreement" which can include "charges." Id. § 1.3.

The AT&T website, quoted by Plaintiff in the Amended Complaint, defines the Administrative Fee and further expressly states: "AT&T reserves the right to increase its fees or impose additional fees." Def.'s Mot. to Dismiss, Ex. 4. AT&T's billing statement also expressly discloses the existence of the Administrative Fee, with each billing statement providing the monthly amount as an independent line item. Def.'s Mot. to Dismiss, Ex. 5. The Wireless Customer Agreement, website, and billing statement (incorporated by reference into the Amended Complaint) refute and thereby negate the assertion that the Administrative Fee was not properly disclosed. Therefore, no claim can proceed on these allegations as a matter of law.

2.    How the Administrative Fee is used and increased.

Plaintiff next alleges that AT&T is telling the consumer one thing but doing another.  Quoting AT&T's website, Plaintiff alleged:

AT&T's representation that the Administrative Fee is a charge assessed by AT&T that helps defray a portion of certain expenses AT&T incurs, including but not limited to: (a) charges AT&T or its agents pay to interconnect with other carriers to deliver calls from AT&T customers to their customers; and (b) charges associated with cell site rents and maintenance are false.

Am. Compl. ¶ 78; see also ¶¶ 44, 60, 84. According to Plaintiff, the Administrative Fee is not tied to either interconnect or cell site charges because AT&T has increased the fee even though these costs have allegedly decreased. Id. ¶¶ 29-32. Based on this assertion, Plaintiff theorizes that the Administrative Fee is part of "a scheme to funnel direct profit to AT&T rather than pay for any identifiable increase in costs." Id. ¶ 60.

First, the Court rejects any suggestion that AT&T's charging of an Administrative Fee is per se deceptive as the term "administrative fee" by itself does not suggest that AT&T will apply the Administrative Fee in any particular way. See Maor v. Dollar Thrifty Auto. Grp., Inc., No. 15-22959-CIV, 2018 WL 4698512, at *4 (S.D. Fla. Sept. 30, 2018) ("Solely using the term 'administrative fee,' without more, does not restrict how the fee may be used or represent any purpose or nature behind the fee."); Berry v. Budget Rent A Car Systems Inc., 497 F. Supp. 2d 1361, 1367 (S.D. Fla. 2007) (dismissing FDUTPA claim with prejudice, explaining "the simple fact" that defendant itemized a "cost recovery fee" as a separate charge is not unfair or deceptive).

Second, while Plaintiff alleges that AT&T does not actually use the Administrative Fee to offset interconnect costs, cell site rents and/or maintenance charges, which he alleges is deceptive to consumers, the definition provided by the Plaintiff does not limit AT&T to only offsetting those two specific cost categories. Instead, it states that AT&T may defray a portion of certain expenses "including but not limited to" charges for interconnection and for cell site rents and maintenance. Am. Compl. ¶¶ 44, 60, 78, 84. And, inclusion of the phrase "including but not limited to" is not in and of itself unfair and deceptive. Therefore, taking Plaintiff's allegations as true, interconnect costs, cell site rents and/or maintenance charges serve as examples of and not limitations to how AT&T can apply the Administrative Fee, meaning AT&T's alleged use of the fee to offset other expenses and costs would still comply with the fee's definition and cannot be considered deceptive, unfair, false, or a violation of the parties' agreement.

Finally, despite Plaintiff counsel's repeated argument during the hearing that the Administrative Fee was disclosed to customers as being tied to increases in a specific set of expense categories, the Amended Complaint and the website language contain no reference to "increases," and Plaintiff has not alleged any instances where AT&T made such statements. Instead, AT&T merely stated that the Administrative Fees would "help[] defray a portion of certain expenses AT&T incurs." Plaintiff has not alleged or identified any representation by AT&T that the Administrative Fee has always offset the exact same percentage of its expenses, or that the fee will increase or decrease solely based on increases or decreases to its interconnection or cell site rents and maintenance costs. Accordingly, because no reasonable consumer could interpret the Administrative Fee, its definition, or its application as deceptive, unfair, or based on a misrepresentation, Plaintiff's FDUTPA and fraud claims on this allegation necessarily fail. See Day v. Sarasota Doctors Hosp., Inc., No. 19-01522, 2021 WL 288969, at *4 (M.D. Fla. Jan. 28, 2021) (finding FDUTPA claim failed where "no reasonable consumer could be deceived by the [Defendant's conduct or the parties' contract] under the circumstances alleged . . .").

Therefore, applying the law to the undisputed facts of this case, based on the website and contract language relied on by Plaintiff, no amount of discovery will enable Plaintiff to state a cause of action related to how AT&T defines, uses, or increases the Administrative Fee, and no claim can proceed on these allegations as a matter of law.

3.      The Administrative Fee is not a pass-through fee.

Finally, Plaintiff alleges that the Administrative Fee is a "textbook pass through fee" as "it is not what its being used for despite its definition in the wireless agreement." Am. Compl. ¶ 86. Florida law is clear that an impermissible "pass-through" fee is one that purports to be collected for payment to a third party, but in reality the company is keeping the fee for itself.  See Latman v. Costa Cruise Lines, N.V., 758 So. 2d 699, 703 (Fla. 3d DCA 2000) (finding that use of the term "port charge" misrepresents to a reasonable consumer that it is a "pass-through" charge which the cruise line will pay to the relevant port authorities).

Here, there is no allegation that AT&T ever represented or suggested the Administrative Fee would be paid to anyone other than AT&T; therefore, the Court finds that Plaintiff has not and cannot allege that the Administrative Fee is a pass-through fee and no claim can proceed on these allegations. See Vorst v. TBC Retail Grp., Inc., No. 12-CV-80013, 2012 WL 13026643, at *2 (S.D. Fla. Apr. 12, 2012) (dismissing FDUTPA pass-through claim based on the finding that "Plaintiff's conclusory allegations that the oil disposal fee was represented as a pure pass-through expense and that Defendant retains the fee as a profit are insufficient."); see also Maor, 2018 WL 4698512, at *5 ("Plaintiff has not identified any provisions in the rental contract, and this Court has found none, which constitute a representation to a reasonable consumer that the 'administrative fee' was a pass-through charge which Defendants would pay to others."); Berry, 497 F. Supp. 2d at 1367 (finding that the term "cost recovery fee" is not a pass-through fee as "itself implies that the company will keep the money collected as 'recovery' for its costs.").

In any event, as previously found, the website's definition of the Administrative Fee does not limit how it may be applied or what costs it can be used to offset. Id. ¶¶ 44, 60, 78, 84.

The Court does not find the cases relied on by Plaintiff in support of their administrative fee claims persuasive. In Calderon v. Sixt Rent a Car, LLC, No. 19-CV-62408, 2020 WL 700381, at *7 (S.D. Fla. Feb. 12, 2020), the defendant was alleged to have deceived their customers by incorporating the terms of a separate agreement that contained undisclosed, and allegedly fraudulent, charges. Id. at *4 ("That Sixt's employee did not provide Calderon or Marin the Rental Jacket prior to them agreeing to its terms is not insignificant."). That is a far cry from the case at hand, especially given Plaintiff's tacit admission that the Administrative Fee is disclosed on the website and the monthly billing statement.

Similarly, Deere Constr., LLC v. Cemex Constr. Materials Florida, LLC, 198 F.Supp.3d 1332 (S.D. Fla. 2016) involved a failure to disclose an environmental charge that defendant represented was derived and directly tied to the Federal Energy Information Administration's weekly reporting of diesel fuel pricing. Id. at 1334. Again, because Plaintiff admits that the Administrative Fee was disclosed and its definition does not directly tie the fee to the rise or fall of AT&T's interconnection and cell site costs, Deere is inapplicable to the facts at hand.

Accordingly, because Plaintiff's Administrative Fee-based claims for fraud, FDUTPA damages, good faith and fair dealing, and unjust enrichment are premised on inaccuracies, misrepresentations, breaches, and deceptive or unfair trade practices that are refuted by the contracts they rely upon, they fail as a matter of law. Ginsberg, 645 So. 2d at 494; TRG Night Hawk Ltd., 17 So. 3d at 784.

B.    Plaintiff's "throttling" allegations in Counts 1, 2, and 4.

The remainder of Plaintiff's claims for fraud, FDUTPA damages, and good faith and fair dealing are based on allegations pertaining to network management practices designed to remedy network congestion caused by individual consumers who use exponentially more data than others. Plaintiff complains that even though they had an unlimited data plan, AT&T "throttled"

(or slowed down) their data speeds after they used a certain amount of data during a monthly billing cycle. Am. Compl. ¶¶ 18-19, 23.

AT&T went into great detail to inform this Court that the Wireless Consumer Agreement shows, the term "unlimited" refers to the amount of data, not the speed of that data and that Plaintiff's alleged belief that "unlimited" refers to both the amount and speed of the data is wrong. AT&T did an extensive comparison between what the Plaintiff alleges and what the agreement actually says however the essence and substance of Plaintiff's claim as alleged in the amended complaint for FDUTPA violation against AT&T is different. Plaintiff claims that AT&T purportedly promised "unlimited data" but by throttling Plaintiff's data to the point where it was non-usable, violated the FDUPTA because "unlimited" didn't truly mean, "unlimited".  Plaintiff also alleged that "AT&T possesses internal focus group research indicating that its throttling program was inconsistent with consumer understanding of an "unlimited" data plan." Plaintiff alleged that "AT&T's wireless customer agreements do not state that an unlimited mobile data plan customer's use of more than a specified amount of data is a prohibited activity. Nor do the agreements provide that AT&T may modify, diminish, or impair the service of unlimited mobile data plan customers engaged in permissible activities if these customers use more than a specified amount of data." Plaintiff also alleges that "AT&T imposed significant data speed restrictions on Plaintiff by virtue of its use of its network which flows through the United States and in particular, Florida. This practice was and is an unfair and deceptive trade practice. Where the FTC has already found "data throttling" a violation of the FTC, the Court must by law consider such a finding in construing whether data throttling is a violation of FDUTPA. Fla. Stat. Sec. 501.204(2) states:

> It is the intent of the Legislature that, in construing subsection (1), due consideration and great weight shall be given to the interpretations of the Federal Trade Commission and the federal courts relating to s. 5(a)(1) of the Federal Trade Commission Act, 15 U.S.C. s. 45(a)(1) as of July 1, 2017.

See Sec. 501.204(2), Fla. Stat. (emphasis added).

Slowing one's data speed to the point of limiting access to using data is not providing unlimited data, even when AT&T argues unlimited refers to "amount" of data and not "Speed" of Data. Furthermore, there is no clear definition of "prohibited activity" despite what is stated in the Wireless Consumer agreement. Based on the above arguments, this Court finds that Plaintiff has pled specifically the element of an unfair and deceptive practice required for a FDUTPA claim with respect to data throttling.

We now analyze the individual Counts to see the effect (if any) the "Throttling" allegation has on all 6 counts.

Count 1 - Fraud

Even though this Court finds that AT&T May have throttled Plaintiff's unlimited data account, Plaintiff's Fraud Claim (COUNT 1) still Fails as currently pled.

9

In Florida, a plaintiff must plead fraud by alleging that the defendant: 1) misrepresented a material fact, 2) knew or should have known of the falsity of the statement, 3) intended that the misrepresentation would induce Plaintiff to rely and act on it, and 4) that Plaintiff suffered injury in justifiable reliance on the misrepresentation. Witt v. La Gorce Country Club, Inc., 35 So. 3d 1033, 1040 (Fla. 3d DCA 2010). In Florida, claimants must plead fraud (or fraudulent inducement) with particularity, as required by Rule 1.120(b). See Fla. R. Civ. P. 1.120(b) ("[A]ll averments of fraud . . . shall be stated with such particularity as the circumstances may permit."); Cedars Healthcare Grp., Ltd. v. Mehta, 16 So. 3d 914, 917 (Fla. 3d DCA 2009).

AT&T argues that Counts 1-5 all sound in fraud[6] Plaintiff has failed to satisfy this pleading standard in this case.  Plaintiff contends that they pled their claims to the best of their ability as circumstances may permit and argues that they cannot allege specifics because "Plaintiff is not in possession of the specific digital advertisements and contracts issued by AT&T." Response at ¶ 68. The Court finds this argument unpersuasive. Plaintiff does not dispute that the Wireless Customer Agreement is on AT&T's website. And Plaintiff is undisputedly familiar with the AT&T website, as they rely on it in their Amended Complaint. Am. Compl. ¶¶ 44, 60, 78, 84.

Nevertheless, even though Plaintiff alleged the first element—that AT&T misrepresented and/or omitted facts relating to the potential for data speed reductions, Plaintiff failed to plead the other four elements with specificity. The Amended Complaint fails to provide a single detail regarding Plaintiff's own interactions with AT&T, or the time, place, and manner of how they were deceived. There is no particularly pled assertion explaining where, when, what, and how these misrepresentations or omissions were material to *Plaintiff's* decision to do business with AT&T, that *they* relied on them, or that *they* proximately caused *their* damages. Plaintiff merely recites the last element of fraud, alleging: "Plaintiff relied on AT&T's representations regarding providing unlimited data, and, as a result, incurred damages and was injured as a result of the fraud by omission." Am. Compl. ¶ 43. Plaintiff does not even attempt to allege that their reliance was justified.  They do not point to a single date to show when their data speed was reduced, if any. Nor do they explain how such a temporary speed reduction caused them harm or allege what measure of actual damages they incurred for any given month of service. This is the kind of information that would have been at Plaintiff's disposal; no "circumstances" prevented Plaintiff from alleging such facts if they existed. Conclusory assertions disguised as fact do not meet the high standard required by Rule 1.120(b). See Williams v. Burger King Corp., No. 19-24755, 2020 WL 5083550, at *3 (S.D. Fla. July 20, 2020) (dismissing the complaint because it "fails to provide any more specific details regarding the preparation of the 'Impossible Whopper'"); Myers v. Myers, 652 So. 2d 1214, 1215 (Fla. 5th DCA 1995) ("Allegations contained in a pleading are insufficient if they are too general, vague or conclusory.").

---

[6] Claims 1-5 incorporate the same factual basis of Plaintiff's fraud claim (paragraphs 1-38) and all claims allege that AT&T knowingly, intentionally and fraudulently deceived the Plaintiff regarding AT&T's Administrative Fee, purported data "throttling," and Privacy Policy. See, e.g., Am. Compl. ¶ 24 (alleging that AT&T's unlimited plan was "a bait-and-switch scam"), id. (alleging that AT&T "covertly increases the actual price" of its services by "padding all post-paid wireless customers' bills" with a "bogus" administrative fee), ¶ 25 (alleging the Administrative Fee "is never adequately and honestly disclosed"), ¶ 27 (alleging that AT&T "deliberately hides" the Administrative Fee), ¶ 61 (alleging that AT&T "knew" the Administrative Fee was inflated).

For these reasons, Plaintiff fails to plead the fraud claims with particularity as is required by Florida law. See Fla. R. Civ. P. 1.120(b); Mehta, 16 So. 3d at 917 (requiring claims sounding in fraud "be pled with particularity and must specifically identify misrepresentations or omissions of fact, as well as time, place or manner in which they were made.") (emphasis added). Accordingly, the Court finds that Plaintiff's fraud claim, requires dismissal without prejudice.

Count 2 – Damages under FDUTPA

Even though Plaintiff has sufficiently pled a deceptive or unfair act or practice, Plaintiff still failed to sufficiently allege causation and actual damages. This is so under ordinary and heightened pleading standards. As Judge Lody Jean ruled in another case filed by Plaintiff's counsel against AT&T, "Plaintiff has pled a FDUTPA claim as a personal tort sounding in fraud" and, "[w]here the 'gravamen of the claim sounds in fraud' it is subject to the rules governing a fraud claim." Order Granting AT&T's Motion for Final Summary Judgment, Claims Holding Group, LLC v. AT&T Mobility, Case No: 2020-000024-SP-05 (July 22, 2020)[7]. Plaintiff failed to plead with particularity when or how a short data speed reduction caused harm to Plaintiff personally, or what kind of actual damages they incurred as a result of this practice.

"[I]t is well recognized in this state that a claim for damages under FDUTPA has three elements: (1) a deceptive act or unfair practice; (2) causation; and (3) actual damages." Kia Motors Am. Corp. v. Butler, 985 So. 2d 1133, 1140 (Fla. 3d DCA 2008).

The Court finds that the Plaintiff has established a deceptive act or unfair practice with respect to Data throttling however the other 2 elements are lacking.  Based on the above, the Court finds Plaintiff's FDUTPA claim (Count 2) does not sufficiently maintain a cause of action and therefore this count still requires dismissal without prejudice.

Count 3 – Declaratory and Injunctive relief under "FDUTPA"

To state a claim for injunctive or declaratory relief under FDUTPA, a plaintiff "must show (1) that it is aggrieved, in that its rights have been, are being, or will be adversely affected, by (2) a violation of FDUTPA, meaning an unfair or deceptive practice which is injurious to consumers." Stewart Agency, Inc. v. Arrigo Enterprises, Inc., 266 So. 3d 207, 214 (Fla. 4th DCA 2019). Plaintiff alleges that AT&T caused them damages through its "Bogus" Administrative Fee, which he again describes as "a textbook pass-through fee." Am. Compl. ¶ 86. However as discussed above this Court does not find the Administrative Fee as Bogus or a pass-through fee or a fee

---

[7] Citing Librizzi v. Ocwen Loan Servicing, LLC, 120 F. Supp. 3d 1368, 1381 (S.D. Fla. 2015) (Bloom, J.) (finding that FDUTPA claims must be pled with particularity where plaintiff alleged defendant caused damages through deception); Mehta, 16 So. 3d at 917; USA Nutraceuticals Grp., Inc. v. BPI Sports, LLC, No. 15-CIV-80352, 2016 WL 4254257, at *3 (S.D. Fla. Feb. 16, 2016) ("[C]ourts regularly apply Rule 9(b) to FDUTPA claims, as such claims uniquely sound in both tort and fraud.").

based on any misrepresentation. Therefore, the Court does not find that this count can be cured through any amendment and therefore this count requires **dismissal with prejudice**.

Count 4 – Breach of contract/ Good Faith and Fair Dealing.

In support of the good faith and fair dealing claim, Plaintiff alleges that AT&T breached unspecified provisions of the Wireless Customer Agreement and acted in a commercially unreasonable manner by throttling Plaintiff's data and charging the "bogus" Administrative Fee. Am. Compl. ¶ 79 ("The express terms of the wireless agreement required AT&T to provide unlimited data and true administrative costs as defined by the contract."); see also ¶¶ 78-81. Florida law recognizes the implied covenant of good faith and fair dealing in every contract, with two limitations:

> First, the implied covenant of good faith should not be invoked to override the express terms of the agreement between the parties.

> Second, a claim for breach of the implied covenant of good faith and fair dealing cannot be maintained under Florida law absent an allegation that an express term of the contract has been breached.

Ins. Concepts & Design, Inc. v. Healthplan Servs., Inc., 785 So. 2d 1232, 1234 (Fla. 4th DCA 2001).

First, Plaintiff's breach allegation is not tied to any particular provision in the Agreement. Am. Compl. ¶ 80 (alleging "AT&T breached the express terms of the wireless agreement by failing to provide unlimited data" with nothing more).

Also, Plaintiff's good faith and fair dealing claim is not substantively distinguishable from the fraud claim. See Am. Compl. ¶ 77 (alleging false statements of material fact as basis for breach of the duty of good faith and fair dealing). The problems with this claim become even more troublesome under the heightened pleading standard that applies to claims that sound in fraud.

Accordingly, the Court therefore finds that Plaintiff's good faith and fair dealing claim requires dismissal without prejudice with leave to amend to identify the express term(s) of the Agreement alleged to have been breached.

Count 5 - Unjust Enrichment

Even though Plaintiff has indicated that this claim is pled in the alternative, it still as to be examined as a separate and distinct cause of action.

"The elements of a cause of action for unjust enrichment are: (1) plaintiff has conferred a benefit on the defendant, who has knowledge thereof; (2) defendant voluntarily accepts and retains the benefit conferred; and (3) the circumstances are such that it would be inequitable for the defendant to retain the benefit without first paying the value thereof to the plaintiff." Duty Free

World, Inc. v. Miami Perfume Junction, Inc., 253 So. 3d 689, 693 (Fla. 3d DCA 2018). "Florida law is clear that 'a plaintiff cannot pursue a quasi-contract claim for unjust enrichment if an express contract exists concerning the same subject matter.'" Sterling Breeze Owners' Ass'n, Inc. v. New Sterling Resorts, LLC, 255 So. 3d 434, 437 (Fla. 1st DCA 2018), reh'g denied (Oct. 16, 2018). A contract implied in law or "quasi contract" operates where there is no contract "to provide a remedy where one party was unjustly enriched, where that party received a benefit under circumstances that made it unjust to retain it without giving compensation." Commerce P'ship. 8098 Ltd P'ship v. Equity Contracting Co., Inc., 695 So.2d383, 386 (Fla. 4th DCA 1997). That is definitely not the case here. Plaintiff has acknowledged the existence of a contract between the parties that governs the subject matter of this lawsuit, thus barring Plaintiff's quasi-contract claim for unjust enrichment. New Sterling Resorts, LLC, 255 So. 3d at 437. The fact that Plaintiff chose not to incorporate the paragraphs acknowledging the existence of the Wireless Customer Agreement into the unjust enrichment count does not save the claim as this Court does not have to accept as true or even consider "internally inconsistent factual claims." Gallego v. Wells Fargo Bank, N.A., 276 So. 3d 989, 990 (Fla. 3d DCA 2019).

Furthermore, Like Counts 1-4, Plaintiff's claim of unjust enrichment hinges on their assertion that the administrative fee is deceptive—an assertion that, as discussed in detail above, is directly contradicted by both the Wireless Customer Agreement and AT&T's website. Additionally, while the claim sounds in fraud, it is not pleaded with specificity as is required by Florida law. See Fla. R. Civ. P. 1.110(b); Mehta, 16 So. 3d at 917.

Plaintiff's unjust enrichment claim cannot be cured though amendment, requiring that it be dismissed with prejudice. In cases where it is apparent that a pleading cannot be amended to state a cause of action, or where an amendment would be futile, dismissal with prejudice is appropriate. Central Florida Investments, Inc v. Charles Levin Timeshares, 659 So.2d 492 (Fla. 5th DCA 1995)


Count 6 – True bill of Discovery

Plaintiff's final claim for a pure bill of discovery is based on Plaintiff's "belie[f]" that AT&T provided Plaintiff's geolocation data to unauthorized persons without Plaintiff's consent. Am. Compl. ¶ 133. The Amended Complaint provides a long history regarding AT&T collecting customer geolocation data and then disseminating it to third-party data aggregators and location-based service (LBS) providers, which Plaintiff alleges is in direct violation of both AT&T's privacy policy and the Telecommunications Act. Id. ¶¶ 92-98.

Florida law is clear that a pure bill of discovery claim justified only under "narrow and limited circumstances." Venezia Lakes Homeowners Ass'n, Inc. v. Precious Homes at Twin Lakes Prop. Owners Ass'n, Inc., 34 So. 3d 755, 756 (Fla. 3d DCA 2010); The Complaint for a Pure Bill of Discovery - A Living, Breathing, Modern Day Dinosaur, Florida Bar Journal, Volume 78, No. 3, March 2004. "[A] bill of discovery may not be used 'as a fishing expedition to see if causes of action exist.'" Venezia Lakes, 34 So. 3d at 758 (quoting Mendez, 700 So. 2d at 47)). "Nor is it available simply to obtain a preview of discovery obtainable once suit is filed." Id.; see RAV

<u>Bahamas Ltd. v. Marlin Three, LLC</u>, 333 So. 3d 1158, 1163 (Fla. 3d DCA 2022) (stating pure bill claims "may not be used, like here, 'as a fishing expedition to see if causes of action exist'").

Plaintiff's pure bill of discovery claim does not seek to identify potential defendants, but plainly states that the defendant has been identified— AT&T. Am. Compl. ¶ 134 ("There is no way for Plaintiff to determine whether AT&T MOBILITY, LLC violated its own privacy policy via its customer service line or any possibly application on its customer service website without filing this action.") Instead, as plainly stated by both the Amended Complaint, "Plaintiffs [sic] seeks a pure bill of discovery to determine if AT&T MOBILITY, LLC violated either Florida or Federal law." Id. at ¶ 135. (Emphasis added). This is exactly the type of "fishing expedition" that has been expressly disallowed by the Third DCA. See <u>Venezia Lakes,</u> 34 So. 3d at 758 ("[A] bill of discovery may not be used 'as a fishing expedition to see if causes of action exist.'") (Citation omitted).

Because Plaintiff's pure bill of discovery claim is an improper fishing expedition to determine if a cause of action exists against AT&T, it is hereby dismissed with prejudice.

IV.    Conclusion

After careful consideration, detailed analysis of the Motion, response to the motion and being fully advised in the premises, it is hereby:

ORDERED AND ADJUDGED

1. The Motion to dismiss Count One as to the allegation of AT&T charging a "Bogus" Administrative fee is GRANTED and  this is **Dismissed with prejudice**, while as to the allegation of AT&T Throttling Plaintiff's unlimited data account, this is dismissed with leave to amend within 20 days from the date of this order to show how the misrepresentation/misstatements induced this Plaintiff to rely and act on it and show how this Plaintiff suffered injury upon reliance on the misrepresentation/misstatements.
2. The Motion to Dismiss Count 2, Damages Under "FDUTPA" is also dismissed with leave to amend in 20 days to plead <u>with specificity</u> a proper cause of action showing AT&T's practice of Throttling is a violation of FDUTPA.
3. The Motion to Dismiss Counts 3 – Declaratory and injunctive relief under FDUTPA; 5 – Unjust Enrichment and Count 6 – Pure bill of discovery, are all **Dismissed with prejudice** for the reasons stated in the order above.
4. The Motion to Dismiss Count 4 – Breach of implied duty of good faith and fair dealing is dismissed with leave to amend within 20 days from the date of this order to identify the express term(s) of the Agreement alleged to have been breached only as to the "Throttling" allegation. As to the allegation regarding the "Bogus" Administrative fee, the Motion is GRANTED, and the Allegation is **Dismissed with Prejudice**.

14

DONE and ORDERED in Chambers at Miami-Dade County, Florida on this 1st day of May 2023.

Honorable Chiaka Ihekwaba
COUNTY COURT JUDGE

SIGNED AND DATED
MAY 1 - 2023
Judge Chiaka Ihekwaba

CC
Andrew Robert Ingalls, aingalls@daypitney.com
Andrew Robert Ingalls, brodriguez@daypitney.com
Evelyn Davila, edavila@daypitney.com
Jessica Solorzano, jsolorzano@daypitney.com
Manuel A. Garcia-Linares, mgarcialinares@daypitney.com
Manuel A. Garcia-Linares, brodriguez@daypitney.com
Maury L Udell, notice66@bmulaw.com
Rachel L. Kittl, rkittl@bmulaw.com

15

**IN THE COUNTY COURT OF THE ELEVENTH JUDICIAL
CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA**

CASE NO: <u>2019-011857-SP-26</u>
SECTION: <u>SD05</u>
JUDGE: <u>Michaelle Gonzalez-Paulson</u>

**Francisco Batista**

Plaintiff(s) / Petitioner(s)

vs.

**AT&T Mobility LLC**

Defendant(s) / Respondent(s)

_____/

<u>**ORDER GRANTING DEFENDANT'S MOTION TO DISMISS PLAINTIFF'S SECOND
AMENDED COMPLAINT**</u>

On April 28, 2022, this Court heard Defendant AT&T Mobility, LLC's *Motion to Dismiss Plaintiff's Second Amended Complaint*. After considering the motion, Plaintiff's response, the amended complaint, all relevant pleadings, the arguments of counsel, and being otherwise duly advised in the premises, the Court hereby **GRANTS** AT&T's Motion on all counts for the reasons set forth below.

**I. Background.**

Plaintiff filed an Amended Complaint on deemed filed on June 26, 2020, asserting six claims against AT&T: (1) fraud, (2) breach of implied duty of good faith and fair dealing, (3) damages under the Florida Deceptive and Unfair Trade Practices Act § 501.201, *et seq.*, Fla. Stat. ("FDUTPA"), (4) unjust enrichment, and (5) declaratory relief under FDUTPA, and (6) injunctive relief under FDUTPA. Counts 1-3 are based on allegations that AT&T charged Plaintiff a "bogus" Administrative Fee and "throttled" Plaintiff's unlimited data account and Count 4 is based on the Administrative Fee alone. Counts 5-6 allege that AT&T provided Plaintiff's geolocation data to third-party aggregators and location-based service providers without Plaintiff's

consent.

While the Amended Complaint specifically references, incorporates, and quotes from the Wireless Customer Agreement, AT&T's website, and AT&T billing statements as the bases for Plaintiff's claims, none of those documents are attached to the Complaint. (Am. Compl. ¶¶ 15, 18-19, 30, 47, 49-50, 53 (Agreement); ¶¶ 33, 56, 40, 64 (AT&T's website), ¶¶ 21, 22, 56 (billing statements)).

AT&T filed a Motion to Dismiss ("Motion") on July 1, 2020, attaching the Wireless Customer Agreement in effect at the time this case was filed to its Motion to Dismiss as Exhibit 1. AT&T noted that Plaintiff's Amended Complaint is almost entirely composed of claims copy-and-pasted from other lawsuits and is identical to over one hundred other cases pending before courts in this jurisdiction filed by counsel for Plaintiff. None of the allegations in the Amended Complaint allege facts specific to Plaintiff. Plaintiff responded to AT&T's Motion on April 22, 2022, and the Court heard the Motion on April 28, 2022. At the hearing, counsel for the Plaintiff voluntarily dismissed Counts 5 and 6. Transcript 24:17-19 ("Judge, I'll announce on these five that I'll withdraw the geolocation counts without prejudice"). The Court grants the Motion to Dismiss as to the remaining Count 1-4 for the following reasons.

## II.      Motion to Dismiss Standard

The standard for determining whether a motion to dismiss should be granted is whether, based on the well-pleaded allegations and incorporated attachments, the movant is entitled to judgment as a matter of law. *Golden Gate Homes, LC v. Levey*, 59 So. 3d 275, 280 (Fla. 3d DCA 2011). In cases where it is apparent that a pleading cannot be amended to state a cause of action, or where an amendment would be futile, dismissal *with prejudice* is appropriate. *Central Florida Investments, Inc. v. Charles Levin Timeshares*, 659 So. 2d 492 (Fla. 5th DCA 1995).

While the Court is generally limited to the complaint's four corners, it is required to

consider exhibits attached to and incorporated into the complaint. *Rolle v. Cold Stone Creamery, Inc*., 212 So. 3d 1073, 1076 (Fla. 3d DCA 2017). Moreover, when a party refers to a document in the complaint, the trial court may use that document to assess the nature of the claims alleged in the complaint. *Glen Garron, LLC v. Buchwald*, 210 So. 3d 229, 233 (Fla. 5th DCA 2017). Where an exhibit attached to a complaint contradicts the allegations in the complaint, the exhibits control and may form the basis for a motion to dismiss. *See Fladell v. Palm Beach Cty. Canvassing Bd*., 772 So. 2d 1240, 1242 (Fla. 2000).

Here, the Amended Complaint specifically references, incorporates, and quotes from the Wireless Customer Agreement, AT&T's website, and AT&T billing statements as the bases for Plaintiff's claims. (Am. Compl. ¶¶ 15, 18-19, 30, 47, 49-50, 53, 41-43 (Agreement); ¶¶ 33, 56, 40, 64 (AT&T's website), ¶¶ 21, 22, 56 (billing statements)). Under Florida Rule of Civil Procedure 1.130(a), Plaintiff had the duty to attach or incorporate the underlying Agreement, billing statements, and website language onto its complaint. Fla. R. Civ. P. 1.130(a) ("All . . . contracts, accounts, or documents on which action may be brought [or copies of their material portions] . . . must be incorporated in or attached to the pleading."). Plaintiff contends that it did not attach the Agreement because "it is under the exclusive control of AT&T," Am. Compl. ¶¶ 22 and 46.[1] Thus, Plaintiff apparently filed this lawsuit alleging, among other things, that "AT&T has breached the express terms of the wireless agreement" without knowing what the Agreement says.

AT&T's Motion to Dismiss attaches a copy of the Wireless Customer Agreement, a portion of the AT&T website defining the Administrative Fee, and a recent AT&T billing statement. *See* Def.'s Mot. to Dismiss Exs. 1-3. Because the Amended Complaint specifically references, incorporates, and quotes from these documents, AT&T argued that they are within the four corners of the Amended Complaint and can be considered by the Court in ruling on the underlying motion. *See Buchwald*, 210 So. 3d at 233 ("When a party refers to a document in the complaint, the trial court may use that document to assess the nature of the claims alleged in the complaint"); *One Call*

*Prop. Servs., Inc. v. Sec. First Ins. Co.*, 165 So. 3d 749, 752 (Fla. 4th DCA 2015) ("[W]here the terms of a legal document are impliedly incorporated by reference into the complaint, the trial court may consider the contents of the document in ruling on a motion to dismiss.").[2]

At the hearing, however, Plaintiff argued that AT&T had the burden to prove up the documents (which the Plaintiff failed to attach to the Amended Complaint), and took the position that AT&T was required to authenticate the Agreement before this Court could consider it. The Court does not find Plaintiff's arguments persuasive. The Court could not consider any such "authentication" via affidavit as Plaintiff suggests at this stage of the proceedings. Requiring AT&T to cure Plaintiff's deficiency under heightened evidentiary requirements would not only ignore Rule 1.130(a), but do away with the incorporation by reference doctrine, and turn this Motion to Dismiss into a summary judgment motion. No legal authority supporting such a proposition has been cited or provided to the Court. The federal and summary judgment cases upon which Plaintiff relies do not apply here. Plaintiff's attempt to base their claims on the express language of the Agreement—while precluding consideration of that same Agreement at this stage of the proceedings—would cause unnecessary delay, require needless discovery, and is not well taken.[3]

A court's duty to accept the facts in the complaint as true does not require the court to ignore specific factual details of the pleading in favor of general or conclusory allegations. *Griffin Indus. v. Irvin*, 496 F.3d 1189 (11th Cir. 2007). Thus, this Court does not find merit in Plaintiff's assertion that AT&T must authenticate the Agreement for this Court to properly consider it when Plaintiff incorporated the Agreement by reference. Because the Amended Complaint specifically references, incorporates, and quotes from these documents, they are within the four corners of the Amended Complaint and will be considered by the Court in ruling on the underlying motion. *See Buchwald*, 210 So. 3d at 233; *One Call Prop. Servs., Inc.*, 165 So. 3d at 752.

### III. Counts 1-4

Plaintiff's claims for fraud, FDUTPA damages, good faith and fair dealing, and unjust enrichment are based upon two separate factual theories: "bogus" administrative fees and "throttling," the alleged practice of slowing data speeds when mobile phone users meet certain data usage thresholds. These claims are ripe for dismissal because they are facially negated by documents relied on and incorporated into the Amended Complaint and contain other pleading deficiencies and errors of law that cannot be cured through amendment.

In Florida, "[a] party cannot recover for alleged false misrepresentations that are adequately dealt with or expressly contradicted in a later written contract." *TRG Night Hawk Ltd. v. Registry Dev. Corp.*, 17 So. 3d 782, 784 (Fla. 2d DCA 2009); *see also GVK Int'l Bus. Grp., Inc. v. Levkovitz*, No. 3D19- 1119, 2020 WL 4197407, at *2 (Fla. 3d DCA July 22, 2020); *Taylor Woodrow Homes Fla., Inc. v. 4/46-A Corp.*, 850 So. 2d 536, 542 (Fla. 5th DCA 2003). "To hold otherwise is to invite contracting parties to make agreements of the kind in suit and then avoid them by simply taking the stand and swearing that they relied on some other statement." *TRG Night Hawk Ltd.*, 17 So. 3d at 784. Moreover, "a party who signs a contract whose terms contradict the alleged misrepresentations on which he relied is barred 'from seeking relief pursuant to FDUTPA, as she acted unreasonably.'" *Id.* (citing *Rosa v. Amoco Oil Co*., 262 F. Supp. 2d 1364, 1368 (S.D. Fla. 2003)). In particular, with respect to FDUTPA claims, "[c]ourts routinely dismiss FDUTPA claims where those claims are directly and fully rebutted by express evidence in a governing written contract." *Sol. Z v. Alma Lasers, Inc*., No. 11-CV-21396-CIV, 2013 WL 12246356, at *5 (S.D. Fla. Jan. 22, 2013). And, as in this case, where a plaintiff alleges a FDUTPA action based on misrepresentation and "plaintiff relies on written statements that are expressly contradicted by a subsequent contract, the plaintiff's reliance on those statements is not reasonable as a matter of law for a FDUTPA claim." *Id*. At the pleading stage, "where the allegations of the complaint are contradicted by the exhibits, the plain meaning of the exhibits will control." *Ginsberg v. Lennar Fla. Holdings, Inc*., 645 So. 2d 490, 494 (Fla. 3d DCA 1994).

A.      **Plaintiff's Administrative Fee allegations in Counts 1-4.**

Plaintiff alleges that AT&T has wrongfully charged a $1.99 monthly Administrative Fee. Plaintiff asserts that the fee is "bogus" for three reasons: (1) AT&T failed to adequately disclose the existence of the Administrative Fee; (2) the Administrative Fee is deceptively defined and applied; and, (3) the Administrative Fee is an illegal "pass-through" fee.

AT&T counters that these allegations are belied by the Amended Complaint and the documents it is based on. The Court finds AT&T's arguments persuasive. Plaintiff pursued this lawsuit without ever consulting the Agreement upon which the allegations are based. Had Plaintiff conducted such a review, it would have been clear that the Agreement, website, and billing statements facially negate Plaintiff's allegations.

1.      **Disclosure of the Administrative Fee.**

Plaintiff alleges that AT&T did not adequately disclose the existence of the Administrative Fee when they signed up for AT&T's services and thereafter tried to conceal the fee by burying the line-item charge in the billing statement. Am. Compl. ¶¶ 20-21. In response, Defendant argues that the Wireless Customer Agreement, website and billing statements expressly disclose the administrative fee and AT&T's right to make changes to charges billed to customers.[4] For example, section 1.4 of the Agreement states: "Charges include, without limitation airtime, roaming, recurring monthly service, activation, **administrative**, and late payment charges . . . whether assessed directly upon you or upon AT&T." Mot. to Dismiss, Ex. 1 § 1.4. The Wireless Customer Agreement also reserves the right for AT&T to "make changes to this Agreement" which can include "charges." *Id.* § 1.3.

The AT&T website, quoted by Plaintiff in the Amended Complaint, defines the Administrative Fee and further expressly states: "AT&T reserves the right to increase its fees or impose additional fees." Def.'s Mot. to Dismiss, Ex. 2. AT&T's billing statement also expressly

discloses the existence of the Administrative Fee, with the billing statement providing the monthly amount. Def.'s Mot. to Dismiss, Ex. 3. The Wireless Customer Agreement, website, and billing statement (incorporated by reference into the Amended Complaint) refute and thereby negate the assertion that the Administrative Fee was not properly disclosed. Therefore, no claim can proceed on these allegations as a matter of law.

### 2. How the Administrative Fee is used and increased.

Plaintiff next alleges that AT&T is telling the consumer one thing but doing another. Quoting AT&T's website, Plaintiff alleged:

> AT&T's representation that the Administrative Fee is a charge assessed by AT&T that helps defray a portion of certain expenses AT&T incurs, including but not limited to: (a) charges AT&T or its agents pay to interconnect with other carriers to deliver calls from AT&T customers to their customers; and (b) charges associated with cell site rents and maintenance are false.

Am. Compl. ¶¶ 33, 56, 40, 64. According to Plaintiff, the Administrative Fee is not tied to either interconnect or cell site charges because AT&T has continuously increased the fee even though these costs have allegedly decreased. *Id.* ¶ 22. Based on this assertion, Plaintiff theorizes that the Administrative Fee is part of "a scheme to funnel direct profit to AT&T rather than pay for any identifiable increase in costs." Am. Compl. ¶ 56.

First, the Court rejects any suggestion that AT&T's charging of an Administrative Fee is *per se* deceptive as the term "administrative fee" by itself does not suggest that AT&T will apply the Administrative Fee in any particular way. *See Maor v. Dollar Thrifty Auto. Grp., Inc.*, No. 15-22959-CIV, 2018 WL 4698512, at *4 (S.D. Fla. Sept. 30, 2018) ("Solely using the term 'administrative fee,' without more, does not restrict how the fee may be used or represent any purpose or nature behind the fee."); *Berry v. Budget Rent A Car Systems Inc.*, 497 F. Supp. 2d 1361, 1367 (S.D. Fla. 2007) (dismissing FDUTPA claim with prejudice, explaining "the simple fact" that defendant itemized a "cost recovery fee" as a separate charge is not unfair or deceptive).

Second, while Plaintiff alleges that AT&T does not actually use the Administrative Fee to offset interconnect costs, cell site rents and/or maintenance charges which is deceptive to consumers, the definition provided by the Plaintiff does not limit AT&T to only offsetting those two specific cost categories. Instead, it states that AT&T may defray a portion of certain expenses "**including but not limited to**" charges for interconnection and for cell site rents and maintenance. Am. Compl. ¶¶ 33, 56, 40, 64. And, inclusion of the phrase "including but not limited to" is not in and of itself unfair and deceptive. Therefore, taking Plaintiff's allegations as true, interconnect costs, cell site rents and/or maintenance charges serve as examples of and not limitations to how AT&T can apply the Administrative Fee, meaning AT&T's alleged use of the fee to offset other expenses and costs would still comply with the fee's definition and cannot be considered deceptive, unfair, false, or a violation of the parties' agreement.

Finally, despite Plaintiff counsel's repeated argument during the hearing that the Administrative Fee was disclosed to customers as being tied to ***increases*** in a specific set of expense categories, the Amended Complaint and the website language contain no reference to "increases," and Plaintiff has not alleged any instances where AT&T made such statements. Instead, AT&T merely stated that the Administrative Fees would "help[] defray a portion of certain expenses AT&T incurs." Plaintiff has not alleged or identified any representation by AT&T that the Administrative Fee has always offset the exact same percentage of its expenses, or that the fee will increase or decrease solely based on increases or decreases to its interconnection or cell site rents and maintenance costs. Accordingly, because no reasonable consumer could interpret the Administrative Fee, its definition, or its application as deceptive, unfair, or based on a misrepresentation, Plaintiff's FDUTPA and fraud claims necessarily fail. *See Day v. Sarasota Doctors Hosp., Inc.*, No. 19-01522, 2021 WL 288969, at *4 (M.D. Fla. Jan. 28, 2021) (finding FDUTPA claim failed where "no reasonable consumer could be deceived by the [Defendant's conduct or the parties' contract] under the circumstances alleged . . .").

Therefore, applying the law to the undisputed facts of this case, based on the website and contract language relied on by Plaintiff, no amount of discovery will enable Plaintiff to state a cause of action related to how AT&T defines, uses, or increases the Administrative Fee, and no claim can proceed on these allegations as a matter of law.

       **3.**      **The Administrative Fee is not a pass-through fee.**

Finally, Plaintiff alleges that the Administrative Fee is a "textbook pass through fee" as "it is not what its being used for despite its definition in the wireless agreement." Am. Compl. ¶ 66. Florida law is clear that an impermissible "pass-through" fee is one that purports to be collected for payment to a third party, but in reality the company is keeping the fee for itself.  *See Latman v. Costa Cruise Lines, N.V.*, 758 So. 2d 699, 703 (Fla. 3d DCA 2000) (finding that use of the term "port charge" misrepresents to a reasonable consumer that it is a "pass-through" charge which the cruise line will pay to the relevant port authorities).

Here, there is no allegation that AT&T ever represented or suggested the Administrative Fee would be paid to anyone other than AT&T; therefore, the Court finds that Plaintiff has not and cannot allege that the Administrative Fee is a pass-through fee and no claim can proceed on these allegations. *See Vorst v. TBC Retail Grp., Inc.*, No. 12-CV-80013, 2012 WL 13026643, at *2 (S.D. Fla. Apr. 12, 2012) (dismissing FDUTPA pass-through claim based on the finding that "Plaintiff's conclusory allegations that the oil disposal fee was represented as a pure pass-through expense and that Defendant retains the fee as a profit are insufficient."); *see also Maor*, 2018 WL 4698512, at *5 ("Plaintiff has not identified any provisions in the rental contract, and this Court has found none, which constitute a representation to a reasonable consumer that the 'administrative fee' was a pass-through charge which Defendants would pay to others."); *Berry*, 497 F. Supp. 2d at 1367 (finding that the term "cost recovery fee" is not a pass-through fee as "itself implies that the company will keep the money collected as 'recovery' for its costs.").

In any event, as previously found, the website's definition of the Administrative Fee does

not limit how it may be applied or what costs it can be used to offset. *Id.* ¶¶ 33, 56, 40, 64.

The Court does not find the cases relied on by Plaintiff in support of their administrative fee claims persuasive. In *Calderon v. Sixt Rent a Car, LLC*, No. 19-CV-62408, 2020 WL 700381, at *7 (S.D. Fla. Feb. 12, 2020), the defendant was alleged to have deceived their customers by incorporating the terms of a separate agreement that contained undisclosed, and allegedly fraudulent, charges. *Id.* at *4 ("That Sixt's employee did not provide Calderon or Marin the Rental Jacket prior to them agreeing to its terms is not insignificant."). That is a far cry from the case at hand, especially given Plaintiff's tacit admission that the Administrative Fee is disclosed on the website and the monthly billing statement.

Similarly, *Deere Constr., LLC v. Cemex Constr. Materials Florida, LLC*, 198 F.Supp.3d 1332 (S.D. Fla. 2016) involved a failure to disclose an environmental charge that defendant represented was derived and directly tied to the Federal Energy Information Administration's weekly reporting of diesel fuel pricing. *Id.* at 1334. Again, because Plaintiff admits that the Administrative Fee was disclosed and its definition does not directly tie the fee to the rise or fall of AT&T's interconnection and cell site costs, *Deere* is inapplicable to the facts at hand.[5]

Accordingly, because Plaintiff's Administrative Fee-based claims for fraud, FDUTPA damages, good faith and fair dealing, and unjust enrichment are premised on purported falsehoods, misrepresentations, breaches, and deceptive or unfair trade practices that are refuted by the contracts they rely upon, they fail as a matter of law. *Ginsberg*, 645 So. 2d at 494; *TRG Night Hawk Ltd.*, 17 So. 3d at 784.

**B.      Plaintiff's "throttling" allegations in Counts 1-3.**

The remainder of Plaintiff's claims for fraud, FDUTPA damages, and good faith and fair dealing are based on allegations pertaining to network management practices designed to remedy network congestion caused by individual consumers who use exponentially more data than others.

Plaintiff complains that even though they had an unlimited data plan, AT&T "throttled" (or slowed down) their data speeds after they used a certain amount of data during a monthly billing cycle. Am. Compl. ¶¶ 9-11, 14. However, as the Wireless Consumer Agreement shows, the term "unlimited" refers to the *amount* of data, not the *speed* of that data. Unlike customers on tiered data plans, unlimited customers pay a set price without regard to the *amount* of data used. Plaintiff's alleged belief that "unlimited" refers to both the amount and speed of the data is wrong. Once again, the Agreement negates Plaintiff's allegations as the following comparison shows:

| What Plaintiff Alleges | What the Agreement Actually Says |
|---|---|
| AT&T represented, directly or indirectly, expressly or by implication, to the Plaintiff, an unlimited mobile data plan customer, that the amount of data that the Plaintiff could access in any billing period would not be limited.<br><br>**Am. Compl. ¶ 30** | **Unlimited Data Customers.** If you are an AT&T unlimited data plan customer, you agree that "unlimited means you pay a fixed monthly charge for wireless data service regardless of how much data you use . . . "unlimited' does <u>not</u> mean that you can use AT&T's wireless data service in any way that you choose, or for any prohibited activities."<br><br>AT&T may reduce your data throughput speeds at any time or place if your data usage exceeds an applicable, identified usage threshold during any billing cycle.<br><br>**Motion, Ex. 1 (Agreement) § 6.2 (emphasis in orig.)** |
| AT&T's wireless customer agreements do not state that an unlimited mobile data plan customer's use of more than a specified amount of data is a prohibited activity.<br><br>**Am. Compl. ¶ 15** | "Prohibited Activities" include, among other items, anything that: "excessively and disproportionately contributes to network congestion," "degrades network performance," or can "cause harm to the network or other customers."<br><br>"[U]nlimited" does <u>not</u> mean that you can use AT&T's wireless data service . . . for any prohibited activities.<br><br>**Motion, Ex. 1 (Agreement) § 6.2 (emphasis in orig.)** |
| [The] unlimited mobile data contract with Plaintiff . . . did not provide that AT&T could modify, diminish, or impair the services of who use more than a specified amount of data for permissible activities. | AT&T may modify, without advance notice, the permitted and prohibited activities.<br><br>You agree that . . . if you use AT&T's wireless data services in any manner that is prohibited, . . . AT&T may reduce your data throughput speeds at any time or place if your data usage |

| **What Plaintiff Alleges** | **What the Agreement Actually Says** |
|---|---|
| **Am. Compl. ¶ 15, 47** | exceeds an applicable, identified usage threshold during any billing cycle.<br><br>**Motion, Ex. 1 (Agreement) § 6.2.** |
| AT&T omitted the fact that it intended to throttle Plaintiff's data, without Plaintiff's knowledge or specific consent.<br><br>**Am. Compl. ¶ 31** | AT&T may modify, without advance notice, the permitted and prohibited activities, [and] may engage in any reasonable network management practice . . . to reduce network congestion.<br><br>**Motion, Ex. 1 (Agreement) § 6.2** |

On its face, the Agreement does not say what the Plaintiff alleges it says. In light of these contract provisions, the Court finds that the Agreement clearly reserves the right for AT&T to "reduce . . . data throughput speeds at any time or place if your data usage exceeds an applicable, identified usage threshold during any billing cycle," and even expressly states that, even if you are an "unlimited" customer, "AT&T can limit, restrict, suspend or terminate your data service . . . ." Def.'s Mot. to Dismiss, Ex. 1. Therefore, no claim can proceed based on these allegations as a matter of law.

**C.     Additional grounds for dismissing each cause of action in Counts 1-4.**

Having held that Plaintiff's Administrative Fees and data "throttling" claims are negated by the Agreement and other exhibits implicitly incorporated into and expressly relied on by the Amended Complaint, the Court now examines each cause of action alleged in Counts 1-4. This claim-by-claim analysis reveals several additional grounds supporting the underlying order based on Plaintiff's failure to properly plead their fraud, breach of the duty of good faith and fair dealing, FDUTPA damages, and unjust enrichment claims.

    1. **Plaintiff's Fraud Claim Fails as a Matter of Law.**

In Florida, a plaintiff must plead fraud by alleging that the defendant: 1) misrepresented a material fact, 2) knew or should have known of the falsity of the statement, 3) intended that the misrepresentation would induce Plaintiff to rely and act on it, and 4) that Plaintiff suffered injury in justifiable reliance on the misrepresentation. *Witt v. La Gorce Country Club, Inc.*, 35 So. 3d 1033, 1040 (Fla. 3d DCA 2010). In Florida, claimants must plead fraud (or fraudulent inducement) with particularity, as required by Rule 1.120(b). *See* Fla. R. Civ. P. 1.120(b) ("[A]ll averments of fraud . . . shall be stated with such particularity as the circumstances may permit."); *Cedars Healthcare Grp., Ltd. v. Mehta*, 16 So. 3d 914, 917 (Fla. 3d DCA 2009).

AT&T argues that Counts 1-4 all sound in fraud[6] and Plaintiff failed to satisfy this pleading standard. In response, Plaintiff contends that they pled their claims to the best of their ability as circumstances may permit and argues that they cannot allege specifics because "Plaintiff is not in possession of the specific digital advertisements and contracts issued by AT&T." Response at ¶ 67. The Court finds this argument unpersuasive. Plaintiff does not dispute that the Wireless Customer Agreement is on AT&T's website. And Plaintiff is undisputedly familiar with the AT&T website, as they rely on it in their Amended Complaint. Am. Compl. ¶¶ 21, 33, 56.

Nevertheless, even assuming Plaintiff facially alleged the first element—that AT&T misrepresented facts relating to the Administrative Fee and omitted facts relating to the potential for data speed reductions—the documents relied on and incorporated into the Amended Complaint refute Plaintiff's allegation that those statements or omissions were false, that AT&T knew they were false, that AT&T intended Plaintiff to rely on them, and that any reliance was justified. *See* sections III.A, III.B, *supra*. Moreover, Plaintiff failed to plead the other four elements with specificity. The Amended Complaint fails to provide a single detail regarding Plaintiff's own interactions with AT&T, or the time, place, and manner of how they were deceived. *Id.* There is no particularly-pled assertion explaining where, when, what, and how these alleged misrepresentations or omissions were material *to Plaintiff's* decision to do business with AT&T, that *they* relied on

them, or that they proximately caused *their* damages.

For example, as to throttling, Plaintiff merely recites the last element of fraud, alleging: "Plaintiff relied on AT&T's representations regarding providing unlimited data, and, as a result, incurred damages and was injured as a result of the fraud by omission." Am. Compl. ¶ 32. Plaintiff does not even attempt to allege that their reliance was justified. *Id*. They do not point to a single date to show *when* their data speed was reduced, if any. Nor do they explain *how* such a temporary speed reduction caused them harm or allege *what* measure of actual damages they incurred for any given month of service. This is the kind of information that would have been at Plaintiff's disposal; no "circumstances" prevented Plaintiff from alleging such facts if they existed. And as to administrative fees, Plaintiff fails to allege *when* they saw the website's definition of Administrative Fees and *how* they justifiably relied on it in deciding to use AT&T services. Conclusory assertions disguised as fact do not meet the high standard required by Rule 1.120(b). *See Williams*, 2020 WL 5083550, at *3 (dismissing the complaint because it "fails to provide any more specific details regarding the preparation of the 'Impossible Whopper'"); *Myers v. Myers*, 652 So. 2d 1214, 1215 (Fla. 5th DCA 1995) ("Allegations contained in a pleading are insufficient if they are too general, vague or conclusory.").

For these reasons, Plaintiff fails to plead the fraud claims with particularity as is required by Florida law. *See* Fla. R. Civ. P. 1.120(b); *Mehta*, 16 So. 3d at 917 (requiring claims sounding in fraud "be pled with particularity and must specifically identify misrepresentations or omissions of fact, **as well as time, place or manner in which they were made**.") (emphasis added). Accordingly, the Court finds that Plaintiff's fraud claims cannot be cured though amendment, requiring dismissal *with prejudice*.

### 2.      Plaintiff's Good Faith and Fair Dealing Claim Fails as a Matter of Law.

In support of the good faith and fair dealing claim, Plaintiff alleges that AT&T breached

unspecified provisions of the Wireless Customer Agreement and acted in a commercially unreasonable manner by throttling Plaintiff's data and charging the "bogus" Administrative Fee. Am. Compl. ¶ 41 ("The express terms of the wireless agreement required AT&T to provide unlimited data and true administrative costs as defined by the contract."); *see also* 40-43. Florida law recognizes the implied covenant of good faith and fair dealing in every contract, with two limitations:

> First, the implied covenant of good faith should not be invoked to override the express terms of the agreement between the parties.

> Second, a claim for breach of the implied covenant of good faith and fair dealing cannot be maintained under Florida law absent an allegation that an express term of the contract has been breached.

*Ins. Concepts & Design, Inc. v. Healthplan Servs., Inc.*, 785 So. 2d 1232, 1234 (Fla. 4th DCA 2001). Both of these limitations apply here.

First, Plaintiff's breach allegation is not tied to any particular provision in the Agreement. Am. Compl. ¶ 42 (alleging "AT&T breached the express terms of the wireless agreement by failing to provide unlimited data" with nothing more). Second, as the Court held in parts A and B above, the parties' Agreement expressly authorizes the conduct complained of, and therefore Plaintiff cannot invoke the doctrine to override the express agreement of the parties. *See Healthplan Servs., Inc.*, 785 So. 2d at 1234. Plaintiff cannot show that AT&T failed to act in a commercially reasonable manner when it abided by the express language of the parties' Agreement.

Finally, Plaintiff's good faith and fair dealing claim is not substantively distinguishable from the fraud claim. *See* Am. Compl. ¶ 40 (alleging false statements of material fact as basis for breach of the duty of good faith and fair dealing). The problems with this claim become even more troublesome under the heightened pleading standard that applies to claims that sound in fraud. *See* Part III.C.1, *supra*.

Accordingly, the Court finds Plaintiff's good faith and fair dealing claim cannot be cured

though amendment, requiring dismissal *with prejudice*.

### 3.    Plaintiff's FDUTPA Damages Claim Fails as a Matter of Law.

"[I]t is well recognized in this state that a claim for damages under FDUTPA has three elements: (1) a deceptive act or unfair practice; (2) causation; and (3) actual damages."*Kia Motors Am. Corp. v. Butler*, 985 So. 2d 1133, 1140 (Fla. 3d DCA 2008). Plaintiff alleges that AT&T caused them damages through its failure to adequately disclose, as well as misrepresentations regarding, its data throttling policy and the Administrative Fee, which he again describes as "a textbook pass through fee." Am. Compl. ¶ 66.

As discussed above, Plaintiff's allegations supporting the FDUTPA damages claim are directly contradicted and hence negated by the Wireless Customer Agreement, AT&T's website, and billing statements. *See supra*, parts III.A and III.B. No amount of discovery will enable Plaintiff to sufficiently plead the first element of FDUTPA. Taking Plaintiff's allegations as true, AT&T's data management practices are not deceptive or unfair, since the Wireless Customer Agreement allowed AT&T to reduce data speeds of all customers—including unlimited customers—to preserve network integrity. The Wireless Customer Agreement, website and billing statements, incorporated by reference in the Amended Complaint, also disclosed the Administrative Fee, and neither the imposition of an Administrative Fee nor the contractual use of the phrase "including but not limited to," is sufficient to state a claim for deceptive or unfair business practices. Finally, the Administrative Fee is not a "pass-through fee" by definition. *See Maor*, 2018 WL 4698512, at *5; *Berry*, 497 F. Supp. 2d at 1367.

Even if a reasonable unlimited data customer would think that they were immune to AT&T's network management practices after entering into a contract stating the opposite (and somehow sufficiently pled a deceptive or unfair act or practice), Plaintiff still failed to sufficiently allege causation and actual damages. Similarly, even if AT&T used the Administrative Fees to

defray costs other than interconnection costs and cell site rents and maintenance (and Plaintiff somehow sufficiently pled a deceptive or unfair act or practice), Plaintiff still failed to sufficiently allege causation and actual damages.

This is so under ordinary and heightened pleading standards. As Judge Lody Jean ruled in another case filed by Plaintiff's counsel against AT&T, "Plaintiff has pled a FDUTPA claim as a personal tort sounding in fraud" and, "[w]here the 'gravamen of the claim sounds in fraud' it is subject to the rules governing a fraud claim." Order Granting AT&T's Motion for Final Summary Judgment, *Claims Holding Group, LLC v. AT&T Mobility*, Case No: 2020-000024-SP-05 (July 22, 2020).[7] Plaintiff failed to plead with particularity *when* or *how* a short data speed reduction caused harm to Plaintiff personally, *how* Plaintiff would be harmed if AT&T in fact used their $1.99 Administrative Fees to defray costs other than for interconnection costs and cell site rents and maintenance, or *what* kind of actual damages they incurred as a result of either practice.

Based on the above, the Court finds Plaintiff's FDUTPA damages claim cannot be cured though amendment, requiring dismissal *with prejudice*.

### 4.    Plaintiff's Unjust Enrichment Claim Fails as a Matter of Law.

"The elements of a cause of action for unjust enrichment are: (1) plaintiff has conferred a benefit on the defendant, who has knowledge thereof; (2) defendant voluntarily accepts and retains the benefit conferred; and (3) the circumstances are such that it would be inequitable for the defendant to retain the benefit without first paying the value thereof to the plaintiff." *Duty Free World, Inc. v. Miami Perfume Junction, Inc.*, 253 So. 3d 689, 693 (Fla. 3d DCA 2018). "Florida law is clear that 'a plaintiff cannot pursue a quasi-contract claim for unjust enrichment if an express contract exists concerning the same subject matter.'" *Sterling Breeze Owners' Ass'n, Inc. v. New Sterling Resorts, LLC*, 255 So. 3d 434, 437 (Fla. 1st DCA 2018), *reh'g denied* (Oct. 16, 2018).

Like Counts 1-3, Plaintiff's claim of unjust enrichment hinges on their assertion that the

administrative fee is deceptive—an assertion that, as discussed in detail above, is directly contradicted by both the Wireless Customer Agreement and AT&T's website. Additionally, while the claim sounds in fraud, it is not pleaded with specificity as is required by Florida law. *See* Fla. R. Civ. P. 1.110(b); *Mehta*, 16 So. 3d at 917.

The claim also fails because Plaintiff has acknowledged the existence of a contract between the parties that governs the subject matter of this lawsuit, thus barring Plaintiff's quasi-contract claim for unjust enrichment. *New Sterling Resorts, LLC*, 255 So. 3d at 437. The fact that Plaintiff chose not to incorporate the paragraphs acknowledging the existence of the Wireless Customer Agreement into the unjust enrichment count does not save the claim as this Court does not have to accept as true or even consider "internally inconsistent factual claims." *Gallego v. Wells Fargo Bank, N.A.*, 276 So. 3d 989, 990 (Fla. 3d DCA 2019).

Plaintiff's unjust enrichment claim cannot be cured though amendment, requiring that it be dismissed *with prejudice*.

## IV.   Conclusion

For the reasons stated above, this Court grants AT&T's Motion to Dismiss. As all claims in this matter have now been adjudicated, the clerk is directed to close this matter.

---

[1] Plaintiff's counsel has previously abandoned this assertion in a similar hearing in front of Judge Lehr, where it was undisputed that the Agreement is available on AT&T's website. *See* AT&T's Mot. Dismiss Hr'g Tr., 28:24-25; 49:18-20; 50:15-16, *Ann Green v. AT&T Mobility*, Case No. 2019-16864-SP-23 (July 22, 2020).

[2] At the hearing, Plaintiff's counsel argued that *One Call* involved a contract attached to a motion to dismiss "where there was no dispute on the insurance contract." Transcript 28:1-2. A review of the decision reveals that this assertion is false. *One Call Prop. Servs. Inc.*, 165 So. 3d at 751 ("One Call filed a written response to the motion to dismiss, arguing that the motion impermissibly went

beyond the four corners of the complaint . . . .").

[3]    Further, Plaintiff does not contest the veracity or accuracy of the exhibits. And the Amended Complaint does not rely on any specific version of the Wireless Customer Agreement, but hinges on the more general proposition that "AT&T's wireless customer agreements do not state that an unlimited mobile data plan customer's use of more than a specified amount of data is a prohibited activity." Am. Compl. ¶ 15 (emphasis added).

[4]    As noted, Plaintiff takes no issue with the authenticity of AT&T's website or billing statements introduced into the record by AT&T, and this Court finds Plaintiff incorporated them by reference in the Amended Complaint. *See, e.g.,* Am. Compl. ¶¶ 21, 22, 33, 56, 40, 64.

[5]    While counsel for Plaintiff argued at the hearing that AT&T represented that its interconnection costs are going up, the Amended Complaint does not contain any such allegation. Regardless, counsel's assertion is contradicted by the Administrative Fee definition provided by the Plaintiff, which only states that the fee is used to "defray a **portion** of certain expenses AT&T incurs," including but not limited to interconnection and cell site costs. Am. Compl. ¶ 33. (emphasis added). No increase in costs is mentioned.

[6]    Claims 1-4 incorporate the same factual basis of Plaintiff's fraud claim (paragraphs 1-27) and all claims allege that AT&T knowingly, intentionally and fraudulently deceived the Plaintiff regarding AT&T's Administrative Fee, purported data "throttling," and Privacy Policy. *See, e.g.*, Am. Compl. ¶ 18-19 (alleging that AT&T's unlimited plan was "a bait-and-switch"), *id.* (alleging that AT&T "covertly increases the actual price" of its services by "padding all post-paid wireless customers' bills" with a "bogus" administrative fee), ¶ 20 (alleging the Administrative Fee "is never adequately and honestly disclosed"), ¶ 21 (alleging that AT&T "deliberately hides" the Administrative Fee), ¶ 57 (alleging that AT&T "knew" the Administrative Fee was inflated).

[7]    Citing *Librizzi v. Ocwen Loan Servicing, LLC*, 120 F. Supp. 3d 1368, 1381 (S.D. Fla. 2015) (Bloom, J.) (finding that FDUTPA claims must be pled with particularity where plaintiff alleged defendant caused damages through deception); *Mehta*, 16 So. 3d at 917; *USA Nutraceuticals Grp., Inc. v. BPI Sports, LLC*, No. 15-CIV-80352, 2016 WL 4254257, at *3 (S.D. Fla. Feb. 16, 2016) ("[C]ourts regularly apply Rule 9(b) to FDUTPA claims, as such claims uniquely sound in both tort and fraud.").

**DONE** and **ORDERED** in Chambers at Miami-Dade County, Florida on this 8th day of September, 2022.

2019-011857-SP-26 09-08-2022 1:34 PM
Hon. Michaelle Gonzalez-Paulson

**COUNTY COURT JUDGE**
Electronically Signed

<div style="border: 2px solid red; color: red;">

Final Order as to All Parties SRS #: **12** (Other)

THE COURT DISMISSES THIS CASE AGAINST ANY PARTY NOT LISTED IN THIS FINAL ORDER OR PREVIOUS ORDER(S). THIS CASE IS CLOSED AS TO ALL PARTIES.

</div>

**Electronically Served:**
Alicia Thomsen, athomsen@daypitney.com
Andrew Robert Ingalls, aingalls@daypitney.com
Andrew Robert Ingalls, brodriguez@daypitney.com
Andrew Robert Ingalls, maristasalado@daypitney.com
Evelyn Davila, edavila@daypitney.com
Jessica Solorzano, jsolorzano@daypitney.com
Manuel A. Garcia-Linares, mgarcialinares@daypitney.com
Manuel A. Garcia-Linares, athomsen@daypitney.com
Maury L Udell, notice66@bmulaw.com
Maury L Udell, blopez@bmulaw.com
Rachel Kittl, rkittl@bmulaw.com


**Physically Served:**

**IN THE COUNTY COURT OF THE ELEVENTH JUDICIAL
CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA**

CASE NO: 2019-011857-SP-26
SECTION: SD05
JUDGE: Michaelle Gonzalez-Paulson

**Francisco Batista**

Plaintiff(s) / Petitioner(s)

vs.

**AT&T Mobility LLC**

Defendant(s) / Respondent(s)

_____/

<u>**ORDER DENYING PETITIONER'S MOTION FOR REHEARING**</u>

**THIS CAUSE** came before the Court for consideration of Plaintiff's Motion for Rehearing. On April 28, 2022, this Court heard Defendant AT&T Mobility, LLC's Motion to Dismiss Plaintiff's Second Amended Complaint. On September 23, 2022, the Plaintiff filed a Motion for Rehearing, and the Defendant filed a Response on November 18, 2022.

The Court having reviewed the subject motion, Respondent's response to the motion, the Clerk's docket sheet, the prior orders issued in this case, and being fully advised in the premises, hereby enters the following ruling

**WHEREFORE**, **IT IS ORDERED AND ADJUDGED** that Plaintiff's Motion for Rehearing is **DENIED.**

The Court finds that Plaintiff is simply attempting to rehash the same issues previously considered by this Court, presenting nothing new. *See Pullum v. Cincinnati, Inc.,* 467 So. 2d 657 (Fla. 1985); *Hollywood Inc. v. Clark,* 153 Fla. 501, 15 So. 2d 175 (Fla. 1943) (*a* prime function of the petition for rehearing is to present to the trial court some point which it overlooked or failed to consider, which renders a decree inequitable or erroneous); *Pingree v. Quaintance,* 394 So. 2d 161 (Fla. 1st DCA 1981); *Balmoral Ass'n v. Grimaldi*, 107 So3d 1149 (Fla.3d DCA 2013).

Plaintiff's Motion for Rehearing seeks to reargue the same matters already disposed of by this Court.  *See generally Ayala v. Gonzalez,* 984 So. 2d 523 (Fla. 5th DCA

2008); *Lowe Inv. Corp v. Clemente,* 685 So. 2d 84 (Fla. 2d DCA 1996).

**DONE** and **ORDERED** in Chambers at Miami-Dade County, Florida on this 19th day of December, 2022.

2019-011857-SP-26 12-19-2022 3:31 PM
Hon. Michaelle Gonzalez-Paulson

**COUNTY COURT JUDGE**
Electronically Signed

No Further Judicial Action Required on **THIS MOTION**

CLERK TO **RECLOSE** CASE IF POST JUDGMENT

**Electronically Served:**
Andrew Robert Ingalls, aingalls@daypitney.com
Andrew Robert Ingalls, brodriguez@daypitney.com
Andrew Robert Ingalls, maristasalado@daypitney.com
Evelyn Davila, edavila@daypitney.com
Jessica Solorzano, jsolorzano@daypitney.com
Manuel A. Garcia-Linares, mgarcialinares@daypitney.com
Manuel A. Garcia-Linares, athomsen@daypitney.com
Maury L Udell, notice66@bmulaw.com
Maury L Udell, blopez@bmulaw.com
Rachel Kittl, rkittl@bmulaw.com

**Physically Served:**

**IN THE COUNTY COURT OF THE ELEVENTH JUDICIAL
CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA**

CASE NO: 2020-000158-SP-24
SECTION: MB01
JUDGE: Stephanie Silver

**Melissa Davimos**

Plaintiff(s) / Petitioner(s)

vs.

**AT&T MOBILITY, LLC**

Defendant(s) / Respondent(s)

_____/

## ORDER ON MOTION TO DISMISS

THIS CAUSE, came before the Court upon Defendant AT&T's Motion to Dismiss Plaintiff's

Amended Complaint seeking dismissal of all claims pled by Plaintiff.

## Background

This case arises out of Plaintiff's claim as an AT&T customer against AT&T for
violation of FDUTPA, breach of implied contract of good faith and fair dealing, false advertising
pursuant to 817.41 Stat., unjust enrichment, declaratory relief and injunctive relief pursuant to
FDUTPA for geo-location information misuse.

## Standard of Review

A motion to dismiss merely tests the legal sufficiency of a complaint; it cannot be used to
resolve factual disputes. *Minor v. Brunetti,* 43 So. 3d 178, 179 (Fla. 3d DCA 2010) (citing *The
Fla. Bar v. Greene,* 926 So. 2d 1195, 1199 (Fla. 2006)). Accordingly, when ruling on such a
motion, a trial court must accept all factual allegations as true and must construe all reasonable
inferences in favor of the pleader. *See id.* A complaint should therefore never be dismissed
"unless the movant can establish beyond any doubt that claimant could prove no set of facts
whatever in support of his claim." *Charles v. Fla. Foreclosure Placement Ctr., LLC,* 988 So.
2d 1157, 1161 (Fla. 3d DCA 2008) (citing *Gandy v. Trans World Computer Tech. Group,*
787 So. 2d 116, 118 (Fla. 2d DCA 2001)).  It is precisely because of this heavy burden that
motions to dismiss are disfavored and granted sparingly. *Oguz v. Oguz,* 478 So. 2d 437, 440,

n.9 (Fla. 5th DCA 1985) (Sharp, J. concurring).

## COUNT 1- FRAUD

To prove fraud, the Plaintiff must allege that the Defendant misrepresented a material fact, knew or should of known of the falsity of the statement, intended that the misrepresentation would induce Plaintiff to rely and act on its fraudulent conduct, and that injury occurred. Plaintiff here has claimed that the Administrative Fee is "bogus" in all respects and that the Plaintiff has paid the administrative fee, thereby suffering injury. A Motion to Dismiss only must have allegations sufficient to state a cause of action. For this count, the Plaintiff's complaint survives and the Motion to Dismiss is denied.

## COUNT 2 – BREACH OF IMPLIED DUTY OF GOOD FAITH AND FAIR DEALING

Florida law recognizes that parties enter into agreements in good faith in every contract except when it overrides the express terms of the written agreement. *Ins. Concepts & Design, Inc. v. Healthplan Servs., Inc.*, 786 So.2d 1232, 1234 (Fla. 4th DCA 2001). The Plaintiff has alleged that AT&T breached its duty of good faith in providing services. The Motion to Dismiss is denied. The Plaintiff, has not, however, identified the specific terms of the Agreement alleged to have been breached. Therefore, the Plaintiff has twenty days to file a More Definite Statement identifying the express terms of the agreement that were breached.

## COUNT 3 – FDUPTA

Florida Statute Section 501.204(1) states that unfair or deceptive acts or practices in trade or commerce are prohibited. To state a FDUPTA claim, the Plaintiff must allege that the practices were unfair or deceptive, there was a causal link, and actual damages. *Dolphin LLC v. WCI CMTYS, Inc.*, 715 F.3d 1243, 1250 (11th Cir. 2013). Whether particular conduct constitutes such an unfair or deceptive trade practice is a question of fact." *Suris v. Gilmore Liquidating, Inc.,* 651 So.2d 1282, 1283 (Fla. 3d DCA 1995)). "[A] claim under FDUTPA is not defined by the express terms of a contract, but instead encompasses unfair and deceptive practices arising out of business relationships." *Id.* "A practice will be deemed 'unfair' when it 'offends established public policy and when the practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers, (or competitors or other businessmen).' " *Hanson Hams, Inc. v. HBH Franchise Co., LLC,* No. 03–61198–CIV, 2003 WL 22768687, at *2 (S.D.Fla. Nov. 7, 2003) (quoting *Day v. Le–Jo Enters., Inc.,* 521 So.2d 175, 178 (Fla. 3rd DCA 1988)).

The Plaintiff has pled that the Administrative Fee is part of a design to profit AT&T rather than pay for what it has determined is an increase in cost. Therefore, the Plaintiff has stated a cause of action for FDUPTA based on the allegation that AT&T's practice of applying the administrative fee in and of itself is unfair and deceptive. Therefore, AT&T's Motion to Dismiss is denied on this Count.

## COUNT 4 – UNJUST ENRICHMENT

The Plaintiff has alleged that AT&T has benefitted from unjust enrichment in its collection of the administrative fee. "The elements of a cause of action for unjust enrichment are: (1) plaintiff has conferred a benefit on the defendant, who has knowledge thereof; (2) defendant voluntarily accepts and retains the benefit conferred; and (3) the circumstances are such that it would be inequitable for the defendant to retain the benefit without first paying the value thereof to the plaintiff." *Duty Free World, Inc. v. Miami Perfume Junction, Inc.*, 253 So. 3d 689, 693 (Fla. 3d DCA 2018). "Florida law is clear that 'a plaintiff cannot pursue a quasi-contract claim for unjust enrichment if an express contract exists concerning the same subject matter.'" *Sterling Breeze Owners' Ass'n, Inc. v. New Sterling Resorts, LLC*, 255 So. 3d 434, 437 (Fla. 1st DCA 2018), *reh'g denied* (Oct. 16, 2018).

The claim fails because Plaintiff has acknowledged the existence of a contract between the parties that governs the subject matter of this lawsuit, thus barring Plaintiff's quasi-contract claim for unjust enrichment. *Id.* at 437. In this case, there is a written contract. Plaintiff's unjust enrichment claim cannot be cured though amendment. Therefore, Count 4 is dismissed with prejudice.

## COUNTS 5 AND 6 – DECLARATORY AND INJUNCTIVE RELIEF

Plaintiff's claims for declaratory and injunctive relief under FDUTPA are based on Plaintiff's "belie[f]" that AT&T provided Plaintiff's geolocation data to unauthorized persons without Plaintiff's consent. Am. Compl. ¶¶ 95, 128. The Amended Complaint provides a long history regarding AT&T collecting customer geolocation data and then disseminating it to third-party data aggregators and location-based service (LBS) providers, which Plaintiff alleges is in direct violation of both AT&T's privacy policy and the Telecommunications Act. *Id.* ¶¶ 71-72. Important here, in support of the geolocation claims, Plaintiff attaches, among other items, correspondence between United States Senator Ron Wyden and AT&T regarding alleged

unauthorized geolocation disclosure; and, a February 28, 2020 *Notice of Apparent Liability for Forfeiture and Admonishment* filed by the Federal Communications Commission against AT&T (the "NAL").

To state a claim for injunctive or declaratory relief under FDUTPA, a plaintiff "must show (1) that it is aggrieved, in that its rights have been, are being, or will be adversely affected, by (2) a violation of FDUTPA, meaning an unfair or deceptive practice which is injurious to consumers." *Stewart Agency, Inc. v. Arrigo Enterprises, Inc*., 266 So. 3d 207, 214 (Fla. 4th DCA 2019). "Put plainly, a plaintiff is 'aggrieved' under FDUTPA when the deceptive conduct alleged has caused a **non-speculative injury** that has affected the plaintiff beyond a general interest in curbing deceptive or unfair conduct." *Superior Consulting Servs., Inc. v. Shaklee Corp*., No. 616CV2001ORL31GJK, 2017 WL 2834783, at *7 (M.D. Fla. June 30, 2017) (emphasis added).

AT&T argues that Plaintiff fails to adequately allege that she has been "aggrieved" and is seeking to enjoin a practice that Plaintiff acknowledges has already stopped. The Court agrees. Plaintiff's claims are based on Plaintiff's "belie[f]" that AT&T allowed customer geolocation data to be accessed by unauthorized persons without Plaintiff's consent". While the Amended Complaint walks through a long narrative of AT&T's alleged failure to protect its customers' geolocation data, it fails to present a single fact tying that alleged failure to Plaintiff or provide any factual basis for Plaintiff's "belief" that Plaintiff's own geolocation data was wrongfully disclosed. Accordingly, the Court concludes that Plaintiff's speculative allegations do not sufficiently allege that Plaintiff's "rights have been, are being, or will be adversely affected," and therefore do not satisfy either Rule 1.110(b) or Rule 1.120(b). *Stewart Agency, Inc*., 266 So. 3d at 214.

Similarly, Plaintiff's conclusory statement that Plaintiff "believes" she may have been "aggrieved as result of AT&T's knowing and flagrant violation of its own privacy practices" asserts no facts in support and cannot carry Plaintiff's claims. Am. Compl. ¶ 134; *see Nodal-Tarafa v. ARDC Corp*., 579 So. 2d 414 (Fla. 3d DCA 1991) ("[U]ltimate legal conclusions are . . . patently insufficient to state a cause of action . . . ."). Plaintiff has failed to sufficiently plead that she has been aggrieved by AT&T's alleged geolocation practice, one of the two basic elements of a claim for equitable relief under FDUTPA.[11]   Therefore, Count 5 is dismissed *with prejudice.*

In addition to being subject to dismissal for failure to allege that Plaintiff was aggrieved, Count 6 for injunctive relief fails as Plaintiff, through the exhibits she attached to the Amended Complaint, concedes that AT&T has stopped engaging in the practice she seeks to enjoin (*i.e.* disclosing geolocation data to third-party aggregators). Specifically, the letter from AT&T to Senator Wyden attached as Exhibit H to the Amended Complaint states that AT&T "will cease providing location information to all aggregators by the end of March 2019." Ex. H, p. 2. Consistent with this statement, the NAL attached as Exhibit J acknowledges that AT&T "terminated access to customer location information over the course of 3 months in early 2019." Ex. J, ¶ 69; *see also* ¶ 12 (indicating that AT&T stopped it location-based services practice

before the February 28, 2020 NAL).

Plaintiff amended the complaint to add Counts 5 and 6 on May 19, 2020. Accordingly, based on the exhibits she attached to the Amended Complaint, Plaintiff admits that AT&T stopped the practice that she alleges violates FDUTPA more than a year before Plaintiff filed the Amended Complaint.[12] This admission is fatal to her demand for injunctive relief as it leaves nothing for this Court to enjoin. *See, e.g. Dapeer v. Neutrogena Corp.*, 95 F. Supp. 3d 1366, 1373 (S.D. Fla. 2015) (dismissing FDUTPA claim for injunctive relief based on plaintiff's admission that defendant had stopped engaging in the challenged practice). Without any legitimate threat of future harm, Plaintiff is not entitled to the injunctive relief as a matter of law.

Because the Plaintiff has failed to disclose whether the Defendant disclosed her geolocation data to a third party, and because Plaintiff admits that the alleged practice has actually stopped (and stopped more than a full year before Plaintiff brought these claims), the claims for injunctive and declaratory relief under FDUTPA cannot be cured through amendment, requiring dismissal *without prejudice*. If the Plaintiff can demonstrate that she has been harmed by having her data disclosed to a third party, and when and to whom the data was disclosed, the Plaintiff may refile this Count.

### COUNT 7 – PLAINTIFF'S FALSE ADVERTISING CLAIM

Because misleading advertising is a form of fraud, establishing a claim under § 817.41, Fla. Stat. requires proving "each of the elements of common law fraud in the inducement, including reliance and detriment." *Meridian Tr. Co. v. Batista*, No. 17- 3051, 2018 WL 4760277, at *4 (S.D. Fla. Sept. 30, 2018) (quoting *Rollins, Inc. v. Butland*, 951 So. 2d 860, 877 (Fla. 2d DCA 2006)). "Accordingly, a claim for false advertisement under Florida law must be pled with particularity." *Id*. The Defendant believes that this claim cannot be cured through amendment. This Court respectfully disagrees.

Plaintiff's claim is based on AT&T's alleged false advertisements regarding its ability to "throttle" customers on an unlimited data plan. The Plaintiff has alleged that the advertisements the Plaintiff reviewed were false.  The Plaintiff, however, did not disclose which advertisement the Plaintiff relied upon and how it was false. The Plaintiff did not disclose when the advertisement was viewed and did not provide how the advertisement was false. Therefore, while this Court denies the Defendant's Motion to Dismiss Count 7 of the Complaint, this Court is requiring the Plaintiff to provide a more definite statement within 20 days describing in detail which advertisement the Plaintiff relied upon, the date it was viewed, the method by which it was viewed (television, radio, internet), and how the advertisement was false. The Plaintiff shall attach the advertisement viewed as an exhibit to its more definite statement.

### CONCLUSION

WHEREFORE, it is ORDERED AND ADJUDGED that the Motion to Dismiss Count 1 is DENIED. The Motion to Dismiss Count 3 is DENIED. The Motion to Dismiss Counts 4 and 5 is GRANTED *with prejudice*. The Motion to Dismiss Count 6 is GRANTED *without prejudice*. The Motion to Dismiss Counts 2 and 7 is denied. However, the Plaintiff has 20 days to file a More Definite Statement. Failure to do so will result in dismissal of those counts. The Defendant will have leave to file a supplemental Motion to Dismiss Counts 2 and 7 if it determines it is appropriate.

The Defendant has 20 days to respond to the Complaint as to Counts 1 and 3.

**DONE** and **ORDERED** in Chambers at Miami-Dade County, Florida on this 12th day of October, 2020.

2020-000158-SP-24 10-12-2020 12:39 PM

2020-000158-SP-24 10-12-2020 12:39 PM
Hon. Stephanie Silver

**COUNTY COURT JUDGE**
Electronically Signed

No Further Judicial Action Required on **THIS MOTION**

CLERK TO **RECLOSE** CASE IF POST JUDGMENT

**Electronically Served:**
Adam Beighley, adam@bmulaw.com
Adam Beighley, rkittl@bmulaw.com
Andrew R. Ingalls, aingalls@daypitney.com
Andrew R. Ingalls, brodriguez@daypitney.com
Evelyn Davila, edavila@daypitney.com
Jessica Solorzano, jsolorzano@daypitney.com
Manuel A. Garcia-Linares, mgarcialinares@daypitney.com
Manuel A. Garcia-Linares, brodriguez@daypitney.com
Maury L Udell, notice66@bmulaw.com

**Physically Served:**

Case 1:25-cv-20381-RAR   Document 1-2   Entered on FLSD Docket 01/27/2025   Page 458 of 1553

IN THE COUNTY COURT OF THE ELEVENTH JUDICIAL
CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA

CASE NO: 2020-000158-SP-24
SECTION: MB01
JUDGE: Stephanie Silver

**Melissa Davimos**

Plaintiff(s) / Petitioner(s)

vs.

**AT&T MOBILITY, LLC**

Defendant(s) / Respondent(s)

_____/

## <u>ORDER DISMISSING COUNTS 2 AND 7 OF PLAINTIFF'S THIRD AMENDED COMPLAINT</u>

On August 14, 2020, this Court heard Defendant AT&T Mobility, LLC's *Motion to Dismiss Plaintiff's Third Amended Complaint*.

On October 12, 2020, this Court entered an Order granting, in part, and denying in part, AT&T's Motion to Dismiss.  With respect to Counts 2 and 7 of Plaintiff's Third Amended Complaint, this Court directed Plaintiff to file a More Definite Statement within 20 days from that date, stating:

> The Motion to Dismiss Counts 2 and 7 is denied. However, the Plaintiff has 20 days to file a More Definite Statement. Failure to do so will result in dismissal of those counts.

Plaintiff's More Definite Statement was due on November 2, 2020.  To date, Plaintiff has not filed a More Definite Statement as directed by this Court nor has the Plaintiff requested additional time to comply.  As such, Counts 2 and 7 of Plaintiff's Third Amended Complaint are hereby dismissed *with prejudice* for failure to comply with Court Order.

**DONE** and **ORDERED** in Chambers at Miami-Dade County, Florida on this 13th day of November, 2020.

2020-000158-SP-24 11-13-2020 4:29 PM

Hon. Stephanie Silver

**COUNTY COURT JUDGE**
Electronically Signed

No Further Judicial Action Required on **THIS MOTION**

CLERK TO **RECLOSE** CASE IF POST JUDGMENT

**Electronically Served:**
Adam Beighley, adam@bmulaw.com
Adam Beighley, rkittl@bmulaw.com
Andrew R. Ingalls, aingalls@daypitney.com
Andrew R. Ingalls, brodriguez@daypitney.com
Evelyn Davila, edavila@daypitney.com
Jessica Solorzano, jsolorzano@daypitney.com
Manuel A. Garcia-Linares, mgarcialinares@daypitney.com
Manuel A. Garcia-Linares, brodriguez@daypitney.com
Maury L Udell, notice66@bmulaw.com


**Physically Served:**

**IN THE COUNTY COURT OF THE ELEVENTH JUDICIAL
CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA**

CASE NO: 2020-000158-SP-24
SECTION: MB01
JUDGE: Stephanie Silver

**Melissa Davimos**

Plaintiff(s) / Petitioner(s)

vs.

**AT&T MOBILITY, LLC**

Defendant(s) / Respondent(s)

_____/

## ORDER GRANTING AT&T'S MOTION FOR RECONSIDERATION AND CLARIFICATION OF ORDER ON MOTION TO DISMISS

On December 2, 2020, this Court heard Defendant AT&T Mobility, LLC's *Motion for Reconsideration and Clarification of Order on Motion to Dismiss*, which was directed at this Court's October 12, 2020 Order granting in part and denying in part AT&T's *Motion to Dismiss*. After considering the *Motion* as well as the argument of counsel, the Court finds as follows.

### A. **Plaintiff's data throttling claims contradict the plain terms of the parties' contract**

In addition to Plaintiff's challenges to AT&T's administrative fee, which were addressed by the original Dismissal Order, Plaintiff's fraud (Count 1) and FDUTPA damages (Count 3) claims also allege that AT&T "throttled" (or slowed down) Plaintiff's data speeds and that this "throttling" is not allowed for unlimited customers under the parties' Wireless Customer Agreement. Third Am. Compl. ¶¶ 14-15. As established by the underlying *Motion to Dismiss* and *Motion for Reconsideration,* the factual assertions that form the basis of these "claims are

directly and fully rebutted by express evidence in [the] governing written [Wireless Customer Agreement]." *Sol. Z v. Alma Lasers, Inc.*, No. 11-CV-21396-CIV, 2013 WL 12246356, at *5 (S.D. Fla. Jan. 22, 2013).

Therefore, because Florida law is clear that Plaintiff's data throttling claims cannot rely on alleged misrepresentations that contradict the plain language of the parties' contract, the Court finds the data throttling component of Plaintiff's fraud and FDUTPA damages claims must be dismissed *with prejudice. Id.*; *see also GVK Int'l Bus. Grp., Inc. v. Levkovitz*, No. 3D19-1119, 2020 WL 4197407, at *2 (Fla. 3d DCA July 22, 2020) (affirming trial court's dismissal of complaint *with prejudice* based on the finding that "[a] party to a contract may not recover in fraud for alleged oral misrepresentations that have been 'adequately covered or expressly contradicted in a later written contract.'"). This Court therefore clarifies its original Order entered to add that the throttling provision of the complaint is hereby dismissed.

## B. **Count 6**

At the Motion for Reconsideration, the Defendant discussed how this Court should have dismissed the injunctive relief claim because the FDUPTA activity claimed was no longer occurring. This Court maintains its position in the Order on the Motion to Dismiss entered in October 2020. This Court addressed Plaintiff's claim for injunctive relief under FDUTPA (count 6) in its original Dismissal Order, stating as follows:

[B]ased on the exhibits she attached to the Amended Complaint, Plaintiff admits that AT&T stopped the practice that she alleges violates FDUTPA more than a year before Plaintiff filed the Amended Complaint. **This admission is fatal to her demand for injunctive relief as it leaves nothing for this Court to enjoin.** *See, e.g. Dapeer v. Neutrogena Corp.*, 95 F. Supp. 3d 1366, 1373 (S.D. Fla. 2015) (dismissing FDUTPA claim for injunctive relief based on plaintiff's admission that defendant had stopped engaging in the challenged practice). **Without any legitimate threat of future harm, Plaintiff is not entitled to the injunctive relief as a matter of law.**

Dismissal Order. p. 5 (emphasis added). The Dismissal Order then goes on to state that

based on Plaintiff's admission, her "claims for injunctive and declaratory relief under FDUTPA cannot be cured through amendment." *Id.*

Based on the finding that Plaintiff's claim for injunctive relief under FDUTPA cannot be cured through amendment, dismissal *with prejudice* is required. *See Glatstian v. Cleveland Clinic Fla.*, 680 So. 2d 1141, 1141 (Fla. 3d DCA 1996) (finding that dismissal with prejudice is proper if "it is clear that the pleading cannot be amended to state a cause of action") (quoting *Gamma Dev. Corp. v. Steinberg*, 621 So. 2d 718, 719 (Fla. 4th DCA 1993)). This Court hereby corrects its order. This Court meant to dismiss Counts 5 and 6 (declaratory relief and injunctive relief) with prejudice. Since Count 6 has a fatal flaw, the count is dismissed with prejudice.

**WHEREFORE,** for the reasons stated herein and on the record, the data throttling component of Plaintiff's claims for fraud (count 1) and FDUTPA damages (count 3) claims, as well as the claim for FDUTPA injunctive relief (count 6), are hereby dismissed *with prejudice*. AT&T shall respond to the remaining counts 1 and 3 as to the administrative fee within forty five days.

**DONE** and **ORDERED** in Chambers at Miami-Dade County, Florida on this <u>3rd day of December, 2020</u>.

2020-000158-SP-24 12-03-2020 4:42 PM

<u>2020-000158-SP-24 12-03-2020 4:42 PM</u>
Hon. Stephanie Silver

**COUNTY COURT JUDGE**
Electronically Signed

No Further Judicial Action Required on **THIS MOTION**

CLERK TO **RECLOSE** CASE IF POST JUDGMENT

**Electronically Served:**

Adam Beighley, adam@bmulaw.com

Adam Beighley, rkittl@bmulaw.com

Andrew R. Ingalls, aingalls@daypitney.com

Andrew R. Ingalls, brodriguez@daypitney.com

Evelyn Davila, edavila@daypitney.com

Jessica Solorzano, jsolorzano@daypitney.com

Manuel A. Garcia-Linares, mgarcialinares@daypitney.com

Manuel A. Garcia-Linares, brodriguez@daypitney.com

Maury L Udell, notice66@bmulaw.com

**Physically Served:**

**IN THE COUNTY COURT OF THE ELEVENTH JUDICIAL
CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA**

CASE NO: 2020-001293-SP-24
SECTION: MB01
JUDGE: Stephanie Silver

**Alina Gonzalez**

Plaintiff(s) / Petitioner(s)

vs.

**AT&T Mobility LLC**

Defendant(s) / Respondent(s)

_____/

## ORDER ON DEFENDANT'S MOTION TO DISMISS

   THIS CAUSE having come on the Defendant's Motion to Dismiss, and this Court having
heard argument of counsel on July 13, 2021, and this Court having reviewed the pleadings, the
docket in this case, and other cases, and case law provided by the parties and on this Court's own
research, it is hereby ORDERED AND ADJUDGED:

 This Court is well aware that the case law states that Motions to Dismiss are supposed to be
granted sparingly and the granting of such a motion is generally disfavored. *See, e.g.*, *Oguz v.
Oguz,* 478 So.2d 437 (Fla. 5th DCA 1998). *Minor v. Brunetti*, 43 So.3d 178 (Fla. 3d DCA 2010).
The Plaintiff has filed a six count Amended Statement of Claim stating that AT&T Mobility
violated the wireless contract entered into between the Plaintiff and Defendant, committed fraud,
committed a breach of contract, and was unjustly enriched in charging certain fees and by
throttling (or slowing down) the Plaintiff's unlimited wireless service.

### COUNT 1 - FRAUD

This Court **denies** the Defendant's Motion to Dismiss based on fraud for the reasons stated in
*Davimos v. AT&T*, 2020 158 SP 24. The Defendant shall file an answer within 20 days.

### COUNT 2 - VIOLATION OF FDUPTA

This Court **denies** the Defendant's Motion to Dismiss based on FDUPTA for the reasons stated
in *Davimos v. AT&T*, 2020 158 SP 24. The Defendant shall answer the Complaint within 20
days.

## COUNT 3 - DECLARATORY AND/OR INJUNCTIVE RELIEF

### a. Injunctive Relief

This Court has reviewed the Complaint and sees no claim for Injunctive Relief. In Paragraph 67, the Plaintiff seeks a declaratory judgment that AT&T violated FDUPTA. The Plaintiff states in other paragraphs that a declaration is needed. Even though the title of Count 3 is an action for both Declaratory and/or Injunctive Relief, the Plaintiff has made no written efforts to obtain an injunction. Therefore, the Motion to Dismiss is **GRANTED** without prejudice.

### b. Declaratory Judgment

The Plaintiff alleges a declaration is needed to determine whether AT&T may continue to charge the fee. This Court expressly notes that the Wireless Agreement between the parties at Paragraph 1.4 states that the Defendant may charge an administrative charge. Additionally, a party may seek a declaratory judgment "in suits solely seeking a determination of any fact affecting the application of any" right or privilege. *Peoples Trust Ins. Co. v. Franco*, 305 So.3d 579 (Fla. 3d DCA 2020) (quoting *Higgins v. State Farm*, 894 So.2d 5 (Fla. 2004). Other counts of this Complaint partially subsume the declaratory action and the claim must be dismissed. Therefore, the Defendant's Motion to Dismiss is **GRANTED WITH PREJUDICE.**

## COUNT 4 - BREACH OF CONTRACT

The Plaintiff claims that the contract between the parties was breached by improperly throttling the Plaintiff's wireless service and by misrepresenting the use of the administrative charge.

### a. Throttling

The Plaintiff alleges that its wireless data service was improperly delayed or throttled. The Plaintiff must state the injury occurred and how the injury occurred. Therefore, the Plaintiff must give a more definite statement detailing the date, time, and what injury  suffered by any alleged stoppage and/or delay in data. The Plaintiff has 10 days to furnish this Information. At this time, the Defendant's Motion to Dismiss is **DENIED**. This Court, however, is requiring the Plaintiff to furnish the Defendant a More Definite Statement.

### b. Administrative Fee

The Plaintiff claims that AT&T charged a "bogus" administrative fee and that AT&T misrepresented what the administrative fee was being used for. The Plaintiff has made a sufficient claim to survive a Motion to Dismiss by these allegations. The Defendant's Motion to

Dismiss is therefore **DENIED**. *Deere Construction, LLC v. Cemex Construction Materials*, 198 F.Supp.3d 1332 (S.D. Fla. 2016). The Plaintiff, however, must provide to the Defendant how the charge was "bogus" and "misrepresented" in the contract. The Plaintiff must also provide a copy of the dispute furnished to AT&T pursuant to Paragraph 1.4 of the Contract. The Plaintiff has ten days to furnish a more definite statement and a copy or detail concerning the bill dispute as referenced in the Contract.

## COUNT 5 - UNJUST ENRICHMENT

This Court **GRANTS** the Defendant's Motion to Dismiss Count 5 with prejudice. The written contract exists concerning the same subject matter. *See Sterling Breeze Ass'n., Inc. v. New Sterling*, 255 So.3d 434 (Fla. 1st DCA 2018).

## COUNT 6 - PURE BILL OF DISCOVERY

Count 6 of the Complaint is a Pure Bill of Discovery Claim. Florida law is clear that there are very few circumstances in which a Pure Bill of Discovery Claim will survive. *The Complaint for a Pure Bill of Discovery - A Living, Breathing, Modern Day Dinosaur*, Florida Bar Journal, Volume 78, No. 3, March 2004. A pure bill of discovery is forbidden when the action is a fishing expedition and when there is an adequate remedy at law. *See, e.g. Adventist Health System v. Hegwood*, 569 So.2d 1295 (Fla. 5th DCA 1990).

In this claim, the Plaintiff now seeks to obtain information from AT&T regarding AT&T's collection of geolocation data and whether it was sold to any other third parties inappropriately. The Plaintiff has alleged that a host of companies received this Plaintiff's personal information and is ultimately asking this Court to require AT&T to provide a litany of documents to the Plaintiff.

These include:

  1) Any code of business ethics in effect when Plaintiff became a customer of AT&T Mobility.

It should be noted that this Court has reviewed the Complaint and can find no statement as to when this Plaintiff became an AT&T Customer or even what the Plaintiff's phone number was. Additionally, this Court notes that any "code of business ethics" is vague. This Claim is therefore DISMISSED without prejudice.

  2)  Any specific information regarding Plaintiff's location data maintained by AT&T or its

<u>affiliates and whether said data was improperly sold or divulged to anyone improperly, including data aggregators.</u>

This Court **GRANTS** the Motion to Dismiss with prejudice. However, AT&T is hereby Ordered to maintain this information, if AT&T still retains the information.

3)   <u>Any contract or agreement between AT&T and Microbilt during Plaintiff's time as a customer.</u>

A pure bill of discovery is not allowed in order to see if a cause of action exists. *See Mendez v. Cochran*, 700 So.2d 46 (Fla. 4th DCA 1997). This Court is aware of the distinction made in *Adventist Health*, *supra.,* and finds that none of those same circumstances exist, the Defendant's Motion to Dismiss is **GRANTED** with prejudice.

4)   <u>Any contract between AT&T and TechnoCom d/b/a Location Smart.</u>

This request is designed to see if a cause of action exists. Florida law prohibits such a cause of action. The Motion to Dismiss is **GRANTED with prejudice.** *See Mendez, supra. See also, Vorbeck v. Betancourt*, 107 So.3d 1142 (Fla. 3d DCA 2012).

5.   <u>Five reviews or audits of its disclosure of customer location information to third parties.</u>

The Motion to Dismiss is **GRANTED** with prejudice, *Id.*

6.   <u>Any written policies and procedures in place regarding the safekeeping of confidential proprietary network information.</u>

The Plaintiff fails to allege what policies or procedures in place, by whom they are retained, or what entity prepared them. This Court finds the request irrelevant and **GRANTS** the Motion to Dismiss with prejudice.

7. <u>Any written policies and procedures in place regarding the safekeeping of confidential proprietary  information.</u>

The Plaintiff fails to allege what policies or procedures in place, by whom they are retained, or what entity prepared them. This Court finds the request irrelevant and **GRANTS** the Motion to Dismiss with prejudice.

<p style="text-align:center">7. <u>Any contract between AT&T and Zumigo.</u></p>

This request is designed to see if a cause of action exists. Florida law prohibits such a cause of action. The Motion to Dismiss is **GRANTED with prejudice.** *See Mendez, supra.*

<p style="text-align:center"><u>CONCLUSION</u></p>

The Defendant's Motion to Dismiss Counts 1 and 2 are **DENIED**. The Defendant has 20 days to answer. As to Count 3 and any injunctive relief the Plaintiff may seek, the Motion to Dismiss is **GRANTED** without prejudice. As to the Declaratory Judgment, the Motion to Dismiss is **GRANTED** with prejudice. As to Count 4, Breach of Contract, the Motion to Dismiss as to Throttling is **DENIED**. The Plaintiff has 10 days to file a More Definite Statement. As to the Administrative Fee, the Defendant's Motion to Dismiss is **DENIED**. The Plaintiff must file a More Definite Statement within 10 days. As to Count 5, the Motion to Dismiss is **GRANTED** with prejudice. As to Count 6, the Motion to Dismiss seven of the requested items is **GRANTED** with prejudice and as to one remaining item, the Motion to Dismiss is **GRANTED** without prejudice.

**DONE** and **ORDERED** in Chambers at Miami-Dade County, Florida on this <u>15th day of July,</u> <u>2021</u>.

<p style="text-align:right">2020-001293-SP-24 07-15-2021 5:48 PM</p>

<p style="text-align:center"><u>2020-001293-SP-24 07-15-2021 5:48 PM</u><br>Hon. Stephanie Silver<br><br>**COUNTY COURT JUDGE**<br>Electronically Signed</p>

No Further Judicial Action Required on **THIS MOTION**

CLERK TO **RECLOSE** CASE IF POST JUDGMENT

**Electronically Served:**

Andrew R. Ingalls, aingalls@daypitney.com

Andrew R. Ingalls, brodriguez@daypitney.com

Evelyn Davila, edavila@daypitney.com

Jessica Solorzano, jsolorzano@daypitney.com

Manuel A. Garcia-Linares, mgarcialinares@daypitney.com

Manuel A. Garcia-Linares, brodriguez@daypitney.com

Maury L Udell, notice66@bmulaw.com

Rachel Kittl, rkittl@bmulaw.com

**Physically Served:**

Case 1:25-cv-20381-RAR Document 1-2 Entered on FLSD Docket 01/27/2025 Page 470 of 1553

**IN THE COUNTY COURT OF THE ELEVENTH JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA**

CASE NO: 2019-017777-SP-23
SECTION: ND03
JUDGE: Linda Singer Stein

**Wilson Enriquez**

Plaintiff(s) / Petitioner(s)

vs.

**A T & T Mobility (LLC)**

Defendant(s) / Respondent(s)

_____/

## ORDER ON DEFENDANT'S AMENDED MOTION TO DISMISS PLAINTIFF'S SECOND AMENDED COMPLAINT

This cause came before the Court on Defendant's Amended Motion to Dismiss Plaintiff's Second Amended Complaint. After careful consideration, presiding over a hearing, review of the motion, response, the Second Amended Complaint, legal authorities and the applicable standard on a motion to dismiss, the Court's rulings are set forth below.

A motion to dismiss merely tests the legal sufficiency of a complaint. It cannot be used to resolve factual disputes. Minor v. Brunetti, 43 So.3d 178, 179 (Fla. 3d DCA 2010).  When ruling on such a motion, a trial court must accept all factual allegations as true and must construe all reasonable inferences in favor of the pleader. Id.

Plaintiff has referred to Defendant's customer agreement and website in its Second Amended Complaint. While the Court is generally limited to the complaint's four corners, it is required to consider exhibits attached to and incorporated into the complaint. Rolle v. Cold Stone Creamery, Inc., 212 So.3d 1073, 1076 (Fla. 3d DCA 2017). When a party refers to a document in the complaint, the trial court may use that document to assess the nature of the claims alleged in the complaint. Glen Garron, LLC. v. Buchwald, 210 So.3d 229, 233 (Fla. 5th DCA 2017) and One Call Prop. Servs., Inc. v. Security First Ins. Co., 165 So.3d 749, 752 (Fla. 4th DCA 2015).

**COUNTS I, II and III are ruled on as follows:**

As to all allegations in the Second Amended Complaint regarding an alleged failure to disclose an Administrative Fee, Defendant's Motion to Dismiss is GRANTED with prejudice.  The Administrative Fee is disclosed in Section 1.4 of the Wireless Customer Agreement referenced in Plaintiff's Second Amended Complaint.

As to all allegations in the Second Amended Complaint that the Administrative Fee is an illegal "pass-through" fee, Defendant's Motion to Dismiss is GRANTED with prejudice.  The plain language in the Defendant's website, which is also referenced in the Plaintiff's Second Amended Complaint, states that the Fee is charged in order for Defendant to "recover" certain fees it has incurred, not to pay fees it is incurring.

As to the allegations in the Second Amended Complaint that Defendant's practice of applying the Administrative Fee is in and of itself unfair and deceptive, Defendant's Motion to Dismiss is DENIED.

As to all allegations in the Second Amended Complaint regarding improper data throttling, Defendant's Motion to Dismiss is DENIED.

**COUNT IV for Unjust Enrichment:** Defendant's Motion to Dismiss is GRANTED with prejudice.


**DONE** and **ORDERED** in Chambers at Miami-Dade County, Florida on this 28th day of June, 2021.


2019-017777-SP-23 06-28-2021 2:41 PM

2019-017777-SP-23 06-28-2021 2:41 PM
Hon. Linda Singer Stein

**COUNTY COURT JUDGE**
Electronically Signed

No Further Judicial Action Required on **THIS MOTION**

CLERK TO **RECLOSE** CASE IF POST JUDGMENT


**Electronically Served:**
Andrew Robert Ingalls, aingalls@daypitney.com
Andrew Robert Ingalls, brodriguez@daypitney.com
Evelyn Davila, edavila@daypitney.com
Jessica Solorzano, jsolorzano@daypitney.com
Manuel A. Garcia-Linares, mgarcialinares@daypitney.com
Manuel A. Garcia-Linares, brodriguez@daypitney.com

Maury L Udell, notice66@bmulaw.com
Rachel L. Kittl, rkittl@bmulaw.com

**Physically Served:**

**IN THE COUNTY COURT OF THE ELEVENTH JUDICIAL
CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA**

CASE NO: 2019-017777-SP-23
SECTION: ND03
JUDGE: Linda Singer Stein

**Wilson Enriquez**

Plaintiff(s) / Petitioner(s)

vs.

**A T & T Mobility (LLC)**

Defendant(s) / Respondent(s)

_____/

### ORDER ON DEFENDANT'S MOTION FOR RECONSIDERATION ON MOTION TO DISMISS AND MOTION FOR EXTENSION OF TIME TO RESPOND TO COUNTS 1, 2 AND 3

This cause came before the Court on the above titled motion with regard to the Plaintiff's allegations of throttling. After careful consideration of the motion, response and reply, Defendant's Motion for Reconsideration on its June 28, 2021 Order on dismissal is GRANTED in part as to Count I (fraud) and DENIED in part as to Count 2 (good faith and fair dealing and Count 3 (FDUTPA). The Court clarifies its ruling as follows. As quoted by Defendant, the Wireless Customer Agreement (WCA) states "AT & T may reduce your data throughput speeds at any time or place **if** your data usage exceeds an applicable, identified usage threshold during any billing cycle." (Emphasis added).

Accordingly, in reconsidering the Defendant's motion to dismiss and the language of the WCA, the Court reconsiders its Order dated June 28, 2021 and finds that Count I for fraud is DISMISSED with prejudice. Based upon the language of the WCA, Counts 2 and 3 withstand a motion to dismiss on the allegations of throttling and, therefore, Defendant's Motion for Reconsideration to Dismiss those counts is DENIED.

Defendant's Motion for Extension of Time to Respond to Counts 1, 2 and 3 are GRANTED.

**DONE** and **ORDERED** in Chambers at Miami-Dade County, Florida on this <u>14th day of September, 2021</u>.

<u>2019-017777-SP-23 09-14-2021 12:07 PM</u>
Hon. Linda Singer Stein

**COUNTY COURT JUDGE**
Electronically Signed

No Further Judicial Action Required on **THIS MOTION**

CLERK TO **RECLOSE** CASE IF POST JUDGMENT

**Electronically Served:**
Andrew Robert Ingalls, aingalls@daypitney.com
Andrew Robert Ingalls, brodriguez@daypitney.com
Evelyn Davila, edavila@daypitney.com
Jessica Solorzano, jsolorzano@daypitney.com
Manuel A. Garcia-Linares, mgarcialinares@daypitney.com
Manuel A. Garcia-Linares, brodriguez@daypitney.com
Maury L Udell, notice66@bmulaw.com
Rachel L. Kittl, rkittl@bmulaw.com

**Physically Served:**

**IN THE COUNTY COURT IN AND FOR
MIAMI-DADE COUNTY, FLORIDA**

**CIVIL DIVISION (01)
CASE NO.: 2019-16864-SP-23 (01)**

ANN GREEN,
**Plaintiff(s)**
vs.

AT&T MOBILITY (LLC)
**Defendant(s)**

_____/

## ORDER ON MOTION TO DISMISS

**THIS CAUSE** having come before the Court on Defendant AT&T Mobility, LLC's

Motion to Dismiss Plaintiff's Amended Complaint.  Upon careful consideration of the parties'

written submissions, and after entertaining oral argument, the Court finds as follows:

### I.    FACTS AS PLED

The Defendant, AT&T Mobility, LLC ("AT&T"), is the cell phone service provider of

Plaintiff. Plaintiff brings six counts in their[1] Amended Complaint: (I) fraud, (II) breach of implied

duty of good faith and fair dealing, (III) damages under the Florida Deceptive and Unfair Trade

Practices Act § 501.201, *et seq.*, Fla. Stat. ("FDUTPA"), (IV) unjust enrichment, (V) declaratory

relief under FDUTPA, and (VI) injunctive relief under FDUTPA. Counts I through IV are based

on two separate and distinct allegations: first that AT&T fraudulently misrepresented the

"unlimited" nature of Plaintiff's data plan and "throttled" Plaintiff's data speeds without Plaintiff's

---

[1] The Court heard five other Motions to Dismiss filed by AT&T at the July 22, 2020 hearing, all directed at complaints filed by Plaintiff's counsel on behalf of other purported AT&T customers that, absent the case caption and plaintiff name, were identical to the Amended Complaint here. For purposes of this Order, which is entered on all six (6) cases heard, the Court will refer to the "Plaintiff" in the plural form.

knowledge or consent which resulted in the Plaintiff's "unlimited" plan being materially limited, and second that AT&T improperly charged an "Administrative Fee" to Plaintiff which was not disclosed to Plaintiff when they signed up for service and is not used as represented by AT&T but is instead a means for AT&T to charge more per month while advertising lower prices. Counts V and VI allege that AT&T may have provided Plaintiff's location data to third-party aggregators and location-based service providers without Plaintiff's consent.

## II.    THE MOTION TO DISMISS

### A. Legal Standard

A motion to dismiss merely tests the legal sufficiency of a complaint; it cannot be used to resolve factual disputes. *Minor v. Brunetti*, 43 So. 3d 178, 179 (Fla. 3d DCA 2010) (citing *The Fla. Bar v. Greene*, 926 So. 2d 1195, 1199 (Fla. 2006)). Accordingly, when ruling on such a motion, a trial court must accept all factual allegations as true and must construe all reasonable inferences in favor of the pleader. *Id.*

While the Court is generally limited to the complaint's four corners, it is required to consider exhibits attached to and incorporated into the complaint. *Rolle v. Cold Stone Creamery, Inc.*, 212 So. 3d 1073, 1076 (Fla. 3d DCA 2017). Moreover, when a party refers to a document in the complaint, the trial court may use that document to assess the nature of the claims alleged in the complaint. *Glen Garron, LLC v. Buchwald*, 210 So. 3d 229, 233 (Fla. 5th DCA 2017); *One Call Prop. Servs., Inc. v. Security First Ins. Co.*, 165 So. 3d 749, 752 (Fla. 4th DCA 2015) ("[W]here the terms of a legal document are impliedly incorporated by reference into the complaint, the trial court may consider the contents of the document in ruling on a motion to dismiss."); *Golden Gate Homes, LC v. Levey*, 59 So. 3d 275, 280 (Fla. 3d DCA 2011) (reviewing

complaint's "well-pled allegations and incorporated attachments" on a motion to dismiss); *see also Rolle*, 212 So. 3d at 1076.

Attached to AT&T's Motion to Dismiss is a copy of the alleged controlling contract between Plaintiff and AT&T, the fee schedule from AT&Ts website, and a copy of a billing statement from Plaintiff's specific account with AT&T. Notably, Plaintiff does not contest the veracity of the exhibits, only this Court's ability to consider them. Pl.'s Resp. to Mot. to Dismiss ¶ 2. Because the Amended Complaint specifically references, incorporates, and quotes from these documents, they are within the four corners of the Amended Complaint and will be considered by the Court in ruling on the underlying motion.[2]

### B. Analysis

<u>**Counts I-III as they relate to "throttling" of the Plaintiff's data speeds**</u>

In Florida, "[a] party cannot recover for alleged false misrepresentations that are adequately dealt with or expressly contradicted in a later written contract." *TRG Night Hawk Ltd. v. Registry Dev. Corp.*, 17 So. 3d 782, 784 (Fla. 2d DCA 2009); *see also Taylor Woodrow Homes Fla., Inc. v. 4/46-A Corp.*, 850 So. 2d 536, 542 (Fla. 5th DCA 2003). "'To hold otherwise is to invite contracting parties to make agreements of the kind in suit and then avoid them by simply taking the stand and swearing that they relied on some other statement.'" *TRG Night Hawk Ltd.*, 17 So. 3d at 784 (citing *Tevini v. Roscioli Yacht Sales, Inc.*, 597 So.2d 913, 914 (Fla. 4th DCA 1992)). Moreover, "a party who signs a contract whose terms contradict the alleged misrepresentations on

---

[2] The Amended Complaint specifically references, incorporates, and quotes from the Wireless Customer Agreement, AT&T's website, and AT&T billing statements. (Am. Compl. ¶¶ 15-16, 29-31, 33, 38-43, 47-49 (Agreement); ¶¶ 22-24, 33, 40, 56-57, 64 (AT&T's website), ¶¶ 19, 21-22, 33, 53, 56, 63 (billing statements)). While the Amended Complaint alleges that Plaintiff did not attach the Agreement because "it is under the exclusive control of AT&T," Am. Compl. ¶¶ 30, 49, Plaintiff's counsel abandoned that assertion at the hearing, where it was undisputed that the Agreement is available on AT&T's website. Tr. 28:24-25; 49:18-20; 50:15-16.

which he relied is barred 'from seeking relief pursuant to FDUTPA, as she acted unreasonably.'" *Id.* (citing *Rosa v. Amoco Oil Co.*, 262 F. Supp. 2d 1364, 1368 (S.D. Fla. 2003)). At the pleading stage, "where the allegations of the complaint are contradicted by the exhibits, the plain meaning of the exhibits will control." *Ginsburg v. Lennar Fla. Holdings, Inc.*, 645 So. 2d 490, 494 (Fla. 3d DCA 1994).

Here, the allegations in the complaint are related to alleged acts or omission which are explicitly refuted by the later contract. For example, Plaintiff alleges that AT&T, "[b]y virtue of its advertisement of unlimited data to Plaintiff for a set price . . . undertook the duty to disclose . . . that it intended to throttle Plaintiff's data. . . ." Am. Compl. ¶¶ 29, 31. As the Wireless Consumer Agreement shows, AT&T did in fact disclose that it intended to throttle Plaintiff's data and makes it clear that the term "unlimited" refers to the *amount* of data, not the *speed* of that data. Unlike customers on tiered data plans, unlimited customers pay a set price without regard to the *amount* of data used. Plaintiff's belief that "unlimited" refers to both the amount and speed of the data is contradicted by the terms of the contract as shown by the following comparison:

| Allegation | Contract |
| --- | --- |
| AT&T represented, directly or indirectly, expressly or by implication, to the Plaintiff, an unlimited mobile data plan customer, that the amount of data that the Plaintiff could access in any billing period would not be limited.<br><br>**Am. Complaint ¶ 30** | **Unlimited Data Customers.** If you are an AT&T unlimited data plan customer, you agree that "unlimited means you pay a fixed monthly charge for wireless data service regardless of how much data you use . . . "unlimited' does not mean that you can use AT&T's wireless data service in any way that you choose, or for any prohibited activities."<br><br>AT&T may reduce your data throughput speeds at any time or place if your data usage exceeds an applicable, identified usage threshold during any billing cycle. |

4

| | |
|---|---|
| | **Motion, Ex. 1 (Agreement) § 6.2 (emphasis in orig.)** |
| AT&T's wireless customer agreements do not state that an unlimited mobile data plan customer's use of more than a specified amount of data is a prohibited activity.<br><br>**Am. Complaint ¶ 15** | "Prohibited Activities" include, among other items, anything that: "excessively and disproportionately contributes to network congestion," "degrades network performance," or can "cause harm to the network or other customers."<br><br>"[U]nlimited" does not mean that you can use AT&T's wireless data service . . . for any prohibited activities.<br><br>**Motion, Ex. 1 (Agreement) § 6.2 (emphasis in orig.)** |
| [The] unlimited mobile data contract with Plaintiff . . . did not provide that AT&T could modify, diminish, or impair the services of who use more than a specified amount of data for permissible activities.<br><br>**Am. Complaint ¶ 15, 47** | AT&T may modify, without advance notice, the permitted and prohibited activities.<br><br>You agree that . . . if you use AT&T's wireless data services in any manner that is prohibited, . . . AT&T may reduce your data throughput speeds at any time or place if your data usage exceeds an applicable, identified usage threshold during any billing cycle.<br><br>**Motion, Ex. 1 (Agreement) § 6.2.** |
| AT&T represented, directly or indirectly, expressly or by implication, to the Plaintiff, an unlimited mobile data plan customer, that the amount of data that the Plaintiff could access in any billing period would not be limited.<br><br>**Am. Complaint ¶ 30** | **Unlimited Data Customers.** If you are an AT&T unlimited data plan customer, you agree that "unlimited means you pay a fixed monthly charge for wireless data service regardless of how much data you use . . . "unlimited' does not mean that you can use AT&T's wireless data service in any way that you choose, or for any prohibited activities."<br><br>AT&T may reduce your data throughput speeds at any time or place if your data usage exceeds an applicable, identified usage threshold during any billing cycle.<br><br>**Motion, Ex. 1 (Agreement) § 6.2** |

| | |
|---|---|
| AT&T omitted the fact that it intended to throttle Plaintiff's data, without Plaintiff's knowledge or specific consent.<br><br>**Am. Complaint ¶ 31** | AT&T may modify, without advance notice, the permitted and prohibited activities, [and] may engage in any reasonable network management practice . . . to reduce network congestion.<br><br>**Motion, Ex. 1 (Agreement) § 6.2** |

Again, where an exhibit attached to a complaint contradicts the allegations in the complaint, the exhibits control and may form the basis for a motion to dismiss. *See Fladell v. Palm Beach Cty. Canvassing Bd.*, 772 So. 2d 1240, 1242 (Fla. 2000) (Upholding the trial court's dismissal of the action *with prejudice* because, even accepting the allegations in the complaint as true, they were fully negated by the exhibits attached to the complaint.) For the reasons stated above, Counts I through III as to the allegations of improper "data throttling" are dismissed *with prejudice*.

### Counts I-III as they relate to allegations of an improper administrative fee

Plaintiff alleges that AT&T has wrongfully charged her a $1.99 monthly Administrative Fee. Plaintiff asserts that the fee is "bogus" for three reasons: (1) AT&T failed to adequately disclose the existence of the Administrative Fee; (2) the Administrative Fee is an illegal "pass-through" fee; and (3) the Administrative Fee is deceptively defined and applied. Am. Compl. ¶¶ 20, 23-24, 27, 53.

As to the first allegation, that AT&T failed to disclose the existence of the Administrative Fee, this is belied by the Amended Complaint and the documents it is based on. The Wireless Customer Agreement expressly discloses the Administrative Fee and AT&T's right to make changes to charges billed to customers. Section 1.4 of the Agreement states: "Charges include, without limitation airtime, roaming, recurring monthly service, activation, **administrative**, and

6

late payment charges . . . whether assessed directly upon you or upon AT&T." Mot. to Dismiss, Ex. 1 § 1.4 (emphasis added). Section 1.3 of the Agreement further reserves the right for AT&T to "make changes to this Agreement" which can include "charges." *Id.* at § 1.3.

Moreover, AT&T's website and billing statement also expressly disclose the existence of the Administrative Fee, with the website defining the recurring fees and the billing statement providing the monthly amount to be charged to Plaintiff's account.[3] Mot. to Dismiss, Exs. 2-3.

The Wireless Customer Agreement, website, and billing statement (which Plaintiff incorporated by reference into the Amended Complaint) refute and thereby negate the assertion that the Administrative Fee was not properly disclosed. Therefore, no claim can proceed on this allegation as a matter of law.

Second, Plaintiff alleges that the Administrative Fee is a "textbook pass through fee" as "it is not what its being used for despite its definition in the wireless agreement." Am. Compl. at ¶ 53. Florida law is clear that an impermissible "pass-through" fee is one that purports to be collected for payment to a <u>third party</u>, but in reality the company is keeping the fee for itself. *See Latman v. Costa Cruise Lines, N.V.*, 758 So. 2d 699, 703 (Fla. 3d DCA 2000). In *Latman*, a cruise line added "port charges" to its ticket price. The term was undefined, however, the Court determined that the plaintiff's allegation that the term itself "informs the consumer that these are 'pass-through' charges paid by the cruise line to the relevant authorities" and not simply monies kept (wholly or partially) by the cruise line, when accepted as true for purposes of a motion to dismiss, was sufficient to allege a violation of FDUTPA. *Id.* at 703 ("We therefore conclude that where the cruise line bills the passenger for port charges but keeps part of the money for itself, that is a deceptive practice under FDUTPA.")

---

[3] Note that the Administrative Fee cannot exceed the $1.99 per month charged per AT&T's website. Mot. to Dismiss, Ex. 2.

Here, there is no allegation that AT&T ever represented or suggested the Administrative Fee would be paid to anyone other than AT&T.  Even if Plaintiff did make the allegation, it would be in contradiction to the plain language of the website which states that the Fee is charged in order for AT&T to "recover" certain fees it has incurred, not to pay fees it is incurring.[4] Therefore the Court finds that Plaintiff has not and cannot allege that the Administrative Fee is a "pass-through" fee and no claim can proceed on these allegations. *See Vorst v. TBC Retail Grp., Inc.*, No. 12-CV-80013, 2012 WL 13026643, at *2 (S.D. Fla. Apr. 12, 2012) (dismissing FDUTPA pass-through claim based on the finding that "Plaintiff's conclusory allegations that the oil disposal fee was represented as a pure pass- through expense and that Defendant retains the fee as a profit are insufficient."); *see also Maor v. Dollar Thrifty Automotive Group, Inc.,* 2018 WL 4698512, *5 (S.D. Fla. 2018) ("Plaintiff has not identified any provisions in the rental contract, and this Court has found none, which constitute a representation to a reasonable consumer that the 'administrative fee' was a pass-through charge which Defendants would pay to others."); *Berry v. Budget Rent A Car Sys., Inc.*, 497 F. Supp. 2d 1361, 1367 (S.D. Fla. 2007) (finding that the term "cost recovery fee" is not a pass-through fee as "itself implies that the company will keep the money collected as 'recovery' for its costs.").

The Court finds Plaintiff's reliance on *Harrison v. Lee Auto Holdings, Inc.* unpersuasive for two reasons. 295 So. 3d 857 (Fla. 5th DCA 2020). First, in *Harrison*, the plaintiff adequately

---

[4] The website language which defines the Administrative Fee is as follows:

> A monthly fee charged to help AT&T recover a portion of certain expenses AT&T incurs, including but not limited to: (a) charges AT&T or its agents pay to interconnect with other carriers to deliver calls from AT&T customers to their customers; and (b) charges associated with cell site rents and maintenance. This fee is not a tax or charge which the government requires AT&T to collect from its customers.

Mot. to Dismiss, Ex. 2 p. 1.

pleaded that an electronic filing fee was "a pass-through charge payable to the government or another third party." *Id.* at 859. Again, the Amended Complaint contains no such allegations. Second, the *Harrison* court based its finding on the fact that the contract between the parties was "reasonably susceptible to more than one interpretation." *Id.* at 863. Here, the Wireless Customer Agreement and website relied upon by Plaintiff are unambiguous in defining the Administrative Fee and how it is to be applied.[5]

Plaintiff has also alleged that the Administrative Fee is "bogus" because AT&T's practice of applying the administrative fee is in and of itself unfair and deceptive. This is Plaintiff's best argument. Quoting from AT&T's website, Plaintiff alleges:

> AT&T's representation that the Administrative Fee is a charge assessed by AT&T that helps defray a portion of certain expenses AT&T incurs, including but not limited to: (a) charges AT&T or its agents pay to interconnect with other carriers to deliver calls from AT&T customers to their customers; and (b) charges associated with cell site rents and maintenance are false.

Am. Compl. ¶¶ 33, 40, 56, 64.[6] According to Plaintiff, the Administrative Fee is not tied to either interconnect or cell site charges because AT&T has continuously increased the fee even though these costs have allegedly decreased. *Id.* ¶¶ 23-27.

Though Plaintiff alleges that AT&T does not actually use the Administrative Fee to offset interconnect costs, cell site rents and/or maintenance charges, and that this is deceptive to consumers, the definition of the Administrative Fee provided *by the Plaintiff* does not limit AT&T to only offsetting those two specific cost categories. Instead, it states that AT&T may recover a

---

[5] "[W]hen the language is clear and unambiguous, it must be construed to mean 'just what the language therein implies and nothing more.' " *Dezer Intracoastal Mall, LLC v. Seahorse Grill, LLC*, 277 So. 3d 187, 190 (Fla. Dist. Ct. App. 2019) (*citing Walgreen Co. v. Habitat Dev. Corp.*, 655 So. 2d 164, 165 (Fla. 3d DCA 1995) (*quoting Camichos v. Diana Stores Corp.*, 157 Fla. 349, 25 So. 2d 864, 870 (1946)).

[6] *See* Fn. 3 for actual language from website.

portion of certain expenses **"including but not limited to"** charges for interconnection and for cell site rents and maintenance. *Id.* ¶¶ 33, 40, 56, 64 (emphasis added). Inclusion of the phrase "including but not limited to" is not in and of itself unfair and deceptive.[7] Therefore, taking Plaintiff's allegations as true, interconnect costs, cell site rents and/or maintenance charges serve as examples of and not limitations to how AT&T can apply the Administrative Fee. Put simply, AT&T's alleged use of the Fee to recover other expenses and costs would still comply with the fee's definition, which is set forth in Plaintiff's own Amended Complaint as taken from AT&T's website, and cannot be considered deceptive, unfair, false, or a violation of the parties' agreement.

However, by definition, the Fee is limited to "recover a portion of certain expenses AT&T incurs" and Plaintiff has plausibly pled that the Administrative Fee is part of "a scheme to funnel direct profit to AT&T rather than pay for any identifiable increase in costs." Am. Compl. ¶ 56. In Paragraph 57, Plaintiff alleges that AT&T knew that the monthly administrative fee was inflated and not the result of good faith financial practices but instead designed to raise profit for the company without a specific actual change in price for services.[8]

Therefore, the allegations of the complaint are such that they are not belied by the exhibits attached to the complaint and the Court will discuss further whether the Plaintiff has stated a claim for fraud, breach of implied duty of good faith and fair dealing, and/or FDUPTA as it relates to the

---

[7] A true statement may be nevertheless deceptive if it omits to state a material fact or facts necessary in order to make the statement not misleading. *See Askew v. Firestone*, 421 So.2d 151, 158 (Fla. 1982)

[8] Despite Plaintiff counsel's repeated argument during the hearing that the Administrative Fee was disclosed to customers as being tied to *increases* in a specific set of expense categories, the Amended Complaint and the website language contain no reference to "increases," and Plaintiff has not alleged any instances where AT&T made such statements. Instead, the language is clear that the Administrative Fees would "recover a portion of certain fees AT&T incurs."

remaining claim that the Administrative Fee is "bogus" because AT&T's practice of applying the administrative fee is in and of itself unfair and deceptive.

## FRAUD

In Florida, a plaintiff must plead fraud by alleging that the defendant: 1) misrepresented a material fact, 2) knew or should have known of the falsity of the statement, 3) intended that the misrepresentation would induce Plaintiff to rely and act on it, and 4) that Plaintiff suffered injury in justifiable reliance on the misrepresentation. *Witt v. La Gorce Country Club, Inc.*, 35 So. 3d 1033, 1040 (Fla. 3d DCA 2010). In Florida, claimants must plead fraud (or fraudulent inducement) with particularity, as required by Rule 1.120(b), *See* Fla. R. Civ. P. 1.120(b) ("[A]ll averments of fraud . . . shall be stated with such particularity as the circumstances may permit."); *Cedars Healthcare Grp., Ltd. v. Mehta*, 16 So. 3d 914, 917 (Fla. 3d DCA 2009).

Here, Plaintiff has pled that 1) the claimed reason for the collection of the Administrative Fee (*i.e.* "to recover a certain portion of expenses that AT&T incurs") is "bogus"; 2) that AT&T is aware that the Administrative Fee is "bogus"; 3) that the "bogus" fee is intended to increase profits to AT&T while allowing AT&T to continue to advertise lower cell phone plan prices to induce customers to sign up; and 4) that the Plaintiff suffered injury (the payment of the "bogus" Administrative Fee) when they relied upon AT&T's false advertising. Am. Compl. ¶¶ 33-36. The Plaintiff has pled her claim for fraud with particularity sufficient to defeat a motion to dismiss as it relates to the allegation that AT&T's practice of applying the administrative fee is in and of itself unfair and deceptive.

## BREACH OF IMPLIED DUTY OF GOOD FAITH AND FAIR DEALING

Florida law recognizes the implied covenant of good faith and fair dealing in every contract, with two limitations:

> First, the implied covenant of good faith should not be invoked to override the express terms of the agreement between the parties.

> Second, a claim for breach of the implied covenant of good faith and fair dealing cannot be maintained under Florida law absent an allegation that an express term of the contract has been breached.

*Ins. Concepts & Design, Inc. v. Healthplan Servs., Inc.*, 785 So. 2d 1232, 1234 (Fla. 4th DCA 2001). Both of these limitations apply here.

Plaintiff's breach allegation as it relates to the Administrative Fee is not tied to any particular provision in the contract. Paragraph 42 of the Amended Complaint alleged "AT&T breached the express terms of the wireless agreement," however, this follows the only allegation in Count II regarding the Administrative Fee which states that the misrepresentations made to the Plaintiff were on its "bills to Plaintiff and its website." Am. Compl. ¶ 40. Section 1.4 of the Agreement states: "Charges include, without limitation airtime, roaming, recurring monthly service, activation, administrative, and late payment charges . . . whether assessed directly upon you or upon AT&T." Mot. to Dismiss, Ex. 1 § 1.4. The Wireless Customer Agreement, in section 1.3, further reserves the right for AT&T to "make changes to this Agreement" which can include "charges." *Id.* at § 1.3. Therefore, Count II is dismissed without prejudice for failure to state a cause of action for breach of implied duty of good faith and fair dealing with leave to amend to identify the express term(s) of the Agreement alleged to have been breached.

## FDUTPA

The FDUTPA prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.204(1). To state a FDUTPA claim, a plaintiff must allege "(1) a deceptive act or unfair trade practice; (2) causation; and (3) actual damages." *Dolphin LLC v. WCI*

*Cmtys. Inc.,* 715 F.3d 1243, 1250 (11th Cir. 2013) (citing *Rollins, Inc. v. Butland,* 951 So. 2d 860, 869 (Fla. 2d DCA 2006)). An unfair practice is "one that offends established public policy and ... [one that] is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." *Hetrick v. Ideal Image Dev. Corp.,* 372 F. App'x 985, 992 (11th Cir. 2010) (quoting *Samuels v. King Motor Co. of Fort Lauderdale,* 782 So. 2d 489, 499 (Fla. 4th DCA 2001)).

As previously discussed, Plaintiff has plausibly pled that the Administrative Fee is part of "a scheme to funnel direct profit to AT&T rather than pay for any identifiable increase in costs." Am. Compl. ¶ 56. Plaintiff alleges that AT&T knew that the monthly administrative fee was inflated and not the result of good faith financial practices but instead designed to raise profit for the company without a specific actual change in price for services. Am. Compl. ¶ 57. Lastly, the wireless bill attached to AT&T's Motion to Dismiss shows that Plaintiff was in fact charged a monthly administrative fee of $1.99. Mot. to Dismiss, Ex. 3.

The Plaintiff has stated a cause of action for FDUTPA violation based on the allegation that AT&T's practice of applying the administrative fee is in and of itself unfair and deceptive and AT&T's Motion to Dismiss is due to be denied on this basis.

## Count IV Unjust Enrichment

"Florida law is clear that 'a plaintiff cannot pursue a quasi-contract claim for unjust enrichment if an express contract exists concerning the same subject matter.'" *Sterling Breeze Owners' Ass'n, Inc. v. New Sterling Resorts, LLC,* 255 So. 3d 434, 437 (Fla. 1st DCA 2018), *reh'g denied* (Oct. 16, 2018); *Kovtan v. Frederiksen,* 449 So.2d 1, 1 (Fla. 2d DCA 1984) ("It is well settled that the law will not imply a contract where an express contract exists concerning the same subject matter."); *In re Estate of Lonstein,* 433 So.2d 672, 674 (Fla. 4th DCA 1983) (same). A contract implied in law, or "quasi contract," operates when there is no contract "to provide a

remedy where one party was unjustly enriched, where that party received a benefit under circumstances that made it unjust to retain it without giving compensation." *Commerce P'ship. 8098 Ltd. P'ship v. Equity Contracting Co., Inc.,* 695 So.2d 383, 386 (Fla. 4th DCA 1997).

The Plaintiff has acknowledged the existence of a contract between the parties that governs the subject matter of this lawsuit, thus barring Plaintiff's quasi- contract claim for unjust enrichment. Plaintiff's unjust enrichment claim cannot be cured though amendment. In cases where it is apparent that a pleading cannot be amended to state a cause of action, or where an amendment would be futile, dismissal *with prejudice* is appropriate. *Central Florida Investments, Inc. v. Charles Levin Timeshares,* 659 So. 2d 492 (Fla. 5th DCA 1995).

### Counts V & VI declaratory and injunctive relief pursuant to FDUPTA

Florida Statutes § 501.211(1), which establishes the cause of action for declaratory or injunctive relief under FDUTPA, provides in pertinent part:

> Without regard to any other remedy or relief to which a person is entitled, anyone aggrieved by a violation of this part may bring an action to obtain a declaratory judgment that an act or practice violates this part and to enjoin a person who has violated, is violating, or is otherwise likely to violate this part.

To state a claim for injunctive or declaratory relief under FDUTPA, a plaintiff "must show (1) that it is aggrieved, in that its rights have been, are being, or will be adversely affected, by (2) a violation of FDUTPA, meaning an unfair or deceptive practice which is injurious to consumers." *Stewart Agency, Inc. v. Arrigo Enterprises, Inc.,* 266 So. 3d 207, 214 (Fla. 4th DCA 2019) ("for someone to be aggrieved, the injury claimed to have been suffered cannot be merely speculative." *Ahearn,* 180 So. 3d at 173). "Put plainly, a plaintiff is 'aggrieved' under FDUTPA when the deceptive conduct alleged has caused a **non-speculative injury** that has affected the plaintiff beyond a general interest in curbing deceptive or unfair conduct." *Superior Consulting*

14

*Servs., Inc. v. Shaklee Corp.*, No. 616CV2001ORL31GJK, 2017 WL 2834783, at *7 (M.D. Fla. June 30, 2017) (emphasis added).

Counts V and VI are based on Plaintiff's "belie[f]" that AT&T provided Plaintiff's geolocation data to unauthorized persons without Plaintiff's consent. Am. Compl. ¶¶ 95, 128. While the Amended Complaint walks through a long narrative of AT&T's alleged failure to protect its customers' geolocation data, it fails to present a single fact tying that alleged failure to Plaintiff or provide any factual basis for Plaintiff's "belief" that Plaintiff's own geolocation data was wrongfully disclosed. Accordingly, the Court concludes that Plaintiff's speculative allegations do not sufficiently allege that Plaintiff's "rights have been, are being, or will be adversely affected," and therefore do not satisfy either Rule 1.110(b) or Rule 1.120(b). *Stewart Agency, Inc.*, 266 So. 3d at 214.[9]

Similarly, Plaintiff's conclusory statement that Plaintiff "believes" they may have been "aggrieved as result of AT&T's knowing and flagrant violation of its own privacy practices" asserts no facts in support and cannot carry Plaintiff's claims. Am. Compl. ¶ 134; *see Nodal-Tarafa v. ARDC Corp.*, 579 So. 2d 414 (Fla. 3d DCA 1991) ("[U]ltimate legal conclusions are . . . patently insufficient to state a cause of action . . . ."). Plaintiff has failed to sufficiently plead that

---

[9] In support of the geolocation claims, Plaintiff attaches, among other items, correspondence between United States Senator Ron Wyden and AT&T regarding alleged unauthorized geolocation disclosure (Am. Compl. Ex. H); and, a February 28, 2020 *Notice of Apparent Liability for Forfeiture and Admonishment* filed by the Federal Communications Commission against AT&T (the "NAL") (Am. Compl. Ex. J). While these exhibits appear to support Plaintiff's claims that AT&T was, in fact, disseminating geolocation data of its customers at one time, they do not relate to the Plaintiff specifically and they seem to indicate that the practice complained of has ceased. Specifically, the letter from AT&T to Senator Wyden attached as Exhibit H to the Amended Complaint states that AT&T "will cease providing location information to all aggregators by the end of March 2019." Ex. H, p. 2. Consistent with this statement, the NAL attached as Exhibit J says that AT&T agreed it would terminate "access to customer location information over the course of 3 months in early 2019." Ex. J, ¶ 69. Whether the practice has in fact ceased is debated by the parties; however, the Court need not conclude the meaning of these exhibits one way or another as the Plaintiff has failed to plead that she is aggrieved as discussed infra.

they have been aggrieved by AT&T's alleged geolocation practice, one of the two basic elements of a claim for equitable relief under FDUTPA. At the hearing, Plaintiff's counsel admitted that he has no evidence to allege more specifically that his client was actually aggrieved and thus the claims for injunctive and declaratory relief under FDUTPA cannot be cured through amendment, requiring dismissal *with prejudice*. Tr. at 67:18-24.

## IV. CONCLUSION

After careful consideration, upon the reasons detailed above, it is hereby **ORDERED and ADJUDGED**:

1. Counts I through III as to the allegations of 1) improper "data throttling"; 2) that the Administrative Fee was not disclosed to the Plaintiff; and 3) that the Administrative Fee is an illegal "pass-through" fee are dismissed *with prejudice* for the reasons stated above.

2. The Motion to Dismiss Counts I and III as to the allegation that AT&T's practice of applying the administrative fee is in and of itself unfair and deceptive is *denied*.

3. Count II is dismissed without prejudice with leave to amend within ten (10) days from the date of this order to identify the express term(s) of the Agreement alleged to have been breached.

4. Count IV, V, and VI are dismissed *with prejudice* for the reasons stated above.

**DONE AND ORDERED** in Dade County, Florida this 25 day of **August 2020.**

SIGNED and DATED

AUG 25 2020

⌈Judge⌋ Myriam Lehr

MYRIAM LEHR
COUNTY COURT JUDGE

**Copies furnished to all parties.**

16

**2019-16864**
**Ann Green vs. AT&T Mobility (LLC)**

**Mauray L. Udell, Esq.**
**150 West Flagler Street, Ste. 1800**
**Miami, Florida   33130-1536**

**Manuel A. Garcia-Linares**
**396 Alhambra Circle N. Tower, Fl. 14**
**Miami, Florida   33134-5045**

Case 1:25-cv-20381-RAR   Document 1-2   Entered on FLSD Docket 01/27/2025   Page 492 of 1553

**IN THE COUNTY COURT OF THE ELEVENTH JUDICIAL
CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA**

CASE NO: 2019-017231-SP-23
SECTION: ND02
JUDGE: Natalie Moore

**Rob Caruso**

Plaintiff(s) / Petitioner(s)

vs.

**A T & T Mobility (LLC)**

Defendant(s) / Respondent(s)

_____/

## ORDER GRANTING DEFENDANT'S MOTION FOR JUDGMENT ON THE PLEADINGS AND FINAL JUDGMENT IN FAVOR OF DEFENDANT

This cause came before the Court on May 26, 2022, on Defendant's motion for judgment on the pleadings. The Court has reviewed the pleadings, heard the arguments of counsel, and considered the applicable law. It is hereby

**ORDERED** and **ADJUDGED** that Defendant's motion for judgment on the pleadings is **GRANTED**.

Plaintiff, Rob Caruso ("Caruso") is proceeding on a four-count statement of claim against Defendant, AT&T Mobility, LLC ("AT&T"). Plaintiff alleges fraud, breach of implied duty of good faith and fair dealing, violation of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") and unjust enrichment.

Pursuant to a contract between Plaintiff and Defendant, AT&T provided cell phone service, including a data plan, to Caruso in exchange for monthly payments. At the heart of each of Plaintiff's claims are two issues. (1) Defendant advertised and sold an "unlimited" data plan but then throttled or slowed data access for users who have exceeded an unspecified data amount in a monthly billing cycle. (2) Defendant charges an administrative fee that Plaintiff argues was not properly disclosed to consumers, is deceptively defined and applied, and is an illegal "pass-through" fee.

Defendant filed a motion for judgment on the pleadings. A motion for judgment on the pleadings tests the legal sufficiency of a cause of action or defense. U.S. Fire Ins. Co. v. ADT Sec. Servs., Inc., 134 So.3d 477, 479 (Fla. 2d DCA 2013). "A party can only obtain judgment on the pleadings if it is entitled to judgment as a matter of law based solely on the pleadings and attachments thereto." Id.  "In passing on a motion for judgment on the pleadings made by a defendant, all well-pleaded material allegations of the complaint and all fair inferences to be drawn therefrom are taken as true and the inquiry concerns whether the plaintiff has stated a viable cause of action." Siegel v. Whitaker, 946 So.2d 1079, 1081 (Fla. 5th DCA 2006).

"It is well settled that a Rule 1.140(c) motion for a judgment on the pleadings must be decided wholly on the pleadings—which includes consideration of exhibits attached thereto." Clarke v. Henderson, 74 So.3d 112,

114 (Fla. 3d DCA 2011). "Any exhibit attached to a pleading shall be considered a part thereof for all purposes." Fla. R. Civ. Pro. 1.130. "When a party refers to a document in the complaint, the trial court may use that document to assess the nature of the claims alleged in the complaint." Glen Garron, LLC v. Buchwald, 210 So.3d 229, 233 (Fla. 5th DCA 2017). Where those exhibits contradict the allegations in the complaint, the exhibits control, and that can lead the Court to order dismissal or judgment on the pleadings. Southeast Med. Prod., Inc. v. Williams, 718 So.2d 306, 307 (Fla. 2nd DCA  1998).

Plaintiff's complaint repeatedly refers to the contract between the parties (also referred to by the parties as the "Wireless Customer Agreement" or the "Mobile Data Contract"), the billing statements issued to Plaintiff, and Defendant's website. In the complaint, Plaintiff states that he does not have possession of the contract between the parties but that it is in Defendant's possession. Plaintiff pleads that the contract, the billing statements, and the website are all central to, or form the basis of, Plaintiff's claims. Plaintiff refers to the "express terms" of the contract, and "representations" on the billing statements and website. When a complaint refers to a document but does not attach it, that document is impliedly incorporated by reference into the complaint and thus becomes part of the pleadings a court may consider. One Call Prop. Servs., Inc. v. Sec. First Ins. Co., 165 So.3d 749, 752 (Fla. 4th DCA 2015).

Defendant attached to its motion a standard contract, a copy of a billing statement sent to Plaintiff, and an excerpt from its website. The contract and the excerpt from the website are publicly available and can by accessed by anyone. Defendant argues that these documents are referred to in the complaint and are therefore impliedly incorporated by reference. Defendant asks the Court to consider these documents as part of the pleadings and use them to decide its motion. Plaintiff argues that the exhibits attached to the motion are unauthenticated, not part of the pleadings or the record, and, therefore, cannot be considered.

The Court concludes that the contract, the billing statement, and the excerpt from the website are incorporated by reference into Plaintiff's complaint. First, while Plaintiff may have argued the documents have not been authenticated, Plaintiff has not made any assertions that the documents provided are inauthentic. Second, this case, and over 200 like it, have been in litigation for nearly three years. For reasons unknown to the Court, Plaintiff has not yet obtained any of these documents in discovery. Plaintiff is obligated to obtain copies of the contract and the documents upon which this claim is premised and amend his statement of claim to include those documents. Plaintiff cannot base his claims on the express language of the contract and representations on the billing statements and website – *that he does not have* – and then argue that the Court cannot consider that same contract, bill, and website once provided. Finally, the Court considered the argument that it has not been shown that the contract and website excerpts provided were the correct versions, as these documents can be changed over time. But because Plaintiff's complaint makes no reference to time, such as when misstatements were made or when the Defendant violated FDUTPA or the implied duty of good faith, the Court finds this argument unpersuasive. Nonetheless, as explained below, the Court would grant Defendant's motion for judgment on the pleadings as to each count, even if the documents provided in the motion were not considered.

## Count 1: Fraud

In Florida, a plaintiff must plead fraud by alleging that the defendant (1) misrepresented a material fact, (2) knew or should have known of the falsity of the statement, (3) intended that the misrepresentation would induce Plaintiff to rely and act on it, and (4) that Plaintiff suffered injury in justifiable reliance on the misrepresentation. Witt v. La Gorce Country Club, Inc., 35 So.3d 1033, 1040 (Fla. 3d DCA 2010). "In all

averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with such particularity as the circumstances may permit." Fla. R. Civ. P. 1.120. "In order for a claim of fraud in the inducement to withstand a motion to dismiss, it must allege fraud with the requisite particularity required by Florida Rule of Civil Procedure 1.120(b), including who made the false statement, the substance of the false statement, the time frame in which it was made, and the context in which the statement was made." Bankers Mut. Cap. Corp. v. U.S. Fid. & Guar. Co., 784 So.2d 485, 490 (Fla. 4th DCA 2001).

To support his fraud claim, Plaintiff asserts that after advertising an "unlimited" data plan, Defendant then had a duty to disclose material information and all related billing practices (namely that data access may be slowed after certain thresholds are surpassed). Plaintiff asserts that Defendant did not disclose its intention to throttle Plaintiff's data access and he would not have purchased an unlimited data plan had that been disclosed. Plaintiff further asserts that Defendant made "representations" on its bills and its website regarding the assessed administrative fee that were false statements of material fact. Plaintiff alleges that Defendant represented the fee is assessed to defray a portion of certain expenses Defendant incurs, yet this is not the actual use of the fee.

As pled, Defendant is entitled to a judgment as a matter of law for the claim of fraud. First, Plaintiff has not stated with particularity what actual statements misrepresenting a material fact were made, when they were made, or how any alleged misrepresentations impacted him. The complaint does not identify a specific statement regarding the nature of "unlimited" data. It does not indicate if or when Plaintiff had his data speeds slowed. It does not explain what damages Plaintiff suffered. Similarly, Plaintiff does not state with particularity when he was told the nature of the administrative fees or what injury he suffered other than the general statement that he relied on the (unidentified) representations and paid the fee.

Next, even if the Court were to consider the terms "unlimited" or "administrative" to be statements, or to look to the descriptions of what Plaintiff alleges are statements on the website and billing statements, Plaintiff fails to explain how the statements are misrepresentations of material facts because Plaintiff does not show the statements are factually incorrect. In Williams v. Burger King Corp., 2020 WL 5083550 (S.D. Fla. July 20, 2020) the court dismissed consumer fraud claims alleging that Burger King 's advertisement of a non-meat "Impossible Burger" was a representation that it would cook the burgers on a grill that did not also cook meat. The court concluded that the advertising of an "Impossible Whopper" represented only that the burger itself would not contain meat and not how it would be cooked. Here, Plaintiff states that Defendant represented "the amount of data that the Plaintiff could access in any billing period would not be limited." But Plaintiff does not allege that this was a material misrepresentation, instead submitting, without any legal basis, that Defendant had a duty to disclose that that some data speeds would be slowed and did not do so. This is likely because Plaintiff cannot credibly argue the offering of an unlimited amount of data includes a promise of how fast the data can be accessed. The slowing of some data does not render the offer of an unlimited plan false.

Similarly, Plaintiff asserts that the billing statements and website represent that the administrative fee is "a charge assessed by AT&T that helps defray a portion of certain expenses AT&T incurs, *including but not limited to*: (a) charges AT&T or its agents pay to interconnect with other carriers to deliver calls from AT&T customers to their customers; and (b) charges associated with cell site rents and maintenance." (Emphasis added.) Plaintiff argues that this statement was false, as the fees were not used for this purpose and Defendant's costs in interconnect charges and cell site charges actually decreased over time. The statement Plaintiff identifies stating how the administrative fee may be used is not an exclusive list. Even if the fee is

used for some other purpose, the plain meaning of the statement described by Plaintiff is not factually incorrect.

Finally, a careful review of the contract, the billing statement, and the excerpt of the website that were produced by Defendant and are impliedly incorporated by reference as exhibits to the complaint shows that those exhibits clearly contradict the allegations in the complaint. For example, the contract between the parties specifically states that "If you are an AT&T unlimited data plan customer, you agree that "unlimited means you pay a fixed monthly charge for wireless data service regardless of how much data you use . . . "unlimited' does not mean that you can use AT&T's wireless data service in any way that you choose, or for any prohibited activities. AT&T may reduce your data throughput speeds at any time or place if your data usage exceeds an applicable, identified usage threshold during any billing cycle." Similarly, the excerpt of the website reflects the exact language identified by Plaintiff, indicating that the administrative fee may be used to defray costs, including but not limited to the costs for interconnection or cell site rents and maintenance. The contract, billing statements, and website expressly and clearly address and allow the conduct Plaintiff alleges is fraudulent. Not only do the exhibits contradict the allegations in the complaint, in Florida, "[a] party cannot recover for alleged false misrepresentations that are adequately dealt with or expressly contradicted in a later written contract." TRG Night Hawk Ltd. v. Registry Dev. Corp., 17 So.3d 782, 784 (Fla. 2d DCA 2009).

**Count 2: Breach of Implied Duty of Good Faith and Fair Dealing**

"The implied covenant of good faith exists in virtually all contractual relationships." *Sepe v. City of Safety Harbor,* 761 So.2d 1182, 1184 (Fla. 2d DCA 2000)*.* This covenant is intended to protect "the reasonable expectations of the contracting parties in light of their express agreement*." Barnes v. Burger King Corp.,* 932 F.Supp. 1420, 1438 (S.D. Fla. 1996). There are two limitations that courts must consider. First, the implied covenant is not an independent term within the parties' contract. Thus, it cannot override an express contractual provision. *Ernie Haire Ford, Inc. v. Ford Motor Co.,* 260 F.3d 1285 (11th Cir. 2001). Second, "a claim for breach of the implied covenant of good faith and fair dealing cannot be maintained under Florida law absent an allegation that an express term of the contract has been breached." Ins. Concepts & Design, Inc. v. Healthplan Servs., Inc., 785 So.2d 1232, 1234 (Fla. 4th DCA 2001). Both apply here.

Plaintiff alleges that Defendant breached the implied covenant of good faith and fair dealing by providing a contract that gave Plaintiff a "reasonable expectation of performance of the agreement with no throttling of Plaintiff's Data plan." Plaintiff further asserts that Defendant was "required to act in a commercially reasonable manner" and not "act capriciously to contravene the reasonable expectations of the Plaintiff." Despite referencing the throttling of data and the objected to administrative fee, Plaintiff never actually asserts that Defendant acted in a commercially unreasonable manner. Instead, Plaintiff asserts that the contract contains *express terms* that required AT&T to provide unlimited data and true administrative costs as defined by the contract. Plaintiff makes the conclusory statement that Defendant breached the express terms of the contract, but never identifies what term of the contract was breached or what conduct constituted a breach. As pled, Plaintiff's claim fails to state a cause of action for breach of the implied covenant of good faith and fair dealing.

Further, looking to the exhibits incorporated by reference in the complaint, the Court concludes that the express terms of the contract allow for the specific conduct to which Plaintiff objects. As the exhibits clearly disprove the allegation that Defendant breached the express terms of the contract, Defendant is entitled to

judgment as a matter of law on this claim.

**Count 3: Florida's Deceptive and Unfair Trade Practices Act.**

A claim for damages under FDUTPA has three elements: (1) a deceptive act or unfair practice, (2) causation, and (3) actual damages." Kia Motors Am. Corp. v. Butler, 985 So.2d 1133, 1140 (Fla. 3d DCA 2008). Plaintiff alleges that Defendant engaged in deceptive acts or unfair practices by imposing data speed restrictions on Plaintiff after entering into a contract that provides for access to unlimited data; by failing to disclose its intention to impose those restrictions on customers with unlimited data plans; and by imposing an administrative fee that is not used as Defendant represents it is used, is unilaterally increased, and, Plaintiff argues, is a "pass-through" fee.

First, the Court finds the conclusory allegation that the administrative fee is a pass-through fee to be insufficiently pled. Florida law is clear that an impermissible "pass-through" fee is one that purports to be collected for payment to a third party but really is retained by the company charging the fee. Latman v. Costa Cruise Lines, N.V., 758 So. 2d 699, 703 (Fla. 3d DCA 2000) (finding that use of the term "port charge" misrepresents to a reasonable consumer that it is a "pass-through" charge which the cruise line will pay to the relevant port authorities). Next, Plaintiff has failed to plead that the alleged deceptive or unfair acts caused harm or that actual damages were incurred.

Finally, as described above, the contract, billing statements, and website excerpt that are incorporated by reference into the complaint clearly refute the allegations made by Plaintiff and expressly allow the conduct Plaintiff identifies. A party cannot recover for alleged false misrepresentations that are addressed and expressly contradicted in a later written contract. Taylor Woodrow Homes Fla., Inc. v. 4/46–A Corp., 850 So.2d 536, 542–43 (Fla. 5th DCA 2003); Hillcrest Pac. Corp. v. Yamamura, 727 So.2d 1053, 1056 (Fla. 4th DCA 1999). A party who signs a contract whose terms contradict the alleged misrepresentations on which he relied is barred from seeking relief pursuant to FDUTPA, as he acted unreasonably. Rosa v. Amoco Oil Co., 262 F.Supp.2d 1364, 1368 (S.D. Fla. 2003). A consumer cannot claim deception when she signed documents containing the agreements she now complains about. "No reasonable consumer would be deceived in this situation." Silver v. Countrywide Home Loans, Inc., 760 F.Supp.2d 1330, 1343 (S.D. Fla. 2011), aff'd, 483 F. App'x 568 (11th Cir. 2012).

**Count 4: Unjust Enrichment**

"The elements of a cause of action for unjust enrichment are (1) plaintiff has conferred a benefit on the defendant, who has knowledge thereof; (2) defendant voluntarily accepts and retains the benefit conferred; and (3) the circumstances are such that it would be inequitable for the defendant to retain the benefit without first paying the value thereof to the plaintiff." Duty Free World, Inc. v. Miami Perfume Junction, Inc., 253 So.3d 689, 693 (Fla. 3d DCA 2018). "Florida law is clear that 'a plaintiff cannot pursue a quasi-contract claim for unjust enrichment if an express contract exists concerning the same subject matter.'" Sterling Breeze Owners' Ass'n, Inc. v. New Sterling Resorts, LLC, 255 So.3d 434, 437 (Fla. 1st DCA 2018).

Plaintiff's claim of unjust enrichment hinges on their assertion that the administrative fee is deceptive—an assertion that, as discussed in detail above, is directly contradicted by both the Wireless Customer Agreement and AT&T's website. The claim also fails because Plaintiff has acknowledged the existence of a contract between the parties that governs the subject matter of this lawsuit, thus barring Plaintiff's quasi-contract claim for unjust enrichment. Id.

For these reasons, Defendant's motion for judgment on the pleadings is GRANTED. Final Judgment is entered in favor of the Defendant. Plaintiff shall take nothing by this action and Defendant shall go hence without day. The Court retains jurisdiction to enter further orders that are proper including, without limitation, to determine entitlement to and amount of costs or attorney's fees.

**DONE** and **ORDERED** in Chambers at Miami-Dade County, Florida on this <u>29th day of July, 2022</u>.

<u>2019-017231-SP-23 07-29-2022 3:34 PM</u>
Hon. Natalie Moore

**COUNTY COURT JUDGE**
Electronically Signed

---

Final Order as to All Parties SRS #: **12** (Other)

THE COURT DISMISSES THIS CASE AGAINST ANY PARTY NOT LISTED IN THIS FINAL ORDER OR PREVIOUS ORDER(S). THIS CASE IS CLOSED AS TO ALL PARTIES.

---

**Electronically Served:**
Alicia Thomsen, athomsen@daypitney.com
Andrew Robert Ingalls, aingalls@daypitney.com
Andrew Robert Ingalls, brodriguez@daypitney.com
Evelyn Davila, edavila@daypitney.com
Jessica Solorzano, jsolorzano@daypitney.com
Manuel A. Garcia-Linares, mgarcialinares@daypitney.com
Manuel A. Garcia-Linares, athomsen@daypitney.com
Maury L Udell, notice66@bmulaw.com
Maury L Udell, blopez@bmulaw.com
Rachel Kittl, rkittl@bmulaw.com

**Physically Served:**

**IN THE COUNTY COURT OF THE ELEVENTH JUDICIAL
CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA**

CASE NO: 2019-017231-SP-23
SECTION: ND02
JUDGE: Natalie Moore

**Rob Caruso**

Plaintiff(s) / Petitioner(s)

vs.

**A T & T Mobility (LLC)**

Defendant(s) / Respondent(s)

_____/

### ORDER GRANTING PLAINTIFF'S MOTION FOR REHEARING AND GRANTING
### DEFENDANT'S MOTION FOR JUDGMENT ON THE PLEADINGS

This cause came before the Court on February 2, 2023, on Plaintiff's motion for rehearing of
Defendant's motion for judgment on the pleadings. The Court has reviewed the pleadings, heard
the arguments of counsel, and considered the applicable law.

It is hereby **ORDERED** and **ADJUDGED** that Plaintiff's motion for rehearing is **GRANTED** for
the reasons stated on the record.

It is further **ORDERED** and **ADJUDGED** that Defendant's motion for judgment on the pleadings
is **GRANTED**.

Plaintiff, Rob Caruso ("Caruso") is proceeding on a four-count complaint against Defendant,
AT&T Mobility, LLC ("AT&T"). Plaintiff alleges fraud, breach of implied duty of good faith and
fair dealing, violation of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") and
unjust enrichment. Pursuant to a contract between Plaintiff and Defendant, AT&T provided cell
phone service, including a data plan, to Caruso in exchange for monthly payments. At the heart of
each of Plaintiff's claims are two issues. (1) Defendant advertised and sold an "unlimited" data plan
but then throttled or slowed data access for users who have exceeded an unspecified data amount in
a monthly billing cycle. (2) Defendant charges an administrative fee that Plaintiff argues was not
properly disclosed to consumers, is deceptively defined and applied, and is an illegal "pass-
through" fee.

Defendant filed a motion for judgment on the pleadings. A motion for judgment on the pleadings
tests the legal sufficiency of a cause of action or defense. U.S. Fire Ins. Co. v. ADT Sec. Servs.,
Inc., 134 So.3d 477, 479 (Fla. 2d DCA 2013). "A party can only obtain judgment on the pleadings
if it is entitled to judgment as a matter of law based solely on the pleadings and attachments
thereto." Id. "In passing on a motion for judgment on the pleadings made by a defendant, all well-
pleaded material allegations of the complaint and all fair inferences to be drawn therefrom are

taken as true and the inquiry concerns whether the plaintiff has stated a viable cause of action." Siegel v. Whitaker, 946 So.2d 1079, 1081 (Fla. 5th DCA 2006). "It is well settled that a Rule 1.140(c) motion for a judgment on the pleadings must be decided wholly on pleadings—which includes consideration of exhibits attached thereto." Clarke v. Henderson, 74 So.3d 112, 114 (Fla. 3d DCA 2011).

## Count 1: Fraud

In Florida, a plaintiff must plead fraud by alleging that the defendant (1) misrepresented a material fact, (2) knew or should have known of the falsity of the statement, (3) intended that the misrepresentation would induce Plaintiff to rely and act on it, and (4) that Plaintiff suffered injury in justifiable reliance on the misrepresentation. Witt v. La Gorce Country Club, Inc., 35 So.3d 1033, 1040 (Fla. 3d DCA 2010). "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with such particularity as the circumstances may permit." Fla. R. Civ. P. 1.120. "In order for a claim of fraud in the inducement to withstand a motion to dismiss, it must allege fraud with the requisite particularity required by Florida Rule of Civil Procedure 1.120(b), including who made the false statement, the substance of the false statement, the time frame in which it was made, and the context in which the statement was made." Bankers Mut. Cap. Corp. v. U.S. Fid. & Guar. Co., 784 So.2d 485, 490 (Fla. 4th DCA 2001).

To support his fraud claim, Plaintiff asserts that after offering an "unlimited" data plan, Defendant then had a duty to disclose material information and all related billing practices (namely that data access may be slowed after certain thresholds are surpassed). Plaintiff asserts that Defendant did not disclose its intention to throttle Plaintiff's data access and he would not have purchased an unlimited data plan had that been disclosed. Plaintiff further asserts that Defendant made representations on its bills and its website regarding the assessed administrative fee that were false statements of material fact. Plaintiff alleges that Defendant represented the fee is assessed to defray a portion of certain expenses Defendant incurs, yet this is not the actual use of the fee.

As pled, Defendant is entitled to a judgment as a matter of law for the claim of fraud. First, despite broadly asserting that Defendant made certain representations or offers, no specifics are provided. Plaintiff has not stated with particularity what actual statements, representations or offers were made, when they were made, where or how they were made, or how any alleged misrepresentations impacted him. The complaint also fails to indicate if or when Plaintiff had his data speeds slowed. It does not explain what damages Plaintiff suffered. Similarly, with regard to the administrative fee, Plaintiff does not state with particularity what injury he suffered other than the general statement that he relied on the (unidentified) representations and paid the fee.

## Count 2: Breach of Implied Duty of Good Faith and Fair Dealing

"The implied covenant of good faith exists in virtually all contractual relationships." Sepe v. City of Safety Harbor, 761 So.2d 1182, 1184 (Fla. 2d DCA 2000). This covenant is intended to protect "the reasonable expectations of the contracting parties in light of their express agreement." Barnes v. Burger King Corp., 932 F.Supp. 1420, 1438 (S.D. Fla. 1996). There are two limitations that courts must consider. First, the implied covenant is not an independent term within the parties' contract. Thus, it cannot override an express contractual provision. Ernie Haire Ford, Inc. v. Ford

Motor Co., 260 F.3d 1285 (11th Cir. 2001). Second, "a claim for breach of the implied covenant of good faith and fair dealing cannot be maintained under Florida law absent an allegation that an express term of the contract has been breached." Ins. Concepts & Design, Inc. v. Healthplan Servs., Inc., 785 So.2d 1232, 1234 (Fla. 4th DCA 2001).

Plaintiff alleges that Defendant breached the implied covenant of good faith and fair dealing by providing a contract that gave Plaintiff a "reasonable expectation of performance of the agreement with no throttling of Plaintiff's Data plan." Plaintiff further asserts that Defendant was "required to act in a commercially reasonable manner" and not "act capriciously to contravene the reasonable expectations of the Plaintiff." Despite referencing the throttling of data and the objected to administrative fee, Plaintiff never actually asserts that Defendant acted in a commercially unreasonable manner. Plaintiff makes the conclusory statement that Defendant breached the express terms of the contract, but never identifies what term of the contract was breached or what conduct constituted a breach. As pled, Plaintiff's claim fails to state a cause of action for breach of the implied covenant of good faith and fair dealing.

## Count 3: Florida's Deceptive and Unfair Trade Practices Act.

A claim for damages under FDUTPA has three elements: (1) a deceptive act or unfair practice, (2) causation, and (3) actual damages." Kia Motors Am. Corp. v. Butler, 985 So.2d 1133, 1140 (Fla. 3d DCA 2008). Plaintiff alleges that Defendant engaged in deceptive acts or unfair practices by imposing data speed restrictions on Plaintiff after entering into a contract that provides for access to unlimited data; by failing to disclose its intention to impose those restrictions on customers with unlimited data plans; and by imposing an administrative fee that is not used as Defendant represents it is used, is unilaterally increased, and, Plaintiff argues, is a "pass-through" fee.

First, the Court finds the conclusory allegation that the administrative fee is a pass-through fee to be insufficiently pled. Florida law is clear that an impermissible "pass-through" fee is one that purports to be collected for payment to a third party but really is retained by the company charging the fee. Latman v. Costa Cruise Lines, N.V., 758 So. 2d 699, 703 (Fla. 3d DCA 2000) (finding that use of the term "port charge" misrepresents to a reasonable consumer that it is a "pass-through" charge which the cruise line will pay to the relevant port authorities). Nor has Plaintiff identified any statement that suggests the administrative fee purports to be collected for or paid to another party. Further, with regard to the deceptive acts and unfair practices that are alleged, Plaintiff has failed to plead that the alleged acts in fact caused harm to this specific Plaintiff or that actual damages were incurred.

## Count 4: Unjust Enrichment

"The elements of a cause of action for unjust enrichment are (1) plaintiff has conferred a benefit on the defendant, who has knowledge thereof; (2) defendant voluntarily accepts and retains the benefit conferred; and (3) the circumstances are such that it would be inequitable for the defendant to retain the benefit without first paying the value thereof to the plaintiff." Duty Free World, Inc. v. Miami Perfume Junction, Inc., 253 So.3d 689, 693 (Fla. 3d DCA 2018). "Florida law is clear that 'a plaintiff cannot pursue a quasi-contract claim for unjust enrichment if an express contract exists concerning the same subject matter.'" Sterling Breeze Owners' Ass'n, Inc. v. New Sterling Resorts,

LLC, 255 So.3d 434, 437 (Fla. 1st DCA 2018). Plaintiff has acknowledged the existence of a contract between the parties that governs the subject matter of this lawsuit, and with express terms relating to the administrative fee and the data plans, thus barring Plaintiff's quasi-contract claim for unjust enrichment. Id.

**Failure to Attach the Contract to the Complaint**

Plaintiff's complaint repeatedly refers to the contract between the parties (also referred to by the parties as the "Wireless Customer Agreement" or the "Mobile Data Contract"), the billing statements issued to Plaintiff, and Defendant's website. In the complaint, Plaintiff states that he does not have possession of the contract between the parties but that it is in Defendant's possession. Plaintiff pleads that the contract, the billing statements, and the website are all central to, or form the basis of, Plaintiff's claims. Plaintiff refers to the "express terms" of the contract, and "representations" on the billing statements and website

Contracts on which an action may be brought, or defense made, must be incorporated in or attached to the pleadings. Fla. R. Civ. Pro. Rule 1.130. "A complaint based on a written instrument does not state a cause of action until the instrument or an adequate portion thereof is attached to or incorporated in the pleading in question." Safeco Ins. Co. of Am. v. Ware, 401 So. 2d 1129, 1130 (Fla. Dist. Ct. App. 1981). If a pleader states that he does not have a copy of the writing involved, then he should obtain a copy thereof through discovery or otherwise and attach it to the appropriate pleading by amendment. Id. Because this action involves a contract on which this action is brought or defense can be made, the complaint fails to state a cause of action and must be amended to include the contract between the parties when the Plaintiff obtains it.

For these reasons, Defendant's motion for judgment on the pleadings is **GRANTED**.

Plaintiff shall have 60 days to amend the complaint to sufficiently state a cause of action. It is further ordered that Defendant shall have 20 days to provide the contract between the parties to Plaintiff. If Fl. R. Civ. Pro. 1.130 requires attachment of the contract or another document to the amended complaint, Plaintiff shall attach it or advise, in the pleadings, that it is not in possession of the contract or document.

**DONE** and **ORDERED** in Chambers at Miami-Dade County, Florida on this 22nd day of February, 2023.

2019-017231-SP-23 02-22-2023 8:16 PM
Hon. Natalie Moore

**COUNTY COURT JUDGE**
Electronically Signed

Final Order as to All Parties SRS #: **12** (Other)

THE COURT DISMISSES THIS CASE AGAINST ANY PARTY NOT LISTED IN THIS FINAL ORDER OR PREVIOUS ORDER(S). THIS CASE IS CLOSED AS TO ALL PARTIES.

**Electronically Served:**
Alicia Thomsen-Lopez, athomsen@daypitney.com
Andrew Robert Ingalls, aingalls@daypitney.com
Andrew Robert Ingalls, brodriguez@daypitney.com
Evelyn Davila, edavila@daypitney.com
Jessica Solorzano, jsolorzano@daypitney.com
Manuel A. Garcia-Linares, mgarcialinares@daypitney.com
Manuel A. Garcia-Linares, athomsen@daypitney.com
Maury L Udell, notice66@bmulaw.com
Maury L Udell, blopez@bmulaw.com
Rachel Kittl, rkittl@bmulaw.com


**Physically Served:**

Case 1:25-cv-20381-RAR Document 1-2 Entered on FLSD Docket 01/27/2025 Page 503 of 1553

**IN THE COUNTY COURT OF THE ELEVENTH JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA**

CASE NO: 2022-047425-SP-25
SECTION: CG03
JUDGE: Patricia Marino Pedraza

**Steven Braverman**

Plaintiff(s) / Petitioner(s)

vs.

**AT&T Mobility, LLC**

Defendant(s) / Respondent(s)

_____/

## ORDER DENYING MOTION TO DISMISS

THIS CAUSE having come before the Court on [D.E. 21] Defendant's Motion to Dismiss Amended Statement of Claim on January 17, 2024, having heard argument of counsel, having fully reviewed the record and materials and case law submitted by the parties, and being otherwise fully advised in the premises therein, it is hereby:

## PROCEDURAL BACKGROUND

Plaintiff filed an amended statement of claim on August 30, 2023 [D.E.14] which pled four (4) counts: (1) FDUPTA damages, (2) FDUPTA declaratory relief (3) Unjust Enrichment and (4) Pure Bill of Discovery. Plaintiff has withdrawn Count 4 without prejudice at the hearing. For the following reasons AT&T's Motion to Dismiss Amended Counts 1 -3 of the Amended Statement of Claim is DENIED.

## LEGAL STANDARD

Generally, a motion to dismiss tests only the legal sufficiency of a complaint and it is not intended to determine issues of ultimate fact. "[T]he trial court is necessarily confined to the well-pled facts alleged in the four corners of the complaint." Lewis v.

Barnett Bank of S. Florida, N.A., 604 So. 2d 937 (Fla. 3d DCA 1992). The primary purpose of a motion to dismiss is to request the trial court to determine whether the complaint properly states a cause of action upon which relief can be granted and, if it does not, to enter an order of dismissal. Provence v. Palm Beach Taverns, Inc., 676 So. 2d 1022 (Fla. 4th DCA 1996). The court must draw all reasonable inferences in favor of the nonmoving party. *Id.* Thus, the question for this Court to decide is whether, assuming the well pleaded factual allegations in the amended statement of claim are true, Plaintiff would be entitled to the relief requested. A motion to dismiss that attempts to contest the merits of the claims is procedurally improper. *See* Hill v Murphy, 872 So. 2d 919, 921 (Fla. 2d DCA 2003); *see also* HSBC Bank USA, N.A. v. Nelson, 246 So.3d 486, 489 (Fla. 2d DCA 2018) ("[m]otions to dismiss and for summary judgment are not interchangeable, and may not be substituted for another").

## ANALYSIS

### I. This Court Cannot Rely Unauthenticated Documents not Attached to the Complaint in Ruling on a Motion to Dismiss

A trial court may not rely on any documents that are not attached to the complaint when considering the motion to dismiss. Kidwell Grp., LLC. v. Am. Integrity Ins. Co. of Fla., 339 So. 3d 1068 (Fla. 2d DCA 2022). AT&T has provided no case law to support its claim that something outside the pleadings can be considered on a motion to dismiss. The authenticity of AT&T's documents and website referenced in AT&T's motion—as well as the question whether the complete website is appended to the motion, cannot be verified and therefore cannot be considered on a motion to dismiss. See Legacy Entm't Grp., LLC v. Endemol USA, 2015 WL 12838795, at *4 (M.D. Fla. Oct. 1, 2015) (Declining to consider "excerpts from a third-party website" on the ground that a defendant "'must attach the entirety of the document, not just excerpts' or summaries, because it is not possible to determine a document's authenticity or accuracy without a complete picture." (ellipsis and citation omitted). Therefore, Defendant's Motion to Dismiss based on language referenced in the purported contracts and documents would be an attempted short-cut of the Court's function.

### II. Plaintiff's Amended Statement of Claim States a Cause of Action for Violation of FDUPTA

Defendant does not suggest that Plaintiff's Complaint has failed to plead the elements of a cause of action for FDUTPA.  In reviewing the complaint in the light most favorable to the Plaintiff, courts have held that misrepresentations regarding similar charges support FDUTPA claims. See, e.g., <u>James D. Hinson Elec. Contracting Co., Inc. v. Bell South Telecommunications, Inc.</u>, 796 F.Supp.2d 1341, 1353 (M.D. Fla. 2011) (inclusion of unrecoverable charges for "claims processing" in costs of damage to underground facilities billed to excavators); <u>Turner Greenberg Assocs., Inc. v. Pathman</u>, 885 So.2d 1004, 1008 (Fla. 4th DCA 2004) (furniture store's collection of a freight/insurance charge in connection with financed furniture sales was a "[A] claim for damages under FDUTPA has three elements: (1) a deceptive act or unfair practice; (2) causation; and (3) actual damages."). *See also* <u>Rollins v. Butland</u>, 951 So. 2d 860, 867-69 (Fla. 2d DCA 2006).  Plaintiffs' amended statement of claim has pled the necessary elements under Florida law. See paragraphs 50-63 of the amended statement of claim. In <u>Gundel v. AV Homes, Inc.</u>, 290 So. 3d 1080 (Fla. 2d DCA 2020), the Second District Court of Appeal reiterated the law of Florida that reliance is not an element of a claim for damages under the FDUTPA.

Moreover, FDUTPA claims can be based on deceptive or unfair practices that do not involve fraud ... and need not be pled with particularity. S<u>IG, Inc. v. AT & T Digital Life, Inc.</u>, 971 F.Supp.2d 1178, 1195 (S.D. Fla. 2013); See <u>Perret v. Wyndham Vacation Resorts, Inc.</u>, 846 F.Supp.2d 1327, 1333 (S.D.Fla.2012); <u>Hill v. Hoover Co.</u>, 899 F.Supp.2d 1259, 1263 (N.D.Fla. 2012). Courts routinely refuse to excise "in line item fashion" portions of a complaint where the claim at hand is otherwise adequately stated. See, e.g., <u>Fox v. Loews Corp.</u>, 309 F. Supp. 3d 1241, 1251 (S.D. Fla. 2018); <u>Mansoorian v. Brock & Scott, PLLC</u>, No. 8:18-cv-1876-T33TGW, 2018 WL 6413484, at *5 (M.D. Fla. Dec. 6, 2018) (denying motion to dismiss and refusing to strike certain allegations "merely because [defendant]contends that some of the allegations are insufficient" and even though plaintiffs "may not be entitled to relief on all claims." Because the statute is designed to protect consumers, the scope of the conduct that may constitute an "unfair or deceptive" practice is "extremely broad." <u>Day v. Le–Jo Enters., Inc.</u>, 521 So. 2d 175, 177 (Fla. 3d DCA 1988). A "claim under FDUTPA is not defined by the express terms of a contract, but instead encompasses unfair and deceptive practices arising out of business relationships." See <u>Siever v. BWGaskets, Inc.</u>, 669 F. Supp. 2d 1286, 1293 (M.D. Fla. 2009).

Whether a practice is "deceptive or unfair" is determined by an objective analysis, and ordinarily is a question of fact for the jury to determine. See Calderon v. Sixt Rental Car, LLC, 2020 WL 700381 (S.D.Fla. 2020). In Calderon, the plaintiff alleged that Sixt Rental attempted to merge the two contracts in order to perpetuate their "systematic scheme" of charging customers fraudulent fees to bring in additional revenue. The Court held that the complaint states a cause of action based on the allegation of an illegal profit scheme through the use of "fees". Similarly in in Deere Construction, LLC v. Cemex Construction Materials Fla., LLC, 198 F.Supp.3d 1332 (S.D.Fla., 2016), the district court in ruling on the viability of a FDUPTA claim held that:

> [W]ith regard to the claimed deceptive act or unfair practice, the Amended Complaint makes abundantly clear Plaintiff's claim is not that it did not know about the "fuel surcharge" and "environmental charge. Those fees are undoubtedly disclosed in the agreement and Defendants' invoices. What is allegedly deceptive is that the so called "fuel surcharges" and "environmental charges," labeled as such by Defendants, were not in fact designed to cover anything related to fuel or the environment. Defendants chose the two adjectives that describe the fees being assessed. Each adjective carries meaning. But the messages, according to Plaintiff, are deceptive." Id. at 1338 (emphasis added).

The amended statement of claim alleges that AT&T kept the fee for itself, as additional revenue, and did not use it to defray expenses.  For example, it is alleged in paragraph 18:

**"The so-called Administrative Fee is not, in fact, a bona fide administrative fee, but rather is simply a means for AT&T to charge more per month for the service itself without having to advertise the higher prices as a scheme to increase revenue. AT&T Mobility, LLC's previous in court public admissions (filed by its corporate counsel, Patricia Cruz, Esq.) to the conduct alleged via its filing of its "consent to payment for conduct for the claims**

asserted or which could have been asserted" in the cases of **Erin Young v. AT&T Mobility, LLC**, Case No. 2019-2027-SP-26, EFiling#87601121 or **Tamara Crespo v. AT&T Mobility, LLC**, Case No. 2019-2026-SP26, E-Filing#87600869 both of which alleged AT&T's violation of FDUTPA for illegal data throttling and bogus administrative fee, is further evidence of AT&T Mobility, LLC's illegal, immoral and unethical conduct."

Hence, at its core, the issue is whether, as a matter of fact, AT&T used the administrative fee to defray expenses paid to third parties, or whether it kept it for itself. This presents a fact question that cannot be resolved on a motion to dismiss the complaints. See Advance Mold Servs. v. Universal N. Am. Ins. Co., 2023 WL 8793260 (Fla. 3d DCA Dec. 20, 2023). In Advance Mold Servs., the defendant moved to dismiss an assignee's breach of insurance contract action, contending that a fee designated on an estimate as "Hazardous Waste/Mold Cleaning Supervisory/Admin-per hour" constituted a statutorily prohibited "administrative fee." The plaintiff asserted that the fee was used to 23 | Page pay a supervisor and not as a clerical fee associated with administering the contract. This court held that a question of fact existed, precluding dismissal of complaint, as to whether the fee constituted an "administrative fee."

The Third District Court of Appeal's decision in Advance Mold Servs. is on point. Here, a fact question exists as to whether the administrative fee was what it was represented to be: a fee assessed to defray or recover expenses AT&T pays to third parties associated with providing wireless service. The issue of whether AT&T uses the revenue generated from the administrative fee to defray or recover such expenses, or instead keeps it for itself, is one of fact that cannot be determined on a motion to dismiss the complaint. The allegations of Plaintiff's Count I clearly state a cause of action for FDUPTA violation for damages and Defendant's Motion to Dismiss Said Count is DENIED.

### III. Plaintiff's Amended Statement of Claim States a Cause of Action for Declaratory Relief

In Imperial Fire & Cas. Ins. Co. v. Acosta, 337 So. 3d 89, 92 (Fla. 3d DCA 2021), the Third District Court of Appeal held that a viable complaint for declaratory relief must allege, at a minimum, that: "(1) there is a bona fide dispute between the parties; (2) the plaintiff has a justiciable question as to the existence or nonexistence

of some right, status, immunity, power or privilege, or as to some fact upon which existence of such a claim may depend; (3) the plaintiff is in doubt as to the claim; and (4) there is a bona fide, actual, present need for the declaration." <u>Ribaya</u>, 162 So. 3d at 352. A review of the amended statement of claim shows that Plaintiff has pled the necessary elements for declaratory relief under Florida law. Moreover, the FDUTPA statute itself recognizes a claim for declaratory relief. See <u>Orkin Exterminating Co. v. Petsch</u>, 872 So. 2d 259, 264 (Fla. 2d DCA 2004) (Florida Statutes section "501.211(1) authorizes injunctive relief, even if that relief does not benefit the customer who filed the suit."); <u>Schauer v. Morse Operations, Inc.</u>, 5 So. 3d 2 (Fla. 4th DCA 2009) (noting that section "501.211 provides that a person aggrieved by a violation of FDUTPA may obtain a declaratory judgment that an act or practice violates FDUTPA"). Defendant's Motion takes no issue as to whether Plaintiff has properly pled a claim for declaratory relief under FDUTPA. Therefore, Plaintiff has stated a cause of action for declaratory relief under FDUTPA and Defendant's Motion to Dismiss is DENIED.

IV. **Plaintiff's Amended Statement of Claim States a Cause of Action for Unjust Enrichment**

Defendant takes no issue as to whether Plaintiff has pled a claim for unjust enrichment but instead relies on documents outside the four (4) corners of the pleading. The plaintiff can allege the existence of a contract and simultaneously plead unjust enrichment in the alternative, pending proof of an express contract concerning the same subject matter. <u>See</u> <u>Bowe</u>, 2014 U.S. Dist. LEXIS 19556 at 12 (defendant's motion to dismiss unjust enrichment count held to be premature because it is "upon a showing that an express contract exists that the unjust enrichment count fails"), quoting <u>Martorella v. Deutsche Bank Nat'l Trust Co.</u>, 931 F.Supp. 2d 1218, 1228 (S.D. Fla. 2013); <u>Real Estate Value Co., Inc. v. Carnival Corp.</u>, 92 So. 3d 255, 263 (Fla. 3d DCA 2012) ("Under Florida law, a party may simultaneously allege the existence of an express contract and alternatively plead a claim for unjust enrichment…. Of course, upon a showing that an express contract concerning the same subject matter exists, the unjust enrichment claim necessarily fails," citing <u>Hazen v. Cobb</u>, 96 Fla. 151, 117 So. 853, 857- 58 (1928)); <u>Williams v. Bear Stearns & Co.</u>, 725 So. 2d 397, 400 (Fla. 5th DCA 1998) ("Until an express contract is proven, a motion to dismiss a claim for… unjust enrichment… is premature"). If an express contract is proven, the Court will entertain dismissal of the unjust enrichment count if not withdrawn by Plaintiff.

V. **Pre-emption Does not Apply Based on the Allegations of the Amended Statement of Claim**

While a defendant may assert preemption on a motion to dismiss, the court must determine the issue as a matter of law based only on the well-pleaded allegations in the complaint, assuming the facts asserted.  *See* Hanft v. Phelan, 488 So.2d 531, 532 n. 1 (Fla.1986); Boca Burger, Inc. v. F., 912 So. 2d 561, 568–69 (Fla. 2005), as revised on denial of reh'g (Sept. 29, 2005).  Nowhere in the well-pled complaint is there any reference to or even a discussion of the Federal Communications Act or the basis of Defendant's preemption defense.  In fact, paragraph 5 of the amended statement of claim states that "this claim is not preempted by any federal statute."   Based on the four-corners of the complaint and viewing the allegations in the light most favorable to the Plaintiff, Defendant's claim of preemption fails as a matter of law on a motion to dismiss.

## CONCLUSION

As stated above, a motion to dismiss tests only the legal sufficiency of a complaint and it is not intended to determine issues of ultimate fact, and the court is confined to the well-pled facts contained within in the four corners of the complaint." Lewis v. Barnett Bank of S. Florida, N.A., supra. The question for this Court to decide is whether, assuming the well-pleaded factual allegations in the amended statement of claim are true, Plaintiff would be entitled to the relief requested. In light of the analysis set forth above, this Court finds that Plaintiff states a cause of action  as to Counts 1-3 and therefore Defendant's motion to dismiss is hereby DENIED.

Defendant shall serve its answer within 10 days from the date of this order.

**DONE** and **ORDERED** in Chambers at Miami-Dade County, Florida on this 6th day of February, 2024.

2022-047425-SP-25 02-06-2024 1:25 PM
Hon. Patricia Marino Pedraza

**COUNTY COURT JUDGE**
Electronically Signed

<div style="border: 1px solid red;">

No Further Judicial Action Required on **THIS MOTION**

CLERK TO **RECLOSE** CASE IF POST JUDGMENT

</div>

**Electronically Served:**

Andrew R. Ingalls, aingalls@daypitney.com

Andrew R. Ingalls, brodriguez@daypitney.com

Evelyn Davila, edavila@daypitney.com

Jessica Solorzano, jsolorzano@daypitney.com

Kenneth B Schurr, kbsservice@schurrlaw.com

Manuel A. Garcia-Linares, mgarcialinares@daypitney.com

Manuel A. Garcia-Linares, athomsen@daypitney.com

Maury L. Udell, notice66@bmulaw.com

Maury L. Udell, blopez@bmulaw.com

**Physically Served:**

Case 1:25-cv-20381-RAR Document 1-2 Entered on FLSD Docket 01/27/2025 Page 511 of 1553

**IN THE COUNTY COURT OF THE ELEVENTH JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA**

CASE NO: 2020-024852-SP-26
SECTION: SD03
JUDGE: Gloria Gonzalez-Meyer

**Blackstone Medical Services**

Plaintiff(s) / Petitioner(s)

vs.

**AT&T Mobility LLC**

Defendant(s) / Respondent(s)

_____/

## ORDER ON DEFENDANT'S MOTION TO DISMISS

THIS CAUSE having come before the Court on Defendant's Motion to Dismiss on June 23, 2022, having heard argument of counsel, having fully reviewed the record and materials and case law submitted by the parties, and being otherwise fully advised in the premises therein, it is hereby

ORDERED AND ADJUDGED as follows:

## FACTUAL BACKGROUND

1. Plaintiff filed an amended statement of claim on April 6, 2021 [D.E.13] which pled six (6) counts: Fraud, FDUTPA violation, Declaratory Relief under FDUTPA, Breach of Contract, Good Faith and Fair Dealing, Unjust Enrichment and Pure Bill of Discovery.

2. For the following reasons, AT&T's motion to dismiss is **DENIED. LEGAL STANDARD**

Generally, a motion to dismiss tests only the legal sufficiency of a complaint and it is not intended to determine issues of ultimate fact. "[T]he trial court is necessarily confined to the well-pled facts alleged in the four corners of the complaint." Lewis v. Barnett Bank of S. Florida, N.A., 604 So. 2d 937 (Fla. 3d DCA 1992). The primary purpose of a motion to dismiss is to request the trial court to determine whether the complaint properly states a cause of action upon which relief can be granted and, if it does not, to enter an order of dismissal. Provence v. Palm Beach Taverns, Inc., 676 So. 2d 1022 (Fla. 4th DCA 1996).

The court must draw all reasonable inferences in favor of the nonmoving party. Id. Thus, the question for this Court to decide is whether, assuming the well-pleaded factual allegations in the amended statement of claim are true, Plaintiff would be entitled to the relief requested. A motion to dismiss that attempts to contest the merits of the claims is procedurally improper. See Hill v. Murphy, 872 So. 2d 919, 921 (Fla. 2d DCA 2003); see also HSBC Bank USA, N.A. v. Nelson, 246 So. 3d 486, 489 (Fla. 2d DCA 2018) ("[m]otions to dismiss and for summary judgment are not interchangeable, and may not be substituted for another").

## I. **The Court Cannot Rely on Documents not Attached to the Complaint in Ruling on a Motion to Dismiss**

A trial court may not rely on any documents that are not attached to the complaint when considering the motion to dismiss. Kidwell Grp., LLC. v. Am. Integrity Ins. Co. of Fla., No. 5D21-1000, 2022 WL 1694905, at *1 (Fla. 2d DCA 2022). AT&T has provided no case law to support its claim that something outside

the pleadings can be considered on a **motion to dismiss**. The authenticity of AT&T's document and website referenced in AT&T's motion—as well as the question whether the complete website is appended to the motion, cannot be verified and therefore cannot be considered on a motion to dismiss. See also Legacy Entm't Grp., LLC v. Endemol USA, 2015 WL 12838795, at *4 (M.D. Fla. Oct. 1, 2015) (Declining to consider "excerpts from a third-party website" on the ground that a defendant "'must attach the entirety of the document, not just excerpts' or summaries, because it is not possible to determine a document's authenticity or accuracy without a complete picture." (ellipsis and citation omitted).    Therefore, Defendant's Motion to Dismiss based on language referenced in the purported contract would be an attempted short-cut of the Court's function.

## II. <u>Plaintiff's Amended Statement of Claim States a Cause of Action for Violation of FDUPTA</u>

### A. **Administrative Fee**

Courts have held that misrepresentations regarding similar charges support FDUTPA claims. See, e.g., James D. Hinson Elec. Contracting Co., Inc. v. Bell South Telecommunications, Inc., 796 F.Supp.2d 1341, 1353 (M.D. Fla. 2011) (inclusion of unrecoverable charges for "claims processing" in costs of damage to underground facilities billed to excavators); Turner Greenberg Assocs., Inc. v. Pathman, 885 So.2d 1004, 1008 (Fla. 4th DCA 2004) (furniture store's collection of a freight/insurance charge in connection with financed furniture sales was a

deceptive and unfair trade practice; fee was in reality a customer surcharge)."

"[A] claim for damages under FDUTPA has three elements: (1) a deceptive act or unfair practice; (2) causation; and (3) actual damages."). See also See also Rollins v. Butland, 951 So. 2d 860, 867-69 (Fla. 2d DCA 2006). Plaintiffs' amended statement of claim has pled the necessary elements under Florida law. See paragraphs 50-63 of the amended statement of claim. In Gundel v. AV Homes, Inc., 290 So. 3d 1080 (Fla. 2d DCA 2020), the Second District Court of Appeal reiterated the law of Florida that reliance is not an element of a claim for damages under the FDUTPA.

Moreover, FDUTPA claims can be based on deceptive or unfair practices that do not involve fraud ... and need not be pled with particularity. *SIG, Inc. v. AT & T Digital Life, Inc.,* 971 F.Supp.2d 1178, 1195 (S.D. Fla. 2013); *See Perret v. Wyndham Vacation Resorts, Inc.,* 846 F.Supp.2d 1327, 1333 (S.D.Fla.2012); *Hill v. Hoover Co.,* 899 F.Supp.2d 1259, 1263 (N.D.Fla. 2012). Courts routinely refuse to excise "in line-item fashion" portions of a complaint where the claim at hand is otherwise adequately stated. *See, e.g.,* Fox v. Loews Corp., 309 F. Supp. 3d 1241, 1251 (S.D. Fla. 2018); Mansoorian v. Brock & Scott, PLLC, No. 8:18-cv-1876-T-33TGW, 2018 WL 6413484, at *5 (M.D. Fla. Dec. 6, 2018) (denying motion to dismiss and refusing to strike certain allegations "merely because [defendant] contends that some of the allegations are insufficient" and even though plaintiffs "may not be entitled to

Relief on all claims."

Because the statute is designed to protect consumers, the scope of the conduct that may constitute an "unfair or deceptive" practice is "extremely broad." Day v. Le–Jo Enters., Inc., 521 So. 2d 175, 177 (Fla. 3d DCA 1988) A "claim under FDUTPA is not defined by the express terms of a contract, but instead encompasses unfair and deceptive practices arising out of bu relationships." *See* Siever v. BWGaskets, Inc., 669 F. Supp. 2d 1286, 1293 (M.D. Fla. 2009). Moreover, whether a practice is "deceptive or unfair" is determined by an objective analysis, and ordinarily is a **question of fact for the jury** to determine. See Calderon v. Sixt Rental Car, LLC, 2020 WL 700381 (S.D.Fla. 2020). In Calderon, the plaintiff alleged that Sixt Rental attempted to merge the two contracts *in order to* perpetuate their "systematic scheme" of charging customers fraudulent fees to bring in additional revenue. The Court held that the complaint states a cause of action based on the allegation of an illegal profit scheme through the use of "fees". Similarly in in Deere Construction, LLC v. Cemex Construction Materials Fla., LLC, 198 F.Supp.3d 1332 (S.D.Fla., 2016), the district court in ruling on the viability of a FDUPTA claim held that:

> "[w]ith regard to the claimed deceptive act or unfair practice, the Amended Complaint makes abundantly clear Plaintiff's claim is not that it did not know about the "fuel surcharge" and "environmental charge. Those fees are undoubtedly disclosed in the agreement and Defendants' invoices. What is allegedly deceptive is that the so-called "fuel surcharges" and "environmental charges," labeled as such by Defendants, **were not in fact designed to cover**

**anything related to fuel or the environment.** Defendants chose the two adjectives that describe the fees being assessed. ***Each adjective carries meaning***. But the messages, according to Plaintiff, are deceptive." Id. at 1338 (emphasis added).  Such allegations stated a cause of action for FDUPTA violation."

B. **Data Throttling**

The essence and substance of Plaintiff's claim as alleged in the amended statement of claim for FDUTPA violation against AT&T is that AT&T purportedly promised "unlimited data" but by throttling Plaintiff's data to the point where it was non-usable, violated the FDUPTA because unlimited didn't truly mean, unlimited. In Plaintiff alleged that "AT&T possesses internal focus group research indicating that its throttling program was inconsistent with consumer understanding of an "unlimited" data plan." Plaintiff alleged that "AT&T's wireless customer agreements do not state that an unlimited mobile data plan customer's use of more than a specified amount of data is a prohibited activity.  Nor do the agreements provide that AT&T may modify, diminish, or impair the service of unlimited mobile data plan customers engaged in permissible activities if these customers use more than a specified amount of data." Plaintiff also alleged that "AT&T imposed significant data speed restrictions on Plaintiff by virtue of its use of its network which flows through the United States and in particular, Florida.  This practice was and is an unfair and deceptive trade practice and is specifically.  Lastly, Plaintiff alleged that it suffered actual damages as a result of the violation of FDUTPA.  Where the FTC has already found "data throttling" a violation of the FTC, the Court must by law give

consideration to such a finding in construing whether data throttling is a violation of FDUTPA.  Fla. Stat. Sec. 501.204(2) states:

> It is the intent of the Legislature that, **in construing subsection (1), due consideration and great weight shall be given to the interpretations of the Federal Trade Commission and the federal courts relating to s. 5(a)(1) of the Federal Trade Commission Act, 15 U.S.C. s. 45(a)(1) as of July 1, 2017**.

> See Sec. 501.204(2), Fla. Stat. (emphasis added).

Slowing one's data speed to the point of limiting access to using data is not providing unlimited data.  Plaintiff has pled specifically the elements of a FDUTPA claim with respect to data throttling.

### III. <u>Plaintiff's Amended Statement of Claim States a Cause of Action for Declaratory Relief Under FDUTPA</u>

In <u>Imperial Fire & Cas. Ins. Co. v. Acosta</u>, 337 So. 3d 89, 92 (Fla. 3d DCA 2021), the Third District Court of Appeal held that a viable complaint for declaratory relief must allege, at a minimum, that:

> "(1) there is a bona fide dispute between the parties; (2) the plaintiff has a justiciable question as to the existence or nonexistence of some right, status, immunity, power or privilege, or as to some fact upon which existence of such a claim may depend; (3) the plaintiff is in doubt as to the claim; and (4) there is a bona fide, actual, present need for

the declaration."

*Ribaya*, 162 So. 3d at 352.

A review of the amended statement of claim shows that Plaintiff has pled the necessary elements for declaratory relief under Florida law.  Moreover, the FDUTPA statute itself recognizes a claim for declaratory relief.  *See Orkin Exterminating Co. v. Petsch*, 872 So. 2d 259, 264 (Fla. 2d DCA 2004) (Florida Statutes section "501.211(1) authorizes injunctive relief, even if that relief does not benefit the customer who filed the suit.");  *Schauer v. Morse Operations, Inc.*, 5 So. 3d 2 (Fla. 4th DCA 2009) (noting that section "501.211 provides that a person aggrieved by a violation of FDUTPA may obtain a declaratory judgment that an act or practice violates FDUTPA").  Therefore, Plaintiff has stated a cause of action for declaratory relief under FDUTPA.

IV. **Plaintiff has Sufficiently Pled a Cause of Action for Fraud**

-

Fraud involves "a departure from fundamental honesty, moral uprightness, or fair play," United States v. Ragosta, 970 F.2d 1085, 1090 (2d Cir. 1992) (quoting United States v. Goldblatt, 813 F.2d 619, 624 (3d Cir. 1987)), and depriving one of property through "dishonest methods or schemes" or "trick, deceit, chicane or overreaching," *Id.* (internal quotation marks omitted).  AT&T's Motion simply conflates an incorrect theory that a FDUTPA claim must include a claim for fraud or

that because the court did not reference all allegations of fraud that somehow Plaintiff failed to state a cause of action. In order to plead a claim for fraud, a plaintiff must plead that Defendant 1) misrepresented a material fact, 2) knew or should have known of the falsity of the statement, 3) intended that the misrepresentation would induce Plaintiff to rely and act on it and 4) that Plaintiff suffered injury in justifiable reliance on the misrepresentation. Witt v. La Gorce, 35 So. 3d 1033 (Fla. 3d DCA 2010). Whether a party has made intentional fraudulent misrepresentations is a question of fact. See D & M Jupiter, Inc. v. Friedopfer, 853 So. 2d 485 (Fla. 4th DCA 2003); Jenne v. Broward Serv. Ctr., Inc., 717 So. 2d 585, 586 (Fla. 4th DCA 1998). Once Plaintiff presented evidence as to the elements of fraud in the inducement, it was within the fact finder's province to determine whether fraud existed. *See* Lou Bachrodt Chevrolet, Inc. v. Savage, 570 So. 2d 306, 308 (Fla. 4th DCA 1990). Plaintiff properly pled the first element: a misrepresentation of a material fact. Plaintiff properly pled the second element: knowledge by the person making the statement that the representation is false. Plaintiff has alleged knowledge by the Defendant that the statement and representation was false. Plaintiff properly pled the third element: intent by the person making the statement that the representation would induce another to rely and act on it. Plaintiff has alleged intent by the Defendant that the representation would induce Plaintiff and other customers to rely and act on it, thus Plaintiff has satisfied the third element: Through its misrepresentations, Defendant intended to induce Plaintiff to pay Defendant for cell phone and data services. Plaintiff properly pled the fourth element: that the plaintiff suffered injury in justifiable reliance on the representation.

While the Court is aware of the cases that stand for the proposition that "fraud must be plead with sufficient particularity". the circumstances constituting fraud or mistake shall be stated with such particularity *as the circumstances may permit."* Bankers Mut. Captial Corp. v. U.S. Fidelity and Guar. Co., 784 So. 2d 485 (Fla. 4th DCA 2001). *See also* Fla. R. Civ. P. 1.120(b) (In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with such particularity as the circumstances may permit. Malice, intent, knowledge, mental attitude, and other condition of mind of a person may be averred generally.)  The Bankers court found that the complaint clearly met the requisite particularity because the complaint clearly stated who made the misrepresentation, when the misrepresentation was made, and who the misrepresentations were made to. 784 So. 2d 485, at 490.

V. **Plaintiff Stated A Cause of Action for Breach of Implied Covenant of Good Faith and Fair Dealing**

Florida                    contract                    law                    r

covenant      of good faith and fair dealing in every contract Cty. of Brevard v. Miorelli Eng'g, Inc., 703 So. 2d 1049, 1050 (Fla. 1997) (" '[E]very contract includes an implied covenant that the parties will perform in good faith.' " quoting Champagne– Webber, Inc. v. City of Fort Lauderdale, 519 So. 2d 696, 697 (Fla. 4th DCA 1988)); Ins. Concepts & Design, Inc. v. Healthplan Servs., Inc., 785 So. 2d 1232, 1234–35 (Fla. 4th DCA 2001). The      implied      covenant of good faith and fair dealing is designed to protect the contracting parties'

reasonable expectations. Speedway Super America, LLC v. Tropic Enters., Inc., 966 So. 2d 1, 3 (Fla. 2d DCA 2007). Plaintiff has stated a proper claim for breach of contract for implied covenant of good faith and fair dealing in that he has also alleged that an express term of the contract has been breached. See Flagship Resort Development Corp. v. Interval Intern, Inc., 28 So. 3d 915 (Fla. 3d DCA 2010). Plaintiff has specifically pled that AT&T breached the express provision of the contract (i.e., failing to provide unlimited data) and therefore Plaintiff has properly pled a cause of action for breach of implied covenant of fair dealing.

## VI. **Plaintiff has Properly Pled a Caues of Action for Unjust Enrichment**

> For purposes of a motion to dismiss, Plaintiff has stated a cause of action for unjust enrichment.  However, if an express contract is later made part of the record, the court will entertain a subsequent motion to dismiss this Count if not withdrawn by Plaintiff.

## VII. **Plaintiff has Properly Pled a Claim for Pure Bill of Discovery**

A pure bill of discovery, although rarely needed, is still an authorized proceeding. See Lewis v. Weaver, 989 So. 2d 586 (Fla 4th DCA 2007).   A pure bill of discovery "lies to obtain the disclosure of facts within the defendant's knowledge, or deeds or writings or other things in his custody, in aid of the prosecution.  See, Publix Super Markets v. Frazier, 696 So. 2d 1369 (Fla. 4th DCA 1997).   In RAV Bahamas Ltd., v. Marlin Three, LLC, the Third District Court of Appeal held "[I]n the absence of an adequate legal remedy, equity has long authorized a pure bill of discovery as an appropriate remedy to obtain information such as the identity of a proper party defendant or the appropriate legal theory for relief." Trak Microwave Corp. v. Culley, 728 So. 2d 1177, 1178 (Fla. 2d DCA 1998). A bill of discovery may also be used "to obtain information necessary for meeting a condition precedent to filing suit." Mendez v. Cochran, 700 So. 2d 46, 47 (Fla. 4th DCA 1997).

The pure bill remains available to "identify potential defendants and theories of liability," but "may not be used 'as a fishing expedition to see if cause of action exist.' " Mendez v. Cochran, 700 So. 2d 46, 47 (Fla. 4th DCA 1997) quoting Publix Supermarkets, Inc.

In the instant case, Plaintiff's pure bill of discovery, as pled in Count VI of the Amended Statement of Claim, alleges that the discovery is required to determine the proper parties against whom relief will and should be sought, etc., and whether AT&T collected Plaintiff's (and other consumer's geolocation data and disseminated

same to third-parties, despite the alleged agreement not to disseminate same, etc.) Plaintiff further alleges that AT&T is in sole possession of this information; that Plaintiff has no other means of obtaining the necessary information, and that said information was requested of Defendant, to no avail.  See Amended Statement of Claim at pgs. 20-22.

A pure bill of discovery should be granted if there is some reasonable basis to believe that discovery in a later damages action would be inadequate or too late to vindicate the litigant's right to evidence; when that has been made to appear, the pure bill allows a putative plaintiff to obtain the disclosure of facts within the defendant's knowledge, or deeds or writings or other things in the defendant's custody, in aid of the prosecution or defense of an action pending or about to be commenced.  Lewis v. Weaver, supra.   Hence, Defendant's motion to dismiss Count VI is denied and Defendant shall serve its answer within 20 days from the date of this order.

## CONCLUSION

 As stated above, a motion to dismiss tests only the legal sufficiency of a complaint and it is not intended to determine issues of ultimate fact, and the court is confined to the well-pled facts contained within in the four corners of the complaint." Lewis v. Barnett Bank of S. Florida, N.A., supra.  The question for this Court to decide is whether, assuming the well-pleaded factual allegations in the amended statement of claim are true, Plaintiff would be entitled to the relief requested.  In light of the Count-by-Count analysis set forth above, this Court finds that Counts I-VI state a cause of action and therefore Defendant's motion to dismiss is hereby DENIED. Defendant shall serve its answer to Counts I-VI within 20 days from the date of this order.

**DONE** and **ORDERED** in Chambers at Miami-Dade County, Florida on this <u>16th day of July, 2022</u>.

<u>2020-024852-SP-26 07-16-2022 4:39 PM</u>
Hon. Gloria Gonzalez-Meyer

**COUNTY COURT JUDGE**
Electronically Signed

No Further Judicial Action Required on **THIS MOTION**

CLERK TO **RECLOSE** CASE IF POST JUDGMENT

**Electronically Served:**
Andrew R. Ingalls, aingalls@daypitney.com
Andrew R. Ingalls, brodriguez@daypitney.com
Evelyn Davila, edavila@daypitney.com
Jessica Solorzano, jsolorzano@daypitney.com
Kenneth B Schurr, kbsservice@schurrlaw.com
Kenneth Schurr, counselken@schurrlaw.com
Manuel A. Garcia-Linares, mgarcialinares@daypitney.com
Manuel A. Garcia-Linares, athomsen@daypitney.com
Maury L Udell, notice66@bmulaw.com
Maury L Udell, blopez@bmulaw.com
Rachel L. Kittl, rkittl@bmulaw.com

**Physically Served:**

**IN THE COUNTY COURT OF THE ELEVENTH JUDICIAL
CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA**

CASE NO: 2019-017356-SP-23
SECTION: ND06
JUDGE: Ayana Harris

**Mary Lynn E Ghizzone**

Plaintiff(s) / Petitioner(s)

vs.

**A T & T Mobility (LLC)**

Defendant(s) / Respondent(s)

_____/

## ORDER DENYING MOTION TO DISMISS

    **THIS CAUSE** having come before the Court on Defendant's Motion to Dismiss, and the Court having fully reviewed the record and materials and case law submitted by the parties, carefully listened to the arguments of counsel, and being otherwise fully advised in the premises, finds as follows:

### FACTUAL BACKGROUND

    On February 28, 2020, Plaintiff filed an Amended Complaint alleging (1) Fraud; (2) Breach of Contract: Implied Duty of Good Faith and Fair Dealing; (3) FDUTPA violation;  (4) and Unjust Enrichment.

    On April 2, 2021, Defendant filled a Motion to Dismiss Amended Complaint.

    For the following reasons, AT&T's motion to dismiss is **DENIED.**

### LEGAL STANDARD

    A motion to dismiss examines the legal sufficiency of the plaintiff's complaint. *Grove Isle Association, Inc. v. Grove Isle Associates,* LLLP, 137 So. 3d 1081 (Fla. 3d DCA 2014). In order to rule on a motion to dismiss, a trial court must limit itself to the four corners of the plaintiff's complaint. *Id.* While examining the four corners of the complaint, the allegations are assumed to be true and must be construed using all reasonable inferences in favor of the nonmoving party. *Id.* A motion to dismiss tests the legal sufficiency of the claims being made and not the resolution of any factual disputes.

    Thus, the question for this Court to decide is whether, assuming all well-pled factual allegations are true, Plaintiff would be entitled to the relief requested. A motion to dismiss that attempts to contest the merits of the claims is procedurally improper. *See Hill v. Murphy*, 872 So.

2d 919, 921 (Fla. 2d DCA 2003); *see also HSBC Bank USA, N.A. v. Nelson*, 246 So. 3d 486, 489 (Fla. 2d DCA 2018) ("[m]otions to dismiss and for summary judgment are not interchangeable, and may not be substituted for another").

A trial court may not rely on any documents that are not attached to the complaint when considering the motion to dismiss. *Kidwell Grp., LLC. v. Am. Integrity Ins. Co. of Fla.,* No. 5D21-1000, 2022 WL 1694905, at *1 (Fla. 2d DCA 2022). AT&T has provided no case law to support its claim that something outside the pleadings can be considered on a motion to dismiss. The authenticity of AT&T's document and website referenced in AT&T's motion—as well as the question whether the complete website is appended to the motion, cannot be verified and therefore cannot be considered on a motion to dismiss. *See also Legacy Entm't Grp., LLC v. Endemol USA*, 2015 WL 12838795, at *4 (M.D. Fla. Oct. 1, 2015) (Declining to consider "excerpts from a third-party website" on the ground that a defendant "'must attach the entirety of the document, not just excerpts' or summaries, because it is not possible to determine a document's authenticity or accuracy without a complete picture." (ellipsis and citation omitted). AT&T's reliance on One Call Prop. Srvs., Inc. v. Security First Ins. Co., 165 So. 3d 749, 752 (Fla. 4th DCA 2015) is misplaced. In *One Call*, the Fourth District Court of Appeal ruled that only where terms are impliedly incorporated by reference into complaint and said document is part of the record can a trial court consider the contents of the document. The Fourth District Court of Appeal noted that the authenticated insurance policy at issue was placed in the record and incorporated by referenced which allowed the Court to construe the policy at the motion to dismiss stage. In the instant case, there is no authenticated copy of the wireless customer agreement between Plaintiff and AT&T. Therefore, Defendant's Motion to Dismiss based on language referenced in the purported contract would be an attempted short-cut of the Court's function.

## ANALYSIS AND FINDINGS

Plaintiffs' Corrected First Amended Complaint ("Complaint") contains a total of three counts directed at Defendant PVG. a. Count II – Violations of Florida Statute Sec. 828.29 (PVG) b. Count III – Civil Conspiracy (Petland and PVG) c. Count IV – Violations of Florida Deceptive and Unfair Trade Practices Act Case No: 2020-008226-CC-23 Page 2 of 9 (FDUTPA)

Plaintiff's Amended Complaint contains a total of four counts: (1) Fraud; (2) Breach of Contract: Implied Duty of Good Faith and Fair Dealing; (3) FDUTPA violation; (4) and Unjust Enrichment.

The Court addresses each count in turn:

### I. **COUNT I: FRAUD**

Fraud involves "a departure from fundamental honesty, moral uprightness, or fair play," *United States v. Ragosta*, 970 F.2d 1085, 1090 (2d Cir. 1992) (quoting *United States v. Goldblatt*, 813 F.2d 619, 624 (3d Cir. 1987)), and depriving one of property through "dishonest methods or schemes" or "trick, deceit, chicane or overreaching," *Id.* (internal quotation marks omitted).

In order to plead a valid claim for fraud, a plaintiff must plead that Defendant 1) misrepresented a material fact, 2) knew or should have known of the falsity of the statement, 3) intended that the

misrepresentation would induce Plaintiff to rely and act on it and 4) that Plaintiff suffered injury in justifiable reliance on the misrepresentation. *Witt v. La Gorce,* 35 So. 3d 1033 (Fla. 3d DCA 2010). Whether a party has made intentional fraudulent misrepresentations is a question of fact. *See D & M Jupiter, Inc. v. Friedopfer,* 853 So. 2d 485 (Fla. 4th DCA 2003); *Jenne v. Broward Serv. Ctr., Inc.,* 717 So. 2d 585, 586 (Fla. 4th DCA 1998).

Plaintiff properly pled misrepresentation of a material fact, knowledge by Defendant that the statement and representation was false, intent by Defendant that the representation would induce Plaintiff and other customers to rely and act on it, and that Plaintiff suffered injury in justifiable reliance on the representation. As such, Plaintiff has pled all required elements of fraud.

## II. COUNT II: BREACH OF CONTRACT: IMPLIED DUTY OF GOOD FAITH AND FAIR DEALING

Florida contract law recognizes the implied covenant of good faith and fair dealing in every contract. *Cty. of Brevard v. Miorelli Eng'g, Inc.,* 703 So. 2d 1049, 1050 (Fla. 1997) ("[E]very contract includes an implied covenant that the parties will perform in good faith.' " *quoting Champagne–Webber, Inc. v. City of Fort Lauderdale,* 519 So. 2d 696, 697 (Fla. 4th DCA 1988)); *Ins. Concepts & Design, Inc. v. Healthplan Servs., Inc.,* 785 So. 2d 1232, 1234–35 (Fla. 4th DCA 2001). The implied covenant of good faith and fair dealing is designed to protect the contracting parties' reasonable expectations. *Speedway SuperAmerica, LLC v. Tropic Enters., Inc.,* 966 So. 2d 1, 3 (Fla. 2d DCA 2007); *Cox v. CSX Intermodal, Inc.,* 732 So. 2d 1092, 1097 (Fla. 1st DCA 1999). A duty of good faith must "relate to the performance of an express term of the contract and is not an abstract and independent term of a contract which may be asserted as a source of breach when all other terms have been performed pursuant to the contract requirements." Id.(quoting *Hosp. Corp. of Am. v. Fla. Med. Ctr., Inc.,* 710 So. 2d 573, 575 (Fla. 4th DCA 1998)); *see also Johnson Enter. of Jacksonville, Inc. v. FPL Group, Inc.,* 162 F.3d 1290, 1314 (11th Cir. 1998) ("[G]ood faith requirement does not exist 'in the air'. Rather, it attaches only to the performance of a specific contractual obligation.").

Plaintiff has stated a proper claim for breach of contract for implied covenant of good faith and fair dealing in that he has also alleged that an express term of the contract has been breached. *See Flagship Resort Development Corp. v. Interval Intern, Inc.,* 28 So. 3d 915 (Fla. 3d DCA 2010). Plaintiff has specifically pled that AT&T breached the express provision of the contract (i.e., failing to provide unlimited data) and therefore Plaintiff has properly pled a cause of action for breach of implied covenant of fair dealing.

## III. COUNT III: DAMAGES UNDER FDUPTA

Plaintiff alleges that Defendant violated the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), Fla. Stat. §§501.201, *et seq.* In order for a consumer to claim damages under FDUTPA, they must prove three elements: (1) a deceptive act or unfair practice; (2) causation; and (3) actual damages. *Rollins, Inc. v. Butland,* 951 So. 2d 860, 869 (Fla. 2d DCA 2006). Plaintiff

Because the statute is designed to protect consumers, the scope of the conduct that may constitute an "unfair or deceptive" practice is "extremely broad." *Day v. Le–Jo Enters., Inc.,* 521 So. 2d 175, 177 (Fla. 3d DCA 1988)  A "claim under FDUTPA is not defined by the express terms

of a contract, but instead encompasses unfair and deceptive practices arising out of business relationships." *See Siever v. BWGaskets, Inc.,* 669 F. Supp. 2d 1286, 1293 (M.D. Fla. 2009). Accordingly, Plaintiff's Amended Complaint pleads the necessary elements of FDUPTA under Florida law.

## IV. **COUNT IV: UNJUST ENRICHMENT**

For purposes of a motion to dismiss, Plaintiff has stated a cause of action for unjust enrichment. However, if an express contract concerning the same subject matter is later made part of the record, the Court will entertain a subsequent motion to dismiss of this count if not withdrawn by Plaintiff. *See Sterling Breeze Ass'n., Inc. v. New Sterling,* 255 So.3d 434 (Fla. 1st DCA 2018).

### **CONCLUSION**

For the reasons herein stated, it is hereby **ORDERED AND ADJUDGED** that:

1. Defendant's motion to dismiss is hereby **DENIED**.

2. Defendant shall serve its Answer to the Amended Complaint within 20 days from the date of this Order.

**DONE** and **ORDERED** in Chambers at Miami-Dade County, Florida on this 30th day of September, 2022.

2019-017356-SP-23 09-30-2022 11:50 PM
Hon. Ayana Harris

**COUNTY COURT JUDGE**
Electronically Signed

No Further Judicial Action Required on **THIS MOTION**

CLERK TO **RECLOSE** CASE IF POST JUDGMENT

**Electronically Served:**
Andrew Robert Ingalls, aingalls@daypitney.com
Andrew Robert Ingalls, brodriguez@daypitney.com
Andrew Robert Ingalls, maristasalado@daypitney.com
Evelyn Davila, edavila@daypitney.com
Jessica Solorzano, jsolorzano@daypitney.com
Manuel A. Garcia-Linares, mgarcialinares@daypitney.com

Manuel A. Garcia-Linares, athomsen@daypitney.com
Maury L Udell, notice66@bmulaw.com
Maury L Udell, blopez@bmulaw.com
Megan Elizabeth Pearl, mpearl@bmulaw.com
Megan Elizabeth Pearl, blopez@bmulaw.com
Rachel L. Kittl, rkittl@bmulaw.com


**Physically Served:**

# EXHIBIT 2

## AT&T Consumer Service Agreement

Print

# AT&T Consumer Service Agreement

### 1.0
### General Terms

Welcome to AT&T!

By activating, using, or paying for any AT&T products or services ("AT&T Service(s)" or "Service(s)"), you agree to be bound by this Consumer Service Agreement ("Agreement"). If you don't agree, please contact us immediately to cancel your order and/or service and return any products. For AT&T Services, visit att.com/contactus, and for FirstNet, visit firstnet.com.

**Please read this Agreement carefully. It requires you and AT&T to resolve disputes through arbitration on an individual basis rather than jury trials or class actions. It also governs how we handle your information, including information related to your AT&T Account and your location.**

### 1.1 Our Agreement

In this Agreement, unless otherwise specified, "AT&T" and "we" mean the AT&T affiliated companies and their successors and assigns.

AT&T offers many products and services. This Agreement includes a set of universal terms ("General Terms") and specific Service terms ("Service Terms"). You're bound by the General Terms and the Service Terms for each AT&T Service you purchase or use. In addition, your Agreement incorporates AT&T's Privacy Policy (at att.com/privacy), Acceptable Use Policy (at att.com/legal/terms.aup.html), any Customer Service Summary provided to you, and any other documents or terms specifically referenced in the applicable General Terms and Service Terms. In the event of a conflict between the General Terms and the applicable Service Terms, the Service Terms will govern our relationship with you.

Please use these links to view the Service Terms for each specific Service:

- **If you have postpaid AT&T Wireless service** (including FirstNet Subscriber Paid User service), your Wireless Service Terms are in Section 2.
- **If you have prepaid AT&T Wireless service**, you're subject to the Prepaid Wireless Service Terms in Section 3 as well as the Wireless Service Terms in Section 2.
- **If you have a DataConnect/Session-based Wireless plan**, you're subject to the Service Terms in Section 4, in addition to the Wireless Service Terms in Section 2 and (if your data plan is prepaid) the Prepaid Wireless Service Terms in Section 3.
- **If you're an AT&T Phone customer**, your Service Terms are in Section 5.
- **If you have home internet from AT&T, including AT&T Fiber, AT&T Internet, AT&T Internet Air, AT&T Fixed Wireless, or AT&T DSL service**, your Service Terms are in Section 6. If your home internet service is provided via the AT&T Wireless Network, you will also be subject to the applicable sections of the Wireless Services Terms in Section 2.
- **If you have Business Internet service** (for small business), you're subject to the Business Internet Service Terms in Section 7 as well as the Internet Service Terms in Section 6.

### 1.2 Your AT&T Account and Account Access

You may need to set up one or more accounts ("AT&T Account(s)" or "Account(s)") in order to purchase or use AT&T Services. You must ensure that any information you provide us in connection with your AT&T Accounts and AT&T Services, including contact information and billing information, is accurate and current.

You're responsible for any activity that occurs on or through your AT&T Accounts. We do not guarantee the security of your AT&T Accounts. You must ensure that your Account information and password(s) for accessing your Accounts and personal information are secure. If you learn of any unauthorized use of any AT&T Account, please contact us immediately.

**You agree that all users of your AT&T Services (including minors), are subject to the limitations and obligations of this Agreement, including its arbitration provision and privacy policy.** It's your duty to inform them of their limitations and obligations and to provide this Agreement to them.

You may designate individuals (such as family members) to act on your behalf ("Authorized Users"). Authorized Users can manage your AT&T Accounts, including changing or adding Services. You're responsible for all actions and changes made by any Authorized Users, including purchases of products and additional AT&T Services.

If you are not present or do not identify yourself when an AT&T Service is installed, you authorize any adult (the minimum age may differ by state or territory) present to act on your behalf, regardless of whether you designated that adult as an Authorized User. You also authorize this adult to accept any related terms and conditions, agreements, and charges,. Further, you authorize us to provide information about and make changes to your AT&T Accounts (as well as to perform any credit checks on you that we deem appropriate to implement the changes or respond to questions) at the direction of this adult. AT&T reserves the right to refuse to allow an adult to authorize installation, take any action regarding your AT&T Accounts, or receive any information if we decide in our sole discretion that the adult has failed to provide sufficient identifying information or cannot answer questions about you or your AT&T Accounts to our satisfaction.

You may have previously been given the option to combine credentials to log onto multiple AT&T Accounts and/or third-party accounts. In AT&T's sole discretion, we may end this option and require separate credentials for different accounts.

### 1.3 Dispute Resolution

**Please read this carefully. It affects your rights.**

**1.3.1 Summary:**
This part of the Agreement outlines how disputes between you and AT&T will be resolved through our informal dispute resolution process, individual arbitration, or small claims court. The informal dispute resolution process gives you the opportunity to explain what happened to someone in, or working with, our legal department. Under the terms of this Agreement, AT&T is encouraged to resolve issues early, without going any further.

An "arbitration" is a less formal alternative to a lawsuit or jury trial in court. A neutral third party, called an arbitrator, decides the dispute. The arbitrator applies the same law and can award the same individualized remedies that a court could award, but uses streamlined procedures and limits discovery to simplify the process and reduce costs. The arbitrator's decision is legally binding, and it is subject to very limited review by courts. **You and AT&T agree that arbitration will take place on an individual basis. Class arbitrations, class actions, and representative actions are not permitted. This means that you and AT&T will neither file a lawsuit (in any court other than a small claims court), nor pursue or participate in an action seeking relief on behalf of others.**

*While subsection 1.3.2 lays out the specifics, here are the steps you would take to resolve a dispute:*

- **Contact customer service.** We encourage you to give customer service a call first. A phone call, chat session, or email with us is usually the quickest way to resolve an issue. Check out att.com/contactus to find the right service or product team for your issue.

- **You choose.** If you aren't satisfied after talking to customer service, you can choose to file your individual claim in small claims court or send us a Notice of Dispute, which is required before starting arbitration.

- **Let's work it out.** If you decide not to go to small claims court, start the informal dispute resolution process by sending a Notice of Dispute to our legal department, which you can complete and send online. You and AT&T agree to give each other at least 60 days to share information and try to reach an agreement. (We'll use the same process if we have a dispute with you.) At your or our request, we'll schedule an Informal Settlement Conference to try to reach an agreement by phone or videoconference.

- **Pursue an arbitration.** If the dispute still isn't resolved, you can pursue an individual arbitration. The nation's largest non-profit arbitration provider, the American Arbitration Association (AAA), will administer the arbitration and select the neutral arbitrator, with input from both you and AT&T. Some things to keep in mind:
  - AT&T will usually pay all of the arbitration fees (with some exceptions).
  - Any hearings will be in the same county as your billing address, or they might be held by phone or videoconference.
  - In some cases, if you win, we will pay double attorney's fees (if any) and a minimum of $10,000.

There are special rules for coordinated (or mass) arbitrations, where the same lawyers or a group of coordinated lawyers seek to file 25 or more similar arbitrations. If you choose to be part of those proceedings, the cases will proceed in stages, so it might take longer to arbitrate your dispute than it would otherwise.

**1.3.2 Arbitration Agreement**

**1.3.2.1 Claims Subject to Arbitration:**
To the greatest extent permitted by law, AT&T and you agree to arbitrate all disputes and claims between you and AT&T, except for claims arising from bodily injury or death. This arbitration provision is intended to be broadly interpreted. It includes, but is not limited to:

- claims arising out of or relating to any aspect of the relationship between us, whether based in contract, tort, fraud, misrepresentation, or any other statutory or common-law legal theory;

- claims that arose before the existence of this or any prior Agreement (including, but not limited to, claims relating to advertising);

- claims for mental or emotional distress or injury not arising out of bodily injury;

- claims that are currently the subject of purported class action litigation in which you are not a member of a certified class; and

- claims that may arise after the termination of this Agreement.

References in Section 1.3 to "AT&T" or "we" include our past, present, and future parents, subsidiaries, affiliates, and related entities, as well as AT&T's and all of those entities' officers, agents, employees, licensors, predecessors in interest, successors, and assigns. References in Section 1.3 to "you" include your past, present, and future parents, subsidiaries, affiliates, related entities, agents, employees, predecessors in interest, successors, and assigns; and all authorized or unauthorized users or beneficiaries of AT&T Services or products under past, present, or future Agreements between you and AT&T.

**Small Claims Option.** Despite this arbitration provision, either you or AT&T may bring an action seeking only individualized relief in the small claims court for the county (or parish) of your billing address, so long as the action is not removed or appealed to a court of general jurisdiction.

This arbitration provision does not preclude you from bringing issues to the attention of federal, state, or local agencies, including, for example, the Federal Communications Commission. Those agencies can, if the law allows, seek relief against us on your behalf. **By entering into this Agreement, you and AT&T are each waiving the right to a trial by jury or to participate in a class action.** This Agreement evidences a transaction in interstate commerce, and thus the Federal Arbitration Act governs the interpretation and enforcement of this arbitration provision. This arbitration provision will survive termination of this Agreement.

**1.3.2.2 Pre-Arbitration Informal Dispute Resolution Process:**
Customer service is available to help and usually can resolve any concerns you may have. If that does not work, the first step in the dispute resolution process is to send a written Notice of Dispute ("Notice"). (We'll also send you a Notice to your billing address if we have a dispute with you.) You may download the Notice form at att.com/arbitration-forms. The Notice to AT&T may be sent by U.S. mail or professional courier service to Legal Department - Notice of Dispute, AT&T, 208 S. Akard, Office #2900.13, Dallas, Texas 75202 (the "Notice Address"), or, alternatively, submitted electronically by following the instructions at att.com/noticeofdispute. The Notice must include all of the information requested on the Notice form, including: (a) the claimant's name, address, and phone number; (b) the Account number at issue; (c) the services (if any) to which the claim pertains; (d) a description of the nature and basis of the claim or dispute; and (e) an explanation of the specific relief sought and the basis for the calculations. The Notice must be personally signed by you (if you are the claimant) or by an AT&T representative (if we are the claimant). To safeguard your Account, you might be required to provide both your authentication and consent for us to discuss your Account or share your Account information with anyone but you, including an attorney ("Authentication and Consent").

Whoever sends the Notice must give the other party 60 days after receipt of a complete Notice (including your Authentication and Consent, if required) to investigate the claim. During that period, either you or AT&T may request an individualized discussion (by phone call or videoconference) regarding settlement ("Informal Settlement Conference"). You and AT&T must work together in good faith to select a mutually agreeable time for the Informal Settlement Conference (which can be after the 60-day period). You and an AT&T representative must personally participate, unless otherwise agreed in writing. Your and AT&T's lawyers (if any) also can participate.

**Any applicable statute of limitations or contractual limitations period will be tolled** for the claims and requested relief in the Notice during the "Informal Resolution Period." The Informal Resolution Period is the number of days between the date that the complete Notice (and Authentication and Consent, if required) is received by the other party, and the later of (1) 60 days later or (2) the date the Informal Settlement Conference is completed, if timely requested.

Any arbitration proceeding cannot be commenced until after the Informal Resolution Period has ended. (Subsection 1.3.2.7 contains additional requirements for commencing certain coordinated arbitrations.) All of the pre-arbitration dispute resolution requirements are essential so that you and AT&T have a meaningful chance to resolve disputes informally. If any aspect of these requirements has not been met, a court can enjoin the filing or prosecution of an arbitration. In addition, unless prohibited by law, the AAA may not accept, administer, assess, or demand fees in connection with such an arbitration. If the arbitration already is pending, it must be dismissed.

**1.3.2.3 Arbitration Procedure:**
You may download a form to initiate arbitration at att.com/arbitration-forms. In addition, information on how to commence an arbitration proceeding, including how to file a consumer arbitration online, is at adr.org/support. A copy of the arbitration demand must be sent to AAA and the Notice Address, and a copy of the Notice must be attached to your arbitration demand.

The arbitration will be governed by the then-current Consumer Arbitration Rules ("AAA Rules") of the AAA, as modified by this arbitration provision, and will be administered by AAA. (If AAA refuses to enforce any part of this arbitration provision, you and AT&T will select another arbitration provider. If there is no agreement, the court will do so.) The AAA Rules are available online at adr.org or may be requested by writing to the Notice Address. (You may obtain information that is designed for non-lawyers about the arbitration process at att.com/arbitration-information.)

As in court, you and AT&T agree that any counsel representing someone in arbitration certifies that they're complying with the requirements of Federal Rule of Civil Procedure 11(b), including a certification that the claim or the relief sought is neither frivolous nor brought for an improper purpose. The arbitrator is authorized to impose any sanctions available under AAA Rules, Federal Rule of Civil Procedure 11, or applicable federal or state law against all appropriate represented parties and counsel.

All issues are for the arbitrator to decide, except only a court can decide the following:

- issues relating to the scope and enforceability of the arbitration provision,
- whether a dispute can or must be brought in arbitration,
- whether the AAA cannot or will not administer the arbitration in accordance with this arbitration provision,
- whether subsection 1.3.2.2 has been complied with or violated for purposes of awarding relief under that subsection that a court can award, and
- whether subsections 1.3.2.6, 1.3.2.7, or 1.3.2.8 have been complied with or violated.

The arbitrator may consider rulings in other arbitrations involving different customers, but an arbitrator's ruling will not be binding in proceedings involving different customers.

Unless you and AT&T agree otherwise, any arbitration hearings will take place in the county (or parish) of your billing address. If your claim is valued at $10,000 or less, you may choose whether the arbitration will be conducted solely based on documents submitted to the arbitrator or through a telephonic, videoconference, or in-person hearing under AAA Rules. If your claim exceeds $10,000, the right to a hearing will be determined by AAA Rules. During the arbitration, the amount of any settlement offers must not be disclosed to the arbitrator until after the arbitrator determines the relief, if any, to which you or AT&T is entitled. Regardless of how the arbitration is conducted, the arbitrator must issue a reasoned written decision sufficient to explain the essential findings and conclusions on which his or her decision is based. Except as provided in subsection 1.3.2.6 below, the arbitrator can award the same damages and relief that a court can award under applicable law.

**1.3.2.4 Arbitration Fees:**

We will pay all AAA filing, administration, case-management, hearing, and arbitrator fees if we initiate an arbitration. If you initiate arbitration of claims valued at $75,000 or less, we will pay those fees, so long as you have fully complied with the requirements in subsection 1.3.2.2. In such cases, we will pay the filing fee directly to AAA upon receiving a written request from you at the Notice Address or, if AAA requires you to pay the filing fee to commence arbitration, we will send that amount to AAA and request that AAA reimburse you. If, however, the arbitrator finds that either the substance of your claim or the relief sought is frivolous or brought for an improper purpose (as measured by the standards set forth in Federal Rule of Civil Procedure 11(b)), then the allocation and payment of all such fees will be governed by AAA Rules.

**1.3.2.5 Alternative Payment and Attorney Premium:**
If you fully complied with the requirements above in subsection 1.3.2.2 and the arbitrator issues an award in your favor that is greater than the value of our last written settlement offer made before the arbitrator was selected, then we will:

- pay you the amount of the award or $10,000 (the "Alternative Payment"), whichever is greater; and

- pay the attorney you retained, if any, twice the amount of attorneys' fees and reimburse any expenses (including expert witness fees and costs) that your attorney reasonably incurs for investigating, preparing, and pursuing your claim in arbitration (the "Attorney Premium").

If we did not make a written offer to settle the dispute before the arbitrator was selected, and the arbitrator awards you any relief on the merits, you and your attorney will be entitled to receive the Alternative Payment and the Attorney Premium, respectively.

Disputes regarding the payment and reimbursement of attorneys' fees, expenses, the Alternative Payment, and the Attorney Premium may be resolved by the arbitrator upon request from either party made within 14 days of the arbitrator's ruling on the merits. In assessing whether an award that includes attorneys' fees and expenses is greater than the value of our last written settlement offer, the calculation will include only the reasonable attorneys' fees and expenses you incurred pursuing this arbitration through the date of our settlement offer.

The right to the Attorney Premium supplements any right to attorneys' fees and expenses you may have under applicable law. Thus, if you would be entitled to a larger amount under the applicable law, this arbitration provision does not preclude the arbitrator from awarding you that amount. However, you may not recover both the Attorney Premium and a duplicative award of attorneys' fees or expenses.

**1.3.2.6 Requirement of Individual Arbitration:**
The arbitrator may award relief (including, but not limited to, damages, restitution, declaratory relief, and injunctive relief) only in favor of the individual party seeking relief and only to the extent necessary to provide relief warranted by that party's individual claim. YOU AND AT&T AGREE THAT EACH MAY BRING CLAIMS AGAINST THE OTHER ONLY IN YOUR OR ITS INDIVIDUAL CAPACITY, AND NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED CLASS, REPRESENTATIVE, OR PRIVATE ATTORNEY GENERAL PROCEEDING. Further, unless both you and AT&T agree otherwise, the arbitrator may not consolidate more than one person's or entity's claims and may not otherwise preside over any form of a representative, class, private attorney general, or public injunction proceeding.

If a court (after exhaustion of all appeals) declares unenforceable any of these prohibitions on consolidation or non-individualized relief (such as class, representative, private attorney general, or public injunctive relief), then all other aspects of the case must be arbitrated first. After completing arbitration, the remaining (non-arbitrable) aspects of the case will then be decided by a court.

**1.3.2.7 Administration of Coordinated Arbitrations:**
If 25 or more claimants submit Notices or seek to file arbitrations raising similar claims and are represented by the same or coordinated counsel (whether such cases are pursued simultaneously or not), all the cases must be resolved in staged proceedings. **You agree to this process even though it may delay the arbitration of your claim.** In the first stage, claimants' counsel and AT&T will each select 25 cases (50 cases total) to be filed in arbitration and resolved individually by different arbitrators. If feasible, the arbitrators will be from the respective claimants' home states. If there are fewer than 50 cases, all will be filed in arbitration. In the meantime, no other cases may be filed or proceed in arbitration, and the AAA must not assess or demand payment of fees for the remaining cases or administer or accept them.

The arbitrators are encouraged to resolve the cases within 120 days of appointment or as swiftly as possible thereafter, consistent with fairness to the parties. After the first stage is completed, the parties must engage in a single mediation of all remaining cases, and AT&T will pay the mediation fee. If the parties cannot agree how to resolve the remaining cases after mediation, they will repeat the process of selecting and filing 50 cases to be resolved individually by different arbitrators, followed by mediation.

If any claims remain after the second stage, the process will be repeated until all claims are resolved, with four differences. First, a total of 100 cases may be filed in the third and later stages. Second, the cases will be randomly selected. Third, arbitrators who decided cases in the first two stages may be appointed in later stages if different arbitrators are not available. Fourth, mediation is optional at the election of counsel for the claimants.

Between stages, counsel will meet and confer regarding ways to improve the efficiency of the staged proceedings, including whether to increase the number of cases filed in each stage. Either party may also negotiate with AAA regarding the amount or timing of AAA fees.

If this subsection applies to a Notice, the Informal Resolution Period for the claims and relief set forth in that Notice will be extended (including the tolling of any applicable statute of limitations or contractual limitations period for the claims and requested relief) until that Notice is selected for a staged proceeding, withdrawn, or otherwise resolved. A court will have the authority to enforce this subsection, including by enjoining the mass filing, the prosecution or administration of arbitrations, or the assessment or collection of AAA fees.

This subsection and each of its requirements are intended to be severable from the rest of this arbitration provision. If, after exhaustion of all appeals, a court decides that the staging process in this subsection is not enforceable, then the cases may be filed in arbitration and the payment of AAA filing, administration, case-management, hearing, and arbitrator fees will be assessed as the arbitrations advance and arbitrators are appointed rather than when the arbitrations are initiated.

**1.3.2.8 Future Changes to Arbitration Provision:**

Notwithstanding any provision in this Agreement to the contrary, if AT&T makes any future change to this arbitration provision (other than a change to the Notice Address), you may reject any such change by sending us written notice via U.S. Mail within 30 days of the first notice of the change to Legal Department – Revised Arbitration Opt-Out, AT&T, 208 S. Akard, Office #2900.13, Dallas, Texas 75202. Include your name, address, phone number, account number, and a statement personally signed by you that you wish to reject the change to the arbitration provision. By rejecting any future change, you are agreeing that you will arbitrate any dispute between you and AT&T in accordance with the language of this version of the arbitration provision.

**1.3.2.9 Puerto Rico Customers:**

For Puerto Rico customers, all references to "small claims court" in this arbitration provision should be understood to mean the Puerto Rico Telecommunications Regulatory Board.

**1.3.3 Forum Selection:**

Unless you and AT&T agree otherwise, to the greatest extent permitted by law, the state and federal courts in Dallas, Texas will have exclusive jurisdiction over any disputes (except for disputes brought in small claims court) that are not subject to arbitration or over any action involving the applicability or enforceability of the arbitration provision or any of its parts. You and AT&T consent to the jurisdiction of those courts and waive any objections as to personal jurisdiction or as to the laying of venue in such courts due to inconvenient forum or any other basis or any right to seek to transfer or change venue of any such action to another court.

## 1.4 How We May Contact You

You agree that AT&T and its current and future affiliates, assignees, successors, employees, agents, and others acting or purporting to act on our behalf (for example, outside collection agencies), can contact you regarding your Accounts, your AT&T Services, and additional products and services that we or third parties may offer, using any means or method (including by phone, mail, email, text message (such as SMS/MMS), chat (such as RCS), push notifications, or other medium), as well as by including messages on or inserts with bills for your AT&T Services.

You agree that notices provided to you using any of these methods are considered received by you. You agree to provide accurate, current contact information about yourself, that you have authority to consent to communications to any phone numbers or email addresses you provide, and that you will promptly notify us if your contact information has changed.

You also agree that AT&T and its current and future affiliates, assignees, successors, employees, agents, and others acting or purporting to act on our behalf (for example, outside collection agencies) can at any time send you email or other electronic messages to any phone number or email address associated with your AT&T Services by any means, including an automated system that sends preset messages.

You further agree that any calls or messages sent to numbers or email addresses you provide to AT&T or its current and future affiliates, assignees, successors, employees, agents, and others acting or purporting to act on our behalf (for example, outside collection agencies), or to numbers or email addresses associated with your AT&T Services, may be sent using an automatic telephone dialing system, artificial or prerecorded voices, or other automated dialing equipment such as a predictive dialer, and that you cannot revoke your consent to be contacted in this manner.

**Please review your bill for messages and inserts.** We will send important messages to you through bill messages and bill inserts.If you have electronic billing, you are considered to have received these notices once your electronic bill is available for viewing. If you get a paper bill, you are considered to have received these notices three days after we mail the bill to you.

Communications you may include, but are not limited to, emergency alerts, updates to this Agreement, communications regarding payments or past-due balances, and information concerning promotions regarding any AT&T Services or products or services offered by our third-party partners. You are not required to agree to receive promotional communications to purchase any AT&T Services. **You can unsubscribe from promotional emails, calls, or messages by following the unsubscribe options** in the promotional communication itself or in the AT&T Privacy Policy. For more information about your rights and choices regarding how we communicate with you, visit att.com/sites/privacy_policy/rights_choices.

## 1.5 Termination or Suspension of AT&T Services

You may cancel or terminate any of your AT&T Services at any time. If you cancel an AT&T Service:

- you might lose any discounts you obtained from bundling AT&T Services together;
- if you have an active installment plan for devices or accessories associated with the cancelled AT&T Services, your agreement for that installment plan might specify that your termination of AT&T Service is a default that triggers acceleration of the remaining installment plan payments; and
- some AT&T Services may not work (or work the same way) after the cancellation of a bundled service.

AT&T reserves the right to modify, suspend, or discontinue any function or feature of any AT&T Service, including your rates or charges, or to terminate your AT&T Service entirely, for any reason, including but not limited to:

- compliance with an order by a state or federal agency, court, or arbitrator;
- any interruption or loss of either your or AT&T's rights to access any part of the network facilities required to provide your services, including rights to access the land or buildings where the facilities are located; or
- any Misconduct by you or any user of your AT&T. "Misconduct" includes but is not limited to:
  - any conduct that we believe violates this Agreement or AT&T's Acceptable Use Policy;
  - any conduct that involves the use of abusive, threatening, or unreasonable conduct toward any of our employees or representatives, whether in person,

      over the phone, or in writing;

- any abusive, fraudulent, or unlawful use of any AT&T Services;

- providing us with false or misleading information about you, users of your AT&T Services, or use of AT&T Services, including inaccurate information related to your creditworthiness;

- any use of AT&T Services in a manner that negatively affects our or other entities' networks, customers, or operations, or that infringes anyone's intellectual property rights, violates others' privacy, generates spam or abusive messaging or calling, or results in the publication of threatening, offensive, or illegal materials;

- any reselling of AT&T Services (including selling of use of or access to AT&T Services); or

- any failure to make all required payments when due or to maintain sufficient amounts on deposit or pay another form of credit security, as well as any change that we determine creates a risk of non-payment (such as a deterioration in your creditworthiness).

Regardless of the reason or whether you or we terminate your AT&T Services:

- unless required by applicable law, there is no proration of charges and you are still responsible for the full month's payment even if your AT&T Services are terminated before the end of a billing cycle;

- any Account balance or unused portion for the terminated AT&T Service (such as a prepaid service) will not be refunded or credited back;

- your licenses to use any associated software are terminated;

- you are obligated to return any Equipment associated with the terminated AT&T Service (if required by the applicable Service Terms or other agreement); and

- we reserve the right to delete any data, files, or other information associated with you or your AT&T Account or terminated AT&T Services.

In addition, if a term commitment to maintain service or programming for a particular length of time is not met, and either you cancel an AT&T Service or we terminate it for misconduct, you will be subject to any applicable early-termination fee(s) under subsection 1.9.6.

If any of your AT&T Services are suspended, you are still responsible for paying any applicable charges for that AT&T Service.

## 1.6 Disclaimer of Warranties

**You're using AT&T Services at your own risk. Unless expressly set out in this Agreement, AT&T Services are provided on an "as is" and "as available" basis, without warranties or guaranties of any kind. To the greatest extent permitted by law, AT&T (including our past, present, and future parents, subsidiaries, affiliates, related entities, as well as AT&T's and all of those entities' officers, agents, employees, licensors, predecessors in interest, successors, and assigns) expressly disclaims all warranties of any kind, whether oral, express, implied, or statutory, including but not limited to the implied warranties of title, merchantability, fitness for a particular purpose, non-infringement, and any warranties implied by a course of performance, course of dealing, or usage of trade.** No one is authorized to make warranties on our behalf. We do not guarantee that AT&T Services will meet your requirements, be of a particular quality or speed, or will be uninterrupted, accurate, secure, maintained, and kept free from viruses or other harmful components. There is no security or protection guarantee against unauthorized access to your AT&T Services, personal information, or AT&T Account. We do not guarantee that AT&T Services are suitable for use in situations in which absolutely accurate data transmission or security is required or that could result in personal injury, property damage, or financial loss. We also do not guarantee that AT&T Services will be interoperable with your hardware or software and that incompatibility won't lead to damage or loss of data.

## 1.7 Limitations of Liability

You agree that:

- AT&T is not an insurer of AT&T Services, nor can it insure the accuracy of your information or the privacy or security of your AT&T Accounts;

- AT&T has no control over the acts and conduct of third parties;

- AT&T is not responsible for losses incurred as a result of your or a third-party's use of your AT&T wireless number or other AT&T Service as a source of authentication or verification in connection with any social media, email, financial, cryptocurrency or other account;

**To the greatest extent permitted by law, AT&T is not liable for any reason to you, or any user or beneficiary of AT&T Services, for any indirect, incidental, special, consequential, treble, punitive, or exemplary damages**, including but not limited to damages for personal injury; property damage; or loss of revenue, profits, business, goodwill, use, data, or other tangible or intangible losses (even if we've been told of the possibility of those damages) resulting from, for example:

- use of AT&T Services (which includes equipment, software, and inside or outside wiring);

- the performance or nonperformance of AT&T Services;

- the actions or inaction of AT&T or its agents with respect to the provision or delivery of any AT&T Services or that relate to your AT&T Account or our relationship with you;

- any action of a third-party, such as unauthorized access to your AT&T Accounts or AT&T Services (including the use of your AT&T Accounts or AT&T Services to access a third-party account); or

- any alleged actions or representations, statements, promises, or agreements by AT&T that are not expressly set forth in this Agreement regarding the use, performance, suitability, safety, reliability, security, or any other aspect or attribute of AT&T Services;

To the greatest extent permitted by law, **AT&T is not liable to you for any damages of any kind** resulting in any way from:

- the installation, maintenance, removal, or technical support of AT&T Services, **even if the damage results from the ordinary negligence of our installer or other representative**;

- any unauthorized access to your AT&T Accounts or AT&T Services (including the use of your AT&T Accounts or AT&T Services to access a third-party account), **even if the unauthorized access was the result of ordinary negligence by an AT&T employee, representative, agent, or any person or entity purporting to act on AT&T's behalf**;

- any inability to reach 911 or other emergency services, any alleged interference with alarm or medical monitoring signals, or any failure of alarm or medical monitoring signals to reach their intended monitoring stations;

- the use, inability to use, or the lack of interoperability between AT&T Services and any third-party hardware, software, or service, even if charges for the third-party hardware, software, or service appear on your AT&T bill;

- the loss of your information, such as missed or deleted voicemails, text messages, emails, pictures, or files; or

- any interruption, error, limitation, delay in any AT&T Service, or any other problem caused, in whole or in part, by you or something outside of our control, including, but not limited to, environmental conditions, emergency conditions, power or network outages, transmission errors, equipment damage or repairs, limits in system capacity, unavailability of radio frequency channels, governmental actions, labor disputes, riots, terrorism, or the acts of third parties.

To the greatest extent permitted by law, **our total liability to you (under any legal theory) is a credit or refund that must not exceed the total amount of charges you paid us for the applicable AT&T Service during the shorter of (i) the preceding 24-month period or (ii) the period in which you experienced the issue giving rise to your claims.** If you are disputing a charge on your bill, Section 1.10 requires you either to notify customer service or submit a Notice of Dispute within 180 days of the bill date.

To the greatest extent permitted by law, **you must commence any legal action, whether by filing a lawsuit in small claims court or by filing a demand for arbitration, within two years of the date of the event or facts giving rise to the dispute or you waive the right to pursue that claim** (this contractual limitations period is tolled by the submission of a valid Notice of Dispute under subsection 1.3 of this Agreement).

Each of the limitations of liability in this Agreement will apply to claims you bring against third parties to the extent that we would be required to indemnify that third-partyIf applicable law prohibits a limitation in this Agreement, all other limitations will apply to the greatest extent permitted by law. References in Section 1.7 to "AT&T" and "we" include our past, present, and future parents, subsidiaries, affiliates, and related entities, as well as AT&T's and all of those entities' officers, agents, employees, licensors, predecessors in interest, successors, and assigns.

## 1.8 Indemnification

To the fullest extent allowed by applicable law, you agree to release, hold harmless, indemnify, and defend AT&T (including our past, present, and future parents, subsidiaries, affiliates, and related entities, as well as AT&T's and all of those entities' officers, agents, employees, licensors, predecessors in interest, successors, and assigns) from any and all claims of any person or entity for damages, fines, penalties, or expenses of any nature arising out of or relating to, directly or indirectly:

- your or your Authorized Users' access to, use of, or inability to access or use any AT&T Service;

- any violation by you or your Authorized Users of this Agreement;

- your or your Authorized Users' violation of law (including negligence, willful misconduct, and infringement of anyone's intellectual property rights); or

- any other claim, demand, action, or complaint by any person or entity claiming by or through you or your Authorized Users that in any way arises out of or relates to this Agreement or any AT&T Service.

## 1.9 Charges and Payments

### 1.9.1 Credit Check:
By applying for or using AT&T Services, you're giving us permission to obtain your credit information from consumer credit reporting agencies at any time and for any reason. We also may share information about your credit with AT&T's current and future affiliates, assignees, successors, employees, agents, and others acting or purporting to act on our behalf at any time and for any reason. We may refuse to provide AT&T Services or require an advance payment, a nonrefundable payment, or other form of credit requirement if we determine that you may be a credit risk due to (1) your credit rating; (2) insufficient credit history; (3) previous late payments, suspension, disconnection or restoral of service; or (4) fraudulent or abusive use of any AT&T Services within the last five years. We will not pay interest on advance payments or deposits unless required by law. We may, however, require special payment terms, such as additional advance payments or deposits, if we determine that the initial payment was inadequate. We may establish limits and restrict AT&T Services or features as we deem appropriate. And we may immediately interrupt or suspend AT&T Services until your balance is brought below the limit we set for you. Any charges you incur in excess of your limit become immediately due. Upon determination solely by us of satisfactory payment history or as required by law, we may begin refunding deposits through bill credits or cash payments or as otherwise determined solely by us. If you are delinquent in any payment to us, you also authorize us to report any late payment or nonpayment to credit reporting agencies.

### 1.9.2 Billing:
**Different AT&T Services bill in different ways.** Please see the Service Terms for each AT&T Service for details and applicable fees and charges. In addition, you agree to pay your amounts due in full each billing cycle (usually once every 30 days): (1) the then-current monthly charges for your AT&T Services; (2) any applicable charges for equipment required for AT&T Services; (3) activation fees, connection, or installation charges, if any; (4) late fees and AT&T Service restoral fees, if any; (5) AT&T fees and other AT&T charges disclosed in the Service Terms; (6) charges for third-party content or services purchased or ordered using your AT&T Services or equipment; and (7) any applicable taxes and fees that AT&T pays to municipalities and other governmental entities and may pass on to you,

regardless of whether applicable law assesses them on you or us. You are responsible for paying all charges specified in this Agreement, including charges incurred by any person who gains access to your AT&T Services or equipment, even if you did not authorize the charges. Please note that billing will begin as soon as your AT&T Service is provisioned or activated for you, even if you have not used it or installed it.

**1.9.3 Late-Payment Charge and Dishonored Check Fee:**
You agree that, for each bill not paid in full by the payment due date, we may assess a late-payment charge (subject to applicable law and except as expressly agreed in writing). Our acceptance of late or partial payments (even if marked "Paid in Full") won't waive any of our rights to demand payment of the full amount due. You will also be charged a fee for each and any check or other forms of payment made (including credit card charge-backs) that are returned unpaid for any reason (subject to applicable law and except as expressly agreed in writing).

**1.9.4 Collections:**
If you don't pay your bill in full and on time, you agree that you may be subject to collections either by us or a third-party collections agency. To the extent permitted by law, you must pay us any costs and fees, including attorneys' fees, we reasonably incur to collect amounts you owe us. Subject to applicable law, you agree that we're not responsible or liable for any negative consequences that may arise as a result of our reporting your Account, payment information, or history to any third-party credit reporting or collections agency.

**1.9.5 Autopay:**
If you enroll in an automatic credit card billing, automatic payment, or electronic funds transfer plan, you authorize us or our agent to charge or place holds on the credit or debit card or financial institution account number you provide to us, without requiring a signed receipt. You certify you are the owner of the payment method, authorize us to store this information, and authorize us to automatically charge the amount of your monthly bill(s) each month on the date indicated on your monthly bill, and to charge any amounts outstanding if you cancel AT&T Service. If you were required to provide a credit card when you started an AT&T Service, you also authorize us to charge that card (in lieu of your autopay card, if different) for any amounts outstanding if you cancel AT&T Service. You agree to provide us with updated credit or debit card or bank account information when needed by calling the customer care number on your bill or online at att.com/myatt. You acknowledge that, if your card-issuing bank participates in a card updater program and unless you opt out of this service, your bank may provide us with updated card numbers and expiration dates, and we will update our files with this information and continue to charge your card. You agree that we're not responsible for any insufficient funds or other charges you might incur as a result of any attempts to charge or place holds on your credit or debit card or to transfer funds. When payment is made by credit or debit card, payment will also be subject to the terms and conditions established by the credit or debit card issuer. If charges cannot be processed through your credit or debit card, or if your bank draft or electronic funds transfer is returned for insufficient funds, we may charge you an additional fee.

**You can cancel your authorization for automatic credit-card billing, automatic payment, or electronic funds transfer by calling the customer care number on your bill or online at att.com/myatt.** If you do so, you may lose certain promotions or discounts. You also should contact your card issuer or financial institution to advise that you have cancelled your enrollment.

**1.9.6 Early Termination Fee:**
Your Customer Service Summary, order confirmation, or applicable fee schedule for your AT&T Service may include a minimum period in which you must maintain service on an eligible plan ("Service Commitment") or maintain certain programming ("Programming Commitment"). If you do not meet that commitment, you agree to pay an early termination fee. That fee is not a penalty, but rather is an alternative means for you to perform your obligations under the Agreement that partially compensates us for the fact that the Service Commitment or Programming Commitment on which your monthly rate is based was not completed.

**1.9.7 Application of Credits:**
Any amounts refunded in the form of bill credits, cash payments, or any other form will include all applicable taxes, fees and surcharges that were originally paid on such amounts. Credit amounts, such as customer loyalty rewards, that do not represent a refund of, or a discount to, the price paid for any good or AT&T Service will not result in the refund of any tax, fee, or surcharge you previously paid.

**1.9.8 Business or Government Benefits:**
You may receive or be eligible for certain discounts, credits, promotions, and other benefits ("Benefits") through a business or government customer's agreement with us ("Business Agreement") or if you are otherwise eligible to participate in our military/government discount or benefit programs. All such Benefits are provided to you solely as a result of the corresponding Business Agreement or at our discretion and may be modified or terminated without notice. You may also be eligible for certain additional rate plans and/or other Services. For Wireless Services, please see att.com/iru-additional-terms for additional terms.

If a business or government entity pays your charges or is otherwise liable for the charges, you authorize us to share your Account information with it or its authorized agents. If you use Service(s) and/or receive certain Benefits pursuant to or arising from a Business Agreement with us, but you're liable for your own charges, then you authorize us to share enough Account information with your business or government entity, or its authorized agents, to verify your continuing eligibility for those Services or Benefits. You also agree we may contact you to confirm your continued eligibility for the Services and/or Benefits.

You may receive Benefits because of your agreement to have the charges for your Services, billed by a company affiliated with AT&T ("Joint Billing") or because you subscribe to certain services provided by an affiliate. If you cancel Joint Billing or the service from the affiliate, your rates will be adjusted without notice to a rate plan for which you qualify.

Benefits may vary and are subject to the corresponding Business Agreement and ongoing eligibility/enrollment criteria, which we may verify or audit in our discretion. FirstNet individual users must also satisfy the eligibility criteria for FirstNet service and will be subject to re-verification of eligibility from time-to-time.

## 1.10 Questions or Disputes Regarding Charges

If you believe that there's something wrong with your bill, please contact customer service as soon as possible. If you're not satisfied with customer service's resolution, you may send us a Notice of Dispute pursuant to subsection 1.3.

**If you have a billing dispute, you have 180 days from the date of the bill either to notify customer service or submit a Notice of Dispute. Otherwise, you'll have waived your rights to dispute the bill and to participate in any legal action raising that dispute. This limitations period does not apply in any state in which this contractual notice provision is prohibited.**

## 1.11 Privacy

### 1.11.1 Privacy Policy:

We take your privacy seriously. For more information about how we collect, use, and protect your personal information, including your location information, please see the AT&T Privacy Policy located at att.com/privacy. FirstNet individual users should review the FirstNet Privacy Policy at firstnet.com.

### 1.11.2 Use by Children:

Children under the age of 13 should not be permitted to access AT&T Services unless allowed by an Account holder who is their legal guardian. By permitting a child to access an AT&T Service, you are giving your child access to all features (such as email, texts, and device applications), the internet, and a broad range of third-party content. It is your sole responsibility to determine whether the features are appropriate for a minor.

AT&T is not responsible for any content accessed by you or minors. In addition, AT&T does not guarantee the accuracy of any access controls available from AT&T, and you agree that you will not hold us liable for any loss or damage of any kind incurred as a result of the use of any such access controls.

## 1.12 Governing Law

The law of the state in which we currently provide you with AT&T Services (or, for wireless service, the state of your current billing address or current address of record) governs this Agreement, except to the extent that law is preempted by or inconsistent with applicable federal law.

## 1.13 End User Licensing Terms

If you connect to AT&T Services by using, downloading, or installing an application or other Software that we made available, whether directly or indirectly through vendors, your use of the Software is subject to this Agreement and any End User License Agreement ("EULA") for the Software.

### 1.13.1 Definition of Software:

The term "Software" means the following: (a) any application related to the Services or this Agreement, including, without limitation, any software code, scripts, interfaces, graphics, displays, text, documentation, and other components; (b) any updates, modifications, or enhancements to it; and (c) any specific AT&T or vendor web site to which the Software directs you via any browser.

### 1.13.2 License Grant:

We (or for vendors' Software, the vendor) remain the owner of the Software, which isn't being sold to you. So long as you comply with the terms of this Agreement and any EULA provided with the Software, AT&T grants you a revocable, nonexclusive, nontransferable, limited right to install and use the Software on a single computer or device that you own and control and to access and use the Software on such device. We're not responsible for any material or content that you transmit, store, delete, record, or play using the Software.

### 1.13.3 Restrictions on Use:

You may use the Software only in strict adherence to the terms of this Agreement, the EULA, and the terms of any other agreements associated with your device. You may not: (a) decompile, reverse engineer, disassemble, attempt to derive the source code of or decrypt the Software; (b) make any modification, adaptation, improvement, enhancement, translation, or derivative work from the Software; (c) violate any applicable laws, rules, or regulations in connection with your access or use of the Software; (d) remove, alter, or obscure any proprietary notice (including any notice of copyright or trademark) of AT&T, its suppliers, or the licensors of the Software; (e) other than resale by an AT&T-authorized reseller, use the Software for any revenue-generating endeavor or commercial enterprise other than the use of this Software to participate in our Services; (f) use the Software for creating a product, Service, or software that is, directly or indirectly, competitive with or in any way a substitute for any Services, product, or software offered by us; (g) use the Software to send automated queries to any web site or to send any unsolicited commercial email; or (h) use any proprietary information or interfaces of AT&T or other intellectual property of AT&T in the design, development, manufacture, licensing, or distribution of any applications, accessories, or devices for use with the Software.

### 1.13.4 Export Limits:

None of the Software or underlying information or technology may be downloaded or otherwise exported or re-exported: (a) into (or to a national or resident of) any country to which the United States has embargoed goods; or (b) to anyone on the U.S. Treasury Department's list of Specially Designated Nationals or the U.S. Commerce Department's Table of Deny Orders. The Software and any underlying technology may not be exported outside the United States or to any foreign entity or "foreign person" as defined by U.S. government regulations, including without limitation, anyone who is not a citizen, national, or lawful permanent resident of the United States.

## 1.14 Intellectual Property Rights

### 1.14.1 AT&T IP:

You agree that Software, AT&T Services, and AT&T equipment ("AT&T IP") are protected by trademark, copyright, patent and intellectual property laws, and/or international treaty provisions. You also agree that the source and object code of AT&T IP and the format, directories, queries, algorithms, structure, and organization of AT&T IP are the intellectual property and proprietary and confidential information of AT&T, its suppliers, and its licensors. Except as expressly stated in this Agreement, you are not granted any intellectual property rights in or to AT&T IP by implication, estoppel, or other legal theory, and all rights in and to AT&T IP not expressly granted in this Agreement are hereby reserved and retained by us. Nor do you have any intellectual or other property rights in any information that we

provide or use to deliver AT&T Services, such as any Account or phone numbers or email addresses assigned to you.

**1.14.2 Third-Party Software:**

AT&T IP may utilize or include third-party software that is subject to open source and third-party license terms ("Third-Party Software"). You acknowledge and agree that your right to use such Third-Party Software as part of the Services is subject to and is governed by the terms and conditions of the open source or third-party license applicable to such Third-Party Software, including, without limitation, any applicable acknowledgements, license terms, and disclaimers contained therein ("Third-Party Software Notices") and including all posted changes to Third-Party Software Notices. In the event of a conflict between the terms of this Agreement and the terms of those licenses, the terms of those licenses will control your use of the relevant Third-Party Software. In no event will the Application or components thereof be deemed to be "open source" or "publicly available" software. You agree that your use of AT&T IP is subject to the terms of all Third-Party Software Notices.

**1.14.3 AT&T Marks:**

You agree that AT&T names and their related logos and all related product and service names, design marks, and slogans are trademarks and service marks owned by and used under license from AT&T (the "AT&T Marks"). You are not authorized to use the AT&T Marks in any advertising, publicity, or in any other commercial manner without the prior written consent of AT&T, which may be withheld for any or no reason.

**1.14.4 Copyright Infringement and Digital Millennium Copyright Act:**

AT&T respects the intellectual property rights of others. If you believe that your work has been copied and has been posted, stored, or transmitted in connection with AT&T Services in a way that constitutes copyright infringement, in accordance with the Digital Millennium Copyright Act ("DMCA"), please tell us by providing the information listed at att.com/legal/terms.dmca.html to our Copyright Agent for notice of claims of copyright infringement to copyright@att.com. For more information about AT&T's copyright protection practices under the DMCA and for information on how to contact our DMCA agent, please refer to att.com/legal/terms.dmca.html.

**1.14.5 Copyright Alert Program:**

We maintain the AT&T Copyright Alert Program (AT&T CAP) that allows copyright holders to notify us of claimed infringement occurring on our transitory digital network communications services pursuant to 17 U.S.C. § 512(a). For more information on the AT&T CAP, please visit copyright.att.net.

Under the AT&T CAP, content owners may submit notifications to us of alleged copyright infringement based on information they have independently collected in accordance with the industry standard Automated Copyright Notice System. If a content owner or its authorized agent submits an infringement notice identifying an IP address that we can, with reasonable efforts, trace to a particular and identifiable AT&T subscriber as of the date and time identified in the notice, we will forward a copyright alert to the contact information on file for the subscriber Account, advising the Account holder of the allegation and providing information about online copyright infringement.

If you receive a copyright alert, it is your responsibility to take immediate action to check your internet connected devices and your local network to ensure that you don't generate additional copyright infringement notices. If, after you receive a copyright alert, we receive additional copyright infringement notices which are traceable to an IP address associated with your Account, we may temporarily redirect your internet access service to a webpage where you will be required to review and acknowledge material on the importance of copyright and the lawful use of content available over the internet. Upon completion of this review, redirection will be discontinued and your service will be restored to normal. After this stage, if we continue to receive copyright infringement notices that are traceable to an IP address associated with your Account, we may take further action consistent with 17 U.S.C. § 512(i), which may ultimately result in termination of your AT&T Services.

The Account holders' personally identifiable information is protected throughout this process. We will not provide such information to content owners unless required to do so by court order. For more information about AT&T's Copyright Alert Program, please go to: copyright.att.net.

Our policies may be periodically revised and, in addition, we may in our sole discretion voluntarily participate, on terms acceptable to us, in copyright alert and graduated response programs with other stakeholders. By using the AT&T Services, you agree that we have the right, but not the obligation, to challenge on your behalf the legitimacy of any notification of copyright infringement which we receive, and you agree to grant us such limited authority as may be necessary to allow for such a challenge.

## 1.15 Information, Content, Services, And Applications Provided By Third Parties

WE ARE NOT A PUBLISHER OF THIRD-PARTY INFORMATION, APPLICATIONS, SERVICES, OR OTHER CONTENT AND WE ARE NOT RESPONSIBLE FOR ANY OPINIONS, ADVICE, STATEMENTS, OTHER INFORMATION, SERVICES, OR GOODS PROVIDED BY THIRD PARTIES. AT&T, its service providers, and its suppliers—in providing information, services, applications, content, or products—do not underwrite, or assume your risk in any manner whatsoever. You agree that your use of third-party information, applications, services, content, or products is at your own risk, for which we're neither responsible nor warrant their safety, quality, or appropriateness and we do not provide customer service, repairs, or other support.

Third-party content or service providers may impose additional charges. Any information you provide to third parties is governed by their policies or terms.

Some services give you the ability to access, view, listen to, interact with, record, and/or store third-party audio and visual content ("Third-Party Content"). You understand that we don't guarantee the access to or availability of any particular Third-Party Content, or the length of time any particular Third-Party Content may remain available. You also understand that Third-Party Content is the copyrighted material of the third-party that supplies it, is protected by copyright and other applicable laws, and may not be reproduced, published, broadcast, rewritten, or redistributed without the written permission of the third-party that supplied it, except to the extent allowed under the "fair use" provisions of the U.S. copyright laws or comparable provisions of foreign laws. You agree that we will have no liability to you, or to anyone else who uses your AT&T Account or your AT&T services, with regard to any Third-Party Content.

We reserve the right in our sole discretion to restrict or deny access to any Third-Party Content or other third-party information, application, services, or products.

### 1.16 Assignment and Third Parties

**1.16.1 Assignment:**
We may assign this Agreement or parts of this Agreement to any third party without your consent and without notice to you, but you cannot assign the Agreement or any rights or legal claims arising from it without our prior written permission. Upon any assignment of this Agreement by AT&T, all references in this Agreement to "AT&T" "we," "us," or "our" shall refer solely to the assignee of this Agreement and shall no longer refer to AT&T or its affiliates. From the date of an assignment by AT&T, we will no longer be your service provider and the assignee shall be responsible for providing your services. You acknowledge and agree that AT&T will have no liability or obligation to you if this Agreement is assigned by AT&T, and your recourse for any liabilities or obligations will be solely limited to the assignee of this Agreement.

**1.16.2 Third parties:**
Except as stated in this Agreement, anyone who uses or benefits from your AT&T Services is not a third-party beneficiary who can enforce this Agreement against you, us, or anyone else.

### 1.17 About this Agreement

**1.17.1 Your Ability to Contract:**
By agreeing, acknowledging, or signing any agreement or terms and conditions or otherwise activating, using, or paying for any AT&T Service – which constitutes acceptance of this Agreement – you're confirming that you're over the age of majority and have the capacity to enter into binding contracts. In addition, if you're using AT&T Services on behalf of any entity, such as a corporation or other organization, you're accepting this Agreement on that entity's behalf. If that entity has separately entered into a business agreement with us, those business terms control.

**1.17.2 Changes to Agreement:**
We may add, modify, or delete any terms, conditions, rates, or fees for any AT&T Service at any time. We will provide you with notice of changes that are materially adverse to you (this does not include changes in fees or surcharges imposed by the government and passed onto you or changes to rates, fees, or surcharges within limits set forth in this Agreement or any incorporated documents) by email, bill insert or message, text or other message, posting on the website for your AT&T Service, mail, or other method we deem practicable. We also may provide you with notice of non-material changes in our sole discretion. Your continued use or payment for AT&T Services after the effective date of the change means you have accepted the change. If we notify you of a materially adverse change concerning an AT&T Service during your Service or Programming Commitment, and if you don't accept the change, you must cancel the AT&T Service within 14 days of the notice to avoid an early termination fee, if applicable. Continued use of the AT&T Service is your acceptance of any changes.

**1.17.3 Conflicting Terms:**
This Agreement supersedes any prior agreement between us regarding your AT&T Services. In the event of a conflict between this Agreement and an applicable EULA, this Agreement controls unless the EULA specifically states otherwise. The English version of this Agreement is the original one. If there is a conflict between it and any translated version, the English version controls.

**1.17.4 Severability:**
If any provision of this Agreement is found to be unenforceable, **the remaining provisions will remain in full force and effect.**

**1.17.5 Survival:**
Although you or we can terminate this Agreement, some terms will continue to apply after termination. These terms include, but are not limited to, the provisions regarding dispute resolution (subsection 1.3), disclaimer of warranties (subsection 1.6), limitations of liability (subsection 1.7), indemnification (subsection 1.8), and governing law (subsection 1.12).

**1.17.6 Entire Agreement:**
This Agreement constitutes our entire agreement and supersedes any prior or contemporaneous agreements or understandings between us, either written or oral. This integration clause means that, to the greatest extent permitted by applicable law, you cannot rely on marketing materials or statements or promises by our employees or agents to modify the terms of this Agreement.

**1.17.7 Operational Limits/Force Majeure:**
Our ability to provide AT&T Services to you is subject to the availability and the operational limitations of the equipment and associated facilities, including third-party networks that AT&T does not control. You understand and agree that temporary interruptions or delays of AT&T Services may occur, and that AT&T is not liable for them. In addition, we aren't responsible for interruptions or delays caused by events outside our control, such as war, acts or threats of terrorism, civil disorder, labor strikes or disruptions, natural disasters (including fires, floods, earthquakes, and severe weather), medical epidemics, pandemics or outbreaks, destruction of network facilities or transportation infrastructure, or any other events beyond our reasonable control.

**1.17.8 Non-Waiver of Rights:**
We may decide not to enforce rights or remedies under this Agreement in specific instances. That decision is not a waiver of any of our rights or remedies.

## 2.0
## AT&T Wireless Service Terms

AT&T wireless service, including FirstNet individual users' wireless service ("Wireless Service"), is provided by AT&T Mobility LLC, acting on behalf of its FCC-licensed affiliates or AT&T's assignee or successor ("AT&T" or "us" in these Wireless Service Terms).

Section 2 contains terms applicable to all AT&T Wireless Services. Section 3 contains supplemental terms for AT&T PREPAID Wireless Service and Section 4 contains supplemental terms for DataConnect/Session-based Wireless plans. If terms in Section 2 conflict with terms in either Section 3 or 4, the terms in Section 3 or 4 will control.

For questions about Wireless Service, please call 800.331.0500 for postpaid service and 800.901.9878 for prepaid service.

## 2.1 Wireless Service Agreement

Your Wireless Service Agreement includes the following:

- Your Customer Service Summary;
- Your Wireless Service terms and conditions found in the brochures that are available in the retail store and online at att.com/mobilityplans at the time of your purchase; and
- Additional terms and conditions that apply to your use of AT&T apps, features and services, which are available in the app, on your Device and online at att.com/appterms or the associated service page at att.com.

AT&T's wireless network may provide broadband access to the internet. For more information about how AT&T helps transmit information to points on the internet and how we manage our network, please see att.com/broadbandinfo. The information provided on the broadband information page is not part of your Agreement.

## 2.2 Wireless Service Description

Your Wireless Service includes:

- Services included in your rate plan, which sets forth your monthly usage allotment and charges for voice, messaging and/or data services; overage rates when you exceed your rate plan's monthly usage allotment; pay-per-use rates; and coverage area. Unless specified otherwise in your rate plan terms, any unused allotment of voice, messaging and data services, from one billing cycle will not carry over to any other billing cycle.
- Any optional features and services you add to any line on your Account, which may be subject to additional charges and terms and conditions.

Unless otherwise specified in your rate plan, your Wireless Service does not include—and additional charges may apply for use of—other carriers' networks in the U.S. or while traveling internationally.

AT&T Wireless Service may be used with: (a) a mobile device that contains a SIM that is assigned to your Account or (b) a device that is designed and purchased for use exclusively on AT&T's network (referred to in the Wireless Service Terms interchangeably as "Device" or "Equipment").

**2.2.1 Voice Service:**
If your rate plan includes voice service, subject to the limitations in this Agreement, you can make and receive calls within your rate plan's coverage area ("Voice Service"). Additional charges may apply for Voice Service used outside your rate plan's coverage area.

**2.2.2 Messaging Service:**
If your rate plan includes the ability to send and receive AT&T text (SMS), pictures or video (MMS), and/or Advanced Messaging (RCS) chat messages (collectively "Messages"), subject to the limitations in this Agreement, you will be able to receive and send such messages ("Messaging Service"). Apps that use other messaging protocols and over the top third-party messaging apps may incur data charges. Messages sent from or received on tablets, laptops, smart watches, or other connected devices are treated as data usage, not messages. AT&T does not guarantee delivery of messages. Messages, including downloaded content, not delivered within 72 hours will be deleted and no longer available. AT&T reserves the right to change this delivery period as needed without notification.

Advanced Messaging will not work if messaging or data has been blocked on your line. For more information on Advanced Messaging, visit att.com/advancedmessaging. Maximum limits on group message size apply depending on device mix and capabilities. MMS and SMS Messaging Service and data plan may need to be provisioned on an account in order to use Messaging. Some elements of Messages may not be accessible, viewable, or heard due to limitations on certain wireless devices. AT&T reserves the right to change the Message size limit at any time without notification. Text message notifications may be sent to non-Picture/Video Messaging subscribers if they subscribe to Text Messaging. You may receive unsolicited messages from third parties as a result of visiting internet sites.

**2.2.3 Data Service:**
If your rate plan includes data, subject to the limitations in this Agreement, you will be able to browse the internet and access wireless services, content and apps, including those that enable sending and receiving of emails, use of GPS navigation, streaming of video, and other customary mobile internet-enabled capabilities ("Data Service"). Services provided via the Data Service may be provided by AT&T or its affiliates, assignees, successors, or by third parties subject to service-specific terms and conditions.

**2.2.4 AT&T Wi-Fi Service:**
If you have a qualified rate plan and a Wi-Fi capable device, AT&T W-Fi Service in the U.S. may be available to you at no additional charge and your device may auto-authenticate at AT&T Wi-Fi Service locations. Use of AT&T Wi-Fi Service in the U.S. is subject to the Wi-Fi Terms of Service ("Wi-Fi Terms") found at att.com/legal/terms.wiFiServices.html. If you auto-authenticate at our Wi-Fi Service locations, your use may be subject to the Wi-Fi Terms and the URL filtering choices of the location owner or operator. Auto-authentication can be disabled on your device, e.g., by turning off Wi-Fi. Certain information about you or your Device may be collected when you use AT&T's Wi-Fi Service. (Note that AT&T Wi-Fi Service is for Wireless customers; home networking Wi-Fi for Internet Service customers is subject instead to the terms in subsection 6.2.4.)

**2.2.5 Caller ID:**

Your caller identification ("Caller ID") information (such as your name and phone number) may be displayed on the Device or bill of the person receiving your call; technical limitations may, in some circumstances, prevent you from blocking the transmission of Caller ID information. Contact customer service for information on blocking the display of your name and number. Caller ID blocking may not be available when using Data Services. If applicable to your rate plan and Device, an in-coming call identification feature may apply that will notify of in-coming calls and that may apply generic labels such as telemarketing, suspected spam, and/or suspected fraud to some of those calls.

## 2.3 Where can I use my Wireless Service?

To activate and maintain your Wireless Service you must have a U.S. mailing address and live within AT&T's, its assignee's or its successor's owned and operated network coverage area. Our coverage maps can be found at att.com/coverageviewer. There are gaps in coverage maps, which, by their nature, are only approximations of actual coverage. Please be aware that even within your coverage area many things can affect the availability and quality of your Wireless Service, including, but not limited to, network capacity, your Device, your rate plan, terrain, buildings, foliage and weather. Wireless Service or particular wireless technologies (such as 5G) will not be available in all areas at all times.

We utilize different network technologies in our wireless network and not all Devices work on all wireless technologies. We do not guarantee that you will receive any specific network capability at any given time, including any particular network speed. Actual network speeds depend upon device characteristics, network technology, availability, coverage, tasks, file characteristics, applications and other factors.

Wireless Service may be interrupted, delayed, or otherwise limited for a variety of reasons, including environmental conditions, unavailability of radio frequency channels, system capacity, network management, priority access by National Security and Emergency Preparedness personnel in the event of a disaster or emergency, coordination with other systems, equipment modifications and repairs, and problems with the facilities of interconnecting carriers.

## 2.4 Service Activation and Term Commitment

### 2.4.1 Establishing Service and Service Term:

To establish Wireless Service, you may have been required to provide a credit card. You may use this or another credit or debit card to establish recurring payments. See Section 2.35 regarding payment upon cancellation. These Wireless Service Terms begin on the day we activate your Wireless Service and continue through termination of your Wireless Service for any reason.

### 2.4.2 Term Commitment:

If you have agreed to a Service Commitment, you are required to maintain Wireless Service on an eligible plan for the Service Commitment period. Once you complete your Service Commitment, your contract for Wireless Service will continue on a month-to-month basis and automatically renews unless you cancel it or your Wireless Service is otherwise terminated. If you do not have a Service Commitment (for example, you purchase your Device from us at full retail price, under an installment plan, or bring your own Device), your Service is provided on a month-to-month basis and automatically renews unless cancelled or terminated. See att.com/howtocancel for details on how to cancel.

### 2.4.3 Device Activation:

If you purchased a Device that was shipped to you, you agree to activate the Device within seven (7) days of the shipment date. If your Device is not activated by you, for post-paid Wireless Service, we may activate the Device for you within a month of shipping and your monthly recurring charges, and any applicable Service Commitment, will begin.

### 2.4.4 Early Termination Fee ("ETF"):

If you terminate your Agreement before completion of your Service Commitment, you agree to pay an ETF unless the ETF is waived by subsection 2.4.5. The ETF amount will be an amount up to your purchase price and will reduce each full month of your Service Commitment that you complete. For details, see att.com/equipmentETF.

### 2.4.5 Your Termination Rights and Ability to Change Wireless Service:

You can cancel any individual line of Wireless Service on your Account or your whole Account at any time. You must pay all amounts owed for Wireless Service used prior to cancellation including applicable taxes, surcharges, AT&T fees, and other fees. Authorized agents may charge additional fees. If you cancel your Wireless Service within the first 3 days of activation, we will refund your activation fee, if applicable. If you have a Service Commitment, you can cancel Wireless Service within 14 days of activation by returning the Device you purchased, and you will not be required to pay an ETF. Your Device must be in like-new condition with original packaging to be eligible for return. See att.com/returns for details. AT&T also may charge you a restocking fee for any returns. If you cancel prior to end of your billing period, your monthly Wireless Service charges are not refunded or prorated.

You also can change your Wireless Service at any time, but the Wireless Service available to you depends on your Device. Your Device may require certain Wireless Service, for example, smartphone users must have a rate plan that includes both voice and data.

## 2.5 Prohibited Uses of Wireless Services

Our wireless network is a shared resource, which we manage for the benefit of all of our customers. To ensure the activities of some users do not impair the ability of all our customers to have access to reliable services provided at reasonable costs, we forbid certain activities and uses ("Prohibited Network Uses"). We may take any and all reasonable actions necessary to prevent and stop Prohibited Network Uses or any other violation of AT&T's Acceptable Use Policy. Prohibited Network Uses include use of AT&T Wireless Service that, in AT&T's sole determination:

- hinders other customers' access to the wireless network;

- involves a mechanism that is used to originate, amplify, enhance, retransmit or generate a radio frequency signal without our permission;

- negatively affects our network or compromises network security or capacity;

- excessively and disproportionately contributes to network congestion;

- adversely impacts network service levels or legitimate data flows;

- degrades network performance;

- causes harm to other customers;

- tethers a wireless Device to a computing device if you have not subscribed to a rate plan with a tethering feature;

- uses any Device for Wireless Service with an ineligible rate plan;

- constitutes the reselling of any Wireless Service; or

- is excessive or unreasonable.

**2.5.1 Examples of Prohibited Network Uses of Voice Service:**

Our unlimited Voice Service is provided primarily for live dialogue between individuals. If your use of unlimited Voice Service for call forwarding, conference calling or purposes other than live dialogue between individuals exceeds 1,000 minutes per month, AT&T may terminate your Service or change you to a rate plan with no unlimited voice usage components. Our unlimited Voice Service may not be used for any other commercial purposes, including, but not limited to: (1) maintaining an open line to provide dispatch or monitoring services; (2) accessing or remote call forwarding to multi-party chat line services; (3) transmitting broadcasts or pre-recorded materials; or (4) telemarketing.

**2.5.2 Examples of Prohibited Network Uses of Messaging Service:**

Our Messaging Services are provided solely for communication between, and/or initiated by, individuals for personal use. You may not use Messaging Services for commercial purposes, including, but not limited to: (1) sending unsolicited, unauthorized, spam, or other unwanted messages (whether SMS, MMS, RCS, or other); (2) sending or receiving unusually high numbers of messages or messages not originated on your Device; or (3) reselling or transferring messaging capabilities. See the Acceptable Use Policy (located at att.com/legal/terms.aup.html) for more information. We may terminate or restrict your Messaging Service for tethered messaging, excessive use, or misuse.

**2.5.3 Examples of Prohibited Network Uses of Data Service:**

Data Service may not be used in any manner that: defeats, obstructs, penetrates, or attempts to defeat, obstruct, or penetrate, the security measures of AT&T's wireless network or systems, or another entity's network or systems; accesses, or attempts to access without authority, the accounts of others; or adversely affects the ability of other people or systems to use either AT&T's Wireless Services or other parties' internet-based resources. For example, this prohibition includes, but is not limited to: malicious software or "malware" that is designed, intentionally or unintentionally, to infiltrate a network or computer system such as spyware, worms, Trojan horses, rootkits, and/or crimeware; "denial of service" attacks against a network host or individual user; and "spam" or unsolicited commercial or bulk email (or activities that have the effect of facilitating unsolicited commercial or bulk email).

Data Service may not be used in any manner that has the effect of excessively contributing to network congestion, hindering other customers' access to the network, or degrading network performance. For example, this includes, but is not limited to: server devices or host computer applications such as continuous Web camera posts or broadcasts, automatic data feeds, or automated machine-to-machine connections; "auto-responders," "cancel bots," or similar automated or manual routines that generate excessive amounts of traffic or that disrupt user groups or email use by others; use of the Wireless Service as a substitute or backup for private lines or full-time or dedicated data connections; peer-to-peer (P2P) file sharing services; and software or other devices that maintain continuous active internet connections when a connection would otherwise be idle or any "keep alive" functions.

Data Service also may not be used with high bandwidth applications, services and content that are not optimized to work with Data Service and, therefore disproportionately and excessively contribute to network congestion. This includes, but is not limited to, redirecting television signals for viewing on computing devices; web broadcasting; and/or the operation of servers, telemetry devices, or supervisory control and data acquisition devices.

## 2.6 Unlimited Data Service

If you are subscribed to an AT&T unlimited data plan, you agree that "unlimited" means you pay a single monthly flat rate for wireless Data Service regardless of how much data you use. You further agree that "unlimited" does not mean that wireless data will be transmitted at any particular speed or that you can use AT&T's wireless Data Service in any way that you choose or for any Prohibited Network Uses. If you use your unlimited data plan in any manner that is prohibited, AT&T can limit, restrict, suspend or terminate your Data Service. We may also migrate you from the unlimited data plan to a tiered data plan and charge you the appropriate monthly fees. We will provide you with notice of this change at least one billing period in advance either by a bill message, email, text message, or other appropriate means.

Except for FirstNet individual users, AT&T may also reduce your data throughput speeds at any time based on the terms of your data plan, which may include times when your usage exceeds an applicable, identified data usage threshold during any billing period. Reduced data throughput speeds mean you may experience reduced data speeds and increased latency, which may cause websites to load more slowly and affect the performance of data-heavy activities such as video streaming.

Reduced data throughput speeds apply when using Data Services at times and in areas experiencing network congestion compared to other customers using the same cell site. Standard speeds will resume once the cell site is no longer congested or when your data session moves to an uncongested cell site, and speeds will no longer be reduced during periods of network congestion at the start of your next billing period, unless your usage again exceeds an applicable, identified data usage threshold for that next billing period.

There are no mobile network-related speed reductions if you use Wi-Fi, and Wi-Fi data usage does not count against a monthly data usage threshold for wireless Data service. For more information, go to att.com/broadbandinfo and att.com/datainfo.

## 2.7 AT&T's Rights to Change, Reduce, Cancel, Suspend, Interrupt or Terminate Wireless Service or the Agreement

AT&T can take any and all actions necessary to protect the AT&T wireless network, ensure compliance with this Agreement and prevent and/or stop Prohibited Network Uses. AT&T may also change, reduce, interrupt, suspend, limit or cancel your Wireless Service or terminate your Agreement without advance notice for any reason, including, but not limited to the following actions by you or any user of your Device or on your Account:

- misconduct described by subsection 1.5;
- living or predominantly using Wireless Service outside of the AT&T owned and operated domestic network coverage area;
- exceeding our off-net roaming usage allowances; and
- engaging or attempting to engage in Prohibited Network Uses.

If you lose your eligibility for a particular Wireless Service, we may modify, remove, or change your Wireless Service to one for which you qualify. **If we determine that you are using your Device without the correct rate plan, we reserve the right to switch you to the required rate plan and charge you the appropriate monthly charges and fees.** If we change your rate plan, you may change to another eligible rate plan. We may engage in any reasonable network management practice to enhance customer service, to reduce network congestion, to adapt to advances and changes in technology, and/or to respond to the limited availability of wireless bandwidth and spectrum. We may reduce your data throughput speeds at any time or place according to your rate plan.

**If we cancel your Wireless Service for misconduct or violations of this Agreement and you have a Service Commitment, we may charge you an ETF in addition to interrupting, suspending, modifying, or terminating your Wireless Service and Agreement.**

## 2.8 Use of Wireless Service on Other Wireless Carrier Networks

AT&T has agreements with other wireless carriers that allow you to use Wireless Service outside of AT&T's owned and operated wireless network. Within the U.S. and certain U.S. territories, the use of other carrier networks is referred to as domestic off-net usage. Use of other carrier networks while traveling internationally is called international roaming or international off-net usage. Both off-net usage and international roaming are dependent upon the agreements we have at any given time with other wireless carriers, and the network technology, frequencies, and functionality of those networks. Availability, quality of coverage, and speed for Wireless Service for off-net usage and international roaming are not guaranteed and may be changed without notice. AT&T may also reduce speeds (to 2G or other speeds) or suspend wireless Data Service for off-net and international roaming at any time without notice and without regard to the amount of data you have consumed during the billing period.

### 2.8.1 Limits on Use of Other Wireless Carrier Networks in the U.S.:

In most cases you are not charged separately for domestic off-net usage. Please check your rate plan terms to determine whether any extra charges apply for domestic roaming. However, if your rate plan provides for off-net usage, you still must use your Device predominantly within the AT&T owned and operated wireless network. Thus, if we provide you with off-net usage, we may suspend, limit or cancel your continued use of other carriers' networks if you exceed the following off-net thresholds:

- **Voice:** If you use more than 750 minutes during any month.
- **Data:** If you use more than 100 megabytes of data during any month.
- **Messaging:** If you use more than 3,000 messages during any month.

We will provide you with notice if we take action because you exceed any of these thresholds.

For current information about our coverage, please visit att.com/coverageviewer. Please be aware that your Device may connect to another wireless carrier's network even when you are located within the AT&T owned and operated network coverage area.

### 2.8.2 Use of Wireless Service while Outside the U.S.:

Your rate plan may include the capability to send and receive calls and text messages and use data for international roaming. Certain eligibility restrictions may apply to international roaming, which may be based on Wireless Service tenure, payment history and/or credit. We may in our sole discretion block or remove your ability to use international roaming until our eligibility criteria is met.

International roaming rates apply to any calls made or received, messages sent, and data used while outside the U.S. International roaming rates are subject to change without notice and vary by country. **If you do not subscribe to an international roaming package or plan, you will be charged pay-per-use rates that may be substantially higher on a per unit basis than international package rates.** Coverage within other countries and territories may vary depending on your Device type, plan and package and may be changed by us at any time without notice. For rates, coverage and details, see att.com/global.

We may send courtesy "alert" messages when your Device connects to a wireless network in another country to notify you of international roaming data use. There is no guarantee you will receive these alerts and they are not a guarantee of a particular bill limit.

You may be charged international roaming voice airtime usage rates when incoming calls are routed to voicemail, even if no message is left, for both the incoming call and the call forward to voicemail. You may also incur those roaming charges for unanswered calls if your Device is powered off if you previously had turned it on and allowed it to register on a foreign carrier's network; there may be a lag time between when you power off your Device and when you are no longer registered on the foreign carrier's network. You will be charged for all data usage, including without limitation your use of messaging apps, visual voicemail and access to cloud-based services. You may also be charged taxes on international roaming rates. Billing for international roaming usage may be delayed up to three billing cycles due

to the time it takes for wireless carriers to report international roaming usage.

**Please note that substantial charges may be incurred if your Device is taken out of the U.S. even if international roaming is not intentionally used.** Many Devices have preloaded and downloaded apps that transmit and receive data without user intervention and can generate unexpected charges when your Device is powered on outside the U.S. **If you want to block international roaming services, please call 314.925.6925 (at no charge from your AT&T wireless phone).**

## 2.9 Use of Wireless Service for Calls or Messages to International Phone Numbers

International long distance includes calls or messages made from the U.S. to any other country. **Unless you subscribe to a package or rate plan that includes international long distance, you will be charged pay-per-use rates for calls or messages initiated from the U.S. to any other country.** International long distance calling rates are charged on a per-minute basis and are subject to change without notice. **Unless a foreign country is included as a calling destination within your rate plan's coverage area, international long distance rates are charged for each call in addition to usage of your rate plan voice airtime minutes.** Calling or messaging to some countries may not be available. Calls to international wireless numbers may cost more than calls to wireline numbers. If a call is placed to an international wireline number and the call is forwarded to a wireless number, you will be charged for a call terminated to a wireless number. Additional charges apply to numbers for premium rated services. For rates and details visit att.com/global.

## 2.10 Wi-Fi Calling for AT&T Wireless Customers

**Important Information about Wi-Fi Calling for AT&T Wireless Service Customers**

**TTY Devices are not compatible with Wi-Fi Calling:** Wi-Fi Calling lets you call and text over Wi-Fi when cellular coverage is limited or unavailable. Your Device must be set to AT&T HD voice and have internet access. Loss of your internet connection during voice Wi-Fi Calling will disconnect your call, including 911 calls. In the U.S. or internationally, you can use Wi-Fi Calling to call numbers in the U.S. at no additional charge (excluding 411 calls and other premium numbers). International long distance rates/plans apply when calling international numbers from within the U.S. International roaming rates apply when calling international numbers while traveling outside the U.S. Certain countries restrict Wi-Fi calling. No Wi-Fi Calling to 211, 311, 511, and 811. See att.com/wificalling for more.

**911 Calling with TTY & Real-time Text:** Due to technical limitations, **Wi-Fi Calling cannot be used with TTY devices and will not support TTY 911 calls.** Persons with communications disabilities can use Real Time Text (att.com/RTT) as an alternative to TTY. 911 services can be reached by either (1) calling 911 using Real Time Text, (2) calling 911 directly using a TTY device over the cellular network or from a landline telephone, (3) sending a text message to 911 directly, (4) using relay services to place a TTY or captioned telephone services (CTS) call from a wireless phone or from a landline telephone, or (5) using relay services to place a IP Relay or IP CTS call over a cellular or IP network.

**911 Call Routing:** 911 calls using Wi-Fi Calling will first attempt to route to the appropriate emergency response center using automatic location information from your Device or, if that fails, the Emergency Address (no P.O. Boxes) entered in your Wi-Fi Calling settings. To set up Wi-Fi Calling you will need to enter a US address. You can change your Emergency Address at any time by selecting "Update Emergency Address" in your Wi-Fi Calling menu. To ensure proper routing of 911 calls update your Emergency Address as needed. 911 service may be delayed or unavailable if automatic location information is unavailable or if using Wi-Fi Calling from a location different from the Emergency Address you entered.

**You acknowledge that you received and understand the foregoing information about 911 calls using Wi-Fi Calling as an AT&T Wireless Service customer, and you further agree that if you dial 911 on a Device using Wi-Fi Calling, AT&T may treat the automatic location information transmitted by your Device as your temporarily updated Wi-Fi Calling Emergency Address.**

## 2.11 Your Device

A voice plan is required on all voice-capable Devices, unless specifically noted otherwise in the terms governing your rate plan. An eligible rate plan is required for certain types of Devices, including smartphones. A tethering plan may be required to enable tethering on a compatible Device, depending on the terms of your rate plan.

**2.11.1 Terms Applicable to Use of Your Device with Wireless Service:**
We may periodically change your Device's preloaded software, apps or programing remotely, without notice (e.g., to update Device software or direct your Device to use network services most appropriate for your typical usage). We may also remotely program or reconfigure your Device upon activation on the AT&T network and at other times, as well as install additional software and apps.

You cannot (nor can you allow anyone else to) make any modifications to any Device purchased from AT&T or its programming to enable it to operate on any other system, except in accordance with the AT&T Device Unlock Policy found at att.com/deviceunlock. We may, at our sole discretion, modify the programming of your Device to enable operation on other systems. You may not tamper with, replace, or modify your Device operating system from its original equipment manufacturer specifications and capabilities.

You are solely responsible for complying with United States Export Control laws and regulations and the import laws and regulations of foreign countries when traveling internationally with your Device.

**2.11.2 Stolen or Lost Device:**
Contact us immediately to report your Device as lost or stolen so we can suspend your Wireless Service. If you receive your bill and there are charges for unauthorized usage after you reported your Device as lost or stolen, you must notify us of the unauthorized charges within 30 days. While your phone is suspended you will remain responsible for complying with all other obligations under this Agreement, including, but not limited to paying your monthly Service charges. You can report your Device as lost or stolen by contacting us at 800.331.0500 if you are in the United States, or (+1)916.843.4685 if you are abroad. FirstNet individual users

should contact us at 800.574.7000. If you have not received a courtesy suspension of monthly Service charges during the previous year, you may request a courtesy suspension until you replace or recover your Device (up to 30 days).

**2.11.3 Unlocking a Device:**
Your Device may have been programmed with a SIM lock which prevents it from operating with other wireless carriers' networks. If you wish to use your Device with another wireless carrier, you must enter an unlock code to unlock the phone. You can find out whether you meet the eligibility criteria in our Device Unlock Policy and, if eligible, obtain unlock instructions by visiting att.com/deviceunlock.

## 2.12 AT&T Use of Location Information

AT&T collects information about the location of your Device from our network and from your Device. We monitor, collect, and use this location information, together with other information we get from our network and your Device, to provide Wireless Service to you. We also use it to maintain and improve our network and the quality of your wireless experience.

**For more information about the how we may collect and use information, including location, please refer to the AT&T Privacy Policy at att.com/privacy. FirstNet individual users should review the FirstNet Privacy Policy at firstnet.com.**

## 2.13 NOTICE REGARDING TRANSMISSION OF WIRELESS EMERGENCY ALERTS (Commercial Mobile Alert Service)

AT&T has chosen to offer, at no additional charge, wireless emergency alerts, including enhanced geo-targeting (where selected by the alert originator and supported by the handset), within portions of its service area, as defined by this Agreement, on wireless emergency alert capable Devices.

Wireless emergency alerts, including enhanced geo-targeting (where selected by the alert originator and supported by the handset), may not be available on all Devices or in the entire service area, or if a subscriber is outside of the AT&T service area. In areas in which the emergency alerts are transmitted, such alerts may not be received even though a Device is capable of receiving them. For details on the availability of this service and wireless emergency alert capable devices, including the availability and benefits of enhanced geo-targeting (where selected by the alert originator and supported by the handset), please ask a sales representative, or go to att.com/support/article/wireless/KM1009041. This notice is required by FCC Rule 47 C.F.R. § 10.240 (Commercial Mobile Alert Service).

In transmitting emergency alerts pursuant to federal law, AT&T, including its officers, directors, employees, vendors, assignees, successors and agents, shall not be liable to any subscriber to, or user of, AT&T's Wireless Service or Equipment for any act or omission related to or any harm resulting from the transmission of, or the failure to transmit, an emergency alert; or the release to a government entity or agency, public safety, fire service, law enforcement official, emergency medical service, or emergency facility of subscriber information used in connection with delivering an emergency alert.

## 2.14 Mobile Content

You understand that Devices can be used to acquire or purchase goods, content, and services (including subscription plans), such as ring tones, graphics, games, applications and news alerts from AT&T or other companies ("Content").

You have full-time access to your Content purchase transaction history on our website. You may contest and seek refunds for unauthorized purchases and purchases with which you are not satisfied, but such refunds are not guaranteed. AT&T reserves the right to restrict Content purchases or terminate the Account of anyone who seeks refunds on improper grounds or otherwise abuses this Service.

Actual Content may vary based on the Device capabilities. Content may be delivered in multiple messages. Content charges are incurred at the stated one-time download rate or subscription rate, plus a per kilobyte or per megabyte default pay per use charge for the Content transport when delivered, unless you have a data or rate plan and such charges appear separately on your bill. You may be charged each time you download Content. Data Service charges may apply in addition to Content charges.

## 2.15 Charges, Fees, Billing, and Payment

**2.15.1 Charges:**
You are responsible for all charges incurred on your Account. We bill most Wireless Service one month in advance. In addition to charges authorized elsewhere in this Agreement (including subsection 1.9), your bill may include:

- the monthly cost of the rate plan you have selected;
- Device and other installment plan payments, if you purchased your Device or other services under an AT&T installment plan;
- optional services, charges for Content, Third Party Charges, and other purchases billed to your Account;
- pay-per-use and overage charges;
- other charges and AT&T fees described below; and
- occasional fees for special Account assistance as discussed below.

Some usage charges, such as those that depend on information from a third party, may be billed in subsequent bill cycles after the charges have been incurred.

Additional charges may include, but are not limited to:

**Third Party Charges.** You can make donations and purchase goods, Content, apps, and services (including subscriptions) from certain other companies ("Third

Party Charges") or us by billing those charges to your wireless Account. You are responsible for all authorized third party charges which will appear in a separate section of your bill. **You can prevent third party purchases by adding Purchase Blocker to your Account through your myAT&T app or call Customer Service at 800.331.0500.** Also, usage by others can be restricted by use of parental controls or similar features, visit att.com/securefamily to learn more.

**AT&T Monthly Fees** include but are not limited to the following: an AT&T Administrative Fee charged to help AT&T recover a portion of certain expenses AT&T incurs, including but not limited to: (a) charges AT&T or its agents pay to interconnect with other carriers to deliver calls from AT&T customers to their customers, and (b) charges associated with cell site rents and maintenance; and, an AT&T Regulatory Cost Recovery Fee charged to help AT&T recover the cost of: (a) government fees imposed on AT&T and (b) complying with government imposed regulatory requirements. These and other AT&T Fees are not taxes or charges which the government requires AT&T to collect from its customers. The amounts we charge may change. See att.com/mobilityfees for more info.

**Online Fee Schedule.** For additional information on fees that may appear on your bill and that you agree to pay, please visit att.com/mobilityfees.

### 2.15.2 Billing:
Unless agreed to otherwise when you subscribe, you may receive an electronic (paperless) bill at AT&T's online account management site (att.com/myatt or the myAT&T app, collectively "myAT&T") unless you tell us you want a paper bill. If you have electronic billing, each month we will send you an email notice to your official email address on file with AT&T when your electronic bill is available online. You may review your monthly bill or switch back to a paper bill by changing your billing preferences at myAT&T. FirstNet individual users can manage their billing through FirstNet Central at firstnetcentral.firstnet.com/.

### 2.15.3 Primary Place of Use:
To determine your primary place of use ("PPU") and which jurisdiction's taxes and assessments to collect, you're required to provide us with your street address. If you don't provide us with such address, or if it falls outside our licensed Services area, we may either reasonably designate a PPU within the licensed Services area for you or discontinue service. You must live and have a mailing address within AT&T's owned network coverage area or its assignee's or successor's.

### 2.15.4 Calculation of Charges:
Usage and monthly fees will be billed as specified in your rate plan terms of service. Your Customer Service Summary also provides an estimate of your total monthly bill.

If you select a rate plan that includes a predetermined allotment of Services (for example, a predetermined amount of airtime, messages, or data), unless otherwise specifically provided as a part of such rate plan, any unused allotment of Services from one billing cycle will not carry over to any other billing cycle.

Usage on networks not owned by AT&T is limited as provided in your rate plan. Charges will be based on the location of the site receiving and transmitting service and not the location of the subscriber.

### 2.15.4.1 Voice Service/Calls:
Voice calls on our network will incur per-minute voice airtime charges unless specified otherwise in your rate plan. We round any fraction of a minute up to the next full minute. For outgoing calls, billable time may start either when you first press Send or when the call connects to a network, and for incoming calls, it starts when the call connects to a network (which may be before it rings). Usage time may end several seconds after you press End or after the call disconnects. For calls made on our network, we charge only for calls that are answered, including by machines.

### 2.15.4.2 Messaging Service/Text, Picture, Video, and Rich Communication Messages:
If your rate plan does not include unlimited or an allotment of messaging, standard pay-per-use rates apply when a message is sent or received, whether read or unread, viewed or unviewed, solicited or unsolicited. Generally, one text message equals 160 characters; however, text messages that include special characters, like emojis or non-Latin alphabet characters may be limited to 70 characters. Text messages that exceed the character limit will be charged as multiple individual messages according to your rate plan. Messaging Service can deliver video and pictures messages (MMS) up to only 1MB in size, or up to 100MB in size with RCS. AT&T reserves the right to change the message size limit at any time. Messages sent to tablets, laptops, or other connected Devices are excluded from unlimited messaging plans or plans including unlimited messaging. You are charged for each part of messages that you send or receive in multiple parts. Message rates apply whether the message is read, unread, solicited, or unsolicited. Messages sent through applications may incur data usage charges.

Plans that do not provide for unlimited messaging are subject to the following provisions:

SMS and MMS messages are rated at 160 characters per message. Messages larger than 160 characters will be rated as an additional message. You are charged for each part of messages that are delivered to you in multiple parts. Premium SMS and MMS messages are charged at their stated rates. Standard rates apply to all incoming messages when in the U.S. Different, non-standard per message charges apply to international messages sent from the U.S. or while outside the U.S. Messaging pricing is for domestic messages only. When a single message is sent to multiple recipients, the sender is charged for one message for each recipient and each recipient is charged for the message received. Text, Picture, and Video messages are charged when sent or received, whether read or unread, solicited or unsolicited.

With Advanced Messaging (RCS) chat, your wireless rate plan's SMS and MMS rates apply. Each text/file attachment counts and is charged as a separate SMS/MMS. If you do not enroll in a monthly recurring plan for messaging or data, you may still have access to messaging and data and be charged on a pay-per-use basis if you use those Services.

### 2.15.4.3 Data Service:
Data Service usage is calculated and billed in full KB or MB increments, as applicable, based on your rate plan. Actual data usage is rounded up to the next full KB or MB at the end of each data session for billing purposes. AT&T calculates a full KB or MB usage for every fraction of the last KB or MB of data usage occurring in each session. The full KBs or MBs calculated for each data session during a billing period are added together to determine billing. Network overhead, software update requests, email notifications, and resend requests caused by network errors can increase measured KBs or MBs. A data session started on our network will continue until the session ends, even when you connect to a Wi-Fi network after the session starts. For example, if you start to download an audio file using cellular

data and then connect to a Wi-Fi network while the audio file is still downloading, your audio file will continue to finish downloading over the cellular network. Your bill may not separately identify the data usage attributable to your use of specific sites, sessions or services used.

Data use occurs whenever your Device is connected to our network and is engaged in any data transmission, including those you initiate, or those running automatically in the background without your knowledge and whether the data transmission successful or not. Some applications, content, programs and software on your Device (including both downloads and preloads) automatically and regularly send and receive data transmission in order to function properly, without you affirmatively initiating the request and without your knowledge.

Your rate plan data allowance is limited to usage in the United States, unless service in other locations is included in your rate plan or international roaming is included as part of your rate plan or package.

**Data Overage**: Once you exceed your monthly data allowance (including any available data, such as Bonus Data or Rollover Data), during your billing period, you may automatically be provided with additional increments of data and charged as specified in your rate plan. Data overage can be used only in the bill period for which it was provided and does not rollover.

**2.15.5 Delayed Billing:**
Billing of usage for calls, messages, data or other Wireless Services (such as usage when roaming on other carriers' networks, including internationally) may occasionally be delayed. Such usage charges may appear in a later billing cycle and will be deducted from any applicable allotments for that month, regardless of when the usage actually occurred, even if this results in additional charges for that month.

## 2.16 Miscellaneous Services

**2.16.1 AT&T Roadside Assistance:**
AT&T Roadside Assistance ("RA") is an optional feature that may be purchased separately and automatically billed to the wireless Account. RA service is provided by American Traveler Motor Club, Inc., a licensed motor club. For complete RA Terms and Conditions, refer to your RA Welcome Kit or go to att.com/roadside.

**2.16.2 Optional AT&T Mobile Insurance, AT&T Protect Advantage for 1, and AT&T Protect Advantage for 4:**
If eligible, you have 30 days from activation or upgrade to enroll in optional AT&T Protect Advantage for 1 or AT&T Protect Advantage for 4. For details visit att.com/protectadvantage. AT&T Mobile Insurance and the insurance component of AT&T Protect Advantage for 1 and AT&T Protect Advantage for 4 are underwritten by Continental Casualty Company, a CNA company (CNA) and administered by Asurion Protection Services, LLC (in California, Asurion Protection Services Insurance Agency, LLC, CA Lic. #OD63161, in Puerto Rico, Asurion Protection Services of Puerto Rico, Inc.), licensed agent of CNA. Protect Extended Service Contract for 1 and 4 are provided by Asurion Warranty Protection Services, LLC, or one of its affiliates.

AT&T may change the insurer, service contract obligor and/or administrator for the AT&T device protection program at any time with advance notice. You will have the right to opt out by cancelling your enrollment in the program. However, if you continue to pay the charges for the program after we inform you of such a change, you will be presumed to have consented to be enrolled under the new insurer's group insurance policy and service contract, although you have the right to cancel at any time.

**2.16.3 Lifeline Services:**
As part of a federal government program, AT&T offers discounted wireless service to qualified low-income residents in selected states. For questions or to apply for Lifeline service, call 800.377.9450. For tips on how to protect against fraud, please visit the CPUC's website at, calphoneinfo.com.

**2.16.4 AT&T Wireless Internet Service:**
AT&T Wireless Internet service (formerly Wireless Home Phone and Internet service or WHPI) uses mobile wireless gateway equipment called an AT&T Wireless Internet device ("WI Device"). With AT&T Wireless Internet service, the WI Device allows you to connect a landline phone to place and receive calls, and to connect up to eleven internet-capable devices (one via Ethernet and ten via Wi-Fi) to have mobile broadband internet access over the AT&T wireless network. See Section 2 for more information about how AT&T Wireless Service works.

AT&T Wireless Internet service requires that you subscribe to an eligible wireless rate plan to take advantage of one or both capabilities. Tiered shared rate plan options allow you to share a monthly allotment of domestic wireless talk, text, and/or data usage among your connected internet-capable devices. If your usage exceeds the monthly allotment of the plan you select during a billing period, you automatically will be charged for overages or your data may be slowed as specified in your plan. If you do not use all of the monthly allotment(s) of the plan you select during a billing period (or Rollover period, as applicable), you forfeit that usage.

If your WI Device is used to roam on other carrier networks, AT&T's off-net usage restrictions apply. Messaging services and international roaming are not supported by AT&T Wireless Internet service. If you use a wireless rate plan not designed for AT&T Wireless Internet service with your WI Device, AT&T reserves the right to switch you to an appropriate plan and bill you the associated charges for such plan.

**911 calls are routed based on the wireless network's automatic location technology. You should expect to provide your location address to the emergency response center responsible for sending first responders (e.g., police, medical assistance, or fire) to your location. The WI Device has battery backup power and will work in the event of a power outage. However, if you connect a landline phone to the WI Device that itself requires external electric power to operate (e.g., a cordless phone), you will not be able to place and receive calls over that phone during a power outage.**

Please note that AT&T Wireless Internet service is different from AT&T Fixed Wireless Internet, which is discussed in subsection 6.14.2.

## 2.17 Disclaimer of Warranties and Limitations of Liability for Wireless Service

**2.17.1 Disclaimer of Warranties:**

Unless prohibited by law, the following limitations of liability apply in addition to the disclaimers in Section 1.6. We and our predecessors in interest, successors, and assigns, as well as our past, present and future subsidiaries, affiliates, related entities, and each of those entities' officers, agents, employees, and licensors make no warranty, express or implied, of merchantability or fitness for a particular purpose, suitability, accuracy, security, or performance regarding any Device, Wireless Service, Software or applications. Because of inherent limitations in wireless communications, and because we cannot control your choice or use of wireless Devices, to the maximum extent permitted by law, in no event will AT&T be liable, for any:

- act or omission of a third party we do not control;

- damage or injury caused by third party information, applications or content (e.g. apps, games, etc.) preloaded, accessible, or used through your Device;

- damage or injury caused by interruptions, failures to transmit, or delays in the Wireless Service provided by or through us;

- damage or injury caused by your use of Wireless Service provided by us while you are operating a vehicle;

- claims against you by third parties;

- unauthorized access to your Device, Wireless Service, or AT&T Account;

- damage or injury caused by a suspension or termination of Wireless Service by AT&T; or

- damage or injury caused by failure or delay in connecting a call to 911 or any other emergency service.

**2.17.2 Limitations of Liability for Wireless Service:**
In addition to the limitations of liability set forth in Section 1.7, your Wireless Service is also subject to the following additional limitations of liability.

Not all plans or Wireless Services are available for purchase or use in all sales channels, in all areas or with all Devices. AT&T is not responsible for loss or disclosure of any information you transmit or provide to us. AT&T's Wireless Services are not equivalent to wireline internet. AT&T is not responsible for nonproprietary services or their effects on Devices.

We may, but does not have the obligation to, refuse to transmit any information through the Wireless Services and may screen and delete information prior to delivery of that information to you. There are gaps in service within the Wireless Services areas shown on coverage maps, which, by their nature, are only approximations of actual coverage.

Notwithstanding the foregoing, if your Wireless Service is interrupted for 24 or more continuous hours by a cause within our control, we will issue you, upon request, a credit equal to a pro-rata adjustment of the monthly Service fee for the time period your Service was unavailable, not to exceed the monthly Service fee. Our liability to you for Service failures is limited solely to the credit set forth above. AT&T is not liable to you for changes in operation or technology that cause or render your Device and/or software to be obsolete or require modification.

References in this Section 2.17.2 to "AT&T" and "we" include our past, present and future parents, subsidiaries, affiliates, and related entities, as well as AT&T's and all of those entities' officers, agents, employees, licensors, predecessors in interest, successors, and assigns.

## 2.18 Terms That Apply Only To Specific States

**2.18.1 California: Unauthorized Charges:**
You are not liable for charges you did not authorize, but the fact that a call was placed from your Device is evidence that the call was authorized. Unauthorized charges may include calls made to or from your phone or other Device after it was lost or stolen. Once you report to us that the Device is lost or stolen, and your Device is suspended, you will not be responsible for subsequent charges incurred by that Device. You can report your Device as lost or stolen and suspend Services without a charge by contacting us at the phone number listed on your bill or at att.com/my/#/suspendrestore.

If you notify us of any charges on your bill you claim are unauthorized, we will investigate. If there are charges on your bill for calls made after the Device was lost or stolen, but before you reported it to us, notify us of the disputed charges and we will investigate. You may submit documents, statements and other information to show any charges were not authorized. We will advise you of the result of our investigation within 30 days. If you do not agree with the outcome, you may file a complaint with the California Public Utilities Commission and you may have other legal rights. While an investigation is underway, you do not have to pay any charges you dispute or associated late charges, and we will not send the disputed amount to collection or file an adverse credit report about it. While your phone is suspended you will remain responsible for complying with all other obligations under this Agreement, including but not limited to, your monthly fee. We both have a duty to act in good faith and in a reasonable and responsible manner including in connection with the loss or theft of your Device.

**2.18.2 Connecticut: Questions About Your Service:**
If you have any questions or concerns about your AT&T Service, please call Customer Care at 800.331.0500, dial 611 from your wireless phone, or visit att.com/wireless. If you have questions about the Unlimited Local or Unlimited Long Distance Service, please call 800.288.2020 or visit att.com. If you are a Connecticut customer and we cannot resolve your issue, you have the option of contacting the Public Utilities Regulatory Authority (PURA). Online: ct.gov/pura; Phone: 800.382.4586; Mail: Connecticut DPUC, 10 Franklin Square, New Britain, CT 06051.

**2.18.3 Puerto Rico:**
If you are a Puerto Rico customer and we cannot resolve your issue, you may notify the Telecommunications Regulatory Board of Puerto Rico of your grievance. Mail: 500 Ave Roberto H. Todd, (Parada 18), San Juan, Puerto Rico 00907-3941; Phone: 787.756.0804 or 866.578.5500; Online: jrtpr.pr.gov, in addition to having available arbitration, as provided in Section 1.3.

**3.0**

## Terms that Apply Only to AT&T PREPAID Customers

### 3.1 Applicability of this Section

This Section 3 pertains only to AT&T PREPAID customers, including AT&T PREPAID Multi-Line customers.

### 3.2 Charges

AT&T will not provide you with monthly bills. You may access your Account on our website, via the myAT&T app, by calling customer service, or by visiting an AT&T store. You are responsible for paying all charges for Services provided under this Agreement (such as subsection 1.9), including charges made by any person you permit to have direct or indirect access to your Device even if you did not authorize its use. These include but are not limited to (a) access charges; (b) usage charges; (c) charges for features and/or add-ons; (d) taxes, fees and other assessments imposed by the government that we are required to collect and remit to the government; (e) other fees and charges as set forth at att.com/mobilityfees; and (f) surcharges that we collect and retain from our customers that include, but are not limited to, Federal or State Universal Service fees, regulatory charges, and government taxes or fees imposed on gross receipts, sales and/or property that we incur in providing services to our customers. In some jurisdictions, certain recurring fees or taxes are included in the rate plan charge each month pursuant to applicable state or local law. For more info, see att.com/shop/en/wireless/prepaidE911.html.

### 3.3 Payment and Cancellation

You must make a payment to your Account within 26 days of activation or your Account will be canceled. Active service requires Account payment in full for monthly plans and minimum $25 Account payment for per minute and daily plans. If required, AT&T will refund the applicable activation fee if you cancel your service within the first 3 days of activation. **AT&T PREPAID cards and other account payments are nontransferable and nonrefundable.** The *888* command for payment only works with PINS/Cards purchased from AT&T-owned retail stores and select authorized retail locations and may not work on all Device types. Amounts deposited into your Account expire in accordance with the stated payment denomination expiration period ($10-$24 payments expire in 30 days, $25 to $99 in 90 days, $100 or more in 365 days). Unused Account balance forfeited upon expiration. If you are on a monthly plan, including one that requires one payment for multiple months of service, the applicable plan charge will automatically be deducted from your Account balance at the end of the day (11:59pm Central Time) on your plan's payment due date. **Applicable plan charge for any AT&T PREPAID plan is not refundable and not exchangeable, and any unused services of your plan are forfeited if you change to another plan during your plan's period.** If your Account balance is insufficient to pay the applicable plan charge, you will not be able to use your plan services, data services, or any pay-per-use services until you make a payment to your AT&T PREPAID account with the applicable amount or your plan is renewed. AT&T PREPAID accounts for phone plans will be canceled 60 days after expiration. AT&T PREPAID Accounts with data plans will be canceled 365 days after expiration. A new wireless phone number is required to reactivate service once Account is canceled.

### 3.4 Devices

Devices sold under the AT&T PREPAID brand are sold exclusively for use with AT&T PREPAID service, are designed for use only on the AT&T network and may not function on other wireless networks. By purchasing a Device designed for use with AT&T PREPAID service, you agree to activate and use it with AT&T PREPAID service. You also agree that you will not make, nor will you assist others to make, any modifications to any Device or programming to enable it to operate on any other system or network except in accordance with the Device Unlock Policy found at att.com/prepaiddeviceunlock. AT&T may, at its sole and absolute discretion, modify the programming to enable the operation of the Device on other systems. You understand and acknowledge that Devices designed for use with AT&T PREPAID service are sold solely for use with the AT&T network and that AT&T will be significantly damaged if you use or assist others to use our Devices for any other purpose. You also agree not to take any action to circumvent limits on the quantity of Devices that may be purchased. You will be liable to AT&T for any damages resulting from conduct prohibited in this section.

### 3.5 Monthly Plans

Monthly plans are good for 30 days at applicable charge. Monthly plans expire at 11:59 p.m. C.S.T. on the 30th day. When you first activate a plan, the day that the plan is activated counts as the first full day and counts toward the first 30 days, so your plan may be less than a full thirty days during the first month, depending on the time of plan activation.

### 3.6 Voice, Data & Messaging Services for Mobile Phones

Nationwide voice minutes included in plans are intended for domestic use only unless on a Monthly plan that includes in-country calls while in Mexico & Canada. Calling from the U.S. includes calling from the United States. Additional charges apply to all other calls. For information on per-minute rates and Add-Ons for international long distance calls, visit att.com/prepaidintl. Wi-Fi Calling requires Wi-Fi Calling-capable smartphone, AT&T PREPAID Account provisioned with HD Voice, Wi-Fi network, and eligible rate plan (excludes pay per use plans). Unlimited messaging includes unlimited text, picture and video messages within the U.S. (and in Mexico and Canada on plans that include usage in Mexico & Canada) and to select countries. For a list of countries, go to att.com/prepaidIntlText.

**3.6.1 Pay-Per-Minute Plans:**
In a Pay-Per-Minute plan, Voice calls, text messages and data usage are charged at then prevailing per minute/per message/per usage rates. Pay-per-use data service is available only on basic and messaging phones.

**3.6.2 Daily Plans:**
Daily plans include unlimited nationwide calling and unlimited messaging for a rate charge assessed and paid each day phone is used to make or receive voice

calls, including a call to voice mailbox, or send a text or picture/video/sound message. The day for purposes of Daily plan rate charge starts when you make a call, accept an incoming call, or send a message and ends 24 hours later. If you move in or out of Wi-Fi coverage during a Wi-Fi call when your 24 hours expires, a new 24-hour period will begin and the daily plan charge will apply. A minimum Account balance sufficient to pay Daily plan rate charge required to place or receive first call of the day or send a message. Pay-per-use data service is automatically available for basic and messaging phones at then prevailing pay-per-use data rate. A Data Add-On is available for an additional charge for all Device types. Once Data Add-On is depleted, basic/messaging phone users will automatically revert to pay-per-use data. To continue using data on a smartphone, customer must purchase another Data Add-On or be restricted to Wi-Fi.

**3.6.3 Monthly Plans:**

Monthly plans include unlimited nationwide calling and unlimited messaging. Certain Monthly plans may include data service. Data availability and allotments vary by plan. Certain Monthly plans for smartphones include a high-speed data allowance and, thereafter, unlimited data usage at reduced data speeds of up to 128 Kbps for the rest of the 30-day plan term. Certain Monthly plans have 5G Access. 5G service requires a compatible 5G device. 5G service is not available everywhere. See att.com/5Gforyou for details. Actual speeds vary by Device and location. For specific data allowance and speeds on these plans and other details, see att.com/prepaidplans. Data Add-On available on certain Monthly plans for an additional cost. Pay-per-use data service not available on Monthly plans.

## 3.7 Add-ons

Add-ons are good for 30 days, except the International Travel and BridgePay Add-Ons, which are good for 7 days. Add-Ons expire at 11:59 p.m. C.S.T. on the last day of the term, except for Daily Data Add-Ons, which expire 24 hours after you purchase the Add-On. When you first activate an Add-On, the day that the plan is activated counts as the first full day and counts toward the number of days in the term. You must have an active (not expired) plan to purchase, use, or renew an Add-On, with the exception of the BridgePay Add-On. If your Account balance expires before the last day of the Add-On term, Add-On cannot be used and the remaining time on Add-On will continue to run unless you add money to your Account during the Add-On period. Renew an Add-On before its expiration date and any unused allotment will roll over to your renewed Add-On time period. Unlimited Add-Ons and the East Asia/India and Latin America/Caribbean Add-Ons do not roll over. Standard rates apply if Add-On not renewed.

**3.7.1 Monthly Data Add-Ons:**

When you add a data Add-On to a Monthly or Multi-Month plan that includes a data allotment, the use of data will be counted first against your data Add-On and then against the data allotment of your plan. If you renew your plan during the term of your data Add-On, any data remaining in your data Add-On will continue to be used until the data Add-On expires or is depleted.

**3.7.2 Daily Data Add-Ons:**

The Data Day Pass Add-On for the Daily plan begins at the time you purchase the Add-On and ends 24 hours later. After data Add-On expires or is depleted, usage will be charged according to your underlying plan.

**3.7.3 Hotspot Data Add-Ons:**

When you add a hotspot data Add-On to a Monthly or Multi-Month plan that includes a hotspot data allotment, the use of data will be counted first against your hotspot data Add-On and then against the hotspot data allotment in your plan. If a Monthly plan includes a hotspot data allotment, the unused portion of the hotspot data allotment in your plan will remain available for use until the last day of your monthly plan term, provided you deplete your hotspot data Add-On. If you renew your plan during the term of your hotspot data Add-On, any data remaining in your hotspot data Add-On will continue to be used until the hotspot data Add-On expires or is depleted.

**3.7.4 Monthly Messaging Add-Ons:**

A Monthly Messaging Add-On may be added only to the Pay-Per-Minute plan.

**3.7.5 Monthly International Calling Add-Ons:**

Countries and/or call destinations not included in International Calling Add-Ons are charged at standard pay-per-use rates for international long distance. For details on pay-per-use charges and International Calling Add-Ons, go to att.com/prepaidintl. International Calling Add-Ons with an allotment of minutes may not be purchased more than twice within any 30 day period, or AT&T reserves the right to block international calling and/or suspend or terminate your AT&T PREPAID service.

**3.7.6 International Travel Add-On:**

Requires an HD Voice capable device and an active monthly plan. For a list of countries, see att.com/prepaidintl.

**3.7.7 AT&T PREPAID WHS International Long Distance Add-On:**

The AT&T PREPAID WHS International Long Distance Add-On contains an allotment of minutes from the U.S. to specific countries. This Add-On can only be added to AT&T PREPAID Wireless Home Phone or Wireless Home Phone & Internet Monthly plans. For a list of countries and details, see att.com/prepaidwirelesshome.

## 3.8 Pay-Per-Use Text/Picture/Video Messaging

There is a charge per message sent or received, whether read or unread, delivered or undelivered, solicited or unsolicited.

## 3.9 Data

International data roaming is not available on AT&T PREPAID plans (except plans that include use of plan data in Mexico and Canada).

**3.9.1 Data Only Plans:**

Data only plans are available for use on eligible smartphones, tablets, and stand-alone mobile hotspot devices only.

**3.9.2 Video Streaming:**
Eligible content recognized as video will stream in SD (about 480p, max 1.5 Mbps). Ability to stream, video resolution and speed are not guaranteed and are affected by other factors. If two or more tethered devices are watching video from the same source at the same time, we may identify it as a single video and slow the speeds collectively to a max of 1.5 Mbps, which may impair your ability to watch video on these tethered devices. You can pause video on all but one of the tethered devices,or watch video from different sources to resolve this issue. See att.com/streamsaver for details. **For plans that include Stream Saver:** You can turn it off any time at att.com/myatt for access to HD video, if available.

## 3.10 Conference Calling and Call Forwarding

If your use of conference calling, including any variation thereof, or call forwarding exceeds 750 minutes per month, AT&T may, at its option, impose a per minute usage charge for all calling over 750 minutes using one or more of these features, terminate your service or change your plan to one with no unlimited usage components. AT&T will provide notice that it intends to take any of the above actions

## 3.11 Off-net Usage

For a listing of available off-net and international roaming locations, where per-minute usage or roaming rates apply, go to att.com/prepaid/static-pages/ild-add-ons-ppu/. For additional terms and limitations applicable to Off-net Usage, please refer to Sections 2.8 and 2.8.1.

## 3.12 AT&T PREPAID Wireless Home Internet Services

AT&T Wireless Home Internet ("AWHI") for AT&T PREPAID customers requires an eligible device and an AT&T PREPAID AWHI monthly data plan. Plan good for 30 days. See sections 2.16.4 and 7.14.1 for additional terms.

## 3.13 AT&T PREPAID Multi-Line

**Activation, acceptance of an invitation to join, and/or use of a AT&T PREPAID Multi-Line Account constitutes acceptance of these Service Terms.** In the event of a conflict between the terms and conditions in this subsection [3.13.1 through 3.13.5] and other terms, these terms in this subsection will control.

**3.13.1 AT&T PREPAID Multi-Line Account:**
For details on eligible phone plans, go to att.com/multiline. AT&T reserves the right to change the number of allowable lines on Multi-Line Accounts without notice. One payment due date is established for all lines on the Multi-Line Account. Limit one rate plan change per line, per plan term.

**3.13.2 Plan Data Proration:**
When a line ("Member") is added to the Multi-Line Account during the plan term, the high-speed data allowance for the plan's plan is pro-rated based on the number of days remaining in the Multi-Line Account term. The high-speed data allowance is also pro-rated any time the Account Owner changes the monthly plan for any line, including the Account Owner's line, after establishing the Multi-Line Account.

**3.13.3 Consent To Disclose Customer Proprietary Network Information (Cpni), Including Plan And Other Account Information To Account Owner:**
BY ACCEPTING AN INVITATION TO JOIN AN ACCOUNT OWNER'S MULTI-LINE ACCOUNT OR BY USING AT&T PREPAID SERVICES WHILE PART OF A MULTI-LINE ACCOUNT, THE MEMBER CONSENTS TO DISCLOSURE OF CPNI AS DISCUSSED IN THIS SUBSECTION.

CPNI is information that relates to the type of telecommunications services you currently purchase, how you use them, and the billing information related to those services, including plan, calling details, type of wireless services and other items relating to your wireless telecommunications services. Once a Member joins a Multi-Line Account, the Member's AT&T PREPAID Account information, including account history, plan information, call detail records, billing information, and voice and data usage information, will be shared with and accessible by the Account Owner of the Multi-Line Account. The Member has the right to restrict the disclosure of the Member's CPNI and other account information to the Account Owner. Restricting disclosure of the Member's CPNI will not affect any other service(s) to which the Member currently subscribes from AT&T, however, it will prevent the Member from being able to join an AT&T PREPAID Multi-Line Account, since this information (CPNI) is necessary for the Account Owner to manage the Multi-Line Account. The Member's CPNI authorization is effective until the Member revokes it by removing the Member's line(s) from a Multi-Line Account.

**3.13.4 Payment and Balance:**
Account Owner is responsible for paying monthly plan charges for all lines on Multi-Line Account. Members continue to select and pay for optional Add-Ons or pay-per-use services out of their own AT&T PREPAID Account balance. Upon adding a Member line to the Multi-Line Account, full monthly payment will be due to activate Member's service but a pro-rated credit will be issued to the Account Owner's account for the Member's unused plan term, if applicable. A prorated credit may also be issued to the Account Owner for unused days of the Member's prior monthly plan (prior to joining the Multi-Line Account), if applicable (one credit per 30 days). Applicable plan charge for each line on the Multi-Line Account for each renewal period will be automatically deducted from the Account Owner's Account balance at the end of the day (11:59pm Central Time) on the plan renewal date. The total payment due for all lines must be paid in order to renew service. **Applicable plan charge for any AT&T PREPAID plan is not refundable and not exchangeable, and any unused services of the plan are forfeited if the Account Owner changes to another plan during the plan term.** If Account Owner's Account balance is insufficient to pay the applicable plan charges for all lines on the Multi-Line Account, plan services, data services, or any pay-per-use services will be unavailable until Account Owner renews all lines. Unused Account balance is forfeited upon expiration.

**3.13.5 Account Access:**
You authorize us to provide CPNI and other account information to the Account Owner, and to allow the Account Owner to make changes to the Multi-Line Account, including new or extended service commitments and the purchase of products and/or services, upon the direction of any person able to provide information we

deem sufficient to identify the person as the Account Owner. Such access will include, but is not limited to, the ability to view Multi-Line Account information, make changes to the plans under the Multi-Line Account, perform upgrades, and view payment information.

### 3.14 AT&T Personal Cloud

Requires eligible rate plan and AT&T Personal Cloud app to utilize cloud storage. If rate plan that includes feature or AT&T Personal Cloud Add-On is not renewed, you will be unable to upload to your Personal Cloud and all stored content will be permanently deleted within 30 days. If you port out your number, you will immediately lose access to stored content; make sure to move your Personal Cloud stored content before porting out a line that has this feature.

## 4.0
## Terms that Apply Only to DataConnect Pass Plan / Session-Based Wireless Data Services

### 4.1 Applicability of this Section

This Section 4 pertains only to session-based data services provided to you with access to AT&T's wireless data services, including but not limited to, features that may be used with Data Services and are offered pursuant to the Plans below. Data Services are only provided for prescribed purposes.

### 4.2 AT&T Data Plans ("Plans")

Plans can only be used on AT&T's wireless network and with select roaming carriers, depending on the Plan selected. Plans require a Device capable of working on AT&T's wireless network. You acknowledge that when your allotment of data usage expires, any downloads of products or services will cease and AT&T is not responsible for any fees you must pay to download the product or service again. AT&T may send alerts to your Device and/or email to notify you of any data usage and/or days remaining on your Plan. These are courtesy alerts. There is no guarantee you will receive such alerts and, by the time you receive them, your actual data usage and/or the days remaining on your Plan may already have expired, or be different than what is described in the alert. All sales are final and discounts are not available for these Plans. Payments are non-refundable. There is no separate charge to change a Plan or to cancel. Customers are responsible for provisioning and managing their Plans. AT&T reserves the right to change these terms and Plans, and to suspend your Account if Devices other than the registered Device are used with the Plans. Plans include access to available public AT&T Wi-Fi Hot Spots. Availability and quality of coverage, and access to Data Services while roaming are not guaranteed.

**4.2.1 Domestic Plans:**
Domestic Plans may be purchased with a data usage allotment measured in MBs or GBs, for a specified period of time, as defined in the Plan. The specified period of time begins to expire immediately upon plan activation, whether or not you are using the service. If you purchase a Domestic Plan with a data usage allotment and you use all of your allotment prior to the expiration of the specified period, your access to our Data Services will cease for the remainder of the specified period. If you want to continue using our Data Services during the remaining specified period, you will need to purchase an additional Plan. If a purchase is made prior to the completion of your current Plan, data usage will continue under your current Plan until expired. Note: If an additional Plan is purchased, the specified period for the additional Plan and, if applicable, the auto renew period, starts when your current Plan expires, or at the time you purchase the additional Plan if your prior Plan has already expired. If the additional Plan purchased has an automatic renewal, prior Plans with automatic renewal will not automatically renew. Domestic Plans include the U.S.

**4.2.2 International Plans:**
International Plans may be purchased with a data usage allotment measured in MBs or GBs for a specified period utilizing an approved payment method. International Plans should be purchased before traveling outside the U.S. You must be currently subscribed to a Domestic Plan at the time of purchase. If the Domestic Plan expires prior to the completion of the International Plan, all usage following the expiration of the Domestic Plan, whether domestic or international, will be deducted from the International Plan until such time as that Plan expires or another Domestic Plan becomes active (i.e. if you cancel your Domestic Plan after ordering an International Plan, U.S. domestic data usage will be counted against your International Plan, until you order another Domestic Plan). You can select the date on which the International Plan starts, which can be future dated up to 60 days after purchase. All future-dated International Plans become active at midnight Eastern Time of the date selected. Unless future-dated, the International Plan will start immediately upon purchase. Once your specified period expires or you use all of your allotment of data usage prior to the expiration of the specified period, whichever occurs first, your access to our Data Services will cease. If you want to continue using our Data Services, you will need to purchase an additional Plan. International Plans do not automatically renew.

**4.2.3 Worldwide Plans:**
Worldwide Plans may be purchased with a data usage allotment measured in MBs or GBs for a specified period utilizing an approved payment method. Worldwide Plans may be purchased as a standalone plan or along with a Domestic Plan, and should be purchased before traveling outside the U.S. If you do not have a separate Domestic Plan, all data usage occurring in the U.S. and countries listed at att.com/globalcountries will be deducted from the available data allotment in your Worldwide Plan. If you have data usage available in a separate Domestic Plan, then your domestic data usage will be deducted from your Domestic Plan and your international data usage will be deducted from the data available in your Worldwide Plan. However, if the Domestic Plan expires prior to the completion of the Worldwide Plan, all usage, whether domestic or international, will be deducted from the Worldwide Plan until such time as that Plan expires or another Domestic Plan becomes active (i.e. if you cancel your Domestic Plan after ordering a Worldwide Plan, U.S. domestic data usage will be counted against your Worldwide Plan until you order another Domestic Plan). You can select the date on which the Worldwide Plan starts, which can be future-dated up to 60 days after purchase. All future-dated Worldwide Plans become active at midnight Eastern Time of the date selected. Unless future-dated, the Worldwide Plan will start immediately upon purchase. Once your specified period expires or you use all of your allotment of data usage prior to the expiration of the specified period, whichever occurs first, your

access to our Data Services will cease. If you want to continue using our Data Services, you will need to purchase an additional Plan. Worldwide Plans do not automatically renew.

**4.2.4 Tax-Exempt Certification:**
If you certify that your Account is tax-exempt, you agree to indemnify, defend, and hold harmless AT&T from any and all taxes, claims, lawsuits, damages, losses, liabilities, costs, fines, penalties, and expenses (including reasonable attorney fees) that arise from your certifying that your Account is tax exempt.

## 4.3 Term

Your Agreement begins on the day your Plan for Data Services are activated and continues until your Plan expires as set forth in Section 4.2.

## 4.4 Prepayment and no proration

You agree to pay in advance for your Plan and there is no proration of charges if your Plan is terminated. You may make payments by credit card or debit card or other payment methods accepted by AT&T. In order to process your automatic renewal in a timely fashion and ensure your continued use of the service, AT&T will, depending on your plan, charge your payment method for the automatic renewal: (1) within seven days before your new plan specified period is set to begin, or (2) any time after 75% of your usage based plan has been consumed. You may cancel the automatic renewal of your service at any time and your cancellation shall take effect after we have had a reasonable opportunity to act on your notice.

# 5.0
# AT&T Phone Service Terms

AT&T Phone Service is provided by one of the following AT&T affiliates, depending upon your service address: Southwestern Bell Telephone Company; Pacific Bell Telephone Company; Illinois Bell Telephone Company; Indiana Bell Telephone Company, Incorporated; Michigan Bell Telephone Company; Nevada Bell Telephone Company; The Ohio Bell Telephone Company; Wisconsin Bell, Inc.; or BellSouth Telecommunications, LLC (each individually and collectively referred to in the AT&T Phone Service Terms as "AT&T"). Your AT&T Phone Services are governed by this Agreement, including these AT&T Phone Service Terms and the U-verse Fee Schedule available at att.com/VoiceUverseTVFees ("U-verse Fee Schedule").

You might be receiving AT&T Phone Service through an arrangement with your property owner or manager. If so, you are still subject to this Agreement, except that AT&T may not directly charge you for AT&T Phone Service (including equipment) provided to you as part of that arrangement, and the equipment-return provisions in Section 5.4.3 may not apply to you even though equipment remains AT&T-owned. You will be responsible for fees and charges associated with additional AT&T Phone Service orders. You may have an additional contract with your property owner or manager, but AT&T is neither responsible for nor bound by the terms of that contract between you and your property owner or manager. If the arrangement with your property owner or manager terminates, you will continue receiving AT&T Phone Services under standard billing terms and this Agreement unless you notify AT&T.

If you have any questions about your AT&T Phone Services, please call us at 800.288.2020.

## 5.1 Term Commitment

**5.1.1 Term of Service:**
If you accepted a Service Commitment for your AT&T Phone Service, these AT&T Phone Service Terms will automatically continue on a month-to-month basis at the conclusion of your Service Commitment, and AT&T will automatically begin charging the applicable month-to-month fee. If you have no Service Commitment, these AT&T Phone Service Terms are a month-to-month agreement.

**5.1.2 Early Termination Fee ("ETF"):**
If you terminate your AT&T Phone Service before completion of your Service Commitment, you agree to pay an ETF. The ETF amount reduces each full month of your Service Commitment that you complete.

**5.1.3 Your Termination Rights:**
Within the first 14 days after we activate your AT&T Phone Service, you may terminate it for any reason without incurring an ETF (unless you would owe an ETF for a prior Service Commitment that you had ended early by entering into the new, now-terminated Service Commitment). However, you agree to pay AT&T for all fees, charges, and other amounts incurred and owed under your Agreement, and you agree to comply with Section 5.4.3 regarding equipment return. If you fail to return AT&T equipment, you will be charged an equipment non-return fee of up to $150. Some dealers may impose additional fees.

## 5.2 Installation and Repair

To install or repair your AT&T Phone Service, you acknowledge that AT&T may use existing wiring, including altering the wiring and removing accessories, located within your unit ("Inside Wiring"), and that AT&T and its agents may drill, cut, and otherwise alter improvements on the premises (including walls, flooring, and/or other surfaces) in order to install, maintain, or repair AT&T Phone Service or equipment. You warrant that you own or control the Inside Wiring and premises and give AT&T and its agents permission to use, alter, and remove equipment from them. If you do not own your premises or your unit is part of a multi-tenant environment (e.g., an apartment building, condominium, or private subdivision), you warrant that you have obtained permission from any necessary party, including, but not limited to, the owner, landlord, or building manager, to allow AT&T and its agents reasonable access to install, maintain, and repair your AT&T Phone Service

and equipment and to make any alterations that we deem appropriate for the work to be performed. You agree to indemnify AT&T and its agents from and against all claims by an owner, landlord, building manager, or other party in connection with installation, maintenance, repair, or provision of AT&T Phone Service.

You will provide AT&T and its agents with reasonable access to your premises in order to install, maintain, and repair AT&T Phone Service and equipment. If you are not at the premises at the time of installation or repair, you authorize any other adult resident or guest at your residence to grant access to your premises for these purposes. You understand and agree that by authorizing an adult resident or guest to grant access to your premises, you authorize that adult to act on your behalf, including accepting this Agreement and any related agreements required in connection with the completion of the installation, activation, or repair of AT&T Phone Service and approving any changes to them.

You will be responsible for payment of service charges for visits by AT&T or its agents to your premises when a service request results from causes not attributable to AT&T or its agents, including, but not limited to, when you are unwilling to complete troubleshooting steps requested by AT&T. In addition to any applicable Dispatch Fee (as described in the U-Verse Fee Schedule), you are responsible for damage to and the entire cost of any necessary service, repair, or replacement of any equipment that is attributable to your improper installation, abuse, negligence, or misuse of the equipment, as determined by AT&T. We also reserve the right to charge reasonable shipping and handling fees in connection with replacement of any equipment. You understand that repair or replacement of AT&T Phone Service or equipment may (i) cause stored content to be deleted, (ii) reset personal settings, or (iii) otherwise alter the equipment.

## 5.3 Fees and Charges

In return for receiving our AT&T Phone Service, you promise to pay—and agree that we may charge your credit or debit card on file with us—the charges described in subsection 1.9, the U-Verse Fee Schedule, and the following charges:

### 5.3.1 Monthly Service Charges:

Billing for the AT&T Phone Service commences when AT&T has provisioned the AT&T Phone Service. Recurring charges for each month's AT&T Phone Service will be billed one month in advance. Billing is based on a 30-day cycle. Non-recurring and usage-based charges for the AT&T Phone Service generally will be billed in the billing cycle following the transaction. Your first bill for AT&T Phone Service may include pro-rated charges for a partial monthly period prior to the beginning of your first monthly billing cycle. Upon termination, subject to applicable law, your effective date of cancellation will be the last day of your current billing cycle and you will receive AT&T Phone Service until the end of your billing cycle (exceptions may apply to certain promotional periods and must be in writing). You will not receive a prorated credit or refund for any remaining days of AT&T Phone Service in your billing cycle after termination. Your AT&T Phone Service will continue until the end of the bill cycle. A downgrade fee may apply if you make changes to your AT&T Phone Service within thirty (30) days of AT&T Phone Service provisioning or later programming orders.

### 5.3.2 Usage Charges:

Non-recurring and usage-based charges for AT&T Phone Service generally will be billed in the billing cycle following the transaction. For a list of additional charges and fees that could apply to the AT&T Phone Service, please see the U-Verse Fee Schedule (at att.com/VoiceUverseTVFees). The Fee Schedule is incorporated into this AT&T Phone Service Terms by this reference.

## 5.4 Equipment

Equipment that AT&T provides may be new or refurbished. Any equipment or software that was not provided to you by AT&T, including batteries, is not AT&T's responsibility, and AT&T will not provide support or maintenance of it. Depending on your service address, your AT&T Phone Service will include one of the following Equipment configurations:

- A Wi-Fi® Gateway ("WG") located inside your premises, and certain service-specific equipment set forth in Sections 5.6.4 that is required for AT&T Phone Service to function (in the AT&T Phone Services Terms, the term "Equipment" is used to refer to all service-specific equipment, including the WG). If you do not purchase the Equipment from AT&T, you agree to pay a monthly equipment fee for the Equipment as part of your purchase of AT&T Phone Service for the duration of your receipt of AT&T Phone Service. Equipment fees may be included in your monthly charge for AT&T Phone Service or be charged separately (different taxes and surcharges may apply to the equipment fees, AT&T Phone Service fees, and/or the equipment fee portion of AT&T Phone Service fees). Equipment fee/purchase options depend on the Services you order and installation options you choose. The Equipment requires electrical power from your premises to operate, which you are responsible for providing.

- If you have a WG inside your premises, you may also have an Optical Network Terminal ("ONT"), which is a box that may be located inside your premises, on the outside of your premises, in a central location in a multi-tenant building, or in your garage, where AT&T's fiber network terminates. The ONT also requires electrical power from your home to operate, which you are responsible for providing. AT&T will install your ONT device. The ONT power supply box converts the AC power in your home to the DC power required by the ONT.

- If you do not have a WG located inside your premises, your service is provided by an Intelligent Network Interface Device ("iNID") and certain service specific equipment set forth in Sections 5.6.4 that is required for AT&T Phone Service to function (the iNID is among the service-specific equipment collectively referred to in the AT&T Phone Services Terms as "Equipment"). If you do not purchase the Equipment from AT&T, you agree to pay a monthly equipment fee for the Equipment as part of your purchase of AT&T Phone Service for the duration of your receipt of AT&T Phone Service. Equipment fees may be included in your monthly charge for AT&T Phone Service or be charged separately. Equipment fee/purchase options depend on the AT&T Phone Services you order and the installation options you choose. The iNID includes three components: (1) a unit typically located on the outside of your premises or in your garage where the AT&T network terminates (the outside unit); (2) a home networking hub, which provides wireless networking capability and is located inside your premises, (the inside unit); and (3) a power supply unit, typically located in a sheltered area either inside your premises or in an attached structure. You are responsible for providing the electrical power for the iNID.

### 5.4.1 Battery Backups for AT&T-provided Equipment:

It is your responsibility to provide your own battery backup for your WG, or ONT. If there is an iNID at your premises, AT&T provides the initial battery backup, but all subsequent battery backups are your responsibility. For more information and minimum specifications regarding battery backups from third parties, see att.com/batterybackup. AT&T will not provide battery backups for customer-owned equipment.

**5.4.2 Management and Maintenance of AT&T Equipment:**
AT&T reserves the right to manage the AT&T Equipment during the time you are an AT&T customer and retains exclusive rights to data the Equipment generates. Neither you nor a third party may change, interfere with, or block access to the Equipment data or settings. You agree that you will use the Equipment only for its intended residential use, and not for any other purpose (such as on another AT&T network, or on another provider's (non-AT&T) network). You agree to use appropriate and reasonable care in using any and all Equipment. As explained in Section 5.2, AT&T will repair or replace damaged Equipment as AT&T deems necessary. AT&T will not provide support for, or be responsible for, ongoing maintenance or management of, customer-owned equipment.

**5.4.3 Return of Equipment:**
Upon termination of AT&T Phone Service for any reason, you must return the Equipment, undamaged, within 21 calendar days to AT&T. If the Equipment is not returned within 21 calendar days, or is returned damaged, you will be charged for the value of the Equipment. We may retain any advance payment or deposit, or portion thereof that previously had not been refunded, if you fail to return the Equipment within this time period. If the Equipment is returned within 90 days of termination, any fees charged for the Equipment will be refunded (other than fees for damages). No refunds will be made for any Equipment returned more than 90 days after termination.

In addition to termination of service, this subsection applies if your existing Equipment is replaced or upgraded for any reason.

## 5.5 Theft Of AT&T Equipment Or AT&T Phone Service

You agree to notify AT&T immediately, in writing or by calling us at 800.288.2020, if the Equipment is stolen or if you become aware at any time that AT&T Phone Services are being stolen or fraudulently used. When you call or write, you must provide your AT&T Account number and a detailed description of the circumstances of the Equipment theft, including documentation of theft (e.g., a copy of a police report) or stolen or fraudulent use of AT&T Phone Service. You will be responsible for all charges incurred on your AT&T Account until you report the theft or fraudulent use of AT&T Phone Service. You will be responsible for stolen Equipment, but AT&T may in its sole discretion waive or reduce charges for stolen Equipment upon submission of documentation of theft or other circumstances. Failure to provide notice to AT&T of theft in a timely manner may result in the termination of your AT&T Services and additional charges to you. Unless notified otherwise by AT&T, after you report the theft or fraudulent use of the AT&T Phone Service, you will remain responsible for paying your monthly fees for AT&T Services not stolen or fraudulently used.

## 5.6 Service

**5.6.1 Service Description:**
AT&T Phone is an enhanced voice communication service that converts voice communications into Internet Protocol (IP) packets that are carried over AT&T's IP network—*i.e.*, "voice over IP" or "VoIP." AT&T Phone Service includes direct-dialed calling and certain calling and call management features, as well as additional or advanced features that may be offered at additional costs, all of which AT&T, in its sole discretion, may add, modify, or delete from time to time. AT&T Phone Service also includes a telephone number or numbers that will be included in printed directories and/or directory assistance databases, and options, available at additional costs, to have numbers withheld from printed directories and/or directory assistance databases. It is not mobile or nomadic and will function only where installed.

**5.6.2 AT&T Phone Accounts and Subaccounts:**
When you accept the AT&T Service terms, you become the main Account holder for each telephone number assigned to the AT&T Phone Service and all plans, features, and functionalities associated with each telephone number, whether those telephone numbers, plans, features, and functionalities are purchased initially or are added subsequently. You will be asked to choose a unique name for the main Account (your main Account ID). You may create up to ten subaccounts under your main Account, for others in your household. Each subaccount will have a separate password and ID. Main Account holders are responsible for all activity on their main Account and on any and all subaccounts. Violations of this Agreement in a main Account or in a subaccount can result in suspension or termination of the main Account and all subaccounts. Call histories (call logs for outgoing, answered, and missed calls) for each telephone number are accessible in the main Account and in each subaccount created under the telephone number. Main Account holders, as well as anyone provides information we deem sufficient to identify the main Account holder, can reset subaccount passwords and IDs by contacting Customer Service and can delete and recreate subaccounts. You agree to advise all subaccount holders that the main Account holder can have access to all aspects of their subaccount, including, but not limited to, feature settings, voicemail messages, and address books. All subaccount holders can therefore have no expectation of privacy vis-à-vis the main Account holder with regard to any aspect of the subaccount.

**5.6.3 Billing And Payments:**
For AT&T Phone service, nonrecurring and usage-based charges generally billed in the billing cycle following the transaction include, but are not limited to, international calling (including surcharges for international termination to a wireless phone number), Operator Services, Directory Assistance (411 or 800.555.1212), call trace, and overage minutes associated with defined minutes-of-use plans (e.g. Phone 200 plan). Partial minutes are rounded up for per-minute usage charges.

**5.6.4 AT&T Phone Equipment:**
AT&T Phone Service requires a regular touchtone landline telephone, which you must supply and which must be connected to the WG or iNID, either directly or through your home's Inside Wiring. (Rotary and pulse phones will not work). The WG or iNID will support up to two AT&T Phone lines (telephone numbers used for inbound and outbound calling). You agree that neither you nor a third party will move Equipment used for AT&T Phone Service within your premises or to any other physical location outside of the premises where it was installed. AT&T Phone Service is not designed to be nomadic and will not function properly if the WG is moved or altered. If you require the WG to be moved, you must contact AT&T. Failure to do so may result in a failure of AT&T Phone Service and/or in AT&T's suspension, modification, or termination of your Service.

**5.6.5 Interruptions, Limitations, And Modifications To Service:**

Since voice over IP is dependent on the IP network, the availability of an adequate power source, and correct Equipment configuration, AT&T does not guarantee that AT&T Phone Service will be continuous or error-free. You acknowledge and understand that AT&T cannot guarantee that voice over IP communication is secure.

You also acknowledge that AT&T may establish general practices and limits concerning use of AT&T Phone Service, AT&T Phone Service cannot be used to make operator-assisted collect or third-party billing calls (unless the third-party Collect Call company separately handles and bills for the call), nor can AT&T Phone Service be used to make 900/976 calls; area code 500, 700, and 710 calls; 10-10-XXX dial-around calls; or international operator or directory assistance calls. Also, the ability to call certain N11 services (211, 311, 511) may not be available.

AT&T also limits the maximum number of days that messages will be retained; the maximum number messages that will be retained by the Service; the maximum size of any message; and the maximum disk space that will be allotted on AT&T's servers on your behalf. You agree that AT&T will have no responsibility or liability for the deletion, for failure to store or to deliver any messages and other communications, for the modification or malformation of communications, or for other content maintained or transmitted by AT&T Phone Service. You acknowledge that AT&T reserves the right to log off Accounts or disconnect sessions that are inactive for an extended period of time. You further acknowledge that AT&T reserves the right to change these general practices and limits at any time without advance notice.

**5.6.6 Limitations of 911 Service:**

AT&T Phone Service, which is provided via voice over IP, is not the same as traditional wireline telephone service, and **911 service doesn't work the same as with traditional wirelines telephones.** You agree to tell anyone who may use your AT&T Phone Service of the limitations of 911 service. **AT&T makes no warranty that access to 911 will be uninterrupted, timely, secure, or error-free.** 911 service is available only at your service address, while connected to a properly powered and configured iNID or WG (and a properly powered and configured ONT, if applicable) and after AT&T Phone Service has been properly activated. 911 service will not function if your AT&T Phone Service isn't functioning or if there is a power or network outage, broadband connection failure, or if your service has been disconnected or suspended. Following an outage, you may be required to reset or reconfigure your Equipment before 911 service will work. AT&T strongly recommends that you maintain an alternative means of accessing 911 services, such as a cellular phone, at all times. AT&T is not responsible for any losses incurred because of an inability to dial 911 or to access emergency service personnel for any reason. And you agree to defend, indemnify, and hold harmless AT&T and its subsidiaries, affiliates, officers, agents, directors, employees, and service providers for any claim by you or anyone else relating in any way to 911 service.

**5.6.7 Premise Alarm and Other Device Compatibility:**

AT&T makes no warranty that AT&T Phone Service is appropriate for or capable of use with monitored burglar or fire alarms or medical monitoring systems or devices. Use of such systems is at your own risk. Not only may AT&T Phone Service be interrupted, delayed, or insecure, it may be incompatible with such systems or devices, and will not work in the event of a power or network outage, and may not work for other reasons. You agree to notify AT&T if you purchase a monitored burglar or fire alarm system before that system is installed, as installation may require re-writing of AT&T Phone Services at your expense. AT&T does not provide support for, or re-wiring of AT&T Phone Service in support of, medical monitoring systems or devices. Once AT&T Phone Service has been installed for use with a monitored burglar or fire alarm system, you agree that you will not modify the Inside Wiring of your home, move or reconfigure your WG in any way, or plug any telephone equipment into the back of your WG without contacting AT&T and your alarm service provider. Taking any of those actions could cause a failure of your AT&T Phone Service or alarm system. You agree to waive any claim against AT&T relating to interference with or disruption of a monitored burglar or fire alarm, medical monitoring device, or other similar systems or devices.

**5.6.8 Local Number Portability:**

In the event you are transferring an existing phone number for your AT&T Phone Service (i.e., porting a number to AT&T), you hereby authorize AT&T to process your order for AT&T Phone Services and to notify your existing provider of your decision to switch your local, local toll, and long distance services to AT&T Phone Service, and you represent that you are authorized to take this action. Not all telephone numbers are eligible for porting to AT&T Phone Service.

**5.6.9 Voicemail:**

AT&T Phone Service includes Voicemail, a full-featured voicemail service. AT&T does not guarantee that voicemail messages will be saved or be able to be retrieved. If you access your Voicemail voice mailbox from outside your local calling area, you may incur applicable local toll or long distance charges.

In addition, the Voicemail service allows you the option to integrate your AT&T wireless service voice mailbox with your AT&T Phone Voicemail mailbox. (Wireless service from AT&T must be purchased separately.) Calls forwarded to your Voicemail voice mailbox from your wireless phone will not incur airtime charges. However, airtime charges may apply when using your wireless handset to retrieve messages. Pager notification allows your pager to notify you when a message is received in your Voicemail voice mailbox. Your pager can have either an email address or your pager can have a telephone number associated with it and must be set up through the Voicemail mailbox. Paging service and equipment must be purchased separately. Other restrictions may apply.

Voicemail may include a Voicemail-to-Text ("VMTT") feature that provides automated transcription of your voicemail. AT&T is not responsible nor liable for: 1) errors in the conversion of or its inability to transcribe voicemail messages to text/email; 2) lost or misdirected messages; or 3) content that is unlawful, harmful, threatening, abusive, obscene, tortious, or otherwise objectionable. We can't filter, edit or control voice, text, or email messages, or guarantee the security of messages. We can interrupt, restrict or terminate VMTT without notice if your use of VMTT adversely impacts AT&T's network (e.g., by abnormal calling patterns or an unusually large number of repeated calls and messages) or if your use is otherwise abusive, fraudulent, or does not comply with the law.

You are solely responsible for and will comply with all applicable laws as to the content of any text messages or emails you receive from VMTT that you forward or include in a reply to any other person. You authorize AT&T or a third party working on AT&T's behalf to listen to, and transcribe all or part of a voicemail message and to convert such voicemail message into text/email, and to use voicemail messages and transcriptions to enhance, train and improve AT&T's speech recognition and transcription services, software and equipment. You agree that the results of benchmarking VMTT against competing products or services is AT&T confidential information requiring AT&T's written consent to disclose. Additional charges may apply to receiving email on your wireless device from VMTT, as well as, replying to

or forwarding VMTT messages via SMS (text) or email, depending on your plan. Transcription times cannot be guaranteed. You are responsible for providing a correct email address and updating the email address when changes to the email account are made.

**5.6.10 Prohibited Uses of AT&T Phone Service:**
You agree that you will NOT use AT&T Phone Service:

- To engage in auto-dialing, continuous or extensive call forwarding, telemarketing, fax broadcasting or fax blasting, or for uses that result in excessive usage inconsistent with normal residential usage patterns. In addition, connection of your AT&T Phone Service to a device which converts use of AT&T Service to an outbound trunk line by more than one individual is prohibited. If AT&T determines, in its sole discretion, that you are reselling or transferring AT&T Phone service or that you are using it for any of these activities, AT&T reserves the right, without advance notice, immediately to terminate or modify your AT&T Service, or to change your call plan to a different offer on a prospective basis, and, in addition, to assess additional charges for each month in which excessive usage occurred. If you subscribe to a calling plan which includes unlimited calling of any type, unless otherwise specified by your specific plan in marketing materials associated herewith, consistent monthly use in excess of 5,000 aggregate minutes per month, taking into account all types of calling in your plan which are provided on an unlimited basis, shall be presumed to be inconsistent with these restrictions and shall be subject to the conditions above.

- As an announcement service, particularly with regard to Voicemail. Use of Voicemail service as an announcement service and/or other improper or excessive use may impair AT&T's ability to provide reasonable service to other customers. AT&T reserves the right to cancel your AT&T Phone Service at any time, with or without notice, if as determined solely by AT&T based on its network/service design and usage experience, your messaging service is (1) being used in an improper manner including, but not limited to, using it as an announcement service or for unlawful purposes, (2) consistently generating excessive usage, (3) affecting AT&T's ability to provide reasonable service to other customers, or (4) being used to interfere with another's use of the voicemail system.

**5.6.11 Special Terms for North Carolina Customers:**
If you reside in Durham or Concord, your AT&T Service may not include a telephone number or numbers in printed directories and/or directory assistance databases, and you may not have the option to have numbers withheld from printed directories and/or directory assistance databases.

**5.6.12 AT&T Phone for Business.**

**5.6.12.1 AT&T Phone for Business Equipment:**
AT&T Phone for Business service requires a regular touchtone landline telephone, which you must supply and which must be connected to the WG, FBG, IAD or iNID, either directly or through your premise's inside wiring. (Rotary and pulse phones will not work.) The WG, FBG or iNID will support up to two AT&T Phone for Business lines (telephone numbers used for inbound and outbound calling), additional AT&T Phone for Business lines will be supported by an Integrated Access Device (IAD) which, when necessary, will be installed in a tethered arrangement with the WG or the FBG.

**You agree that neither you nor a third party will move AT&T Phone for Business Equipment used for AT&T Phone for Business Service within your premises or to any other physical location outside of the premises where it was installed by AT&T. AT&T Phone for Business Service is not designed to be nomadic and will not function property if the WG, FBG or the IAD is moved or altered by a non-AT&T employee. If you require the WG, FBG or IAD to be moved, you must contact AT&T. Failure to do so may result in a failure of the service and/or in AT&T's termination of your service.**

**5.6.12.2 Interruptions, Limitations, and Modifications to Service:**
*Telephone Line assignment on the WG or FBG.* You acknowledge and agree that under certain service configurations, there may be a need for AT&T to keep a telephone line connected to port one of the WG or FBG. Under these circumstances, if the telephone line connected to port one (of the WG or FBG) is disconnected, AT&T will proceed to move one of the remaining lines, if existent, to populate the otherwise vacant port one to provide proper functioning of the service. You acknowledge and agree that this action will require a technician dispatch and will be billed at the associated prices prevailing for the service.

**5.6.12.3 Arbitration Agreement:**
If you are an AT&T Phone for Business customer, all disputes between us will be resolved through binding arbitration as prescribed by Section 1.3, except that (1) the AAA will apply its Commercial Arbitration Rules, as modified by this section and Section 1.3, unless the claims are valued at $25,000 or less; (2) AT&T will pay all AAA fees listed in Section 1.3.2.4 for arbitrations you initiate after fully complying with Section 1.3.2.2 only if your claims are valued at $25,000 or less; (3) you are eligible for the Alternative Payment and Attorney Premium in arbitrations you initiate after fully complying with Section 1.3.2.2 only if your claims are valued at $25,000 or less; and (4) the arbitrator will issue a reasoned decision only if you or AT&T requests it.


# 6.0
# AT&T Internet Service Terms


These Internet Service Terms govern the Internet access services provisioned by AT&T described in Section 6.1 below, including Internet Protocol (IP) based services provisioned over copper, copper-fiber hybrid, fiber or wireless networks as well as legacy digital subscriber line (DSL) services (collectively "Internet Service"). The Internet Services are currently marketed under the names AT&T Internet, AT&T Fixed Wireless, and AT&T DSL, but see Section 6.1. below for a partial list of other names under which these services have been marketed in the past.

Your use of AT&T Internet Services is governed by these AT&T Internet Service Terms, as well as your Customer Service Summary or Order Confirmation letter, AT&T's Access ID Terms and Conditions (at att.com/accessidterms), the att.net Terms of Use (at att.com/legal/terms.attNetTermsOfUse.html), AT&T's Policies for Considering Copyright Infringement Claims (at att.com/legal/terms.dmca.html), the Internet Fee Schedule (available at att.com/ConsumerInternetFees for consumer customers and att.com/BusinessInternetFees for business customers) ("Internet Fee Schedule"), along with the applicable policies and additional terms which AT&T makes you aware of, and if you have been notified of temporary changes to your Internet Service, the terms and conditions for that temporary service posted at

att.com/temporaryterms. To the extent that your AT&T Internet Service is delivered over some portion of the AT&T wireless network, your service will also be subject to the AT&T Wireless Service Terms in Section 2. The current fixed internet access speed tiers AT&T offers may be found on AT&T's Speed Tier page at att.net/speedtiers.

In these AT&T Internet Service Terms, "AT&T" or "we" refers to the AT&T affiliate for your service and location identified in section 6.1 and "you" refers to the Account holder, Sub-Account holder, and any Authorized User(s), as those terms are defined in Sections 6.3.1 and 6.3.2.

These AT&T Internet Service Terms are based on four general principles.

- (1) We support our customers' right to free expression.

- (2) We will give our customers clear notice of any meaningful limitations on the Services.

- (3) We will give our customers clear information about the experience they can expect when using the Services.

- (4) We will provide consumer internet access service in discrete, non-overlapping speed tiers.

For more information about how AT&T helps transmit your information to points on the Internet, how AT&T manages the network, internet options such as different service capability and expected and actual speed ranges, device attachment rules, activities which may impair or degrade your internet experience, and for additional information regarding network practices with respect to monthly data usage allowances related to AT&T Internet Service, please visit att.com/broadbandinfo.

If the location to which your Internet Service is provisioned is in a multi-tenant environment (*e.g.*, an apartment building or condominium, sometimes referred to herein as a "MTU"), provision of your Internet Service may be subject to other terms and conditions imposed by the owner and/or manager of the MTU (*e.g.*, a landlord or home owners' association). You will need to refer to the owner/manager of your particular MTU for more information regarding any MTU specific terms which may apply.

## 6.1 Trade Names, and Your AT&T Internet Service Provider

AT&T Internet Service is marketed under various trade names. In these Service Terms, AT&T Wired Internet Services, which are discussed below in Section 6.15, include those services which have been marketed as AT&T Fiber, AT&T Internet, AT&T Internet Basic, AT&T High Speed Internet (including Max and Max Plus), and U-verse Internet. DSL Internet Services, which are discussed below in Section 6.17, include those services which have been marketed as AT&T High Speed Internet (including Lite, Ultra, Xtreme, XtremePro, Basic, Express, Pro, and Elite), AT&T High Speed Internet Direct (including Lite, Ultra, Xtreme, XtremePro, Basic, Express, Pro, and Elite), DSL Direct (including Express, Pro, and Elite), and FastAccess DSL and/or FastAccess DSL Direct (including Lite, Ultra, Xtreme, and XtremePro), Wireless Home Internet, which is discussed in Section 6.14.2, include those services that have been marketed as AT&T Fixed Wireless Internet and AT&T Wireless Home Internet. Business Internet Services, which are discussed below in Section 7, include AT&T Business Fiber, AT&T Internet for Business, AT&T High Speed Internet Business Edition, AT&T High Speed Internet Business Edition Direct, FastAccess Business DSL, FastAccess Business DSL Direct, and AT&T Internet for Business On Demand.

Except as specified otherwise in writing, your AT&T Wired Internet Services are provided by your local AT&T telephone company as set forth below:

- BellSouth Telecommunications, LLC in AL, GA, FL, KY, LA, MS, NC, SC, and TN;

- Southwestern Bell Telephone Company in AR, KS, MO, OK, and TX;

- Pacific Bell Telephone Company in CA;

- Illinois Bell Telephone Company in IL;

- Indiana Bell Telephone Company, Incorporated in IN;

- Michigan Bell Telephone Company in MI;

- Nevada Bell Telephone company in NV;

- The Ohio Bell Telephone Company in OH; and

- Wisconsin Bell, Inc. in WI.

Outside of the local AT&T telephone company franchise areas in these states, as well as in all states not listed above, AT&T Internet Services are generally provided by Teleport Communications America, LLC and/or one or more of its subsidiaries. In New York, AT&T Internet Services are generally provided by TC Systems, Inc. Wireless Home Internet Services are provided in all states by AT&T Mobility LLC, acting on behalf of its FCC-licensed affiliates doing business as AT&T.

## 6.2 Internet Service Description

### 6.2.1 Service Description:

AT&T Internet Service offers you a capability for acquiring or retrieving information from; generating, storing, transforming, processing, or utilizing information on; or making available information to other internet end points connected directly or indirectly to AT&T's network. Unless otherwise specified, AT&T Internet Services include the following:

### 6.2.1.1 Site Access / E-Mail Services:

Access to att.net and related services, including an e-mail account for the Account holder and any Sub Accounts, is generally included with your Internet Service. Such access will be subject to the att.net Terms of Use found at att.com/legal/terms.attNetTermsOfUse.html. By utilizing such access, including accessing the included e-mail account(s), you are agreeing to be bound by the terms thereof.

**6.2.1.2 DNS Services / DNS Error Assist:**

Domain Name System (or DNS) services translate domain names into the numerical IP addresses needed for locating and identifying computer services and devices within the underlying network protocols commonly used to organize the internet. The DNS Services include DNS Error Assist, which upon entry of an incomplete or inaccurate Web address will automatically search for similar or related terms and present you with suggested sites you may want to reach instead of providing only an error message. If you prefer to opt out of DNS Error Assist, you may do so by visiting att.com/privacychoices from your desktop or from your mobile Web browser.

**6.2.1.3 IP Addresses:**

Unless otherwise specified, AT&T Internet Service is provided with a dynamic Internet Protocol ("IP") address, a static IP address, a multiple static IP address service (as applicable), or a privately managed IP address utilizing CGNat (Carrier Gateway NAT or Carrier Gateway Network Address Translator) technology, at the sole discretion of AT&T. Static IP addresses are not available with all AT&T Internet Services or all tiers within certain AT&T Internet Services. Unless otherwise specified, a dynamic IP address is a single internet address intended for use with a single Account, served by a single modem or gateway, and a static IP address or multiple static IP address is intended for use with a single computer or a network of devices, computers and/or servers. You may not use the Service in a manner that is inconsistent with these intended uses. Unless otherwise specified, AT&T Internet Services will support both IPv6 and IPv4 Internet addresses; however, to reach IPv6-exclusive internet content, some of your equipment may require upgrades or replacement. For more information about IPv6 and how it affects you, visit att.com/help/internet/ipv6/. The manner by which AT&T will elect to support IPv6 or IPv4 and the technology used to do so shall be at AT&T's sole discretion and AT&T cannot guarantee that every third party service will be fully compatible with the technology that AT&T elects to employ for a particular purpose. For more information about AT&T's Network Management Practice, please visit AT&T's Broadband Information page at att.com/broadbandinfo.

**6.2.1.4 Interconnection:**

Because the internet consists of multiple interconnected networks and most internet end points (e.g., websites and other content providers) are not directly connected to AT&T's network, AT&T must connect to and exchange traffic with other networks to provide its subscribers the capability of uploading data to or downloading data from internet end points that are connected to those networks. To that end, AT&T has entered into commercially negotiated agreements to exchange traffic with such networks on mutually agreeable terms. Consistent with its longstanding practice, AT&T does not warrant that it will establish or expand the connections between its network and other networks except on such mutually agreeable terms. To the extent AT&T is unable to reach agreement on terms of interconnection or network expansion with these other networks it could affect your service. These impacts on your service performance are described in more detail in AT&T's Open Internet notice. AT&T therefore makes no promise express or implied that you will be able to upload data to or download data from internet end points connected to other networks at any particular speed.

Like the other networks that make up the internet, AT&T's is a shared network, which means that the transmission links and other network resources used to provide the Service are shared among AT&T's subscribers. AT&T manages this network for the benefit of all users based on a variety of factors, and our technical expertise.

**6.2.2 "Speed" of Internet Services, Technology and Data Usage:**

AT&T offers many internet access service options, each of which has a specific service capability speed range. The term "speed" is commonly used as a shorthand way to describe the capacity at which a particular internet access service can transmit data. This capacity is typically measured in the number of kilobits, megabits or gigabits that can be transmitted in one second (Kbps, Mbps or Gbps). Some applications like a short email without attachments or basic web browsing do not require high service capability speeds to function optimally, while other activities like transferring large data files can be performed faster with higher-speed services. Your service capability speed may not be suitable for some applications, particularly those involving real-time or near real-time, high-bandwidth uses such as streaming video or video conferencing.

**6.2.2.1 AT&T Speed Tiers Page:**

The current speed ranges AT&T offers may be found on AT&T's Speed Tier page at att.net/speedtiers, which identifies the downstream and upstream rates at which your "Connection" (as that term is defined below) transfers internet access data between the network interface device at your home, office, or apartment building to the point you connect to the AT&T network..

**6.2.2.2 Connection:**

Because service performance varies on an end-to-end basis, the service capability speeds of AT&T are limited to, and measured between, the equipment utilized to provision your Internet Service at the fixed address or location you identified when ordering the Internet Service and a point on the AT&T network, sometimes referred to as the "Connection" or your "internet connection." The Connection constitutes only one segment of the end-to-end transmission path connecting the end user to internet web sites or content providers.

**6.2.2.3 Expected Speeds:**

Because there are many factors which may impact the speed experienced by any particular internet user at any particular time (as described in more detail below), the "Expected Speed" represents an anticipated, theoretical speed of the Connection, based on network design and engineering, measured over time. At any moment in time, a particular observed speed will vary from the Expected Speed. However, AT&T manages its wired internet network toward an overall median speed consistent with the Expected Speed. Wireless networks are generally subject to greater variability as a result of environmental factors beyond AT&T's control, so it may not be possible to provide Expected Speeds for services which are delivered over a wireless network.

**6.2.2.4 Technology:**

Unless otherwise expressly agreed to the contrary, AT&T makes no warranty with regard to the technology used to provision any particular Internet Service. Notwithstanding any description that may be furnished for a particular Internet Service, AT&T reserves the right, in its sole and absolute discretion, to make changes to the technology used to provision all or any portion of any Internet Service. So long as the essential functionality of the Internet Service from a user perspective is not negatively impacted in a material way any change in technology, AT&T has no obligation to notify you of any changes in technology and changes in technology will not affect your rights or obligations with respect to the Internet Service you have purchased.

For any particular Internet Service, the technology utilized to provision different portions of the Service may vary significantly. In those circumstances, and unless

otherwise expressly agreed to the contrary, AT&T shall only be responsible for the technology utilized to provision the Connection. As discussed in further detail below, AT&T has no control over, and makes no warranties with respect to, the technology within the premises to which the internet Service is provisioned (e.g. the inside wiring, local Wi-Fi, home network and/or local access network). AT&T further has no control over and makes no warranties with respect to the technology utilized by content providers for purposes of operating the servers which an end user must access in order to receive access to the content.

**6.2.2.5 Other Factors that Impact Speed:**
In addition to issues presented by the various technologies over which an internet access may operate on an end-to end basis, end-to-end performance of your Internet Service will also depend on a variety of other factors, including (but not limited to): the number of subscribers simultaneously using the network; specific characteristics of the location from which you are accessing the internet; specific characteristics of your intended destination on the internet; overall traffic on the internet; Wi-Fi connectivity; interference with high frequency spectrum on your telephone line; wiring inside your premises, office or apartment complex; the capacity or performance of your network devices, routers, gateways or modems; the servers with which you must communicate with in order to reach your intended destination and/or access the content you are trying to access; internal and external network management factors (including Overhead, which refers to the various control and signaling data required to achieve the reliable transmission of internet access data); and the networks you and others are using when communicating. In addition, your use of other AT&T services (such as U-verse TV, AT&T Phone, Unified Messaging, and other services) that may share the capacity of your broadband connection with the Service may impact the amount of capacity available for your use of the Service at that particular time and thus affect the performance of the Service.

In addition, Internet Service delivered over wireless networks may be interrupted, delayed, or otherwise limited for a variety of reasons, including environmental conditions, unavailability of radio frequency channels, congestion from other users, system capacity, network management, power outages, priority access by National Security and Emergency Preparedness personnel in the event of a disaster or emergency, coordination with other systems, equipment or infrastructure damages or modifications and repairs, proximity of antennas and/or cell towers, the location and rotation of antennas, cell tower outage or site outage, maintenance work at a cell tower or antennae site, blockage of or interference with the signal between the end user premises and the cell tower or antennae, problems with the facilities of interconnecting carriers and/or power outages.

Consequently, AT&T does not guarantee the performance of your service on an end- to-end basis. This is also why third party speed tests which include other portions of the overall internet connection beyond the Connection itself may yield results which are outside the expected speed range for your particular service plan on the Speed Tier page. AT&T expressly disclaims any warranty with respect to the outcome of these third party speed tests.

**6.2.2.6 Download vs Upload Speeds:**
The term "download" generally refers to the process of a user utilizing their local device or computer to access information stored on a remote device, computer or server connected to the internet and includes activities ranging from "surfing" the internet to downloading a file to streaming video. The term "upload" generally refers to the process of a user sending information from their device or computer to a remote device, computer or server connected to the internet. Unless otherwise specified, references to the "speed" of an Internet Service will solely be with respect to the download speed of that Service. Similarly, unless otherwise specified, AT&T makes no guarantee that the upload speed of a particular Internet Service will be the same as the download speed, either in terms of the applicable speed range or in terms of actual performance at any given moment. In fact, as set forth on the Speed Tier Page, many Internet Services have expected upload speeds which are lower than the comparable expected download speeds. As a result, and as a result of the many other factors that might affect speed at any given moment, the actual upload and download speed of any Internet Service will vary greatly from time to time and day to day.

**6.2.2.7 Data Usage on Residential Internet Services:**
The residential Internet Service you purchased includes either an unlimited data allowance or a monthly data usage allowance with overage charges for usage in excess of your allowance. More details regarding the applicable data allowance, is set forth in the Customer Service Summary or Order Confirmation Letter you received. Use of certain services, including but not limited to digital TV features and apps, AT&T Digital Life, home security, home automation and medical alarm systems, whether provided by AT&T or a third party, may count towards your Internet data usage allowance. For additional information about the use of your residential AT&T Internet Service, including management of your data usage, as well as information about other data plans that you might consider, please refer to att.com/internet-usage. (This paragraph is not applicable to Business Internet Services.)

**6.2.3 Availability and Service Changes:**

**6.2.3.1 Availability:**
AT&T Internet Services are not available in all areas, and may not be available at certain speed tiers (or at all) at your location, even if our initial testing, an AT&T website and/or any sales representative or other personnel associated with AT&T indicated that your location qualified for a particular speed tier or Service. If your location is situated in an MTU, availability of any particular Internet Service may depend upon the owner and/or manager of the MTU agreeing to grant AT&T access to the MTU and/or to your particular location.

The availability of any Internet Service may also be subject to various limitations upon the capacity of the various technologies utilized in AT&T's network to support a given number of customers on any particular Internet Service and/or speed tier in a given area ("Capacity Limitations"). Some AT&T Internet Services are more likely to be subject to Capacity Limitations. When a particular part of AT&T's network is approaching a Capacity Limitation, it can be very difficult for AT&T to predict exactly when or how that Capacity Limitation will impact upon the availability of a particular Internet Service to a particular location. This may mean that, although a certain location may be theoretically capable of receiving the Internet Service in question, Capacity Limitations at the time a particular order is placed may mean that a particular Service is not available to a particular location. This can even occur between the time that a Service is ordered and the time that the Services is installed / fulfilled, resulting in a Service that was shown as being available to a particular location at the time an order was placed no longer being available at the time of installation. As discussed in Section in more detail with respect to particular Services below, Capacity Limitations may also mean that if a Service is terminated at any location for any reason whatsoever, it may not be possible to restore or renew that Service at that location.

AT&T also reserves the right, in its sole discretion, to stop offering some or all AT&T Internet Services at a particular location, whether because AT&T has or expects

to lose necessary access rights to the equipment required to deliver a particular service to that location or AT&T has otherwise determined that it is no longer in AT&T's best interests to offer a particular service or services to that location. AT&T may do this either by terminating current service(s) to the location, pursuant to Section 6.5 below, or by removing the location from eligibility for the purchase of new service(s) ("Grandfathered"). If a service to a particular location has been Grandfathered, current service(s) may not be interrupted but if service is suspended or terminated at that location for any reason AT&T will not be able to guarantee that service will be renewed or restored at that location. New service at that location may not be available for purchase from AT&T or the service available may be substantially different from the service that has been Grandfathered.

For all those reasons, AT&T makes absolutely no guarantee as to the availability of any Internet Service at any location.

### 6.2.3.2 Service Changes and Technology Conversions:

AT&T may modify or discontinue any Internet Service, temporarily or permanently, and will publish the terms and conditions for temporary changes (which are incorporated into this Agreement) at att.com/temporaryterms. AT&T also will endeavor to provide you with reasonable notice of material changes to your Internet Service. Your continued use or subscription to Internet Service after the effective date of the change constitutes acceptance of the change and any associated terms and conditions. In addition, if AT&T determines to provision Internet Service at your location utilizing a different technology, we will evaluate whether the conversion can occur without noticeable interruptions during normal business hours and no single interruption outside of normal business hours of more than one (1) hour in length. If so, we may elect to proceed with the conversion without prior notice to you. Otherwise, we will endeavor to provide you with up to thirty (30) days' advance notice of the conversion. Following that period, we may at our sole discretion, either disconnect your service or temporarily suspend your service for up to fifteen (15) days to facilitate the conversion process.

As part of any conversion, we may, in our discretion, discontinue the particular Internet Service you are currently receiving and make available to you an alternate Internet Service of comparable or better Speed at the then applicable rates, terms, and conditions, which may differ from your previous Internet Service rates, terms, and conditions (including Bundle Discounts). If you are on a Term Plan and your overall price will increase as a result of this conversion, taking into account all applicable credits and discounts, you will not have to pay any applicable Early Termination Fee if you elect to cancel your Internet Service within the period specified for doing so on your updated Customer Service Summary or Confirmation Letter.

Your new Internet Service may require different or additional equipment in order to fully utilize. If so, we will endeavor to either provide you with the required equipment or notify you of any equipment you will be required to provide on your own. You may also be required to review and accept new or additional terms and conditions related to the new Internet Service and/or new equipment.

### 6.2.4 Home Networking / Home Wi-Fi:

### 6.2.4.1 Inside Wiring:

When ordering AT&T Internet Service, you will be responsible for providing any copper wire or fiber optic cable required for local networking purposes within your premises ("Inside Wiring" or "IW"), including any copper wire or fiber optic cable between the AT&T network termination interface at your location and the internet gateway (WG) equipment that will be located at your premises as well as any wiring or cabling you may choose to use to connect internet enabled devices to the internet gateway (WG). In most cases, the IW will already be present in your existing locations, however you will be responsible for providing any additional IW which may be required. If additional IW is required, you may have the option of ordering IW from AT&T or installing your own IW. If you elect to install your own IW, the IW must be installed and available for use by AT&T Technicians before you order AT&T Internet Service. If IW service is ordered from AT&T, it is your sole responsibility to obtain landlord permission or approvals for such IW.

### 6.2.4.2 Disclaimer of Warranties:

The condition of the IW over which your Internet Service is transmitted within your premises will impact the performance of the Internet Service, including with respect to speed, reliability, and latency. You are solely responsible for the condition of any IW and AT&T expressly disclaims any responsibility for it. If IW is provided by AT&T, upon completion of installation you will have full ownership and responsibility for that IW. **Regardless of whether you or AT&T provides or installs IW, to the greatest extent permitted by applicable law, AT&T makes no warranty to you or any other party for any work or materials constituting or associated with IW. AT&T expressly disclaims any warranty of merchantability or fitness for a particular use, and AT&T has no responsibility to maintain, update, repair, replace, de-install, or remove any installed IW.**

### 6.2.4.3 Home Wi-Fi / Local Wi-Fi:

Depending upon the Internet Service you purchase, your Internet Service may include Wi-Fi enabled home networking equipment ("Wi-Fi Equipment") in order to help you allow Wi-Fi enabled devices to wirelessly connect to your Internet Service ("Home Wi-Fi," or for business customers, "Local Wifi"). AT&T may also make available additional, optional internet related equipment for sale or lease in connection with your Service, such as various types of home networking equipment (ex: Wi-Fi Extenders). Unless otherwise expressly specified to the contrary, any amounts for the purchase or lease of this additional equipment will be separate from and in addition to amounts payable for your Service. Use of such additional equipment may be subject to additional terms and conditions as specified in connection therewith.

In order to use Home Wi-Fi or Local Wi-Fi, you must have Wi-Fi enabled devices that (a) meet U.S. and WiFi Alliance standards; (b) are compatible with the Wi-Fi network being generated by the applicable Wi-Fi Equipment; and (c) are capable of running IP and related protocols. The Wi-Fi enabled device you are utilizing must be in close enough proximity to the Wi-Fi Equipment to achieve connectivity with the Home Wi-Fi or Local Wi-Fi. Actual Home Wi-Fi or Local Wi-Fi coverage and quality may vary depending upon the location of the Wi-Fi Equipment, the location of the applicable Wi-Fi enabled device and conditions in and around the premises in which both the Equipment and the Wi-Fi enabled device operate.

Home Wi-Fi or Local Wi-Fi is designed to provide you with the highest speed available from your home network at any given point in time, subject to the many different factors that can affect network performance. AT&T's most recent generation of Wi-Fi Equipment generally supports the Wi-Fi 6 (IEEE 802.11ax) standard and is compatible with older Wi-Fi (IEEE 802.11 a/b/g/n/ac) standards, although older Home Wi-Fi Equipment may only support older standards. The theoretical maximum speed you may be capable of achieving from your Home Wi-Fi will depend heavily on which Wi-Fi (IEEE 802.11) standard is supported by the Wi-Fi

Equipment you have as well as which Wi-Fi (IEEE 802.11) standard is supported by the particular device you are utilizing. (By way of example only, Wi-Fi 1 (IEEE 802.11b) offers a theoretical maximum of 11 Mbps while Wi-Fi 6 (IEEE 802.11ax) offers a theoretical maximum of over 1 Gbps. Even if the Wi-Fi Equipment at your location is capable of supporting Wi-Fi 6 (IEEE 802.11ax), if you are utilizing an older device that is only capable of supporting the older Wi-Fi 1 (IEEE 802.11b) standard, your theoretical maximum speed will be limited to 11 Mbps.)

Although the Wi-Fi 1-6 (IEEE 802.11 a/b/g/n/ac/ax) standards have theoretical maximum speeds ranging from over ten Mbps to over a gigabit per second, depending on which standard applies, actual Wi-Fi speeds will be substantially lower than the theoretical maximum speeds which describe the physical throughput rate including Wi-Fi protocol communications. The result is that the maximum you can receive may not exceed 40%-50% of the theoretical maximum Wi-Fi standard speed and may be significantly lower depending on other applicable factors. In addition to the factors discussed above, the actual speed you experience over Wi-Fi will depend in part on the speed of the connection between the Wi-Fi network you are accessing and the destination you want to reach on the Internet, which may be significantly below the theoretical maximum speed of the service. (By way of example only, if you order AT&T Internet 100, with a download Expected Speed of 100 Mbps according to the AT&T Speed Tier page, even if the Wi-Fi Equipment at your location and the device you are utilizing are both capable of supporting the Wi-Fi 6 (IEEE 802.11ax) standard with a theoretical maximum speed of over 1 Gbps, the theoretical maximum internet download speed with your device connected to your Home Wi-Fi would not be expected to exceed 100 Mbps.)

**6.2.4.4 Home Network Management and Security:**
AT&T reserves the right to manage remotely any equipment used to access any Internet Service, whether that equipment is connected via a wired or wireless connection. That may include facilitating the connection of that equipment, monitoring traffic for potential issues, managing applicable settings and/or remotely updating software or firmware. Nonetheless, you remain ultimately responsible for all security measures over your in-home network, including any Inside Wiring, local area network(s) and/or Wi-Fi Equipment. That includes, but is not limited to, access to authorization codes or passwords, as well as any encryption you deem necessary or required.

AT&T may provide you with tools or software to assist you in managing one or more aspects of your home network (including apps like AT&T's Smart Home Manager and network based services like AT&T Smart Security, which software would then be included in the term "Software" as used herein below). AT&T may also make available additional, optional security or network management applications for sale or subscription in connection with your Service. Unless otherwise expressly specified to the contrary, any amounts for the purchase or subscription of these additional services will be separate from and in addition to amounts payable for your Internet Service. Use of such additional services may be subject to additional terms and conditions as specified in connection therewith.

Your use of tools, features and/or software made available to you by AT&T is at your own discretion and you remain ultimately responsible for all aspects of your home network, including any activity by children or other guests that you may allow (either intentionally or unintentionally, through lack of adequate security measures) to access your AT&T Internet Services via your home network and/or Home Wi-Fi and any devices or equipment you may elect to connect to your home network and/or Home Wi-Fi.. For that reason, AT&T recommends that you take all necessary measures to ensure adequate network security and to closely monitor use of your AT&T Internet Services and your home network by anyone accessing your home network, especially children.

**6.2.5 Nationwide Wi-Fi Hot Spots (For Internet):**
Access to AT&T's nationwide network of Wi-Fi Hot Spots may be available to you as part of the Service, and the AT&T Wi-Fi Hot Spots will provide you with access to the internet via certain AT&T Internet access points (Locations). Primarily, this access is provided via a Wi-Fi network using a Wi-Fi Alliance (IEEE 802.11) standard. To access the Wi-Fi Hot Spots, you must have a device that is compatible with the specific Wi-Fi equipment deployed at a Location. Access to the Hot Spots is intended for the limited purposes of assisting with access to the public internet for e-mail and web browsing or other purposes consistent with the AT&T Wi-Fi Terms of Service, which may be found at att.com/legal/terms.wiFiServices.html. In order to gain access to the Internet at a Location, you may need your Account information, including your Member ID. If you are also an AT&T Mobility customer, you may auto-authenticate at certain Locations without the use of your Member ID. The AT&T Wi-Fi Terms of Service will govern your use of AT&T Wi-Fi Hot Spots.

## 6.3 Registration and Membership

**6.3.1 Account Holder:**
When you complete the registration process for the Service, you become the Account holder. To be an Account holder, you must either be: (i) 18 years or older, if an individual, or (ii) be a corporation, partnership, or other legal entity duly formed (and incorporated if applicable) in good standing where required to do business with all legal authority and power to accept this Agreement and acting through your duly authorized representative. You will be asked to choose a unique "Member ID" for your account.

**6.3.2 Sub Accounts:**
Account holders may also create up to ten accounts with separate login credentials that are linked to the Account holder's account (each a "Sub Account"). Each Sub Account may also be required to accept this Agreement and complete the Sub Account registration.

**6.3.3 Account Holder Responsibility:**
The Account holder is responsible for all activity associated with the Account and any of its Sub Accounts, including all fees and charges, whether the charges are incurred by the Account or the Sub Accounts. Use of Member ID subjects you to the AT&T Access ID Terms and Conditions (available at att.com/accessidterms), which are incorporated herein by reference.

**6.3.4 Registration Data:**
All information that you provide to AT&T must be accurate, including your name, address, credit or charge card numbers and expiration dates, and any payment information ("Registration Data"). You are responsible for keeping all Registration Data accurate and must provide changes promptly to the AT&T Member Center by going to att.com/myatt.

**6.3.5 Password Protections:**

Your Account password or passcode (as applicable) must be provided to engage in most online or telephonically enabled account management functions. You agree to immediately notify AT&T if your password or passcode has been compromised and/or you wish to remove an authorized user from your Account.

## 6.4 Pricing

In return for receiving AT&T Internet Service, you promise to pay—and agree that we may charge your credit or debit card on file with us—the charges described in subsection 1.9, the Internet Fee Schedule, and the following charges:

### 6.4.1 Monthly Service Charges, Term Plans, and Bundle Discounts:
Billing commences when AT&T has provisioned your Internet Service. During each monthly billing cycle, you will be billed in advance, at our rates in effect at the time, for all AT&T Internet Services you order. When you purchased the AT&T Internet Service, you agreed to a specific monthly price and plan, which may have included a term for the Service of one or more years ("Term Plan"). Some plans may offer a discount on the Service if you sign up for other AT&T services ("Bundle Discount"). You agree to maintain your Service and any bundled services for the applicable term of the Term Plan or Bundle Discount, as applicable. If you signed up for a Term Plan or a Bundle Discount, the price under the applicable plans is valid until one of the following events occurs, at which time the price of your Service may revert to the then-current price for such Service: (1) the term of your plan expires; (2) you change your current Service address to another Service address; (3) you drop one of the AT&T services that you were required to purchase to receive the special rate; or (4) AT&T exercises a right under this Agreement to terminate your Account's (or any associated Sub Account's or Authorized User's) use of the Service.

### 6.4.2 Early Termination Fees:
If before the end of any applicable term, either you cancel your Internet Service or we terminate it for misconduct pursuant to subsection 1.5, you will be subject to any early termination fee specified in your Customer Service Summary, Order Confirmation Letter, or applicable fee schedule.

## 6.5 Termination or Cancellation of Service

### 6.5.1 Suspension and/or Termination upon Loss of Access:
Upon any interruption or loss of either your or AT&T's rights to access any part of the network facilities required to provide your Internet Service, including the interruption or loss of any rights to access the land or buildings in which the facilities are located, AT&T may, in its sole discretion, suspend or terminate all or any portion of your Internet Service. In general and where applicable, AT&T will utilize available public rights of way to access network facilities utilized for providing Services. However, if you are the owner of the location to which your Services are provisioned, it is ultimately your responsibility to secure any necessary rights of access outside of the public rights of way. If you lease or rent the location at which you wish to receive Services, or if the location is located in a MTU type of arrangement, receipt of Services is expressly conditioned on the owner, landlord, and/or building manager providing all customary, reasonable, and necessary rights and permissions to allow AT&T access to the network facilities necessary to provide your Internet Service. AT&T makes no representation and can't guarantee that the owner, landlord and/or building manager has or will provide the applicable rights and permissions necessary for you to receive Internet Service or any particular grade of Internet Service, and explicitly disclaims any such representation or guarantee. In the event of any interruption or loss of access, AT&T will endeavor to provide you with reasonable advanced notice of any suspension or termination of Internet Service. However the timing of any suspension or termination, as well as the timing of any resumption of AT&T Internet Services, are entirely at AT&T's reasonable discretion. In general, and unless otherwise specified, billing will continue for your monthly charges while your Service is suspended due to a loss of access.

### 6.5.2 Suspension and/or Termination due to Capacity Limitations:
Where a service is subject to Capacity Limitations, events may occur which are outside of AT&T's control which may restrict network capacity to the point where AT&T is unable to continue to provide a particular Internet service to certain locations where particular Capacity Limitations apply or which may result in a degradation of the capacity or speed of Internet service provided to certain locations (each a "Capacity Limitation Event"). AT&T will utilize available network management practices in order to mitigate against the occurrence of a Capacity Limitation Event and to continue to provide Internet service to any locations impacted by a Capacity Limitation Event. However, restrictions on AT&T's ability to apply network management practices may mean that a Capacity Limitation Event is unavailable. Upon the occurrence of a Capacity Limitation Event impacting your location, AT&T may, in its sole discretion, suspend or terminate all or any portion of your Internet Service or may continue to provide Internet service at a reduced capacity or a lower speed. In the event of any anticipated interruption, loss of access, or degradation of service due to a Capacity Limitation Event, AT&T will endeavor to provide you with reasonable advanced notice of any suspension, termination, or degradation of Internet service and may also offer alternative forms of Internet service where available. However, the timing of any suspension, termination, or degradation, as well as the timing of any resumption of AT&T Internet Services, are entirely at AT&T's reasonable discretion. In general, and unless otherwise specified, billing will be suspended for your monthly charges while your Service is suspended due to a Capacity Limitation Event.

### 6.5.3 Suspension and/or Termination as part of Technology Conversion:
When and/or if you are selected for conversion to a more updated Internet technology, we will evaluate whether the conversion can occur without noticeable interruptions during normal business hours. If we determine that interruptions are likely or unavoidable, we will provide at least thirty days' notice of the discontinuation or suspension of your Service via email, direct mail, bill page message, or bill insert. Thirty days after such notice, we may at our sole discretion, either disconnect your current service or temporarily suspend your service for up to fifteen days. Refusal to reasonably facilitate conversion, including by refusing to schedule an appointment to allow our technicians to complete necessary updates to AT&T Equipment and/or network facilities at your location, may result in the termination of your service.

### 6.5.4 Restoral Fee and Payment of Past Due Amounts:
If either you or AT&T suspends a Service for any reason set forth herein (other than due to AT&T's loss of access, a Capacity Limitation Event, or a conversion from older Internet Technology), you must make satisfactory arrangements to pay all past due amounts in order to have that Service restored. You will also be required to pay a Service Restoral Fee of no more than $50 per incident of suspension or termination of a particular Service (subject to applicable law and except as may otherwise have been expressly agreed in writing). Please see the applicable Fee Schedules at att.com/ConsumerInternetFees and/or att.com/BusinessInternetFees

to determine the Restoral Fee amount applicable to your particular Service(s). The Restoral Fee will be assessed on the next monthly bill you receive following the resumption of Service.

## 6.6 Payment

### 6.6.1 Method of Payment:

Your monthly charges may be billed via a monthly AT&T bill or to a credit card. Credit card billing is not available for AT&T High Speed Internet Direct. AT&T Internet customers will automatically receive an online bill unless you specifically notify us that you want to receive a paper bill by calling 800.288.2020.

### 6.6.2 Online Billing:

You must register online to establish a personal myAT&T account and provide a billing email address. You will then be able to view and pay your bill online by logging on to your personal myAT&T account (username and password required).

## 6.7 Equipment & Software

### 6.7.1 Customer Equipment:

Other than the equipment and/or software provided to you by AT&T for use with the Service (collectively, the "AT&T Equipment"), you must provide all equipment, devices, and software necessary to receive the Service. Any equipment or software that was not provided to you by AT&T, including batteries, is not the responsibility of AT&T, and AT&T will not provide support for, or be responsible for ongoing maintenance of such equipment.

Regardless of whether the equipment used to access your Service (modem, gateway, etc.) is owned by you or AT&T, AT&T reserves the right to manage such equipment for the duration of your Service, and retains exclusive rights to data generated by the equipment. Neither you nor a third party may change, interfere with, or block access to equipment, the data, or settings while you continue to receive the Service.

### 6.7.2 AT&T Equipment:

Any AT&T Equipment, including modems, routers, antennas, or gateways, will be either a new or a fully inspected and tested refurbished unit.

AT&T will repair or replace damaged AT&T Equipment as AT&T deems necessary and may charge you a fee for repair or replacement of the equipment. You understand that repair or replacement of equipment may delete stored content, reset personal settings, or otherwise alter the functionality of such equipment. You will be responsible for payment of service charges for visits by AT&T or its subcontractors to your premises when a service request results from causes not attributable to AT&T or its subcontractors, including, but not limited to, when you are unwilling to complete troubleshooting steps requested by AT&T. If you own the equipment or if the equipment is damaged due to your intentional acts or negligence as determined by AT&T, you will be responsible for the price of repair or replacement.

If the AT&T Equipment was damaged due to your intentional acts, negligence, or use inconsistent with this Agreement, as determined by AT&T, you will be responsible for the price of repair or replacement. Any tampering with the AT&T Equipment, including, for example, opening and attempting to modify the Equipment will be treated as damage due to your intentional acts or negligence. You agree that you will use the equipment only for its intended use and not for any other purpose (such as on another AT&T network, or on another provider's (non-AT&T) network). You agree to use appropriate and reasonable care in using all AT&T Equipment.

### 6.7.3 Access and Installation of Equipment:

You will provide AT&T and its subcontractors with reasonable access to your premises in order to install, maintain, repair, and/or update the Internet Service, and you authorize any other Adult resident or guest at your residence (each, an Authorized User for purposes of this Agreement) to grant access to your premises for these purposes. You understand and agree that AT&T may drill, cut, and otherwise alter improvements on the premises (including walls, flooring, and/or other surfaces) in order to install, maintain, repair, and/or update the Internet Service. If you do not own your premises or your unit is part of a MTU, you warrant that you have obtained permission from any necessary party, including but not limited to the owner, landlord, or building manager, to allow AT&T and its subcontractors reasonable access to install, maintain, repair, and/or update the Internet Service and to make any alterations AT&T deems appropriate for the work to be performed.

You acknowledge that AT&T may use existing wiring, including altering the wiring and removing accessories, located within your unit. You warrant that you own or control the Inside Wiring, and give AT&T permission to use, alter, and remove equipment from, such wiring. Without limiting any other provisions of this TOS, you agree to indemnify AT&T from and against all claims by an owner, landlord, building manager, or other party in connection with installation, maintenance, repair, or provision of the Services.

### 6.7.4 Power and Battery Backup:

The AT&T Equipment may require electrical power from your premises to operate, which you are responsible for providing. If there is a gateway at your premises, AT&T will not provide an initial gateway battery backup unit or an initial backup battery. Any backup battery solution is your responsibility. You may choose to purchase battery backup for your AT&T Equipment from third party manufacturers or retailers. For more information and minimum specifications visit att.com/batterybackup.

You also agree to be solely responsible for determining when backup batteries for any AT&T Equipment require replacement and for replacing and recycling used batteries. You agree to read and follow all manufacturer or vendor directions for the replacement and recycling of backup batteries. For more information and minimum specifications visit att.com/batterybackup.

**Note that AT&T Equipment without battery backup will not function in the event of a loss of customer-supplied power. This will disrupt your Internet Service as well as any additional services that use the AT&T Connection for transport (e.g. Voice over IP including e911) or require an internet connection to operate properly. AT&T will have no liability for loss of any service(s), whether provisioned by AT&T or a third party, in the event of**

**interruption of customer-supplied power, with or without battery backup present in the AT&T equipment.**

**6.7.5 Theft or Misuse:**
You agree to notify AT&T immediately, in writing or by calling the AT&T customer support line, if the AT&T Equipment is stolen or if you become aware at any time that Services are being stolen or fraudulently used. When you call or write, you must provide a detailed description of the circumstances of the theft, including documentation of theft or fraudulent use of the AT&T Equipment or Services (such as a copy of a police report). You will be responsible for all charges incurred until you report the theft or fraudulent use. You will also be responsible for stolen AT&T Equipment not owned by you, however, AT&T may in its sole discretion waive or reduce charges upon submission of documentation of theft or other circumstances. Failure to provide notice to AT&T of theft in a timely manner may result in the termination of your Services and additional charges to you. Unless notified otherwise by AT&T, after you report the theft or fraudulent use of the Services, you will remain responsible for paying your monthly fees for Services not stolen or fraudulently used.

**6.7.6 Return of AT&T Equipment:**
Except as otherwise provided, AT&T Equipment must be returned to AT&T undamaged, within twenty-one (21) calendar days after your Service is terminated for any reason. If Equipment is not returned within twenty-one (21) calendar days, or is returned damaged, you will be charged a Non-Return Equipment Fee. We may retain any advance payment or deposit, or portion thereof that previously had not been refunded, if you fail to return the AT&T Equipment within this time period. If all AT&T Equipment is returned within six (6) months of termination, any fees charged for such AT&T Equipment will be refunded (other than fees for damages). No refunds will be made for AT&T Equipment returned more than six (6) months after termination. This subsection also applies if your existing Equipment is replaced or upgraded for any reason.

## 6.8 Account Security

You will receive a password associated with your Member ID upon completing the Service registration process. You agree to keep confidential all passwords, IP addresses, and computer names and are solely responsible for any liability or damages resulting from your failure to maintain that confidentiality. You are also solely and fully responsible and liable for all activities that occur under your password, Member ID or IP address. You agree to change your password periodically, ensure that you exist from your Account at the end of each session, and immediately notify AT&T if you suspect any breach of security such as loss, theft, Public Use or unauthorized disclosure or use of your Account or any Sub Account, password, Member ID, or any credit or charge card number provided to AT&T by calling:

- 800.288.2020 for AT&T Internet and AT&T Fiber consumer subscribers and Fixed Wireless subscribers;

- 855.220.5211 for Access from AT&T in English (855.220.5225 for Access from AT&T in Spanish);

- 877.722.3755 for AT&T High Speed Internet subscribers, and AT&T High Speed Internet Direct (Business and Consumer); and

- 888.321.2375 for FastAccess DSL.

There is a risk that other users may attempt to access your computer through the Internet or connected networks. You acknowledge this risk as inherent to the shared nature of the Service and you agree to take full responsibility for taking adequate security precautions and safeguarding your data from loss.

In addition, you agree not to use any other user's account, Member ID, or password at any time without the express permission and consent of the holder of that account, Member ID, or password. You may not transfer or assign your Account and have no right to a particular Member ID, IP address, or other information or identifier we assign to you.

## 6.9 Restrictions on Use

**6.9.1 No Resale:**
The Service is provided for your use only (unless otherwise specifically stated) and you agree not to, whether for a fee or without charge, reproduce, duplicate, copy, sell, transfer, trade, resell, re-provision, redistribute, or rent the Service, your membership in the Service, any portion of the Service, use of the Service, or access to the Service, including, but not limited to, reselling capabilities enabled or used by a specific application (including, without limitation, Voice Over Internet Protocol (VOIP) via wired, wireless, or other means. For example, you agree that the Service is not to be used to trunk or facilitate public internet access ("hotspots") or any other public use of the Service, or for any high-volume purpose. All aspects of the Service, except that portion provided by third party providers, is copyrighted and property of AT&T.

**6.9.2 Network Management:**
AT&T reserves the right to engage in reasonable network management practices, to protect its broadband network from harm, compromised capacity, degradation in network performance or service levels, or uses of the Service which may adversely impact access to or the use of the Service by other customers. Reasonable network management practices that AT&T may adopt include, but are not limited to, the following: (i) a cap on data usage; (ii) a modification of a customer's serving facility or service technology; and/or (iii) a modification of or a limitation on a customer's data throughput speed or data consumption.

A very small percentage of customers use the Service in a way which creates harm to the network, compromised capacity, degradation in network performance or service levels, or which may adversely impact access to or the use of the Service by other customers. In the event that AT&T adopts a network management practice which will apply to your Service, we will provide you with a notice, by web posting, bill insert, email, letter and/or other appropriate means, which describes the network management practice, explains how it will work, and explains how it could impact your Service.

## 6.10 Data Management / Content

**6.10.1 Data Management:**
You are responsible for management of your information including but not limited to back-up and restoration of data, erasing data from disk space you control and changing data on or settings for your modem and/or router. AT&T is not responsible for the loss of your data or for the back-up or restoration of your data regardless

of whether this data is maintained on our servers or your computer server.

**6.10.2 Content:**
You, and not AT&T, are entirely responsible for all content that you upload, download, post, email, transmit or otherwise make available by use of the Service ("User Content").

AT&T does not claim ownership of User Content. However, with respect to User Content you submit or otherwise make available via your Internet Service, you grant AT&T a nonexclusive, unrestricted, irrevocable, worldwide, sublicenseable, transferable, perpetual, unlimited, assignable, fully paid up and royalty-free right to copy, display, edit, publish, prepare derivative works of, distribute, process, analyze, use and commercialize, in any media known or hereinafter developed, to such User Content.

AT&T may preserve User Content and may also disclose User Content if required to do so by law or in the good faith belief that such preservation or disclosure is reasonably necessary to: (a) comply with legal process; (b) enforce this Agreement; (c) respond to claims that any Content violates the rights of third parties; or, (d) protect the rights, property, or personal safety of AT&T, other end users, and the public.

## 6.11 Customer Service Support

AT&T provides free basic customer care for Service purchased from AT&T and covered under this Agreement. Although AT&T reserves certain rights related to equipment necessary to receive the Service and will repair or replace damaged equipment as AT&T deems necessary (in each case, as described in, and subject to the terms and conditions (including fees and other charges) set forth in, Section 6.7.2 above), AT&T does not provide support for devices that access the Service under this Agreement.

## 6.12 Contact Information

Unless otherwise specified in this Agreement, notices by Members to AT&T must be given by calling: for AT&T Dial subscribers (866.722.3425), for AT&T High Speed Internet subscribers (Business and Consumer) (877.722.3755), for AT&T Internet and AT&T Fiber subscribers (Consumer Only) (800.288.2020), for FastAccess DSL and BellSouth Dial Internet subscribers (Business and Consumer) (888.321.2375), for Fixed Wireless Internet (Business and Consumer) (800.288.2020), and for AT&T Internet for Business and AT&T Business Fiber (800.321.2000).

## 6.13 AT&T Wired Internet Service

**6.13.1 AT&T Wired Internet Service:**
"AT&T Wired Internet Service" refers to any internet service provided entirely through a terrestrial, wired Internet Protocol technology, whether copper based or optical fiber based, and generally encompasses those services marketed as "AT&T Internet," "AT&T Fiber," AT&T High Speed Internet (including Max and Max Plus), and U-verse Internet. AT&T Wired Internet Service does not include services which use Asynchronous Transfer Mode technology instead of Internet Protocol technology, such as AT&T DSL. The terms in this Section 6.13 apply to customers purchasing and/or receiving AT&T Wired Internet Services and supersede any conflicting terms contained in the rest of these Internet Access Service Terms with respect to your AT&T Wired Internet Services.

**6.13.2 Additional Equipment for AT&T Wired Internet Customers:**
AT&T will make available to you certain equipment, which may include one or more of the following:

- a Wi-Fi Gateway ("WG") located inside your premises;
- an Optical Network Terminal ("ONT") where AT&T's fiber network terminates, which may be located inside your premises, on the outside of your premises, in your garage, or in a central location in a MTU environment; and
- an Intelligent Network Interface Device ("iNID") (which provide your services if you do not have a gateway),

all of which are herein collectively referred to as "Internet Equipment," required for your Service. If you have not purchased Internet Equipment from AT&T or if previously purchased Internet Equipment is beyond the one-year (1-year) warranty period (from date of installation) and requires replacement, then you agree to pay a monthly equipment fee for the Internet Equipment, as part of your purchase of or continued use of the Service and/or other AT&T services. Equipment fees and purchase options depend on the AT&T Services and/or rate plans you order and the installation options you choose.

The WG is installed inside your premises and is required for the Service to function. A WG allows multiple devices to connect and communicate to the internet wirelessly. Smartphones, tablets and laptops are common devices that access the internet through a WG. A WG resides indoors and has a power cord that plugs into a common electrical outlet. A battery backup is recommended in case of a power outage. Some WGs have an external battery backup while others have an internal battery backup. AT&T will install the WG. Once the WG has been installed by AT&T, you may not move the WG to a different location or reposition at your address or any other address. Our latest WGs combine the WG and the ONT into a single device, but many older WGs still require a separate ONT to operate.

AT&T may also make available additional, optional internet related equipment for sale or lease in connection with your Service, such as various types of home networking equipment (ex: Wi-Fi Extenders). Unless otherwise expressly specified to the contrary, any amounts for the purchase or lease of this additional equipment will be separate from and in addition to amounts payable for your Service. Use of such additional equipment may be subject to additional terms and conditions as specified in connection therewith.

**6.13.3 Return of Equipment:**
If your Internet Service is provided by an iNID, you should not return the iNID home networking hub, (Model# j38HG) or the ONT. AT&T is the owner of the WG and any other AT&T Equipment. Upon termination of your Internet Service for any reason, AT&T shall remain the owner of the WG and any other AT&T Equipment. Unless we tell you otherwise in writing, you must return the WG and any other AT&T Equipment, undamaged, within 21 calendar days to AT&T. If the WG or any

other AT&T Equipment is not returned within 21 calendar days, or is returned damaged, you may be charged for the replacement value of the WG or other AT&T Internet Equipment and/or the applicable Equipment Non-return Fee. Return of any additional and/or optional equipment may be subject to different rules or requirements than the Internet Equipment which will be communicated to you at the time of purchase and/or return.

**6.13.4 Capacity Limitations/Grandfathering:**
Certain types of AT&T Wired Internet Services are subject to limits upon availability due to Capacity Limitations. Similarly, certain types of AT&T Wired Internet Services are subject to limits upon availability due to Grandfathering. Where this applies, if AT&T Wired Internet Services are suspended or terminated at your location for any reason, AT&T cannot guarantee that you will be able subsequently to renew or restore Internet Service at that location.

## 6.14 Wireless Home Internet Services

**6.14.1 Wireless Home Internet Services Description:**
Wireless Home Internet Services are designed to deliver internet access to a fixed location using wireless networks and include those services currently marketed by AT&T as AT&T Internet Air, AT&T Fixed Wireless Internet and AT&T Wireless Home Internet. Wireless Home Internet Services can be physically fixed to a location by means of externally mounted antennas or can be mobile services limited to operation in a certain location by network based restrictions. See the description, plan details and related terms for your particular Wireless Home Internet Service for more details.

To the extent that your Wireless Home Internet Service is delivered over some portion of the AT&T wireless network, your service will be subject to the AT&T's Wireless Service Terms in Section 2 in addition to the terms which apply to AT&T Internet Services more generally. To the extent that your Wireless Home Internet Service is served via an AT&T PREPAID wireless service plan, your service will be subject to the AT&T PREPAID Service Terms in Section 3 in addition to the terms which apply to AT&T Internet Services and/or AT&T Wireless Services more generally.

**6.14.1.1 Service Availability and Limitations:**
Wireless Home Internet Services will not be available in all areas at all times and availability may vary by specific service. Many factors can affect the availability and quality of Wireless Home Internet Services, including, but not limited to, Capacity Limitations and service limitations, such as network capacity, terrain, buildings, foliage, and weather. Unless otherwise specified, Wireless Home Internet Services are delivered via cell sites in AT&T's wireless network. Each cell site can support only a limited number of Wireless Home Internet Service subscribers. These Capacity Limitations may mean that a Wireless Home Internet Service may be identified as available to your location at the time of ordering but may not prove to be available at the time scheduled for installation. Wireless Home Internet Services may also be subject to limits upon availability due to Grandfathering. Where Capacity Limitations or Grandfathering apply, if a Wireless Home Internet service is suspended or terminated at your location for any reason, AT&T cannot guarantee that you will be able subsequently to renew or restore the same or any Wireless Home Internet service at that location.

Unless otherwise specified, Wireless Home Internet Services are not generally compatible with analog services, including, but not limited to, wireless messaging services, alarm and security systems, fax machines, medical alert and monitoring services, credit card machines, IP/PBX Phone systems, or Dial Up Internet. Wireless Home Internet Services may not be compatible with DVR/Satellite systems; check with your provider. Public IP addresses are generally not used or available through Wireless Home Internet Services. Services like Web hosting, or hosted services, such as cameras, gaming systems, peer-to-peer file sharing, etc., that require a public IP address may not be supported.

**6.14.1.2 Prohibited Network Uses:**
As explained in subsection 2.5, AT&T may take any and all reasonable actions necessary to restrict any Prohibited Network Uses or any other violation of AT&T's Acceptable Use Policy, up to and including termination of service.

**6.14.1.3 AT&T's Network Management:**
With respect to your Wireless Home Internet Services, you agree that AT&T has the right to do the following:

- AT&T may modify, without advance notice, the permitted and prohibited activities by this Agreement;

- AT&T may engage in any reasonable network management practice to enhance customer service, to reduce network congestion, to adapt to advances and changes in technology, and/or to respond to the availability of wireless bandwidth and spectrum, including by taking any actions authorized by subsections 2.7 and 6.9;

- AT&T will provide you with advance notice of the usage threshold applicable to your data plan, or any changes to the applicable usage threshold either by a bill insert, email, text message or other appropriate means; and

- AT&T may use reasonable methods to monitor and collect customer usage information to better optimize the operation of the network. Details concerning the information that AT&T collects about its customers, and how it uses and protects that information are addressed in the AT&T Privacy Policy (see att.com/privacy).

**6.14.2 Fixed Wireless Internet Service**

**6.14.2.1 Fixed Wireless Internet Service or Fixed Wireless Internet:**
"Fixed Wireless Internet Service" or "Fixed Wireless Internet" refers to a wireless high-speed internet access service that offers you a capability for acquiring or retrieving information from; generating, storing, transforming, processing, or utilizing information on; or making available information to other internet end points connected directly or indirectly via a fixed wireless connection to the AT&T network.

The terms in this Section 6.14 apply to customers purchasing and/or receiving Fixed Wireless Internet Service and supersede any conflicting terms contained in the rest of these AT&T Internet Service Terms with respect to your Fixed Wireless Internet Service.

**6.14.2.2 Speed:**

As set forth on the Speed Tier Page, Fixed Wireless Internet customers should expect to see service capability speeds of 10Mbps or over downstream and 1Mbps upstream. However, due to the variability of wireless networks caused by environmental factors which are beyond AT&T's control, AT&T does not guarantee you any particular speed.

**6.14.2.3 IP Addresses:**
Static IP addresses are not used or available as part of the Fixed Wireless Internet Service. Services such as Web hosting, or hosted services such as camera, gaming server, etc. that require static IP address are not supported by Fixed Wireless Internet. See Section 7.14.8 for more information on service limitations.

**6.14.2.4 Service Requirements:**
To qualify for Fixed Wireless Internet Service, you must reside in an area where we provide Fixed Wireless Internet service. Fixed Wireless Internet requires an outdoor antenna that is professionally mounted on or near the exterior of your service location. Unless otherwise noted in the terms governing your plan, an eligible Fixed Wireless Internet plan is required.

Customers obtaining internet services under the Connect America Fund (CAF) program may be randomly subjected to performance testing to comply with FCC CAFII certification requirements. Performance testing will be conducted for a duration of four weeks and should have minimal impact on customer's internet access experience. This testing will conducted by AT&T and should not require any customer intervention.

**6.14.2.5 Changing Service Location:**
You may not use the Fixed Wireless Internet Service at any address other than your Service address or move any of the AT&T Equipment to another address while you remain an AT&T Fixed Wireless customer. If you are moving to a new residence at which Fixed Wireless Internet Service is available, and you wish to continue using the Service, you may request that AT&T install the Service and the AT&T Equipment at, and change your Service address to, your new residence, although we may require a contract extension for any such installation and change. If Fixed Wireless Internet Service is not available at your new residence or if we cannot perform installation at such residence for any reason, and if you also have a Term Plan, you will be charged any applicable ETF. If you change your service location but fail to call us at 800.288.2020 to give us prior notice, your Service will not be cancelled, and your Service charges will continue to apply.

**6.14.2.6 Fixed Wireless Equipment:**
Depending on your Service address, your Fixed Wireless Internet Service will include some or all of the following AT&T Equipment:

- **(1) Outdoor Antenna:** The Outdoor Antenna provides an interface to AT&T's network. The Outdoor Antenna and the APS (described below) require electrical power from your service location to operate, which you are responsible for providing. AT&T will install your Outdoor Antenna. Once the Outdoor Antenna has been installed by AT&T, you may not move the Outdoor Antenna to a different location or reposition at your address or any other address while you continue to receive the Service.

- **(2) Antenna Power Supply ("APS"):** The APS provides power supply and data connectivity for the Outdoor Antenna; your unit has integrated lightning surge protection and two LED Indicators: Power and Outdoor Antenna connectivity. AT&T will install your APS. Once the APS has been installed by AT&T, you may not move the APS to a different location or reposition at your address or any other address while you continue to receive the Service.

- **(3) Wi-Fi Gateway ("WG"):** The WG is installed inside your premises and is required for the Service to function. A WG allows multiple devices to connect and communicate to the internet wirelessly. Smartphones, tablets and laptops are common devices that access the internet through a WG. A WG resides indoors and has a power cord that plugs into a common electrical outlet. A battery backup is recommended in case of a power outage. Some WGs have an external battery backup while others have an internal battery backup. AT&T will install the WG. Once the WG has been installed by AT&T, you may not move the WG to a different location or reposition at your address or any other address.

You agree that, while you continue to receive the Service, neither you nor a third party will move the AT&T Equipment within your premises or to any other physical location outside of the premises where it was installed by AT&T. AT&T Fixed Wireless Internet Service is not designed to be nomadic and may not function properly if the AT&T Equipment is moved or altered by a non-AT&T employee. If you require the AT&T Equipment to be moved while you continue to receive the Service, you must contact AT&T. Failure to do so may result in a failure of the Service and/or in AT&T's termination of your Service.

**6.14.2.7 Responsibility for and Return of AT&T Equipment:**
Upon termination of your Service for any reason, AT&T shall remain the owner of the WG, and you must return the WG, undamaged, within 21 calendar days to AT&T. If the WG is not returned within 21 calendar days, or is returned damaged, you will be charged for the replacement value of the WG.

Although the Outdoor Antenna and APS will constitute AT&T Equipment during the term of any Fixed Wireless Internet Service, you will be considered the owner of the Outdoor Antenna and APS for all other purposes and you will not need to return the Outdoor Antenna and APS to AT&T upon termination of your Fixed Wireless Internet Service. Upon termination of your Service for any reason, the Outdoor Antenna and APS will remain where installed at your location and you will be solely responsible for any and all future service, care, maintenance and removal of the Outdoor Antenna and APS. Service, care, maintenance and removal of the Outdoor Antenna and APS should be performed only by an experienced professional; you should not attempt to perform such activities yourself. AT&T shall have no ongoing duty, obligation, or responsibility to perform any service, care, or maintenance on the Outdoor Antenna and/or APS or to uninstall or remove the Outdoor Antenna and/or APS after termination of the Service. AT&T shall have no liability to you or any other person or entity related to or arising out of the Outdoor Antenna and/or APS. You agree to indemnify and hold AT&T and its subsidiaries, affiliates, officers, agents, licensors, employees, sub-contractors, and partners harmless from any claim or demand, made after termination of Service, arising out of or related to the Outdoor Antenna and/or APS, including, but not limited to, claims for personal injury, property damage, wear and tear, or equipment degradation.

**6.14.2.8 Service Availability and Limitations:**
In addition to the standard service availability and limitations faced by all Wireless Home Internet Services, Fixed Wireless Internet Service is subject to the following additional service limitations and/or Capacity Limitations:

- use of capacity due to high number of users simultaneously using data intensive applications;

- damage to the Outdoor Antenna or cables;

- rotation of Outdoor Antenna from the optimum bearing;

- blockage of the signal between premise antenna and the cell tower (caused by artificial objects – building, barn, etc.); and

- improper installation or tampering with Outdoor Antenna.

**6.14.3 AT&T Wireless Home Internet Service:**

AT&T Wireless Home Internet service uses mobile wireless gateway equipment called an AT&T Wireless Home Internet device ("WI Device") to provide Internet access via the AT&T wireless networks. With AT&T Wireless Home Internet service, the WI Device allows you to connect internet-capable devices via an included Ethernet port and via a Home Wi-Fi network generated from the WI Device. All devices connected to the WI Device will share the same connection to the wireless network.

AT&T Wireless Home Internet service requires that you subscribe to an eligible wireless rate plan, which may include an AT&T PREPAID rate plan. See Section 2 for more information about how AT&T Wireless Service and wireless rate plans work. See Section 3 for more information about how AT&T PREPAID service and rate plans work.

**AT&T Wireless Home Internet Service does not support voice calling. However, a landline phone plugged into the available RJ11 jack on the back of the WI Device may be able to make Emergency 911 calls. 911 calls made via the AT&T Wireless Home Internet Service would be routed based on the wireless network's automatic location technology. You will need to provide your location address to the emergency response center responsible for sending first responders (e.g., police, medical assistance, or fire) to your location. The WI Device has battery backup power and, if charged, will work in the event of a power outage. However, a landline phone connected to the WI Device would require external electric power to operate (e.g., a cordless phone) in the event of a power outage.**

**6.14.4 AT&T Internet Air**

**6.14.4.1 "AT&T Internet Air" or "AT&T Internet Air Service"** refers to a wireless high-speed internet access service that offers you a capability for acquiring or retrieving information from; generating, storing, transforming, processing, or utilizing information on; or making available information to other internet end points connected directly or indirectly via a fixed wireless connection to the AT&T network.

**6.14.4.2 Speed / Network Management:** The speed of AT&T Internet Air service is very dependent upon the connection the Wi-Fi Gateway can achieve with the AT&T Mobile network. Availability of 5G connectivity may depend upon your location and/or the position of the AT&T Equipment within your location. Unless otherwise specified in your plan terms or order confirmation, AT&T makes absolutely no commitment with respect to the speeds AT&T Internet Air will be able to achieve in a particular location. To maximize performance, every effort should be made to position the AT&T Equipment in the optimal position for your location. See att.com/broadbandinfo for information on the performance characteristics of different generations of the AT&T Mobile network and for network management practices applicable to AT&T Internet Air specifically and the AT&T Mobile network generally.

**6.14.4.3 IP Addresses:** Static IP addresses are not a standard part of the AT&T Internet Air Service. Services such as Web hosting, or hosted services such as camera, gaming server, etc. that require static IP address may not be supported by AT&T Internet Air. See Section 6.14.4.8 for more information on service limitations.

**6.14.4.4 Service Requirements:** To qualify for AT&T Internet Air Service, you must reside in an area eligible for AT&T Internet Air service at the time you seek to purchase Service. Service areas for AT&T Internet Air are determined by coverage and capacity availability on the local mobile network; because network capacity fluctuates, service areas for AT&T Internet Air are subject change over time. If your AT&T Internet Air service is cancelled or terminated, you may not qualify to reactivate the Service if your location is deemed no longer eligible. AT&T Internet Air requires a wireless enabled Wi-Fi Gateway with an activated AT&T SIM card to facilitate the wireless connection to the AT&T Mobile network.

**6.14.4.5 Changing Service Location:** You may not use the AT&T Internet Air Service at any address other than your designated Service address or move any of the AT&T Equipment to another address while you remain an AT&T Internet Air customer. If you are moving to a new residence, you must cancel your AT&T Internet Air service and return the AT&T Equipment. If you move the AT&T Equipment to a location outside your designated Service address but fail to call us at 800.288.2020 to cancel your AT&T Internet Air service your Service will not automatically be cancelled and your Service charges will continue to apply. Additionally, if you move the AT&T Equipment to a location outside your designated Service address without the express written consent of AT&T:

- the service may not operate as intended; and

- we have the right, in our sole discretion, to terminate your AT&T Internet Air service without notice.

You will remain responsible for any Service charges until your Service is cancelled or terminated. You will also remain responsible for returning the AT&T Equipment.

**6.14.4.6 AT&T Internet Air Equipment:** Your AT&T Internet Air Service will include the following AT&T Equipment:

**(1) Wi-Fi Gateway ("WG"):** The WG is designed to be installed inside your premises and is required for the Service to function. A WG allows multiple devices to connect and communicate to the internet wirelessly. Smartphones, tablets, and laptops are common devices that access the internet through a WG. A WG is designed exclusively for use indoors and has a power cord that plugs into a common electrical outlet. A battery backup is recommended in case of a power outage. Some WGs may have an external battery backup while others may have an internal battery backup.

The AT&T Equipment should be installed and activated by following the set-up guide and associated tools (including the Smart Home Manager app) provided for that purpose. In order to achieve the best possible signal strength, it may be necessary to install the AT&T Equipment near a window facing the direction of the nearest wireless tower. Not following the set-up guide or electing to install the AT&T Equipment in a location that is not recommended by the set-up guide and/or the

associated tools may result in degradation of Service quality, in terms of speed, bandwidth, latency and/or reliability. Similarly, once the AT&T Equipment has been installed and activated, relocating the WG within your address may result in interruption or degradation of your Service. AT&T is not responsible for any interruption or degradation of Service as a result of the AT&T Equipment being installed in a less than optimal location.

You agree that, while you continue to receive the Service, neither you nor a third party will move the AT&T Equipment to any other physical location outside of your registered service location. AT&T Internet Air Service is not designed to be nomadic and may not function properly if the AT&T Equipment is moved to a location outside of your registered service location. If you require the AT&T Equipment to be moved while you continue to receive the Service, you must contact AT&T. Failure to do so may result in a failure of the Service and/or in AT&T's termination of your Service. You will remain responsible for any Service charges until your Service has been cancelled or terminated.

**6.14.4.7 Responsibility for and Return of AT&T Equipment:** Upon termination of your Service for any reason, AT&T shall remain the owner of the WG, and you must return the WG, undamaged, within 21 calendar days of termination. If the WG is not returned within 21 calendar days, or is returned damaged, you will be charged an equipment non-return fee. (See the Internet Fee Schedule for details.)

**6.14.4.8 Service Availability and Limitations:** In addition to the standard service availability and limitations faced by all Wireless Home Internet Services, AT&T Internet Air Service is subject to the following additional service limitations and/or Capacity Limitations:

- Local congestion caused by the use of network capacity by high numbers of users simultaneously using data intensive applications in the vicinity of the cell tower serving the Service address;

- blockage of the signal between the Service address and the cell tower (caused by artificial objects – building, barn, etc.);

In order to ensure the best quality of service for all customers using the mobility network, during times of heavy network congestion AT&T may:

- temporarily prioritize services that may be most severely impacted by congestion; and/or

- temporarily de-prioritize and/or throttle services deemed likely to contribute to heavy congestion.

## 6.15 DSL Internet Service

**6.15.1 DSL Service:**
"DSL Service" or "DSL Internet Service" refers to any Internet Service provided through traditional Digital Subscriber Line technology, which may include Services sold under the names AT&T High Speed Internet (including Lite, Ultra, Xtreme, XtremePro, Basic, Express, Pro, and Elite), AT&T High Speed Internet Direct (including Lite, Ultra, Xtreme, XtremePro, Basic, Express, Pro, and Elite), and FastAccess DSL (including Lite, Ultra, Xtreme, and XtremePro). (Note: Internet Services sold under the name AT&T High Speed Internet included both DSL Services and AT&T Wired Internet Services. If you are unsure which applies to your Internet Service, please contact us for more information.)

The terms in this Section 6.15 apply to customers purchasing and/or receiving DSL Internet Service and supersede any conflicting terms contained in the rest of these Internet Service Terms with respect to your DSL Internet Service.

**6.15.2 Termination of Local Wireline Voice Service:**
If you change or terminate your AT&T local wireline voice service, we may in our discretion either terminate your DSL Service or continue to provide it at the then-current rates, terms, and conditions. You agree to pay any new or higher monthly fees that may apply to your new DSL Service after termination of the wireline voice service. If AT&T elects to terminate your DSL Service, we reserve the right to charge any applicable early termination fees.

**6.15.3 Capacity Limitations/Grandfathering:**
DSL Internet Services are particularly subject to limits upon availability due to Capacity Limitations. Similarly, certain types of AT&T Internet Services are subject to limits upon availability due to Grandfathering. If DSL Internet Services are suspended or terminated at your locations for any reason, AT&T cannot guarantee that you will be able to subsequently renew or restore DSL Internet Service at that location.

**6.15.4 Conversion from DSL Service to AT&T Wired Internet Service:**
When AT&T is able to provision AT&T Wired Internet Service at your location, we may, in our discretion, discontinue your DSL Service and make available to you AT&T Wired Internet Service at the then applicable rates, terms, and conditions, which may differ from your previous DSL Service rates, terms, and conditions (including Bundle Discounts). See Section 7.2 for additional terms governing conversion of your Internet Service. In the event that you elect to receive AT&T Wired Internet Service, your new Internet Service may require different AT&T Equipment. When you are selected for conversion, we will provide at least thirty days' notice of the discontinuation or suspension of your Service via email, direct mail, bill page message, or bill insert. Thirty days after such notice, we may at our sole discretion, either disconnect your service or temporarily suspend your service for up to fifteen days.

**6.15.5 Billing:**
Credit card billing may not be available for AT&T High Speed Internet Direct.

## 6.16 Dial Up Internet

As of December 2020. AT&T has discontinued the provision of Dial Up Internet service.

## 6.17 Access from AT&T

**6.17.1 Access from AT&T**
"Access from AT&T" refers to AT&T's program designed to make low cost wireline home internet service exclusively available to Qualifying Households using certain

Qualifying Home Internet Services (as those terms are defined below). The terms in this Section 6.17 apply to customers participating in the Access from AT&T program and supersede any conflicting terms contained in the rest of these Internet Service Terms with respect to your participation in the Access from AT&T program.

**6.17.2 Qualifying Households:**
Access from AT&T is available only to Qualifying Households. A Qualifying Household refers to any individual or household with:

- at least one resident who participates in a "Qualifying Program," as that term is defined below;

- with an address in AT&T's 21-state wired home internet service area, at which AT&T offers "Qualifying Home Internet Service," as that term is defined below; and

- no outstanding debt for AT&T Internet Service of any kind within the last six (6) months and no outstanding debt incurred under the Access from AT&T program.

AT&T reserves the right, in its sole and absolute discretion, to make changes to the required qualifications for participation in the Access from AT&T program. Changes to program qualification requirements will not impact existing program participants unless we send you specific prior to any change taking effect with respect to your Account.

**6.17.3 Limited Availability:**
Access from AT&T is only available to Qualifying Households. If your residence is not a Qualifying Household, you are not eligible for Access from AT&T.

**6.17.4 Qualifying Programs:**
Participation in the Access from AT&T program is open to participants in the following "Qualifying Programs":

- the Federal Communication Commission's Affordable Connectivity Program (ACP)

- the U.S. Supplemental Nutrition Assistance Program (SNAP); and

- the Supplemental Security Income (SSI) program in the State of California (California residents only).

- the National School Lunch Program.

AT&T may, in its sole discretion. expand the scope of "Qualifying Programs" for the Access from AT&T program. Access from AT&T is also available to households with income below 200% of federal poverty guidelines.

Visit att.com/internet/access/ for more details on additional Qualifying Programs, if any, and for more details about qualifying based on income.

**6.17.5 Qualifying Home Internet Services:**
Depending upon the facilities at a particular location within AT&T's 21-state wired home internet service area, Access from AT&T can be provided via either DSL Service or AT&T Wired Internet Service. Either DSL Service or AT&T Wired Internet Service will be "Qualifying Home Internet Service" to the extent that it is available for purchase at a particular address. (To check for service availability, visit att.com/shop/internet/access/index.html.) Qualifying Households will be provisioned, at AT&T's sole discretion, with the highest Qualifying Speed Tier available based on the facilities at the applicable residence. If Qualifying Home Internet Service is not available for purchase at your address, you will not be able to participate in the Access from AT&T program.

**6.17.6 Qualifying Speed Tier:**
"Qualifying Speed Tiers" and prices for the Access from AT&T program are subject to change. **Customers should call 855.220.5211 or visit att.com/shop /internet/access/ for current Qualifying Speed Tiers and associated prices.**

Service availability and speed may vary by address. Unless otherwise specified on your CSS, AT&T will assign you the fastest speed tier available where you live, up to 10 Mbps download speed, which shall be at AT&T's sole discretion.

**6.17.7 Qualifying Home Internet Service Terms:**
Other terms applicable to your Access for AT&T program will depend on the Qualifying Home Internet Service you receive. In general, you will be subject to all the terms applicable to the Service Type into which your Qualifying Home Internet Service falls. However, you will not be required to:

- make any annual or monthly term commitments;

- provide a deposit in order to initiate installation or activation of the Qualifying Home Internet Service; or

- pay an installation fee associated with the installation of the Qualifying Home Internet Service.

**6.17.8 Equipment for Access from AT&T Customers:**
AT&T will make available to you certain equipment for use in connection with your Access from AT&T Service, depending on the Qualifying Home Internet Service you receive. For more information about Equipment, see the relevant terms above for the Qualifying Home Internet Service.


# 7.0
# Business Internet Service

The following additional terms apply to customers purchasing and/or receiving Business Internet Services, including AT&T Business Fiber, AT&T Internet for Business, AT&T High Speed Internet Business Edition, AT&T High Speed Internet Business Edition Direct, FastAccess Business DSL, FastAccess Business DSL Direct, and AT&T Internet for Business On Demand. In the event of a conflict between these terms and terms elsewhere in Sections 1 or 6 of this Agreement, the

following terms will apply solely with respect to Business Internet Services.

### 7.1 Inside Wire

In addition to the terms above in Section 6.2.4 (including the disclaimer of warranties), for AT&T Internet for Business (fiber-based only), any determination of whether IW work will be provided by you or AT&T will be made at the time the installation technician is dispatched and surveys the job.

### 7.2 Service Guides

If you are an AT&T FastAccess Business DSL or an AT&T High Speed Internet Business Edition customer, you are also subject to the terms set forth in the service guides for these services, which are incorporated herein by reference and may be found at:

- https://serviceguidenew.att.com/sg_flashPlayerPage/FADSL (Fast Access® Business DSL)
- https://serviceguidenew.att.com/sg_flashPlayerPage/HSI (AT&T High Speed Internet Business Edition)

### 7.3 Reimbursement for Time, Materials and Expenses

If, before the service commencement date, either you cancel an order for or terminates any Business Internet Service or service component (other than as permitted for default by AT&T) or AT&T cancels an order for or terminates any such Service or service component for cause, you will reimburse AT&T for time, materials, and expenses incurred before the effective date of such cancellation or termination, plus any third-party charges resulting from the cancellation or termination.

### 7.4 Arbitration Agreement

If you are a Business Internet Service customer, all disputes between us will be resolved through binding arbitration as prescribed by Section 1.3, except that (1) the AAA will apply its Commercial Arbitration Rules, as modified by this section and Section 1.3, unless the claims are valued at $25,000 or less; (2) AT&T will pay all AAA fees listed in Section 1.3.2.4 for arbitrations you initiate after fully complying with Section 1.3.2.2 only if your claims are valued at $25,000 or less; (3) you are eligible for the Alternative Payment and Attorney Premium in arbitrations you initiate after fully complying with Section 1.3.2.2 only if your claims are valued at $25,000 or less; and (4) the arbitrator will issue a reasoned decision only if you or AT&T requests it.

# EXHIBIT 3

# WIRELESS CUSTOMER AGREEMENT ("Agreement")

Print

"AT&T" or "we", "us," or "our" refers to AT&T Mobility LLC, acting on behalf of its affiliates doing business as AT&T or other brands owned by AT&T. "You" or "your" refers to the person or entity that is the customer of record.

**PLEASE READ THIS AGREEMENT CAREFULLY TO ENSURE THAT YOU UNDERSTAND EACH PROVISION, INCLUDING OUR USE OF YOUR LOCATION INFORMATION (SEE SECTION 3.6). THIS AGREEMENT REQUIRES THE USE OF ARBITRATION ON AN INDIVIDUAL BASIS TO RESOLVE DISPUTES, RATHER THAN JURY TRIALS OR CLASS ACTIONS, AND ALSO LIMITS THE REMEDIES AVAILABLE TO YOU IN THE EVENT OF A DISPUTE.**

This Agreement, including the AT&T Privacy Policy Located at att.com/privacy, Customer Service Summary, and terms of service for wireless products, features, applications, and services (including content and other AT&T services included with your wireless service) ("Services") not otherwise described herein that are posted on applicable AT&T websites or devices, and any documents expressly referred to herein or therein, make up the complete agreement between you and AT&T and supersede any and all prior agreements and understandings relating to the subject matter of this Agreement.

AT&T's wireless network may provide broadband access to the Internet. For more information about how AT&T helps transmit information to points on the Internet and how we manage our network, please see the Broadband Information page which can be found at: www.att.com/broadbandinfo.

## 1.0 TERM COMMITMENT, CHARGES, BILLING AND PAYMENT

### 1.1 What Is The Term Of My Service? How Can I Fulfill My Service Commitment? What are My Rights to Cancel Service and Terminate My Agreement?

AT&T wireless Service(s) may be used with: (a) a mobile device that contains a SIM that is assigned to your account ("Device") and/or, (b) a device that is designed and purchased for use exclusively on AT&T's network ("Equipment").

**Term of Service.** Your Agreement begins on the day we activate your Service(s) and continues through the Term of Service, typically a 12 month or 24 month period ("Service Commitment"), specified on your Customer Service Summary. At the end of your service commitment, this Agreement will automatically continue on a month-to-month basis. If your Agreement has no Service Commitment, it is a month-to-month Agreement.

**Device Activation.** If you purchased a device that was shipped to You, You agree to activate the device within seven (7) days of the shipment date. If Your device is not activated by You, we may activate the device for You within a month of shipping and Your monthly recurring charges, and any applicable Service Commitment, will begin.

**Fulfillment of Service Commitment.** You have received certain benefits from us in exchange for your Service Commitment, which may include, but are not limited to, a subsidized wireless device. There are two alternative ways to fulfill your Service Commitment. You can pay for the Services described in your Customer Service Summary for the term of your Service Commitment, or you can terminate your Agreement prior to the end of your Service Commitment and pay an Early Termination Fee ("ETF"). The Early Termination Fee is not a penalty, but rather is an alternative means for you to perform your obligations under the Agreement that partially compensates us for the fact that the Service Commitment on which your rate plan is based was not completed.

**Your Termination Rights.** Within the first 14 days after service activation, you may terminate your Agreement for any reason and not be required to pay an ETF. If you terminate within three (3) days of accepting the Agreement, AT&T will refund your activation fee, if any. However, you agree to pay AT&T for all fees, charges, and other amounts incurred and owed under your Agreement, and you agree to return to AT&T any Equipment you purchased from AT&T in connection with your Service Commitment. If you fail to return this Equipment, you will be charged the difference between the amount you paid AT&T for the Equipment and the amount you would have been charged for the Equipment had you not agreed to a Service Commitment. AT&T also may charge you a restocking fee for any returned Equipment. Some dealers may impose additional fees.

After the first 14 days, you may terminate your Agreement for any reason. However, you agree to pay AT&T for all fees, charges, and other amounts incurred and owed under your Agreement along with the applicable ETF. The Early Termination Fee is either: (a) $325 or (b) $150. The ETF reduces each full month of your Service Commitment that you complete. To determine whether your Equipment has a $325 Early Termination Fee or a $150 Early Termination Fee, and the amount of reduction, check att.com/equipmentETF.

After your Service Commitment ends and you are on a month-to-month Agreement, you may terminate your Agreement at any time with 30 days notice without incurring an ETF. If you sign a new Agreement before the end of the term of your existing Agreement and terminate that new Agreement within 14 days as allowed above, you agree that you will be bound by the terms and conditions of your existing Agreement including fulfillment of any remaining Service Commitment thereunder.

### 1.2 What are AT&T's Rights to Cancel My Service(s) and Terminate My Agreement?

AT&T may interrupt, suspend or cancel your Services and terminate your Agreement without advance notice for any reason including, but not limited to, the following:

- Any conduct that we believe violates this Agreement or AT&T's Acceptable Use Policy;
- Any conduct that involves the use of abusive, derogatory, insulting, threatening, vulgar or similarly unreasonable language or behavior directed at any of our employees or representatives whether it be in person, over the phone, or in writing;
- Any abusive use of our network or Services;
- You use your Device/Equipment and/or our Services for an unlawful or fraudulent purpose;
- You use your Device/Equipment and/or our Services in any way that: (a) is harmful to, interferes with, or negatively affects our network, other customers, or the network of any other provider, (b) is harmful to, interferes with, or negatively affects our Services or operations, (c) infringes intellectual property rights of AT&T or others, (d) results in the publication of threatening, offensive or illegal material, or (e) generates spam or other abusive messaging or calling, a security risk, or a violation of privacy;
- You resell our Services either alone or as part of any other good or service;
- You fail to make all required payments when due;
- Your credit has deteriorated and/or we believe that there is a risk of non-payment;

- We discover that you are underage;
- You provide inaccurate or misleading credit information; or
- You modify your device from its manufacturer's specifications.

AT&T's rights under this Section 1.2 are in addition to any specific rights that we reserve in other provisions of this Agreement to interrupt, suspend, modify, or cancel your Services and terminate your Agreement.

After your Service Commitment ends and you are on a month-to-month Agreement, AT&T may terminate your Agreement at any time with 30 days notice.

### 1.3 Can AT&T Change My Terms And Rates?

From time to time we might make changes to this Agreement. This could include charges, discounts, coverage, technologies, and other Service terms. We commit that we'll provide you with notice either in your monthly bill or separately at least 30 days before we make any materially adverse change. So, for instance, if we increase your rate plan or the price of any of your Services more than what we've previously told you (such as in your Customer Service Summary) those would be materially adverse changes. But, not all changes are materially adverse. For example, here is a list of some changes that are not materially adverse: (1) increases to international roaming rates; (2) increases to charges for international long distance rates; (3) increases to AT&T fees and taxes imposed by the government and passed on to you; and (4) changes to surcharges and regulatory cost recovery charges that do not exceed the limits set forth in your Agreement. We also want you to know that, if we make a materially adverse change during your Service Commitment (if any), you can cancel impacted Service without paying an early termination fee. **But, you do need to notify us of your desire to cancel Service at the following address within 30 days of receiving the notice: AT&T, PO Box 10330, Fort Wayne, IN 46851.**

### 1.4 How Will I Receive My Bill? What Charges Am I Responsible For? How Much Time Do I Have To Dispute My Bill?

You will receive an electronic (paperless) bill at AT&T's online account management site unless you tell us you want a paper bill. You will be given the option to choose electronic billing or paper billing when you purchase service. Each month we will send you an email notice when your electronic bill is available online. This will be sent to your official email address on file with AT&T. You are required to keep your email address current and to notify us immediately of any change in your email address. You always have the option of switching back to a paper bill by changing your billing preferences at AT&T's online account management site. You will not receive a paper bill in the mail unless you expressly request one.

You are responsible for paying all charges for or resulting from Services provided under this Agreement, including any activation fee that may apply to each voice or data line. You will receive monthly bills that are due in full.

IF YOU DISPUTE ANY CHARGES ON YOUR BILL, YOU MUST NOTIFY US IN WRITING AT AT&T BILL DISPUTE, 1025 LENOX PARK, ATLANTA, GA 30319 WITHIN 100 DAYS OF THE DATE OF THE BILL OR YOU'LL HAVE WAIVED YOUR RIGHT TO DISPUTE THE BILL AND TO PARTICIPATE IN ANY LEGAL ACTION RAISING SUCH DISPUTE.

Charges include, without limitation, airtime, roaming, recurring monthly service, activation, administrative, and late payment charges; regulatory cost recovery and other surcharges; optional feature charges; toll, collect call and directory assistance charges; restoral and reactivation charges; any other charges or calls billed to your phone number; and applicable taxes and governmental fees, whether assessed directly upon you or upon AT&T.

To determine your primary place of use ("PPU") and which jurisdiction's taxes and assessments to collect, you're required to provide us with your residential or business street address. If you don't provide us with such address, or if it falls outside our licensed Services area, we may reasonably designate a PPU within the licensed Services area for you. You must live and have a mailing address within AT&T's owned network coverage area.

**Auto Bill Pay:** If you enroll your account for automatic bill payments ("Auto Bill Pay"), you authorized AT&T to charge your debit/credit card or bank account automatically to pay your monthly statements, as well as any unpaid balances and fees if your AT&T service is disconnected. To cancel your authorization for Auto Bill Pay, you must call 1-800-288-2020. You should also contact your card issuer or financial institution to advise that you have cancelled your enrollment. You will lose any promotional credits associated with your account if you opt out from Auto Bill Pay.

### 1.5 How Does AT&T Calculate My Bill?

Usage and monthly fees will be billed as specified in your customer service summary or rate plan information online. If the Equipment you order is shipped to you, your Services may be activated before you take delivery of the Equipment so that you can use it promptly upon receipt. Thus, you may be charged for Services while your Equipment is still in transit. If, upon receiving your first bill, you have been charged for Services while your Equipment was in transit, you may contact Customer Care 1-800-331-0500 to request a credit. Except as provided below, monthly Services and certain other charges are billed one month in advance, and there is no proration of such charges if Service is terminated on other than the last day of your billing cycle. Monthly Service and certain other charges are billed in arrears if you're a former customer of AT&T Wireless and maintain uninterrupted Service on select AT&T rate plans, however, if you elect to receive your bills for your Services combined with your wireline phone bill (where available) you will be billed in advance as provided above. You agree to pay for all services used with your Device.

AIRTIME AND OTHER MEASURED USAGE ("CHARGEABLE TIME") IS BILLED IN FULL-MINUTE INCREMENTS, AND ACTUAL AIRTIME AND USAGE ARE ROUNDED UP TO THE NEXT FULL-MINUTE INCREMENT AT THE END OF EACH CALL FOR BILLING PURPOSES. AT&T CHARGES A FULL MINUTE OF AIRTIME USAGE FOR EVERY FRACTION OF THE LAST MINUTE OF AIRTIME USED ON EACH WIRELESS CALL. UNLESS OTHERWISE PROVIDED IN YOUR PLAN, MINUTES WILL BE DEPLETED ACCORDING TO USAGE IN THE FOLLOWING ORDER: NIGHT AND WEEKEND MINUTES, MOBILE TO MOBILE MINUTES, ANYTIME MINUTES AND ROLLOVER, EXCEPT THAT MINUTES THAT ARE PART OF BOTH A LIMITED PACKAGE AND AN UNLIMITED PACKAGE WILL NOT BE DEPLETED FROM THE LIMITED PACKAGE. Chargeable Time begins for outgoing calls when you press SEND (or similar key) and for incoming calls when a signal connection from the caller is established with our facilities. Chargeable Time ends after you press END (or similar key), but not until your wireless telephone's signal of call disconnect is received by our facilities and the call disconnect signal has been confirmed.

All outgoing calls for which we receive answer supervision or which have at least 30 seconds of Chargeable Time, including ring time, shall incur a minimum of one minute airtime charge. Answer supervision is generally received when a call is answered; however, answer supervision may also be generated by voicemail systems, private branch exchanges, and interexchange switching equipment. Chargeable Time may include time for us to recognize that only one party has disconnected from the call, time to clear the channels in use, and ring time. Chargeable Time may also occur from other uses of our facilities, including by way of example, voicemail deposits and retrievals, and call transfers. Calls that begin in one rate period and end in another rate period may be billed in their entirety at the rates for the period in which the call began.

DATA TRANSPORT OR USAGE IS CALCULATED IN FULL-KILOBYTE INCREMENTS, AND ACTUAL TRANSPORT OR USAGE IS ROUNDED UP TO THE NEXT FULL-KILOBYTE INCREMENT AT THE END OF EACH DATA SESSION FOR BILLING PURPOSES. AT&T CALCULATES A FULL KILOBYTE OF DATA TRANSPORT/USAGE FOR EVERY FRACTION OF THE LAST KILOBYTE OF DATA TRANSPORT/USAGE USED ON EACH DATA SESSION. TRANSPORT OR USAGE IS BILLED EITHER BY THE KILOBYTE ("KB") OR MEGABYTE ("MB"). IF BILLED BY MB, THE FULL KBs CALCULATED FOR EACH DATA SESSION

CALCULATED FOR EACH DATA SESSION DURING THE BILLING PERIOD ARE TOTALED TO DETERMINE BILLING. NETWORK OVERHEAD, SOFTWARE UPDATE REQUESTS, EMAIL NOTIFICATIONS, AND RESEND REQUESTS CAUSED BY NETWORK ERRORS CAN INCREASE MEASURED KILOBYTES. DATA TRANSPORT/USAGE OCCURS WHENEVER YOUR DEVICE IS CONNECTED TO OUR NETWORK AND IS ENGAGED IN ANY DATA TRANSMISSION, AS DISCUSSED IN MORE DETAIL IN SECTION 6.4.

If you select a rate plan that includes a predetermined allotment of Services (for example, a predetermined amount of airtime, megabytes or messages), unless otherwise specifically provided as a part of such rate plan, any unused allotment of Services from one billing cycle will not carry over to any other billing cycle. We may bill you in a format as we determine from time to time. Additional charges may apply for additional copies of your bill, or for detailed information about your usage of Services.

**Delayed Billing:** Billing of usage for calls, messages, data or other Services (such as usage when roaming on other carriers' networks, including internationally) may occasionally be delayed. Such usage charges may appear in a later billing cycle, will be deducted from Anytime monthly minutes or other Services allotments for the month when the usage is actually billed, and may result in additional charges for that month. Those minutes will be applied against your Anytime monthly minutes in the month in which the calls appear on your bill. You also remain responsible for paying your monthly Service fee if your Service is suspended for nonpayment. We may require payment by money order, cashier's check, or a similarly secure form of payment at our discretion.

### 1.6 Are Advance Payments And/Or Deposits Required?

We may require you to make deposits or advance payments for Services, which we may offset against any unpaid balance on your account. Interest won't be paid on advance payments or deposits unless required by law. We may require additional advance payments or deposits if we determine that the initial payment was inadequate. Based on your creditworthiness as we determine it, we may establish a credit limit and restrict Services or features. If your account balance goes beyond the limit we set for you, we may immediately interrupt or suspend Services until your balance is brought below the limit. Any charges you incur in excess of your limit become immediately due. If you have more than one account with us, you must keep all accounts in good standing to maintain Services. If one account is past due or over its limit, all accounts in your name are subject to interruption or termination and all other available collection remedies.

### 1.7 What if I fail to pay my AT&T Bill when it is due?

You agree that for each bill not paid in full by the due date, AT&T may charge and you will pay a late payment fee. Restrictive endorsements are void.

You expressly authorize, and specifically consent to allowing, AT&T and/or its outside collection agencies, outside counsel, or other agents to contact you in connection with any and all matters relating to unpaid past due charges billed by AT&T to you. You agree that, for attempts to collect unpaid past due charges, such contact may be made to any mailing address, telephone number, cellular phone number, e-mail address, or any other electronic address that you have provided, or may in the future provide, to AT&T. You agree and acknowledge that any e-mail address or any other electronic address that you provide to AT&T is your private address and is not accessible to unauthorized third parties. For attempts to collect unpaid charges, you agree that in addition to individual persons attempting to communicate directly with you, any type of contact described above may be made using, among other methods, pre-recorded or artificial voice messages delivered by an automatic telephone dialing system, pre-set e-mail messages delivered by an automatic e-mailing system, or any other pre-set electronic messages delivered by any other automatic electronic messaging system.

### 1.8 What Happens If My Check Bounces?

We'll charge you up to $30 (depending on applicable law) for any check or other instrument (including credit card charge backs) returned unpaid for any reason.

### 1.9 Are There Business or Government Benefits?

You may receive or be eligible for certain discounts, credits, promotions, and other benefits ("Benefits") through a business or government customer's agreement with us ("Business Agreement"). All such Benefits are provided to you solely as a result of the corresponding Business Agreement, and may be modified or terminated without notice. You may also be eligible for certain additional rate plans and/or other Services. Please see http://www.att.com/iru-additional-terms for such Services and the associated additional terms, which are hereby incorporated by reference.

If a business or government entity pays your charges or is otherwise liable for the charges, you authorize us to share your account information with it or its authorized agents. If you use Service(s) and/or receive certain Benefits tied to a Business Agreement with us, but you're liable for your own charges, then you authorize us to share enough account information with it or its authorized agents to verify your continuing eligibility for those Services or Benefits.

You may receive Benefits because of your agreement to have the charges for your Services, billed ("Joint Billing") by a wireline company affiliated with AT&T ("Affiliate") or because you subscribe to certain services provided by an Affiliate. If you cancel Joint Billing or the Affiliate service your rates will be adjusted without notice to a rate plan for which you qualify.

### 1.10 Who Can Access My Account and for What Purpose?

You may add an Authorized/Approved User to Your account. Doing so authorizes Us to provide the Authorized/Approved User with information about, and access to, Your account. Authorized/Approved Users include:

(a) A person authorized by You to act on Your behalf with respect to Your account when the person is in a retail store;

(b) A person who calls into customer service and provides sufficient account information; and

(c) A person who registers for secondary access to Your account in AT&T's online account management system, provides sufficient account information, and has access to a device that is billed to Your account.

Authorized/Approved Users can view Your account and payment information, make changes to the plans under Your account, purchase devices including via financing agreements, add new lines of service, and perform other account functions. You are responsible for all changes made or actions taken by Authorized/Approved Users.

By taking these actions as Your agent, Authorized/Approved Users authorize Us to perform a credit check on You, share Your credit information between Us and our Affiliates, and obtain a credit report on You from a consumer reporting agency.

You may remove an Authorized/Approved User at any time by contacting Us. The removal will take effect after we have a reasonable opportunity to process the request. If You remove an Authorized/Approved User, we recommend that You reset your account passcode and online credentials.

You consent to the use by us or our authorized agents of regular mail, predictive or autodialing equipment, email, text messaging, facsimile or other reasonable means to contact you to advise you about our Services or other matters we believe may be of interest to you. In any event, we reserve the right to contact you by any means regarding customer service-related notifications, or other such information.

### 1.4 How will AT&T communicate with me about my Service?

As your wireless carrier, we will need to communicate with you about your Service on occasion. We and our authorized agents may contact you by: bill message, text message, email, phone call, postal mail, in-app notification, push notification, or by other reasonable means, to advise you about your Service or other matters we believe may be of interest to you. **We and our authorized agents may use any one or a combination of these methods of communication to convey important notices (for example, changes to this Agreement, to your Service, legal notices, etc.). You expressly consent on behalf of all the wireless lines on your account to all such methods of communication regarding your Service, whether active or inactive.**

Email and text messages to your AT&T device are two of the primary methods that we use to contact you. The email address you provide at the time of ordering or Service activation is the email address we will use to communicate with you. You can update your email address through myAT&T, using the myAT&T app, or by calling Customer Care at 800.331.0500. **Notices from us to you are considered immediately delivered when we send them to your email address or by text message to your AT&T device.**

Bill messages and inserts are another key way we share information with you. If you have online billing, those notices will be deemed received by you when your online bill is available for viewing. If you get a paper bill, those notices will be deemed received by you three days after we mail the bill to you. **Please do not overlook the important messages section of your bill.**

## 2.0 HOW DO I RESOLVE DISPUTES WITH AT&T?

### 2.1 Dispute Resolution By Binding Arbitration

**PLEASE READ THIS CAREFULLY. IT AFFECTS YOUR RIGHTS.**

Summary:

Most customer concerns can be resolved quickly and to the customer's satisfaction by calling our customer service department at 1-800-331-0500. **In the unlikely event that AT&T's customer service department is unable to resolve a complaint you may have to your satisfaction (or if AT&T has not been able to resolve a dispute it has with you after attempting to do so informally), we each agree to resolve those disputes through binding arbitration or small claims court instead of in courts of general jurisdiction.** Arbitration is more informal than a lawsuit in court. Arbitration uses a neutral arbitrator instead of a judge or jury, allows for more limited discovery than in court, and is subject to very limited review by courts. Arbitrators can award the same damages and relief that a court can award. **Any arbitration under this Agreement will take place on an individual basis; class arbitrations and class actions are not permitted.** For any non-frivolous claim that does not exceed $75,000, AT&T will pay all costs of the arbitration. Moreover, in arbitration you are entitled to recover attorneys' fees from AT&T to at least the same extent as you would be in court.

In addition, under certain circumstances (as explained below), AT&T will pay you more than the amount of the arbitrator's award and will pay your attorney (if any) twice his or her reasonable attorneys' fees if the arbitrator awards you an amount that is greater than what AT&T has offered you to settle the dispute.

### 2.2 Arbitration Agreement

1. AT&T and you agree to arbitrate **all disputes and claims** between us. This agreement to arbitrate is intended to be broadly interpreted. It includes, but is not limited to:

   - claims arising out of or relating to any aspect of the relationship between us, whether based in contract, tort, statute, fraud, misrepresentation or any other legal theory;

   - claims that arose before this or any prior Agreement (including, but not limited to, claims relating to advertising);

   - claims that are currently the subject of purported class action litigation in which you are not a member of a certified class; and

   - claims that may arise after the termination of this Agreement.

   References to "AT&T," "you," and "us" include our respective subsidiaries, affiliates, agents, employees, predecessors in interest, successors, and assigns, as well as all authorized or unauthorized users or beneficiaries of services or Devices under this or prior Agreements between us. Notwithstanding the foregoing, either party may bring an individual action in small claims court. This arbitration agreement does not preclude you from bringing issues to the attention of federal, state, or local agencies, including, for example, the Federal Communications Commission. Such agencies can, if the law allows, seek relief against us on your behalf. **You agree that, by entering into this Agreement, you and AT&T are each waiving the right to a trial by jury or to participate in a class action.** This Agreement evidences a transaction in interstate commerce, and thus the Federal Arbitration Act governs the interpretation and enforcement of this provision. This arbitration provision shall survive termination of this Agreement.

2. A party who intends to seek arbitration must first send to the other, by certified mail, a written Notice of Dispute ("Notice"). The Notice to AT&T should be addressed to: Office for Dispute Resolution, AT&T, 1025 Lenox Park Blvd., Atlanta, GA 30319 ("Notice Address"). The Notice must (a) describe the nature and basis of the claim or dispute; and (b) set forth the specific relief sought ("Demand"). If AT&T and you do not reach an agreement to resolve the claim within 30 days after the Notice is received, you or AT&T may commence an arbitration proceeding. During the arbitration, the amount of any settlement offer made by AT&T or you shall not be disclosed to the arbitrator until after the arbitrator determines the amount, if any, to which you or AT&T is entitled. You may download or copy a form Notice and a form to initiate arbitration at att.com/arbitration-forms.

3. After AT&T receives notice at the Notice Address that you have commenced arbitration, it will promptly reimburse you for your payment of the filing fee, unless your claim is for greater than $75,000. (The filing fee currently is $200 for claims under $10,000 but is subject to change by the arbitration provider. If you are unable to pay this fee, AT&T will pay it directly upon receiving a written request at the Notice Address.) The arbitration will be governed by the Commercial Arbitration Rules and the Supplementary Procedures for Consumer Related Disputes (collectively, "AAA Rules") of the American Arbitration Association ("AAA"), as modified by this Agreement, and will be administered by the AAA. The AAA Rules are available online at adr.org, by calling the AAA at 1-800-778-7879, or by writing to the Notice Address. (You may obtain information that is designed for non-lawyers about the arbitration process at att.com/arbitration-information.) The arbitrator is bound by the terms of this Agreement. All issues are for the arbitrator to decide, except that issues relating to the scope and enforceability of the arbitration provision are for the court to decide. Unless AT&T and you agree otherwise, any arbitration hearings will take place in the county (or parish) of your billing address. If your claim is for $10,000 or less, we agree that you may choose whether the arbitration will be conducted solely on the basis of documents submitted to the arbitrator, through a telephonic hearing, or by an in-person hearing as established by the AAA Rules. If your claim exceeds $10,000, the right to a hearing will be determined by the AAA Rules. Regardless of the manner in which the arbitration is conducted, the arbitrator shall issue a reasoned written decision sufficient to explain the essential findings and conclusions on which the award is based. Except as otherwise provided for herein, AT&T will pay all AAA filing, administration, and arbitrator fees for any arbitration initiated in accordance with the notice requirements above. If, however, the arbitrator finds that either the substance of your claim or the relief sought in the Demand is frivolous or brought for an improper purpose (as measured by the standards set forth in Federal Rule of Civil Procedure 11(b)), then the payment of all such fees will be governed by the AAA Rules. In such case, you agree to reimburse AT&T for all monies previously disbursed by it that are otherwise your

obligation to review such policies. In addition, federal or state laws may apply to and govern such content. Your access to third-party content, applications, and services is governed by the AAA rules.

4. If, after finding in your favor in any respect on the merits of your claim, the arbitrator issues you an award that is greater than the value of AT&T's last written settlement offer made before an arbitrator was selected, then AT&T will:

   - pay you the amount of the award or $10,000 ("the alternative payment"), whichever is greater; and

   - pay your attorney, if any, twice the amount of attorneys' fees, and reimburse any expenses (including expert witness fees and costs) that your attorney reasonably accrues for investigating, preparing, and pursuing your claim in arbitration ("the attorney premium").

   If AT&T did not make a written offer to settle the dispute before an arbitrator was selected, you and your attorney will be entitled to receive the alternative payment and the attorney premium, respectively, if the arbitrator awards you any relief on the merits. The arbitrator may make rulings and resolve disputes as to the payment and reimbursement of fees, expenses, and the alternative payment and the attorney premium at any time during the proceeding and upon request from either party made within 14 days of the arbitrator's ruling on the merits.

5. The right to attorneys' fees and expenses discussed in paragraph (4) supplements any right to attorneys' fees and expenses you may have under applicable law. Thus, if you would be entitled to a larger amount under the applicable law, this provision does not preclude the arbitrator from awarding you that amount. However, you may not recover duplicative awards of attorneys' fees or costs. Although under some laws AT&T may have a right to an award of attorneys' fees and expenses if it prevails in an arbitration, AT&T agrees that it will not seek such an award.

6. The arbitrator may award declaratory or injunctive relief only in favor of the individual party seeking relief and only to the extent necessary to provide relief warranted by that party's individual claim. **YOU AND AT&T AGREE THAT EACH MAY BRING CLAIMS AGAINST THE OTHER ONLY IN YOUR OR ITS INDIVIDUAL CAPACITY, AND NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED CLASS OR REPRESENTATIVE PROCEEDING.** Further, unless both you and AT&T agree otherwise, the arbitrator may not consolidate more than one person's claims, and may not otherwise preside over any form of a representative or class proceeding. If this specific provision is found to be unenforceable, then the entirety of this arbitration provision shall be null and void.

7. Notwithstanding any provision in this Agreement to the contrary, we agree that if AT&T makes any future change to this arbitration provision (other than a change to the Notice Address) during your Service Commitment, you may reject any such change by sending us written notice within 30 days of the change to the Arbitration Notice Address provided above. By rejecting any future change, you are agreeing that you will arbitrate any dispute between us in accordance with the language of this provision.

**2.3 Puerto Rico Customers**

For Puerto Rico customers, references to "small claims court" in sections 2.1 and 2.2 should be understood to mean the Puerto Rico Telecommunications Regulatory Board.


**3.0 TERMS RELATING TO YOUR DEVICE AND CONTENT**

**3.1 Your Device**

Your Device must be compatible with, and not interfere with, our Services and must comply with all applicable laws, rules, and regulations. We may periodically program your Device remotely with system settings for roaming service, to direct your Device to use network services most appropriate for your typical usage, and other features that cannot be changed manually. Some device manufacturers will no longer pre-load certain applications into the device memory. As a result, AT&T may remotely pre-load certain applications to your device at activation and periodically update those applications. You can delete any application that AT&T remotely pre-loads on your device.

You agree that you won't make any modifications to your Equipment or its programming to enable the Equipment to operate on any other system. AT&T may, at its sole and absolute discretion, modify the programming to enable the operation of the Equipment on other systems.

If you bought a Device from AT&T, it has been programmed with a SIM lock which will prevent it from operating with other compatible wireless telephone carriers' services. If you wish to use this Device with the service of another wireless telephone carrier, AT&T will unlock your device if you meet certain qualifications including, but not limited to the following: (a) you have paid for your Device in full; (b) your device was purchased on an installment plan and the service on your wireless number has been active for at least sixty days and is in good standing (i.e. it has no past due amount owed AT&T); (c) you have fulfilled your Service Commitment by expiration of any contractual term; (d) your Device has not been reported lost or stolen; and (e) AT&T has the Unlock Code (where applicable) or can reasonably obtain it from the manufacturer. For Devices sold with a Prepaid Plan, AT&T will unlock your device upon request when you have completed six (6) months of AT&T Prepaid service. For further details on eligibility requirements and for assistance on unlocking your device, please visit att.com/deviceunlock.

You are solely responsible for complying with U.S. Export Control laws and regulations and the import laws and regulations of foreign countries when traveling internationally with your Device.

**3.2 Where and How Does AT&T Service Work?**

AT&T does not guarantee availability of wireless network. Services may be subject to certain Device and compatibility/limitations including memory, storage, network availability, coverage, accessibility and data conversion limitations. Services (including without limitation, eligibility requirements, plans, pricing, features and/or service areas) are subject to change without notice.

When outside AT&T's coverage area, access will be limited to information and applications previously downloaded to or resident on your device. Coverage areas vary between AT&T network technologies. See coverage map(s), available at store or from your sales representative, for details or the coverage map at www.att.com/coverageviewer.

Actual network speeds depend upon device characteristics, network, network availability and coverage levels, tasks, file characteristics, applications and other factors. Performance may be impacted by transmission limitations, terrain, in-building/in-vehicle use and capacity constraints.

**3.3 What Information, Content, And Applications Are Provided By Third Parties?**

Certain information, applications, or other content is provided by independently owned and operated content providers or service providers who are subject to change at any time without notice.

AT&T IS NOT A PUBLISHER OF THIRD-PARTY INFORMATION, APPLICATIONS, OR OTHER CONTENT AND IS NOT RESPONSIBLE FOR ANY OPINIONS, ADVICE, STATEMENTS, OR OTHER INFORMATION, SERVICES OR GOODS PROVIDED BY THIRD PARTIES.

Third-party content or service providers may impose additional charges. Policies regarding intellectual property, privacy and other policies or terms of use may differ among AT&T's content or service providers and you are bound by such policies or terms when you visit their respective sites or use their services. It is your responsibility

Any information you involuntarily or voluntarily provide to third parties is governed by their policies or terms. The accuracy, appropriateness, content, completeness, timeliness, usefulness, security, safety, merchantability, fitness for a particular purpose, transmission or correct sequencing of any application, information or downloaded data is not guaranteed or warranted by AT&T or any content providers or other third party. Delays or omissions may occur. Neither AT&T nor its content providers, service providers or other third parties shall be liable to you for any loss or injury arising out of or caused, in whole or in part, by your use of any information, application or content, or any information, application, or other content acquired through the Service.

You acknowledge that every business or personal decision, to some degree or another, represents an assumption of risk, and that neither AT&T nor its content and service providers or suppliers, in providing information, applications or other content or services, or access to information, applications, or other content underwrites, can underwrite, or assumes your risk in any manner whatsoever.

### 3.4 How Can I Get Mobile Content?

You understand that Devices can be used to acquire or purchase goods, content, and services (including subscription plans) like ring tones, graphics, games, applications and news alerts from AT&T or other companies ("Content"). You understand that you are responsible for all authorized charges associated with such Content from any Device assigned to your account, that these charges will appear on your bill (including charges on behalf of other companies), and that such purchases can be restricted by using parental controls available from an AT&T salesperson, or by calling AT&T. Any person using any Device assigned to your account to order Content on your account may be deemed to have corresponding authority to consent to the use or disclosure of your account information, including customer proprietary network information (CPNI), to facilitate the processing or provisioning of and/or billing for such Content. CPNI is information that relates to the quantity, technical configuration, type, destination, location and amount of use of a telecommunications service, and you have the right, and AT&T has the duty under federal law, to protect the confidentiality of CPNI. You have the right to withhold authorization of this disclosure and use of your CPNI without affecting the provision of any service(s) to which you currently subscribe from AT&T.

You are responsible for reviewing your monthly bills to ensure that all charges for Content are accurate.

Additionally, you have full-time access to your Content purchase transaction history on our website. You may contest and seek refunds for unauthorized purchases and purchases with which you are not satisfied. AT&T reserves the right to restrict Content purchases or terminate the account of anyone who seeks refunds on improper grounds or otherwise abuses this Service.

Actual Content may vary based on the Device capabilities. Content may be delivered in multiple messages. Content charges are incurred at the stated one-time download rate or subscription rate, plus a per kilobyte or per megabyte default pay per use charge for the Content transport when delivered, unless you have a data plan and such charges appear separately on your bill. You will be charged each time you download Content. Data Service charges apply.

### 3.5 Am I Responsible If Someone Makes A Purchase With My Device?

Except as otherwise provided in this Agreement, if your Device is used by others to make Content purchases, you are responsible for all such purchases. If this occurs, you are giving those other users your authority to:

1. make Content purchases from those Devices, and to incur charges for those Content purchases that will appear on your bill;

2. give consent required for that Content, including the consent to use that user's location information to deliver customized information to that user's Device; or

3. make any representation required for that content, including a representation of the user's age, if requested.

Usage by others can be restricted by use of parental controls or similar features. Visit att.com/securefamily to learn more.

### 3.6 Does AT&T Collect Location-Based Network Performance Information From My Device? Can I Use Location-Based Services With My Device?

AT&T collects information about the approximate location of your Device in relation to our cell towers and the Global Positioning System (GPS). We use that information, as well as other usage and performance information also obtained from our network and your Device, to provide you with wireless voice and data services, and to maintain and improve our network and the quality of your wireless experience. We may also use location information to create aggregate data from which your personally identifiable information has been removed or obscured. Such aggregate data may be used for a variety of purposes such as scientific and marketing research and services such as vehicle traffic volume monitoring. It is your responsibility to notify users on your account that we may collect and use location information from Devices.

Your Device is also capable of using optional Content at your request or the request of a user on your account, offered by AT&T or third parties that make use of a Device's location information ("Location-Based Services"). Please review the terms and conditions and the associated privacy policy for each Location-Based Service to learn how the location information will be used and protected. For more information on Location-Based Services, please visit att.com/privacy.

Our directory assistance service (411) may use the location of a Device to deliver relevant customized 411 information based upon the user's request for a listing or other 411 service. By using this directory assistance service, the user is consenting to our use of that user's location information for such purpose. This location information may be disclosed to a third party to perform the directory assistance service and for no other purpose. Such location information will be retained only as long as is necessary to provide the relevant customized 411 information and will be discarded after such use. Please see our privacy policy at att.com/privacy for additional details.

### 3.7 What If My Device Is Lost Or Stolen?

If your wireless Device is lost or stolen, you must contact us immediately to report the Device lost or stolen. You're not liable for charges you did not authorize, but the fact that a call was placed from your Device is evidence that the call was authorized. Once you report to us that the Device is lost or stolen, you will not be responsible for subsequent charges incurred by that Device.

You can report your Device as lost or stolen and suspend Services without a charge by contacting us at the phone number listed on your bill or at wireless.att.com. If there are charges on your bill for calls made after the Device was lost or stolen, but before you reported it to us, notify us of the disputed charges and we will investigate. You may submit documents, statements and other information to show any charges were not authorized. You may be asked to provide information and you may submit information to support your claim. We will advise you of the result of our investigation within 30 days. While your phone is suspended you will remain responsible for complying with all other obligations under this Agreement, including, but not limited to, your monthly fee. We both have a duty to act in good faith in a reasonable and responsible manner including in connection with the loss or theft of your Device. (California Customers see Section 11.1 "California: What if there are Unauthorized Charges Billed to My Device?" below.)

## 4.0 TERMS RELATING TO THE USE AND LIMITATIONS OF SERVICE

**4.1 What Are The Limitations On Service And Liability?**

Unless prohibited by law, the following limitations of liability apply. Service may be interrupted, delayed, or otherwise limited for a variety of reasons, including environmental conditions, unavailability of radio frequency channels, system capacity, priority access by National Security and Emergency Preparedness personnel in the event of a disaster or emergency, coordination with other systems, equipment modifications and repairs, and problems with the facilities of interconnecting carriers. We may block access to certain categories of numbers (e.g., 976, 900, and international destinations) at our sole discretion.

Additional hardware, software, subscription, credit or debit card, Internet access from your compatible PC and/or special network connection may be required and you are solely responsible for arranging for or obtaining all such requirements. Some solutions may require third party products and/or services, which are subject to any applicable third party terms and conditions and may require separate purchase from and/or agreement with the third party provider. AT&T is not responsible for any consequential damages caused in any way by the preceding hardware, software or other items/requirements for which you are responsible.

Not all plans or Services are available for purchase or use in all sales channels, in all areas or with all devices. AT&T is not responsible for loss or disclosure of any sensitive information you transmit. AT&T's wireless services are not equivalent to wireline Internet. AT&T is not responsible for nonproprietary services or their effects on devices.

We may, but do not have the obligation to, refuse to transmit any information through the Services and may screen and delete information prior to delivery of that information to you. There are gaps in service within the Services areas shown on coverage maps, which, by their nature, are only approximations of actual coverage.

WE DO NOT GUARANTEE YOU UNINTERRUPTED SERVICE OR COVERAGE. WE CANNOT ASSURE YOU THAT IF YOU PLACE A 911 CALL YOU WILL BE FOUND. AIRTIME AND OTHER SERVICE CHARGES APPLY TO ALL CALLS, INCLUDING INVOLUNTARILY TERMINATED CALLS. AT&T MAKES NO WARRANTY, EXPRESS OR IMPLIED, OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, SUITABILITY, ACCURACY, SECURITY, OR PERFORMANCE REGARDING ANY SERVICES, SOFTWARE OR GOODS, AND IN NO EVENT SHALL AT&T BE LIABLE, WHETHER OR NOT DUE TO ITS OWN NEGLIGENCE, for any:

  a. act or omission of a third party;

  b. mistakes, omissions, interruptions, errors, failures to transmit, delays, or defects in the Services or Software provided by or through us;

  c. damage or injury caused by the use of Services, Software, or Device, including use in a vehicle;

  d. claims against you by third parties;

  e. damage or injury caused by a suspension or termination of Services or Software by AT&T; or

  f. damage or injury caused by failure or delay in connecting a call to 911 or any other emergency service.

Notwithstanding the foregoing, if your Service is interrupted for 24 or more continuous hours by a cause within our control, we will issue you, upon request, a credit equal to a pro-rata adjustment of the monthly Service fee for the time period your Service was unavailable, not to exceed the monthly Service fee. Our liability to you for Service failures is limited solely to the credit set forth above.

Unless prohibited by law, AT&T isn't liable for any indirect, special, punitive, incidental or consequential losses or damages you or any third party may suffer by use of, or inability to use, Services, Software, or Devices provided by or through AT&T, including loss of business or goodwill, revenue or profits, or claims of personal injuries.

To the full extent allowed by law, you hereby release, indemnify, and hold AT&T and its officers, directors, employees and agents harmless from and against any and all claims of any person or entity for damages of any nature arising in any way from or relating to, directly or indirectly, service provided by AT&T or any person's use thereof (including, but not limited to, vehicular damage and personal injury), INCLUDING CLAIMS ARISING IN WHOLE OR IN PART FROM THE ALLEGED NEGLIGENCE OF AT&T, or any violation by you of this Agreement. This obligation shall survive termination of your Service with AT&T. AT&T is not liable to you for changes in operation, equipment, or technology that cause your Device or Software to be rendered obsolete or require modification.

SOME STATES, INCLUDING THE STATE OF KANSAS, DON'T ALLOW DISCLAIMERS OF IMPLIED WARRANTIES OR LIMITS ON REMEDIES FOR BREACH. THEREFORE, THE ABOVE LIMITATIONS OR EXCLUSIONS MAY NOT APPLY TO YOU. THIS AGREEMENT GIVES YOU SPECIFIC LEGAL RIGHTS, AND YOU MAY HAVE OTHER RIGHTS WHICH VARY FROM STATE TO STATE.

**4.2 How Can I Use My AT&T Service?**

All use of AT&T's wireless network and Services is governed by AT&T's Acceptable Use Policy, which can be found at att.com/AcceptableUsePolicy, as determined solely by AT&T. AT&T can revise its Acceptable Use Policy at any time without notice by updating this posting.

**4.3 Who Is Responsible For Security?**

AT&T DOES NOT GUARANTEE SECURITY. Data encryption is available with some, but not all, Services sold by AT&T. If you use your Device to access company email or information, it is your responsibility to ensure your use complies with your company's internal IT and security procedures.

**4.4 How Can I Use the Software?**

The software, interfaces, documentation, data, and content provided for your Equipment may be updated, downloaded, or replaced by feature enhancements, software updates, system restore software or data generated or provided subsequently by AT&T (hereinafter "Software") is licensed, not sold, to you by AT&T and/or its licensors/suppliers for use only on your Equipment. Your use of the Software shall comply with its intended purposes as determined by us, all applicable laws, and AT&T's Acceptable Use Policy at att.com/AcceptableUsePolicy.

You are not permitted to use the Software in any manner not authorized by this License. You may not (and you agree not to enable others to) copy, decompile, reverse engineer, disassemble, reproduce, attempt to derive the source code of, decrypt, modify, defeat protective mechanisms, combine with other software, or create derivative works of the Software or any portion thereof. You may not rent, lease, lend, sell, redistribute, transfer or sublicense the Software or any portion thereof. You agree the Software contains proprietary content and information owned by AT&T and/or its licensors/suppliers.

AT&T and its licensors/suppliers reserve the right to change, suspend, terminate, remove, impose limits on the use or access to, or disable access to, the Software at any time without notice and will have no liability for doing so. You acknowledge AT&T's Software licensors/suppliers are intended third party beneficiaries of this license, including the indemnification, limitation of liability, disclaimer of warranty provisions found in this Agreement.

**4.5 How Can I Use Another Carrier's Network (Off-Net Usage)?**

**4.5.1 Voice**

If your use of minutes (including unlimited Services) on other carrier networks ("off-net voice usage") during any two consecutive months exceed your off-net voice usage allowance, AT&T may, at its option, terminate your Services, deny your continued use of other carriers' coverage or change your plan to one imposing usage

**4.5.2 Data**

If you use Data Services on other carriers' wireless networks ("off-net data usage") your data usage may be reduced to 2G speeds. In addition, if your off-net data usage during any month exceeds your off-net data usage allowance, AT&T may at its option terminate your access to Data Services, deny your continued use of other carriers' coverage, further reduce your off-net data usage speed, or change your plan to one imposing usage charges for off-net data usage. Your off-net data usage allowance is equal to the lesser of 100 megabytes or 20% of the kilobytes included with your plan. You may be required to use a Device programmed with AT&T's preferred roaming database.

**4.5.3 Messaging**

If you use messaging services (including unlimited Services) on other carrier networks ("off-net messaging usage") during any two consecutive months exceed your off-net messaging usage allowance, AT&T may, at its option, terminate your messaging service, deny your continued use of other carriers' coverage or change your plan to one imposing usage charges for off-net messaging usage. Your off-net messaging usage allowance is equal to the lesser of 3,000 messages or 50% of the messages included with your plan.

**4.5.4 Notice**

If you exceed your allowances stated above and AT&T determines to suspend or terminate your access, deny your usage of other carrier's coverage, or change your plan to a different plan, AT&T will provide notice and you may terminate this Agreement.

**4.6 How Do I Get Service Outside AT&T's Wireless Network (Roaming)?**

Services originated or received while outside your plan's included coverage area are subject to roaming charges. Domestic roaming charges for wireless data or voice Services may be charged with some plans when outside AT&T's wireless network. International roaming rates apply for any voice, messaging or data usage incurred outside the U.S., Puerto Rico and U.S. Virgin Islands. Use of Services when roaming is dependent upon roaming carrier's support of applicable network technology and functionality. Display on your device may not indicate whether you will incur roaming charges. Check with roaming carriers individually for support and coverage details.

**4.6.1 International Services**

Certain eligibility restrictions apply which may be based on service tenure, payment history and/or credit. Rates are subject to change. For countries, rates and additional details, see att.com/global.

**4.6.1.1 International Long Distance:**

International rates apply for calls made and messages sent from the U.S., Puerto Rico and U.S.V.I. to another country. Calling or messaging to some countries may not be available. Calls to wireless numbers and numbers for special services, such as Premium Rated Services, may cost more than calls to wireline numbers. If a customer calls an overseas wireline number and the call is forwarded to a wireless number, the customer will be charged for a call terminated to a wireless number. International Long Distance calling rates are charged per minute and apply throughout the same footprint in which the customer's airtime package minutes apply.

**4.6.1.2 International Long Distance Text, Picture & Video Messaging:**

Additional charges apply for premium messages and content. Messages over 300 KBs are billed an additional 50¢/message. For a complete list of countries, please visit att.com/text2world.

**4.6.1.3 International Roaming:**

Compatible Device required. Your plan may include the capability to make and receive calls and texts and use data while roaming internationally. AT&T, in its sole discretion, may block your ability to use your Device while roaming internationally until eligibility criteria are met. International roaming rates, which vary by country, apply for all calls placed or received while outside the United States, Puerto Rico and U.S.V.I. Please consult att.com/global or call 611 from your mobile device or 800-331-0500 for a list of currently available countries and carriers. All countries may not be available for roaming. All carriers within available countries may not be available on certain plans or packages. Availability, quality of coverage and services while roaming are not guaranteed. When roaming internationally, you will be charged international roaming airtime rates including when incoming calls are routed to voicemail, even if no message is left. Substantial charges may be incurred if Device is taken out of the U.S. even if no services are intentionally used. Billing for international roaming usage may be delayed up to three billing cycles due to reporting between carriers. Taxes are additional. If you want to block the ability to make and receive calls or use data functions while roaming internationally, you may request that by calling 1-314-925-6925 (at no charge from your wireless phone). For AT&T Canada and Mexico Travel Minutes, package and overage rates apply only in Canada or Mexico, and if you remove the package before your monthly bill cycle ends, the included monthly minutes allotment will be reduced proportionately.

**4.6.1.4 International Data:**

International data rates apply to all data usage outside the U.S., Puerto Rico and U.S.V.I., including accessing cloud-based services to upload/download/stream content. International data roaming may be reduced to 2G speeds. Many Devices, including iPhone, transmit and receive data messages without user intervention and can generate unexpected charges when powered "on" outside the United States, Puerto Rico and U.S.V.I. AT&T may send "alerts" via SMS or email, to notify you of data usage. These are courtesy alerts. There is no guarantee you will receive them. They are not a guarantee of a particular bill limit. Receipt of Visual Voicemail messages are charged at international data pay-per-use rates unless customer has an international data plan/package, in which case receipt of Visual Voicemail messages decrement Kilobytes included in such plan/package.

**4.6.1.5 Data Global Add-Ons and Global Messaging Plans/Packages:**

Require that domestic data or messaging capability be in place. Rates apply only for usage within "roam zone" comprised of select carriers. Within the roam zone, overage rate applies if you exceed the MBs allotted for any Data Global Add-On or the messages allotted for any Global Messaging Plan/Package. International roaming pay-per-use rates apply in countries outside the roam zone. See att.com/globalcountries for current roam zone list.

**4.6.1.6 Data Connect Global/North America Plans:**

1. You agree to abide by the terms of the applicable voice rate plan and this Service Agreement, which, along with certain FCC and Federal and State laws, make up your Service Agreement for Wireless Customer Agreement.

#### 4.6.1.7 Cruise Ship Roaming:

Cruise ship roaming rates apply for calls placed or data used while on the ship.

#### 4.6.1.8 International Miscellaneous

**Export Restrictions:** You are solely responsible for complying with U.S. Export Control laws and regulations, and the import laws and regulations of foreign countries when traveling internationally with your Device.

## 5.0 WHAT VOICE SERVICES DOES AT&T OFFER?

### 5.1 What Are The General Terms That Apply To All AT&T Voice Rate Plans?

You may obtain usage information by calling customer service or using one of our automated systems. **Pricing/Taxes/No Proration:** Prices do not include taxes, directory assistance, roaming, Universal Service Fees, and other surcharges. Final month's charges are not prorated. **Activation Fees:** Activation Fee may apply for each new line. **Nights and Weekends:** Nights are 9:00 p.m. to 6:00 a.m. Weekends are 9:00 p.m. Friday to 6:00 a.m. Monday (based on time of day at the cell site or switch providing your Service). Included long distance calls can be made from the 50 United States, Puerto Rico and U.S. Virgin Islands to the 50 United States, Puerto Rico, U.S. Virgin Islands, Guam and Northern Mariana Islands. Roaming charges do not apply when roaming within the Services area of land-based networks of the 50 United States, Puerto Rico and U.S. Virgin Islands. Additional charges apply to Services used outside the land borders of the U.S., Puerto Rico and U.S. Virgin Islands.

### 5.2 Voicemail

Unless you subscribe to an Unlimited Voice Plan or are an upstate New York customer subscribing to Enhanced Voicemail, airtime charges apply to calls to your voicemail service, including calls where the caller does not leave a message, because the call has been completed, calls to listen to, send, reply to, or forward messages, or to perform other activities with your voicemail service, including calls forwarded from other phones to your voicemail service. You are solely responsible for establishing and maintaining security passwords to protect against unauthorized use of your voicemail service. For information as to the number of voicemail messages you can store, when voicemail messages will be deleted, and other voicemail features, see att.com/wirelessvoicemail. We reserve the right to change the number of voicemails you can store, the length you can store voicemail messages, when we delete voicemail messages, and other voicemail features without notice. We may deactivate your voicemail service if you do not initialize it within a reasonable period after activation. We will reactivate the service upon your request. See att.com/global for information about using voicemail internationally.

### 5.3 Voicemail-To-Text (VMTT)

AT&T is not responsible, nor liable for: 1) errors in the conversion of or its inability to transcribe voicemail messages to text/email; 2) lost or misdirected messages; or, 3) content that is unlawful, harmful, threatening, abusive, obscene, tortious, or otherwise objectionable.

We do not filter, edit or control voice, text, or email messages, or guarantee the security of messages. We can interrupt, restrict or terminate VMTT without notice, if your use of VMTT adversely impacts AT&T's network, for example that could occur from abnormal calling patterns or an unusually large number of repeated calls and messages; or if your use is otherwise abusive, fraudulent, or does not comply with the law.

You are solely responsible for and will comply with all applicable laws as to the content of any text messages or emails you receive from VMTT that you forward to or include in a reply to any other person. You authorize AT&T or a third party working on AT&T's behalf to listen to, and transcribe all or part of a voicemail message and to convert such voicemail message into text/email, and to use voicemail messages and transcriptions to enhance, train and improve AT&T's speech recognition and transcription services, software and equipment.

Charges for VMTT include the conversion of the voicemail message and the text message sent to your wireless device. Additional charges, however, may apply to receiving email on your wireless device from VMTT, as well as, replying to or forwarding VMTT messages via SMS (text) or email, depending on your plan.

SMS (text messaging) blocking is incompatible with VMTT. (If you do not have a texting plan on your handset, we add a texting pay per use feature when you add VMTT with text delivery.) If you are traveling outside the U.S. coverage area, you will incur international data charges for emails received from VMTT, as well as, charges for emails you respond to or forward from VMTT, unless you have an international data plan and the usage falls within the plan's usage limits.

Transcription times cannot be guaranteed. Customers purchasing email delivery are responsible for providing a correct email address and updating the email address when changes to the email account are made.

If you choose SMS (text) delivery, VMTT only converts the first 480 characters of a voicemail message into text and you will receive up to three text messages of a transcribed message. The transcription, therefore, may not include the entire voicemail message with SMS delivery. Adding VMTT will create a new voicemail box and all messages and greetings will be deleted from your current voicemail box.

### 5.4 Unlimited Voice Services

Unlimited voice Services are provided primarily for reasonably uninterrupted live dialog between two individuals. If your use of unlimited voice Services for conference calling or call forwarding exceeds 750 minutes per month, AT&T may, at its option, terminate your Service or change your plan to one with no unlimited usage components.

AT&T may, in its sole discretion, terminate your Service or change your plan to one with no unlimited voice usage if it reasonably determines or has a reasonable basis to believe that you are engaged in any of the following prohibited activities: (1) maintaining an open line of communication to provide dispatch or monitoring services; (2) accessing or providing access to multi-party chat line services; (3) using the Service with a SIM box or SIM server network to generate or simulate voice calls; (4) transmitting broadcasts; (5) transmitting pre-recorded materials; (6) telemarketing; (7) initiating autodialed calls; (8) initiating any other calls or connections that are not for the purposes of reasonably uninterrupted live dialog between individuals; (9) using the Service for any fraudulent purpose; (10) reselling or rebilling the Service either alone or as part of any other good or service; or (11) any abusive use of our network or Services.

### 5.5 Caller ID

Your caller identification information (such as your name and phone number) may be displayed on the Device or bill of the person receiving your call; technical limitations may, in some circumstances, prevent you from blocking the transmission of caller identification information. Contact customer service for information on blocking the display of your name and number. Caller ID blocking is not available when using Data Services, and your wireless number is transmitted to Internet sites

unavailable, unreliable or inaccurate. Enhanced services that depend on location information, including E911, may not function properly and may not be available in all areas or networks. Enhanced services that apply specifically as telemarketing, suspected spam, and/or suspected fraud to some of those calls.

**5.6 Rollover® Minutes**

If applicable to your plan, Rollover Minutes accumulate and expire through 12 rolling bill periods. Bill Period 1 (activation) unused Anytime Minutes will not carry over. Bill Period 2 unused Anytime Minutes will begin to carry over. Rollover Minutes accumulated starting with Bill Period 2 will expire each bill period as they reach a 12-bill-period age. Rollover Minutes will also expire immediately upon default or if customer changes to a non-Rollover plan. If you change plans (including the formation of a FamilyTalk plan), or if an existing subscriber joins your existing FamilyTalk plan, any accumulated Rollover Minutes in excess of your new plan or the primary FamilyTalk line's included Anytime Minutes will expire. Rollover Minutes are not redeemable for cash or credit and are not transferable. If you change to non-AT&T Unity plans with Rollover Minutes (including the formation of a FamilyTalk plan) any accumulated Rollover Minutes in excess of your new non-AT&T Unity plan or the primary non-AT&T Unity FamilyTalk line's included Anytime Minutes will expire.

**5.7 Mobile To Mobile Minutes**

If applicable to your plan, Mobile to Mobile Minutes may be used when directly dialing or receiving calls from any other AT&T wireless phone number from within your calling area. Mobile to Mobile Minutes may not be used for interconnection to other networks. Calls to AT&T voicemail and return calls from voicemail are not included.

**5.8 Family Talk® Plan**

If applicable to your plan, FamilyTalk may require up to a two-year Service Commitment for each line. FamilyTalk plans include only package minutes included with the primary number, and minutes are shared by the additional lines. The rate shown for additional minutes applies to all minutes in excess of the Anytime Minutes. FamilyTalk requires two lines. If the rate plan for the primary number is changed to an ineligible plan or the primary number is disconnected, one of the existing additional lines shall become the primary number on the rate plan previously subscribed to by the former primary number; if only one line remains, it shall be converted to the closest single line rate.

**5.9 A-List®**

A-List is available only with select Nation, FamilyTalk and Unity plans. Nation Plan and Individual Subscribers can place/receive calls to/from up to 5 (and FamilyTalk subscribers can place/receive calls to/from up to 10) wireline or wireless telephone numbers without being charged for airtime minutes. All qualifying lines on a FamilyTalk account share the same 10 A-List numbers. Only standard domestic wireline or wireless numbers may be added and A-List is only for domestic calls. Directory assistance, 900 numbers, chat lines, pay per call numbers, customer's own wireless or Voice Mail access numbers, numbers for call routing services and call forwarding services from multiple phones, and machine to machine numbers are not eligible. Depending on the PBX system, a private telephone system often serving businesses, AT&T may not be able to determine if your selected PBX A-List number is calling/receiving calls from your wireless number and airtime charges could apply. Forwarded calls will be billed based on the originating number, not the call forwarding number, and airtime charges may apply. Only voice calling is eligible. A-List number selections may only be managed online via MyWireless Account. Selected telephone numbers do not become active until 24 hours after added. AT&T reserves the right to block any A-List number and to reduce the amount of telephone numbers that can be used for A-List without notice. A-List is not eligible on Save/Promotional Plans.

**5.10 AT&T Viva Mexicoˢᴹ ("Mexico Plan") & AT&T Nation®/FamilyTalk® With Canada ("Canada Plan")**

Certain eligibility requirements apply. Anytime Minutes and Night and Weekend Minutes between Mexico and your U.S. wireless coverage area if you subscribe to the Mexico Plan, or Canada and your U.S. wireless coverage area if you subscribe to the Canada Plan, will be treated for billing purposes as calls to and from your U.S. wireless coverage area.

Calls made from or received in Mexico and Canada cannot exceed your monthly off-net usage allowance (the lesser of 750 min./mo. or 40% of your Anytime Minutes/mo.) in any two consecutive months. Calls made from or received in Mexico and Canada will not qualify as Mobile to Mobile Minutes. Special rates apply for data usage in Mexico and Canada. International long distance text, instant, picture and video messaging rates apply to messaging from the U.S. to Mexico and Canada and international roaming rates apply when such messages are sent from Mexico and Canada.

International Roaming charges apply when using voice and data Services outside Mexico and your U.S. wireless coverage area if you subscribe to the Mexico Plan, and Canada and your U.S. wireless coverage area, if you subscribe to the Canada Plan. International long distance charges apply when calling to areas outside Mexico and your U.S. wireless coverage area if you subscribe to the Mexico Plan, and Canada and your U.S. wireless coverage area if you subscribe to the Canada Plan.

Anytime Minutes are primarily for live dialog between two people. You may not use your Services other than as intended by AT&T and applicable law. Plans are for individual, non-commercial use only and are not for resale. Unlimited Microcell Calling feature cannot be used on accounts with Viva Mexico and Nation Canada calling plans.

**5.11 AT&T Unityˢᴹ And AT&T Unityˢᴹ-FamilyTalk® Plans Requirements**

**5.11.1 Eligibility Requirements:**

AT&T local and wireless combined bill required. For residential customers, qualifying AT&T local plan from AT&T required. For business customers, qualifying AT&T local service plan required. Specific AT&T Services that qualify vary by location; see att.com or call 1-800-288-2020. Certain business accounts are not eligible for Unity plans. Discounts on any other combined-bill wireless plans will be lost if an AT&T Unity plan is added to your combined bill. If an existing wireless plan is upgraded to an AT&T Unity plan, all discounts and promotions will be lost when subscribing to that plan.

**5.11.2 AT&T Unityˢᴹ Minutes:**

AT&T Unity Calling Minutes may be used when directly dialing or receiving calls from any other eligible AT&T wireline or wireless phone number from within your calling area. Calls to AT&T voicemail and return calls from voicemail not included. AT&T Unity Minutes are not included when checking usage for the current billing period.

**5.12 VoiceDial Services**

Regular airtime charges apply. Mobile to Mobile Minutes do not apply. Calls to 911, 411, 611, 711 and international dialing cannot be completed with VoiceDial Services. Caller ID cannot be blocked. Caller ID will be delivered on calls, even if you have permanently blocked your name and number. For complete terms and conditions, see att.com/voicedial.

**5.13 AT&T Messaging Unlimited with Mobile to Any Mobile Calling Feature**

minutes only apply when you directly dial another U.S. mobile number or directly receive a call from another U.S. mobile phone number from within your calling area in the U.S., Puerto Rico, or U.S.V.I. Mobile to Any Mobile is not available with the AT&T Viva Mexico or AT&T Nation/FamilyTalk with Canada plans. Calls made through Voice Connect, calls to directory assistance, and calls to voicemail and return calls from voicemail are not included. Only numbers included in the wireless number database that AT&T uses will be treated as a call to a mobile number or a call received from a mobile number. So for example, Type 1 numbers belonging to other carriers and not included in the industry wireless LNP database, and numbers for which ports to wireless service have not yet completed, will not be treated as a call to a mobile number or a call received from a mobile number. Also calls made to and calls received from mobile toll-free numbers, mobile chat lines, mobile directory assistance, calling applications, numbers for call routing and call forwarding services, and machine to machine numbers are not included.

## 6.0 WHAT DATA AND MESSAGING SERVICES DOES AT&T OFFER?

### 6.1 What Are The General Terms That Apply To All Data And Messaging Plans?

AT&T provides wireless data and messaging Services, including but not limited to, features that may be used with Data Services and wireless content and applications ("Data Services"). The absolute capacity of the wireless data network is limited; consequently, Data Services may only be used for permitted activities. Pricing and data allowances for Data Services are device dependent and based on the capabilities and capacity of each Device.

**For Data Services with a monthly megabyte (MB) or gigabyte (GB) data allowance, once you exceed your monthly data allowance you will be automatically charged for overage as specified in the applicable rate plan. All data allowances, including overages, must be used in the billing period in which the allowance is provided. Unused data allowances will not roll over to subsequent billing periods.**

AT&T data plans are designed for use with only one of the following distinct Device types: (1) Smartphones, (2) basic and Quick Messaging phones, (3) tablets, (4) LaptopConnect cards, (5) stand-alone Mobile Hotspot devices, and (6) Home Bases. A data plan designated for one type of device may not be used with another type of device. For example, a data plan designated for use with a basic phone or a Smartphone may not be used with a LaptopConnect card, tablet, or stand-alone Mobile Hotspot device, by tethering devices together, by SIM card transfer, or any other means. A data tethering plan, however, may be purchased for an additional fee to enable tethering on a compatible device. An Activation Fee may apply for each data line.

Consumer data plans do not allow access to corporate email, company intranet sites, and other business applications. Access to corporate email, company intranet sites, and/or other business applications requires an applicable Enterprise Data plan. Enterprise Email requires an eligible data plan and Device. Terms may vary depending on selected Enterprise Email solution.

AT&T RESERVES THE RIGHT TO TERMINATE YOUR DATA SERVICES WITH OR WITHOUT CAUSE, INCLUDING WITHOUT LIMITATION, UPON EXPIRATION OR TERMINATION OF YOUR WIRELESS CUSTOMER AGREEMENT.

### 6.2 What Are The Intended Uses Of AT&T's Wireless Data Service?

AT&T's wireless data network is a shared resource, which AT&T manages for the benefit of all of its customers so that they can enjoy a consistent, high-quality mobile broadband experience and a broad range of mobile Internet services, applications and content. However, certain activities and uses of the network by an individual customer or small group of customers can negatively impact the use and enjoyment of the network by others. Therefore, certain activities and uses of AT&T's wireless data service are permitted and others are prohibited. The terms and conditions of your use of AT&T's wireless data service are set forth below.

**Permitted Activities.** AT&T's wireless data services are intended to be used for the following permitted activities: (i) web browsing; (ii) email; and (iii) intranet access if permitted by your rate plan (for example, access to corporate intranets, email, and individual productivity applications like customer relationship management, sales force, and field service automation); (d) uploading and downloading applications and content to and from the Internet or third-party application stores, and (e) using applications and content without excessively contributing to network congestion.

You agree to use AT&T's wireless data services only for these permitted activities.

**Prohibited Activities.** AT&T's wireless data services are not intended to be used in any manner which has any of the following effects and such use is prohibited if it: (a) conflicts with applicable law, (b) hinders other customers' access to the wireless network, (c) compromises network security or capacity, (d) excessively and disproportionately contributes to network congestion, (e) adversely impacts network service levels or legitimate data flows, (f) degrades network performance, (g) causes harm to the network or other customers, (h) is resold either alone or as part of any other good or service, (i) tethers a wireless device to a computing device (such as a computer, Smartphone, eBook or eReader, media player, laptop, or other devices with similar functions) through use of connection kits, applications, devices or accessories (using wired or wireless technology) and you have not subscribed to a specific data plan designed for this purpose, or (j) there is a specific data plan required for a particular use and you have not subscribed to that plan.

The following specific uses of AT&T's wireless data services are prohibited:

- AT&T's wireless data services may not be used in any manner that defeats, obstructs or penetrates, or attempts to defeat, obstruct or penetrate the security measures of AT&T's wireless network or systems, or another entity's network or systems; that accesses, or attempts to access without authority, the accounts of others; or that adversely affects the ability of other people or systems to use either AT&T's wireless services or other parties' Internet-based resources. For example, this includes, but is not limited to, malicious software or "malware" that is designed, intentionally or unintentionally, to infiltrate a network or computer system such as spyware, worms, Trojan horses, rootkits, and/or crimeware; "denial of service" attacks against a network host or individual user; and "spam" or unsolicited commercial or bulk email (or activities that have the effect of facilitating unsolicited commercial email or unsolicited bulk e-mail).

- AT&T's wireless data services may not be used in any manner that has the effect of excessively contributing to network congestion, hindering other customers' access to the network, or degrading network performance by maintaining a sustained and continuous wireless data service connection or active wireless Internet connection. For example, this includes, but is not limited to, server devices or host computer applications such as continuous Web camera posts or broadcasts, automatic data feeds, or automated machine-to-machine connections; "auto-responders," "cancel-bots," or similar automated or manual routines that generate excessive amounts of traffic or that disrupt user groups or email use by others; use of the service as a substitute or backup for private lines or full-time or dedicated data connections; peer-to-peer (P2P) file sharing services; and software or other devices that maintain continuous active Internet connections when a connection would otherwise be idle or any "keep alive" functions, unless they adhere to AT&T data retry requirements (as may be modified from time to time).

- AT&T's wireless data services also may not be used with high bandwidth applications, services and content that are not optimized to work with AT&T's wireless data services and, therefore disproportionately and excessively contribute to network congestion. This includes, but is not limited to, redirecting television signals for viewing on computing devices, web broadcasting, and/or the operation of servers, telemetry devices, or supervisory control and data acquisition devices, unless they meet AT&T's wireless data services optimization requirements.

You agree not to use AT&T's wireless data services for any of these prohibited activities.

AT&T's Right To Enforce Compliance. You agree that AT&T has a right to enforce these Data Service Terms, and you agree that AT&T may control the data services in any manner that is prohibited, including, but not limited to, the following actions:

- AT&T may modify, without advance notice, the permitted and prohibited activities, and the optimization requirements for your wireless data services;

- AT&T may engage in any reasonable network management practice to enhance customer service, to reduce network congestion, to adapt to advances and changes in technology, and/or to respond to the availability of wireless bandwidth and spectrum;

- AT&T may reduce your data throughput speeds at any time or place if your data usage exceeds an applicable, identified usage threshold during any billing cycle. AT&T will provide you with advance notice of the usage threshold applicable to your data plan, or any changes to the applicable usage threshold either by a bill insert, email, text message or other appropriate means;

- AT&T may use reasonable methods to monitor and collect customer usage information to better optimize the operation of the network. Details concerning the information that AT&T collects about its customers, and how it uses and protects that information is addressed in the AT&T Privacy Policy (see att.com/privacy);

- If you are an AT&T unlimited data plan customer, AT&T may migrate you from the unlimited data plan to a tiered data plan and bill you the appropriate monthly fees. We will provide you with notice of this change at least one billing cycle in advance either by a bill insert, email, text message, or other appropriate means;

- AT&T may interrupt, suspend, cancel or terminate your wireless data services without advance notice.

**Unlimited Data Customers.** If you are an AT&T unlimited data plan customer, you agree that "unlimited" means you pay a fixed monthly charge for wireless data service regardless of how much data you use. You further agree that "unlimited" does <u>not</u> mean that you can use AT&T's wireless data service in any way that you choose or for any prohibited activities, and that if you use your unlimited data plan in any manner that is prohibited, AT&T can limit, restrict, suspend or terminate your data service or switch you to a tiered data plan.

**6.3** <u>What Are The Voice And Data Plan Requirements?</u>

A voice plan is required on all voice-capable Devices, unless specifically noted otherwise in the terms governing your plan.

An eligible tiered pricing data plan is required for certain Devices, including iPhones and other designated Smartphones. Eligible voice and tiered pricing data plans cover voice and data usage in the U.S. and do not cover International voice and data usage and charges. If it is determined that you are using a voice-capable Device without a voice plan, or that you are using an iPhone or designated Smartphone without an eligible voice and tiered data plan, AT&T reserves the right to switch you to the required plan or plans and bill you the appropriate monthly fees. In the case of the tiered data plan, you will be placed on the data plan which provides you with the greatest monthly data usage allowance. If you determine that you do not require that much data usage in a month, you may request a lower data tier at a lower monthly recurring fee.

**6.4** <u>How Does AT&T Calculate My Data Usage/Billing?</u>

DATA TRANSPORT/USAGE OCCURS WHENEVER YOUR DEVICE IS CONNECTED TO OUR NETWORK AND IS ENGAGED IN ANY DATA TRANSMISSION, INCLUDING BUT NOT LIMITED TO: (i) SENDING OR RECEIVING EMAIL, DOCUMENTS, OR OTHER CONTENT, (ii) ACCESSING WEBSITES, OR (iii) DOWNLOADING AND USING APPLICATIONS. SOME APPLICATIONS, CONTENT, PROGRAMS, AND SOFTWARE THAT YOU DOWNLOAD OR THAT COMES PRE-LOADED ON YOUR DEVICE AUTOMATICALLY AND REGULARLY SEND AND RECEIVE DATA TRANSMISSIONS IN ORDER TO FUNCTION PROPERLY, WITHOUT YOU AFFIRMATIVELY INITIATING THE REQUEST AND WITHOUT YOUR KNOWLEDGE. FOR EXAMPLE, APPLICATIONS THAT PROVIDE REAL-TIME INFORMATION AND LOCATION-BASED APPLICATIONS CONNECT TO OUR NETWORK, AND SEND AND RECEIVE UPDATED INFORMATION SO THAT IT IS AVAILABLE TO YOU WHEN YOU WANT TO ACCESS IT. IN ADDITION, ANY ADVERTISEMENTS OR ADVERTISER-RELATED MESSAGES OR DATA DELIVERED TO YOUR DEVICE, EVEN IF DELIVERED TO AN APPLICATION, AS WELL AS ANY MESSAGES OR CONTENT THAT INITIATE IN RESPONSE TO AN ADVERTISEMENT, WILL COUNT TOWARD YOUR DATA USAGE. YOU WILL BE BILLED FOR ALL DATA TRANSPORT AND USAGE WHEN YOUR DEVICE IS CONNECTED TO OUR NETWORK, INCLUDING THAT WHICH YOU AFFIRMATIVELY INITIATE OR THAT WHICH RUNS AUTOMATICALLY IN THE BACKGROUND WITHOUT YOUR KNOWLEDGE, AND WHETHER SUCCESSFUL OR NOT. A DATA SESSION INITIATED ON THE AT&T NETWORK WILL CONTINUE ITS CONNECTION OVER THE AT&T NETWORK UNTIL THE DATA TRANSMISSION IS CONCLUDED, EVEN WHEN YOU CONNECT TO A WI-FI NETWORK DURING THE TRANSMISSION.

Unless designated for International or Canada use, prices and included use apply to access and use on AT&T's wireless network and the wireless networks of other companies with which AT&T has a contractual relationship within the United States and its territories (Puerto Rico and the U.S. Virgin Islands), excluding areas within the Gulf of Mexico.

Usage on networks not owned by AT&T is limited as provided in your data plan. Charges will be based on the location of the site receiving and transmitting service and not the location of the subscriber. Mobile Broadband and 4G access requires a compatible device.

Data Service charges paid in advance for monthly or annual Data Services are nonrefundable. Some Data Services may require an additional monthly subscription fee and/or be subject to additional charges and restrictions. Prices do not include taxes, directory assistance, roaming, universal services fees or other surcharges.

In order to assess your usage during an applicable billing period, you may obtain approximate usage information by calling customer service or using one of our automated systems.

**6.5** <u>Text Messaging And Picture/Video Messaging</u>

If you do not enroll in a monthly recurring plan for messaging, data, or Video Share, you may have access to messaging, data, and video share services and be charged on a pay-per-use basis if you use those services.

Messages are limited to 160 characters per message. Premium text and picture/video messages are charged at their stated rates. Standard rates apply to all incoming messages when in the U.S. Different, non-standard per message charges apply to international messages sent from the U.S.

Text, Picture, and Video messages are charged when sent or received, whether read or unread, solicited or unsolicited. AT&T does not guarantee delivery of messages. Text, Picture, and Video messages, including downloaded content, not delivered within 3 days will be deleted. AT&T reserves the right to change this delivery period as needed without notification.

You are charged for each part of messages that are delivered to you in multiple parts. Picture/Video Messaging, data plan, and Text Messaging may need to be provisioned on an account in order to use Picture/Video Messaging. Some elements of Picture/Video messages may not be accessible, viewable, or heard due to limitations on certain wireless phones, PCs, or e-mail.

AT&T reserves the right to change the Picture/Video message size limit at any time without notification. Picture/Video Messaging pricing is for domestic messages only. When a single message is sent to multiple recipients, the sender is charged for one message for each recipient and each recipient is charged for the message received.

third parties as a result of visiting Internet sites, and a per-message charge may apply whether the message is read or unread, solicited or unsolicited.

You agree you will not use our messaging services to send messages that contain advertising or a commercial solicitation to any person or entity without their consent. You will have the burden of proving consent with clear and convincing evidence if a person or entity complains you did not obtain their consent. Consent cannot be evidenced by third party lists you purchased or obtained. You further agree you will not use our messaging service to send messages that: (a) are bulk messages (b) are automatically generated; (c) can disrupt AT&T's network; (d) harass or threaten another person (e) interfere with another customer's use or enjoyment of AT&T's Services; (f) generate significant or serious customer complaints, (g) that falsify or mask the sender/originator of the message; or (h) violate any law or regulation. AT&T reserves the right, but is not obligated, to deny, disconnect, suspend, modify and/or terminate your messaging service or messaging services with any associated account(s), or to deny, disconnect, suspend, modify and/or terminate the account(s), without notice, as to anyone using messaging services in any manner that is prohibited. Our failure to take any action in the event of a violation shall not be construed as a waiver of the right to enforce such terms, conditions, or policies. Advertising and commercial solicitations do not include messaging that: (a) facilitates, completes, or confirms a commercial transaction where the recipient of such message has previously agreed to enter into with the sender of such message; or (b) provides account information, service or product information, warranty information, product recall information, or safety or security information with respect to a commercial product or service used or purchased by the recipient of such message.

**6.6 Unlimited Messaging**

Unlimited Messaging Plans or plans with unlimited messaging include only AT&T's Short Messaging Service (SMS) and Multimedia Messaging Service (MMS) and not any other messaging services or applications. Messages are intended for direct communication between phones and must originate from your phone. Messages sent to tablets, laptops, or other connected devices are excluded from Unlimited Messaging Plans or plans including unlimited messaging. Messages sent through applications may incur data charges. We may terminate or restrict your messaging Service for tethered messaging, excessive use or misuse.

**6.7 Mobile Email**

Requires e-mail account with compatible internet service provider and a downloaded or preloaded e-mail application for the wireless device. Access and use of Mobile Email is billed by total volume of data sent and received (in kilobytes) in accordance with your data plan. E-mail attachments cannot be sent, downloaded, read, or forwarded on the mobile device. Only a paper clip icon appears indicating an attachment. You must view attachments from your PC. Upgrades to the application may be required in order to continue to use the Service. Wireless data usage charges will apply for downloading the application and any upgrades.

**6.8 Mobile Video**

Compatible Phone and eligible data plan required. Service not available outside AT&T's Mobile Broadband and 4G coverage areas. Premium content is charged at stated monthly subscription rates or at stated pay per view rates. Content rotates and is subject to withdrawal. Mobile Video is for individual use, not for resale, commercial purposes or public broadcast. Content can only be displayed on the device screen. No content may be captured, downloaded, forwarded, duplicated, stored, or transmitted. The content owner reserves and owns all content rights. All trademarks, service marks, logos, and copyrights not owned by AT&T are the property of their owners. Some Mobile Video content is intended for mature audiences and may be inappropriate for younger viewers. Parental guidance suggested. Use Parental Controls to restrict access to mature content. Content may be provided by independent providers, and AT&T is not responsible for their content. Providers may collect certain information from your use for tracking and managing content usage.

**6.9 AT&T Wi-Fi Services & Wi-Fi Calling**

**AT&T Wi-Fi service use with a Wi-Fi capable wireless device is subject to the Terms of Services & Acceptable Use Policy ("Terms") found at att.com/attwifitosaup. Your use represents your agreement to those Terms, incorporated herein by reference.** AT&T Wi-Fi Basic service is available at no additional charge to wireless customers with select Wi-Fi capable devices and a qualified data rate plan. Other restrictions may apply.

**Important Information about Wi-Fi Calling:**

- **TTY Devices are not compatible with Wi-Fi Calling.**

- Wi-Fi Calling lets you make calls and send text messages over Wi-Fi when cellular coverage is limited or unavailable. Your device must be set to AT&T HD voice and have Internet access. Loss of your Internet connection during voice Wi-Fi calls will disconnect your call, including 911 calls. In the U.S. or internationally, you can use Wi-Fi Calling to numbers in the U.S., Puerto Rico and U.S. Virgin Islands at no additional charge (excluding 411 calls and other premium numbers). International long distance rates/plans may apply. No Wi-Fi Calling to 211, 311, 511, and 811. Certain countries restrict Wi-Fi calling. See att.com/wificalling for more info.

- 911 Calling with TTY & Real-Time Text. Due to technical limitations, **Wi-Fi Calling cannot be used with TTY devices and will not support TTY 911 calls.** Persons with communications disabilities can use Real Time Text (www.att.com/RTT) as an alternative to TTY. 911 services can be reached by either (1) calling 911 using Real Time Text (2) calling 911 directly using a TTY device over the cellular network or from a landline telephone, or (3) sending a text message to 911 directly, or (4) using relay services to place a TTY or captioned telephone services (CTS) call from a wireless phone or from a landline telephone, or (5) using relay services to place a IP Relay or IP CTS call over a cellular or IP network.

- **911 Call Routing.** 911 calls using Wi-Fi Calling will first attempt to route to the appropriate emergency response center using automatic location information from your device. If such information is unavailable, the Emergency Address (No P.O. Boxes) entered in your Wi-Fi Calling settings will be used for routing. To set up Wi-Fi Calling you will need to enter a US address. You can change your Emergency Address at any time by selecting "Update Emergency Address" in your Wi-Fi Calling menu. To ensure proper routing of 911 calls update your Emergency Address as needed. 911 service may be delayed or unavailable if automatic location information is unavailable or if using Wi-Fi Calling from a location different from the Emergency Address you entered.

- **You acknowledge that you received and understand the foregoing information about 911 calls using Wi-Fi Calling, and you further agree that if you dial 911 on a device using Wi-Fi Calling, AT&T may treat the automatic location information transmitted by your device as your temporarily updated Wi-Fi Calling Emergency Address.**

- If you make Wi-Fi calls while outside of the United States, the call will be billed as if it is being placed from the United States. This means that a Wi-Fi call placed to the United States will be treated as a domestic call within the United States, but a Wi-Fi call placed to a number outside of the United States will be billed as an international long distance (ILD) call from the United States to that foreign number. This will happen even if you have purchased an international roaming plan. To avoid unexpected ILD charges while you are outside of the United States, you should use Wi-Fi Calling only for calls to the United States and should turn it off for all other calls.

**6.10 DataConnect Plans**

**6.10.1 What Are the General Terms that Apply to All DataConnect Plans?**

We may, at our discretion, suspend your account if we believe your data use is excessive, unusual or is better suited to another rate plan. If you are on a data plan that does not include a monthly MB/GB allowance and additional data usage rates, you agree that AT&T has the right to impose additional charges if you use more than 5 GB in a month; provided that, prior to the imposition of any additional charges, AT&T shall provide you with notice and you shall have the right to terminate your Data Service.

### 6.10.2 Data Global Add-On/DataConnect Global Plans/DataConnect North America Plans

Available countries, coverage and participating international carriers included in the "Select International Roam Zone" and "Select Canada/Mexico Roam Zone" vary from our generally available Canada/international wireless data roam zones and may not be as extensive. The Select International Roam Zone is restricted to select international wireless carrier(s). Select Canada/Mexico Roam Zone is restricted to select wireless carrier(s) and coverage areas within Canada and Mexico. See att.com/dataconnectglobal for a current list of participating carriers and eligible roam zones. With respect to the countries included in the Select International Roam Zone, you will be restricted from accessing Data Service through any non-participating Canada/international wireless carriers that may otherwise be included in our generally available Canada and international wireless data roam zones. With the DataConnect North America Plan, you will be restricted from accessing Data Service through any non-participating Canada/Mexico wireless carriers that may otherwise be included in our generally available Canada and international wireless data roam zones.

DATA GLOBAL ADD-ON- May only be used with eligible Equipment. Domestic data usage not included. Qualified domestic wireless data plan required. If combined with a wireless voice plan that includes international voice roaming, your international wireless voice roaming in countries included in the Global Data Add-On's Select International Roam Zone will be limited to the participating Canada/international wireless carriers and you will be restricted from voice roaming through any non-participating Canada/international wireless carriers that may otherwise be included in our generally available Canada and international voice roam zones.

DATACONNECT GLOBAL/NORTH AMERICA PLANS - Requires minimum one-year Service Commitment and you must remain on the plan, for a minimum one-year term. Voice access is restricted and prohibited.

## 6.11 AT&T DataPlus℠/AT&T DataPro℠ Plans

### 6.11.1 AT&T Data Plans With Tethering

Tethering is a wireless or wired method in which your AT&T Mobile device is used as a modem or router to provide a Internet Access connection to other devices, such as laptops, netbooks, tablets, smartphones, other phones, USB modems, network routers, mobile hotspots, media players, gaming consoles, and other data-capable devices. AT&T data plans with tethering enabled may be used for tethering your AT&T Mobile device to other devices. If you are on a data plan that does not include a monthly megabyte allowance and additional data usage rates, you agree that AT&T has the right to impose additional charges if you use more than 5 GB in a month; prior to the imposition of any additional charges, AT&T shall provide you with notice and you shall have the right to terminate your Service (early termination charges may apply).

### 6.11.2 Blackberry® Personal

Supports personal email access to up to 10 Internet email accounts. Users storing more than 1,000 emails or email older than 30 days, may have some emails automatically deleted. May not be used to access corporate email such as BlackBerry Enterprise Server.

### 6.11.3 Blackberry® Connect; Blackberry Enterprise; Blackberry International

Supports BlackBerry Enterprise Server™ for corporate access (valid Client Access License required), and personal email access to up to 10 Internet email accounts as per BlackBerry Personal. BlackBerry International requires a minimum one-year agreement.

## 6.12 GOOD Plan

Requires compatible Good Server and, as to each end user, a compatible Good Client Access License (CAL) for use with a qualifying AT&T data plan. Solution includes software, products and related services provided by Good Technology, Inc. ("Good"), which are subject to applicable Good terms and conditions. Good is solely responsible for all statements regarding, and technical support for, its software, products and services.

## 6.13 Microsoft® Direct Push

Requires compatible Microsoft® Exchange Server and, as to each end user, a compatible device, a Direct Push enabled email account, and a qualifying AT&T Data Plan. Plans include end user customer support from AT&T for compatible devices. AT&T does not sell, supply, install or otherwise support Microsoft® software, products or services (including without limitation, Exchange and Direct Push).

## 6.14 AT&T Mobile Share® Plans (with Unlimited Talk and Text)

AT&T Mobile Share plans, including Mobile Share Value plans, allow you to share a monthly allotment of domestic wireless data usage, along with unlimited domestic talk and texting services among up to ten (10) Devices. You choose a specific allotment of monthly shared data usage for a monthly recurring charge and then pay an additional charge for each Device added to the Mobile Share plan you select. You must specifically identify the devices (the "Designated Devices") that will share your monthly allotment of data usage under the Mobile Share plan you select. If you add a WI Device for unlimited talk only, it will be counted as one of the (10) Designated Devices under the Mobile Share plan. Designated Devices can include: smartphone(s), tablet(s), gaming device(s), modem(s), netbook(s), laptop(s), mobile hotspot(s), basic or quick messaging phone(s), WI Device(s). If, during a billing period, your data usage exceeds the monthly allotment of data in the Mobile Share plan you select, plus any other data (such as available Rollover Data) that you may have for use during the billing period, you will automatically be charged for overage as specified in your rate plan. Unless specified otherwise, data allowances, including overages and Rollover Data, must be used in the billing period provided or you will forfeit that usage. Authorized users on the account may temporarily suspend data access for particular Device(s) during a specific billing cycle, but monthly charges for the suspended Device(s) will continue to apply. Tethering and/or mobile hotspot use is permitted with Mobile Share plans with capable Designated Devices; provided, however, that such use is limited to a maximum of five (5) simultaneous users per Device. An activation fee will be charged when converting from a prepaid or Session-Based plan to a Mobile Share plan or when you activate an additional Device on an existing Mobile Share plan. Access to corporate email, intranet sites and/or other business applications may be available for an additional monthly charge per Device (no additional charge for Mobile Share Value plans). Discounts otherwise applicable to your Mobile Share rate plan do not apply to the additional monthly Device charge. Additional deposits and other restrictions may apply.

**Rollover Data**℠: Only Mobile Share Value® plans include the Rollover Data feature. With Rollover Data, unused data from the monthly plan allotment rounds up to the nearest MB and carries over for one billing period. **Unused Rollover Data automatically expires after one billing period or with any plan change (such as changing data amounts or termination).** Unused overage data does not roll over. Rollover Data is always consumed last, after your other data allowances. Unused

Data-only plans do not include Rollover Data.

If you use a Mobile Share plan with any device that is not a Designated Data Device, for tethering or as a mobile hotspot with more than five (5) users, or otherwise use the plan in any way that is inconsistent with its terms, you agree that AT&T may: (a) suspend or terminate service to the account; (b) place any non-complying Device on an appropriate Mobile Share plan; and/or (c) add any other required element of the plan.

**Device upgrades**: If you upgrade to a new smartphone, a discounted access charge is only available for that line when purchasing a new smartphone via AT&T Next℠ or when you bring your own smartphone or you purchase a new smartphone at full retail price. If you upgrade your Device to a new smartphone on a 2-year Service Commitment, that line is ineligible for the discount and the discount is lost.

### 6.15 AT&T Mobile Share - Data Plans (for Data-Only Devices)

AT&T Mobile Share - Data plans allow you to share a monthly allotment of domestic wireless data usage among up to ten (10) 3G, HSPA+ or LTE Devices (excluding smartphones and basic or quick messaging phones). You choose a specific allotment of monthly shared data usage for a monthly recurring charge and then pay an additional charge for each Device added to the Mobile Share - Data plan you select. You must specifically identify one or more eligible devices (the "Designated Data Devices") that will share your monthly allotment of data usage under the Mobile Share - Data plan you select. Designated Data Devices can include: tablet(s), gaming device(s), modem(s), netbook(s), laptop(s), or mobile hotspot(s). If, during a billing period, your data usage exceeds the monthly allotment of data in the Mobile Share - Data plan you select, you will automatically be charged for overage as specified in your rate plan. If, during a billing period, you do not use all of the data allotment in the Mobile Share - Data plan you select, you will forfeit that usage. Authorized users on the account may temporarily suspend data access for particular Designated Data Device(s) during a specific billing cycle, but monthly charges for the suspended Designated Data Device(s) will continue to apply. Tethering and/or mobile hotspot use is permitted with Mobile Share - Data plans with capable Designated Data Devices; provided, however, that such use is limited to a maximum of five (5) simultaneous users per Designated Data Device. An activation fee will be charged when converting from a prepaid or Session-Based plan to a Mobile Share - Data plan or when you activate an additional Designated Data Device on an existing Mobile Share - Data plan. Designated Data Devices that are capable of accessing corporate email, intranet sites and/or other business applications may do so for no additional monthly access charge. Discounts otherwise applicable to your Mobile Share - Data rate plan do not apply to the additional monthly Device charge. Additional deposits and other restrictions may apply.

If you use a Mobile Share - Data plan with a smartphone, with any device that is not a Designated Data Device, for tethering or as a mobile hotspot with more than five (5) simultaneous users, or otherwise use the plan in any way that is inconsistent with its terms, you agree that AT&T may: (a) suspend or terminate service to the account; (b) place any non-complying Device on an appropriate Mobile Share plan; and/or (c) add any other required element of the plan.

## 7.0 AT&T Wireless Home Services

### 7.1 AT&T Wireless Home Phone Service

AT&T Wireless Home Phone ("WHP") service utilizes mobile wireless gateway Equipment now called an AT&T Wireless Internet device ("WI Device", formerly called a Wireless Home Phone device or WHP Device). With WHP service, the WI Device allows you to connect a landline phone to place and receive calls over the AT&T wireless network. See Section 3.2 for more information about how AT&T wireless service works.

WHP service provides voice service only and requires that you subscribe to an eligible wireless voice plan option, such as: (1) Wireless Home Phone unlimited plan or (2) AT&T Mobile Share plan. If your WI Device is used to roam on other carrier networks, AT&T's off-net usage restrictions apply. Text messaging, data services, features and international roaming are not supported by WHP service. If you use a wireless voice plan not designed for WHP service with your WI Device, AT&T reserves the right to switch you to an appropriate plan and bill you the associated fees for such plan.

911 calls are routed based on the wireless network's automatic location technology. You should expect to provide your location address to the emergency response center responsible for sending first responders (e.g. police, medical assistance, or fire) to your location. The WI Device has battery backup power and will work in the event of a power outage. However, if you connect a landline phone to the WI Device that itself requires external electric power to operate (e.g., a cordless phone), you will not be able to place and receive calls over that phone during a power outage.

### 7.2 AT&T Wireless Internet Service

AT&T Wireless Internet service (formerly Wireless Home Phone and Internet service or WHPI) also utilizes the WI Device (the WHPI service used the Home Base device. With AT&T Wireless Internet service, the WI Device allows you to connect a landline phone to place and receive calls, and to connect up to twelve (12) Internet-capable devices (one (1) via Ethernet and ten (10) via Wi-Fi) to have mobile broadband Internet access over the AT&T wireless network. See Section 3.2 for more information about how AT&T wireless service works.

AT&T Wireless Internet service requires that you subscribe to an eligible wireless voice and/or data plan to take advantage of one or both capabilities. Tiered shared data plan options allow you to share a monthly allotment of domestic wireless data usage among your connected internet-capable devices. If your data usage exceeds the monthly data allotment of the plan you select during a billing period, you automatically will be charged for overages as specified in your plan. If you do not use all of the monthly data allotment of the plan you select during a billing period, you forfeit that usage. You may also add your WI Device to your AT&T Mobile Share plan if the monthly allotment of domestic wireless data usage under your AT&T Mobile Share plan is 10 GB or more.

If your WI Device is used to roam on other carrier networks, AT&T's off-net usage restrictions apply. Messaging services and international roaming are not supported by AT&T Wireless Internet service. If you use a wireless voice and/or data plan not designed for AT&T Wireless Internet service with your WI Device, AT&T reserves the right to switch you to an appropriate plan and bill you the associated fees for such plan.

911 calls are routed based on the wireless network's automatic location technology. You should expect to provide your location address to the emergency response center responsible for sending first responders (e.g. police, medical assistance, or fire) to your location. The WI Device has battery backup power and will work in the event of a power outage. However, if you connect a landline phone to the WI Device that itself requires external electric power to operate (e.g., a cordless phone), you will not be able to place and receive calls over that phone during a power outage.

## 8.0 ARE THERE OTHER TERMS AND CONDITIONS THAT APPLY TO FEATURES AND APPLICATIONS?

Terms and conditions for certain features and applications are provided on the Device at the time of feature/application activation or first use. Certain features/applications will not be available in all areas at all times.

## 9.0 WHAT IS AT&T ROADSIDE ASSISTANCE & OPTIONAL AT&T MOBILE INSURANCE, AT&T Mobile Protection Pack & AT&T Multi-Device Protection Pack?

**9.1 AT&T Roadside Assistance**

AT&T Roadside Assistance ("RA") is an optional feature that may be purchased separately and automatically billed to the wireless account. RA service is provided by American Traveler Motor Club, Inc., a licensed motor club. For complete RA Terms and Conditions, refer to your RA Welcome Kit or go to att.com/roadside.

**9.2 Optional AT&T Mobile Insurance, AT&T Mobile Protection Pack & AT&T Multi-Device Protection Pack**

If eligible, you have 30 days from activation or upgrade to enroll in optional AT&T Mobile Insurance, AT&T Mobile Protection Pack or AT&T Multi-Device Protection Pack. For details visit www.att.com/deviceprotection. AT&T Mobile Insurance and AT&T Multi Device Insurance are underwritten by Continental Casualty Company, a CNA company (CNA) and administered by Asurion Protection Services, LLC (in California, Asurion Protection Services Insurance Agency, LLC, CA Lic. #OD63161, in Puerto Rico, Asurion Protection Services of Puerto Rico, Inc.), CNA's licensed agent for the customers of AT&T.


## 10.0 WHAT OTHER TERMS AND CONDITIONS APPLY TO MY WIRELESS SERVICE?

**10.1 Intellectual Property**

You must respect the intellectual property rights of AT&T, our third-party content providers, and any other owner of intellectual property whose protected property may appear on any website and/or dialogue box controlled by AT&T or accessed through the AT&T's websites. Except for material in the public domain, all material displayed in association with the Service is copyrighted or trademarked. Except for personal, non-commercial use, trademarked and copyrighted material may not be copied, downloaded, redistributed, modified or otherwise exploited, in whole or in part, without the permission of the owner. The RIM and BlackBerry families of related marks, images and symbols are the exclusive properties and trademarks or registered trademarks of Research In Motion Limited - used by permission. Good, the Good logo and GoodLink are trademarks of Good Technology, Inc., in the United States and/or other countries. Good Technology, Inc., and its products and services are not related to, sponsored by or affiliated with Research In Motion Limited. All other marks contained herein are the property of their respective owners.

©2012 AT&T Intellectual Property. All rights reserved. AT&T, AT&T logo and all other marks contained herein are trademarks of AT&T Intellectual Property and/or AT&T affiliated companies. Apple iPhone: ™ and © 2010 Apple Inc. All rights reserved. Apple is a trademark of Apple Inc., registered in the U.S. and other countries. iPhone is a trademark of Apple Inc.

**10.2 Severability**

If any provision of this Agreement is found to be unenforceable by a court or agency of competent jurisdiction, the remaining provisions will remain in full force and effect. The foregoing does not apply to the prohibition against class or representative actions that is part of the arbitration clause; if that prohibition is found to be unenforceable, the arbitration clause (but only the arbitration clause) shall be null and void.

**10.3 Assignment; Governing Law; English Language**

**10.3.1 Assignment**

AT&T may assign this Agreement, but you may not assign this Agreement without our prior written consent.

**10.3.2 Governing Law**

The law of the state of your billing address shall govern this Agreement except to the extent that such law is preempted by or inconsistent with applicable federal law. In the event of a dispute between us, the law of the state of your billing address at the time the dispute is commenced, whether in litigation or arbitration, shall govern except to the extent that such law is preempted by or inconsistent with applicable federal law.

**10.3.3 English Language**

The original version of this Agreement is in the English language. Any discrepancy or conflicts between the English version and any other language version will be resolved with reference to and by interpreting the English version.

**10.4 Lifeline Services**

As part of a federal government program, AT&T offers discounted wireless service to qualified low-income residents in selected states. For questions or to apply for Lifeline service, call 1-800-377-9450. Puerto Rico customers should contact 1-787-405-5463. For tips on how to protect against fraud, please visit the CPUC's website at, CalPhoneInfo.com.

**10.5 Trial Services**

Trial Services are subject to the terms and conditions of this Agreement; may have limited availability; and may be withdrawn at any time.

**10.6 NOTICE REGARDING TRANSMISSION OF WIRELESS EMERGENCY ALERTS (Commercial Mobile Alert Service)**

AT&T has chosen to offer wireless emergency alerts within portions of its service area, as defined by the terms and conditions of its Agreement, on wireless emergency alert capable devices.

There is no additional charge for these wireless emergency alerts. Wireless emergency alerts may not be available on all devices or in the entire service area, or if a subscriber is outside of the AT&T service area. In areas in which the emergency alerts are transmitted, such alerts may not be received by a subscriber or user of AT&T's wireless service even though the subscriber has a device capable of receiving them.

For details on the availability of this service and wireless emergency alert capable devices, please ask a sales representative, or go to att.com and click the Wireless Emergency Alerts link. This notice is required by FCC Rule 47 C.F.R. § 10.250 (Commercial Mobile Alert Service).

In transmitting emergency alerts pursuant to federal law, AT&T, including its officers, directors, employees, vendors, and agents, shall not be liable to any subscriber to, or user of, AT&T's wireless service or equipment for any act or omission related to or any harm resulting from the transmission of, or the failure to transmit, an emergency alert; or the release to a government entity or agency, public safety, fire service, law enforcement official, emergency medical service, or emergency facility of subscriber information used in connection with delivering an emergency alert.


## 11.0 WHAT TERMS APPLY ONLY TO SPECIFIC STATES?

**11.1 California: What If There Are Unauthorized Charges Billed To My Device?**

You are not liable for charges you did not authorize, but the fact that a call was placed from your Device is evidence that the call was authorized. Unauthorized charges may include calls made to or from your phone or other Device after it was lost or stolen. Once you report to us that the Device is lost or stolen and your Device is suspended, you will not be responsible for subsequent charges incurred by that Device. You can report your Device as lost or stolen and suspend Services without a charge by contacting us at the phone number listed on your bill or at wireless.att.com.

If you notify us of any charges on your bill you claim are unauthorized, we will investigate. If there are charges on your bill for calls made after the Device was lost or stolen, but before you reported it to us, notify us of the disputed charges and we will investigate. You may submit documents, statements and other information to show any charges were not authorized. We will advise you of the result of our investigation within 30 days. If you do not agree with the outcome, you may file a complaint with the California Public Utilities Commission and you may have other legal rights. While an investigation is underway, you do not have to pay any charges you dispute or associated late charges, and we will not send the disputed amount to collection or file an adverse credit report about it. While your phone is suspended you will remain responsible for complying with all other obligations under this Agreement, including but not limited to, your monthly fee. We both have a duty to act in good faith and in a reasonable and responsible manner including in connection with the loss or theft of your Device.

**11.2 Connecticut: Questions About Your Service**

If you have any questions or concerns about your AT&T Service, please call Customer Care at 1-800-331-0500, dial 611 from your wireless phone, or visit att.com/wireless. If you have questions about the Unlimited Local or Unlimited Long Distance Service, please call 1-800-288-2020 or visit att.com. If you are a Connecticut customer and we cannot resolve your issue, you have the option of contacting the Public Utilities Regulatory Authority (PURA). Online: ct.gov.pura; Phone: 1-800-382-4586; Mail: Connecticut DPUC, 10 Franklin Square, New Britain, CT 06051.

**11.3 Puerto Rico**

If you are a Puerto Rico customer and we cannot resolve your issue, you may notify the Telecommunications Regulatory Board of Puerto Rico of your grievance. Mail: 500 Ave Roberto H. Todd, (Parada 18), San Juan, Puerto Rico 00907-3941; Phone: 1-787-756-0804 or 1-866-578-5500; Online: jrtpr.gobierno.pr, in addition to having available arbitration, as provided in Section 2.0.

**Return to Table of Contents**

IN THE COUNTY COURT OF THE 11TH
JUDICIAL CIRCUIT IN AND FOR MIAMI-
DADE COUNTY, FLORIDA

Sergio Salani,                                    CASE NO.: 2022-047421-SP-25

       Plaintiff,                                BAR NO.: 121673

v.

AT&T Mobility, LLC,

       Defendant.

_____/

## PLAINTIFF'S MOTION FOR LEAVE TO FILE SECOND AMENDED STATEMENT OF CLAIM

Plaintiff, Sergio Salani, through his undersigned counsel, hereby files this Motion for Leave to File Second Amended Statement of Claim against Defendant, AT&T, Mobility, LLC ("AT&T MOBILITY, LLC"), and further alleges as follows:

1. Plaintiff seeks to amend his complaint to assert claims related to AT&T's admitted allowance of Plaintiff's personal data to be breached.

2. Florida courts applying rule 1.190(e) long ago established that the public policy of our state favors the liberal amendment of pleadings and that courts should resolve all doubts in favor of allowing the amendment of pleadings to allow cases to be decided on their merit. *Harrison v. Dep't of Mgmt. Servs., Div. of State Grp. Ins*., 339 So. 3d 504, 505 (Fla. 1st DCA 2022) (internal citations omitted).

3. The decision to grant leave to amend rests upon the trial court's discretion, and any doubts should be resolved in favor of the amendment. *Overnight Success Const., Inc.*

*v. Pavarini Const. Co., Inc.*, 955 So. 2d 658 (Fla. 3d DCA 2007) (citing *Thompson v. Jared Kane Co., Inc.*, 872 So. 2d 356, 360 (Fla. 2d DCA 2004).

4. Generally, "'absent exceptional circumstances, requests for leave to amend pleadings should be granted.'" *Marquesa at Pembroke Pines Condo. Ass'n, Inc. v. Powell*, 183 So. 3d 1278, 1279 (Fla. 4th DCA 2016) (quoting *Thompson v. Jared Kane Co., Inc.*, 872 So. 2d 356, 360 (Fla. 2d DCA 2004)); see also *Thompson v. Publix Supermarkets, Inc.*, 615 So. 2d 796 (Fla. 1st DCA 1993)(same).

5. Public policy favors liberally permitting amendments to pleadings in the interest of justice so that a case can be considered on its merits. *RV-7 Prop., Inc. v. Stefani De La O, Inc.*, 187 So. 3d 915 (Fla. 3d DCA 2016)("The reason for the liberal allowance of amended pleadings is to provide the best chance for cases to be decided on their merits."); *Geico Gen. Ins. Co. v. Hialeah Diagnostics, Inc.*, No. 3D21-101, 2021 WL 3745207 (Fla. 3d DCA 2021); *Dimick v. Ray*, 774 So. 2d 830 (Fla. 4th DCA 2000); *Mount Sinai Hosp. of Greater Miami, Inc. v. Cordis Corp.*, 285 So. 2d 645 (Fla. 3d DCA 1973), cert. denied 292 So. 2d 25 (1974); *Laurencio v. Deutsche Bank Nat'l Trust Co.*, 65 So.3d 1190, 1193 (Fla. 2d DCA 2011).

6. Another guiding principle is that '[t]he primary consideration in determining whether a motion for leave to amend should be granted is whether the opposing party would be prejudiced by the amendment.'" *Id.* (quoting Philip J. Padovano, *Florida Civil Practice* § 7:10 n.16 (2020 ed.)).

7. A party may, with leave of the court, amend a pleading at, or even after, a hearing on a motion for summary judgment. *Griffin v. Palm Beach Cty. Bd. of Cty. Comm'rs*, 296 So. 3d 918, 920 (Fla. 4th DCA 2020). The primary consideration in determining whether a

motion for leave to amend should be granted is a test of prejudice, and such leave "should not be denied unless the privilege has been abused or the complaint is clearly not amendable." Id.

8. An amendment should be allowed "unless it clearly appears that allowing the amendment would prejudice the opposing party; the privilege to amend has been abused; or amendment would be futile." *See Video Indep. Med. Examination, Inc. v. City of Weston*, 792 So. 2d 680, 681 (Fla. 4th DCA 2001) (quoting *Spradley v. Stick*, 622 So. 2d 610, 613 (Fla. 1st DCA 1993)).

9. In exercising its discretion to allow the amendment of pleadings, the trial court should still weigh the amendment in terms of the prejudice to the opposing party in the preparation for trial; if the amendment simply restates an issue already present in the case of which the opposing party is aware and needs no extensive preparation for trial, then there may be no prejudice to the opposing party and great prejudice to the moving party to deny the amendment. *Newman v. State Farm Mut. Auto. Ins. Co*., 858 So. 2d 1205 (Fla. 4th DCA 2003).

10. Even in instances where the motion to amend is not filed until shortly before trial, the 'justice factor' can outweigh the prejudice to the opposing party caused by having to prepare for the new issue—typically, such prejudice should be remedied with a continuance instead of the denial of amendment." *Sorenson v. Bank of New York Mellon as Tr. for Certificate Holders CWALT, Inc*., 261 So. 3d 660, 663 (Fla. 2d DCA 2018), reh'g denied (holding trial court abused its discretion in denying Defendant/Appellee the opportunity to amend to add new arguments solely because of the length of time the action had been pending)Further, where a non-movant already knows of facts giving

rise to the proposed amendment, such an amendment cannot result in prejudice because it merely addresses that of which the non-movant is already aware. See *Life Gen. Sec. Ins. Co. v. Horal*, 667 So. 2d 867, 970 (Fla. 4th DCA 1996) (holding that the non-movant "would be hard pressed to complain of prejudice since the facts eliciting the proposed were known by her"); *see also United Servs. Auto. Ass'n v. Univ. Chiropractic Ctr.*, 20 Fla. L. Weekly Supp. 873a (Fla. 17th Cir. Ct. May 23, 2013). Further, courts "should be especially liberal when leave to amend is sought at or before a hearing on a motion for summary judgment." *Hutson v. Plantation Open MRI, LLC*, 66 So. 3d 1042, 1044 (Fla. 4th DCA 2011).

11. It is error for a court to deny an amendment solely based on the length of time an action has been pending and without weighing the amendment in terms of prejudice to a provider's ability to prepare for the new defenses. *Progressive Select Ins. Co. v. TheImaging Ctr. of West Palm Beach, LLC a/a/o Erica Prete*, 4D21-3074 (Fla. 4th DCA Mar. 8, 2023). ("If, however, leave to amend is sought at or before a hearing on a motion for summary judgment, appellate courts have routinely rejected a finding of prejudice."); *see also GEICO Gen. Ins. Co. v. A & C Med. Ctr., Inc.*, No. 3D22-0145, 2023 WL 1999636, at *2 (Fla. 3d DCA 2023)("this court and others have declined to impute prejudice on a time delay alone."); *GEICO Indemnity Co. v. Simply Health Care, Inc. a/a/o Yurisleydi Azqueriz-Estrada*, 2023 WL 2903412 (Fla. 3d DCA 2023) (finding trial Court abused its discretion in failing to grant leave to amend); *Design Neuroscience Ctrs., P.L. v. Preston J. Fields, P.A.*, 2023 WL 2777480 (Fla. 3d DCA 2023)("prejudice based on the length of time a case has been pending does not alone justify denying a motion for leave to amend.").

12. Plaintiff has attached its proposed second amended statement of claim as Exhibit "A" to this Motion.

Wherefore, Plaintiff respectfully requests that this Court GRANT the Motion herein and any other relief the Court deems just and proper.

## **CERTIFICATE OF SERVICE**

WE HEREBY CERTIFY that a true and correct copy of the foregoing was served via e-mail this this June 17, 2024 to all counsel of record.

**Beighley, Myrick, Udell, Lynne & Zeichman PA**
*Attorneys for Plaintiff*
2601 S. Bayshore Drive, Suite 770
Miami, FL 33133
(305) 349-3930 – Phone

By:      /s/ *Maury L. Udell*
Maury L. Udell, Esquire
mudell@bmulaw.com
Fla. Bar 121673

# EXHIBIT "A"

IN THE COUNTY COURT OF THE 11TH JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA

Sergio Salani,

CASE NO.: 2022-047421-SP-25

      Plaintiff,

BAR NO.: 121673

v.

AT&T Mobility, LLC,

      Defendant.

_____/

## SECOND AMENDED STATEMENT OF CLAIM

Plaintiff, Sergio Salani, through its undersigned counsel, hereby files this Second Amended Statement of Claim against Defendant, AT&T, Mobility, LLC ("AT&T MOBILITY, LLC"), and further alleges as follows:

## GENERAL ALLEGATIONS

1. This is an action against AT&T for damages for $8,000, exclusive of interest, attorney's fees, and costs.

2. At all material times, Plaintiff was a customer of AT&T, XXX-XX9-8349.

3. AT&T MOBILITY, LLC is a foreign limited liability company licensed and doing business in Miami-Dade County, Florida subject to the general and specific jurisdiction of this Court.

4. Venue is proper in Miami-Dade County, Florida.

5. Plaintiff has complied with all statutory and/or contractual conditions precedent to filing this action.  Plaintiff is the title holder to any claim against AT&T MOBILITY, LLC and has an interest in the subject matter of this claim.  Plaintiff's claim is not preempted by any federal statute.

6. According to court filings made by AT&T MOBILITY, LLC in federal court, it is a nongovernmental limited liability company that has no parent company, but its members are BellSouth Mobile Data, Inc.; SBC Long Distance, LLC; and SBC Tower Holdings LLC. Those entities (and thus AT&T MOBILITY, LLC) are all indirectly wholly owned by AT&T Inc., which is the only publicly held company with a 10 percent or greater ownership stake in them.

7. AT&T, Inc. reports its consolidated business results, and breaks out selected disclosures for its major operating segments. Their segments are strategic business units that offer different products and services over various technology platforms and/or in different geographies that are managed accordingly. They analyze the operating segments based on segment contribution, which consists of operating income, excluding acquisition-related costs and other significant items, and equity in net income (loss) of affiliates for investments managed within each operating segment.

8. There are four reportable segments of AT&T, Inc.: (1) Communications, (2) Warner Media, (3) Latin America and (4) Xandr. AT&T MOBILITY, LLC is a major retailer of smartphones and provider of wireless broadband internet access service for smartphones.

9. Smartphone owners use mobile data for, including but not limited to, sending and receiving email, using GPS navigation, watching and streaming video, and browsing the internet. AT&T MOBILITY, LLC is a major retailer of smartphones and provider of wireless broadband internet access service for smartphones ("mobile data"). Smartphone owners use mobile data for, including but not limited to, sending and receiving email, using GPS navigation, watching and streaming video, and browsing the internet.

10. AT&T MOBILITY, LLC's place in AT&T Inc corporate structure can be identified as follows:



11. The Communications segment provides wireless and wireline telecom, video and broadband services to consumers located in the U.S. or in U.S. territories and businesses globally. Communications services and products are marketed under the AT&T, Cricket, AT&T PREPAID and DIRECTV brand names. The Communications segment provided approximately 84% of 2018 segment operating revenues and 84% of our 2018 total segment contribution. This segment contains the Mobility, Entertainment Group and Business Wireline business units.

12. Within Communications is the Mobility business unit that provides nationwide wireless services to consumers and wholesale and resale wireless subscribers located in the United States or U.S. territories by utilizing our network to provide voice and data services, including high-speed internet over wireless devices. They classify subscribers as either postpaid, prepaid, connected device or reseller. As of December 31, 2018, they served 153 million Mobility subscribers, including 77 million postpaid, 17 million prepaid, 8 million reseller and 51 million connected devices. Their Mobility business unit revenue includes (2) reported categories: Wireless Services, and Equipment.

13. AT&T MOBILITY, LLC offers a range of nationwide wireless voice and data communications services in a variety of pricing plans to meet the communications needs of targeted customer categories. Their wireless services also include advertising revenues generated from the subscriber relationships. They offer plans that include features allowing for the sharing of voice, text and data across multiple devices, which attracts subscribers from other providers and minimize subscriber churn. The churn rate, also known as the rate of attrition or customer churn, is the rate at which customers stop doing business with an entity within a given time period.

14. Customers in the "connected device" category (e.g., users of session-based tablets, monitoring devices and automobile systems) generally purchase those devices from third-party suppliers that buy data access supported by our network. They also offer nationwide wireless voice and data communications to certain customers who prefer to pay in advance. These services are offered under the Cricket and AT&T PREPAID brands and are typically monthly prepaid services.

15. AT&T MOBILITY, LLC sells a wide variety of handsets, wirelessly enabled computers (e.g., tablets and notebooks) and wireless data cards manufactured by various suppliers for use with our voice and data services. They also sell accessories, such as carrying cases and hands-free devices. They sell through their own company-owned stores, agents and third-party retail stores. Like other wireless service providers, they have historically provided postpaid subscribers substantial equipment subsidies to initiate, renew or upgrade service.

16. AT&T MOBILITY, LLC prominently advertises particular flat monthly amounts for its post-paid wireless service plans. Then, after customers sign up, AT&T MOBILITY, LLC actually charges higher monthly amount for service and for terms of usage than the customers were promised and agreed to pay. AT&T MOBILITY, LLC covertly increases the actual overall price by padding all post-paid wireless customers' bills each month, including Plaintiff's bills, with a bogus so-called Administrative Fee  (currently $1.99 every month for each phone line) on top of the advertised price.  AT&T MOBILITY, LLC has stated that it charges the administrative fee because it is a "standard administrative fee" across the wireless industry.  However, in 2017, T-Mobile eliminated the "administrative charges". Moreover, prepaid carriers like MetroPCS and AT&T's subsidiary Cricket Wireless *do not charge administrative fees.*

17. The Administrative Fee is not properly disclosed to customers before or when they sign up, and in fact it is never adequately and honestly disclosed.

18. The so-called Administrative Fee is not, in fact, a bona fide administrative fee, but rather is simply a means for AT&T MOBILITY, LLC to charge more per month for the term of usage itself without having to advertise the higher overall price as a scheme to increase

revenue.  AT&T Mobility, LLC's previous in court public admissions (filed by its corporate counsel, Patricia Cruz, Esq.) to the conduct alleged in this case (data throttling) via its filing of its "consent to payment for conduct for the claims asserted or which could have been asserted" in the cases of Erin Young v. AT&T Mobility, LLC, Case No. 2019-2027-SP-26, EFiling#87601121 or Tamara Crespo v. AT&T Mobility, LLC, Case No. 2019-2026-SP26, E-Filing#87600869 both of which alleged AT&T's violation of FDUTPA for illegal data throttling and bogus administrative fee, is further evidence of AT&T Mobility, LLC's illegal, immoral and unethical conduct.

19. Making matters worse, AT&T MOBILITY, LLC deliberately confuse Plaintiff and misleadingly suggests that the Administrative Fee is akin to a tax or another standard government pass-through fee, when in fact it is simply a way for AT&T MOBILITY, LLC to advertise and promise lower amounts than it actually charges.

20. The administrative fee is not, in fact, tied to the costs that AT&T MOBILITY, LLC's incurs. This is corroborated by the fact that AT&T has repeatedly increased the amount of the monthly Administrative Fee since the fee was first imposed, while during that same time period the stated "costs" for (i.e., interconnect charges and cell site rental charges) have actually *decreased* according to AT&T's own financial statements and public filings with the Securities and Exchange Commission.

21. AT&T MOBILITY, LLC's cell site rental and maintenance costs or interconnectivity costs, which AT&T MOBILITY, LLC's financial statements show have gone down at the same time AT&T MOBILITY, LLC has significantly increased the amount of the administrative fee as a term of usage.

22. Thus, by AT&T MOBILITY, LLC's own design, AT&T MOBILITY, LLC's scheme is to keep customers from realizing they are being deceived and thus overcharged for the term of

usage.  Such a deceptive practice is AT&T's misrepresentation of why a fee is being charged and where the money for the fee is being transferred to, if anywhere.

23. AT&T MOBILITY, LLC imposed and has increased the Administrative Fee as a covert way to increase the amount AT&T can charge as a term of usage without having to specifically advertise such higher amounts to use the service.   AT&T MOBILITY, LLC increased the Administrative Fee in large part to fund unrelated corporate liabilities of its parent company AT&T Inc., including to pay down the debt incurred in connection with the acquisition of Time Warner Inc. in 2018.

24. In all events, AT&T MOBILITY, LLC should clearly disclose the Administrative Fee and should clearly and accurately state the true monthly prices and applicable costs of AT&T Mobility, LLC for its terms of usage and the correct amount to charge.

25. Since the Administrative Fee was first introduced in 2013, AT&T MOBILITY, LLC has increased the amount of the fee three times, including twice over a three-month period in 2018.  The current amount that AT&T MOBILITY, LLC charges all post-paid wireless customers for this fee is $1.99 per line every month, i.e., more than 200% more than the original amount of the fee, including Plaintiff's bill.

26. AT&T MOBILITY, LLC has used this Administrative Fee scheme to improperly squeeze consumers for **hundreds of millions of dollars** in additional revenue without disclosing the actual "increased costs" in any financial filing available to any customer, including Plaintiff.

27. In essence, AT&T MOBILITY, LLC introduced the bogus Administrative Fee as a way to covertly increase the actual monthly price customers are charged for their service, and then has continued to use the Administrative Fee and unilateral increases thereto as a

lever by which AT&T MOBILITY, LLC continues to ratchet up the price without the customer realizing and after the customer is already committed.

28. The Administrative Fee is part of a design to profit AT&T MOBILITY, LLC rather than pay for what it has determined is an increase in actual costs of AT&T MOBILITY, LLC.  Thus, the practice of applying the administrative fee to Plaintiff's bill is in and of itself is unfair and deceptive.

29. This scheme has enabled, and continues to enable, AT&T MOBILITY, LLC to effectively increase its amount charged without having to publicly announce those higher amounts, and allows AT&T MOBILITY, LLC to entice more customers by misrepresenting the costs customers would pay both in absolute terms and relative to other wireless providers in the industry.

30. The Third District Court of Appeal authored the case of *Advance Mold Servs. v. Universal N. Am. Ins. Co.*, 2023 Fla. App. LEXIS 8638 (Fla. 3d DCA Dec. 20, 2023). In *Advance Mold Servs.*, the defendant moved to dismiss an assignee's breach of insurance contract action, contending that a fee designated on an estimate as "Hazardous Waste/Mold Cleaning-Supervisory/Admin-per hour" constituted a statutorily prohibited "**administrative fee**." **The plaintiff asserted that the fee was used to pay a supervisor and not as a clerical fee associated with administering the contract. This court held that a question of fact existed, precluding dismissal of complaint, as to whether the fee constituted an "administrative fee."**

## <u>COUNT I - FRAUD</u>

31. Plaintiff re-alleges, restates, and incorporates the allegations contained in paragraphs one (1) through thirty (30) above, and further alleges as follows:

32.      AT&T MOBILITY, LLC's representations on its bills to Plaintiff regarding the administrative fee charged on the account were false statements of material fact.  AT&T MOBILITY, LLC's representation that the  Administrative Fee is a charge assessed by AT&T MOBILITY,LLC that helps defray a portion of certain expenses AT&T MOBILITY, LLC incurs, including but not limited to: (a) charges AT&T MOBILITY, LLC or its agents pay to interconnect with other carriers to deliver calls from AT&T MOBILITY, LLC customers to their customers; and (b) charges associated with cell site rents and maintenance" are false.

33. AT&T MOBILITY, LLC knew or should have known that the representations all identified above were false as AT&T MOBILITY, LLC's cost in interconnect charges and cell site charges actually decreased.

34. AT&T MOBILITY, LLC intended that the representations above caused Plaintiff to continue as a customer with AT&T MOBILITY, LLC and otherwise pay the administrative fee to maintain an account with AT&T MOBILITY, LLC.

35. Plaintiff has suffered damages in justifiable reliance on the representations above including but not limited to the payment for bogus administrative fees on a monthly basis.

WHEREFORE, Plaintiff respectfully requests that this Court grant judgment in its favor and against AT&T MOBILITY, LLC for compensatory damages, nominal damages, interest, court costs, and any other relief the Court deems just and proper.

## COUNT II - DAMAGES UNDER THE FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT

36. Plaintiff re-alleges, restates, and incorporates the allegations contained in paragraphs one (1) through thirty (30) above, and further alleges as follows:

37. Plaintiff, at all material times, was a consumer, as defined under the Florida Deceptive

and Unfair Trade Practices Act ("FDUTPA"), § 501.201, *et seq*., Fla. Stat.

38. AT&T MOBILITY, LLC, at all material times, was engaged in trade or commerce, as defined under the FDUTPA and is not otherwise exempt.

39. In the advertising, sale, and renewal of mobile data and wireless plans and acceptance of payments, AT&T MOBILITY, LLC has represented, directly or indirectly, expressly or by implication, to customers that it would be charged a certain amount for terms of usage. AT&T MOBILITY, LLC has since added an "Administrative Fee" to Plaintiff's bill which is unfair and deceptive as it is not what it's being used for.   The administrative fee is a textbook pass through-fee.

40. Since the Administrative Fee was first imposed in 2013, AT&T MOBILITY, LLC has unilaterally increased the monthly amount of the fee three times. AT&T MOBILITY, LLC increased the Administrative Fee to $0.76 per month per phone line starting in June 2016. Then, in 2018, the increases because larger and more frequent (around the same time AT&T MOBILITY, LLC's parent company incurred significant debt in acquiring Time Warner Inc.).

41. AT&T MOBILITY, LLC raised the Administrative Fee to $1.26 per month per phone line starting in April 2018, and then again to $1.99 per month per phone line starting in June 2018, which is the current monthly fee as of this filing. Thus, between March 2018 and June 2018 alone, AT&T MOBILITY, LLC increased the Administrative Fee a whopping 162% increase in just three months.

42.        AT&T MOBILITY, LLC's representations to Plaintiff regarding the administrative fee charged are deceptive and in fact misrepresent the truth.   AT&T MOBILITY, LLC's representation that the Administrative Fee is a charge assessed by AT&T MOBILITY, LLC that helps defray a portion of certain expenses AT&T MOBILITY, LLC incurs, including but not limited

to: (a) charges AT&T MOBILITY, LLC or its agents pay to interconnect with other carriers to deliver calls from AT&T MOBILITY, LLC customers to their customers; and (b) charges associated with cell site rents and maintenance is false.  The administrative fee is instead a scheme to funnel direct profit to AT&T MOBILITY, LLC rather than pay for any identifiable increase in costs.

43. AT&T MOBILITY, LLC knew or should have known that the representations regarding the administrative fee are false as AT&T MOBILITY, LLC's cost in interconnect charges and cell site charges actually decreased based on its own SEC federal filings.  AT&T MOBILITY, LLC knew that the monthly administrative fee was inflated, and not the result of good faith financial practices but instead designed to raise profit for the company without a specific actual change in price for the term of usage. Such a practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers, including Plaintiff.

44. AT&T MOBILITY, LLC's knowingly unfair or deceptive trade practices of assessing and collecting a bogus administrative fee are the proximate cause of Plaintiff's 's actual damages.

45. AT&T MOBILITY, LLC's unfair and deceptive trade practice is not a result of a bona fide error or mistake but instead a conscious decision by AT&T MOBILITY, LLC.

46. Plaintiff has retained the undersigned to represent it in this action and pay a reasonable fee for said legal services.

WHEREFORE, Plaintiff respectfully requests that this Court grant judgment in its favor and against AT&T MOBILITY, LLC for damages, interest, court costs, attorney's fees pursuant to §501.2105, Florida Statutes, and any other relief the Court deems just and proper.

## COUNT III – ACTION FOR DECLARATORY AND/OR INJUNCTIVE RELIEF UNDER FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT ("FDUTPA") –

47. Plaintiff re-alleges, restates, and incorporates the allegations contained in paragraphs one (1) through thirty (30) above, and further alleges as follows:

48. Under the FDUTPA, without regard to any other remedy or relief to which a person is entitled, anyone aggrieved by a violation of this part may bring an action to obtain a declaratory judgment that an act or practice violates this part and to enjoin a person who has violated, is violating, or is otherwise likely to violate 501.201 et. seq. See Fla. Stat. §501.211(1). Plaintiff is an aggrieved consumer whose rights have been, are being, or will be adversely affected, by AT&T MOBILITY, LLC.'s violation of FDUTPA--meaning an unfair or deceptive practice which is injurious to consumers, including Plaintiff.

49. Pursuant to AT&T MOBILITY, LLC's above-described acts or practices of placing a bogus administrative fee on Plaintiff's account, AT&T MOBILITY, LLC violated the FDUTPA. The Administrative Fee is part of a design to profit AT&T MOBILITY, LLC rather than pay for what it has determined is an increased in cost of AT&T MOBILITY, LLC. Thus, the practice of applying the administrative fee to Plaintiff's bill is in and of itself is unfair and deceptive.

50. Plaintiff seeks a declaratory judgment that AT&T MOBILITY, LLC's acts or practices have violated the FDUTPA.

51. Plaintiff seeks to determine whether the FDUTPA prohibits AT&T MOBILITY, LLC from continuing to apply the bogus administrative fee which is likely to occur in the future.

52. There is a bona fide dispute between the parties. Plaintiff has a justiciable question as to the existence or non-existence of some right, status, immunity, power, or privilege, or some fact upon which their claim may depend.

53. Plaintiff is in doubt as to the right of AT&T MOBILITY, LLC to continue to charge an unlawful fee which violates FDUTPA.

54. There is a bona fide, actual, and present need for the declaration.

55. Plaintiff has retained the undersigned to represent it in this action and pay a reasonable fee for said legal services.

      WHEREFORE, Plaintiff respectfully requests that this Court grant declaratory judgment and/or injunctive relief in its favor and against AT&T MOBILITY, LLC, court costs, attorney's fees pursuant to Section 501.2105, Florida Statutes, and any other relief the Court deems just and proper.

## <u>COUNT IV – UNJUST ENRICHMENT</u>

56. Plaintiff re-alleges, restates, and incorporates the allegations contained in paragraphs one (1) through seven (7), twenty-five (25) through twenty-eight (28) above, and further alleges as follows:

57. Defendant assessed improper increased charges of $1.99/month administrative fee on Plaintiff's account.  It is not a tax or charge which the government requires AT&T to collect from its customers.  This charge is subject to change from time to time as AT&T's costs change which is improperly labeled.

58. In June of 2018, Defendant increased its "administrative fee" to $1.99/per, per month with no specific reason or allegation that AT&T's costs had changed.

59. Defendant knew the monthly administrative fee was inflated and not the result of good faith financial practices and not actual costs of AT&T Mobility, LLC. Defendant had knowledge of payments by Plaintiff and voluntarily accepted and retained the benefit conferred on it.

60. AT&T MOBILITY, LLC's unfair and deceptive trade practice is not a result of a bona fide error or mistake but instead a conscious decision by AT&T MOBILITY, LLC.

61. Under the circumstances, it would be inequitable for Defendant to retain the benefit and thus as a result of the bogus administrative fee, Plaintiff suffered damages.

62. Plaintiff has retained the undersigned to represent it in this action and pay a reasonable fee for said legal services.

　　　　WHEREFORE, Plaintiff demands judgment against Defendant for compensatory damages, interest, court costs and any other relief the Court deems just and proper.

## COUNT V – NEGLIGENCE FOR DATA BREACH

63. Plaintiff re-alleges, restates, and incorporates the allegations contained in paragraphs one (1) through thirty (30) above, and further alleges as follows:

64. AT&T learned and had actual knowledge that a well-known threat actor claimed to be selling a database containing the personal information of over 70 million AT&T customers.  This  information included customers' names, addresses, phone numbers, Social Security numbers, and dates of birth.  Instead of investigating the source and cause of the massive breach, AT&T denied the allegations, ignored the issue, and continued with business as usual and proceeded to tell at least one media outlet that "the information that appeared in an internet chat room does not appear to have come from our systems."[1] And when questioned about its vendors, AT&T chose not to speculate: "Given this information did not come from us, we can't speculate on where it came from or whether it is valid."[2] AT&T attempted to fully wash its hands of the disaster it created.

65. The same customer data is no longer just for sale; it has been fully exposed on the Dark

Web. And after years of denial, AT&T eventually has changed its denial tune and finally admitted that approximately 73 million former and current AT&T customers' personal and sensitive information was released onto the Dark Web (the "Data Breach"), including Plaintiff's information.

66. According to AT&T, customers' impacted information included a combination of their "full name, email address, mailing address, phone number, social security number, date of birth, and AT&T account number and passcode" (collectively, "PII"), which AT&T collected as a condition for use of its services. This recent revelation marks a concerning turn of events.  AT&T mandated that before any of its customers are able to use its services, each and every customer was required to entrust AT&T with their PII, and by implied contract, AT&T agreed to safeguard and protect that PII, but massively failed to do so, then it lied to the public when it told the public that the leaked data of 73 million past and current AT&T customers did not come from AT&T only to be cornered later and forced to sheepishly admit that the data breach did in fact originate with AT&T.  AT&T failed to safeguard the PII of its customers including Plaintiff, and failed to take reasonable measures to protect the PII of its own customers because doing so would cost more and possibly decrease its profits.

67. Equally troubling is that AT&T still appears clueless as to the source of the breach. One would hope that – in nearly three years – a telecom giant like AT&T would have conducted a "robust investigation" into the data leak to determine who was responsible, where the data originated from, which customers were impacted, how the Data Breach occurred, and other key factors. But it did not. Had it done so, the 73 million customers could have attempted to adequately protect themselves. Instead, AT&T remained willfully blind and

recklessly exposed the PII pf 73 million people to the Dark Web.

68. This Data Breach and resulting injuries occurred because AT&T failed to implement reasonable security procedures and practices (including failing to exercise appropriate managerial control over third-party partner's data security), failed to disclose material facts surrounding its deficient data security protocols, and failed to timely notify the victims of the Data Breach.

69. As a result of AT&T's failure to protect the PII it was entrusted to safeguard, Plaintiff now faces a significant risk of identity theft and fraud, financial fraud, and other identity-related fraud now and into the indefinite future.  Plaintiff also faces the significant present and future expense of monitoring PII which which was entrusted to AT&T.

70. In connection with providing its wireless services, AT&T required Plaintiff to provide personal information, including but not limited to names, addresses, Social Security numbers, and dates of birth. As a result, when consumers contract AT&T's services, their highly sensitive PII is stored on AT&T's network servers.

71. Given the amount and sensitive nature of the data it collects, AT&T maintains policies explaining its privacy practices handling consumers' personal information. Through these policies, AT&T represents to consumers and the public that it possesses robust security features to protect PII and it they their responsibility to protect PII seriously.

72. Given AT&T's avowed and superior experience in its field handling highly sensitive personal information, it obviously understood the need to protect consumers' PII and prioritize data security.  But actually satisfying that obligation posed a minor expense which conflicted with AT&T's profit motive and cavalier corporate culture.

73. AT&T admitted that its data security was breached and acknowledged the legitimacy of

the leaked customer data:

AT&T has determined that AT&T data-specific fields were contained in a data set released on the dark web approximately two weeks ago. While AT&T has made this determination, it is not yet known whether the data in those fields originated from AT&T or one of its vendors. With respect to the balance of the data set, which includes personal information such as social security numbers, the source of the data is still being assessed.

AT&T has launched a robust investigation supported by internal and external cybersecurity experts. Based on our preliminary analysis, the data set appears to be from 2019 or earlier, impacting approximately 7.6 million current AT&T account holders and approximately 65.4 million former account holders.

Currently, AT&T does not have evidence of unauthorized access to its systems resulting in exfiltration of the data set. The company is communicating proactively with those impacted and will be offering credit monitoring at our expense where applicable.  We encourage current and former customers with questions to visit www.att.com/accountsafety for more information.

As of today, this incident has not had a material impact on AT&T's operations.

74. AT&T had a duty to protect Plaintiff's private information and massively breached that duty.

75. But AT&T, like any company of its size that collects and stores massive amounts of sensitive PII, should have had robust state-of-the-art protections in place to detect and terminate a successful intrusion long before access and exposure of customer data. AT&T also should have exercised appropriate managerial control over their third-party partners' data security when it knew these partners stored its customers' PII in the course of carrying out the business of their partnership. AT&T's failure to prevent the breach is inexcusable given its knowledge that it and its affiliates are prime targets for cyberattacks.

76. In 2022, the National Security Agency (NSA), the Cybersecurity and Infrastructure Security Agency (CISA), and the Federal Bureau of Investigation (FBI) co-authored the joint Cybersecurity Advisory explicitly highlighting [t]elecommunications and network

service provider targeting" by cyber actors. The Advisory explains how cyber actors exploit and access telecommunication organizations and network service providers though the use of open-source tools "that allows for the scanning of IP addresses for vulnerabilities." Once these cyber actors gain an initial foothold, they identify "critical users and infrastructure including systems critical to maintaining the security of authentication, authorization, and accounting."

77. Thus, whether the data breach occurred through AT&T's own systems or its third-party vendors, AT&T was responsible for the protection of Plaintiff's PII.

78. And AT&T recognized these risks in its own regulatory filings with the SEC.

79. If not through its own history, AT&T surely understood the risk from its competitors. Considering recent high profile data breaches at other telecommunications companies, such as Xfinity (36,000,000 impacted, announced December 2023); T-Mobile (37,000,000 impacted, announced January 2023); and US-Cellular (52,000 impacted, announced March 2023), among others, AT&T knew or should have known that its data and consumers' PII would be, or had already been, targeted by cybercriminals.

80. To prevent unauthorized access, CISA encourages organizations like AT&T to:

   a. Conduct regular    vulnerability        scanning to identify and address vulnerabilities, particularly on internet-facing devices;

   b. Regularly patch and update software to latest available versions, prioritizing timely patching of internet-facing servers and software processing internet data;

   c. Ensure devices are properly configured and that security features are enabled;

   d. Employ best practices for use of Remote Desktop Protocol (RDP) as threat actors often gain initial access to a network through exposed and poorly secured remote

services; and

    e. Disable operating system network file sharing protocol known as Server Message Block (SMB) which is used by threat actors to travel through a network to spread malware or access sensitive data.

81. The CISA guidance further recommends use of a centrally managed antivirus software utilizing automatic updates that will protect all devices connected to a network (as opposed to requiring separate software on each individual device), as well as implementing a real-time intrusion detection system that will detect potentially malicious network activity that occurs prior to ransomware deployment.

82. Consequently, AT&T knew of the importance of safeguarding PII and of the foreseeable consequences that would occur if their data security system was breached, including the significant costs that would be imposed on customers as a result of a breach.

83. But despite all of the publicly available knowledge of the continued compromises of PII and despite holding the PII of millions of customers, AT&T failed to use reasonable care in maintaining the privacy and security of the PII of Plaintiff.

84. Had AT&T implemented industry standard security measures, adequately invested in data security, and promptly investigated cybersecurity issues, unauthorized parties likely would not have been able to access AT&T's or its third- party vendors' systems and the Data Breach would have been prevented or much smaller in scope.

85. The PII of consumers, including Plaintiff's, remains of high value to criminals, as evidenced by the continued sale and trade of such information on underground markets found on the "dark web"— which is a part of the internet that is intentionally hidden and inaccessible through standard web browsers

86. Data sets that include PII demand a much higher price on the black market. For example,

the information likely exposed in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach, where victims can easily cancel or close credit and debit card accounts.[25] The information likely disclosed in this Data Breach is impossible to "close" and difficult, if not impossible, to change (such as Social Security numbers).

87. There is also an active and robust *legitimate* market for PII. In 2021, the data brokering industry alone was valued at $319 billion. In fact, the data marketplace is so sophisticated that consumers can actually sell their non-public information directly to a data broker who in turn aggregates the information and provides it to marketers or app developers. Consumers who agree to provide their web browsing history to the Nielsen Corporation can receive up to $50.00 a year.

88. Because their PII has independent value, Plaintiffs must take measures to protect it including by, as AT&T's online notice instructs, placing "alerts" with credit reporting agencies, changing passcodes, and reviewing and monitoring credit reports and accounts for unauthorized activity, which may take years to discover and detect.

89. In connection with obtaining AT&T's services, Plaintiff was required to provide highly sensitive personal information, such as his contact information, date of birth, Social Security number, and so on. AT&T also prompted Mr. Isbell to create login credentials to access his accounts.

90. In the regular course of business, AT&T shared Plaintiff's information with several third-party partners whom AT&T was obligated to verify their data security practices because those third parties stored the information AT&T collected.

91. Plaintiff used the website "haveibeenpwned.com" to check if his PII had been part of the

AT&T Data Breach. The website confirmed that Plaintiff was a victim of the Data Breach.

92. As a result of the Data Breach, Plaintiff has spent time and effort researching the breach and reviewing his financial statements for evidence of unauthorized activity, which he will continue to do indefinitely.  Plaintiff will also incur the significant cost of present and future credit monitoring to catch the likely identity theft as early as possible.

93. Plaintiff also suffered emotional distress knowing that his highly personal information, such as his financial information and Social Security number, is no longer confidential and can be used for extortion, theft or fraud, and any number of additional harms against him for the rest of his life.

94. Because AT&T continues to store and share Plaintiff's PII in the regular course of its business, Plaintiff has a continuing interest in ensuring that the PII is protected and safeguarded from additional authorized access.

95. Federal agencies have issued recommendations and guidelines to help minimize the risks of a data breach for businesses holding sensitive data. For example, the Federal Trade Commission (FTC) has issued numerous guides for businesses highlighting the importance of reasonable data security practices, which should be factored into all business-related decision making.

96. The FTC's publication Protecting Personal Information: A Guide for Business sets forth fundamental data security principles and practices for businesses to implement and follow as a means to protect sensitive data.

97. Among other things, the guidelines note that businesses should (a) protect the personal customer information that they collect and store; (b) properly dispose of personal information that is no longer needed; (c) encrypt information stored on their computer

networks; (d) understand their network's vulnerabilities; and (e) implement policies to correct security problems. The FTC guidelines further recommend that businesses use an intrusion detection system, monitor all incoming traffic for unusual activity, monitor for large amounts of data being transmitted from their system, and have a response plan ready in the event of a breach.

98. Additionally, the FTC recommends that organizations limit access to sensitive data, require complex passwords to be used on networks, use industry- tested methods for security; monitor for suspicious activity on the network, and verify that third-party service providers have implemented reasonable security measures.

99. The FTC has brought enforcement actions against businesses for failing to reasonably protect customer information, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

100.    AT&T was fully aware of its obligation to implement and use reasonable measures to protect customers' PII but failed to comply with these basic recommendations and guidelines that would have prevented this breach from occurring. AT&T's failure to employ reasonable measures to protect against unauthorized access to customer information constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

101.    Although limited detail is available on the Data Breach in terms of exactly how it occurred or the identity of the exact  AT&T employee or business partner who's access

triggered the Data Breach, but AT&T's failure to safeguard customers' PII suggests AT&T failed to fully comply with industry-standard cybersecurity practices, including, but not limited to, proper firewall configuration, network segmentation, secure credential storage, rate limiting, user-activity monitoring, data-loss prevention, encryption, intrusion detection and prevention, and exercising managerial control over third-party vendors' cybersecurity practices.

102.    AT&T's failure to keep Plaintiff's PII secure has severe ramifications. Given the sensitive nature of the PII stolen in the Data Breach—names, date of birth, Social Security numbers, and potentially other sensitive information—hackers can commit identity theft, financial fraud, and other identity-related fraud against Plaintiff now and into the indefinite future

103. As a result, Plaintiff has suffered injury and face an imminent and substantial risk of further injury including identity theft and related cybercrimes due to the Data Breach. Indeed, Plaintiff's PII has already been published to the Dark Web available for any cybercriminal to misuse.

104. As discussed above, the PII likely exposed in the Data Breach is highly coveted and valuable on underground markets as it can be used to commit identity theft and fraud. Malicious actors use PII to, among other things, gain access to consumers' bank accounts, social media, and credit cards. Malicious actors can also use PII to open new financial accounts, open new utility accounts, obtain medical treatment using victims' health insurance, file fraudulent tax returns, obtain government benefits, obtain government IDs, or create "synthetic identities.

105. Further, malicious actors may wait months or years to use the PII obtained in data

breaches, as victims often become complacent and less diligent in monitoring their accounts after a significant period of time has passed. These actors will also re-use stolen PII, meaning individuals can be the victims of several cybercrimes stemming from a single data breach.

106. Even in instances where an individual is reimbursed for a financial loss due to identity theft or fraud, that does not make that individual whole again as there is typically significant time and effort associated with seeking reimbursement. According to the Government Accountability Office, which conducted a study regarding data breaches: "law enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data has been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm. The unauthorized disclosure of the sensitive PII to data thieves also reduces its inherent value to its owner, which has been recognized by courts as an independent form of harm.

107. Consumers are injured every time their data is stolen and traded on underground markets, even if they have been victims of previous data breaches. Indeed, the dark web is comprised of multiple discrete repositories of stolen information that can be aggregated together or accessed by different criminal actors who intend to use it for different fraudulent purposes. Each data breach increases the likelihood that a victim's personal information will be exposed to more individuals who are seeking to misuse it at the victim's expense. And here, Plaintiff's PII is already available to criminal actors on the dark web.

108. As the result of the wide variety of injuries that can be traced to the Data Breach, Plaintiff

has and will continue to suffer economic loss and other actual harm for which they are

entitled to damages, including, but not limited to, the following the unconsented disclosure

of confidential information to a third party;

- losing the value of the explicit and implicit promises of data security;
- identity theft and fraud resulting from the theft of their PII;
- costs associated with the detection and prevention of identity theft and unauthorized use of their financial accounts;
- anxiety, emotional distress, and loss of privacy;
- costs associated with purchasing credit monitoring, credit freezes, and identity theft protection services;
- unauthorized charges and loss of use of and access to their financial and investment account funds and costs associated with inability to obtain money from their accounts or being limited in the amount of money they were permitted to obtain from their accounts, including missed payments on bills and loans, late charges and fees, and adverse effects on their credit;
- lowered credit scores resulting from credit inquiries following fraudulent activities;
- costs associated with monitoring one's own PII and credit use'
- costs associated with identity theft insurance coverage;
- costs associated with higher credit costs in the event of an identity theft;
- costs associated with time spent and the loss of productivity or the enjoyment of one's life from taking time to address and attempt to mitigate and address the actual and future consequences of the Data Breach, including searching for fraudulent activity, imposing withdrawal and purchase limits on compromised accounts, and the stress, nuisance, and annoyance of dealing with the repercussions of the Data Breach; and
- the continued, imminent, and certainly impending injury flowing from potential fraud and identify theft posed by their PII being in the possession of one or many unauthorized third parties.

109. Plaintiff has a direct interest in AT&T's promises and duties to protect its PII, *i.e.,* that

AT&T *not increase* their risk of identity theft and fraud. Because AT&T failed to live up to

its promises and duties in this respect, Plaintiff seek the present value of identity protection

services to compensate them for the present harm and present and continuing increased

risk of harm caused by AT&T's wrongful conduct.

110. Through this remedy, Plaintiff seeks to restore himself close to the same position as

they would have occupied but for AT&T's wrongful conduct, namely their failure to

adequately protect Plaintiff's PII. Plaintiff further seeks to recover the value of the unauthorized access to their PII permitted through AT&T's wrongful conduct. This measure of damages is analogous to the remedies for unauthorized use of intellectual property. Like a technology covered by a trade secret or patent, use or access to a person's PII is non-rivalrous—the unauthorized use by another does not diminish the rights-holder's ability to practice the patented invention or use the trade-secret protected technology.

111. Nevertheless, a plaintiff may generally recover the reasonable use value of the IP—*i.e.,* a "reasonable royalty" from an infringer. This is true even though the infringer's use did not interfere with the owner's own use (as in the case of a non- practicing patentee) and even though the owner would not have otherwise licensed such IP to the infringer. A similar royalty or license measure of damages is appropriate here under common law damages principles authorizing recovery of rental or use value. This measure is appropriate because (a) Plaintiff has a protectible property interest in their PII; (b) the minimum damages measure for the unauthorized use of personal property is its rental value; and (c) rental value is established with reference to market value, i.e., evidence regarding the value of similar transactions.

112. Defendant AT&T required Plaintiff's PII as a condition to receiving AT&T's services. AT&T collected and stored this PII for commercial gain. AT&T collected, stored, and through  its partnerships with third-party vendors, shared the data with these vendors for providing AT&T's services as well as commercial gain.

113. AT&T owed a duty of care to Plaintiff to provide adequate data security, consistent with industry standards, to ensure that AT&T's and its vendors' systems and networks

adequately protected the PII

114. AT&T owed a duty of care to Plaintiff so as to alleviate the risk of compromising Plaintiff's PII.

115. AT&T's duty to use reasonable care in protecting PII arises because of the parties' relationship, as well as common law and federal law, including the FTC regulations described above and AT&T's own policies and promises regarding privacy and data security.

116. AT&T knew, or should have known, of the risks inherent in collecting and storing PII in a centralized location for the purpose of carrying out the business of the partnership, its vendors' vulnerability to network attacks, and the importance of adequate security.

117. AT&T breached its duty to Plaintiff in numerous ways, as described herein, including by:

- Failing to exercise reasonable care and implement adequate security systems, protocols, and practices sufficient to protect the PII of Plaintiff;
- Failing to ensure its vendors implemented adequate security systems, protocols, and practices sufficient to protect the PII of Plaintiff;
- Failing to supervise its vendors regarding vendors' data security systems, protocols, and practices when it knew or should have known those systems, protocols, and practices were inadequate;
- Failing to comply with industry standard data security measures for the telecommunications industry leading up to the Data Breach;
- Failing to comply with its own privacy policies;

- Failing to comply with regulations protecting the PII at issue during the period of the Data Breach;
- Failing to adequately monitor, evaluate, and ensure the security of their vendors' network and systems;
- Failing to recognize in a timely manner that PII had been compromised; and

- Failing to timely and adequately disclose the Data Breach.

118. Plaintiff's PII would not have been compromised but for AT&T's wrongful and negligent breach of its duties

119. AT&T's failure to take proper security measures to protect the sensitive PII of Plaintiff as described herein, created conditions conducive to a foreseeable, intentional criminal act, namely the unauthorized access, copying, and exfiltrating of PII by unauthorized third parties. Given that telecommunications businesses are prime targets for hackers, Plaintiff are part of a foreseeable, discernible group that was at high risk of having its PII misused or disclosed if not adequately protected by AT&T.

120. It was also foreseeable that AT&T's failure to provide timely and forthright notice of the Data Breach would result in injury to Plaintiff.

121. As a direct and proximate result of AT&T's conduct, Plaintiff has and will suffer damages including: (i) the loss of rental or use value of their PII; (ii) the unconsented disclosure of their PII to unauthorized third parties; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, fraud, and/or unauthorized use of their PII; (iv) lost opportunity costs associated with addressing and attempting to mitigate the actual and future consequences of the Data Breach, including, but not limited to, efforts spent researching how to prevent, detect, contest, and recover from fraud and identity theft; (v) time, effort, and expense associated with placing fraud alerts or freezes on credit reports; (vi) anxiety, emotional distress, loss of privacy, and other economic and non-economic losses; (vii) the continued risk to their PII, which remains in AT&T's possession and is subject to further unauthorized disclosures so long as AT&T fails to undertake appropriate and adequate measures to protect it; (viii) future costs in terms of

time, effort and money that will be expended to prevent, detect, contest, and repair the inevitable and continuing consequences of compromised PII for the rest of their lives; and (ix) any nominal damages that may be awarded.

WHEREFORE, Plaintiff respectfully requests that this Court grant judgment in his favor and against AT&T for nominal and compensatory damages, interest, court costs, and any other relief the Court deems just and proper.

## COUNT VI-VIOLATION OF FDUTPA FOR DATA BREACH

122. Plaintiff re-alleges, restates, and incorporates the allegations contained in paragraphs one (1) through twenty-seven (27) above and further alleges as follows:

123. Defendant engaged in unfair or deceptive acts or practices in the conduct of consumer transactions in violation of FDUTPA, including but not limited to:

    a. Representing that its services were of a particular standard or quality that it knew or should have known were of another;

    b. Failing to implement and maintain reasonable security and privacy measures to protect Plaintiff's Sensitive Information, which was a direct and proximate cause of the Data Breach;

    c. Failing to identify foreseeable security and privacy risks, and remediate identified security and privacy risks, which was a direct and proximate cause of the Data Breach;

    d. Failing to comply with common law and statutory duties pertaining to the security and privacy of Plaintiff;s Sensitive Information, including duties imposed by the FTCA, 15 U.S.C. § 45, which was a direct and proximate cause of the Cyber-Attack and data breach;

    e. Misrepresenting that it would protect the privacy and confidentiality of Plaintiff's Sensitive Information, including by implementing and maintaining reasonable security measures;

    f. Omitting, suppressing, and concealing the material fact that it did not reasonably or adequately secure Plaintiff's Sensitive Information; and

    g. Omitting, suppressing, and concealing the material fact that it did not comply with common law and statutory duties pertaining to the security and privacy of Plaintiff's Personal Information, including duties imposed by the FTCA, 15 U.S.C. § 45, which

was a direct and proximate cause of the Data Breach.

124.   Defendant's representations and omissions were material because it was likely to deceive reasonable consumers about the adequacy of Defendant's data security and ability to protect the confidentiality of consumers' Sensitive Information.

125.   In addition, Defendant's failure to secure consumers' PHI violated the

FTCA and therefore violated FDUTPA.

126.   Defendant knew or should have known that its computer systems and data security practices were inadequate to safeguard the Sensitive Information of Plaintiff, deter hackers, and detect a breach within a reasonable time, and that the risk of a data breach was highly likely.

127.   The aforesaid conduct constitutes a violation of FDUTPA, Fla. Stat. § 501.204, in that it is a restraint on trade or commerce.

128.   As a direct and proximate result of Defendant's violation of FDUTPA, Plaintiff is entitled to a judgment under Fla. Stat. § 501.201, *et seq*, to enjoin further violations, to recover the costs of this action (including reasonable attorney's fees), and such other further relief as the Court deems just and proper.

129.   Defendant's implied and express representations that it would adequately safeguard Plaintiff's Sensitive Information constitute representations as to characteristics, uses or benefits of services that such services did not actually have, in violation of Fla. Stat. § 501.202(2).

130.   Most, if not all, of the alleged misrepresentations and omissions by AT&T complained of herein that led to inadequate safety measures to protect patient information occurred within or were approved within Florida.

131.   AT&T's implied and express representations that it would adequately safeguard

Plaintiff's Sensitive Information constitute representations as to the particular standard, quality, or grade of services that such services did not actually have (as the data security services were of another, inferior quality), in violation of Fla. Stat. § 501.204.

132.  AT&T knowingly made false or misleading statements in its privacy policy regarding the use of personal information submitted by members of the public in that Defendant advertised it is committed to protecting privacy and securely maintaining personal information. Defendant did not securely maintain personal information as represented.

133.  These violations have caused actual damages to Plaintiff and created an unreasonable, imminent risk of future injury.

134.  Plaintiff brings this action under the Deceptive and Unfair Trade Practices Act to seek such injunctive relief necessary to enjoin further violations and to recover costs of this action, including reasonable attorneys' fees and costs.

WHEREFORE, Plaintiff respectfully requests that this Court grant judgment in its favor and against AT&T for damages and injunctive relief requiring, declaratory relief, court costs, attorney's fees pursuant to §501.2105, Florida Statutes, and any other relief the Court deems just and proper.

### <u>COUNT VII - BREACH OF IMPLIED DUTY OF GOOD FAITH AND FAIR DEALING</u>

135.  Plaintiff re-alleges, restates and incorporates the allegations contained in paragraphs one (1) through thirty (30) above, and further alleges as follows:

136.  Plaintiff had a wireless agreement with AT&T wherein Plaintiff had a reasonable expectation of performance of the agreement with no throttling of Plaintiff's data speed so as to provide Plaintiff with unlimited data.

137.  AT&T was required to act in a commercially reasonable manner and limiting its ability

to act capriciously to contravene the reasonable expectations of the Plaintiff in the AT&T's performance wireless agreement.

138. Moreover, AT&T was required to act in a commercially reasonable manner in billing Plaintiff for bogus administrative costs which were not for what they claimed in the contract

139. . AT&T's representations on its bills to Plaintiff and it its website regarding the administrative fee charged on the account were false statements of material fact.

140.  AT&T's representation that the  Administrative Fee is a charge assessed by AT&T that helps defray a portion of certain expenses AT&T incurs, including but not limited to: (a) charges AT&T or its agents pay to interconnect with other carriers to deliver calls from AT&T customers to their customers; and (b) charges associated with cell site rents and maintenance are false."  Instead, these fees were designed simply to increase profits for AT&T.

141. The express terms of the wireless agreement required AT&T to provide unlimited data and true administrative costs as defined by the contract.

142. Plaintiff was required to provide their PII to AT&T as a condition to receiving AT&T's services.

143. As part of these transactions, AT&T agreed to safeguard and protect the PII of Plaintiff. Implicit in these transactions between AT&T and Plaintiff was the obligation that AT&T would use the PII for approved business purposes only and would not make unauthorized disclosures of the information or allow unauthorized access to the information.

144. Additionally, AT&T implicitly promised to retain this PII only under conditions that kept

such information secure and confidential and therefore had a duty to reasonably safeguard and protect the PII of Plaintiff from unauthorized disclosure or access.

145. Plaintiff entered into implied contracts with the reasonable expectation that AT&T's data security practices and policies, including adequate managerial supervision of vendors' data security, were reasonable and consistent with industry standards.  believed that AT&T would use part of the monies paid to AT&T under the implied contracts to fund adequate and reasonable data security practices to protect their PII.

146. Plaintiff would not have provided and entrusted their PII to AT&T or would have paid less for AT&T's services in the absence of the implied contract between them and AT&T. The safeguarding of Plaintiff's PII was critical to realizing the intent of the parties.

147. The nature of AT&T's implied promise itself—the subject matter of the contractual provision at issue—was to protect Plaintiff's PII in order to prevent harm and prevent present and continuing increased risk.

148. AT&T breached its implied contract with Plaintiff by failing to reasonably safeguard and protect Plaintiff's PII, which was compromised as a result of the Data Breach.

149. As a direct and proximate result of AT&T's breaches, Plaintiff sustained actual losses and damages as alleged herein, including that they did not receive the benefits of the bargains for which they paid.  Alternatively Plaintiff seeks an award of nominal damages.

150. AT&T has breached the express terms of the wireless agreement.

151. As a result of AT&T's breach of implied covenant of good faith and fair dealing, Plaintiff has been damaged.

WHEREFORE, Plaintiff respectfully requests that this Court grant judgment in its favor and against AT&T for compensatory damages, nominal damages, interest, court

costs, and any other relief the Court deems just and proper.

## CERTIFICATE OF SERVICE

WE HEREBY CERTIFY that a true and correct copy of the foregoing was served via e-mail this this June 17, 2024: to Manuel A. Garcia-Linares, Esquire mgarcialinares@daypitney.com   jsolorzano@daypitney.com   edavila@daypitney.com Andrew R. Ingalls, Esquire (aingalls@daypitney.com) Day Pitney LLP, 396 Alhambra Circle, North Tower - 14th Floor, Miami, Florida 33134.

**Beighley, Myrick, Udell, Lynne & Zeichman PA**
*Attorneys for Plaintiff*
2601 S. Bayshore Drive, Suite 770
Miami, FL 33133
(305) 349-3930 – Phone

By:     /s/ Maury L. Udell
Maury L. Udell, Esquire
mudell@bmulaw.com
Fla. Bar 121673

Case 1:25-cv-20381-RAR   Document 1-2   Entered on FLSD Docket 01/27/2025   Page 633 of 1553

IN THE COUNTY COURT OF THE 11TH JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA

Sergio Salani,

CASE NO.: 2022-047421-SP-25

      Plaintiff,

BAR NO.: 121673

v.

AT&T Mobility, LLC,

      Defendant.

_____/

## NOTICE OF HEARING
*Motion Calendar – Coordinated with Defense counsel*

PLEASE TAKE NOTICE that a hearing will be held before the **Honorable Jorge Perez Santiago**, one of the Judges of the above-styled Court, via Zoom, *https://zoom.us/j/98219078652, Meeting ID: 982 1907 8652*, on **August 21, 2024 at 9:30 A.M.**, or as soon thereafter as same may be heard on:

**[D.E. #32] PLAINTIFF'S MOTION FOR LEAVE TO FILE SECOND AMENDED STATEMENT OF CLAIM,** *filed 6/17/24*

PLEASE BE GOVERNED ACCORDINGLY.

**MOVANT COUNSEL CERTIFIES THAT A BONA FIDE EFFORT TO AGREE OR TO NARROW THE ISSUES ON THE MOTIONS NOTICED HAS BEEN MADE WITH OPPOSING COUNSEL.**

## <u>CERTIFICATE OF SERVICE</u>

WE HEREBY CERTIFY that a true and correct copy of the foregoing was served via e-mail this this June 27, 2024 to all counsel of record.

**Beighley, Myrick, Udell, Lynne & Zeichman PA**
*Attorneys for Plaintiff*
2601 S. Bayshore Drive, Suite 770
Miami, FL 33133
(305) 349-3930 – Phone

By:     _/s/ Maury L. Udell_
        Maury L. Udell, Esquire
        mudell@bmulaw.com
        Fla. Bar 121673

IN THE COUNTY COURT OF THE
ELEVENTH JUDICIAL CIRCUIT, IN AND
FOR MIAMI-DADE COUNTY, FLORIDA

CASE NO. 2022-047421-SP-25

SERGIO SALANI,

      Plaintiff,

v.

AT&T MOBILITY LLC,

      Defendant.

_____/

### AT&T MOBILITY LLC'S RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION FOR LEAVE TO FILE SECOND AMENDED STATEMENT OF CLAIM[1]

Defendant, AT&T Mobility LLC ("AT&T"), through its undersigned counsel, hereby files its Response in Opposition to Plaintiff's, Sergio Salani ("Plaintiff"), Motion for Leave to File Second Amended Statement of Claim, and states:

### BACKGROUND

1.      Plaintiff filed a Second Amended Statement of Claim on April 29, 2024, asserting claims for: (**i**) Fraud, (**ii**) Damages Under FDUTPA, (**iii**) Declaratory and/or Injunctive Relief under FDUTPA, and (**iv**) Unjust Enrichment. All four counts were based on the theory that AT&T allegedly improperly charged Plaintiff a "bogus" $1.99 administrative pass-through fee without disclosing its existence.

2.      On May 31, 2024, AT&T filed its Motion to Dismiss Plaintiff's Second Amended Statement of Claim with Prejudice, ruling upon which is still pending before this Court.

---

[1] This would actually be Plaintiff's request to file a Third Amended Statement of Claim as Plaintiff has already filed an Amended Statement of Claim and a Second Amended Statement of Claim.

3.      On June 17, 2024, Plaintiff filed a Motion for Leave to File Second Amended Statement of Claim. The Second Amended Statement of Claim asserts claims for: (**i**) Fraud, (**ii**) Damages under FDUTPA, (**iii**) Declaratory and/or Injunctive Relief under FDUTPA, (**iv**) Unjust Enrichment, (**v**) Negligence for Data Breach, and (**vi**) Violation of FDUTPA for Data Breach. Counts 1 through 4 again challenge the $1.99 administrative fee. Counts 5 and 6 allege for the first time that AT&T or unidentified "third party vendors" failed to safeguard Plaintiff's "PII" due to a data breach (the "Data Breach Claims"). Plaintiff does not allege how, when, or where this alleged data breach occurred.

4.      Important here, the Data Breach Claims are part of an ongoing Multi-District Litigation, *In re: AT&T Inc. Customer Data Security Breach Litigation*, Case No. 3:24-MD-03114, pending in the United States District Court, Northern District of Texas (the "MDL"). Indeed, as of July 14, 2024, over 60 related putative class actions have been filed against AT&T and its related entities, including AT&T Mobility LLC, in 12 federal district courts in 8 states in connection with the Data Breach. The putative class plaintiffs in each action purport to represent all individuals whose information was allegedly impacted by the Data Breach, and allege AT&T failed to safeguard their personal information in violation of common law, contracts, and consumer protection statutes. On June 5, 2024, the Judicial Panel on Multidistrict Litigation (JPML) issued a Transfer Order consolidating actions relating to the Data Breach on the grounds that centralization will eliminate duplicative discovery, prevent inconsistent pretrial rulings, and conserve the resources of the parties, their counsel, and the judiciary. The JPML assigned the consolidated proceeding to Judge Ada E. Brown in the Northern District of Texas and broadly noted that "any other related actions" are potential tag-along actions pursuant to the JPML Rules. *See In re AT&T Inc. Customer Data Sec. Breach Litig.*, JPML No. 3114, ECF No. 139 (June 5, 2024). Copies of the consolidation orders are attached as **Exhibit 1**.

2

5.      On July 31, 2024, the Third District Court of Appeal affirmed dismissal of complaints *with prejudice* in five substantively identical cases filed by Plaintiff's counsel raising the same administrative fee issues here: (i) *Orr v. AT&T Mobility LLC*, 2020-08179-SP-26 (3D23-097); (ii) *Milian v. AT&T Mobility LLC*, 2020-21937-SP-26 (3D23-098); (iii) *Ysidron v. AT&T Mobility LLC*, 2020-21932-SP-26 (3D23-099); (iv) *Barger v. AT&T Mobility LLC*, 2020-08181-SP-26 (3D23-100); and (v) *Batista v. AT&T Mobility LLC*, 2019-11857-SP-26 (3D23-101).  The Third District Court of Appeal's opinion is attached as **Exhibit 2**.

6.      Plaintiff's Motion for Leave to Amend should be denied as the Second Amended Statement of Claim is futile. In addition, given the fact that the Data Breach Claims are already being litigated in the MDL, Plaintiff's motion should be denied.

## ARGUMENT

## I.      The standard for denying pleading amendments.

Florida law is clear that the amendment of pleadings is a matter within the sound judicial discretion of the trial court, and the Court's decision to permit or refuse an amendment will not be disturbed absent an abuse of discretion.  *See Hickman v. Barclay's Int'l Realty, Inc.,* 5 So. 3d 804, 807 (Fla. 4th DCA 2009). The trial court acts within its discretion to deny leave to amend where any one of the following three factors is present: (1) the amendment is futile; (2) the privilege to amend has been abused; or (3) the amendment would prejudice the opposing party. *Laurencio v. Deutsche Bank Nat'l Trust Co.,* 65 So. 3d 1190, 1193 (Fla. 2d DCA 2011). "A proposed amendment is futile if it is insufficiently pled . . . or is insufficient as a matter of law." *Quality Roof Servs., Inc. v. Intervest Nat'l Bank,* 21 So. 3d 883, 885 (Fla. 4th DCA 2009).

## II.      Plaintiff reasserts administrative fee claims that are futile.

As argued by AT&T's Motion to Dismiss filed May 31, 2024,[2] numerous judges have already determined that the administrative fee theory underlying Plaintiff's Fraud, FDUTPA, and Unjust Enrichment claims are directly contradicted by the contract between AT&T and its consumers that the claims are based upon.[3] A copy of the Consumer Service Agreement, the applicable contract when this case was filed, is attached as **Exhibit 4**. The same is true for Plaintiff's theory that AT&T failed to disclose the administrative fee and that it is an improper pass-through fee. *See* Ex. 3, Order on Defendant's Motion to Dismiss entered by Judge Stephanie Silver in *Moscoso v. AT&T Mobility LLC*, 2020-001294-SP-24, on August 10, 2021, as well as in nine other matters pending before that court ("This Court expressly notes that the Wireless Agreement between the parties at Paragraph 1.4 states that the Defendant may charge an administrative charge."). This direct contradiction is fatal to Plaintiff's claims.

Indeed, the Third District Court of Appeal in *Orr, et al. v. AT&T Mobility LLC* (Nos. 3D23-0097, 3D23-0098, 3D23-0099, 3D23-0100, & 3D23-0101) affirmed dismissal of complaints with

---

[2] For the sake of brevity, AT&T will not fully repeat the arguments made by the Motion to Dismiss, but incorporates those arguments and accompanying exhibits into this Response.

[3] Specifically, Judge Murray granted AT&T's Motion for Judgment on the Pleadings in 84 separate cases brought against AT&T by the same counsel representing Plaintiff in this case. the Court announced his ruling orally on the record at the end of the hearings. *See Small vs. AT&T Mobility LLC*, Case No. 2019-001003-SP-20 (Miami-Dade Cty. Ct.), DE 100 (hearing transcript filed 1/29/2021). To avoid entry of judgment against them, all 84 plaintiffs dismissed their cases before a written judgment could be issued. Furthermore, Judge Ihekwaba entered orders in five different cases dismissing claims asserted here *with prejudice*; Judge Gonzalez-Paulson entered orders in five cases dismissing the same claims asserted here *with prejudice* (these orders are currently on appeal before the Third DCA); Judge Silver entered a series of orders dismissing nearly all of the same claims asserted here, the majority *with prejudice*; Judge Singer Stein entered a series of orders dismissing similar claims as asserted here, some *with prejudice*; Judge Lehr dismissed identical claims filed in six cases also brought by Plaintiff's counsel against AT&T, some *with prejudice*, finding they failed as a matter of law; and Judge Moore entered an order dismissing claims asserted here, with leave to replead. Judge Marino Pedraza, Judge Gonzalez Meyer, and Judge Harris denied AT&T's Motions to Dismiss in their entirety. Examples from each set of orders are attached as **Composite Exhibit 3.**

prejudice in five substantively identical cases raising the same administrative fee issues here: (i) *Orr v. AT&T Mobility LLC*, 2020-08179-SP-26 (3D23-097); (ii) *Milian v. AT&T Mobility LLC*, 2020-21937-SP-26 (3D23-098); (iii) *Ysidron v. AT&T Mobility LLC*, 2020-21932-SP-26 (3D23-099); (iv) *Barger v. AT&T Mobility LLC*, 2020-08181-SP-26 (3D23-100); and (v) *Batista v. AT&T Mobility LLC*, 2019-11857-SP-26 (3D23-101).  All five cases reviewed by the Third DCA in *Orr* failed for the same reason as the theories underlying Plaintiff's administrative fee claims—they are directly contradicted by the Consumer Service Agreement incorporated by reference into the complaint upon which the claims are based. As Plaintiff's proposed Second Amended Statement of Claim hinges on this rejected administrative fee theory, they all fail as a matter of law. Accordingly, Plaintiff's Motion for Leave to Amend should be denied.

### III.    AT&T would be prejudiced by the addition of the Data Breach Claims.

"It is manifest that the further the case progresses, the more likely the granting of such amendment is inclined to prejudice the opponent." *Airlift Int'l, Inc. v. Linee Aeree Italiane, S. p. A.*, 212 So. 2d 109, 110 (Fla. 3d DCA 1968) "A court may exercise its discretion to deny such leave to amend where 'it clearly appears that allowing the amendment would prejudice the opposing party.'" *DiGiacomo v. Mosquera*, 322 So. 3d 734, 738 (Fla. 3d DCA 2021) (quoting *Dieudonne v. Publix Super Markets, Inc.*, 994 So. 2d 505, 507 (Fla. 3d DCA 2008)).

The MDL court has primary jurisdiction over the subject matter underlying the Data Breach Claims. Indeed, Plaintiff's claims are virtually indistinguishable from those already filed across the country against AT&T Inc. and AT&T Mobility LLC in connection with the Data Breach and consolidated for coordinated proceedings in the Northern District of Texas. *See, e.g., Garner v. AT&T Inc.*, Case No. 3:24-cv-00962 (N.D. Tex.), ECF 1 at ¶¶ 21, 52, 53, 133, 155 (claims for violations of the duty of good faith and fear dealing and the FDUTPA brought by a Florida citizen on behalf of a nationwide putative class of "[a]ll natural persons in the United States whose Personally Identifiable

Information was compromised" as a result of the data incident and also on behalf of a subclass of "[a]ll natural persons in the State of Florida whose Personally Identifiable Information was compromised" as a result of the data incident); *Pires v. AT&T, Inc.*, Case No. 9:2024-cv-80744 (S.D. Fl.) (case brought by Florida citizens and consolidated in the MDL). Allowing Plaintiff to litigate his identical claims here would create a risk of inconsistent rulings, as the MDL court's rulings could preempt or conflict with any decisions made by this Court. This would severely prejudice AT&T as the law is clear that "exposure to a potential inconsistent ruling on the same issue by another court constitutes irreparable harm." *Inphynet Contracting Servs., Inc. v. Matthews*, 196 So. 3d 449, 463 (Fla. 4th DCA 2016).

Allowing the amendment would also waste judicial resources and create unnecessary complications. The MDL process is specifically designed to handle complex, multi-jurisdictional litigation efficiently. *See In re Res. Expl., Inc., Sec. Litig.*, 483 F. Supp. 817, 821 (J.P.M.L. 1980) (consolidation of related cases "ensure[s] that the actions are supervised by a single judge who, from day-to-day contact with all aspects of the litigation, will be in the best position to design a pretrial program that will prevent duplicative discovery . . . and substantially conserve the time and efforts of the parties, the witnesses and the federal judiciary"). The Data Breach Claims would be addressed more comprehensively and effectively within the MDL. Judicial economy strongly favors resolving the new cause of action within the MDL, where all related claims are centralized. In fact, courts have rejected attempts by plaintiffs to avoid the efficiencies of federal MDL jurisdiction. *See, e.g.*, *Kitec Plumbing Sys. Prods. Liab. Litig.*, 2010 WL 11618052 (N.D. Tex. Aug. 23, 2010) (refusing to remand plaintiffs to state court because it would "create duplicative, overlapping or even identical litigation to [the MDL]"); *Simon v. Marriott Int'l, Inc.*, 2019 WL 4573415 (D. Md. Sept. 20, 2019) (declining plaintiffs' request for remand to state court despite plaintiff's artful pleading around diversity jurisdiction because

otherwise "[plaintiffs] could recover from both their state court action and from the MDL" and "it could disrupt the orderly progress of the pretrial process in the MDL").

Plaintiff will not be prejudiced by litigating this claim in the MDL, as it ensures a coordinated and efficient resolution of all related issues.

**IV.     The Second Amended Statement of Claim is futile because Plaintiff failed to attach the Consumer Service Agreement and AT&T Privacy Policy.**

Florida Rule of Civil Procedure 1.130(a) provides, in pertinent part, that "[a]ll . . . documents on which action may be brought or defense made, or a copy thereof or a copy of the portions thereof material to the pleadings, must be incorporated in or attached to the pleading." The Second Amended Statement of Claim fails to attach either the Consumer Service Agreement or privacy policy that the administrative fee and Data Breach Claims are based on. *See, e.g.* Sec. Am. St. Cl. ¶ 170 ("AT&T knowingly made false or misleading statements in its privacy policy regarding the use of personal information submitted by members of the public . . . ."). Plaintiff's violation of Rule 1.130(a) renders the Second Amended Statement of Claim futile. *See Safeco Ins. Co. of Am. v. Ware*, 401 So. 2d 1129, 1130 (Fla. 4th DCA 1981) ("In the case of a complaint based on a written instrument it does not state a cause of action until the instrument or an adequate portion thereof is attached to or incorporated in the pleading in question.").

**WHEREFORE**, Defendant AT&T respectfully requests that the Court enter an order denying Plaintiff's Motion for Leave to File a Second Amended Statement of Claim and grant such further relief as the Court deems just and proper.

119724523.2

Dated: August 14, 2024

Respectfully submitted,

By: */s/ Manuel A. Garcia-Linares*
       Manuel A. Garcia-Linares, Esq.
       Florida Bar No. 985252
       mgarcialinares@daypitney.com
       athomsen@daypitney.com
       Andrew R. Ingalls, Esq.
       Florida Bar No. 112558
       aingalls@daypitney.com
       athomsen@daypitney.com
       **DAY PITNEY LLP**
       396 Alhambra Circle
       North Tower – 14th Floor
       Miami, Florida 33134
       Telephone: (305) 373-4000
       Facsimile:   (305) 373-4099
       *Counsel for Defendant AT&T Mobility LLC*

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on August 14, 2024, I electronically filed the foregoing document with the Clerk of the Court via e-portal and served: **Maury L. Udell, Esq.**, Beighley, Myrick, Udell, Lynne & Zeichman, P.A., 2601 South Bayshore Drive, Suite 770, Miami, Florida 33133, Email: mudell@bmulaw.com and notice66@bmulaw.com, *Counsel for Plaintiff.*

By: */s/ Manuel A. Garcia-Linares*
       Manuel A. Garcia-Linares, Esq.

119724523.2

# EXHIBIT 1

UNITED STATES JUDICIAL PANEL
on
MULTIDISTRICT LITIGATION

IN RE: AT&T INC. CUSTOMER DATA
SECURITY BREACH LITIGATION                                   MDL No. 3114

TRANSFER ORDER

**Before the Panel:**[*]  Plaintiff in one action (*Petroski*) moves under 28 U.S.C. § 1407 to centralize this litigation in the Northern District of Texas.  This litigation consists of twelve putative class actions pending in two districts, the Northern District of Texas and the Western District of Oklahoma, as listed on Schedule A.  Since the filing of the motion, all actions in the Northern District of Texas have been consolidated for all purposes.  The Panel has been notified of eighteen overlapping putative class actions in seven other districts – the Northern District of California, Eastern District of California, Southern District of California, Northern District of Georgia, Northern District of Illinois, Western District of Missouri, and Eastern District of Texas.[1]

Plaintiffs in all actions and defendants AT&T Inc. and AT&T Mobility unanimously support centralization, with the disagreement limited to the appropriate transferee district. Plaintiffs in eighteen actions and defendants request the Northern District of Texas.  Plaintiffs in five actions request the Northern District of Georgia.  Plaintiffs in two actions request the Western District of Oklahoma.  Plaintiffs in two actions request the Eastern District of Texas and plaintiff in one action requests the Northern District of Illinois.

On the basis of the papers filed and the hearing session held, we find that these actions involve common questions of fact, and that centralization in the Northern District of Texas will serve the convenience of the parties and witnesses and promote the just and efficient conduct of this litigation.  These putative class actions present common factual questions concerning an alleged data security breach announced by AT&T in March 2024 concerning the personal information of over 70 million former and current AT&T customers released on the dark web.[2]

---

[*]  Judge David C. Norton and Judge Roger T. Benitez did not participate in the decision of this matter.  One or more Panel members who could be members of the putative classes in this litigation have renounced their participation in the classes and have participated in this decision.

[1]  These and any other related actions are potential tag-along actions. *See* Panel Rules 1.1(h), 7.1, and 7.2.

[2]  The personal information allegedly compromised by the breach includes customer names, email addresses, mailing addresses, phone numbers, social security numbers, dates of birth, AT&T account numbers, and passcodes.

The common factual questions include how and when the breach occurred, AT&T's data security practices with respect to safeguarding personal information, the investigation into the breach, the alleged delay in disclosing the breach, and the nature of any alleged damages. Centralization will eliminate duplicative discovery; prevent inconsistent pretrial rulings, including with respect to class certification and expert witness issues; and conserve the resources of the parties, their counsel, and the judiciary.

We conclude that the Northern District of Texas is an appropriate transferee district. Defendant AT&T Inc. has its headquarters in Dallas, Texas, where common witnesses and other evidence likely will be found. Most of the related actions are pending there, and defendants and many plaintiffs support this district as their first or second choice for the transferee venue. We assign this litigation to the Honorable Ada E. Brown, a skilled jurist with the willingness and ability to manage this litigation, who has not yet had the opportunity to preside over an MDL. We are confident she will steer this matter on a prudent course.

IT IS THEREFORE ORDERED that the actions listed on Schedule A and pending outside the Northern District of Texas are transferred to the Northern District of Texas and, with the consent of that court, assigned to the Honorable Ada E. Brown for coordinated or consolidated pretrial proceedings.

PANEL ON MULTIDISTRICT LITIGATION

_Karen K. Caldwell_
Karen K. Caldwell
Chair

Nathaniel M. Gorton          Matthew F. Kennelly
Dale A. Kimball              Madeline Cox Arleo

**IN RE: AT&T INC. CUSTOMER DATA
SECURITY BREACH LITIGATION**                              MDL No. 3114

# SCHEDULE A

### Western District of Oklahoma

KNIGHT, ET AL. v. AT&T, INC., C.A. No. 5:24−00324

### Northern District of Texas

PETROSKI v. AT&T, INC., C.A. No. 3:24−00757
MARCH v. AT&T, INC., C.A. No. 3:24−00758
NELLI v. AT&T, INC., C.A. No. 3:24−00759
MONTOYA v. AT&T, INC., C.A. No. 3:24−00760
JARAMILLO v. AT&T, INC., C.A. No. 3:24−00761
BARKLEY v. AT&T, INC., C.A. No. 3:24−00769
BAGLEY v. AT&T, INC., C.A. No. 3:24−00770
CUMO, ET AL. v. AT&T, INC., C.A. No. 3:24−00772
SLOVENKAY, ET AL. v. AT&T, INC., C.A. No. 3:24−00774
DEAN v. AT&T, INC, C.A. No. 3:24−00776
COLLIER v. AT&T, INC., C.A. No. 3:24−00782

**UNITED STATES JUDICIAL PANEL**
**on**
**MULTIDISTRICT LITIGATION**

**IN RE: AT&T INC. CUSTOMER DATA SECURITY**
**BREACH LITIGATION**                                    MDL No. 3114

(SEE ATTACHED SCHEDULE)

**CONDITIONAL TRANSFER ORDER (CTO −1)**

On June 5, 2024, the Panel transferred 1 civil action(s) to the United States District Court for the N District of Texas for coordinated or consolidated pretrial proceedings pursuant to 28 U.S.C. § 1 __F.Supp.3d__ (J.P.M.L. 2024). Since that time, no additional action(s) have been transferred to the District of Texas. With the consent of that court, all such actions have been assigned to the Honora Brown.

It appears that the action(s) on this conditional transfer order involve questions of fact that are com actions previously transferred to the Northern District of Texas and assigned to Judge Brown.

Pursuant to Rule 7.1 of the Rules of Procedure of the United States Judicial Panel on Multidistrict L the action(s) on the attached schedule are transferred under 28 U.S.C. § 1407 to the Northern D Texas for the reasons stated in the order of June 5, 2024, and, with the consent of that court, assig Honorable Ada E. Brown.

This order does not become effective until it is filed in the Office of the Clerk of the United States Court for the Northern District of Texas. The transmittal of this order to said Clerk shall be staye from the entry thereof. If any party files a notice of opposition with the Clerk of the Panel within thi period, the stay will be continued until further order of the Panel.

Inasmuch as no objection is
pending at this time, the
stay is lifted.

**Jun 14, 2024**

CLERK'S OFFICE
UNITED STATES
JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

FOR THE PANEL:

*Tiffaney D. Pete*

Tiffaney D. Pete
Clerk of the Panel

**IN RE: AT&T INC. CUSTOMER DATA SECURITY
BREACH LITIGATION**                                    MDL No. 3114

### SCHEDULE CTO−1 − TAG−ALONG ACTIONS

| **DIST** | **DIV.** | **C.A.NO.** | **CASE CAPTION** |
|----------|----------|-------------|------------------|

**CALIFORNIA EASTERN**

| | | | |
|----------|----------|-------------|------------------|
| CAE | 1 | 24-00438 | Walker v. AT&T, Inc. |

**CALIFORNIA NORTHERN**

| | | | |
|----------|----------|-------------|------------------|
| CAN | 3 | 24-02451 | Kinchen et al v. AT&T Mobility LLC et al |
| CAN | 3 | 24-02657 | Penning v. AT&T Inc. |
| CAN | 5 | 24-02356 | Vita et al v. AT&T, Inc. |

**CALIFORNIA SOUTHERN**

| | | | |
|----------|----------|-------------|------------------|
| CAS | 3 | 24-00798 | Telford v. AT&T, INC. |

**GEORGIA NORTHERN**

| | | | |
|----------|----------|-------------|------------------|
| GAN | 1 | 24-01414 | Unruh et al v. AT&T Mobility LLC et al |
| GAN | 1 | 24-01475 | Hodge v. AT&T Mobility LLC et al |
| GAN | 1 | 24-01580 | Hasson et al v. AT&T Mobility LLC et al |
| GAN | 1 | 24-01690 | Oliver v. AT&T Mobility, L.L.C. et al |
| GAN | 1 | 24-01752 | Schaefer v. AT&T, Inc. et al |

**ILLINOIS NORTHERN**

| | | | |
|----------|----------|-------------|------------------|
| ILN | 1 | 24-02973 | Boykin v. AT&T, Inc. |
| ILN | 1 | 24-03054 | Chernik v. AT&T, Inc. et al |
| ILN | 1 | 24-04097 | McGreevy et al v. AT&T INC. |
| ILN | 1 | 24-04310 | Berendt et al v. AT&T, Inc. |

**MISSOURI WESTERN**

| | | | |
|----------|----------|-------------|------------------|
| MOW | 4 | 24-00234 | Doss et al v. AT&T Inc. |

**TEXAS EASTERN**

| | | | |
|----------|----------|-------------|------------------|
| TXE | 2 | 24-00261 | Sanford v. AT&T |
| TXE | 2 | 24-00373 | Stephens et al v. AT&T et al |
| TXE | 4 | 24-00305 | Carrasco v. AT&T Inc. |

# EXHIBIT 2

# Third District Court of Appeal

### State of Florida

Opinion filed July 31, 2024.
Not final until disposition of timely filed motion for rehearing.

————————————

Nos. 3D23-0097, 3D23-0098, 3D23-0099, 3D23-0100, & 3D23-0101
Lower Tribunal Nos. 20-8179 SP, 20-21937 SP, 20-21932 SP, 20-8181 SP, 19-11857 SP

————————————

**Sharon L. Orr, et al.,**
Appellants,

vs.

**AT&T Mobility, LLC,**
Appellee.

Appeals from the County Court for Miami-Dade County, Michaelle Gonzalez-Paulson, Judge.

Beighley, Myrick, Udell & Lynne, P.A. and Maury L. Udell; David B. Pakula, P.A. and David B. Pakula (Pembroke Pines), for appellants.

Dentons US LLP, Jonathan H. Kaskel, and Angel A. Cortiñas, for appellee.

Before EMAS, SCALES and GORDO, JJ.

GORDO, J.

In these consolidated appeals, Sharon L. Orr, Mario Milian, Monique Ysidron, Edward Barger and Francisco Batista (collectively, the "Appellants") challenge the trial court's dismissal of their complaints with prejudice.  We have jurisdiction.  Fla. R. App. P. 9.030(b)(1)(A).  Finding no error in the trial court's orders, we affirm.

The Appellants entered into wireless customer agreements with AT&T Mobility LLC ("AT&T"), which included an administrative fee charge for providing unlimited data with potential speed restrictions.  The Appellants later filed claims against AT&T based on relevant sections of the wireless customer agreement, alleging deceptive administrative fee charges and data throttling.[1]  AT&T moved to dismiss the complaints with prejudice and included the wireless customer agreement as an exhibit to its motions.  After a hearing, the trial court granted AT&T's motions to dismiss each complaint with prejudice.

"A trial court's ruling on a motion to dismiss is subject to *de novo* review."  Skupin v. Hemisphere Media Grp., Inc., 314 So. 3d 353, 355 (Fla. 3d DCA 2020) (quoting Kopel v. Kopel, 229 So. 3d 812, 815 (Fla. 2017)).  "When ruling on a motion to dismiss, the Court 'must limit itself to the four

---

[1]  "Data throttling" is described as the imposition of speed restrictions on a user's internet connection by a service provider.

corners of the complaint, including any attached or incorporated exhibits, assuming the allegations in the complaint to be true and construing all reasonable inferences therefrom in favor of the non-moving party.'" Id. (quoting Grove Isle Ass'n, Inc. v. Grove Isle Assocs., LLLP, 137 So. 3d 1081, 1089 (Fla. 3d DCA 2014)).

On appeal, the Appellants argue the trial court erred in considering the wireless customer agreement attached to AT&T's motion to dismiss.[2] We start with the basic premise that "[o]rdinarily only a complaint . . . and its attachments may be considered when passing on a motion to dismiss." Air Quality Assessors of Fla. v. Southern-Owners Ins. Co., 354 So. 3d 569, 571 (Fla. 1st DCA 2022). When, however, "the terms of a legal document are impliedly incorporated by reference into the complaint, the trial court may consider the contents of the document in ruling on a motion to dismiss." Id. (quoting One Call Prop. Servs. Inc. v. Sec. First Ins. Co., 165 So. 3d 749, 752 (Fla. 4th DCA 2015)). The Appellants raised the wireless customer agreement as the basis for their complaints and expressly relied upon the agreement to attempt to state causes of action. Because the allegations in the complaints incorporated the wireless customer agreement by relying on and quoting it, the trial court properly considered the agreement while ruling

---

[2] We affirm the other issues raised without further discussion.

3

on AT&T's motion to dismiss the complaint with prejudice.  See Von Dyck v. Gavin, 350 So. 3d 842, 845 (Fla. 1st DCA 2022) ("The [Agreement] was not attached to the complaint but numerous references were made to the [Agreement] in the complaint, and Appellant raised the [Agreement] as the basis for one of its arguments.  Thus, we find no error in the trial court's dismissal of the [Agreement] portion of Appellant's complaint."); Veal v. Voyager Prop. & Cas. Ins. Co., 51 So. 3d 1246, 1249-50 (Fla. 2d DCA 2011) ("[T]he complaint refers to the settlement agreement, and in fact, [plaintiff's] standing to bring suit is premised on the terms of that agreement. Accordingly, since the complaint impliedly incorporates the terms of the agreement by reference, the trial court was entitled to review the terms of that agreement to determine the nature of the claim being alleged.").

Affirmed.

# COMPOSITE EXHIBIT 3

**IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT IN AND FOR DADE COUNTY, FLORIDA**

| DIVISION | | CASE NUMBER |
|---|---|---|
| ☐ CIVIL<br>☐ OTHER | **MEMO OF DISPOSITION** | 2019-000864-SP-20<br><br>Section No.  CL01 |

| PLAINTIFF(S)<br>David Adams | VS. DEFENDANT(S)<br>AT&T Mobility LLC | **FILED**<br>CLOCK-IN<br>**JAN 2 8 2021**<br>CLERK |
|---|---|---|

| PLAINTIFF ATTORNEY(S)<br>Udell, Maury L | DEFENDANT ATTORNEY(S)<br>Garcia-Linares, Manuel A., ESQ | DATE OF HEARING<br>01/28/2021 -<br>1:30 PM | TYPE<br>Special Sets |
|---|---|---|---|

**MOTIONS**

TYPE OF<br>MOTION For Judgement on<br>COURT RULING ON MOTION: Plding

☑ GRANTED   ☐ DENIED   ☐<br>WITHHELD

COMMENTS:<br>_____<br>_____<br>_____

**CALENDAR DIRECTIONS**

CASE CONTINUED:<br>☐ NOTICE OF SERVICE PROCESS

☐ PENDING SERVICE          ☐ PENDING SETTLEMENT

☐ SET CASE FOR _____ ESTIMATED<br>_____ TIME REQUIRED _____

☐ MEDIATION          ☐ NON JURY TRIAL<br>          ☐ JURY TRIAL

☐ STIPULATED WAIVER FOR APPEARANCE AT PRE-TRIAL<br>☐ ORDER INVOKING RULES OF CIVIL PROCEDURE<br>☐ MOTION TO INVOKE THE RULES OF CIVIL PROCEDURE

**DISPOSITIONS**

☐ DEFAULT   ☐ FINAL JUDGMENT   ☐ DEFAULT JUDGMENT   ☐ SUMMARY JUDGMENT   ☐ AGREED JUDGMENT

☐ ORDER OF DISMISSAL          AMOUNT OF JUDGMENT          JUDGMENT FOR THE PLAINTIFF

☐ WITHOUT PREJUDICE   PRINCIPAL $ _____   INTEREST $ _____   ☐ STIPULATION FOR PAYMENT AND<br>ORDER OF DISMISSAL

☐ WITH PREJUDICE          COURT COSTS $ _____   ATTORNEY FEES $ _____

☐ VOLUNTARY DISMISSAL

**CONDITION OF DISPOSITION**

☐ EXECUTION OF JUDGMENT WITHHELD      ☐ ORDER WITHHOLDING JUDGMENT      ☐ PLAINTIFF TO SUBMIT PROOF<br>PENDING PAYMENT BY DEFENDANT OF THE ABOVE JUDGMENT AT A RATE OF

$ _____ PER _____, COMMENCING _____<br>          WEEK/MONTH          DATE

SWORN TESTIMONY TAKEN IN COURT: _____

JUDGMENT OR ORDER TO BE PREPARED BY:   ☐ PLAINTIFF   ☐ DEFENDANT   ☐ COURT<br>☐ DEFENDANT TO FILE ANSWER IN _____ DAYS<br>☐ A DEFAULT IS HEREBY ENTERED AGAINST _____<br>FOR FAILURE TO APPEAR AT PRETRIAL AS REQUIRED BY LAW

By: **PRISCILLA JONES**          GORDON C. MURRAY, SR<br>DEPUTY CLERK          County Court Judge

HARVEY RUVIN<br>CLERK OF COURTS

Sonnia Martinez<br>COURT REPORTER          JUDGE

Co. Fernando & Assoc.

IN THE COUNTY COURT OF THE ELEVENTH JUDICIAL CIRCUIT IN AND FOR
MIAMI-DADE COUNTY, FLORIDA

CASE NO: 2019-017806-SP-23

JUDGE: Chiaka Ihekwaba

**Johan Duluc**

      Plaintiff(s)

vs.

**AT&T Mobility (LLC)**

      Defendant(s)

_____/



### ORDER ON DEFENDANT'S MOTION TO DISMISS

On November 4, 2022, and November 10, 2022, this Court heard Defendant AT&T Mobility,
LLC's Motion to Dismiss Plaintiff's Second Amended Complaint. After considering the motion,
Plaintiff's response, the second amended complaint, all relevant pleadings, the arguments of
counsel, and being otherwise duly advised in the premises, the Court hereby GRANTS AT&T's
Motion for the reasons and in the manner set forth below.

I.  Background.

      Plaintiff filed a Second Amended Complaint on September 23, 2022 (the "Amended
Complaint"), asserting six claims against AT&T, these are as follows:

Count (1) Fraud.

Count (2) Damages under the Florida Deceptive and Unfair Trade Practices Act § 501.201, et
seq., Fla. Stat. ("FDUTPA").

Count (3) Declaratory and Injunctive relief under "FDUTPA".

Count (4) Breach of Contract/Good Faith and Fair Dealing.

Count (5) Unjust Enrichment,

and

Count (6) Pure Bill of Discovery.

Counts 1, 2, and 4 are based on allegations that AT&T charged Plaintiff a "bogus" Administrative
Fee and "throttled" Plaintiff's unlimited data account and Counts 3 and 5 are based on the

1

Administrative Fee alone. Count 6 alleges that AT&T may have provided Plaintiff's geolocation data to third-party aggregators and location-based service providers without Plaintiff's consent.

While the Amended Complaint specifically references, incorporates, and quotes from the Wireless Customer Agreement, AT&T's website, and AT&T billing statements as the bases for Plaintiff's claims, none of those documents are attached to the Complaint despite being produced to Plaintiff by AT&T in April 2020. (Am. Compl. ¶¶ 23-24, 41, 51, 53-54, 57, 78-80 (Agreement); ¶¶ 44, 60, 78, 84 (AT&T's website), ¶¶ 27, 31, 44, 60 (billing statements)).

AT&T filed a Motion to Dismiss ("Motion") on October 10, 2022, attaching copies of the Wireless Customer Agreement alongside Plaintiff's signatures to its Motion to Dismiss as Exhibit 3. These documents were produced to Plaintiff in April 2020. AT&T noted that Plaintiff's Amended Complaint is almost entirely composed of claims copy-and-pasted from other lawsuits and is identical to over one hundred other cases pending before courts in this jurisdiction filed by counsel for Plaintiff. None of the allegations in the Amended Complaint allege facts specific to Plaintiff. Plaintiff responded to AT&T's Motion on October 31, 2022, and the Court heard the Motion on November 4, 2022, and November 10, 2022. The Court grants the Motion to Dismiss as to Counts 3, 5 & 6 with prejudice and Counts 1, 2 & 4 without prejudice for the following reasons.

II.     Motion to Dismiss Standard

The standard for determining whether a motion to dismiss should be granted is whether, based on the well-pleaded allegations and incorporated attachments, the movant is entitled to judgment as a matter of law. Golden Gate Homes, LC v. Levey, 59 So. 3d 275, 280 (Fla. 3d DCA 2011). In cases where it is apparent that a pleading cannot be amended to state a cause of action, or where an amendment would be futile, dismissal with prejudice is appropriate. Central Florida Investments, Inc. v. Charles Levin Timeshares, 659 So. 2d 492 (Fla. 5th DCA 1995).

"As a general rule, when considering a motion to dismiss, a trial court is limited to the allegations within the four corners of the complaint and any attachments. However, there are several exceptions to this general rule." Steiner Transocean Ltd. v. Efremova, 109 So. 3d 871, 873 (Fla. 3d DCA 2013). One of these exceptions to the four-corner rule is the incorporation by reference doctrine, stating that "[w]hen a party refers to a document in the complaint, the trial court may use that document to assess the nature of the claims alleged in the complaint." Glen Garron, LLC v. Buchwald, 210 So. 3d 229, 233 (Fla. 5th DCA 2017)[1]; see also Brodeur v.

---

[1]While Buchwald involved a motion for judgment on the pleadings, "a motion for judgment on the pleadings is governed by the same legal test as a motion to dismiss for failure to state a cause of action" Urribari v. 52 SW 5th CT WHSE, LLC, 266 So.3d 1257, 1262 (Fla. 4th DCA 2019)

Miami-Dade Cnty., 81 So. 3d 491, 492 n.1. (Fla. 3d DCA 2012) ("Ordinarily the trial court's determination, and our review, of a motion to dismiss are confined to the face of the complaint and those documents referred to within the complaint.") (emphasis added); One Call Prop. Servs., Inc. v. Security First Ins. Co., 165 So. 3d 749, 752 (Fla. 4th DCA 2015) ("[W]here the terms of a legal document are impliedly incorporated by reference into the complaint, the trial court may consider the contents of the document in ruling on a motion to dismiss."). Where an exhibit attached to a complaint contradicts the allegations in the complaint, the exhibits control and may form the basis for a motion to dismiss. See Fladell v. Palm Beach Cty. Canvassing Bd., 772 So. 2d 1240, 1242 (Fla. 2000).

Here, the Amended Complaint specifically references, incorporates, and quotes from the Wireless Customer Agreement, AT&T's website, and AT&T billing statements as the bases for Plaintiff's claims. (Am. Compl. ¶¶ 23-24, 41, 51, 53-54, 57, 78-80 (Agreement); ¶¶ 44, 60, 78, 84 (AT&T's website), ¶¶ 27, 31, 44, 60 (billing statements)).

Under Florida Rule of Civil Procedure 1.130(a), Plaintiff had the duty to attach or incorporate the underlying Agreement, billing statements, and website language onto its complaint. Fla. R. Civ. P. 1.130(a) ("All . . . contracts, accounts, or documents on which action may be brought [or copies of their material portions] . . . must be incorporated in or attached to the pleading."). Plaintiff contends that it did not attach the Agreement because "it is under the exclusive control of AT&T," Am. Compl. ¶¶ 41 and 53[2]. Thus, Plaintiff apparently filed this lawsuit alleging, among other things, that "AT&T has breached the express terms of the wireless agreement" without knowing what the Agreement says.

AT&T's Motion to Dismiss attaches copies of Wireless Customer Agreement alongside Plaintiff's signatures, a portion of the AT&T website defining the Administrative Fee, and a recent AT&T billing statement. See Def.'s Mot. to Dismiss Exs. 3-5. Because the Amended Complaint specifically references, incorporates, and quotes from these documents, AT&T argued that they are within the four corners of the Amended Complaint and can be considered by the Court in ruling on the underlying motion. See Buchwald, 210 So. 3d at 233 ("When a party refers to a document in the complaint, the trial court may use that document to assess the nature of the claims alleged in the complaint"); Von Dyck v. Gavin, 350 So. 3d 842, 844–45 (Fla. 1st DCA 2022) ("We also note that the trial court did not err when it considered the APA when analyzing the merits of Appellees' motion to dismiss . . . .The APA was not attached to the complaint but numerous references were made to the APA in the complaint, and Appellant raised the APA as the basis for one of its arguments.").

---

[2] Plaintiff's counsel has previously abandoned this assertion in a similar hearing in front of Judge Lehr, where it was undisputed that the Agreement is available on AT&T's website. See AT&T's Mot. Dismiss Hr'g Tr., 28:24-25; 49:18-20; 50:15-16, Ann Green v. AT&T Mobility, Case No. 2019-16864-SP-23 (July 22, 2020).

At the hearing, however, Plaintiff argued that AT&T had the burden to prove up the documents (which the Plaintiff failed to attach to the Amended Complaint) and took the position that AT&T was required to authenticate the Agreement before this Court could consider it. The Court does not find Plaintiff's arguments persuasive. The Court could not consider any such "authentication" via affidavit as Plaintiff suggests at this stage of the proceedings[3]. Requiring AT&T to cure Plaintiff's deficiency under heightened evidentiary requirements would not only ignore Rule 1.130(a), but do away with the incorporation by reference doctrine, and turn this Motion to Dismiss into a summary judgment motion. No legal authority supporting such a proposition has been cited or provided to the Court. The federal and summary judgment cases upon which Plaintiff relies do not apply here. Plaintiff's attempt to base their claims on the express language of the Agreement—while precluding consideration of that same Agreement at this stage of the proceedings—would cause unnecessary delay, require needless discovery, and is not well taken[4].

A court's duty to accept the facts in the complaint as true does not require the court to ignore specific factual details of the pleading in favor of general or conclusory allegations. Griffin Indus. v. Irvin, 496 F.3d 1189 (11th Cir. 2007). Thus, this Court does not find merit in Plaintiff's assertion that AT&T must authenticate the Agreement for this Court to properly consider it when Plaintiff incorporated the Agreement by reference.

Because the Amended Complaint specifically references, incorporates, and quotes from these documents, they are within the four corners of the Amended Complaint and will be considered by the Court in ruling on the underlying motion. See Buchwald, 210 So. 3d at 233; One Call Prop. Servs., Inc., 165 So. 3d at 752.

III. Counts 1-5

Plaintiff's claims for fraud, FDUTPA damages, FDUTPA declaratory and injunctive relief, good faith and fair dealing, and unjust enrichment are based upon two separate factual theories: "bogus" administrative fees and "throttling," the practice of slowing data speeds when mobile phone users meet certain data usage thresholds. Most of these claims are ripe for dismissal

---

[3] ] In addition, AT&T filed copies of the WCA authenticated by declaration to its § 57.105 Sanctions Motion for Raising a Legally Deficient "Administrative Fee" Claim filed February 5, 2021. See D.E. 92

[4] Further, Plaintiff does not contest the veracity or accuracy of the exhibits. And the Amended Complaint does not rely on any specific version of the Wireless Customer Agreement, but hinges on the more general proposition that "AT&T MOBILITY, LLC's wireless customer agreements do not state that an unlimited mobile data plan customer's use of more than a specified amount of data is a prohibited activity." Am. Compl. ¶ 23.

because they are facially negated by documents relied on and incorporated into the Amended Complaint and contain other pleading deficiencies and errors of law, some of which cannot be cured through amendment.

In Florida, "[a] party cannot recover for alleged false misrepresentations that are adequately dealt with or expressly contradicted in a later written contract." TRG Night Hawk Ltd. v. Registry Dev. Corp., 17 So. 3d 782, 784 (Fla. 2d DCA 2009); see also GVK Int'l Bus. Grp., Inc. v. Levkovitz, No. 3D19- 1119, 2020 WL 4197407, at *2 (Fla. 3d DCA July 22, 2020); Taylor Woodrow Homes Fla., Inc. v. 4/46-A Corp., 850 So. 2d 536, 542 (Fla. 5th DCA 2003). "To hold otherwise is to invite contracting parties to make agreements of the kind in suit and then avoid them by simply taking the stand and swearing that they relied on some other statement." TRG Night Hawk Ltd., 17 So. 3d at 784.

A.      Plaintiff's Administrative Fee allegations in Counts 1-5.

Plaintiff alleges that AT&T has wrongfully charged a $1.99 monthly Administrative Fee. Plaintiff asserts that the fee is "bogus" for three reasons: (1) AT&T failed to adequately disclose the existence of the Administrative Fee; (2) the Administrative Fee is deceptively defined and applied; and, (3) the Administrative Fee is an illegal "pass-through" fee.

AT&T counters that these allegations are belied by the Amended Complaint and the documents it is based on. The Court finds AT&T's arguments persuasive. Plaintiff pursued this lawsuit without ever consulting the Agreement upon which the allegations are based. Had Plaintiff conducted such a review, it would have been clear that the Agreement, website, and billing statements facially negate Plaintiff's allegations.

1.      Disclosure of the Administrative Fee.

Plaintiff alleges that AT&T did not adequately disclose the existence of the Administrative Fee when they signed up for AT&T's services and thereafter tried to conceal the fee by burying the line-item charge in the billing statement. Am. Compl. ¶¶ 27-28. In response, AT&T argues that the Wireless Customer Agreement, website and billing statements expressly disclose the administrative fee and AT&T's right to make changes to charges billed to customers[5]. For example, section 1.4 of the Agreement states: "Charges include, without limitation, airtime, roaming, recurring monthly service, activation, administrative, and late payment charges . . .

---

[5] As noted, Plaintiff takes no issue with the authenticity of AT&T's website or billing statements introduced into the record by AT&T, and this Court finds Plaintiff incorporated them by reference in the Amended Complaint. See, e.g., Am. Compl. ¶¶ 27, 31, 44, 60, 78, 84.

5

whether assessed directly upon you or upon AT&T." Mot. to Dismiss, Ex. 3 § 1.4. The Wireless Customer Agreement also reserves the right for AT&T to "make changes to this Agreement" which can include "charges." Id. § 1.3.

The AT&T website, quoted by Plaintiff in the Amended Complaint, defines the Administrative Fee and further expressly states: "AT&T reserves the right to increase its fees or impose additional fees." Def.'s Mot. to Dismiss, Ex. 4. AT&T's billing statement also expressly discloses the existence of the Administrative Fee, with each billing statement providing the monthly amount as an independent line item. Def.'s Mot. to Dismiss, Ex. 5. The Wireless Customer Agreement, website, and billing statement (incorporated by reference into the Amended Complaint) refute and thereby negate the assertion that the Administrative Fee was not properly disclosed. Therefore, no claim can proceed on these allegations as a matter of law.

2.    How the Administrative Fee is used and increased.

Plaintiff next alleges that AT&T is telling the consumer one thing but doing another.  Quoting AT&T's website, Plaintiff alleged:

AT&T's representation that the Administrative Fee is a charge assessed by AT&T that helps defray a portion of certain expenses AT&T incurs, including but not limited to: (a) charges AT&T or its agents pay to interconnect with other carriers to deliver calls from AT&T customers to their customers; and (b) charges associated with cell site rents and maintenance are false.

Am. Compl. ¶ 78; see also ¶¶ 44, 60, 84. According to Plaintiff, the Administrative Fee is not tied to either interconnect or cell site charges because AT&T has increased the fee even though these costs have allegedly decreased. Id. ¶¶ 29-32. Based on this assertion, Plaintiff theorizes that the Administrative Fee is part of "a scheme to funnel direct profit to AT&T rather than pay for any identifiable increase in costs." Id. ¶ 60.

First, the Court rejects any suggestion that AT&T's charging of an Administrative Fee is per se deceptive as the term "administrative fee" by itself does not suggest that AT&T will apply the Administrative Fee in any particular way. See Maor v. Dollar Thrifty Auto. Grp., Inc., No. 15-22959-CIV, 2018 WL 4698512, at *4 (S.D. Fla. Sept. 30, 2018) ("Solely using the term 'administrative fee,' without more, does not restrict how the fee may be used or represent any purpose or nature behind the fee."); Berry v. Budget Rent A Car Systems Inc., 497 F. Supp. 2d 1361, 1367 (S.D. Fla. 2007) (dismissing FDUTPA claim with prejudice, explaining "the simple fact" that defendant itemized a "cost recovery fee" as a separate charge is not unfair or deceptive).

Second, while Plaintiff alleges that AT&T does not actually use the Administrative Fee to offset interconnect costs, cell site rents and/or maintenance charges, which he alleges is deceptive to consumers, the definition provided by the Plaintiff does not limit AT&T to only offsetting those two specific cost categories. Instead, it states that AT&T may defray a portion of certain expenses "including but not limited to" charges for interconnection and for cell site rents and maintenance. Am. Compl. ¶¶ 44, 60, 78, 84. And, inclusion of the phrase "including but not limited to" is not in and of itself unfair and deceptive. Therefore, taking Plaintiff's allegations as true, interconnect costs, cell site rents and/or maintenance charges serve as examples of and not limitations to how AT&T can apply the Administrative Fee, meaning AT&T's alleged use of the fee to offset other expenses and costs would still comply with the fee's definition and cannot be considered deceptive, unfair, false, or a violation of the parties' agreement.

Finally, despite Plaintiff counsel's repeated argument during the hearing that the Administrative Fee was disclosed to customers as being tied to increases in a specific set of expense categories, the Amended Complaint and the website language contain no reference to "increases," and Plaintiff has not alleged any instances where AT&T made such statements. Instead, AT&T merely stated that the Administrative Fees would "help[] defray a portion of certain expenses AT&T incurs." Plaintiff has not alleged or identified any representation by AT&T that the Administrative Fee has always offset the exact same percentage of its expenses, or that the fee will increase or decrease solely based on increases or decreases to its interconnection or cell site rents and maintenance costs. Accordingly, because no reasonable consumer could interpret the Administrative Fee, its definition, or its application as deceptive, unfair, or based on a misrepresentation, Plaintiff's FDUTPA and fraud claims on this allegation necessarily fail. See Day v. Sarasota Doctors Hosp., Inc., No. 19-01522, 2021 WL 288969, at *4 (M.D. Fla. Jan. 28, 2021) (finding FDUTPA claim failed where "no reasonable consumer could be deceived by the [Defendant's conduct or the parties' contract] under the circumstances alleged . . .").

Therefore, applying the law to the undisputed facts of this case, based on the website and contract language relied on by Plaintiff, no amount of discovery will enable Plaintiff to state a cause of action related to how AT&T defines, uses, or increases the Administrative Fee, and no claim can proceed on these allegations as a matter of law.

3.      The Administrative Fee is not a pass-through fee.

Finally, Plaintiff alleges that the Administrative Fee is a "textbook pass through fee" as "it is not what its being used for despite its definition in the wireless agreement." Am. Compl. ¶ 86. Florida law is clear that an impermissible "pass-through" fee is one that purports to be collected for payment to a third party, but in reality the company is keeping the fee for itself. See Latman v. Costa Cruise Lines, N.V., 758 So. 2d 699, 703 (Fla. 3d DCA 2000) (finding that use of the term "port charge" misrepresents to a reasonable consumer that it is a "pass-through" charge which the cruise line will pay to the relevant port authorities).

Here, there is no allegation that AT&T ever represented or suggested the Administrative Fee would be paid to anyone other than AT&T; therefore, the Court finds that Plaintiff has not and cannot allege that the Administrative Fee is a pass-through fee and no claim can proceed on these allegations. See Vorst v. TBC Retail Grp., Inc., No. 12-CV-80013, 2012 WL 13026643, at *2 (S.D. Fla. Apr. 12, 2012) (dismissing FDUTPA pass-through claim based on the finding that "Plaintiff's conclusory allegations that the oil disposal fee was represented as a pure pass-through expense and that Defendant retains the fee as a profit are insufficient."); see also Maor, 2018 WL 4698512, at *5 ("Plaintiff has not identified any provisions in the rental contract, and this Court has found none, which constitute a representation to a reasonable consumer that the 'administrative fee' was a pass-through charge which Defendants would pay to others."); Berry, 497 F. Supp. 2d at 1367 (finding that the term "cost recovery fee" is not a pass-through fee as "itself implies that the company will keep the money collected as 'recovery' for its costs.").

In any event, as previously found, the website's definition of the Administrative Fee does not limit how it may be applied or what costs it can be used to offset. Id. ¶¶ 44, 60, 78, 84.

The Court does not find the cases relied on by Plaintiff in support of their administrative fee claims persuasive. In Calderon v. Sixt Rent a Car, LLC, No. 19-CV-62408, 2020 WL 700381, at *7 (S.D. Fla. Feb. 12, 2020), the defendant was alleged to have deceived their customers by incorporating the terms of a separate agreement that contained undisclosed, and allegedly fraudulent, charges. Id. at *4 ("That Sixt's employee did not provide Calderon or Marin the Rental Jacket prior to them agreeing to its terms is not insignificant."). That is a far cry from the case at hand, especially given Plaintiff's tacit admission that the Administrative Fee is disclosed on the website and the monthly billing statement.

Similarly, Deere Constr., LLC v. Cemex Constr. Materials Florida, LLC, 198 F.Supp.3d 1332 (S.D. Fla. 2016) involved a failure to disclose an environmental charge that defendant represented was derived and directly tied to the Federal Energy Information Administration's weekly reporting of diesel fuel pricing. Id. at 1334. Again, because Plaintiff admits that the Administrative Fee was disclosed and its definition does not directly tie the fee to the rise or fall of AT&T's interconnection and cell site costs, Deere is inapplicable to the facts at hand.

Accordingly, because Plaintiff's Administrative Fee-based claims for fraud, FDUTPA damages, good faith and fair dealing, and unjust enrichment are premised on inaccuracies, misrepresentations, breaches, and deceptive or unfair trade practices that are refuted by the contracts they rely upon, they fail as a matter of law. Ginsberg, 645 So. 2d at 494; TRG Night Hawk Ltd., 17 So. 3d at 784.


B.      Plaintiff's "throttling" allegations in Counts 1, 2, and 4.

The remainder of Plaintiff's claims for fraud, FDUTPA damages, and good faith and fair dealing are based on allegations pertaining to network management practices designed to remedy network congestion caused by individual consumers who use exponentially more data than others. Plaintiff complains that even though they had an unlimited data plan, AT&T "throttled"

8

(or slowed down) their data speeds after they used a certain amount of data during a monthly billing cycle. Am. Compl. ¶¶ 18-19, 23.

AT&T went into great detail to inform this Court that the Wireless Consumer Agreement shows, the term "unlimited" refers to the amount of data, not the speed of that data and that Plaintiff's alleged belief that "unlimited" refers to both the amount and speed of the data is wrong. AT&T did an extensive comparison between what the Plaintiff alleges and what the agreement actually says however the essence and substance of Plaintiff's claim as alleged in the amended complaint for FDUTPA violation against AT&T is different. Plaintiff claims that AT&T purportedly promised "unlimited data" but by throttling Plaintiff's data to the point where it was non-usable, violated the FDUPTA because "unlimited" didn't truly mean, "unlimited".  Plaintiff also alleged that "AT&T possesses internal focus group research indicating that its throttling program was inconsistent with consumer understanding of an "unlimited" data plan." Plaintiff alleged that "AT&T's wireless customer agreements do not state that an unlimited mobile data plan customer's use of more than a specified amount of data is a prohibited activity. Nor do the agreements provide that AT&T may modify, diminish, or impair the service of unlimited mobile data plan customers engaged in permissible activities if these customers use more than a specified amount of data." Plaintiff also alleges that "AT&T imposed significant data speed restrictions on Plaintiff by virtue of its use of its network which flows through the United States and in particular, Florida. This practice was and is an unfair and deceptive trade practice. Where the FTC has already found "data throttling" a violation of the FTC, the Court must by law consider such a finding in construing whether data throttling is a violation of FDUTPA. Fla. Stat. Sec. 501.204(2) states:

> It is the intent of the Legislature that, in construing subsection (1), due consideration and great weight shall be given to the interpretations of the Federal Trade Commission and the federal courts relating to s. 5(a)(1) of the Federal Trade Commission Act, 15 U.S.C. s. 45(a)(1) as of July 1, 2017.

See Sec. 501.204(2), Fla. Stat. (emphasis added).

Slowing one's data speed to the point of limiting access to using data is not providing unlimited data, even when AT&T argues unlimited refers to "amount" of data and not "Speed" of Data. Furthermore, there is no clear definition of "prohibited activity" despite what is stated in the Wireless Consumer agreement. Based on the above arguments, this Court finds that Plaintiff has pled specifically the element of an unfair and deceptive practice required for a FDUTPA claim with respect to data throttling.

We now analyze the individual Counts to see the effect (if any) the "Throttling" allegation has on all 6 counts.

Count 1 - Fraud

Even though this Court finds that AT&T May have throttled Plaintiff's unlimited data account, Plaintiff's Fraud Claim (COUNT 1) still Fails as currently pled.

In Florida, a plaintiff must plead fraud by alleging that the defendant: 1) misrepresented a material fact, 2) knew or should have known of the falsity of the statement, 3) intended that the misrepresentation would induce Plaintiff to rely and act on it, and 4) that Plaintiff suffered injury in justifiable reliance on the misrepresentation. Witt v. La Gorce Country Club, Inc., 35 So. 3d 1033, 1040 (Fla. 3d DCA 2010). In Florida, claimants must plead fraud (or fraudulent inducement) with particularity, as required by Rule 1.120(b). See Fla. R. Civ. P. 1.120(b) ("[A]ll averments of fraud . . . shall be stated with such particularity as the circumstances may permit."); Cedars Healthcare Grp., Ltd. v. Mehta, 16 So. 3d 914, 917 (Fla. 3d DCA 2009).

AT&T argues that Counts 1-5 all sound in fraud[6] Plaintiff has failed to satisfy this pleading standard in this case.  Plaintiff contends that they pled their claims to the best of their ability as circumstances may permit and argues that they cannot allege specifics because "Plaintiff is not in possession of the specific digital advertisements and contracts issued by AT&T." Response at ¶ 68. The Court finds this argument unpersuasive. Plaintiff does not dispute that the Wireless Customer Agreement is on AT&T's website. And Plaintiff is undisputedly familiar with the AT&T website, as they rely on it in their Amended Complaint. Am. Compl. ¶¶ 44, 60, 78, 84.

Nevertheless, even though Plaintiff alleged the first element—that AT&T misrepresented and/or omitted facts relating to the potential for data speed reductions, Plaintiff failed to plead the other four elements with specificity. The Amended Complaint fails to provide a single detail regarding Plaintiff's own interactions with AT&T, or the time, place, and manner of how they were deceived. There is no particularly pled assertion explaining where, when, what, and how these misrepresentations or omissions were material to *Plaintiff's* decision to do business with AT&T, that *they* relied on them, or that *they* proximately caused *their* damages. Plaintiff merely recites the last element of fraud, alleging: "Plaintiff relied on AT&T's representations regarding providing unlimited data, and, as a result, incurred damages and was injured as a result of the fraud by omission." Am. Compl. ¶ 43. Plaintiff does not even attempt to allege that their reliance was justified.  They do not point to a single date to show when their data speed was reduced, if any. Nor do they explain how such a temporary speed reduction caused them harm or allege what measure of actual damages they incurred for any given month of service. This is the kind of information that would have been at Plaintiff's disposal; no "circumstances" prevented Plaintiff from alleging such facts if they existed. Conclusory assertions disguised as fact do not meet the high standard required by Rule 1.120(b). See Williams v. Burger King Corp., No. 19-24755, 2020 WL 5083550, at *3 (S.D. Fla. July 20, 2020) (dismissing the complaint because it "fails to provide any more specific details regarding the preparation of the 'Impossible Whopper'"); Myers v. Myers, 652 So. 2d 1214, 1215 (Fla. 5th DCA 1995) ("Allegations contained in a pleading are insufficient if they are too general, vague or conclusory.").

---

[6] Claims 1-5 incorporate the same factual basis of Plaintiff's fraud claim (paragraphs 1-38) and all claims allege that AT&T knowingly, intentionally and fraudulently deceived the Plaintiff regarding AT&T's Administrative Fee, purported data "throttling," and Privacy Policy. See, e.g., Am. Compl. ¶ 24 (alleging that AT&T's unlimited plan was "a bait-and-switch scam"), id. (alleging that AT&T "covertly increases the actual price" of its services by "padding all post-paid wireless customers' bills" with a "bogus" administrative fee), ¶ 25 (alleging the Administrative Fee "is never adequately and honestly disclosed"), ¶ 27 (alleging that AT&T "deliberately hides" the Administrative Fee), ¶ 61 (alleging that AT&T "knew" the Administrative Fee was inflated).

For these reasons, Plaintiff fails to plead the fraud claims with particularity as is required by Florida law. See Fla. R. Civ. P. 1.120(b); Mehta, 16 So. 3d at 917 (requiring claims sounding in fraud "be pled with particularity and must specifically identify misrepresentations or omissions of fact, as well as time, place or manner in which they were made.") (emphasis added). Accordingly, the Court finds that Plaintiff's fraud claim, requires dismissal without prejudice.

Count 2 – Damages under FDUTPA

Even though Plaintiff has sufficiently pled a deceptive or unfair act or practice, Plaintiff still failed to sufficiently allege causation and actual damages. This is so under ordinary and heightened pleading standards. As Judge Lody Jean ruled in another case filed by Plaintiff's counsel against AT&T, "Plaintiff has pled a FDUTPA claim as a personal tort sounding in fraud" and, "[w]here the 'gravamen of the claim sounds in fraud' it is subject to the rules governing a fraud claim." Order Granting AT&T's Motion for Final Summary Judgment, Claims Holding Group, LLC v. AT&T Mobility, Case No: 2020-000024-SP-05 (July 22, 2020)[7]. Plaintiff failed to plead with particularity when or how a short data speed reduction caused harm to Plaintiff personally, or what kind of actual damages they incurred as a result of this practice.

"[I]t is well recognized in this state that a claim for damages under FDUTPA has three elements: (1) a deceptive act or unfair practice; (2) causation; and (3) actual damages." Kia Motors Am. Corp. v. Butler, 985 So. 2d 1133, 1140 (Fla. 3d DCA 2008).

The Court finds that the Plaintiff has established a deceptive act or unfair practice with respect to Data throttling however the other 2 elements are lacking.  Based on the above, the Court finds Plaintiff's FDUTPA claim (Count 2) does not sufficiently maintain a cause of action and therefore this count still requires dismissal without prejudice.

Count 3 – Declaratory and Injunctive relief under "FDUTPA"

To state a claim for injunctive or declaratory relief under FDUTPA, a plaintiff "must show (1) that it is aggrieved, in that its rights have been, are being, or will be adversely affected, by (2) a violation of FDUTPA, meaning an unfair or deceptive practice which is injurious to consumers." Stewart Agency, Inc. v. Arrigo Enterprises, Inc., 266 So. 3d 207, 214 (Fla. 4th DCA 2019). Plaintiff alleges that AT&T caused them damages through its "Bogus" Administrative Fee, which he again describes as "a textbook pass-through fee." Am. Compl. ¶ 86. However as discussed above this Court does not find the Administrative Fee as Bogus or a pass-through fee or a fee

---

[7] Citing Librizzi v. Ocwen Loan Servicing, LLC, 120 F. Supp. 3d 1368, 1381 (S.D. Fla. 2015) (Bloom, J.) (finding that FDUTPA claims must be pled with particularity where plaintiff alleged defendant caused damages through deception); Mehta, 16 So. 3d at 917; USA Nutraceuticals Grp., Inc. v. BPI Sports, LLC, No. 15-CIV-80352, 2016 WL 4254257, at *3 (S.D. Fla. Feb. 16, 2016) ("[C]ourts regularly apply Rule 9(b) to FDUTPA claims, as such claims uniquely sound in both tort and fraud.").

based on any misrepresentation. Therefore, the Court does not find that this count can be cured through any amendment and therefore this count requires **dismissal with prejudice**.

Count 4 – Breach of contract/ Good Faith and Fair Dealing.

In support of the good faith and fair dealing claim, Plaintiff alleges that AT&T breached unspecified provisions of the Wireless Customer Agreement and acted in a commercially unreasonable manner by throttling Plaintiff's data and charging the "bogus" Administrative Fee. Am. Compl. ¶ 79 ("The express terms of the wireless agreement required AT&T to provide unlimited data and true administrative costs as defined by the contract."); see also ¶¶ 78-81. Florida law recognizes the implied covenant of good faith and fair dealing in every contract, with two limitations:

> First, the implied covenant of good faith should not be invoked to override the express terms of the agreement between the parties.

> Second, a claim for breach of the implied covenant of good faith and fair dealing cannot be maintained under Florida law absent an allegation that an express term of the contract has been breached.

Ins. Concepts & Design, Inc. v. Healthplan Servs., Inc., 785 So. 2d 1232, 1234 (Fla. 4th DCA 2001).

First, Plaintiff's breach allegation is not tied to any particular provision in the Agreement. Am. Compl. ¶ 80 (alleging "AT&T breached the express terms of the wireless agreement by failing to provide unlimited data" with nothing more).

Also, Plaintiff's good faith and fair dealing claim is not substantively distinguishable from the fraud claim. See Am. Compl. ¶ 77 (alleging false statements of material fact as basis for breach of the duty of good faith and fair dealing). The problems with this claim become even more troublesome under the heightened pleading standard that applies to claims that sound in fraud.

Accordingly, the Court therefore finds that Plaintiff's good faith and fair dealing claim requires dismissal without prejudice with leave to amend to identify the express term(s) of the Agreement alleged to have been breached.

Count 5 - Unjust Enrichment

Even though Plaintiff has indicated that this claim is pled in the alternative, it still as to be examined as a separate and distinct cause of action.

"The elements of a cause of action for unjust enrichment are: (1) plaintiff has conferred a benefit on the defendant, who has knowledge thereof; (2) defendant voluntarily accepts and retains the benefit conferred; and (3) the circumstances are such that it would be inequitable for the defendant to retain the benefit without first paying the value thereof to the plaintiff." Duty Free

12

World, Inc. v. Miami Perfume Junction, Inc., 253 So. 3d 689, 693 (Fla. 3d DCA 2018). "Florida law is clear that 'a plaintiff cannot pursue a quasi-contract claim for unjust enrichment if an express contract exists concerning the same subject matter.'" Sterling Breeze Owners' Ass'n, Inc. v. New Sterling Resorts, LLC, 255 So. 3d 434, 437 (Fla. 1st DCA 2018), reh'g denied (Oct. 16, 2018). A contract implied in law or "quasi contract" operates where there is no contract "to provide a remedy where one party was unjustly enriched, where that party received a benefit under circumstances that made it unjust to retain it without giving compensation." Commerce P'ship. 8098 Ltd P'ship v. Equity Contracting Co., Inc., 695 So.2d383, 386 (Fla. 4th DCA 1997). That is definitely not the case here. Plaintiff has acknowledged the existence of a contract between the parties that governs the subject matter of this lawsuit, thus barring Plaintiff's quasi-contract claim for unjust enrichment. New Sterling Resorts, LLC, 255 So. 3d at 437. The fact that Plaintiff chose not to incorporate the paragraphs acknowledging the existence of the Wireless Customer Agreement into the unjust enrichment count does not save the claim as this Court does not have to accept as true or even consider "internally inconsistent factual claims." Gallego v. Wells Fargo Bank, N.A., 276 So. 3d 989, 990 (Fla. 3d DCA 2019).

Furthermore, Like Counts 1-4, Plaintiff's claim of unjust enrichment hinges on their assertion that the administrative fee is deceptive—an assertion that, as discussed in detail above, is directly contradicted by both the Wireless Customer Agreement and AT&T's website. Additionally, while the claim sounds in fraud, it is not pleaded with specificity as is required by Florida law. See Fla. R. Civ. P. 1.110(b); Mehta, 16 So. 3d at 917.

Plaintiff's unjust enrichment claim cannot be cured though amendment, requiring that it be dismissed with prejudice. In cases where it is apparent that a pleading cannot be amended to state a cause of action, or where an amendment would be futile, dismissal with prejudice is appropriate. Central Florida Investments, Inc v. Charles Levin Timeshares, 659 So.2d 492 (Fla. 5th DCA 1995)


Count 6 – True bill of Discovery

Plaintiff's final claim for a pure bill of discovery is based on Plaintiff's "belie[f]" that AT&T provided Plaintiff's geolocation data to unauthorized persons without Plaintiff's consent. Am. Compl. ¶ 133. The Amended Complaint provides a long history regarding AT&T collecting customer geolocation data and then disseminating it to third-party data aggregators and location-based service (LBS) providers, which Plaintiff alleges is in direct violation of both AT&T's privacy policy and the Telecommunications Act. Id. ¶¶ 92-98.

Florida law is clear that a pure bill of discovery claim justified only under "narrow and limited circumstances." Venezia Lakes Homeowners Ass'n, Inc. v. Precious Homes at Twin Lakes Prop. Owners Ass'n, Inc., 34 So. 3d 755, 756 (Fla. 3d DCA 2010); The Complaint for a Pure Bill of Discovery - A Living, Breathing, Modern Day Dinosaur, Florida Bar Journal, Volume 78, No. 3, March 2004. "[A] bill of discovery may not be used 'as a fishing expedition to see if causes of action exist.'" Venezia Lakes, 34 So. 3d at 758 (quoting Mendez, 700 So. 2d at 47)). "Nor is it available simply to obtain a preview of discovery obtainable once suit is filed." Id.; see RAV

13

Bahamas Ltd. v. Marlin Three, LLC, 333 So. 3d 1158, 1163 (Fla. 3d DCA 2022) (stating pure bill claims "may not be used, like here, 'as a fishing expedition to see if causes of action exist'").

Plaintiff's pure bill of discovery claim does not seek to identify potential defendants, but plainly states that the defendant has been identified— AT&T. Am. Compl. ¶ 134 ("There is no way for Plaintiff to determine whether AT&T MOBILITY, LLC violated its own privacy policy via its customer service line or any possibly application on its customer service website without filing this action.") Instead, as plainly stated by both the Amended Complaint, "Plaintiffs [sic] seeks a pure bill of discovery to determine if AT&T MOBILITY, LLC violated either Florida or Federal law." Id. at ¶ 135. (Emphasis added). This is exactly the type of "fishing expedition" that has been expressly disallowed by the Third DCA. See Venezia Lakes, 34 So. 3d at 758 ("[A] bill of discovery may not be used 'as a fishing expedition to see if causes of action exist.'") (Citation omitted).

Because Plaintiff's pure bill of discovery claim is an improper fishing expedition to determine if a cause of action exists against AT&T, it is hereby dismissed with prejudice.


IV.    Conclusion


After careful consideration, detailed analysis of the Motion, response to the motion and being fully advised in the premises, it is hereby:

ORDERED AND ADJUDGED

1.  The Motion to dismiss Count One as to the allegation of AT&T charging a "Bogus" Administrative fee is GRANTED and  this is **Dismissed with prejudice**, while as to the allegation of AT&T Throttling Plaintiff's unlimited data account, this is dismissed with leave to amend within 20 days from the date of this order to show how the misrepresentation/misstatements induced this Plaintiff to rely and act on it and show how this Plaintiff suffered injury upon reliance on the misrepresentation/misstatements.
2.  The Motion to Dismiss Count 2, Damages Under "FDUTPA" is also dismissed with leave to amend in 20 days to plead with specificity a proper cause of action showing AT&T's practice of Throttling is a violation of FDUTPA.
3.  The Motion to Dismiss Counts 3 – Declaratory and injunctive relief under FDUTPA; 5 – Unjust Enrichment and Count 6 – Pure bill of discovery, are all **Dismissed with prejudice** for the reasons stated in the order above.
4.  The Motion to Dismiss Count 4 – Breach of implied duty of good faith and fair dealing is dismissed with leave to amend within 20 days from the date of this order to identify the express term(s) of the Agreement alleged to have been breached only as to the "Throttling" allegation. As to the allegation regarding the "Bogus" Administrative fee, the Motion is GRANTED, and the Allegation is **Dismissed with Prejudice**.

14

DONE and ORDERED in Chambers at Miami-Dade County, Florida on this 1st day of May 2023.

Honorable Chiaka Ihekwaba
COUNTY COURT JUDGE

SIGNED AND DATED

MAY 1 - 2023

Judge Chiaka Ihekwaba

CC
Andrew Robert Ingalls, aingalls@daypitney.com
Andrew Robert Ingalls, brodriguez@daypitney.com
Evelyn Davila, edavila@daypitney.com
Jessica Solorzano, jsolorzano@daypitney.com
Manuel A. Garcia-Linares, mgarcialinares@daypitney.com
Manuel A. Garcia-Linares, brodriguez@daypitney.com
Maury L Udell, notice66@bmulaw.com
Rachel L. Kittl, rkittl@bmulaw.com

15

Case 1:25-cv-20381-RAR   Document 1-2   Entered on FLSD Docket 01/27/2025   Page 671 of 1553

**IN THE COUNTY COURT OF THE ELEVENTH JUDICIAL**
**CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA**

CASE NO: 2019-011857-SP-26
SECTION: SD05
JUDGE: Michaelle Gonzalez-Paulson

**Francisco Batista**

Plaintiff(s) / Petitioner(s)

vs.

**AT&T Mobility LLC**

Defendant(s) / Respondent(s)

_____/

## <u>ORDER GRANTING DEFENDANT'S MOTION TO DISMISS PLAINTIFF'S SECOND AMENDED COMPLAINT</u>

On April 28, 2022, this Court heard Defendant AT&T Mobility, LLC's *Motion to Dismiss Plaintiff's Second Amended Complaint*. After considering the motion, Plaintiff's response, the amended complaint, all relevant pleadings, the arguments of counsel, and being otherwise duly advised in the premises, the Court hereby **GRANTS** AT&T's Motion on all counts for the reasons set forth below.

## I. Background.

Plaintiff filed an Amended Complaint on deemed filed on June 26, 2020, asserting six claims against AT&T: (1) fraud, (2) breach of implied duty of good faith and fair dealing, (3) damages under the Florida Deceptive and Unfair Trade Practices Act § 501.201, *et seq.,* Fla. Stat. ("FDUTPA"), (4) unjust enrichment, and (5) declaratory relief under FDUTPA, and (6) injunctive relief under FDUTPA.  Counts 1-3 are based on allegations that AT&T charged Plaintiff a "bogus" Administrative Fee and "throttled" Plaintiff's unlimited data account and Count 4 is based on the Administrative Fee alone. Counts 5-6 allege that AT&T provided Plaintiff's geolocation data to third-party aggregators and location-based service providers without Plaintiff's

consent.

While the Amended Complaint specifically references, incorporates, and quotes from the Wireless Customer Agreement, AT&T's website, and AT&T billing statements as the bases for Plaintiff's claims, none of those documents are attached to the Complaint. (Am. Compl. ¶¶ 15, 18-19, 30, 47, 49-50, 53 (Agreement); ¶¶ 33, 56, 40, 64 (AT&T's website), ¶¶ 21, 22, 56 (billing statements)).

AT&T filed a Motion to Dismiss ("Motion") on July 1, 2020, attaching the Wireless Customer Agreement in effect at the time this case was filed to its Motion to Dismiss as Exhibit 1. AT&T noted that Plaintiff's Amended Complaint is almost entirely composed of claims copy-and-pasted from other lawsuits and is identical to over one hundred other cases pending before courts in this jurisdiction filed by counsel for Plaintiff. None of the allegations in the Amended Complaint allege facts specific to Plaintiff. Plaintiff responded to AT&T's Motion on April 22, 2022, and the Court heard the Motion on April 28, 2022. At the hearing, counsel for the Plaintiff voluntarily dismissed Counts 5 and 6. Transcript 24:17-19 ("Judge, I'll announce on these five that I'll withdraw the geolocation counts without prejudice"). The Court grants the Motion to Dismiss as to the remaining Count 1-4 for the following reasons.

## II.    Motion to Dismiss Standard

The standard for determining whether a motion to dismiss should be granted is whether, based on the well-pleaded allegations and incorporated attachments, the movant is entitled to judgment as a matter of law. *Golden Gate Homes, LC v. Levey*, 59 So. 3d 275, 280 (Fla. 3d DCA 2011). In cases where it is apparent that a pleading cannot be amended to state a cause of action, or where an amendment would be futile, dismissal *with prejudice* is appropriate. *Central Florida Investments, Inc. v. Charles Levin Timeshares*, 659 So. 2d 492 (Fla. 5th DCA 1995).

While the Court is generally limited to the complaint's four corners, it is required to

consider exhibits attached to and incorporated into the complaint. *Rolle v. Cold Stone Creamery, Inc.*, 212 So. 3d 1073, 1076 (Fla. 3d DCA 2017). Moreover, when a party refers to a document in the complaint, the trial court may use that document to assess the nature of the claims alleged in the complaint. *Glen Garron, LLC v. Buchwald*, 210 So. 3d 229, 233 (Fla. 5th DCA 2017). Where an exhibit attached to a complaint contradicts the allegations in the complaint, the exhibits control and may form the basis for a motion to dismiss. *See Fladell v. Palm Beach Cty. Canvassing Bd.*, 772 So. 2d 1240, 1242 (Fla. 2000).

Here, the Amended Complaint specifically references, incorporates, and quotes from the Wireless Customer Agreement, AT&T's website, and AT&T billing statements as the bases for Plaintiff's claims. (Am. Compl. ¶¶ 15, 18-19, 30, 47, 49-50, 53, 41-43 (Agreement); ¶¶ 33, 56, 40, 64 (AT&T's website), ¶¶ 21, 22, 56 (billing statements)). Under Florida Rule of Civil Procedure 1.130(a), Plaintiff had the duty to attach or incorporate the underlying Agreement, billing statements, and website language onto its complaint. Fla. R. Civ. P. 1.130(a) ("All . . . contracts, accounts, or documents on which action may be brought [or copies of their material portions] . . . must be incorporated in or attached to the pleading."). Plaintiff contends that it did not attach the Agreement because "it is under the exclusive control of AT&T," Am. Compl. ¶¶ 22 and 46.[1] Thus, Plaintiff apparently filed this lawsuit alleging, among other things, that "AT&T has breached the express terms of the wireless agreement" without knowing what the Agreement says.

AT&T's Motion to Dismiss attaches a copy of the Wireless Customer Agreement, a portion of the AT&T website defining the Administrative Fee, and a recent AT&T billing statement. *See* Def.'s Mot. to Dismiss Exs. 1-3. Because the Amended Complaint specifically references, incorporates, and quotes from these documents, AT&T argued that they are within the four corners of the Amended Complaint and can be considered by the Court in ruling on the underlying motion. *See Buchwald*, 210 So. 3d at 233 ("When a party refers to a document in the complaint, the trial court may use that document to assess the nature of the claims alleged in the complaint"); *One Call*

*Prop. Servs., Inc. v. Sec. First Ins. Co.*, 165 So. 3d 749, 752 (Fla. 4th DCA 2015) ("[W]here the terms of a legal document are impliedly incorporated by reference into the complaint, the trial court may consider the contents of the document in ruling on a motion to dismiss.").[2]

At the hearing, however, Plaintiff argued that AT&T had the burden to prove up the documents (which the Plaintiff failed to attach to the Amended Complaint), and took the position that AT&T was required to authenticate the Agreement before this Court could consider it. The Court does not find Plaintiff's arguments persuasive. The Court could not consider any such "authentication" via affidavit as Plaintiff suggests at this stage of the proceedings. Requiring AT&T to cure Plaintiff's deficiency under heightened evidentiary requirements would not only ignore Rule 1.130(a), but do away with the incorporation by reference doctrine, and turn this Motion to Dismiss into a summary judgment motion. No legal authority supporting such a proposition has been cited or provided to the Court. The federal and summary judgment cases upon which Plaintiff relies do not apply here. Plaintiff's attempt to base their claims on the express language of the Agreement—while precluding consideration of that same Agreement at this stage of the proceedings—would cause unnecessary delay, require needless discovery, and is not well taken.[3]

A court's duty to accept the facts in the complaint as true does not require the court to ignore specific factual details of the pleading in favor of general or conclusory allegations. *Griffin Indus. v. Irvin*, 496 F.3d 1189 (11th Cir. 2007). Thus, this Court does not find merit in Plaintiff's assertion that AT&T must authenticate the Agreement for this Court to properly consider it when Plaintiff incorporated the Agreement by reference. Because the Amended Complaint specifically references, incorporates, and quotes from these documents, they are within the four corners of the Amended Complaint and will be considered by the Court in ruling on the underlying motion. *See Buchwald*, 210 So. 3d at 233; *One Call Prop. Servs., Inc.*, 165 So. 3d at 752.

### III. Counts 1-4

Plaintiff's claims for fraud, FDUTPA damages, good faith and fair dealing, and unjust enrichment are based upon two separate factual theories: "bogus" administrative fees and "throttling," the alleged practice of slowing data speeds when mobile phone users meet certain data usage thresholds. These claims are ripe for dismissal because they are facially negated by documents relied on and incorporated into the Amended Complaint and contain other pleading deficiencies and errors of law that cannot be cured through amendment.

In Florida, "[a] party cannot recover for alleged false misrepresentations that are adequately dealt with or expressly contradicted in a later written contract." *TRG Night Hawk Ltd. v. Registry Dev. Corp.*, 17 So. 3d 782, 784 (Fla. 2d DCA 2009); *see also GVK Int'l Bus. Grp., Inc. v. Levkovitz*, No. 3D19- 1119, 2020 WL 4197407, at *2 (Fla. 3d DCA July 22, 2020); *Taylor Woodrow Homes Fla., Inc. v. 4/46-A Corp.*, 850 So. 2d 536, 542 (Fla. 5th DCA 2003). "To hold otherwise is to invite contracting parties to make agreements of the kind in suit and then avoid them by simply taking the stand and swearing that they relied on some other statement." *TRG Night Hawk Ltd.*, 17 So. 3d at 784. Moreover, "a party who signs a contract whose terms contradict the alleged misrepresentations on which he relied is barred 'from seeking relief pursuant to FDUTPA, as she acted unreasonably.'" *Id.* (citing *Rosa v. Amoco Oil Co.*, 262 F. Supp. 2d 1364, 1368 (S.D. Fla. 2003)). In particular, with respect to FDUTPA claims, "[c]ourts routinely dismiss FDUTPA claims where those claims are directly and fully rebutted by express evidence in a governing written contract." *Sol. Z v. Alma Lasers, Inc.*, No. 11-CV-21396-CIV, 2013 WL 12246356, at *5 (S.D. Fla. Jan. 22, 2013). And, as in this case, where a plaintiff alleges a FDUTPA action based on misrepresentation and "plaintiff relies on written statements that are expressly contradicted by a subsequent contract, the plaintiff's reliance on those statements is not reasonable as a matter of law for a FDUTPA claim." *Id.* At the pleading stage, "where the allegations of the complaint are contradicted by the exhibits, the plain meaning of the exhibits will control." *Ginsberg v. Lennar Fla. Holdings, Inc.*, 645 So. 2d 490, 494 (Fla. 3d DCA 1994).

A.       **Plaintiff's Administrative Fee allegations in Counts 1-4.**

Plaintiff alleges that AT&T has wrongfully charged a $1.99 monthly Administrative Fee. Plaintiff asserts that the fee is "bogus" for three reasons: (1) AT&T failed to adequately disclose the existence of the Administrative Fee; (2) the Administrative Fee is deceptively defined and applied; and, (3) the Administrative Fee is an illegal "pass-through" fee.

AT&T counters that these allegations are belied by the Amended Complaint and the documents it is based on. The Court finds AT&T's arguments persuasive. Plaintiff pursued this lawsuit without ever consulting the Agreement upon which the allegations are based. Had Plaintiff conducted such a review, it would have been clear that the Agreement, website, and billing statements facially negate Plaintiff's allegations.

1.       **Disclosure of the Administrative Fee.**

Plaintiff alleges that AT&T did not adequately disclose the existence of the Administrative Fee when they signed up for AT&T's services and thereafter tried to conceal the fee by burying the line-item charge in the billing statement. Am. Compl. ¶¶ 20-21. In response, Defendant argues that the Wireless Customer Agreement, website and billing statements expressly disclose the administrative fee and AT&T's right to make changes to charges billed to customers.[4] For example, section 1.4 of the Agreement states: "Charges include, without limitation airtime, roaming, recurring monthly service, activation, **administrative**, and late payment charges . . . whether assessed directly upon you or upon AT&T." Mot. to Dismiss, Ex. 1 § 1.4. The Wireless Customer Agreement also reserves the right for AT&T to "make changes to this Agreement" which can include "charges." *Id.* § 1.3.

The AT&T website, quoted by Plaintiff in the Amended Complaint, defines the Administrative Fee and further expressly states: "AT&T reserves the right to increase its fees or impose additional fees." Def.'s Mot. to Dismiss, Ex. 2. AT&T's billing statement also expressly

discloses the existence of the Administrative Fee, with the billing statement providing the monthly amount. Def.'s Mot. to Dismiss, Ex. 3. The Wireless Customer Agreement, website, and billing statement (incorporated by reference into the Amended Complaint) refute and thereby negate the assertion that the Administrative Fee was not properly disclosed. Therefore, no claim can proceed on these allegations as a matter of law.

### 2.        How the Administrative Fee is used and increased.

Plaintiff next alleges that AT&T is telling the consumer one thing but doing another. Quoting AT&T's website, Plaintiff alleged:

> AT&T's representation that the Administrative Fee is a charge assessed by AT&T that helps defray a portion of certain expenses AT&T incurs, including but not limited to: (a) charges AT&T or its agents pay to interconnect with other carriers to deliver calls from AT&T customers to their customers; and (b) charges associated with cell site rents and maintenance are false.

Am. Compl. ¶¶ 33, 56, 40, 64. According to Plaintiff, the Administrative Fee is not tied to either interconnect or cell site charges because AT&T has continuously increased the fee even though these costs have allegedly decreased. *Id.* ¶ 22. Based on this assertion, Plaintiff theorizes that the Administrative Fee is part of "a scheme to funnel direct profit to AT&T rather than pay for any identifiable increase in costs." Am. Compl. ¶ 56.

First, the Court rejects any suggestion that AT&T's charging of an Administrative Fee is *per se* deceptive as the term "administrative fee" by itself does not suggest that AT&T will apply the Administrative Fee in any particular way. *See Maor v. Dollar Thrifty Auto. Grp., Inc.*, No. 15-22959-CIV, 2018 WL 4698512, at *4 (S.D. Fla. Sept. 30, 2018) ("Solely using the term 'administrative fee,' without more, does not restrict how the fee may be used or represent any purpose or nature behind the fee."); *Berry v. Budget Rent A Car Systems Inc.*, 497 F. Supp. 2d 1361, 1367 (S.D. Fla. 2007) (dismissing FDUTPA claim with prejudice, explaining "the simple fact" that defendant itemized a "cost recovery fee" as a separate charge is not unfair or deceptive).

Second, while Plaintiff alleges that AT&T does not actually use the Administrative Fee to offset interconnect costs, cell site rents and/or maintenance charges which is deceptive to consumers, the definition provided by the Plaintiff does not limit AT&T to only offsetting those two specific cost categories. Instead, it states that AT&T may defray a portion of certain expenses "**including but not limited to**" charges for interconnection and for cell site rents and maintenance. Am. Compl. ¶¶ 33, 56, 40, 64. And, inclusion of the phrase "including but not limited to" is not in and of itself unfair and deceptive. Therefore, taking Plaintiff's allegations as true, interconnect costs, cell site rents and/or maintenance charges serve as examples of and not limitations to how AT&T can apply the Administrative Fee, meaning AT&T's alleged use of the fee to offset other expenses and costs would still comply with the fee's definition and cannot be considered deceptive, unfair, false, or a violation of the parties' agreement.

Finally, despite Plaintiff counsel's repeated argument during the hearing that the Administrative Fee was disclosed to customers as being tied to ***increases*** in a specific set of expense categories, the Amended Complaint and the website language contain no reference to "increases," and Plaintiff has not alleged any instances where AT&T made such statements. Instead, AT&T merely stated that the Administrative Fees would "help[] defray a portion of certain expenses AT&T incurs." Plaintiff has not alleged or identified any representation by AT&T that the Administrative Fee has always offset the exact same percentage of its expenses, or that the fee will increase or decrease solely based on increases or decreases to its interconnection or cell site rents and maintenance costs. Accordingly, because no reasonable consumer could interpret the Administrative Fee, its definition, or its application as deceptive, unfair, or based on a misrepresentation, Plaintiff's FDUTPA and fraud claims necessarily fail. *See Day v. Sarasota Doctors Hosp., Inc.*, No. 19-01522, 2021 WL 288969, at *4 (M.D. Fla. Jan. 28, 2021) (finding FDUTPA claim failed where "no reasonable consumer could be deceived by the [Defendant's conduct or the parties' contract] under the circumstances alleged . . .").

Therefore, applying the law to the undisputed facts of this case, based on the website and contract language relied on by Plaintiff, no amount of discovery will enable Plaintiff to state a cause of action related to how AT&T defines, uses, or increases the Administrative Fee, and no claim can proceed on these allegations as a matter of law.

### 3.     The Administrative Fee is not a pass-through fee.

Finally, Plaintiff alleges that the Administrative Fee is a "textbook pass through fee" as "it is not what its being used for despite its definition in the wireless agreement." Am. Compl. ¶ 66. Florida law is clear that an impermissible "pass-through" fee is one that purports to be collected for payment to a third party, but in reality the company is keeping the fee for itself.  *See Latman v. Costa Cruise Lines, N.V.*, 758 So. 2d 699, 703 (Fla. 3d DCA 2000) (finding that use of the term "port charge" misrepresents to a reasonable consumer that it is a "pass-through" charge which the cruise line will pay to the relevant port authorities).

Here, there is no allegation that AT&T ever represented or suggested the Administrative Fee would be paid to anyone other than AT&T; therefore, the Court finds that Plaintiff has not and cannot allege that the Administrative Fee is a pass-through fee and no claim can proceed on these allegations. *See Vorst v. TBC Retail Grp., Inc.*, No. 12-CV-80013, 2012 WL 13026643, at *2 (S.D. Fla. Apr. 12, 2012) (dismissing FDUTPA pass-through claim based on the finding that "Plaintiff's conclusory allegations that the oil disposal fee was represented as a pure pass-through expense and that Defendant retains the fee as a profit are insufficient."); *see also Maor*, 2018 WL 4698512, at *5 ("Plaintiff has not identified any provisions in the rental contract, and this Court has found none, which constitute a representation to a reasonable consumer that the 'administrative fee' was a pass-through charge which Defendants would pay to others."); *Berry*, 497 F. Supp. 2d at 1367 (finding that the term "cost recovery fee" is not a pass-through fee as "itself implies that the company will keep the money collected as 'recovery' for its costs.").

In any event, as previously found, the website's definition of the Administrative Fee does

not limit how it may be applied or what costs it can be used to offset. *Id.* ¶¶ 33, 56, 40, 64.

The Court does not find the cases relied on by Plaintiff in support of their administrative fee claims persuasive. In *Calderon v. Sixt Rent a Car, LLC*, No. 19-CV-62408, 2020 WL 700381, at *7 (S.D. Fla. Feb. 12, 2020), the defendant was alleged to have deceived their customers by incorporating the terms of a separate agreement that contained undisclosed, and allegedly fraudulent, charges. *Id.* at *4 ("That Sixt's employee did not provide Calderon or Marin the Rental Jacket prior to them agreeing to its terms is not insignificant."). That is a far cry from the case at hand, especially given Plaintiff's tacit admission that the Administrative Fee is disclosed on the website and the monthly billing statement.

Similarly, *Deere Constr., LLC v. Cemex Constr. Materials Florida, LLC*, 198 F.Supp.3d 1332 (S.D. Fla. 2016) involved a failure to disclose an environmental charge that defendant represented was derived and directly tied to the Federal Energy Information Administration's weekly reporting of diesel fuel pricing. *Id.* at 1334. Again, because Plaintiff admits that the Administrative Fee was disclosed and its definition does not directly tie the fee to the rise or fall of AT&T's interconnection and cell site costs, *Deere* is inapplicable to the facts at hand.[5]

Accordingly, because Plaintiff's Administrative Fee-based claims for fraud, FDUTPA damages, good faith and fair dealing, and unjust enrichment are premised on purported falsehoods, misrepresentations, breaches, and deceptive or unfair trade practices that are refuted by the contracts they rely upon, they fail as a matter of law. *Ginsberg*, 645 So. 2d at 494; *TRG Night Hawk Ltd.*, 17 So. 3d at 784.

**B.     Plaintiff's "throttling" allegations in Counts 1-3.**

The remainder of Plaintiff's claims for fraud, FDUTPA damages, and good faith and fair dealing are based on allegations pertaining to network management practices designed to remedy network congestion caused by individual consumers who use exponentially more data than others.

Plaintiff complains that even though they had an unlimited data plan, AT&T "throttled" (or slowed down) their data speeds after they used a certain amount of data during a monthly billing cycle. Am. Compl. ¶¶ 9-11, 14. However, as the Wireless Consumer Agreement shows, the term "unlimited" refers to the *amount* of data, not the *speed* of that data. Unlike customers on tiered data plans, unlimited customers pay a set price without regard to the *amount* of data used. Plaintiff's alleged belief that "unlimited" refers to both the amount and speed of the data is wrong. Once again, the Agreement negates Plaintiff's allegations as the following comparison shows:

| What Plaintiff Alleges | What the Agreement Actually Says |
|---|---|
| AT&T represented, directly or indirectly, expressly or by implication, to the Plaintiff, an unlimited mobile data plan customer, that the amount of data that the Plaintiff could access in any billing period would not be limited.<br><br>**Am. Compl. ¶ 30** | **Unlimited Data Customers.** If you are an AT&T unlimited data plan customer, you agree that "unlimited means you pay a fixed monthly charge for wireless data service regardless of how much data you use . . . "unlimited' does <u>not</u> mean that you can use AT&T's wireless data service in any way that you choose, or for any prohibited activities."<br><br>AT&T may reduce your data throughput speeds at any time or place if your data usage exceeds an applicable, identified usage threshold during any billing cycle.<br><br>**Motion, Ex. 1 (Agreement) § 6.2 (emphasis in orig.)** |
| AT&T's wireless customer agreements do not state that an unlimited mobile data plan customer's use of more than a specified amount of data is a prohibited activity.<br><br>**Am. Compl. ¶ 15** | "Prohibited Activities" include, among other items, anything that: "excessively and disproportionately contributes to network congestion," "degrades network performance," or can "cause harm to the network or other customers."<br><br>"[U]nlimited" does <u>not</u> mean that you can use AT&T's wireless data service . . . for any prohibited activities.<br><br>**Motion, Ex. 1 (Agreement) § 6.2 (emphasis in orig.)** |
| [The] unlimited mobile data contract with Plaintiff . . . did not provide that AT&T could modify, diminish, or impair the services of who use more than a specified amount of data for permissible activities. | AT&T may modify, without advance notice, the permitted and prohibited activities.<br><br>You agree that . . . if you use AT&T's wireless data services in any manner that is prohibited, . . . AT&T may reduce your data throughput speeds at any time or place if your data usage |

| **What Plaintiff Alleges** | **What the Agreement Actually Says** |
|---|---|
| **Am. Compl. ¶ 15, 47** | exceeds an applicable, identified usage threshold during any billing cycle.<br><br>**Motion, Ex. 1 (Agreement) § 6.2.** |
| AT&T omitted the fact that it intended to throttle Plaintiff's data, without Plaintiff's knowledge or specific consent.<br><br>**Am. Compl. ¶ 31** | AT&T may modify, without advance notice, the permitted and prohibited activities, [and] may engage in any reasonable network management practice . . . to reduce network congestion.<br><br>**Motion, Ex. 1 (Agreement) § 6.2** |

On its face, the Agreement does not say what the Plaintiff alleges it says. In light of these contract provisions, the Court finds that the Agreement clearly reserves the right for AT&T to "reduce . . . data throughput speeds at any time or place if your data usage exceeds an applicable, identified usage threshold during any billing cycle," and even expressly states that, even if you are an "unlimited" customer, "AT&T can limit, restrict, suspend or terminate your data service . . . ." Def.'s Mot. to Dismiss, Ex. 1. Therefore, no claim can proceed based on these allegations as a matter of law.

**C.      Additional grounds for dismissing each cause of action in Counts 1-4.**

Having held that Plaintiff's Administrative Fees and data "throttling" claims are negated by the Agreement and other exhibits implicitly incorporated into and expressly relied on by the Amended Complaint, the Court now examines each cause of action alleged in Counts 1-4. This claim-by-claim analysis reveals several additional grounds supporting the underlying order based on Plaintiff's failure to properly plead their fraud, breach of the duty of good faith and fair dealing, FDUTPA damages, and unjust enrichment claims.

1. **Plaintiff's Fraud Claim Fails as a Matter of Law.**

In Florida, a plaintiff must plead fraud by alleging that the defendant: 1) misrepresented a material fact, 2) knew or should have known of the falsity of the statement, 3) intended that the misrepresentation would induce Plaintiff to rely and act on it, and 4) that Plaintiff suffered injury in justifiable reliance on the misrepresentation. *Witt v. La Gorce Country Club, Inc.*, 35 So. 3d 1033, 1040 (Fla. 3d DCA 2010). In Florida, claimants must plead fraud (or fraudulent inducement) with particularity, as required by Rule 1.120(b). *See* Fla. R. Civ. P. 1.120(b) ("[A]ll averments of fraud . . . shall be stated with such particularity as the circumstances may permit."); *Cedars Healthcare Grp., Ltd. v. Mehta*, 16 So. 3d 914, 917 (Fla. 3d DCA 2009).

AT&T argues that Counts 1-4 all sound in fraud[6] and Plaintiff failed to satisfy this pleading standard. In response, Plaintiff contends that they pled their claims to the best of their ability as circumstances may permit and argues that they cannot allege specifics because "Plaintiff is not in possession of the specific digital advertisements and contracts issued by AT&T." Response at ¶ 67. The Court finds this argument unpersuasive. Plaintiff does not dispute that the Wireless Customer Agreement is on AT&T's website. And Plaintiff is undisputedly familiar with the AT&T website, as they rely on it in their Amended Complaint. Am. Compl. ¶¶ 21, 33, 56.

Nevertheless, even assuming Plaintiff facially alleged the first element—that AT&T misrepresented facts relating to the Administrative Fee and omitted facts relating to the potential for data speed reductions—the documents relied on and incorporated into the Amended Complaint refute Plaintiff's allegation that those statements or omissions were false, that AT&T knew they were false, that AT&T intended Plaintiff to rely on them, and that any reliance was justified. *See* sections III.A, III.B, *supra*. Moreover, Plaintiff failed to plead the other four elements with specificity. The Amended Complaint fails to provide a single detail regarding Plaintiff's own interactions with AT&T, or the time, place, and manner of how they were deceived. *Id.* There is no particularly-pled assertion explaining where, when, what, and how these alleged misrepresentations or omissions were material *to Plaintiff's* decision to do business with AT&T, that *they* relied on

them, or that they proximately caused *their* damages.

For example, as to throttling, Plaintiff merely recites the last element of fraud, alleging: "Plaintiff relied on AT&T's representations regarding providing unlimited data, and, as a result, incurred damages and was injured as a result of the fraud by omission." Am. Compl. ¶ 32. Plaintiff does not even attempt to allege that their reliance was justified. *Id*. They do not point to a single date to show *when* their data speed was reduced, if any. Nor do they explain *how* such a temporary speed reduction caused them harm or allege *what* measure of actual damages they incurred for any given month of service. This is the kind of information that would have been at Plaintiff's disposal; no "circumstances" prevented Plaintiff from alleging such facts if they existed. And as to administrative fees, Plaintiff fails to allege *when* they saw the website's definition of Administrative Fees and *how* they justifiably relied on it in deciding to use AT&T services. Conclusory assertions disguised as fact do not meet the high standard required by Rule 1.120(b). *See Williams*, 2020 WL 5083550, at *3 (dismissing the complaint because it "fails to provide any more specific details regarding the preparation of the 'Impossible Whopper'"); *Myers v. Myers*, 652 So. 2d 1214, 1215 (Fla. 5th DCA 1995) ("Allegations contained in a pleading are insufficient if they are too general, vague or conclusory.").

For these reasons, Plaintiff fails to plead the fraud claims with particularity as is required by Florida law. *See* Fla. R. Civ. P. 1.120(b); *Mehta*, 16 So. 3d at 917 (requiring claims sounding in fraud "be pled with particularity and must specifically identify misrepresentations or omissions of fact, **as well as time, place or manner in which they were made**.") (emphasis added). Accordingly, the Court finds that Plaintiff's fraud claims cannot be cured though amendment, requiring dismissal *with prejudice*.

2.      **Plaintiff's Good Faith and Fair Dealing Claim Fails as a Matter of Law.**

In support of the good faith and fair dealing claim, Plaintiff alleges that AT&T breached

unspecified provisions of the Wireless Customer Agreement and acted in a commercially unreasonable manner by throttling Plaintiff's data and charging the "bogus" Administrative Fee. Am. Compl. ¶ 41 ("The express terms of the wireless agreement required AT&T to provide unlimited data and true administrative costs as defined by the contract."); *see also* 40-43. Florida law recognizes the implied covenant of good faith and fair dealing in every contract, with two limitations:

> First, the implied covenant of good faith should not be invoked to override the express terms of the agreement between the parties.

> Second, a claim for breach of the implied covenant of good faith and fair dealing cannot be maintained under Florida law absent an allegation that an express term of the contract has been breached.

*Ins. Concepts & Design, Inc. v. Healthplan Servs., Inc.*, 785 So. 2d 1232, 1234 (Fla. 4th DCA 2001). Both of these limitations apply here.

First, Plaintiff's breach allegation is not tied to any particular provision in the Agreement. Am. Compl. ¶ 42 (alleging "AT&T breached the express terms of the wireless agreement by failing to provide unlimited data" with nothing more). Second, as the Court held in parts A and B above, the parties' Agreement expressly authorizes the conduct complained of, and therefore Plaintiff cannot invoke the doctrine to override the express agreement of the parties. *See Healthplan Servs., Inc.*, 785 So. 2d at 1234. Plaintiff cannot show that AT&T failed to act in a commercially reasonable manner when it abided by the express language of the parties' Agreement.

Finally, Plaintiff's good faith and fair dealing claim is not substantively distinguishable from the fraud claim. *See* Am. Compl. ¶ 40 (alleging false statements of material fact as basis for breach of the duty of good faith and fair dealing). The problems with this claim become even more troublesome under the heightened pleading standard that applies to claims that sound in fraud. *See* Part III.C.1, *supra*.

Accordingly, the Court finds Plaintiff's good faith and fair dealing claim cannot be cured

though amendment, requiring dismissal *with prejudice*.

### 3.     Plaintiff's FDUTPA Damages Claim Fails as a Matter of Law.

"[I]t is well recognized in this state that a claim for damages under FDUTPA has three elements: (1) a deceptive act or unfair practice; (2) causation; and (3) actual damages."*Kia Motors Am. Corp. v. Butler*, 985 So. 2d 1133, 1140 (Fla. 3d DCA 2008). Plaintiff alleges that AT&T caused them damages through its failure to adequately disclose, as well as misrepresentations regarding, its data throttling policy and the Administrative Fee, which he again describes as "a textbook pass through fee." Am. Compl. ¶ 66.

As discussed above, Plaintiff's allegations supporting the FDUTPA damages claim are directly contradicted and hence negated by the Wireless Customer Agreement, AT&T's website, and billing statements. *See supra*, parts III.A and III.B. No amount of discovery will enable Plaintiff to sufficiently plead the first element of FDUTPA. Taking Plaintiff's allegations as true, AT&T's data management practices are not deceptive or unfair, since the Wireless Customer Agreement allowed AT&T to reduce data speeds of all customers—including unlimited customers—to preserve network integrity. The Wireless Customer Agreement, website and billing statements, incorporated by reference in the Amended Complaint, also disclosed the Administrative Fee, and neither the imposition of an Administrative Fee nor the contractual use of the phrase "including but not limited to," is sufficient to state a claim for deceptive or unfair business practices. Finally, the Administrative Fee is not a "pass-through fee" by definition. *See Maor*, 2018 WL 4698512, at *5; *Berry*, 497 F. Supp. 2d at 1367.

Even if a reasonable unlimited data customer would think that they were immune to AT&T's network management practices after entering into a contract stating the opposite (and somehow sufficiently pled a deceptive or unfair act or practice), Plaintiff still failed to sufficiently allege causation and actual damages. Similarly, even if AT&T used the Administrative Fees to

defray costs other than interconnection costs and cell site rents and maintenance (and Plaintiff somehow sufficiently pled a deceptive or unfair act or practice), Plaintiff still failed to sufficiently allege causation and actual damages.

This is so under ordinary and heightened pleading standards. As Judge Lody Jean ruled in another case filed by Plaintiff's counsel against AT&T, "Plaintiff has pled a FDUTPA claim as a personal tort sounding in fraud" and, "[w]here the 'gravamen of the claim sounds in fraud' it is subject to the rules governing a fraud claim." Order Granting AT&T's Motion for Final Summary Judgment, *Claims Holding Group, LLC v. AT&T Mobility*, Case No: 2020-000024-SP-05 (July 22, 2020).[7] Plaintiff failed to plead with particularity *when* or *how* a short data speed reduction caused harm to Plaintiff personally, *how* Plaintiff would be harmed if AT&T in fact used their $1.99 Administrative Fees to defray costs other than for interconnection costs and cell site rents and maintenance, or *what* kind of actual damages they incurred as a result of either practice.

Based on the above, the Court finds Plaintiff's FDUTPA damages claim cannot be cured though amendment, requiring dismissal *with prejudice*.

### 4.    Plaintiff's Unjust Enrichment Claim Fails as a Matter of Law.

"The elements of a cause of action for unjust enrichment are: (1) plaintiff has conferred a benefit on the defendant, who has knowledge thereof; (2) defendant voluntarily accepts and retains the benefit conferred; and (3) the circumstances are such that it would be inequitable for the defendant to retain the benefit without first paying the value thereof to the plaintiff." *Duty Free World, Inc. v. Miami Perfume Junction, Inc.*, 253 So. 3d 689, 693 (Fla. 3d DCA 2018). "Florida law is clear that 'a plaintiff cannot pursue a quasi-contract claim for unjust enrichment if an express contract exists concerning the same subject matter.'" *Sterling Breeze Owners' Ass'n, Inc. v. New Sterling Resorts, LLC*, 255 So. 3d 434, 437 (Fla. 1st DCA 2018), *reh'g denied* (Oct. 16, 2018).

Like Counts 1-3, Plaintiff's claim of unjust enrichment hinges on their assertion that the

administrative fee is deceptive—an assertion that, as discussed in detail above, is directly contradicted by both the Wireless Customer Agreement and AT&T's website. Additionally, while the claim sounds in fraud, it is not pleaded with specificity as is required by Florida law. *See* Fla. R. Civ. P. 1.110(b); *Mehta*, 16 So. 3d at 917.

The claim also fails because Plaintiff has acknowledged the existence of a contract between the parties that governs the subject matter of this lawsuit, thus barring Plaintiff's quasi-contract claim for unjust enrichment. *New Sterling Resorts, LLC*, 255 So. 3d at 437. The fact that Plaintiff chose not to incorporate the paragraphs acknowledging the existence of the Wireless Customer Agreement into the unjust enrichment count does not save the claim as this Court does not have to accept as true or even consider "internally inconsistent factual claims." *Gallego v. Wells Fargo Bank, N.A.*, 276 So. 3d 989, 990 (Fla. 3d DCA 2019).

Plaintiff's unjust enrichment claim cannot be cured though amendment, requiring that it be dismissed *with prejudice*.

## IV.   Conclusion

For the reasons stated above, this Court grants AT&T's Motion to Dismiss. As all claims in this matter have now been adjudicated, the clerk is directed to close this matter.

---

[1] Plaintiff's counsel has previously abandoned this assertion in a similar hearing in front of Judge Lehr, where it was undisputed that the Agreement is available on AT&T's website. *See* AT&T's Mot. Dismiss Hr'g Tr., 28:24-25; 49:18-20; 50:15-16, *Ann Green v. AT&T Mobility*, Case No. 2019-16864-SP-23 (July 22, 2020).

[2] At the hearing, Plaintiff's counsel argued that *One Call* involved a contract attached to a motion to dismiss "where there was no dispute on the insurance contract." Transcript 28:1-2. A review of the decision reveals that this assertion is false. *One Call Prop. Servs. Inc.*, 165 So. 3d at 751 ("One Call filed a written response to the motion to dismiss, arguing that the motion impermissibly went

beyond the four corners of the complaint . . . .").

[3]  Further, Plaintiff does not contest the veracity or accuracy of the exhibits. And the Amended Complaint does not rely on any specific version of the Wireless Customer Agreement, but hinges on the more general proposition that "AT&T's wireless customer agreements do not state that an unlimited mobile data plan customer's use of more than a specified amount of data is a prohibited activity." Am. Compl. ¶ 15 (emphasis added).

[4]  As noted, Plaintiff takes no issue with the authenticity of AT&T's website or billing statements introduced into the record by AT&T, and this Court finds Plaintiff incorporated them by reference in the Amended Complaint. *See, e.g.,* Am. Compl. ¶¶ 21, 22, 33, 56, 40, 64.

[5]  While counsel for Plaintiff argued at the hearing that AT&T represented that its interconnection costs are going up, the Amended Complaint does not contain any such allegation. Regardless, counsel's assertion is contradicted by the Administrative Fee definition provided by the Plaintiff, which only states that the fee is used to "defray a **portion** of certain expenses AT&T incurs," including but not limited to interconnection and cell site costs. Am. Compl. ¶ 33. (emphasis added). No increase in costs is mentioned.

[6]  Claims 1-4 incorporate the same factual basis of Plaintiff's fraud claim (paragraphs 1-27) and all claims allege that AT&T knowingly, intentionally and fraudulently deceived the Plaintiff regarding AT&T's Administrative Fee, purported data "throttling," and Privacy Policy. *See, e.g.*, Am. Compl. ¶ 18-19 (alleging that AT&T's unlimited plan was "a bait-and-switch"), *id.* (alleging that AT&T "covertly increases the actual price" of its services by "padding all post-paid wireless customers' bills" with a "bogus" administrative fee), ¶ 20 (alleging the Administrative Fee "is never adequately and honestly disclosed"), ¶ 21 (alleging that AT&T "deliberately hides" the Administrative Fee), ¶ 57 (alleging that AT&T "knew" the Administrative Fee was inflated).

[7]  Citing *Librizzi v. Ocwen Loan Servicing, LLC*, 120 F. Supp. 3d 1368, 1381 (S.D. Fla. 2015) (Bloom, J.) (finding that FDUTPA claims must be pled with particularity where plaintiff alleged defendant caused damages through deception); *Mehta*, 16 So. 3d at 917; *USA Nutraceuticals Grp., Inc. v. BPI Sports, LLC*, No. 15-CIV-80352, 2016 WL 4254257, at *3 (S.D. Fla. Feb. 16, 2016) ("[C]ourts regularly apply Rule 9(b) to FDUTPA claims, as such claims uniquely sound in both tort and fraud.").

**DONE** and **ORDERED** in Chambers at Miami-Dade County, Florida on this <u>8th day of September, 2022</u>.

<u>2019-011857-SP-26 09-08-2022 1:34 PM</u>
Hon. Michaelle Gonzalez-Paulson

**COUNTY COURT JUDGE**
Electronically Signed

<div style="color:red; border:1px solid red;">

Final Order as to All Parties SRS #: **12** (Other)

THE COURT DISMISSES THIS CASE AGAINST ANY PARTY NOT LISTED IN THIS FINAL ORDER OR PREVIOUS ORDER(S). THIS CASE IS CLOSED AS TO ALL PARTIES.

</div>

**Electronically Served:**
Alicia Thomsen, athomsen@daypitney.com
Andrew Robert Ingalls, aingalls@daypitney.com
Andrew Robert Ingalls, brodriguez@daypitney.com
Andrew Robert Ingalls, maristasalado@daypitney.com
Evelyn Davila, edavila@daypitney.com
Jessica Solorzano, jsolorzano@daypitney.com
Manuel A. Garcia-Linares, mgarcialinares@daypitney.com
Manuel A. Garcia-Linares, athomsen@daypitney.com
Maury L Udell, notice66@bmulaw.com
Maury L Udell, blopez@bmulaw.com
Rachel Kittl, rkittl@bmulaw.com


**Physically Served:**

Case 1:25-cv-20381-RAR Document 1-2 Entered on FLSD Docket 01/27/2025 Page 691 of 1553

**IN THE COUNTY COURT OF THE ELEVENTH JUDICIAL
CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA**

CASE NO: <u>2019-011857-SP-26</u>
SECTION: <u>SD05</u>
JUDGE: <u>Michaelle Gonzalez-Paulson</u>

**Francisco Batista**

Plaintiff(s) / Petitioner(s)

vs.

**AT&T Mobility LLC**

Defendant(s) / Respondent(s)

_____/

<u>**ORDER DENYING PETITIONER'S MOTION FOR REHEARING**</u>

**THIS CAUSE** came before the Court for consideration of Plaintiff's Motion for Rehearing. On April 28, 2022, this Court heard Defendant AT&T Mobility, LLC's Motion to Dismiss Plaintiff's Second Amended Complaint. On September 23, 2022, the Plaintiff filed a Motion for Rehearing, and the Defendant filed a Response on November 18, 2022.

The Court having reviewed the subject motion, Respondent's response to the motion, the Clerk's docket sheet, the prior orders issued in this case, and being fully advised in the premises, hereby enters the following ruling

**WHEREFORE**, **IT IS ORDERED AND ADJUDGED** that Plaintiff's Motion for Rehearing is **DENIED.**

The Court finds that Plaintiff is simply attempting to rehash the same issues previously considered by this Court, presenting nothing new. *See Pullum v. Cincinnati, Inc.,* 467 So. 2d 657 (Fla. 1985); *Hollywood Inc. v. Clark,* 153 Fla. 501, 15 So. 2d 175 (Fla. 1943) (*a* prime function of the petition for rehearing is to present to the trial court some point which it overlooked or failed to consider, which renders a decree inequitable or erroneous); *Pingree v. Quaintance,* 394 So. 2d 161 (Fla. 1st DCA 1981); *Balmoral Ass'n v. Grimaldi*, 107 So3d 1149 (Fla.3d DCA 2013).

Plaintiff's Motion for Rehearing seeks to reargue the same matters already disposed of by this Court. *See generally Ayala v. Gonzalez,* 984 So. 2d 523 (Fla. 5th DCA

2008); *Lowe Inv. Corp v. Clemente,* 685 So. 2d 84 (Fla. 2d DCA 1996).

**DONE** and **ORDERED** in Chambers at Miami-Dade County, Florida on this 19th day of December, 2022.

2019-011857-SP-26 12-19-2022 3:31 PM
Hon. Michaelle Gonzalez-Paulson

**COUNTY COURT JUDGE**
Electronically Signed

---

No Further Judicial Action Required on **THIS MOTION**

CLERK TO **RECLOSE** CASE IF POST JUDGMENT

---

**Electronically Served:**
Andrew Robert Ingalls, aingalls@daypitney.com
Andrew Robert Ingalls, brodriguez@daypitney.com
Andrew Robert Ingalls, maristasalado@daypitney.com
Evelyn Davila, edavila@daypitney.com
Jessica Solorzano, jsolorzano@daypitney.com
Manuel A. Garcia-Linares, mgarcialinares@daypitney.com
Manuel A. Garcia-Linares, athomsen@daypitney.com
Maury L Udell, notice66@bmulaw.com
Maury L Udell, blopez@bmulaw.com
Rachel Kittl, rkittl@bmulaw.com

**Physically Served:**

IN THE COUNTY COURT OF THE ELEVENTH JUDICIAL
CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA

CASE NO: 2020-000158-SP-24
SECTION: MB01
JUDGE: Stephanie Silver

**Melissa Davimos**

Plaintiff(s) / Petitioner(s)

vs.

**AT&T MOBILITY, LLC**

Defendant(s) / Respondent(s)

_____/

## ORDER ON MOTION TO DISMISS

THIS CAUSE, came before the Court upon Defendant AT&T's Motion to Dismiss Plaintiff's

Amended Complaint seeking dismissal of all claims pled by Plaintiff.

## Background

This case arises out of Plaintiff's claim as an AT&T customer against AT&T for
violation of FDUTPA, breach of implied contract of good faith and fair dealing, false advertising
pursuant to 817.41 Stat., unjust enrichment, declaratory relief and injunctive relief pursuant to
FDUTPA for geo-location information misuse.

## Standard of Review

A motion to dismiss merely tests the legal sufficiency of a complaint; it cannot be used to
resolve factual disputes. *Minor v. Brunetti*, 43 So. 3d 178, 179 (Fla. 3d DCA 2010) (citing *The
Fla. Bar v. Greene*, 926 So. 2d 1195, 1199 (Fla. 2006)). Accordingly, when ruling on such a
motion, a trial court must accept all factual allegations as true and must construe all reasonable
inferences in favor of the pleader. *See id*. A complaint should therefore never be dismissed
"unless the movant can establish beyond any doubt that claimant could prove no set of facts
whatever in support of his claim." *Charles v. Fla. Foreclosure Placement Ctr., LLC*, 988 So.
2d 1157, 1161 (Fla. 3d DCA 2008) (citing *Gandy v. Trans World Computer Tech. Group*,
787 So. 2d 116, 118 (Fla. 2d DCA 2001)).  It is precisely because of this heavy burden that
motions to dismiss are disfavored and granted sparingly. *Oguz v. Oguz*, 478 So. 2d 437, 440,

n.9 (Fla. 5th DCA 1985) (Sharp, J. concurring).

## COUNT 1- FRAUD

To prove fraud, the Plaintiff must allege that the Defendant misrepresented a material fact, knew or should of known of the falsity of the statement, intended that the misrepresentation would induce Plaintiff to rely and act on its fraudulent conduct, and that injury occurred. Plaintiff here has claimed that the Administrative Fee is "bogus" in all respects and that the Plaintiff has paid the administrative fee, thereby suffering injury. A Motion to Dismiss only must have allegations sufficient to state a cause of action. For this count, the Plaintiff's complaint survives and the Motion to Dismiss is denied.

## COUNT 2 – BREACH OF IMPLIED DUTY OF GOOD FAITH AND FAIR DEALING

Florida law recognizes that parties enter into agreements in good faith in every contract except when it overrides the express terms of the written agreement. *Ins. Concepts & Design, Inc. v. Healthplan Servs., Inc.*, 786 So.2d 1232, 1234 (Fla. 4th DCA 2001). The Plaintiff has alleged that AT&T breached its duty of good faith in providing services. The Motion to Dismiss is denied. The Plaintiff, has not, however, identified the specific terms of the Agreement alleged to have been breached. Therefore, the Plaintiff has twenty days to file a More Definite Statement identifying the express terms of the agreement that were breached.

## COUNT 3 – FDUPTA

Florida Statute Section 501.204(1) states that unfair or deceptive acts or practices in trade or commerce are prohibited. To state a FDUPTA claim, the Plaintiff must allege that the practices were unfair or deceptive, there was a causal link, and actual damages. *Dolphin LLC v. WCI CMTYS, Inc.*, 715 F.3d 1243, 1250 (11th Cir. 2013). Whether particular conduct constitutes such an unfair or deceptive trade practice is a question of fact." *Suris v. Gilmore Liquidating, Inc.,* 651 So.2d 1282, 1283 (Fla. 3d DCA 1995)). "[A] claim under FDUTPA is not defined by the express terms of a contract, but instead encompasses unfair and deceptive practices arising out of business relationships." *Id.* "A practice will be deemed 'unfair' when it 'offends established public policy and when the practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers, (or competitors or other businessmen).' " *Hanson Hams, Inc. v. HBH Franchise Co., LLC,* No. 03–61198–CIV, 2003 WL 22768687, at *2 (S.D.Fla. Nov. 7, 2003) (quoting *Day v. Le–Jo Enters., Inc.,* 521 So.2d 175, 178 (Fla. 3rd DCA 1988)).

The Plaintiff has pled that the Administrative Fee is part of a design to profit AT&T rather than pay for what it has determined is an increase in cost. Therefore, the Plaintiff has stated a cause of action for FDUPTA based on the allegation that AT&T's practice of applying the administrative fee in and of itself is unfair and deceptive. Therefore, AT&T's Motion to Dismiss is denied on this Count.

## COUNT 4 – UNJUST ENRICHMENT

The Plaintiff has alleged that AT&T has benefitted from unjust enrichment in its collection of the administrative fee. "The elements of a cause of action for unjust enrichment are: (1) plaintiff has conferred a benefit on the defendant, who has knowledge thereof; (2) defendant voluntarily accepts and retains the benefit conferred; and (3) the circumstances are such that it would be inequitable for the defendant to retain the benefit without first paying the value thereof to the plaintiff." *Duty Free World, Inc. v. Miami Perfume Junction, Inc.*, 253 So. 3d 689, 693 (Fla. 3d DCA 2018). "Florida law is clear that 'a plaintiff cannot pursue a quasi-contract claim for unjust enrichment if an express contract exists concerning the same subject matter.'" *Sterling Breeze Owners' Ass'n, Inc. v. New Sterling Resorts, LLC*, 255 So. 3d 434, 437 (Fla. 1st DCA 2018), *reh'g denied* (Oct. 16, 2018).

The claim fails because Plaintiff has acknowledged the existence of a contract between the parties that governs the subject matter of this lawsuit, thus barring Plaintiff's quasi-contract claim for unjust enrichment. *Id.* at 437. In this case, there is a written contract. Plaintiff's unjust enrichment claim cannot be cured though amendment. Therefore, Count 4 is dismissed with prejudice.

## COUNTS 5 AND 6 – DECLARATORY AND INJUNCTIVE RELIEF

Plaintiff's claims for declaratory and injunctive relief under FDUTPA are based on Plaintiff's "belie[f]" that AT&T provided Plaintiff's geolocation data to unauthorized persons without Plaintiff's consent. Am. Compl. ¶¶ 95, 128. The Amended Complaint provides a long history regarding AT&T collecting customer geolocation data and then disseminating it to third-party data aggregators and location-based service (LBS) providers, which Plaintiff alleges is in direct violation of both AT&T's privacy policy and the Telecommunications Act. *Id.* ¶¶ 71-72. Important here, in support of the geolocation claims, Plaintiff attaches, among other items, correspondence between United States Senator Ron Wyden and AT&T regarding alleged

unauthorized geolocation disclosure; and, a February 28, 2020 *Notice of Apparent Liability for Forfeiture and Admonishment* filed by the Federal Communications Commission against AT&T (the "NAL").

To state a claim for injunctive or declaratory relief under FDUTPA, a plaintiff "must show (1) that it is aggrieved, in that its rights have been, are being, or will be adversely affected, by (2) a violation of FDUTPA, meaning an unfair or deceptive practice which is injurious to consumers." *Stewart Agency, Inc. v. Arrigo Enterprises, Inc.*, 266 So. 3d 207, 214 (Fla. 4th DCA 2019). "Put plainly, a plaintiff is 'aggrieved' under FDUTPA when the deceptive conduct alleged has caused **a non-speculative injury** that has affected the plaintiff beyond a general interest in curbing deceptive or unfair conduct." *Superior Consulting Servs., Inc. v. Shaklee Corp.*, No. 616CV2001ORL31GJK, 2017 WL 2834783, at *7 (M.D. Fla. June 30, 2017) (emphasis added).

AT&T argues that Plaintiff fails to adequately allege that she has been "aggrieved" and is seeking to enjoin a practice that Plaintiff acknowledges has already stopped. The Court agrees. Plaintiff's claims are based on Plaintiff's "belie[f]" that AT&T allowed customer geolocation data to be accessed by unauthorized persons without Plaintiff's consent". While the Amended Complaint walks through a long narrative of AT&T's alleged failure to protect its customers' geolocation data, it fails to present a single fact tying that alleged failure to Plaintiff or provide any factual basis for Plaintiff's "belief" that Plaintiff's own geolocation data was wrongfully disclosed. Accordingly, the Court concludes that Plaintiff's speculative allegations do not sufficiently allege that Plaintiff's "rights have been, are being, or will be adversely affected," and therefore do not satisfy either Rule 1.110(b) or Rule 1.120(b). *Stewart Agency, Inc.*, 266 So. 3d at 214.

Similarly, Plaintiff's conclusory statement that Plaintiff "believes" she may have been "aggrieved as result of AT&T's knowing and flagrant violation of its own privacy practices" asserts no facts in support and cannot carry Plaintiff's claims. Am. Compl. ¶ 134; *see Nodal-Tarafa v. ARDC Corp.*, 579 So. 2d 414 (Fla. 3d DCA 1991) ("[U]ltimate legal conclusions are . . . patently insufficient to state a cause of action . . . ."). Plaintiff has failed to sufficiently plead that she has been aggrieved by AT&T's alleged geolocation practice, one of the two basic elements of a claim for equitable relief under FDUTPA.[11]   Therefore, Count 5 is dismissed *with prejudice.*

In addition to being subject to dismissal for failure to allege that Plaintiff was aggrieved, Count 6 for injunctive relief fails as Plaintiff, through the exhibits she attached to the Amended Complaint, concedes that AT&T has stopped engaging in the practice she seeks to enjoin (*i.e.* disclosing geolocation data to third-party aggregators). Specifically, the letter from AT&T to Senator Wyden attached as Exhibit H to the Amended Complaint states that AT&T "will cease providing location information to all aggregators by the end of March 2019." Ex. H, p. 2. Consistent with this statement, the NAL attached as Exhibit J acknowledges that AT&T "terminated access to customer location information over the course of 3 months in early 2019." Ex. J, ¶ 69; *see also* ¶ 12 (indicating that AT&T stopped it location-based services practice

before the February 28, 2020 NAL).

Plaintiff amended the complaint to add Counts 5 and 6 on May 19, 2020. Accordingly, based on the exhibits she attached to the Amended Complaint, Plaintiff admits that AT&T stopped the practice that she alleges violates FDUTPA more than a year before Plaintiff filed the Amended Complaint.[12] This admission is fatal to her demand for injunctive relief as it leaves nothing for this Court to enjoin. *See, e.g. Dapeer v. Neutrogena Corp.*, 95 F. Supp. 3d 1366, 1373 (S.D. Fla. 2015) (dismissing FDUTPA claim for injunctive relief based on plaintiff's admission that defendant had stopped engaging in the challenged practice). Without any legitimate threat of future harm, Plaintiff is not entitled to the injunctive relief as a matter of law.

Because the Plaintiff has failed to disclose whether the Defendant disclosed her geolocation data to a third party, and because Plaintiff admits that the alleged practice has actually stopped (and stopped more than a full year before Plaintiff brought these claims), the claims for injunctive and declaratory relief under FDUTPA cannot be cured through amendment, requiring dismissal *without prejudice*. If the Plaintiff can demonstrate that she has been harmed by having her data disclosed to a third party, and when and to whom the data was disclosed, the Plaintiff may refile this Count.

COUNT 7 – PLAINTIFF'S FALSE ADVERTISING CLAIM

Because misleading advertising is a form of fraud, establishing a claim under § 817.41, Fla. Stat. requires proving "each of the elements of common law fraud in the inducement, including reliance and detriment." *Meridian Tr. Co. v. Batista*, No. 17- 3051, 2018 WL 4760277, at *4 (S.D. Fla. Sept. 30, 2018) (quoting *Rollins, Inc. v. Butland*, 951 So. 2d 860, 877 (Fla. 2d DCA 2006)). "Accordingly, a claim for false advertisement under Florida law must be pled with particularity." *Id*. The Defendant believes that this claim cannot be cured through amendment. This Court respectfully disagrees.

Plaintiff's claim is based on AT&T's alleged false advertisements regarding its ability to "throttle" customers on an unlimited data plan. The Plaintiff has alleged that the advertisements the Plaintiff reviewed were false.  The Plaintiff, however, did not disclose which advertisement the Plaintiff relied upon and how it was false. The Plaintiff did not disclose when the advertisement was viewed and did not provide how the advertisement was false. Therefore, while this Court denies the Defendant's Motion to Dismiss Count 7 of the Complaint, this Court is requiring the Plaintiff to provide a more definite statement within 20 days describing in detail which advertisement the Plaintiff relied upon, the date it was viewed, the method by which it was viewed (television, radio, internet), and how the advertisement was false. The Plaintiff shall attach the advertisement viewed as an exhibit to its more definite statement.

CONCLUSION

WHEREFORE, it is ORDERED AND ADJUDGED that the Motion to Dismiss Count 1 is DENIED. The Motion to Dismiss Count 3 is DENIED. The Motion to Dismiss Counts 4 and 5 is GRANTED *with prejudice*. The Motion to Dismiss Count 6 is GRANTED *without prejudice*. The Motion to Dismiss Counts 2 and 7 is denied. However, the Plaintiff has 20 days to file a More Definite Statement. Failure to do so will result in dismissal of those counts. The Defendant will have leave to file a supplemental Motion to Dismiss Counts 2 and 7 if it determines it is appropriate.

The Defendant has 20 days to respond to the Complaint as to Counts 1 and 3.

**DONE** and **ORDERED** in Chambers at Miami-Dade County, Florida on this 12th day of October, 2020.

2020-000158-SP-24 10-12-2020 12:39 PM

2020-000158-SP-24 10-12-2020 12:39 PM
Hon. Stephanie Silver

**COUNTY COURT JUDGE**
Electronically Signed

No Further Judicial Action Required on **THIS MOTION**

CLERK TO **RECLOSE** CASE IF POST JUDGMENT

**Electronically Served:**
Adam Beighley, adam@bmulaw.com
Adam Beighley, rkittl@bmulaw.com
Andrew R. Ingalls, aingalls@daypitney.com
Andrew R. Ingalls, brodriguez@daypitney.com
Evelyn Davila, edavila@daypitney.com
Jessica Solorzano, jsolorzano@daypitney.com
Manuel A. Garcia-Linares, mgarcialinares@daypitney.com
Manuel A. Garcia-Linares, brodriguez@daypitney.com
Maury L Udell, notice66@bmulaw.com

**Physically Served:**

Case 1:25-cv-20381-RAR Document 1-2 Entered on FLSD Docket 01/27/2025 Page 700 of 1553

**IN THE COUNTY COURT OF THE ELEVENTH JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA**

CASE NO: 2020-000158-SP-24
SECTION: MB01
JUDGE: Stephanie Silver

**Melissa Davimos**

Plaintiff(s) / Petitioner(s)

vs.

**AT&T MOBILITY, LLC**

Defendant(s) / Respondent(s)

_____/

## ORDER DISMISSING COUNTS 2 AND 7 OF PLAINTIFF'S THIRD AMENDED COMPLAINT

On August 14, 2020, this Court heard Defendant AT&T Mobility, LLC's *Motion to Dismiss Plaintiff's Third Amended Complaint*.

On October 12, 2020, this Court entered an Order granting, in part, and denying in part, AT&T's Motion to Dismiss. With respect to Counts 2 and 7 of Plaintiff's Third Amended Complaint, this Court directed Plaintiff to file a More Definite Statement within 20 days from that date, stating:

> The Motion to Dismiss Counts 2 and 7 is denied. However, the Plaintiff has 20 days to file a More Definite Statement. Failure to do so will result in dismissal of those counts.

Plaintiff's More Definite Statement was due on November 2, 2020. To date, Plaintiff has not filed a More Definite Statement as directed by this Court nor has the Plaintiff requested additional time to comply. As such, Counts 2 and 7 of Plaintiff's Third Amended Complaint are hereby dismissed *with prejudice* for failure to comply with Court Order.

**DONE** and **ORDERED** in Chambers at Miami-Dade County, Florida on this <u>13th day of</u>
<u>November, 2020</u>.

<u>2020-000158-SP-24 11-13-2020 4:29 PM</u>
Hon. Stephanie Silver

**COUNTY COURT JUDGE**
Electronically Signed

No Further Judicial Action Required on **THIS MOTION**

CLERK TO **RECLOSE** CASE IF POST JUDGMENT

**Electronically Served:**
Adam Beighley, adam@bmulaw.com
Adam Beighley, rkittl@bmulaw.com
Andrew R. Ingalls, aingalls@daypitney.com
Andrew R. Ingalls, brodriguez@daypitney.com
Evelyn Davila, edavila@daypitney.com
Jessica Solorzano, jsolorzano@daypitney.com
Manuel A. Garcia-Linares, mgarcialinares@daypitney.com
Manuel A. Garcia-Linares, brodriguez@daypitney.com
Maury L Udell, notice66@bmulaw.com

**Physically Served:**

Case 1:25-cv-20381-RAR   Document 1-2   Entered on FLSD Docket 01/27/2025   Page 702 of 1553

IN THE COUNTY COURT OF THE ELEVENTH JUDICIAL
CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA

CASE NO: 2020-000158-SP-24
SECTION: MB01
JUDGE: Stephanie Silver

**Melissa Davimos**

Plaintiff(s) / Petitioner(s)

vs.

**AT&T MOBILITY, LLC**

Defendant(s) / Respondent(s)

_____/

## ORDER GRANTING AT&T'S MOTION FOR RECONSIDERATION AND CLARIFICATION OF ORDER ON MOTION TO DISMISS

On December 2, 2020, this Court heard Defendant AT&T Mobility, LLC's *Motion for Reconsideration and Clarification of Order on Motion to Dismiss*, which was directed at this Court's October 12, 2020 Order granting in part and denying in part AT&T's *Motion to Dismiss*. After considering the *Motion* as well as the argument of counsel, the Court finds as follows.

### A. **Plaintiff's data throttling claims contradict the plain terms of the parties' contract**

In addition to Plaintiff's challenges to AT&T's administrative fee, which were addressed by the original Dismissal Order, Plaintiff's fraud (Count 1) and FDUTPA damages (Count 3) claims also allege that AT&T "throttled" (or slowed down) Plaintiff's data speeds and that this "throttling" is not allowed for unlimited customers under the parties' Wireless Customer Agreement. Third Am. Compl. ¶¶ 14-15. As established by the underlying *Motion to Dismiss* and *Motion for Reconsideration,* the factual assertions that form the basis of these "claims are

directly and fully rebutted by express evidence in [the] governing written [Wireless Customer Agreement]." *Sol. Z v. Alma Lasers, Inc.*, No. 11-CV-21396-CIV, 2013 WL 12246356, at *5 (S.D. Fla. Jan. 22, 2013).

Therefore, because Florida law is clear that Plaintiff's data throttling claims cannot rely on alleged misrepresentations that contradict the plain language of the parties' contract, the Court finds the data throttling component of Plaintiff's fraud and FDUTPA damages claims must be dismissed *with prejudice. Id.*; *see also GVK Int'l Bus. Grp., Inc. v. Levkovitz*, No. 3D19-1119, 2020 WL 4197407, at *2 (Fla. 3d DCA July 22, 2020) (affirming trial court's dismissal of complaint *with prejudice* based on the finding that "[a] party to a contract may not recover in fraud for alleged oral misrepresentations that have been 'adequately covered or expressly contradicted in a later written contract.'"). This Court therefore clarifies its original Order entered to add that the throttling provision of the complaint is hereby dismissed.

## B. **Count 6**

At the Motion for Reconsideration, the Defendant discussed how this Court should have dismissed the injunctive relief claim because the FDUPTA activity claimed was no longer occurring. This Court maintains its position in the Order on the Motion to Dismiss entered in October 2020.  This Court addressed Plaintiff's claim for injunctive relief under FDUTPA (count 6) in its original Dismissal Order, stating as follows:

[B]ased on the exhibits she attached to the Amended Complaint, Plaintiff admits that AT&T stopped the practice that she alleges violates FDUTPA more than a year before Plaintiff filed the Amended Complaint. **This admission is fatal to her demand for injunctive relief as it leaves nothing for this Court to enjoin.** *See, e.g. Dapeer v. Neutrogena Corp.*, 95 F. Supp. 3d 1366, 1373 (S.D. Fla. 2015) (dismissing FDUTPA claim for injunctive relief based on plaintiff's admission that defendant had stopped engaging in the challenged practice). **Without any legitimate threat of future harm, Plaintiff is not entitled to the injunctive relief as a matter of law.**

Dismissal Order. p. 5 (emphasis added). The Dismissal Order then goes on to state that

based on Plaintiff's admission, her "claims for injunctive and declaratory relief under FDUTPA cannot be cured through amendment." *Id.*

Based on the finding that Plaintiff's claim for injunctive relief under FDUTPA cannot be cured through amendment, dismissal *with prejudice* is required. *See Glatstian v. Cleveland Clinic Fla.*, 680 So. 2d 1141, 1141 (Fla. 3d DCA 1996) (finding that dismissal with prejudice is proper if "it is clear that the pleading cannot be amended to state a cause of action") (quoting *Gamma Dev. Corp. v. Steinberg*, 621 So. 2d 718, 719 (Fla. 4th DCA 1993)). This Court hereby corrects its order. This Court meant to dismiss Counts 5 and 6 (declaratory relief and injunctive relief) with prejudice. Since Count 6 has a fatal flaw, the count is dismissed with prejudice.

**WHEREFORE,** for the reasons stated herein and on the record, the data throttling component of Plaintiff's claims for fraud (count 1) and FDUTPA damages (count 3) claims, as well as the claim for FDUTPA injunctive relief (count 6), are hereby dismissed *with prejudice*. AT&T shall respond to the remaining counts 1 and 3 as to the administrative fee within forty five days.

**DONE** and **ORDERED** in Chambers at Miami-Dade County, Florida on this <u>3rd day of December, 2020</u>.

2020-000158-SP-24 12-03-2020 4:42 PM

<u>2020-000158-SP-24 12-03-2020 4:42 PM</u>
Hon. Stephanie Silver

**COUNTY COURT JUDGE**
Electronically Signed

No Further Judicial Action Required on **THIS MOTION**

CLERK TO **RECLOSE** CASE IF POST JUDGMENT

**Electronically Served:**

Adam Beighley, adam@bmulaw.com

Adam Beighley, rkittl@bmulaw.com

Andrew R. Ingalls, aingalls@daypitney.com

Andrew R. Ingalls, brodriguez@daypitney.com

Evelyn Davila, edavila@daypitney.com

Jessica Solorzano, jsolorzano@daypitney.com

Manuel A. Garcia-Linares, mgarcialinares@daypitney.com

Manuel A. Garcia-Linares, brodriguez@daypitney.com

Maury L Udell, notice66@bmulaw.com

**Physically Served:**

Case 1:25-cv-20381-RAR   Document 1-2   Entered on FLSD Docket 01/27/2025   Page 706 of 1553

**IN THE COUNTY COURT OF THE ELEVENTH JUDICIAL
CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA**

CASE NO: 2020-001293-SP-24
SECTION: MB01
JUDGE: Stephanie Silver

**Alina Gonzalez**

Plaintiff(s) / Petitioner(s)

vs.

**AT&T Mobility LLC**

Defendant(s) / Respondent(s)

_____/

## ORDER ON DEFENDANT'S MOTION TO DISMISS

   THIS CAUSE having come on the Defendant's Motion to Dismiss, and this Court having heard argument of counsel on July 13, 2021, and this Court having reviewed the pleadings, the docket in this case, and other cases, and case law provided by the parties and on this Court's own research, it is hereby ORDERED AND ADJUDGED:

   This Court is well aware that the case law states that Motions to Dismiss are supposed to be granted sparingly and the granting of such a motion is generally disfavored. *See, e.g.*, *Oguz v. Oguz,* 478 So.2d 437 (Fla. 5th DCA 1998). *Minor v. Brunetti*, 43 So.3d 178 (Fla. 3d DCA 2010). The Plaintiff has filed a six count Amended Statement of Claim stating that AT&T Mobility violated the wireless contract entered into between the Plaintiff and Defendant, committed fraud, committed a breach of contract, and was unjustly enriched in charging certain fees and by throttling (or slowing down) the Plaintiff's unlimited wireless service.

### COUNT 1 - FRAUD

This Court **denies** the Defendant's Motion to Dismiss based on fraud for the reasons stated in *Davimos v. AT&T*, 2020 158 SP 24. The Defendant shall file an answer within 20 days.

### COUNT 2 - VIOLATION OF FDUPTA

This Court **denies** the Defendant's Motion to Dismiss based on FDUPTA for the reasons stated in *Davimos v. AT&T*, 2020 158 SP 24. The Defendant shall answer the Complaint within 20 days.

## COUNT 3 - DECLARATORY AND/OR INJUNCTIVE RELIEF

### a. Injunctive Relief

This Court has reviewed the Complaint and sees no claim for Injunctive Relief. In Paragraph 67, the Plaintiff seeks a declaratory judgment that AT&T violated FDUPTA. The Plaintiff states in other paragraphs that a declaration is needed. Even though the title of Count 3 is an action for both Declaratory and/or Injunctive Relief, the Plaintiff has made no written efforts to obtain an injunction. Therefore, the Motion to Dismiss is **GRANTED** without prejudice.

### b. Declaratory Judgment

The Plaintiff alleges a declaration is needed to determine whether AT&T may continue to charge the fee. This Court expressly notes that the Wireless Agreement between the parties at Paragraph 1.4 states that the Defendant may charge an administrative charge. Additionally, a party may seek a declaratory judgment "in suits solely seeking a determination of any fact affecting the application of any" right or privilege. *Peoples Trust Ins. Co. v. Franco*, 305 So.3d 579 (Fla. 3d DCA 2020) (quoting *Higgins v. State Farm*, 894 So.2d 5 (Fla. 2004). Other counts of this Complaint partially subsume the declaratory action and the claim must be dismissed. Therefore, the Defendant's Motion to Dismiss is **GRANTED WITH PREJUDICE.**

## COUNT 4 - BREACH OF CONTRACT

The Plaintiff claims that the contract between the parties was breached by improperly throttling the Plaintiff's wireless service and by misrepresenting the use of the administrative charge.

### a. Throttling

The Plaintiff alleges that its wireless data service was improperly delayed or throttled. The Plaintiff must state the injury occurred and how the injury occurred. Therefore, the Plaintiff must give a more definite statement detailing the date, time, and what injury  suffered by any alleged stoppage and/or delay in data. The Plaintiff has 10 days to furnish this Information. At this time, the Defendant's Motion to Dismiss is **DENIED**. This Court, however, is requiring the Plaintiff to furnish the Defendant a More Definite Statement.

### b. Administrative Fee

The Plaintiff claims that AT&T charged a "bogus" administrative fee and that AT&T misrepresented what the administrative fee was being used for. The Plaintiff has made a sufficient claim to survive a Motion to Dismiss by these allegations. The Defendant's Motion to

Dismiss is therefore **DENIED**. *Deere Construction, LLC v. Cemex Construction Materials*, 198 F.Supp.3d 1332 (S.D. Fla. 2016). The Plaintiff, however, must provide to the Defendant how the charge was "bogus" and "misrepresented" in the contract. The Plaintiff must also provide a copy of the dispute furnished to AT&T pursuant to Paragraph 1.4 of the Contract. The Plaintiff has ten days to furnish a more definite statement and a copy or detail concerning the bill dispute as referenced in the Contract.

### COUNT 5 - UNJUST ENRICHMENT

This Court **GRANTS** the Defendant's Motion to Dismiss Count 5 with prejudice. The written contract exists concerning the same subject matter. *See Sterling Breeze Ass'n., Inc. v. New Sterling*, 255 So.3d 434 (Fla. 1st DCA 2018).

### COUNT 6 - PURE BILL OF DISCOVERY

Count 6 of the Complaint is a Pure Bill of Discovery Claim. Florida law is clear that there are very few circumstances in which a Pure Bill of Discovery Claim will survive. *The Complaint for a Pure Bill of Discovery - A Living, Breathing, Modern Day Dinosaur*, Florida Bar Journal, Volume 78, No. 3, March 2004. A pure bill of discovery is forbidden when the action is a fishing expedition and when there is an adequate remedy at law. *See, e.g. Adventist Health System v. Hegwood*, 569 So.2d 1295 (Fla. 5th DCA 1990).

In this claim, the Plaintiff now seeks to obtain information from AT&T regarding AT&T's collection of geolocation data and whether it was sold to any other third parties inappropriately. The Plaintiff has alleged that a host of companies received this Plaintiff's personal information and is ultimately asking this Court to require AT&T to provide a litany of documents to the Plaintiff.

These include:

  1) Any code of business ethics in effect when Plaintiff became a customer of AT&T Mobility.

It should be noted that this Court has reviewed the Complaint and can find no statement as to when this Plaintiff became an AT&T Customer or even what the Plaintiff's phone number was. Additionally, this Court notes that any "code of business ethics" is vague. This Claim is therefore DISMISSED without prejudice.

  2)   Any specific information regarding Plaintiff's location data maintained by AT&T or its

*affiliates and whether said data was improperly sold or divulged to anyone improperly, including data aggregators.*

This Court **GRANTS** the Motion to Dismiss with prejudice. However, AT&T is hereby Ordered to maintain this information, if AT&T still retains the information.

3)   Any contract or agreement between AT&T and Microbilt during Plaintiff's time as a customer.

A pure bill of discovery is not allowed in order to see if a cause of action exists. *See Mendez v. Cochran*, 700 So.2d 46 (Fla. 4th DCA 1997). This Court is aware of the distinction made in *Adventist Health*, *supra.*, and finds that none of those same circumstances exist, the Defendant's Motion to Dismiss is **GRANTED** with prejudice.

4)   Any contract between AT&T and TechnoCom d/b/a Location Smart.

This request is designed to see if a cause of action exists. Florida law prohibits such a cause of action. The Motion to Dismiss is **GRANTED with prejudice.** *See Mendez, supra*. *See also, Vorbeck v. Betancourt*, 107 So.3d 1142 (Fla. 3d DCA 2012).

5.   Five reviews or audits of its disclosure of customer location information to third parties.

The Motion to Dismiss is **GRANTED** with prejudice, *Id.*

6.   Any written policies and procedures in place regarding the safekeeping of confidential proprietary network information.

The Plaintiff fails to allege what policies or procedures in place, by whom they are retained, or what entity prepared them. This Court finds the request irrelevant and **GRANTS** the Motion to Dismiss with prejudice.

7. Any written policies and procedures in place regarding the safekeeping of confidential proprietary  information.

The Plaintiff fails to allege what policies or procedures in place, by whom they are retained, or what entity prepared them. This Court finds the request irrelevant and **GRANTS** the Motion to Dismiss with prejudice.

### 7. Any contract between AT&T and Zumigo.

This request is designed to see if a cause of action exists. Florida law prohibits such a cause of action. The Motion to Dismiss is **GRANTED with prejudice.** *See Mendez, supra.*

### CONCLUSION

The Defendant's Motion to Dismiss Counts 1 and 2 are **DENIED**. The Defendant has 20 days to answer. As to Count 3 and any injunctive relief the Plaintiff may seek, the Motion to Dismiss is **GRANTED** without prejudice. As to the Declaratory Judgment, the Motion to Dismiss is **GRANTED** with prejudice. As to Count 4, Breach of Contract, the Motion to Dismiss as to Throttling is **DENIED**. The Plaintiff has 10 days to file a More Definite Statement. As to the Administrative Fee, the Defendant's Motion to Dismiss is **DENIED**. The Plaintiff must file a More Definite Statement within 10 days. As to Count 5, the Motion to Dismiss is **GRANTED** with prejudice. As to Count 6, the Motion to Dismiss seven of the requested items is **GRANTED** with prejudice and as to one remaining item, the Motion to Dismiss is **GRANTED** without prejudice.

**DONE** and **ORDERED** in Chambers at Miami-Dade County, Florida on this 15th day of July, 2021.

2020-001293-SP-24 07-15-2021 5:48 PM

2020-001293-SP-24 07-15-2021 5:48 PM
Hon. Stephanie Silver

**COUNTY COURT JUDGE**
Electronically Signed

No Further Judicial Action Required on **THIS MOTION**

CLERK TO **RECLOSE** CASE IF POST JUDGMENT

**Electronically Served:**

Andrew R. Ingalls, aingalls@daypitney.com

Andrew R. Ingalls, brodriguez@daypitney.com

Evelyn Davila, edavila@daypitney.com

Jessica Solorzano, jsolorzano@daypitney.com

Manuel A. Garcia-Linares, mgarcialinares@daypitney.com

Manuel A. Garcia-Linares, brodriguez@daypitney.com

Maury L Udell, notice66@bmulaw.com

Rachel Kittl, rkittl@bmulaw.com

**Physically Served:**

Case 1:25-cv-20381-RAR Document 1-2 Entered on FLSD Docket 01/27/2025 Page 712 of 1553

**IN THE COUNTY COURT OF THE ELEVENTH JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA**

CASE NO: 2019-017777-SP-23
SECTION: ND03
JUDGE: Linda Singer Stein

**Wilson Enriquez**

Plaintiff(s) / Petitioner(s)

vs.

**A T & T Mobility (LLC)**

Defendant(s) / Respondent(s)

_____/

## ORDER ON DEFENDANT'S AMENDED MOTION TO DISMISS PLAINTIFF'S SECOND AMENDED COMPLAINT

This cause came before the Court on Defendant's Amended Motion to Dismiss Plaintiff's Second Amended Complaint. After careful consideration, presiding over a hearing, review of the motion, response, the Second Amended Complaint, legal authorities and the applicable standard on a motion to dismiss, the Court's rulings are set forth below.

A motion to dismiss merely tests the legal sufficiency of a complaint. It cannot be used to resolve factual disputes. Minor v. Brunetti, 43 So.3d 178, 179 (Fla. 3d DCA 2010). When ruling on such a motion, a trial court must accept all factual allegations as true and must construe all reasonable inferences in favor of the pleader. Id.

Plaintiff has referred to Defendant's customer agreement and website in its Second Amended Complaint. While the Court is generally limited to the complaint's four corners, it is required to consider exhibits attached to and incorporated into the complaint. Rolle v. Cold Stone Creamery, Inc., 212 So.3d 1073, 1076 (Fla. 3d DCA 2017). When a party refers to a document in the complaint, the trial court may use that document to assess the nature of the claims alleged in the complaint. Glen Garron, LLC. v. Buchwald, 210 So.3d 229, 233 (Fla. 5th DCA 2017) and One Call Prop. Servs., Inc. v. Security First Ins. Co., 165 So.3d 749, 752 (Fla. 4th DCA 2015).

**COUNTS I, II and III are ruled on as follows:**

As to all allegations in the Second Amended Complaint regarding an alleged failure to disclose an Administrative Fee, Defendant's Motion to Dismiss is GRANTED with prejudice. The Administrative Fee is disclosed in Section 1.4 of the Wireless Customer Agreement referenced in Plaintiff's Second Amended Complaint.

As to all allegations in the Second Amended Complaint that the Administrative Fee is an illegal "pass-through" fee, Defendant's Motion to Dismiss is GRANTED with prejudice.  The plain language in the Defendant's website, which is also referenced in the Plaintiff's Second Amended Complaint, states that the Fee is charged in order for Defendant to "recover" certain fees it has incurred, not to pay fees it is incurring.

As to the allegations in the Second Amended Complaint that Defendant's practice of applying the Administrative Fee is in and of itself unfair and deceptive, Defendant's Motion to Dismiss is DENIED.

As to all allegations in the Second Amended Complaint regarding improper data throttling, Defendant's Motion to Dismiss is DENIED.

**COUNT IV for Unjust Enrichment:** Defendant's Motion to Dismiss is GRANTED with prejudice.

**DONE** and **ORDERED** in Chambers at Miami-Dade County, Florida on this 28th day of June, 2021.

2019-017777-SP-23 06-28-2021 2:41 PM

2019-017777-SP-23 06-28-2021 2:41 PM
Hon. Linda Singer Stein

**COUNTY COURT JUDGE**
Electronically Signed

No Further Judicial Action Required on **THIS MOTION**

CLERK TO **RECLOSE** CASE IF POST JUDGMENT

**Electronically Served:**
Andrew Robert Ingalls, aingalls@daypitney.com
Andrew Robert Ingalls, brodriguez@daypitney.com
Evelyn Davila, edavila@daypitney.com
Jessica Solorzano, jsolorzano@daypitney.com
Manuel A. Garcia-Linares, mgarcialinares@daypitney.com
Manuel A. Garcia-Linares, brodriguez@daypitney.com

Maury L Udell, notice66@bmulaw.com
Rachel L. Kittl, rkittl@bmulaw.com


**Physically Served:**

Case 1:25-cv-20381-RAR   Document 1-2   Entered on FLSD Docket 01/27/2025   Page 715 of 1553

**IN THE COUNTY COURT OF THE ELEVENTH JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA**

CASE NO: 2019-017777-SP-23
SECTION: ND03
JUDGE: Linda Singer Stein

**Wilson Enriquez**

Plaintiff(s) / Petitioner(s)

vs.

**A T & T Mobility (LLC)**

Defendant(s) / Respondent(s)

_____/

### ORDER ON DEFENDANT'S MOTION FOR RECONSIDERATION ON MOTION TO DISMISS AND MOTION FOR EXTENSION OF TIME TO RESPOND TO COUNTS 1, 2 AND 3

This cause came before the Court on the above titled motion with regard to the Plaintiff's allegations of throttling. After careful consideration of the motion, response and reply, Defendant's Motion for Reconsideration on its June 28, 2021 Order on dismissal is GRANTED in part as to Count I (fraud) and DENIED in part as to Count 2 (good faith and fair dealing and Count 3 (FDUTPA). The Court clarifies its ruling as follows. As quoted by Defendant, the Wireless Customer Agreement (WCA) states "AT & T may reduce your data throughput speeds at any time or place **if** your data usage exceeds an applicable, identified usage threshold during any billing cycle." (Emphasis added).

Accordingly, in reconsidering the Defendant's motion to dismiss and the language of the WCA, the Court reconsiders its Order dated June 28, 2021 and finds that Count I for fraud is DISMISSED with prejudice. Based upon the language of the WCA, Counts 2 and 3 withstand a motion to dismiss on the allegations of throttling and, therefore, Defendant's Motion for Reconsideration to Dismiss those counts is DENIED.

Defendant's Motion for Extension of Time to Respond to Counts 1, 2 and 3 are GRANTED.

**DONE** and **ORDERED** in Chambers at Miami-Dade County, Florida on this <u>14th day of September, 2021</u>.

<u>2019-017777-SP-23 09-14-2021 12:07 PM</u>
Hon. Linda Singer Stein

**COUNTY COURT JUDGE**
Electronically Signed

No Further Judicial Action Required on **THIS MOTION**

CLERK TO **RECLOSE** CASE IF POST JUDGMENT

**Electronically Served:**
Andrew Robert Ingalls, aingalls@daypitney.com
Andrew Robert Ingalls, brodriguez@daypitney.com
Evelyn Davila, edavila@daypitney.com
Jessica Solorzano, jsolorzano@daypitney.com
Manuel A. Garcia-Linares, mgarcialinares@daypitney.com
Manuel A. Garcia-Linares, brodriguez@daypitney.com
Maury L Udell, notice66@bmulaw.com
Rachel L. Kittl, rkittl@bmulaw.com

**Physically Served:**

**IN THE COUNTY COURT IN AND FOR**
**MIAMI-DADE COUNTY, FLORIDA**

**CIVIL DIVISION (01)**
**CASE NO.: 2019-16864-SP-23 (01)**

ANN GREEN,
**Plaintiff(s)**
vs.

AT&T MOBILITY (LLC)
**Defendant(s)**

_____/

## ORDER ON MOTION TO DISMISS

**THIS CAUSE** having come before the Court on Defendant AT&T Mobility, LLC's

Motion to Dismiss Plaintiff's Amended Complaint.  Upon careful consideration of the parties'

written submissions, and after entertaining oral argument, the Court finds as follows:

### I.    FACTS AS PLED

The Defendant, AT&T Mobility, LLC ("AT&T"), is the cell phone service provider of

Plaintiff. Plaintiff brings six counts in their[1] Amended Complaint: (I) fraud, (II) breach of implied

duty of good faith and fair dealing, (III) damages under the Florida Deceptive and Unfair Trade

Practices Act § 501.201, *et seq.*, Fla. Stat. ("FDUTPA"), (IV) unjust enrichment, (V) declaratory

relief under FDUTPA, and (VI) injunctive relief under FDUTPA. Counts I through IV are based

on two separate and distinct allegations: first that AT&T fraudulently misrepresented the

"unlimited" nature of Plaintiff's data plan and "throttled" Plaintiff's data speeds without Plaintiff's



---

[1] The Court heard five other Motions to Dismiss filed by AT&T at the July 22, 2020 hearing, all directed at complaints filed by Plaintiff's counsel on behalf of other purported AT&T customers that, absent the case caption and plaintiff name, were identical to the Amended Complaint here. For purposes of this Order, which is entered on all six (6) cases heard, the Court will refer to the "Plaintiff" in the plural form.

knowledge or consent which resulted in the Plaintiff's "unlimited" plan being materially limited, and second that AT&T improperly charged an "Administrative Fee" to Plaintiff which was not disclosed to Plaintiff when they signed up for service and is not used as represented by AT&T but is instead a means for AT&T to charge more per month while advertising lower prices. Counts V and VI allege that AT&T may have provided Plaintiff's location data to third-party aggregators and location-based service providers without Plaintiff's consent.

## II.    THE MOTION TO DISMISS

### A. Legal Standard

A motion to dismiss merely tests the legal sufficiency of a complaint; it cannot be used to resolve factual disputes. *Minor v. Brunetti*, 43 So. 3d 178, 179 (Fla. 3d DCA 2010) (citing *The Fla. Bar v. Greene*, 926 So. 2d 1195, 1199 (Fla. 2006)). Accordingly, when ruling on such a motion, a trial court must accept all factual allegations as true and must construe all reasonable inferences in favor of the pleader. *Id.*

While the Court is generally limited to the complaint's four corners, it is required to consider exhibits attached to and incorporated into the complaint. *Rolle v. Cold Stone Creamery, Inc.*, 212 So. 3d 1073, 1076 (Fla. 3d DCA 2017). Moreover, when a party refers to a document in the complaint, the trial court may use that document to assess the nature of the claims alleged in the complaint. *Glen Garron, LLC v. Buchwald*, 210 So. 3d 229, 233 (Fla. 5th DCA 2017); *One Call Prop. Servs., Inc. v. Security First Ins. Co.*, 165 So. 3d 749, 752 (Fla. 4th DCA 2015) ("[W]here the terms of a legal document are impliedly incorporated by reference into the complaint, the trial court may consider the contents of the document in ruling on a motion to dismiss."); *Golden Gate Homes, LC v. Levey*, 59 So. 3d 275, 280 (Fla. 3d DCA 2011) (reviewing

complaint's "well-pled allegations and incorporated attachments" on a motion to dismiss); *see also Rolle*, 212 So. 3d at 1076.

Attached to AT&T's Motion to Dismiss is a copy of the alleged controlling contract between Plaintiff and AT&T, the fee schedule from AT&Ts website, and a copy of a billing statement from Plaintiff's specific account with AT&T. Notably, Plaintiff does not contest the veracity of the exhibits, only this Court's ability to consider them. Pl.'s Resp. to Mot. to Dismiss ¶ 2. Because the Amended Complaint specifically references, incorporates, and quotes from these documents, they are within the four corners of the Amended Complaint and will be considered by the Court in ruling on the underlying motion.[2]

### B. Analysis

### Counts I-III as they relate to "throttling" of the Plaintiff's data speeds

In Florida, "[a] party cannot recover for alleged false misrepresentations that are adequately dealt with or expressly contradicted in a later written contract." *TRG Night Hawk Ltd. v. Registry Dev. Corp.*, 17 So. 3d 782, 784 (Fla. 2d DCA 2009); *see also Taylor Woodrow Homes Fla., Inc. v. 4/46-A Corp.*, 850 So. 2d 536, 542 (Fla. 5th DCA 2003). "'To hold otherwise is to invite contracting parties to make agreements of the kind in suit and then avoid them by simply taking the stand and swearing that they relied on some other statement.'" *TRG Night Hawk Ltd.*, 17 So. 3d at 784 (citing *Tevini v. Roscioli Yacht Sales, Inc.*, 597 So.2d 913, 914 (Fla. 4th DCA 1992)). Moreover, "a party who signs a contract whose terms contradict the alleged misrepresentations on

---

[2] The Amended Complaint specifically references, incorporates, and quotes from the Wireless Customer Agreement, AT&T's website, and AT&T billing statements. (Am. Compl. ¶¶ 15-16, 29-31, 33, 38-43, 47-49 (Agreement); ¶¶ 22-24, 33, 40, 56-57, 64 (AT&T's website), ¶¶ 19, 21-22, 33, 53, 56, 63 (billing statements)). While the Amended Complaint alleges that Plaintiff did not attach the Agreement because "it is under the exclusive control of AT&T," Am. Compl. ¶¶ 30, 49, Plaintiff's counsel abandoned that assertion at the hearing, where it was undisputed that the Agreement is available on AT&T's website. Tr. 28:24-25; 49:18-20; 50:15-16.

which he relied is barred 'from seeking relief pursuant to FDUTPA, as she acted unreasonably.'" *Id.* (citing *Rosa v. Amoco Oil Co.*, 262 F. Supp. 2d 1364, 1368 (S.D. Fla. 2003)). At the pleading stage, "where the allegations of the complaint are contradicted by the exhibits, the plain meaning of the exhibits will control." *Ginsburg v. Lennar Fla. Holdings, Inc.*, 645 So. 2d 490, 494 (Fla. 3d DCA 1994).

Here, the allegations in the complaint are related to alleged acts or omission which are explicitly refuted by the later contract. For example, Plaintiff alleges that AT&T, "[b]y virtue of its advertisement of unlimited data to Plaintiff for a set price . . . undertook the duty to disclose . . . . that it intended to throttle Plaintiff's data. . . ." Am. Compl. ¶¶ 29, 31. As the Wireless Consumer Agreement shows, AT&T did in fact disclose that it intended to throttle Plaintiff's data and makes it clear that the term "unlimited" refers to the *amount* of data, not the *speed* of that data. Unlike customers on tiered data plans, unlimited customers pay a set price without regard to the *amount* of data used. Plaintiff's belief that "unlimited" refers to both the amount and speed of the data is contradicted by the terms of the contract as shown by the following comparison:

| Allegation | Contract |
| --- | --- |
| AT&T represented, directly or indirectly, expressly or by implication, to the Plaintiff, an unlimited mobile data plan customer, that the amount of data that the Plaintiff could access in any billing period would not be limited.<br><br>**Am. Complaint ¶ 30** | **Unlimited Data Customers.** If you are an AT&T unlimited data plan customer, you agree that "unlimited means you pay a fixed monthly charge for wireless data service regardless of how much data you use . . . "unlimited' does not mean that you can use AT&T's wireless data service in any way that you choose, or for any prohibited activities."<br><br>AT&T may reduce your data throughput speeds at any time or place if your data usage exceeds an applicable, identified usage threshold during any billing cycle. |

| | |
|---|---|
| | Motion, Ex. 1 (Agreement) § 6.2 (emphasis in orig.) |
| AT&T's wireless customer agreements do not state that an unlimited mobile data plan customer's use of more than a specified amount of data is a prohibited activity.<br><br>**Am. Complaint ¶ 15** | "Prohibited Activities" include, among other items, anything that: "excessively and disproportionately contributes to network congestion," "degrades network performance," or can "cause harm to the network or other customers."<br><br>"[U]nlimited" does not mean that you can use AT&T's wireless data service . . . for any prohibited activities.<br><br>**Motion, Ex. 1 (Agreement) § 6.2 (emphasis in orig.)** |
| [The] unlimited mobile data contract with Plaintiff . . . did not provide that AT&T could modify, diminish, or impair the services of who use more than a specified amount of data for permissible activities.<br><br>**Am. Complaint ¶ 15, 47** | AT&T may modify, without advance notice, the permitted and prohibited activities.<br><br>You agree that . . . if you use AT&T's wireless data services in any manner that is prohibited, . . . AT&T may reduce your data throughput speeds at any time or place if your data usage exceeds an applicable, identified usage threshold during any billing cycle.<br><br>**Motion, Ex. 1 (Agreement) § 6.2.** |
| AT&T represented, directly or indirectly, expressly or by implication, to the Plaintiff, an unlimited mobile data plan customer, that the amount of data that the Plaintiff could access in any billing period would not be limited.<br><br>**Am. Complaint ¶ 30** | **Unlimited Data Customers.** If you are an AT&T unlimited data plan customer, you agree that "unlimited means you pay a fixed monthly charge for wireless data service regardless of how much data you use . . . "unlimited' does not mean that you can use AT&T's wireless data service in any way that you choose, or for any prohibited activities."<br><br>AT&T may reduce your data throughput speeds at any time or place if your data usage exceeds an applicable, identified usage threshold during any billing cycle.<br><br>**Motion, Ex. 1 (Agreement) § 6.2** |

| AT&T omitted the fact that it intended to throttle Plaintiff's data, without Plaintiff's knowledge or specific consent.<br><br>**Am. Complaint ¶ 31** | AT&T may modify, without advance notice, the permitted and prohibited activities, [and] may engage in any reasonable network management practice . . . to reduce network congestion.<br><br>**Motion, Ex. 1 (Agreement) § 6.2** |
| --- | --- |

Again, where an exhibit attached to a complaint contradicts the allegations in the complaint, the exhibits control and may form the basis for a motion to dismiss. *See Fladell v. Palm Beach Cty. Canvassing Bd.*, 772 So. 2d 1240, 1242 (Fla. 2000) (Upholding the trial court's dismissal of the action *with prejudice* because, even accepting the allegations in the complaint as true, they were fully negated by the exhibits attached to the complaint.) For the reasons stated above, Counts I through III as to the allegations of improper "data throttling" are dismissed *with prejudice.*

### Counts I-III as they relate to allegations of an improper administrative fee

Plaintiff alleges that AT&T has wrongfully charged her a $1.99 monthly Administrative Fee. Plaintiff asserts that the fee is "bogus" for three reasons: (1) AT&T failed to adequately disclose the existence of the Administrative Fee; (2) the Administrative Fee is an illegal "pass-through" fee; and (3) the Administrative Fee is deceptively defined and applied. Am. Compl. ¶¶ 20, 23-24, 27, 53.

As to the first allegation, that AT&T failed to disclose the existence of the Administrative Fee, this is belied by the Amended Complaint and the documents it is based on. The Wireless Customer Agreement expressly discloses the Administrative Fee and AT&T's right to make changes to charges billed to customers. Section 1.4 of the Agreement states: "Charges include, without limitation airtime, roaming, recurring monthly service, activation, **administrative**, and

late payment charges . . . whether assessed directly upon you or upon AT&T." Mot. to Dismiss, Ex. 1 § 1.4 (emphasis added). Section 1.3 of the Agreement further reserves the right for AT&T to "make changes to this Agreement" which can include "charges." *Id.* at § 1.3.

Moreover, AT&T's website and billing statement also expressly disclose the existence of the Administrative Fee, with the website defining the recurring fees and the billing statement providing the monthly amount to be charged to Plaintiff's account.[3] Mot. to Dismiss, Exs. 2-3.

The Wireless Customer Agreement, website, and billing statement (which Plaintiff incorporated by reference into the Amended Complaint) refute and thereby negate the assertion that the Administrative Fee was not properly disclosed. Therefore, no claim can proceed on this allegation as a matter of law.

Second, Plaintiff alleges that the Administrative Fee is a "textbook pass through fee" as "it is not what its being used for despite its definition in the wireless agreement." Am. Compl. at ¶ 53. Florida law is clear that an impermissible "pass-through" fee is one that purports to be collected for payment to a <u>third party</u>, but in reality the company is keeping the fee for itself. *See Latman v. Costa Cruise Lines, N.V.*, 758 So. 2d 699, 703 (Fla. 3d DCA 2000). In *Latman*, a cruise line added "port charges" to its ticket price. The term was undefined, however, the Court determined that the plaintiff's allegation that the term itself "informs the consumer that these are 'pass-through' charges paid by the cruise line to the relevant authorities" and not simply monies kept (wholly or partially) by the cruise line, when accepted as true for purposes of a motion to dismiss, was sufficient to allege a violation of FDUTPA. *Id.* at 703 ("We therefore conclude that where the cruise line bills the passenger for port charges but keeps part of the money for itself, that is a deceptive practice under FDUTPA.")

---

[3] Note that the Administrative Fee cannot exceed the $1.99 per month charged per AT&T's website. Mot. to Dismiss, Ex. 2.

Here, there is no allegation that AT&T ever represented or suggested the Administrative Fee would be paid to anyone other than AT&T. Even if Plaintiff did make the allegation, it would be in contradiction to the plain language of the website which states that the Fee is charged in order for AT&T to "recover" certain fees it has incurred, not to pay fees it is incurring.[4] Therefore the Court finds that Plaintiff has not and cannot allege that the Administrative Fee is a "pass-through" fee and no claim can proceed on these allegations. *See Vorst v. TBC Retail Grp., Inc.*, No. 12-CV-80013, 2012 WL 13026643, at *2 (S.D. Fla. Apr. 12, 2012) (dismissing FDUTPA pass-through claim based on the finding that "Plaintiff's conclusory allegations that the oil disposal fee was represented as a pure pass- through expense and that Defendant retains the fee as a profit are insufficient."); *see also Maor v. Dollar Thrifty Automotive Group, Inc.*, 2018 WL 4698512, *5 (S.D. Fla. 2018) ("Plaintiff has not identified any provisions in the rental contract, and this Court has found none, which constitute a representation to a reasonable consumer that the 'administrative fee' was a pass-through charge which Defendants would pay to others."); *Berry v. Budget Rent A Car Sys., Inc.*, 497 F. Supp. 2d 1361, 1367 (S.D. Fla. 2007) (finding that the term "cost recovery fee" is not a pass-through fee as "itself implies that the company will keep the money collected as 'recovery' for its costs.").

The Court finds Plaintiff's reliance on *Harrison v. Lee Auto Holdings, Inc.* unpersuasive for two reasons. 295 So. 3d 857 (Fla. 5th DCA 2020). First, in *Harrison*, the plaintiff adequately

---

[4] The website language which defines the Administrative Fee is as follows:

> A monthly fee charged to help AT&T recover a portion of certain expenses AT&T incurs, including but not limited to: (a) charges AT&T or its agents pay to interconnect with other carriers to deliver calls from AT&T customers to their customers; and (b) charges associated with cell site rents and maintenance. This fee is not a tax or charge which the government requires AT&T to collect from its customers.

Mot. to Dismiss, Ex. 2 p. 1.

pleaded that an electronic filing fee was "a pass-through charge payable to the government or another third party." *Id.* at 859. Again, the Amended Complaint contains no such allegations. Second, the *Harrison* court based its finding on the fact that the contract between the parties was "reasonably susceptible to more than one interpretation." *Id.* at 863. Here, the Wireless Customer Agreement and website relied upon by Plaintiff are unambiguous in defining the Administrative Fee and how it is to be applied.[5]

Plaintiff has also alleged that the Administrative Fee is "bogus" because AT&T's practice of applying the administrative fee is in and of itself unfair and deceptive. This is Plaintiff's best argument. Quoting from AT&T's website, Plaintiff alleges:

> AT&T's representation that the Administrative Fee is a charge assessed by AT&T that helps defray a portion of certain expenses AT&T incurs, including but not limited to: (a) charges AT&T or its agents pay to interconnect with other carriers to deliver calls from AT&T customers to their customers; and (b) charges associated with cell site rents and maintenance are false.

Am. Compl. ¶¶ 33, 40, 56, 64.[6] According to Plaintiff, the Administrative Fee is not tied to either interconnect or cell site charges because AT&T has continuously increased the fee even though these costs have allegedly decreased. *Id.* ¶¶ 23-27.

Though Plaintiff alleges that AT&T does not actually use the Administrative Fee to offset interconnect costs, cell site rents and/or maintenance charges, and that this is deceptive to consumers, the definition of the Administrative Fee provided *by the Plaintiff* does not limit AT&T to only offsetting those two specific cost categories. Instead, it states that AT&T may recover a

---

[5] "[W]hen the language is clear and unambiguous, it must be construed to mean 'just what the language therein implies and nothing more.' " *Dezer Intracoastal Mall, LLC v. Seahorse Grill, LLC*, 277 So. 3d 187, 190 (Fla. Dist. Ct. App. 2019) (*citing Walgreen Co. v. Habitat Dev. Corp.*, 655 So. 2d 164, 165 (Fla. 3d DCA 1995) (*quoting Camichos v. Diana Stores Corp.*, 157 Fla. 349, 25 So. 2d 864, 870 (1946)).

[6] *See* Fn. 3 for actual language from website.

portion of certain expenses **"including but not limited to"** charges for interconnection and for cell site rents and maintenance. *Id.* ¶¶ 33, 40, 56, 64 (emphasis added). Inclusion of the phrase "including but not limited to" is not in and of itself unfair and deceptive.[7] Therefore, taking Plaintiff's allegations as true, interconnect costs, cell site rents and/or maintenance charges serve as examples of and not limitations to how AT&T can apply the Administrative Fee. Put simply, AT&T's alleged use of the Fee to recover other expenses and costs would still comply with the fee's definition, which is set forth in Plaintiff's own Amended Complaint as taken from AT&T's website, and cannot be considered deceptive, unfair, false, or a violation of the parties' agreement.

However, by definition, the Fee is limited to "recover a portion of certain expenses AT&T incurs" and Plaintiff has plausibly pled that the Administrative Fee is part of "a scheme to funnel direct profit to AT&T rather than pay for any identifiable increase in costs." Am. Compl. ¶ 56. In Paragraph 57, Plaintiff alleges that AT&T knew that the monthly administrative fee was inflated and not the result of good faith financial practices but instead designed to raise profit for the company without a specific actual change in price for services.[8]

Therefore, the allegations of the complaint are such that they are not belied by the exhibits attached to the complaint and the Court will discuss further whether the Plaintiff has stated a claim for fraud, breach of implied duty of good faith and fair dealing, and/or FDUPTA as it relates to the

---

[7] A true statement may be nevertheless deceptive if it omits to state a material fact or facts necessary in order to make the statement not misleading. *See Askew v. Firestone*, 421 So.2d 151, 158 (Fla. 1982)

[8] Despite Plaintiff counsel's repeated argument during the hearing that the Administrative Fee was disclosed to customers as being tied to *increases* in a specific set of expense categories, the Amended Complaint and the website language contain no reference to "increases," and Plaintiff has not alleged any instances where AT&T made such statements. Instead, the language is clear that the Administrative Fees would "recover a portion of certain fees AT&T incurs."

remaining claim that the Administrative Fee is "bogus" because AT&T's practice of applying the administrative fee is in and of itself unfair and deceptive.

## FRAUD

In Florida, a plaintiff must plead fraud by alleging that the defendant: 1) misrepresented a material fact, 2) knew or should have known of the falsity of the statement, 3) intended that the misrepresentation would induce Plaintiff to rely and act on it, and 4) that Plaintiff suffered injury in justifiable reliance on the misrepresentation. *Witt v. La Gorce Country Club, Inc.*, 35 So. 3d 1033, 1040 (Fla. 3d DCA 2010). In Florida, claimants must plead fraud (or fraudulent inducement) with particularity, as required by Rule 1.120(b), *See* Fla. R. Civ. P. 1.120(b) ("[A]ll averments of fraud . . . shall be stated with such particularity as the circumstances may permit."); *Cedars Healthcare Grp., Ltd. v. Mehta*, 16 So. 3d 914, 917 (Fla. 3d DCA 2009).

Here, Plaintiff has pled that 1) the claimed reason for the collection of the Administrative Fee (*i.e.* "to recover a certain portion of expenses that AT&T incurs") is "bogus"; 2) that AT&T is aware that the Administrative Fee is "bogus"; 3) that the "bogus" fee is intended to increase profits to AT&T while allowing AT&T to continue to advertise lower cell phone plan prices to induce customers to sign up; and 4) that the Plaintiff suffered injury (the payment of the "bogus" Administrative Fee) when they relied upon AT&T's false advertising. Am. Compl. ¶¶ 33-36. The Plaintiff has pled her claim for fraud with particularity sufficient to defeat a motion to dismiss as it relates to the allegation that AT&T's practice of applying the administrative fee is in and of itself unfair and deceptive.

## BREACH OF IMPLIED DUTY OF GOOD FAITH AND FAIR DEALING

Florida law recognizes the implied covenant of good faith and fair dealing in every contract, with two limitations:

> First, the implied covenant of good faith should not be invoked to override the express terms of the agreement between the parties.

> Second, a claim for breach of the implied covenant of good faith and fair dealing cannot be maintained under Florida law absent an allegation that an express term of the contract has been breached.

*Ins. Concepts & Design, Inc. v. Healthplan Servs., Inc.*, 785 So. 2d 1232, 1234 (Fla. 4th DCA 2001). Both of these limitations apply here.

Plaintiff's breach allegation as it relates to the Administrative Fee is not tied to any particular provision in the contract. Paragraph 42 of the Amended Complaint alleged "AT&T breached the express terms of the wireless agreement," however, this follows the only allegation in Count II regarding the Administrative Fee which states that the misrepresentations made to the Plaintiff were on its "bills to Plaintiff and its website." Am. Compl. ¶ 40. Section 1.4 of the Agreement states: "Charges include, without limitation airtime, roaming, recurring monthly service, activation, administrative, and late payment charges . . . whether assessed directly upon you or upon AT&T." Mot. to Dismiss, Ex. 1 § 1.4. The Wireless Customer Agreement, in section 1.3, further reserves the right for AT&T to "make changes to this Agreement" which can include "charges." *Id.* at § 1.3. Therefore, Count II is dismissed without prejudice for failure to state a cause of action for breach of implied duty of good faith and fair dealing with leave to amend to identify the express term(s) of the Agreement alleged to have been breached.

### FDUTPA

The FDUTPA prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.204(1). To state a FDUTPA claim, a plaintiff must allege "(1) a deceptive act or unfair trade practice; (2) causation; and (3) actual damages." *Dolphin LLC v. WCI*

*Cmtys. Inc.,* 715 F.3d 1243, 1250 (11th Cir. 2013) (citing *Rollins, Inc. v. Butland,* 951 So. 2d 860, 869 (Fla. 2d DCA 2006)). An unfair practice is "one that offends established public policy and ... [one that] is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." *Hetrick v. Ideal Image Dev. Corp.,* 372 F. App'x 985, 992 (11th Cir. 2010) (quoting *Samuels v. King Motor Co. of Fort Lauderdale,* 782 So. 2d 489, 499 (Fla. 4th DCA 2001)).

As previously discussed, Plaintiff has plausibly pled that the Administrative Fee is part of "a scheme to funnel direct profit to AT&T rather than pay for any identifiable increase in costs." Am. Compl. ¶ 56. Plaintiff alleges that AT&T knew that the monthly administrative fee was inflated and not the result of good faith financial practices but instead designed to raise profit for the company without a specific actual change in price for services. Am. Compl. ¶ 57. Lastly, the wireless bill attached to AT&T's Motion to Dismiss shows that Plaintiff was in fact charged a monthly administrative fee of $1.99. Mot. to Dismiss, Ex. 3.

The Plaintiff has stated a cause of action for FDUTPA violation based on the allegation that AT&T's practice of applying the administrative fee is in and of itself unfair and deceptive and AT&T's Motion to Dismiss is due to be denied on this basis.

## Count IV Unjust Enrichment

"Florida law is clear that 'a plaintiff cannot pursue a quasi-contract claim for unjust enrichment if an express contract exists concerning the same subject matter.'" *Sterling Breeze Owners' Ass'n, Inc. v. New Sterling Resorts, LLC*, 255 So. 3d 434, 437 (Fla. 1st DCA 2018), *reh'g denied* (Oct. 16, 2018); *Kovtan v. Frederiksen,* 449 So.2d 1, 1 (Fla. 2d DCA 1984) ("It is well settled that the law will not imply a contract where an express contract exists concerning the same subject matter."); *In re Estate of Lonstein,* 433 So.2d 672, 674 (Fla. 4th DCA 1983) (same). A contract implied in law, or "quasi contract," operates when there is no contract "to provide a

remedy where one party was unjustly enriched, where that party received a benefit under circumstances that made it unjust to retain it without giving compensation." *Commerce P'ship. 8098 Ltd. P'ship v. Equity Contracting Co., Inc.,* 695 So.2d 383, 386 (Fla. 4th DCA 1997).

The Plaintiff has acknowledged the existence of a contract between the parties that governs the subject matter of this lawsuit, thus barring Plaintiff's quasi- contract claim for unjust enrichment. Plaintiff's unjust enrichment claim cannot be cured though amendment. In cases where it is apparent that a pleading cannot be amended to state a cause of action, or where an amendment would be futile, dismissal *with prejudice* is appropriate. *Central Florida Investments, Inc. v. Charles Levin Timeshares,* 659 So. 2d 492 (Fla. 5th DCA 1995).

## Counts V & VI declaratory and injunctive relief pursuant to FDUPTA

Florida Statutes § 501.211(1), which establishes the cause of action for declaratory or injunctive relief under FDUTPA, provides in pertinent part:

> Without regard to any other remedy or relief to which a person is entitled, anyone aggrieved by a violation of this part may bring an action to obtain a declaratory judgment that an act or practice violates this part and to enjoin a person who has violated, is violating, or is otherwise likely to violate this part.

To state a claim for injunctive or declaratory relief under FDUTPA, a plaintiff "must show (1) that it is aggrieved, in that its rights have been, are being, or will be adversely affected, by (2) a violation of FDUTPA, meaning an unfair or deceptive practice which is injurious to consumers." *Stewart Agency, Inc. v. Arrigo Enterprises, Inc.,* 266 So. 3d 207, 214 (Fla. 4th DCA 2019) ("for someone to be aggrieved, the injury claimed to have been suffered cannot be merely speculative." *Ahearn,* 180 So. 3d at 173). "Put plainly, a plaintiff is 'aggrieved' under FDUTPA when the deceptive conduct alleged has caused a **non-speculative injury** that has affected the plaintiff beyond a general interest in curbing deceptive or unfair conduct." *Superior Consulting*

*Servs., Inc. v. Shaklee Corp.*, No. 616CV2001ORL31GJK, 2017 WL 2834783, at *7 (M.D. Fla. June 30, 2017) (emphasis added).

Counts V and VI are based on Plaintiff's "belie[f]" that AT&T provided Plaintiff's geolocation data to unauthorized persons without Plaintiff's consent. Am. Compl. ¶¶ 95, 128. While the Amended Complaint walks through a long narrative of AT&T's alleged failure to protect its customers' geolocation data, it fails to present a single fact tying that alleged failure to Plaintiff or provide any factual basis for Plaintiff's "belief" that Plaintiff's own geolocation data was wrongfully disclosed. Accordingly, the Court concludes that Plaintiff's speculative allegations do not sufficiently allege that Plaintiff's "rights have been, are being, or will be adversely affected," and therefore do not satisfy either Rule 1.110(b) or Rule 1.120(b). *Stewart Agency, Inc.*, 266 So. 3d at 214.[9]

Similarly, Plaintiff's conclusory statement that Plaintiff "believes" they may have been "aggrieved as result of AT&T's knowing and flagrant violation of its own privacy practices" asserts no facts in support and cannot carry Plaintiff's claims. Am. Compl. ¶ 134; *see Nodal-Tarafa v. ARDC Corp.*, 579 So. 2d 414 (Fla. 3d DCA 1991) ("[U]ltimate legal conclusions are . . . . patently insufficient to state a cause of action . . . ."). Plaintiff has failed to sufficiently plead that

---

[9] In support of the geolocation claims, Plaintiff attaches, among other items, correspondence between United States Senator Ron Wyden and AT&T regarding alleged unauthorized geolocation disclosure (Am. Compl. Ex. H); and, a February 28, 2020 *Notice of Apparent Liability for Forfeiture and Admonishment* filed by the Federal Communications Commission against AT&T (the "NAL") (Am. Compl. Ex. J). While these exhibits appear to support Plaintiff's claims that AT&T was, in fact, disseminating geolocation data of its customers at one time, they do not relate to the Plaintiff specifically and they seem to indicate that the practice complained of has ceased. Specifically, the letter from AT&T to Senator Wyden attached as Exhibit H to the Amended Complaint states that AT&T "will cease providing location information to all aggregators by the end of March 2019." Ex. H, p. 2. Consistent with this statement, the NAL attached as Exhibit J says that AT&T agreed it would terminate "access to customer location information over the course of 3 months in early 2019." Ex. J, ¶ 69. Whether the practice has in fact ceased is debated by the parties; however, the Court need not conclude the meaning of these exhibits one way or another as the Plaintiff has failed to plead that she is aggrieved as discussed infra.

they have been aggrieved by AT&T's alleged geolocation practice, one of the two basic elements of a claim for equitable relief under FDUTPA. At the hearing, Plaintiff's counsel admitted that he has no evidence to allege more specifically that his client was actually aggrieved and thus the claims for injunctive and declaratory relief under FDUTPA cannot be cured through amendment, requiring dismissal *with prejudice*. Tr. at 67:18-24.

## IV. CONCLUSION

After careful consideration, upon the reasons detailed above, it is hereby **ORDERED and ADJUDGED:**

1. Counts I through III as to the allegations of 1) improper "data throttling"; 2) that the Administrative Fee was not disclosed to the Plaintiff; and 3) that the Administrative Fee is an illegal "pass-through" fee are dismissed *with prejudice* for the reasons stated above.

2. The Motion to Dismiss Counts I and III as to the allegation that AT&T's practice of applying the administrative fee is in and of itself unfair and deceptive is *denied.*

3. Count II is dismissed without prejudice with leave to amend within ten (10) days from the date of this order to identify the express term(s) of the Agreement alleged to have been breached.

4. Count IV, V, and VI are dismissed *with prejudice* for the reasons stated above.

**DONE AND ORDERED** in Dade County, Florida this 25 day of **August 2020.**

SIGNED and DATED

AUG 2 5 2020

Judge Myriam Lehr

MYRIAM LEHR
COUNTY COURT JUDGE

**Copies furnished to all parties.**

16

**2019-16864**
**Ann Green vs. AT&T Mobility (LLC)**

**Mauray L. Udell, Esq.**
**150 West Flagler Street, Ste. 1800**
**Miami, Florida  33130-1536**

**Manuel A. Garcia-Linares**
**396 Alhambra Circle N. Tower, Fl. 14**
**Miami, Florida  33134-5045**

**IN THE COUNTY COURT OF THE ELEVENTH JUDICIAL
CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA**

CASE NO: 2019-017231-SP-23
SECTION: ND02
JUDGE: Natalie Moore

**Rob Caruso**

Plaintiff(s) / Petitioner(s)

vs.

**A T & T Mobility (LLC)**

Defendant(s) / Respondent(s)

_____/

**ORDER GRANTING DEFENDANT'S MOTION FOR JUDGMENT ON THE PLEADINGS
AND FINAL JUDGMENT IN FAVOR OF DEFENDANT**

This cause came before the Court on May 26, 2022, on Defendant's motion for judgment on the pleadings. The Court has reviewed the pleadings, heard the arguments of counsel, and considered the applicable law. It is hereby

**ORDERED** and **ADJUDGED** that Defendant's motion for judgment on the pleadings is **GRANTED**.

Plaintiff, Rob Caruso ("Caruso") is proceeding on a four-count statement of claim against Defendant, AT&T Mobility, LLC ("AT&T"). Plaintiff alleges fraud, breach of implied duty of good faith and fair dealing, violation of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") and unjust enrichment.

Pursuant to a contract between Plaintiff and Defendant, AT&T provided cell phone service, including a data plan, to Caruso in exchange for monthly payments. At the heart of each of Plaintiff's claims are two issues. (1) Defendant advertised and sold an "unlimited" data plan but then throttled or slowed data access for users who have exceeded an unspecified data amount in a monthly billing cycle. (2) Defendant charges an administrative fee that Plaintiff argues was not properly disclosed to consumers, is deceptively defined and applied, and is an illegal "pass-through" fee.

Defendant filed a motion for judgment on the pleadings. A motion for judgment on the pleadings tests the legal sufficiency of a cause of action or defense. U.S. Fire Ins. Co. v. ADT Sec. Servs., Inc., 134 So.3d 477, 479 (Fla. 2d DCA 2013). "A party can only obtain judgment on the pleadings if it is entitled to judgment as a matter of law based solely on the pleadings and attachments thereto." Id. "In passing on a motion for judgment on the pleadings made by a defendant, all well-pleaded material allegations of the complaint and all fair inferences to be drawn therefrom are taken as true and the inquiry concerns whether the plaintiff has stated a viable cause of action." Siegel v. Whitaker, 946 So.2d 1079, 1081 (Fla. 5th DCA 2006).

"It is well settled that a Rule 1.140(c) motion for a judgment on the pleadings must be decided wholly on the pleadings—which includes consideration of exhibits attached thereto." Clarke v. Henderson, 74 So.3d 112,

114 (Fla. 3d DCA 2011). "Any exhibit attached to a pleading shall be considered a part thereof for all purposes." Fla. R. Civ. Pro. 1.130. "When a party refers to a document in the complaint, the trial court may use that document to assess the nature of the claims alleged in the complaint." Glen Garron, LLC v. Buchwald, 210 So.3d 229, 233 (Fla. 5th DCA 2017). Where those exhibits contradict the allegations in the complaint, the exhibits control, and that can lead the Court to order dismissal or judgment on the pleadings. Southeast Med. Prod., Inc. v. Williams, 718 So.2d 306, 307 (Fla. 2nd DCA  1998).

Plaintiff's complaint repeatedly refers to the contract between the parties (also referred to by the parties as the "Wireless Customer Agreement" or the "Mobile Data Contract"), the billing statements issued to Plaintiff, and Defendant's website. In the complaint, Plaintiff states that he does not have possession of the contract between the parties but that it is in Defendant's possession. Plaintiff pleads that the contract, the billing statements, and the website are all central to, or form the basis of, Plaintiff's claims. Plaintiff refers to the "express terms" of the contract, and "representations" on the billing statements and website. When a complaint refers to a document but does not attach it, that document is impliedly incorporated by reference into the complaint and thus becomes part of the pleadings a court may consider. One Call Prop. Servs., Inc. v. Sec. First Ins. Co., 165 So.3d 749, 752 (Fla. 4th DCA 2015).

Defendant attached to its motion a standard contract, a copy of a billing statement sent to Plaintiff, and an excerpt from its website. The contract and the excerpt from the website are publicly available and can by accessed by anyone. Defendant argues that these documents are referred to in the complaint and are therefore impliedly incorporated by reference. Defendant asks the Court to consider these documents as part of the pleadings and use them to decide its motion. Plaintiff argues that the exhibits attached to the motion are unauthenticated, not part of the pleadings or the record, and, therefore, cannot be considered.

The Court concludes that the contract, the billing statement, and the excerpt from the website are incorporated by reference into Plaintiff's complaint. First, while Plaintiff may have argued the documents have not been authenticated, Plaintiff has not made any assertions that the documents provided are inauthentic. Second, this case, and over 200 like it, have been in litigation for nearly three years. For reasons unknown to the Court, Plaintiff has not yet obtained any of these documents in discovery. Plaintiff is obligated to obtain copies of the contract and the documents upon which this claim is premised and amend his statement of claim to include those documents. Plaintiff cannot base his claims on the express language of the contract and representations on the billing statements and website – *that he does not have* – and then argue that the Court cannot consider that same contract, bill, and website once provided. Finally, the Court considered the argument that it has not been shown that the contract and website excerpts provided were the correct versions, as these documents can be changed over time. But because Plaintiff's complaint makes no reference to time, such as when misstatements were made or when the Defendant violated FDUTPA or the implied duty of good faith, the Court finds this argument unpersuasive. Nonetheless, as explained below, the Court would grant Defendant's motion for judgment on the pleadings as to each count, even if the documents provided in the motion were not considered.

## Count 1: Fraud

In Florida, a plaintiff must plead fraud by alleging that the defendant (1) misrepresented a material fact, (2) knew or should have known of the falsity of the statement, (3) intended that the misrepresentation would induce Plaintiff to rely and act on it, and (4) that Plaintiff suffered injury in justifiable reliance on the misrepresentation. Witt v. La Gorce Country Club, Inc., 35 So.3d 1033, 1040 (Fla. 3d DCA 2010). "In all

averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with such particularity as the circumstances may permit." Fla. R. Civ. P. 1.120. "In order for a claim of fraud in the inducement to withstand a motion to dismiss, it must allege fraud with the requisite particularity required by Florida Rule of Civil Procedure 1.120(b), including who made the false statement, the substance of the false statement, the time frame in which it was made, and the context in which the statement was made." Bankers Mut. Cap. Corp. v. U.S. Fid. & Guar. Co., 784 So.2d 485, 490 (Fla. 4th DCA 2001).

To support his fraud claim, Plaintiff asserts that after advertising an "unlimited" data plan, Defendant then had a duty to disclose material information and all related billing practices (namely that data access may be slowed after certain thresholds are surpassed). Plaintiff asserts that Defendant did not disclose its intention to throttle Plaintiff's data access and he would not have purchased an unlimited data plan had that been disclosed. Plaintiff further asserts that Defendant made "representations" on its bills and its website regarding the assessed administrative fee that were false statements of material fact. Plaintiff alleges that Defendant represented the fee is assessed to defray a portion of certain expenses Defendant incurs, yet this is not the actual use of the fee.

As pled, Defendant is entitled to a judgment as a matter of law for the claim of fraud. First, Plaintiff has not stated with particularity what actual statements misrepresenting a material fact were made, when they were made, or how any alleged misrepresentations impacted him. The complaint does not identify a specific statement regarding the nature of "unlimited" data. It does not indicate if or when Plaintiff had his data speeds slowed. It does not explain what damages Plaintiff suffered. Similarly, Plaintiff does not state with particularity when he was told the nature of the administrative fees or what injury he suffered other than the general statement that he relied on the (unidentified) representations and paid the fee.

Next, even if the Court were to consider the terms "unlimited" or "administrative" to be statements, or to look to the descriptions of what Plaintiff alleges are statements on the website and billing statements, Plaintiff fails to explain how the statements are misrepresentations of material facts because Plaintiff does not show the statements are factually incorrect. In Williams v. Burger King Corp., 2020 WL 5083550 (S.D. Fla. July 20, 2020) the court dismissed consumer fraud claims alleging that Burger King 's advertisement of a non-meat "Impossible Burger" was a representation that it would cook the burgers on a grill that did not also cook meat. The court concluded that the advertising of an "Impossible Whopper" represented only that the burger itself would not contain meat and not how it would be cooked. Here, Plaintiff states that Defendant represented "the amount of data that the Plaintiff could access in any billing period would not be limited." But Plaintiff does not allege that this was a material misrepresentation, instead submitting, without any legal basis, that Defendant had a duty to disclose that that some data speeds would be slowed and did not do so. This is likely because Plaintiff cannot credibly argue the offering of an unlimited amount of data includes a promise of how fast the data can be accessed. The slowing of some data does not render the offer of an unlimited plan false.

Similarly, Plaintiff asserts that the billing statements and website represent that the administrative fee is "a charge assessed by AT&T that helps defray a portion of certain expenses AT&T incurs, *including but not limited to*: (a) charges AT&T or its agents pay to interconnect with other carriers to deliver calls from AT&T customers to their customers; and (b) charges associated with cell site rents and maintenance." (Emphasis added.) Plaintiff argues that this statement was false, as the fees were not used for this purpose and Defendant's costs in interconnect charges and cell site charges actually decreased over time. The statement Plaintiff identifies stating how the administrative fee may be used is not an exclusive list. Even if the fee is

used for some other purpose, the plain meaning of the statement described by Plaintiff is not factually incorrect.

Finally, a careful review of the contract, the billing statement, and the excerpt of the website that were produced by Defendant and are impliedly incorporated by reference as exhibits to the complaint shows that those exhibits clearly contradict the allegations in the complaint. For example, the contract between the parties specifically states that "If you are an AT&T unlimited data plan customer, you agree that "unlimited means you pay a fixed monthly charge for wireless data service regardless of how much data you use . . . "unlimited' does not mean that you can use AT&T's wireless data service in any way that you choose, or for any prohibited activities. AT&T may reduce your data throughput speeds at any time or place if your data usage exceeds an applicable, identified usage threshold during any billing cycle." Similarly, the excerpt of the website reflects the exact language identified by Plaintiff, indicating that the administrative fee may be used to defray costs, including but not limited to the costs for interconnection or cell site rents and maintenance. The contract, billing statements, and website expressly and clearly address and allow the conduct Plaintiff alleges is fraudulent. Not only do the exhibits contradict the allegations in the complaint, in Florida, "[a] party cannot recover for alleged false misrepresentations that are adequately dealt with or expressly contradicted in a later written contract." TRG Night Hawk Ltd. v. Registry Dev. Corp., 17 So.3d 782, 784 (Fla. 2d DCA 2009).

**Count 2: Breach of Implied Duty of Good Faith and Fair Dealing**

"The implied covenant of good faith exists in virtually all contractual relationships." *Sepe v. City of Safety Harbor*, 761 So.2d 1182, 1184 (Fla. 2d DCA 2000). This covenant is intended to protect "the reasonable expectations of the contracting parties in light of their express agreement." *Barnes v. Burger King Corp.*, 932 F.Supp. 1420, 1438 (S.D. Fla. 1996). There are two limitations that courts must consider. First, the implied covenant is not an independent term within the parties' contract. Thus, it cannot override an express contractual provision. *Ernie Haire Ford, Inc. v. Ford Motor Co.*, 260 F.3d 1285 (11th Cir. 2001). Second, "a claim for breach of the implied covenant of good faith and fair dealing cannot be maintained under Florida law absent an allegation that an express term of the contract has been breached." Ins. Concepts & Design, Inc. v. Healthplan Servs., Inc., 785 So.2d 1232, 1234 (Fla. 4th DCA 2001). Both apply here.

Plaintiff alleges that Defendant breached the implied covenant of good faith and fair dealing by providing a contract that gave Plaintiff a "reasonable expectation of performance of the agreement with no throttling of Plaintiff's Data plan." Plaintiff further asserts that Defendant was "required to act in a commercially reasonable manner" and not "act capriciously to contravene the reasonable expectations of the Plaintiff." Despite referencing the throttling of data and the objected to administrative fee, Plaintiff never actually asserts that Defendant acted in a commercially unreasonable manner. Instead, Plaintiff asserts that the contract contains *express terms* that required AT&T to provide unlimited data and true administrative costs as defined by the contract. Plaintiff makes the conclusory statement that Defendant breached the express terms of the contract, but never identifies what term of the contract was breached or what conduct constituted a breach. As pled, Plaintiff's claim fails to state a cause of action for breach of the implied covenant of good faith and fair dealing.

Further, looking to the exhibits incorporated by reference in the complaint, the Court concludes that the express terms of the contract allow for the specific conduct to which Plaintiff objects. As the exhibits clearly disprove the allegation that Defendant breached the express terms of the contract, Defendant is entitled to

judgment as a matter of law on this claim.

**Count 3: Florida's Deceptive and Unfair Trade Practices Act.**

A claim for damages under FDUTPA has three elements: (1) a deceptive act or unfair practice, (2) causation, and (3) actual damages." Kia Motors Am. Corp. v. Butler, 985 So.2d 1133, 1140 (Fla. 3d DCA 2008). Plaintiff alleges that Defendant engaged in deceptive acts or unfair practices by imposing data speed restrictions on Plaintiff after entering into a contract that provides for access to unlimited data; by failing to disclose its intention to impose those restrictions on customers with unlimited data plans; and by imposing an administrative fee that is not used as Defendant represents it is used, is unilaterally increased, and, Plaintiff argues, is a "pass-through" fee.

First, the Court finds the conclusory allegation that the administrative fee is a pass-through fee to be insufficiently pled. Florida law is clear that an impermissible "pass-through" fee is one that purports to be collected for payment to a third party but really is retained by the company charging the fee. Latman v. Costa Cruise Lines, N.V., 758 So. 2d 699, 703 (Fla. 3d DCA 2000) (finding that use of the term "port charge" misrepresents to a reasonable consumer that it is a "pass-through" charge which the cruise line will pay to the relevant port authorities). Next, Plaintiff has failed to plead that the alleged deceptive or unfair acts caused harm or that actual damages were incurred.

Finally, as described above, the contract, billing statements, and website excerpt that are incorporated by reference into the complaint clearly refute the allegations made by Plaintiff and expressly allow the conduct Plaintiff identifies. A party cannot recover for alleged false misrepresentations that are addressed and expressly contradicted in a later written contract. Taylor Woodrow Homes Fla., Inc. v. 4/46–A Corp., 850 So.2d 536, 542–43 (Fla. 5th DCA 2003); Hillcrest Pac. Corp. v. Yamamura, 727 So.2d 1053, 1056 (Fla. 4th DCA 1999). A party who signs a contract whose terms contradict the alleged misrepresentations on which he relied is barred from seeking relief pursuant to FDUTPA, as he acted unreasonably. Rosa v. Amoco Oil Co., 262 F.Supp.2d 1364, 1368 (S.D. Fla. 2003). A consumer cannot claim deception when she signed documents containing the agreements she now complains about. "No reasonable consumer would be deceived in this situation." Silver v. Countrywide Home Loans, Inc., 760 F.Supp.2d 1330, 1343 (S.D. Fla. 2011), aff'd, 483 F. App'x 568 (11th Cir. 2012).

**Count 4: Unjust Enrichment**

"The elements of a cause of action for unjust enrichment are (1) plaintiff has conferred a benefit on the defendant, who has knowledge thereof; (2) defendant voluntarily accepts and retains the benefit conferred; and (3) the circumstances are such that it would be inequitable for the defendant to retain the benefit without first paying the value thereof to the plaintiff." Duty Free World, Inc. v. Miami Perfume Junction, Inc., 253 So.3d 689, 693 (Fla. 3d DCA 2018). "Florida law is clear that 'a plaintiff cannot pursue a quasi-contract claim for unjust enrichment if an express contract exists concerning the same subject matter.'" Sterling Breeze Owners' Ass'n, Inc. v. New Sterling Resorts, LLC, 255 So.3d 434, 437 (Fla. 1st DCA 2018).

Plaintiff's claim of unjust enrichment hinges on their assertion that the administrative fee is deceptive—an assertion that, as discussed in detail above, is directly contradicted by both the Wireless Customer Agreement and AT&T's website. The claim also fails because Plaintiff has acknowledged the existence of a contract between the parties that governs the subject matter of this lawsuit, thus barring Plaintiff's quasi-contract claim for unjust enrichment. Id.

For these reasons, Defendant's motion for judgment on the pleadings is GRANTED. Final Judgment is entered in favor of the Defendant. Plaintiff shall take nothing by this action and Defendant shall go hence without day. The Court retains jurisdiction to enter further orders that are proper including, without limitation, to determine entitlement to and amount of costs or attorney's fees.

**DONE** and **ORDERED** in Chambers at Miami-Dade County, Florida on this 29th day of July, 2022.

2019-017231-SP-23 07-29-2022 3:34 PM
Hon. Natalie Moore

**COUNTY COURT JUDGE**
Electronically Signed

Final Order as to All Parties SRS #: **12** (Other)

THE COURT DISMISSES THIS CASE AGAINST ANY PARTY NOT LISTED IN THIS FINAL ORDER OR PREVIOUS ORDER(S). THIS CASE IS CLOSED AS TO ALL PARTIES.

**Electronically Served:**
Alicia Thomsen, athomsen@daypitney.com
Andrew Robert Ingalls, aingalls@daypitney.com
Andrew Robert Ingalls, brodriguez@daypitney.com
Evelyn Davila, edavila@daypitney.com
Jessica Solorzano, jsolorzano@daypitney.com
Manuel A. Garcia-Linares, mgarcialinares@daypitney.com
Manuel A. Garcia-Linares, athomsen@daypitney.com
Maury L Udell, notice66@bmulaw.com
Maury L Udell, blopez@bmulaw.com
Rachel Kittl, rkittl@bmulaw.com


**Physically Served:**

Case 1:25-cv-20381-RAR Document 1-2 Entered on FLSD Docket 01/27/2025 Page 740 of 1553

**IN THE COUNTY COURT OF THE ELEVENTH JUDICIAL
CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA**

CASE NO: 2019-017231-SP-23
SECTION: ND02
JUDGE: Natalie Moore

**Rob Caruso**

Plaintiff(s) / Petitioner(s)

vs.

**A T & T Mobility (LLC)**

Defendant(s) / Respondent(s)

_____/

## ORDER GRANTING PLAINTIFF'S MOTION FOR REHEARING AND GRANTING DEFENDANT'S MOTION FOR JUDGMENT ON THE PLEADINGS

This cause came before the Court on February 2, 2023, on Plaintiff's motion for rehearing of Defendant's motion for judgment on the pleadings. The Court has reviewed the pleadings, heard the arguments of counsel, and considered the applicable law.

It is hereby **ORDERED** and **ADJUDGED** that Plaintiff's motion for rehearing is **GRANTED** for the reasons stated on the record.

It is further **ORDERED** and **ADJUDGED** that Defendant's motion for judgment on the pleadings is **GRANTED**.

Plaintiff, Rob Caruso ("Caruso") is proceeding on a four-count complaint against Defendant, AT&T Mobility, LLC ("AT&T"). Plaintiff alleges fraud, breach of implied duty of good faith and fair dealing, violation of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") and unjust enrichment. Pursuant to a contract between Plaintiff and Defendant, AT&T provided cell phone service, including a data plan, to Caruso in exchange for monthly payments. At the heart of each of Plaintiff's claims are two issues. (1) Defendant advertised and sold an "unlimited" data plan but then throttled or slowed data access for users who have exceeded an unspecified data amount in a monthly billing cycle. (2) Defendant charges an administrative fee that Plaintiff argues was not properly disclosed to consumers, is deceptively defined and applied, and is an illegal "pass-through" fee.

Defendant filed a motion for judgment on the pleadings. A motion for judgment on the pleadings tests the legal sufficiency of a cause of action or defense. U.S. Fire Ins. Co. v. ADT Sec. Servs., Inc., 134 So.3d 477, 479 (Fla. 2d DCA 2013). "A party can only obtain judgment on the pleadings if it is entitled to judgment as a matter of law based solely on the pleadings and attachments thereto." Id. "In passing on a motion for judgment on the pleadings made by a defendant, all well-pleaded material allegations of the complaint and all fair inferences to be drawn therefrom are

taken as true and the inquiry concerns whether the plaintiff has stated a viable cause of action." Siegel v. Whitaker, 946 So.2d 1079, 1081 (Fla. 5th DCA 2006). "It is well settled that a Rule 1.140(c) motion for a judgment on the pleadings must be decided wholly on pleadings—which includes consideration of exhibits attached thereto." Clarke v. Henderson, 74 So.3d 112, 114 (Fla. 3d DCA 2011).

## Count 1: Fraud

In Florida, a plaintiff must plead fraud by alleging that the defendant (1) misrepresented a material fact, (2) knew or should have known of the falsity of the statement, (3) intended that the misrepresentation would induce Plaintiff to rely and act on it, and (4) that Plaintiff suffered injury in justifiable reliance on the misrepresentation. Witt v. La Gorce Country Club, Inc., 35 So.3d 1033, 1040 (Fla. 3d DCA 2010). "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with such particularity as the circumstances may permit." Fla. R. Civ. P. 1.120. "In order for a claim of fraud in the inducement to withstand a motion to dismiss, it must allege fraud with the requisite particularity required by Florida Rule of Civil Procedure 1.120(b), including who made the false statement, the substance of the false statement, the time frame in which it was made, and the context in which the statement was made." Bankers Mut. Cap. Corp. v. U.S. Fid. & Guar. Co., 784 So.2d 485, 490 (Fla. 4th DCA 2001).

To support his fraud claim, Plaintiff asserts that after offering an "unlimited" data plan, Defendant then had a duty to disclose material information and all related billing practices (namely that data access may be slowed after certain thresholds are surpassed). Plaintiff asserts that Defendant did not disclose its intention to throttle Plaintiff's data access and he would not have purchased an unlimited data plan had that been disclosed. Plaintiff further asserts that Defendant made representations on its bills and its website regarding the assessed administrative fee that were false statements of material fact. Plaintiff alleges that Defendant represented the fee is assessed to defray a portion of certain expenses Defendant incurs, yet this is not the actual use of the fee.

As pled, Defendant is entitled to a judgment as a matter of law for the claim of fraud. First, despite broadly asserting that Defendant made certain representations or offers, no specifics are provided. Plaintiff has not stated with particularity what actual statements, representations or offers were made, when they were made, where or how they were made, or how any alleged misrepresentations impacted him. The complaint also fails to indicate if or when Plaintiff had his data speeds slowed. It does not explain what damages Plaintiff suffered. Similarly, with regard to the administrative fee, Plaintiff does not state with particularity what injury he suffered other than the general statement that he relied on the (unidentified) representations and paid the fee.

## Count 2: Breach of Implied Duty of Good Faith and Fair Dealing

"The implied covenant of good faith exists in virtually all contractual relationships." Sepe v. City of Safety Harbor, 761 So.2d 1182, 1184 (Fla. 2d DCA 2000). This covenant is intended to protect "the reasonable expectations of the contracting parties in light of their express agreement." Barnes v. Burger King Corp., 932 F.Supp. 1420, 1438 (S.D. Fla. 1996). There are two limitations that courts must consider. First, the implied covenant is not an independent term within the parties' contract. Thus, it cannot override an express contractual provision. Ernie Haire Ford, Inc. v. Ford

Motor Co., 260 F.3d 1285 (11th Cir. 2001). Second, "a claim for breach of the implied covenant of good faith and fair dealing cannot be maintained under Florida law absent an allegation that an express term of the contract has been breached." Ins. Concepts & Design, Inc. v. Healthplan Servs., Inc., 785 So.2d 1232, 1234 (Fla. 4th DCA 2001).

Plaintiff alleges that Defendant breached the implied covenant of good faith and fair dealing by providing a contract that gave Plaintiff a "reasonable expectation of performance of the agreement with no throttling of Plaintiff's Data plan." Plaintiff further asserts that Defendant was "required to act in a commercially reasonable manner" and not "act capriciously to contravene the reasonable expectations of the Plaintiff." Despite referencing the throttling of data and the objected to administrative fee, Plaintiff never actually asserts that Defendant acted in a commercially unreasonable manner. Plaintiff makes the conclusory statement that Defendant breached the express terms of the contract, but never identifies what term of the contract was breached or what conduct constituted a breach. As pled, Plaintiff's claim fails to state a cause of action for breach of the implied covenant of good faith and fair dealing.

## Count 3: Florida's Deceptive and Unfair Trade Practices Act.

A claim for damages under FDUTPA has three elements: (1) a deceptive act or unfair practice, (2) causation, and (3) actual damages." Kia Motors Am. Corp. v. Butler, 985 So.2d 1133, 1140 (Fla. 3d DCA 2008). Plaintiff alleges that Defendant engaged in deceptive acts or unfair practices by imposing data speed restrictions on Plaintiff after entering into a contract that provides for access to unlimited data; by failing to disclose its intention to impose those restrictions on customers with unlimited data plans; and by imposing an administrative fee that is not used as Defendant represents it is used, is unilaterally increased, and, Plaintiff argues, is a "pass-through" fee.

First, the Court finds the conclusory allegation that the administrative fee is a pass-through fee to be insufficiently pled. Florida law is clear that an impermissible "pass-through" fee is one that purports to be collected for payment to a third party but really is retained by the company charging the fee. Latman v. Costa Cruise Lines, N.V., 758 So. 2d 699, 703 (Fla. 3d DCA 2000) (finding that use of the term "port charge" misrepresents to a reasonable consumer that it is a "pass-through" charge which the cruise line will pay to the relevant port authorities). Nor has Plaintiff identified any statement that suggests the administrative fee purports to be collected for or paid to another party. Further, with regard to the deceptive acts and unfair practices that are alleged, Plaintiff has failed to plead that the alleged acts in fact caused harm to this specific Plaintiff or that actual damages were incurred.

## Count 4: Unjust Enrichment

"The elements of a cause of action for unjust enrichment are (1) plaintiff has conferred a benefit on the defendant, who has knowledge thereof; (2) defendant voluntarily accepts and retains the benefit conferred; and (3) the circumstances are such that it would be inequitable for the defendant to retain the benefit without first paying the value thereof to the plaintiff." Duty Free World, Inc. v. Miami Perfume Junction, Inc., 253 So.3d 689, 693 (Fla. 3d DCA 2018). "Florida law is clear that 'a plaintiff cannot pursue a quasi-contract claim for unjust enrichment if an express contract exists concerning the same subject matter.'" Sterling Breeze Owners' Ass'n, Inc. v. New Sterling Resorts,

LLC, 255 So.3d 434, 437 (Fla. 1st DCA 2018). Plaintiff has acknowledged the existence of a contract between the parties that governs the subject matter of this lawsuit, and with express terms relating to the administrative fee and the data plans, thus barring Plaintiff's quasi-contract claim for unjust enrichment. Id.

**Failure to Attach the Contract to the Complaint**

Plaintiff's complaint repeatedly refers to the contract between the parties (also referred to by the parties as the "Wireless Customer Agreement" or the "Mobile Data Contract"), the billing statements issued to Plaintiff, and Defendant's website. In the complaint, Plaintiff states that he does not have possession of the contract between the parties but that it is in Defendant's possession. Plaintiff pleads that the contract, the billing statements, and the website are all central to, or form the basis of, Plaintiff's claims. Plaintiff refers to the "express terms" of the contract, and "representations" on the billing statements and website

Contracts on which an action may be brought, or defense made, must be incorporated in or attached to the pleadings. Fla. R. Civ. Pro. Rule 1.130. "A complaint based on a written instrument does not state a cause of action until the instrument or an adequate portion thereof is attached to or incorporated in the pleading in question." Safeco Ins. Co. of Am. v. Ware, 401 So. 2d 1129, 1130 (Fla. Dist. Ct. App. 1981). If a pleader states that he does not have a copy of the writing involved, then he should obtain a copy thereof through discovery or otherwise and attach it to the appropriate pleading by amendment. Id. Because this action involves a contract on which this action is brought or defense can be made, the complaint fails to state a cause of action and must be amended to include the contract between the parties when the Plaintiff obtains it.

For these reasons, Defendant's motion for judgment on the pleadings is **GRANTED**.

Plaintiff shall have 60 days to amend the complaint to sufficiently state a cause of action. It is further ordered that Defendant shall have 20 days to provide the contract between the parties to Plaintiff. If Fl. R. Civ. Pro. 1.130 requires attachment of the contract or another document to the amended complaint, Plaintiff shall attach it or advise, in the pleadings, that it is not in possession of the contract or document.

**DONE** and **ORDERED** in Chambers at Miami-Dade County, Florida on this 22nd day of February, 2023.

2019-017231-SP-23 02-22-2023 8:16 PM
Hon. Natalie Moore

**COUNTY COURT JUDGE**
Electronically Signed

Final Order as to All Parties SRS #: **12** (Other)

THE COURT DISMISSES THIS CASE AGAINST ANY PARTY NOT LISTED IN THIS FINAL ORDER OR PREVIOUS ORDER(S). THIS CASE IS CLOSED AS TO ALL PARTIES.

**Electronically Served:**
Alicia Thomsen-Lopez, athomsen@daypitney.com
Andrew Robert Ingalls, aingalls@daypitney.com
Andrew Robert Ingalls, brodriguez@daypitney.com
Evelyn Davila, edavila@daypitney.com
Jessica Solorzano, jsolorzano@daypitney.com
Manuel A. Garcia-Linares, mgarcialinares@daypitney.com
Manuel A. Garcia-Linares, athomsen@daypitney.com
Maury L Udell, notice66@bmulaw.com
Maury L Udell, blopez@bmulaw.com
Rachel Kittl, rkittl@bmulaw.com

**Physically Served:**

**IN THE COUNTY COURT OF THE ELEVENTH JUDICIAL
CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA**

CASE NO: 2022-047425-SP-25
SECTION: CG03
JUDGE: Patricia Marino Pedraza

**Steven Braverman**

Plaintiff(s) / Petitioner(s)

vs.

**AT&T Mobility, LLC**

Defendant(s) / Respondent(s)

_____/

## ORDER DENYING MOTION TO DISMISS

THIS CAUSE having come before the Court on [D.E. 21] Defendant's Motion to Dismiss Amended Statement of Claim on January 17, 2024, having heard argument of counsel, having fully reviewed the record and materials and case law submitted by the parties, and being otherwise fully advised in the premises therein, it is hereby:


## PROCEDURAL BACKGROUND


Plaintiff filed an amended statement of claim on August 30, 2023 [D.E.14] which pled four (4) counts: (1) FDUPTA damages, (2) FDUPTA declaratory relief (3) Unjust Enrichment and (4) Pure Bill of Discovery. Plaintiff has withdrawn Count 4 without prejudice at the hearing. For the following reasons AT&T's Motion to Dismiss Amended Counts 1 -3 of the Amended Statement of Claim is DENIED.


## LEGAL STANDARD


Generally, a motion to dismiss tests only the legal sufficiency of a complaint and it is not intended to determine issues of ultimate fact. "[T]he trial court is necessarily confined to the well-pled facts alleged in the four corners of the complaint." Lewis v.

Barnett Bank of S. Florida, N.A., 604 So. 2d 937 (Fla. 3d DCA 1992). The primary purpose of a motion to dismiss is to request the trial court to determine whether the complaint properly states a cause of action upon which relief can be granted and, if it does not, to enter an order of dismissal. Provence v. Palm Beach Taverns, Inc., 676 So. 2d 1022 (Fla. 4th DCA 1996). The court must draw all reasonable inferences in favor of the nonmoving party. *Id.* Thus, the question for this Court to decide is whether, assuming the well pleaded factual allegations in the amended statement of claim are true, Plaintiff would be entitled to the relief requested. A motion to dismiss that attempts to contest the merits of the claims is procedurally improper. *See* Hill v Murphy, 872 So. 2d 919, 921 (Fla. 2d DCA 2003); *see also* HSBC Bank USA, N.A. v. Nelson, 246 So.3d 486, 489 (Fla. 2d DCA 2018) ("[m]otions to dismiss and for summary judgment are not interchangeable, and may not be substituted for another").


**ANALYSIS**

   I. **This Court Cannot Rely Unauthenticated Documents not Attached to the Complaint in Ruling on a Motion to Dismiss**

   A trial court may not rely on any documents that are not attached to the complaint when considering the motion to dismiss. Kidwell Grp., LLC. v. Am. Integrity Ins. Co. of Fla., 339 So. 3d 1068 (Fla. 2d DCA 2022). AT&T has provided no case law to support its claim that something outside the pleadings can be considered on a motion to dismiss. The authenticity of AT&T's documents and website referenced in AT&T's motion—as well as the question whether the complete website is appended to the motion, cannot be verified and therefore cannot be considered on a motion to dismiss. See Legacy Entm't Grp., LLC v. Endemol USA, 2015 WL 12838795, at *4 (M.D. Fla. Oct. 1, 2015) (Declining to consider "excerpts from a third-party website" on the ground that a defendant "'must attach the entirety of the document, not just excerpts' or summaries, because it is not possible to determine a document's authenticity or accuracy without a complete picture." (ellipsis and citation omitted). Therefore, Defendant's Motion to Dismiss based on language referenced in the purported contracts and documents would be an attempted short-cut of the Court's function.


   II. **Plaintiff's Amended Statement of Claim States a Cause of Action for Violation of FDUPTA**

Defendant does not suggest that Plaintiff's Complaint has failed to plead the elements of a cause of action for FDUTPA.  In reviewing the complaint in the light most favorable to the Plaintiff, courts have held that misrepresentations regarding similar charges support FDUTPA claims. See, e.g., <u>James D. Hinson Elec. Contracting Co., Inc. v. Bell South Telecommunications, Inc.</u>, 796 F.Supp.2d 1341, 1353 (M.D. Fla. 2011) (inclusion of unrecoverable charges for "claims processing" in costs of damage to underground facilities billed to excavators); <u>Turner Greenberg Assocs., Inc. v. Pathman</u>, 885 So.2d 1004, 1008 (Fla. 4th DCA 2004) (furniture store's collection of a freight/insurance charge in connection with financed furniture sales was a "[A] claim for damages under FDUTPA has three elements: (1) a deceptive act or unfair practice; (2) causation; and (3) actual damages."). *See also* <u>Rollins v. Butland</u>, 951 So. 2d 860, 867-69 (Fla. 2d DCA 2006).  Plaintiffs' amended statement of claim has pled the necessary elements under Florida law. See paragraphs 50-63 of the amended statement of claim. In <u>Gundel v. AV Homes, Inc.</u>, 290 So. 3d 1080 (Fla. 2d DCA 2020), the Second District Court of Appeal reiterated the law of Florida that reliance is not an element of a claim for damages under the FDUTPA.

Moreover, FDUTPA claims can be based on deceptive or unfair practices that do not involve fraud ... and need not be pled with particularity. S<u>IG, Inc. v. AT & T Digital Life, Inc.</u>, 971 F.Supp.2d 1178, 1195 (S.D. Fla. 2013); See <u>Perret v. Wyndham Vacation Resorts, Inc.</u>, 846 F.Supp.2d 1327, 1333 (S.D.Fla.2012); <u>Hill v. Hoover Co.</u>, 899 F.Supp.2d 1259, 1263 (N.D.Fla. 2012). Courts routinely refuse to excise "in line item fashion" portions of a complaint where the claim at hand is otherwise adequately stated. See, e.g., <u>Fox v. Loews Corp.</u>, 309 F. Supp. 3d 1241, 1251 (S.D. Fla. 2018); <u>Mansoorian v. Brock & Scott, PLLC</u>, No. 8:18-cv-1876-T33TGW, 2018 WL 6413484, at *5 (M.D. Fla. Dec. 6, 2018) (denying motion to dismiss and refusing to strike certain allegations "merely because [defendant]contends that some of the allegations are insufficient" and even though plaintiffs "may not be entitled to relief on all claims." Because the statute is designed to protect consumers, the scope of the conduct that may constitute an "unfair or deceptive" practice is "extremely broad." <u>Day v. Le–Jo Enters., Inc.</u>, 521 So. 2d 175, 177 (Fla. 3d DCA 1988). A "claim under FDUTPA is not defined by the express terms of a contract, but instead encompasses unfair and deceptive practices arising out of business relationships." See <u>Siever v. BWGaskets, Inc.</u>, 669 F. Supp. 2d 1286, 1293 (M.D. Fla. 2009).

Whether a practice is "deceptive or unfair" is determined by an objective analysis, and ordinarily is a question of fact for the jury to determine. See Calderon v. Sixt Rental Car, LLC, 2020 WL 700381 (S.D.Fla. 2020). In Calderon, the plaintiff alleged that Sixt Rental attempted to merge the two contracts in order to perpetuate their "systematic scheme" of charging customers fraudulent fees to bring in additional revenue. The Court held that the complaint states a cause of action based on the allegation of an illegal profit scheme through the use of "fees". Similarly in in Deere Construction, LLC v. Cemex Construction Materials Fla., LLC, 198 F.Supp.3d 1332 (S.D.Fla., 2016), the district court in ruling on the viability of a FDUPTA claim held that:

> [W]ith regard to the claimed deceptive act or unfair practice, the Amended Complaint makes abundantly clear Plaintiff's claim is not that it did not know about the "fuel surcharge" and "environmental charge. Those fees are undoubtedly disclosed in the agreement and Defendants' invoices. What is allegedly deceptive is that the so called "fuel surcharges" and "environmental charges," labeled as such by Defendants, were not in fact designed to cover anything related to fuel or the environment. Defendants chose the two adjectives that describe the fees being assessed. Each adjective carries meaning. But the messages, according to Plaintiff, are deceptive." Id. at 1338 (emphasis added).

The amended statement of claim alleges that AT&T kept the fee for itself, as additional revenue, and did not use it to defray expenses.  For example, it is alleged in paragraph 18:

**"The so-called Administrative Fee is not, in fact, a bona fide administrative fee, but rather is simply a means for AT&T to charge more per month for the service itself without having to advertise the higher prices as a scheme to increase revenue. AT&T Mobility, LLC's previous in court public admissions (filed by its corporate counsel, Patricia Cruz, Esq.) to the conduct alleged via its filing of its "consent to payment for conduct for the claims**

asserted or which could have been asserted" in the cases of Erin Young v. AT&T Mobility, LLC, Case No. 2019-2027-SP-26, EFiling#87601121 or Tamara Crespo v. AT&T Mobility, LLC, Case No. 2019-2026-SP26, E-Filing#87600869 both of which alleged AT&T's violation of FDUTPA for illegal data throttling and bogus administrative fee, is further evidence of AT&T Mobility, LLC's illegal, immoral and unethical conduct."

Hence, at its core, the issue is whether, as a matter of fact, AT&T used the administrative fee to defray expenses paid to third parties, or whether it kept it for itself. This presents a fact question that cannot be resolved on a motion to dismiss the complaints. See Advance Mold Servs. v. Universal N. Am. Ins. Co., 2023 WL 8793260 (Fla. 3d DCA Dec. 20, 2023). In Advance Mold Servs., the defendant moved to dismiss an assignee's breach of insurance contract action, contending that a fee designated on an estimate as "Hazardous Waste/Mold Cleaning Supervisory/Admin-per hour" constituted a statutorily prohibited "administrative fee." The plaintiff asserted that the fee was used to 23 | Page pay a supervisor and not as a clerical fee associated with administering the contract. This court held that a question of fact existed, precluding dismissal of complaint, as to whether the fee constituted an "administrative fee."

The Third District Court of Appeal's decision in Advance Mold Servs. is on point. Here, a fact question exists as to whether the administrative fee was what it was represented to be: a fee assessed to defray or recover expenses AT&T pays to third parties associated with providing wireless service. The issue of whether AT&T uses the revenue generated from the administrative fee to defray or recover such expenses, or instead keeps it for itself, is one of fact that cannot be determined on a motion to dismiss the complaint. The allegations of Plaintiff's Count I clearly state a cause of action for FDUPTA violation for damages and Defendant's Motion to Dismiss Said Count is DENIED.

III. **Plaintiff's Amended Statement of Claim States a Cause of Action for Declaratory Relief**

In Imperial Fire & Cas. Ins. Co. v. Acosta, 337 So. 3d 89, 92 (Fla. 3d DCA 2021), the Third District Court of Appeal held that a viable complaint for declaratory relief must allege, at a minimum, that: "(1) there is a bona fide dispute between the parties; (2) the plaintiff has a justiciable question as to the existence or nonexistence

of some right, status, immunity, power or privilege, or as to some fact upon which existence of such a claim may depend; (3) the plaintiff is in doubt as to the claim; and (4) there is a bona fide, actual, present need for the declaration." <u>Ribaya</u>, 162 So. 3d at 352. A review of the amended statement of claim shows that Plaintiff has pled the necessary elements for declaratory relief under Florida law. Moreover, the FDUTPA statute itself recognizes a claim for declaratory relief. See <u>Orkin Exterminating Co. v. Petsch</u>, 872 So. 2d 259, 264 (Fla. 2d DCA 2004) (Florida Statutes section "501.211(1) authorizes injunctive relief, even if that relief does not benefit the customer who filed the suit."); <u>Schauer v. Morse Operations, Inc.</u>, 5 So. 3d 2 (Fla. 4th DCA 2009) (noting that section "501.211 provides that a person aggrieved by a violation of FDUTPA may obtain a declaratory judgment that an act or practice violates FDUTPA"). Defendant's Motion takes no issue as to whether Plaintiff has properly pled a claim for declaratory relief under FDUTPA. Therefore, Plaintiff has stated a cause of action for declaratory relief under FDUTPA and Defendant's Motion to Dismiss is DENIED.

## IV. **Plaintiff's Amended Statement of Claim States a Cause of Action for Unjust Enrichment**

Defendant takes no issue as to whether Plaintiff has pled a claim for unjust enrichment but instead relies on documents outside the four (4) corners of the pleading. The plaintiff can allege the existence of a contract and simultaneously plead unjust enrichment in the alternative, pending proof of an express contract concerning the same subject matter. <u>See</u> <u>Bowe</u>, 2014 U.S. Dist. LEXIS 19556 at 12 (defendant's motion to dismiss unjust enrichment count held to be premature because it is "upon a showing that an express contract exists that the unjust enrichment count fails"), quoting <u>Martorella v. Deutsche Bank Nat'l Trust Co.</u>, 931 F.Supp. 2d 1218, 1228 (S.D. Fla. 2013); <u>Real Estate Value Co., Inc. v. Carnival Corp.</u>, 92 So. 3d 255, 263 (Fla. 3d DCA 2012) ("Under Florida law, a party may simultaneously allege the existence of an express contract and alternatively plead a claim for unjust enrichment…. Of course, upon a showing that an express contract concerning the same subject matter exists, the unjust enrichment claim necessarily fails," citing <u>Hazen v. Cobb</u>, 96 Fla. 151, 117 So. 853, 857- 58 (1928)); <u>Williams v. Bear Stearns & Co.</u>, 725 So. 2d 397, 400 (Fla. 5th DCA 1998) ("Until an express contract is proven, a motion to dismiss a claim for… unjust enrichment… is premature"). If an express contract is proven, the Court will entertain dismissal of the unjust enrichment count if not withdrawn by Plaintiff.

## V. **Pre-emption Does not Apply Based on the Allegations of the Amended Statement of Claim**

While a defendant may assert preemption on a motion to dismiss, the court must determine the issue as a matter of law based only on the well-pleaded allegations in the complaint, assuming the facts asserted.  *See* Hanft v. Phelan, 488 So.2d 531, 532 n. 1 (Fla.1986); Boca Burger, Inc. v. F., 912 So. 2d 561, 568–69 (Fla. 2005), as revised on denial of reh'g (Sept. 29, 2005).  Nowhere in the well-pled complaint is there any reference to or even a discussion of the Federal Communications Act or the basis of Defendant's preemption defense.  In fact, paragraph 5 of the amended statement of claim states that "this claim is not preempted by any federal statute."  Based on the four-corners of the complaint and viewing the allegations in the light most favorable to the Plaintiff, Defendant's claim of preemption fails as a matter of law on a motion to dismiss.

## CONCLUSION

As stated above, a motion to dismiss tests only the legal sufficiency of a complaint and it is not intended to determine issues of ultimate fact, and the court is confined to the well-pled facts contained within in the four corners of the complaint." Lewis v. Barnett Bank of S. Florida, N.A., supra. The question for this Court to decide is whether, assuming the well-pleaded factual allegations in the amended statement of claim are true, Plaintiff would be entitled to the relief requested. In light of the analysis set forth above, this Court finds that Plaintiff states a cause of action  as to Counts 1-3 and therefore Defendant's motion to dismiss is hereby DENIED.

Defendant shall serve its answer within 10 days from the date of this order.

**DONE** and **ORDERED** in Chambers at Miami-Dade County, Florida on this 6th day of February, 2024.

2022-047425-SP-25 02-06-2024 1:25 PM
Hon. Patricia Marino Pedraza

**COUNTY COURT JUDGE**
Electronically Signed

No Further Judicial Action Required on **THIS MOTION**

CLERK TO **RECLOSE** CASE IF POST JUDGMENT

**Electronically Served:**
Andrew R. Ingalls, aingalls@daypitney.com
Andrew R. Ingalls, brodriguez@daypitney.com
Evelyn Davila, edavila@daypitney.com
Jessica Solorzano, jsolorzano@daypitney.com
Kenneth B Schurr, kbsservice@schurrlaw.com
Manuel A. Garcia-Linares, mgarcialinares@daypitney.com
Manuel A. Garcia-Linares, athomsen@daypitney.com
Maury L. Udell, notice66@bmulaw.com
Maury L. Udell, blopez@bmulaw.com

**Physically Served:**

Case 1:25-cv-20381-RAR   Document 1-2   Entered on FLSD Docket 01/27/2025   Page 753 of 1553

**IN THE COUNTY COURT OF THE ELEVENTH JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA**

CASE NO: 2020-024852-SP-26
SECTION: SD03
JUDGE: Gloria Gonzalez-Meyer

**Blackstone Medical Services**

Plaintiff(s) / Petitioner(s)

vs.

**AT&T Mobility LLC**

Defendant(s) / Respondent(s)

_____/

## ORDER ON DEFENDANT'S MOTION TO DISMISS

THIS CAUSE having come before the Court on Defendant's Motion to Dismiss on June 23, 2022, having heard argument of counsel, having fully reviewed the record and materials and case law submitted by the parties, and being otherwise fully advised in the premises therein, it is hereby

ORDERED AND ADJUDGED as follows:

## FACTUAL BACKGROUND

1. Plaintiff filed an amended statement of claim on April 6, 2021 [D.E.13] which pled six (6) counts: Fraud, FDUTPA violation, Declaratory Relief under FDUTPA, Breach of Contract, Good Faith and Fair Dealing, Unjust Enrichment and Pure Bill of Discovery.

2. For the following reasons, AT&T's motion to dismiss is **DENIED. LEGAL STANDARD**

Generally, a motion to dismiss tests only the legal sufficiency of a complaint and it is not intended to determine issues of ultimate fact. "[T]he trial court is necessarily confined to the well-pled facts alleged in the four corners of the complaint." Lewis v. Barnett Bank of S. Florida, N.A., 604 So. 2d 937 (Fla. 3d DCA 1992). The primary purpose of a motion to dismiss is to request the trial court to determine whether the complaint properly states a cause of action upon which relief can be granted and, if it does not, to enter an order of dismissal. Provence v. Palm Beach Taverns, Inc., 676 So. 2d 1022 (Fla. 4th DCA 1996).

The court must draw all reasonable inferences in favor of the nonmoving party. Id. Thus, the question for this Court to decide is whether, assuming the well-pleaded factual allegations in the amended statement of claim are true, Plaintiff would be entitled to the relief requested. A motion to dismiss that attempts to contest the merits of the claims is procedurally improper. See Hill v. Murphy, 872 So. 2d 919, 921 (Fla. 2d DCA 2003); see also HSBC Bank USA, N.A. v. Nelson, 246 So. 3d 486, 489 (Fla. 2d DCA 2018) ("[m]otions to dismiss and for summary judgment are not interchangeable, and may not be substituted for another").

I. **The Court Cannot Rely on Documents not Attached to the Complaint in Ruling on a Motion to Dismiss**

A trial court may not rely on any documents that are not attached to the complaint when considering the motion to dismiss. Kidwell Grp., LLC. v. Am. Integrity Ins. Co. of Fla., No. 5D21-1000, 2022 WL 1694905, at *1 (Fla. 2d DCA 2022). AT&T has provided no case law to support its claim that something outside

the pleadings can be considered on a **motion to dismiss**. The authenticity of AT&T's document and website referenced in AT&T's motion—as well as the question whether the complete website is appended to the motion, cannot be verified and therefore cannot be considered on a motion to dismiss. See also Legacy Entm't Grp., LLC v. Endemol USA, 2015 WL 12838795, at *4 (M.D. Fla. Oct. 1, 2015) (Declining to consider "excerpts from a third-party website" on the ground that a defendant "'must attach the entirety of the document, not just excerpts' or summaries, because it is not possible to determine a document's authenticity or accuracy without a complete picture." (ellipsis and citation omitted).   Therefore, Defendant's Motion to Dismiss based on language referenced in the purported contract would be an attempted short-cut of the Court's function.

## II. <u>**Plaintiff's Amended Statement of Claim States a Cause of Action for Violation of FDUPTA**</u>

### A. **Administrative Fee**

Courts have held that misrepresentations regarding similar charges support FDUTPA claims. See, e.g., James D. Hinson Elec. Contracting Co., Inc. v. Bell South Telecommunications, Inc., 796 F.Supp.2d 1341, 1353 (M.D. Fla. 2011) (inclusion of unrecoverable charges for "claims processing" in costs of damage to underground facilities billed to excavators); Turner Greenberg Assocs., Inc. v. Pathman, 885 So.2d 1004, 1008 (Fla. 4th DCA 2004) (furniture store's collection of a freight/insurance charge in connection with financed furniture sales was a

deceptive and unfair trade practice; fee was in reality a customer surcharge)."

"[A] claim for damages under FDUTPA has three elements: (1) a deceptive act or unfair practice; (2) causation; and (3) actual damages."). See also See also Rollins v. Butland, 951 So. 2d 860, 867-69 (Fla. 2d DCA 2006). Plaintiffs' amended statement of claim has pled the necessary elements under Florida law. See paragraphs 50-63 of the amended statement of claim. In Gundel v. AV Homes, Inc., 290 So. 3d 1080 (Fla. 2d DCA 2020), the Second District Court of Appeal reiterated the law of Florida that reliance is not an element of a claim for damages under the FDUTPA.

Moreover, FDUTPA claims can be based on deceptive or unfair practices that do not involve fraud ... and need not be pled with particularity. *SIG, Inc. v. AT & T Digital Life, Inc.,* 971 F.Supp.2d 1178, 1195 (S.D. Fla. 2013); *See Perret v. Wyndham Vacation Resorts, Inc.,* 846 F.Supp.2d 1327, 1333 (S.D.Fla.2012); *Hill v. Hoover Co.,* 899 F.Supp.2d 1259, 1263 (N.D.Fla. 2012). Courts routinely refuse to excise "in line-item fashion" portions of a complaint where the claim at hand is otherwise adequately stated. *See, e.g.*, Fox v. Loews Corp., 309 F. Supp. 3d 1241, 1251 (S.D. Fla. 2018); Mansoorian v. Brock & Scott, PLLC, No. 8:18-cv-1876-T-33TGW, 2018 WL 6413484, at *5 (M.D. Fla. Dec. 6, 2018) (denying motion to dismiss and refusing to strike certain allegations "merely because [defendant] contends that some of the allegations are insufficient" and even though plaintiffs "may not be entitled to

Relief on all claims."

Because the statute is designed to protect consumers, the scope of the conduct that may constitute an "unfair or deceptive" practice is "extremely broad." Day v. Le–Jo Enters., Inc., 521 So. 2d 175, 177 (Fla. 3d DCA 1988) A "claim under FDUTPA is not defined by the express terms of a contract, but instead encompasses unfair and deceptive practices arising out of bu[...] relationships." *See* Siever v. BWGaskets, Inc., 669 F. Supp. 2d 1286, 1293 (M.D. Fla. 2009). Moreover, whether a practice is "deceptive or unfair" is determined by an objective analysis, and ordinarily is a **question of fact for the jury** to determine. See Calderon v. Sixt Rental Car, LLC, 2020 WL 700381 (S.D.Fla. 2020). In Calderon, the plaintiff alleged that Sixt Rental attempted to merge the two contracts *in order to* perpetuate their "systematic scheme" of charging customers fraudulent fees to bring in additional revenue. The Court held that the complaint states a cause of action based on the allegation of an illegal profit scheme through the use of "fees". Similarly in in Deere Construction, LLC v. Cemex Construction Materials Fla., LLC, 198 F.Supp.3d 1332 (S.D.Fla., 2016), the district court in ruling on the viability of a FDUPTA claim held that:

> "[w]ith regard to the claimed deceptive act or unfair practice, the Amended Complaint makes abundantly clear Plaintiff's claim is not that it did not know about the "fuel surcharge" and "environmental charge. Those fees are undoubtedly disclosed in the agreement and Defendants' invoices. What is allegedly deceptive is that the so-called "fuel surcharges" and "environmental charges," labeled as such by Defendants, **were not in fact designed to cover**

**anything related to fuel or the environment.** Defendants chose the two adjectives that describe the fees being assessed. ***Each adjective carries meaning***. But the messages, according to Plaintiff, are deceptive." Id. at 1338 (emphasis added). Such allegations stated a cause of action for FDUPTA violation."

B. **Data Throttling**

The essence and substance of Plaintiff's claim as alleged in the amended statement of claim for FDUTPA violation against AT&T is that AT&T purportedly promised "unlimited data" but by throttling Plaintiff's data to the point where it was non-usable, violated the FDUPTA because unlimited didn't truly mean, unlimited. In Plaintiff alleged that "AT&T possesses internal focus group research indicating that its throttling program was inconsistent with consumer understanding of an "unlimited" data plan." Plaintiff alleged that "AT&T's wireless customer agreements do not state that an unlimited mobile data plan customer's use of more than a specified amount of data is a prohibited activity. Nor do the agreements provide that AT&T may modify, diminish, or impair the service of unlimited mobile data plan customers engaged in permissible activities if these customers use more than a specified amount of data." Plaintiff also alleged that "AT&T imposed significant data speed restrictions on Plaintiff by virtue of its use of its network which flows through the United States and in particular, Florida. This practice was and is an unfair and deceptive trade practice and is specifically. Lastly, Plaintiff alleged that it suffered actual damages as a result of the violation of FDUTPA. Where the FTC has already found "data throttling" a violation of the FTC, the Court must by law give

consideration to such a finding in construing whether data throttling is a violation of FDUTPA.  Fla. Stat. Sec. 501.204(2) states:

> It is the intent of the Legislature that, **in construing subsection (1), due consideration and great weight shall be given to the interpretations of the Federal Trade Commission and the federal courts relating to s. 5(a)(1) of the Federal Trade Commission Act, 15 U.S.C. s. 45(a)(1) as of July 1, 2017**.

> See Sec. 501.204(2), Fla. Stat. (emphasis added).

Slowing one's data speed to the point of limiting access to using data is not providing unlimited data.  Plaintiff has pled specifically the elements of a FDUTPA claim with respect to data throttling.

III. **Plaintiff's Amended Statement of Claim States a Cause of Action for Declaratory Relief Under FDUTPA**

In <u>Imperial Fire & Cas. Ins. Co. v. Acosta</u>, 337 So. 3d 89, 92 (Fla. 3d DCA 2021), the Third District Court of Appeal held that a viable complaint for declaratory relief must allege, at a minimum, that:

> "(1) there is a bona fide dispute between the parties; (2) the plaintiff has a justiciable question as to the existence or nonexistence of some right, status, immunity, power or privilege, or as to some fact upon which existence of such a claim may depend; (3) the plaintiff is in doubt as to the claim; and (4) there is a bona fide, actual, present need for

the declaration."

*Ribaya*, 162 So. 3d at 352.

A review of the amended statement of claim shows that Plaintiff has pled the necessary elements for declaratory relief under Florida law.  Moreover, the FDUTPA statute itself recognizes a claim for declaratory relief.  *See Orkin Exterminating Co. v. Petsch*, 872 So. 2d 259, 264 (Fla. 2d DCA 2004) (Florida Statutes section "501.211(1) authorizes injunctive relief, even if that relief does not benefit the customer who filed the suit."); *Schauer v. Morse Operations, Inc.*, 5 So. 3d 2 (Fla. 4th DCA 2009) (noting that section "501.211 provides that a person aggrieved by a violation of FDUTPA may obtain a declaratory judgment that an act or practice violates FDUTPA").  Therefore, Plaintiff has stated a cause of action for declaratory relief under FDUTPA.

IV. **Plaintiff has Sufficiently Pled a Cause of Action for Fraud**

-

Fraud involves "a departure from fundamental honesty, moral uprightness, or fair play," United States v. Ragosta, 970 F.2d 1085, 1090 (2d Cir. 1992) (quoting United States v. Goldblatt, 813 F.2d 619, 624 (3d Cir. 1987)), and depriving one of property through "dishonest methods or schemes" or "trick, deceit, chicane or overreaching," *Id.* (internal quotation marks omitted).  AT&T's Motion simply conflates an incorrect theory that a FDUTPA claim must include a claim for fraud or

that because the court did not reference all allegations of fraud that somehow Plaintiff failed to state a cause of action. In order to plead a claim for fraud, a plaintiff must plead that Defendant 1) misrepresented a material fact, 2) knew or should have known of the falsity of the statement, 3) intended that the misrepresentation would induce Plaintiff to rely and act on it and 4) that Plaintiff suffered injury in justifiable reliance on the misrepresentation. Witt v. La Gorce, 35 So. 3d 1033 (Fla. 3d DCA 2010). Whether a party has made intentional fraudulent misrepresentations is a question of fact. See D & M Jupiter, Inc. v. Friedopfer, 853 So. 2d 485 (Fla. 4th DCA  2003); Jenne v. Broward Serv. Ctr., Inc., 717 So. 2d 585, 586 (Fla. 4th DCA 1998). Once Plaintiff presented evidence as to the elements of fraud in the inducement, it was within the fact finder's province to determine whether fraud existed. *See* Lou Bachrodt Chevrolet, Inc. v. Savage, 570 So. 2d 306, 308 (Fla. 4th DCA 1990).  Plaintiff properly pled the first element: a misrepresentation of a material fact.  Plaintiff properly pled the second element: knowledge by the person making the statement that the representation is false. Plaintiff has alleged knowledge by the Defendant that the statement and representation was false. Plaintiff properly pled the third element: intent by the person making the statement that the representation would induce another to rely and act on it. Plaintiff has alleged intent by the Defendant that the representation would induce Plaintiff and other customers to rely and act on it, thus Plaintiff has satisfied the third element: Through its misrepresentations, Defendant intended to induce Plaintiff to pay Defendant for cell phone and data services.  Plaintiff properly pled the fourth element: that the plaintiff suffered injury in justifiable reliance on the representation.

While the Court is aware of the cases that stand for the proposition that "fraud must be plead with sufficient particularity". the circumstances constituting fraud or mistake shall be stated with such particularity *as the circumstances may permit."* Bankers Mut. Captial Corp. v. U.S. Fidelity and Guar. Co., 784 So. 2d 485 (Fla. 4th DCA 2001). *See also* Fla. R. Civ. P. 1.120(b) (In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with such particularity as the circumstances may permit. Malice, intent, knowledge, mental attitude, and other condition of mind of a person may be averred generally.)  The <u>Bankers</u> court found that the complaint clearly met the requisite particularity because the complaint clearly stated who made the misrepresentation, when the misrepresentation was made, and who the misrepresentations were made to. 784 So. 2d 485, at 490.

V. **<u>Plaintiff Stated A Cause of Action for Breach of Implied Covenant of Good Faith and Fair Dealing</u>**

Florida                  contract                  law                  r
covenant     of good faith and fair dealing in every contract Cty. of Brevard v. Miorelli Eng'g, Inc., 703 So. 2d 1049, 1050 (Fla. 1997) (" '[E]very contract includes an implied covenant that the parties will perform in good faith.' " quoting Champagne– Webber, Inc. v. City of Fort Lauderdale, 519 So. 2d 696, 697 (Fla. 4th DCA 1988)); Ins. Concepts & Design, Inc. v. Healthplan Servs., Inc., 785 So. 2d 1232, 1234–35 (Fla. 4th DCA 2001). The     implied     covenant of good faith and fair dealing is designed to protect the contracting parties'

reasonable expectations. Speedway Super America, LLC v. Tropic Enters., Inc., 966 So. 2d 1, 3 (Fla. 2d DCA 2007). Plaintiff has stated a proper claim for breach of contract for implied covenant of good faith and fair dealing in that he has also alleged that an express term of the contract has been breached. See Flagship Resort Development Corp. v. Interval Intern, Inc., 28 So. 3d 915 (Fla. 3d DCA 2010). Plaintiff has specifically pled that AT&T breached the express provision of the contract (i.e., failing to provide unlimited data) and therefore Plaintiff has properly pled a cause of action for breach of implied covenant of fair dealing.

### VI. **Plaintiff has Properly Pled a Caues of Action for Unjust Enrichment**

For purposes of a motion to dismiss, Plaintiff has stated a cause of action for unjust enrichment. However, if an express contract is later made part of the record, the court will entertain a subsequent motion to dismiss this Count if not withdrawn by Plaintiff.

### VII. **Plaintiff has Properly Pled a Claim for Pure Bill of Discovery**

A pure bill of discovery, although rarely needed, is still an authorized proceeding. See Lewis v. Weaver, 989 So. 2d 586 (Fla 4th DCA 2007).    A pure bill of discovery "lies to obtain the disclosure of facts within the defendant's knowledge, or deeds or writings or other things in his custody, in aid of the prosecution.  See, Publix Super Markets v. Frazier, 696 So. 2d 1369 (Fla. 4th DCA 1997).    In RAV Bahamas Ltd., v. Marlin Three, LLC, the Third District Court of Appeal held "[I]n the absence of an adequate legal remedy, equity has long authorized a pure bill of discovery as an appropriate remedy to obtain information such as the identity of a proper party defendant or the appropriate legal theory for relief." Trak Microwave Corp. v. Culley, 728 So. 2d 1177, 1178 (Fla. 2d DCA 1998). A bill of discovery may also be used "to obtain information necessary for meeting a condition precedent to filing suit." Mendez v. Cochran, 700 So. 2d 46, 47 (Fla. 4th DCA 1997).

The pure bill remains available to "identify potential defendants and theories of liability," but "may not be used 'as a fishing expedition to see if cause of action exist.' " Mendez v. Cochran, 700 So. 2d 46, 47 (Fla. 4th DCA 1997) quoting Publix Supermarkets, Inc.

In the instant case, Plaintiff's pure bill of discovery, as pled in Count VI of the Amended Statement of Claim, alleges that the discovery is required to determine the proper parties against whom relief will and should be sought, etc., and whether AT&T collected Plaintiff's (and other consumer's geolocation data and disseminated

same to third-parties, despite the alleged agreement not to disseminate same, etc.) Plaintiff further alleges that AT&T is in sole possession of this information; that Plaintiff has no other means of obtaining the necessary information, and that said information was requested of Defendant, to no avail.  See Amended Statement of Claim at pgs. 20-22.

A pure bill of discovery should be granted if there is some reasonable basis to believe that discovery in a later damages action would be inadequate or too late to vindicate the litigant's right to evidence; when that has been made to appear, the pure bill allows a putative plaintiff to obtain the disclosure of facts within the defendant's knowledge, or deeds or writings or other things in the defendant's custody, in aid of the prosecution or defense of an action pending or about to be commenced.  Lewis v. Weaver, supra.   Hence, Defendant's motion to dismiss Count VI is denied and Defendant shall serve its answer within 20 days from the date of this order.

## CONCLUSION

 As stated above, a motion to dismiss tests only the legal sufficiency of a complaint and it is not intended to determine issues of ultimate fact, and the court is confined to the well-pled facts contained within in the four corners of the complaint." Lewis v. Barnett Bank of S. Florida, N.A., supra.  The question for this Court to decide is whether, assuming the well-pleaded factual allegations in the amended statement of claim are true, Plaintiff would be entitled to the relief requested.  In light of the Count-by-Count analysis set forth above, this Court finds that Counts I-VI state a cause of action and therefore Defendant's motion to dismiss is hereby DENIED. Defendant shall serve its answer to Counts I-VI within 20 days from the date of this order.

**DONE** and **ORDERED** in Chambers at Miami-Dade County, Florida on this <u>16th day of July, 2022</u>.

<u>2020-024852-SP-26 07-16-2022 4:39 PM</u>
Hon. Gloria Gonzalez-Meyer

**COUNTY COURT JUDGE**
Electronically Signed

---

No Further Judicial Action Required on **THIS MOTION**

CLERK TO **RECLOSE** CASE IF POST JUDGMENT

---

**Electronically Served:**
Andrew R. Ingalls, aingalls@daypitney.com
Andrew R. Ingalls, brodriguez@daypitney.com
Evelyn Davila, edavila@daypitney.com
Jessica Solorzano, jsolorzano@daypitney.com
Kenneth B Schurr, kbsservice@schurrlaw.com
Kenneth Schurr, counselken@schurrlaw.com
Manuel A. Garcia-Linares, mgarcialinares@daypitney.com
Manuel A. Garcia-Linares, athomsen@daypitney.com
Maury L Udell, notice66@bmulaw.com
Maury L Udell, blopez@bmulaw.com
Rachel L. Kittl, rkittl@bmulaw.com


**Physically Served:**

Case 1:25-cv-20381-RAR   Document 1-2   Entered on FLSD Docket 01/27/2025   Page 767 of 1553

**IN THE COUNTY COURT OF THE ELEVENTH JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA**

CASE NO: 2022-047430-SP-25
SECTION: CG02
JUDGE: Gloria Gonzalez-Meyer

**Adam Spring**

Plaintiff(s) / Petitioner(s)

vs.

**AT&T Mobility, LLC**

Defendant(s) / Respondent(s)

_____/

## ORDER DENYING MOTION TO DISMISS

Docket Number: 23

Date Filed: (4/24/23)

Full Name of Motion: AT&T Mobility LLC's Motion to Dismiss Plaintiff's Amended Statement of Claim

THIS CAUSE having come before the Court on Defendant's Motion to Dismiss Amended Statement of Claim on July 25, 2023, having heard argument of counsel, having fully reviewed the record and materials and case law submitted by the parties, and being otherwise fully advised in the premises therein, it is hereby:

## FACTUAL BACKGROUND

Plaintiff filed an amended statement of claim on 1 [D.E.13] which pled two (2) counts: FDUTPA and Unjust Enrichment. For the following reasons AT&T's Motion to Dismiss Amended Statement of Claim is DENIED.

## LEGAL STANDARD

Generally, a motion to dismiss tests only the legal sufficiency of a complaint and it is not intended to determine issues of ultimate fact. "[T]he trial court is necessarily confined to the well-pled facts alleged in the four corners of the complaint." Lewis v. Barnett Bank of S. Florida, N.A., 604 So. 2d 937 (Fla. 3d DCA 1992). The primary purpose of a motion to dismiss is to request the trial court to determine whether the complaint properly states a cause of action upon which relief can be granted and, if it does not, to enter an order of dismissal. Provence v. Palm Beach Taverns, Inc., 676 So. 2d 1022 (Fla. 4th DCA 1996).

The court must draw all reasonable inferences in favor of the nonmoving party. *Id.* Thus, the question for this Court to decide is whether, assuming the well pleaded factual allegations in the amended statement of claim are true, Plaintiff would be entitled to the relief requested. A motion to dismiss that attempts to contest the merits of the claims is procedurally improper. *See* Hill v. Murphy, 872 So. 2d 919, 921 (Fla. 2d DCA 2003); *see also* HSBC Bank USA, N.A. v. Nelson, 246 So.3d 486, 489 (Fla. 2d DCA 2018) ("[m]otions to dismiss and for summary judgment are not interchangeable, and may not be substituted for another").

## ANALYSIS

### I. **This Court Cannot Rely Unauthenticated Documents not Attached to the Complaint in Ruling on a Motion to Dismiss**

A trial court may not rely on any documents that are not attached to the complaint when considering the motion to dismiss. Kidwell Grp., LLC. v. Am. Integrity Ins. Co. of Fla., 339 So. 3d 1068 (Fla. 2d DCA 2022). AT&T has provided no case law to support its claim that something outside the pleadings can be considered on a motion to dismiss. The authenticity of AT&T's documents and website referenced in AT&T's motion—as well as the question whether the complete website is appended to the motion, cannot be verified and therefore cannot be considered on a motion to dismiss. See  Legacy Entm't Grp., LLC v. Endemol USA, 2015 WL 12838795, at *4 (M.D. Fla. Oct. 1, 2015) (Declining to consider "excerpts from a third-party website" on the ground that a defendant "'must attach the entirety of the document, not just excerpts' or summaries, because it is not possible to determine a document's authenticity or  accuracy without a complete picture." (ellipsis and citation omitted). Therefore, Defendant's Motion to Dismiss based on language referenced in the purported contracts and documents would be an attempted short-cut of the Court's function.

II. **Plaintiff's Amended Statement of Claim States a Cause of Action for Violation of FDUPTA I**


Administrative Fee. Courts have held that misrepresentations regarding similar charges support FDUTPA claims. See, e.g., Hinson D. Elec. Contracting Co., Inc. v. Bell South Telecommunications, Inc., 796 F.Supp.2d 1341, 1353 (M.D. Fla. 2011) (inclusion of unrecoverable charges for "claims processing" in costs of damage to underground facilities billed to excavators); Turner Greenberg Assocs., Inc. v. Pathman, 885 So.2d 1004, 1008 (Fla. 4th DCA 2004) (furniture store's collection of a freight/insurance charge in connection with financed furniture sales was a "[A] claim for damages under FDUTPA has three elements: (1) a deceptive act or unfair practice; (2) causation; and (3) actual damages."). *See also* Rollins v. Butland, 951 So. 2d 860, 867-69 (Fla. 2d DCA 2006).


Plaintiffs' amended statement of claim has pled the necessary elements under Florida law. See paragraphs 50-63 of the amended statement of claim.  In Gundel v. AV Homes, Inc., 290 So. 3d 1080 (Fla. 2d DCA 2020), the Second District Court of Appeal reiterated the law of Florida that reliance is not an element of a claim for damages under the FDUTPA. Moreover, FDUTPA claims can be based on deceptive or unfair practices that do not involve fraud ... and need not be pled with particularity. SIG, Inc. v. AT & T Digital Life, Inc., 971 F.Supp.2d 1178, 1195 (S.D. Fla. 2013); See Perret v. Wyndham Vacation Resorts, Inc., 846 F.Supp.2d 1327, 1333 (S.D.Fla.2012); Hill v. Hoover Co., 899 F.Supp.2d 1259, 1263 (N.D.Fla. 2012).  Courts routinely refuse to excise "in line-item fashion" portions of a complaint where the claim at hand is otherwise adequately stated. See, e.g., Fox v. Loews Corp., 309 F. Supp. 3d 1241, 1251 (S.D. Fla. 2018); Mansoorian v. Brock & Scott, PLLC, No. 8:18-cv-1876-T33TGW, 2018 WL 6413484, at *5 (M.D. Fla. Dec. 6, 2018) (denying motion to dismiss and refusing to strike certain allegations "merely because [defendant] contends that some of the allegations are insufficient" and even though plaintiffs "may not be entitled to relief on all claims."


Because the statute is designed to protect consumers, the scope of the conduct that may constitute an "unfair or deceptive" practice is "extremely broad." Day v. Le–Jo Enters., Inc., 521 So. 2d 175, 177 (Fla. 3d DCA 1988). A "claim under FDUTPA is not defined by the express terms of a contract, but instead encompasses unfair and deceptive practices arising out of business relationships." See Siever v. BWGaskets, Inc., 669 F. Supp. 2d 1286, 1293 (M.D. Fla. 2009). Moreover, whether a practice is "deceptive or unfair" is determined by an objective analysis, and ordinarily is a question of fact for the jury to determine. See Calderon v. Sixt Rental Car, LLC, 2020 WL 700381 (S.D.Fla. 2020).  In Calderon, the plaintiff alleged that Sixt Rental attempted to merge the two contracts in order to perpetuate their "systematic scheme" of charging customers fraudulent fees to bring in additional revenue.  The Court held that the complaint states a cause of action based on the allegation of an illegal profit scheme through the use of "fees".  Similarly in in

Deere Construction, LLC v. Cemex Construction Materials Fla., LLC, 198 F.Supp.3d 1332 (S.D.Fla., 2016), the district court in ruling on the viability of a FDUPTA claim held that:

> [W]ith regard to the claimed deceptive act or unfair practice, the Amended Complaint makes abundantly clear Plaintiff's claim is not that it did not know about the "fuel surcharge" and "environmental charge. Those fees are undoubtedly disclosed in the agreement and Defendants' invoices. What is allegedly deceptive is that the so-called "fuel surcharges" and "environmental charges," labeled as such by Defendants, were not in fact designed to cover anything related to fuel or the environment. Defendants chose the two adjectives that describe the fees being assessed. Each adjective carries meaning. But the messages, according to Plaintiff, are deceptive." Id. at 1338 (emphasis added).

The allegations of Plaintiff's Count I clearly states a cause of action for FDUPTA violation.

III. **Plaintiff's Amended Statement of Claim States a Cause of Action for Unjust Enrichment**

Defendant takes no issue as to whether Plaintiff has pled a claim for unjust enrichment. The plaintiff can allege the existence of a contract and simultaneously plead unjust enrichment in the alternative, pending proof of an express contract concerning the same subject matter. *See* Bowe, 2014 U.S. Dist. LEXIS 19556 at 12 (defendant's motion to dismiss unjust enrichment count held to be premature because it is "upon a showing that an express contract exists that the unjust enrichment count fails", quoting Martorella v. Deutsche Bank Nat'l Trust Co., 931 F. Supp. 2d 1218, 1228 (S.D. Fla. 2013); Real Estate Value Co., Inc. v. Carnival Corp., 92 So. 3d 255, 263 (Fla. 3d DCA 2012) ("Under Florida law, a party may simultaneously allege the existence of an express contract and alternatively plead a claim for unjust enrichment…. Of course, upon a showing that an express contract concerning the same subject matter exists, the unjust enrichment claim necessarily fails," citing Hazen v. Cobb, 96 Fla. 151, 117 So. 853, 857-58 (1928)); Williams v. Bear Stearns & Co., 725 So. 2d 397, 400 (Fla. 5th DCA 1998) ("Until an express contract is proven, a motion to dismiss a claim for… unjust enrichment… is premature"). If an express contract is proven, the Court will entertain dismissal of the unjust enrichment count if not withdrawn by Plaintiff.

**CONCLUSION**

As stated above, a motion to dismiss tests only the legal sufficiency of a complaint and it is not intended to determine issues of ultimate fact, and the court is confined to the well-pled facts contained within in the four corners of the complaint." Lewis v. Barnett Bank of S. Florida, N.A., supra.  The question for this Court to decide is whether, assuming the well-pleaded factual allegations in the amended statement of claim are true, Plaintiff would be entitled to the relief requested.  In light of the  analysis set forth above, this Court finds that Plaintiff states a cause of action and therefore Defendant's motion to dismiss is hereby DENIED.  Defendant shall serve its answer within 15 days from the date of this order.

**DONE** and **ORDERED** in Chambers at Miami-Dade County, Florida on this 26th day of July, 2023.

2022-047430-SP-25 07-26-2023 8:37 AM

2022-047430-SP-25 07-26-2023 8:37 AM
Hon. Gloria Gonzalez-Meyer

**COUNTY COURT JUDGE**
Electronically Signed

No Further Judicial Action Required on **THIS MOTION**

CLERK TO **RECLOSE** CASE IF POST JUDGMENT

**Electronically Served:**
Andrew R. Ingalls, aingalls@daypitney.com
Andrew R. Ingalls, brodriguez@daypitney.com
Evelyn Davila, edavila@daypitney.com
Jessica Solorzano, jsolorzano@daypitney.com
Kenneth B Schurr, kbsservice@schurrlaw.com
Manuel A. Garcia-Linares, mgarcialinares@daypitney.com
Manuel A. Garcia-Linares, athomsen@daypitney.com
Maury L. Udell, notice66@bmulaw.com
Maury L. Udell, blopez@bmulaw.com

**Physically Served:**

**IN THE COUNTY COURT OF THE ELEVENTH JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA**

CASE NO: 2019-017356-SP-23
SECTION: ND06
JUDGE: Ayana Harris

**Mary Lynn E Ghizzone**

Plaintiff(s) / Petitioner(s)

vs.

**A T & T Mobility (LLC)**

Defendant(s) / Respondent(s)

_____/

## ORDER DENYING MOTION TO DISMISS

**THIS CAUSE** having come before the Court on Defendant's Motion to Dismiss, and the Court having fully reviewed the record and materials and case law submitted by the parties, carefully listened to the arguments of counsel, and being otherwise fully advised in the premises, finds as follows:

### FACTUAL BACKGROUND

On February 28, 2020, Plaintiff filed an Amended Complaint alleging (1) Fraud; (2) Breach of Contract: Implied Duty of Good Faith and Fair Dealing; (3) FDUTPA violation; (4) and Unjust Enrichment.

On April 2, 2021, Defendant filled a Motion to Dismiss Amended Complaint.

For the following reasons, AT&T's motion to dismiss is **DENIED.**

### LEGAL STANDARD

A motion to dismiss examines the legal sufficiency of the plaintiff's complaint. *Grove Isle Association, Inc. v. Grove Isle Associates,* LLLP, 137 So. 3d 1081 (Fla. 3d DCA 2014). In order to rule on a motion to dismiss, a trial court must limit itself to the four corners of the plaintiff's complaint. *Id.* While examining the four corners of the complaint, the allegations are assumed to be true and must be construed using all reasonable inferences in favor of the nonmoving party. *Id.* A motion to dismiss tests the legal sufficiency of the claims being made and not the resolution of any factual disputes.

Thus, the question for this Court to decide is whether, assuming all well-pled factual allegations are true, Plaintiff would be entitled to the relief requested. A motion to dismiss that attempts to contest the merits of the claims is procedurally improper. *See Hill v. Murphy*, 872 So.

2d 919, 921 (Fla. 2d DCA 2003); *see also HSBC Bank USA, N.A. v. Nelson*, 246 So. 3d 486, 489 (Fla. 2d DCA 2018) ("[m]otions to dismiss and for summary judgment are not interchangeable, and may not be substituted for another").

A trial court may not rely on any documents that are not attached to the complaint when considering the motion to dismiss. *Kidwell Grp., LLC. v. Am. Integrity Ins. Co. of Fla.,* No. 5D21-1000, 2022 WL 1694905, at *1 (Fla. 2d DCA 2022).  AT&T has provided no case law to support its claim that something outside the pleadings can be considered on a motion to dismiss.  The authenticity of AT&T's document and website referenced in AT&T's motion—as well as the question whether the complete website is appended to the motion, cannot be verified and therefore cannot be considered on a motion to dismiss. *See also Legacy Entm't Grp., LLC v. Endemol USA,* 2015 WL 12838795, at *4 (M.D. Fla. Oct. 1, 2015) (Declining to consider "excerpts from a third-party website" on the ground that a defendant "'must attach the entirety of the document, not just excerpts' or summaries, because it is not possible to determine a document's authenticity or accuracy without a complete picture." (ellipsis and citation omitted).   AT&T's reliance on One Call Prop. Srvs., Inc. v. Security First Ins. Co., 165 So. 3d 749, 752 (Fla. 4th DCA 2015) is misplaced. In *One Call*, the Fourth District Court of Appeal ruled that only where terms are impliedly incorporated by reference into complaint and said document is part of the record can a trial court consider the contents of the document. The Fourth District Court of Appeal noted that the authenticated insurance policy at issue was placed in the record and incorporated by referenced which allowed the Court to construe the policy at the motion to dismiss stage.  In the instant case, there is no authenticated copy of the wireless customer agreement between Plaintiff and AT&T.  Therefore, Defendant's Motion to Dismiss based on language referenced in the purported contract would be an attempted short-cut of the Court's function.

## ANALYSIS AND FINDINGS

Plaintiffs' Corrected First Amended Complaint ("Complaint") contains a total of three counts directed at Defendant PVG. a. Count II – Violations of Florida Statute Sec. 828.29 (PVG) b. Count III – Civil Conspiracy (Petland and PVG) c. Count IV – Violations of Florida Deceptive and Unfair Trade Practices Act Case No: 2020-008226-CC-23 Page 2 of 9 (FDUTPA)

Plaintiff's Amended Complaint contains a total of four counts: (1) Fraud; (2) Breach of Contract: Implied Duty of Good Faith and Fair Dealing; (3) FDUTPA violation;  (4) and Unjust Enrichment.

The Court addresses each count in turn:

## I. COUNT I: FRAUD

Fraud involves "a departure from fundamental honesty, moral uprightness, or fair play," *United States v. Ragosta*, 970 F.2d 1085, 1090 (2d Cir. 1992) (quoting *United States v. Goldblatt*, 813 F.2d 619, 624 (3d Cir. 1987)), and depriving one of property through "dishonest methods or schemes" or "trick, deceit, chicane or overreaching," *Id.* (internal quotation marks omitted).

In order to plead a valid claim for fraud, a plaintiff must plead that Defendant 1) misrepresented a material fact, 2) knew or should have known of the falsity of the statement, 3) intended that the

misrepresentation would induce Plaintiff to rely and act on it and 4) that Plaintiff suffered injury in justifiable reliance on the misrepresentation. *Witt v. La Gorce,* 35 So. 3d 1033 (Fla. 3d DCA 2010). Whether a party has made intentional fraudulent misrepresentations is a question of fact. *See D & M Jupiter, Inc. v. Friedopfer,* 853 So. 2d 485 (Fla. 4th DCA 2003); *Jenne v. Broward Serv. Ctr., Inc.,* 717 So. 2d 585, 586 (Fla. 4th DCA 1998).

Plaintiff properly pled misrepresentation of a material fact, knowledge by Defendant that the statement and representation was false, intent by Defendant that the representation would induce Plaintiff and other customers to rely and act on it, and that Plaintiff suffered injury in justifiable reliance on the representation. As such, Plaintiff has pled all required elements of fraud.

## II. COUNT II: BREACH OF CONTRACT: IMPLIED DUTY OF GOOD FAITH AND FAIR DEALING

Florida contract law recognizes the implied covenant of good faith and fair dealing in every contract. *Cty. of Brevard v. Miorelli Eng'g, Inc.,* 703 So. 2d 1049, 1050 (Fla. 1997) ("[E]very contract includes an implied covenant that the parties will perform in good faith.' " *quoting Champagne–Webber, Inc. v. City of Fort Lauderdale,* 519 So. 2d 696, 697 (Fla. 4th DCA 1988)); *Ins. Concepts & Design, Inc. v. Healthplan Servs., Inc.,* 785 So. 2d 1232, 1234–35 (Fla. 4th DCA 2001). The implied covenant of good faith and fair dealing is designed to protect the contracting parties' reasonable expectations. *Speedway SuperAmerica, LLC v. Tropic Enters., Inc.,* 966 So. 2d 1, 3 (Fla. 2d DCA 2007); *Cox v. CSX Intermodal, Inc.,* 732 So. 2d 1092, 1097 (Fla. 1st DCA 1999). A duty of good faith must "relate to the performance of an express term of the contract and is not an abstract and independent term of a contract which may be asserted as a source of breach when all other terms have been performed pursuant to the contract requirements." Id.(quoting *Hosp. Corp. of Am. v. Fla. Med. Ctr., Inc.,* 710 So. 2d 573, 575 (Fla. 4th DCA 1998)); *see also Johnson Enter. of Jacksonville, Inc. v. FPL Group, Inc.,* 162 F.3d 1290, 1314 (11th Cir. 1998) ("[G]ood faith requirement does not exist 'in the air'. Rather, it attaches only to the performance of a specific contractual obligation.").

Plaintiff has stated a proper claim for breach of contract for implied covenant of good faith and fair dealing in that he has also alleged that an express term of the contract has been breached. *See Flagship Resort Development Corp. v. Interval Intern, Inc.,* 28 So. 3d 915 (Fla. 3d DCA 2010). Plaintiff has specifically pled that AT&T breached the express provision of the contract (i.e., failing to provide unlimited data) and therefore Plaintiff has properly pled a cause of action for breach of implied covenant of fair dealing.

## III. COUNT III: DAMAGES UNDER FDUPTA

Plaintiff alleges that Defendant violated the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), Fla. Stat. §§501.201, *et seq.* In order for a consumer to claim damages under FDUTPA, they must prove three elements: (1) a deceptive act or unfair practice; (2) causation; and (3) actual damages. *Rollins, Inc. v. Butland,* 951 So. 2d 860, 869 (Fla. 2d DCA 2006). Plaintiff

Because the statute is designed to protect consumers, the scope of the conduct that may constitute an "unfair or deceptive" practice is "extremely broad." *Day v. Le–Jo Enters., Inc.,* 521 So. 2d 175, 177 (Fla. 3d DCA 1988) A "claim under FDUTPA is not defined by the express terms

of a contract, but instead encompasses unfair and deceptive practices arising out of business relationships." *See Siever v. BWGaskets, Inc.,* 669 F. Supp. 2d 1286, 1293 (M.D. Fla. 2009). Accordingly, Plaintiff's Amended Complaint pleads the necessary elements of FDUPTA under Florida law.

IV. **COUNT IV: UNJUST ENRICHMENT**

     For purposes of a motion to dismiss, Plaintiff has stated a cause of action for unjust enrichment. However, if an express contract concerning the same subject matter is later made part of the record, the Court will entertain a subsequent motion to dismiss of this count if not withdrawn by Plaintiff. *See Sterling Breeze Ass'n., Inc. v. New Sterling,* 255 So.3d 434 (Fla. 1st DCA 2018).

<div align="center"><u>**CONCLUSION**</u></div>

For the reasons herein stated, it is hereby **ORDERED AND ADJUDGED** that:

1. Defendant's motion to dismiss is hereby **DENIED.**

2. Defendant shall serve its Answer to the Amended Complaint within 20 days from the date of this Order.

**DONE** and **ORDERED** in Chambers at Miami-Dade County, Florida on this <u>30th day of September, 2022</u>.

<div align="right">

<u>2019-017356-SP-23 09-30-2022 11:50 PM</u>
Hon. Ayana Harris

**COUNTY COURT JUDGE**
Electronically Signed

</div>

<div style="border: 2px solid red; color: red; padding: 10px;">

No Further Judicial Action Required on **THIS MOTION**

CLERK TO **RECLOSE** CASE IF POST JUDGMENT

</div>

**Electronically Served:**
Andrew Robert Ingalls, aingalls@daypitney.com
Andrew Robert Ingalls, brodriguez@daypitney.com
Andrew Robert Ingalls, maristasalado@daypitney.com
Evelyn Davila, edavila@daypitney.com
Jessica Solorzano, jsolorzano@daypitney.com
Manuel A. Garcia-Linares, mgarcialinares@daypitney.com

Manuel A. Garcia-Linares, athomsen@daypitney.com
Maury L Udell, notice66@bmulaw.com
Maury L Udell, blopez@bmulaw.com
Megan Elizabeth Pearl, mpearl@bmulaw.com
Megan Elizabeth Pearl, blopez@bmulaw.com
Rachel L. Kittl, rkittl@bmulaw.com


**Physically Served:**

**IN THE COUNTY COURT OF THE ELEVENTH JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA**

CASE NO: 2019-017356-SP-23
SECTION: ND06
JUDGE: Ayana Harris

**Mary Lynn E Ghizzone**

Plaintiff(s) / Petitioner(s)

vs.

**A T & T Mobility (LLC)**

Defendant(s) / Respondent(s)

_____/

## ORDER ON DEFENDANT'S MOTION FOR RECONSIDERATION ON MOTION TO DISMISS (D.E. #93)

THIS CAUSE having come before the Court on Defendant's Motion for Reconsideration on Motion to Dismiss (D.E. #93), and the Court, after having reviewed the Motion and being advised in the premises, hereby finds as follows,

**ORDERED AND ADJUDGED** as follows

1. Defendant's Motion is hereby **DENIED**.

2. Defendant shall have twenty (20) days to file its answer to the operative complaint.

**DONE** and **ORDERED** in Chambers at Miami-Dade County, Florida on this 30th day of June, 2024.

2019-017356-SP-23 06-30-2024 10:26 PM
Hon. Ayana Harris

**COUNTY COURT JUDGE**
Electronically Signed

No Further Judicial Action Required on **THIS MOTION**

CLERK TO **RECLOSE** CASE IF POST JUDGMENT

**Electronically Served:**
Andrew Robert Ingalls, aingalls@daypitney.com
Andrew Robert Ingalls, brodriguez@daypitney.com
Andrew Robert Ingalls, maristasalado@daypitney.com
Evelyn Davila, edavila@daypitney.com
Jessica Solorzano, jsolorzano@daypitney.com
Manuel A. Garcia-Linares, mgarcialinares@daypitney.com
Manuel A. Garcia-Linares, athomsen@daypitney.com
Maury L. Udell, notice66@bmulaw.com
Maury L. Udell, blopez@bmulaw.com
Megan Elizabeth Pearl, mpearl@bmulaw.com
Megan Elizabeth Pearl, blopez@bmulaw.com
Rachel L. Kittl, rkittl@bmulaw.com

**Physically Served:**

# EXHIBIT 4

## AT&T Consumer Service Agreement

Print

# AT&T Consumer Service Agreement

### 1.0
### General Terms

Welcome to AT&T!

By activating, using, or paying for any AT&T products or services ("AT&T Service(s)" or "Service(s)"), you agree to be bound by this Consumer Service Agreement ("Agreement"). If you don't agree, please contact us immediately to cancel your order and/or service and return any products. For AT&T Services, visit att.com/contactus, and for FirstNet, visit firstnet.com.

**Please read this Agreement carefully. It requires you and AT&T to resolve disputes through arbitration on an individual basis rather than jury trials or class actions. It also governs how we handle your information, including information related to your AT&T Account and your location.**

#### 1.1 Our Agreement

In this Agreement, unless otherwise specified, "AT&T" and "we" mean the AT&T affiliated companies and their successors and assigns.

AT&T offers many products and services. This Agreement includes a set of universal terms ("General Terms") and specific Service terms ("Service Terms"). You're bound by the General Terms and the Service Terms for each AT&T Service you purchase or use. In addition, your Agreement incorporates AT&T's Privacy Policy (at att.com/privacy), Acceptable Use Policy (at att.com/legal/terms.aup.html), any Customer Service Summary provided to you, and any other documents or terms specifically referenced in the applicable General Terms and Service Terms. In the event of a conflict between the General Terms and the applicable Service Terms, the Service Terms will govern our relationship with you.

Please use these links to view the Service Terms for each specific Service:

- **If you have postpaid AT&T Wireless service** (including FirstNet Subscriber Paid User service), your Wireless Service Terms are in Section 2.
- **If you have prepaid AT&T Wireless service,** you're subject to the Prepaid Wireless Service Terms in Section 3 as well as the Wireless Service Terms in Section 2.
- **If you have a DataConnect/Session-based Wireless plan,** you're subject to the Service Terms in Section 4, in addition to the Wireless Service Terms in Section 2 and (if your data plan is prepaid) the Prepaid Wireless Service Terms in Section 3.
- **If you're an AT&T Phone customer,** your Service Terms are in Section 5.
- **If you have home internet from AT&T, including AT&T Fiber, AT&T Internet, AT&T Internet Air, AT&T Fixed Wireless, or AT&T DSL service,** your Service Terms are in Section 6. If your home internet service is provided via the AT&T Wireless Network, you will also be subject to the applicable sections of the Wireless Services Terms in Section 2.
- **If you have Business Internet service** (for small business), you're subject to the Business Internet Service Terms in Section 7 as well as the Internet Service Terms in Section 6.

#### 1.2 Your AT&T Account and Account Access

You may need to set up one or more accounts ("AT&T Account(s)" or "Account(s)") in order to purchase or use AT&T Services. You must ensure that any information you provide us in connection with your AT&T Accounts and AT&T Services, including contact information and billing information, is accurate and current.

You're responsible for any activity that occurs on or through your AT&T Accounts. We do not guarantee the security of your AT&T Accounts. You must ensure that your Account information and password(s) for accessing your Accounts and personal information are secure. If you learn of any unauthorized use of any AT&T Account, please contact us immediately.

**You agree that all users of your AT&T Services (including minors), are subject to the limitations and obligations of this Agreement, including its arbitration provision and privacy policy.** It's your duty to inform them of their limitations and obligations and to provide this Agreement to them.

You may designate individuals (such as family members) to act on your behalf ("Authorized Users"). Authorized Users can manage your AT&T Accounts, including changing or adding Services. You're responsible for all actions and changes made by any Authorized Users, including purchases of products and additional AT&T Services.

If you are not present or do not identify yourself when an AT&T Service is installed, you authorize any adult (the minimum age may differ by state or territory) present to act on your behalf, regardless of whether you designated that adult as an Authorized User. You also authorize this adult to accept any related terms and conditions, agreements, and charges,. Further, you authorize us to provide information about and make changes to your AT&T Accounts (as well as to perform any credit checks on you that we deem appropriate to implement the changes or respond to questions) at the direction of this adult. AT&T reserves the right to refuse to allow an adult to authorize installation, take any action regarding your AT&T Accounts, or receive any information if we decide in our sole discretion that the adult has failed to provide sufficient identifying information or cannot answer questions about you or your AT&T Accounts to our satisfaction.

You may have previously been given the option to combine credentials to log onto multiple AT&T Accounts and/or third-party accounts. In AT&T's sole discretion, we may end this option and require separate credentials for different accounts.

## 1.3 Dispute Resolution

**Please read this carefully. It affects your rights.**

### 1.3.1 Summary:

This part of the Agreement outlines how disputes between you and AT&T will be resolved through our informal dispute resolution process, individual arbitration, or small claims court. The informal dispute resolution process gives you the opportunity to explain what happened to someone in, or working with, our legal department. Under the terms of this Agreement, AT&T is encouraged to resolve issues early, without going any further.

An "arbitration" is a less formal alternative to a lawsuit or jury trial in court. A neutral third party, called an arbitrator, decides the dispute. The arbitrator applies the same law and can award the same individualized remedies that a court could award, but uses streamlined procedures and limits discovery to simplify the process and reduce costs. The arbitrator's decision is legally binding, and it is subject to very limited review by courts. **You and AT&T agree that arbitration will take place on an individual basis. Class arbitrations, class actions, and representative actions are not permitted. This means that you and AT&T will neither file a lawsuit (in any court other than a small claims court), nor pursue or participate in an action seeking relief on behalf of others.**

*While subsection 1.3.2 lays out the specifics, here are the steps you would take to resolve a dispute:*

- **Contact customer service.** We encourage you to give customer service a call first. A phone call, chat session, or email with us is usually the quickest way to resolve an issue. Check out att.com/contactus to find the right service or product team for your issue.

- **You choose.** If you aren't satisfied after talking to customer service, you can choose to file your individual claim in small claims court or send us a Notice of Dispute, which is required before starting arbitration.

- **Let's work it out.** If you decide not to go to small claims court, start the informal dispute resolution process by sending a Notice of Dispute to our legal department, which you can complete and send online. You and AT&T agree to give each other at least 60 days to share information and try to reach an agreement. (We'll use the same process if we have a dispute with you.) At your or our request, we'll schedule an Informal Settlement Conference to try to reach an agreement by phone or videoconference.

- **Pursue an arbitration.** If the dispute still isn't resolved, you can pursue an individual arbitration. The nation's largest non-profit arbitration provider, the American Arbitration Association (AAA), will administer the arbitration and select the neutral arbitrator, with input from both you and AT&T. Some things to keep in mind:
  - AT&T will usually pay all of the arbitration fees (with some exceptions).
  - Any hearings will be in the same county as your billing address, or they might be held by phone or videoconference.
  - In some cases, if you win, we will pay double attorney's fees (if any) and a minimum of $10,000.

There are special rules for coordinated (or mass) arbitrations, where the same lawyers or a group of coordinated lawyers seek to file 25 or more similar arbitrations. If you choose to be part of those proceedings, the cases will proceed in stages, so it might take longer to arbitrate your dispute than it would otherwise.

### 1.3.2 Arbitration Agreement

### 1.3.2.1 Claims Subject to Arbitration:

To the greatest extent permitted by law, AT&T and you agree to arbitrate all disputes and claims between you and AT&T, except for claims arising from bodily injury or death. This arbitration provision is intended to be broadly interpreted. It includes, but is not limited to:

- claims arising out of or relating to any aspect of the relationship between us, whether based in contract, tort, fraud, misrepresentation, or any other statutory or common-law legal theory;

- claims that arose before the existence of this or any prior Agreement (including, but not limited to, claims relating to advertising);

- claims for mental or emotional distress or injury not arising out of bodily injury;

- claims that are currently the subject of purported class action litigation in which you are not a member of a certified class; and

- claims that may arise after the termination of this Agreement.

References in Section 1.3 to "AT&T" or "we" include our past, present, and future parents, subsidiaries, affiliates, and related entities, as well as AT&T's and all of those entities' officers, agents, employees, licensors, predecessors in interest, successors, and assigns. References in Section 1.3 to "you" include your past, present, and future parents, subsidiaries, affiliates, related entities, agents, employees, predecessors in interest, successors, and assigns; and all authorized or unauthorized users or beneficiaries of AT&T Services or products under past, present, or future Agreements between you and AT&T.

**Small Claims Option.** Despite this arbitration provision, either you or AT&T may bring an action seeking only individualized relief in the small claims court for the county (or parish) of your billing address, so long as the action is not removed or appealed to a court of general jurisdiction.

This arbitration provision does not preclude you from bringing issues to the attention of federal, state, or local agencies, including, for example, the Federal Communications Commission. Those agencies can, if the law allows, seek relief against us on your behalf. **By entering into this Agreement, you and AT&T are each waiving the right to a trial by jury or to participate in a class action.** This Agreement evidences a transaction in interstate commerce, and thus the Federal Arbitration Act governs the interpretation and enforcement of this arbitration provision. This arbitration provision will survive termination of this Agreement.

**1.3.2.2 Pre-Arbitration Informal Dispute Resolution Process:**
Customer service is available to help and usually can resolve any concerns you may have. If that does not work, the first step in the dispute resolution process is to send a written Notice of Dispute ("Notice"). (We'll also send you a Notice to your billing address if we have a dispute with you.) You may download the Notice form at att.com/arbitration-forms. The Notice to AT&T may be sent by U.S. mail or professional courier service to Legal Department - Notice of Dispute, AT&T, 208 S. Akard, Office #2900.13, Dallas, Texas 75202 (the "Notice Address"), or, alternatively, submitted electronically by following the instructions at att.com/noticeofdispute. The Notice must include all of the information requested on the Notice form, including: (a) the claimant's name, address, and phone number; (b) the Account number at issue; (c) the services (if any) to which the claim pertains; (d) a description of the nature and basis of the claim or dispute; and (e) an explanation of the specific relief sought and the basis for the calculations. The Notice must be personally signed by you (if you are the claimant) or by an AT&T representative (if we are the claimant). To safeguard your Account, you might be required to provide both your authentication and consent for us to discuss your Account or share your Account information with anyone but you, including an attorney ("Authentication and Consent").

Whoever sends the Notice must give the other party 60 days after receipt of a complete Notice (including your Authentication and Consent, if required) to investigate the claim. During that period, either you or AT&T may request an individualized discussion (by phone call or videoconference) regarding settlement ("Informal Settlement Conference"). You and AT&T must work together in good faith to select a mutually agreeable time for the Informal Settlement Conference (which can be after the 60-day period). You and an AT&T representative must personally participate, unless otherwise agreed in writing. Your and AT&T's lawyers (if any) also can participate.

**Any applicable statute of limitations or contractual limitations period will be tolled** for the claims and requested relief in the Notice during the "Informal Resolution Period." The Informal Resolution Period is the number of days between the date that the complete Notice (and Authentication and Consent, if required) is received by the other party, and the later of (1) 60 days later or (2) the date the Informal Settlement Conference is completed, if timely requested.

Any arbitration proceeding cannot be commenced until after the Informal Resolution Period has ended. (Subsection 1.3.2.7 contains additional requirements for commencing certain coordinated arbitrations.) All of the pre-arbitration dispute resolution requirements are essential so that you and AT&T have a meaningful chance to resolve disputes informally. If any aspect of these requirements has not been met, a court can enjoin the filing or prosecution of an arbitration. In addition, unless prohibited by law, the AAA may not accept, administer, assess, or demand fees in connection with such an arbitration. If the arbitration already is pending, it must be dismissed.

**1.3.2.3 Arbitration Procedure:**
You may download a form to initiate arbitration at att.com/arbitration-forms. In addition, information on how to commence an arbitration proceeding, including how to file a consumer arbitration online, is at adr.org/support. A copy of the arbitration demand must be sent to AAA and the Notice Address, and a copy of the Notice must be attached to your arbitration demand.

The arbitration will be governed by the then-current Consumer Arbitration Rules ("AAA Rules") of the AAA, as modified by this arbitration provision, and will be administered by AAA. (If AAA refuses to enforce any part of this arbitration provision, you and AT&T will select another arbitration provider. If there is no agreement, the court will do so.) The AAA Rules are available online at adr.org or may be requested by writing to the Notice Address. (You may obtain information that is designed for non-lawyers about the arbitration process at att.com/arbitration-information.)

As in court, you and AT&T agree that any counsel representing someone in arbitration certifies that they're complying with the requirements of Federal Rule of Civil Procedure 11(b), including a certification that the claim or the relief sought is neither frivolous nor brought for an improper purpose. The arbitrator is authorized to impose any sanctions available under AAA Rules, Federal Rule of Civil Procedure 11, or applicable federal or state law against all appropriate represented parties and counsel.

All issues are for the arbitrator to decide, except only a court can decide the following:

- issues relating to the scope and enforceability of the arbitration provision,
- whether a dispute can or must be brought in arbitration,
- whether the AAA cannot or will not administer the arbitration in accordance with this arbitration provision,
- whether subsection 1.3.2.2 has been complied with or violated for purposes of awarding relief under that subsection that a court can award, and
- whether subsections 1.3.2.6, 1.3.2.7, or 1.3.2.8 have been complied with or violated.

The arbitrator may consider rulings in other arbitrations involving different customers, but an arbitrator's ruling will not be binding in proceedings involving different customers.

Unless you and AT&T agree otherwise, any arbitration hearings will take place in the county (or parish) of your billing address. If your claim is valued at $10,000 or less, you may choose whether the arbitration will be conducted solely based on documents submitted to the arbitrator or through a telephonic, videoconference, or in-person hearing under AAA Rules. If your claim exceeds $10,000, the right to a hearing will be determined by AAA Rules. During the arbitration, the amount of any settlement offers must not be disclosed to the arbitrator until after the arbitrator determines the relief, if any, to which you or AT&T is entitled. Regardless of how the arbitration is conducted, the arbitrator must issue a reasoned written decision sufficient to explain the essential findings and conclusions on which his or her decision is based. Except as provided in subsection 1.3.2.6 below, the arbitrator can award the same damages and relief that a court can award under applicable law.

**1.3.2.4 Arbitration Fees:**

We will pay all AAA filing, administration, case-management, hearing, and arbitrator fees if we initiate an arbitration. If you initiate arbitration of claims valued at $75,000 or less, we will pay those fees, so long as you have fully complied with the requirements in subsection 1.3.2.2. In such cases, we will pay the filing fee directly to AAA upon receiving a written request from you at the Notice Address or, if AAA requires you to pay the filing fee to commence arbitration, we will send that amount to AAA and request that AAA reimburse you. If, however, the arbitrator finds that either the substance of your claim or the relief sought is frivolous or brought for an improper purpose (as measured by the standards set forth in Federal Rule of Civil Procedure 11(b)), then the allocation and payment of all such fees will be governed by AAA Rules.

**1.3.2.5 Alternative Payment and Attorney Premium:**
If you fully complied with the requirements above in subsection 1.3.2.2 and the arbitrator issues an award in your favor that is greater than the value of our last written settlement offer made before the arbitrator was selected, then we will:

- pay you the amount of the award or $10,000 (the "Alternative Payment"), whichever is greater; and

- pay the attorney you retained, if any, twice the amount of attorneys' fees and reimburse any expenses (including expert witness fees and costs) that your attorney reasonably incurs for investigating, preparing, and pursuing your claim in arbitration (the "Attorney Premium").

If we did not make a written offer to settle the dispute before the arbitrator was selected, and the arbitrator awards you any relief on the merits, you and your attorney will be entitled to receive the Alternative Payment and the Attorney Premium, respectively.

Disputes regarding the payment and reimbursement of attorneys' fees, expenses, the Alternative Payment, and the Attorney Premium may be resolved by the arbitrator upon request from either party made within 14 days of the arbitrator's ruling on the merits. In assessing whether an award that includes attorneys' fees and expenses is greater than the value of our last written settlement offer, the calculation will include only the reasonable attorneys' fees and expenses you incurred pursuing this arbitration through the date of our settlement offer.

The right to the Attorney Premium supplements any right to attorneys' fees and expenses you may have under applicable law. Thus, if you would be entitled to a larger amount under the applicable law, this arbitration provision does not preclude the arbitrator from awarding you that amount. However, you may not recover both the Attorney Premium and a duplicative award of attorneys' fees or expenses.

**1.3.2.6 Requirement of Individual Arbitration:**
The arbitrator may award relief (including, but not limited to, damages, restitution, declaratory relief, and injunctive relief) only in favor of the individual party seeking relief and only to the extent necessary to provide relief warranted by that party's individual claim. YOU AND AT&T AGREE THAT EACH MAY BRING CLAIMS AGAINST THE OTHER ONLY IN YOUR OR ITS INDIVIDUAL CAPACITY, AND NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED CLASS, REPRESENTATIVE, OR PRIVATE ATTORNEY GENERAL PROCEEDING. Further, unless both you and AT&T agree otherwise, the arbitrator may not consolidate more than one person's or entity's claims and may not otherwise preside over any form of a representative, class, private attorney general, or public injunction proceeding.

If a court (after exhaustion of all appeals) declares unenforceable any of these prohibitions on consolidation or non-individualized relief (such as class, representative, private attorney general, or public injunctive relief), then all other aspects of the case must be arbitrated first. After completing arbitration, the remaining (non-arbitrable) aspects of the case will then be decided by a court.

**1.3.2.7 Administration of Coordinated Arbitrations:**
If 25 or more claimants submit Notices or seek to file arbitrations raising similar claims and are represented by the same or coordinated counsel (whether such cases are pursued simultaneously or not), all the cases must be resolved in staged proceedings. **You agree to this process even though it may delay the arbitration of your claim. In** the first stage, claimants' counsel and AT&T will each select 25 cases (50 cases total) to be filed in arbitration and resolved individually by different arbitrators. If feasible, the arbitrators will be from the respective claimants' home states. If there are fewer than 50 cases, all will be filed in arbitration. In the meantime, no other cases may be filed or proceed in arbitration, and the AAA must not assess or demand payment of fees for the remaining cases or administer or accept them.

The arbitrators are encouraged to resolve the cases within 120 days of appointment or as swiftly as possible thereafter, consistent with fairness to the parties. After the first stage is completed, the parties must engage in a single mediation of all remaining cases, and AT&T will pay the mediation fee. If the parties cannot agree how to resolve the remaining cases after mediation, they will repeat the process of selecting and filing 50 cases to be resolved individually by different arbitrators, followed by mediation.

If any claims remain after the second stage, the process will be repeated until all claims are resolved, with four differences. First, a total of 100 cases may be filed in the third and later stages. Second, the cases will be randomly selected. Third, arbitrators who decided cases in the first two stages may be appointed in later stages if different arbitrators are not available. Fourth, mediation is optional at the election of counsel for the claimants.

Between stages, counsel will meet and confer regarding ways to improve the efficiency of the staged proceedings, including whether to increase the number of cases filed in each stage. Either party may also negotiate with AAA regarding the amount or timing of AAA fees.

If this subsection applies to a Notice, the Informal Resolution Period for the claims and relief set forth in that Notice will be extended (including the tolling of any applicable statute of limitations or contractual limitations period for the claims and requested relief) until that Notice is selected for a staged proceeding, withdrawn, or otherwise resolved. A court will have the authority to enforce this subsection, including by enjoining the mass filing, the prosecution or administration of arbitrations, or the assessment or collection of AAA fees.

This subsection and each of its requirements are intended to be severable from the rest of this arbitration provision. If, after exhaustion of all appeals, a court decides that the staging process in this subsection is not enforceable, then the cases may be filed in arbitration and the payment of AAA filing, administration, case-management, hearing, and arbitrator fees will be assessed as the arbitrations advance and arbitrators are appointed rather than when the arbitrations are initiated.

**1.3.2.8 Future Changes to Arbitration Provision:**

Notwithstanding any provision in this Agreement to the contrary, if AT&T makes any future change to this arbitration provision (other than a change to the Notice Address), you may reject any such change by sending us written notice via U.S. Mail within 30 days of the first notice of the change to Legal Department – Revised Arbitration Opt-Out, AT&T, 208 S. Akard, Office #2900.13, Dallas, Texas 75202. Include your name, address, phone number, account number, and a statement personally signed by you that you wish to reject the change to the arbitration provision. By rejecting any future change, you are agreeing that you will arbitrate any dispute between you and AT&T in accordance with the language of this version of the arbitration provision.

**1.3.2.9 Puerto Rico Customers:**

For Puerto Rico customers, all references to "small claims court" in this arbitration provision should be understood to mean the Puerto Rico Telecommunications Regulatory Board.

**1.3.3 Forum Selection:**

Unless you and AT&T agree otherwise, to the greatest extent permitted by law, the state and federal courts in Dallas, Texas will have exclusive jurisdiction over any disputes (except for disputes brought in small claims court) that are not subject to arbitration or over any action involving the applicability or enforceability of the arbitration provision or any of its parts. You and AT&T consent to the jurisdiction of those courts and waive any objections as to personal jurisdiction or as to the laying of venue in such courts due to inconvenient forum or any other basis or any right to seek to transfer or change venue of any such action to another court.

## 1.4 How We May Contact You

You agree that AT&T and its current and future affiliates, assignees, successors, employees, agents, and others acting or purporting to act on our behalf (for example, outside collection agencies), can contact you regarding your Accounts, your AT&T Services, and additional products and services that we or third parties may offer, using any means or method (including by phone, mail, email, text message (such as SMS/MMS), chat (such as RCS), push notifications, or other medium), as well as by including messages on or inserts with bills for your AT&T Services.

You agree that notices provided to you using any of these methods are considered received by you. You agree to provide accurate, current contact information about yourself, that you have authority to consent to communications to any phone numbers or email addresses you provide, and that you will promptly notify us if your contact information has changed.

You also agree that AT&T and its current and future affiliates, assignees, successors, employees, agents, and others acting or purporting to act on our behalf (for example, outside collection agencies) can at any time send you email or other electronic messages to any phone number or email address associated with your AT&T Services by any means, including an automated system that sends preset messages.

You further agree that any calls or messages sent to numbers or email addresses you provide to AT&T or its current and future affiliates, assignees, successors, employees, agents, and others acting or purporting to act on our behalf (for example, outside collection agencies), or to numbers or email addresses associated with your AT&T Services, may be sent using an automatic telephone dialing system, artificial or prerecorded voices, or other automated dialing equipment such as a predictive dialer, and that you cannot revoke your consent to be contacted in this manner.

**Please review your bill for messages and inserts.** We will send important messages to you through bill messages and bill inserts.If you have electronic billing, you are considered to have received these notices once your electronic bill is available for viewing. If you get a paper bill, you are considered to have received these notices three days after we mail the bill to you.

Communications to you may include, but are not limited to, emergency alerts, updates to this Agreement, communications regarding payments or past-due balances, and information concerning promotions regarding any AT&T Services or products or services offered by our third-party partners. You are not required to agree to receive promotional communications to purchase any AT&T Services. **You can unsubscribe from promotional emails, calls, or messages by following the unsubscribe options** in the promotional communication itself or in the AT&T Privacy Policy. For more information about your rights and choices regarding how we communicate with you, visit att.com/sites/privacy_policy/rights_choices.

## 1.5 Termination or Suspension of AT&T Services

You may cancel or terminate any of your AT&T Services at any time. If you cancel an AT&T Service:

- you might lose any discounts you obtained from bundling AT&T Services together;

- if you have an active installment plan for devices or accessories associated with the cancelled AT&T Services, your agreement for that installment plan might specify that your termination of AT&T Service is a default that triggers acceleration of the remaining installment plan payments; and

- some AT&T Services may not work (or work the same way) after the cancellation of a bundled service.

AT&T reserves the right to modify, suspend, or discontinue any function or feature of any AT&T Service, including your rates or charges, or to terminate your AT&T Service entirely, for any reason, including but not limited to:

- compliance with an order by a state or federal agency, court, or arbitrator;

- any interruption or loss of either your or AT&T's rights to access any part of the network facilities required to provide your services, including rights to access the land or buildings where the facilities are located; or

- any Misconduct by you or any user of your AT&T. "Misconduct" includes but is not limited to:

  ◦ any conduct that we believe violates this Agreement or AT&T's Acceptable Use Policy;

  ◦ any conduct that involves the use of abusive, threatening, or unreasonable conduct toward any of our employees or representatives, whether in person,

- over the phone, or in writing;

  ○ any abusive, fraudulent, or unlawful use of any AT&T Services;

  ○ providing us with false or misleading information about you, users of your AT&T Services, or use of AT&T Services, including inaccurate information related to your creditworthiness;

  ○ any use of AT&T Services in a manner that negatively affects our or other entities' networks, customers, or operations, or that infringes anyone's intellectual property rights, violates others' privacy, generates spam or abusive messaging or calling, or results in the publication of threatening, offensive, or illegal materials;

  ○ any reselling of AT&T Services (including selling of use of or access to AT&T Services); or

  ○ any failure to make all required payments when due or to maintain sufficient amounts on deposit or pay another form of credit security, as well as any change that we determine creates a risk of non-payment (such as a deterioration in your creditworthiness).

Regardless of the reason or whether you or we terminate your AT&T Services:

- unless required by applicable law, there is no proration of charges and you are still responsible for the full month's payment even if your AT&T Services are terminated before the end of a billing cycle;

- any Account balance or unused portion for the terminated AT&T Service (such as a prepaid service) will not be refunded or credited back;

- your licenses to use any associated software are terminated;

- you are obligated to return any Equipment associated with the terminated AT&T Service (if required by the applicable Service Terms or other agreement); and

- we reserve the right to delete any data, files, or other information associated with you or your AT&T Account or terminated AT&T Services.

In addition, if a term commitment to maintain service or programming for a particular length of time is not met, and either you cancel an AT&T Service or we terminate it for misconduct, you will be subject to any applicable early-termination fee(s) under subsection 1.9.6.

If any of your AT&T Services are suspended, you still responsible for paying any applicable charges for that AT&T Service.

## 1.6 Disclaimer of Warranties

**You're using AT&T Services at your own risk. Unless expressly set out in this Agreement, AT&T Services are provided on an "as is" and "as available" basis, without warranties or guaranties of any kind. To the greatest extent permitted by law, AT&T (including our past, present, and future parents, subsidiaries, affiliates, related entities, as well as AT&T's and all of those entities' officers, agents, employees, licensors, predecessors in interest, successors, and assigns) expressly disclaims all warranties of any kind, whether oral, express, implied, or statutory, including but not limited to the implied warranties of title, merchantability, fitness for a particular purpose, non-infringement, and any warranties implied by a course of performance, course of dealing, or usage of trade.** No one is authorized to make warranties on our behalf. We do not guarantee that AT&T Services will meet your requirements, be of a particular quality or speed, or will be uninterrupted, accurate, secure, maintained, and kept free from viruses or other harmful components. There is no security or protection guarantee against unauthorized access to your AT&T Services, personal information, or AT&T Account. We do not guarantee that AT&T Services are suitable for use in situations in which absolutely accurate data transmission or security is required or that could result in personal injury, property damage, or financial loss. We also do not guarantee that AT&T Services will be interoperable with your hardware or software and that incompatibility won't lead to damage or loss of data.

## 1.7 Limitations of Liability

You agree that:

- AT&T is not an insurer of AT&T Services, nor can it insure the accuracy of your information or the privacy or security of your AT&T Accounts;

- AT&T has no control over the acts and conduct of third parties;

- AT&T is not responsible for losses incurred as a result of your or a third-party's use of your AT&T wireless number or other AT&T Service as a source of authentication or verification in connection with any social media, email, financial, cryptocurrency or other account;

**To the greatest extent permitted by law, AT&T is not liable for any reason to you, or any user or beneficiary of AT&T Services, for any indirect, incidental, special, consequential, treble, punitive, or exemplary damages**, including but not limited to damages for personal injury; property damage; or loss of revenue, profits, business, goodwill, use, data, or other tangible or intangible losses (even if we've been told of the possibility of those damages) resulting from, for example:

- use of AT&T Services (which includes equipment, software, and inside or outside wiring);

- the performance or nonperformance of AT&T Services;

- the actions or inaction of AT&T or its agents with respect to the provision or delivery of any AT&T Services or that relate to your AT&T Account or our relationship with you;

- any action of a third-party, such as unauthorized access to your AT&T Accounts or AT&T Services (including the use of your AT&T Accounts or AT&T Services to access a third-party account); or

- any alleged actions or representations, statements, promises, or agreements by AT&T that are not expressly set forth in this Agreement regarding the use, performance, suitability, safety, reliability, security, or any other aspect or attribute of AT&T Services;

To the greatest extent permitted by law, **AT&T is not liable to you for any damages of any kind** resulting in any way from:

- the installation, maintenance, removal, or technical support of AT&T Services, **even if the damage results from the ordinary negligence of our installer or other representative**;

- any unauthorized access to your AT&T Accounts or AT&T Services (including the use of your AT&T Accounts or AT&T Services to access a third-party account), **even if the unauthorized access was the result of ordinary negligence by an AT&T employee, representative, agent, or any person or entity purporting to act on AT&T's behalf**;

- any inability to reach 911 or other emergency services, any alleged interference with alarm or medical monitoring signals, or any failure of alarm or medical monitoring signals to reach their intended monitoring stations;

- the use, inability to use, or the lack of interoperability between AT&T Services and any third-party hardware, software, or service, even if charges for the third-party hardware, software, or service appear on your AT&T bill;

- the loss of your information, such as missed or deleted voicemails, text messages, emails, pictures, or files; or

- any interruption, error, limitation, delay in any AT&T Service, or any other problem caused, in whole or in part, by you or something outside of our control, including, but not limited to, environmental conditions, emergency operations, power or network outages, transmission errors, equipment damage or repairs, limits in system capacity, unavailability of radio frequency channels, governmental actions, labor disputes, riots, terrorism, or the acts of third parties.

To the greatest extent permitted by law, **our total liability to you (under any legal theory) is a credit or refund that must not exceed the total amount of charges you paid us for the applicable AT&T Service during the shorter of (i) the preceding 24-month period or (ii) the period in which you experienced the issue giving rise to your claims.** If you are disputing a charge on your bill, Section 1.10 requires you either to notify customer service or submit a Notice of Dispute within 180 days of the bill date.

To the greatest extent permitted by law, **you must commence any legal action, whether by filing a lawsuit in small claims court or by filing a demand for arbitration, within two years of the date of the event or facts giving rise to the dispute or you waive the right to pursue that claim** (this contractual limitations period is tolled by the submission of a valid Notice of Dispute under subsection 1.3 of this Agreement).

Each of the limitations of liability in this Agreement will apply to claims you bring against third parties to the extent that we would be required to indemnify that third-party if applicable law prohibits a limitation in this Agreement, all other limitations will apply to the greatest extent permitted by law. References in Section 1.7 to "AT&T" and "we" include our past, present, and future parents, subsidiaries, affiliates, and related entities, as well as AT&T's and all of those entities' officers, agents, employees, licensors, predecessors in interest, successors, and assigns.

## 1.8 Indemnification

To the fullest extent allowed by applicable law, you agree to release, hold harmless, indemnify, and defend AT&T (including our past, present, and future parents, subsidiaries, affiliates, and related entities, as well as AT&T's and all of those entities' officers, agents, employees, licensors, predecessors in interest, successors, and assigns) from any and all claims of any person or entity for damages, fines, penalties, or expenses of any nature arising out of or relating to, directly or indirectly:

- your or your Authorized Users' access to, use of, or inability to access or use any AT&T Service;

- any violation by you or your Authorized Users of this Agreement;

- your or your Authorized Users' violation of law (including negligence, willful misconduct, and infringement of anyone's intellectual property rights); or

- any other claim, demand, action, or complaint by any person or entity claiming by or through you or your Authorized Users that in any way arises out of or relates to this Agreement or any AT&T Service.

## 1.9 Charges and Payments

### 1.9.1 Credit Check:

By applying for or using AT&T Services, you're giving us permission to obtain your credit information from consumer credit reporting agencies at any time and for any reason. We also may share information about your credit with AT&T's current and future affiliates, assignees, successors, employees, agents, and others acting or purporting to act on our behalf at any time and for any reason. We may refuse to provide AT&T Services or require an advance payment, a nonrefundable payment, or other form of credit requirement if we determine that you may be a credit risk due to (1) your credit rating; (2) insufficient credit history; (3) previous late payments, suspension, disconnection or restoral of service; or (4) fraudulent or abusive use of any AT&T Services within the last five years. We will not pay interest on advance payments or deposits unless required by law. We may, however, require special payment terms, such as additional advance payments or deposits, if we determine that the initial payment was inadequate. We may establish limits and restrict AT&T Services or features as we deem appropriate. And we may immediately interrupt or suspend AT&T Services until your balance is brought below the limit we set for you. Any charges you incur in excess of your limit become immediately due. Upon determination solely by us of satisfactory payment history or as required by law, we may begin refunding deposits through bill credits or cash payments or as otherwise determined solely by us. If you are delinquent in any payment to us, you also authorize us to report any late payment or nonpayment to credit reporting agencies.

### 1.9.2 Billing:

**Different AT&T Services bill in different ways.** Please see the Service Terms for each AT&T Service for details and applicable fees and charges. In addition, you agree to pay your amounts due in full each billing cycle (usually once every 30 days): (1) the then-current monthly charges for your AT&T Services; (2) any applicable charges for equipment required for AT&T Services; (3) activation fees, connection, or installation charges, if any; (4) late fees and AT&T Service restoral fees, if any; (5) AT&T fees and other AT&T charges disclosed in the Service Terms; (6) charges for third-party content or services purchased or ordered using your AT&T Services or equipment; and (7) any applicable taxes and fees that AT&T pays to municipalities and other governmental entities and may pass on to you,

regardless of whether applicable law assesses them on you or us. You are responsible for paying all charges specified in this Agreement, including charges incurred by any person who gains access to your AT&T Services or equipment, even if you did not authorize the charges. Please note that billing will begin as soon as your AT&T Service is provisioned or activated for you, even if you have not used it or installed it.

**1.9.3 Late-Payment Charge and Dishonored Check Fee:**

You agree that, for each bill not paid in full by the payment due date, we may assess a late-payment charge (subject to applicable law and except as expressly agreed in writing). Our acceptance of late or partial payments (even if marked "Paid in Full") won't waive any of our rights to demand payment of the full amount due. You will also be charged a fee for each and any check or other forms of payment made (including credit card charge-backs) that are returned unpaid for any reason (subject to applicable law and except as expressly agreed in writing).

**1.9.4 Collections:**

If you don't pay your bill in full and on time, you agree that you may be subject to collections either by us or a third-party collections agency. To the extent permitted by law, you must pay us any costs and fees, including attorneys' fees, we reasonably incur to collect amounts you owe us. Subject to applicable law, you agree that we're not responsible or liable for any negative consequences that may arise as a result of our reporting your Account, payment information, or history to any third-party credit reporting or collections agency.

**1.9.5 Autopay:**

If you enroll in an automatic credit card billing, automatic payment, or electronic funds transfer plan, you authorize us or our agent to charge or place holds on the credit or debit card or financial institution account number you provide to us, without requiring a signed receipt. You certify you are the owner of the payment method, authorize us to store this information, and authorize us to automatically charge the amount of your monthly bill(s) each month on the date indicated on your monthly bill, and to charge any amounts outstanding if you cancel AT&T Service. If you were required to provide a credit card when you started an AT&T Service, you also authorize us to charge that card (in lieu of your autopay card, if different) for any amounts outstanding if you cancel AT&T Service. You agree to provide us with updated credit or debit card or bank account information when needed by calling the customer care number on your bill or online at att.com/myatt. You acknowledge that, if your card-issuing bank participates in a card updater program and unless you opt out of this service, your bank may provide us with updated card numbers and expiration dates, and we will update our files with this information and continue to charge your card. You agree that we're not responsible for any insufficient funds or other charges you might incur as a result of any attempts to charge or place holds on your credit or debit card or to transfer funds. When payment is made by credit or debit card, payment will also be subject to the terms and conditions established by the credit or debit card issuer. If charges cannot be processed through your credit or debit card, or if your bank draft or electronic funds transfer is returned for insufficient funds, we may charge you an additional fee.

**You can cancel your authorization for automatic credit-card billing, automatic payment, or electronic funds transfer by calling the customer care number on your bill or online at att.com/myatt.** If you do so, you may lose certain promotions or discounts. You also should contact your card issuer or financial institution to advise that you have cancelled your enrollment.

**1.9.6 Early Termination Fee:**

Your Customer Service Summary, order confirmation, or applicable fee schedule for your AT&T Service may include a minimum period in which you must maintain service on an eligible plan ("Service Commitment") or maintain certain programming ("Programming Commitment"). If you do not meet that commitment, you agree to pay an early termination fee. That fee is not a penalty, but rather is an alternative means for you to perform your obligations under the Agreement that partially compensates us for the fact that the Service Commitment or Programming Commitment on which your monthly rate is based was not completed.

**1.9.7 Application of Credits:**

Any amounts refunded in the form of bill credits, cash payments, or any other form will include all applicable taxes, fees and surcharges that were originally paid on such amounts. Credit amounts, such as customer loyalty rewards, that do not represent a refund of, or a discount to, the price paid for any good or AT&T Service will not result in the refund of any tax, fee, or surcharge you previously paid.

**1.9.8 Business or Government Benefits:**

You may receive or be eligible for certain discounts, credits, promotions, and other benefits ("Benefits") through a business or government customer's agreement with us ("Business Agreement") or if you are otherwise eligible to participate in our military/government discount or benefit programs. All such Benefits are provided to you solely as a result of the corresponding Business Agreement or at our discretion and may be modified or terminated without notice. You may also be eligible for certain additional rate plans and/or other Services. For Wireless Services, please see att.com/iru-additional-terms for additional terms.

If a business or government entity pays your charges or is otherwise liable for the charges, you authorize us to share your Account information with it or its authorized agents. If you use Service(s) and/or receive certain Benefits pursuant to or arising from a Business Agreement with us, but you're liable for your own charges, then you authorize us to share enough Account information with your business or government entity, or its authorized agents, to verify your continuing eligibility for those Services or Benefits. You also agree we may contact you to confirm your continued eligibility for the Services and/or Benefits.

You may receive Benefits because of your agreement to have the charges for your Services, billed by a company affiliated with AT&T ("Joint Billing") or because you subscribe to certain services provided by an affiliate. If you cancel Joint Billing or the service from the affiliate, your rates will be adjusted without notice to a rate plan for which you qualify.

Benefits may vary and are subject to the corresponding Business Agreement and ongoing eligibility/enrollment criteria, which we may verify or audit in our discretion. FirstNet individual users must also satisfy the eligibility criteria for FirstNet service and will be subject to re-verification of eligibility from time-to-time.

## 1.10 Questions or Disputes Regarding Charges

If you believe that there's something wrong with your bill, please contact customer service as soon as possible. If you're not satisfied with customer service's resolution, you may send us a Notice of Dispute pursuant to subsection 1.3.

**If you have a billing dispute, you have 180 days from the date of the bill either to notify customer service or submit a Notice of Dispute. Otherwise, you'll have waived your rights to dispute the bill and to participate in any legal action raising that dispute. This limitations period does not apply in any state in which this contractual notice provision is prohibited.**

## 1.11 Privacy

**1.11.1 Privacy Policy:**
We take your privacy seriously. For more information about how we collect, use, and protect your personal information, including your location information, please see the AT&T Privacy Policy located at att.com/privacy. FirstNet individual users should review the FirstNet Privacy Policy at firstnet.com.

**1.11.2 Use by Children:**
Children under the age of 13 should not be permitted to access AT&T Services unless allowed by an Account holder who is their legal guardian. By permitting a child to access an AT&T Service, you are giving your child access to all features (such as email, texts, and device applications), the internet, and a broad range of third-party content. It is your sole responsibility to determine whether the features are appropriate for a minor.

AT&T is not responsible for any content accessed by you or minors. In addition, AT&T does not guarantee the accuracy of any access controls available from AT&T, and you agree that you will not hold us liable for any loss or damage of any kind incurred as a result of the use of any such access controls.

## 1.12 Governing Law

The law of the state in which we currently provide you with AT&T Services (or, for wireless service, the state of your current billing address or current address of record) governs this Agreement, except to the extent that law is preempted by or inconsistent with applicable federal law.

## 1.13 End User Licensing Terms

If you connect to AT&T Services by using, downloading, or installing an application or other Software that we made available, whether directly or indirectly through vendors, your use of the Software is subject to this Agreement and any End User License Agreement ("EULA") for the Software.

**1.13.1 Definition of Software:**
The term "Software" means the following: (a) any application related to the Services or this Agreement, including, without limitation, any software code, scripts, interfaces, graphics, displays, text, documentation, and other components; (b) any updates, modifications, or enhancements to it; and (c) any specific AT&T or vendor web site to which the Software directs you via any browser.

**1.13.2 License Grant:**
We (or for vendors' Software, the vendor) remain the owner of the Software, which isn't being sold to you. So long as you comply with the terms of this Agreement and any EULA provided with the Software, AT&T grants you a revocable, nonexclusive, nontransferable, limited right to install and use the Software on a single computer or device that you own and control and to access and use the Software on such device. We're not responsible for any material or content that you transmit, store, delete, record, or play using the Software.

**1.13.3 Restrictions on Use:**
You may use the Software only in strict adherence to the terms of this Agreement, the EULA, and the terms of any other agreements associated with your device. You may not: (a) decompile, reverse engineer, disassemble, attempt to derive the source code of or decrypt the Software; (b) make any modification, adaptation, improvement, enhancement, translation, or derivative work from the Software; (c) violate any applicable laws, rules, or regulations in connection with your access or use of the Software; (d) remove, alter, or obscure any proprietary notice (including any notice of copyright or trademark) of AT&T, its suppliers, or the licensors of the Software; (e) other than resale by an AT&T-authorized reseller, use the Software for any revenue-generating endeavor or commercial enterprise other than the use of this Software to participate in our Services; (f) use the Software for creating a product, Service, or software that is, directly or indirectly, competitive with or in any way a substitute for any Services, product, or software offered by us; (g) use the Software to send automated queries to any web site or to send any unsolicited commercial email; or (h) use any proprietary information or interfaces of AT&T or other intellectual property of AT&T in the design, development, manufacture, licensing, or distribution of any applications, accessories, or devices for use with the Software.

**1.13.4 Export Limits:**
None of the Software or underlying information or technology may be downloaded or otherwise exported or re-exported: (a) into (or to a national or resident of) any country to which the United States has embargoed goods; or (b) to anyone on the U.S. Treasury Department's list of Specially Designated Nationals or the U.S. Commerce Department's Table of Deny Orders. The Software and any underlying technology may not be exported outside the United States or to any foreign entity or "foreign person" as defined by U.S. government regulations, including without limitation, anyone who is not a citizen, national, or lawful permanent resident of the United States.

## 1.14 Intellectual Property Rights

**1.14.1 AT&T IP:**
You agree that Software, AT&T Services, and AT&T equipment ("AT&T IP") are protected by trademark, copyright, patent and intellectual property laws, and/or international treaty provisions. You also agree that the source and object code of AT&T IP and the format, directories, queries, algorithms, structure, and organization of AT&T IP are the intellectual property and proprietary and confidential information of AT&T, its suppliers, and its licensors. Except as expressly stated in this Agreement, you are not granted any intellectual property rights in or to AT&T IP by implication, estoppel, or other legal theory, and all rights in and to AT&T IP not expressly granted in this Agreement are hereby reserved and retained by us. Nor do you have any intellectual or other property rights in any information that we

provide or use to deliver AT&T Services, such as any Account or phone numbers or email addresses assigned to you.

**1.14.2 Third-Party Software:**
AT&T IP may utilize or include third-party software that is subject to open source and third-party license terms ("Third-Party Software"). You acknowledge and agree that your right to use such Third-Party Software as part of the Services is subject to and is governed by the terms and conditions of the open source or third-party license applicable to such Third-Party Software, including, without limitation, any applicable acknowledgements, license terms, and disclaimers contained therein ("Third-Party Software Notices") and including all posted changes to Third-Party Software Notices. In the event of a conflict between the terms of this Agreement and the terms of those licenses, the terms of those licenses will control your use of the relevant Third-Party Software. In no event will the Application or components thereof be deemed to be "open source" or "publicly available" software. You agree that your use of AT&T IP is subject to the terms of all Third-Party Software Notices.

**1.14.3 AT&T Marks:**
You agree that AT&T names and their related logos and all related product and service names, design marks, and slogans are trademarks and service marks owned by and used under license from AT&T (the "AT&T Marks"). You are not authorized to use the AT&T Marks in any advertising, publicity, or in any other commercial manner without the prior written consent of AT&T, which may be withheld for any or no reason.

**1.14.4 Copyright Infringement and Digital Millennium Copyright Act:**
AT&T respects the intellectual property rights of others. If you believe that your work has been copied and has been posted, stored, or transmitted in connection with AT&T Services in a way that constitutes copyright infringement, in accordance with the Digital Millennium Copyright Act ("DMCA"), please tell us by providing the information listed at att.com/legal/terms.dmca.html to our Copyright Agent for notice of claims of copyright infringement to copyright@att.com. For more information about AT&T's copyright protection practices under the DMCA and for information on how to contact our DMCA agent, please refer to att.com/legal/terms.dmca.html.

**1.14.5 Copyright Alert Program:**
We maintain the AT&T Copyright Alert Program (AT&T CAP) that allows copyright holders to notify us of claimed infringement occurring on our transitory digital network communications services pursuant to 17 U.S.C. § 512(a). For more information on the AT&T CAP, please visit copyright.att.net.

Under the AT&T CAP, content owners may submit notifications to us of alleged copyright infringement based on information they have independently collected in accordance with the industry standard Automated Copyright Notice System. If a content owner or its authorized agent submits an infringement notice identifying an IP address that we can, with reasonable efforts, trace to a particular and identifiable AT&T subscriber as of the date and time identified in the notice, we will forward a copyright alert to the contact information on file for the subscriber Account, advising the Account holder of the allegation and providing information about online copyright infringement.

If you receive a copyright alert, it is your responsibility to take immediate action to check your internet connected devices and your local network to ensure that you don't generate additional copyright infringement notices. If, after you receive a copyright alert, we receive additional copyright infringement notices which are traceable to an IP address associated with your Account, we may temporarily redirect your internet access service to a webpage where you will be required to review and acknowledge material on the importance of copyright and the lawful use of content available over the internet. Upon completion of this review, redirection will be discontinued and your service will be restored to normal. After this stage, if we continue to receive copyright infringement notices that are traceable to an IP address associated with your Account, we may take further action consistent with 17 U.S.C. § 512(i), which may ultimately result in termination of your AT&T Services.

The Account holders' personally identifiable information is protected throughout this process. We will not provide such information to content owners unless required to do so by court order. For more information about AT&T's Copyright Alert Program, please go to: copyright.att.net.

Our policies may be periodically revised and, in addition, we may in our sole discretion voluntarily participate, on terms acceptable to us, in copyright alert and graduated response programs with other stakeholders. By using the AT&T Services, you agree that we have the right, but not the obligation, to challenge on your behalf the legitimacy of any notification of copyright infringement which we receive, and you agree to grant us such limited authority as may be necessary to allow for such a challenge.

## 1.15 Information, Content, Services, And Applications Provided By Third Parties

WE ARE NOT A PUBLISHER OF THIRD-PARTY INFORMATION, APPLICATIONS, SERVICES, OR OTHER CONTENT AND WE ARE NOT RESPONSIBLE FOR ANY OPINIONS, ADVICE, STATEMENTS, OTHER INFORMATION, SERVICES, OR GOODS PROVIDED BY THIRD PARTIES. AT&T, its service providers, and its suppliers—in providing information, services, applications, content, or products—do not underwrite, or assume your risk in any manner whatsoever. You agree that your use of third-party information, applications, services, content, or products is at your own risk, for which we're neither responsible nor warrant their safety, quality, or appropriateness and we do not provide customer service, repairs, or other support.

Third-party content or service providers may impose additional charges. Any information you provide to third parties is governed by their policies or terms.

Some services give you the ability to access, view, listen to, interact with, record, and/or store third-party audio and visual content ("Third-Party Content"). You understand that we don't guarantee the access to or availability of any particular Third-Party Content, or the length of time any particular Third-Party Content may remain available. You also understand that Third-Party Content is the copyrighted material of the third-party that supplies it, is protected by copyright and other applicable laws, and may not be reproduced, published, broadcast, rewritten, or redistributed without the written permission of the third-party that supplied it, except to the extent allowed under the "fair use" provisions of the U.S. copyright laws or comparable provisions of foreign laws. You agree that we will have no liability to you, or to anyone else who uses your AT&T Account or your AT&T services, with regard to any Third-Party Content.

We reserve the right in our sole discretion to restrict or deny access to any Third-Party Content or other third-party information, application, services, or products.

**1.16 Assignment and Third Parties**

**1.16.1 Assignment:**
We may assign this Agreement or parts of this Agreement to any third party without your consent and without notice to you, but you cannot assign the Agreement or any rights or legal claims arising from it without our prior written permission. Upon any assignment of this Agreement by AT&T, all references in this Agreement to "AT&T" "we," "us," or "our" shall refer solely to the assignee of this Agreement and shall no longer refer to AT&T or its affiliates. From the date of an assignment by AT&T, we will no longer be your service provider and the assignee shall be responsible for providing your services. You acknowledge and agree that AT&T will have no liability or obligation to you if this Agreement is assigned by AT&T, and your recourse for any liabilities or obligations will be solely limited to the assignee of this Agreement.

**1.16.2 Third parties:**
Except as stated in this Agreement, anyone who uses or benefits from your AT&T Services is not a third-party beneficiary who can enforce this Agreement against you, us, or anyone else.

**1.17 About this Agreement**

**1.17.1 Your Ability to Contract:**
By agreeing, acknowledging, or signing any agreement or terms and conditions or otherwise activating, using, or paying for any AT&T Service – which constitutes acceptance of this Agreement – you're confirming that you're over the age of majority and have the capacity to enter into binding contracts. In addition, if you're using AT&T Services on behalf of any entity, such as a corporation or other organization, you're accepting this Agreement on that entity's behalf. If that entity has separately entered into a business agreement with us, those business terms control.

**1.17.2 Changes to Agreement:**
We may add, modify, or delete any terms, conditions, rates, or fees for any AT&T Service at any time. We will provide you with notice of changes that are materially adverse to you (this does not include changes in fees or surcharges imposed by the government and passed onto you or changes to rates, fees, or surcharges within limits set forth in this Agreement or any incorporated documents) by email, bill insert or message, text or other message, posting on the website for your AT&T Service, mail, or other method we deem practicable. We also may provide you with notice of non-material changes in our sole discretion. Your continued use or payment for AT&T Services after the effective date of the change means you have accepted the change. If we notify you of a materially adverse change concerning an AT&T Service during your Service or Programming Commitment, and if you don't accept the change, you must cancel the AT&T Service within 14 days of the notice to avoid an early termination fee, if applicable. Continued use of the AT&T Service is your acceptance of any changes.

**1.17.3 Conflicting Terms:**
This Agreement supersedes any prior agreement between us regarding your AT&T Services. In the event of a conflict between this Agreement and an applicable EULA, this Agreement controls unless the EULA specifically states otherwise. The English version of this Agreement is the original one. If there is a conflict between it and any translated version, the English version controls.

**1.17.4 Severability:**
If any provision of this Agreement is found to be unenforceable, **the remaining provisions will remain in full force and effect.**

**1.17.5 Survival:**
Although you or we can terminate this Agreement, some terms will continue to apply after termination. These terms include, but are not limited to, the provisions regarding dispute resolution (subsection 1.3), disclaimer of warranties (subsection 1.6), limitations of liability (subsection 1.7), indemnification (subsection 1.8), and governing law (subsection 1.12).

**1.17.6 Entire Agreement:**
This Agreement constitutes our entire agreement and supersedes any prior or contemporaneous agreements or understandings between us, either written or oral. This integration clause means that, to the greatest extent permitted by applicable law, you cannot rely on marketing materials or statements or promises by our employees or agents to modify the terms of this Agreement.

**1.17.7 Operational Limits/Force Majeure:**
Our ability to provide AT&T Services to you is subject to the availability and the operational limitations of the equipment and associated facilities, including third-party networks that AT&T does not control. You understand and agree that temporary interruptions or delays of AT&T Services may occur, and that AT&T is not liable for them. In addition, we aren't responsible for interruptions or delays caused by events outside our control, such as war, acts or threats of terrorism, civil disorder, labor strikes or disruptions, natural disasters (including fires, floods, earthquakes, and severe weather), medical epidemics, pandemics or outbreaks, destruction of network facilities or transportation infrastructure, or any other events beyond our reasonable control.

**1.17.8 Non-Waiver of Rights:**
We may decide not to enforce rights or remedies under this Agreement in specific instances. That decision is not a waiver of any of our rights or remedies.


# 2.0
# AT&T Wireless Service Terms

AT&T wireless service, including FirstNet individual users' wireless service ("Wireless Service"), is provided by AT&T Mobility LLC, acting on behalf of its FCC-licensed affiliates or AT&T's assignee or successor ("AT&T" or "us" in these Wireless Service Terms).

Section 2 contains terms applicable to all AT&T Wireless Services. Section 3 contains supplemental terms for AT&T PREPAID Wireless Service and Section 4 contains supplemental terms for DataConnect/Session-based Wireless plans. If terms in Section 2 conflict with terms in either Section 3 or 4, the terms in Section 3 or 4 will control.

For questions about Wireless Service, please call 800.331.0500 for postpaid service and 800.901.9878 for prepaid service.

## 2.1 Wireless Service Agreement

Your Wireless Service Agreement includes the following:

- Your Customer Service Summary;
- Your Wireless Service terms and conditions found in the brochures that are available in the retail store and online at att.com/mobilityplans at the time of your purchase; and
- Additional terms and conditions that apply to your use of AT&T apps, features and services, which are available in the app, on your Device and online at att.com/appterms or the associated service page at att.com.

AT&T's wireless network may provide broadband access to the internet. For more information about how AT&T helps transmit information to points on the internet and how we manage our network, please see att.com/broadbandinfo. The information provided on the broadband information page is not part of your Agreement.

## 2.2 Wireless Service Description

Your Wireless Service includes:

- Services included in your rate plan, which sets forth your monthly usage allotment and charges for voice, messaging and/or data services; overage rates when you exceed your rate plan's monthly usage allotment; pay-per-use rates; and your coverage area. Unless specified otherwise in your rate plan terms, any unused allotment of voice, messaging and data services, from one billing cycle will not carry over to any other billing cycle.
- Any optional features and services you add to any line on your Account, which may be subject to additional charges and terms and conditions.

Unless otherwise specified in your rate plan, your Wireless Service does not include—and additional charges may apply for use of—other carriers' networks in the U.S. or while traveling internationally.

AT&T Wireless Service may be used with: (a) a mobile device that contains a SIM that is assigned to your Account or (b) a device that is designed and purchased for use exclusively on AT&T's network (referred to in the Wireless Service Terms interchangeably as "Device" or "Equipment").

### 2.2.1 Voice Service:
If your rate plan includes voice service, subject to the limitations in this Agreement, you can make and receive calls within your rate plan's coverage area ("Voice Service"). Additional charges may apply for Voice Service used outside your rate plan's coverage area.

### 2.2.2 Messaging Service:
If your rate plan includes the ability to send and receive AT&T text (SMS), pictures or video (MMS), and/or Advanced Messaging (RCS) chat messages (collectively "Messages"), subject to the limitations in this Agreement, you will be able to receive and send such messages ("Messaging Service"). Apps that use other messaging protocols and over the top third-party messaging apps may incur data charges. Messages sent from or received on tablets, laptops, smart watches, or other connected devices are treated as data usage, not messages. AT&T does not guarantee delivery of messages. Messages, including downloaded content, not delivered within 72 hours will be deleted and no longer available. AT&T reserves the right to change this delivery period as needed without notification.

Advanced Messaging will not work if messaging or data has been blocked on your line. For more information on Advanced Messaging, visit att.com/advancedmessaging. Maximum limits on group message size apply depending on device mix and capabilities. MMS and SMS Messaging Service and data plan may need to be provisioned on an account in order to use Messaging. Some elements of Messages may not be accessible, viewable, or heard due to limitations on certain wireless devices. AT&T reserves the right to change the Message size limit at any time without notification. Text message notifications may be sent to non-Picture/Video Messaging subscribers if they subscribe to Text Messaging. You may receive unsolicited messages from third parties as a result of visiting internet sites.

### 2.2.3 Data Service:
If your rate plan includes data, subject to the limitations in this Agreement, you will be able to browse the internet and access wireless services, content and apps, including those that enable sending and receiving of emails, use of GPS navigation, streaming of video, and other customary mobile internet-enabled capabilities ("Data Service"). Services provided via the Data Service may be provided by AT&T or its affiliates, assignees, successors, or by third parties subject to service-specific terms and conditions.

### 2.2.4 AT&T Wi-Fi Service:
If you have a qualified rate plan and a Wi-Fi capable device, AT&T W-Fi Service in the U.S. may be available to you at no additional charge and your device may auto-authenticate at AT&T Wi-Fi Service locations. Use of AT&T W-Fi Service in the U.S. is subject to the Wi-Fi Terms of Service ("Wi-Fi Terms") found at att.com/legal/terms.wiFiServices.html. If you auto-authenticate at our Wi-Fi Service locations, your use may be subject to the Wi-Fi Terms and the URL filtering choices of the location owner or operator. Auto-authentication can be disabled on your device, e.g., by turning off Wi-Fi. Certain information about you or your Device may be collected when you use AT&T's Wi-Fi Service. (Note that AT&T Wi-Fi Service is for Wireless customers; home networking Wi-Fi for Internet Service customers is subject instead to the terms in subsection 6.2.4.)

### 2.2.5 Caller ID:

Your caller identification ("Caller ID") information (such as your name and phone number) may be displayed on the Device or bill of the person receiving your call; technical limitations may, in some circumstances, prevent you from blocking the transmission of Caller ID information. Contact customer service for information on blocking the display of your name and number. Caller ID blocking may not be available when using Data Services. If applicable to your rate plan and Device, an in-coming call identification feature may apply that will notify of in-coming calls and that may apply generic labels such as telemarketing, suspected spam, and/or suspected fraud to some of those calls.

## 2.3 Where can I use my Wireless Service?

To activate and maintain your Wireless Service you must have a U.S. mailing address and live within AT&T's, its assignee's or its successor's owned and operated network coverage area. Our coverage maps can be found at att.com/coverageviewer. There are gaps in coverage maps, which, by their nature, are only approximations of actual coverage. Please be aware that even within your coverage area many things can affect the availability and quality of your Wireless Service, including, but not limited to, network capacity, your Device, your rate plan, terrain, buildings, foliage and weather. Wireless Service or particular wireless technologies (such as 5G) will not be available in all areas at all times.

We utilize different network technologies in our wireless network and not all Devices work on all wireless technologies. We do not guarantee that you will receive any specific network capability at any given time, including any particular network speed. Actual network speeds depend upon device characteristics, network technology, availability, coverage, tasks, file characteristics, applications and other factors.

Wireless Service may be interrupted, delayed, or otherwise limited for a variety of reasons, including environmental conditions, unavailability of radio frequency channels, system capacity, network management, priority access by National Security and Emergency Preparedness personnel in the event of a disaster or emergency, coordination with other systems, equipment modifications and repairs, and problems with the facilities of interconnecting carriers.

## 2.4 Service Activation and Term Commitment

### 2.4.1 Establishing Service and Service Term:
To establish Wireless Service, you may have been required to provide a credit card. You may use this or another credit or debit card to establish recurring payments. See Section 2.35 regarding payment upon cancellation. These Wireless Service Terms begin on the day we activate your Wireless Service and continue through termination of your Wireless Service for any reason.

### 2.4.2 Term Commitment:
If you have agreed to a Service Commitment, you are required to maintain Wireless Service on an eligible plan for the Service Commitment period. Once you complete your Service Commitment, your contract for Wireless Service will continue on a month-to-month basis and automatically renews unless you cancel it or your Wireless Service is otherwise terminated. If you do not have a Service Commitment (for example, you purchase your Device from us at full retail price, under an installment plan, or bring your own Device), your Service is provided on a month-to-month basis and automatically renews unless cancelled or terminated. See att.com/howtocancel for details on how to cancel.

### 2.4.3 Device Activation:
If you purchased a Device that was shipped to you, you agree to activate the Device within seven (7) days of the shipment date. If your Device is not activated by you, for post-paid Wireless Service, we may activate the Device for you within a month of shipping and your monthly recurring charges, and any applicable Service Commitment, will begin.

### 2.4.4 Early Termination Fee ("ETF"):
If you terminate your Agreement before completion of your Service Commitment, you agree to pay an ETF unless the ETF is waived by subsection 2.4.5. The ETF amount will be an amount up to your purchase price and will reduce each full month of your Service Commitment that you complete. For details, see att.com/equipmentETF.

### 2.4.5 Your Termination Rights and Ability to Change Wireless Service:
You can cancel any individual line of Wireless Service on your Account or your whole Account at any time. You must pay all amounts owed for Wireless Service used prior to cancellation including applicable taxes, surcharges, AT&T fees, and other fees. Authorized agents may charge additional fees. If you cancel your Wireless Service within the first 3 days of activation, we will refund your activation fee, if applicable. If you have a Service Commitment, you can cancel Wireless Service within 14 days of activation by returning the Device you purchased, and you will not be required to pay an ETF. Your Device must be in like-new condition with original packaging to be eligible for return. See att.com/returns for details. AT&T also may charge you a restocking fee for any returns. If you cancel prior to end of your billing period, your monthly Wireless Service charges are not refunded or prorated.

You also can change your Wireless Service at any time, but the Wireless Service available to you depends on your Device. Your Device may require certain Wireless Service, for example, smartphone users must have a rate plan that includes both voice and data.

## 2.5 Prohibited Uses of Wireless Services

Our wireless network is a shared resource, which we manage for the benefit of all of our customers. To ensure the activities of some users do not impair the ability of all our customers to have access to reliable services provided at reasonable costs, we forbid certain activities and uses ("Prohibited Network Uses"). We may take any and all reasonable actions necessary to prevent and stop Prohibited Network Uses or any other violation of AT&T's Acceptable Use Policy. Prohibited Network Uses include use of AT&T Wireless Service that, in AT&T's sole determination:

- hinders other customers' access to the wireless network;

- involves a mechanism that is used to originate, amplify, enhance, retransmit or generate a radio frequency signal without our permission;

- negatively affects our network or compromises network security or capacity;

- excessively and disproportionately contributes to network congestion;

- adversely impacts network service levels or legitimate data flows;

- degrades network performance;

- causes harm to other customers;

- tethers a wireless Device to a computing device if you have not subscribed to a rate plan with a tethering feature;

- uses any Device for Wireless Service with an ineligible rate plan;

- constitutes the reselling of any Wireless Service; or

- is excessive or unreasonable.

**2.5.1 Examples of Prohibited Network Uses of Voice Service:**

Our unlimited Voice Service is provided primarily for live dialogue between individuals. If your use of unlimited Voice Service for call forwarding, conference calling or purposes other than live dialogue between individuals exceeds 1,000 minutes per month, AT&T may terminate your Service or change you to a rate plan with no unlimited voice usage components. Our unlimited Voice Service may not be used for any other commercial purposes, including, but not limited to: (1) maintaining an open line to provide dispatch or monitoring services; (2) accessing or remote call forwarding to multi-party chat line services; (3) transmitting broadcasts or pre-recorded materials; or (4) telemarketing.

**2.5.2 Examples of Prohibited Network Uses of Messaging Service:**

Our Messaging Services are provided solely for communication between, and/or initiated by, individuals for personal use. You may not use Messaging Services for commercial purposes, including, but not limited to: (1) sending unsolicited, unauthorized, spam, or other unwanted messages (whether SMS, MMS, RCS, or other); (2) sending or receiving unusually high numbers of messages or messages not originated on your Device; or (3) reselling or transferring messaging capabilities. See the Acceptable Use Policy (located at att.com/legal/terms.aup.html) for more information. We may terminate or restrict your Messaging Service for tethered messaging, excessive use, or misuse.

**2.5.3 Examples of Prohibited Network Uses of Data Service:**

Data Service may not be used in any manner that: defeats, obstructs, penetrates, or attempts to defeat, obstruct, or penetrate, the security measures of AT&T's wireless network or systems, or another entity's network or systems; accesses, or attempts to access without authority, the accounts of others; or adversely affects the ability of other people or systems to use either AT&T's Wireless Services or other parties' internet-based resources. For example, this prohibition includes, but is not limited to: malicious software or "malware" that is designed, intentionally or unintentionally, to infiltrate a network or computer system such as spyware, worms, Trojan horses, rootkits, and/or crimeware; "denial of service" attacks against a network host or individual user; and "spam" or unsolicited commercial or bulk email (or activities that have the effect of facilitating unsolicited commercial or bulk email).

Data Service may not be used in any manner that has the effect of excessively contributing to network congestion, hindering other customers' access to the network, or degrading network performance. For example, this includes, but is not limited to: server devices or host computer applications such as continuous Web camera posts or broadcasts, automatic data feeds, or automated machine-to-machine connections; "auto-responders," "cancel bots," or similar automated or manual routines that generate excessive amounts of traffic or that disrupt user groups or email use by others; use of the Wireless Service as a substitute or backup for private lines or full-time or dedicated data connections; peer-to-peer (P2P) file sharing services; and software or other devices that maintain continuous active internet connections when a connection would otherwise be idle or any "keep alive" functions.

Data Service also may not be used with high bandwidth applications, services and content that are not optimized to work with Data Service and, therefore disproportionately and excessively contribute to network congestion. This includes, but is not limited to, redirecting television signals for viewing on computing devices; web broadcasting; and/or the operation of servers, telemetry devices, or supervisory control and data acquisition devices.

## **2.6 Unlimited Data Service**

If you are subscribed to an AT&T unlimited data plan, you agree that "unlimited" means you pay a single monthly flat rate for wireless Data Service regardless of how much data you use. You further agree that "unlimited" does not mean that wireless data will be transmitted at any particular speed or that you can use AT&T's wireless Data Service in any way that you choose or for any Prohibited Network Uses. If you use your unlimited data plan in any manner that is prohibited, AT&T can limit, restrict, suspend or terminate your Data Service. We may also migrate you from the unlimited data plan to a tiered data plan and charge you the appropriate monthly fees. We will provide you with notice of this change at least one billing period in advance either by a bill message, email, text message, or other appropriate means.

Except for FirstNet individual users, AT&T may also reduce your data throughput speeds at any time based on the terms of your data plan, which may include times when your usage exceeds an applicable, identified data usage threshold during any billing period. Reduced data throughput speeds mean you may experience reduced data speeds and increased latency, which may cause websites to load more slowly and affect the performance of data-heavy activities such as video streaming.

Reduced data throughput speeds apply when using Data Services at times and in areas experiencing network congestion compared to other customers using the same cell site. Standard speeds will resume once the cell site is no longer congested or when your data session moves to an uncongested cell site, and speeds will no longer be reduced during periods of network congestion at the start of your next billing period, unless your usage again exceeds an applicable, identified data usage threshold for that next billing period.

There are no mobile network-related speed reductions if you use Wi-Fi, and Wi-Fi data usage does not count against a monthly data usage threshold for wireless Data service. For more information, go to att.com/broadbandinfo and att.com/datainfo.

## 2.7 AT&T's Rights to Change, Reduce, Cancel, Suspend, Interrupt or Terminate Wireless Service or the Agreement

AT&T can take any and all actions necessary to protect the AT&T wireless network, ensure compliance with this Agreement and prevent and/or stop Prohibited Network Uses. AT&T may also change, reduce, interrupt, suspend, limit or cancel your Wireless Service or terminate your Agreement without advance notice for any reason, including, but not limited to the following actions by you or any user of your Device or on your Account:

- misconduct described by subsection 1.5;

- living or predominantly using Wireless Service outside of the AT&T owned and operated domestic network coverage area;

- exceeding our off-net roaming usage allowances; and

- engaging or attempting to engage in Prohibited Network Uses.

If you lose your eligibility for a particular Wireless Service, we may modify, remove, or change your Wireless Service to one for which you qualify. **If we determine that you are using your Device without the correct rate plan, we reserve the right to switch you to the required rate plan and charge you the appropriate monthly charges and fees.** If we change your rate plan, you may change to another eligible rate plan. We may engage in any reasonable network management practice to enhance customer service, to reduce network congestion, to adapt to advances and changes in technology, and/or to respond to the limited availability of wireless bandwidth and spectrum. We may reduce your data throughput speeds at any time or place according to your rate plan.

**If we cancel your Wireless Service for misconduct or violations of this Agreement and you have a Service Commitment, we may charge you an ETF in addition to interrupting, suspending, modifying, or terminating your Wireless Service and Agreement.**

## 2.8 Use of Wireless Service on Other Wireless Carrier Networks

AT&T has agreements with other wireless carriers that allow you to use Wireless Service outside of AT&T's owned and operated wireless network. Within the U.S. and certain U.S. territories, the use of other carrier networks is referred to as domestic off-net usage. Use of other carrier networks while traveling internationally is called international roaming or international off-net usage. Both off-net usage and international roaming are dependent upon the agreements we have at any given time with other wireless carriers, and the network technology, frequencies, and functionality of those networks. Availability, quality of coverage, and speed for Wireless Service for off-net usage and international roaming are not guaranteed and may be changed without notice. AT&T may also reduce speeds (to 2G or other speeds) or suspend wireless Data Service for off-net and international roaming at any time without notice and without regard to the amount of data you have consumed during the billing period.

### 2.8.1 Limits on Use of Other Wireless Carrier Networks in the U.S.:
In most cases you are not charged separately for domestic off-net usage. Please check your rate plan terms to determine whether any extra charges apply for domestic roaming. However, if your rate plan provides for off-net usage, you still must use your Device predominantly within the AT&T owned and operated wireless network. Thus, if we provide you with off-net usage, we may suspend, limit or cancel your continued use of other carriers' networks if you exceed the following off-net thresholds:

- **Voice:** If you use more than 750 minutes during any month.

- **Data:** If you use more than 100 megabytes of data during any month.

- **Messaging:** If you use more than 3,000 messages during any month.

We will provide you with notice if we take action because you exceed any of these thresholds.

For current information about our coverage, please visit att.com/coverageviewer. Please be aware that your Device may connect to another wireless carrier's network even when you are located within the AT&T owned and operated network coverage area.

### 2.8.2 Use of Wireless Service while Outside the U.S.:
Your rate plan may include the capability to send and receive calls and text messages and use data for international roaming. Certain eligibility restrictions may apply to international roaming, which may be based on Wireless Service tenure, payment history and/or credit. We may in our sole discretion block or remove your ability to use international roaming until our eligibility criteria is met.

International roaming rates apply to any calls made or received, messages sent, and data used while outside the U.S. International roaming rates are subject to change without notice and vary by country. **If you do not subscribe to an international roaming package or plan, you will be charged pay-per-use rates that may be substantially higher on a per unit basis than international package rates.** Coverage within other countries and territories may vary depending on your Device type, plan and package and may be changed by us at any time without notice. For rates, coverage, countries and details, see att.com/global.

We may send courtesy "alert" messages when your Device connects to a wireless network in another country to notify you of international roaming data use. There is no guarantee you will receive these alerts and they are not a guarantee of a particular bill limit.

You may be charged international roaming voice airtime usage rates when incoming calls are routed to voicemail, even if no message is left, for both the incoming call and the call forward to voicemail. You may also incur those roaming charges for unanswered calls if your Device is powered off if you previously had turned it on and allowed it to register on a foreign carrier's network; there may be a lag time between when you power off your Device and when you are no longer registered on the foreign carrier's network. You will be charged for all data usage, including without limitation your use of messaging apps, visual voicemail and access to cloud-based services. You may also be charged taxes on international roaming rates. Billing for international roaming usage may be delayed up to three billing cycles due

to the time it takes for wireless carriers to report international roaming usage.

**Please note that substantial charges may be incurred if your Device is taken out of the U.S. even if international roaming is not intentionally used.** Many Devices have preloaded and downloaded apps that transmit and receive data without user intervention and can generate unexpected charges when your Device is powered on outside the U.S. **If you want to block international roaming services, please call 314.925.6925 (at no charge from your AT&T wireless phone).**

## 2.9 Use of Wireless Service for Calls or Messages to International Phone Numbers

International long distance includes calls or messages made from the U.S. to any other country. **Unless you subscribe to a package or rate plan that includes international long distance, you will be charged pay-per-use rates for calls or messages initiated from the U.S. to any other country.** International long distance calling rates are charged on a per-minute basis and are subject to change without notice. **Unless a foreign country is included as a calling destination within your rate plan's coverage area, international long distance rates are charged for each call in addition to usage of your rate plan voice airtime minutes.** Calling or messaging to some countries may not be available. Calls to international wireless numbers may cost more than calls to wireline numbers. If a call is placed to an international wireline number and the call is forwarded to a wireless number, you will be charged for a call terminated to a wireless number. Additional charges apply to numbers for premium rated services. For rates and details visit att.com/global.

## 2.10 Wi-Fi Calling for AT&T Wireless Customers

**Important Information about Wi-Fi Calling for AT&T Wireless Service Customers**

**TTY Devices are not compatible with Wi-Fi Calling:** Wi-Fi Calling lets you call and text over Wi-Fi when cellular coverage is limited or unavailable. Your Device must be set to AT&T HD voice and have internet access. Loss of your internet connection during voice Wi-Fi calling will disconnect your call, including 911 calls. In the U.S. or internationally, you can use Wi-Fi Calling to call numbers in the U.S. at no additional charge (excluding 411 calls and other premium numbers). International long distance rates/plans apply when calling international numbers from within the U.S. International roaming rates apply when calling international numbers while traveling outside the U.S. Certain countries restrict Wi-Fi calling. No Wi-Fi Calling to 211, 311, 511, and 811. See att.com/wificalling for more.

**911 Calling with TTY & Real-time Text:** Due to technical limitations, **Wi-Fi Calling cannot be used with TTY devices and will not support TTY 911 calls.** Persons with communications disabilities can use Real Time Text (att.com/RTT) as an alternative to TTY. 911 services can be reached by either (1) calling 911 using Real Time Text, (2) calling 911 directly using a TTY device over the cellular network or from a landline telephone, (3) sending a text message to 911 directly, (4) using relay services to place a TTY or captioned telephone services (CTS) call from a wireless phone or from a landline telephone, or (5) using relay services to place a IP Relay or IP CTS call over a cellular or IP network.

**911 Call Routing:** 911 calls using Wi-Fi Calling will first attempt to route to the appropriate emergency response center using automatic location information from your Device or, if that fails, the Emergency Address (no P.O. Boxes) entered in your Wi-Fi Calling settings. To set up Wi-Fi Calling you will need to enter a US address. You can change your Emergency Address at any time by selecting "Update Emergency Address" in your Wi-Fi Calling menu. To ensure proper routing of 911 calls update your Emergency Address as needed. 911 service may be delayed or unavailable if automatic location information is unavailable or if using Wi-Fi Calling from a location different from the Emergency Address you entered.

**You acknowledge that you received and understand the foregoing information about 911 calls using Wi-Fi Calling as an AT&T Wireless Service customer, and you further agree that if you dial 911 on a Device using Wi-Fi Calling, AT&T may treat the automatic location information transmitted by your Device as your temporarily updated Wi-Fi Calling Emergency Address.**

## 2.11 Your Device

A voice plan is required on all voice-capable Devices, unless specifically noted otherwise in the terms governing your rate plan. An eligible rate plan is required for certain types of Devices, including smartphones. A tethering plan may be required to enable tethering on a compatible Device, depending on the terms of your rate plan.

### 2.11.1 Terms Applicable to Use of Your Device with Wireless Service:
We may periodically change your Device's preloaded software, apps or programing remotely, without notice (e.g., to update Device software or direct your Device to use network services most appropriate for your typical usage). We may also remotely program or reconfigure your Device upon activation on the AT&T network and at other times, as well as install additional software and apps.

You cannot (nor can you allow anyone else to) make any modifications to any Device purchased from AT&T or its programming to enable it to operate on any other system, except in accordance with the AT&T Device Unlock Policy found at att.com/deviceunlock. We may, at our sole discretion, modify the programming of your Device to enable operation on other systems. You may not tamper with, replace, or modify your Device operating system from its original equipment manufacturer specifications and capabilities.

You are solely responsible for complying with United States Export Control laws and regulations and the import laws and regulations of foreign countries when traveling internationally with your Device.

### 2.11.2 Stolen or Lost Device:
Contact us immediately to report your Device as lost or stolen so we can suspend your Wireless Service. If you receive your bill and there are charges for unauthorized usage after you reported your Device as lost or stolen, you must notify us of the unauthorized charges within 30 days. While your phone is suspended you will remain responsible for complying with all other obligations under this Agreement, including, but not limited to paying your monthly Service charges. You can report your Device as lost or stolen by contacting us at 800.331.0500 if you are in the United States, or (+1)916.843.4685 if you are abroad. FirstNet individual users

should contact us at 800.574.7000. If you have not received a courtesy suspension of monthly Service charges during the previous year, you may request a courtesy suspension until you replace or recover your Device (up to 30 days).

**2.11.3 Unlocking a Device:**
Your Device may have been programmed with a SIM lock which prevents it from operating with other wireless carriers' networks. If you wish to use your Device with another wireless carrier, you must enter an unlock code to unlock the phone. You can find out whether you meet the eligibility criteria in our Device Unlock Policy and, if eligible, obtain unlock instructions by visiting att.com/deviceunlock.

## 2.12 AT&T Use of Location Information

AT&T collects information about the location of your Device from our network and from your Device. We monitor, collect, and use this location information, together with other information we get from our network and your Device, to provide Wireless Service to you. We also use it to maintain and improve our network and the quality of your wireless experience.

**For more information about the how we may collect and use information, including location, please refer to the AT&T Privacy Policy at att.com/privacy. FirstNet individual users should review the FirstNet Privacy Policy at firstnet.com.**

## 2.13 NOTICE REGARDING TRANSMISSION OF WIRELESS EMERGENCY ALERTS (Commercial Mobile Alert Service)

AT&T has chosen to offer, at no additional charge, wireless emergency alerts, including enhanced geo-targeting (where selected by the alert originator and supported by the handset), within portions of its service area, as defined by this Agreement, on wireless emergency alert capable Devices.

Wireless emergency alerts, including enhanced geo-targeting (where selected by the alert originator and supported by the handset), may not be available on all Devices or in the entire service area, or if a subscriber is outside of the AT&T service area. In areas in which the emergency alerts are transmitted, such alerts may not be received even though a Device is capable of receiving them. For details on the availability of this service and wireless emergency alert capable devices, including the availability and benefits of enhanced geo-targeting (where selected by the alert originator and supported by the handset), please ask a sales representative, or go to att.com/support/article/wireless/KM1009041. This notice is required by FCC Rule 47 C.F.R. § 10.240 (Commercial Mobile Alert Service).

In transmitting emergency alerts pursuant to federal law, AT&T, including its officers, directors, employees, vendors, assignees, successors and agents, shall not be liable to any subscriber to, or user of, AT&T's Wireless Service or Equipment for any act or omission related to or any harm resulting from the transmission of, or the failure to transmit, an emergency alert; or the release to a government entity or agency, public safety, fire service, law enforcement official, emergency medical service, or emergency facility of subscriber information used in connection with delivering an emergency alert.

## 2.14 Mobile Content

You understand that Devices can be used to acquire or purchase goods, content, and services (including subscription plans), such as ring tones, graphics, games, applications and news alerts from AT&T or other companies ("Content").

You have full-time access to your Content purchase transaction history on our website. You may contest and seek refunds for unauthorized purchases and purchases with which you are not satisfied, but such refunds are not guaranteed. AT&T reserves the right to restrict Content purchases or terminate the Account of anyone who seeks refunds on improper grounds or otherwise abuses this Service.

Actual Content may vary based on the Device capabilities. Content may be delivered in multiple messages. Content charges are incurred at the stated one-time download rate or subscription rate, plus a per kilobyte or per megabyte default pay per use charge for the Content transport when delivered, unless you have a data or rate plan and such charges appear separately on your bill. You may be charged each time you download Content. Data Service charges may apply in addition to Content charges.

## 2.15 Charges, Fees, Billing, and Payment

**2.15.1 Charges:**
You are responsible for all charges incurred on your Account. We bill most Wireless Service one month in advance. In addition to charges authorized elsewhere in this Agreement (including subsection 1.9), your bill may include:

- the monthly cost of the rate plan you have selected;
- Device and other installment plan payments, if you purchased your Device or other services under an AT&T installment plan;
- optional services, charges for Content, Third Party Charges, and other purchases billed to your Account;
- pay-per-use and overage charges;
- other charges and AT&T fees described below; and
- occasional fees for special Account assistance as discussed below.

Some usage charges, such as those that depend on information from a third party, may be billed in subsequent bill cycles after the charges have been incurred.

Additional charges may include, but are not limited to:

**Third Party Charges.** You can make donations and purchase goods, Content, apps, and services (including subscriptions) from certain other companies ("Third

Party Charges") or us by billing those charges to your wireless Account. You are responsible for all authorized third party charges which will appear in a separate section of your bill. **You can prevent third party purchases by adding Purchase Blocker to your Account through your myAT&T app or call Customer Service at 800.331.0500.** Also, usage by others can be restricted by use of parental controls or similar features, visit att.com/securefamily to learn more.

**AT&T Monthly Fees** include but are not limited to the following: an AT&T Administrative Fee charged to help AT&T recover a portion of certain expenses AT&T incurs, including but not limited to: (a) charges AT&T or its agents pay to interconnect with other carriers to deliver calls from AT&T customers to their customers, and (b) charges associated with cell site rents and maintenance; and, an AT&T Regulatory Cost Recovery Fee charged to help AT&T recover the cost of: (a) government fees imposed on AT&T and (b) complying with government imposed regulatory requirements. These and other AT&T Fees are not taxes or charges which the government requires AT&T to collect from its customers. The amounts we charge may change. See att.com/mobilityfees for more info.

**Online Fee Schedule.** For additional information on fees that may appear on your bill and that you agree to pay, please visit att.com/mobilityfees.

### 2.15.2 Billing:

Unless agreed to otherwise when you subscribe, you may receive an electronic (paperless) bill at AT&T's online account management site (att.com/myatt or the myAT&T app, collectively "myAT&T") unless you tell us you want a paper bill. If you have electronic billing, each month we will send you an email notice to your official email address on file with AT&T when your electronic bill is available online. You may review your monthly bill or switch back to a paper bill by changing your billing preferences at myAT&T. FirstNet individual users can manage their billing through FirstNet Central at firstnetcentral.firstnet.com/.

### 2.15.3 Primary Place of Use:

To determine your primary place of use ("PPU") and which jurisdiction's taxes and assessments to collect, you're required to provide us with your street address. If you don't provide us with such address, or if it falls outside our licensed Services area, we may either reasonably designate a PPU within the licensed Services area for you or discontinue service. You must live and have a mailing address within AT&T's owned network coverage area or its assignee's or successor's.

### 2.15.4 Calculation of Charges:

Usage and monthly fees will be billed as specified in your rate plan terms of service. Your Customer Service Summary also provides an estimate of your total monthly bill.

If you select a rate plan that includes a predetermined allotment of Services (for example, a predetermined amount of airtime, messages, or data), unless otherwise specifically provided as a part of such rate plan, any unused allotment of Services from one billing cycle will not carry over to any other billing cycle.

Usage on networks not owned by AT&T is limited as provided in your rate plan. Charges will be based on the location of the site receiving and transmitting service and not the location of the subscriber.

#### 2.15.4.1 Voice Service/Calls:

Voice calls on our network will incur per-minute voice airtime charges unless specified otherwise in your rate plan. We round any fraction of a minute up to the next full minute. For outgoing calls, billable time may start either when you first press Send or when the call connects to a network, and for incoming calls, it starts when the call connects to a network (which may be before it rings). Usage time may end several seconds after you press End or after the call disconnects. For calls made on our network, we charge only for calls that are answered, including by machines.

#### 2.15.4.2 Messaging Service/Text, Picture, Video, and Rich Communication Messages:

If your rate plan does not include unlimited or an allotment of messaging, standard pay-per-use rates apply when a message is sent or received, whether read or unread, viewed or unviewed, solicited or unsolicited. Generally, one text message equals 160 characters; however, text messages that include special characters, like emojis or non-Latin alphabet characters may be limited to 70 characters. Text messages that exceed the character limit will be charged as multiple individual messages according to your rate plan. Messaging Service can deliver video and pictures messages (MMS) up to only 1MB in size, or up to 100MB in size with RCS. AT&T reserves the right to change the message size limit at any time. Messages sent to tablets, laptops, or other connected Devices are excluded from unlimited messaging plans or plans including unlimited messaging. You are charged for each part of messages that you send or receive in multiple parts. Message rates apply whether the message is read, unread, solicited, or unsolicited. Messages sent through applications may incur data usage charges.

Plans that do not provide for unlimited messaging are subject to the following provisions:

SMS and MMS messages are rated at 160 characters per message. Messages larger than 160 characters will be rated as an additional message. You are charged for each part of messages that are delivered to you in multiple parts. Premium SMS and MMS messages are charged at their stated rates. Standard rates apply to all incoming messages when in the U.S. Different, non-standard per message charges apply to international messages sent from the U.S. or while outside the U.S. Messaging pricing is for domestic messages only. When a single message is sent to multiple recipients, the sender is charged for one message for each recipient and each recipient is charged for the message received. Text, Picture, and Video messages are charged when sent or received, whether read or unread, solicited or unsolicited.

With Advanced Messaging (RCS) chat, your wireless rate plan's SMS and MMS rates apply. Each text/file attachment counts and is charged as a separate SMS/MMS. If you do not enroll in a monthly recurring plan for messaging or data, you may still have access to messaging and data and be charged on a pay-per-use basis if you use those Services.

#### 2.15.4.3 Data Service:

Data Service usage is calculated and billed in full KB or MB increments, as applicable, based on your rate plan. Actual data usage is rounded up to the next full KB or MB at the end of each data session for billing purposes. AT&T calculates a full KB or MB usage for every fraction of the last KB or MB of data usage occurring in each session. The full KBs or MBs calculated for each data session during a billing period are added together to determine billing. Network overhead, software update requests, email notifications, and resend requests caused by network errors can increase measured KBs or MBs. A data session started on our network will continue until the session ends, even when you connect to a Wi-Fi network after the session starts. For example, if you start to download an audio file using cellular

data and then connect to a Wi-Fi network while the audio file is still downloading, your audio file will continue to finish downloading over the cellular network. Your bill may not separately identify the data usage attributable to your use of specific sites, sessions or services used.

Data use occurs whenever your Device is connected to our network and is engaged in any data transmission, including those you initiate, or those running automatically in the background without your knowledge and whether the data transmission successful or not. Some applications, content, programs and software on your Device (including both downloads and preloads) automatically and regularly send and receive data transmission in order to function properly, without you affirmatively initiating the request and without your knowledge.

Your rate plan data allowance is limited to usage in the United States, unless service in other locations is included in your rate plan or international roaming is included as part of your rate plan or package.

**Data Overage**: Once you exceed your monthly data allowance (including any available data, such as Bonus Data or Rollover Data), during your billing period, you may automatically be provided with additional increments of data and charged as specified in your rate plan. Data overage can be used only in the bill period for which it was provided and does not rollover.

**2.15.5 Delayed Billing:**
Billing of usage for calls, messages, data or other Wireless Services (such as usage when roaming on other carriers' networks, including internationally) may occasionally be delayed. Such usage charges may appear in a later billing cycle and will be deducted from any applicable allotments for that month, regardless of when the usage actually occurred, even if this results in additional charges for that month.

## 2.16 Miscellaneous Services

**2.16.1 AT&T Roadside Assistance:**
AT&T Roadside Assistance ("RA") is an optional feature that may be purchased separately and automatically billed to the wireless Account. RA service is provided by American Traveler Motor Club, Inc., a licensed motor club. For complete RA Terms and Conditions, refer to your RA Welcome Kit or go to att.com/roadside.

**2.16.2 Optional AT&T Mobile Insurance, AT&T Protect Advantage for 1, and AT&T Protect Advantage for 4:**
If eligible, you have 30 days from activation or upgrade to enroll in optional AT&T Protect Advantage for 1 or AT&T Protect Advantage for 4. For details visit att.com/protectadvantage. AT&T Mobile Insurance and the insurance component of AT&T Protect Advantage for 1 and AT&T Protect Advantage for 4 are underwritten by Continental Casualty Company, a CNA company (CNA) and administered by Asurion Protection Services, LLC (in California, Asurion Protection Services Insurance Agency, LLC, CA Lic. #OD63161, in Puerto Rico, Asurion Protection Services of Puerto Rico, Inc.), licensed agent of CNA. Protect Extended Service Contract for 1 and 4 are provided by Asurion Warranty Protection Services, LLC, or one of its affiliates.

AT&T may change the insurer, service contract obligor and/or administrator for the AT&T device protection program at any time with advance notice. You will have the right to opt out by cancelling your enrollment in the program. However, if you continue to pay the charges for the program after we inform you of such a change, you will be presumed to have consented to be enrolled under the new insurer's group insurance policy and service contract, although you have the right to cancel at any time.

**2.16.3 Lifeline Services:**
As part of a federal government program, AT&T offers discounted wireless service to qualified low-income residents in selected states. For questions or to apply for Lifeline service, call 800.377.9450. For tips on how to protect against fraud, please visit the CPUC's website at, calphoneinfo.com.

**2.16.4 AT&T Wireless Internet Service:**
AT&T Wireless Internet service (formerly Wireless Home Phone and Internet service or WHPI) uses mobile wireless gateway equipment called an AT&T Wireless Internet device ("WI Device"). With AT&T Wireless Internet service, the WI Device allows you to connect a landline phone to place and receive calls, and to connect up to eleven internet-capable devices (one via Ethernet and ten via Wi-Fi) to have mobile broadband internet access over the AT&T wireless network. See Section 2 for more information about how AT&T Wireless Service works.

AT&T Wireless Internet service requires that you subscribe to an eligible wireless rate plan to take advantage of one or both capabilities. Tiered shared rate plan options allow you to share a monthly allotment of domestic wireless talk, text, and/or data usage among your connected internet-capable devices. If your usage exceeds the monthly allotment of the plan you select during a billing period, you automatically will be charged for overages or your data may be slowed as specified in your plan. If you do not use all of the monthly allotment(s) of the plan you select during a billing period (or Rollover period, as applicable), you forfeit that usage.

If your WI Device is used to roam on other carrier networks, AT&T's off-net usage restrictions apply. Messaging services and international roaming are not supported by AT&T Wireless Internet service. If you use a wireless rate plan not designed for AT&T Wireless Internet service with your WI Device, AT&T reserves the right to switch you to an appropriate plan and bill you the associated charges for such plan.

**911 calls are routed based on the wireless network's automatic location technology. You should expect to provide your location address to the emergency response center responsible for sending first responders (e.g., police, medical assistance, or fire) to your location. The WI Device has battery backup power and will work in the event of a power outage. However, if you connect a landline phone to the WI Device that itself requires external electric power to operate (e.g., a cordless phone), you will not be able to place and receive calls over that phone during a power outage.**

Please note that AT&T Wireless Internet service is different from AT&T Fixed Wireless Internet, which is discussed in subsection 6.14.2.

## 2.17 Disclaimer of Warranties and Limitations of Liability for Wireless Service

**2.17.1 Disclaimer of Warranties:**

Unless prohibited by law, the following limitations of liability apply in addition to the disclaimers in Section 1.6. We and our predecessors in interest, successors, and assigns, as well as our past, present and future subsidiaries, affiliates, related entities, and each of those entities' officers, agents, employees, and licensors make no warranty, express or implied, of merchantability or fitness for a particular purpose, suitability, accuracy, security, or performance regarding any Device, Wireless Service, Software or applications. Because of inherent limitations in wireless communications, and because we cannot control your choice or use of wireless Devices, to the maximum extent permitted by law, in no event will AT&T be liable, for any:

- act or omission of a third party we do not control;

- damage or injury caused by third party information, applications or content (e.g. apps, games, etc.) preloaded, accessible, or used through your Device;

- damage or injury caused by interruptions, failures to transmit, or delays in the Wireless Service provided by or through us;

- damage or injury caused by your use of Wireless Service provided by us while you are operating a vehicle;

- claims against you by third parties;

- unauthorized access to your Device, Wireless Service, or AT&T Account;

- damage or injury caused by a suspension or termination of Wireless Service by AT&T; or

- damage or injury caused by failure or delay in connecting a call to 911 or any other emergency service.

### 2.17.2 Limitations of Liability for Wireless Service:

In addition to the limitations of liability set forth in Section 1.7, your Wireless Service is also subject to the following additional limitations of liability.

Not all plans or Wireless Services are available for purchase or use in all sales channels, in all areas or with all Devices. AT&T is not responsible for loss or disclosure of any information you transmit or provide to us. AT&T's Wireless Services are not equivalent to wireline internet. AT&T is not responsible for nonproprietary services or their effects on Devices.

We may, but does not have the obligation, to refuse to transmit any information through the Wireless Services and may screen and delete information prior to delivery of that information to you. There are gaps in service within the Wireless Services areas shown on coverage maps, which, by their nature, are only approximations of actual coverage.

Notwithstanding the foregoing, if your Wireless Service is interrupted for 24 or more continuous hours by a cause within our control, we will issue you, upon request, a credit equal to a pro-rata adjustment of the monthly Service fee for the time period your Service was unavailable, not to exceed the monthly Service fee. Our liability to you for Service failures is limited solely to the credit set forth above. AT&T is not liable to you for changes in operation or technology that cause or render your Device and/or software to be obsolete or require modification.

References in this Section 2.17.2 to "AT&T" and "we" include our past, present and future parents, subsidiaries, affiliates, and related entities, as well as AT&T's and all of those entities' officers, agents, employees, licensors, predecessors in interest, successors, and assigns.

## 2.18 Terms That Apply Only To Specific States

### 2.18.1 California: Unauthorized Charges:

You are not liable for charges you did not authorize, but the fact that a call was placed from your Device is evidence that the call was authorized. Unauthorized charges may include calls made to or from your phone or other Device after it was lost or stolen. Once you report to us that the Device is lost or stolen, and your Device is suspended, you will not be responsible for subsequent charges incurred by that Device. You can report your Device as lost or stolen and suspend Services without a charge by contacting us at the phone number listed on your bill or at att.com/my/#/suspendrestore.

If you notify us of any charges on your bill you claim are unauthorized, we will investigate. If there are charges on your bill for calls made after the Device was lost or stolen, but before you reported it to us, notify us of the disputed charges and we will investigate. You may submit documents, statements and other information to show any charges were not authorized. We will advise you of the result of our investigation within 30 days. If you do not agree with the outcome, you may file a complaint with the California Public Utilities Commission and you may have other legal rights. While an investigation is underway, you do not have to pay any charges you dispute or associated late charges, and we will not send the disputed amount to collection or file an adverse credit report about it. While your phone is suspended you will remain responsible for complying with all other obligations under this Agreement, including but not limited to, your monthly fee. We both have a duty to act in good faith and in a reasonable and responsible manner including in connection with the loss or theft of your Device.

### 2.18.2 Connecticut: Questions About Your Service:

If you have any questions or concerns about your AT&T Service, please call Customer Care at 800.331.0500, dial 611 from your wireless phone, or visit att.com/wireless. If you have questions about the Unlimited Local or Unlimited Long Distance Service, please call 800.288.2020 or visit att.com. If you are a Connecticut customer and we cannot resolve your issue, you have the option of contacting the Public Utilities Regulatory Authority (PURA). Online: ct.gov/pura; Phone: 800.382.4586; Mail: Connecticut DPUC, 10 Franklin Square, New Britain, CT 06051.

### 2.18.3 Puerto Rico:

If you are a Puerto Rico customer and we cannot resolve your issue, you may notify the Telecommunications Regulatory Board of Puerto Rico of your grievance. Mail: 500 Ave Roberto H. Todd, (Parada 18), San Juan, Puerto Rico 00907-3941; Phone: 787.756.0804 or 866.578.5500; Online: jrtpr.pr.gov, in addition to having available arbitration, as provided in Section 1.3.

**3.0**

## Terms that Apply Only to AT&T PREPAID Customers

### 3.1 Applicability of this Section

This Section 3 pertains only to AT&T PREPAID customers, including AT&T PREPAID Multi-Line customers.

### 3.2 Charges

AT&T will not provide you with monthly bills. You may access your Account on our website, via the myAT&T app, by calling customer service, or by visiting an AT&T store. You are responsible for paying all charges for Services provided under this Agreement (such as subsection 1.9), including charges made by any person you permit to have direct or indirect access to your Device even if you did not authorize its use. These include but are not limited to (a) access charges; (b) usage charges; (c) charges for features and/or add-ons; (d) taxes, fees and other assessments imposed by the government that we are required to collect and remit to the government; (e) other fees and charges as set forth at att.com/mobilityfees; and (f) surcharges that we collect and retain from our customers that include, but are not limited to, Federal or State Universal Service fees, regulatory charges, and government taxes or fees imposed on gross receipts, sales and/or property that we incur in providing services to our customers. In some jurisdictions, certain recurring fees or taxes are included in the rate plan charge each month pursuant to applicable state or local law. For more info, see att.com/shop/en/wireless/prepaidE911.html.

### 3.3 Payment and Cancellation

You must make a payment to your Account within 26 days of activation or your Account will be canceled. Active service requires Account payment in full for monthly plans and minimum $25 Account payment for per minute and daily plans. If required, AT&T will refund the applicable activation fee if you cancel your service within the first 3 days of activation. **AT&T PREPAID cards and other account payments are nontransferable and nonrefundable.** The *888* command for payment only works with PINS/Cards purchased from AT&T-owned retail stores and select authorized retail locations and may not work on all Device types. Amounts deposited into your Account expire in accordance with the stated payment denomination expiration period ($10-$24 payments expire in 30 days, $25 to $99 in 90 days, $100 or more in 365 days). Unused Account balance forfeited upon expiration. If you are on a monthly plan, including one that requires one payment for multiple months of service, the applicable plan charge will automatically be deducted from your Account balance at the end of the day (11:59pm Central Time) on your plan's payment due date. **Applicable plan charge for any AT&T PREPAID plan is not refundable and not exchangeable, and any unused services of your plan are forfeited if you change to another plan during your plan's period.** If your Account balance is insufficient to pay the applicable plan charge, you will not be able to use your plan services, data services, or any pay-per-use services until you make a payment to your AT&T PREPAID account with the applicable amount or your plan is renewed. AT&T PREPAID accounts for phone plans will be canceled 60 days after expiration. AT&T PREPAID Accounts for data plans will be canceled 365 days after expiration. A new wireless phone number is required to reactivate service once Account is canceled.

### 3.4 Devices

Devices sold under the AT&T PREPAID brand are sold exclusively for use with AT&T PREPAID service, are designed for use only on the AT&T network and may not function on other wireless networks. By purchasing a Device designed for use with AT&T PREPAID service, you agree to activate and use it with AT&T PREPAID service. You also agree that you will not make, nor will you assist others to make, any modifications to any Device or programming to enable it to operate on any other system or network except in accordance with the Device Unlock Policy found at att.com/prepaiddeviceunlock. AT&T may, at its sole and absolute discretion, modify the programming to enable the operation of the Device on other systems. You understand and acknowledge that Devices designed for use with AT&T PREPAID service are sold solely for use with the AT&T network and that AT&T will be significantly damaged if you use or assist others to use our Devices for any other purpose. You also agree not to take any action to circumvent limits on the quantity of Devices that may be purchased. You will be liable to AT&T for any damages resulting from conduct prohibited in this section.

### 3.5 Monthly Plans

Monthly plans are good for 30 days at applicable charge. Monthly plans expire at 11:59 p.m. C.S.T. on the 30th day. When you first activate a plan, the day that the plan is activated counts as the first full day and counts toward the first 30 days, so your plan may be less than a full thirty days during the first month, depending on the time of plan activation.

### 3.6 Voice, Data & Messaging Services for Mobile Phones

Nationwide voice minutes included in plans are intended for domestic use only unless on a Monthly plan that includes in-country calls while in Mexico & Canada. Calling from the U.S. includes calling from the United States. Additional charges apply to all other calls. For information on per-minute rates and Add-Ons for international long distance calls, visit att.com/prepaidintl. Wi-Fi Calling requires Wi-Fi Calling-capable smartphone, AT&T PREPAID Account provisioned with HD Voice, Wi-Fi network, and eligible rate plan (excludes pay per use plans). Unlimited messaging includes unlimited text, picture and video messages within the U.S. (and in Mexico and Canada on plans that include usage in Mexico & Canada) and to select countries. For a list of countries, go to att.com/prepaidIntlText.

#### 3.6.1 Pay-Per-Minute Plans:
In a Pay-Per-Minute plan, Voice calls, text messages and data usage are charged at then prevailing per minute/per message/per usage rates. Pay-per-use data service is available only on basic and messaging phones.

#### 3.6.2 Daily Plans:
Daily plans include unlimited nationwide calling and unlimited messaging for a rate charge assessed and paid each day phone is used to make or receive voice

calls, including a call to voice mailbox, or send a text or picture/video/sound message. The day for purposes of Daily plan rate charge starts when you make a call, accept an incoming call, or send a message and ends 24 hours later. If you move in or out of Wi-Fi coverage during a Wi-Fi call when your 24 hours expires, a new 24-hour period will begin and the daily plan charge will apply. A minimum Account balance sufficient to pay Daily plan rate charge required to place or receive first call of the day or send a message. Pay-per-use data service is automatically available for basic and messaging phones at then prevailing pay-per-use data rate. A Data Add-On is available for an additional charge for all Device types. Once Data Add-On is depleted, basic/messaging phone users will automatically revert to pay-per-use data. To continue using data on a smartphone, customer must purchase another Data Add-On or be restricted to Wi-Fi.

**3.6.3 Monthly Plans:**
Monthly plans include unlimited nationwide calling and unlimited messaging. Certain Monthly plans may include data service. Data availability and allotments vary by plan. Certain Monthly plans for smartphones include a high-speed data allowance and, thereafter, unlimited data usage at reduced data speeds of up to 128 Kbps for the rest of the 30-day plan term. Certain Monthly plans have 5G Access. 5G service requires a compatible 5G device. 5G service is not available everywhere. See att.com/5Gforyou for details. Actual speeds vary by Device and location. For specific data allowance and speeds on these plans and other details, see att.com/prepaidplans. Data Add-On available on certain Monthly plans for an additional cost. Pay-per-use data not available on Monthly plans.

## 3.7 Add-ons

Add-ons are good for 30 days, except the International Travel and BridgePay Add-Ons, which are good for 7 days. Add-Ons expire at 11:59 p.m. C.S.T. on the last day of the term, except for Daily Data Add-Ons, which expire 24 hours after you purchase the Add-On. When you first activate an Add-On, the day that the plan is activated counts as the first full day and counts toward the number of days in the term. You must have an active (not expired) plan to purchase, use, or renew an Add-On, with the exception of the BridgePay Add-On. If your Account balance expires before the last day of the Add-On term, Add-On cannot be used and the remaining time on Add-On will continue to run unless you add money to your Account during the Add-On period. Renew an Add-On before its expiration date and any unused allotment will roll over to your renewed Add-On time period. Unlimited Add-Ons and the East Asia/India and Latin America/Caribbean Add-Ons do not roll over. Standard rates apply if Add-On not renewed.

**3.7.1 Monthly Data Add-Ons:**
When you add a data Add-On to a Monthly or Multi-Month plan that includes a data allotment, the use of data will be counted first against your data Add-On and then against the data allotment of your plan. If you renew your plan during the term of your data Add-On, any data remaining in your data Add-On will continue to be used until the data Add-On expires or is depleted.

**3.7.2 Daily Data Add-Ons:**
The Data Day Pass Add-On for the Daily plan begins at the time you purchase the Add-On and ends 24 hours later. After data Add-On expires or is depleted, usage will be charged according to your underlying plan.

**3.7.3 Hotspot Data Add-Ons:**
When you add a hotspot data Add-On to a Monthly or Multi-Month plan that includes a hotspot data allotment, the use of data will be counted first against your hotspot data Add-On and then against the hotspot data allotment in your plan. If a Monthly plan includes a hotspot data allotment, the unused portion of the hotspot data allotment in your plan will remain available for use until the last day of your monthly plan term, provided you deplete your hotspot data Add-On. If you renew your plan during the term of your hotspot data Add-On, any data remaining in your hotspot data Add-On will continue to be used until the hotspot data Add-On expires or is depleted.

**3.7.4 Monthly Messaging Add-Ons:**
A Monthly Messaging Add-On may be added only to the Pay-Per-Minute plan.

**3.7.5 Monthly International Calling Add-Ons:**
Countries and/or call destinations not included in International Calling Add-Ons are charged at standard pay-per-use rates for international long distance. For details on pay-per-use charges and International Calling Add-Ons, go to att.com/prepaidintl. International Calling Add-Ons with an allotment of minutes may not be purchased more than twice within any 30 day period, or AT&T reserves the right to block international calling and/or suspend or terminate your AT&T PREPAID service.

**3.7.6 International Travel Add-On:**
Requires an HD Voice capable device and an active monthly plan. For a list of countries, see att.com/prepaidintl.

**3.7.7 AT&T PREPAID WHS International Long Distance Add-On:**
The AT&T PREPAID WHS International Long Distance Add-On contains an allotment of minutes from the U.S. to specific countries. This Add-On can only be added to AT&T PREPAID Wireless Home Phone or Wireless Home Phone & Internet Monthly plans. For a list of countries and details, see att.com/prepaidwirelesshome.

## 3.8 Pay-Per-Use Text/Picture/Video Messaging

There is a charge per message sent or received, whether read or unread, delivered or undelivered, solicited or unsolicited.

## 3.9 Data

International data roaming is not available on AT&T PREPAID plans (except plans that include use of plan data in Mexico and Canada).

**3.9.1 Data Only Plans:**
Data only plans are available for use on eligible smartphones, tablets, and stand-alone mobile hotspot devices only.

**3.9.2 Video Streaming:**

Eligible content recognized as video will stream in SD (about 480p, max 1.5 Mbps). Ability to stream, video resolution and speed are not guaranteed and are affected by other factors. If two or more tethered devices are watching video from the same source at the same time, we may identify it as a single video and slow the speeds collectively to a max of 1.5 Mbps, which may impair your ability to watch video on these tethered devices. You can pause video on all but one of the tethered devices,or watch video from different sources to resolve this issue. See att.com/streamsaver for details. **For plans that include Stream Saver:** You can turn it off any time at att.com/myatt for access to HD video, if available.

## 3.10 Conference Calling and Call Forwarding

If your use of conference calling, including any variation thereof, or call forwarding exceeds 750 minutes per month, AT&T may, at its option, impose a per minute usage charge for all calling over 750 minutes using one or more of these features, terminate your service or change your plan to one with no unlimited usage components. AT&T will provide notice that it intends to take any of the above actions

## 3.11 Off-net Usage

For a listing of available off-net and international roaming locations, where per-minute usage or roaming rates apply, go to att.com/prepaid/static-pages/ild-add-ons-ppu/. For additional terms and limitations applicable to Off-net Usage, please refer to Sections 2.8 and 2.8.1.

## 3.12 AT&T PREPAID Wireless Home Internet Services

AT&T Wireless Home Internet ("AWHI") for AT&T PREPAID customers requires an eligible device and an AT&T PREPAID AWHI monthly data plan. Plan good for 30 days. See sections 2.16.4 and 7.14.1 for additional terms.

## 3.13 AT&T PREPAID Multi-Line

**Activation, acceptance of an invitation to join, and/or use of a AT&T PREPAID Multi-Line Account constitutes acceptance of these Service Terms.** In the event of a conflict between the terms and conditions in this subsection [3.13.1 through 3.13.5] and other terms, these terms in this subsection will control.

**3.13.1 AT&T PREPAID Multi-Line Account:**
For details on eligible phone plans, go to att.com/multiline. AT&T reserves the right to change the number of allowable lines on Multi-Line Accounts without notice. One payment due date is established for all lines on the Multi-Line Account. Limit one rate plan change per line, per plan term.

**3.13.2 Plan Data Proration:**
When a line ("Member") is added to the Multi-Line Account during the plan term, the high-speed data allowance for the Member's plan is pro-rated based on the number of days remaining in the Multi-Line Account term. The high-speed data allowance is also pro-rated any time the Account Owner changes the monthly plan for any line, including the Account Owner's line, after establishing the Multi-Line Account.

**3.13.3 Consent To Disclose Customer Proprietary Network Information (Cpni), Including Plan And Other Account Information To Account Owner:**
**BY ACCEPTING AN INVITATION TO JOIN AN ACCOUNT OWNER'S MULTI-LINE ACCOUNT OR BY USING AT&T PREPAID SERVICES WHILE PART OF A MULTI-LINE ACCOUNT, THE MEMBER CONSENTS TO DISCLOSURE OF CPNI AS DISCUSSED IN THIS SUBSECTION.**

CPNI is information that relates to the type of telecommunications services you currently purchase, how you use them, and the billing information related to those services, including plan, calling details, type of wireless services and other items relating to your wireless telecommunications services. Once a Member joins a Multi-Line Account, the Member's AT&T PREPAID Account information, including account history, plan information, call detail records, billing information, and voice and data usage information, will be shared with and accessible by the Account Owner of the Multi-Line Account. The Member has the right to restrict the disclosure of the Member's CPNI and other account information to the Account Owner. Restricting disclosure of the Member's CPNI will not affect any other service(s) to which the Member currently subscribes from AT&T, however, it will prevent the Member from being able to join an AT&T PREPAID Multi-Line Account, since this information (CPNI) is necessary for the Account Owner to manage the Multi-Line Account. The Member's CPNI authorization is effective until the Member revokes it by removing the Member's line(s) from a Multi-Line Account.

**3.13.4 Payment and Balance:**
Account Owner is responsible for paying monthly plan charges for all lines on Multi-Line Account. Members continue to select and pay for optional Add-Ons or pay-per-use services out of their own AT&T PREPAID Account balance. Upon adding a Member line to the Multi-Line Account, full monthly payment will be due to activate Member's service but a pro-rated credit will be issued to the Account Owner's account for the Member's unused plan term, if applicable. A prorated credit may also be issued to the Account Owner for unused days of the Member's prior monthly plan (prior to joining the Multi-Line Account), if applicable (one credit per 30 days). Applicable plan charge for each line on the Multi-Line Account for each renewal period will be automatically deducted from the Account Owner's Account balance at the end of the day (11:59pm Central Time) on the plan renewal date. The total payment due for all lines must be paid in order to renew service. **Applicable plan charge for any AT&T PREPAID plan is not refundable and not exchangeable, and any unused services of the plan are forfeited if the Account Owner changes to another plan during the plan term.** If Account Owner's Account balance is insufficient to pay the applicable plan charges for all lines on the Multi-Line Account, plan services, data services, or any pay-per-use services will be unavailable until Account Owner renews all lines. Unused Account balance is forfeited upon expiration.

**3.13.5 Account Access:**
You authorize us to provide CPNI and other account information to the Account Owner, and to allow the Account Owner to make changes to the Multi-Line Account, including new or extended service commitments and the purchase of products and/or services, upon the direction of any person able to provide information we

deem sufficient to identify the person as the Account Owner. Such access will include, but is not limited to, the ability to view Multi-Line Account information, make changes to the plans under the Multi-Line Account, perform upgrades, and view payment information.

### 3.14 AT&T Personal Cloud

Requires eligible rate plan and AT&T Personal Cloud app to utilize cloud storage. If rate plan that includes feature or AT&T Personal Cloud Add-On is not renewed, you will be unable to upload to your Personal Cloud and all stored content will be permanently deleted within 30 days. If you port out your number, you will immediately lose access to stored content; make sure to move your Personal Cloud stored content before porting out a line that has this feature.

## 4.0
## Terms that Apply Only to DataConnect Pass Plan / Session-Based Wireless Data Services

### 4.1 Applicability of this Section

This Section 4 pertains only to session-based data services provided to you with access to AT&T's wireless data services, including but not limited to, features that may be used with Data Services and are offered pursuant to the Plans below. Data Services are only provided for prescribed purposes.

### 4.2 AT&T Data Plans ("Plans")

Plans can only be used on AT&T's wireless network and with select roaming carriers, depending on the Plan selected. Plans require a Device capable of working on AT&T's wireless network. You acknowledge that when your allotment of data usage expires, any downloads of products or services will cease and AT&T is not responsible for any fees you must pay to download the product or service again. AT&T may send alerts to your Device and/or email to notify you of any data usage and/or days remaining on your Plan. These are courtesy alerts. There is no guarantee you will receive such alerts and, by the time you receive them, your actual data usage and/or the days remaining on your Plan may already have expired, or be different than what is described in the alert. All sales are final and discounts are not available for these Plans. Payments are non-refundable. There is no separate charge to change a Plan or to cancel. Customers are responsible for provisioning and managing their Plans. AT&T reserves the right to change these terms and Plans, and to suspend your Account if Devices other than the registered Device are used with the Plans. Plans include access to available public AT&T Wi-Fi Hot Spots. Availability and quality of coverage, and access to Data Services while roaming are not guaranteed.

**4.2.1 Domestic Plans:**
Domestic Plans may be purchased with a data usage allotment measured in MBs or GBs, for a specified period of time, as defined in the Plan. The specified period of time begins to expire immediately upon plan activation, whether or not you are using the service. If you purchase a Domestic Plan with a data usage allotment and you use all of your allotment prior to the expiration of the specified period, your access to our Data Services will cease for the remainder of the specified period. If you want to continue using our Data Services during the remaining specified period, you will need to purchase an additional Plan. If a purchase is made prior to the completion of your current Plan, data usage will continue under your current Plan until expired. Note: If an additional Plan is purchased, the specified period for the additional Plan and, if applicable, the auto renew period, starts when your current Plan expires, or at the time you purchase the additional Plan if your prior Plan has already expired. If the additional Plan purchased has an automatic renewal, prior Plans with automatic renewal will not automatically renew. Domestic Plans include the U.S.

**4.2.2 International Plans:**
International Plans may be purchased with a data usage allotment measured in MBs or GBs for a specified period utilizing an approved payment method. International Plans should be purchased before traveling outside the U.S. You must be currently subscribed to a Domestic Plan at the time of purchase. If the Domestic Plan expires prior to the completion of the International Plan, all usage following the expiration of the Domestic Plan, whether domestic or international, will be deducted from the International Plan until such time as that Plan expires or another Domestic Plan becomes active (i.e. if you cancel your Domestic Plan after ordering an International Plan, U.S. domestic data usage will be counted against your International Plan, until you order another Domestic Plan). You can select the date on which the International Plan starts, which can be future dated up to 60 days after purchase. All future-dated International Plans become active at midnight Eastern Time of the date selected. Unless future-dated, the International Plan will start immediately upon purchase. Once your specified period expires or you use all of your allotment of data usage prior to the expiration of the specified period, whichever occurs first, your access to our Data Services will cease. If you want to continue using our Data Services, you will need to purchase an additional Plan. International Plans do not automatically renew.

**4.2.3 Worldwide Plans:**
Worldwide Plans may be purchased with a data usage allotment measured in MBs or GBs for a specified period utilizing an approved payment method. Worldwide Plans may be purchased as a standalone plan or along with a Domestic Plan, and should be purchased before traveling outside the U.S. If you do not have a separate Domestic Plan, all data usage occurring in the U.S. and countries listed at att.com/globalcountries will be deducted from the available data allotment in your Worldwide Plan. If you have data usage available in a separate Domestic Plan, then your domestic data usage will be deducted from your Domestic Plan and your international data usage will be deducted from the data available in your Worldwide Plan. However, if the Domestic Plan expires prior to the completion of the Worldwide Plan, all usage, whether domestic or international, will be deducted from the Worldwide Plan until such time as that Plan expires or another Domestic Plan becomes active (i.e. if you cancel your Domestic Plan after ordering a Worldwide Plan, U.S. domestic data usage will be counted against your Worldwide Plan until you order another Domestic Plan). You can select the date on which the Worldwide Plan starts, which can be future-dated up to 60 days after purchase. All future-dated Worldwide Plans become active at midnight Eastern Time of the date selected. Unless future-dated, the Worldwide Plan will start immediately upon purchase. Once your specified period expires or you use all of your allotment of data usage prior to the expiration of the specified period, whichever occurs first, your

access to our Data Services will cease. If you want to continue using our Data Services, you will need to purchase an additional Plan. Worldwide Plans do not automatically renew.

**4.2.4 Tax-Exempt Certification:**
If you certify that your Account is tax-exempt, you agree to indemnify, defend, and hold harmless AT&T from any and all taxes, claims, lawsuits, damages, losses, liabilities, costs, fines, penalties, and expenses (including reasonable attorney fees) that arise from your certifying that your Account is tax exempt.

### 4.3 Term

Your Agreement begins on the day your Plan for Data Services are activated and continues until your Plan expires as set forth in Section 4.2.

### 4.4 Prepayment and no proration

You agree to pay in advance for your Plan and there is no proration of charges if your Plan is terminated. You may make payments by credit card or debit card or other payment methods accepted by AT&T. In order to process your automatic renewal in a timely fashion and ensure your continued use of the service, AT&T will, depending on your plan, charge your payment method for the automatic renewal: (1) within seven days before your new plan specified period is set to begin, or (2) any time after 75% of your usage based plan has been consumed. You may cancel the automatic renewal of your service at any time and your cancellation shall take effect after we have had a reasonable opportunity to act on your notice.

# 5.0
# AT&T Phone Service Terms

AT&T Phone Service is provided by one of the following AT&T affiliates, depending upon your service address: Southwestern Bell Telephone Company; Pacific Bell Telephone Company; Illinois Bell Telephone Company; Indiana Bell Telephone Company, Incorporated; Michigan Bell Telephone Company; Nevada Bell Telephone Company; The Ohio Bell Telephone Company; Wisconsin Bell, Inc.; or BellSouth Telecommunications, LLC (each individually and collectively referred to in the AT&T Phone Service Terms as "AT&T"). Your AT&T Phone Services are governed by this Agreement, including these AT&T Phone Service Terms and the U-verse Fee Schedule available at att.com/VoiceUverseTVFees ("U-verse Fee Schedule").

You might be receiving AT&T Phone Service through an arrangement with your property owner or manager. If so, you are still subject to this Agreement, except that AT&T may not directly charge you for AT&T Phone Service (including equipment) provided to you as part of that arrangement, and the equipment-return provisions in Section 5.4.3 may not apply to you even though equipment remains AT&T-owned. You will be responsible for fees and charges associated with additional AT&T Phone Service orders. You may have an additional contract with your property owner or manager, but AT&T is neither responsible for nor bound by the terms of that contract between you and your property owner or manager. If the arrangement with your property owner or manager terminates, you will continue receiving AT&T Phone Services under standard billing terms and this Agreement unless you notify AT&T.

If you have any questions about your AT&T Phone Services, please call us at 800.288.2020.

### 5.1 Term Commitment

**5.1.1 Term of Service:**
If you accepted a Service Commitment for your AT&T Phone Service, these AT&T Phone Service Terms will automatically continue on a month-to-month basis at the conclusion of your Service Commitment, and AT&T will automatically begin charging the applicable month-to-month fee. If you have no Service Commitment, these AT&T Phone Service Terms are a month-to-month agreement.

**5.1.2 Early Termination Fee ("ETF"):**
If you terminate your AT&T Phone Service before completion of your Service Commitment, you agree to pay an ETF. The ETF amount reduces each full month of your Service Commitment that you complete.

**5.1.3 Your Termination Rights:**
Within the first 14 days after we activate your AT&T Phone Service, you may terminate it for any reason without incurring an ETF (unless you would owe an ETF for a prior Service Commitment that you had ended early by entering into the new, now-terminated Service Commitment). However, you agree to pay AT&T for all fees, charges, and other amounts incurred and owed under your Agreement, and you agree to comply with Section 5.4.3 regarding equipment return. If you fail to return AT&T equipment, you will be charged an equipment non-return fee of up to $150. Some dealers may impose additional fees.

### 5.2 Installation and Repair

To install or repair your AT&T Phone Service, you acknowledge that AT&T may use existing wiring, including altering the wiring and removing accessories, located within your unit ("Inside Wiring"), and that AT&T and its agents may drill, cut, and otherwise alter improvements on the premises (including walls, flooring, and/or other surfaces) in order to install, maintain, or repair AT&T Phone Service or equipment. You warrant that you own or control the Inside Wiring and premises and give AT&T and its agents permission to use, alter, and remove equipment from them. If you do not own your premises or your unit is part of a multi-tenant environment (e.g., an apartment building, condominium, or private subdivision), you warrant that you have obtained permission from any necessary party, including, but not limited to, the owner, landlord, or building manager, to allow AT&T and its agents reasonable access to install, maintain, and repair your AT&T Phone Service

and equipment and to make any alterations that we deem appropriate for the work to be performed. You agree to indemnify AT&T and its agents from and against all claims by an owner, landlord, building manager, or other party in connection with installation, maintenance, repair, or provision of AT&T Phone Service.

You will provide AT&T and its agents with reasonable access to your premises in order to install, maintain, and repair AT&T Phone Service and equipment. If you are not at the premises at the time of installation or repair, you authorize any other adult resident or guest at your residence to grant access to your premises for these purposes. You understand and agree that by authorizing an adult resident or guest to grant access to your premises, you authorize that adult to act on your behalf, including accepting this Agreement and any related agreements required in connection with the completion of the installation, activation, or repair of AT&T Phone Service and approving any changes to them.

You will be responsible for payment of service charges for visits by AT&T or its agents to your premises when a service request results from causes not attributable to AT&T or its agents, including, but not limited to, when you are unwilling to complete troubleshooting steps requested by AT&T. In addition to any applicable Dispatch Fee (as described in the U-Verse Fee Schedule), you are responsible for damage to and the entire cost of any necessary service, repair, or replacement of any equipment that is attributable to your improper installation, abuse, negligence, or misuse of the equipment, as determined by AT&T. We also reserve the right to charge reasonable shipping and handling fees in connection with replacement of any equipment. You understand that repair or replacement of AT&T Phone Service or equipment may (i) cause stored content to be deleted, (ii) reset personal settings, or (iii) otherwise alter the equipment.

## 5.3 Fees and Charges

In return for receiving our AT&T Phone Service, you promise to pay—and agree that we may charge your credit or debit card on file with us—the charges described in subsection 1.9, the U-Verse Fee Schedule, and the following charges:

### 5.3.1 Monthly Service Charges:

Billing for the AT&T Phone Service commences when AT&T has provisioned the AT&T Phone Service. Recurring charges for each month's AT&T Phone Service will be billed one month in advance. Billing is based on a 30-day cycle. Non-recurring and usage-based charges for the AT&T Phone Service generally will be billed in the billing cycle following the transaction. Your first bill for AT&T Phone Service may include pro-rated charges for a partial monthly period prior to the beginning of your first monthly billing cycle. Upon termination, subject to applicable law, your effective date of cancellation will be the last day of your current billing cycle and you will receive AT&T Phone Service until the end of your billing cycle (exceptions may apply to certain promotional periods and must be in writing). You will not receive a prorated credit or refund for any remaining days of AT&T Phone Service in your billing cycle after termination. Your AT&T Phone Service will continue until the end of the bill cycle. A downgrade fee may apply if you make changes to your AT&T Phone Service within thirty (30) days of AT&T Phone Service provisioning or later programming orders.

### 5.3.2 Usage Charges:

Non-recurring and usage-based charges for AT&T Phone Service generally will be billed in the billing cycle following the transaction. For a list of additional charges and fees that could apply to the AT&T Phone Service, please see the U-Verse Fee Schedule (at att.com/VoiceUverseTVFees). The Fee Schedule is incorporated into this AT&T Phone Service Terms by this reference.

## 5.4 Equipment

Equipment that AT&T provides may be new or refurbished. Any equipment or software that was not provided to you by AT&T, including batteries, is not AT&T's responsibility, and AT&T will not provide support or maintenance of it. Depending on your service address, your AT&T Phone Service will include one of the following Equipment configurations:

- A Wi-Fi® Gateway ("WG") located inside your premises, and certain service-specific equipment set forth in Sections 5.6.4 that is required for AT&T Phone Service to function (in the AT&T Phone Services Terms, the term "Equipment" is used to refer to all service-specific equipment, including the WG). If you do not purchase the Equipment from AT&T, you agree to pay a monthly equipment fee for the Equipment as part of your purchase of AT&T Phone Service for the duration of your receipt of AT&T Phone Service. Equipment fees may be included in your monthly charge for AT&T Phone Service or be charged separately (different taxes and surcharges may apply to the equipment fees, AT&T Phone Service fees, and/or the equipment fee portion of AT&T Phone Service fees). Equipment fee/purchase options depend on the Services you order and installation options you choose. The Equipment requires electrical power from your premises to operate, which you are responsible for providing.

- If you have a WG inside your premises, you may also have an Optical Network Terminal ("ONT"), which is a box that may be located inside your premises, on the outside of your premises, in a central location in a multi-tenant building, or in your garage, where AT&T's fiber network terminates. The ONT also requires electrical power from your home to operate, which you are responsible for providing. AT&T will install your ONT device. The ONT power supply box converts the AC power in your home to the DC power required by the ONT.

- If you do not have a WG located inside your premises, your service is provided by an Intelligent Network Interface Device ("iNID") and certain service specific equipment set forth in Sections 5.6.4 that is required for AT&T Phone Service to function (the iNID is among the service-specific equipment collectively referred to in the AT&T Phone Services Terms as "Equipment"). If you do not purchase the Equipment from AT&T, you agree to pay a monthly equipment fee for the Equipment as part of your purchase of AT&T Phone Service for the duration of your receipt of AT&T Phone Service. Equipment fees may be included in your monthly charge for AT&T Phone Service or be charged separately. Equipment fee/purchase options depend on the AT&T Phone Services you order and the installation options you choose. The iNID includes three components: (1) a unit typically located on the outside of your premises or in your garage where the AT&T network terminates (the outside unit); (2) a home networking hub, which provides wireless networking capability and is located inside your premises, (the inside unit); and (3) a power supply unit, typically located in a sheltered area either inside your premises or in an attached structure. You are responsible for providing the electrical power for the iNID.

### 5.4.1 Battery Backups for AT&T-provided Equipment:

It is your responsibility to provide your own battery backup for your WG, or ONT. If there is an iNID at your premises, AT&T provides the initial battery backup, but all subsequent battery backups are your responsibility. For more information and minimum specifications regarding battery backups from third parties, see att.com/batterybackup. AT&T will not provide battery backups for customer-owned equipment.

**5.4.2 Management and Maintenance of AT&T Equipment:**
AT&T reserves the right to manage the AT&T Equipment during the time you are an AT&T customer and retains exclusive rights to data the Equipment generates. Neither you nor a third party may change, interfere with, or block access to the Equipment data or settings. You agree that you will use the Equipment only for its intended residential use, and not for any other purpose (such as on another AT&T network, or on another provider's (non-AT&T) network). You agree to use appropriate and reasonable care in using any and all Equipment. As explained in Section 5.2, AT&T will repair or replace damaged Equipment as AT&T deems necessary. AT&T will not provide support for, or be responsible for, ongoing maintenance or management of, customer-owned equipment.

**5.4.3 Return of Equipment:**
Upon termination of AT&T Phone Service for any reason, you must return the Equipment, undamaged, within 21 calendar days to AT&T. If the Equipment is not returned within 21 calendar days, or is returned damaged, you will be charged for the value of the Equipment. We may retain any advance payment or deposit, or portion thereof that previously had not been refunded, if you fail to return the Equipment within this time period. If the Equipment is returned within 90 days of termination, any fees charged for the Equipment will be refunded (other than fees for damages). No refunds will be made for any Equipment returned more than 90 days after termination.

In addition to termination of service, this subsection applies if your existing Equipment is replaced or upgraded for any reason.

## 5.5 Theft Of AT&T Equipment Or AT&T Phone Service

You agree to notify AT&T immediately, in writing or by calling us at 800.288.2020, if the Equipment is stolen or if you become aware at any time that AT&T Phone Services are being stolen or fraudulently used. When you call or write, you must provide your AT&T Account number and a detailed description of the circumstances of the Equipment theft, including documentation of theft (e.g., a copy of a police report) or stolen or fraudulent use of AT&T Phone Service. You will be responsible for all charges incurred on your AT&T Account until you report the theft or fraudulent use of AT&T Phone Service. You will be responsible for stolen Equipment, but AT&T may in its sole discretion waive or reduce charges for stolen Equipment upon submission of documentation of theft or other circumstances. Failure to provide notice to AT&T of theft in a timely manner may result in the termination of your AT&T Services and additional charges to you. Unless notified otherwise by AT&T, after you report the theft or fraudulent use of the AT&T Phone Service, you will remain responsible for paying your monthly fees for AT&T Services not stolen or fraudulently used.

## 5.6 Service

**5.6.1 Service Description:**
AT&T Phone is an enhanced voice communication service that converts voice communications into Internet Protocol (IP) packets that are carried over AT&T's IP network—*i.e.*, "voice over IP" or "VoIP." AT&T Phone Service includes direct-dialed calling and certain calling and call management features, as well as additional or advanced features that may be offered at additional costs, all of which AT&T, in its sole discretion, may add, modify, or delete from time to time. AT&T Phone Service also includes a telephone number or numbers that will be included in printed directories and/or directory assistance databases, and options, available at additional costs, to have numbers withheld from printed directories and/or directory assistance databases. It is not mobile or nomadic and will function only where installed.

**5.6.2 AT&T Phone Accounts and Subaccounts:**
When you accept the AT&T Service terms, you become the main Account holder for each telephone number assigned to the AT&T Phone Service and all plans, features, and functionalities associated with each telephone number, whether those telephone numbers, plans, features, and functionalities are purchased initially or are added subsequently. You will be asked to choose a unique name for the main Account (your main Account ID). You may create up to ten subaccounts under your main Account, for others in your household. Each subaccount will have a separate password and ID. Main Account holders are responsible for all activity on their main Account and on any and all subaccounts. Violations of this Agreement in a main Account or in a subaccount can result in suspension or termination of the main Account and all subaccounts. Call histories (call logs for outgoing, answered, and missed calls) for each telephone number are accessible in the main Account and in each subaccount created under the telephone number. Main Account holders, as well as anyone provides information we deem sufficient to identify the main Account holder, can reset subaccount passwords and IDs by contacting Customer Service and can delete and recreate subaccounts. You agree to advise all subaccount holders that the main Account holder can have access to all aspects of their subaccount, including, but not limited to, feature settings, voicemail messages, and address books. All subaccount holders can therefore have no expectation of privacy vis-à-vis the main Account holder with regard to any aspect of the subaccount.

**5.6.3 Billing And Payments:**
For AT&T Phone service, nonrecurring and usage-based charges generally billed in the billing cycle following the transaction include, but are not limited to, international calling (including surcharges for international termination to a wireless phone number), Operator Services, Directory Assistance (411 or 800.555.1212), call trace, and overage minutes associated with defined minutes-of-use plans (e.g. Phone 200 plan). Partial minutes are rounded up for per-minute usage charges.

**5.6.4 AT&T Phone Equipment:**
AT&T Phone Service requires a regular touchtone landline telephone, which you must supply and which must be connected to the WG or iNID, either directly or through your home's Inside Wiring. (Rotary and pulse phones will not work). The WG or iNID will support up to two AT&T Phone lines (telephone numbers used for inbound and outbound calling). You agree that neither you nor a third party will move Equipment used for AT&T Phone Service within your premises or to any other physical location outside of the premises where it was installed. AT&T Phone Service is not designed to be nomadic and will not function properly if the WG is moved or altered. If you require the WG to be moved, you must contact AT&T. Failure to do so may result in a failure of AT&T Phone Service and/or in AT&T's suspension, modification, or termination of your Service.

**5.6.5 Interruptions, Limitations, And Modifications To Service:**
Since voice over IP is dependent on the IP network, the availability of an adequate power source, and correct Equipment configuration, AT&T does not guarantee that AT&T Phone Service will be continuous or error-free. You acknowledge and understand that AT&T cannot guarantee that voice over IP communication is secure.

You also acknowledge that AT&T may establish general practices and limits concerning use of AT&T Phone Service, AT&T Phone Service cannot be used to make operator-assisted collect or third-party billing calls (unless the third-party Collect Call company separately handles and bills for the call), nor can AT&T Phone Service be used to make 900/976 calls; area code 500, 700, and 710 calls; 10-10-XXX dial-around calls; or international operator or directory assistance calls. Also, the ability to call certain N11 services (211, 311, 511) may not be available.

AT&T also limits the maximum number of days that messages will be retained; the maximum number messages that will be retained by the Service; the maximum size of any message; and the maximum disk space that will be allotted on AT&T's servers on your behalf. You agree that AT&T will have no responsibility or liability for the deletion, for failure to store or to deliver any messages and other communications, for the modification or malformation of communications, or for other content maintained or transmitted by AT&T Phone Service. You acknowledge that AT&T reserves the right to log off Accounts or disconnect sessions that are inactive for an extended period of time. You further acknowledge that AT&T reserves the right to change these general practices and limits at any time without advance notice.

**5.6.6 Limitations of 911 Service:**
AT&T Phone Service, which is provided via voice over IP, is not the same as traditional wireline telephone service, and **911 service doesn't work the same as with traditional wirelines telephones.** You agree to tell anyone who may use your AT&T Phone Service of the limitations of 911 service. **AT&T makes no warranty that access to 911 will be uninterrupted, timely, secure, or error-free.** 911 service is available only at your service address, while connected to a properly powered and configured iNID or WG (and a properly powered and configured ONT, if applicable) and after AT&T Phone Service has been properly activated. 911 service will not function if your AT&T Phone Service isn't functioning or if there is a power or network outage, broadband connection failure, or if your service has been disconnected or suspended. Following an outage, you may be required to reset or reconfigure your Equipment before 911 service will work. AT&T strongly recommends that you maintain an alternative means of accessing 911 services, such as a cellular phone, at all times. AT&T is not responsible for any losses incurred because of an inability to dial 911 or to access emergency service personnel for any reason. And you agree to defend, indemnify, and hold harmless AT&T and its subsidiaries, affiliates, officers, agents, directors, employees, and service providers for any claim by you or anyone else relating in any way to 911 service.

**5.6.7 Premise Alarm and Other Device Compatibility:**
AT&T makes no warranty that AT&T Phone Service is appropriate for or capable of use with monitored burglar or fire alarms or medical monitoring systems or devices. Use of such systems is at your own risk. Not only may AT&T Phone Service be interrupted, delayed, or insecure, it may be incompatible with such systems or devices, and will not work in the event of a power or network outage, and may not work for other reasons. You agree to notify AT&T if you purchase a monitored burglar or fire alarm system before that system is installed, as installation may require re-wiring of AT&T Phone Services at your expense. AT&T does not provide support for, or re-wiring of AT&T Phone Service in support of, medical monitoring systems or devices. Once AT&T Phone Service has been installed for use with a monitored burglar or fire alarm system, you agree that you will not modify the Inside Wiring of your home, move or reconfigure your WG in any way, or plug any telephone equipment into the back of your WG without contacting AT&T and your alarm service provider. Taking any of those actions could cause a failure of your AT&T Phone Service or alarm system. You agree to waive any claim against AT&T relating to interference with or disruption of a monitored burglar or fire alarm, medical monitoring device, or other similar systems or devices.

**5.6.8 Local Number Portability:**
In the event you are transferring an existing phone number for your AT&T Phone Service (i.e., porting a number to AT&T), you hereby authorize AT&T to process your order for AT&T Phone Services and to notify your existing provider of your decision to switch your local, local toll, and long distance services to AT&T Phone Service, and you represent that you are authorized to take this action. Not all telephone numbers are eligible for porting to AT&T Phone Service.

**5.6.9 Voicemail:**
AT&T Phone Service includes Voicemail, a full-featured voicemail service. AT&T does not guarantee that voicemail messages will be saved or be able to be retrieved. If you access your Voicemail voice mailbox from outside your local calling area, you may incur applicable local toll or long distance charges.

In addition, the Voicemail service allows you the option to integrate your AT&T wireless service voice mailbox with your AT&T Phone Voicemail mailbox. (Wireless service from AT&T must be purchased separately.) Calls forwarded to your Voicemail voice mailbox from your wireless phone will not incur airtime charges. However, airtime charges may apply when using your wireless handset to retrieve messages. Pager notification allows your pager to notify you when a message is received in your Voicemail voice mailbox. Your pager can have either an email address or your pager can have a telephone number associated with it and must be set up through the Voicemail mailbox. Paging service and equipment must be purchased separately. Other restrictions may apply.

Voicemail may include a Voicemail-to-Text ("VMTT") feature that provides automated transcription of your voicemail. AT&T is not responsible nor liable for: 1) errors in the conversion of or its inability to transcribe voicemail messages to text/email; 2) lost or misdirected messages; or 3) content that is unlawful, harmful, threatening, abusive, obscene, tortious, or otherwise objectionable. We can interrupt, restrict or terminate VMTT without notice if your use of VMTT adversely impacts AT&T's network (e.g., by abnormal calling patterns or an unusually large number of repeated calls and messages) or if your use is otherwise abusive, fraudulent, or does not comply with the law.

You are solely responsible for and will comply with all applicable laws as to the content of any text messages or emails you receive from VMTT that you forward or include in a reply to any other person. You authorize AT&T or a third party working on AT&T's behalf to listen to, and transcribe all or part of a voicemail message and to convert such voicemail message into text/email, and to use voicemail messages and transcriptions to enhance, train and improve AT&T's speech recognition and transcription services, software and equipment. You agree that the results of benchmarking VMTT against competing products or services is AT&T confidential information requiring AT&T's written consent to disclose. Additional charges may apply to receiving email on your wireless device from VMTT, as well as, replying to

or forwarding VMTT messages via SMS (text) or email, depending on your plan. Transcription times cannot be guaranteed. You are responsible for providing a correct email address and updating the email address when changes to the email account are made.

**5.6.10 Prohibited Uses of AT&T Phone Service:**
You agree that you will NOT use AT&T Phone Service:

- To engage in auto-dialing, continuous or extensive call forwarding, telemarketing, fax broadcasting or fax blasting, or for uses that result in excessive usage inconsistent with normal residential usage patterns. In addition, connection of your AT&T Phone Service to a device which converts use of AT&T Service to an outbound trunk line by more than one individual is prohibited. If AT&T determines, in its sole discretion, that you are reselling or transferring AT&T Phone service or that you are using it for any of these activities, AT&T reserves the right, without advance notice, immediately to terminate or modify your AT&T Service, or to change your call plan to a different offer on a prospective basis, and, in addition, to assess additional charges for each month in which excessive usage occurred. If you subscribe to a calling plan which includes unlimited calling of any type, unless otherwise specified by your specific plan in marketing materials associated herewith, consistent monthly use in excess of 5,000 aggregate minutes per month, taking into account all types of calling in your plan which are provided on an unlimited basis, shall be presumed to be inconsistent with these restrictions and shall be subject to the conditions above.

- As an announcement service, particularly with regard to Voicemail. Use of Voicemail service as an announcement service and/or other improper or excessive use may impair AT&T's ability to provide reasonable service to other customers. AT&T reserves the right to cancel your AT&T Phone Service at any time, with or without notice, if as determined solely by AT&T based on its network/service design and usage experience, your messaging service is (1) being used in an improper manner including, but not limited to, using it as an announcement service or for unlawful purposes, (2) consistently generating excessive usage, (3) affecting AT&T's ability to provide reasonable service to other customers, or (4) being used to interfere with another's use of the voicemail system.

**5.6.11 Special Terms for North Carolina Customers:**
If you reside in Durham or Concord, your AT&T Service may not include a telephone number or numbers in printed directories and/or directory assistance databases, and you may not have the option to have numbers withheld from printed directories and/or directory assistance databases.

**5.6.12 AT&T Phone for Business.**

**5.6.12.1 AT&T Phone for Business Equipment:**
AT&T Phone for Business service requires a regular touchtone landline telephone, which you must supply and which must be connected to the WG, FBG, IAD or iNID, either directly or through your premise's inside wiring. (Rotary and pulse phones will not work.) The WG, FBG or iNID will support up to two AT&T Phone for Business lines (telephone numbers used for inbound and outbound calling), additional AT&T Phone for Business lines will be supported by an Integrated Access Device (IAD) which, when necessary, will be installed in a tethered arrangement with the WG or the FBG.

**You agree that neither you nor a third party will move AT&T Phone for Business Equipment used for AT&T Phone for Business Service within your premises or to any other physical location outside of the premises where it was installed by AT&T. AT&T Phone for Business Service is not designed to be nomadic and will not function property if the WG, FBG or the IAD is moved or altered by a non-AT&T employee. If you require the WG, FBG or IAD to be moved, you must contact AT&T. Failure to do so may result in a failure of the service and/or in AT&T's termination of your service.**

**5.6.12.2 Interruptions, Limitations, and Modifications to Service:**
*Telephone Line assignment on the WG or FBG.* You acknowledge and agree that under certain service configurations, there may be a need for AT&T to keep a telephone line connected to port one of the WG or FBG. Under these circumstances, if the telephone line connected to port one (of the WG or FBG) is disconnected, AT&T will proceed to move one of the remaining lines, if existent, to populate the otherwise vacant port one to provide proper functioning of the service. You acknowledge and agree that this action will require a technician dispatch and will be billed at the associated prices prevailing for the service.

**5.6.12.3 Arbitration Agreement:**
If you are an AT&T Phone for Business customer, all disputes between us will be resolved through binding arbitration as prescribed by Section 1.3, except that (1) the AAA will apply its Commercial Arbitration Rules, as modified by this section and Section 1.3, unless the claims are valued at $25,000 or less; (2) AT&T will pay all AAA fees listed in Section 1.3.2.4 for arbitrations you initiate after fully complying with Section 1.3.2.2 only if your claims are valued at $25,000 or less; (3) you are eligible for the Alternative Payment and Attorney Premium in arbitrations you initiate after fully complying with Section 1.3.2.2 only if your claims are valued at $25,000 or less; and (4) the arbitrator will issue a reasoned decision only if you or AT&T requests it.


# 6.0
# AT&T Internet Service Terms


These Internet Service Terms govern the Internet access services provisioned by AT&T described in Section 6.1 below, including Internet Protocol (IP) based services provisioned over copper, copper-fiber hybrid, fiber or wireless networks as well as legacy digital subscriber line (DSL) services (collectively "Internet Service"). The Internet Services are currently marketed under the names AT&T Internet, AT&T Fixed Wireless, and AT&T DSL, but see Section 6.1. below for a partial list of other names under which these services have been marketed in the past.

Your use of AT&T Internet Services is governed by these AT&T Internet Service Terms, as well as your Customer Service Summary or Order Confirmation letter, AT&T's Access ID Terms and Conditions (at att.com/accessidterms), the att.net Terms of Use (at att.com/legal/terms.attNetTermsOfUse.html), AT&T's Policies for Considering Copyright Infringement Claims (at att.com/legal/terms.dmca.html), the Internet Fee Schedule (available at att.com/ConsumerInternetFees for consumer customers and att.com/BusinessInternetFees for business customers) ("Internet Fee Schedule"), along with the applicable policies and additional terms which AT&T makes you aware of, and if you have been notified of temporary changes to your Internet Service, the terms and conditions for that temporary service posted at

att.com/temporaryterms. To the extent that your AT&T Internet Service is delivered over some portion of the AT&T wireless network, your service will also be subject to the AT&T Wireless Service Terms in Section 2. The current fixed internet access speed tiers AT&T offers may be found on AT&T's Speed Tier page at att.net/speedtiers.

In these AT&T Internet Service Terms, "AT&T" or "we" refers to the AT&T affiliate for your service and location identified in section 6.1 and "you" refers to the Account holder, Sub-Account holder, and any Authorized User(s), as those terms are defined in Sections 6.3.1 and 6.3.2.

These AT&T Internet Service Terms are based on four general principles.

- (1) We support our customers' right to free expression.

- (2) We will give our customers clear notice of any meaningful limitations on the Services.

- (3) We will give our customers clear information about the experience they can expect when using the Services.

- (4) We will provide consumer internet access service in discrete, non-overlapping speed tiers.

For more information about how AT&T helps transmit your information to points on the Internet, how AT&T manages the network, internet options such as different service capability and expected and actual speed ranges, device attachment rules, activities which may impair or degrade your internet experience, and for additional information regarding network practices with respect to monthly data usage allowances related to AT&T Internet Service, please visit att.com/broadbandinfo.

If the location to which your Internet Service is provisioned is in a multi-tenant environment (*e.g.*, an apartment building or condominium, sometimes referred to herein as a "MTU"), provision of your Internet Service may be subject to other terms and conditions imposed by the owner and/or manager of the MTU (*e.g.*, a landlord or home owners' association). You will need to refer to the owner/manager of your particular MTU for more information regarding any MTU specific terms which may apply.

## 6.1 Trade Names, and Your AT&T Internet Service Provider

AT&T Internet Service is marketed under various trade names. In these Service Terms, AT&T Wired Internet Services, which are discussed below in Section 6.15, include those services which have been marketed as AT&T Fiber, AT&T Internet, AT&T Internet Basic, AT&T High Speed Internet (including Max and Max Plus), and U-verse Internet. DSL Internet Services, which are discussed below in Section 6.17, include those services which have been marketed as AT&T High Speed Internet (including Lite, Ultra, Xtreme, XtremePro, Basic, Express, Pro, and Elite), AT&T High Speed Internet Direct (including Lite, Ultra, Xtreme, XtremePro, Basic, Express, Pro, and Elite), DSL Direct (including Express, Pro, and Elite), and FastAccess DSL and/or FastAccess DSL Direct (including Lite, Ultra, Xtreme, and XtremePro), Wireless Home Internet, which is discussed in Section 6.14.2, include those services that have been marketed as AT&T Fixed Wireless Internet and AT&T Wireless Home Internet. Business Internet Services, which are discussed below in Section 7, include AT&T Business Fiber, AT&T Internet for Business, AT&T High Speed Internet Business Edition, AT&T High Speed Internet Business Edition Direct, FastAccess Business DSL, FastAccess Business DSL Direct, and AT&T Internet for Business On Demand.

Except as specified otherwise in writing, your AT&T Wired Internet Services are provided by your local AT&T telephone company as set forth below:

- BellSouth Telecommunications, LLC in AL, GA, FL, KY, LA, MS, NC, SC, and TN;

- Southwestern Bell Telephone Company in AR, KS, MO, OK, and TX;

- Pacific Bell Telephone Company in CA;

- Illinois Bell Telephone Company in IL;

- Indiana Bell Telephone Company, Incorporated in IN;

- Michigan Bell Telephone Company in MI;

- Nevada Bell Telephone company in NV;

- The Ohio Bell Telephone Company in OH; and

- Wisconsin Bell, Inc. in WI.

Outside of the local AT&T telephone company franchise areas in these states, as well as in all states not listed above, AT&T Internet Services are generally provided by Teleport Communications America, LLC and/or one or more of its subsidiaries. In New York, AT&T Internet Services are generally provided by TC Systems, Inc. Wireless Home Internet Services are provided in all states by AT&T Mobility LLC, acting on behalf of its FCC-licensed affiliates doing business as AT&T.

## 6.2 Internet Service Description

### 6.2.1 Service Description:
AT&T Internet Service offers you a capability for acquiring or retrieving information from; generating, storing, transforming, processing, or utilizing information on; or making available information to other internet end points connected directly or indirectly to AT&T's network. Unless otherwise specified, AT&T Internet Services include the following:

#### 6.2.1.1 Site Access / E-Mail Services:
Access to att.net and related services, including an e-mail account for the Account holder and any Sub Accounts, is generally included with your Internet Service. Such access will be subject to the att.net Terms of Use found at att.com/legal/terms.attNetTermsOfUse.html. By utilizing such access, including accessing the included e-mail account(s), you are agreeing to be bound by the terms thereof.

**6.2.1.2 DNS Services / DNS Error Assist:**

Domain Name System (or DNS) services translate domain names into the numerical IP addresses needed for locating and identifying computer services and devices within the underlying network protocols commonly used to organize the internet. The DNS Services include DNS Error Assist, which upon entry of an incomplete or inaccurate Web address will automatically search for similar or related terms and present you with suggested sites you may want to reach instead of providing only an error message. If you prefer to opt out of DNS Error Assist, you may do so by visiting att.com/privacychoices from your desktop or from your mobile Web browser.

**6.2.1.3 IP Addresses:**

Unless otherwise specified, AT&T Internet Service is provided with a dynamic Internet Protocol ("IP") address, a static IP address, a multiple static IP address service (as applicable), or a privately managed IP address utilizing CGNat (Carrier Gateway NAT or Carrier Gateway Network Address Translator) technology, at the sole discretion of AT&T. Static IP addresses are not available with all AT&T Internet Services or all tiers within certain AT&T Internet Services. Unless otherwise specified, a dynamic IP address is a single internet address intended for use with a single Account, served by a single modem or gateway, and a static IP address or multiple static IP address is intended for use with a single computer or a network of devices, computers and/or servers. You may not use the Service in a manner that is inconsistent with these intended uses. Unless otherwise specified, AT&T Internet Services will support both IPv6 and IPv4 Internet addresses; however, to reach IPv6-exclusive internet content, some of your equipment may require upgrades or replacement. For more information about IPv6 and how it affects you, visit att.com/help/internet/ipv6/. The manner by which AT&T will elect to support IPv6 or IPv4 and the technology used to do so shall be at AT&T's sole discretion and AT&T cannot guarantee that every third party service will be fully compatible with the technology that AT&T elects to employ for a particular purpose. For more information about AT&T's Network Management Practice, please visit AT&T's Broadband Information page at att.com/broadbandinfo.

**6.2.1.4 Interconnection:**

Because the internet consists of multiple interconnected networks and most internet end points (e.g., websites and other content providers) are not directly connected to AT&T's network, AT&T must connect to and exchange traffic with other networks to provide its subscribers the capability of uploading data to or downloading data from internet end points that are connected to those networks. To that end, AT&T has entered into commercially negotiated agreements to exchange traffic with such networks on mutually agreeable terms. Consistent with its longstanding practice, AT&T does not warrant that it will establish or expand the connections between its network and other networks except on such mutually agreeable terms. To the extent AT&T is unable to reach agreement on terms of interconnection or network expansion with these other networks it could affect your service. These impacts on your service performance are described in more detail in AT&T's Open Internet notice. AT&T therefore makes no promise express or implied that you will be able to upload data to or download data from internet end points connected to other networks at any particular speed.

Like the other networks that make up the internet, AT&T's is a shared network, which means that the transmission links and other network resources used to provide the Service are shared among AT&T's subscribers. AT&T manages this network for the benefit of all users based on a variety of factors, and our technical expertise.

**6.2.2 "Speed" of Internet Services, Technology and Data Usage:**

AT&T offers many internet access service options, each of which has a specific service capability speed range. The term "speed" is commonly used as a shorthand way to describe the capacity at which a particular internet access service can transmit data. This capacity is typically measured in the number of kilobits, megabits or gigabits that can be transmitted in one second (Kbps, Mbps or Gbps). Some applications like a short email without attachments or basic web browsing do not require high service capability speeds to function optimally, while other activities like transferring large data files can be performed faster with higher-speed services. Your service capability speed may not be suitable for some applications, particularly those involving real-time or near real-time, high-bandwidth uses such as streaming video or video conferencing.

**6.2.2.1 AT&T Speed Tiers Page:**

The current speed ranges AT&T offers may be found on AT&T's Speed Tier page at att.net/speedtiers, which identifies the downstream and upstream rates at which your "Connection" (as that term is defined below) transfers internet access data between the network interface device at your home, office, or apartment building to the point you connect to the AT&T network..

**6.2.2.2 Connection:**

Because service performance varies on an end-to-end basis, the service capability speeds of AT&T are limited to, and measured between, the equipment utilized to provision your Internet Service at the fixed address or location you identified when ordering the Internet Service and a point on the AT&T network, sometimes referred to as the "Connection" or your "internet connection." The Connection constitutes only one segment of the end-to-end transmission path connecting the end user to internet web sites or content providers.

**6.2.2.3 Expected Speeds:**

Because there are many factors which may impact the speed experienced by any particular internet user at any particular time (as described in more detail below), the "Expected Speed" represents an anticipated, theoretical speed of the Connection, based on network design and engineering, measured over time. At any moment in time, a particular observed speed will vary from the Expected Speed. However, AT&T manages its wired internet network toward an overall median speed consistent with the Expected Speed. Wireless networks are generally subject to greater variability as a result of environmental factors beyond AT&T's control, so it may not be possible to provide Expected Speeds for services which are delivered over a wireless network.

**6.2.2.4 Technology:**

Unless otherwise expressly agreed to the contrary, AT&T makes no warranty with regard to the technology used to provision any particular Internet Service. Notwithstanding any description that may be furnished for a particular Internet Service, AT&T reserves the right, in its sole and absolute discretion, to make changes to the technology used to provision all or any portion of any Internet Service. So long as the essential functionality of the Internet Service from a user perspective is not negatively impacted in a material way by any change in technology, AT&T has no obligation to notify you of any changes in technology and changes in technology will not affect your rights or obligations with respect to the Internet Service you have purchased.

For any particular Internet Service, the technology utilized to provision different portions of the Service may vary significantly. In those circumstances, and unless

otherwise expressly agreed to the contrary, AT&T shall only be responsible for the technology utilized to provision the Connection. As discussed in further detail below, AT&T has no control over, and makes no warranties with respect to, the technology within the premises to which the internet Service is provisioned (e.g. the inside wiring, local Wi-Fi, home network and/or local access network). AT&T further has no control over and makes no warranties with respect to the technology utilized by content providers for purposes of operating the servers which an end user must access in order to receive access to the content.

**6.2.2.5 Other Factors that Impact Speed:**

In addition to issues presented by the various technologies over which an internet access may operate on an end-to end basis, end-to-end performance of your Internet Service will also depend on a variety of other factors, including (but not limited to): the number of subscribers simultaneously using the network; specific characteristics of the location from which you are accessing the internet; specific characteristics of your intended destination on the internet; overall traffic on the internet; Wi-Fi connectivity; interference with high frequency spectrum on your telephone line; wiring inside your premises, office or apartment complex; the capacity or performance of your network devices, routers, gateways or modems; the servers with which you must communicate with in order to reach your intended destination and/or access the content you are trying to access; internal and external network management factors (including Overhead, which refers to the various control and signaling data required to achieve the reliable transmission of internet access data); and the networks you and others are using when communicating. In addition, your use of other AT&T services (such as U-verse TV, AT&T Phone, Unified Messaging, and other services) that may share the capacity of your broadband connection with the Service may impact the amount of capacity available for your use of the Service at that particular time and thus affect the performance of the Service.

In addition, Internet Service delivered over wireless networks may be interrupted, delayed, or otherwise limited for a variety of reasons, including environmental conditions, unavailability of radio frequency channels, congestion from other users, system capacity, network management, power outages, priority access by National Security and Emergency Preparedness personnel in the event of a disaster or emergency, coordination with other systems, equipment or infrastructure damages or modifications and repairs, proximity of antennas and/or cell towers, the location and rotation of antennas, cell tower outage or site outage, maintenance work at a cell tower or antennae site, blockage of or interference with the signal between the end user premises and the cell tower or antennae, problems with the facilities of interconnecting carriers and/or power outages.

Consequently, AT&T does not guarantee the performance of your service on an end- to-end basis. This is also why third party speed tests which include other portions of the overall internet connection beyond the Connection itself may yield results which are outside the expected speed range for your particular service plan on the Speed Tier page. AT&T expressly disclaims any warranty with respect to the outcome of these third party speed tests.

**6.2.2.6 Download vs Upload Speeds:**

The term "download" generally refers to the process of a user utilizing their local device or computer to access information stored on a remote device, computer or server connected to the internet and includes activities ranging from "surfing" the internet to downloading a file to streaming video. The term "upload" generally refers to the process of a user sending information from their device or computer to a remote device, computer or server connected to the internet. Unless otherwise specified, references to the "speed" of an Internet Service will solely be with respect to the download speed of that Service. Similarly, unless otherwise specified, AT&T makes no guarantee that the upload speed of a particular Internet Service will be the same as the download speed, either in terms of the applicable speed range or in terms of actual performance at any given moment. In fact, as set forth on the Speed Tier Page, many Internet Services have expected upload speeds which are lower than the comparable expected download speeds. As a result, and as a result of the many other factors that might affect speed at any given moment, the actual upload and download speed of any Internet Service will vary greatly from time to time and day to day.

**6.2.2.7 Data Usage on Residential Internet Services:**

The residential Internet Service you purchased includes either an unlimited data allowance or a monthly data usage allowance with overage charges for usage in excess of your allowance. More details regarding the applicable data allowance, is set forth in the Customer Service Summary or Order Confirmation Letter you received. Use of certain services, including but not limited to digital TV features and apps, AT&T Digital Life, home security, home automation and medical alarm systems, whether provided by AT&T or a third party, may count towards your Internet data usage allowance. For additional information about the use of your residential AT&T Internet Service, including management of your data usage, as well as information about other data plans that you might consider, please refer to att.com/internet-usage. (This paragraph is not applicable to Business Internet Services.)

**6.2.3 Availability and Service Changes:**

**6.2.3.1 Availability:**

AT&T Internet Services are not available in all areas, and may not be available at certain speed tiers (or at all) at your location, even if our initial testing, an AT&T website and/or any sales representative or other personnel associated with AT&T indicated that your location qualified for a particular speed tier or Service. If your location is situated in an MTU, availability of any particular Internet Service may depend upon the owner and/or manager of the MTU agreeing to grant AT&T access to the MTU and/or to your particular location.

The availability of any Internet Service may also be subject to various limitations upon the capacity of the various technologies utilized in AT&T's network to support a given number of customers on any particular Internet Service and/or speed tier in a given area ("Capacity Limitations"). Some AT&T Internet Services are more likely to be subject to Capacity Limitations. When a particular part of AT&T's network is approaching a Capacity Limitation, it can be very difficult for AT&T to predict exactly when or how that Capacity Limitation will impact upon the availability of a particular Internet Service to a particular location. This may mean that, although a certain location may be theoretically capable of receiving the Internet Service in question, Capacity Limitations at the time a particular order is placed may mean that a particular Service is not available to a particular location. This can even occur between the time that a Service is ordered and the time that the Services is installed / fulfilled, resulting in a Service that was shown as being available to a particular location at the time an order was placed no longer being available at the time of installation. As discussed in Section in more detail with respect to particular Services below, Capacity Limitations may also mean that if a Service is terminated at any location for any reason whatsoever, it may not be possible to restore or renew that Service at that location.

AT&T also reserves the right, in its sole discretion, to stop offering some or all AT&T Internet Services at a particular location, whether because AT&T has or expects

to lose necessary access rights to the equipment required to deliver a particular service to that location or AT&T has otherwise determined that it is no longer in AT&T's best interests to offer a particular service or services to that location. AT&T may do this either by terminating current service(s) to the location, pursuant to Section 6.5 below, or by removing the location from eligibility for the purchase of new service(s) ("Grandfathered"). If a service to a particular location has been Grandfathered, current service(s) may not be interrupted but if service is suspended or terminated at that location for any reason AT&T will not be able to guarantee that service will be renewed or restored at that location. New service at that location may not be available for purchase from AT&T or the service available may be substantially different from the service that has been Grandfathered.

For all those reasons, AT&T makes absolutely no guarantee as to the availability of any Internet Service at any location.

**6.2.3.2 Service Changes and Technology Conversions:**

AT&T may modify or discontinue any Internet Service, temporarily or permanently, and will publish the terms and conditions for temporary changes (which are incorporated into this Agreement) at att.com/temporaryterms. AT&T also will endeavor to provide you with reasonable notice of material changes to your Internet Service. Your continued use or subscription to Internet Service after the effective date of the change constitutes acceptance of the change and any associated terms and conditions. In addition, if AT&T determines to provision Internet Service at your location utilizing a different technology, we will evaluate whether the conversion can occur without noticeable interruptions during normal business hours and no single interruption outside of normal business hours of more than one (1) hour in length. If so, we may elect to proceed with the conversion without prior notice to you. Otherwise, we will endeavor to provide you with up to thirty (30) days' advance notice of the conversion. Following that period, we may at our sole discretion, either disconnect your service or temporarily suspend your service for up to fifteen (15) days to facilitate the conversion process.

As part of any conversion, we may, in our discretion, discontinue the particular Internet Service you are currently receiving and make available to you an alternate Internet Service of comparable or better Speed at the then applicable rates, terms, and conditions, which may differ from your previous Internet Service rates, terms, and conditions (including Bundle Discounts). If you are on a Term Plan and your overall price will increase as a result of this conversion, taking into account all applicable credits and discounts, you will not have to pay any applicable Early Termination Fee if you elect to cancel your Internet Service within the period specified for doing so on your updated Customer Service Summary or Confirmation Letter.

Your new Internet Service may require different or additional equipment in order to fully utilize. If so, we will endeavor to either provide you with the required equipment or notify you of any equipment you will be required to provide on your own. You may also be required to review and accept new or additional terms and conditions related to the new Internet Service and/or new equipment.

**6.2.4 Home Networking / Home Wi-Fi:**

**6.2.4.1 Inside Wiring:**

When ordering AT&T Internet Service, you will be responsible for providing any copper wire or fiber optic cable required for local networking purposes within your premises ("Inside Wiring" or "IW"), including any copper wire or fiber optic cable between the AT&T network termination interface at your location and the internet gateway (WG) equipment that will be located at your premises as well as any wiring or cabling you may choose to use to connect internet enabled devices to the internet gateway (WG). In most cases, the IW will already be present in your existing locations, however you will be responsible for providing any additional IW which may be required. If additional IW is required, you may have the option of ordering IW from AT&T or installing your own IW. If you elect to install your own IW, the IW must be installed and available for use by AT&T Technicians before you order AT&T Internet Service. If IW service is ordered from AT&T, it is your sole responsibility to obtain landlord permission or approvals for such IW.

**6.2.4.2 Disclaimer of Warranties:**

The condition of the IW over which your Internet Service is transmitted within your premises will impact the performance of the Internet Service, including with respect to speed, reliability, and latency. You are solely responsible for the condition of any IW and AT&T expressly disclaims any responsibility for it. If IW is provided by AT&T, upon completion of installation you will have full ownership and responsibility for that IW. **Regardless of whether you or AT&T provides or installs IW, to the greatest extent permitted by applicable law, AT&T makes no warranty to you or any other party for any work or materials constituting or associated with IW. AT&T expressly disclaims any warranty of merchantability or fitness for a particular use, and AT&T has no responsibility to maintain, update, repair, replace, de-install, or remove any installed IW.**

**6.2.4.3 Home Wi-Fi / Local Wi-Fi:**

Depending upon the Internet Service you purchase, your Internet Service may include Wi-Fi enabled home networking equipment ("Wi-Fi Equipment") in order to help you allow Wi-Fi enabled devices to wirelessly connect to your Internet Service ("Home Wi-Fi," or for business customers, "Local Wifi"). AT&T may also make available additional, optional internet related equipment for sale or lease in connection with your Service, such as various types of home networking equipment (ex: Wi-Fi Extenders). Unless otherwise expressly specified to the contrary, any amounts for the purchase or lease of this additional equipment will be separate from and in addition to amounts payable for your Service. Use of such additional equipment may be subject to additional terms and conditions as specified in connection therewith.

In order to use Home Wi-Fi or Local Wi-Fi, you must have Wi-Fi enabled devices that (a) meet U.S. and WiFi Alliance standards; (b) are compatible with the Wi-Fi network being generated by the applicable Wi-Fi Equipment; and (c) are capable of running IP and related protocols. The Wi-Fi enabled device you are utilizing must be in close enough proximity to the Wi-Fi Equipment to achieve connectivity with the Home Wi-Fi or Local Wi-Fi. Actual Home Wi-Fi or Local Wi-Fi coverage and quality may vary depending upon the location of the Wi-Fi Equipment, the location of the applicable Wi-Fi enabled device and conditions in and around the premises in which both the Equipment and the Wi-Fi enabled device operate.

Home Wi-Fi or Local Wi-Fi is designed to provide you with the highest speed available from your home network at any given point in time, subject to the many different factors that can affect network performance. AT&T's most recent generation of Wi-Fi Equipment generally supports the Wi-Fi 6 (IEEE 802.11ax) standard and is compatible with older Wi-Fi (IEEE 802.11 a/b/g/n/ac) standards, although older Home Wi-Fi Equipment may only support older standards. The theoretical maximum speed you may be capable of achieving from your Home Wi-Fi will depend heavily on which Wi-Fi (IEEE 802.11) standard is supported by the Wi-Fi

Equipment you have as well as which Wi-Fi (IEEE 802.11) standard is supported by the particular device you are utilizing. (By way of example only, Wi-Fi 1 (IEEE 802.11b) offers a theoretical maximum of 11 Mbps while Wi-Fi 6 (IEEE 802.11ax) offers a theoretical maximum of over 1 Gbps. Even if the Wi-Fi Equipment at your location is capable of supporting Wi-Fi 6 (IEEE 802.11ax), if you are utilizing an older device that is only capable of supporting the older Wi-Fi 1 (IEEE 802.11b) standard, your theoretical maximum speed will be limited to 11 Mbps.)

Although the Wi-Fi 1-6 (IEEE 802.11 a/b/g/n/ac/ax) standards have theoretical maximum speeds ranging from over ten Mbps to over a gigabit per second, depending on which standard applies, actual Wi-Fi speeds will be substantially lower than the theoretical maximum speeds which describe the physical throughput rate including Wi-Fi protocol communications. The result is that the maximum you can receive may not exceed 40%-50% of the theoretical maximum Wi-Fi standard speed and may be significantly lower depending on other applicable factors. In addition to the factors discussed above, the actual speed you experience over Wi-Fi will depend in part on the speed of the connection between the Wi-Fi network you are accessing and the destination you want to reach on the Internet, which may be significantly below the theoretical maximum speed of the service. (By way of example only, if you order AT&T Internet 100, with a download Expected Speed of 100 Mbps according to the AT&T Speed Tier page, even if the Wi-Fi Equipment at your location and the device you are utilizing are both capable of supporting the Wi-Fi 6 (IEEE 802.11ax) standard with a theoretical maximum speed of over 1 Gbps, the theoretical maximum internet download speed with your device connected to your Home Wi-Fi would not be expected to exceed 100 Mbps.)

**6.2.4.4 Home Network Management and Security:**
AT&T reserves the right to manage remotely any equipment used to access any Internet Service, whether that equipment is connected via a wired or wireless connection. That may include facilitating the connection of that equipment, monitoring traffic for potential issues, managing applicable settings and/or remotely updating software or firmware. Nonetheless, you remain ultimately responsible for all security measures over your in-home network, including any Inside Wiring, local area network(s) and/or Wi-Fi Equipment. That includes, but is not limited to, access to authorization codes or passwords, as well as any encryption you deem necessary or required.

AT&T may provide you with tools or software to assist you in managing one or more aspects of your home network (including apps like AT&T's Smart Home Manager and network based services like AT&T Smart Security, which software would then be included in the term "Software" as used herein below). AT&T may also make available additional, optional security or network management applications for sale or subscription in connection with your Service. Unless otherwise expressly specified to the contrary, any amounts for the purchase or subscription of these additional services will be separate from and in addition to amounts payable for your Internet Service. Use of such additional services may be subject to additional terms and conditions as specified in connection therewith.

Your use of tools, features and/or software made available to you by AT&T is at your own discretion and you remain ultimately responsible for all aspects of your home network, including any activity by children or other guests that you may allow (either intentionally or unintentionally, through lack of adequate security measures) to access your AT&T Internet Services via your home network and/or Home Wi-Fi and any devices or equipment you may elect to connect to your home network and/or Home Wi-Fi.. For that reason, AT&T recommends that you take all necessary measures to ensure adequate network security and to closely monitor use of your AT&T Internet Services and your home network by anyone accessing your home network, especially children.

**6.2.5 Nationwide Wi-Fi Hot Spots (For Internet):**
Access to AT&T's nationwide network of Wi-Fi Hot Spots may be available to you as part of the Service, and the AT&T Wi-Fi Hot Spots will provide you with access to the internet via certain AT&T Internet access points (Locations). Primarily, this access is provided via a Wi-Fi network using a Wi-Fi Alliance (IEEE 802.11) standard. To access the Wi-Fi Hot Spots, you must have a device that is compatible with the specific Wi-Fi equipment deployed at a Location. Access to the Hot Spots is intended for the limited purposes of assisting with access to the public internet for e-mail and web browsing or other purposes consistent with the AT&T Wi-Fi Terms of Service, which may be found at att.com/legal/terms.wiFiServices.html. In order to gain access to the Internet at a Location, you may need your Account information, including your Member ID. If you are also an AT&T Mobility customer, you may auto-authenticate at certain Locations without the use of your Member ID. The AT&T Wi-Fi Terms of Service will govern your use of AT&T Wi-Fi Hot Spots.

## 6.3 Registration and Membership

**6.3.1 Account Holder:**
When you complete the registration process for the Service, you become the Account holder. To be an Account holder, you must either be: (i) 18 years or older, if an individual, or (ii) be a corporation, partnership, or other legal entity duly formed (and incorporated if applicable) in good standing where required to do business with all legal authority and power to accept this Agreement and acting through your duly authorized representative. You will be asked to choose a unique "Member ID" for your account.

**6.3.2 Sub Accounts:**
Account holders may also create up to ten accounts with separate login credentials that are linked to the Account holder's account (each a "Sub Account"). Each Sub Account may also be required to accept this Agreement and complete the Sub Account registration.

**6.3.3 Account Holder Responsibility:**
The Account holder is responsible for all activity associated with the Account and any of its Sub Accounts, including all fees and charges, whether the charges are incurred by the Account or the Sub Accounts. Use of Member ID subjects you to the AT&T Access ID Terms and Conditions (available at att.com/accessidterms), which are incorporated herein by reference.

**6.3.4 Registration Data:**
All information that you provide to AT&T must be accurate, including your name, address, credit or charge card numbers and expiration dates, and any payment information ("Registration Data"). You are responsible for keeping all Registration Data accurate and must provide changes promptly to the AT&T Member Center by going to att.com/myatt.

**6.3.5 Password Protections:**

Your Account password or passcode (as applicable) must be provided to engage in most online or telephonically enabled account management functions. You agree to immediately notify AT&T if your password or passcode has been compromised and/or you wish to remove an authorized user from your Account.

## 6.4 Pricing

In return for receiving AT&T Internet Service, you promise to pay—and agree that we may charge your credit or debit card on file with us—the charges described in subsection 1.9, the Internet Fee Schedule, and the following charges:

### 6.4.1 Monthly Service Charges, Term Plans, and Bundle Discounts:

Billing commences when AT&T has provisioned your Internet Service. During each monthly billing cycle, you will be billed in advance, at our rates in effect at the time, for all AT&T Internet Services you order. When you purchased the AT&T Internet Service, you agreed to a specific monthly price and plan, which may have included a term for the Service of one or more years ("Term Plan"). Some plans may offer a discount on the Service if you sign up for other AT&T services ("Bundle Discount"). You agree to maintain your Service and any bundled services for the applicable term of the Term Plan or Bundle Discount, as applicable. If you signed up for a Term Plan or a Bundle Discount, the price under the applicable plans is valid until one of the following events occurs, at which time the price of your Service may revert to the then-current price for such Service: (1) the term of your plan expires; (2) you change your current Service address to another Service address; (3) you drop one of the AT&T services that you were required to purchase to receive the special rate; or (4) AT&T exercises a right under this Agreement to terminate your Account's (or any associated Sub Account's or Authorized User's) use of the Service.

### 6.4.2 Early Termination Fees:

If before the end of any applicable term, either you cancel your Internet Service or we terminate it for misconduct pursuant to subsection 1.5, you will be subject to any early termination fee specified in your Customer Service Summary, Order Confirmation Letter, or applicable fee schedule.

## 6.5 Termination or Cancellation of Service

### 6.5.1 Suspension and/or Termination upon Loss of Access:

Upon any interruption or loss of either your or AT&T's rights to access any part of the network facilities required to provide your Internet Service, including the interruption or loss of any rights to access the land or buildings in which the facilities are located, AT&T may, in its sole discretion, suspend or terminate all or any portion of your Internet Service. In general and where applicable, AT&T will utilize available public rights of way to access network facilities utilized for providing Services. However, if you are the owner of the location to which your Services are provisioned, it is ultimately your responsibility to secure any necessary rights of access outside of the public rights of way. If you lease or rent the location at which you wish to receive Services, or if the location is located in a MTU type of arrangement, receipt of Services is expressly conditioned on the owner, landlord, and/or building manager providing all customary, reasonable, and necessary rights and permissions to allow AT&T access to the network facilities necessary to provide your Internet Service. AT&T makes no representation and can't guarantee that the owner, landlord and/or building manager has or will provide the applicable rights and permissions necessary for you to receive Internet Service or any particular grade of Internet Service, and explicitly disclaims any such representation or guarantee. In the event of any interruption or loss of access, AT&T will endeavor to provide you with reasonable advanced notice of any suspension or termination of Internet Service. However the timing of any suspension or termination, as well as the timing of any resumption of AT&T Internet Services, are entirely at AT&T's reasonable discretion. In general, and unless otherwise specified, billing will continue for your monthly charges while your Service is suspended due to a loss of access.

### 6.5.2 Suspension and/or Termination due to Capacity Limitations:

Where a service is subject to Capacity Limitations, events may occur which are outside of AT&T's control which may restrict network capacity to the point where AT&T is unable to continue to provide a particular Internet service to certain locations where particular Capacity Limitations apply or which may result in a degradation of the capacity or speed of Internet service provided to certain locations (each a "Capacity Limitation Event"). AT&T will utilize available network management practices in order to mitigate against the occurrence of a Capacity Limitation Event and to continue to provide Internet service to any locations impacted by a Capacity Limitation Event. However, restrictions on AT&T's ability to apply network management practices may mean that a Capacity Limitation Event is unavailable. Upon the occurrence of a Capacity Limitation Event impacting your location, AT&T may, in its sole discretion, suspend or terminate all or any portion of your Internet Service or may continue to provide Internet service at a reduced capacity or a lower speed. In the event of any anticipated interruption, loss of access, or degradation of service due to a Capacity Limitation Event, AT&T will endeavor to provide you with reasonable advanced notice of any suspension, termination, or degradation of Internet service and may also offer alternative forms of Internet service where available. However, the timing of any suspension, termination, or degradation, as well as the timing of any resumption of AT&T Internet Services, are entirely at AT&T's reasonable discretion. In general, and unless otherwise specified, billing will be suspended for your monthly charges while your Service is suspended due to a Capacity Limitation Event.

### 6.5.3 Suspension and/or Termination as part of Technology Conversion:

When and/or if you are selected for conversion to a more updated Internet technology, we will evaluate whether the conversion can occur without noticeable interruptions during normal business hours. If we determine that interruptions are likely or unavoidable, we will provide at least thirty days' notice of the discontinuation or suspension of your Service via email, direct mail, bill page message, or bill insert. Thirty days after such notice, we may at our sole discretion, either disconnect your current service or temporarily suspend your service for up to fifteen days. Refusal to reasonably facilitate conversion, including by refusing to schedule an appointment to allow our technicians to complete necessary updates to AT&T Equipment and/or network facilities at your location, may result in the termination of your service.

### 6.5.4 Restoral Fee and Payment of Past Due Amounts:

If either you or AT&T suspends a Service for any reason set forth herein (other than due to AT&T's loss of access, a Capacity Limitation Event, or a conversion from older Internet Technology), you must make satisfactory arrangements to pay all past due amounts in order to have that Service restored. You will also be required to pay a Service Restoral Fee of no more than $50 per incident of suspension or termination of a particular Service (subject to applicable law and except as may otherwise have been expressly agreed in writing). Please see the applicable Fee Schedules at att.com/ConsumerInternetFees and/or att.com/BusinessInternetFees

to determine the Restoral Fee amount applicable to your particular Service(s). The Restoral Fee will be assessed on the next monthly bill you receive following the resumption of Service.

## 6.6 Payment

**6.6.1 Method of Payment:**
Your monthly charges may be billed via a monthly AT&T bill or to a credit card. Credit card billing is not available for AT&T High Speed Internet Direct. AT&T Internet customers will automatically receive an online bill unless you specifically notify us that you want to receive a paper bill by calling 800.288.2020.

**6.6.2 Online Billing:**
You must register online to establish a personal myAT&T account and provide a billing email address. You will then be able to view and pay your bill online by logging on to your personal myAT&T account (username and password required).

## 6.7 Equipment & Software

**6.7.1 Customer Equipment:**
Other than the equipment and/or software provided to you by AT&T for use with the Service (collectively, the "AT&T Equipment"), you must provide all equipment, devices, and software necessary to receive the Service. Any equipment or software that was not provided to you by AT&T, including batteries, is not the responsibility of AT&T, and AT&T will not provide support for, or be responsible for ongoing maintenance of such equipment.

Regardless of whether the equipment used to access your Service (modem, gateway, etc.) is owned by you or AT&T, AT&T reserves the right to manage such equipment for the duration of your Service, and retains exclusive rights to data generated by the equipment. Neither you nor a third party may change, interfere with, or block access to equipment, the data, or settings while you continue to receive the Service.

**6.7.2 AT&T Equipment:**
Any AT&T Equipment, including modems, routers, antennas, or gateways, will be either a new or a fully inspected and tested refurbished unit.

AT&T will repair or replace damaged AT&T Equipment as AT&T deems necessary and may charge you a fee for repair or replacement of the equipment. You understand that repair or replacement of equipment may delete stored content, reset personal settings, or otherwise alter the functionality of such equipment. You will be responsible for payment of service charges for visits by AT&T or its subcontractors to your premises when a service request results from causes not attributable to AT&T or its subcontractors, including, but not limited to, when you are unwilling to complete troubleshooting steps requested by AT&T. If you own the equipment or if the equipment is damaged due to your intentional acts or negligence as determined by AT&T, you will be responsible for the price of repair or replacement.

If the AT&T Equipment was damaged due to your intentional acts, negligence, or use inconsistent with this Agreement, as determined by AT&T, you will be responsible for the price of repair or replacement. Any tampering with the AT&T Equipment, including, for example, opening and attempting to modify the Equipment will be treated as damage due to your intentional acts or negligence. You agree that you will use the equipment only for its intended use and not for any other purpose (such as on another AT&T network, or on another provider's (non-AT&T) network). You agree to use appropriate and reasonable care in using all AT&T Equipment.

**6.7.3 Access and Installation of Equipment:**
You will provide AT&T and its subcontractors with reasonable access to your premises in order to install, maintain, repair, and/or update the Internet Service, and you authorize any other Adult resident or guest at your residence (each, an Authorized User for purposes of this Agreement) to grant access to your premises for these purposes. You understand and agree that AT&T may drill, cut, and otherwise alter improvements on the premises (including walls, flooring, and/or other surfaces) in order to install, maintain, repair, and/or update the Internet Service. If you do not own your premises or your unit is part of a MTU, you warrant that you have obtained permission from any necessary party, including but not limited to the owner, landlord, or building manager, to allow AT&T and its subcontractors reasonable access to install, maintain, repair, and/or update the Internet Service and to make any alterations AT&T deems appropriate for the work to be performed.

You acknowledge that AT&T may use existing wiring, including altering the wiring and removing accessories, located within your unit. You warrant that you own or control the Inside Wiring, and give AT&T permission to use, alter, and remove equipment from, such wiring. Without limiting any other provisions of this TOS, you agree to indemnify AT&T from and against all claims by an owner, landlord, building manager, or other party in connection with installation, maintenance, repair, or provision of the Services.

**6.7.4 Power and Battery Backup:**
The AT&T Equipment may require electrical power from your premises to operate, which you are responsible for providing. If there is a gateway at your premises, AT&T will not provide an initial gateway battery backup unit or an initial backup battery. Any backup battery solution is your responsibility. You may choose to purchase battery backup for your AT&T Equipment from third party manufacturers or retailers. For more information and minimum specifications visit att.com/batterybackup.

You also agree to be solely responsible for determining when backup batteries for any AT&T Equipment require replacement and for replacing and recycling used batteries. You agree to read and follow all manufacturer or vendor directions for the replacement and recycling of backup batteries. For more information and minimum specifications visit att.com/batterybackup.

**Note that AT&T Equipment without battery backup will not function in the event of a loss of customer-supplied power. This will disrupt your Internet Service as well as any additional services that use the AT&T Connection for transport (e.g. Voice over IP including e911) or require an internet connection to operate properly. AT&T will have no liability for loss of any service(s), whether provisioned by AT&T or a third party, in the event of**

**interruption of customer-supplied power, with or without battery backup present in the AT&T equipment.**

**6.7.5 Theft or Misuse:**
You agree to notify AT&T immediately, in writing or by calling the AT&T customer support line, if the AT&T Equipment is stolen or if you become aware at any time that Services are being stolen or fraudulently used. When you call or write, you must provide a detailed description of the circumstances of the theft, including documentation of theft or fraudulent use of the AT&T Equipment or Services (such as a copy of a police report). You will be responsible for all charges incurred until you report the theft or fraudulent use. You will also be responsible for stolen AT&T Equipment not owned by you, however, AT&T may in its sole discretion waive or reduce charges upon submission of documentation of theft or other circumstances. Failure to provide notice to AT&T of theft in a timely manner may result in the termination of your Services and additional charges to you. Unless notified otherwise by AT&T, after you report the theft or fraudulent use of the Services, you will remain responsible for paying your monthly fees for Services not stolen or fraudulently used.

**6.7.6 Return of AT&T Equipment:**
Except as otherwise provided, AT&T Equipment must be returned to AT&T undamaged, within twenty-one (21) calendar days after your Service is terminated for any reason. If Equipment is not returned within twenty-one (21) calendar days, or is returned damaged, you will be charged a Non-Return Equipment Fee. We may retain any advance payment or deposit, or portion thereof that previously had not been refunded, if you fail to return the AT&T Equipment within this time period. If all AT&T Equipment is returned within six (6) months of termination, any fees charged for such AT&T Equipment will be refunded (other than fees for damages). No refunds will be made for AT&T Equipment returned more than six (6) months after termination. This subsection also applies if your existing Equipment is replaced or upgraded for any reason.

## 6.8 Account Security

You will receive a password associated with your Member ID upon completing the Service registration process. You agree to keep confidential all passwords, IP addresses, and computer names and are solely responsible for any liability or damages resulting from your failure to maintain that confidentiality. You are also solely and fully responsible and liable for all activities that occur under your password, Member ID or IP address. You agree to change your password periodically, ensure that you exist from your Account at the end of each session, and immediately notify AT&T if you suspect any breach of security such as loss, theft, Public Use or unauthorized disclosure or use of your Account or any Sub Account, password, Member ID, or any credit or charge card number provided to AT&T by calling:

- 800.288.2020 for AT&T Internet and AT&T Fiber consumer subscribers and Fixed Wireless subscribers;
- 855.220.5211 for Access from AT&T in English (855.220.5225 for Access from AT&T in Spanish);
- 877.722.3755 for AT&T High Speed Internet subscribers, and AT&T High Speed Internet Direct (Business and Consumer); and
- 888.321.2375 for FastAccess DSL.

There is a risk that other users may attempt to access your computer through the Internet or connected networks. You acknowledge this risk as inherent to the shared nature of the Service and you agree to take full responsibility for taking adequate security precautions and safeguarding your data from loss.

In addition, you agree not to use any other user's account, Member ID, or password at any time without the express permission and consent of the holder of that account, Member ID, or password. You may not transfer or assign your Account and have no right to a particular Member ID, IP address, or other information or identifier we assign to you.

## 6.9 Restrictions on Use

**6.9.1 No Resale:**
The Service is provided for your use only (unless otherwise specifically stated) and you agree not to, whether for a fee or without charge, reproduce, duplicate, copy, sell, transfer, trade, resell, re-provision, redistribute, or rent the Service, your membership in the Service, any portion of the Service, use of the Service, or access to the Service, including, but not limited to, reselling capabilities enabled or used by a specific application (including, without limitation, Voice Over Internet Protocol (VOIP) via wired, wireless, or other means. For example, you agree that the Service is not to be used to trunk or facilitate public internet access ("hotspots") or any other public use of the Service, or for any high-volume purpose. All aspects of the Service, except that portion provided by third party providers, is copyrighted and property of AT&T.

**6.9.2 Network Management:**
AT&T reserves the right to engage in reasonable network management practices, to protect its broadband network from harm, compromised capacity, degradation in network performance or service levels, or uses of the Service which may adversely impact access to or the use of the Service by other customers. Reasonable network management practices that AT&T may adopt include, but are not limited to, the following: (i) a cap on data usage; (ii) a modification of a customer's serving facility or service technology; and/or (iii) a modification of or a limitation on a customer's data throughput speed or data consumption.

A very small percentage of customers use the Service in a way which creates harm to the network, compromised capacity, degradation in network performance or service levels, or which may adversely impact access to or the use of the Service by other customers. In the event that AT&T adopts a network management practice which will apply to your Service, we will provide you with a notice, by web posting, bill insert, email, letter and/or other appropriate means, which describes the network management practice, explains how it will work, and explains how it could impact your Service.

## 6.10 Data Management / Content

**6.10.1 Data Management:**
You are responsible for management of your information including but not limited to back-up and restoration of data, erasing data from disk space you control and changing data on or settings for your modem and/or router. AT&T is not responsible for the loss of your data or for the back-up or restoration of your data regardless

of whether this data is maintained on our servers or your computer server.

**6.10.2 Content:**
You, and not AT&T, are entirely responsible for all content that you upload, download, post, email, transmit or otherwise make available by use of the Service ("User Content").

AT&T does not claim ownership of User Content. However, with respect to User Content you submit or otherwise make available via your Internet Service, you grant AT&T a nonexclusive, unrestricted, irrevocable, worldwide, sublicenseable, transferable, perpetual, unlimited, assignable, fully paid up and royalty-free right to copy, display, edit, publish, prepare derivative works of, distribute, process, analyze, use and commercialize, in any media known or hereinafter developed, to such User Content.

AT&T may preserve User Content and may also disclose User Content if required to do so by law or in the good faith belief that such preservation or disclosure is reasonably necessary to: (a) comply with legal process; (b) enforce this Agreement; (c) respond to claims that any Content violates the rights of third parties; or, (d) protect the rights, property, or personal safety of AT&T, other end users, and the public.

## 6.11 Customer Service Support

AT&T provides free basic customer care for Service purchased from AT&T and covered under this Agreement. Although AT&T reserves certain rights related to equipment necessary to receive the Service and will repair or replace damaged equipment as AT&T deems necessary (in each case, as described in, and subject to the terms and conditions (including fees and other charges) set forth in, Section 6.7.2 above), AT&T does not provide support for devices that access the Service under this Agreement.

## 6.12 Contact Information

Unless otherwise specified in this Agreement, notices by Members to AT&T must be given by calling: for AT&T Dial subscribers (866.722.3425), for AT&T High Speed Internet subscribers (Business and Consumer) (877.722.3755), for AT&T Internet and AT&T Fiber subscribers (Consumer Only) (800.288.2020), for FastAccess DSL and BellSouth Dial Internet subscribers (Business and Consumer) (888.321.2375), for Fixed Wireless Internet (Business and Consumer) (800.288.2020), and for AT&T Internet for Business and AT&T Business Fiber (800.321.2000).

## 6.13 AT&T Wired Internet Service

**6.13.1 AT&T Wired Internet Service:**
"AT&T Wired Internet Service" refers to any internet service provided entirely through a terrestrial, wired Internet Protocol technology, whether copper based or optical fiber based, and generally encompasses those services marketed as "AT&T Internet," "AT&T Fiber," AT&T High Speed Internet (including Max and Max Plus), and U-verse Internet. AT&T Wired Internet Service does not include services which use Asynchronous Transfer Mode technology instead of Internet Protocol technology, such as AT&T DSL. The terms in this Section 6.13 apply to customers purchasing and/or receiving AT&T Wired Internet Services and supersede any conflicting terms contained in the rest of these Internet Access Service Terms with respect to your AT&T Wired Internet Services.

**6.13.2 Additional Equipment for AT&T Wired Internet Customers:**
AT&T will make available to you certain equipment, which may include one or more of the following:

- a Wi-Fi Gateway ("WG") located inside your premises;
- an Optical Network Terminal ("ONT") where AT&T's fiber network terminates, which may be located inside your premises, on the outside of your premises, in your garage, or in a central location in a MTU environment; and
- an Intelligent Network Interface Device ("iNID") (which provide your services if you do not have a gateway),

all of which are herein collectively referred to as "Internet Equipment," required for your Service. If you have not purchased Internet Equipment from AT&T or if previously purchased Internet Equipment is beyond the one-year (1-year) warranty period (from date of installation) and requires replacement, then you agree to pay a monthly equipment fee for the Internet Equipment, as part of your purchase of or continued use of the Service and/or other AT&T services. Equipment fees and purchase options depend on the AT&T Services and/or rate plans you order and the installation options you choose.

The WG is installed inside your premises and is required for the Service to function. A WG allows multiple devices to connect and communicate to the internet wirelessly. Smartphones, tablets and laptops are common devices that access the internet through a WG. A WG resides indoors and has a power cord that plugs into a common electrical outlet. A battery backup is recommended in case of a power outage. Some WGs have an external battery backup while others have an internal battery backup. AT&T will install the WG. Once the WG has been installed by AT&T, you may not move the WG to a different location or reposition at your address or any other address. Our latest WGs combine the WG and the ONT into a single device, but many older WGs still require a separate ONT to operate.

AT&T may also make available additional, optional internet related equipment for sale or lease in connection with your Service, such as various types of home networking equipment (ex: Wi-Fi Extenders). Unless otherwise expressly specified to the contrary, any amounts for the purchase or lease of this additional equipment will be separate from and in addition to amounts payable for your Service. Use of such additional equipment may be subject to additional terms and conditions as specified in connection therewith.

**6.13.3 Return of Equipment:**
If your Internet Service is provided by an iNID, you should not return the iNID home networking hub, (Model# j38HG) or the ONT. AT&T is the owner of the WG and any other AT&T Equipment. Upon termination of your Internet Service for any reason, AT&T shall remain the owner of the WG and any other AT&T Equipment. Unless we tell you otherwise in writing, you must return the WG and any other AT&T Equipment, undamaged, within 21 calendar days to AT&T. If the WG or any

other AT&T Equipment is not returned within 21 calendar days, or is returned damaged, you may be charged for the replacement value of the WG or other AT&T Internet Equipment and/or the applicable Equipment Non-return Fee. Return of any additional and/or optional equipment may be subject to different rules or requirements than the Internet Equipment which will be communicated to you at the time of purchase and/or return.

**6.13.4 Capacity Limitations/Grandfathering:**
Certain types of AT&T Wired Internet Services are subject to limits upon availability due to Capacity Limitations. Similarly, certain types of AT&T Wired Internet Services are subject to limits upon availability due to Grandfathering. Where this applies, if AT&T Wired Internet Services are suspended or terminated at your location for any reason, AT&T cannot guarantee that you will be able subsequently to renew or restore Internet Service at that location.

## 6.14 Wireless Home Internet Services

**6.14.1 Wireless Home Internet Services Description:**
Wireless Home Internet Services are designed to deliver internet access to a fixed location using wireless networks and include those services currently marketed by AT&T as AT&T Internet Air, AT&T Fixed Wireless Internet and AT&T Wireless Home Internet. Wireless Home Internet Services can be physically fixed to a location by means of externally mounted antennas or can be mobile services limited to operation in a certain location by network based restrictions. See the description, plan details and related terms for your particular Wireless Home Internet Service for more details.

To the extent that your Wireless Home Internet Service is delivered over some portion of the AT&T wireless network, your service will be subject to the AT&T's Wireless Service Terms in Section 2 in addition to the terms which apply to AT&T Internet Services more generally. To the extent that your Wireless Home Internet Service is served via an AT&T PREPAID wireless service plan, your service will be subject to the AT&T PREPAID Service Terms in Section 3 in addition to the terms which apply to AT&T Internet Services and/or AT&T Wireless Services more generally.

**6.14.1.1 Service Availability and Limitations:**
Wireless Home Internet Services will not be available in all areas at all times and availability may vary by specific service. Many factors can affect the availability and quality of Wireless Home Internet Services, including, but not limited to, Capacity Limitations and service limitations, such as network capacity, terrain, buildings, foliage, and weather. Unless otherwise specified, Wireless Home Internet Services are delivered via cell sites in AT&T's wireless network. Each cell site can support only a limited number of Wireless Home Internet Service subscribers. These Capacity Limitations may mean that a Wireless Home Internet Service may be identified as available to your location at the time of ordering but may not prove to be available at the time scheduled for installation. Wireless Home Internet Services may also be subject to limits upon availability due to Grandfathering. Where Capacity Limitations or Grandfathering apply, if a Wireless Home Internet service is suspended or terminated at your location for any reason, AT&T cannot guarantee that you will be able subsequently to renew or restore the same or any Wireless Home Internet service at that location.

Unless otherwise specified, Wireless Home Internet Services are not generally compatible with analog services, including, but not limited to, wireless messaging services, alarm and security systems, fax machines, medical alert and monitoring services, credit card machines, IP/PBX Phone systems, or Dial Up Internet. Wireless Home Internet Services may not be compatible with DVR/Satellite systems; check with your provider. Public IP addresses are generally not used or available through Wireless Home Internet Services. Services like Web hosting, or hosted services, such as cameras, gaming systems, peer-to-peer file sharing, etc., that require a public IP address may not be supported.

**6.14.1.2 Prohibited Network Uses:**
As explained in subsection 2.5, AT&T may take any and all reasonable actions necessary to restrict any Prohibited Network Uses or any other violation of AT&T's Acceptable Use Policy, up to and including termination of service.

**6.14.1.3 AT&T's Network Management:**
With respect to your Wireless Home Internet Services, you agree that AT&T has the right to do the following:

- AT&T may modify, without advance notice, the permitted and prohibited activities by this Agreement;

- AT&T may engage in any reasonable network management practice to enhance customer service, to reduce network congestion, to adapt to advances and changes in technology, and/or to respond to the availability of wireless bandwidth and spectrum, including by taking any actions authorized by subsections 2.7 and 6.9;

- AT&T will provide you with advance notice of the usage threshold applicable to your data plan, or any changes to the applicable usage threshold either by a bill insert, email, text message or other appropriate means; and

- AT&T may use reasonable methods to monitor and collect customer usage information to better optimize the operation of the network. Details concerning the information that AT&T collects about its customers, and how it uses and protects that information are addressed in the AT&T Privacy Policy (see att.com/privacy).

**6.14.2 Fixed Wireless Internet Service**

**6.14.2.1 Fixed Wireless Internet Service or Fixed Wireless Internet:**
"Fixed Wireless Internet Service" or "Fixed Wireless Internet" refers to a wireless high-speed internet access service that offers you a capability for acquiring or retrieving information from; generating, storing, transforming, processing, or utilizing information on; or making available information to other internet end points connected directly or indirectly via a fixed wireless connection to the AT&T network.

The terms in this Section 6.14 apply to customers purchasing and/or receiving Fixed Wireless Internet Service and supersede any conflicting terms contained in the rest of these AT&T Internet Service Terms with respect to your Fixed Wireless Internet Service.

**6.14.2.2 Speed:**

As set forth on the Speed Tier Page, Fixed Wireless Internet customers should expect to see service capability speeds of 10Mbps or over downstream and 1Mbps upstream. However, due to the variability of wireless networks caused by environmental factors which are beyond AT&T's control, AT&T does not guarantee you any particular speed.

**6.14.2.3 IP Addresses:**
Static IP addresses are not used or available as part of the Fixed Wireless Internet Service. Services such as Web hosting, or hosted services such as camera, gaming server, etc. that require static IP address are not supported by Fixed Wireless Internet. See Section 7.14.8 for more information on service limitations.

**6.14.2.4 Service Requirements:**
To qualify for Fixed Wireless Internet Service, you must reside in an area where we provide Fixed Wireless Internet service. Fixed Wireless Internet requires an outdoor antenna that is professionally mounted on or near the exterior of your service location. Unless otherwise noted in the terms governing your plan, an eligible Fixed Wireless Internet plan is required.

Customers obtaining internet services under the Connect America Fund (CAF) program may be randomly subjected to performance testing to comply with FCC CAFII certification requirements. Performance testing will be conducted for a duration of four weeks and should have minimal impact on customer's internet access experience. This testing will conducted by AT&T and should not require any customer intervention.

**6.14.2.5 Changing Service Location:**
You may not use the Fixed Wireless Internet Service at any address other than your Service address or move any of the AT&T Equipment to another address while you remain an AT&T Fixed Wireless customer. If you are moving to a new residence at which Fixed Wireless Internet Service is available, and you wish to continue using the Service, you may request that AT&T install the Service and the AT&T Equipment at, and change your Service address to, your new residence, although we may require a contract extension for any such installation and change. If Fixed Wireless Internet Service is not available at your new residence or if we cannot perform installation at such residence for any reason, and if you also have a Term Plan, you will be charged any applicable ETF. If you change your service location but fail to call us at 800.288.2020 to give us prior notice, your Service will not be cancelled, and your Service charges will continue to apply.

**6.14.2.6 Fixed Wireless Equipment:**
Depending on your Service address, your Fixed Wireless Internet Service will include some or all of the following AT&T Equipment:

- **(1) Outdoor Antenna:** The Outdoor Antenna provides an interface to AT&T's network. The Outdoor Antenna and the APS (described below) require electrical power from your service location to operate, which you are responsible for providing. AT&T will install your Outdoor Antenna. Once the Outdoor Antenna has been installed by AT&T, you may not move the Outdoor Antenna to a different location or reposition at your address or any other address while you continue to receive the Service.

- **(2) Antenna Power Supply ("APS"):** The APS provides power supply and data connectivity for the Outdoor Antenna; your unit has integrated lightning surge protection and two LED Indicators: Power and Outdoor Antenna connectivity. AT&T will install your APS. Once the APS has been installed by AT&T, you may not move the APS to a different location or reposition at your address or any other address while you continue to receive the Service.

- **(3) Wi-Fi Gateway ("WG"):** The WG is installed inside your premises and is required for the Service to function. A WG allows multiple devices to connect and communicate to the internet wirelessly. Smartphones, tablets and laptops are common devices that access the internet through a WG. A WG resides indoors and has a power cord that plugs into a common electrical outlet. A battery backup is recommended in case of a power outage. Some WGs have an external battery backup while others have an internal battery backup. AT&T will install the WG. Once the WG has been installed by AT&T, you may not move the WG to a different location or reposition at your address or any other address.

You agree that, while you continue to receive the Service, neither you nor a third party will move the AT&T Equipment within your premises or to any other physical location outside of the premises where it was installed by AT&T. AT&T Fixed Wireless Internet Service is not designed to be nomadic and may not function properly if the AT&T Equipment is moved or altered by a non-AT&T employee. If you require the AT&T Equipment to be moved while you continue to receive the Service, you must contact AT&T. Failure to do so may result in a failure of the Service and/or in AT&T's termination of your Service.

**6.14.2.7 Responsibility for and Return of AT&T Equipment:**
Upon termination of your Service for any reason, AT&T shall remain the owner of the WG, and you must return the WG, undamaged, within 21 calendar days to AT&T. If the WG is not returned within 21 calendar days, or is returned damaged, you will be charged for the replacement value of the WG.

Although the Outdoor Antenna and APS will constitute AT&T Equipment during the term of any Fixed Wireless Internet Service, you will be considered the owner of the Outdoor Antenna and APS for all other purposes and you will not need to return the Outdoor Antenna and APS to AT&T upon termination of your Fixed Wireless Internet Service. Upon termination of your Service for any reason, the Outdoor Antenna and APS will remain where installed at your location and you will be solely responsible for any and all future service, care, maintenance and removal of the Outdoor Antenna and APS. Service, care, maintenance and removal of the Outdoor Antenna and APS should be performed only by an experienced professional; you should not attempt to perform such activities yourself. AT&T shall have no ongoing duty, obligation, or responsibility to perform any service, care, or maintenance on the Outdoor Antenna and/or APS or to uninstall or remove the Outdoor Antenna and/or APS after termination of the Service. AT&T shall have no liability to you or any other person or entity related to or arising out of the Outdoor Antenna and/or APS. You agree to indemnify and hold AT&T and its subsidiaries, affiliates, officers, agents, licensors, employees, sub-contractors, and partners harmless from any claim or demand, made after termination of Service, arising out of or related to the Outdoor Antenna and/or APS, including, but not limited to, claims for personal injury, property damage, wear and tear, or equipment degradation.

**6.14.2.8 Service Availability and Limitations:**
In addition to the standard service availability and limitations faced by all Wireless Home Internet Services, Fixed Wireless Internet Service is subject to the following additional service limitations and/or Capacity Limitations:

- use of capacity due to high number of users simultaneously using data intensive applications;

- damage to the Outdoor Antenna or cables;

- rotation of Outdoor Antenna from the optimum bearing;

- blockage of the signal between premise antenna and the cell tower (caused by artificial objects – building, barn, etc.); and

- improper installation or tampering with Outdoor Antenna.

**6.14.3 AT&T Wireless Home Internet Service:**

AT&T Wireless Home Internet service uses mobile wireless gateway equipment called an AT&T Wireless Home Internet device ("WI Device") to provide Internet access via the AT&T wireless networks. With AT&T Wireless Home Internet service, the WI Device allows you to connect internet-capable devices via an included Ethernet port and via a Home Wi-Fi network generated from the WI Device. All devices connected to the WI Device will share the same connection to the wireless network.

AT&T Wireless Home Internet service requires that you subscribe to an eligible wireless rate plan, which may include an AT&T PREPAID rate plan. See Section 2 for more information about how AT&T Wireless Service and wireless rate plans work. See Section 3 for more information about how AT&T PREPAID service and rate plans work.

**AT&T Wireless Home Internet Service does not support voice calling. However, a landline phone plugged into the available RJ11 jack on the back of the WI Device may be able to make Emergency 911 calls. 911 calls made via the AT&T Wireless Home Internet Service would be routed based on the wireless network's automatic location technology. You will need to provide your location address to the emergency response center responsible for sending first responders (e.g., police, medical assistance, or fire) to your location. The WI Device has battery backup power and, if charged, will work in the event of a power outage. However, a landline phone connected to the WI Device would require external electric power to operate (e.g., a cordless phone) in the event of a power outage.**

**6.14.4 AT&T Internet Air**

**6.14.4.1 "AT&T Internet Air" or "AT&T Internet Air Service"** refers to a wireless high-speed internet access service that offers you a capability for acquiring or retrieving information from; generating, storing, transforming, processing, or utilizing information on; or making available information to other internet end points connected directly or indirectly via a fixed wireless connection to the AT&T network.

**6.14.4.2 Speed / Network Management:** The speed of AT&T Internet Air service is very dependent upon the connection the Wi-Fi Gateway can achieve with the AT&T Mobile network. Availability of 5G connectivity may depend upon your location and/or the position of the AT&T Equipment within your location. Unless otherwise specified in your plan terms or order confirmation, AT&T makes absolutely no commitment with respect to the speeds AT&T Internet Air will be able to achieve in a particular location. To maximize performance, every effort should be made to position the AT&T Equipment in the optimal position for your location. See att.com/broadbandinfo for information on the performance characteristics of different generations of the AT&T Mobile network and for network management practices applicable to AT&T Internet Air specifically and the AT&T Mobile network generally.

**6.14.4.3 IP Addresses:** Static IP addresses are not a standard part of the AT&T Internet Air Service. Services such as Web hosting, or hosted services such as camera, gaming server, etc. that require static IP address may not be supported by AT&T Internet Air. See Section 6.14.4.8 for more information on service limitations.

**6.14.4.4 Service Requirements:** To qualify for AT&T Internet Air Service, you must reside in an area eligible for AT&T Internet Air service at the time you seek to purchase Service. Service areas for AT&T Internet Air are determined by coverage and capacity availability on the local mobile network; because network capacity fluctuates, service areas for AT&T Internet Air are subject change over time. If your AT&T Internet Air service is cancelled or terminated, you may not qualify to reactivate the Service if your location is deemed no longer eligible. AT&T Internet Air requires a wireless enabled Wi-Fi Gateway with an activated AT&T SIM card to facilitate the wireless connection to the AT&T Mobile network.

**6.14.4.5 Changing Service Location:** You may not use the AT&T Internet Air Service at any address other than your designated Service address or move any of the AT&T Equipment to another address while you remain an AT&T Internet Air customer. If you are moving to a new residence, you must cancel your AT&T Internet Air service and return the AT&T Equipment. If you move the AT&T Equipment to a location outside your designated Service address but fail to call us at 800.288.2020 to cancel your AT&T Internet Air service your Service will not automatically be cancelled and your Service charges will continue to apply. Additionally, if you move the AT&T Equipment to a location outside your designated Service address without the express written consent of AT&T:

- the service may not operate as intended; and

- we have the right, in our sole discretion, to terminate your AT&T Internet Air service without notice.

You will remain responsible for any Service charges until your Service is cancelled or terminated. You will also remain responsible for returning the AT&T Equipment.

**6.14.4.6 AT&T Internet Air Equipment:** Your AT&T Internet Air Service will include the following AT&T Equipment:

**(1) Wi-Fi Gateway ("WG"):** The WG is designed to be installed inside your premises and is required for the Service to function. A WG allows multiple devices to connect and communicate to the internet wirelessly. Smartphones, tablets, and laptops are common devices that access the internet through a WG. A WG is designed exclusively for use indoors and has a power cord that plugs into a common electrical outlet. A battery backup is recommended in case of a power outage. Some WGs may have an external battery backup while others may have an internal battery backup.

The AT&T Equipment should be installed and activated by following the set-up guide and associated tools (including the Smart Home Manager app) provided for that purpose. In order to achieve the best possible signal strength, it may be necessary to install the AT&T Equipment near a window facing the direction of the nearest wireless tower. Not following the set-up guide or electing to install the AT&T Equipment in a location that is not recommended by the set-up guide and/or the

associated tools may result in degradation of Service quality, in terms of speed, bandwidth, latency and/or reliability. Similarly, once the AT&T Equipment has been installed and activated, relocating the WG within your address may result in interruption or degradation of your Service. AT&T is not responsible for any interruption or degradation of Service as a result of the AT&T Equipment being installed in a less than optimal location.

You agree that, while you continue to receive the Service, neither you nor a third party will move the AT&T Equipment to any other physical location outside of your registered service location. AT&T Internet Air Service is not designed to be nomadic and may not function properly if the AT&T Equipment is moved to a location outside of your registered service location. If you require the AT&T Equipment to be moved while you continue to receive the Service, you must contact AT&T. Failure to do so may result in a failure of the Service and/or in AT&T's termination of your Service. You will remain responsible for any Service charges until your Service has been cancelled or terminated.

**6.14.4.7 Responsibility for and Return of AT&T Equipment:** Upon termination of your Service for any reason, AT&T shall remain the owner of the WG, and you must return the WG, undamaged, within 21 calendar days to AT&T. If the WG is not returned within 21 calendar days, or is returned damaged, you will be charged an equipment non-return fee. (See the Internet Fee Schedule for details.)

**6.14.4.8 Service Availability and Limitations:** In addition to the standard service availability and limitations faced by all Wireless Home Internet Services, AT&T Internet Air Service is subject to the following additional service limitations and/or Capacity Limitations:

- Local congestion caused by the use of network capacity by high numbers of users simultaneously using data intensive applications in the vicinity of the cell tower serving the Service address;

- blockage of the signal between the Service address and the cell tower (caused by artificial objects – building, barn, etc.);

In order to ensure the best quality of service for all customers using the mobility network, during times of heavy network congestion AT&T may:

- temporarily prioritize services that may be most severely impacted by congestion; and/or

- temporarily de-prioritize and/or throttle services deemed likely to contribute to heavy congestion.

## 6.15 DSL Internet Service

**6.15.1 DSL Service:**
"DSL Service" or "DSL Internet Service" refers to any Internet Service provided through traditional Digital Subscriber Line technology, which may include Services sold under the names AT&T High Speed Internet (including Lite, Ultra, Xtreme, XtremePro, Basic, Express, Pro, and Elite), AT&T High Speed Internet Direct (including Lite, Ultra, Xtreme, XtremePro, Basic, Express, Pro, and Elite), and FastAccess DSL (including Lite, Ultra, Xtreme, and XtremePro). (Note: Internet Services sold under the name AT&T High Speed Internet included both DSL Services and AT&T Wired Internet Services. If you are unsure which applies to your Internet Service, please contact us for more information.)

The terms in this Section 6.15 apply to customers purchasing and/or receiving DSL Internet Service and supersede any conflicting terms contained in the rest of these Internet Service Terms with respect to your DSL Internet Service.

**6.15.2 Termination of Local Wireline Voice Service:**
If you change or terminate your AT&T local wireline voice service, we may in our discretion either terminate your DSL Service or continue to provide it at the then-current rates, terms, and conditions. You agree to pay any new or higher monthly fees that may apply to your new DSL Service after termination of the wireline voice service. If AT&T elects to terminate your DSL Service, we reserve the right to charge any applicable early termination fees.

**6.15.3 Capacity Limitations/Grandfathering:**
DSL Internet Services are particularly subject to limits upon availability due to Capacity Limitations. Similarly, certain types of AT&T Internet Services are subject to limits upon availability due to Grandfathering. If DSL Internet Services are suspended or terminated at your locations for any reason, AT&T cannot guarantee that you will be able to subsequently renew or restore DSL Internet Service at that location.

**6.15.4 Conversion from DSL Service to AT&T Wired Internet Service:**
When AT&T is able to provision AT&T Wired Internet Service at your location, we may, in our discretion, discontinue your DSL Service and make available to you AT&T Wired Internet Service at the then applicable rates, terms, and conditions, which may differ from your previous DSL Service rates, terms, and conditions (including Bundle Discounts). See Section 7.2 for additional terms governing conversion of your Internet Service. In the event that you elect to receive AT&T Wired Internet Service, your new Internet Service may require different AT&T Equipment. When you are selected for conversion, we will provide at least thirty days' notice of the discontinuation or suspension of your Service via email, direct mail, bill page message, or bill insert. Thirty days after such notice, we may at our sole discretion, either disconnect your service or temporarily suspend your service for up to fifteen days.

**6.15.5 Billing:**
Credit card billing may not be available for AT&T High Speed Internet Direct.

## 6.16 Dial Up Internet

As of December 2020. AT&T has discontinued the provision of Dial Up Internet service.

## 6.17 Access from AT&T

**6.17.1 Access from AT&T**
"Access from AT&T" refers to AT&T's program designed to make low cost wireline home internet service exclusively available to Qualifying Households using certain

Qualifying Home Internet Services (as those terms are defined below). The terms in this Section 6.17 apply to customers participating in the Access from AT&T program and supersede any conflicting terms contained in the rest of these Internet Service Terms with respect to your participation in the Access from AT&T program.

**6.17.2 Qualifying Households:**

Access from AT&T is available only to Qualifying Households. A Qualifying Household refers to any individual or household with:

- at least one resident who participates in a "Qualifying Program," as that term is defined below;

- with an address in AT&T's 21-state wired home internet service area, at which AT&T offers "Qualifying Home Internet Service," as that term is defined below; and

- no outstanding debt for AT&T Internet Service of any kind within the last six (6) months and no outstanding debt incurred under the Access from AT&T program.

AT&T reserves the right, in its sole and absolute discretion, to make changes to the required qualifications for participation in the Access from AT&T program. Changes to program qualification requirements will not impact existing program participants unless we send you specific prior to any change taking effect with respect to your Account.

**6.17.3 Limited Availability:**

Access from AT&T is only available to Qualifying Households. If your residence is not a Qualifying Household, you are not eligible for Access from AT&T.

**6.17.4 Qualifying Programs:**

Participation in the Access from AT&T program is open to participants in the following "Qualifying Programs":

- the Federal Communication Commission's Affordable Connectivity Program (ACP)

- the U.S. Supplemental Nutrition Assistance Program (SNAP); and

- the Supplemental Security Income (SSI) program in the State of California (California residents only).

- the National School Lunch Program.

AT&T may, in its sole discretion. expand the scope of "Qualifying Programs" for the Access from AT&T program. Access from AT&T is also available to households with income below 200% of federal poverty guidelines.

Visit att.com/internet/access/ for more details on additional Qualifying Programs, if any, and for more details about qualifying based on income.

**6.17.5 Qualifying Home Internet Services:**

Depending upon the facilities at a particular location within AT&T's 21-state wired home internet service area, Access from AT&T can be provided via either DSL Service or AT&T Wired Internet Service. Either DSL Service or AT&T Wired Internet Service will be "Qualifying Home Internet Service" to the extent that it is available for purchase at a particular address. (To check for service availability, visit att.com/shop/internet/access/index.html.) Qualifying Households will be provisioned, at AT&T's sole discretion, with the highest Qualifying Speed Tier available based on the facilities at the applicable residence. If Qualifying Home Internet Service is not available for purchase at your address, you will not be able to participate in the Access from AT&T program.

**6.17.6 Qualifying Speed Tier:**

"Qualifying Speed Tiers" and prices for the Access from AT&T program are subject to change. **Customers should call 855.220.5211 or visit att.com/shop /internet/access/ for current Qualifying Speed Tiers and associated prices.**

Service availability and speed may vary by address. Unless otherwise specified on your CSS, AT&T will assign you the fastest speed tier available where you live, up to 10 Mbps download speed, which shall be at AT&T's sole discretion.

**6.17.7 Qualifying Home Internet Service Terms:**

Other terms applicable to your Access for AT&T program will depend on the Qualifying Home Internet Service you receive. In general, you will be subject to all the terms applicable to the Service Type into which your Qualifying Home Internet Service falls. However, you will not be required to:

- make any annual or monthly term commitments;

- provide a deposit in order to initiate installation or activation of the Qualifying Home Internet Service; or

- pay an installation fee associated with the installation of the Qualifying Home Internet Service.

**6.17.8 Equipment for Access from AT&T Customers:**

AT&T will make available to you certain equipment for use in connection with your Access from AT&T Service, depending on the Qualifying Home Internet Service you receive. For more information about Equipment, see the relevant terms above for the Qualifying Home Internet Service.

# 7.0
# Business Internet Service

The following additional terms apply to customers purchasing and/or receiving Business Internet Services, including AT&T Business Fiber, AT&T Internet for Business, AT&T High Speed Internet Business Edition, AT&T High Speed Internet Business Edition Direct, FastAccess Business DSL, FastAccess Business DSL Direct, and AT&T Internet for Business On Demand. In the event of a conflict between these terms and terms elsewhere in Sections 1 or 6 of this Agreement, the

following terms will apply solely with respect to Business Internet Services.

### 7.1 Inside Wire

In addition to the terms above in Section 6.2.4 (including the disclaimer of warranties), for AT&T Internet for Business (fiber-based only), any determination of whether IW work will be provided by you or AT&T will be made at the time the installation technician is dispatched and surveys the job.

### 7.2 Service Guides

If you are an AT&T FastAccess Business DSL or an AT&T High Speed Internet Business Edition customer, you are also subject to the terms set forth in the service guides for these services, which are incorporated herein by reference and may be found at:

- https://serviceguidenew.att.com/sg_flashPlayerPage/FADSL (Fast Access® Business DSL)
- https://serviceguidenew.att.com/sg_flashPlayerPage/HSI (AT&T High Speed Internet Business Edition)

### 7.3 Reimbursement for Time, Materials and Expenses

If, before the service commencement date, either you cancel an order for or terminates any Business Internet Service or service component (other than as permitted for default by AT&T) or AT&T cancels an order for or terminates any such Service or service component for cause, you will reimburse AT&T for time, materials, and expenses incurred before the effective date of such cancellation or termination, plus any third-party charges resulting from the cancellation or termination.

### 7.4 Arbitration Agreement

If you are a Business Internet Service customer, all disputes between us will be resolved through binding arbitration as prescribed by Section 1.3, except that (1) the AAA will apply its Commercial Arbitration Rules, as modified by this section and Section 1.3, unless the claims are valued at $25,000 or less; (2) AT&T will pay all AAA fees listed in Section 1.3.2.4 for arbitrations you initiate after fully complying with Section 1.3.2.2 only if your claims are valued at $25,000 or less; (3) you are eligible for the Alternative Payment and Attorney Premium in arbitrations you initiate after fully complying with Section 1.3.2.2 only if your claims are valued at $25,000 or less; and (4) the arbitrator will issue a reasoned decision only if you or AT&T requests it.

Case 1:25-cv-20381-RAR   Document 1-2   Entered on FLSD Docket 01/27/2025   Page 824 of 1553

IN THE COUNTY COURT OF THE 11TH JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA

Sergio Salani,

      Plaintiff,

v.

AT&T Mobility, LLC,

      Defendant.

_____/

CASE NO.: 2022-047421-SP-25

BAR NO.: 121673

## NOTICE OF CANCELLATION

PLEASE TAKE NOTICE that the undersigned hereby cancels the hearing set for **August 21, 2024 at 9:30 A.M.** on the following motions:

**[D.E. #32] PLAINTIFF'S MOTION FOR LEAVE TO FILE SECOND AMENDED STATEMENT OF CLAIM, *filed 6/17/24***

## CERTIFICATE OF SERVICE

WE HEREBY CERTIFY that a true and correct copy of the foregoing was served via e-mail this this August 20, 2024 to all counsel of record.

**Beighley, Myrick, Udell, Lynne & Zeichman PA**
*Attorneys for Plaintiff*
2601 S. Bayshore Drive, Suite 770
Miami, FL 33133
(305) 349-3930 – Phone

By:    /s/ *Maury L. Udell*
          Maury L. Udell, Esquire
          mudell@bmulaw.com
          Fla. Bar 121673

IN THE COUNTY COURT OF THE
ELEVENTH JUDICIAL CIRCUIT, IN AND
FOR MIAMI-DADE COUNTY, FLORIDA

CASE NO. 2022-047421-SP-25

SERGIO SALANI,

      Plaintiff,

v.

AT&T MOBILITY LLC,

      Defendant.

_____/

**NOTICE OF FILING SUPPLEMENTAL AUTHORITY IN SUPPORT
OF DEFENDANT AT&T MOBILITY LLC'S MOTION TO DISMISS THE SECOND
AMENDED STATEMENT OF CLAIM WITH PREJUDICE**

      Defendant, AT&T Mobility LLC ("AT&T"), gives notice of the following attached supplemental authority in support of its *Motion to Dismiss the Second Amended Statement of Claim with Prejudice* filed May 31, 2024 [DE 31]:

      1.      On July 31, 2024, the Third District Court of Appeal in *Orr, et al. v. AT&T Mobility LLC,* 3D23-0097, 2024 WL 3588350 (Fla. 3d DCA July 31, 2024) **affirmed the dismissal with prejudice** by Judge Gonzalez-Paulson of complaints in five substantively identical cases (filed by the same Plaintiff's attorneys) that raised the same issues here: (i) *Orr v. AT&T Mobility LLC,* 2020-08179-SP-26 (3D23-097); (ii) *Milian v. AT&T Mobility LLC,* 2020-21937-SP-26 (3D23-098); (iii) *Ysidron v. AT&T Mobility LLC,* 2020-21932-SP-26 (3D23-099); (iv) *Barger v. AT&T Mobility LLC,* 2020-08181-SP-26 (3D23-100); and (v) *Batista v. AT&T Mobility LLC,* 2019-11857-SP-26 (3D23-101). The Third DCA's opinion is attached as **Exhibit 1**.

      2.      In *Orr*, the Third DCA considered whether Judge Gonzalez-Paulson properly considered the Wireless Customer Agreements attached to AT&T's motions to dismiss. The Third

DCA affirmed dismissal, based on the Wireless Customer Agreements, and explained that "[b]ecause the allegations in the complaints incorporated the Wireless Customer Agreement by relying on and quoting it, the trial court properly considered the agreement while ruling on AT&T's motion to dismiss the complaint with prejudice." *See* Exhibit 1 at 3-4.

3.      The Court here is faced with the same issue – Plaintiff has relied upon and quoted from the Consumer Service Agreement[1] that it did not attach to the second amended statement of claim *but* that AT&T attached to and relied on in its motion to dismiss.  The Third DCA's opinion in *Orr* is controlling.  This Court may rely upon the Consumer Service Agreement and should dismiss Plaintiff's second amended statement of claim with prejudice.  *See Pardo v. State*, 596 So.2d 665 (Fla.1992) (in the absence of interdistrict conflict, district court decisions bind all Florida trial courts).

4.      Additionally, the Third DCA expressly affirmed on all remaining issues addressed by the trial court orders on appeal.  *Id* at 3. n.2. Those same issues were raised by AT&T in moving to dismiss Plaintiff's second amended statement of claim and further warrant dismissal with prejudice.

5.      The trial court orders of dismissal with prejudice in the five cases are attached as **Composite Exhibit 2**.

6.      The trial court orders denying Plaintiffs' motions for rehearing in the five cases are attached as **Composite Exhibit 3**.

7.      The operative complaints giving rise to the trial court orders are attached as **Composite Exhibit 4**.

8.      The parties' appellate briefing in *Orr* is attached as **Exhibit 5** (Appellants' Initial Brief), **Exhibit 6** (Appellee's Answer Brief), and **Exhibit 7** (Appellants' Reply Brief).

---

[1] The Consumer Service Agreement is the name of the omnibus agreement that merged into a single document the Wireless Consumer Agreement and AT&T agreements for other services.

Dated: August 22, 2024

Respectfully submitted,

By: */s/ Manuel A. Garcia-Linares*
      Manuel A. Garcia-Linares, Esq.
      Florida Bar No. 985252
      mgarcialinares@daypitney.com
      athomsen@daypitney.com
      Andrew R. Ingalls, Esq.
      Florida Bar No. 112558
      aingalls@daypitney.com
      athomsen@daypitney.com
      **DAY PITNEY LLP**
      396 Alhambra Circle
      North Tower – 14th Floor
      Miami, Florida 33134
      Telephone: (305) 373-4000
      Facsimile:   (305) 373-4099
      *Counsel for Defendant AT&T Mobility LLC*

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on August 22, 2024, I electronically filed the foregoing document with the Clerk of the Court via e-portal and served: **Maury L. Udell, Esq.**, BEIGHLEY, MYRICK, UDELL, LYNNE & ZEICHMAN, P.A., 2601 South Bayshore Drive, Suite 770, Miami, Florida 33133, Email: mudell@bmulaw.com and notice66@bmulaw.com, *Counsel for Plaintiff.*

By: */s/ Manuel A. Garcia-Linares*
      Manuel A. Garcia-Linares, Esq.

3

# EXHIBIT 1

# Third District Court of Appeal

## State of Florida

Opinion filed July 31, 2024.
Not final until disposition of timely filed motion for rehearing.

————————————

Nos. 3D23-0097, 3D23-0098, 3D23-0099, 3D23-0100, & 3D23-0101
Lower Tribunal Nos. 20-8179 SP, 20-21937 SP, 20-21932 SP, 20-8181 SP,
19-11857 SP

————————————

**Sharon L. Orr, et al.,**
Appellants,

vs.

**AT&T Mobility, LLC,**
Appellee.

Appeals from the County Court for Miami-Dade County, Michaelle Gonzalez-Paulson, Judge.

Beighley, Myrick, Udell & Lynne, P.A. and Maury L. Udell; David B. Pakula, P.A. and David B. Pakula (Pembroke Pines), for appellants.

Dentons US LLP, Jonathan H. Kaskel, and Angel A. Cortiñas, for appellee.

Before EMAS, SCALES and GORDO, JJ.

GORDO, J.

In these consolidated appeals, Sharon L. Orr, Mario Milian, Monique Ysidron, Edward Barger and Francisco Batista (collectively, the "Appellants") challenge the trial court's dismissal of their complaints with prejudice.  We have jurisdiction.  Fla. R. App. P. 9.030(b)(1)(A).  Finding no error in the trial court's orders, we affirm.

The Appellants entered into wireless customer agreements with AT&T Mobility LLC ("AT&T"), which included an administrative fee charge for providing unlimited data with potential speed restrictions.  The Appellants later filed claims against AT&T based on relevant sections of the wireless customer agreement, alleging deceptive administrative fee charges and data throttling.[1]  AT&T moved to dismiss the complaints with prejudice and included the wireless customer agreement as an exhibit to its motions.  After a hearing, the trial court granted AT&T's motions to dismiss each complaint with prejudice.

"A trial court's ruling on a motion to dismiss is subject to *de novo* review."  Skupin v. Hemisphere Media Grp., Inc., 314 So. 3d 353, 355 (Fla. 3d DCA 2020) (quoting Kopel v. Kopel, 229 So. 3d 812, 815 (Fla. 2017)).  "When ruling on a motion to dismiss, the Court 'must limit itself to the four

---

[1]  "Data throttling" is described as the imposition of speed restrictions on a user's internet connection by a service provider.

corners of the complaint, including any attached or incorporated exhibits, assuming the allegations in the complaint to be true and construing all reasonable inferences therefrom in favor of the non-moving party.'" Id. (quoting Grove Isle Ass'n, Inc. v. Grove Isle Assocs., LLLP, 137 So. 3d 1081, 1089 (Fla. 3d DCA 2014)).

On appeal, the Appellants argue the trial court erred in considering the wireless customer agreement attached to AT&T's motion to dismiss.[2]  We start with the basic premise that "[o]rdinarily only a complaint . . . and its attachments may be considered when passing on a motion to dismiss." Air Quality Assessors of Fla. v. Southern-Owners Ins. Co., 354 So. 3d 569, 571 (Fla. 1st DCA 2022).  When, however, "the terms of a legal document are impliedly incorporated by reference into the complaint, the trial court may consider the contents of the document in ruling on a motion to dismiss." Id. (quoting One Call Prop. Servs. Inc. v. Sec. First Ins. Co., 165 So. 3d 749, 752 (Fla. 4th DCA 2015)).  The Appellants raised the wireless customer agreement as the basis for their complaints and expressly relied upon the agreement to attempt to state causes of action.  Because the allegations in the complaints incorporated the wireless customer agreement by relying on and quoting it, the trial court properly considered the agreement while ruling

---

[2]  We affirm the other issues raised without further discussion.

on AT&T's motion to dismiss the complaint with prejudice.  See Von Dyck v. Gavin, 350 So. 3d 842, 845 (Fla. 1st DCA 2022) ("The [Agreement] was not attached to the complaint but numerous references were made to the [Agreement] in the complaint, and Appellant raised the [Agreement] as the basis for one of its arguments.  Thus, we find no error in the trial court's dismissal of the [Agreement] portion of Appellant's complaint."); Veal v. Voyager Prop. & Cas. Ins. Co., 51 So. 3d 1246, 1249-50 (Fla. 2d DCA 2011) ("[T]he complaint refers to the settlement agreement, and in fact, [plaintiff's] standing to bring suit is premised on the terms of that agreement. Accordingly, since the complaint impliedly incorporates the terms of the agreement by reference, the trial court was entitled to review the terms of that agreement to determine the nature of the claim being alleged.").

     Affirmed.

# COMPOSITE EXHIBIT 2

**IN THE COUNTY COURT OF THE ELEVENTH JUDICIAL
CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA**

CASE NO: 2020-008181-SP-26
SECTION: SD05
JUDGE: Michaelle Gonzalez-Paulson

**Edward Barger**

Plaintiff(s) / Petitioner(s)

vs.

**AT&T Mobility LLC**

Defendant(s) / Respondent(s)

_____/

<u>**ORDER GRANTING DEFENDANT'S MOTION TO DISMISS PLAINTIFF'S AMENDED
STATEMENT OF CLAIM**</u>

On April 28, 2022, this Court heard Defendant AT&T Mobility, LLC's *Motion to Dismiss Plaintiff's Amended Statement of Claim*. After considering the motion, Plaintiff's response, the amended complaint, all relevant pleadings, the arguments of counsel, and being otherwise duly advised in the premises, the Court hereby **GRANTS** AT&T's Motion on all counts for the reasons set forth below.

## I.  Background.

Plaintiff filed an Amended Statement of Claim on February 8, 2022 (the "Amended Complaint"), asserting six claims against AT&T: (1) fraud, (2) damages under the Florida Deceptive and Unfair Trade Practices Act § 501.201, *et seq.,* Fla. Stat. ("FDUTPA"), (3) declaratory and injunctive relief under FDUTPA, (4) breach of implied duty of good faith and fair dealing, (5) unjust enrichment, and (6) pure bill of discovery. Counts 1, 2, and 4 are based on allegations that AT&T charged Plaintiff a "bogus" Administrative Fee and "throttled" Plaintiff's unlimited data account and Counts 3 and 5 are based on the Administrative Fee alone. Count 6

alleges that AT&T provided Plaintiff's geolocation data to third-party aggregators and location-based service providers without Plaintiff's consent.

While the Amended Complaint specifically references, incorporates, and quotes from the Wireless Customer Agreement, AT&T's website, and AT&T billing statements as the bases for Plaintiff's claims, none of those documents are attached to the Complaint. (Am. Compl. ¶¶ 24-25, 41, 51, 53-54, 57, 79-81 (Agreement); ¶¶ 44, 60, 78, 84 (AT&T's website), ¶¶ 27-28, 31, 60 (billing statements)).

AT&T filed a Motion to Dismiss ("Motion") on February 22, 2022, attaching the Wireless Customer Agreement in effect at the time this case was filed to its Motion to Dismiss as Exhibit 2. AT&T noted that Plaintiff's Amended Complaint is almost entirely composed of claims copy-and-pasted from other lawsuits and is identical to over one hundred other cases pending before courts in this jurisdiction filed by counsel for Plaintiff. None of the allegations in the Amended Complaint allege facts specific to Plaintiff. Plaintiff responded to AT&T's Motion on April 22, 2022, and the Court heard the Motion on April 28, 2022. At the hearing, counsel for the Plaintiff voluntarily dismissed Count 6. Transcript 24:17-19 ("Judge, I'll announce on these five that I'll withdraw the geolocation counts without prejudice"). The Court grants the Motion to Dismiss as to the remaining Count 1-5 for the following reasons.

## II.     Motion to Dismiss Standard

The standard for determining whether a motion to dismiss should be granted is whether, based on the well-pleaded allegations and incorporated attachments, the movant is entitled to judgment as a matter of law. *Golden Gate Homes, LC v. Levey*, 59 So. 3d 275, 280 (Fla. 3d DCA 2011). In cases where it is apparent that a pleading cannot be amended to state a cause of action, or where an amendment would be futile, dismissal *with prejudice* is appropriate. *Central Florida Investments, Inc. v. Charles Levin Timeshares*, 659 So. 2d 492 (Fla. 5th DCA 1995).

While the Court is generally limited to the complaint's four corners, it is required to consider exhibits attached to and incorporated into the complaint. *Rolle v. Cold Stone Creamery, Inc.*, 212 So. 3d 1073, 1076 (Fla. 3d DCA 2017). Moreover, when a party refers to a document in the complaint, the trial court may use that document to assess the nature of the claims alleged in the complaint. *Glen Garron, LLC v. Buchwald*, 210 So. 3d 229, 233 (Fla. 5th DCA 2017). Where an exhibit attached to a complaint contradicts the allegations in the complaint, the exhibits control and may form the basis for a motion to dismiss. *See Fladell v. Palm Beach Cty. Canvassing Bd.*, 772 So. 2d 1240, 1242 (Fla. 2000).

Here, the Amended Complaint specifically references, incorporates, and quotes from the Wireless Customer Agreement, AT&T's website, and AT&T billing statements as the bases for Plaintiff's claims. (Am. Compl. ¶¶ 24-25, 41, 51, 53-54, 57, 79-81 (Agreement); ¶¶ 44, 60, 78, 84 (AT&T's website), ¶¶ 26-27, 30, 59 (billing statements)). Under Florida Rule of Civil Procedure 1.130(a), Plaintiff had the duty to attach or incorporate the underlying Agreement, billing statements, and website language onto its complaint.  Fla. R. Civ. P. 1.130(a) ("All . . . contracts, accounts, or documents on which action may be brought [or copies of their material portions] . . . must be incorporated in or attached to the pleading."). Plaintiff contends that it did not attach the Agreement because "it is under the exclusive control of AT&T," Am. Compl. ¶¶ 31 and 50.[1] Thus, Plaintiff apparently filed this lawsuit alleging, among other things, that "AT&T has breached the express terms of the wireless agreement" without knowing what the Agreement says.

AT&T's Motion to Dismiss attaches a copy of the Wireless Customer Agreement, a portion of the AT&T website defining the Administrative Fee, and a recent AT&T billing statement.  *See* Def.'s Mot. to Dismiss Exs. 2-4. Because the Amended Complaint specifically references, incorporates, and quotes from these documents, AT&T argued that they are within the four corners of the Amended Complaint and can be considered by the Court in ruling on the underlying motion. *See Buchwald*, 210 So. 3d at 233 ("When a party refers to a document in the complaint, the trial

court may use that document to assess the nature of the claims alleged in the complaint"); *One Call Prop. Servs., Inc. v. Sec. First Ins. Co.*, 165 So. 3d 749, 752 (Fla. 4th DCA 2015) ("[W]here the terms of a legal document are impliedly incorporated by reference into the complaint, the trial court may consider the contents of the document in ruling on a motion to dismiss.").[2]

At the hearing, however, Plaintiff argued that AT&T had the burden to prove up the documents (which the Plaintiff failed to attach to the Amended Complaint), and took the position that AT&T was required to authenticate the Agreement before this Court could consider it. The Court does not find Plaintiff's arguments persuasive. The Court could not consider any such "authentication" via affidavit as Plaintiff suggests at this stage of the proceedings. Requiring AT&T to cure Plaintiff's deficiency under heightened evidentiary requirements would not only ignore Rule 1.130(a), but do away with the incorporation by reference doctrine, and turn this Motion to Dismiss into a summary judgment motion. No legal authority supporting such a proposition has been cited or provided to the Court. The federal and summary judgment cases upon which Plaintiff relies do not apply here. Plaintiff's attempt to base their claims on the express language of the Agreement—while precluding consideration of that same Agreement at this stage of the proceedings—would cause unnecessary delay, require needless discovery, and is not well taken.[3]

A court's duty to accept the facts in the complaint as true does not require the court to ignore specific factual details of the pleading in favor of general or conclusory allegations. *Griffin Indus. v. Irvin*, 496 F.3d 1189 (11th Cir. 2007). Thus, this Court does not find merit in Plaintiff's assertion that AT&T must authenticate the Agreement for this Court to properly consider it when Plaintiff incorporated the Agreement by reference. Because the Amended Complaint specifically references, incorporates, and quotes from these documents, they are within the four corners of the Amended Complaint and will be considered by the Court in ruling on the underlying motion. *See Buchwald*, 210 So. 3d at 233; *One Call Prop. Servs., Inc.*, 165 So. 3d at 752.

### III. Counts 1-5

Plaintiff's claims for fraud, FDUTPA damages, FDUTPA declaratory and injunctive relief, good faith and fair dealing, and unjust enrichment are based upon two separate factual theories: "bogus" administrative fees and "throttling," the alleged practice of slowing data speeds when mobile phone users meet certain data usage thresholds. These claims are ripe for dismissal because they are facially negated by documents relied on and incorporated into the Amended Complaint and contain other pleading deficiencies and errors of law that cannot be cured through amendment.

In Florida, "[a] party cannot recover for alleged false misrepresentations that are adequately dealt with or expressly contradicted in a later written contract." *TRG Night Hawk Ltd. v. Registry Dev. Corp.*, 17 So. 3d 782, 784 (Fla. 2d DCA 2009); *see also GVK Int'l Bus. Grp., Inc. v. Levkovitz*, No. 3D19- 1119, 2020 WL 4197407, at *2 (Fla. 3d DCA July 22, 2020); *Taylor Woodrow Homes Fla., Inc. v. 4/46-A Corp.*, 850 So. 2d 536, 542 (Fla. 5th DCA 2003). "To hold otherwise is to invite contracting parties to make agreements of the kind in suit and then avoid them by simply taking the stand and swearing that they relied on some other statement." *TRG Night Hawk Ltd.*, 17 So. 3d at 784. Moreover, "a party who signs a contract whose terms contradict the alleged misrepresentations on which he relied is barred 'from seeking relief pursuant to FDUTPA, as she acted unreasonably.'" *Id.* (citing *Rosa v. Amoco Oil Co.*, 262 F. Supp. 2d 1364, 1368 (S.D. Fla. 2003)). In particular, with respect to FDUTPA claims, "[c]ourts routinely dismiss FDUTPA claims where those claims are directly and fully rebutted by express evidence in a governing written contract." *Sol. Z v. Alma Lasers, Inc.*, No. 11-CV-21396-CIV, 2013 WL 12246356, at *5 (S.D. Fla. Jan. 22, 2013). And, as in this case, where a plaintiff alleges a FDUTPA action based on misrepresentation and "plaintiff relies on written statements that are expressly contradicted by a subsequent contract, the plaintiff's reliance on those statements is not reasonable as a matter of law for a FDUTPA claim." *Id.* At the pleading stage, "where the allegations of the complaint are contradicted by the exhibits, the plain meaning of the exhibits will control." *Ginsberg v. Lennar Fla. Holdings, Inc.*, 645 So. 2d 490, 494 (Fla. 3d DCA 1994).

A.      **Plaintiff's Administrative Fee allegations in Counts 1-5.**

Plaintiff alleges that AT&T has wrongfully charged a $1.99 monthly Administrative Fee. Plaintiff asserts that the fee is "bogus" for three reasons: (1) AT&T failed to adequately disclose the existence of the Administrative Fee; (2) the Administrative Fee is deceptively defined and applied; and, (3) the Administrative Fee is an illegal "pass-through" fee.

AT&T counters that these allegations are belied by the Amended Complaint and the documents it is based on. The Court finds AT&T's arguments persuasive. Plaintiff pursued this lawsuit without ever consulting the Agreement upon which the allegations are based. Had Plaintiff conducted such a review, it would have been clear that the Agreement, website, and billing statements facially negate Plaintiff's allegations.

1.      **Disclosure of the Administrative Fee.**

Plaintiff alleges that AT&T did not adequately disclose the existence of the Administrative Fee when they signed up for AT&T's services and thereafter tried to conceal the fee by burying the line-item charge in the billing statement. Am. Compl. ¶¶ 26-28. In response, Defendant argues that the Wireless Customer Agreement, website and billing statements expressly disclose the administrative fee and AT&T's right to make changes to charges billed to customers.[4] For example, section 1.4 of the Agreement states: "Charges include, without limitation airtime, roaming, recurring monthly service, activation, **administrative**, and late payment charges . . . whether assessed directly upon you or upon AT&T." Mot. to Dismiss, Ex. 2 § 1.4. The Wireless Customer Agreement also reserves the right for AT&T to "make changes to this Agreement" which can include "charges." *Id.* § 1.3.

The AT&T website, quoted by Plaintiff in the Amended Complaint, defines the Administrative Fee and further expressly states: "AT&T reserves the right to increase its fees or impose additional fees." Def.'s Mot. to Dismiss, Ex. 3. AT&T's billing statement also expressly discloses the existence of the Administrative Fee, with the billing statement providing the monthly

amount. Def.'s Mot. to Dismiss, Ex. 4. The Wireless Customer Agreement, website, and billing statement (incorporated by reference into the Amended Complaint) refute and thereby negate the assertion that the Administrative Fee was not properly disclosed. Therefore, no claim can proceed on these allegations as a matter of law.

### 2.      How the Administrative Fee is used and increased.

Plaintiff next alleges that AT&T is telling the consumer one thing but doing another. Quoting AT&T's website, Plaintiff alleged:

> AT&T's representation that the Administrative Fee is a charge assessed by AT&T that helps defray a portion of certain expenses AT&T incurs, including but not limited to: (a) charges AT&T or its agents pay to interconnect with other carriers to deliver calls from AT&T customers to their customers; and (b) charges associated with cell site rents and maintenance are false.

Am. Compl. ¶¶ 44, 60, 78, 84. According to Plaintiff, the Administrative Fee is not tied to either interconnect or cell site charges because AT&T has continuously increased the fee even though these costs have allegedly decreased. *Id.* ¶¶ 28-31. Based on this assertion, Plaintiff theorizes that the Administrative Fee is part of "a scheme to funnel direct profit to AT&T rather than pay for any identifiable increase in costs." Am. Compl. ¶ 60.

First, the Court rejects any suggestion that AT&T's charging of an Administrative Fee is *per se* deceptive as the term "administrative fee" by itself does not suggest that AT&T will apply the Administrative Fee in any particular way. *See Maor v. Dollar Thrifty Auto. Grp., Inc.*, No. 15-22959-CIV, 2018 WL 4698512, at *4 (S.D. Fla. Sept. 30, 2018) ("Solely using the term 'administrative fee,' without more, does not restrict how the fee may be used or represent any purpose or nature behind the fee."); *Berry v. Budget Rent A Car Systems Inc.*, 497 F. Supp. 2d 1361, 1367 (S.D. Fla. 2007) (dismissing FDUTPA claim with prejudice, explaining "the simple fact" that defendant itemized a "cost recovery fee" as a separate charge is not unfair or deceptive).

Second, while Plaintiff alleges that AT&T does not actually use the Administrative Fee to

offset interconnect costs, cell site rents and/or maintenance charges which is deceptive to consumers, the definition provided by the Plaintiff does not limit AT&T to only offsetting those two specific cost categories. Instead, it states that AT&T may defray a portion of certain expenses "**including but not limited to**" charges for interconnection and for cell site rents and maintenance. Am. Compl. ¶¶ 44, 60, 78, 84. And, inclusion of the phrase "including but not limited to" is not in and of itself unfair and deceptive. Therefore, taking Plaintiff's allegations as true, interconnect costs, cell site rents and/or maintenance charges serve as examples of and not limitations to how AT&T can apply the Administrative Fee, meaning AT&T's alleged use of the fee to offset other expenses and costs would still comply with the fee's definition and cannot be considered deceptive, unfair, false, or a violation of the parties' agreement.

Finally, despite Plaintiff counsel's repeated argument during the hearing that the Administrative Fee was disclosed to customers as being tied to *increases* in a specific set of expense categories, the Amended Complaint and the website language contain no reference to "increases," and Plaintiff has not alleged any instances where AT&T made such statements. Instead, AT&T merely stated that the Administrative Fees would "help[] defray a portion of certain expenses AT&T incurs." Plaintiff has not alleged or identified any representation by AT&T that the Administrative Fee has always offset the exact same percentage of its expenses, or that the fee will increase or decrease solely based on increases or decreases to its interconnection or cell site rents and maintenance costs. Accordingly, because no reasonable consumer could interpret the Administrative Fee, its definition, or its application as deceptive, unfair, or based on a misrepresentation, Plaintiff's FDUTPA and fraud claims necessarily fail. *See Day v. Sarasota Doctors Hosp., Inc.*, No. 19-01522, 2021 WL 288969, at *4 (M.D. Fla. Jan. 28, 2021) (finding FDUTPA claim failed where "no reasonable consumer could be deceived by the [Defendant's conduct or the parties' contract] under the circumstances alleged . . .").

Therefore, applying the law to the undisputed facts of this case, based on the website and

contract language relied on by Plaintiff, no amount of discovery will enable Plaintiff to state a cause of action related to how AT&T defines, uses, or increases the Administrative Fee, and no claim can proceed on these allegations as a matter of law.

### 3. The Administrative Fee is not a pass-through fee.

Finally, Plaintiff alleges that the Administrative Fee is a "textbook pass through fee" as "it is not what its being used for despite its definition in the wireless agreement." Am. Compl. ¶ 86. Florida law is clear that an impermissible "pass-through" fee is one that purports to be collected for payment to a third party, but in reality the company is keeping the fee for itself. *See Latman v. Costa Cruise Lines, N.V.*, 758 So. 2d 699, 703 (Fla. 3d DCA 2000) (finding that use of the term "port charge" misrepresents to a reasonable consumer that it is a "pass-through" charge which the cruise line will pay to the relevant port authorities).

Here, there is no allegation that AT&T ever represented or suggested the Administrative Fee would be paid to anyone other than AT&T; therefore, the Court finds that Plaintiff has not and cannot allege that the Administrative Fee is a pass-through fee and no claim can proceed on these allegations. *See Vorst v. TBC Retail Grp., Inc.*, No. 12-CV-80013, 2012 WL 13026643, at *2 (S.D. Fla. Apr. 12, 2012) (dismissing FDUTPA pass-through claim based on the finding that "Plaintiff's conclusory allegations that the oil disposal fee was represented as a pure pass-through expense and that Defendant retains the fee as a profit are insufficient."); *see also Maor*, 2018 WL 4698512, at *5 ("Plaintiff has not identified any provisions in the rental contract, and this Court has found none, which constitute a representation to a reasonable consumer that the 'administrative fee' was a pass-through charge which Defendants would pay to others."); *Berry*, 497 F. Supp. 2d at 1367 (finding that the term "cost recovery fee" is not a pass-through fee as "itself implies that the company will keep the money collected as 'recovery' for its costs.").

In any event, as previously found, the website's definition of the Administrative Fee does not limit how it may be applied or what costs it can be used to offset. *Id.* ¶¶ 44, 60, 78, 84.

The Court does not find the cases relied on by Plaintiff in support of their administrative fee claims persuasive. In *Calderon v. Sixt Rent a Car, LLC*, No. 19-CV-62408, 2020 WL 700381, at *7 (S.D. Fla. Feb. 12, 2020), the defendant was alleged to have deceived their customers by incorporating the terms of a separate agreement that contained undisclosed, and allegedly fraudulent, charges. *Id*. at *4 ("That Sixt's employee did not provide Calderon or Marin the Rental Jacket prior to them agreeing to its terms is not insignificant."). That is a far cry from the case at hand, especially given Plaintiff's tacit admission that the Administrative Fee is disclosed on the website and the monthly billing statement.

Similarly, *Deere Constr., LLC v. Cemex Constr. Materials Florida, LLC*, 198 F.Supp.3d 1332 (S.D. Fla. 2016) involved a failure to disclose an environmental charge that defendant represented was derived and directly tied to the Federal Energy Information Administration's weekly reporting of diesel fuel pricing. *Id*. at 1334. Again, because Plaintiff admits that the Administrative Fee was disclosed and its definition does not directly tie the fee to the rise or fall of AT&T's interconnection and cell site costs, *Deere* is inapplicable to the facts at hand.[5]

Accordingly, because Plaintiff's Administrative Fee-based claims for fraud, FDUTPA damages, good faith and fair dealing, and unjust enrichment are premised on purported falsehoods, misrepresentations, breaches, and deceptive or unfair trade practices that are refuted by the contracts they rely upon, they fail as a matter of law. *Ginsberg*, 645 So. 2d at 494; *TRG Night Hawk Ltd.*, 17 So. 3d at 784.

**B.      Plaintiff's "throttling" allegations in Counts 1, 2, and 4.**

The remainder of Plaintiff's claims for fraud, FDUTPA damages, and good faith and fair dealing are based on allegations pertaining to network management practices designed to remedy network congestion caused by individual consumers who use exponentially more data than others. Plaintiff complains that even though they had an unlimited data plan, AT&T "throttled" (or slowed

down) their data speeds after they used a certain amount of data during a monthly billing cycle. Am. Compl. ¶¶ 19-20, 23. However, as the Wireless Consumer Agreement shows, the term "unlimited" refers to the *amount* of data, not the *speed* of that data. Unlike customers on tiered data plans, unlimited customers pay a set price without regard to the *amount* of data used. Plaintiff's alleged belief that "unlimited" refers to both the amount and speed of the data is wrong. Once again, the Agreement negates Plaintiff's allegations as the following comparison shows:

| What Plaintiff Alleges | What the Agreement Actually Says |
| --- | --- |
| AT&T represented, directly or indirectly, expressly or by implication, to the Plaintiff, an unlimited mobile data plan customer, that the amount of data that the Plaintiff could access in any billing period would not be limited.<br><br>**Am. Compl. ¶ 41** | **Unlimited Data Customers.** If you are an AT&T unlimited data plan customer, you agree that "unlimited means you pay a fixed monthly charge for wireless data service regardless of how much data you use . . . "unlimited' does <u>not</u> mean that you can use AT&T's wireless data service in any way that you choose, or for any prohibited activities."<br><br>AT&T may reduce your data throughput speeds at any time or place if your data usage exceeds an applicable, identified usage threshold during any billing cycle.<br><br>**Motion, Ex. 2 (Agreement) § 6.2 (emphasis in orig.)** |
| AT&T's wireless customer agreements do not state that an unlimited mobile data plan customer's use of more than a specified amount of data is a prohibited activity.<br><br>**Am. Compl. ¶ 24** | "Prohibited Activities" include, among other items, anything that: "excessively and disproportionately contributes to network congestion," "degrades network performance," or can "cause harm to the network or other customers."<br><br>"[U]nlimited" does <u>not</u> mean that you can use AT&T's wireless data service . . . for any prohibited activities.<br><br>**Motion, Ex. 2 (Agreement) § 6.2 (emphasis in orig.)** |
| [The] unlimited mobile data contract with Plaintiff . . . did not provide that AT&T could modify, diminish, or impair the services of who use more than a specified amount of data for permissible activities. | AT&T may modify, without advance notice, the permitted and prohibited activities.<br><br>You agree that . . . if you use AT&T's wireless data services in any manner that is prohibited, . . . AT&T may reduce your data throughput speeds at any time or place if your data usage exceeds an applicable, identified usage threshold during any |

| What Plaintiff Alleges | What the Agreement Actually Says |
|---|---|
| **Am. Compl. ¶ 24, 51** | billing cycle.<br><br>**Motion, Ex. 2 (Agreement) § 6.2.** |
| AT&T omitted the fact that it intended to throttle Plaintiff's data, without Plaintiff's knowledge or specific consent.<br><br>**Am. Compl. ¶ 42** | AT&T may modify, without advance notice, the permitted and prohibited activities, [and] may engage in any reasonable network management practice . . . to reduce network congestion.<br><br>**Motion, Ex. 2 (Agreement) § 6.2** |

On its face, the Agreement does not say what the Plaintiff alleges it says. In light of these contract provisions, the Court finds that the Agreement clearly reserves the right for AT&T to "reduce . . . data throughput speeds at any time or place if your data usage exceeds an applicable, identified usage threshold during any billing cycle," and even expressly states that, even if you are an "unlimited" customer, "AT&T can limit, restrict, suspend or terminate your data service . . . ." Def.'s Mot. to Dismiss, Ex. 2. Therefore, no claim can proceed based on these allegations as a matter of law.

**C.      Additional grounds for dismissing each cause of action in Counts 1-5.**

Having held that Plaintiff's Administrative Fees and data "throttling" claims are negated by the Agreement and other exhibits implicitly incorporated into and expressly relied on by the Amended Complaint, the Court now examines each cause of action alleged in Counts 1-4. This claim-by-claim analysis reveals several additional grounds supporting the underlying order based on Plaintiff's failure to properly plead their fraud, breach of the duty of good faith and fair dealing, FDUTPA damages, and unjust enrichment claims.

1. **Plaintiff's Fraud Claim Fails as a Matter of Law.**

In Florida, a plaintiff must plead fraud by alleging that the defendant: 1) misrepresented a

material fact, 2) knew or should have known of the falsity of the statement, 3) intended that the misrepresentation would induce Plaintiff to rely and act on it, and 4) that Plaintiff suffered injury in justifiable reliance on the misrepresentation. *Witt v. La Gorce Country Club, Inc.*, 35 So. 3d 1033, 1040 (Fla. 3d DCA 2010). In Florida, claimants must plead fraud (or fraudulent inducement) with particularity, as required by Rule 1.120(b). *See* Fla. R. Civ. P. 1.120(b) ("[A]ll averments of fraud . . . shall be stated with such particularity as the circumstances may permit."); *Cedars Healthcare Grp., Ltd. v. Mehta*, 16 So. 3d 914, 917 (Fla. 3d DCA 2009).

AT&T argues that Counts 1-5 all sound in fraud[6] and Plaintiff failed to satisfy this pleading standard. In response, Plaintiff contends that they pled their claims to the best of their ability as circumstances may permit and argues that they cannot allege specifics because "Plaintiff is not in possession of the specific digital advertisements and contracts issued by AT&T." Response at ¶ 67. The Court finds this argument unpersuasive. Plaintiff does not dispute that the Wireless Customer Agreement is on AT&T's website. And Plaintiff is undisputedly familiar with the AT&T website, as they rely on it in their Amended Complaint. Am. Compl. ¶¶ 27-28, 44, 60.

Nevertheless, even assuming Plaintiff facially alleged the first element—that AT&T misrepresented facts relating to the Administrative Fee and omitted facts relating to the potential for data speed reductions—the documents relied on and incorporated into the Amended Complaint refute Plaintiff's allegation that those statements or omissions were false, that AT&T knew they were false, that AT&T intended Plaintiff to rely on them, and that any reliance was justified. *See* sections III.A, III.B, *supra*. Moreover, Plaintiff failed to plead the other four elements with specificity. The Amended Complaint fails to provide a single detail regarding Plaintiff's own interactions with AT&T, or the time, place, and manner of how they were deceived. *Id.* There is no particularly-pled assertion explaining where, when, what, and how these alleged misrepresentations or omissions were material *to Plaintiff's* decision to do business with AT&T, that *they* relied on them, or that they proximately caused *their* damages.

For example, as to throttling, Plaintiff merely recites the last element of fraud, alleging: "Plaintiff relied on AT&T's representations regarding providing unlimited data, and, as a result, incurred damages and was injured as a result of the fraud by omission." Am. Compl. ¶ 43. Plaintiff does not even attempt to allege that their reliance was justified. *Id*. They do not point to a single date to show *when* their data speed was reduced, if any. Nor do they explain *how* such a temporary speed reduction caused them harm or allege *what* measure of actual damages they incurred for any given month of service. This is the kind of information that would have been at Plaintiff's disposal; no "circumstances" prevented Plaintiff from alleging such facts if they existed. And as to administrative fees, Plaintiff fails to allege *when* they saw the website's definition of Administrative Fees and *how* they justifiably relied on it in deciding to use AT&T services. Conclusory assertions disguised as fact do not meet the high standard required by Rule 1.120(b). *See Williams*, 2020 WL 5083550, at *3 (dismissing the complaint because it "fails to provide any more specific details regarding the preparation of the 'Impossible Whopper'"); *Myers v. Myers*, 652 So. 2d 1214, 1215 (Fla. 5th DCA 1995) ("Allegations contained in a pleading are insufficient if they are too general, vague or conclusory.").

For these reasons, Plaintiff fails to plead the fraud claims with particularity as is required by Florida law. *See* Fla. R. Civ. P. 1.120(b); *Mehta*, 16 So. 3d at 917 (requiring claims sounding in fraud "be pled with particularity and must specifically identify misrepresentations or omissions of fact, **as well as time, place or manner in which they were made**.") (emphasis added). Accordingly, the Court finds that Plaintiff's fraud claims cannot be cured though amendment, requiring dismissal *with prejudice*.

### 2.    Plaintiff's Good Faith and Fair Dealing Claim Fails as a Matter of Law.

In support of the good faith and fair dealing claim, Plaintiff alleges that AT&T breached unspecified provisions of the Wireless Customer Agreement and acted in a commercially unreasonable manner by throttling Plaintiff's data and charging the "bogus" Administrative Fee.

Am. Compl. ¶ 79 ("The express terms of the wireless agreement required AT&T to provide unlimited data and true administrative costs as defined by the contract."); *see also* ¶¶ 78-81. Florida law recognizes the implied covenant of good faith and fair dealing in every contract, with two limitations:

> First, the implied covenant of good faith should not be invoked to override the express terms of the agreement between the parties.

> Second, a claim for breach of the implied covenant of good faith and fair dealing cannot be maintained under Florida law absent an allegation that an express term of the contract has been breached.

*Ins. Concepts & Design, Inc. v. Healthplan Servs., Inc.*, 785 So. 2d 1232, 1234 (Fla. 4th DCA 2001). Both of these limitations apply here.

First, Plaintiff's breach allegation is not tied to any particular provision in the Agreement. Am. Compl. ¶ 80 (alleging "AT&T breached the express terms of the wireless agreement by failing to provide unlimited data" with nothing more). Second, as the Court held in parts A and B above, the parties' Agreement expressly authorizes the conduct complained of, and therefore Plaintiff cannot invoke the doctrine to override the express agreement of the parties. *See Healthplan Servs., Inc.*, 785 So. 2d at 1234. Plaintiff cannot show that AT&T failed to act in a commercially reasonable manner when it abided by the express language of the parties' Agreement.

Finally, Plaintiff's good faith and fair dealing claim is not substantively distinguishable from the fraud claim. *See* Am. Compl. ¶ 77 (alleging false statements of material fact as basis for breach of the duty of good faith and fair dealing). The problems with this claim become even more troublesome under the heightened pleading standard that applies to claims that sound in fraud. *See* Part III.C.1, *supra*.

Accordingly, the Court finds Plaintiff's good faith and fair dealing claim cannot be cured though amendment, requiring dismissal *with prejudice*.

**3.      Plaintiff's FDUTPA Claims Fail as a Matter of Law.**

"[I]t is well recognized in this state that a claim for damages under FDUTPA has three elements: (1) a deceptive act or unfair practice; (2) causation; and (3) actual damages." *Kia Motors Am. Corp. v. Butler*, 985 So. 2d 1133, 1140 (Fla. 3d DCA 2008). To state a claim for injunctive or declaratory relief under FDUTPA, a plaintiff "must show (1) that it is aggrieved, in that its rights have been, are being, or will be adversely affected, by (2) a violation of FDUTPA, meaning an unfair or deceptive practice which is injurious to consumers." *Stewart Agency, Inc. v. Arrigo Enterprises, Inc.*, 266 So. 3d 207, 214 (Fla. 4th DCA 2019). Plaintiff alleges that AT&T caused them damages through its failure to adequately disclose, as well as misrepresentations regarding, its data throttling policy and the Administrative Fee, which he again describes as "a textbook pass through fee." Am. Compl. ¶ 86.

As discussed above, Plaintiff's allegations supporting the FDUTPA claims are directly contradicted and hence negated by the Wireless Customer Agreement, AT&T's website, and billing statements. *See supra*, parts III.A and III.B. No amount of discovery will enable Plaintiff to sufficiently plead that AT&T violated FDUTPA. Taking Plaintiff's allegations as true, AT&T's data management practices are not deceptive or unfair, since the Wireless Customer Agreement allowed AT&T to reduce data speeds of all customers—including unlimited customers—to preserve network integrity. The Wireless Customer Agreement, website and billing statements, incorporated by reference in the Amended Complaint, also disclosed the Administrative Fee, and neither the imposition of an Administrative Fee nor the contractual use of the phrase "including but not limited to," is sufficient to state a claim for deceptive or unfair business practices. Finally, the Administrative Fee is not a "pass-through fee" by definition. *See Maor*, 2018 WL 4698512, at *5; *Berry*, 497 F. Supp. 2d at 1367.

Even if a reasonable unlimited data customer would think that they were immune to AT&T's network management practices after entering into a contract stating the opposite (and

somehow sufficiently pled a deceptive or unfair act or practice), Plaintiff still failed to sufficiently allege causation and actual damages. Similarly, even if AT&T used the Administrative Fees to defray costs other than interconnection costs and cell site rents and maintenance (and Plaintiff somehow sufficiently pled a deceptive or unfair act or practice), Plaintiff still failed to sufficiently allege causation and actual damages.

This is so under ordinary and heightened pleading standards. As Judge Lody Jean ruled in another case filed by Plaintiff's counsel against AT&T, "Plaintiff has pled a FDUTPA claim as a personal tort sounding in fraud" and, "[w]here the 'gravamen of the claim sounds in fraud' it is subject to the rules governing a fraud claim." Order Granting AT&T's Motion for Final Summary Judgment, *Claims Holding Group, LLC v. AT&T Mobility*, Case No: 2020-000024-SP-05 (July 22, 2020).[7] Plaintiff failed to plead with particularity *when* or *how* a short data speed reduction caused harm to Plaintiff personally, *how* Plaintiff would be harmed if AT&T in fact used their $1.99 Administrative Fees to defray costs other than for interconnection costs and cell site rents and maintenance, or *what* kind of actual damages they incurred as a result of either practice.

Based on the above, the Court finds Plaintiff's FDUTPA claims cannot be cured though amendment, requiring dismissal *with prejudice*.

### 4.    Plaintiff's Unjust Enrichment Claim Fails as a Matter of Law.

"The elements of a cause of action for unjust enrichment are: (1) plaintiff has conferred a benefit on the defendant, who has knowledge thereof; (2) defendant voluntarily accepts and retains the benefit conferred; and (3) the circumstances are such that it would be inequitable for the defendant to retain the benefit without first paying the value thereof to the plaintiff." *Duty Free World, Inc. v. Miami Perfume Junction, Inc.*, 253 So. 3d 689, 693 (Fla. 3d DCA 2018). "Florida law is clear that 'a plaintiff cannot pursue a quasi-contract claim for unjust enrichment if an express contract exists concerning the same subject matter.'" *Sterling Breeze Owners' Ass'n, Inc. v. New*

*Sterling Resorts, LLC*, 255 So. 3d 434, 437 (Fla. 1st DCA 2018), *reh'g denied* (Oct. 16, 2018).

Like Counts 1-4, Plaintiff's claim of unjust enrichment hinges on their assertion that the administrative fee is deceptive—an assertion that, as discussed in detail above, is directly contradicted by both the Wireless Customer Agreement and AT&T's website. Additionally, while the claim sounds in fraud, it is not pleaded with specificity as is required by Florida law. *See* Fla. R. Civ. P. 1.110(b); *Mehta*, 16 So. 3d at 917.

The claim also fails because Plaintiff has acknowledged the existence of a contract between the parties that governs the subject matter of this lawsuit, thus barring Plaintiff's quasi-contract claim for unjust enrichment. *New Sterling Resorts, LLC*, 255 So. 3d at 437. The fact that Plaintiff chose not to incorporate the paragraphs acknowledging the existence of the Wireless Customer Agreement into the unjust enrichment count does not save the claim as this Court does not have to accept as true or even consider "internally inconsistent factual claims." *Gallego v. Wells Fargo Bank, N.A.*, 276 So. 3d 989, 990 (Fla. 3d DCA 2019).

Plaintiff's unjust enrichment claim cannot be cured though amendment, requiring that it be dismissed *with prejudice*.

### IV.   Conclusion

For the reasons stated above, this Court grants AT&T's Motion to Dismiss. As all claims in this matter have now been adjudicated, the clerk is directed to close this matter.

---

[1] Plaintiff's counsel has previously abandoned this assertion in a similar hearing in front of Judge Lehr, where it was undisputed that the Agreement is available on AT&T's website. *See* AT&T's Mot. Dismiss Hr'g Tr., 28:24-25; 49:18-20; 50:15-16, *Ann Green v. AT&T Mobility*, Case No. 2019-16864-SP-23 (July 22, 2020).

[2]   At the hearing, Plaintiff's counsel argued that *One Call* involved a contract attached to a motion to dismiss "where there was no dispute on the insurance contract." Transcript 28:1-2. A review of the decision reveals that this assertion is false. *One Call Prop. Servs. Inc.*, 165 So. 3d at 751 ("One Call filed a written response to the motion to dismiss, arguing that the motion impermissibly went beyond the four corners of the complaint . . . .").

[3]   Further, Plaintiff does not contest the veracity or accuracy of the exhibits. And the Amended Complaint does not rely on any specific version of the Wireless Customer Agreement, but hinges on the more general proposition that "AT&T's wireless customer agreements do not state that an unlimited mobile data plan customer's use of more than a specified amount of data is a prohibited activity." Am. Compl. ¶ 24 (emphasis added).

[4]   As noted, Plaintiff takes no issue with the authenticity of AT&T's website or billing statements introduced into the record by AT&T, and this Court finds Plaintiff incorporated them by reference in the Amended Complaint. *See, e.g.*, Am. Compl. ¶¶ 27-28, 31, 44, 60, 78, 84.

[5]   While counsel for Plaintiff argued at the hearing that AT&T represented that its interconnection costs are going up, the Amended Complaint does not contain any such allegation. Regardless, counsel's assertion is contradicted by the Administrative Fee definition provided by the Plaintiff, which only states that the fee is used to "defray a **portion** of certain expenses AT&T incurs," including but not limited to interconnection and cell site costs. Am. Compl. ¶ 44. (emphasis added). No increase in costs is mentioned.

[6]   Claims 1-4 incorporate the same factual basis of Plaintiff's fraud claim (paragraphs 1-37) and all claims allege that AT&T knowingly, intentionally and fraudulently deceived the Plaintiff regarding AT&T's Administrative Fee, purported data "throttling," and Privacy Policy. *See, e.g.*, Am. Compl. ¶ 25 (alleging that AT&T's unlimited plan was "a bait-and-switch scam"), *id.* (alleging that AT&T "covertly increases the actual price" of its services by "padding all post-paid wireless customers' bills" with a "bogus" administrative fee), ¶ 26 (alleging the Administrative Fee "is never adequately and honestly disclosed"), ¶ 27 (alleging that AT&T "deliberately hides" the Administrative Fee), ¶ 61 (alleging that AT&T "knew" the Administrative Fee was inflated).

[7]   Citing *Librizzi v. Ocwen Loan Servicing, LLC*, 120 F. Supp. 3d 1368, 1381 (S.D. Fla. 2015) (Bloom, J.) (finding that FDUTPA claims must be pled with particularity where plaintiff alleged defendant caused damages through deception); *Mehta*, 16 So. 3d at 917; *USA Nutraceuticals Grp., Inc. v. BPI Sports, LLC*, No. 15-CIV-80352, 2016 WL 4254257, at *3 (S.D. Fla. Feb. 16, 2016) ("[C]ourts regularly apply Rule 9(b) to FDUTPA claims, as such claims uniquely sound in both tort and fraud.").

**DONE** and **ORDERED** in Chambers at Miami-Dade County, Florida on this <u>8th day of</u> <u>September, 2022</u>.

<u>2020-008181-SP-26 09-08-2022 1:40 PM</u>
Hon. Michaelle Gonzalez-Paulson

**COUNTY COURT JUDGE**
Electronically Signed

Final Order as to All Parties SRS #: **12** (Other)

THE COURT DISMISSES THIS CASE AGAINST ANY PARTY NOT LISTED IN THIS FINAL ORDER OR PREVIOUS ORDER(S). THIS CASE IS CLOSED AS TO ALL PARTIES.

**Electronically Served:**
Alicia Thomsen, athomsen@daypitney.com
Andrew R. Ingalls, aingalls@daypitney.com
Andrew R. Ingalls, brodriguez@daypitney.com
Evelyn Davila, edavila@daypitney.com
Jessica Solorzano, jsolorzano@daypitney.com
Manuel A. Garcia-Linares, mgarcialinares@daypitney.com
Manuel A. Garcia-Linares, athomsen@daypitney.com
Maury L Udell, notice66@bmulaw.com
Maury L Udell, blopez@bmulaw.com
Rachel Kittl, rkittl@bmulaw.com


**Physically Served:**

Case 1:25-cv-20381-RAR   Document 1-2   Entered on FLSD Docket 01/27/2025   Page 854 of 1553

**IN THE COUNTY COURT OF THE ELEVENTH JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA**

CASE NO: 2019-011857-SP-26
SECTION: SD05
JUDGE: Michaelle Gonzalez-Paulson

**Francisco Batista**

Plaintiff(s) / Petitioner(s)

vs.

**AT&T Mobility LLC**

Defendant(s) / Respondent(s)

_____/

## ORDER GRANTING DEFENDANT'S MOTION TO DISMISS PLAINTIFF'S SECOND AMENDED COMPLAINT

On April 28, 2022, this Court heard Defendant AT&T Mobility, LLC's *Motion to Dismiss Plaintiff's Second Amended Complaint*. After considering the motion, Plaintiff's response, the amended complaint, all relevant pleadings, the arguments of counsel, and being otherwise duly advised in the premises, the Court hereby **GRANTS** AT&T's Motion on all counts for the reasons set forth below.

## I. Background.

Plaintiff filed an Amended Complaint on deemed filed on June 26, 2020, asserting six claims against AT&T: (1) fraud, (2) breach of implied duty of good faith and fair dealing, (3) damages under the Florida Deceptive and Unfair Trade Practices Act § 501.201, *et seq.,* Fla. Stat. ("FDUTPA"), (4) unjust enrichment, and (5) declaratory relief under FDUTPA, and (6) injunctive relief under FDUTPA.  Counts 1-3 are based on allegations that AT&T charged Plaintiff a "bogus" Administrative Fee and "throttled" Plaintiff's unlimited data account and Count 4 is based on the Administrative Fee alone.  Counts 5-6 allege that AT&T provided Plaintiff's geolocation data to third-party aggregators and location-based service providers without Plaintiff's

consent.

While the Amended Complaint specifically references, incorporates, and quotes from the Wireless Customer Agreement, AT&T's website, and AT&T billing statements as the bases for Plaintiff's claims, none of those documents are attached to the Complaint. (Am. Compl. ¶¶ 15, 18-19, 30, 47, 49-50, 53 (Agreement); ¶¶ 33, 56, 40, 64 (AT&T's website), ¶¶ 21, 22, 56 (billing statements)).

AT&T filed a Motion to Dismiss ("Motion") on July 1, 2020, attaching the Wireless Customer Agreement in effect at the time this case was filed to its Motion to Dismiss as Exhibit 1. AT&T noted that Plaintiff's Amended Complaint is almost entirely composed of claims copy-and-pasted from other lawsuits and is identical to over one hundred other cases pending before courts in this jurisdiction filed by counsel for Plaintiff. None of the allegations in the Amended Complaint allege facts specific to Plaintiff. Plaintiff responded to AT&T's Motion on April 22, 2022, and the Court heard the Motion on April 28, 2022. At the hearing, counsel for the Plaintiff voluntarily dismissed Counts 5 and 6. Transcript 24:17-19 ("Judge, I'll announce on these five that I'll withdraw the geolocation counts without prejudice"). The Court grants the Motion to Dismiss as to the remaining Count 1-4 for the following reasons.

## II.      Motion to Dismiss Standard

The standard for determining whether a motion to dismiss should be granted is whether, based on the well-pleaded allegations and incorporated attachments, the movant is entitled to judgment as a matter of law. *Golden Gate Homes, LC v. Levey*, 59 So. 3d 275, 280 (Fla. 3d DCA 2011). In cases where it is apparent that a pleading cannot be amended to state a cause of action, or where an amendment would be futile, dismissal *with prejudice* is appropriate. *Central Florida Investments, Inc. v. Charles Levin Timeshares*, 659 So. 2d 492 (Fla. 5th DCA 1995).

While the Court is generally limited to the complaint's four corners, it is required to

consider exhibits attached to and incorporated into the complaint. *Rolle v. Cold Stone Creamery, Inc*., 212 So. 3d 1073, 1076 (Fla. 3d DCA 2017). Moreover, when a party refers to a document in the complaint, the trial court may use that document to assess the nature of the claims alleged in the complaint. *Glen Garron, LLC v. Buchwald*, 210 So. 3d 229, 233 (Fla. 5th DCA 2017). Where an exhibit attached to a complaint contradicts the allegations in the complaint, the exhibits control and may form the basis for a motion to dismiss. *See Fladell v. Palm Beach Cty. Canvassing Bd*., 772 So. 2d 1240, 1242 (Fla. 2000).

Here, the Amended Complaint specifically references, incorporates, and quotes from the Wireless Customer Agreement, AT&T's website, and AT&T billing statements as the bases for Plaintiff's claims. (Am. Compl. ¶¶ 15, 18-19, 30, 47, 49-50, 53, 41-43 (Agreement); ¶¶ 33, 56, 40, 64 (AT&T's website), ¶¶ 21, 22, 56 (billing statements)). Under Florida Rule of Civil Procedure 1.130(a), Plaintiff had the duty to attach or incorporate the underlying Agreement, billing statements, and website language onto its complaint. Fla. R. Civ. P. 1.130(a) ("All . . . contracts, accounts, or documents on which action may be brought [or copies of their material portions] . . . must be incorporated in or attached to the pleading."). Plaintiff contends that it did not attach the Agreement because "it is under the exclusive control of AT&T," Am. Compl. ¶¶ 22 and 46.[1] Thus, Plaintiff apparently filed this lawsuit alleging, among other things, that "AT&T has breached the express terms of the wireless agreement" without knowing what the Agreement says.

AT&T's Motion to Dismiss attaches a copy of the Wireless Customer Agreement, a portion of the AT&T website defining the Administrative Fee, and a recent AT&T billing statement. *See* Def.'s Mot. to Dismiss Exs. 1-3. Because the Amended Complaint specifically references, incorporates, and quotes from these documents, AT&T argued that they are within the four corners of the Amended Complaint and can be considered by the Court in ruling on the underlying motion. *See Buchwald*, 210 So. 3d at 233 ("When a party refers to a document in the complaint, the trial court may use that document to assess the nature of the claims alleged in the complaint"); *One Call*

*Prop. Servs., Inc. v. Sec. First Ins. Co*., 165 So. 3d 749, 752 (Fla. 4th DCA 2015) ("[W]here the terms of a legal document are impliedly incorporated by reference into the complaint, the trial court may consider the contents of the document in ruling on a motion to dismiss.").[2]

At the hearing, however, Plaintiff argued that AT&T had the burden to prove up the documents (which the Plaintiff failed to attach to the Amended Complaint), and took the position that AT&T was required to authenticate the Agreement before this Court could consider it. The Court does not find Plaintiff's arguments persuasive. The Court could not consider any such "authentication" via affidavit as Plaintiff suggests at this stage of the proceedings. Requiring AT&T to cure Plaintiff's deficiency under heightened evidentiary requirements would not only ignore Rule 1.130(a), but do away with the incorporation by reference doctrine, and turn this Motion to Dismiss into a summary judgment motion. No legal authority supporting such a proposition has been cited or provided to the Court. The federal and summary judgment cases upon which Plaintiff relies do not apply here. Plaintiff's attempt to base their claims on the express language of the Agreement—while precluding consideration of that same Agreement at this stage of the proceedings—would cause unnecessary delay, require needless discovery, and is not well taken.[3]

A court's duty to accept the facts in the complaint as true does not require the court to ignore specific factual details of the pleading in favor of general or conclusory allegations. *Griffin Indus. v. Irvin*, 496 F.3d 1189 (11th Cir. 2007). Thus, this Court does not find merit in Plaintiff's assertion that AT&T must authenticate the Agreement for this Court to properly consider it when Plaintiff incorporated the Agreement by reference. Because the Amended Complaint specifically references, incorporates, and quotes from these documents, they are within the four corners of the Amended Complaint and will be considered by the Court in ruling on the underlying motion. *See Buchwald*, 210 So. 3d at 233; *One Call Prop. Servs., Inc*., 165 So. 3d at 752.

### III. Counts 1-4

Plaintiff's claims for fraud, FDUTPA damages, good faith and fair dealing, and unjust enrichment are based upon two separate factual theories: "bogus" administrative fees and "throttling," the alleged practice of slowing data speeds when mobile phone users meet certain data usage thresholds. These claims are ripe for dismissal because they are facially negated by documents relied on and incorporated into the Amended Complaint and contain other pleading deficiencies and errors of law that cannot be cured through amendment.

In Florida, "[a] party cannot recover for alleged false misrepresentations that are adequately dealt with or expressly contradicted in a later written contract." *TRG Night Hawk Ltd. v. Registry Dev. Corp*., 17 So. 3d 782, 784 (Fla. 2d DCA 2009); *see also GVK Int'l Bus. Grp., Inc. v. Levkovitz*, No. 3D19- 1119, 2020 WL 4197407, at *2 (Fla. 3d DCA July 22, 2020); *Taylor Woodrow Homes Fla., Inc. v. 4/46-A Corp*., 850 So. 2d 536, 542 (Fla. 5th DCA 2003). "To hold otherwise is to invite contracting parties to make agreements of the kind in suit and then avoid them by simply taking the stand and swearing that they relied on some other statement." *TRG Night Hawk Ltd*., 17 So. 3d at 784. Moreover, "a party who signs a contract whose terms contradict the alleged misrepresentations on which he relied is barred 'from seeking relief pursuant to FDUTPA, as she acted unreasonably.'" *Id*. (citing *Rosa v. Amoco Oil Co*., 262 F. Supp. 2d 1364, 1368 (S.D. Fla. 2003)). In particular, with respect to FDUTPA claims, "[c]ourts routinely dismiss FDUTPA claims where those claims are directly and fully rebutted by express evidence in a governing written contract." *Sol. Z v. Alma Lasers, Inc*., No. 11-CV-21396-CIV, 2013 WL 12246356, at *5 (S.D. Fla. Jan. 22, 2013). And, as in this case, where a plaintiff alleges a FDUTPA action based on misrepresentation and "plaintiff relies on written statements that are expressly contradicted by a subsequent contract, the plaintiff's reliance on those statements is not reasonable as a matter of law for a FDUTPA claim." *Id*. At the pleading stage, "where the allegations of the complaint are contradicted by the exhibits, the plain meaning of the exhibits will control." *Ginsberg v. Lennar Fla. Holdings, Inc*., 645 So. 2d 490, 494 (Fla. 3d DCA 1994).

A.    **Plaintiff's Administrative Fee allegations in Counts 1-4.**

Plaintiff alleges that AT&T has wrongfully charged a $1.99 monthly Administrative Fee. Plaintiff asserts that the fee is "bogus" for three reasons: (1) AT&T failed to adequately disclose the existence of the Administrative Fee; (2) the Administrative Fee is deceptively defined and applied; and, (3) the Administrative Fee is an illegal "pass-through" fee.

AT&T counters that these allegations are belied by the Amended Complaint and the documents it is based on. The Court finds AT&T's arguments persuasive. Plaintiff pursued this lawsuit without ever consulting the Agreement upon which the allegations are based. Had Plaintiff conducted such a review, it would have been clear that the Agreement, website, and billing statements facially negate Plaintiff's allegations.

1.    **Disclosure of the Administrative Fee.**

Plaintiff alleges that AT&T did not adequately disclose the existence of the Administrative Fee when they signed up for AT&T's services and thereafter tried to conceal the fee by burying the line-item charge in the billing statement. Am. Compl. ¶¶ 20-21. In response, Defendant argues that the Wireless Customer Agreement, website and billing statements expressly disclose the administrative fee and AT&T's right to make changes to charges billed to customers.[4] For example, section 1.4 of the Agreement states: "Charges include, without limitation airtime, roaming, recurring monthly service, activation, **administrative**, and late payment charges . . . whether assessed directly upon you or upon AT&T." Mot. to Dismiss, Ex. 1 § 1.4. The Wireless Customer Agreement also reserves the right for AT&T to "make changes to this Agreement" which can include "charges." *Id.* § 1.3.

The AT&T website, quoted by Plaintiff in the Amended Complaint, defines the Administrative Fee and further expressly states: "AT&T reserves the right to increase its fees or impose additional fees." Def.'s Mot. to Dismiss, Ex. 2. AT&T's billing statement also expressly

discloses the existence of the Administrative Fee, with the billing statement providing the monthly amount. Def.'s Mot. to Dismiss, Ex. 3. The Wireless Customer Agreement, website, and billing statement (incorporated by reference into the Amended Complaint) refute and thereby negate the assertion that the Administrative Fee was not properly disclosed. Therefore, no claim can proceed on these allegations as a matter of law.

### 2. How the Administrative Fee is used and increased.

Plaintiff next alleges that AT&T is telling the consumer one thing but doing another. Quoting AT&T's website, Plaintiff alleged:

> AT&T's representation that the Administrative Fee is a charge assessed by AT&T that helps defray a portion of certain expenses AT&T incurs, including but not limited to: (a) charges AT&T or its agents pay to interconnect with other carriers to deliver calls from AT&T customers to their customers; and (b) charges associated with cell site rents and maintenance are false.

Am. Compl. ¶¶ 33, 56, 40, 64. According to Plaintiff, the Administrative Fee is not tied to either interconnect or cell site charges because AT&T has continuously increased the fee even though these costs have allegedly decreased. *Id.* ¶ 22. Based on this assertion, Plaintiff theorizes that the Administrative Fee is part of "a scheme to funnel direct profit to AT&T rather than pay for any identifiable increase in costs." Am. Compl. ¶ 56.

First, the Court rejects any suggestion that AT&T's charging of an Administrative Fee is *per se* deceptive as the term "administrative fee" by itself does not suggest that AT&T will apply the Administrative Fee in any particular way. *See Maor v. Dollar Thrifty Auto. Grp., Inc.*, No. 15-22959-CIV, 2018 WL 4698512, at *4 (S.D. Fla. Sept. 30, 2018) ("Solely using the term 'administrative fee,' without more, does not restrict how the fee may be used or represent any purpose or nature behind the fee."); *Berry v. Budget Rent A Car Systems Inc.*, 497 F. Supp. 2d 1361, 1367 (S.D. Fla. 2007) (dismissing FDUTPA claim with prejudice, explaining "the simple fact" that defendant itemized a "cost recovery fee" as a separate charge is not unfair or deceptive).

Second, while Plaintiff alleges that AT&T does not actually use the Administrative Fee to offset interconnect costs, cell site rents and/or maintenance charges which is deceptive to consumers, the definition provided by the Plaintiff does not limit AT&T to only offsetting those two specific cost categories. Instead, it states that AT&T may defray a portion of certain expenses "**including but not limited to**" charges for interconnection and for cell site rents and maintenance. Am. Compl. ¶¶ 33, 56, 40, 64. And, inclusion of the phrase "including but not limited to" is not in and of itself unfair and deceptive. Therefore, taking Plaintiff's allegations as true, interconnect costs, cell site rents and/or maintenance charges serve as examples of and not limitations to how AT&T can apply the Administrative Fee, meaning AT&T's alleged use of the fee to offset other expenses and costs would still comply with the fee's definition and cannot be considered deceptive, unfair, false, or a violation of the parties' agreement.

Finally, despite Plaintiff counsel's repeated argument during the hearing that the Administrative Fee was disclosed to customers as being tied to ***increases*** in a specific set of expense categories, the Amended Complaint and the website language contain no reference to "increases," and Plaintiff has not alleged any instances where AT&T made such statements. Instead, AT&T merely stated that the Administrative Fees would "help[] defray a portion of certain expenses AT&T incurs." Plaintiff has not alleged or identified any representation by AT&T that the Administrative Fee has always offset the exact same percentage of its expenses, or that the fee will increase or decrease solely based on increases or decreases to its interconnection or cell site rents and maintenance costs. Accordingly, because no reasonable consumer could interpret the Administrative Fee, its definition, or its application as deceptive, unfair, or based on a misrepresentation, Plaintiff's FDUTPA and fraud claims necessarily fail. *See Day v. Sarasota Doctors Hosp., Inc.*, No. 19-01522, 2021 WL 288969, at *4 (M.D. Fla. Jan. 28, 2021) (finding FDUTPA claim failed where "no reasonable consumer could be deceived by the [Defendant's conduct or the parties' contract] under the circumstances alleged . . .").

Therefore, applying the law to the undisputed facts of this case, based on the website and contract language relied on by Plaintiff, no amount of discovery will enable Plaintiff to state a cause of action related to how AT&T defines, uses, or increases the Administrative Fee, and no claim can proceed on these allegations as a matter of law.

### 3.  The Administrative Fee is not a pass-through fee.

Finally, Plaintiff alleges that the Administrative Fee is a "textbook pass through fee" as "it is not what its being used for despite its definition in the wireless agreement." Am. Compl. ¶ 66. Florida law is clear that an impermissible "pass-through" fee is one that purports to be collected for payment to a third party, but in reality the company is keeping the fee for itself.  *See Latman v. Costa Cruise Lines, N.V.*, 758 So. 2d 699, 703 (Fla. 3d DCA 2000) (finding that use of the term "port charge" misrepresents to a reasonable consumer that it is a "pass-through" charge which the cruise line will pay to the relevant port authorities).

Here, there is no allegation that AT&T ever represented or suggested the Administrative Fee would be paid to anyone other than AT&T; therefore, the Court finds that Plaintiff has not and cannot allege that the Administrative Fee is a pass-through fee and no claim can proceed on these allegations. *See Vorst v. TBC Retail Grp., Inc.*, No. 12-CV-80013, 2012 WL 13026643, at *2 (S.D. Fla. Apr. 12, 2012) (dismissing FDUTPA pass-through claim based on the finding that "Plaintiff's conclusory allegations that the oil disposal fee was represented as a pure pass-through expense and that Defendant retains the fee as a profit are insufficient."); *see also Maor*, 2018 WL 4698512, at *5 ("Plaintiff has not identified any provisions in the rental contract, and this Court has found none, which constitute a representation to a reasonable consumer that the 'administrative fee' was a pass-through charge which Defendants would pay to others."); *Berry*, 497 F. Supp. 2d at 1367 (finding that the term "cost recovery fee" is not a pass-through fee as "itself implies that the company will keep the money collected as 'recovery' for its costs.").

In any event, as previously found, the website's definition of the Administrative Fee does

not limit how it may be applied or what costs it can be used to offset. *Id.* ¶¶ 33, 56, 40, 64.

The Court does not find the cases relied on by Plaintiff in support of their administrative fee claims persuasive. In *Calderon v. Sixt Rent a Car, LLC*, No. 19-CV-62408, 2020 WL 700381, at *7 (S.D. Fla. Feb. 12, 2020), the defendant was alleged to have deceived their customers by incorporating the terms of a separate agreement that contained undisclosed, and allegedly fraudulent, charges. *Id.* at *4 ("That Sixt's employee did not provide Calderon or Marin the Rental Jacket prior to them agreeing to its terms is not insignificant."). That is a far cry from the case at hand, especially given Plaintiff's tacit admission that the Administrative Fee is disclosed on the website and the monthly billing statement.

Similarly, *Deere Constr., LLC v. Cemex Constr. Materials Florida, LLC*, 198 F.Supp.3d 1332 (S.D. Fla. 2016) involved a failure to disclose an environmental charge that defendant represented was derived and directly tied to the Federal Energy Information Administration's weekly reporting of diesel fuel pricing. *Id.* at 1334. Again, because Plaintiff admits that the Administrative Fee was disclosed and its definition does not directly tie the fee to the rise or fall of AT&T's interconnection and cell site costs, *Deere* is inapplicable to the facts at hand.[5]

Accordingly, because Plaintiff's Administrative Fee-based claims for fraud, FDUTPA damages, good faith and fair dealing, and unjust enrichment are premised on purported falsehoods, misrepresentations, breaches, and deceptive or unfair trade practices that are refuted by the contracts they rely upon, they fail as a matter of law. *Ginsberg*, 645 So. 2d at 494; *TRG Night Hawk Ltd.*, 17 So. 3d at 784.

**B.      Plaintiff's "throttling" allegations in Counts 1-3.**

The remainder of Plaintiff's claims for fraud, FDUTPA damages, and good faith and fair dealing are based on allegations pertaining to network management practices designed to remedy network congestion caused by individual consumers who use exponentially more data than others.

Plaintiff complains that even though they had an unlimited data plan, AT&T "throttled" (or slowed down) their data speeds after they used a certain amount of data during a monthly billing cycle. Am. Compl. ¶¶ 9-11, 14. However, as the Wireless Consumer Agreement shows, the term "unlimited" refers to the *amount* of data, not the *speed* of that data. Unlike customers on tiered data plans, unlimited customers pay a set price without regard to the *amount* of data used. Plaintiff's alleged belief that "unlimited" refers to both the amount and speed of the data is wrong. Once again, the Agreement negates Plaintiff's allegations as the following comparison shows:

| **What Plaintiff Alleges** | **What the Agreement Actually Says** |
|---|---|
| AT&T represented, directly or indirectly, expressly or by implication, to the Plaintiff, an unlimited mobile data plan customer, that the amount of data that the Plaintiff could access in any billing period would not be limited.<br><br>**Am. Compl. ¶ 30** | **Unlimited Data Customers.** If you are an AT&T unlimited data plan customer, you agree that "unlimited means you pay a fixed monthly charge for wireless data service regardless of how much data you use . . . "unlimited' does <u>not</u> mean that you can use AT&T's wireless data service in any way that you choose, or for any prohibited activities."<br><br>AT&T may reduce your data throughput speeds at any time or place if your data usage exceeds an applicable, identified usage threshold during any billing cycle.<br><br>**Motion, Ex. 1 (Agreement) § 6.2 (emphasis in orig.)** |
| AT&T's wireless customer agreements do not state that an unlimited mobile data plan customer's use of more than a specified amount of data is a prohibited activity.<br><br>**Am. Compl. ¶ 15** | "Prohibited Activities" include, among other items, anything that: "excessively and disproportionately contributes to network congestion," "degrades network performance," or can "cause harm to the network or other customers."<br><br>"[U]nlimited" does <u>not</u> mean that you can use AT&T's wireless data service . . . for any prohibited activities.<br><br>**Motion, Ex. 1 (Agreement) § 6.2 (emphasis in orig.)** |
| [The] unlimited mobile data contract with Plaintiff . . . did not provide that AT&T could modify, diminish, or impair the services of who use more than a specified amount of data for permissible activities. | AT&T may modify, without advance notice, the permitted and prohibited activities.<br><br>You agree that . . . if you use AT&T's wireless data services in any manner that is prohibited, . . . AT&T may reduce your data throughput speeds at any time or place if your data usage |

| **What Plaintiff Alleges** | **What the Agreement Actually Says** |
|---|---|
| **Am. Compl. ¶ 15, 47** | exceeds an applicable, identified usage threshold during any billing cycle.<br><br>**Motion, Ex. 1 (Agreement) § 6.2.** |
| AT&T omitted the fact that it intended to throttle Plaintiff's data, without Plaintiff's knowledge or specific consent.<br><br>**Am. Compl. ¶ 31** | AT&T may modify, without advance notice, the permitted and prohibited activities, [and] may engage in any reasonable network management practice . . . to reduce network congestion.<br><br>**Motion, Ex. 1 (Agreement) § 6.2** |

On its face, the Agreement does not say what the Plaintiff alleges it says. In light of these contract provisions, the Court finds that the Agreement clearly reserves the right for AT&T to "reduce . . . data throughput speeds at any time or place if your data usage exceeds an applicable, identified usage threshold during any billing cycle," and even expressly states that, even if you are an "unlimited" customer, "AT&T can limit, restrict, suspend or terminate your data service . . . ." Def.'s Mot. to Dismiss, Ex. 1. Therefore, no claim can proceed based on these allegations as a matter of law.

**C.     Additional grounds for dismissing each cause of action in Counts 1-4.**

Having held that Plaintiff's Administrative Fees and data "throttling" claims are negated by the Agreement and other exhibits implicitly incorporated into and expressly relied on by the Amended Complaint, the Court now examines each cause of action alleged in Counts 1-4. This claim-by-claim analysis reveals several additional grounds supporting the underlying order based on Plaintiff's failure to properly plead their fraud, breach of the duty of good faith and fair dealing, FDUTPA damages, and unjust enrichment claims.

**1. Plaintiff's Fraud Claim Fails as a Matter of Law.**

In Florida, a plaintiff must plead fraud by alleging that the defendant: 1) misrepresented a material fact, 2) knew or should have known of the falsity of the statement, 3) intended that the misrepresentation would induce Plaintiff to rely and act on it, and 4) that Plaintiff suffered injury in justifiable reliance on the misrepresentation. *Witt v. La Gorce Country Club, Inc.*, 35 So. 3d 1033, 1040 (Fla. 3d DCA 2010). In Florida, claimants must plead fraud (or fraudulent inducement) with particularity, as required by Rule 1.120(b). *See* Fla. R. Civ. P. 1.120(b) ("[A]ll averments of fraud . . . shall be stated with such particularity as the circumstances may permit."); *Cedars Healthcare Grp., Ltd. v. Mehta*, 16 So. 3d 914, 917 (Fla. 3d DCA 2009).

AT&T argues that Counts 1-4 all sound in fraud[6] and Plaintiff failed to satisfy this pleading standard. In response, Plaintiff contends that they pled their claims to the best of their ability as circumstances may permit and argues that they cannot allege specifics because "Plaintiff is not in possession of the specific digital advertisements and contracts issued by AT&T." Response at ¶ 67. The Court finds this argument unpersuasive. Plaintiff does not dispute that the Wireless Customer Agreement is on AT&T's website. And Plaintiff is undisputedly familiar with the AT&T website, as they rely on it in their Amended Complaint. Am. Compl. ¶¶ 21, 33, 56.

Nevertheless, even assuming Plaintiff facially alleged the first element—that AT&T misrepresented facts relating to the Administrative Fee and omitted facts relating to the potential for data speed reductions—the documents relied on and incorporated into the Amended Complaint refute Plaintiff's allegation that those statements or omissions were false, that AT&T knew they were false, that AT&T intended Plaintiff to rely on them, and that any reliance was justified. *See* sections III.A, III.B, *supra*. Moreover, Plaintiff failed to plead the other four elements with specificity. The Amended Complaint fails to provide a single detail regarding Plaintiff's own interactions with AT&T, or the time, place, and manner of how they were deceived. *Id.* There is no particularly-pled assertion explaining where, when, what, and how these alleged misrepresentations or omissions were material *to Plaintiff's* decision to do business with AT&T, that *they* relied on

them, or that they proximately caused *their* damages.

For example, as to throttling, Plaintiff merely recites the last element of fraud, alleging: "Plaintiff relied on AT&T's representations regarding providing unlimited data, and, as a result, incurred damages and was injured as a result of the fraud by omission." Am. Compl. ¶ 32. Plaintiff does not even attempt to allege that their reliance was justified. *Id*. They do not point to a single date to show *when* their data speed was reduced, if any. Nor do they explain *how* such a temporary speed reduction caused them harm or allege *what* measure of actual damages they incurred for any given month of service. This is the kind of information that would have been at Plaintiff's disposal; no "circumstances" prevented Plaintiff from alleging such facts if they existed. And as to administrative fees, Plaintiff fails to allege *when* they saw the website's definition of Administrative Fees and *how* they justifiably relied on it in deciding to use AT&T services. Conclusory assertions disguised as fact do not meet the high standard required by Rule 1.120(b). *See Williams*, 2020 WL 5083550, at *3 (dismissing the complaint because it "fails to provide any more specific details regarding the preparation of the 'Impossible Whopper'"); *Myers v. Myers*, 652 So. 2d 1214, 1215 (Fla. 5th DCA 1995) ("Allegations contained in a pleading are insufficient if they are too general, vague or conclusory.").

For these reasons, Plaintiff fails to plead the fraud claims with particularity as is required by Florida law. *See* Fla. R. Civ. P. 1.120(b); *Mehta*, 16 So. 3d at 917 (requiring claims sounding in fraud "be pled with particularity and must specifically identify misrepresentations or omissions of fact, **as well as time, place or manner in which they were made**.") (emphasis added). Accordingly, the Court finds that Plaintiff's fraud claims cannot be cured though amendment, requiring dismissal *with prejudice*.

### 2.    Plaintiff's Good Faith and Fair Dealing Claim Fails as a Matter of Law.

In support of the good faith and fair dealing claim, Plaintiff alleges that AT&T breached

unspecified provisions of the Wireless Customer Agreement and acted in a commercially unreasonable manner by throttling Plaintiff's data and charging the "bogus" Administrative Fee. Am. Compl. ¶ 41 ("The express terms of the wireless agreement required AT&T to provide unlimited data and true administrative costs as defined by the contract."); *see also* 40-43. Florida law recognizes the implied covenant of good faith and fair dealing in every contract, with two limitations:

> First, the implied covenant of good faith should not be invoked to override the express terms of the agreement between the parties.

> Second, a claim for breach of the implied covenant of good faith and fair dealing cannot be maintained under Florida law absent an allegation that an express term of the contract has been breached.

*Ins. Concepts & Design, Inc. v. Healthplan Servs., Inc.*, 785 So. 2d 1232, 1234 (Fla. 4th DCA 2001). Both of these limitations apply here.

First, Plaintiff's breach allegation is not tied to any particular provision in the Agreement. Am. Compl. ¶ 42 (alleging "AT&T breached the express terms of the wireless agreement by failing to provide unlimited data" with nothing more). Second, as the Court held in parts A and B above, the parties' Agreement expressly authorizes the conduct complained of, and therefore Plaintiff cannot invoke the doctrine to override the express agreement of the parties. *See Healthplan Servs., Inc.*, 785 So. 2d at 1234. Plaintiff cannot show that AT&T failed to act in a commercially reasonable manner when it abided by the express language of the parties' Agreement.

Finally, Plaintiff's good faith and fair dealing claim is not substantively distinguishable from the fraud claim. *See* Am. Compl. ¶ 40 (alleging false statements of material fact as basis for breach of the duty of good faith and fair dealing). The problems with this claim become even more troublesome under the heightened pleading standard that applies to claims that sound in fraud. *See* Part III.C.1, *supra*.

Accordingly, the Court finds Plaintiff's good faith and fair dealing claim cannot be cured

though amendment, requiring dismissal *with prejudice*.

### 3.    Plaintiff's FDUTPA Damages Claim Fails as a Matter of Law.

"[I]t is well recognized in this state that a claim for damages under FDUTPA has three elements: (1) a deceptive act or unfair practice; (2) causation; and (3) actual damages." *Kia Motors Am. Corp. v. Butler*, 985 So. 2d 1133, 1140 (Fla. 3d DCA 2008). Plaintiff alleges that AT&T caused them damages through its failure to adequately disclose, as well as misrepresentations regarding, its data throttling policy and the Administrative Fee, which he again describes as "a textbook pass through fee." Am. Compl. ¶ 66.

As discussed above, Plaintiff's allegations supporting the FDUTPA damages claim are directly contradicted and hence negated by the Wireless Customer Agreement, AT&T's website, and billing statements. *See supra*, parts III.A and III.B. No amount of discovery will enable Plaintiff to sufficiently plead the first element of FDUTPA. Taking Plaintiff's allegations as true, AT&T's data management practices are not deceptive or unfair, since the Wireless Customer Agreement allowed AT&T to reduce data speeds of all customers—including unlimited customers—to preserve network integrity. The Wireless Customer Agreement, website and billing statements, incorporated by reference in the Amended Complaint, also disclosed the Administrative Fee, and neither the imposition of an Administrative Fee nor the contractual use of the phrase "including but not limited to," is sufficient to state a claim for deceptive or unfair business practices. Finally, the Administrative Fee is not a "pass-through fee" by definition. *See Maor*, 2018 WL 4698512, at *5; *Berry*, 497 F. Supp. 2d at 1367.

Even if a reasonable unlimited data customer would think that they were immune to AT&T's network management practices after entering into a contract stating the opposite (and somehow sufficiently pled a deceptive or unfair act or practice), Plaintiff still failed to sufficiently allege causation and actual damages. Similarly, even if AT&T used the Administrative Fees to

defray costs other than interconnection costs and cell site rents and maintenance (and Plaintiff somehow sufficiently pled a deceptive or unfair act or practice), Plaintiff still failed to sufficiently allege causation and actual damages.

This is so under ordinary and heightened pleading standards. As Judge Lody Jean ruled in another case filed by Plaintiff's counsel against AT&T, "Plaintiff has pled a FDUTPA claim as a personal tort sounding in fraud" and, "[w]here the 'gravamen of the claim sounds in fraud' it is subject to the rules governing a fraud claim." Order Granting AT&T's Motion for Final Summary Judgment, *Claims Holding Group, LLC v. AT&T Mobility*, Case No: 2020-000024-SP-05 (July 22, 2020).[7] Plaintiff failed to plead with particularity *when* or *how* a short data speed reduction caused harm to Plaintiff personally, *how* Plaintiff would be harmed if AT&T in fact used their $1.99 Administrative Fees to defray costs other than for interconnection costs and cell site rents and maintenance, or *what* kind of actual damages they incurred as a result of either practice.

Based on the above, the Court finds Plaintiff's FDUTPA damages claim cannot be cured though amendment, requiring dismissal *with prejudice*.

### 4.    Plaintiff's Unjust Enrichment Claim Fails as a Matter of Law.

"The elements of a cause of action for unjust enrichment are: (1) plaintiff has conferred a benefit on the defendant, who has knowledge thereof; (2) defendant voluntarily accepts and retains the benefit conferred; and (3) the circumstances are such that it would be inequitable for the defendant to retain the benefit without first paying the value thereof to the plaintiff." *Duty Free World, Inc. v. Miami Perfume Junction, Inc.*, 253 So. 3d 689, 693 (Fla. 3d DCA 2018). "Florida law is clear that 'a plaintiff cannot pursue a quasi-contract claim for unjust enrichment if an express contract exists concerning the same subject matter.'" *Sterling Breeze Owners' Ass'n, Inc. v. New Sterling Resorts, LLC*, 255 So. 3d 434, 437 (Fla. 1st DCA 2018), *reh'g denied* (Oct. 16, 2018).

Like Counts 1-3, Plaintiff's claim of unjust enrichment hinges on their assertion that the

administrative fee is deceptive—an assertion that, as discussed in detail above, is directly contradicted by both the Wireless Customer Agreement and AT&T's website. Additionally, while the claim sounds in fraud, it is not pleaded with specificity as is required by Florida law. *See* Fla. R. Civ. P. 1.110(b); *Mehta*, 16 So. 3d at 917.

The claim also fails because Plaintiff has acknowledged the existence of a contract between the parties that governs the subject matter of this lawsuit, thus barring Plaintiff's quasi-contract claim for unjust enrichment. *New Sterling Resorts, LLC*, 255 So. 3d at 437. The fact that Plaintiff chose not to incorporate the paragraphs acknowledging the existence of the Wireless Customer Agreement into the unjust enrichment count does not save the claim as this Court does not have to accept as true or even consider "internally inconsistent factual claims." *Gallego v. Wells Fargo Bank, N.A.*, 276 So. 3d 989, 990 (Fla. 3d DCA 2019).

Plaintiff's unjust enrichment claim cannot be cured though amendment, requiring that it be dismissed *with prejudice*.

## IV.   Conclusion

For the reasons stated above, this Court grants AT&T's Motion to Dismiss. As all claims in this matter have now been adjudicated, the clerk is directed to close this matter.

---

[1] Plaintiff's counsel has previously abandoned this assertion in a similar hearing in front of Judge Lehr, where it was undisputed that the Agreement is available on AT&T's website. *See* AT&T's Mot. Dismiss Hr'g Tr., 28:24-25; 49:18-20; 50:15-16, *Ann Green v. AT&T Mobility*, Case No. 2019-16864-SP-23 (July 22, 2020).

[2] At the hearing, Plaintiff's counsel argued that *One Call* involved a contract attached to a motion to dismiss "where there was no dispute on the insurance contract." Transcript 28:1-2. A review of the decision reveals that this assertion is false. *One Call Prop. Servs. Inc.*, 165 So. 3d at 751 ("One Call filed a written response to the motion to dismiss, arguing that the motion impermissibly went

beyond the four corners of the complaint . . . .").

[3]  Further, Plaintiff does not contest the veracity or accuracy of the exhibits. And the Amended Complaint does not rely on any specific version of the Wireless Customer Agreement, but hinges on the more general proposition that "AT&T's wireless customer agreements do not state that an unlimited mobile data plan customer's use of more than a specified amount of data is a prohibited activity." Am. Compl. ¶ 15 (emphasis added).

[4]  As noted, Plaintiff takes no issue with the authenticity of AT&T's website or billing statements introduced into the record by AT&T, and this Court finds Plaintiff incorporated them by reference in the Amended Complaint. *See, e.g.,* Am. Compl. ¶¶ 21, 22, 33, 56, 40, 64.

[5]  While counsel for Plaintiff argued at the hearing that AT&T represented that its interconnection costs are going up, the Amended Complaint does not contain any such allegation. Regardless, counsel's assertion is contradicted by the Administrative Fee definition provided by the Plaintiff, which only states that the fee is used to "defray a **portion** of certain expenses AT&T incurs," including but not limited to interconnection and cell site costs. Am. Compl. ¶ 33. (emphasis added). No increase in costs is mentioned.

[6]  Claims 1-4 incorporate the same factual basis of Plaintiff's fraud claim (paragraphs 1-27) and all claims allege that AT&T knowingly, intentionally and fraudulently deceived the Plaintiff regarding AT&T's Administrative Fee, purported data "throttling," and Privacy Policy. *See, e.g.,* Am. Compl. ¶ 18-19 (alleging that AT&T's unlimited plan was "a bait-and-switch"), *id.* (alleging that AT&T "covertly increases the actual price" of its services by "padding all post-paid wireless customers' bills" with a "bogus" administrative fee), ¶ 20 (alleging the Administrative Fee "is never adequately and honestly disclosed"), ¶ 21 (alleging that AT&T "deliberately hides" the Administrative Fee), ¶ 57 (alleging that AT&T "knew" the Administrative Fee was inflated).

[7]  Citing *Librizzi v. Ocwen Loan Servicing, LLC*, 120 F. Supp. 3d 1368, 1381 (S.D. Fla. 2015) (Bloom, J.) (finding that FDUTPA claims must be pled with particularity where plaintiff alleged defendant caused damages through deception); *Mehta*, 16 So. 3d at 917; *USA Nutraceuticals Grp., Inc. v. BPI Sports, LLC*, No. 15-CIV-80352, 2016 WL 4254257, at *3 (S.D. Fla. Feb. 16, 2016) ("[C]ourts regularly apply Rule 9(b) to FDUTPA claims, as such claims uniquely sound in both tort and fraud.").

**DONE** and **ORDERED** in Chambers at Miami-Dade County, Florida on this 8th day of September, 2022.

2019-011857-SP-26 09-08-2022 1:34 PM
Hon. Michaelle Gonzalez-Paulson

**COUNTY COURT JUDGE**
Electronically Signed

Final Order as to All Parties SRS #: **12** (Other)

THE COURT DISMISSES THIS CASE AGAINST ANY PARTY NOT LISTED IN THIS FINAL ORDER OR PREVIOUS ORDER(S). THIS CASE IS CLOSED AS TO ALL PARTIES.

**Electronically Served:**
Alicia Thomsen, athomsen@daypitney.com
Andrew Robert Ingalls, aingalls@daypitney.com
Andrew Robert Ingalls, brodriguez@daypitney.com
Andrew Robert Ingalls, maristasalado@daypitney.com
Evelyn Davila, edavila@daypitney.com
Jessica Solorzano, jsolorzano@daypitney.com
Manuel A. Garcia-Linares, mgarcialinares@daypitney.com
Manuel A. Garcia-Linares, athomsen@daypitney.com
Maury L Udell, notice66@bmulaw.com
Maury L Udell, blopez@bmulaw.com
Rachel Kittl, rkittl@bmulaw.com


**Physically Served:**

**IN THE COUNTY COURT OF THE ELEVENTH JUDICIAL
CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA**

CASE NO: 2020-021937-SP-26
SECTION: SD05
JUDGE: Michaelle Gonzalez-Paulson

**Mario Milian**

Plaintiff(s) / Petitioner(s)

vs.

**ATT Mobility LLC**

Defendant(s) / Respondent(s)

_____/

<u>**ORDER GRANTING DEFENDANT'S MOTION TO DISMISS PLAINTIFF'S AMENDED
STATEMENT OF CLAIM**</u>

On April 28, 2022, this Court heard Defendant AT&T Mobility, LLC's *Motion to Dismiss Plaintiff's Amended Statement of Claim*. After considering the motion, Plaintiff's response, the amended complaint, all relevant pleadings, the arguments of counsel, and being otherwise duly advised in the premises, the Court hereby **GRANTS** AT&T's Motion on all counts for the reasons set forth below.

## I. Background.

Plaintiff filed an Amended Statement of Claim on December 10, 2021 (the "Amended Complaint"), asserting six claims against AT&T: (1) fraud, (2) damages under the Florida Deceptive and Unfair Trade Practices Act § 501.201, *et seq.,* Fla. Stat. ("FDUTPA"), (3) declaratory and injunctive relief under FDUTPA, (4) breach of implied duty of good faith and fair dealing, (5) unjust enrichment, and (6) pure bill of discovery. Counts 1, 2, and 4 are based on allegations that AT&T charged Plaintiff a "bogus" Administrative Fee and "throttled" Plaintiff's unlimited data account and Counts 3 and 5 are based on the Administrative Fee alone. Count 6 alleges that AT&T provided Plaintiff's geolocation data to third-party aggregators and location-

based service providers without Plaintiff's consent.

While the Amended Complaint specifically references, incorporates, and quotes from the Wireless Customer Agreement, AT&T's website, and AT&T billing statements as the bases for Plaintiff's claims, none of those documents are attached to the Complaint. (Am. Compl. ¶¶ 24-25, 41, 51, 53-54, 57, 79-81 (Agreement); ¶¶ 44, 60, 78, 84 (AT&T's website), ¶¶ 27-28, 31, 60 (billing statements)).

AT&T filed a Motion to Dismiss ('Motion") on December 30, 2021, attaching the Wireless Customer Agreement in effect at the time this case was filed to its Motion to Dismiss as Exhibit 2. AT&T noted that Plaintiff's Amended Complaint is almost entirely composed of claims copy-and-pasted from other lawsuits and is identical to over one hundred other cases pending before courts in this jurisdiction filed by counsel for Plaintiff. None of the allegations in the Amended Complaint allege facts specific to Plaintiff. Plaintiff responded to AT&T's Motion on April 22, 2022, and the Court heard the Motion on April 28, 2022. At the hearing, counsel for the Plaintiff voluntarily dismissed Count 6. Transcript 24:17-19 ("Judge, I'll announce on these five that I'll withdraw the geolocation counts without prejudice").

## II.   Motion to Dismiss Standard

The standard for determining whether a motion to dismiss should be granted is whether, based on the well-pleaded allegations and incorporated attachments, the movant is entitled to judgment as a matter of law. *Golden Gate Homes, LC v. Levey*, 59 So. 3d 275, 280 (Fla. 3d DCA 2011). In cases where it is apparent that a pleading cannot be amended to state a cause of action, or where an amendment would be futile, dismissal *with prejudice* is appropriate. *Central Florida Investments, Inc. v. Charles Levin Timeshares*, 659 So. 2d 492 (Fla. 5th DCA 1995).

While the Court is generally limited to the complaint's four corners, it is required to consider exhibits attached to and incorporated into the complaint. *Rolle v. Cold Stone Creamery,*

*Inc*., 212 So. 3d 1073, 1076 (Fla. 3d DCA 2017). Moreover, when a party refers to a document in the complaint, the trial court may use that document to assess the nature of the claims alleged in the complaint. *Glen Garron, LLC v. Buchwald*, 210 So. 3d 229, 233 (Fla. 5th DCA 2017). Where an exhibit attached to a complaint contradicts the allegations in the complaint, the exhibits control and may form the basis for a motion to dismiss. *See Fladell v. Palm Beach Cty. Canvassing Bd*., 772 So. 2d 1240, 1242 (Fla. 2000).

Here, the Amended Complaint specifically references, incorporates, and quotes from the Wireless Customer Agreement, AT&T's website, and AT&T billing statements as the bases for Plaintiff's claims. (Am. Compl. ¶¶ 24-25, 41, 51, 53-54, 57, 79-81 (Agreement); ¶¶ 44, 60, 78, 84 (AT&T's website), ¶¶ 27-28, 31, 60 (billing statements)). Under Florida Rule of Civil Procedure 1.130(a), Plaintiff had the duty to attach or incorporate the underlying Agreement, billing statements, and website language onto its complaint.  Fla. R. Civ. P. 1.130(a) ("All . . .  contracts, accounts, or documents on which action may be brought [or copies of their material portions] . . . must be incorporated in or attached to the pleading."). Plaintiff contends that it did not attach the Agreement because "it is under the exclusive control of AT&T," Am. Compl. ¶¶ 31 and 50.[1] Thus, Plaintiff apparently filed this lawsuit alleging, among other things, that "AT&T has breached the express terms of the wireless agreement" without knowing what the Agreement says.

AT&T's Motion to Dismiss attaches a copy of the Wireless Customer Agreement, a portion of the AT&T website defining the Administrative Fee, and a recent AT&T billing statement.  *See* Def.'s Mot. to Dismiss Exs. 2-4. Because the Amended Complaint specifically references, incorporates, and quotes from these documents, AT&T argued that they are within the four corners of the Amended Complaint and can be considered by the Court in ruling on the underlying motion. *See Buchwald*, 210 So. 3d at 233 ("When a party refers to a document in the complaint, the trial court may use that document to assess the nature of the claims alleged in the complaint"); *One Call Prop. Servs., Inc. v. Sec. First Ins. Co*., 165 So. 3d 749, 752 (Fla. 4th DCA 2015) ("[W]here the

terms of a legal document are impliedly incorporated by reference into the complaint, the trial court may consider the contents of the document in ruling on a motion to dismiss.").[2]

A court's duty to accept the facts in the complaint as true does not require the court to ignore specific factual details of the pleading in favor of general or conclusory allegations. *Griffin Indus. v. Irvin*, 496 F.3d 1189 (11th Cir. 2007). Thus, this Court does not find merit in Plaintiff's assertion that AT&T must authenticate the Agreement for this Court to properly consider it when Plaintiff incorporated the Agreement by reference. Because the Amended Complaint specifically references, incorporates, and quotes from these documents, they are within the four corners of the Amended Complaint and will be considered by the Court in ruling on the underlying motion. *See Buchwald*, 210 So. 3d at 233; *One Call Prop. Servs., Inc.*, 165 So. 3d at 752.

### III. Counts 1-5

Plaintiff's claims for fraud, FDUTPA damages, FDUTPA declaratory and injunctive relief, good faith and fair dealing, and unjust enrichment are based upon two separate factual theories: "bogus" administrative fees and "throttling," the alleged practice of slowing data speeds when mobile phone users meet certain data usage thresholds. These claims are ripe for dismissal because they are facially negated by documents relied on and incorporated into the Amended Complaint and contain other pleading deficiencies and errors of law that cannot be cured through amendment.

In Florida, "[a] party cannot recover for alleged false misrepresentations that are adequately dealt with or expressly contradicted in a later written contract." *TRG Night Hawk Ltd. v. Registry Dev. Corp.*, 17 So. 3d 782, 784 (Fla. 2d DCA 2009); *see also GVK Int'l Bus. Grp., Inc. v. Levkovitz*, No. 3D19- 1119, 2020 WL 4197407, at *2 (Fla. 3d DCA July 22, 2020); *Taylor Woodrow Homes Fla., Inc. v. 4/46-A Corp.*, 850 So. 2d 536, 542 (Fla. 5th DCA 2003). "To hold otherwise is to invite contracting parties to make agreements of the kind in suit and then avoid them by simply taking the stand and swearing that they relied on some other statement." *TRG Night Hawk Ltd.*, 17 So. 3d at

784. Moreover, "a party who signs a contract whose terms contradict the alleged misrepresentations on which he relied is barred 'from seeking relief pursuant to FDUTPA, as she acted unreasonably.'" *Id.* (citing *Rosa v. Amoco Oil Co.*, 262 F. Supp. 2d 1364, 1368 (S.D. Fla. 2003)). In particular, with respect to FDUTPA claims, "[c]ourts routinely dismiss FDUTPA claims where those claims are directly and fully rebutted by express evidence in a governing written contract." *Sol. Z v. Alma Lasers, Inc.*, No. 11-CV-21396-CIV, 2013 WL 12246356, at *5 (S.D. Fla. Jan. 22, 2013). And, as in this case, where a plaintiff alleges a FDUTPA action based on misrepresentation and "plaintiff relies on written statements that are expressly contradicted by a subsequent contract, the plaintiff's reliance on those statements is not reasonable as a matter of law for a FDUTPA claim." *Id.* At the pleading stage, "where the allegations of the complaint are contradicted by the exhibits, the plain meaning of the exhibits will control." *Ginsberg v. Lennar Fla. Holdings, Inc.*, 645 So. 2d 490, 494 (Fla. 3d DCA 1994).

## A.    Plaintiff's Administrative Fee allegations in Counts 1-5.

Plaintiff alleges that AT&T has wrongfully charged a $1.99 monthly Administrative Fee. Plaintiff asserts that the fee is "bogus" for three reasons: (1) AT&T failed to adequately disclose the existence of the Administrative Fee; (2) the Administrative Fee is deceptively defined and applied; and, (3) the Administrative Fee is an illegal "pass-through" fee.

AT&T counters that these allegations are belied by the Amended Complaint and the documents it is based on. The Court finds AT&T's arguments persuasive. Plaintiff pursued this lawsuit without ever consulting the Agreement upon which the allegations are based. Had Plaintiff conducted such a review, it would have been clear that the Agreement, website, and billing statements facially negate Plaintiff's allegations.

### 1.    Disclosure of the Administrative Fee.

Plaintiff alleges that AT&T did not adequately disclose the existence of the Administrative Fee when they signed up for AT&T's services and thereafter tried to conceal the fee by burying the

line-item charge in the billing statement. Am. Compl. ¶¶ 26-28. In response, Defendant argues that the Wireless Customer Agreement, website and billing statements expressly disclose the administrative fee and AT&T's right to make changes to charges billed to customers.[3] For example, section 1.4 of the Agreement states: "Charges include, without limitation airtime, roaming, recurring monthly service, activation, **administrative**, and late payment charges . . . whether assessed directly upon you or upon AT&T." Mot. to Dismiss, Ex. 2 § 1.4. The Wireless Customer Agreement also reserves the right for AT&T to "make changes to this Agreement" which can include "charges." *Id.* § 1.3.

The AT&T website, quoted by Plaintiff in the Amended Complaint, defines the Administrative Fee and further expressly states: "AT&T reserves the right to increase its fees or impose additional fees." Def.'s Mot. to Dismiss, Ex. 3. AT&T's billing statement also expressly discloses the existence of the Administrative Fee, with the billing statement providing the monthly amount. Def.'s Mot. to Dismiss, Ex. 4. The Wireless Customer Agreement, website, and billing statement (incorporated by reference into the Amended Complaint) refute and thereby negate the assertion that the Administrative Fee was not properly disclosed. Therefore, no claim can proceed on these allegations as a matter of law.

### 2.     How the Administrative Fee is used and increased.

Plaintiff next alleges that AT&T is telling the consumer one thing but doing another. Quoting AT&T's website, Plaintiff alleged:

> AT&T's representation that the Administrative Fee is a charge assessed by AT&T that helps defray a portion of certain expenses AT&T incurs, including but not limited to: (a) charges AT&T or its agents pay to interconnect with other carriers to deliver calls from AT&T customers to their customers; and (b) charges associated with cell site rents and maintenance are false.

Am. Compl. ¶¶ 44, 60, 78, 84. According to Plaintiff, the Administrative Fee is not tied to either interconnect or cell site charges because AT&T has continuously increased the fee even though these costs have allegedly decreased. *Id.* ¶¶ 28-31. Based on this assertion, Plaintiff theorizes that

the Administrative Fee is part of "a scheme to funnel direct profit to AT&T rather than pay for any identifiable increase in costs." Am. Compl. ¶ 60.

First, the Court rejects any suggestion that AT&T's charging of an Administrative Fee is *per se* deceptive as the term "administrative fee" by itself does not suggest that AT&T will apply the Administrative Fee in any particular way. *See Maor v. Dollar Thrifty Auto. Grp., Inc.*, No. 15-22959-CIV, 2018 WL 4698512, at *4 (S.D. Fla. Sept. 30, 2018) ("Solely using the term 'administrative fee,' without more, does not restrict how the fee may be used or represent any purpose or nature behind the fee."); *Berry v. Budget Rent A Car Systems Inc*., 497 F. Supp. 2d 1361, 1367 (S.D. Fla. 2007) (dismissing FDUTPA claim with prejudice, explaining "the simple fact" that defendant itemized a "cost recovery fee" as a separate charge is not unfair or deceptive).

Second, while Plaintiff alleges that AT&T does not actually use the Administrative Fee to offset interconnect costs, cell site rents and/or maintenance charges which is deceptive to consumers, the definition provided by the Plaintiff does not limit AT&T to only offsetting those two specific cost categories. Instead, it states that AT&T may defray a portion of certain expenses "**including but not limited to**" charges for interconnection and for cell site rents and maintenance. Am. Compl. ¶¶ 44, 60, 78, 84. And, inclusion of the phrase "including but not limited to" is not in and of itself unfair and deceptive. Therefore, taking Plaintiff's allegations as true, interconnect costs, cell site rents and/or maintenance charges serve as examples of and not limitations to how AT&T can apply the Administrative Fee, meaning AT&T's alleged use of the fee to offset other expenses and costs would still comply with the fee's definition and cannot be considered deceptive, unfair, false, or a violation of the parties' agreement.

Finally, despite Plaintiff counsel's repeated argument during the hearing that the Administrative Fee was disclosed to customers as being tied to *increases* in a specific set of expense categories, the Amended Complaint and the website language contain no reference to "increases," and Plaintiff has not alleged any instances where AT&T made such statements.

Instead, AT&T merely stated that the Administrative Fees would "help defray a portion of certain expenses AT&T incurs." Plaintiff has not alleged or identified any representation by AT&T that the Administrative Fee has always offset the exact same percentage of its expenses, or that the fee will increase or decrease solely based on increases or decreases to its interconnection or cell site rents and maintenance costs. Accordingly, because no reasonable consumer could interpret the Administrative Fee, its definition, or its application as deceptive, unfair, or based on a misrepresentation, Plaintiff's FDUTPA and fraud claims necessarily fail. *See Day v. Sarasota Doctors Hosp., Inc.*, No. 19-01522, 2021 WL 288969, at *4 (M.D. Fla. Jan. 28, 2021) (finding FDUTPA claim failed where "no reasonable consumer could be deceived by the [Defendant's conduct or the parties' contract] under the circumstances alleged . . .").

Therefore, applying the law to the undisputed facts of this case, based on the website and contract language relied on by Plaintiff, no amount of discovery will enable Plaintiff to state a cause of action related to how AT&T defines, uses, or increases the Administrative Fee, and no claim can proceed on these allegations as a matter of law.

### 3.    The Administrative Fee is not a pass-through fee.

Finally, Plaintiff alleges that the Administrative Fee is a "textbook pass through fee" as "it is not what its being used for despite its definition in the wireless agreement." Am. Compl. ¶ 86. Florida law is clear that an impermissible "pass-through" fee is one that purports to be collected for payment to a third party, but in reality the company is keeping the fee for itself.  *See Latman v. Costa Cruise Lines, N.V.*, 758 So. 2d 699, 703 (Fla. 3d DCA 2000) (finding that use of the term "port charge" misrepresents to a reasonable consumer that it is a "pass-through" charge which the cruise line will pay to the relevant port authorities).

Here, there is no allegation that AT&T ever represented or suggested the Administrative Fee would be paid to anyone other than AT&T; therefore, the Court finds that Plaintiff has not and cannot allege that the Administrative Fee is a pass-through fee and no claim can proceed on these

allegations. *See Vorst v. TBC Retail Grp., Inc.*, No. 12-CV-80013, 2012 WL 13026643, at *2 (S.D. Fla. Apr. 12, 2012) (dismissing FDUTPA pass-through claim based on the finding that "Plaintiff's conclusory allegations that the oil disposal fee was represented as a pure pass-through expense and that Defendant retains the fee as a profit are insufficient."); *see also Maor*, 2018 WL 4698512, at *5 ("Plaintiff has not identified any provisions in the rental contract, and this Court has found none, which constitute a representation to a reasonable consumer that the 'administrative fee' was a pass-through charge which Defendants would pay to others."); *Berry*, 497 F. Supp. 2d at 1367 (finding that the term "cost recovery fee" is not a pass-through fee as "itself implies that the company will keep the money collected as 'recovery' for its costs.").

In any event, as previously found, the website's definition of the Administrative Fee does not limit how it may be applied or what costs it can be used to offset. *Id.* ¶¶ 44, 60, 78, 84.

The Court does not find the cases relied on by Plaintiff in support of their administrative fee claims persuasive. In *Calderon v. Sixt Rent a Car, LLC*, No. 19-CV-62408, 2020 WL 700381, at *7 (S.D. Fla. Feb. 12, 2020), the defendant was alleged to have deceived their customers by incorporating the terms of a separate agreement that contained undisclosed, and allegedly fraudulent, charges. *Id.* at *4 ("That Sixt's employee did not provide Calderon or Marin the Rental Jacket prior to them agreeing to its terms is not insignificant."). That is a far cry from the case at hand, especially given Plaintiff's tacit admission that the Administrative Fee is disclosed on the website and the monthly billing statement.

Similarly, *Deere Constr., LLC v. Cemex Constr. Materials Florida, LLC*, 198 F.Supp.3d 1332 (S.D. Fla. 2016) involved a failure to disclose an environmental charge that defendant represented was derived and directly tied to the Federal Energy Information Administration's weekly reporting of diesel fuel pricing. *Id.* at 1334. Again, because Plaintiff admits that the Administrative Fee was disclosed and its definition does not directly tie the fee to the rise or fall of AT&T's interconnection and cell site costs, *Deere* is inapplicable to the facts at hand.[4]

Accordingly, because Plaintiff's Administrative Fee-based claims for fraud, FDUTPA damages, good faith and fair dealing, and unjust enrichment are premised on purported falsehoods, misrepresentations, breaches, and deceptive or unfair trade practices that are refuted by the contracts they rely upon, they fail as a matter of law. *Ginsberg*, 645 So. 2d at 494; *TRG Night Hawk Ltd.*, 17 So. 3d at 784.

**B.      Plaintiff's "throttling" allegations in Counts 1, 2, and 4.**

The remainder of Plaintiff's claims for fraud, FDUTPA damages, and good faith and fair dealing are based on allegations pertaining to network management practices designed to remedy network congestion caused by individual consumers who use exponentially more data than others. Plaintiff complains that even though they had an unlimited data plan, AT&T "throttled" (or slowed down) their data speeds after they used a certain amount of data during a monthly billing cycle. Am. Compl. ¶¶ 19-20, 23. However, as the Wireless Consumer Agreement shows, the term "unlimited" refers to the *amount* of data, not the *speed* of that data. Unlike customers on tiered data plans, unlimited customers pay a set price without regard to the *amount* of data used. Plaintiff's alleged belief that "unlimited" refers to both the amount and speed of the data is wrong. Once again, the Agreement negates Plaintiff's allegations as the following comparison shows:

| **What Plaintiff Alleges** | **What the Agreement Actually Says** |
|---|---|
| AT&T represented, directly or indirectly, expressly or by implication, to the Plaintiff, an unlimited mobile data plan customer, that the amount of data that the Plaintiff could access in any billing period would not be limited.<br><br><br><br>**Am. Compl. ¶ 41** | **Unlimited Data Customers.** If you are an AT&T unlimited data plan customer, you agree that "unlimited means you pay a fixed monthly charge for wireless data service regardless of how much data you use . . . "unlimited' does <u>not</u> mean that you can use AT&T's wireless data service in any way that you choose, or for any prohibited activities."<br><br>AT&T may reduce your data throughput speeds at any time or place if your data usage exceeds an applicable, identified usage threshold during any billing cycle.<br><br>**Motion, Ex. 2 (Agreement) § 6.2 (emphasis in orig.)** |

| **What Plaintiff Alleges** | **What the Agreement Actually Says** |
|---|---|
| AT&T's wireless customer agreements do not state that an unlimited mobile data plan customer's use of more than a specified amount of data is a prohibited activity.<br><br>**Am. Compl. ¶ 24** | "Prohibited Activities" include, among other items, anything that: "excessively and disproportionately contributes to network congestion," "degrades network performance," or can "cause harm to the network or other customers."<br><br>"[U]nlimited" does <u>not</u> mean that you can use AT&T's wireless data service . . . for any prohibited activities.<br><br>**Motion, Ex. 2 (Agreement) § 6.2 (emphasis in orig.)** |
| [The] unlimited mobile data contract with Plaintiff . . . did not provide that AT&T could modify, diminish, or impair the services of who use more than a specified amount of data for permissible activities.<br><br>**Am. Compl. ¶ 24, 51** | AT&T may modify, without advance notice, the permitted and prohibited activities.<br><br>You agree that . . . if you use AT&T's wireless data services in any manner that is prohibited, . . . AT&T may reduce your data throughput speeds at any time or place if your data usage exceeds an applicable, identified usage threshold during any billing cycle.<br><br>**Motion, Ex. 2 (Agreement) § 6.2.** |
| AT&T omitted the fact that it intended to throttle Plaintiff's data, without Plaintiff's knowledge or specific consent.<br><br>**Am. Compl. ¶ 42** | AT&T may modify, without advance notice, the permitted and prohibited activities, [and] may engage in any reasonable network management practice . . . to reduce network congestion.<br><br>**Motion, Ex. 2 (Agreement) § 6.2** |

On its face, the Agreement does not say what the Plaintiff alleges it says. In light of these contract provisions, the Court finds that the Agreement clearly reserves the right for AT&T to "reduce . . . data throughput speeds at any time or place if your data usage exceeds an applicable, identified usage threshold during any billing cycle," and even expressly states that, even if you are an "unlimited" customer, "AT&T can limit, restrict, suspend or terminate your data service . . . ." Def.'s Mot. to Dismiss, Ex. 2. Therefore, no claim can proceed based on these allegations as a matter of law.

**C.     Additional grounds for dismissing each cause of action in Counts 1-5.**

Having held that Plaintiff's Administrative Fees and data "throttling" claims are negated by the Agreement and other exhibits implicitly incorporated into and expressly relied on by the Amended Complaint, the Court now examines each cause of action alleged in Counts 1-5. This claim-by-claim analysis reveals several additional grounds supporting the underlying order based on Plaintiff's failure to properly plead their fraud, breach of the duty of good faith and fair dealing, FDUTPA damages, and unjust enrichment claims.

1. **Plaintiff's Fraud Claim Fails as a Matter of Law.**

In Florida, a plaintiff must plead fraud by alleging that the defendant: 1) misrepresented a material fact, 2) knew or should have known of the falsity of the statement, 3) intended that the misrepresentation would induce Plaintiff to rely and act on it, and 4) that Plaintiff suffered injury in justifiable reliance on the misrepresentation. *Witt v. La Gorce Country Club, Inc.*, 35 So. 3d 1033, 1040 (Fla. 3d DCA 2010). In Florida, claimants must plead fraud (or fraudulent inducement) with particularity, as required by Rule 1.120(b). *See* Fla. R. Civ. P. 1.120(b) ("[A]ll averments of fraud . . . shall be stated with such particularity as the circumstances may permit."); *Cedars Healthcare Grp., Ltd. v. Mehta*, 16 So. 3d 914, 917 (Fla. 3d DCA 2009).

AT&T argues that Counts 1-4 all sound in fraud[5] and Plaintiff failed to satisfy this pleading standard. In response, Plaintiff contends that they pled their claims to the best of their ability as circumstances may permit and argues that they cannot allege specifics because "Plaintiff is not in possession of the specific digital advertisements and contracts issued by AT&T." Response at ¶ 67. The Court finds this argument unpersuasive. Plaintiff does not dispute that the Wireless Customer Agreement is on AT&T's website. And Plaintiff is undisputedly familiar with the AT&T website, as they rely on it in their Amended Complaint. Am. Compl. ¶¶ 27-28, 44, 60

Nevertheless, even assuming Plaintiff facially alleged the first element—that AT&T misrepresented facts relating to the Administrative Fee and omitted facts relating to the potential

for data speed reductions—the documents relied on and incorporated into the Amended Complaint refute Plaintiff's allegation that those statements or omissions were false, that AT&T knew they were false, that AT&T intended Plaintiff to rely on them, and that any reliance was justified. *See* sections III.A, III.B, *supra*. Moreover, Plaintiff failed to plead the other four elements with specificity. The Amended Complaint fails to provide a single detail regarding Plaintiff's own interactions with AT&T, or the time, place, and manner of how they were deceived. *Id.* There is no particularly-pled assertion explaining where, when, what, and how these alleged misrepresentations or omissions were material *to Plaintiff's* decision to do business with AT&T, that *they* relied on them, or that they proximately caused *their* damages.

For example, as to throttling, Plaintiff merely recites the last element of fraud, alleging: "Plaintiff relied on AT&T's representations regarding providing unlimited data, and, as a result, incurred damages and was injured as a result of the fraud by omission." Am. Compl. ¶ 43. Plaintiff does not even attempt to allege that their reliance was justified. *Id*. They do not point to a single date to show *when* their data speed was reduced, if any. Nor do they explain *how* such a temporary speed reduction caused them harm or allege *what* measure of actual damages they incurred for any given month of service. This is the kind of information that would have been at Plaintiff's disposal; no "circumstances" prevented Plaintiff from alleging such facts if they existed. And as to administrative fees, Plaintiff fails to allege *when* they saw the website's definition of Administrative Fees and *how* they justifiably relied on it in deciding to use AT&T services. Conclusory assertions disguised as fact do not meet the high standard required by Rule 1.120(b). *See Williams*, 2020 WL 5083550, at *3 (dismissing the complaint because it "fails to provide any more specific details regarding the preparation of the 'Impossible Whopper'"); *Myers v. Myers*, 652 So. 2d 1214, 1215 (Fla. 5th DCA 1995) ("Allegations contained in a pleading are insufficient if they are too general, vague or conclusory.").

For these reasons, Plaintiff fails to plead the fraud claims with particularity as is required by

Florida law. *See* Fla. R. Civ. P. 1.120(b); *Mehta*, 16 So. 3d at 917 (requiring claims sounding in fraud "be pled with particularity and must specifically identify misrepresentations or omissions of fact, **as well as time, place or manner in which they were made**.") (emphasis added). Accordingly, the Court finds that Plaintiff's fraud claims cannot be cured though amendment, requiring dismissal *with prejudice*.

### 2.     Plaintiff's Good Faith and Fair Dealing Claim Fails as a Matter of Law.

In support of the good faith and fair dealing claim, Plaintiff alleges that AT&T breached unspecified provisions of the Wireless Customer Agreement and acted in a commercially unreasonable manner by throttling Plaintiff's data and charging the "bogus" Administrative Fee. Am. Compl. ¶ 79 ("The express terms of the wireless agreement required AT&T to provide unlimited data and true administrative costs as defined by the contract."); *see also* ¶¶ 78-81. Florida law recognizes the implied covenant of good faith and fair dealing in every contract, with two limitations:

> First, the implied covenant of good faith should not be invoked to override the express terms of the agreement between the parties.
>
> Second, a claim for breach of the implied covenant of good faith and fair dealing cannot be maintained under Florida law absent an allegation that an express term of the contract has been breached.

*Ins. Concepts & Design, Inc. v. Healthplan Servs., Inc.*, 785 So. 2d 1232, 1234 (Fla. 4th DCA 2001). Both of these limitations apply here.

First, Plaintiff's breach allegation is not tied to any particular provision in the Agreement. Am. Compl. ¶ 80 (alleging "AT&T breached the express terms of the wireless agreement by failing to provide unlimited data" with nothing more). Second, as the Court held in parts A and B above, the parties' Agreement expressly authorizes the conduct complained of, and therefore Plaintiff cannot invoke the doctrine to override the express agreement of the parties. *See Healthplan Servs., Inc.*, 785 So. 2d at 1234. Plaintiff cannot show that AT&T failed to act in a commercially

reasonable manner when it abided by the express language of the parties' Agreement.

Finally, Plaintiff's good faith and fair dealing claim is not substantively distinguishable from the fraud claim. *See* Am. Compl. ¶ 77 (alleging false statements of material fact as basis for breach of the duty of good faith and fair dealing). The problems with this claim become even more troublesome under the heightened pleading standard that applies to claims that sound in fraud. *See* Part III.C.1, *supra*.

Accordingly, the Court finds Plaintiff's good faith and fair dealing claim cannot be cured though amendment, requiring dismissal *with prejudice*.

### 3.     Plaintiff's FDUTPA Claims Fail as a Matter of Law.

"[I]t is well recognized in this state that a claim for damages under FDUTPA has three elements: (1) a deceptive act or unfair practice; (2) causation; and (3) actual damages."*Kia Motors Am. Corp. v. Butler*, 985 So. 2d 1133, 1140 (Fla. 3d DCA 2008). To state a claim for injunctive or declaratory relief under FDUTPA, a plaintiff "must show (1) that it is aggrieved, in that its rights have been, are being, or will be adversely affected, by (2) a violation of FDUTPA, meaning an unfair or deceptive practice which is injurious to consumers." *Stewart Agency, Inc. v. Arrigo Enterprises, Inc.*, 266 So. 3d 207, 214 (Fla. 4th DCA 2019). Plaintiff alleges that AT&T caused them damages through its failure to adequately disclose, as well as misrepresentations regarding, its data throttling policy and the Administrative Fee, which he again describes as "a textbook pass through fee." Am. Compl. ¶ 86.

As discussed above, Plaintiff's allegations supporting the FDUTPA claims are directly contradicted and hence negated by the Wireless Customer Agreement, AT&T's website, and billing statements. *See supra*, parts III.A and III.B. No amount of discovery will enable Plaintiff to sufficiently plead that AT&T violated FDUTPA. Taking Plaintiff's allegations as true, AT&T's data management practices are not deceptive or unfair, since the Wireless Customer Agreement

allowed AT&T to reduce data speeds of all customers—including unlimited customers—to preserve network integrity. The Wireless Customer Agreement, website and billing statements, incorporated by reference in the Amended Complaint, also disclosed the Administrative Fee, and neither the imposition of an Administrative Fee nor the contractual use of the phrase "including but not limited to," is sufficient to state a claim for deceptive or unfair business practices. Finally, the Administrative Fee is not a "pass-through fee" by definition. *See Maor*, 2018 WL 4698512, at *5; *Berry*, 497 F. Supp. 2d at 1367.

Even if a reasonable unlimited data customer would think that they were immune to AT&T's network management practices after entering into a contract stating the opposite (and somehow sufficiently pled a deceptive or unfair act or practice), Plaintiff still failed to sufficiently allege causation and actual damages. Similarly, even if AT&T used the Administrative Fees to defray costs other than interconnection costs and cell site rents and maintenance (and Plaintiff somehow sufficiently pled a deceptive or unfair act or practice), Plaintiff still failed to sufficiently allege causation and actual damages.

This is so under ordinary and heightened pleading standards. As Judge Lody Jean ruled in another case filed by Plaintiff's counsel against AT&T, "Plaintiff has pled a FDUTPA claim as a personal tort sounding in fraud" and, "[w]here the 'gravamen of the claim sounds in fraud' it is subject to the rules governing a fraud claim." Order Granting AT&T's Motion for Final Summary Judgment, *Claims Holding Group, LLC v. AT&T Mobility*, Case No: 2020-000024-SP-05 (July 22, 2020).[6] Plaintiff failed to plead with particularity *when* or *how* a short data speed reduction caused harm to Plaintiff personally, *how* Plaintiff would be harmed if AT&T in fact used their $1.99 Administrative Fees to defray costs other than for interconnection costs and cell site rents and maintenance, or *what* kind of actual damages they incurred as a result of either practice.

Based on the above, the Court finds Plaintiff's FDUTPA claims cannot be cured though amendment, requiring dismissal *with prejudice*.

**4.      Plaintiff's Unjust Enrichment Claim Fails as a Matter of Law.**

"The elements of a cause of action for unjust enrichment are: (1) plaintiff has conferred a benefit on the defendant, who has knowledge thereof; (2) defendant voluntarily accepts and retains the benefit conferred; and (3) the circumstances are such that it would be inequitable for the defendant to retain the benefit without first paying the value thereof to the plaintiff." *Duty Free World, Inc. v. Miami Perfume Junction, Inc.*, 253 So. 3d 689, 693 (Fla. 3d DCA 2018). "Florida law is clear that 'a plaintiff cannot pursue a quasi-contract claim for unjust enrichment if an express contract exists concerning the same subject matter.'" *Sterling Breeze Owners' Ass'n, Inc. v. New Sterling Resorts, LLC*, 255 So. 3d 434, 437 (Fla. 1st DCA 2018), *reh'g denied* (Oct. 16, 2018).

Like Counts 1-4, Plaintiff's claim of unjust enrichment hinges on their assertion that the administrative fee is deceptive—an assertion that, as discussed in detail above, is directly contradicted by both the Wireless Customer Agreement and AT&T's website. Additionally, while the claim sounds in fraud, it is not pleaded with specificity as is required by Florida law. *See* Fla. R. Civ. P. 1.110(b); *Mehta*, 16 So. 3d at 917.

The claim also fails because Plaintiff has acknowledged the existence of a contract between the parties that governs the subject matter of this lawsuit, thus barring Plaintiff's quasi-contract claim for unjust enrichment. *New Sterling Resorts, LLC*, 255 So. 3d at 437. The fact that Plaintiff chose not to incorporate the paragraphs acknowledging the existence of the Wireless Customer Agreement into the unjust enrichment count does not save the claim as this Court does not have to accept as true or even consider "internally inconsistent factual claims." *Gallego v. Wells Fargo Bank, N.A.*, 276 So. 3d 989, 990 (Fla. 3d DCA 2019).

Plaintiff's unjust enrichment claim cannot be cured though amendment, requiring that it be dismissed *with prejudice*.

**IV.   Conclusion**

For the reasons stated above, this Court grants AT&T's Motion to Dismiss. As all claims in this matter have now been adjudicated, the clerk is directed to close this matter.

---

[1] Plaintiff's counsel has previously abandoned this assertion in a similar hearing in front of Judge Lehr, where it was undisputed that the Agreement is available on AT&T's website. *See* AT&T's Mot. Dismiss Hr'g Tr., 28:24-25; 49:18-20; 50:15-16, *Ann Green v. AT&T Mobility*, Case No. 2019-16864-SP-23 (July 22, 2020).

[2] At the hearing, Plaintiff's counsel argued that *One Call* involved a contract attached to a motion to dismiss "where there was no dispute on the insurance contract." Transcript 28:1-2. A review of the decision reveals that this assertion is false. *One Call Prop. Servs. Inc.*, 165 So. 3d at 751 ("One Call filed a written response to the motion to dismiss, arguing that the motion impermissibly went beyond the four corners of the complaint . . . .").

[3] As noted, Plaintiff takes no issue with the authenticity of AT&T's website or billing statements introduced into the record by AT&T, and this Court finds Plaintiff incorporated them by reference in the Amended Complaint. *See, e.g.*, Am. Compl. ¶¶ 27-28, 31, 44, 60, 78, 84.

[4] While counsel for Plaintiff argued at the hearing that AT&T represented that its interconnection costs are going up, the Amended Complaint does not contain any such allegation. Regardless, counsel's assertion is contradicted by the Administrative Fee definition provided by the Plaintiff, which only states that the fee is used to "defray a **portion** of certain expenses AT&T incurs," including but not limited to interconnection and cell site costs. Am. Compl. ¶ 44. (emphasis added). No increase in costs is mentioned.

[5] Claims 1-4 incorporate the same factual basis of Plaintiff's fraud claim (paragraphs 1-37) and all claims allege that AT&T knowingly, intentionally and fraudulently deceived the Plaintiff regarding AT&T's Administrative Fee, purported data "throttling," and Privacy Policy. *See, e.g.*, Am. Compl. ¶ 25 (alleging that AT&T's unlimited plan was "a bait-and-switch scam"), *id.* (alleging that AT&T "covertly increases the actual price" of its services by "padding all post-paid wireless customers' bills" with a "bogus" administrative fee), ¶ 26 (alleging the Administrative Fee "is never adequately and honestly disclosed"), ¶ 27 (alleging that AT&T "deliberately hides" the Administrative Fee), ¶ 61 (alleging that AT&T "knew" the Administrative Fee was inflated).

[6] Citing *Librizzi v. Ocwen Loan Servicing, LLC*, 120 F. Supp. 3d 1368, 1381 (S.D. Fla. 2015) (Bloom, J.) (finding that FDUTPA claims must be pled with particularity where plaintiff alleged defendant caused damages through deception); *Mehta*, 16 So. 3d at 917; *USA Nutraceuticals Grp., Inc. v. BPI Sports, LLC*, No. 15-CIV-80352, 2016 WL 4254257, at *3 (S.D. Fla. Feb. 16, 2016) ("[C]ourts regularly apply Rule 9(b) to FDUTPA claims, as such claims uniquely sound in both tort

and fraud.").

**DONE** and **ORDERED** in Chambers at Miami-Dade County, Florida on this <u>8th day of September, 2022</u>.

<u>2020-021937-SP-26 09-08-2022 1:33 PM</u>
Hon. Michaelle Gonzalez-Paulson

**COUNTY COURT JUDGE**
Electronically Signed

---

Final Order as to All Parties SRS #: **12** (Other)

THE COURT DISMISSES THIS CASE AGAINST ANY PARTY NOT LISTED IN THIS FINAL ORDER OR PREVIOUS ORDER(S). THIS CASE IS CLOSED AS TO ALL PARTIES.

---

**Electronically Served:**
Alicia Thomsen, athomsen@daypitney.com
Andrew R. Ingalls, aingalls@daypitney.com
Andrew R. Ingalls, brodriguez@daypitney.com
Evelyn Davila, edavila@daypitney.com
Jessica Solorzano, jsolorzano@daypitney.com
Manuel A. Garcia-Linares, mgarcialinares@daypitney.com
Manuel A. Garcia-Linares, athomsen@daypitney.com
Maury L Udell, notice66@bmulaw.com
Maury L Udell, blopez@bmulaw.com
Rachel Kittl, rkittl@bmulaw.com


**Physically Served:**

Case 1:25-cv-20381-RAR   Document 1-2   Entered on FLSD Docket 01/27/2025   Page 893 of 1553

**IN THE COUNTY COURT OF THE ELEVENTH JUDICIAL
CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA**

CASE NO: 2020-008179-SP-26
SECTION: SD05
JUDGE: Michaelle Gonzalez-Paulson

**Sharon Orr**

Plaintiff(s) / Petitioner(s)

vs.

**AT&T Mobility LLC**

Defendant(s) / Respondent(s)

_____/

## ORDER GRANTING DEFENDANT'S MOTION TO DISMISS PLAINTIFF'S AMENDED SMALL CLAIMS COMPLAINT

On April 28, 2022, this Court heard Defendant AT&T Mobility, LLC's *Motion to Dismiss Plaintiff's Amended Small Claims Complaint*. After considering the motion, Plaintiff's response, the amended complaint, all relevant pleadings, the arguments of counsel, and being otherwise duly advised in the premises, the Court hereby **GRANTS** AT&T's Motion on all counts for the reasons set forth below.

### I.  Background.

Plaintiff filed an Amended Complaint on July 14, 2021, asserting five  claims against AT&T: (1) fraud, (2) damages under the Florida Deceptive and Unfair Trade Practices Act § 501.201, *et seq.,* Fla. Stat. ("FDUTPA"), (3) declaratory and injunctive relief under FDUTPA, (4) unjust enrichment, and (5) pure bill of discovery. Counts 1 through 4 are based on allegations that AT&T charged Plaintiff a "bogus" Administrative Fee. Count 5 alleges that AT&T provided Plaintiff's geolocation data to third-party aggregators and location-based service providers without Plaintiff's consent.

While the Amended Complaint specifically references, incorporates, and quotes from the Wireless Customer Agreement, AT&T's website, and AT&T billing statements as the bases for Plaintiff's claims, none of those documents are attached to the Complaint. (Am. Compl. ¶¶ 16, 39 (Agreement); ¶¶ 32, 42, 58 (AT&T's website), ¶¶ 18-19, 22, 42 (billing statements)).

AT&T filed a Motion to Dismiss ("Motion") on August 6, 2021, attaching the Wireless Customer Agreement in effect at the time this case was filed to its Motion to Dismiss as Exhibit 2. AT&T noted that Plaintiff's Amended Complaint is almost entirely composed of claims copy-and-pasted from other lawsuits and is identical to over one hundred other cases pending before courts in this jurisdiction filed by counsel for Plaintiff. None of the allegations in the Amended Complaint allege facts specific to Plaintiff. Plaintiff responded to AT&T's Motion on April 22, 2022, and the Court heard the Motion on April 28, 2022. At the hearing, counsel for the Plaintiff voluntarily dismissed Count 5. Transcript 24:17-19 ("Judge, I'll announce on these five that I'll withdraw the geolocation counts without prejudice"). The Court grants the Motion to Dismiss as to the remaining Count 1-4 for the following reasons.

## II.     Motion to Dismiss Standard

The standard for determining whether a motion to dismiss should be granted is whether, based on the well-pleaded allegations and incorporated attachments, the movant is entitled to judgment as a matter of law. *Golden Gate Homes, LC v. Levey*, 59 So. 3d 275, 280 (Fla. 3d DCA 2011). In cases where it is apparent that a pleading cannot be amended to state a cause of action, or where an amendment would be futile, dismissal *with prejudice* is appropriate. *Central Florida Investments, Inc. v. Charles Levin Timeshares*, 659 So. 2d 492 (Fla. 5th DCA 1995).

While the Court is generally limited to the complaint's four corners, it is required to consider exhibits attached to and incorporated into the complaint. *Rolle v. Cold Stone Creamery, Inc.*, 212 So. 3d 1073, 1076 (Fla. 3d DCA 2017). Moreover, when a party refers to a document in

the complaint, the trial court may use that document to assess the nature of the claims alleged in the complaint. *Glen Garron, LLC v. Buchwald*, 210 So. 3d 229, 233 (Fla. 5th DCA 2017). Where an exhibit attached to a complaint contradicts the allegations in the complaint, the exhibits control and may form the basis for a motion to dismiss. *See Fladell v. Palm Beach Cty. Canvassing Bd.*, 772 So. 2d 1240, 1242 (Fla. 2000).

Here, the Amended Complaint specifically references, incorporates, and quotes from the Wireless Customer Agreement, AT&T's website, and AT&T billing statements as the bases for Plaintiff's claims. (Am. Compl. ¶¶ 16, 39 (Agreement); ¶¶ 32, 42, 58 (AT&T's website), ¶¶ 18-19, 22, 42 (billing statements)). Under Florida Rule of Civil Procedure 1.130(a), Plaintiff had the duty to attach or incorporate the underlying Agreement, billing statements, and website language onto its complaint.  Fla. R. Civ. P. 1.130(a) ("All . . .  contracts, accounts, or documents on which action may be brought [or copies of their material portions] . . . must be incorporated in or attached to the pleading.").  Plaintiff contends that it did not attach the Agreement because "it is under the exclusive control of AT&T," Am. Compl. ¶¶ 22 and 38.[1] Thus, Plaintiff apparently filed this lawsuit alleging, among other things, that "AT&T has breached the express terms of the wireless agreement" without knowing what the Agreement says.

AT&T's Motion to Dismiss attaches a copy of the Wireless Customer Agreement, a portion of the AT&T website defining the Administrative Fee, and a recent AT&T billing statement.  *See* Def.'s Mot. to Dismiss Exs. 2-4. Because the Amended Complaint specifically references, incorporates, and quotes from these documents, AT&T argued that they are within the four corners of the Amended Complaint and can be considered by the Court in ruling on the underlying motion. *See Buchwald*, 210 So. 3d at 233 ("When a party refers to a document in the complaint, the trial court may use that document to assess the nature of the claims alleged in the complaint"); *One Call Prop. Servs., Inc. v. Sec. First Ins. Co.*, 165 So. 3d 749, 752 (Fla. 4th DCA 2015) ("[W]here the terms of a legal document are impliedly incorporated by reference into the complaint, the trial court

may consider the contents of the document in ruling on a motion to dismiss.").[2]

At the hearing, however, Plaintiff argued that AT&T had the burden to prove up the documents (which the Plaintiff failed to attach to the Amended Complaint), and took the position that AT&T was required to authenticate the Agreement before this Court could consider it. The Court does not find Plaintiff's arguments persuasive. The Court could not consider any such "authentication" via affidavit as Plaintiff suggests at this stage of the proceedings. Requiring AT&T to cure Plaintiff's deficiency under heightened evidentiary requirements would not only ignore Rule 1.130(a), but do away with the incorporation by reference doctrine, and turn this Motion to Dismiss into a summary judgment motion. No legal authority supporting such a proposition has been cited or provided to the Court. The federal and summary judgment cases upon which Plaintiff relies do not apply here. Plaintiff's attempt to base their claims on the express language of the Agreement—while precluding consideration of that same Agreement at this stage of the proceedings—would cause unnecessary delay, require needless discovery, and is not well taken.

A court's duty to accept the facts in the complaint as true does not require the court to ignore specific factual details of the pleading in favor of general or conclusory allegations. *Griffin Indus. v. Irvin*, 496 F.3d 1189 (11th Cir. 2007). Thus, this Court does not find merit in Plaintiff's assertion that AT&T must authenticate the Agreement for this Court to properly consider it when Plaintiff incorporated the Agreement by reference. Because the Amended Complaint specifically references, incorporates, and quotes from these documents, they are within the four corners of the Amended Complaint and will be considered by the Court in ruling on the underlying motion. *See Buchwald*, 210 So. 3d at 233; *One Call Prop. Servs., Inc.*, 165 So. 3d at 752.

### III. Counts 1-4

Plaintiff's claims for fraud, FDUTPA damages, FDUTPA declaratory and injunctive relief, good faith and fair dealing, and unjust enrichment are based upon AT&T's alleged "bogus"

administrative fees. These claims are ripe for dismissal because they are facially negated by documents relied on and incorporated into the Amended Complaint and contain other pleading deficiencies and errors of law that cannot be cured through amendment.

In Florida, "[a] party cannot recover for alleged false misrepresentations that are adequately dealt with or expressly contradicted in a later written contract." *TRG Night Hawk Ltd. v. Registry Dev. Corp.*, 17 So. 3d 782, 784 (Fla. 2d DCA 2009); *see also GVK Int'l Bus. Grp., Inc. v. Levkovitz*, No. 3D19- 1119, 2020 WL 4197407, at *2 (Fla. 3d DCA July 22, 2020); *Taylor Woodrow Homes Fla., Inc. v. 4/46-A Corp.*, 850 So. 2d 536, 542 (Fla. 5th DCA 2003). "To hold otherwise is to invite contracting parties to make agreements of the kind in suit and then avoid them by simply taking the stand and swearing that they relied on some other statement." *TRG Night Hawk Ltd.*, 17 So. 3d at 784. Moreover, "a party who signs a contract whose terms contradict the alleged misrepresentations on which he relied is barred 'from seeking relief pursuant to FDUTPA, as she acted unreasonably.'" *Id.* (citing *Rosa v. Amoco Oil Co.*, 262 F. Supp. 2d 1364, 1368 (S.D. Fla. 2003)). In particular, with respect to FDUTPA claims, "[c]ourts routinely dismiss FDUTPA claims where those claims are directly and fully rebutted by express evidence in a governing written contract." *Sol. Z v. Alma Lasers, Inc.*, No. 11-CV-21396-CIV, 2013 WL 12246356, at *5 (S.D. Fla. Jan. 22, 2013). And, as in this case, where a plaintiff alleges a FDUTPA action based on misrepresentation and "plaintiff relies on written statements that are expressly contradicted by a subsequent contract, the plaintiff's reliance on those statements is not reasonable as a matter of law for a FDUTPA claim." *Id.* At the pleading stage, "where the allegations of the complaint are contradicted by the exhibits, the plain meaning of the exhibits will control." *Ginsberg v. Lennar Fla. Holdings, Inc.*, 645 So. 2d 490, 494 (Fla. 3d DCA 1994).

A.      **Plaintiff's Administrative Fee allegations in Counts 1-4.**

Plaintiff alleges that AT&T has wrongfully charged a $1.99 monthly Administrative Fee. Plaintiff asserts that the fee is "bogus" for three reasons: (1) AT&T failed to adequately disclose the

existence of the Administrative Fee; (2) the Administrative Fee is deceptively defined and applied; and, (3) the Administrative Fee is an illegal "pass-through" fee.

AT&T counters that these allegations are belied by the Amended Complaint and the documents it is based on. The Court finds AT&T's arguments persuasive. Plaintiff pursued this lawsuit without ever consulting the Agreement upon which the allegations are based. Had Plaintiff conducted such a review, it would have been clear that the Agreement, website, and billing statements facially negate Plaintiff's allegations.

### 1.      Disclosure of the Administrative Fee.

Plaintiff alleges that AT&T did not adequately disclose the existence of the Administrative Fee when they signed up for AT&T's services and thereafter tried to conceal the fee by burying the line-item charge in the billing statement. Am. Compl. ¶¶ 17-197. In response, Defendant argues that the Wireless Customer Agreement, website and billing statements expressly disclose the administrative fee and AT&T's right to make changes to charges billed to customers.[3] For example, section 1.4 of the Agreement states: "Charges include, without limitation airtime, roaming, recurring monthly service, activation, **administrative**, and late payment charges . . . whether assessed directly upon you or upon AT&T." Mot. to Dismiss, Ex. 2 § 1.4. The Wireless Customer Agreement also reserves the right for AT&T to "make changes to this Agreement" which can include "charges." *Id.* § 1.3.

The AT&T website, quoted by Plaintiff in the Amended Complaint, defines the Administrative Fee and further expressly states, "AT&T reserves the right to increase its fees or impose additional fees." Def.'s Mot. to Dismiss, Ex. 3. AT&T's billing statement also expressly discloses the existence of the Administrative Fee, with the billing statement providing the monthly amount. Def.'s Mot. to Dismiss, Ex. 4. The Wireless Customer Agreement, website, and billing statement (incorporated by reference into the Amended Complaint) refute and thereby negate the assertion that the Administrative Fee was not properly disclosed. Therefore, no claim can proceed

on these allegations as a matter of law.

> **2.      How the Administrative Fee is used and increased.**

Plaintiff next alleges that AT&T is telling the consumer one thing but doing another. Quoting AT&T's website, Plaintiff alleged:

> AT&T's representation that the Administrative Fee is a charge assessed by AT&T that helps defray a portion of certain expenses AT&T incurs, including but not limited to: (a) charges AT&T or its agents pay to interconnect with other carriers to deliver calls from AT&T customers to their customers; and (b) charges associated with cell site rents and maintenance are false.

Am. Compl. ¶¶ 32, 42, 58. According to Plaintiff, the Administrative Fee is not tied to either interconnect or cell site charges because AT&T has continuously increased the fee even though these costs have allegedly decreased. *Id.* ¶¶ 19-22. Based on this assertion, Plaintiff theorizes that the Administrative Fee is part of "a scheme to funnel direct profit to AT&T rather than pay for any identifiable increase in costs." Am. Compl. ¶ 42.

First, the Court rejects any suggestion that AT&T's charging of an Administrative Fee is *per se* deceptive as the term "administrative fee" by itself does not suggest that AT&T will apply the Administrative Fee in any particular way. *See Maor v. Dollar Thrifty Auto. Grp., Inc.*, No. 15-22959-CIV, 2018 WL 4698512, at *4 (S.D. Fla. Sept. 30, 2018) ("Solely using the term 'administrative fee,' without more, does not restrict how the fee may be used or represent any purpose or nature behind the fee."); *Berry v. Budget Rent A Car Systems Inc.*, 497 F. Supp. 2d 1361, 1367 (S.D. Fla. 2007) (dismissing FDUTPA claim with prejudice, explaining "the simple fact" that defendant itemized a "cost recovery fee" as a separate charge is not unfair or deceptive).

Second, while Plaintiff alleges that AT&T does not actually use the Administrative Fee to offset interconnect costs, cell site rents and/or maintenance charges which is deceptive to consumers, the definition provided by the Plaintiff does not limit AT&T to only offsetting those two specific cost categories. Instead, it states that AT&T may defray a portion of certain expenses

"**including but not limited to**" charges for interconnection and for cell site rents and maintenance. Am. Compl. ¶¶ 32, 42, 58. And, inclusion of the phrase "including but not limited to" is not in and of itself unfair and deceptive. Therefore, taking Plaintiff's allegations as true, interconnect costs, cell site rents and/or maintenance charges serve as examples of and not limitations to how AT&T can apply the Administrative Fee, meaning AT&T's alleged use of the fee to offset other expenses and costs would still comply with the fee's definition and cannot be considered deceptive, unfair, false, or a violation of the parties' agreement.

Finally, despite Plaintiff counsel's repeated argument during the hearing that the Administrative Fee was disclosed to customers as being tied to *increases* in a specific set of expense categories, the Amended Complaint and the website language contain no reference to "increases," and Plaintiff has not alleged any instances where AT&T made such statements. Instead, AT&T merely stated that the Administrative Fees would "help[] defray a portion of certain expenses AT&T incurs." Plaintiff has not alleged or identified any representation by AT&T that the Administrative Fee has always offset the exact same percentage of its expenses, or that the fee will increase or decrease solely based on increases or decreases to its interconnection or cell site rents and maintenance costs. Accordingly, because no reasonable consumer could interpret the Administrative Fee, its definition, or its application as deceptive, unfair, or based on a misrepresentation, Plaintiff's FDUTPA and fraud claims necessarily fail. *See Day v. Sarasota Doctors Hosp., Inc.*, No. 19-01522, 2021 WL 288969, at *4 (M.D. Fla. Jan. 28, 2021) (finding FDUTPA claim failed where "no reasonable consumer could be deceived by the [Defendant's conduct or the parties' contract] under the circumstances alleged . . .").

Therefore, applying the law to the undisputed facts of this case, based on the website and contract language relied on by Plaintiff, no amount of discovery will enable Plaintiff to state a cause of action related to how AT&T defines, uses, or increases the Administrative Fee, and no claim can proceed on these allegations as a matter of law.

### 3.      The Administrative Fee is not a pass-through fee.

Finally, Plaintiff alleges that the Administrative Fee is a "textbook pass through fee" as "it is not what its being used for despite its definition in the wireless agreement." Am. Compl. ¶ 60. Florida law is clear that an impermissible "pass-through" fee is one that purports to be collected for payment to a third party, but in reality the company is keeping the fee for itself.  *See Latman v. Costa Cruise Lines, N.V.*, 758 So. 2d 699, 703 (Fla. 3d DCA 2000) (finding that use of the term "port charge" misrepresents to a reasonable consumer that it is a "pass-through" charge which the cruise line will pay to the relevant port authorities).

Here, there is no allegation that AT&T ever represented or suggested the Administrative Fee would be paid to anyone other than AT&T; therefore, the Court finds that Plaintiff has not and cannot allege that the Administrative Fee is a pass-through fee and no claim can proceed on these allegations. *See Vorst v. TBC Retail Grp., Inc.*, No. 12-CV-80013, 2012 WL 13026643, at *2 (S.D. Fla. Apr. 12, 2012) (dismissing FDUTPA pass-through claim based on the finding that "Plaintiff's conclusory allegations that the oil disposal fee was represented as a pure pass-through expense and that Defendant retains the fee as a profit are insufficient."); *see also Maor*, 2018 WL 4698512, at *5 ("Plaintiff has not identified any provisions in the rental contract, and this Court has found none, which constitute a representation to a reasonable consumer that the 'administrative fee' was a pass-through charge which Defendants would pay to others."); *Berry*, 497 F. Supp. 2d at 1367 (finding that the term "cost recovery fee" is not a pass-through fee as "itself implies that the company will keep the money collected as 'recovery' for its costs.").

In any event, as previously found, the website's definition of the Administrative Fee does not limit how it may be applied or what costs it can be used to offset. *Id.* ¶¶ 32, 42, 58.

The Court does not find the cases relied on by Plaintiff in support of their administrative fee claims persuasive. In *Calderon v. Sixt Rent a Car, LLC*, No. 19-CV-62408, 2020 WL 700381, at *7 (S.D. Fla. Feb. 12, 2020), the defendant was alleged to have deceived their customers by

incorporating the terms of a separate agreement that contained undisclosed, and allegedly fraudulent, charges. *Id*. at \*4 ("That Sixt's employee did not provide Calderon or Marin the Rental Jacket prior to them agreeing to its terms is not insignificant."). That is a far cry from the case at hand, especially given Plaintiff's tacit admission that the Administrative Fee is disclosed on the website and the monthly billing statement.

Similarly, *Deere Constr., LLC v. Cemex Constr. Materials Florida, LLC*, 198 F.Supp.3d 1332 (S.D. Fla. 2016) involved a failure to disclose an environmental charge that defendant represented was derived and directly tied to the Federal Energy Information Administration's weekly reporting of diesel fuel pricing. *Id.* at 1334. Again, because Plaintiff admits that the Administrative Fee was disclosed and its definition does not directly tie the fee to the rise or fall of AT&T's interconnection and cell site costs, *Deere* is inapplicable to the facts at hand.[4]

Accordingly, because Plaintiff's Administrative Fee-based claims for fraud, FDUTPA damages, good faith and fair dealing, and unjust enrichment are premised on purported falsehoods, misrepresentations, breaches, and deceptive or unfair trade practices that are refuted by the contracts they rely upon, they fail as a matter of law. *Ginsberg*, 645 So. 2d at 494; *TRG Night Hawk Ltd.*, 17 So. 3d at 784.

**B.      Additional grounds for dismissing each cause of action in Counts 1-4.**

Having held that Plaintiff's Administrative Fees claims are negated by the Agreement and other exhibits implicitly incorporated into and expressly relied on by the Amended Complaint, the Court now examines each cause of action alleged in Counts 1-4. This claim-by-claim analysis reveals several additional grounds supporting the underlying order based on Plaintiff's failure to properly plead their fraud, breach of the duty of good faith and fair dealing, FDUTPA damages, and unjust enrichment claims.

1. **Plaintiff's Fraud Claim Fails as a Matter of Law.**

In Florida, a plaintiff must plead fraud by alleging that the defendant: 1) misrepresented a material fact, 2) knew or should have known of the falsity of the statement, 3) intended that the misrepresentation would induce Plaintiff to rely and act on it, and 4) that Plaintiff suffered injury in justifiable reliance on the misrepresentation. *Witt v. La Gorce Country Club, Inc.*, 35 So. 3d 1033, 1040 (Fla. 3d DCA 2010). In Florida, claimants must plead fraud (or fraudulent inducement) with particularity, as required by Rule 1.120(b). *See* Fla. R. Civ. P. 1.120(b) ("[A]ll averments of fraud . . . shall be stated with such particularity as the circumstances may permit."); *Cedars Healthcare Grp., Ltd. v. Mehta*, 16 So. 3d 914, 917 (Fla. 3d DCA 2009).

AT&T argues that Counts 1-4 all sound in fraud[5] and Plaintiff failed to satisfy this pleading standard. In response, Plaintiff contends that they pled their claims to the best of their ability as circumstances may permit and argues that they cannot allege specifics because "Plaintiff is not in possession of the specific digital advertisements and contracts issued by AT&T." Response at ¶ 67. The Court finds this argument unpersuasive. Plaintiff does not dispute that the Wireless Customer Agreement is on AT&T's website. And Plaintiff is undisputedly familiar with the AT&T website, as they rely on it in their Amended Complaint. Am. Compl. ¶¶ 18-19, 32, 42.

Nevertheless, even assuming Plaintiff facially alleged the first element—that AT&T misrepresented facts relating to the Administrative Fee and omitted facts relating to the potential for data speed reductions—the documents relied on and incorporated into the Amended Complaint refute Plaintiff's allegation that those statements or omissions were false, that AT&T knew they were false, that AT&T intended Plaintiff to rely on them, and that any reliance was justified. *See* sections III.A, III.B, *supra*. Moreover, Plaintiff failed to plead the other four elements with specificity. The Amended Complaint fails to provide a single detail regarding Plaintiff's own interactions with AT&T, or the time, place, and manner of how they were deceived. *Id.* There is no particularly-pled assertion explaining where, when, what, and how these alleged misrepresentations or omissions were material *to Plaintiff's* decision to do business with AT&T, that *they* relied on

them, or that they proximately caused *their* damages. Plaintiff fails to allege *when* they saw the website's definition of Administrative Fees and *how* they justifiably relied on it in deciding to use AT&T services. Conclusory assertions disguised as fact do not meet the high standard required by Rule 1.120(b). *See Williams*, 2020 WL 5083550, at *3 (dismissing the complaint because it "fails to provide any more specific details regarding the preparation of the 'Impossible Whopper'"); *Myers v. Myers*, 652 So. 2d 1214, 1215 (Fla. 5th DCA 1995) ("Allegations contained in a pleading are insufficient if they are too general, vague or conclusory.").

For these reasons, Plaintiff fails to plead the fraud claims with particularity as is required by Florida law. *See* Fla. R. Civ. P. 1.120(b); *Mehta*, 16 So. 3d at 917 (requiring claims sounding in fraud "be pled with particularity and must specifically identify misrepresentations or omissions of fact, **as well as time, place or manner in which they were made**.") (emphasis added). Accordingly, the Court finds that Plaintiff's fraud claims cannot be cured though amendment, requiring dismissal *with prejudice*.

## 2.    Plaintiff's FDUTPA Claims Fail as a Matter of Law.

"[I]t is well recognized in this state that a claim for damages under FDUTPA has three elements: (1) a deceptive act or unfair practice; (2) causation; and (3) actual damages."*Kia Motors Am. Corp. v. Butler*, 985 So. 2d 1133, 1140 (Fla. 3d DCA 2008). To state a claim for injunctive or declaratory relief under FDUTPA, a plaintiff "must show (1) that it is aggrieved, in that its rights have been, are being, or will be adversely affected, by (2) a violation of FDUTPA, meaning an unfair or deceptive practice which is injurious to consumers." *Stewart Agency, Inc. v. Arrigo Enterprises, Inc.*, 266 So. 3d 207, 214 (Fla. 4th DCA 2019). Plaintiff alleges that AT&T caused them damages through its failure to adequately disclose, as well as misrepresentations regarding, the Administrative Fee, which he again describes as "a textbook pass through fee." Am. Compl. ¶ 60.

As discussed above, Plaintiff's allegations supporting the FDUTPA claims are directly contradicted and hence negated by the Wireless Customer Agreement, AT&T's website, and billing statements. *See supra*, parts III.A and III.B. No amount of discovery will enable Plaintiff to sufficiently plead that AT&T violated FDUTPA. Taking Plaintiff's allegations as true, AT&T's practices are not deceptive or unfair, since the Wireless Customer Agreement, website and billing statements, incorporated by reference in the Amended Complaint, disclosed the Administrative Fee, and neither the imposition of an Administrative Fee nor the contractual use of the phrase "including but not limited to," is sufficient to state a claim for deceptive or unfair business practices. Finally, the Administrative Fee is not a "pass-through fee" by definition. *See Maor*, 2018 WL 4698512, at *5; *Berry*, 497 F. Supp. 2d at 1367.

Even if AT&T used the Administrative Fees to defray costs other than interconnection costs and cell site rents and maintenance (and Plaintiff somehow sufficiently pled a deceptive or unfair act or practice), Plaintiff still failed to sufficiently allege causation and actual damages.

This is so under ordinary and heightened pleading standards. As Judge Lody Jean ruled in another case filed by Plaintiff's counsel against AT&T, "Plaintiff has pled a FDUTPA claim as a personal tort sounding in fraud" and, "[w]here the 'gravamen of the claim sounds in fraud' it is subject to the rules governing a fraud claim." Order Granting AT&T's Motion for Final Summary Judgment, *Claims Holding Group, LLC v. AT&T Mobility*, Case No: 2020-000024-SP-05 (July 22, 2020).[6] Plaintiff failed to plead with particularity *how* Plaintiff would be harmed if AT&T in fact used their $1.99 Administrative Fees to defray costs other than for interconnection costs and cell site rents and maintenance, or *what* kind of actual damages they incurred as a result.

Based on the above, the Court finds Plaintiff's FDUTPA claims cannot be cured though amendment, requiring dismissal *with prejudice*.

**3.      Plaintiff's Unjust Enrichment Claim Fails as a Matter of Law.**

"The elements of a cause of action for unjust enrichment are: (1) plaintiff has conferred a benefit on the defendant, who has knowledge thereof; (2) defendant voluntarily accepts and retains the benefit conferred; and (3) the circumstances are such that it would be inequitable for the defendant to retain the benefit without first paying the value thereof to the plaintiff." *Duty Free World, Inc. v. Miami Perfume Junction, Inc.*, 253 So. 3d 689, 693 (Fla. 3d DCA 2018). "Florida law is clear that 'a plaintiff cannot pursue a quasi-contract claim for unjust enrichment if an express contract exists concerning the same subject matter.'" *Sterling Breeze Owners' Ass'n, Inc. v. New Sterling Resorts, LLC*, 255 So. 3d 434, 437 (Fla. 1st DCA 2018), *reh'g denied* (Oct. 16, 2018).

Like Counts 1-3, Plaintiff's claim of unjust enrichment hinges on their assertion that the administrative fee is deceptive—an assertion that, as discussed in detail above, is directly contradicted by both the Wireless Customer Agreement and AT&T's website. Additionally, while the claim sounds in fraud, it is not pleaded with specificity as is required by Florida law. *See* Fla. R. Civ. P. 1.110(b); *Mehta*, 16 So. 3d at 917.

The claim also fails because Plaintiff has acknowledged the existence of a contract between the parties that governs the subject matter of this lawsuit, thus barring Plaintiff's quasi-contract claim for unjust enrichment. *New Sterling Resorts, LLC*, 255 So. 3d at 437. The fact that Plaintiff chose not to incorporate the paragraphs acknowledging the existence of the Wireless Customer Agreement into the unjust enrichment count does not save the claim as this Court does not have to accept as true or even consider "internally inconsistent factual claims." *Gallego v. Wells Fargo Bank, N.A.*, 276 So. 3d 989, 990 (Fla. 3d DCA 2019).

Plaintiff's unjust enrichment claim cannot be cured though amendment, requiring that it be dismissed *with prejudice*.

## IV.   Conclusion

For the reasons stated above, this Court grants AT&T's Motion to Dismiss. As all claims in

this matter have now been adjudicated, the clerk is directed to close this matter.

---

[1] Plaintiff's counsel has previously abandoned this assertion in a similar hearing in front of Judge Lehr, where it was undisputed that the Agreement is available on AT&T's website. *See* AT&T's Mot. Dismiss Hr'g Tr., 28:24-25; 49:18-20; 50:15-16, *Ann Green v. AT&T Mobility*, Case No. 2019-16864-SP-23 (July 22, 2020).

[2] At the hearing, Plaintiff's counsel argued that *One Call* involved a contract attached to a motion to dismiss "where there was no dispute on the insurance contract." Transcript 28:1-2. A review of the decision reveals that this assertion is false. *One Call Prop. Servs. Inc.*, 165 So. 3d at 751 ("One Call filed a written response to the motion to dismiss, arguing that the motion impermissibly went beyond the four corners of the complaint . . . .").

[3] As noted, Plaintiff takes no issue with the authenticity of AT&T's website or billing statements introduced into the record by AT&T, and this Court finds Plaintiff incorporated them by reference in the Amended Complaint. *See, e.g.,* Am. Compl. ¶¶ 18-19, 22, 32, 42, 58.

[4] While counsel for Plaintiff argued at the hearing that AT&T represented that its interconnection costs are going up, the Amended Complaint does not contain any such allegation. Regardless, counsel's assertion is contradicted by the Administrative Fee definition provided by the Plaintiff, which only states that the fee is used to "defray a **portion** of certain expenses AT&T incurs," including but not limited to interconnection and cell site costs. Am. Compl. ¶ 42. (emphasis added). No increase in costs is mentioned.

[5] Claims 1-4 incorporate the same factual basis of Plaintiff's fraud claim (paragraphs 1-28) and all claims allege that AT&T knowingly, intentionally and fraudulently deceived the Plaintiff regarding AT&T's Administrative Fee and Privacy Policy. *See, e.g.,* Am. Compl. ¶ 16 (alleging that AT&T's unlimited plan was "a bait-and-switch scam"), *id.* (alleging that AT&T "covertly increases the actual price" of its services by "padding all post-paid wireless customers' bills" with a "bogus" administrative fee), ¶ 17 (alleging the Administrative Fee "is never adequately and honestly disclosed"), ¶ 18 (alleging that AT&T "deliberately hides" the Administrative Fee), ¶ 43 (alleging that AT&T "knew" the Administrative Fee was inflated).

[6] Citing *Librizzi v. Ocwen Loan Servicing, LLC*, 120 F. Supp. 3d 1368, 1381 (S.D. Fla. 2015) (Bloom, J.) (finding that FDUTPA claims must be pled with particularity where plaintiff alleged defendant caused damages through deception); *Mehta*, 16 So. 3d at 917; *USA Nutraceuticals Grp., Inc. v. BPI Sports, LLC*, No. 15-CIV-80352, 2016 WL 4254257, at *3 (S.D. Fla. Feb. 16, 2016) ("[C]ourts regularly apply Rule 9(b) to FDUTPA claims, as such claims uniquely sound in both tort and fraud.").

**DONE** and **ORDERED** in Chambers at Miami-Dade County, Florida on this 8th day of September, 2022.

2020-008179-SP-26 09-08-2022 1:44 PM
Hon. Michaelle Gonzalez-Paulson

**COUNTY COURT JUDGE**
Electronically Signed

Final Order as to All Parties SRS #: **12** (Other)

THE COURT DISMISSES THIS CASE AGAINST ANY PARTY NOT LISTED IN THIS FINAL ORDER OR PREVIOUS ORDER(S). THIS CASE IS CLOSED AS TO ALL PARTIES.

**Electronically Served:**
Alicia Thomsen, athomsen@daypitney.com
Andrew R. Ingalls, aingalls@daypitney.com
Andrew R. Ingalls, brodriguez@daypitney.com
Evelyn Davila, edavila@daypitney.com
Jessica Solorzano, jsolorzano@daypitney.com
Manuel A. Garcia-Linares, mgarcialinares@daypitney.com
Manuel A. Garcia-Linares, athomsen@daypitney.com
Maury L Udell, notice66@bmulaw.com
Maury L Udell, blopez@bmulaw.com
Rachel Kittl, rkittl@bmulaw.com

**Physically Served:**

**IN THE COUNTY COURT OF THE ELEVENTH JUDICIAL
CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA**

CASE NO: 2020-021932-SP-26
SECTION: SD05
JUDGE: Michaelle Gonzalez-Paulson

**Monique Ysidron**

Plaintiff(s) / Petitioner(s)

vs.

**ATT Mobility LLC**

Defendant(s) / Respondent(s)

_____/

**[DEFENDANT'S PROPOSED] ORDER GRANTING DEFENDANT'S MOTION TO
DISMISS PLAINTIFF'S AMENDED SMALL CLAIMS COMPLAINT**

On April 28, 2022, this Court heard Defendant AT&T Mobility, LLC's *Motion to Dismiss Plaintiff's Amended Small Claims Complaint*. After considering the motion, Plaintiff's response, the amended complaint, all relevant pleadings, the arguments of counsel, and being otherwise duly advised in the premises, the Court hereby **GRANTS** AT&T's Motion on all counts for the reasons set forth below.

**I.  Background.**

Plaintiff filed an Amended Complaint on February 19, 2022, asserting six claims against AT&T: (1) fraud, (2) damages under the Florida Deceptive and Unfair Trade Practices Act § 501.201, *et seq.,* Fla. Stat. ("FDUTPA"), (3) declaratory and injunctive relief under FDUTPA, (4) breach of implied duty of good faith and fair dealing, (5) unjust enrichment, and (6) pure bill of discovery. Counts 1, 2, and 4 are based on allegations that AT&T charged Plaintiff a "bogus" Administrative Fee and "throttled" Plaintiff's unlimited data account and Counts 3 and 5 are based on the Administrative Fee alone. Count 6 alleges that AT&T provided Plaintiff's geolocation data

to third-party aggregators and location-based service providers without Plaintiff's consent.

While the Amended Complaint specifically references, incorporates, and quotes from the Wireless Customer Agreement, AT&T's website, and AT&T billing statements as the bases for Plaintiff's claims, none of those documents are attached to the Complaint. (Am. Compl. ¶¶ 24-25, 41, 51, 53-54, 57, 79-81 (Agreement); ¶¶ 44, 60, 78, 84 (AT&T's website), ¶¶ 27-28, 31, 60 (billing statements)).

AT&T filed a Motion to Dismiss ("Motion") on March 12, 2021, attaching the Wireless Customer Agreement in effect at the time this case was filed to its Motion to Dismiss as Exhibit 2. AT&T noted that Plaintiff's Amended Complaint is almost entirely composed of claims copy-and-pasted from other lawsuits and is identical to over one hundred other cases pending before courts in this jurisdiction filed by counsel for Plaintiff. None of the allegations in the Amended Complaint allege facts specific to Plaintiff. Plaintiff responded to AT&T's Motion on July 12, 2021, and the Court heard the Motion on April 28, 2022. At the hearing, counsel for the Plaintiff voluntarily dismissed Count 6. Transcript 24:17-19 ("Judge, I'll announce on these five that I'll withdraw the geolocation counts without prejudice"). The Court grants the Motion to Dismiss as to the remaining Count 1-5 for the following reasons.

## II.    Motion to Dismiss Standard

The standard for determining whether a motion to dismiss should be granted is whether, based on the well-pleaded allegations and incorporated attachments, the movant is entitled to judgment as a matter of law. *Golden Gate Homes, LC v. Levey*, 59 So. 3d 275, 280 (Fla. 3d DCA 2011). In cases where it is apparent that a pleading cannot be amended to state a cause of action, or where an amendment would be futile, dismissal *with prejudice* is appropriate. *Central Florida Investments, Inc. v. Charles Levin Timeshares*, 659 So. 2d 492 (Fla. 5th DCA 1995).

While the Court is generally limited to the complaint's four corners, it is required to

consider exhibits attached to and incorporated into the complaint. *Rolle v. Cold Stone Creamery, Inc.*, 212 So. 3d 1073, 1076 (Fla. 3d DCA 2017). Moreover, when a party refers to a document in the complaint, the trial court may use that document to assess the nature of the claims alleged in the complaint. *Glen Garron, LLC v. Buchwald*, 210 So. 3d 229, 233 (Fla. 5th DCA 2017). Where an exhibit attached to a complaint contradicts the allegations in the complaint, the exhibits control and may form the basis for a motion to dismiss. *See Fladell v. Palm Beach Cty. Canvassing Bd.*, 772 So. 2d 1240, 1242 (Fla. 2000).

Here, the Amended Complaint specifically references, incorporates, and quotes from the Wireless Customer Agreement, AT&T's website, and AT&T billing statements as the bases for Plaintiff's claims. (Am. Compl. ¶¶ 24-25, 41, 51, 53-54, 57, 79-81 (Agreement); ¶¶ 44, 60, 78, 84 (AT&T's website), ¶¶ 27-28, 31, 60 (billing statements)). Under Florida Rule of Civil Procedure 1.130(a), Plaintiff had the duty to attach or incorporate the underlying Agreement, billing statements, and website language onto its complaint. Fla. R. Civ. P. 1.130(a) ("All . . . contracts, accounts, or documents on which action may be brought [or copies of their material portions] . . . must be incorporated in or attached to the pleading."). Plaintiff contends that it did not attach the Agreement because "it is under the exclusive control of AT&T," Am. Compl. ¶¶ 31 and 50.[1] Thus, Plaintiff apparently filed this lawsuit alleging, among other things, that "AT&T has breached the express terms of the wireless agreement" without knowing what the Agreement says.

AT&T's Motion to Dismiss attaches a copy of the Wireless Customer Agreement, a portion of the AT&T website defining the Administrative Fee, and a recent AT&T billing statement. *See* Def.'s Mot. to Dismiss Exs. 2-4. Because the Amended Complaint specifically references, incorporates, and quotes from these documents, AT&T argued that they are within the four corners of the Amended Complaint and can be considered by the Court in ruling on the underlying motion. *See Buchwald*, 210 So. 3d at 233 ("When a party refers to a document in the complaint, the trial court may use that document to assess the nature of the claims alleged in the complaint"); *One Call*

*Prop. Servs., Inc. v. Sec. First Ins. Co.*, 165 So. 3d 749, 752 (Fla. 4th DCA 2015) ("[W]here the terms of a legal document are impliedly incorporated by reference into the complaint, the trial court may consider the contents of the document in ruling on a motion to dismiss.").[2]

At the hearing, however, Plaintiff argued that AT&T had the burden to prove up the documents (which the Plaintiff failed to attach to the Amended Complaint), and took the position that AT&T was required to authenticate the Agreement before this Court could consider it. The Court does not find Plaintiff's arguments persuasive. The Court could not consider any such "authentication" via affidavit as Plaintiff suggests at this stage of the proceedings. Requiring AT&T to cure Plaintiff's deficiency under heightened evidentiary requirements would not only ignore Rule 1.130(a), but do away with the incorporation by reference doctrine, and turn this Motion to Dismiss into a summary judgment motion. No legal authority supporting such a proposition has been cited or provided to the Court. The federal and summary judgment cases upon which Plaintiff relies do not apply here. Plaintiff's attempt to base their claims on the express language of the Agreement—while precluding consideration of that same Agreement at this stage of the proceedings—would cause unnecessary delay, require needless discovery, and is not well taken.[3]

A court's duty to accept the facts in the complaint as true does not require the court to ignore specific factual details of the pleading in favor of general or conclusory allegations. *Griffin Indus. v. Irvin*, 496 F.3d 1189 (11th Cir. 2007). Thus, this Court does not find merit in Plaintiff's assertion that AT&T must authenticate the Agreement for this Court to properly consider it when Plaintiff incorporated the Agreement by reference. Because the Amended Complaint specifically references, incorporates, and quotes from these documents, they are within the four corners of the Amended Complaint and will be considered by the Court in ruling on the underlying motion. *See Buchwald*, 210 So. 3d at 233; *One Call Prop. Servs., Inc.*, 165 So. 3d at 752.

### III. Counts 1-5

Plaintiff's claims for fraud, FDUTPA damages, FDUTPA declaratory and injunctive relief, good faith and fair dealing, and unjust enrichment are based upon two separate factual theories: "bogus" administrative fees and "throttling," the alleged practice of slowing data speeds when mobile phone users meet certain data usage thresholds. These claims are ripe for dismissal because they are facially negated by documents relied on and incorporated into the Amended Complaint and contain other pleading deficiencies and errors of law that cannot be cured through amendment.

In Florida, "[a] party cannot recover for alleged false misrepresentations that are adequately dealt with or expressly contradicted in a later written contract." *TRG Night Hawk Ltd. v. Registry Dev. Corp.*, 17 So. 3d 782, 784 (Fla. 2d DCA 2009); *see also GVK Int'l Bus. Grp., Inc. v. Levkovitz*, No. 3D19- 1119, 2020 WL 4197407, at *2 (Fla. 3d DCA July 22, 2020); *Taylor Woodrow Homes Fla., Inc. v. 4/46-A Corp.*, 850 So. 2d 536, 542 (Fla. 5th DCA 2003). "To hold otherwise is to invite contracting parties to make agreements of the kind in suit and then avoid them by simply taking the stand and swearing that they relied on some other statement." *TRG Night Hawk Ltd.*, 17 So. 3d at 784. Moreover, "a party who signs a contract whose terms contradict the alleged misrepresentations on which he relied is barred 'from seeking relief pursuant to FDUTPA, as she acted unreasonably.'" *Id.* (citing *Rosa v. Amoco Oil Co.*, 262 F. Supp. 2d 1364, 1368 (S.D. Fla. 2003)). In particular, with respect to FDUTPA claims, "[c]ourts routinely dismiss FDUTPA claims where those claims are directly and fully rebutted by express evidence in a governing written contract." *Sol. Z v. Alma Lasers, Inc.*, No. 11-CV-21396-CIV, 2013 WL 12246356, at *5 (S.D. Fla. Jan. 22, 2013). And, as in this case, where a plaintiff alleges a FDUTPA action based on misrepresentation and "plaintiff relies on written statements that are expressly contradicted by a subsequent contract, the plaintiff's reliance on those statements is not reasonable as a matter of law for a FDUTPA claim." *Id.* At the pleading stage, "where the allegations of the complaint are contradicted by the exhibits, the plain meaning of the exhibits will control." *Ginsberg v. Lennar Fla. Holdings, Inc.*, 645 So. 2d 490, 494 (Fla. 3d DCA 1994).

**A.      Plaintiff's Administrative Fee allegations in Counts 1-5.**

Plaintiff alleges that AT&T has wrongfully charged a $1.99 monthly Administrative Fee. Plaintiff asserts that the fee is "bogus" for three reasons: (1) AT&T failed to adequately disclose the existence of the Administrative Fee; (2) the Administrative Fee is deceptively defined and applied; and, (3) the Administrative Fee is an illegal "pass-through" fee.

AT&T counters that these allegations are belied by the Amended Complaint and the documents it is based on. The Court finds AT&T's arguments persuasive. Plaintiff pursued this lawsuit without ever consulting the Agreement upon which the allegations are based. Had Plaintiff conducted such a review, it would have been clear that the Agreement, website, and billing statements facially negate Plaintiff's allegations.

**1.      Disclosure of the Administrative Fee.**

Plaintiff alleges that AT&T did not adequately disclose the existence of the Administrative Fee when they signed up for AT&T's services and thereafter tried to conceal the fee by burying the line-item charge in the billing statement. Am. Compl. ¶¶ 26-28. In response, Defendant argues that the Wireless Customer Agreement, website and billing statements expressly disclose the administrative fee and AT&T's right to make changes to charges billed to customers.[4] For example, section 1.4 of the Agreement states: "Charges include, without limitation airtime, roaming, recurring monthly service, activation, **administrative**, and late payment charges . . . whether assessed directly upon you or upon AT&T." Mot. to Dismiss, Ex. 2 § 1.4. The Wireless Customer Agreement also reserves the right for AT&T to "make changes to this Agreement" which can include "charges." *Id.* § 1.3.

The AT&T website, quoted by Plaintiff in the Amended Complaint, defines the Administrative Fee and further expressly states: "AT&T reserves the right to increase its fees or impose additional fees." Def.'s Mot. to Dismiss, Ex. 3. AT&T's billing statement also expressly discloses the existence of the Administrative Fee, with the billing statement providing the monthly

amount. Def.'s Mot. to Dismiss, Ex. 4. The Wireless Customer Agreement, website, and billing statement (incorporated by reference into the Amended Complaint) refute and thereby negate the assertion that the Administrative Fee was not properly disclosed. Therefore, no claim can proceed on these allegations as a matter of law.

### 2. How the Administrative Fee is used and increased.

Plaintiff next alleges that AT&T is telling the consumer one thing but doing another. Quoting AT&T's website, Plaintiff alleged:

> AT&T's representation that the Administrative Fee is a charge assessed by AT&T that helps defray a portion of certain expenses AT&T incurs, including but not limited to: (a) charges AT&T or its agents pay to interconnect with other carriers to deliver calls from AT&T customers to their customers; and (b) charges associated with cell site rents and maintenance are false.

Am. Compl. ¶¶ 44, 60, 78, 84. According to Plaintiff, the Administrative Fee is not tied to either interconnect or cell site charges because AT&T has continuously increased the fee even though these costs have allegedly decreased. *Id.* ¶¶ 28-31. Based on this assertion, Plaintiff theorizes that the Administrative Fee is part of "a scheme to funnel direct profit to AT&T rather than pay for any identifiable increase in costs." Am. Compl. ¶ 60.

First, the Court rejects any suggestion that AT&T's charging of an Administrative Fee is *per se* deceptive as the term "administrative fee" by itself does not suggest that AT&T will apply the Administrative Fee in any particular way. *See Maor v. Dollar Thrifty Auto. Grp., Inc.*, No. 15-22959-CIV, 2018 WL 4698512, at *4 (S.D. Fla. Sept. 30, 2018) ("Solely using the term 'administrative fee,' without more, does not restrict how the fee may be used or represent any purpose or nature behind the fee."); *Berry v. Budget Rent A Car Systems Inc.*, 497 F. Supp. 2d 1361, 1367 (S.D. Fla. 2007) (dismissing FDUTPA claim with prejudice, explaining "the simple fact" that defendant itemized a "cost recovery fee" as a separate charge is not unfair or deceptive).

Second, while Plaintiff alleges that AT&T does not actually use the Administrative Fee to

offset interconnect costs, cell site rents and/or maintenance charges which is deceptive to consumers, the definition provided by the Plaintiff does not limit AT&T to only offsetting those two specific cost categories. Instead, it states that AT&T may defray a portion of certain expenses "**including but not limited to**" charges for interconnection and for cell site rents and maintenance. Am. Compl. ¶¶ 44, 60, 78, 84. And, inclusion of the phrase "including but not limited to" is not in and of itself unfair and deceptive. Therefore, taking Plaintiff's allegations as true, interconnect costs, cell site rents and/or maintenance charges serve as examples of and not limitations to how AT&T can apply the Administrative Fee, meaning AT&T's alleged use of the fee to offset other expenses and costs would still comply with the fee's definition and cannot be considered deceptive, unfair, false, or a violation of the parties' agreement.

Finally, despite Plaintiff counsel's repeated argument during the hearing that the Administrative Fee was disclosed to customers as being tied to ***increases*** in a specific set of expense categories, the Amended Complaint and the website language contain no reference to "increases," and Plaintiff has not alleged any instances where AT&T made such statements. Instead, AT&T merely stated that the Administrative Fees would "help[] defray a portion of certain expenses AT&T incurs." Plaintiff has not alleged or identified any representation by AT&T that the Administrative Fee has always offset the exact same percentage of its expenses, or that the fee will increase or decrease solely based on increases or decreases to its interconnection or cell site rents and maintenance costs. Accordingly, because no reasonable consumer could interpret the Administrative Fee, its definition, or its application as deceptive, unfair, or based on a misrepresentation, Plaintiff's FDUTPA and fraud claims necessarily fail. *See Day v. Sarasota Doctors Hosp., Inc.*, No. 19-01522, 2021 WL 288969, at *4 (M.D. Fla. Jan. 28, 2021) (finding FDUTPA claim failed where "no reasonable consumer could be deceived by the [Defendant's conduct or the parties' contract] under the circumstances alleged . . .").

Therefore, applying the law to the undisputed facts of this case, based on the website and

contract language relied on by Plaintiff, no amount of discovery will enable Plaintiff to state a cause of action related to how AT&T defines, uses, or increases the Administrative Fee, and no claim can proceed on these allegations as a matter of law.

### 3.    The Administrative Fee is not a pass-through fee.

Finally, Plaintiff alleges that the Administrative Fee is a "textbook pass through fee" as "it is not what its being used for despite its definition in the wireless agreement." Am. Compl. ¶ 86. Florida law is clear that an impermissible "pass-through" fee is one that purports to be collected for payment to a third party, but in reality the company is keeping the fee for itself. *See Latman v. Costa Cruise Lines, N.V.*, 758 So. 2d 699, 703 (Fla. 3d DCA 2000) (finding that use of the term "port charge" misrepresents to a reasonable consumer that it is a "pass-through" charge which the cruise line will pay to the relevant port authorities).

Here, there is no allegation that AT&T ever represented or suggested the Administrative Fee would be paid to anyone other than AT&T; therefore, the Court finds that Plaintiff has not and cannot allege that the Administrative Fee is a pass-through fee and no claim can proceed on these allegations. *See Vorst v. TBC Retail Grp., Inc.*, No. 12-CV-80013, 2012 WL 13026643, at *2 (S.D. Fla. Apr. 12, 2012) (dismissing FDUTPA pass-through claim based on the finding that "Plaintiff's conclusory allegations that the oil disposal fee was represented as a pure pass-through expense and that Defendant retains the fee as a profit are insufficient."); *see also Maor*, 2018 WL 4698512, at *5 ("Plaintiff has not identified any provisions in the rental contract, and this Court has found none, which constitute a representation to a reasonable consumer that the 'administrative fee' was a pass-through charge which Defendants would pay to others."); *Berry*, 497 F. Supp. 2d at 1367 (finding that the term "cost recovery fee" is not a pass-through fee as "itself implies that the company will keep the money collected as 'recovery' for its costs.").

In any event, as previously found, the website's definition of the Administrative Fee does not limit how it may be applied or what costs it can be used to offset. *Id.* ¶¶ 44, 60, 78, 84.

The Court does not find the cases relied on by Plaintiff in support of their administrative fee claims persuasive. In *Calderon v. Sixt Rent a Car, LLC*, No. 19-CV-62408, 2020 WL 700381, at *7 (S.D. Fla. Feb. 12, 2020), the defendant was alleged to have deceived their customers by incorporating the terms of a separate agreement that contained undisclosed, and allegedly fraudulent, charges. *Id*. at *4 ("That Sixt's employee did not provide Calderon or Marin the Rental Jacket prior to them agreeing to its terms is not insignificant."). That is a far cry from the case at hand, especially given Plaintiff's tacit admission that the Administrative Fee is disclosed on the website and the monthly billing statement.

Similarly, *Deere Constr., LLC v. Cemex Constr. Materials Florida, LLC*, 198 F.Supp.3d 1332 (S.D. Fla. 2016) involved a failure to disclose an environmental charge that defendant represented was derived and directly tied to the Federal Energy Information Administration's weekly reporting of diesel fuel pricing. *Id*. at 1334. Again, because Plaintiff admits that the Administrative Fee was disclosed and its definition does not directly tie the fee to the rise or fall of AT&T's interconnection and cell site costs, *Deere* is inapplicable to the facts at hand.[5]

Accordingly, because Plaintiff's Administrative Fee-based claims for fraud, FDUTPA damages, good faith and fair dealing, and unjust enrichment are premised on purported falsehoods, misrepresentations, breaches, and deceptive or unfair trade practices that are refuted by the contracts they rely upon, they fail as a matter of law. *Ginsberg*, 645 So. 2d at 494; *TRG Night Hawk Ltd.*, 17 So. 3d at 784.

## B. Plaintiff's "throttling" allegations in Counts 1, 2, and 4.

The remainder of Plaintiff's claims for fraud, FDUTPA damages, and good faith and fair dealing are based on allegations pertaining to network management practices designed to remedy network congestion caused by individual consumers who use exponentially more data than others. Plaintiff complains that even though they had an unlimited data plan, AT&T "throttled" (or slowed

down) their data speeds after they used a certain amount of data during a monthly billing cycle. Am. Compl. ¶¶ 19-20, 23. However, as the Wireless Consumer Agreement shows, the term "unlimited" refers to the *amount* of data, not the *speed* of that data. Unlike customers on tiered data plans, unlimited customers pay a set price without regard to the *amount* of data used. Plaintiff's alleged belief that "unlimited" refers to both the amount and speed of the data is wrong. Once again, the Agreement negates Plaintiff's allegations as the following comparison shows:

| What Plaintiff Alleges | What the Agreement Actually Says |
|---|---|
| AT&T represented, directly or indirectly, expressly or by implication, to the Plaintiff, an unlimited mobile data plan customer, that the amount of data that the Plaintiff could access in any billing period would not be limited.<br><br>**Am. Compl. ¶ 41** | **Unlimited Data Customers.** If you are an AT&T unlimited data plan customer, you agree that "unlimited means you pay a fixed monthly charge for wireless data service regardless of how much data you use . . . "unlimited' does <u>not</u> mean that you can use AT&T's wireless data service in any way that you choose, or for any prohibited activities."<br><br>AT&T may reduce your data throughput speeds at any time or place if your data usage exceeds an applicable, identified usage threshold during any billing cycle.<br><br>**Motion, Ex. 2 (Agreement) § 6.2 (emphasis in orig.)** |
| AT&T's wireless customer agreements do not state that an unlimited mobile data plan customer's use of more than a specified amount of data is a prohibited activity.<br><br>**Am. Compl. ¶ 24** | "Prohibited Activities" include, among other items, anything that: "excessively and disproportionately contributes to network congestion," "degrades network performance," or can "cause harm to the network or other customers."<br><br>"[U]nlimited" does <u>not</u> mean that you can use AT&T's wireless data service . . . for any prohibited activities.<br><br>**Motion, Ex. 2 (Agreement) § 6.2 (emphasis in orig.)** |
| [The] unlimited mobile data contract with Plaintiff . . . did not provide that AT&T could modify, diminish, or impair the services of who use more than a specified amount of data for permissible activities. | AT&T may modify, without advance notice, the permitted and prohibited activities.<br><br>You agree that . . . if you use AT&T's wireless data services in any manner that is prohibited, . . . AT&T may reduce your data throughput speeds at any time or place if your data usage exceeds an applicable, identified usage threshold during any |

| What Plaintiff Alleges | What the Agreement Actually Says |
|---|---|
| **Am. Compl. ¶ 24, 51** | billing cycle.<br><br>**Motion, Ex. 2 (Agreement) § 6.2.** |
| AT&T omitted the fact that it intended to throttle Plaintiff's data, without Plaintiff's knowledge or specific consent.<br><br>**Am. Compl. ¶ 42** | AT&T may modify, without advance notice, the permitted and prohibited activities, [and] may engage in any reasonable network management practice . . . to reduce network congestion.<br><br>**Motion, Ex. 2 (Agreement) § 6.2** |

On its face, the Agreement does not say what the Plaintiff alleges it says. In light of these contract provisions, the Court finds that the Agreement clearly reserves the right for AT&T to "reduce . . . data throughput speeds at any time or place if your data usage exceeds an applicable, identified usage threshold during any billing cycle," and even expressly states that, even if you are an "unlimited" customer, "AT&T can limit, restrict, suspend or terminate your data service . . . ." Def.'s Mot. to Dismiss, Ex. 2. Therefore, no claim can proceed based on these allegations as a matter of law.

**C.     Additional grounds for dismissing each cause of action in Counts 1-5.**

 Having held that Plaintiff's Administrative Fees and data "throttling" claims are negated by the Agreement and other exhibits implicitly incorporated into and expressly relied on by the Amended Complaint, the Court now examines each cause of action alleged in Counts 1-4. This claim-by-claim analysis reveals several additional grounds supporting the underlying order based on Plaintiff's failure to properly plead their fraud, breach of the duty of good faith and fair dealing, FDUTPA damages, and unjust enrichment claims.

   1. **Plaintiff's Fraud Claim Fails as a Matter of Law.**

   In Florida, a plaintiff must plead fraud by alleging that the defendant: 1) misrepresented a

material fact, 2) knew or should have known of the falsity of the statement, 3) intended that the misrepresentation would induce Plaintiff to rely and act on it, and 4) that Plaintiff suffered injury in justifiable reliance on the misrepresentation. *Witt v. La Gorce Country Club, Inc.*, 35 So. 3d 1033, 1040 (Fla. 3d DCA 2010). In Florida, claimants must plead fraud (or fraudulent inducement) with particularity, as required by Rule 1.120(b). *See* Fla. R. Civ. P. 1.120(b) ("[A]ll averments of fraud . . . shall be stated with such particularity as the circumstances may permit."); *Cedars Healthcare Grp., Ltd. v. Mehta*, 16 So. 3d 914, 917 (Fla. 3d DCA 2009).

AT&T argues that Counts 1-5 all sound in fraud[6] and Plaintiff failed to satisfy this pleading standard. In response, Plaintiff contends that they pled their claims to the best of their ability as circumstances may permit and argues that they cannot allege specifics because "Plaintiff is not in possession of the specific digital advertisements and contracts issued by AT&T." Response at ¶ 67. The Court finds this argument unpersuasive. Plaintiff does not dispute that the Wireless Customer Agreement is on AT&T's website. And Plaintiff is undisputedly familiar with the AT&T website, as they rely on it in their Amended Complaint. Am. Compl. ¶¶ 27-28, 44, 60

Nevertheless, even assuming Plaintiff facially alleged the first element—that AT&T misrepresented facts relating to the Administrative Fee and omitted facts relating to the potential for data speed reductions—the documents relied on and incorporated into the Amended Complaint refute Plaintiff's allegation that those statements or omissions were false, that AT&T knew they were false, that AT&T intended Plaintiff to rely on them, and that any reliance was justified. *See* sections III.A, III.B, *supra*. Moreover, Plaintiff failed to plead the other four elements with specificity. The Amended Complaint fails to provide a single detail regarding Plaintiff's own interactions with AT&T, or the time, place, and manner of how they were deceived. *Id.* There is no particularly-pled assertion explaining where, when, what, and how these alleged misrepresentations or omissions were material *to Plaintiff's* decision to do business with AT&T, that *they* relied on them, or that they proximately caused *their* damages.

For example, as to throttling, Plaintiff merely recites the last element of fraud, alleging: "Plaintiff relied on AT&T's representations regarding providing unlimited data, and, as a result, incurred damages and was injured as a result of the fraud by omission." Am. Compl. ¶ 43. Plaintiff does not even attempt to allege that their reliance was justified. *Id*. They do not point to a single date to show *when* their data speed was reduced, if any. Nor do they explain *how* such a temporary speed reduction caused them harm or allege *what* measure of actual damages they incurred for any given month of service. This is the kind of information that would have been at Plaintiff's disposal; no "circumstances" prevented Plaintiff from alleging such facts if they existed. And as to administrative fees, Plaintiff fails to allege *when* they saw the website's definition of Administrative Fees and *how* they justifiably relied on it in deciding to use AT&T services. Conclusory assertions disguised as fact do not meet the high standard required by Rule 1.120(b). *See Williams*, 2020 WL 5083550, at *3 (dismissing the complaint because it "fails to provide any more specific details regarding the preparation of the 'Impossible Whopper'"); *Myers v. Myers*, 652 So. 2d 1214, 1215 (Fla. 5th DCA 1995) ("Allegations contained in a pleading are insufficient if they are too general, vague or conclusory.").

For these reasons, Plaintiff fails to plead the fraud claims with particularity as is required by Florida law. *See* Fla. R. Civ. P. 1.120(b); *Mehta*, 16 So. 3d at 917 (requiring claims sounding in fraud "be pled with particularity and must specifically identify misrepresentations or omissions of fact, **as well as time, place or manner in which they were made**.") (emphasis added). Accordingly, the Court finds that Plaintiff's fraud claims cannot be cured though amendment, requiring dismissal *with prejudice*.

### 2.      Plaintiff's Good Faith and Fair Dealing Claim Fails as a Matter of Law.

In support of the good faith and fair dealing claim, Plaintiff alleges that AT&T breached unspecified provisions of the Wireless Customer Agreement and acted in a commercially unreasonable manner by throttling Plaintiff's data and charging the "bogus" Administrative Fee.

Am. Compl. ¶ 79 ("The express terms of the wireless agreement required AT&T to provide unlimited data and true administrative costs as defined by the contract."); *see also* ¶¶ 78-81. Florida law recognizes the implied covenant of good faith and fair dealing in every contract, with two limitations:

> First, the implied covenant of good faith should not be invoked to override the express terms of the agreement between the parties.

> Second, a claim for breach of the implied covenant of good faith and fair dealing cannot be maintained under Florida law absent an allegation that an express term of the contract has been breached.

*Ins. Concepts & Design, Inc. v. Healthplan Servs., Inc.*, 785 So. 2d 1232, 1234 (Fla. 4th DCA 2001). Both of these limitations apply here.

First, Plaintiff's breach allegation is not tied to any particular provision in the Agreement. Am. Compl. ¶ 80 (alleging "AT&T breached the express terms of the wireless agreement by failing to provide unlimited data" with nothing more). Second, as the Court held in parts A and B above, the parties' Agreement expressly authorizes the conduct complained of, and therefore Plaintiff cannot invoke the doctrine to override the express agreement of the parties. *See Healthplan Servs., Inc.*, 785 So. 2d at 1234. Plaintiff cannot show that AT&T failed to act in a commercially reasonable manner when it abided by the express language of the parties' Agreement.

Finally, Plaintiff's good faith and fair dealing claim is not substantively distinguishable from the fraud claim. *See* Am. Compl. ¶ 77 (alleging false statements of material fact as basis for breach of the duty of good faith and fair dealing). The problems with this claim become even more troublesome under the heightened pleading standard that applies to claims that sound in fraud. *See* Part III.C.1, *supra*.

Accordingly, the Court finds Plaintiff's good faith and fair dealing claim cannot be cured though amendment, requiring dismissal *with prejudice*.

### 3.      Plaintiff's FDUTPA Claims Fail as a Matter of Law.

"[I]t is well recognized in this state that a claim for damages under FDUTPA has three elements: (1) a deceptive act or unfair practice; (2) causation; and (3) actual damages." *Kia Motors Am. Corp. v. Butler*, 985 So. 2d 1133, 1140 (Fla. 3d DCA 2008). To state a claim for injunctive or declaratory relief under FDUTPA, a plaintiff "must show (1) that it is aggrieved, in that its rights have been, are being, or will be adversely affected, by (2) a violation of FDUTPA, meaning an unfair or deceptive practice which is injurious to consumers." *Stewart Agency, Inc. v. Arrigo Enterprises, Inc.*, 266 So. 3d 207, 214 (Fla. 4th DCA 2019). Plaintiff alleges that AT&T caused them damages through its failure to adequately disclose, as well as misrepresentations regarding, its data throttling policy and the Administrative Fee, which he again describes as "a textbook pass through fee." Am. Compl. ¶ 86.

As discussed above, Plaintiff's allegations supporting the FDUTPA claims are directly contradicted and hence negated by the Wireless Customer Agreement, AT&T's website, and billing statements. *See supra*, parts III.A and III.B. No amount of discovery will enable Plaintiff to sufficiently plead that AT&T violated FDUTPA. Taking Plaintiff's allegations as true, AT&T's data management practices are not deceptive or unfair, since the Wireless Customer Agreement allowed AT&T to reduce data speeds of all customers—including unlimited customers—to preserve network integrity. The Wireless Customer Agreement, website and billing statements, incorporated by reference in the Amended Complaint, also disclosed the Administrative Fee, and neither the imposition of an Administrative Fee nor the contractual use of the phrase "including but not limited to," is sufficient to state a claim for deceptive or unfair business practices. Finally, the Administrative Fee is not a "pass-through fee" by definition. *See Maor*, 2018 WL 4698512, at *5; *Berry*, 497 F. Supp. 2d at 1367.

Even if a reasonable unlimited data customer would think that they were immune to AT&T's network management practices after entering into a contract stating the opposite (and

somehow sufficiently pled a deceptive or unfair act or practice), Plaintiff still failed to sufficiently allege causation and actual damages. Similarly, even if AT&T used the Administrative Fees to defray costs other than interconnection costs and cell site rents and maintenance (and Plaintiff somehow sufficiently pled a deceptive or unfair act or practice), Plaintiff still failed to sufficiently allege causation and actual damages.

This is so under ordinary and heightened pleading standards. As Judge Lody Jean ruled in another case filed by Plaintiff's counsel against AT&T, "Plaintiff has pled a FDUTPA claim as a personal tort sounding in fraud" and, "[w]here the 'gravamen of the claim sounds in fraud' it is subject to the rules governing a fraud claim." Order Granting AT&T's Motion for Final Summary Judgment, *Claims Holding Group, LLC v. AT&T Mobility*, Case No: 2020-000024-SP-05 (July 22, 2020).[7] Plaintiff failed to plead with particularity *when* or *how* a short data speed reduction caused harm to Plaintiff personally, *how* Plaintiff would be harmed if AT&T in fact used their $1.99 Administrative Fees to defray costs other than for interconnection costs and cell site rents and maintenance, or *what* kind of actual damages they incurred as a result of either practice.

Based on the above, the Court finds Plaintiff's FDUTPA claims cannot be cured though amendment, requiring dismissal *with prejudice*.

### 4.      Plaintiff's Unjust Enrichment Claim Fails as a Matter of Law.

"The elements of a cause of action for unjust enrichment are: (1) plaintiff has conferred a benefit on the defendant, who has knowledge thereof; (2) defendant voluntarily accepts and retains the benefit conferred; and (3) the circumstances are such that it would be inequitable for the defendant to retain the benefit without first paying the value thereof to the plaintiff." *Duty Free World, Inc. v. Miami Perfume Junction, Inc.*, 253 So. 3d 689, 693 (Fla. 3d DCA 2018). "Florida law is clear that 'a plaintiff cannot pursue a quasi-contract claim for unjust enrichment if an express contract exists concerning the same subject matter.'" *Sterling Breeze Owners' Ass'n, Inc. v. New*

*Sterling Resorts, LLC*, 255 So. 3d 434, 437 (Fla. 1st DCA 2018), *reh'g denied* (Oct. 16, 2018).

Like Counts 1-4, Plaintiff's claim of unjust enrichment hinges on their assertion that the administrative fee is deceptive—an assertion that, as discussed in detail above, is directly contradicted by both the Wireless Customer Agreement and AT&T's website. Additionally, while the claim sounds in fraud, it is not pleaded with specificity as is required by Florida law. *See* Fla. R. Civ. P. 1.110(b); *Mehta*, 16 So. 3d at 917.

The claim also fails because Plaintiff has acknowledged the existence of a contract between the parties that governs the subject matter of this lawsuit, thus barring Plaintiff's quasi-contract claim for unjust enrichment. *New Sterling Resorts, LLC*, 255 So. 3d at 437. The fact that Plaintiff chose not to incorporate the paragraphs acknowledging the existence of the Wireless Customer Agreement into the unjust enrichment count does not save the claim as this Court does not have to accept as true or even consider "internally inconsistent factual claims." *Gallego v. Wells Fargo Bank, N.A.*, 276 So. 3d 989, 990 (Fla. 3d DCA 2019).

Plaintiff's unjust enrichment claim cannot be cured though amendment, requiring that it be dismissed *with prejudice*.

## IV.   Conclusion

For the reasons stated above, this Court grants AT&T's Motion to Dismiss. As all claims in this matter have now been adjudicated, the clerk is directed to close this matter.

---

[1] Plaintiff's counsel has previously abandoned this assertion in a similar hearing in front of Judge Lehr, where it was undisputed that the Agreement is available on AT&T's website. *See* AT&T's Mot. Dismiss Hr'g Tr., 28:24-25; 49:18-20; 50:15-16, *Ann Green v. AT&T Mobility*, Case No. 2019-16864-SP-23 (July 22, 2020).

[2]   At the hearing, Plaintiff's counsel argued that *One Call* involved a contract attached to a motion to dismiss "where there was no dispute on the insurance contract." Transcript 28:1-2. A review of the decision reveals that this assertion is false. *One Call Prop. Servs. Inc.*, 165 So. 3d at 751 ("One Call filed a written response to the motion to dismiss, arguing that the motion impermissibly went beyond the four corners of the complaint . . . .").

[3]   Further, Plaintiff does not contest the veracity or accuracy of the exhibits. And the Amended Complaint does not rely on any specific version of the Wireless Customer Agreement, but hinges on the more general proposition that "AT&T's wireless customer agreements do not state that an unlimited mobile data plan customer's use of more than a specified amount of data is a prohibited activity." Am. Compl. ¶ 24 (emphasis added).

[4]   As noted, Plaintiff takes no issue with the authenticity of AT&T's website or billing statements introduced into the record by AT&T, and this Court finds Plaintiff incorporated them by reference in the Amended Complaint. *See, e.g.,* Am. Compl. ¶¶ 27-28, 31, 44, 60, 78, 84.

[5]   While counsel for Plaintiff argued at the hearing that AT&T represented that its interconnection costs are going up, the Amended Complaint does not contain any such allegation. Regardless, counsel's assertion is contradicted by the Administrative Fee definition provided by the Plaintiff, which only states that the fee is used to "defray a **portion** of certain expenses AT&T incurs," including but not limited to interconnection and cell site costs. Am. Compl. ¶ 44. (emphasis added). No increase in costs is mentioned.

[6]   Claims 1-4 incorporate the same factual basis of Plaintiff's fraud claim (paragraphs 1-37) and all claims allege that AT&T knowingly, intentionally and fraudulently deceived the Plaintiff regarding AT&T's Administrative Fee, purported data "throttling," and Privacy Policy. *See, e.g.,* Am. Compl. ¶ 25 (alleging that AT&T's unlimited plan was "a bait-and-switch scam"), *id.* (alleging that AT&T "covertly increases the actual price" of its services by "padding all post-paid wireless customers' bills" with a "bogus" administrative fee), ¶ 26 (alleging the Administrative Fee "is never adequately and honestly disclosed"), ¶ 27 (alleging that AT&T "deliberately hides" the Administrative Fee), ¶ 61 (alleging that AT&T "knew" the Administrative Fee was inflated).

[7]   Citing *Librizzi v. Ocwen Loan Servicing, LLC*, 120 F. Supp. 3d 1368, 1381 (S.D. Fla. 2015) (Bloom, J.) (finding that FDUTPA claims must be pled with particularity where plaintiff alleged defendant caused damages through deception); *Mehta*, 16 So. 3d at 917; *USA Nutraceuticals Grp., Inc. v. BPI Sports, LLC*, No. 15-CIV-80352, 2016 WL 4254257, at *3 (S.D. Fla. Feb. 16, 2016) ("[C]ourts regularly apply Rule 9(b) to FDUTPA claims, as such claims uniquely sound in both tort and fraud.").

**DONE** and **ORDERED** in Chambers at Miami-Dade County, Florida on this <u>8th day of September, 2022</u>.

<u>2020-021932-SP-26 09-08-2022 1:45 PM</u>
Hon. Michaelle Gonzalez-Paulson

**COUNTY COURT JUDGE**
Electronically Signed

---

Final Order as to All Parties SRS #: **12** (Other)

THE COURT DISMISSES THIS CASE AGAINST ANY PARTY NOT LISTED IN THIS FINAL ORDER OR PREVIOUS ORDER(S). THIS CASE IS CLOSED AS TO ALL PARTIES.

---

**Electronically Served:**
Alicia Thomsen, athomsen@daypitney.com
Andrew R. Ingalls, aingalls@daypitney.com
Andrew R. Ingalls, brodriguez@daypitney.com
Evelyn Davila, edavila@daypitney.com
Jessica Solorzano, jsolorzano@daypitney.com
Manuel A. Garcia-Linares, mgarcialinares@daypitney.com
Manuel A. Garcia-Linares, athomsen@daypitney.com
Maury L Udell, notice66@bmulaw.com
Maury L Udell, blopez@bmulaw.com
Rachel Kittl, rkittl@bmulaw.com


**Physically Served:**

# COMPOSITE EXHIBIT 3

Case 1:25-cv-20381-RAR   Document 1-2   Entered on FLSD Docket 01/27/2025   Page 930 of 1553

**IN THE COUNTY COURT OF THE ELEVENTH JUDICIAL
CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA**

CASE NO: 2020-008181-SP-26
SECTION: SD05
JUDGE: Michaelle Gonzalez-Paulson

**Edward Barger**

Plaintiff(s) / Petitioner(s)

vs.

**AT&T Mobility LLC**

Defendant(s) / Respondent(s)

_____/

## ORDER DENYING PLAINTIFF'S MOTION FOR REHEARING

**THIS CAUSE** came before the Court for consideration of Plaintiff's Motion for Rehearing. On April 28, 2022, this Court heard Defendant AT&T Mobility, LLC's Motion to Dismiss Plaintiff's Second Amended Complaint. On September 23, 2022, the Plaintiff filed a Motion for Rehearing and the Defendant filed a Response on November 18, 2022.

The Court having reviewed the subject motion, Respondent's response to the motion, the Clerk's docket sheet, the prior orders issued in this case, and being fully advised in the premises, hereby enters the following ruling

**WHEREFORE**, **IT IS ORDERED AND ADJUDGED** that Plaintiff's Motion for Rehearing is **DENIED.**

The Court finds that Plaintiff is simply attempting to rehash the same issues previously considered by this Court, presenting nothing new. *See Pullum v. Cincinnati, Inc.,* 467 So. 2d 657 (Fla. 1985); *Hollywood Inc. v. Clark,* 153 Fla. 501, 15 So. 2d 175 (Fla. 1943) *(*a prime function of the petition for rehearing is to present to the trial court some point which it overlooked or failed to consider, which renders a decree inequitable or erroneous); *Pingree v. Quaintance,* 394 So. 2d 161 (Fla. 1st DCA 1981); *Balmoral Ass'n v. Grimaldi*, 107 So3d 1149 (Fla.3d DCA 2013).

Plaintiff's Motion for Rehearing seeks to reargue the same matters already disposed of by this Court. *See generally Ayala v. Gonzalez,* 984 So. 2d 523 (Fla. 5th DCA 2008)*; Lowe Inv. Corp v. Clemente,* 685 So. 2d 84 (Fla. 2d DCA 1996)*.*

**DONE** and **ORDERED** in Chambers at Miami-Dade County, Florida on this <u>19th day of December, 2022</u>.

<u>2020-008181-SP-26 12-19-2022 3:34 PM</u>
Hon. Michaelle Gonzalez-Paulson

**COUNTY COURT JUDGE**
Electronically Signed

---

No Further Judicial Action Required on **THIS MOTION**

CLERK TO **RECLOSE** CASE IF POST JUDGMENT

---

**Electronically Served:**
Andrew R. Ingalls, aingalls@daypitney.com
Andrew R. Ingalls, brodriguez@daypitney.com
Evelyn Davila, edavila@daypitney.com
Jessica Solorzano, jsolorzano@daypitney.com
Manuel A. Garcia-Linares, mgarcialinares@daypitney.com
Manuel A. Garcia-Linares, athomsen@daypitney.com
Maury L Udell, notice66@bmulaw.com
Maury L Udell, blopez@bmulaw.com
Rachel Kittl, rkittl@bmulaw.com


**Physically Served:**

Case 1:25-cv-20381-RAR   Document 1-2   Entered on FLSD Docket 01/27/2025   Page 932 of 1553

**IN THE COUNTY COURT OF THE ELEVENTH JUDICIAL
CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA**

CASE NO: 2019-011857-SP-26
SECTION: SD05
JUDGE: Michaelle Gonzalez-Paulson

**Francisco Batista**

Plaintiff(s) / Petitioner(s)

vs.

**AT&T Mobility LLC**

Defendant(s) / Respondent(s)

_____/

## ORDER DENYING PETITIONER'S MOTION FOR REHEARING

**THIS CAUSE** came before the Court for consideration of Plaintiff's Motion for Rehearing. On April 28, 2022, this Court heard Defendant AT&T Mobility, LLC's Motion to Dismiss Plaintiff's Second Amended Complaint. On September 23, 2022, the Plaintiff filed a Motion for Rehearing, and the Defendant filed a Response on November 18, 2022.

The Court having reviewed the subject motion, Respondent's response to the motion, the Clerk's docket sheet, the prior orders issued in this case, and being fully advised in the premises, hereby enters the following ruling

**WHEREFORE**, **IT IS ORDERED AND ADJUDGED** that Plaintiff's Motion for Rehearing is **DENIED.**

The Court finds that Plaintiff is simply attempting to rehash the same issues previously considered by this Court, presenting nothing new. *See Pullum v. Cincinnati, Inc.,* 467 So. 2d 657 (Fla. 1985); *Hollywood Inc. v. Clark,* 153 Fla. 501, 15 So. 2d 175 (Fla. 1943) (*a* prime function of the petition for rehearing is to present to the trial court some point which it overlooked or failed to consider, which renders a decree inequitable or erroneous); *Pingree v. Quaintance,* 394 So. 2d 161 (Fla. 1st DCA 1981); *Balmoral Ass'n v. Grimaldi*, 107 So3d 1149 (Fla.3d DCA 2013).

Plaintiff's Motion for Rehearing seeks to reargue the same matters already disposed of by this Court.  *See generally Ayala v. Gonzalez,* 984 So. 2d 523 (Fla. 5th DCA

2008); *Lowe Inv. Corp v. Clemente,* 685 So. 2d 84 (Fla. 2d DCA 1996).

**DONE** and **ORDERED** in Chambers at Miami-Dade County, Florida on this <u>19th day of December, 2022</u>.

<u>2019-011857-SP-26 12-19-2022 3:31 PM</u>
Hon. Michaelle Gonzalez-Paulson

**COUNTY COURT JUDGE**
Electronically Signed

No Further Judicial Action Required on **THIS MOTION**

CLERK TO **RECLOSE** CASE IF POST JUDGMENT

**Electronically Served:**
Andrew Robert Ingalls, aingalls@daypitney.com
Andrew Robert Ingalls, brodriguez@daypitney.com
Andrew Robert Ingalls, maristasalado@daypitney.com
Evelyn Davila, edavila@daypitney.com
Jessica Solorzano, jsolorzano@daypitney.com
Manuel A. Garcia-Linares, mgarcialinares@daypitney.com
Manuel A. Garcia-Linares, athomsen@daypitney.com
Maury L Udell, notice66@bmulaw.com
Maury L Udell, blopez@bmulaw.com
Rachel Kittl, rkittl@bmulaw.com

**Physically Served:**

**IN THE COUNTY COURT OF THE ELEVENTH JUDICIAL
CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA**

CASE NO: 2020-021937-SP-26
SECTION: SD05
JUDGE: Michaelle Gonzalez-Paulson

**Mario Milian**

Plaintiff(s) / Petitioner(s)

vs.

**ATT Mobility LLC**

Defendant(s) / Respondent(s)

_____ /

<u>**ORDER DENYING PLAINTIFF'S MOTION FOR REHEARING**</u>

**THIS CAUSE** came before the Court for consideration of Plaintiff's Motion for Rehearing. On April 28, 2022, this Court heard Defendant AT&T Mobility, LLC's Motion to Dismiss Plaintiff's Second Amended Complaint. On September 23, 2022, the Plaintiff filed a Motion for Rehearing and the Defendant filed a Response on November 18, 2022.

The Court having reviewed the subject motion, Respondent's response to the motion, the Clerk's docket sheet, the prior orders issued in this case, and being fully advised in the premises, hereby enters the following ruling

**WHEREFORE**, **IT IS ORDERED AND ADJUDGED** that Plaintiff's Motion for Rehearing is **DENIED.**

  The Court finds that Plaintiff is simply attempting to rehash the same issues previously considered by this Court, presenting nothing new. *See Pullum v. Cincinnati, Inc.,* 467 So. 2d 657 (Fla. 1985); *Hollywood Inc. v. Clark,* 153 Fla. 501, 15 So. 2d 175 (Fla. 1943) *(*a prime function of the petition for rehearing is to present to the trial court some point which it overlooked or failed to consider, which renders a decree inequitable or erroneous); *Pingree v. Quaintance,* 394 So. 2d 161 (Fla. 1st DCA 1981); *Balmoral Ass'n v. Grimaldi*, 107 So3d 1149 (Fla.3d DCA 2013).

Plaintiff's Motion for Rehearing seeks to reargue the same matters already disposed of by this Court. *See generally Ayala v. Gonzalez,* 984 So. 2d 523 (Fla. 5th DCA 2008)*; Lowe Inv. Corp v. Clemente,* 685 So. 2d 84 (Fla. 2d DCA 1996)*.*

**DONE** and **ORDERED** in Chambers at Miami-Dade County, Florida on this <u>19th day of December, 2022</u>.

<u>2020-021937-SP-26 12-19-2022 3:35 PM</u>
Hon. Michaelle Gonzalez-Paulson

**COUNTY COURT JUDGE**
Electronically Signed

No Further Judicial Action Required on **THIS MOTION**

CLERK TO **RECLOSE** CASE IF POST JUDGMENT

**Electronically Served:**
Andrew R. Ingalls, aingalls@daypitney.com
Andrew R. Ingalls, brodriguez@daypitney.com
Evelyn Davila, edavila@daypitney.com
Jessica Solorzano, jsolorzano@daypitney.com
Manuel A. Garcia-Linares, mgarcialinares@daypitney.com
Manuel A. Garcia-Linares, athomsen@daypitney.com
Maury L Udell, notice66@bmulaw.com
Maury L Udell, blopez@bmulaw.com
Rachel Kittl, rkittl@bmulaw.com


**Physically Served:**

Case 1:25-cv-20381-RAR Document 1-2 Entered on FLSD Docket 01/27/2025 Page 936 of 1553

**IN THE COUNTY COURT OF THE ELEVENTH JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA**

CASE NO: 2020-008179-SP-26
SECTION: SD05
JUDGE: Michaelle Gonzalez-Paulson

**Sharon Orr**

Plaintiff(s) / Petitioner(s)

vs.

**AT&T Mobility LLC**

Defendant(s) / Respondent(s)

_____/

## ORDER DENYING PLAINTIFF'S MOTION FOR REHEARING

**THIS CAUSE** came before the Court for consideration of Plaintiff's Motion for Rehearing. On April 28, 2022, this Court heard Defendant AT&T Mobility, LLC's Motion to Dismiss Plaintiff's Second Amended Complaint. On September 23, 2022, the Plaintiff filed a Motion for Rehearing and the Defendant filed a Response on November 18, 2022.

The Court having reviewed the subject motion, Respondent's response to the motion, the Clerk's docket sheet, the prior orders issued in this case, and being fully advised in the premises, hereby enters the following ruling

**WHEREFORE**, **IT IS ORDERED AND ADJUDGED** that Plaintiff's Motion for Rehearing is **DENIED.**

The Court finds that Plaintiff is simply attempting to rehash the same issues previously considered by this Court, presenting nothing new. *See Pullum v. Cincinnati, Inc.,* 467 So. 2d 657 (Fla. 1985); *Hollywood Inc. v. Clark,* 153 Fla. 501, 15 So. 2d 175 (Fla. 1943) *(*a prime function of the petition for rehearing is to present to the trial court some point which it overlooked or failed to consider, which renders a decree inequitable or erroneous); *Pingree v. Quaintance,* 394 So. 2d 161 (Fla. 1st DCA 1981); *Balmoral Ass'n v. Grimaldi*, 107 So3d 1149 (Fla.3d DCA 2013).

Plaintiff's Motion for Rehearing seeks to reargue the same matters already disposed of by this Court. *See generally Ayala v. Gonzalez,* 984 So. 2d 523 (Fla. 5th DCA 2008)*; Lowe Inv. Corp v. Clemente,* 685 So. 2d 84 (Fla. 2d DCA 1996)*.*

**DONE** and **ORDERED** in Chambers at Miami-Dade County, Florida on this <u>19th day of December, 2022</u>.

<u>2020-008179-SP-26 12-19-2022 3:36 PM</u>
Hon. Michaelle Gonzalez-Paulson

**COUNTY COURT JUDGE**
Electronically Signed

No Further Judicial Action Required on **THIS MOTION**

CLERK TO **RECLOSE** CASE IF POST JUDGMENT

**Electronically Served:**
Andrew R. Ingalls, aingalls@daypitney.com
Andrew R. Ingalls, brodriguez@daypitney.com
Evelyn Davila, edavila@daypitney.com
Jessica Solorzano, jsolorzano@daypitney.com
Manuel A. Garcia-Linares, mgarcialinares@daypitney.com
Manuel A. Garcia-Linares, athomsen@daypitney.com
Maury L Udell, notice66@bmulaw.com
Maury L Udell, blopez@bmulaw.com
Rachel Kittl, rkittl@bmulaw.com

**Physically Served:**

Case 1:25-cv-20381-RAR Document 1-2 Entered on FLSD Docket 01/27/2025 Page 938 of 1553

**IN THE COUNTY COURT OF THE ELEVENTH JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA**

CASE NO: 2020-021932-SP-26
SECTION: SD05
JUDGE: Michaelle Gonzalez-Paulson

**Monique Ysidron**

Plaintiff(s) / Petitioner(s)

vs.

**ATT Mobility LLC**

Defendant(s) / Respondent(s)

_____/

## ORDER DENYING PLAINTIFF'S MOTION FOR REHEARING

**THIS CAUSE** came before the Court for consideration of Plaintiff's Motion for Rehearing. On April 28, 2022, this Court heard Defendant AT&T Mobility, LLC's Motion to Dismiss Plaintiff's Second Amended Complaint. On September 23, 2022, the Plaintiff filed a Motion for Rehearing and the Defendant filed a Response on November 18, 2022.

The Court having reviewed the subject motion, Respondent's response to the motion, the Clerk's docket sheet, the prior orders issued in this case, and being fully advised in the premises, hereby enters the following ruling

**WHEREFORE**, **IT IS ORDERED AND ADJUDGED** that Plaintiff's Motion for Rehearing is **DENIED**.

The Court finds that Plaintiff is simply attempting to rehash the same issues previously considered by this Court, presenting nothing new. *See Pullum v. Cincinnati, Inc.,* 467 So. 2d 657 (Fla. 1985); *Hollywood Inc. v. Clark,* 153 Fla. 501, 15 So. 2d 175 (Fla. 1943) *(*a prime function of the petition for rehearing is to present to the trial court some point which it overlooked or failed to consider, which renders a decree inequitable or erroneous); *Pingree v. Quaintance,* 394 So. 2d 161 (Fla. 1st DCA 1981); *Balmoral Ass'n v. Grimaldi*, 107 So3d 1149 (Fla.3d DCA 2013).

Plaintiff's Motion for Rehearing seeks to reargue the same matters already disposed of by this Court. *See generally Ayala v. Gonzalez,* 984 So. 2d 523 (Fla. 5th DCA 2008)*; Lowe Inv. Corp v. Clemente,* 685 So. 2d 84 (Fla. 2d DCA 1996)*.*

**DONE** and **ORDERED** in Chambers at Miami-Dade County, Florida on this <u>19th day of December, 2022</u>.

<u>2020-021932-SP-26 12-19-2022 3:38 PM</u>
Hon. Michaelle Gonzalez-Paulson

**COUNTY COURT JUDGE**
Electronically Signed

No Further Judicial Action Required on **THIS MOTION**

CLERK TO **RECLOSE** CASE IF POST JUDGMENT

**Electronically Served:**
Andrew R. Ingalls, aingalls@daypitney.com
Andrew R. Ingalls, brodriguez@daypitney.com
Evelyn Davila, edavila@daypitney.com
Jessica Solorzano, jsolorzano@daypitney.com
Manuel A. Garcia-Linares, mgarcialinares@daypitney.com
Manuel A. Garcia-Linares, athomsen@daypitney.com
Maury L Udell, notice66@bmulaw.com
Maury L Udell, blopez@bmulaw.com
Rachel Kittl, rkittl@bmulaw.com

**Physically Served:**

# COMPOSITE EXHIBIT 4

Case 1:25-cv-20381-RAR   Document 1-2   Entered on FLSD Docket 01/27/2025   Page 941 of 1553

IN THE COUNTY COURT OF THE 11TH
JUDICIAL CIRCUIT IN AND FOR MIAMI-
DADE COUNTY, FLORIDA

Edward Barger,

       Plaintiff,

v.

AT&T Mobility, LLC,

      Defendant.

_____/

CASE NO.:  2020-8181-SP-26

FLA. BAR NO.: 121673

## <u>AMENDED STATEMENT OF CLAIM</u>

      Plaintiff, Edward Barger, by and through its undersigned counsel, hereby files this Amended Statement of Claim in support of its claim against Defendant, AT&T, Mobility, LLC ("AT&T MOBILITY, LLC"), and further alleges as follows:

## <u>GENERAL ALLEGATIONS</u>

1. This is an action against AT&T for damages for $8,000, exclusive of interest, attorney's fees, and costs.

2. Plaintiff is a customer of AT&T with account #XXXXXX075262.

3. AT&T MOBILITY, LLC is a foreign limited liability company licensed and doing business in Miami-Dade County, Florida subject to the general and specific jurisdiction of this Court.

4. Venue is proper in Miami-Dade County, Florida.

5. Plaintiff has complied with all statutory and/or contractual conditions precedent to filing this action.

6. Plaintiff is the title holder to any claim against AT&T MOBILITY, LLC and has an interest in the subject matter of this claim.

7. According to court filings made by AT&T MOBILITY, LLC in federal court, it is a nongovernmental limited liability company that has no parent company but its members are BellSouth Mobile Data, Inc.; SBC Long Distance, LLC; and SBC Tower Holdings LLC. Those entities (and thus AT&T MOBILITY, LLC) are all indirectly wholly owned by AT&T Inc., which is the only publicly held company with a 10 percent or greater ownership stake in them.

8. AT&T, Inc. reports its consolidated business results, and breaks out selected disclosures for its major operating segments. Their segments are strategic business units that offer different products and services over various technology platforms and/or in different geographies that are managed accordingly. They analyze the operating segments based on segment contribution, which consists of operating income, excluding acquisition-related costs and other significant items, and equity in net income (loss) of affiliates for investments managed within each operating segment.

9. There are four reportable segments of AT&T, Inc.: (1) Communications, (2) Warner Media, (3) Latin America and (4) Xandr. AT&T MOBILITY, LLC is a major retailer of smartphones and provider of wireless broadband internet access service for smartphones.

10. Smartphone owners use mobile data for, including but not limited to, sending and receiving email, using GPS navigation, watching and streaming video, and browsing the internet. AT&T MOBILITY, LLC is a major retailer of smartphones and provider of wireless broadband internet access service for smartphones ("mobile data"). Smartphone owners use mobile data for, including but not limited to, sending and receiving email, using GPS navigation, watching and streaming video, and browsing the internet.

11. AT&T MOBILITY, LLC's place in AT&T Inc corporate structure can be identified as follows:



12. The Communications segment provides wireless and wireline telecom, video and broadband services to consumers located in the U.S. or in U.S. territories and businesses globally. Communications services and products are marketed under the AT&T, Cricket, AT&T PREPAID and DIRECTV brand names. The Communications segment provided approximately 84% of 2018 segment operating revenues and 84% of our 2018 total segment contribution. This segment contains the Mobility, Entertainment Group and Business Wireline business units.

13. Within Communications is the Mobility business unit that provides nationwide wireless services to consumers and wholesale and resale wireless subscribers located in the United States or U.S. territories by utilizing our network to provide voice and data services, including high-speed internet over wireless devices. They classify subscribers as either postpaid, prepaid, connected device or reseller. As of December 31, 2018, they served 153 million Mobility subscribers, including 77 million postpaid, 17 million prepaid, 8 million reseller and 51 million connected devices. Their Mobility business unit revenue includes (2) reported categories: Wireless Services, and Equipment.

14. AT&T MOBILITY, LLC offers a range of nationwide wireless voice and data communications services in a variety of pricing plans to meet the communications needs of targeted customer categories. Their wireless services also include advertising revenues generated from the subscriber relationships.   They offer plans that include unlimited features allowing for the sharing of voice, text and data across multiple devices, which attracts subscribers from other providers and minimize subscriber churn. The **churn** rate, also known as the rate of attrition or customer **churn,** is the rate at which customers stop doing business with an entity within a given time period.

15. Customers in the "connected device" category (e.g., users of session-based tablets, monitoring devices and automobile systems) generally purchase those devices from third-party suppliers that buy data access supported by our network. They also offer nationwide wireless voice and data communications to certain customers who prefer to pay in advance. These services are offered under the Cricket and AT&T PREPAID brands and are typically monthly prepaid services.

16. AT&T MOBILITY, LLC sells a wide variety of handsets, wirelessly enabled computers (e.g., tablets and notebooks) and wireless data cards manufactured by various suppliers for use with our voice and data services. They also sell accessories, such as carrying cases and hands-free devices. They sell through their own company-owned stores, agents and third-party retail stores. Like other wireless service providers, they have historically provided postpaid contract subscribers substantial equipment subsidies to initiate, renew or upgrade service.

17. In 2007, AT&T MOBILITY, LLC became the exclusive mobile data provider for the Apple iPhone.  Initially, AT&T offered iPhone customers an "unlimited" mobile data plan for $20 per month.  In 2008, when the iPhone 3G was released, AT&T MOBILITY, LLC increased the fee for the unlimited mobile data plan to $30 per month and required all iPhone 3G customers to purchase the data plan.  Since then, AT&T MOBILITY, LLC has slowly increased the price of its "unlimited data plan." As AT&T MOBILITY, LLC began offering subsequent versions of the iPhone and smartphones from competing manufacturers, it imposed a similar requirement on purchasers of those devices.

18. Since June 2010, AT&T MOBILITY, LLC has offered to grandfather these customers' unlimited mobile data plan when they purchase a new smartphone, allowing customers the opportunity to continue with their unlimited mobile data plans rather than requiring them to switch to AT&T's tiered mobile data plans.  The renewed plan continues to cost more than originally advertised per month.

19. Customers who have had their data speed throttled by AT&T MOBILITY, LLC have experienced drastically reduced service such that slow data is virtual no data at all which is in direct contravention of the term "unlimited".

20. As a result, many everyday applications, such as web browsing, GPS navigation, and streaming video, are significantly slower, and, in some cases, are severely impaired or rendered inoperable and thus no data usage.

21. AT&T MOBILITY, LLC possesses internal focus group research indicating that data throttling was inconsistent with consumer understanding of an "unlimited" data plan. The researchers concluded that, "[a]s we'd expect, the reaction to [a proposed data throttling program] was negative; consumers felt 'unlimited should mean unlimited.'" The focus group participants thought the idea was "clearly unfair."

22. The researchers highlighted a consumer's comment that "[i]t seems a bit misleading to call it Unlimited." The researchers observed that "[t]he more consumers talked about it the more they didn't like it." This led the researchers to advise that "[s]aying less is more, [so] don't say too much" in marketing communications concerning such a program.

23. The speed reductions and service restrictions in effect under AT&T MOBILITY, LLC's data throttling program are not determined by real-time network congestion at a particular cellular tower. Throttled customers are subject to this reduced speed even when using smartphones at times when AT&T MOBILITY, LLC's network has ample capacity to carry customers' data, or the use occurs in an area where the network is not congested. Once customers have been throttled during a given billing cycle, AT&T MOBILITY, LLC caps their download speed until the end of the billing cycle, at which time AT&T MOBILITY, LLC restores the data to full speed for these customers.

24. AT&T MOBILITY, LLC's wireless customer agreements do not state that an unlimited mobile data plan customer's use of more than a specified amount of data is a prohibited activity. Nor do the agreements provide that AT&T MOBILITY, LLC may modify, diminish,

or impair the service of unlimited mobile data plan customers engaged in permissible activities if these customers use more than a specified amount of data.

25. AT&T MOBILITY, LLC is a sophisticated company. It knew it needed to invest in enough capacity to deliver service for subscribers who used a lot of data under their unlimited plans, especially since the company had claimed its network was the "fastest" in the nation. Instead of living up to its promises, AT&T MOBILITY, LLC pulled a bait-and switch. AT&T MOBILITY, LLC prominently advertises particular flat monthly rates for its post-paid wireless service plans. Then, after customers sign up, AT&T MOBILITY, LLC actually charges higher monthly rates than the customers were promised and agreed to pay. AT&T MOBILITY, LLC covertly increases the actual price by padding all post-paid wireless customers' bills each month, including Plaintiff's bills, with a bogus so-called Administrative Fee (currently $1.99 every month for each phone line) on top of the advertised price. AT&T MOBILITY, LLC has stated that it charges the administrative fee because it is a "standard administrative fee" across the wireless industry. However, in 2017, T-Mobile eliminated the "administrative charges". Moreover, prepaid carriers like MetroPCS and AT&T's subsidiary Cricket Wireless *do not charge administrative fees.*

26. The Administrative Fee is not properly disclosed to customers before or when they sign up, and in fact it is never adequately and honestly disclosed. The so-called Administrative Fee is not, in fact, a bona fide administrative fee, but rather is simply a means for AT&T MOBILITY, LLC to charge more per month for the service itself without having to advertise the higher prices as a scheme to increase revenue. AT&T Mobility, LLC's previous in court public admissions (filed by its corporate counsel, Patricia Cruz, Esq.) to the conduct alleged in this case (data throttling) via its filing of its "consent to payment for conduct for

the claims asserted or which could have been asserted" in the cases of Erin Young v. AT&T Mobility, LLC, Case No. 2019-2027-SP-26, EFiling#87601121 or Tamara Crespo v. AT&T Mobility, LLC, Case No. 2019-2026-SP26, E-Filing#87600869 both of which alleged AT&T's violation of FDUTPA for illegal data throttling and bogus administrative fee, is further evidence of AT&T Mobility, LLC's illegal, immoral and unethical conduct.

27. Making matters worse, AT&T MOBILITY, LLC deliberately hides the Administrative Fee in its billing statements. In AT&T MOBILITY, LLC's printed monthly billing statements, AT&T MOBILITY, LLC intentionally buries the Administrative Fee in a portion of the statement that: (a) makes it likely customers will not notice it; and (b) misleadingly suggests that the Administrative Fee is akin to a tax or another standard government pass-through fee, when in fact it is simply a way for AT&T MOBILITY, LLC to advertise and promise lower rates than it actually charges.

28. There is no description of the administrative fee on Plaintiff's bill.  Such a description fails to constitute an adequate disclosure of the Administrative Fee, and it serves to further AT&T MOBILITY, LLC's deceptive scheme by suggesting that the Administrative Fee is tied to certain costs associated with AT&T MOBILITY, LLC providing wireless telephone services (interconnect charges and cell site rental charges). Assuming this description was accurate, it would merely reinforce that this undisclosed fee should be included in the advertised monthly price for the service because those are basic costs of providing wireless service itself, and thus a reasonable consumer would expect those costs to be included in the advertised price for the service.

29. Moreover, the administrative fee is not, in fact, tied to the costs that AT&T MOBILITY, LLC's buried description suggests. This is corroborated by the fact that AT&T has

repeatedly increased the amount of the monthly Administrative Fee since the fee was first imposed, while during that same time period the stated "costs" for (i.e., interconnect charges and cell site rental charges) have actually *decreased* according to AT&T's own financial statements and public filings with the Securities and Exchange Commission.

30. AT&T imposed and increased the Administrative Fee that it charged, not, as AT&T MOBILITY, LLC misleadingly stated in its buried description, in response to cell site rental and maintenance costs or interconnectivity costs, which AT&T MOBILITY, LLC's financial statements show have gone down at the same time AT&T MOBILITY, LLC has significantly increased the amount of the fee.

31. Thus, by AT&T MOBILITY, LLC's own design, the printed monthly statements serve to further AT&T MOBILITY, LLC's scheme and keep customers from realizing they are being deceived and thus overcharged.  Such a deceptive practice is AT&T's misrepresentation of why a fee is being charged and where the money for the fee is being transferred to, if anywhere.  AT&T Mobility, LLC chose the descriptive terms and if they do not accurately describe what is being charged and collected, such conduct is actionable under the FDUTPA.

32. AT&T MOBILITY, LLC imposed and has increased the Administrative Fee as a covert way to increase customers' monthly rates without having to advertise such higher rates. AT&T MOBILITY, LLC increased the Administrative Fee in large part to fund unrelated corporate liabilities of its parent company AT&T Inc., including to pay down the debt incurred in connection with the acquisition of Time Warner Inc. in 2018.

33. In all events, AT&T MOBILITY, LLC should clearly disclose the Administrative Fee and should clearly and accurately state the true monthly prices and applicable costs of AT&T

MOBILITY, LLC for its post-paid wireless service plans in its price representations and advertising.

34. Since the Administrative Fee was first introduced in 2013, AT&T MOBILITY, LLC has increased the amount of the fee three times, including twice over a three-month period in 2018. The current amount that AT&T MOBILITY, LLC charges all post-paid wireless customers for this fee is $1.99 per line every month, i.e., more than 200% more than the original amount of the fee, including Plaintiff's bill.

35. AT&T MOBILITY, LLC has used this Administrative Fee scheme to improperly squeeze consumers for **hundreds of millions of dollars** in additional revenue without disclosing the actual "increased costs" in any financial filing available to any customer, including Plaintiff.

36. In essence, AT&T MOBILITY, LLC introduced the bogus Administrative Fee as a way to covertly increase the actual monthly price customers are charged for their service, and then has continued to use the Administrative Fee and unilateral increases thereto as a lever by which AT&T MOBILITY, LLC continues to ratchet up the price without the customer realizing and after the customer is already committed.

37. The Administrative Fee is part of a design to profit AT&T MOBILITY, LLC rather than pay for what it has determined is an increase in cost of AT&T MOBILITY, LLC. Thus, the practice of applying the administrative fee to Plaintiff's bill is in and of itself is unfair and deceptive.

38. This scheme has enabled, and continues to enable, AT&T MOBILITY, LLC to effectively increase its rates without having to publicly announce those higher rates, and allows AT&T MOBILITY, LLC to entice more customers by misrepresenting the costs customers

would pay both in absolute terms and relative to other wireless providers in the industry.

## COUNT I - FRAUD

39. Plaintiff re-alleges, restates, and incorporates the allegations contained in paragraphs one (1) through thirty-eight (38) above, and further alleges as follows:

40. By virtue of its advertisement of unlimited data to Plaintiff for a set price, AT&T MOBILITY, LLC undertook the duty to disclose material information and disclose its data management plan along with its billing practices to Plaintiff so that Plaintiff would receive unlimited data at a set price.

41. Specifically, in the advertising, sale, and renewal of mobile data plans, AT&T MOBILITY, LLC represented, directly or indirectly, expressly or by implication, to the Plaintiff, an unlimited mobile data plan customer, that the amount of data that the Plaintiff could access in any billing period would not be limited.  Plaintiff is not in possession of the mobile data contract as it under the exclusive control of AT&T MOBILITY, LLC.

42. AT&T MOBILITY, LLC specifically omitted the fact that it intended to throttle Plaintiff's data, without Plaintiff's knowledge or specific consent.  Had AT&T MOBILITY, LLC not omitted this information, Plaintiff would have not purchased specific unlimited plan.

43. Plaintiff relied on AT&T MOBILITY, LLC's representations regarding providing unlimited data, and, as a result, incurred damages and was injured as a result of the fraud by omission.

44. Moreover, AT&T MOBILITY, LLC's representations on its bills to Plaintiff and the definition Plaintiff obtained on AT&T MOBILITY, LLC's website regarding the administrative fee charged on the account were false statements of material fact.  AT&T MOBILITY, LLC's representation that the  Administrative Fee is a charge assessed by AT&T MOBILITY,

LLC that helps defray a portion of certain expenses AT&T MOBILITY, LLC incurs, including but not limited to: (a) charges AT&T MOBILITY, LLC or its agents pay to interconnect with other carriers to deliver calls from AT&T MOBILITY, LLC customers to their customers; and (b) charges associated with cell site rents and maintenance" are false.

45. AT&T MOBILITY, LLC knew or should have known that the representations all identified above were false as AT&T MOBILITY, LLC's cost in interconnect charges and cell site charges actually decreased.

46. AT&T MOBILITY, LLC intended that the representations above caused Plaintiff to continue as a customer with AT&T MOBILITY, LLC and otherwise pay the administrative fee to maintain an account with AT&T MOBILITY, LLC.

47. Plaintiff has suffered damages in justifiable reliance on the representations above including but not limited to the payment for bogus administrative fees on a monthly basis.

WHEREFORE, Plaintiff respectfully requests that this Court grant judgment in its favor and against AT&T MOBILITY, LLC for compensatory damages, nominal damages, interest, court costs, and any other relief the Court deems just and proper.

## COUNT II - DAMAGES UNDER THE FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT

48. Plaintiff re-alleges, restates, and incorporates the allegations contained in paragraphs one (1) through thirty-eight (38) above, and further alleges as follows:

49. Plaintiff, at all material times, was a consumer, as defined under the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), § 501.201, *et seq*., Fla. Stat.

50. AT&T MOBILITY, LLC, at all material times, was engaged in trade or commerce, as defined under the FDUTPA and is not otherwise exempt.

51. Upon information and belief, Plaintiff was a consumer who had an "unlimited" data plan as advertised by AT&T.  In the advertising, sale, and renewal of the unlimited mobile data plan, AT&T MOBILITY, LLC entered into a mobile data contract with Plaintiff that was advertised as providing access to unlimited mobile data and did not provide that AT&T MOBILITY, LLC could modify, diminish, or impair the services of customers who use more than a specified amount of data for permissible activities.

52. AT&T MOBILITY, LLC imposed significant data speed restrictions on Plaintiff by virtue of its use of its network which flows throughout the United States and in particular, Florida.  This practice was, and is, an unfair act or a deceptive trade practice and is specifically complained of by the Federal Trade Commission.

53. In the advertising, sale, and renewal of unlimited mobile data plans, AT&T MOBILITY, LLC has represented, directly or indirectly, expressly or by implication, to unlimited mobile data plan customers that the amount of data that the customer could access in any billing period would not be limited.  Such a representation is unfair or deceptive as defined under the FDUTPA.  Plaintiff is not in possession of the actual mobile data contract between the parties, as it under the exclusive control of AT&T MOBILITY, LLC.

54. AT&T MOBILITY, LLC has failed to disclose, or has failed to disclose adequately, that it imposes significant and material data speed restrictions on **unlimited mobile data plan** customers who use more than a fixed amount of data in a given billing cycle.  AT&T MOBILITY, LLC's failure to disclose or adequately disclose this fact, in light of the representations made, was, and is, a deceptive act or practice.

55. AT&T MOBILITY, LLC specifically throttled Plaintiff's data speed, which by its own admission is an unfair or deceptive trade practice as defined under the FDUTPA.

56. These unfair or deceptive trade practices are the proximate cause of Plaintiff's actual damages.

57. Furthermore, in the advertising, sale, and renewal of mobile data and wireless plans and acceptance of payments, AT&T MOBILITY, LLC has represented, directly or indirectly, expressly or by implication, to customers that it would be charged a certain amount.  AT&T MOBILITY, LLC has since added an "Administrative Fee" to Plaintiff's bill which is unfair and deceptive as it is not what its being used for despite its definition in the wireless agreement. The administrative fee is a textbook pass through-fee. AT&T chose the descriptive terms of the administrative fee that does not accurately describe what is being charged and collected, such conduct is actionable under the FDUTPA.

58. Since the Administrative Fee was first imposed in 2013, AT&T MOBILITY, LLC has unilaterally increased the monthly amount of the fee three times. AT&T MOBILITY, LLC increased the Administrative Fee to $0.76 per month per phone line starting in June 2016. Then, in 2018, the increases because larger and more frequent (around the same time AT&T MOBILITY, LLC's parent company incurred significant debt in acquiring Time Warner Inc.).

59. AT&T MOBILITY, LLC raised the Administrative Fee to $1.26 per month per phone line starting in April 2018, and then again to $1.99 per month per phone line starting in June 2018, which is the current monthly fee as of this filing. Thus, between March 2018 and June 2018 alone, AT&T MOBILITY, LLC increased the Administrative Fee a whopping 162% increase in just three months.

60. AT&T MOBILITY, LLC's representations on its bills to Plaintiff and it its website regarding the administrative fee charged are deceptive and in fact misrepresent the truth.  AT&T

MOBILITY, LLC's representation that the Administrative Fee is a charge assessed by AT&T MOBILITY, LLC that helps defray a portion of certain expenses AT&T MOBILITY, LLC incurs, including but not limited to: (a) charges AT&T MOBILITY, LLC or its agents pay to interconnect with other carriers to deliver calls from AT&T MOBILITY, LLC customers to their customers; and (b) charges associated with cell site rents and maintenance is false.  The administrative fee is instead a scheme to funnel direct profit to AT&T MOBILITY, LLC rather than pay for any identifiable increase in costs.

61. AT&T MOBILITY, LLC knew or should have known that the representations regarding the administrative fee are false as AT&T MOBILITY, LLC's cost in interconnect charges and cell site charges actually decreased based on its own SEC federal filings.  AT&T MOBILITY, LLC knew that the monthly administrative fee was inflated, and not the result of good faith financial practices but instead designed to raise profit for the company without a specific actual change in price for services. Such a practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers, including Plaintiff.

62. AT&T MOBILITY, LLC's knowingly unfair or deceptive trade practices of assessing and collecting a bogus administrative fee are the proximate cause of Plaintiff's 's actual damages.

63. AT&T MOBILITY, LLC's unfair and deceptive trade practice is not a result of a bona fide error or mistake but instead a conscious decision by AT&T MOBILITY, LLC.

64. Plaintiff has retained the undersigned to represent it in this action and pay a reasonable fee for said legal services.

WHEREFORE, Plaintiff respectfully requests that this Court grant judgment in its

favor and against AT&T MOBILITY, LLC for damages, interest, court costs, attorney's fees pursuant to §501.2105, Florida Statutes, and any other relief the Court deems just and proper.

### COUNT III – ACTION FOR DECLARATORY AND/OR INJUNCTIVE RELIEF UNDER FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT ("FDUTPA") – BOGUS ADMINISTRATIVE FEE

65. Plaintiff re-alleges, restates, and incorporates the allegations contained in paragraphs one (1) through thirty-eight (38) above, and further alleges as follows:

66. Under the FDUTPA, without regard to any other remedy or relief to which a person is entitled, anyone aggrieved by a violation of this part may bring an action to obtain a declaratory judgment that an act or practice violates this part and to enjoin a person who has violated, is violating, or is otherwise likely to violate 501.201 et. seq.  See Fla. Stat. §501.211(1).  Plaintiff is an aggrieved consumer whose rights have been, are being, or will be adversely affected, by AT&T MOBILITY, LLC.'s violation of FDUTPA--meaning an unfair or deceptive practice which is injurious to consumers, including Plaintiff.

67. Pursuant to AT&T MOBILITY, LLC's above-described acts or practices of placing a bogus administrative fee on Plaintiff's account, AT&T MOBILITY, LLC violated the FDUTPA. The Administrative Fee is part of a design to profit AT&T MOBILITY, LLC rather than pay for what it has determined is an increased in cost of AT&T MOBILITY, LLC. Thus, the practice of applying the administrative fee to Plaintiff's bill is in and of itself is unfair and deceptive.

68. Plaintiff seeks a declaratory judgment that AT&T MOBILITY, LLC's acts or practices have violated the FDUTPA and injunctive relief to prevent AT&T from committing the same improper acts.

69. Plaintiff seeks to determine whether the FDUTPA prohibits AT&T MOBILITY, LLC from continuing to apply the bogus administrative fee which is likely to occur in the future.

70. There is a bona fide dispute between the parties. Plaintiff has a justiciable question as to the existence or non-existence of some right, status, immunity, power, or privilege, or some fact upon which their claim may depend.

71. Plaintiff is in doubt as to the right of AT&T MOBILITY, LLC to continue to charge an unlawful fee which violates FDUTPA.

72. There is a bona fide, actual, and present need for the declaration.

73. Plaintiff has retained the undersigned to represent it in this action and pay a reasonable fee for said legal services.

WHEREFORE, Plaintiff respectfully requests that this Court grant declaratory judgment and/or injunctive relief in its favor and against AT&T MOBILITY, LLC, court costs, attorney's fees pursuant to Section 501.2105, Florida Statutes, and any other relief the Court deems just and proper.

## <u>COUNT IV – BREACH OF CONTRACT – GOOD FAITH AND FAIR DEALING</u>

74. Plaintiff re-alleges, restates, and incorporates the allegations contained in paragraphs one (1) through thirty-eight (38) above, and further alleges as follows

75. Plaintiff had a wireless agreement with AT&T MOBILITY, LLC wherein Plaintiff had a reasonable expectation of performance of the agreement with no throttling of Plaintiff's data speed so as to provide Plaintiff with unlimited data.

76. AT&T MOBILITY, LLC was required to act in a commercially reasonable manner and limiting its ability to act capriciously to contravene the reasonable expectations of the Plaintiff in the AT&T's performance wireless agreement.

77. Moreover, AT&T MOBILITY, LLC was required to act in a commercially reasonable manner in billing Plaintiff for bogus administrative costs which were not for what they claimed in the contract. AT&T's representations on its bills to Plaintiff and it its website regarding the administrative fee charged on the account were false statements of material fact.

78. AT&T MOBILITY, LLC representation that the Administrative Fee is a charge assessed by AT&T that helps defray a portion of certain expenses AT&T incurs, including but not limited to: (a) charges AT&T or its agents pay to interconnect with other carriers to deliver calls from AT&T customers to their customers; and (b) charges associated with cell site rents and maintenance are false. AT&T

79. The express terms of the wireless agreement required AT&T to provide unlimited data and true administrative costs as defined by the contract.

80. AT&T has breached the express terms of the wireless agreement by failing to provide unlimited data.

81. As a result of AT&T's breach of implied covenant of good faith and fair dealing, Plaintiff has been damaged.

WHEREFORE, Plaintiff respectfully requests that this Court grant judgment in its favor and against AT&T for compensatory damages, nominal damages, interest, court costs, and any other relief the Court deems just and proper.

## COUNT V – UNJUST ENRICHMENT

82. Plaintiff re-alleges, restates, and incorporates the allegations contained in paragraphs one (1) through thirty-eight (38) above, and further alleges as follows:

83. AT&T MOBILITY, LLC assessed improper increased charges of $1.99/month

administrative fee on Plaintiff's account.

84. AT&T MOBILITY, LLC has stated that "The Administrative Fee is a charge assessed by AT&T MOBILITY, LLC that helps defray a portion of certain expenses AT&T MOBILITY, LLC incurs, including but not limited to: (a) charges AT&T MOBILITY, LLC or its agents pay to interconnect with other carriers to deliver calls from AT&T MOBILITY, LLC customers to their customers; and (b) charges associated with cell site rents and maintenance. It is not a tax or charge which the government requires AT&T MOBILITY, LLC to collect from its customers.

85. In June of 2018, AT&T MOBILITY, LLC increased its "administrative fee" to $1.99/per, per month with no specific reason or allegation that AT&T MOBILITY, LLC's costs had changed.

86. AT&T MOBILITY, LLC knew the monthly administrative fee was inflated and not the result of good faith financial practices and instead a deceptive fee.  In essence this administrative fee is a textbook pass-through fee designed to increase profits of the company without increasing the advertised price of the services to Plaintiff.

87. AT&T MOBILITY, LLC had knowledge of payments by Plaintiff and voluntarily accepted and retained the benefit conferred on it.

88. Under the circumstances, it would be inequitable for AT&T MOBILITY, LLC to retain the benefit and thus, Plaintiff has suffered damages.

WHEREFORE, Plaintiff demands judgment against AT&T MOBILITY, LLC for compensatory damages, interest, and court costs and any other relief the Court deems just and proper.

## COUNT VI – PURE BILL OF DISCOVERY

89. Plaintiff re-alleges, restates, and incorporates the allegations contained in paragraphs one (1) through thirty-eight (38) above, and further alleges as follows:

90. This is an action for pure bill of discovery.

91. A pure bill of discovery may be used to identify potential defendants and theories of liability and to obtain information necessary for meeting a condition precedent to filing suit.

92. Plaintiff seeks to obtain information regarding AT&T MOBILITY, LLC's collection of Plaintiff's geolocation data and possible unauthorized dissemination to third-parties of the geolocation data collected from its consumers, including Plaintiff.

93. This information is material to determine proper parties against whom relief will and should be sought by subsequent legal action.

94. AT&T MOBILITY, LLC has admitted that it sells customer geolocation data to third-parties, including but not limited to data aggregators, who in turn, are able to use or resell the geolocation data with little or no oversight by AT&T MOBILITY, LLC.

95. AT&T MOBILITY, LLC is obligated to protect the confidential personal information of its customers, including Plaintiff.

96. FCA § 222(a) provides that "[e]very telecommunications carrier has a duty to protect the confidentiality of proprietary information of, and relating to . . . customers . . . ." The "confidential proprietary information" referred to in FCA § 222(a) is abbreviated herein as "CPI."

97. FCA § 222(c) additionally provides that "[e]xcept as required by law or with the approval of the customer, a telecommunications carrier that receives or obtains customer

proprietary network information by virtue of its provision of a telecommunications service shall only use, disclose, or permit access to individually identifiable customer proprietary network information in its provision of (A) the telecommunications service from which such information is derived, or (B) services necessary to, or used in, the provision of such telecommunications service, including the publishing of directories." The "customer proprietary network information" referred to in FCA § 222(c) is abbreviated herein as "CPNI."

98. FCA § 222(h)(1) (emphasis added) defines CPNI as "(A) information that relates to  the quantity, technical configuration, type, destination, **location**, and amount of use of a telecommunications service subscribed to by any customer of a telecommunications carrier, and that is made available to the carrier by the customer solely by virtue of the carrier-customer relationship; and (B) information contained in the bills pertaining to telephone exchange  service or telephone toll service received by a customer of a carrier, except that term does not include subscriber list information."

99. The Federal Communication Commissions ("FCC") has promulgated rules to implement FCA § 222 "to ensure that telecommunications carriers establish effective safeguards to protect against unauthorized use or disclosure of CPNI." *See* 47 CFR § 64.2001, *et seq*. ("CPNI Rules"); CPNI Order, 13 FCC Rcd. at 8195 ¶ 193.

100.    The CPNI Rules limit disclosure and use of CPNI without customer approval to certain limited circumstances (such as cooperation with law enforcement), none of which are applicable to the facts here. CPNI Rules § 64.2005.

101.    The CPNI Rules §§ 64.2009(b), (d), and (e) require carriers to implement safeguards to protect customers' CPNI.

102.     These safeguards include: (i) training personnel "as to when they are and are not authorized to use CPNI[;]" (ii) establishing "a supervisory review process regarding carrier compliance with the rules[;]" and (iii) filing annual compliance certificates with the FCC.

103.     The CPNI Rules § 64.2010 further require carriers to implement measures to prevent the disclosure of CPNI to unauthorized individuals. For example, "carriers must take reasonable measures to discover and protect against attempts to gain unauthorized access to CPNI." CPNI Rules § 64.2010(a).

104.     AT&T MOBILITY, LLC is in sole possession of the information requested and Plaintiff has no other way to obtain the information.

105.     In its Privacy Policy ("Privacy Policy") and Code of Business Conduct ("COBC"), AT&T MOBILITY, LLC acknowledges its responsibilities to protect customers' "Personal Information" under the FCA, the CPNI Rules, and other regulations.

106.     In its Privacy Policy and COBC, AT&T MOBILITY, LLC makes binding promises and commitments to Plaintiff and its customers, that it will protect and secure their "Personal Information." The Privacy Policy defines "Personal Information" as "[i]nformation that identifies or reasonably can be used to identify you." AT&T MOBILITY, LLC states that, included in the information that it collects from and about its customers, is its customers' "wireless device location." AT&T MOBILITY, LLC also collects information relating to the use of its networks, products, and services. "Personal Information" thus includes both CPI and CPNI under FCA § 222 and the CPNI Rules.

107.     In its Privacy Policy, AT&T MOBILITY, LLC promises that it takes its responsibility "to safeguard your [i.e., the customer's] Personal Information seriously" and that it will not share its customers' Personal Information except for legitimate business purposes.

108.     AT&T MOBILITY, LLC Privacy Policy further states that "we will not sell [users'] Personal Information to anyone, for any purpose. Period."

109.     AT&T MOBILITY, LLC further promises that it has numerous safeguards in place to protect the Personal Information of its customers in its Privacy Policy and makes the following promises to its customers:

> We've worked hard to protect your information. And we've established electronic and administrative safeguards designed to make the information we collect secure. Some examples of those safeguards include:
>
> - All of our employees are subject to the AT&T MOBILITY, LLC Code of Business Conduct (COBC) and certain state-mandated codes of conduct. Under the COBC, all employees must follow the laws, rules, regulations, court and/or administrative orders that apply to our business— including, specifically, the legal requirements and company policies surrounding the privacy of communications and the security and privacy of your records. We take this seriously, and any of our employees who fail to meet the standards we've set in the COBC are subject to disciplinary action. That includes dismissal.
>
> - We've implemented technology and security features and strict policy guidelines to safeguard the privacy of your Personal information. Some examples are:
>
>   o Maintaining and protecting the security of computer storage and network equipment, and using our security procedures that require employee user names and passwords to access sensitive data;
>   o Applying encryption or other appropriate security controls to protect Personal Information when stored or transmitted by us;
>   o Limiting access to Personal Information to only those with jobs requiring such access; and
>   o Requiring caller/online authentication before providing Account Information so that only you or someone who knows your Account Information will be able to access or change this information.

110.     AT&T MOBILITY, LLC's COBC also makes binding commitments to Plaintiff as an

AT&T MOBILITY, LLC customer, that it will protect their Personal Information and that it will adhere to all of its legal obligations. Those legal obligations include FCA § 222, the CPNI Rules, and other legal obligations that govern protection of confidential and private information.

111.    The COBC also specifically promises that AT&T MOBILITY, LLC will "protect the privacy of our customers' communications" because "[n]ot only do our customers demand this, but the law requires it . . . . Maintaining the confidentiality of communication is, and always has been, a crucial part of our business."

112.    AT&T MOBILITY, LLC further promises in the COBC that it "protect[s] the information about our customers that they entrust to us." *Id.* Acknowledging that "AT&T MOBILITY, LLC possesses sensitive, detailed information about our customers, who rely on AT&T MOBILITY, LLC to safeguard that information" and that "[l]aws and regulations tell us how to treat such data," AT&T MOBILITY, LLC promises Plaintiff, as AT&T MOBILITY, LLC customers, that "[a]ny inappropriate use of confidential customer information violates our customers' trust and may also violate a law or regulation. *Id.* Preserving our customers' trust by safeguarding their private data is essential to our reputation." *Id.*

113.     On May 8, 2018, Senator Ron Wyden sent a letter ("the Wyden Letter") to AT&T MOBILITY, LLC President and CEO Randall L. Stephenson. In the letter, Senator Wyden expressed, in very clear terms, great concern with AT&T MOBILITY, LLC's handling of consumer information. It had come to Senator Wyden's attention that a company called Securus Technologies, a major provider of correctional-facility telephone services, purchased real-time location information from major wireless carriers, and provided that

information, via a self-service web portal, to the government "for nothing more than the legal equivalent of a pinky promise."

114.    In the Wyden Letter, Senator Wyden detailed how Securus confirmed to him that the web portal enabled surveillance of customers of "every major U.S. wireless carrier," which, in Senator Wyden's words, "needlessly exposes millions of Americans to potential abuse and unchecked surveillance by the government."

115.    Senator Wyden also explained how wireless carriers "are prohibited from sharing certain customer information, including location data, unless the carrier either has the customer's consent or sharing is otherwise required by law." He ultimately concluded that, "the fact that Securus provide[d] this service at all suggests that AT&T MOBILITY, LLC does not sufficiently control access to [its] customers' private information."

116.    The process by which Securus obtained access to the customers' information in the first place is part of the problem. It purchased real-time location information on AT&T MOBILITY, LLC's customers "through a third party location aggregator that has a commercial relationship with the major wireless carriers . . . ."

117.    In the Wyden Letter, Senator Wyden demanded that AT&T MOBILITY, LLC "undertake a comprehensive audit of each third party" with whom AT&T MOBILITY, LLC shared its customers' personal information, and "terminate [its] data-sharing relationships with all third parties that have misrepresented customer consent or abused their access to sensitive customer data.

118.    Six months later, on January 8, 2019, Motherboard (a news outlet) ran an investigative article ("the Article") concerning major telecommunications carriers (including AT&T MOBILITY, LLC) selling access to geolocation data to third-parties

(hereinafter "The Article")

119.     In the Article, the journalist gave a bounty hunter $300 to locate a cell phone. The bounty hunter did just that using "real-time location data sold to bounty hunters that ultimately originated from the major [telecommunications carriers].

120.     The Article revealed that a company called MicroBilt was selling cell phone geolocation services with little oversight to a spread of different private industries, "ranging from car salesmen and property managers to bail bondsmen and bounty hunters . . . ." Additionally, this "spying capability is also being resold to others on the black market who are not licensed by the company to use it . . . seemingly without MicroBilt's knowledge."

121.     Motherboard's investigation revealed that "a wide variety of companies can access cell phone location data, and . . . the information trickles down from cell phone providers to a wide array of smaller players, who don't necessarily have the correct safeguards in place to protect that data."

122.     Motherboard found that some of the location aggregators were so sloppy that "anyone could geolocate nearly any phone in the United States at a click of a mouse."

123.     In response to a request for comment, AT&T MOBILITY, LLC told Motherboard that use of its customers' data by bounty hunters "would violate [its] contract and Privacy Policy."

124.     The telecommunications carriers are the beginning of a dizzying chain of data selling, where data goes from company to company, and ultimately ends up in the hands of literally anybody who is looking.

125.     The information a person could obtain included the name and address of an

individual, and the geolocation of that individual's cell phone.

126.     One of the data aggregators with whom AT&T MOBILITY, LLC contracted is called MicroBilt.

127.     MicroBilt was engaged in the process of selling consumer data to literally anybody who would pay for it, including the name and address of an individual, and the geolocation of that individual's cell phone. Some of the sectors that utilized MicroBilt's services were landlords, car salesmen, and others conducting credit checks.

128.     In essence, AT&T MOBILITY, LLC was relying on the end user of the location data not to abuse the data, or not to obtain the data under false pretenses. In practice, the end users exercised no oversight over the process whatsoever.

129.     On March 26, 2019, the FTC issued an order to AT&T MOBILITY, LLC, among others, seeking information the agency will use to examine how it collects, retains, uses, and discloses information about consumers and their devices.

130.     AT&T MOBILITY, LLC is a telecommunications common carrier engaged in interstate commerce by wire regulated by the FCA and subject to the requirements, *inter alia,* of §§ 206 and 222 of the FCA.

131.     FCA § 222(a) requires every telecommunications carrier to protect, among other things, its customers' CPI.

132.     FCA § 222(c) further requires every telecommunications carrier to protect, among other things, its customers' CPNI.

133.     Plaintiff believes the information disclosed by AT&T MOBILITY, LLC to third-parties, including but not limited to data aggregators, without consent was CPI and CPNI under FCA § 222 is unlawful. AT&T MOBILITY, LLC may have  failed to protect the

confidentiality of Plaintiff's CPI and CPNI including their wireless telephone numbers, account information, private communications, and location, by divulging that information to third-parties, including but not limited to data aggregators.

134.     There is no way for Plaintiff to determine whether AT&T MOBILITY, LLC violated its own privacy policy via its customer service line or any possibly application on its customer service website without filing this action.

135.     Plaintiffs seeks a pure bill of discovery to determine if AT&T MOBILITY, LLC violated either Florida or Federal law.

WHEREFORE, Plaintiff respectfully requests that this Court:

A.  Direct AT&T Mobility, LLC to produce to Plaintiff any information, but not limited to, the following:

(1) Any code of business ethics in effect when Plaintiff became a customer of AT&T MOBILITY, LLC;

(2)  Any contract or agreement between AT&T MOBILITY, LLC or its affiliates and Microbilt during Plaintiff's time as a customer;

(3) Any contract between AT&T MOBILITY, LLC or its affiliates and TechnoCom Corporation d/b/a LocationSmart in effect during Plaintiff's time as an AT&T MOBILITY, LLC customer;

(4) Any contract between AT&T MOBILITY, LLC or its affiliates and Zumigo during Plaintiff's time as an AT&T MOBILITY, LLC customer;

(5) Between January 2016 and May 2019, the five reviews or audits of its disclosure of customer location information to third parties conducted by AT&T MOBILITY, LLC or its affiliates;

(6) Any written policies and procedures in place regarding safeguarding customer proprietary network information (referred to as "CPNI"), including Plaintiff's;

(7) Any written policies and procedures in place regarding safeguarding the confidential proprietary information," including Plaintiff's;

(8) Any specific information regarding Plaintiff's location data maintained by AT&T MOBILITY, LLC or its affiliates and whether said data was improperly sold or divulged to anyone improperly, including data aggregators;

B.  Any such further relief as the Honorable Court may deem just and proper;

## CERTIFICATE OF SERVICE

WE HEREBY CERTIFY that a true and correct copy of the foregoing was sent via e-portal this 8th of February, 2022 to: Manuel A. Garcia-Linares, Esquire (mgarcialinares@daypitney.com,                                  brodriguez@daypitney.com, jsolorzano@daypitney.com) Andrew R. Ingalls, Esquire (aingalls@daypitney.com) Day Pitney LLP, 396 Alhambra Circle, North Tower - 14th Floor, Miami, Florida 33134.

Beighley, Myrick, Udell & Lynne, PA
Attorneys for Plaintiff
2601 S. Bayshore Dr.
Suite 770
Miami, FL 33133
(305) 349-3930 – Phone


By:     _/s/  Maury L. Udell_____
Maury L. Udell, Esquire
mudell@bmulaw.com
Fla. Bar 121673

IN THE COUNTY COURT OF THE 11TH JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA

Francisco Batista,
     Plaintiff,

v.

AT&T Mobility, LLC,

     Defendant.

_____/

CASE NO.: 2019-011857-SP-26

BAR NO.: 121673

## <u>AMENDED COMPLAINT</u>

Plaintiff, Francisco Batista, through its undersigned counsel, hereby files this Second Amended Complaint in support of its claim against Defendant, AT&T, Mobility, LLC ("Defendant"), and further alleges as follows:

## <u>GENERAL ALLEGATIONS</u>

1. This is an action against AT&T for damages for $8,000, exclusive of interest, attorney's fees, and costs.

2. Plaintiff is a proper person and a customer of AT&T with redacted account xxxxxxx16547 and redacted cell phone xxx-xx1-4555.

3. AT&T is a foreign limited liability company licensed and doing business in Miami-Dade County, Florida subject to the general and specific jurisdiction of this Court.

4. Venue is proper in Miami-Dade County, Florida.

5. Plaintiff has complied with all statutory and/or contractual conditions precedent to filing this action.

6. AT&T is a major retailer of smartphones and provider of wireless broadband internet

access service for smartphones. Smartphone owners use mobile data for, including but not limited to, sending and receiving email, using GPS navigation, watching and streaming video, and browsing the internet. AT&T is a major retailer of smartphones and provider of wireless broadband internet access service for smartphones ("mobile data"). Smartphone owners use mobile data for, including but not limited to, sending and receiving email, using GPS navigation, watching and streaming video, and browsing the internet.

7.  In 2007, AT&T became the exclusive mobile data provider for the Apple iPhone.  Initially, AT&T offered iPhone customers an "unlimited" mobile data plan for $20 per month.  In 2008, when the iPhone 3G was released, AT&T increased the fee for the unlimited mobile data plan to $30 per month, and required all iPhone 3G customers to purchase the data plan.  Since then, AT&T has slowly increased the price of its "unlimited data plan." As AT&T began offering subsequent versions of the iPhone and smartphones from competing manufacturers, it imposed a similar requirement on purchasers of those devices.

8.  In June 2010, AT&T ceased offering the unlimited mobile data plan to new smartphone customers and, since then, has required new smartphone customers to purchase one of AT&T's "tiered" mobile data plans.  Unlike the unlimited mobile data plan, AT&T's tiered mobile data plans specify a data allowance—e.g., 250 Megabytes ("MBs"), 3 Gigabytes ("GBs")—and customers who exceed the stated data allowance are charged for using additional data at the rate set forth in the tiered mobile data plan.

9.  By the time AT&T stopped offering the unlimited mobile data plan to new customers, millions of customers had accepted AT&T's offer to purchase an unlimited mobile data plan. Since June 2010, AT&T has offered to grandfather these customers' unlimited mobile data plan when they purchase a new smartphone, allowing customers the opportunity to continue with their

unlimited mobile data plans rather than requiring them to switch to AT&T's tiered mobile data plans. The renewed plan continues to cost more than originally advertised per month.

10. Customers who have been throttled by AT&T have experienced drastically reduced service under both the original and revised versions of the throttling program.

11. As a result, many everyday applications, such as web browsing, GPS navigation, and streaming video, are significantly slower, and, in some cases, are severely impaired or rendered practically inoperable.

12. AT&T possesses internal focus group research indicating that its throttling program was inconsistent with consumer understanding of an "unlimited" data plan. The researchers concluded that, "[a]s we'd expect, the reaction to [a proposed data throttling program] was negative; consumers felt 'unlimited should mean unlimited.'" The focus group participants thought the idea was "clearly unfair."

13. The researchers highlighted a consumer's comment that "[i]t seems a bit misleading to call it Unlimited." The researchers observed that "[t]he more consumers talked about it the more they didn't like it." This led the researchers to advise that "[s]aying less is more, [so] don't say too much" in marketing communications concerning such a program.

14. The speed reductions and service restrictions in effect under AT&T's data throttling program are not determined by real-time network congestion at a particular cellular tower. Throttled customers are subject to this reduced speed even when using smartphones at times when AT&T's network has ample capacity to carry customers' data, or the use occurs in an area where the network is not congested. Once customers have been throttled during a given billing cycle, AT&T caps their download speed until the end of the billing cycle, at which time AT&T restores the data to full speed for these customers.

15. AT&T's wireless customer agreements do not state that an unlimited mobile data plan customer's use of more than a specified amount of data is a prohibited activity.  Nor do the agreements provide that AT&T may modify, diminish, or impair the service of unlimited mobile data plan customers engaged in permissible activities if these customers use more than a specified amount of data.

16. AT&T requires most customers with an unlimited mobile data plan, when purchasing a new smartphone, to enter into a contract with a long-term service commitment (typically lasting two years) in which customers who cancel service before the end of the service commitment must pay an early termination fee ("ETF"), typically in the hundreds of dollars.

17. AT&T wanted the rewards without the risks, so it turned its offer of an "unlimited" data plan into a bait-and-switch scam that victimized millions of Americans. Subscribers were lured in with promises of unlimited data service for a fixed fee, trapped into multiple years of service by punitive termination fees, and then forced to

switch to a more expensive tiered plan with overage fees to actually receive the unlimited data they were promised.

18. AT&T is a sophisticated company. It knew it needed to invest in enough capacity to deliver service for subscribers who used a lot of data under their unlimited plans, especially since the company had claimed its network was the "fastest" in the nation. Instead of living up to its promises, AT&T pulled a bait-and switch.

19. AT&T prominently advertises particular flat monthly rates for its post-paid wireless service plans. Then, after customers sign up, AT&T actually charges higher monthly rates than the customers were promised and agreed to pay. AT&T covertly increases the actual price by padding all post-paid wireless customers' bills each month with a bogus so-called "Administrative Fee" (currently $1.99 every month for each phone line) on top of the advertised price.

20. The Administrative Fee is not disclosed to customers before or when they sign up, and in fact it is never adequately and honestly disclosed. The so-called Administrative Fee is not, in fact, a bona fide administrative fee, but rather is simply a means for AT&T to charge more per month for the service itself without having to advertise the higher prices as a scheme to increase revenue.

21. Making matters worse, AT&T deliberately hides the Administrative Fee in its billing statements. In AT&T's printed monthly billing statements, AT&T intentionally buries the Administrative Fee in a portion of the statement that: (a) makes it likely customers will not notice it; and (b) misleadingly suggests that the Administrative Fee is akin to a tax or another standard government pass-through fee, when in fact it is simply a way for AT&T to advertise and promise lower rates than it actually charges.

22. Thus, by AT&T's own design, the printed monthly statements serve to further AT&T's scheme and keep customers from realizing they are being overcharged. Moreover, in AT&T's online billing statements that Plaintiff and numerous other AT&T wireless customers receive in lieu of printed statements (AT&T encourages customers to sign up for online billing), the default view for the billing statements does not even include any line item at all for the Administrative Fee that AT&T systematically charges to all of its post-paid customers.

23. Deep within AT&T's website— where by design it is unlikely to be viewed by consumers, and certainly not before they purchase their wireless service plans—there is currently a purported description of the Administrative Fee. Not only does this description fail to constitute an adequate disclosure of the Administrative Fee, it serves to further AT&T's deception and scheme by suggesting that the Administrative Fee is tied to certain costs associated with AT&T providing wireless telephone services (interconnect charges and cell site rental charges). Assuming this description were accurate, it would merely reinforce that this undisclosed fee should be included

in the advertised monthly price for the service because those are basic costs of providing wireless service itself, and thus a reasonable consumer would expect those costs to be included in the advertised price for the service.

24. Moreover, the fee is not, in fact, tied to the costs that AT&T's buried description suggests. This is corroborated by the fact that AT&T has repeatedly increased the amount of the monthly Administrative Fee since the fee was first imposed, while during that same time period the stated costs that the Administrative Fee is purportedly paying

for (i.e., interconnect charges and cell site rental charges) have actually *decreased* according to AT&T's financial statements.  In all events, AT&T should clearly disclose the Administrative Fee and should clearly and accurately state the true monthly prices for its post-paid wireless service plans in its price representations and advertising.

25. Since the Administrative Fee was first introduced in 2013, AT&T has increased the amount of the fee three times, including twice over a three-month period in 2018. The current amount that AT&T charges all post-paid wireless customers for this fee is $1.99 per line every month, i.e., more than 200% more than the original amount of the fee.

26.  In the past six years, AT&T has used this Administrative Fee scheme to improperly squeeze consumers for hundreds of millions of dollars in additional charges.

27. In essence, AT&T introduced the bogus Administrative Fee as a way to covertly increase the actual monthly price customers are charged for their service, and then has continued to use the Administrative Fee and unilateral increases thereto as a lever by which AT&T continues to ratchet up the price without the customer realizing and after the customer is already committed. This scheme has enabled, and continues to enable, AT&T to effectively increase its rates without having to publicly announce those higher rates, and allows AT&T to entice more customers by

misrepresenting the costs customers would pay both in absolute terms and relative to other wireless providers in the industry.

## COUNT I - FRAUD

28. Plaintiff re-alleges, restates, and incorporates the allegations contained in paragraphs one (1) through twenty-seven (27) above and further alleges as follows:

29. By virtue of its advertisement of unlimited data to Plaintiff for a set price, AT&T undertook the duty to disclose material information and disclose its data management plan along with its billing practices to Plaintiff so that Plaintiff would receive unlimited data at a set price.

30. Specifically, in the advertising, sale, and renewal of mobile data plans, AT&T represented, directly or indirectly, expressly or by implication, to the Plaintiff, an unlimited mobile data plan customer, that the amount of data that the Plaintiff could access in any billing period would not be limited. Plaintiff is not in possession of the mobile data contract as it under the exclusive control of AT&T.

31. AT&T specifically omitted the fact that it intended to throttle Plaintiff's data, without Plaintiff's knowledge or specific consent.  Had AT&T not omitted this information, Plaintiff would have not purchased specific unlimited plan.

32. Plaintiff relied on AT&T's representations regarding providing unlimited data, and, as a result, incurred damages and was injured as a result of the fraud by omission.

33. Moreover, AT&T's representations on its bills to Plaintiff and it its website regarding the administrative fee charged on the account were false statements of material fact.  AT&T's representation that the  Administrative Fee is a charge assessed by AT&T that helps defray a portion of certain expenses AT&T incurs, including but not limited to: (a) charges AT&T or its agents pay to interconnect with other carriers to deliver calls from AT&T customers to their customers; and (b) charges associated with cell site rents and maintenance are false."

34. AT&T knew or should have known that the representations all identified in paragraph 33 were false as AT&T's cost in interconnect charges and cell site charges actually decreased.

35. AT&T intended that the representations in paragraph 33 induce Plaintiff to continue as a customer with AT&T and otherwise pay the administrative fee to maintain an account with AT&T.

36. Plaintiff has suffered damages in justifiable reliance on the representations in paragraph 33 including but not limited to the payment for bogus administrative fees on a monthly basis.

      WHEREFORE, Plaintiff respectfully requests that this Court grant judgment in its favor and against AT&T for compensatory damages, nominal damages, interest, court costs, and any other relief the Court deems just and proper.

## COUNT II - BREACH OF IMPLIED DUTY OF GOOD FAITH AND FAIR DEALING

37. Plaintiff re-alleges, restates and incorporates the allegations contained in paragraphs one (1) through twenty-seven (27) above, and further alleges as follows:

38. Plaintiff had a wireless agreement with AT&T wherein Plaintiff had a reasonable expectation of performance of the agreement with no throttling of Plaintiff's data speed so as to provide Plaintiff with unlimited data.

39. AT&T was required to act in a commercially reasonable manner and limiting its ability to act capriciously to contravene the reasonable expectations of the Plaintiff in the AT&T's performance wireless agreement.

40. Moreover, AT&T was required to act in a commercially reasonable manner in billing Plaintiff for bogus administrative costs which were not for what they claimed in the contract. AT&T's representations on its bills to Plaintiff and it its website regarding the administrative fee charged on the account were false statements of material fact.  AT&T's representation that the  Administrative Fee is a charge assessed by AT&T that helps defray a portion of certain expenses AT&T incurs,

including but not limited to: (a) charges AT&T or its agents pay to interconnect with other carriers to deliver calls from AT&T customers to their customers; and (b) charges associated with cell site rents and maintenance are false."

41. The express terms of the wireless agreement required AT&T to provide unlimited data and true administrative costs as defined by the contract.

42. AT&T has breached the express terms of the wireless agreement.

43. As a result of AT&T's breach of implied covenant of good faith and fair dealing, Plaintiff has been damaged.

WHEREFORE, Plaintiff respectfully requests that this Court grant judgment in its favor and against AT&T for compensatory damages, nominal damages, interest, court costs, and any other relief the Court deems just and proper.

## COUNT III - DAMAGES UNDER THE FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT

44. Plaintiff re-alleges, restates, and incorporates the allegations contained in paragraphs one (1) through twenty-seven (27) above, and further alleges as follows:

45. Plaintiff, at all material times, was a consumer, as defined under the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), § 501.201, *et seq*., Fla. Stat.

46. AT&T, at all material times, was engaged in trade or commerce, as defined under the FDUTPA and is not otherwise exempt.

47. Upon information and belief, Plaintiff was a consumer who had an "unlimited" data plan as advertised by AT&T. In the advertising, sale, and renewal of the unlimited mobile data plan, AT&T entered into a mobile data contract with Plaintiff that was advertised as providing access to unlimited mobile data and did not provide that AT&T could modify, diminish, or impair the services of customers who use more than a specified amount of data for permissible activities.

48. AT&T imposed significant data speed restrictions on Plaintiff by virtue of its use of its network which flows throughout the United States and in particular, Florida. This practice was, and is, an unfair act or a deceptive trade practice and is specifically complained of by the Federal Trade Commission.

49. In the advertising, sale, and renewal of mobile data plans, AT&T has represented, directly or indirectly, expressly or by implication, to unlimited mobile data plan customers that the amount of data that the customer could access in any billing period would not be limited. Such a representation is unfair or deceptive as defined under the FDUTPA. Plaintiff is not in possession of the actual mobile data contract as it under the exclusive control of AT&T.

50. AT&T has failed to disclose, or has failed to disclose adequately, that it imposes significant and material data speed restrictions on unlimited mobile data plan customers who use more than a fixed amount of data in a given billing cycle. AT&T's failure to

disclose or adequately disclose this fact, in light of the representations made, was, and is, a deceptive act or practice.

51. AT&T specifically throttled Plaintiff's data speed, which by its own admission is an unfair or deceptive trade practice as defined under the FDUTPA.

52. These unfair or deceptive trade practices are the proximate cause of Plaintiff's actual damages.

53. Furthermore, in the advertising, sale, and renewal of mobile data and wireless plans and acceptance of payments, AT&T has represented, directly or indirectly, expressly or by implication, to customers that it would be charged a certain amount. AT&T has since added an "Administrative Fee" to Plaintiff's bill which is unfair and deceptive as it is not what its being used for despite its definition in the wireless agreement. The administrative fee is a textbook pass through fee.

54. Since the Administrative Fee was first imposed in 2013, AT&T has unilaterally increased the

monthly amount of the fee three times. AT&T increased the Administrative Fee to $0.76 per month per phone line starting in June 2016. Then, in 2018, the increases because larger and more frequent (around the same time AT&T's parent company incurred significant debt in acquiring Time Warner Inc.).

55.  AT&T raised the Administrative Fee to $1.26 per month per phone line starting in April 2018, and then again to $1.99 per month per phone line starting in June 2018, which is the current monthly fee as of this filing. Thus, between March 2018 and June 2018 alone, AT&T increased the Administrative Fee a whopping 162% increase in just three months.

56. AT&T's representations on its bills to Plaintiff and it its website regarding the administrative fee charged are deceptive and in fact misrepresent the truth.  AT&T's representation that the Administrative Fee is a charge assessed by AT&T that helps defray a portion of certain expenses AT&T incurs, including but not limited to: (a) charges AT&T or its agents pay to interconnect with other carriers to deliver calls from AT&T customers to their customers; and (b) charges associated with cell site rents and maintenance is false.  The administrative fee is instead a scheme to funnel direct profit to AT&T rather than pay for any identifiable increase in costs.

57. AT&T knew or should have known that the representations regarding the administrative fee are false as AT&T's cost in interconnect charges and cell site charges actually decreased based on its own SEC federal filings.  AT&T knew that the monthly administrative fee was inflated, and not the result of good faith financial practices but instead designed to raise profit for the company without a specific actual change in price for services.

58. AT&T's knowingly unfair or deceptive trade practices of assessing and collecting a bogus administrative fee are the proximate cause of Plaintiff's 's actual damages.

59. AT&T's unfair and deceptive trade practice is not a result of a bona fide error or mistake but

instead a conscious decision by AT&T.

60. Plaintiff has retained the undersigned to represent it in this action and pay a reasonable fee for said legal services.

WHEREFORE, Plaintiff respectfully requests that this Court grant judgment in its favor and against AT&T for damages, interest, court costs, attorney's fees pursuant to §501.2105, Florida Statutes, and any other relief the Court deems just and proper.

## COUNT IV – UNJUST ENRICHMENT

61. Plaintiff re-alleges, restates, and incorporates the allegations contained in paragraphs one (1) through five (5) above, and further alleges as follows:

62. Plaintiff is a customer of AT&T.

63. AT&T assessed improper increased charges of $1.99/month administrative fee on Plaintiff's account.

64. AT&T has stated that "The Administrative Fee is a charge assessed by AT&T that helps defray a portion of certain expenses AT&T incurs, including but not limited to: (a) charges AT&T or its agents pay to interconnect with other carriers to deliver calls from AT&T customers to their customers; and (b) charges associated with cell site rents and maintenance. It is not a tax or charge which the government requires AT&T to collect from its customers. This charge is subject to change from time to time as AT&T's costs change.

65. In June of 2018, AT&T increased its "administrative fee" to $1.99/per, per month with no specific reason or allegation that AT&T's costs had changed.

66. AT&T knew the monthly administrative fee was inflated and not the result of good faith financial practices and instead a deceptive fee.  In essence this administrative fee is a textbook pass-through fee designed to increase profits of the company without increasing the advertised price of the

services to Plaintiff.

67. AT&T had knowledge of payments by Plaintiff and voluntarily accepted and retained the benefit conferred on it.

68. Under the circumstances, it would be inequitable for AT&T to retain the benefit and thus, Plaintiff has suffered damages.

      WHEREFORE, Plaintiff demands judgment against AT&T for compensatory damages, interest, and court costs and any other relief the Court deems just and proper.

## COUNT V – DECLARATORY RELIEF PURSANT TO §501.211(1), FLA. STAT. AGAINST AT&T

69. Plaintiff alleges, restates, and incorporates the allegations contained in paragraphs two (2) through twenty-seven (27) above and further alleges as follows:

70. This is an action for declaratory relief under §501.211(1), Fla. Stat.

71. This action arises out of AT&T's collection of geolocation data and the unauthorized dissemination to third-parties of the geolocation data collected from Plaintiff's cell phone.

72. AT&T admittedly sells customer geolocation data to third-parties, including but not limited to data aggregators, who in turn, are able to use or resell the geolocation data with little or no oversight by AT&T.

73. This is an action for declaratory relief as a result of AT&T's gross failure to safeguard highly personal and private consumer geolocation data.

74. AT&T is obligated to protect the confidential personal information of its customers.

75. FCA § 222(a) provides that "[e]very telecommunications carrier has a duty to protect the confidentiality of proprietary information of, and relating to . . . customers . . . ." The "confidential proprietary information" referred to in FCA § 222(a) is abbreviated herein as "CPI."

76. FCA § 222(c) additionally provides that "[e]xcept as required by law or with the approval of the

customer, a telecommunications carrier that receives or obtains customer proprietary network information by virtue of its provision of a telecommunications service shall only use, disclose, or permit access to individually identifiable customer proprietary network information in its provision of (A) the telecommunications service from which such information is derived, or (B) services necessary to, or used in, the provision of such telecommunications service, including the publishing of directories." The "customer proprietary network information" referred to in FCA § 222(c) is abbreviated herein as "CPNI."

77. FCA § 222(h)(1) (emphasis added) defines CPNI as "(A) information that relates to the quantity, technical configuration, type, destination, **location**, and amount of use of a telecommunications service subscribed to by any customer of a telecommunications carrier, and that is made available to the carrier by the customer solely by virtue of the carrier-customer relationship; and (B) information contained in the bills pertaining to telephone exchange service or telephone toll service received by a customer of a carrier, except that term does not include subscriber list information."

78. The Federal Communication Commissions ("FCC") has promulgated rules to implement FCA § 222 "to ensure that telecommunications carriers establish effective safeguards to protect against unauthorized use or disclosure of CPNI." *See* 47 CFR § 64.2001, *et seq*. ("CPNI Rules"); CPNI Order, 13 FCC Rcd. at 8195 ¶ 193.

79. The CPNI Rules limit disclosure and use of CPNI without customer approval to certain limited circumstances (such as cooperation with law enforcement), none of which are applicable to the facts here. CPNI Rules § 64.2005.

80. The CPNI Rules §§ 64.2009(b), (d), and (e) require carriers to implement safeguards to protect customers' CPNI.

81. These safeguards include: (i) training personnel "as to when they are and are not authorized to use CPNI[;]" (ii) establishing "a supervisory review process regarding carrier compliance with the rules[;]" and (iii) filing annual compliance certificates with the FCC.

82. The CPNI Rules § 64.2010 further require carriers to implement measures to prevent the disclosure of CPNI to unauthorized individuals. For example, "carriers must take reasonable measures to discover and protect against attempts to gain unauthorized access to CPNI." CPNI Rules § 64.2010(a).

83. As further alleged below, Plaintiff believes that AT&T violated FCA § 222 and the CPNI Rules when it disclosed CPNI and CPI to third-parties without Plaintiff's authorization or permission.

84. In its Privacy Policy ("Privacy Policy") and Code of Business Conduct ("COBC"), AT&T acknowledges its responsibilities to protect customers' "Personal Information" under the FCA, the CPNI Rules, and other regulations.

85. A true and correct copy of the Privacy Policy is attached hereto as **Exhibit A**.

86. A true and correct copy of the COBC is attached hereto as **Exhibit B**.

87. In its Privacy Policy and COBC, AT&T makes binding promises and commitments to Plaintiff and its customers, that it will protect and secure their "Personal Information." The Privacy Policy defines "Personal Information" as "[i]nformation that identifies or reasonably can be used to identify you." AT&T states that, included in the information that it collects from and about its customers, is its customers' "wireless device location." AT&T also collects information relating to the use of its networks, products, and services. "Personal Information" thus includes both CPI and CPNI under FCA § 222 and the CPNI Rules.

88. In its Privacy Policy, AT&T promises that it takes its responsibility "to safeguard your [i.e., the customer's] Personal Information seriously" and that it will not share its customers' Personal

Information except for legitimate business purposes.

89. AT & T's Privacy Policy further states that "we will not sell [users'] Personal Information to anyone, for any purpose. Period."

90. AT&T further promises that it has numerous safeguards in place to protect the Personal Information of its customers in its Privacy Policy and makes the following promises to its customers:

> We've worked hard to protect your information. And we've established electronic and administrative safeguards designed to make the information we collect secure. Some examples of those safeguards include:
>
> - All of our employees are subject to the AT&T Code of Business Conduct (COBC) and certain state- mandated codes of conduct. Under the COBC, all employees must follow the laws, rules, regulations, court and/or administrative orders that apply to our business— including, specifically, the legal requirements and company policies surrounding the privacy of communications and the security and privacy of your records. We take this seriously, and any of our employees who fail to meet the standards we've set in the COBC are subject to disciplinary action. That includes dismissal.
>
> - We've implemented technology and security features and strict policy guidelines to safeguard the privacy of your Personal information. Some examples are:
>
>   - Maintaining and protecting the security of computer storage and network equipment, and using our security procedures that require employee user names and passwords to access sensitive data;
>   - Applying encryption or other appropriate security controls to protect Personal Information when stored or transmitted by us;
>   - Limiting access to Personal Information to only those with jobs requiring such access; and
>   - Requiring caller/online authentication before providing Account Information so that only you or someone who knows your Account Information will be able to access or change this information.

91. AT&T's COBC also makes binding commitments to Plaintiff as AT&T customers, that it will protect their Personal Information and that it will adhere to all of its legal obligations. Those legal

obligations include FCA § 222, the CPNI Rules, and other legal obligations that govern protection of confidential and private information.

92. For example, AT&T's chairman and chief executive, Randall Stephenson, and its chief compliance officer, David Huntley promise—in a video addressing AT&T's commitment to customer privacy—that because "[o]ur customers count on us . . . , we will follow not only the letter of the law, but the spirit of the law" and "that we will always take responsibility." A transcript of the video is attached hereto as **Exhibit C.**

93. The COBC also specifically promises that AT&T will "protect the privacy of our customers' communications" because "[n]ot only do our customers demand this, but the law requires it . . . . Maintaining the confidentiality of communication is, and always has been, a crucial part of our business." **Exhibit B** at 10.

94. AT&T further promises in the COBC that it "protect[s] the information about our customers that they entrust to us." *Id.* Acknowledging that "AT&T possesses sensitive, detailed information about our customers, who rely on AT&T to safeguard that information" and that "[l]aws and regulations tell us how to treat such data," AT&T promises Plaintiff, as AT&T customers, that "[a]ny inappropriate use of confidential customer information violates our customers' trust and may also violate a law or regulation. *Id.* Preserving our customers' trust by safeguarding their private data is essential to our reputation." *Id.*

95. Plaintiff believes that AT&T flagrantly and repeatedly violated its commitments made to Plaintiff in its Privacy Policy and COBC, as well as its legal obligations under the FCA and the CPNI Rules by willingly disclosing Plaintiff 's CPNI to unauthorized third-parties.

96. On May 8, 2018, Senator Ron Wyden sent a letter ("the Wyden Letter") to AT&T President and CEO Randall L. Stephenson. The Wyden Letter (attached hereto as **Exhibit D**). In the Letter,

Senator Wyden expressed, in very clear terms, great concern with AT&T's handling of consumer information. It had come to Senator Wyden's attention that a company called Securus Technologies, a major provider of correctional-facility telephone services, purchased real-time location information from major wireless carriers, and provided that information, via a self-service web portal, to the government "for nothing more than the legal equivalent of a pinky promise."

97. In the Wyden Letter, Senator Wyden detailed how Securus confirmed to him that the web portal enabled surveillance of customers of "every major U.S. wireless carrier," which, in Senator Wyden's words, "needlessly exposes millions of Americans to potential abuse and unchecked surveillance by the government."

98. Senator Wyden also explained how wireless carriers "are prohibited from sharing certain customer information, including location data, unless the carrier either has the customer's consent or sharing is otherwise required by law." He ultimately concluded that, "the fact that Securus provide[d] this service at all suggests that AT&T does not sufficiently control access to [its] customers' private information."

99. The process by which Securus obtained access to the customers' information in the first place is part of the problem. It purchased real-time location information on AT&T's customers "through a third party location aggregator that has a commercial relationship with the major wireless carriers . . . ."

100.    AT&T had no active oversight or direction in Securus' use of AT&T customer location data.

101.    In the Wyden Letter, Senator Wyden demanded that AT&T "undertake a comprehensive audit of each third party" with whom AT&T shared its customers' personal information, and "terminate [its] data-sharing relationships with all third parties that have misrepresented customer

consent or abused their access to sensitive customer data."

102.　　On June 15, 2018, AT&T sent a reply letter ("the First AT&T Letter") to Senator Wyden (hereinafter "the First AT&T Letter") (attached hereto as **Exhibit E**). In the First AT&T Letter, after representing that it "values and respects its customers' privacy," AT&T maintained that it had "never authorized the use of its customer data for the Securus web portal . . . ," and that it was "actively investigating the extent to which Securus may have obtained unauthorized access to AT&T customer location data . . . ." AT&T also represented that it had "suspended all access by Securus to AT&T customer location data."

103.　　AT&T went on to detail how it shares its customers' data: it "permits authorized third parties to access customer location data for location-based services . . . only where a customer consents to such disclosure . . . ." It then explained the process of data "aggregation." In AT&T's words, aggregators with whom AT&T contracted "manage[] requests for customer data across multiple carriers." The example provided by AT&T was that a data aggregator could locate a customer who required roadside assistance, and identify the carrier from which location data needed to be requested.

104.　　Next, AT&T stated that location-based services providers (such as Securus) are required to give customers notice and obtain consent to use location information. Evidently, Securus—and others—were not obtaining such consent or providing such notice. AT&T admitted in the First AT&T Letter that it did not authorize Securus' collection of customer data for its self-service web portal.

105.　　AT&T concluded by stating that "AT&T has no reason to believe that there are other instances of unauthorized access to AT&T customer location data."

106.　　Six months later, on January 8, 2019, Motherboard (a news outlet) ran an investigative

article ("the Article") concerning major telecommunications carriers (including AT&T) selling access to geolocation data to third-parties (hereinafter "The Article") (attached hereto as **Exhibit F**).

107.     In the Article, the journalist gave a bounty hunter $300 to locate a cell phone. The bounty hunter did just that using "real-time location data sold to bounty hunters that ultimately originated from the major [telecommunications carriers]."

108.     The Article revealed that a company called MicroBilt was selling cell phone geolocation services with little oversight to a spread of different private industries, "ranging from car salesmen and property managers to bail bondsmen and bounty hunters . . . ." Additionally, this "spying capability is also being resold to others on the black market who are not licensed by the company to use it . . . seemingly without MicroBilt's knowledge."

109.     Motherboard's investigation revealed that "a wide variety of companies can access cell phone location data, and . . . the information trickles down from cell phone providers to a wide array of smaller players, who don't necessarily have the correct safeguards in place to protect that data."

110.     Motherboard found that some of the location aggregators were so sloppy that "anyone could geolocate nearly any phone in the United States at a click of a mouse."

111.     In response to a request for comment, AT&T told Motherboard that use of its customers' data by bounty hunters "would violate [its] contract and Privacy Policy."

112.     The telecommunications carriers are the beginning of a dizzying chain of data selling, where data goes from company to company, and ultimately ends up in the hands of literally anybody who is looking.

113.     The information a person could obtain included the name and address of an individual, and the geolocation of that individual's cell phone.

114.     One of the data aggregators with whom AT&T contracted is called MicroBilt.

115.     MicroBilt was engaged in the process of selling consumer data to literally anybody who would pay for it, including the name and address of an individual, and the geolocation of that individual's cell phone. Some of the sectors that utilized MicroBilt's services were landlords, car salesmen, and others conducting credit checks.

116.     In essence, AT&T was relying on the end user of the location data not to abuse the data, or not to obtain the data under false pretenses. In practice, the end users exercised no oversight over the process whatsoever.

117.     Three weeks after Motherboard published its story, on January 24, 2019, Senator Wyden, along with fourteen other United States Senators, sent a letter to the FCC and Federal Trade Commission (hereinafter "Second Wyden Letter") (attached hereto as **Exhibit G**), urging the chairmen of the respective Commissions to "broadly investigate the sale of Americans' location data by wireless carriers, location aggregators, and other third parties."

118.     On February 15, 2019, AT&T sent Senator Wyden a letter concerning its relationship with MicroBilt (hereinafter "Second AT&T Letter") (attached hereto as **Exhibit H**).

119.     In its letter, AT&T explained that in response to the January 9, 2019 Motherboard story, AT&T "immediately suspended MicroBilt's access to AT&T location information" and that it "began investigating whether any AT&T customers' location information had been transmitted without consent or for purposes beyond the limited fraud-prevention use [it] had authorized for MicroBilt."

120.     In the Second AT&T Letter, AT&T also stated that:

> . . . before we provide location to any aggregator or service provider, we investigate them–i.e., their corporate history, security policies, and privacy policies–as well as their planned use of the data. We do not share location information with any entity for any purpose that

has not been vetted and approved. If approved, the aggregator or service provider must provide conspicuous notice to the customer of the intended use of the information and obtain the customer's consent to that use, and they are prohibited from using it for any other purpose. Those entities must provide AT&T with a confirmation of customer consent for each request for AT&T location data, and we review those records daily.

121.    Finally, AT&T stated that, "based on a review going back to January 2016, beyond the allegations of inappropriate use of location information by Securus Technologies, AT&T has not identified any use of location information where the location aggregator or another third-party obtained AT&T location information without prior customer consent."

122.    On March 13, 2019, Senator Wyden responded in a letter to AT&T, and the other telecommunications carriers (hereinafter "Third Wyden Letter") (attached hereto as **Exhibit I**) seeking additional information regarding AT&T's "repeated sale and improper disclosure of customer location data" to third-parties. In the Third Wyden Letter, Senator Wyden said it was "now abundantly clear that [AT&T has] failed to be [a] good steward[] of [its] customers' private location information."

123.    The Third Wyden Letter also chastised the telecommunications carriers for their failures to comply with a federal law that requires wireless carriers "to protect Customer Proprietary Network Information (CPNI), which includes location data." Wyden also noted that wireless carriers are "required to report breaches of CPNI to federal law enforcement agencies.

124.    On March 26, 2019, the FTC issued an order to AT&T, among others, seeking information the agency will use to examine how it collects, retains, uses, and discloses information about consumers and their devices.

125.    AT&T is a telecommunications common carrier engaged in interstate commerce by wire regulated by the FCA and subject to the requirements, *inter alia,* of §§ 206 and 222 of the FCA.

126.     FCA § 222(a) requires every telecommunications carrier to protect, among other things, its customers' CPI.

127.     FCA § 222(c) further requires every telecommunications carrier to protect, among other things, its customers' CPNI.

128.     Plaintiff believes the information disclosed by AT&T to third-parties, including but not limited to data aggregators, without consent was CPI and CPNI under FCA § 222.  AT&T failed to protect the confidentiality of Plaintiff's CPI and CPNI including their wireless telephone numbers, account information, private communications, and location, by divulging that information to third-parties, including but not limited to data aggregators.

129.     AT&T likely profited from the sale and unauthorized dissemination of Plaintiff s' CPI and CPNI.  On February 28, 2020, the FCC issued a notice of apparent liability for forfeiture and admonishment against AT&T's parent company.  (attached hereto as **Exhibit J**).

130.     Plaintiffs seeks a declaratory judgment that AT&T's blatant violation of its own privacy policy is an unfair, deceptive and/or unconscionable act, and thus a per se violation of §501.203(3)(c), Fla. Stat., the Florida Deceptive and Unfair Trade Practices Act.

131.     Plaintiff seeks a declaratory judgment that AT&T's actions violated the FDUPTA.

132.     AT&T's conduct was not a result of a bona fide error.

133.     Under the FDUTPA, without regard to any other remedy or relief to which a person is entitled, anyone aggrieved by a violation of this part may bring an action to obtain a declaratory judgment that an act or practice violates this part.  See Sec. 501.211(1), Fla. Stat.

134.     Furthermore, any person aggrieved by a violation of FDUTPA may bring an action for declaratory relief.  Plaintiff is aggrieved as result of AT&T's knowing and flagrant violation of its own privacy practices.

135.    Plaintiff seeks a declaratory judgment that AT&T acts or practices have violated Florida law and there is a bona fide dispute between the parties.

136.    Plaintiff has no adequate remedy at law.

137.    Plaintiff has retained the undersigned to represent it in this action and pay a reasonable fee for said legal services.

WHEREFORE, Plaintiff respectfully requests that this Court grant judgment in its favor and against AT&T declaring its conduct as a violation of FDUTPA, court costs, attorney's fees pursuant to §501.2105, Fla. Stat., and any other relief the Court deems just and proper.

**COUNT VI – INJUNCTIVE RELIEF UNDER §501.211(1), FLA. STAT. FOR AT&T'S VIOLATION OF ITS OWN DATA PRIVACY POLICY**

138.     Plaintiff alleges, restates, and incorporates the allegations contained in paragraphs two (2) through twenty-seven (27), seventy-one (71) through one hundred thirty (129) above and further alleges as follows:

139.    This is an action for declaratory relief under §501.211(1), Fla. Stat.

140.    Plaintiff seeks injunctive relief to prevent AT&T's from continuing to commit the actions as alleged in this count which are unconscionable and consequently constitute an unfair or deceptive act or trade practice within the meaning of the FDUPTA.

141.    AT&T's conduct was not a result of a bona fide error.

142.    Under the FDUTPA, without regard to any other remedy or relief to which a person is entitled, anyone aggrieved by a violation of this part may bring an action to enjoin a person who has violated, is violating, or is otherwise likely to violate this part.  See §501.211(1), Fla. Stat.

143.    Furthermore, any person aggrieved by a violation of FDUTPA may bring an action for injunctive relief.

144.    Plaintiff has no adequate remedy at law and seeks to enjoin AT&T from further violating

its own privacy policy as there is a bona fide dispute between the parties.

145.     Plaintiff has retained the undersigned to represent it in this action and pay a reasonable fee for said legal services.

WHEREFORE, Plaintiff respectfully requests that this Court grant injunctive relief against AT&T preventing them from violating FDUTPA, court costs, attorney's fees pursuant to §501.2105, Fla. Stat., and any other relief the Court deems just and proper.

## <u>CERTIFICATE OF SERVICE</u>

WE HEREBY CERTIFY that a true and correct copy of the foregoing was sent via e-portal this 13th day of March, 2020 to: Manuel A. Garcia-Linares, Esquire (mgarcialinares@daypitney.com , brodriguez@daypitney.com , jsolorzano@daypitney.com) Andrew R. Ingalls, Esquire (aingalls@daypitney.com) Day Pitney LLP, 396 Alhambra Circle, North Tower - 14th Floor, Miami, Florida 33134.

Beighley, Myrick, Udell & Lynne, PA
Attorneys for Plaintiff
150 West Flagler Street
Suite 1800
Miami, FL 33130
(305) 349-3930 – Phone

By:      /s/  *Maury L. Udell*
         Maury L. Udell, Esquire
         mudell@bmulaw.com



8 Oct 2016 – 1 Mar 2019

**EXHIBIT "A"**

# About Our Privacy Policy



(/web/)

https://about.att.com/sites/privacy_policy/full_privacy_policy                Go

168 captures (/web/)

Full Privacy Policy (/web/20180201040115/https://about.att.com/sites/privacy_policy/full_privacy_policy)

▲ ▼ About this capture

Whenever you do something like buy one of our products, watch a show or download an app, information is created. Because we know your privacy is important, we have a Privacy Policy to explain how we collect, use and protect that information. There's a quick summary below, and the actual policy is written in **an easy to understand "Frequently Asked Questions" (FAQ) format (/web/20180201040115/https://about.att.com/sites/privacy_policy/terms)**. We want to simplify this explanation, so you can make informed choices about your privacy, and then spend the rest of your time enjoying our products and services.

**Effective May 2, 2017**

# A Quick Summary of Our Privacy Policy

Our Privacy Policy applies to your use of all products, services and websites offered by AT&T and our AT&T affiliates, such as DIRECTV, unless they have a different privacy policy. Because some apps, including some AT&T and DTV branded apps, require additional information, or use information in different ways, they may have their own privacy policies and/or terms and conditions. These apps may also offer you additional choices for managing your personal information.

Back to Top

**Our privacy commitments**

- We don't sell your Personal Information to anyone for any purpose. Period.
- We keep your Personal Information in our business records while you are a customer, or until it is no longer needed for business, tax or legal purposes.
- We will keep your information safe using encryption or other appropriate security controls.

Back to Top

**Here's some of the information we collect:**

- **Account Information** includes your name, address, telephone number, e-mail address, service-related details such as payment data, security codes, service history and other information like that;
- **Network Performance & Usage Information** tells us how you use our networks, our products and our services, and how well our equipment and networks are performing;
- **Web Browsing & Wireless Application Information** tells us about the websites you visit and the mobile applications you use on our networks;
- **Location Information** tells us where your wireless device is located, as well as your ZIP-code and street address;
- **TV Viewing Information** tells us about which programs you watch and record and similar information about how you use our video services and applications.

Back to Top

**Here are the three basic ways we collect it:**

- We get information from you when you do things like make a purchase from us;
- We collect it from how you use our products and services;
- We obtain information from other sources, like credit agencies, marketing companies, and other service providers.

Back to Top

**Here are just some of the ways we use it. To:**

- Provide services and improve your customer experience;
- Send you bills for your services;
- Respond to your questions;
- Address network integrity, help in fraud prevention and network and device security issues;
- Do research and analysis to maintain, protect, develop and improve our networks and services;
- Let you know about service updates, content, offers and promotions that may be of interest to you;
- Improve entertainment options;
- Deliver Relevant Advertising;
- Create External Marketing & Analytics Reports;
- Assist in the prevention and investigation of illegal activities and violations of our Terms of Service or Acceptable Use Policies.

**Back to Top**

**Some examples of who we share your Personal Information with:**

- **Across our companies** to give you the best customer experience and to help you get everything we have to offer.
- **Other, non-AT&T companies that perform services on our behalf** only as needed for them to perform those services. We require them to protect your information consistent with our Policy.
- **With other companies and entities, to:**
  - Respond to 911 requests and other emergencies or exigencies;
  - Comply with court orders and other legal process;
  - Assist with identity verification, and preventing fraud and identity theft;
  - Enforce our agreements and property rights;
  - and Obtain payment for products and services including the transfer or sale of delinquent accounts to third parties for collection

**Back to Top**

**Understanding Personal, Anonymous & Aggregate Information**

- What is Personal Information? Information that identifies or reasonably can be used to identify you.
- What is Anonymous Information? This is information that doesn't identify you and can't reasonably be used to identify you specifically.
- What is Aggregate Information? We take a whole bunch of people's data and combine it into anonymous groups or categories.
- How do we use this information? We use and share this information in many ways including research, analysis, retail marketing, and Relevant Advertising. This data is also included in External Marketing & Analytics Reports.
- Want to learn more? Go **here (/web/20180201040115/https://about.att.com/sites/privacy_policy/terms#aggregate)**.

**Back to Top**

**Our Online Privacy Policy for Children**

- We want you to know that we don't knowingly collect personally identifying information from anyone under the age of 13 unless we first obtain permission from the child's parent or legal guardian.

**Back to Top**

**Your Choices & Controls**

- For information about children's safety and parental controls, view our **AT&T Smart Controls and DIRECTV Parental Controls (http://web.archive.org/web/20180201040115/https://www.att.com/shop/wireless/smartcontrols.html)**.
- You have choices about certain types of advertising you get from us;
- You can control whether your anonymous information is used in our External Marketing & Analytics Reports;
- You can choose whether to receive marketing calls, e-mails or text messages or certain other communications from us;
- You have a choice about how we use your Customer Proprietary Network Information.

**Back to Top.**

Full Privacy Policy | Privacy Policy | AT&T

Visit our **Privacy Policy (/web/20180201040115/https://about.att.com/sites/privacy_policy/full_privacy_policy)** for more information.

- **Definitions (/web/20180201040115/https://about.att.com/sites/privacy_policy/terms#definitions)**
- **Scope of this Policy (/web/20180201040115/https://about.att.com/sites/privacy_policy/terms#scope)**
- **The Information We Collect, How We Collect It, And How We Use It (/web/20180201040115/https://about.att.com/sites/privacy_policy/terms#collect)**
- **Information Sharing (/web/20180201040115/https://about.att.com/sites/privacy_policy/terms#sharing)**
- **Online Activity Tracking and Advertising (/web/20180201040115/https://about.att.com/sites/privacy_policy/terms#tracking)**
- **Location Information (/web/20180201040115/https://about.att.com/sites/privacy_policy/terms#location)**
- **Aggregate and Anonymous Information (/web/20180201040115/https://about.att.com/sites/privacy_policy/terms#aggregate)**
- **External Marketing & Analytics Reports (/web/20180201040115/https://about.att.com/sites/privacy_policy/terms#analytics)**
- **Online Privacy Policy for Children (/web/20180201040115/https://about.att.com/sites/privacy_policy/terms#children)**
- **Data Protection & Security (/web/20180201040115/https://about.att.com/sites/privacy_policy/terms#protection)**
- **Changes (/web/20180201040115/https://about.att.com/sites/privacy_policy/terms#changes)**
- **Choices & Controls (/web/20180201040115/https://about.att.com/sites/privacy_policy/terms#controls)**
- **How to Contact Us (/web/20180201040115/https://about.att.com/sites/privacy_policy/terms#contact)**

**Your California Privacy Rights**

California Civil Code Section 1798.83 entitles California customers to request information concerning whether a business has disclosed Personal Information to any third parties for their direct marketing purposes. As stated in this Privacy Policy, we will not sell your Personal Information to other companies and we will not share it with other companies for them to use for their own marketing purposes without your consent.

**California Web Site Data Collection & "Do Not Track" Notices**

**Web Site Data Collection:** We do not knowingly allow other parties to collect personally identifiable information about your online activities over time and across third-party web sites when you use our websites and services. We provide information about the opt-out choices available to customers, and the opt-out choices provided by certain third-party website and mobile application analytics companies we use **here (/web/20180201040115/https://about.att.com/sites/privacy_policy/rights_choices)**.

**"Do Not Track" Notice:** Because the providers of "do not track" and similar signals do not yet operate according to common, industry-accepted standards, we currently do not respond to those signals. For more information on Do Not Track, please visit **www.allaboutdnt.com (http://web.archive.org/web/20180201040115/http://www.allaboutdnt.com/)**.

California customers who wish to request further information about our compliance with these requirements, or have questions or concerns about our privacy practices and policies may contact us at **privacypolicy@att.com (http://web.archive.org/web/20180201040115/mailto:privacypolicy@att.com)**, or write to us at AT&T Privacy Policy, Chief Privacy Office, 208 S. Akard, Room 1033, Dallas, TX 75202.

**Back to top**

# AT&T Privacy Policy FAQ

## Our AT&T Privacy Policy in easy to understand, FAQ format.

We understand that everyone thinks that privacy policies are long, complicated and difficult to understand. So we're going to try to make this as simple as possible.

**What is the purpose of AT&T's Privacy Policy?** Whenever you do something like buy or use one of our products or services or visit our websites, information is created. Because we know privacy is important to you, we have the AT&T Privacy Policy to explain how we collect, use, protect, and share that created information. Thus, the main purpose of the Policy is to help you

understand our relationship and how we are able to deliver and improve the services we offer.

**How should this Policy be used?** We encourage you to read the whole policy so you will understand fully our relationship. To find specific information, here is an outline of where you will find answers to your questions about key topics:

Visit these links for more information.

- **Definitions**
- **Scope of this Policy**
- **The Information We Collect, How We Collect It, And How We Use It**
- **Information Sharing**
- **Online Activity Tracking and Advertising**
- **Location Information**
- **Aggregate and Anonymous Information**
- **External Marketing & Analytics Reports**
- **Online Privacy Policy for Children**
- **Data Protection & Security**
- **Changes**
- **Choices & Controls**
- **How to Contact Us**

## Definitions

**Let's start with what we mean when we say:**

**Aggregate Information:** We combine individual information into anonymous groups of customers or users. One way to think of it is in terms of a survey or opinion poll. Aggregate information would tell you that 80 percent of the people voted for a candidate, but not who actually voted. These groups are large enough to reasonably prevent individuals from being identified.

**Anonymous Information:** Information that doesn't directly identify and can't reasonably be used to identify an individual customer or user.

**AT&T:** Throughout this Policy, references to "AT&T," "we," "us," and "our" include the family of AT&T companies around the world except affiliates or applications with a separate privacy policy.

**Customer:** Anyone who purchases or uses our products or services. When a customer purchases retail products or services for use by others, like a family account, those family members also are customers.

**Mobile Application:** A software application that runs on smartphones, tablet computers or other mobile devices and that allows users to access a variety of services and information.

**Personal Information:** Information that directly identifies or reasonably can be used to figure out the identity of a customer or user, such as your name, address, phone number and e-mail address. Personal Information does not include published listing information.

**Relevant Advertising:** Creates aggregate audience segments based on non-personally identifiable information about customers (like age, ethnicity, income range, a particular geographic area, and their interests) to serve advertising that is more likely to be useful to those audience segments. "Online behavioral advertising" is one type of Relevant Advertising. It uses interest categories based on the websites visited by people who are not personally identified to deliver advertising online.

**Third-Party Services:** Services from third-party service providers other than AT&T, such as banks or roadside assistance companies.

**User:** Anyone who visits our websites or uses our mobile applications.

**Website:** And other terms like "Internet site," "site" and "web page" all mean the same thing, namely any page or location on the Internet, no matter what device (cell phone, tablet, laptop, PC, etc.) or protocol (http, WAP, ftp or other) is used to access the page or location.

**Back to Top**.

**Questions about the Scope of this Policy**

### 1. To whom does the Policy apply?

This Privacy Policy applies to customers and users of AT&T products and services, except customers and users of products or services provided by an affiliate or an application with a different privacy policy.

### 2. What does this Policy cover?

This Privacy Policy covers our practices regarding the information we collect about our customers and users (how we collect it and how we use it). Use of our products and services, as well as visits to our websites, are subject to this Privacy Policy.

### 3. Do you have any Privacy Policies other than this one?

Yes. Some AT&T affiliates or applications may have separate privacy policies that describe how they collect, use and share information they collect from their customers and users. When we share Personal Information with those affiliates or combine it with information from those applications we protect it in a way consistent with this Privacy Policy.

Additionally, some of our applications may have terms and conditions that describe other privacy commitments or choices in addition to those in this Privacy Policy.

Some areas outside the United States require us to work a little differently. In that case, we may adopt separate privacy policies as necessary to reflect the requirements of applicable local laws.

The Joint AT&T EchoStar Privacy Policy for AT&T|DISH Network Customer Account Information remains in effect for AT&T|DISH subscribers.

### 4. What about my family members and other users of my AT&T account? Does this Policy apply to them?

Yes. You're responsible for making sure all family members or other users under your account understand and agree to this Policy. Get everyone together and talk about it. Or, send it by e-mail to make sure they're on board. Hang it on the fridge. Up to you, just share it!

### 5. When is information not covered by this Policy?

If you purchase or use the products or services of an AT&T affiliate that has a different privacy policy than this one, that privacy policy will apply.

Additionally, this Privacy Policy does not apply any time you give information to companies other than AT&T. Some examples are:

- When you use a non-AT&T Wi-Fi service;
- When you download applications or make purchases from other companies while using our Internet or wireless services;
- When you go to a non-AT&T website from one of our websites or applications (by clicking on a link or an advertisement, for example);
- When you give your information to another company through a website co-branded by AT&T but controlled by the other company;
- If you use public forums - such as social networking services, Internet bulletin boards, chat rooms, or blogs - the information is publicly available, and we cannot prevent distribution and use of that information by other parties;
- Information about your location, usage and the numbers you dial when you're out and about and roaming on the network of another company;
- When you purchase or use non-AT&T products (such as wireless devices, internet browsers and mobile applications) in combination with our services;
- When we license our brand to other companies for their use in marketing and selling certain non-AT&T products and services, information you give those companies is not covered by this Policy.

### 6. Can my information be covered by this Policy and other privacy policies at the same time?

Yes, that can happen. For example:

Sometimes we will work with other, unaffiliated companies to provide a service. In that case your information may be subject to this Policy and that of the other company. For example, you purchase one of our products or services from a retailer like

Best Buy or Amazon.com, any information you provide to them may be subject to both their policy and ours.

If you connect to our Wi-Fi service through another network, such as one provided in a hotel, airport or other venue, any information collected from your use of that network could be subject to either the AT&T Privacy Policy or the venue policy, and sometimes both. The same thing applies if you connect to our network through your employer's corporate network, or any network operated by a non-AT&T company.

We think it's a great idea to take a look at the privacy policies of any companies you do business with to learn how they use your information.

**7.  What about business customers?**

We may have written product or service agreements with our business customers that contain specific provisions about confidentiality, security or handling of information. When one of these agreements differs from or conflicts with this Policy, the terms of those agreements will apply. In all other instances, the terms of this Policy apply.

**Back to Top**.

**Questions About The Information We Collect, How We Collect It, And How We Use It**

**1.  What information do you collect?**

We may collect different types of information based on your use of our products and services and on our business relationship with you.

- **Account Information:**
  - **Contact Information** that allows us to communicate with you. We get this information when you order or register for our services. This would include information like your name, address, telephone number and e-mail address.
  - **Billing Information** related to your financial relationship with us, such as the services we provide to you, the telephone numbers you call and text, your payment history, your credit history, your credit card numbers, Social Security number, security codes and your service history.
- **Technical & Usage Information** related to the services we provide to you, including information about how you use our networks, services, products or websites. Some examples include:
  - **Equipment Information** that identifies the equipment on our networks, such as equipment type, device identifiers, device status, serial numbers, settings, configuration and software.
  - **Network Performance & Usage Information** about the operation of the equipment, services and applications you use on our networks. Examples of this might include wireless device location, the number of text messages sent and received, voice minutes used, calling and texting records, bandwidth used, and resources you use when uploading, downloading or streaming data to and from the Internet. We also collect information like transmission rates and delays, data associated with remote monitoring services and security characteristics.
    - Some Network Performance & Usage Information and some Billing Information is **Customer Proprietary Network Information or "CPNI."** Unique rules apply to CPNI. **Go here (/web/20180201040115/https://about.att.com/sites/privacy_policy/rights_choices#cpni)** to learn more about what it is, how we use it and the choice you can make about that use.
    - **Web Browsing & Mobile Application Information** such as IP addresses, URLs, data transmission rates and delays. We also learn about the pages you visit, the time you spend, the links or advertisements you see and follow, the search terms you enter, how often you open an application, how long you spend using the app and other similar information.
- **Location Information** includes your ZIP-code and street address, as well as the whereabouts of your wireless device. Location information is generated when your device communicates with cell towers, Wi-Fi routers or access points and/or with other technologies, including the satellites that comprise the Global Positioning System.
- **TV Viewing Information** is generated by your use of any of our satellite or IPTV (U-verse) services. These services may include video on demand, pay per view, DVR services, applications to watch your TV on the go for tablet or smartphone (such as AT&T Everywhere app) and similar AT&T services and products, including the programs and channels you and those in your household watch and record, the times you watch and how long you watch. It also includes information like the interactive channels and games provided by U-verse or DIRECTV. We also collect information related to your use and interaction with the equipment in your home, including the TV receivers, set top boxes, remotes and other devices you may use to access our services.

**2.  How Do You Collect Information?**

In three basic ways:

- **You Give It To Us** when you make a purchase or set up an account with us;
- **We Automatically Collect Information** when you use our networks, products and services. For example, we use network tools to collect your call records; we collect wireless device location from our networks and from your device; and we also use **cookies (/web/20180201040115/https://about.att.com/sites/privacy_policy/cookies_and_other_technologies)**, web server logs and other technologies.
- **We Obtain Information from Outside Sources** like credit reports, marketing mailing lists, and commercially available geographic and demographic information along with other publicly available information, such as public posts to social networking sites.

### 3. How Do You Use This Information?

We use your information to improve your experience and to make our business stronger. Some examples include:

- Providing and managing your services, responding to your questions and addressing problems;
- Delivering customized content, or advertising, such as personalized offers for products and services that may be of interest to you;
- Communicating service updates, offers and promotions;
- Protecting network integrity and security, ensuring quality control, optimizing capacity and preventing misuse;
- Network enhancement planning, engineering and technical support;
- Conducting research and analysis for maintaining, protecting and developing our networks and our services;
- Preventing illegal activities, suspected fraud, and potential threats to our networks and our customers' networks;
- Investigating violations of our Terms of Service, Acceptable Use Policies, or other service conditions or restrictions; and
- Protecting the safety of any person.

### 4. Do you use the information I store using one of your cloud services?

We only use it to provide you with that service, unless we first get your permission to use it for something different.

**Back to Top**

### Questions About Information Sharing

### 1. Do you provide information for phone books and Caller ID?

Yes and No.

Yes, we share the names, addresses and telephone numbers of our wireline telephone and U-verse Voice customers with businesses that publish directories and provide directory assistance services. We are required by law to do that. You may **contact us (http://web.archive.org/web/20180201040115/http://about.att.com/sites/privacy_policy/terms#contact)** and we honor your request for non-published or non-listed phone numbers. Once we provide published listing information to those businesses, they may use, sort, package, repackage and make it available again in different formats to anyone.

Yes, we also provide wireline and wireless calling name and number information for CallerID, and related services like Call Trace, which allow a person receiving a call to obtain the name and number of the party calling them.

No, we do not give listing information for wireless numbers to phone book publishers or directory assistance services without your permission.

### 2. Do you share my Personal Information internally?

Yes. Our products and services are developed, managed, marketed and sold by a variety of our affiliated companies. We may share Personal Information internally, including with affiliated companies that may have different privacy policies. When we do this we require the affiliated company or companies to protect the Personal Information in a way consistent with this Privacy Policy. We may also combine Personal Information with data derived from an application that has a different privacy policy. When we do that, this Privacy Policy applies to the combined data set. Sharing information in these ways helps us offer you the high quality, seamless and innovative range of products you have come to expect from us. Some of these include:

- Wireless voice, data, Internet, home security, automation and remote monitoring services provided by AT&T Mobility and AT&T Digital Life; and
- The suite of satellite and IPTV services, Voice and High Speed Internet Access services offered by our companies.

Full Privacy Policy | Privacy Policy Part I

If one of our subsidiaries does not operate under the AT&T brand, information sharing with that subsidiary is handled as though it is a non-AT&T company.

**3.  Do you share my Personal Information with other non-AT&T companies for them to market to me?**

We will only share your Personal Information with other non-AT&T companies for them to use for the marketing of their own products and services when we have your consent.

**4.  Are there any other times when you might provide my Personal Information to other non-AT&T companies or entities?**

Yes. We share your Personal Information with other, non-AT&T companies that perform services for us, like processing your bill. Because we take our responsibility to safeguard your Personal Information seriously, we do not allow those companies to use it for any purpose other than to perform those services, and we require them to protect it in a way consistent with this Privacy Policy. Companies that perform these services may be located outside the United States or the jurisdiction where you reside. If your Personal Information is shared with these companies, it could be accessible to government authorities according to the laws that govern those jurisdictions. There are also occasions when we provide Personal Information to other non-AT&T companies or other entities, such as government agencies, credit bureaus and collection agencies, without your consent. Some examples include sharing to:

- Comply with court orders, subpoenas, lawful discovery requests and other legal or regulatory requirements, and to enforce our legal rights or defend against legal claims;
- Obtain payment or make refunds for products and services that appear on your AT&T billing statements, including the transfer or sale of delinquent accounts or refund obligations to third parties for collection or payment.
- Enforce our agreements and protect our rights or property;
- Assist with identity verification and e-mail address validation;
- Respond to lawful requests by public authorities, including to meet national security or law enforcement requirements;
- Notify, respond or provide information (including location information) to a responsible governmental entity in emergency or exigent circumstances or in situations involving immediate danger of death or serious physical injury; and
- Notify the National Center for Missing and Exploited Children of information concerning child pornography of which we become aware through the provision of our services.

**5.  Do you share my personally identifiable TV Viewing Information with other, non-AT&T companies?**

We don't share your personally identifiable TV Viewing Information with other non-AT&T companies for them to use for the marketing of their own products and services without your consent. We are required to notify you about the special requirements we must follow when it comes to sharing your personally identifiable TV Viewing Information in response to a Court Order:

**Notice Regarding Disclosure of Personally Identifiable Information of Satellite and IPTV Subscribers in Response to A Court Order**

- In the case of a court order obtained by a non-governmental entity, we are authorized to disclose personally identifiable information collected from TV subscribers as a result of the subscriber's use of TV service only after providing prior notice to the subscriber.
- In the case of a court order obtained by a governmental entity, we are authorized to disclose personally identifiable information collected from TV subscribers as a result of the subscriber's use of TV service only if, in the court proceeding relevant to the order:
  - The governmental entity offers clear and convincing evidence that the subject of the information is reasonably suspected of engaging in criminal activity and that the information sought would be material evidence in the case; and
  - The subject of the information has an opportunity to appear and contest the governmental entity's claim; and
  - We have provided notice to the subscriber as required by applicable state law.

**Back to Top**

**Questions About My Information and Advertising**

**1.  Do you use my information to send me advertising?**

Yes. We may use information like the preferences you have expressed and interests you have demonstrated on our websites, in our stores and through use of our products and services, to provide you with marketing information and advertisements for our products and services. Those ads may be delivered on our websites and mobile applications. This is called "first party" advertising. It is part of our service relationship and you are not able to opt-out from this type of advertising.

We or our advertising partners may use **anonymous information gathered through cookies and similar technologies (/web/20180201040115/https://about.att.com/sites/privacy_policy/cookies_and_other_technologies)**, as well as other anonymous and aggregate information that either of us may have to help us tailor the ads you see on non-AT&T sites. For example, if you see an ad from us on a non-AT&T sports-related website, you may later receive an ad for sporting equipment delivered by us on a different website. This is called Online Behavioral Advertising, which is a type of Relevant Advertising.

**2.  Do you use my information for other types of Relevant Advertising?**

Yes. We may also use information we get through your use of our products and services, from our advertising partners, and information like your age and gender to deliver Relevant Advertising that is not Online Behavioral Advertising. We combine your anonymous information with that of other users into aggregate "audience segments". These segments are based on particular interests and/or factual characteristics that everyone in that audience segment is likely to share. We might use that information to send you advertisements that are relevant to those interests or characteristics.  We are careful to only use non-personally identifiable information to create Relevant Advertising with aggregate audience segments that are large enough that you can't be identified individually.

In some cases you may agree to participate in advertising offers or programs through loyalty programs, when you download a mobile app, or other similar programs. In those cases, you will be told about the advertising program when you sign up. For more information about those advertising programs, please consult the terms, conditions, and policies of the specific application or loyalty programs you are interested in or have joined.

**3.  Do you use the location of my device for advertising purposes?**

Yes. We use information about the locations you visit in order to create combined wireless location interest characteristics that can be used to provide Relevant Advertising to you and others like you.

Location characteristics are types of locations - like "movie theaters". People who live in a particular geographic area (a city, ZIP-code or ZIP+ 4 code, for example) might appear to have a high interest in movies, thanks to collective information that shows wireless devices from that area are often located in the vicinity of movie theaters. We might create a "movies characteristic" for that area, and deliver movie ads to the people who live there.

We may associate your wireless device with a particular geographic area, such as a city, ZIP-code, or ZIP + 4 code, based on your billing address or the cell towers you connect with most frequently.

In addition to other privacy protections, the process we use to create our audience segment includes a requirement that the ZIP + 4 or other geographic area to which a wireless location is assigned must contain a minimum of 25 households. ZIP + 4 codes with less than 25 households are combined with other ZIP + 4 codes to satisfy this requirement.

**4.  What's in it for me?**

Just like the name says, you get advertising that's more relevant to your interests. For example, if a particular audience segment, like adults between the ages of 21 and 25 with a certain income range, has demonstrated a greater interest in movies than other segments, we might send them a movie ad for a movie geared toward young adults. This is just one way we deliver content that's more relevant.

**5.  How do you use information about the programs I watch on TV to advertise to me?**

We combine information about the shows that our customers are watching with their common interests to help us figure out what types of advertising they might be interested in seeing.

It sometimes works like this: We look at the group of people watching a particular show. We identify common characteristics within that group. We use those characteristics to identify and deliver advertising that might be most relevant to watchers of that TV show. We might also deliver that same advertising during shows that appear to have similar audiences.

**6.  Do I ever have a chance to tell you what I'm personally interested in?**

Yes. With some programs offered or powered by AT&T you can sign up to receive text-message offers from businesses that are near your current location and match the interests you've selected. You can change your mind at any time and stop participating in these programs.

**7.  What information do you provide to advertisers?**

We may provide reports to advertisers and other business customers about the success of its advertising campaigns. Those reports contain aggregate information about the number of times a particular ad was viewed, when it was viewed, whether it was viewed on a TV, a mobile device or a computer, demographics associated with the viewing audience and other similar information. Your anonymous information will not be included in aggregate reports about the success of Relevant Advertising campaigns if you have opted-out of Relevant Advertising delivered by AT&T.

**Back to Top**

**Questions About Location Information**

**1.  What is location information?**

Exactly what it sounds like! It includes your ZIP-code and street address, as well as the whereabouts of your wireless device.

**2.  How is it used?**

We use it in all kinds of ways, here are some examples:

- **We Provide Wireless Voice and Data Services:** We monitor, collect and use wireless location information, together with other information we get from our network and your wireless device, to maintain and improve our network. We also might use location information with your consent to provide you with a customized experience. For example, when you dial 411 Directory Assistance for a business telephone number, we might use your wireless location information to return the number of the business location closest to you.
- **Location Based Services (LBS):** Your device can be used to access a ton of services based on location. We offer these services via applications that have been pre-loaded or downloaded by you on your device. LBS also may be provided via text message or other functionality. We'll give you prior notice and ask for your consent when your location is used or shared. The form of consent may vary, but will be appropriate for the type of LBS you use.
- **LBS from other providers:** With your consent (to us or the other company) we also may enable LBS from other companies by providing location information to their developers or location service providers.
- We use it for **Advertising**

**3.  How accurate is wireless location information?**

It depends on the technology we're using. For example, we can locate your device based on the cell tower that's serving you. The range could be up to 1,000 meters in any direction from the tower in urban areas, and up to 10,000 meters in rural areas. Wi-Fi networks provide more accurate location information, associating you with the place where the network is located - like a coffee shop - or to an area within or around that place.

Services such as 411, 911, a "friend locator" application or a navigation/mapping application, require more precise information. So for those we develop a more precise estimate of location by associating the serving cell tower ID with other information, like the latitude and longitude of the tower, radio frequency parameters, GPS information and timing differences in radio signals. Depending on a variety of factors, those methods may estimate the location of your device to within 30 to 1000 meters.

**4.  Are you the only ones who can locate my wireless device?**

Other companies may also be able to locate your device. For example, your handset manufacturer and your operating system provider may be able to locate your device. If you download mobile applications, those apps may be able to obtain your location directly from your handset or the operating system. Mobile applications that give you access to your employer's network may also give your employer the ability to locate your device.

We urge you to review policies of all providers.

**Back to Top**

**Questions About Aggregate and Anonymous Information**

**1. Where do you get anonymous information?**

Sometimes we'll collect information about how you use our products **using cookies and other similar technologies (/web/20180201040115/https://about.att.com/sites/privacy_policy/cookies_and_other_technologies)**. This information doesn't include your Personal Information and is considered anonymous.

When we collect information that identifies you personally, we may anonymize it for certain purposes. We remove data fields (such as name, address and telephone number) that can reasonably be used to identify you. We also use a variety of statistical techniques and operational controls to anonymize data. Anonymizing information is one of the tools we use to protect your privacy.

**2. Tell me more about aggregate information.**

Aggregate information is a form of anonymous information. We combine data that meet certain criteria into anonymous groups. For example, we might want to compare how customers in Beverly Hills, CA (or any city, county or ZIP-code) use their cell phones to how customers in Boulder, CO use their cell phones. In order to do that, we would combine customer data in each of the geographies into anonymous groups and look at all that aggregate data to understand how the two groups are different or similar.

**3. Do you share anonymous or aggregate information?**

Yes, we may share this information with other companies and entities for specific uses, which may include:

- Universities, laboratories, think tanks and other entities that conduct networking, social, behavioral, environmental and other types of scientific research, for the purpose of creating fundamental new knowledge;
- Municipalities, government or other entities that may use this data for purposes such as municipal and transportation planning, and emergency and disaster response coordination.

We share this information in external reports like our External Marketing & Analytics Reports and Metric Reports.

**Back to Top**

**Questions About External Marketing & Analytics Reports**

**1. Tell me more about the External Marketing & Analytics Program.**

We use aggregate information to create External Marketing & Analytics Reports that we may sell to other companies for their own marketing, advertising or other similar uses.

These reports may be a combination of information from wireless and Wi-Fi locations, TV Viewing, calling and texting records, website browsing and mobile application usage and other information we have about you and other customers. You have a choice about whether your anonymous information is included in the reports that we sell or provide to other companies.

Some examples of External Marketing & Analytics Reports include:

- Reports for retail businesses that show the number of wireless devices in or near their store locations by time of day and day of the week, together with demographic characteristics or other information about the users (such as device type, age or gender) in those groups.
- Reports that combine anonymous TV Viewing behaviors with other aggregate information we may have about our subscribers to create reports that would help a TV network better understand the audiences that are viewing their programs, those that are not, how frequently they watch, when they watch and other similar information; and
- Reports for device manufacturers that combine information such as device type, make and model with demographic and regional location information to reflect the popularity of particular device types with various customer segments.

**2. Do you provide companies with individual anonymous data as part of your External Marketing & Analytics Program?**

Yes. For example, we might share anonymous TV Viewing Information with media research companies that combine this data with other information to provide audience analysis services about what shows certain audience segments are watching. When we provide individual anonymous information to businesses, we require that they only use it to compile aggregate

reports, and for no other purpose. We also require businesses to agree they will not attempt to identify any person using this information, and that they will handle it in a secure manner, consistent with this Policy.

**3.  Do you use my anonymous information in other types of external reports?**

Yes, we may use your anonymous information to provide Metrics Reports to our business customers and service suppliers. These reports are considered part of the underlying service and we do not sell them to other customers or suppliers.

For example, if you connect to our Wi-Fi service in a hotel, airport or other venue you should know the operator of that venue is our business customer, and that we will provide that operator with Metrics Reports about usage of and communications with the Wi-Fi network in their location. Those reports contain statistical information like:

- The number of devices connecting to the Wi-Fi network, duration of Wi-Fi sessions and the amount of bandwidth used during those sessions; and
- Foot-traffic data, including the numbers of devices inside and outside the store at a given time; the number of new and frequent visitors; where visitors are located within the store (e.g., specific departments or other locations within the venue) and frequency of visits and time spent within the store.
- **NOTE:** When your wireless device is turned on, it regularly sends out signals that enable it to connect to cell towers, Wi-Fi access points or other technologies so that we (and others) are able to provide you with services. These signals can be used to determine your device location. You can turn Wi-Fi to the "off" position on the "settings" feature of your device to prevent the collection of these signals by Wi-Fi equipment in retail stores and other public places.

Another example, we also license video programming from content providers. As part of our agreement, we provide them with Metrics Reports. These reports contain combined measurements and statistical information related to the number of TV subscribers who watched or accessed a particular program at a particular time and other similar measurements.

**Back to Top**

## Questions About Our Online Privacy Policy for Children

**1.  Do you collect information about my children's use?**

We do not knowingly collect personally identifying information from anyone under the age of 13 unless we first obtain permission from the child's parent or legal guardian.

**2.  What happens when my child is using an account not registered to them?**

Internet and wireless devices and services purchased for family use may be used by children without our knowledge. When that happens, information collected may appear to us to be associated with the adult customer who subscribes to our services and will be treated as the adult's information under this Policy.

**3.  What can I do to help better protect my child's information?**

We encourage you to spend time online with your children, and to participate in and monitor their online activity. We have developed a website that offers safety and control tools, expert resources and tips designed to help you manage technology choices and address safety concerns. Please visit **AT&T Smart Controls (http://web.archive.org/web/20180201040115/https://www.att.com/shop/wireless/smartcontrols.html)** for more information.

**4.  What if my child has an AT&T e-mail sub-account?**

If you create an AT&T e-mail sub-account for a child under the age of 13:

- With your permission we collect your child's name, nicknames and aliases, alternative e-mail address, birth date, gender and ZIP-code.
- We use the information collected on sub-accounts to create and maintain those accounts, for research, to customize the advertising and content seen on our pages and for other marketing purposes. Your child can use their AT&T e-mail address and password to log onto websites and online services provided by us, like **uverse.com (http://web.archive.org/web/20180201040115/http://uverse.com/)**. We and our advertising partners may collect and use information about customers who log onto those sites as described in the "**Questions about the Information We Collect, How we Collect It and How We Use It**" section of this Privacy Policy. A list of the advertising partners who collect

information on our sites and the ability to opt-out of advertising provided by those partners is available **here (/web/20180201040115/https://about.att.com/sites/privacy_policy/rights_choices)**.

- We will not contact a child under the age of 13 about special offers or for marketing purposes without parental consent.
- You or your child can review, edit, update, and delete information relating to your child's sub-account and, if you no longer wish your child to have such an account, you can revoke your consent at any time, by logging on to manage your account **here (http://web.archive.org/web/20180201040115/https://www.att.com/olam/loginAction.olamexecute? actionType=manage)**.

You may e-mail us at **privacypolicy@att.com (http://web.archive.org/web/20180201040115/mailto:privacypolicy@att.com)**, call us at 800.495.1547 or write to us at AT&T Privacy Policy, Chief Privacy Office, 208 S. Akard, Room 1033, Dallas, TX 75202 with any questions or concerns you may have about our Children's Online Privacy Policy.

**Back to Top**

## Questions About Data Protection & Security

**1. Do we sell your Personal Information?**

No. We do not sell your **Personal Information (/web/20180201040115/https://about.att.com/sites/privacy_policy/terms#definitions)** to anyone, for any purpose. Period.

**2. How long do we keep your Personal Information?**

We keep your **Personal Information (/web/20180201040115/https://about.att.com/sites/privacy_policy/terms#definitions)** as long as we need it for business, tax or legal purposes. After that, we destroy it by making it unreadable or undecipherable.

**3. What safeguards does AT&T have in place?**

We've worked hard to protect your information. And we've established electronic and administrative safeguards designed to make the information we collect secure. Some examples of those safeguards include:

- All of our employees are subject to the **AT&T Code of Business Conduct (COBC) (http://web.archive.org/web/20180201040115/https://www.att.com/Common/about_us/downloads/att_code_of_business_conduct.pdf** and certain state-mandated codes of conduct. Under the COBC, all employees must follow the laws, rules, regulations, court and/or administrative orders that apply to our business - including, specifically, the legal requirements and company policies surrounding the privacy of communications and the security and privacy of your records. We take this seriously, and any of our employees who fail to meet the standards we've set in the COBC are subject to disciplinary action. That includes dismissal.
- We've implemented technology and security features and strict policy guidelines to safeguard the privacy of your Personal Information. Some examples are:
  - Maintaining and protecting the security of computer storage and network equipment, and using our security procedures that require employee user names and passwords to access sensitive data;
  - Applying encryption or other appropriate security controls to protect Personal Information when stored or transmitted by us;
  - Limiting access to Personal Information to only those with jobs requiring such access; and
  - Requiring caller/online authentication before providing Account Information so that only you or someone who knows your Account Information will be able to access or change the information.
  - Although we strive to keep your Personal Information secure, no security measures are perfect, and we cannot guarantee that your Personal Information will never be disclosed in a manner inconsistent with this Policy (for example, as the result of unauthorized acts by third parties that violate the law or this Policy).

**4. Will you notify me in case of a security breach?**

Laws and regulations guide us in how to give you notification when certain types of sensitive information are involved in a security breach. We will provide you with notice in accordance with these laws and regulations.

**5. Can I review and correct my Personal Information?**

Yes. We are happy to help you review and correct the Personal Information we have associated with your account and billing records within a reasonable time. Please see the **How to Contact Us About This Policy (http://web.archive.org/web/20180201040115/http://about.att.com/sites/privacy_policy/terms#contact)** section.

Back to Top

## Questions About Future Changes

1.  **What happens if there is a change in corporate ownership?**

Information about our customers and users, including Personal Information, may be shared and transferred as part of any merger, acquisition, sale of company assets or transition of service to another provider. This also applies in the unlikely event of an insolvency, bankruptcy or receivership in which customer and user records would be transferred to another entity as a result of such a proceeding.

2.  **Will I be notified if there are changes to this policy?**

We may update this Privacy Policy as necessary to reflect changes we make and to satisfy legal requirements. We will post a prominent notice of material changes on our websites. We will provide you with other appropriate notice of important changes at least 30 days before the effective date.

Back to Top

## Your Choices & Controls

1.  **You can choose not to receive some types of advertising online, on your satellite TV service or on your wireless device.**

    - **Relevant Advertising:** Opt-out of Relevant Advertising delivered by AT&T **here (http://web.archive.org/web/20180201040115/https://cprodmasx.att.com/commonLogin/igate_wam/controller.do? TAM_OP=login&USERNAME=unauthenticated&ERROR_CODE=0x00000000&ERROR_TEXT=HPDBA0521I%20%20%20Successfu**
    - **Online Behavioral Advertising:** Advertising that is customized based on predictions generated from your visits over time and across different websites is sometimes called "online behavioral" or "interest-based" advertising. In accordance with industry self-regulatory principles, you can opt out of online behavioral advertising from companies who participate in the **Digital Advertising Alliance (http://web.archive.org/web/20180201040115/http://www.aboutads.info/)** by going to their **Consumer Choice Page (http://web.archive.org/web/20180201040115/http://www.aboutads.info/choices/#completed)** or by clicking on this icon ▷ **(http://web.archive.org/web/20180201040115/http://www.aboutads.info/)** when you see it on an online ad. Opt-out of online behavioral advertising from many other ad networks at the **Network Advertising Initiative (NAI) site (http://web.archive.org/web/20180201040115/http://www.networkadvertising.org/choices/)**.
    - **Information about Cookies and Similar Technologies:** To limit collection of data on web sites that may be used for advertising, go **here (http://web.archive.org/web/20180201040115/http://about.att.com/sites/privacy_policy/cookies_and_other_technologies)** for information on how to manage cookies and other similar technologies on your computer.
    - **Advertising on att.net:** Opt-out of receiving interest-based advertising when using our att.net portal services powered by **Synacor (http://web.archive.org/web/20180201040115/http://www.aboutads.info/choices)**. Opt-out of interest-based advertising on att.net from Yahoo! This covers att.net email and also the **Yahoo! (http://web.archive.org/web/20180201040115/https://aim.yahoo.com/aim/us/en/optout/index.htm)** portal that is being retired.
    - **Advertising Offers from Apps and Loyalty Programs:** In some cases you may agree to participate in advertising offers or programs through loyalty programs, when you download a mobile app, or other similar programs. For example, if you have the DIRECTV app, you can find out more about your choices concerning how your DIRECTV viewing information is used and shared **here (http://web.archive.org/web/20180201040115/https://www.directv.com/DTVAPP/content/support/DTVAPP_policy)**.

2.  **Do I have choices about receiving first party advertisements from AT&T?**

    > Because first party advertising is part of the service you receive when you visit our websites and use our mobile applications, we don't offer an opt-out for first party advertising.

**3. Can I choose not to receive marketing and other types of communication from AT&T?**

We realize that unwanted marketing contacts can be a hassle and we've worked hard to meet the expectations of customers and potential customers who have expressed a desire to limit certain types of solicitation communications from us.

**E-Mail:** Every marketing e-mail we send contains instructions and a link that will allow you to stop additional marketing e-mails for that product or service type. You also can unsubscribe from AT&T marketing e-mails **here (http://web.archive.org/web/20180201040115/http://www.att.com/remove)**.

**Text Messages:** Opt-out of AT&T marketing text message contacts by replying "stop" to any message.

**AT&T Consumer Telemarketing:** Ask to be removed from our consumer telemarketing lists by contacting us at **one of the numbers listed here (/web/20180201040115/https://about.att.com/sites/privacy_policy/rights_choices#cpnicontact)**. You also can ask the AT&T representative to remove you from our telemarketing lists when you receive a marketing or promotional call from us.

**AT&T Business Telemarketing:** Where required by local laws and/or regulations, we honor requests to be removed from our telemarketing lists from business customers.

**Federal Do Not Call:** The FTC maintains a National Do Not Call Registry at **donotcall.gov (http://web.archive.org/web/20180201040115/http://www.donotcall.gov/)**, and some states in the United States may maintain its own Do Not Call Registry. Putting your number on these Registries also may limit our AT&T telemarketing calls to that number.

**Postal Mail:** To review our Residential Do Not Mail Policy Statement and to limit postal mail solicitations, click **here (/web/20180201040115/https://about.att.com/sites/privacy_policy/att_consumer_marketing)**. You will still receive billing statements, legal notices, product updates and other similar correspondence, and you may still receive some promotional mailings.

All of our practices are designed to satisfy state, provincial and federal legal requirements limiting marketing contacts. Those laws and regulations - such as the requirements governing the state and federal "Do Not Call" lists - generally permit companies to contact their own current and, in some cases, former customers, even when those customers are listed on the federal and state "Do Not Call" lists.

**Automated Calls or Messages:** In some cases, we will ask for your permission to send you automated calls or messages to your mobile phone. To opt out of these calls or messages from AT&T, please go to **Manage Your Privacy Choices (http://web.archive.org/web/20180201040115/http://www.att.com/cmpchoice)**. As required or allowed by law, even if you opt out, AT&T may continue to contact you with automated calls or messages at the telephone number issued by us for certain important informational messages about your service. For example, we may need to let you know about a problem with your wireless service.

Restricting our use of your CPNI will not eliminate all types of our marketing contacts.

**4. Can I choose to exclude my anonymous information from your External Marketing & Analytics and other similar reports?**

Yes. Click **here (http://web.archive.org/web/20180201040115/https://www.att.com/cmpchoice)** to opt-out. This opt-out also applies to the sharing of your anonymous information with other companies for their use in creating marketing and analytics reports. Although this opt out does not apply to Metrics Reports, it will apply if we combine Metrics Report information with other customer information (like demographics) to create reports that we provide to our business customers or service suppliers.

**5. What is DNS error assist?**

> When you mistype a web address, or the address is not working, DNS Error Assist provides an automated list of similar pages – such as possibly the one you meant to type – for your consideration. The service is provided on your AT&T residential broadband connection, and you can opt-out **here (http://web.archive.org/web/20180201040115/http://www.att.com/cmpchoice)**. If you opt-out, you will get a standard "no results found" error message instead of the error-assist page.

**6.  Are there any other opt-out choices I should know about?**

> We may use services provided by analytics companies to obtain information about website performance and how you use our mobile applications and other products and services. **Go here (http://web.archive.org/web/20180201040115/http://www.aboutads.info/choices/)** for more information about the opt-outs made available by some of those vendors, and to make choices about participation. Based on your permission, we may share your mobile device location or other mobile subscriber information with third parties when you use Third-Party Services, such as to prevent fraud when making a bank transaction. If you want to change that permission, you can opt out directly with the third party or you can opt out by going to Manage Your Privacy Choices.

**7.  These Choices and Controls also are available at http://about.att.com/sites/privacy_policy/rights_choices (/web/20180201040115/https://about.att.com/sites/privacy_policy/rights_choices).**

**Back to Top**

## How to Contact Us About This Policy

We encourage you to contact us directly at either of these addresses below for any questions about this Privacy Policy.
- E-mail us at **privacypolicy@att.com (http://web.archive.org/web/20180201040115/mailto:privacypolicy@att.com)**
- Write to us at AT&T Privacy Policy, Chief Privacy Office, 208 S. Akard, Room 1033, Dallas, TX 75202.

For questions not related to privacy click on the "Contact Us" link at the bottom of any **att.com (http://web.archive.org/web/20180201040115/http://www.att.com/)** page. You also can access your online account from the upper right hand corner of our home page at att.com for additional service options.

If you have an unresolved privacy or data use concern that we have not addressed satisfactorily, you may contact our U.S.-based third-party ombudsperson program at **https://www.truste.com/consumer-resources/dispute-resolution/dispute-resolution-faqs/ (/web/20180201040115/https://www.truste.com/consumer-resources/dispute-resolution/dispute-resolution-faqs/)**. If you are not satisfied with our resolution of any dispute, including with respect to privacy or data use concerns, please review our dispute resolution procedures at **http://www.att.com/disputeresolution (http://web.archive.org/web/20180201040115/http://www.att.com/disputeresolution)**.

You also have the option of filing a complaint with the FTC Bureau of Consumer Protection, using an **online form (http://web.archive.org/web/20180201040115/https://www.ftccomplaintassistant.gov/)**, or by calling toll-free 877.FTC.HELP (877.328.4357; TTY: 866.653.4261). Other rights and remedies also may be available to you under federal or other applicable laws.

If you are a satellite TV subscriber, you also have certain rights under **Section 338(i) of the Federal Communications Act (http://web.archive.org/web/20180201040115/http://www.gpo.gov/fdsys/pkg/USCODE-2011-title47/pdf/USCODE-2011-title47-chap5-subchapIII-partI-sec338.pdf)**.

If you are a DIRECTV customer in Puerto Rico, you can exercise and manage your choices by visiting **https://www.directvpr.com/Midirectv/ingresar (http://web.archive.org/web/20180201040115/https://www.directvpr.com/Midirectv/ingresar)** or by calling 787-776-5252.

**Back to Top**

# Customer Proprietary Network Information (CPNI)

**What is CPNI?**

"CPNI" is information about your phone service from us. Your phone service could be a cell phone or any sort of home or business phone. The "information" is things like what kind of services you have, how you use them, or billing information. (Your telephone number, name and address are not considered CPNI.)

**Back to Top**

**How is CPNI Used and Disclosed?**

We do not sell, trade or share your CPNI with anyone outside of the AT&T family of companies* or our authorized agents, unless required by law (example: a court order).

We do use your CPNI internally, however. We may share information about our customers among the AT&T companies and our agents in order to offer you new or enhanced services. For example, we might offer a discount or promotion for Internet or TV services based on your CPNI.

**Back to Top**

**How may I limit the use of my CPNI?**

AT&T uses technology and security features, and strict policy guidelines with ourselves and our agents, to safeguard the privacy of CPNI. It is your right and our duty under federal law to protect the confidentiality of your CPNI.

If you don't want AT&T to use your CPNI internally for things like offers, here is what you can do:

　You can "opt out" online, at **att.com/ecpnioptout (http://web.archive.org/web/20180201040115/http://att.com/ecpnioptout)**, or

　You can call 800.315.8303, any time of day, and follow the prompts, or

　You can speak to a service representative at 800.288.2020 (consumer) or 800.321.2000 (business).

　For languages other than English and Spanish, please visit **world.att.com (http://web.archive.org/web/20180201040115/http://world.att.com/)**.

If you choose to restrict our use of your CPNI, it won't affect any of your services. You can change your mind at any time about allowing (or not allowing) us to use your CPNI, and we'll honor your decision until you change it again. If you do restrict your CPNI use, you may still get marketing from us, but it won't be from using CPNI.

*The AT&T Family of Companies are those companies that provide voice, video and broadband-related products and/or services domestically and internationally, including the AT&T local and long distance companies, AT&T Corp., AT&T Mobility, DIRECTV, and other subsidiaries or affiliates of AT&T Inc. that provide, design, market, or sell these products and/or services.*

**Back to Top**

**Customer Service Contact Numbers**

**Wireless** - 1-800-331-0500

**Business** - 1-800-321-2000

**Residential** - 1-800-288-2020

**Spanish Language** - 1-800-870-5855

**Satellite TV Services** - 1-800-DIRECTV or 1-800-531-5000

For assistance in other languages, please visit **world.att.com (http://web.archive.org/web/20180201040115/http://world.att.com/)**.

**Legacy AT&T Consumer** - 1-800-222-0300

**Customers of the following AT&T family of companies may contact us directly using the following:**

**AT&T Internet Services** - Customers can manage newsletter subscriptions or other e-mail communications from Yahoo! by modifying their AT&T Yahoo! Marketing Preferences.

**Back to Top**



Code of Business Conduct

<span style="color:red">EXHIBIT "B"</span>

February 2019

# A Message from the Chairman & CEO

**To All AT&T Employees:**

Through all the changes to our company and business, one thing has remained constant: our unswerving commitment to our values. And that starts with our core value of Live True, which means striving to do the right thing – with no exceptions or compromises.

That pledge has been a vital part of who we are for more than 140 years. And our Code of Business Conduct is the how-to manual to help us achieve it.

Our Code applies to all of us. It lays out our commitment to our values, our customers, our stakeholders and each other. It serves as the foundation of our business and guides how we operate. And it goes beyond just words to include tools and resources that can help us make the right decision every time.

This year, I ask that you do more. I challenge you to find ways to incorporate its principles into everything you do.

Thank you for living our values and representing the very best of AT&T.

Randall Stephenson



© 2019 AT&T Intellectual Property. AT&T, Globe logo, and DIRECTV are registered trademarks and service marks of AT&T Intellectual Property and/or AT&T affiliated companies. All other marks are the property of their respective owners.



Code of Business Conduct

EXHIBIT "C"

# Introduction

Our Code of Business Conduct lays out our commitment to our values and the Code itself, and to live true by each other, our customers, our shareholders and to all who have a stake in AT&T's success.

While no Code of Business Conduct can provide rules that cover every situation or challenge, ours serves as a guide for each of us. It reinforces our commitment to "just do the right thing" and empowers us to take action and make the right decisions, even when they're challenging.

By keeping our commitments and making the right decisions, we safeguard AT&T's solid reputation. It is this reputation that enables us to deliver on our mission with the integrity and trust our customers expect.

© 2019 AT&T Intellectual Property. AT&T, Globe logo, and DIRECTV are registered trademarks and service marks of AT&T Intellectual Property and/or AT&T affiliated companies. All other marks are the property of their respective owners.

 Code of Business Conduct

# Our Commitment to the Code

**We live true to our values.**

Live true. Do the right thing, no compromise. Think big. Innovate and get there first. Pursue excellence. In everything, every time. Inspire imagination. Give people what they don't expect. Be there. When customers & colleagues need you most. Stand for equality. Speak with your actions. Embrace freedom. Press, speech, beliefs. Make a difference. Impact your world.



**We respect the Code and apply it to our work every day.**

As AT&T employees, we are part of a long tradition of employees who have conducted themselves in an ethical manner that reflects positively on the Company. We focus on doing the right thing – upholding our shared commitment to complying with laws, regulations, and internal policies. Each employee is responsible for being familiar with the information in this Code and for following the Code and the Company's policies and guidelines. We understand that violations may result in discipline, up to and including termination of employment.

We know that no one has the authority to direct any employee to violate the law, this Code, or AT&T's policies. This Code applies to all employees of AT&T around the world.

The Code of Business Conduct forms a strong foundation for ethical business conduct, but it is not a substitute for good judgment and cannot address every situation we may encounter. If we are ever unsure about what to do in a particular situation, we must ask ourselves a few critical questions, as outlined in AT&T's Ethical Decision-Making Model.

If the answer to any of the questions in the model is "no", we must not proceed.

© 2019 AT&T Intellectual Property. AT&T, Globe logo, and DIRECTV are registered trademarks and service marks of AT&T Intellectual Property and/or AT&T affiliated companies. All other marks are the property of their respective owners.



Code of Business Conduct



## Live True!
### Do the right thing, no compromise.

When faced with a decision, ask yourself...

Is it consistent with Our Values?

Does it comply with AT&T policies and the law?

Does it feel right?

Would I feel ok if it made the news?

YES ON ALL

NO ON ANY

### Unsure?
Speak with your supervisor, HR or
Ask Compliance (844-533-2248).

© 2019 AT&T Intellectual Property. AT&T, Globe logo, and DIRECTV are registered trademarks and service marks of AT&T Intellectual Property and/or AT&T affiliated companies. All other marks are the property of their respective owners.



Code of Business Conduct

# Our Commitment to the Code (continued)

## We know our reporting rights and responsibilities.

We report when we observe a violation, or what reasonably appears to be a violation, of the law, this Code, or Company policies and guidelines. We use these reporting rights responsibly, without intending to harass others or to report trivial matters. We do not knowingly and willfully make false, fictitious statements or representations. We can raise questions or concerns or make a report to our supervisors, any manager, Human Resources, the Chief Compliance Office, Asset Protection or the Legal Department.

If reporting to our supervisors or the resources above is uncomfortable, employees may make confidential and anonymous reports of suspected or actual violations of AT&T's Code of Business Conduct or other Company Policies using the existing reporting resources as follows:

## Reporting Resources

| Entity/Location | Resource #/Website |
|---|---|
| AT&T US Employees | AT&T Hotline - 888-871-2622 |
| AT&T Mexico | 01 800 212 5575<br>Reporting Online via Email |
| Vrio | EthicsPoint |
| AppNexus | North America - AT&T Hotline - 888-871-2622<br>Europe - 00 800 2002 0033<br>Australia - 00 11 800 2002 0033<br>Singapore - 001 800 2002 0033<br>Website<br>Reporting Online via Email |
| Invidi | Chief Financial Officer, Human Resources, or Supervisor<br>Anonymous Reporting Hotline - 609-580-1666 |
| AlienVault (AV) | Compliance and Information Reporting Line – 844-560-8002<br>Reporting Online Via Email |
| Most of World (non-US, non-Latin America) | Human Resources Representative |
| **Asset Protection** | |
| AT&T – All Operating Companies/Affiliates | AT&T Asset Protection<br>800-807-4205 (domestic)<br>908-658-0380 (non-US) |
| **Investor Relations** | |
| AT&T – All Operating Companies/Affiliates | AT&T Investor Relations. (Report accounting or auditing concerns) |

© 2019 AT&T Intellectual Property. AT&T, Globe logo, and DIRECTV are registered trademarks and service marks of AT&T Intellectual Property and/or AT&T affiliated companies. All other marks are the property of their respective owners.



Code of Business Conduct

# Our Commitment to the Code (continued)

## We cooperate with investigations to uphold the Code.

AT&T investigates possible violations of the law, this Code, important Company policies, as well as any other behavior that we believe is unethical and/or could harm the Company's reputation. We cooperate fully with the Company's investigations to protect all the commitments we have made in this Code.

## We do not retaliate.

AT&T does not tolerate retaliation against those who report suspected violations. Retaliation must be reported immediately so that the Company can investigate promptly and take appropriate action.

## We know where to find additional guidance.

We can find more detailed information to help foster an ethical environment through our Company policy websites. We can also contact Ask Compliance with any questions related to the Code, policies and ethics in general.

© 2019 AT&T Intellectual Property. AT&T, Globe logo, and DIRECTV are registered trademarks and service marks of AT&T Intellectual Property and/or AT&T affiliated companies. All other marks are the property of their respective owners.

 **AT&T**

# Our Commitment to Live True

### We do the right thing, no compromise.

This statement applies to everything we do at AT&T. Our daily interactions should start and end with honesty and integrity. We hold ourselves and each other to a high standard of ethical behavior. Many groups - shareholders, customers, communities, suppliers, public authorities, our fellow employees - can trust what we say and do. We take personal responsibility for meeting the goals we share and keeping our commitments.

### We treat each other with respect and do not permit intimidation, discrimination or harassment in the workplace.

When the actions of some cause others to feel intimidated, offended, or to lose dignity, all of us suffer. We must treat each other courteously and professionally. We insist on a positive work environment and speak out if that goal is compromised by anyone.

AT&T employees are protected from unlawful discrimination on the basis of race, color, religion, religious creed, national origin, ancestry, age, sex, sexual orientation, gender, gender identity, gender expression, physical disability, cognitive disability, pregnancy, medical condition, genetic information, marital status, citizenship status, military status, veteran status or any other characteristic protected by federal, state, or local laws.

### We support a work environment that is inclusive and diverse.

Differing viewpoints that we each bring to the workplace challenge us collectively to think more broadly and allow us to be more creative in the products and processes we develop. We realize that the world we serve is diverse in its social customs and cultural traditions, and we respect and embrace those differences.

### We create a safe and secure place to work.

The importance of working safely has been part of our heritage for over a century. We promote safety to protect both our workforce and our customers. When public safety is at issue, we take reasonable precautions to safeguard the public, as well as our employees and customers. We keep up-to-date on laws, regulations, and practices related to the safety and health of the workplace and our products and services.

We comply with those legal and Company requirements. In addition, we do not tolerate or permit threats, violence, or other disruptive behavior in our work environments.

Our concern for a safe workplace extends to protecting information about us that the Company maintains. We hold the personal information of our employees, retirees, and their beneficiaries in strict confidence.

© 2019 AT&T Intellectual Property. AT&T, Globe logo, and DIRECTV are registered trademarks and service marks of AT&T Intellectual Property and/or AT&T affiliated companies. All other marks are the property of their respective owners.



Code of Business Conduct

# Our Commitment to Our Business and Our Shareholders

## We work lawfully and in accordance with regulations that apply to us.

We are diligent about following the laws and regulations that relate to our business. There are no shortcuts. We do not expose the business to fines or loss of reputation by failing to follow any rules that may apply to us. The Company's internal policies and procedures support and clarify these laws and regulations and facilitate our compliance. We offer and receive training as appropriate to enhance our understanding and monitor it for effectiveness.

## We are consistent in our business practices across our global markets.

Our business is growing into many parts of the world. We are eager to understand the diverse economies, governments, political climates, and the cultural and social characteristics of the countries we serve. This understanding will help us compete. While our goal is to conduct business consistently across the globe and in accordance with the principles of this Code, we adjust our practices to comply with the laws and requirements of our diverse markets. Thus, where local country laws are more stringent or differ from the provisions of this Code, those local laws prevail for employees working in those countries.

## We protect the Company's physical assets and intellectual property.

All AT&T's assets, from a physical asset such as a truck or a tower to an intellectual property asset such as a patent or trademark, are essential tools for our success. We focus on being good stewards of the assets we use every day. We are personally responsible for the proper use of the Company assets in our care and preventing their loss. This includes protecting ideas, research, inventions, proprietary information, and the AT&T brand itself.

## We manage the Company's records and information appropriately.

We create, use, retain, and dispose of our business records and information in a careful manner according to the Company's Records and Information Management policies and schedules. We follow the Legal Department's instruction when records should be held for potential or pending litigation, investigations, or in response to court orders.

© 2019 AT&T Intellectual Property. AT&T, Globe logo, and DIRECTV are registered trademarks and service marks of AT&T Intellectual Property and/or AT&T affiliated companies. All other marks are the property of their respective owners.



Code of Business Conduct

# Our Commitment to Our Business and Our Shareholders (continued)

## We use electronic communications responsibly.

Communication, in its many forms, including social media like wikis and blogs, should be professional, appropriate, and respectful. The communications systems in place at AT&T are primarily for business use. We may use these systems only occasionally for personal e-mail or Internet access, but we do not allow this use to be disruptive to the needs of the business. We do not use these systems to access or distribute obscene or offensive media.

## We avoid and resolve conflicts of interest.

When acting on behalf of AT&T, we put the Company's interests ahead of our own personal gain. This means we do not allow our own interest or our family or other relationships to influence the decisions we make on behalf of the Company. Conflicts of interest can undermine our business judgment, threaten AT&T's reputation, and expose the Company to risk. We avoid conflicts of interest, disclose and resolve them promptly if they arise, and strive to avoid even the appearance of such conflicts.

We do not allow our business decisions to be influenced by gifts, favors, or hospitality from others. Accepting or offering gifts, favors, or entertainment can create a conflict, result in the appearance of a conflict, and, in some cases, violate the law. If we have any doubts, we seek guidance before accepting or offering any material gifts, favors, or entertainment.

## We strive to do business with ethical suppliers.

We try to do business with suppliers, third parties, and business partners that enhance our level of service and provide products and services of quality. We seek suppliers who share our commitments to human rights (including labor rights), diversity, and ethical and sustainable business practices.

© 2019 AT&T Intellectual Property. AT&T, Globe logo, and DIRECTV are registered trademarks and service marks of AT&T Intellectual Property and/or AT&T affiliated companies. All other marks are the property of their respective owners.



# Our Commitment to Our Customers

### We follow ethical sales practices.

Our customers should always know we value them. We fairly represent our products and services to them. We listen to our customers and challenge ourselves to find new ways to deliver a unique customer experience.

We earn and preserve their trust by treating them with honesty and integrity and in a professional, courteous manner. We deliver what we promise. We do not provide goods or services that customers did not authorize.

Sometimes our customers are our competitors and suppliers as well. In those situations, we serve them in the same professional manner we would extend to any customer.

## We comply with regulations that apply to government customers.

Doing business with certain government entities (both domestic and global) requires adhering to strict and sometimes unique regulations. We are well trained about these rules, and we follow these regulations in our interaction with governments. We are committed to this enhanced level of diligence for these governmental customers. We follow instructions to seek advice immediately from our internal experts whenever we are in doubt about any activity. In particular, dealing with schools, libraries, and rural health care providers imposes strict rules that require special training prior to any activity and require constant diligence.

## We guard the privacy of our customers' communications.

We protect the privacy of our customers' communications. Not only do our customers demand this, but the law requires it. Consistent with this principle, although we comply with government requests for customer communications, we do so only to the extent required by law. Maintaining the confidentiality of communications is, and always has been, a crucial part of our business.

## We protect the information about our customers that they entrust to us.

AT&T possesses sensitive, detailed information about our customers who rely on AT&T to safeguard that information. Laws and regulations tell us how to treat such data. Any inappropriate use of confidential customer information violates our customers' trust and may also violate a law or regulation. Preserving our customers' trust by safeguarding their private data is essential to our reputation.

© 2019 AT&T Intellectual Property. AT&T, Globe logo, and DIRECTV are registered trademarks and service marks of AT&T Intellectual Property and/or AT&T affiliated companies. All other marks are the property of their respective owners.



# Our Commitment to Make a Difference

## We support community activities.

Everywhere we do business, we try to participate in activities to make our communities better places to live, work, and grow. We strengthen our communities by providing good jobs, donating our time and talents, supporting underserved populations, and promoting education programs that create economic opportunity. Our own success can foster a better quality of life for others.

## We support political involvement.

AT&T encourages us to participate in the political process. We vote, volunteer our time, contribute to the candidates we individually support, and hold political office. Because of laws governing the election process, we conduct personal political activities on our own time and with our own resources. We comply with pertinent campaign laws.

## We are responsible for the environment.

We are committed to operate and to provide products and services in an environmentally responsible and sustainable manner. We keep up-to-date on laws, regulations, and practices related to the environment that are pertinent to our business. We comply with those legal and Company requirements. We report environmental concerns or issues through the appropriate Company channels.

We strive to minimize our environmental impact in ways that are relevant to our business and important to the communities we serve. By harnessing the scale of our network to deliver more sustainable solutions, we connect people and businesses seamlessly. That increases efficiency, supports environmental sustainability, and strengthens our connection to the world we all share. We are committed to taking meaningful steps to become more resource-efficient and to engage our employees and suppliers in helping us minimize our effect on the environment.

© 2019 AT&T Intellectual Property. AT&T, Globe logo, and DIRECTV are registered trademarks and service marks of AT&T Intellectual Property and/or AT&T affiliated companies. All other marks are the property of their respective owners.

 **AT&T**

Code of Business Conduct

# Our Commitment to Others

## We maintain integrity in our financial reporting and business records.

For the sake of our shareholders, creditors, and others, we strive to generate reliable financial reporting and business records. We are committed to full, fair, timely, accurate, and understandable disclosure in the reports and documents we file or submit to the U. S. Securities and Exchange Commission and regulators around the globe. We prepare our business records and financial reports with integrity and honesty, whether they are externally reported or used internally to oversee the Company's operations. We report concerns about financial, accounting, and auditing matters, as well as issues regarding business records, through the appropriate Company channels, as outlined earlier in the reporting section.

## We communicate honestly.

When questions arise about our business, whether from the news media or others, we provide answers to the public that are prompt and honest. These responses come through our senior leadership or through others who are authorized to speak to the public on AT&T's behalf. When we release information about the Company to the public, we do it fairly and impartially, without favoring any individual or group.

## We do not engage in insider trading.

We must keep inside information confidential. Inside information is non-public information which is either owned by AT&T or another person or entity. It may be known by some people, but not yet generally known by the public. Examples include information about AT&T's financial position, future releases, products, services or plans. It can be valuable to others, inside and outside AT&T.  Use of inside information for personal gain could result in jail time, fines, or both. If we have inside information obtained through our positions at AT&T – the information may relate to AT&T, or to a supplier, customer, or competitor – we may not use that information to trade in securities of the relevant company nor may we provide the information to others. The laws extend even to inside information we gain accidentally through our positions and apply to members of our families. We ask for advice on this issue from our Legal Department if we are in doubt about whether we possess inside information.

© 2019 AT&T Intellectual Property. AT&T, Globe logo, and DIRECTV are registered trademarks and service marks of AT&T Intellectual Property and/or AT&T affiliated companies. All other marks are the property of their respective owners.



Code of Business Conduct

# Our Commitment to Others (continued)

## We support fair competition and comply with the antitrust laws.

AT&T succeeds in the marketplace by competing aggressively but fairly. Our products and services stand on their own merits. We do not misrepresent the characteristics of our products and services, and we do not deceive our customers or engage in any other unfair practices.

AT&T does not seek to eliminate or reduce competition through any illegal agreement with competitors. For example, AT&T will not agree with a competitor on the prices that AT&T or the competitor will charge, the customers that AT&T or the competitor will serve, or the services that AT&T or the competitor will offer. In fact, all of these are topics that should not be discussed at all with a competitor.

Because our dealings with competitors are subject to scrutiny, we consult with our Legal Department before any contact with a competitor, and we do not enter into an agreement with a competitor unless the agreement has been cleared in advance by the Legal Department.

The Legal Department is ready to help us whenever we have questions about these complex issues. If we are in doubt about what is permitted under the antitrust laws, we seek advice from the Legal Department.

## We do not make improper payments.

We follow ethical business practices throughout the world in our dealings with public officials, other companies, and private citizens. We do not seek to influence them, directly, indirectly, or through a third party, through the payment of bribes or kickbacks or any other unethical payment. Such activity erodes our integrity and, in most cases, violates the law. We strive to avoid even the appearance of improper influence. In particular, we are extra vigilant when dealing with government officials.

© 2019 AT&T Intellectual Property. AT&T, Globe logo, and DIRECTV are registered trademarks and service marks of AT&T Intellectual Property and/or AT&T affiliated companies. All other marks are the property of their respective owners.

## A Conversation with Randall Stephenson and David Huntley: Code of Business Conduct

**Why is it important for us to have a Code of Business Conduct?**
**Stephenson:** We're guided by a core set of values at AT&T. That's who we are.  These values guide our mission, which is what we're all about.  And our strategy is how we fulfill that mission. The Code of Business Conduct is the codification of our core values.  It lays out the guidelines and expectations for how we do business, how we operate, and how we interact with customers, suppliers, owners, and each other.  We hold ourselves to the highest standards. That means always doing the right thing.  And it means operating with integrity, transparency, and honesty in everything we do.

**What does our Code of Business Conduct mean to our employees?**
**Huntley:** Our customers count on us.  They count on us to create the best entertainment and communications experiences in the world.  And that requires an environment of trust from all employees at AT&T.  Trust that we will protect their information.  That we will do what we say. That we will follow not only the letter of the law, but the spirit of the law.  And that we will always take responsibility.  When our employees do those things, we protect our brand and we respect our customers.  And that makes us a stronger company and a great place to work.  Our interactive Code of Business Conduct, available on your desktop or mobile device, empowers employees to take personal ownership of an ethical culture here at AT&T.

**How does our Code of Business Conduct align with where we're headed as a company?**
**Stephenson:** Our business has changed radically over the years. And it will continue to change as we become a global leader in telecom, media, and technology.  But what will never change is our commitment to our core values and the Code of Business Conduct.  Consistently following the Code and doing the right thing has never been more important.  It's the foundation of who we are.

## Code of Business Conduct: Mission Statement

Our vision at AT&T - connect people with their world, everywhere they live, work, and play, and do it better than anyone else - is what unifies us as a company.  In order to fulfill that mission, each of us must take personal responsibility for protecting AT&T's long-standing reputation as an ethical business.  Our Code of Business Conduct lays out our commitment to each other, to our customers, to our shareholders, and to all who have a stake in AT&T's success.

While no Code of Business Conduct can provide rules that cover every situation or challenge, ours serves as a guide for each of us.  It reinforces our commitment to just do the right thing, and empowers us to take action and make the right decisions, even when they're challenging. By keeping our commitment and making the right decisions, we safeguard AT&T's solid reputation.  It is this reputation that enables us to deliver on our mission with the integrity and trust our customers expect.

RON WYDEN
OREGON

RANKING MEMBER OF COMMITTEE ON
FINANCE

221 DIRKSEN SENATE OFFICE BUILDING
WASHINGTON, DC 20510
(202) 224-5244

# United States Senate
WASHINGTON, DC 20510–3703

**COMMITTEES:**
COMMITTEE ON FINANCE
COMMITTEE ON BUDGET
COMMITTEE ON ENERGY & NATURAL RESOURCES
SELECT COMMITTEE ON INTELLIGENCE
JOINT COMMITTEE ON TAXATION

May 8, 2018

Randall L. Stephenson
President and Chief Executive Officer
AT&T Inc.
208 South Akard Street
Dallas, TX 75202

 EXHIBIT "D"

Dear Mr. Stephenson:

I am writing to insist that AT&T take proactive steps to prevent the unrestricted disclosure and potential abuse of private customer data, including real-time location information, by at least one other company to the government.

I recently learned that Securus Technologies, a major provider of correctional-facility telephone services, purchases real-time location information from major wireless carriers and provides that information, via a self-service web portal, to the government for nothing more than the legal equivalent of a pinky promise. Securus confirmed to my office that its web portal enables surveillance of customers of every major U.S. wireless carrier. This practice skirts wireless carrier's legal obligation to be the sole conduit by which the government may conduct surveillance of Americans' phone records, and needlessly exposes millions of Americans to potential abuse and unchecked surveillance by the government.

Wireless carriers are prohibited from sharing certain customer information, including location data, unless the carrier either has the customer's consent or sharing is otherwise required by law. When responding to law enforcement requests, wireless carriers must take affirmative steps to verify that a request is supported by appropriate legal authority. Further, wireless providers must ensure surveillance of communications and call records using their facilities can only be conducted with the direct and specific oversight of the provider.

The fact that Securus provides this service at all suggests that AT&T does not sufficiently control access to your customers' private information. Securus informed my office that it purchases real-time location information on AT&T's customers—through a third party location aggregator that has a commercial relationship with the major wireless carriers—and routinely shares that information with its government clients. Correctional officers simply visit Securus' web portal, enter any U.S. phone number, and then upload a document purporting to be an "official document giving permission" to obtain real-time location data. Senior officials from Securus have confirmed to my office that it never checks the legitimacy of those uploaded documents to determine whether they are in fact court orders and has dismissed suggestions that it is obligated to do so.

911 NE 11TH AVENUE
SUITE 630
PORTLAND, OR 97232
(503) 326-7525

405 EAST 8TH AVE
SUITE 2020
EUGENE, OR 97401
(541) 431-0229

SAC ANNEX BUILDING
105 FIR ST
SUITE 201
LA GRANDE, OR 97850
(541) 962-7691

U.S. COURTHOUSE
310 WEST 6TH ST
ROOM 118
MEDFORD, OR 97501
(541) 858-5122

THE JAMISON BUILDING
131 NW HAWTHORNE AVE
SUITE 107
BEND, OR 97701
(541) 330-9142

707 13TH ST, SE
SUITE 285
SALEM, OR 97301
(503) 589-4555

HTTP://WYDEN.SENATE.GOV
PRINTED ON RECYCLED PAPER

Even if Securus carefully vetted each request from its law enforcement clients, it still should not be able to provide AT&T customers' private information directly to law enforcement without AT&T's active oversight and direction. The law requires that your company be the sole conduit for law enforcement surveillance of your customers' communications and call records. I have written to the Federal Communications Commission asking that it investigate AT&T's inability or unwillingness to sufficiently safeguard your customers' private information. Further, I have asked the Commission to investigate whether companies involved in the commercial disclosure of customer location data sufficiently verify that targeted individuals have actually consented to that disclosure. A copy of my letter to the Commission is enclosed.

With good reason, your customers expect AT&T to take seriously its commitment to protect customers' private data. AT&T must deliver on that expectation. As such, I ask that you take the following common-sense steps to ensure that your customers' personal information is not abused:

- Promptly undertake a comprehensive audit of each third party with which you share customers' personal information and
  - determine how the third party uses that information,
  - ensure your customers in fact consented to that disclosure and use, and
  - notify customers whose location information you disclosed without their consent.
- Immediately terminate your data-sharing relationships with all third parties that have misrepresented customer consent or abused their access to sensitive customer data.
- Provide a web portal for your customer so that, upon request, each customer can view a list of the third parties with which you share or have previously shared that customer's private information. Americans should be able to obtain this information from wireless carriers, just as they can obtain from the consumer credit agencies a list of the private parties who have accessed their credit reports.

In addition, please provide me with full responses to the following questions no later than June 15, 2018:

1. Please identify the third parties with which your company shares or has shared customer information, including location data, at any time during the past five years. For each third party with which you share information directly, please also include a list of the ultimate end users of that information, as well as all intermediaries.
2. For each of the third parties identified in response to question one, please detail the types of customer information provided to them and the number of customers whose information was shared. For each of these, please detail whether the third party provided proof of customer consent, and if so, how the third party demonstrated that they had obtained customer consent.
3. Please describe in full your process, if any, for determining that each third party identified in response to question one has obtained appropriate customer consent before your company shared that customer's information with them. Specifically, please describe what criteria and processes your company uses to review claims and evidence that a third party has obtained consent.

4. Please describe any incidents known to your company or uncovered during your responses to the above in which a third party with which your company shared customer data misrepresented that they had customer consent.

If you have any questions about this request, please contact Chris Soghoian in my office.

Sincerely,

Ron Wyden
United States Senator



Timothy P. McKone
Executive Vice President
Federal Relations

AT&T Services, Inc.
1120 20th Street, NW
Suite 800
Washington, DC 20036

T 202.463.4144
tm3703@att.com
att.com

June 15, 2018

The Honorable Ron Wyden
United States Senate
221 Dirksen Senate Office Building
Washington, DC 20510

EXHIBIT "E"

Dear Senator Wyden:

Thank you for your letter dated May 8, 2018 regarding a real-time location service that another company, Securus Technologies, Inc. ("Securus"), was apparently providing to law enforcement officials. AT&T takes the concerns you raise in your letter seriously and I can assure you that AT&T values and respects its customers' privacy.

AT&T has never authorized the use of its customer data for the Securus web portal service described in your letter. We are actively investigating the extent to which Securus may have obtained unauthorized access to AT&T customer location data, and we are pressing Securus to provide greater cooperation than they have to this point. Our top priority is to protect our customers' information, and, to that end, we have suspended all access by Securus to AT&T customer location data.

We provide below a summary of the facts based on AT&T's continuing investigation.

**Background**

AT&T permits authorized third parties to access customer location data for location-based services ("LBS") only where a customer consents to such disclosure except in limited cases where a specific provision of law or regulation requires or authorizes access.[1] For instance, AT&T permits roadside assistance companies to access customer location data to find stranded motorists. Other examples include bank-fraud prevention by ensuring the customer is present when making financial transactions, shipment tracking to provide estimated arrival times, and services that help emergency responders locate victims.[2]

To facilitate these services, an intermediary company known as an "aggregator" typically manages requests for customer data across multiple carriers. For example, when customers request emergency roadside assistance and consent to the disclosure of their location data, the roadside assistance company sends the request to an aggregator to identify the carrier from which

---

[1] The CTIA LBS Guidelines provide examples of where provisions of law do not require consent under its discussion of "Scope of Coverage." See CTIA "Best Practices and Guidelines for Location Based Services," *available at* https://www.ctia.org/the-wireless-industry/industry-commitments/best-practices-and-guidelines-for-location-based-services.

[2] *See* CTIA LBS Guidelines.



The Honorable Ron Wyden
June 15, 2018
Page 2

location data needs to be requested.  Without an aggregator, there would be no practical and efficient method to facilitate requests across different carriers.

Such practices are common among all major carriers.  Under the CTIA LBS Guidelines, which AT&T contractually requires all aggregators to follow, LBS providers (such as Securus) are required to give customers notice and obtain consent to use location information.[3]  As we describe below, AT&T did not authorize Securus's collection of customer data for its self-service web portal.

## The Approved Inmate Calling Service

In October 2012, an aggregator named LocationSmart (then called Locaid) sought AT&T's approval for a prison inmate calling service.  Under the use case, LocationSmart's customer, 3Cinteractive, a provider of mobile collect calling service, would share location information with prison officials through prison telecommunications provider Securus (the "Inmate Calling Service").  When a wireless customer receives a call from an inmate, the customer hears an IVR message requesting affirmative consent to share phone location information for investigative purposes.  We understand the correctional facility uses the location information for security purposes, such as to counter schemes involving prisoner escapes or contraband deliveries.  AT&T imposed contractual requirements on LocationSmart requiring it to collect consent for each location request; comply with data security requirements; comply with all applicable laws; and maintain a record of consent for each location request.

## The Unapproved Securus On-Demand Service

The Securus service discussed in your letter relates to a different – and unapproved – use of AT&T location information.  We understand that this program involves the provision of location information to certain law enforcement officials, namely correctional officers at prison facilities, in response to warrants or other lawful demands (the "On Demand Service").  AT&T was not informed of the On-Demand Service and never approved it.  Based on our preliminary assessment, it appears that the On-Demand location requests comprised a tiny fraction – less than two tenths of one percent – of the total requests Securus submitted for the approved Inmate Calling Service.

We now understand that, despite AT&T's requirements to obtain customer consent, Securus did not in fact obtain customer consent before collecting customers' location information for its On-Demand Service.  Instead, Securus evidently relied upon law enforcement's representation that it had appropriate legal authority to obtain customer location data, such as a warrant, court order, or other authorizing document as a proxy for customer

---

[3] See CTIA LBS Guidelines.

The Honorable Ron Wyden
June 15, 2018
Page 3

consent. Despite this fundamental departure from the approved Inmate Calling Service, and without ever informing AT&T of the new service, Securus apparently used the process established for the Inmate Calling Service to provide its On-Demand Service. Consequently, AT&T received confirmation that Securus had obtained consent for each request for location information, which AT&T understood were all related to the approved Inmate Calling Service. Indeed, even if the incoming request for location information to Securus was duly authorized by law, AT&T did not authorize Securus to access AT&T customer location information except in connection with the Inmate Calling Service.

After learning about the Securus On-Demand Service, AT&T took prompt steps to protect customer data and shut down 3Cinteractive and Securus's access to AT&T customer location data. On May 10, 2018, within two days of receiving your letter, AT&T terminated Securus's access to customer information in connection with the On-Demand Service. And on May 16, 2018, after learning that Securus may have suffered a data breach that compromised the log-in credentials of its corrections and law enforcement customers, AT&T suspended the provision of all customer location information to Securus for any purpose, including the Inmate Calling Service.

AT&T has no reason to believe that there are other instances of unauthorized access to AT&T customer location data. Nonetheless, we are reviewing these issues carefully to ensure the proper handling of all AT&T customer information.

Thank you again for raising with us this important area of shared concern.

Sincerely,

EXHIBIT "F"



**MOTHERBOARD**
TECH BY VICE

# I Gave a Bounty Hunter $300. Then He Located Our Phone

T-Mobile, Sprint, and AT&T are selling access to their customers' location data, and that data is ending up in the hands of bounty hunters and others not authorized to possess it, letting them track most phones in the country.

---

By **Joseph Cox**

Jan 8 2019, 12:08pm    

---

IMAGE: SHUTTERSTOCK. REMIX: JASON KOEBLER

Nervously, I gave a bounty hunter a phone number. He had offered to geolocate a phone for me, using a shady, overlooked service intended not for the cops, but for private individuals and businesses. Armed with just the number and a few hundred dollars, he said he could find the current location of most phones in the United States.

The bounty hunter sent the number to his own contact, who would track the phone. The contact responded with a screenshot of Google Maps, containing a blue circle indicating the phone's current location, approximate to a few hundred metres.

Queens, New York. More specifically, the screenshot showed a location in a particular neighborhood—just a couple of blocks from where the target was. The hunter had found the phone (the target gave their consent to Motherboard to be tracked via their T-Mobile phone.)

The bounty hunter did this all without deploying a hacking tool or having any previous knowledge of the phone's whereabouts. Instead, the tracking tool relies on real-time location data sold to bounty hunters that ultimately originated from the telcos themselves, including T-Mobile, AT&T, and Sprint,

a Motherboard investigation has found. These surveillance capabilities are sometimes sold through word-of-mouth networks.

Whereas it's common knowledge that law enforcement agencies can track phones with a warrant to service providers, IMSI catchers, or until recently via other companies that sell location data <u>such as one called Securus</u>, at least one company, called Microbilt, is selling phone geolocation services with little oversight to a spread of different private industries, ranging from car salesmen and property managers to bail bondsmen and bounty hunters, according to sources familiar with the company's products and company documents obtained by Motherboard. Compounding that already highly questionable business practice, this spying capability is also being resold to others on the black market who are not licensed by the company to use it, including me, seemingly without Microbilt's knowledge.

Motherboard's investigation shows just how exposed mobile networks and the data they generate are, leaving them open to surveillance by ordinary citizens, stalkers, and criminals, and comes as media and policy makers are paying more attention than ever to how location and other sensitive data <u>is collected and sold</u>. The investigation also shows that a wide variety of companies can access cell phone location data, and that the information trickles down from cell phone providers to a wide array of smaller players, who don't necessarily have the correct safeguards in place to protect that data.

"People are reselling to the wrong people," the bail industry source who flagged the company to Motherboard said. Motherboard granted the source and others in this story anonymity to talk more candidly about a controversial surveillance capability.

*Got a tip? You can contact Joseph Cox securely on Signal on +44 20 8133 5190, OTR chat on jfcox@jabber.ccc.de, or email joseph.cox@vice.com.*

Your mobile phone is constantly communicating with nearby cell phone towers, so your telecom provider knows where to route calls and texts. From this, telecom companies also work out the phone's approximate location based on its proximity to those towers.

Although many users may be unaware of the practice, telecom companies in the United States sell access to their customers' location data to other companies, called location aggregators, who then sell it to specific clients and industries. Last year, one location aggregator called LocationSmart faced harsh criticism for selling data that ultimately ended up in the hands of Securus, a company which provided phone tracking to low level enforcement without requiring a warrant. LocationSmart also exposed the very data it was selling through a buggy website panel, meaning anyone could geolocate nearly any phone in the United States at a click of a mouse.

[**Subscribe to** CYBER on Apple Podcasts **or any podcast app.**]

There's a complex supply chain that shares some of American cell phone users' most sensitive data, with the telcos potentially being unaware of how the data is being used by the eventual end user, or even whose hands it lands in. Financial companies use phone location data to detect fraud; roadside assistance firms use it to locate stuck customers. But AT&T, for example, told Motherboard the use of its customers' data by bounty hunters goes explicitly against the company's policies, raising questions about how AT&T allowed the sale for this purpose in the first place.

"The allegation here would violate our contract and Privacy Policy," an AT&T spokesperson told Motherboard in an email.

In the case of the phone we tracked, six different entities had potential access to the phone's data. T-Mobile shares location data with an aggregator called Zumigo, which shares information with Microbilt. Microbilt shared that data with a customer using its mobile phone tracking product. The bounty hunter then shared this information with a bail industry source, who shared it with Motherboard.

The CTIA, a telecom industry trade group of which AT&T, Sprint, and T-Mobile are members, has official guidelines for the use of so-called "location-based services" that "rely on two fundamental principles: user notice and consent," the group wrote in those guidelines. Telecom companies and data aggregators that Motherboard spoke to said that they require their clients to get consent from the people they want to track, but it's clear that this is not always happening.



A FLOWCHART SHOWING HOW THE PHONE LOCATION DATA TRICKLED DOWN FROM T-MOBILE TO MOTHERBOARD. IMAGE: MOTHERBOARD.

A second source who has tracked the geolocation industry told Motherboard, while talking about the industry generally, "If there is money to be made they will keep selling the data."

"Those third-level companies sell their services. That is where you see the issues with going to shady folks [and] for shady reasons," the source added.

Frederike Kaltheuner, data exploitation programme lead at campaign group Privacy International, told Motherboard in a phone call that "it's part of a bigger problem; the US has a completely unregulated data ecosystem."

Microbilt buys access to location data from an aggregator called Zumigo and then sells it to a dizzying number of sectors, including landlords <u>to scope out potential renters</u>; <u>motor vehicle salesmen</u>, and others who are <u>conducting credit checks</u>. Armed with just a phone number, Microbilt's "Mobile Device Verify" product can return a target's full name and address, geolocate a phone in an individual instance, or operate as a continuous tracking service.

"You can set up monitoring with control over the weeks, days and even hours that location on a device is checked as well as the start and end dates of monitoring," a <u>company brochure Motherboard found online reads</u>.

Posing as a potential customer, Motherboard explicitly asked a Microbilt customer support staffer whether the company offered phone geolocation for bail bondsmen. Shortly after, another staffer emailed with a price list— locating a phone can cost as little as $4.95 each if searching for a low number of devices. That price gets even cheaper as the customer buys the capability to track more phones. Getting real-time updates on a phone's location can cost around $12.95.

"Dirt cheap when you think about the data you can get," the source familiar with the industry added.



A SECTION OF THE PRICE LIST MOTHERBOARD OBTAINED. IMAGE: MOTHERBOARD.

It's bad enough that access to highly sensitive phone geolocation data is already being sold to a wide range of industries and businesses. But there is also an underground market that Motherboard used to geolocate a phone—one where Microbilt customers resell their access at a profit, and with minimal oversight.

"Blade Runner, the iconic sci-fi movie, is set in 2019. And here we are: there's an unregulated black market where bounty-hunters can buy information about where we are, in real time, over time, and come after us. You don't need to be a replicant to be scared of the consequences," Thomas Rid, professor of strategic studies at Johns Hopkins University, told Motherboard in an online chat.

The bail industry source said his middleman used Microbilt to find the phone. This middleman charged $300, a sizeable markup on the usual Microbilt price. The Google Maps screenshot provided to Motherboard of the target phone's location also included its approximate longitude and latitude coordinates, and a range of how accurate the phone geolocation is: 0.3 miles, or just under 500 metres. It may not necessarily be enough to geolocate someone to a specific building in a populated area, but it can certainly pinpoint a particular borough, city, or neighborhood.

In other cases of phone geolocation it is typically done with the consent of the target, perhaps by sending a text message the user has to deliberately reply to, signalling they accept their location being tracked. This may be done in the earlier roadside assistance example or when a company monitors its fleet of trucks. But when Motherboard tested the geolocation service, the target phone received no warning it was being tracked.

The bail source who originally alerted Microbilt to Motherboard said that bounty hunters have used phone geolocation services for non-work purposes, such as tracking their girlfriends. Motherboard was unable to identify a specific instance of this happening, but domestic stalkers have repeatedly used technology, such as mobile phone malware, to track spouses.

As Motherboard was reporting this story, Microbilt removed documents related to its mobile phone location product from its website.

A Microbilt spokesperson told Motherboard in a statement that the company requires anyone using its mobile device verification services for fraud prevention must first obtain consent of the consumer. Microbilt also confirmed it found an instance of abuse on its platform—our phone ping.

"The request came through a licensed state agency that writes in approximately $100 million in bonds per year and passed all up front credentialing under the pretense that location was being verified to mitigate financial exposure related to a bond loan being considered for the submitted consumer," Microbilt said in an emailed statement. In this case, "licensed state agency" is referring to a private bail bond company, Motherboard confirmed.

"As a result, MicroBilt was unaware that its terms of use were being violated by the rogue individual that submitted the request under false pretenses, does not approve of such use cases, and has a clear policy that such violations will result in loss of access to all MicroBilt services and termination of the requesting party's end-user agreement," Microbilt added. "Upon investigating the alleged abuse and learning of the violation of our contract, we terminated the customer's access to our products and they will not be eligible for reinstatement based on this violation."

Zumigo confirmed it was the company that provided the phone location to Microbilt and defended its practices. In a statement, Zumigo did not seem to take issue with the practice of providing data that ultimately ended up with licensed bounty hunters, but wrote, "illegal access to data is an unfortunate occurrence across virtually every industry that deals in consumer or employee data, and it is impossible to detect a fraudster, or rogue customer, who requests location data of his or her own mobile devices when the required consent is provided. However, Zumigo takes steps to protect privacy by providing a measure of distance (approx. 0.5-1.0 mile) from an actual address." Zumigo told Motherboard it has cut Microbilt's data access.

# "People are reselling to the wrong people."

In Motherboard's case, the successfully geolocated phone was on T-Mobile.

"We take the privacy and security of our customers' information very seriously and will not tolerate any misuse of our customers' data," A T-Mobile spokesperson told Motherboard in an emailed statement. "While T-Mobile does not have a direct relationship with Microbilt, our vendor Zumigo was working with them and has confirmed with us that they have already shut down all transmission of T-Mobile data. T-Mobile has also blocked access to device location data for any request submitted by Zumigo on behalf of Microbilt as an additional precaution."

Microbilt's product documentation suggests the phone location service works on all mobile networks, however the middleman was unable or unwilling to conduct a search for a Verizon device. Verizon did not respond to a request for comment.

AT&T told Motherboard it has cut access to Microbilt as the company investigates.

"We only permit the sharing of location when a customer gives permission for cases like fraud prevention or emergency roadside assistance, or when required by law," the AT&T spokesperson said.

Sprint told Motherboard in a statement that "protecting our customers' privacy and security is a top priority, and we are transparent about that in our Privacy Policy [...] Sprint does not have a direct relationship with MicroBilt. If we determine that any of our customers do and have violated the terms of our contract, we will take appropriate action based on those findings." Sprint would not clarify the contours of its relationship with Microbilt.

These statements sound very familiar. When _The New York Times_ and Senator Ron Wyden published details of Securus last year, the firm that was offering geolocation to low level law enforcement without a warrant, the telcos said they were taking extra measures to make sure their customers' data would not be abused again. Verizon announced it was going to limit data access to companies not using it for legitimate purposes. T-Mobile, Sprint, and AT&T followed suit shortly after with similar promises.

After Wyden's pressure, T-Mobile's CEO John Legere tweeted in June last year "I've personally evaluated this issue & have pledged that @tmobile will not sell customer location data to shady middlemen."

## "It appears these promises were little more than worthless spam in their customers' inboxes."

Months after the telcos said they were going to combat this problem, in the face of an arguably even worse case of abuse and data trading, they are saying much the same thing. Last year, Motherboard reported on a company that previously offered phone geolocation to bounty hunters; here Microbilt is operating even after a wave of outrage from policy makers. In its statement to Motherboard on Monday, T-Mobile said it has nearly finished the process of terminating its agreements with location aggregators.

"It would be bad if this was the first time we learned about it. It's not. Every major wireless carrier pledged to end this kind of data sharing after I exposed this practice last year. Now it appears these promises were little more than worthless spam in their customers' inboxes," Wyden told Motherboard in a statement. Wyden is proposing legislation to safeguard personal data.

Due to the <u>ongoing government shutdown</u>, the Federal Communications Commission (FCC) was unable to provide a statement.

"Wireless carriers' continued sale of location data is a nightmare for national security and the personal safety of anyone with a phone," Wyden added. "When stalkers, spies, and predators know when a woman is alone, or when a home is empty, or where a White House official stops after work, the possibilities for abuse are endless."

***Subscribe to our new cybersecurity podcast,*** <u>CYBER</u>.

---

TAGGED: `TECH`, `MOTHERBOARD`, `SPYING`, `CYBERSECURITY`, `BOUNTY HUNTER`, `STALKING`, `VERIZON`, `T-MOBILE`, `AT&T`, `SECURUS`, `MICROBILT`

---

## Subscribe to the VICE newsletter.

| Your email | Subscribe |

## More like this





**Congress Fears FCC Will Not Investigate Sale of Phone Location Data Before Time Runs Out**

JOSEPH COX



**FCC to Propose Fines of AT&T, T-Mobile, Sprint, Verizon for Selling Location Data**

JOSEPH COX



**Ajit Pai Says FCC's Investigation into Sale of Phone Location Data Nearly Complete**

JOSEPH COX



**AT&T Says Customers Can't Sue the Company for Selling Location Data to Bounty Hunters**

JOSEPH COX



**Hackers Are Breaking Directly Into Telecom**

**SIM Swappers Are Phishing Telecom**

Companies to Take Over Customer Phone Numbers

JOSEPH COX

Company Employees to Access Internal Tools

JOSEPH COX





Verizon Makes SIM Swapping Hard. Why Doesn't AT&T, Sprint, and T-Mobile?

LORENZO FRANCESCHI-BICCHIERAI

This Secretive Surveillance Company Is Selling Cops Cameras Hidden in Gravestones

JOSEPH COX

## Most read





**A Doctor Built a Machine That Helps People Die**

MARJOLEIN DE JONG IN **HEALTH**



**Photo of Couple Boning on Top of Pyramids Prompts International Investigation**

MACK LAMOUREUX IN **TRAVEL**



**Experts Condemn Keto. Will People Finally Stop?**

HANNAH SMOTHERS IN **HEALTH**

**How Did Nature Form This Near-Perfect Rectangular Iceberg?**

BECKY FERREIRA IN **TECH**

## MOTHERBOARD
TECH BY VICE

# Congress Fears FCC Will Not Investigate Sale of Phone Location Data Before Time Runs Out

On Friday, members of a committee urged Ajit Pai's FCC to provide details on its investigation into how phone carriers sold location data to bounty hunters.

By Joseph Cox

Nov 8 2019, 2:06pm

IMAGE: ALEX WONG/GETTY IMAGES

On Friday, 11 democratic members of a congressional committee focused on

**Keep Reading**

## MOTHERBOARD
**TECH BY VICE**

# FCC to Propose Fines of AT&T, T-Mobile, Sprint, Verizon for Selling Location Data

Motherboard previously found the telecom companies sold phone location data to bounty hunters and other third-parties.

By **Joseph Cox**

Feb 27 2020, 3:44pm    

IMAGE: ESCHCOLLECTION

The Federal Communications Commission (FCC) will propose fines for the

**Keep Reading**

# United States Senate

WASHINGTON, DC 20510

<span style="color:red">EXHIBIT "G"</span>

January 24, 2019

The Honorable Joseph J. Simons
Chairman
Federal Trade Commission
600 Pennsylvania Avenue, NW
Washington, DC 20530

The Honorable Ajit Pai
Chairman
Federal Communications Commission
445 12th Street, SW
Washington, DC 20554

Dear Chairman Simons and Chairman Pai:

We write to urge the Federal Trade Commission (FTC) and the Federal Communication Commission (FCC) to broadly investigate the sale of Americans' location data by wireless carriers, location aggregators, and other third parties.

Last year, multiple news reports highlighted the fact that the four major wireless carriers, AT&T, Sprint, T-Mobile, and Verizon, sold their customers' location data to approximately seventy companies, without the explicit knowledge or consent of their customers.  After significant negative press coverage, the wireless industry pledged to end these business practices. A recent investigation published by *Motherboard*, however, demonstrated not only that the wireless carriers are still failing to protect their customers' private information, but also that location data can be purchased by stalkers, domestic abusers, and others. It is clear that these wireless carriers have failed to regulate themselves or police the practices of their business partners, and have needlessly exposed American consumers to serious harm.

To that end, we urge the FTC and the FCC to conduct broad investigations, as appropriate, into the business partnerships between wireless carriers and location aggregators, including resellers and all downstream buyers of location data. Specifically, your agencies should determine whether wireless carriers or aggregators knew, or should have known, that failing to demand and verify subscriber consent would result in individuals obtaining location data without the respective subscriber's knowledge or consent. We also ask your agencies to require the wireless carriers to notify every American whose location they shared or sold and to identify to those subscribers the specific companies that obtained their location information.

Americans expect that their location data will be protected.  The wireless industry has repeatedly demonstrated a blatant disregard for its customers' privacy. It is therefore vital

that regulators take swift action to ensure that consumers are protected. Please respond to this letter by February 5, 2019.

Sincerely,

Ron Wyden
United States Senator

Charles E. Schumer
United States Senator

Edward J. Markey
United States Senator

Richard Blumenthal
United States Senator

Kamala D. Harris
United States Senator

Patrick Leahy
United States Senator

Jeffrey A. Merkley
United States Senator

Benjamin L. Cardin
United States Senator

Sheldon Whitehouse
United States Senator

Amy Klobuchar
United States Senator

Kirsten Gillibrand
United States Senator

Cory A. Booker
United States Senator

Jack Reed
United States Senator

Tina Smith
United States Senator

Bernard Sanders
United States Senator



Timothy P. McKone
Executive Vice President
Federal Relations

AT&T Services, Inc.
1120 20th Street, NW
Suite 800
Washington, DC 20036

T 202.463.4144
tm3703@att.com
att.com

February 15, 2019

The Honorable Ron Wyden
United States Senate
221 Dirksen Senate Office Building
Washington, DC 20510



EXHIBIT "H"

Dear Senator Wyden:

I am responding to your January 17, 2019 letter to AT&T Chairman and CEO Randall Stephenson requesting information regarding AT&T's provision of location-based services. Your letter refers to a January 9 article published by *Motherboard* involving a company named MicroBilt. Although the phone discussed in that article was not an AT&T phone, we immediately suspended MicroBilt's access to AT&T location information and began investigating whether any AT&T customers' location had been transmitted without consent or for purposes beyond the limited fraud-prevention use we had authorized for MicroBilt. That investigation continues, but to date, we are not aware of any such instance.

AT&T has provided location-based services because we recognized the benefits to our customers.[1] Whether it is the towing company receiving the location of a stranded motorist who does not know the nearest mile marker, a lender thwarting fraud and identify theft, or a daughter using a medical alert device to get help for an elderly parent, the benefits from these services are tangible and can be life-saving.

As we detailed in our response to your May 8, 2018 letter we only share location with customer consent and we maintain strict standards to protect against improper use or disclosure of that data. For example, before we provide location to any aggregator or service provider, we investigate them -- i.e., their corporate history, security policies, and privacy policies – as well as their planned use of the data. We do not share location information with any entity for any purpose that has not been vetted and approved. If approved, the aggregator or service provider must provide conspicuous notice to the customer of the intended use of the information and obtain the customer's consent to that use, and they are prohibited from using it for any other purpose. Those entities must provide AT&T with a confirmation of customer consent for each request for AT&T location data, and we review those records daily.

---

[1] The provision of location-based services has never been a significant source of income to AT&T. In 2017, our provision of location-based information to aggregators generated a tiny fraction -- about one thousandth of one percent -- of company revenues.

The Honorable Ron Wyden
United States Senate
February 15, 2019
Page 2

As we further explained, to facilitate location services, AT&T has contractual relationships with two third-party location aggregators that allow such aggregators to share location information with their customers (e.g., roadside-assistance providers) in accordance with AT&T's requirements. Those location aggregators are TechnoCom Corporation d/b/a LocationSmart and Zumigo, Inc.

Notwithstanding the clear benefits of these services, in June 2018, after the Securus incident, AT&T announced that we were ending our work with location aggregators in a way that preserved important services like roadside assistance. To be clear, we did not say that we would stop sharing all location information immediately, but rather "as soon as practical." We chose a phased approach rather than a flash-cut to mitigate the impact on location-based services that offer important public benefits like those described above, and to allow affected companies an opportunity to transition those services. Since that announcement, we have shut down access to most of the companies using the services.

As to the remaining fraud-prevention and consumer-safety uses, in light of recent allegations about the misuse of location services, we have accelerated our phase out plan and will cease providing location information to all aggregators by the end of March 2019. We know this means that consumers may no longer benefit from important services until new methods are developed. This is not a decision that we make lightly, but it is one that we feel is prudent and appropriate under the circumstances.

Finally, your January 17 letter asks for any known incidents where a third party misrepresented that they obtained prior customer consent. While our investigation is ongoing, based on a review going back to January 2016, beyond the allegations of inappropriate use of location information by Securus Technologies, AT&T has not identified any use of location information where the location aggregator or another third party obtained AT&T location information without prior customer consent.

Sincerely,

RON WYDEN
OREGON

RANKING MEMBER OF COMMITTEE ON
FINANCE

221 DIRKSEN SENATE OFFICE BUILDING
WASHINGTON, DC 20510
(202) 224-5244

## United States Senate
WASHINGTON, DC 20510–3703

COMMITTEES:
COMMITTEE ON FINANCE
COMMITTEE ON BUDGET
COMMITTEE ON ENERGY & NATURAL RESOURCES
SELECT COMMITTEE ON INTELLIGENCE
JOINT COMMITTEE ON TAXATION

March 13, 2019


EXHIBIT "I"

Michel Combes
Chief Executive Officer and President
Sprint Corp.
6200 Sprint Parkway
Overland Park, KS 66251

John Legere
Chief Executive Officer
T-Mobile US, Inc.
12920 Southeast 38th Street
Bellevue, WA 98006

Randall L. Stephenson
Chairman and Chief Executive Officer
AT&T Inc.
208 South Akard Street
Dallas, TX 75202

Hans Vestberg
Chief Executive Officer
Verizon Communications Inc.
1095 Avenue of the Americas
New York, NY 10036

Dear Mr. Combes, Mr. Legere, Mr. Stephenson, and Mr. Vestberg:

I write to seek additional information regarding your companies' repeated sale and improper disclosure of customer location data to bail bondsmen, data brokers, and other individuals.

It is now abundantly clear that you have failed to be good stewards of your customers' private location information. In May of 2018, I revealed that Securus, a major provider of prison phone service, created a self-service website through which prison guards could covertly track any phone in America, using location data that Securus purchased from one of your data broker partners. Subsequent reporting by Motherboard revealed numerous examples of shady individuals obtaining your customers' location data.

In letters that your companies sent me on February 15, 2019, you collectively revealed four new incidents, separate from the Securus incident that you had previously acknowledged, in which third parties improperly obtained your customers' location information. While these incidents all involved data brokers, it seems that this is not the only method by which unauthorized individuals have tracked your customers. A March 6, 2019, Motherboard story revealed that stalkers and debt collectors have also obtained location information directly from your companies–by impersonating the police and claiming they needed the information as part of an emergency.

As you know, wireless carriers are required under federal law to protect Customer Proprietary Network Information (CPNI), which includes location data. You are also required to report breaches of CPNI to federal law enforcement agencies. Given your companies' atrocious track record protecting location data, Americans have good reason to doubt your compliance with your

911 NE 11TH AVENUE
SUITE 630
PORTLAND, OR 97232
(503) 326-7525

405 EAST 8TH AVE
SUITE 2020
EUGENE, OR 97401
(541) 431-0229

SAC ANNEX BUILDING
105 FIR ST
SUITE 201
LA GRANDE, OR 97850
(541) 962-7691

U.S. COURTHOUSE
310 WEST 6TH ST
ROOM 118
MEDFORD, OR 97501
(541) 858-5122

THE JAMISON BUILDING
131 NW HAWTHORNE AVE
SUITE 107
BEND, OR 97701
(541) 330-9142

707 13TH ST, SE
SUITE 285
SALEM, OR 97301
(503) 589-4555

HTTP://WYDEN.SENATE.GOV
PRINTED ON RECYCLED PAPER

legal obligation to report such data breaches. To that end, please provide me with complete answers to the following questions by April 5, 2019:

1. Please list and describe all incidents since January 1, 2010 (previously disclosed, or newly discovered) in which a third party with whom your company shared location data misrepresented that it had customer consent, impersonated law enforcement, or otherwise fraudulently obtained location data.

2. For each incident in (1), did your company properly report this breach to the United States Secret Service (USSS) and the Federal Bureau of Investigation (FBI) through the FCC's Data Breach Reporting Portal (https://www.cpnireporting.gov) as required by law?

   a. For each incident in (1) that your company reported to the USSS and FBI through the FCC's Data Breach Reporting Portal, please provide me with a copy of the report submitted to these law enforcement agencies.

   b. For each incident in (1) that was not reported to the USSS and FBI through the FCC's Data Breach Reporting Portal, please explain why your lawyers did not believe that it was necessary to report the breach to law enforcement.

If you have any questions about this request, please contact Chris Soghoian in my office.

Sincerely,

Ron Wyden
United States Senator

Federal Communications Commission                          FCC 20-26

**Before the**
**Federal Communications Commission**
**Washington, DC 20554**

<span style="color:red">**EXHIBIT "J"**</span>

| | | |
|---|---|---|
| In the Matter of | **)** | |
| | **)** | |
| AT&T Inc. | **)** | File No.:  EB-TCD-18-00027704 |
| | **)** | NAL/Acct. No.:  202032170004 |
| | **)** | FRN:  0005193701 |

**NOTICE OF APPARENT LIABILITY FOR FORFEITURE**
**AND ADMONISHMENT**

**Adopted:  February 28, 2020**                          **Released:  February 28, 2020**

By the Commission:  Chairman Pai and Commissioner O'Rielly issuing separate statements; Commissioner Rosenworcel dissenting and issuing a statement; Commissioner Starks approving in part, dissenting in part and issuing a statement.

**TABLE OF CONTENTS**

Heading                                                                          Paragraph #

I.   INTRODUCTION ................................................................................................................. 1
II.  BACKGROUND .................................................................................................................. 4
     A.  Legal Framework ......................................................................................................... 4
     B.  Factual Background .................................................................................................... 11
         1.  AT&T's Wireless Network Services and Customer Location Information ........... 11
         2.  AT&T's Location-Based Services Business Model ............................................. 12
         3.  AT&T's Actions After the Publication of Reports of Unauthorized Access to and Use
             of Customer Location Information ...................................................................... 20
III. DISCUSSION ..................................................................................................................... 31
     A.  Customer Location Information Constitutes CPNI ..................................................... 33
     B.  AT&T Apparently Violated Section 222 and the CPNI Rules by Disclosing CPNI to a
         Missouri Sheriff Without Authorization .................................................................... 42
     C.  AT&T Apparently Failed to Take Reasonable Measures to Protect CPNI .................. 51
     D.  Proposed Forfeiture .................................................................................................. 71
IV.  REQUESTS FOR CONFIDENTIALITY ............................................................................ 82
V.   ORDERING CLAUSES ...................................................................................................... 85

I.      **INTRODUCTION**

        1.      The wireless phone is a universal fixture of modern American life.  Ninety-six percent of all adults in the United States own a mobile phone.[1]  Of those mobile phones, the majority are smartphones that provide Internet access and apps, which Americans use to read, work, shop, and play. More than almost any other product, consumers "often treat [their phones] like body appendages."[2]  The

---

[1] Pew Research Center, Demographics of Mobile Device Ownership and Adoption in the United States – Mobile Fact Sheet (June 12, 2019), https://www.pewresearch.org/internet/fact-sheet/mobile/.

[2] Pew Research Center, Americans' Views on Mobile Etiquette, Chapter 1: Always on Connectivity (Aug. 26, 2015), https://www.pewresearch.org/internet/2015/08/26/chapter-1-always-on-connectivity/.

Federal Communications Commission                                    FCC 20-26

wireless phone goes wherever its owner goes, at all times of the day or night.  For most consumers, the phone is always on and always within reach.[3]  And every phone must constantly share its (and its owner's) location with its wireless carrier because wherever it goes, the networks must be able to find it to know where to route calls.

2.      The American public and federal law consider such information highly personal and sensitive—and justifiably so.  As the Supreme Court has observed, location data associated with wireless service "provides an intimate window into a person's life, revealing not only his particular movements, but through them his familial, political, professional, religious, and sexual associations."[4]  Section 222 of the Communications Act requires carriers to protect the confidentiality of certain customer data related to the provision of telecommunications service, including location information.  The Commission has advised carriers that this duty requires them to take "every reasonable precaution" to safeguard their customers' information.[5]  The Commission has also warned carriers that the FCC would "[take] resolute enforcement action to ensure that the goals of section 222 are achieved."[6]

3.      Today, we do exactly that.  In this Notice of Apparent Liability, we propose a penalty of $57,265,625 against AT&T Inc. (AT&T or Company) for apparently violating section 222 of the Communications Act and the Commission's regulations governing the privacy of customer information.  We find that AT&T apparently disclosed its customers' location information, without their consent, to a third party who was not authorized to receive it.  In addition, even after highly publicized incidents put the Company on notice that its safeguards for protecting customer location information were inadequate, AT&T apparently continued to sell access to its customers' location information for nearly a year without putting in place reasonable safeguards—leaving its customers' data at unreasonable risk of unauthorized disclosure.

## II.      BACKGROUND

### A.      Legal Framework

4.      The Act and the Commission's rules govern and limit telecommunications carriers' use and disclosure of certain customer information.  Section 222(a) of the Act imposes a general duty on telecommunications carriers to "protect the confidentiality of proprietary information" of "customers."[7]  Section 222(c) establishes specific privacy requirements for "customer proprietary network information" or CPNI, namely information relating to the "quantity, technical configuration, type, destination, *location*, and amount of use of a telecommunications service subscribed to by any customer of a telecommunications carrier" and that is "made available to the carrier by the customer solely by virtue of the carrier-customer relationship."[8]  The Commission has issued regulations implementing the privacy requirements of section 222 (CPNI Rules),[9] and has amended those rules over time.  Most relevant to this

---

[3] *Id.*

[4] *Carpenter v. United States*, 138 S. Ct. 2206, 2217 (2018) (internal quotation marks and citations omitted).

[5] *Implementation of the Telecommunications Act of 1996: Telecommunications Carriers' Use of Customer Proprietary Network Information and Other Customer Information*, Report and Order and Further Notice of Proposed Rulemaking, 22 FCC Rcd 6927, 6959, para. 64 (2007) (*2007 CPNI Order*).

[6] *2007 CPNI Order*, 22 FCC Rcd at 6959-60, para. 65.

[7] 47 U.S.C. § 222(a).

[8] 47 U.S.C. § 222(c), (h)(1)(A) (emphasis added).  "Telecommunications service" is defined as "the offering of telecommunications for a fee directly to the public, or to such classes of users as to be effectively available directly to the public, regardless of the facilities used."  47 U.S.C. § 153(53).  The mobile voice services provided by AT&T are "telecommunications services."  *See* 47 U.S.C. § 332(c)(1); H.R. Conf. Rep. No. 104-458 at 125 (1996) ("This definition [of 'telecommunications service'] is intended to include commercial mobile service.").

[9] *See* 47 CFR § 64.2001 *et seq.*

proceeding are the rules that the Commission adopted governing customer consent to the use, sharing, or disclosure of CPNI and those relating to a carrier's duty to discover and protect against unauthorized access to CPNI.

5.        *Customer Consent to Disclose CPNI.*  With limited exceptions, a carrier may only use, disclose, or permit access to CPNI with customer approval.[10]  Generally, carriers must obtain the "opt-in approval" of their customers before disclosing CPNI.[11]  This means that a carrier must obtain the customer's "affirmative, express consent allowing the requested CPNI usage, disclosure, or access after the customer is provided appropriate notification of the carrier's request . . . ."[12]

6.        Prior to 2007, the Commission's rules permitted telecommunications carriers to share customers' CPNI with joint venture partners and independent contractors for certain purposes based on a customer's "opt-out approval."  This means that a customer is deemed to have consented to a particular use of, disclosure of, or access to CPNI after being given notice of the use, disclosure, or access and not objecting thereto.[13]  However, in response to the problem of data brokers on the web selling call detail and other telephone records procured without customer consent,[14] the Commission amended its rules in the *2007 CPNI Order* to require carriers to obtain opt-in approval from a customer before disclosing that customer's CPNI to a carrier's joint venture partner or independent contractor.[15]  The Commission recognized that "once the CPNI is shared with a joint venture partner or independent contractor, the carrier no longer has control over it and thus the potential for loss of this data is heightened."[16]  Given that observation, the Commission concluded that sharing of data with partners and contractors "warrants a requirement of express prior customer authorization,"[17] which would allow individual consumers to determine if they want to bear the increased risk associated with sharing CPNI with independent contractors and joint venture partners.[18]  The Commission emphasized the importance of obtaining express consent particularly because a carrier cannot simply rectify the harms resulting from a breach by terminating its agreement, "nor can the Commission completely alleviate a customer's concerns about the privacy invasion through an enforcement proceeding."[19]  The Commission further concluded that contractual safeguards cannot obviate the need for explicit customer consent, as such safeguards would not change the fact that the risk of unauthorized CPNI disclosures increases when such information is

---

[10] 47 U.S.C. § 222(c)(1) ("Except as required by law *or with the approval of the customer*, a telecommunications carrier that receives or obtains [CPNI] by virtue of its provision of a telecommunications service shall only use, disclose, or permit access to individually identifiable [CPNI] in its provision of (A) the telecommunications service from which such information is derived, or (B) services necessary to, or used in, the provision of such telecommunications service, including the publishing of directories.") (emphasis added).

[11] 47 CFR § 64.2007(b).

[12] *Id.* § 64.2003(k).

[13] *See id.* § 64.2003(l).

[14] *See 2007 CPNI Order*, 22 FCC Rcd at 6928, para. 2.

[15] *Id.* at 6947-53, paras. 37-49.

[16] *Id.* at 6948, para. 39.

[17] *Id.*; *see also id.* at 6949, para. 41 ("Further, we find that an opt-in regime will clarify carriers' information sharing practices because it will force carriers to provide clear and comprehensible notices to their customers in order to gain their express authorization to engage in such activity.").

[18] *2007 CPNI Order*, 22 FCC Rcd at 6950, para. 45.

[19] *Id.* at 6949, para. 42.

Federal Communications Commission                                    FCC 20-26

provided by a carrier to a joint venture partner or independent contractor.[20]  Thus, with limited exceptions, a carrier may only use, disclose, or permit access to CPNI with the customer's opt-in approval.[21]

7.      *Reasonable Measures to Safeguard CPNI.*  The Commission also recognized in the *2007 CPNI Order* that reliance on the opt-in approval requirement alone is insufficient to protect customers' interest in the privacy of their CPNI, finding that at least some data brokers had obtained access to call detail information because of the ease with which a person could pretend to be a particular customer or other authorized person in order to obtain access to that customer's call detail or other private communications records, a practice known as "pretexting."[22]  In light of the harms arising from pretexting, the Commission adopted rules requiring carriers to "take reasonable measures to *discover* and *protect* against attempts to gain unauthorized access to CPNI."[23]  To provide some direction on how carriers should protect against pretexting schemes, the Commission included in its amended rules customer authentication requirements tailored to whether a customer is seeking in-person, online, or over-the-phone access to CPNI.[24]  It also adopted password and account notification requirements.[25]

8.      The Commission made clear that the specific customer authentication requirements it adopted were "minimum standards" and emphasized the Commission's commitment "to taking resolute enforcement action to ensure that the goals of section 222 [were] achieved."[26]  Where there is evidence of an unauthorized disclosure, the Commission specified that it will infer from that evidence that a carrier's practices were unreasonable unless the carrier offers evidence demonstrating that its practices were reasonable.[27]  This burden-shifting approach reflects the Commission's expectation that carriers "take every reasonable precaution to protect the confidentiality of proprietary or personal customer information,"[28] while also heeding industry warnings that adopting prescriptive rules detailing specific security practices could be counterproductive.[29]  The Commission chose to "allow carriers to determine what specific measures will best enable them to ensure compliance with" the requirement that they remain vigilant in their protection of CPNI.[30]  The Commission expected that carriers would employ

---

[20] *Id.* at 6952, para. 49.

[21] *See* 47 CFR § 64.2007(b).

[22] *2007 CPNI Order*, 22 FCC Rcd at 6928, para. 1 & n.1.

[23] 47 CFR § 64.2010(a) (emphasis added).

[24] *See id*. § 64.2010(b)-(d).

[25] *See id.* § 64.2010(e)-(f).

[26] *2007 CPNI Order*, 22 FCC Rcd at 6959–60, para. 65.

[27] *See id.*at 6959, para. 63 (noting that where there is evidence of an unauthorized disclosure, the Commission "will infer . . . that the carrier did not sufficiently protect that customer's CPNI" and that "[a] carrier then must demonstrate that the steps it has taken to protect CPNI from unauthorized disclosure, including the carrier's policies and procedures, are reasonable in light of the threat posed by pretexting and the sensitivity of the customer information at issue").  This approach, which the Commission articulated in the context of pretexting, is particularly applicable here, where a fundamental issue is whether the Company had reasonable measures to ensure that its customers had in fact consented to the disclosure of their CPNI with third parties.  Since at least 2007, it has been foreseeable that entities seeking to gain unauthorized access to CPNI would use false pretenses—of one sort or another—to do so.

[28] *2007 CPNI Order*, 22 FCC Rcd at 6959, para. 64 (citing 47 CFR § 64.2010(a)).

[29] *See 2007 CPNI Order*, 22 FCC Rcd at 6945-46, paras. 33-36 (citing, *inter alia*, CTIA Comments (May 1, 2006) at 6 (arguing that "prescriptive rules detailing specific security practices that must be followed by all carriers do nothing more than provide a road map to criminals and erect a barrier that prevents carriers from adopting new security measures in response to constantly evolving threats")).

[30] *2007 CPNI Order*, 22 FCC Rcd at 6945-46, para. 34.

effective protections that are best suited to their particular systems.[31]  Carriers are not expected to eliminate every vulnerability to the security of CPNI, but they must employ "reasonable measures to discover and protect against attempts to gain unauthorized access to CPNI."[32]  They must also take reasonable measures to protect the confidentiality of CPNI—a permanent and ongoing obligation to police disclosures and ensure proper functioning of security measures.[33]  A variety of government entities provide guidance and publish best practices that are intended to help companies evaluate the strength of their information security measures.[34]

9.     *Section 217.*  Finally, the Act makes clear that carriers cannot disclaim their statutory obligations to protect their customers' CPNI by delegating such obligations to third parties.  Section 217 of the Act provides that "the act, omission, or failure of any officer, agent, or other person acting for or employed by any common carrier or user, acting within the scope of his employment, shall in every case be also deemed to be the act, omission, or failure of such carrier or user as well as that of the person."[35]

10.     *The Scope of the Commission's Authority.*  Our authority to bring action for violations of section 222 of the Communications Act and the CPNI Rules is limited to actions against providers of telecommunications services[36] and providers of interconnected Voice over Internet Protocol services.[37]  To the extent that other entities act unfairly or deceptively by mishandling or failing to protect wireless customer location information, federal civil enforcement authority rests with the Federal Trade Commission, an agency of general jurisdiction.[38]

---

[31] *Id.* at 6959, para. 64.  The Commission explained, for example, that although it declined to impose "audit trail" obligations on carriers at that time, it "expect[ed] carriers through audits or other measures to take reasonable measures to discover and protect against" activity indicative of unauthorized access.  *Id.*  Similarly, the Commission expected that a carrier would "encrypt its CPNI databases if doing so would provide significant additional protection . . . at a cost that is reasonable given the technology a carrier already has implemented," but the Commission did not specifically impose encryption requirements.  *Id.*

[32] 47 CFR § 64.2010(a).

[33] *See 2007 CPNI Order*, 22 FCC Rcd at 6959, para. 64 ("We fully expect carriers to take every reasonable precaution to protect the confidentiality of proprietary or personal customer information.").

[34] For example, the National Institute of Standards and Technology (NIST) is responsible for developing information security standards and guidelines, including minimum requirements for federal information systems.  NIST publishes cybersecurity and privacy frameworks which feature instructive practices and guidelines for organizations to reference.  The publications can be useful in determining whether particular cybersecurity or privacy practices are reasonable by comparison.  The model practices identified in the NIST and other frameworks, however, are not legally binding rules, and we do not consider them as such here.  The Federal Trade Commission (FTC) and the FCC's Communications Security, Reliability, and Interoperability Council (CSRIC) also offer guidance related to managing data security risks.  *See* NIST, Framework for Improving Critical Infrastructure Cybersecurity, Version 1.1 (Apr. 16, 2018), https://nvlpubs.nist.gov/nistpubs/CSWP/NIST.CSWP.04162018.pdf (NIST Cybersecurity Framework); NIST, The NIST Privacy Framework: A Tool for Improving Privacy Through Enterprise Risk Management, Version 1.0 (Jan. 16, 2020), https://www.nist.gov/privacy-framework/privacy-framework; FTC, Start with Security: A Guide for Business, Lessons Learned from FTC Cases (June 2015), https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf; Communications Security, Reliability and Interoperability Council, CSRIC Best Practices, https://opendata.fcc.gov/Public-Safety/CSRIC-Best-Practices/qb45-rw2t/data.

[35] 47 U.S.C. § 217.

[36] 47 U.S.C. § 222.

[37] *2007 CPNI Order*, 22 FCC Rcd at 6954-57, paras 54-59.

[38] 15 U.S.C. § 45(a)(2) ("The [Federal Trade] Commission is hereby empowered and directed to prevent persons . . . from using unfair methods of competition in or affecting commerce and unfair or deceptive acts or practices in or affecting commerce.").

Federal Communications Commission                                    FCC 20-26

### B.       Factual Background

#### 1.       AT&T's Wireless Network Services and Customer Location Information

11.       AT&T provides mobile voice and data services to consumers throughout the United States by enabling consumer mobile phones to make and receive calls or transmit data on AT&T's wireless network.[39]  The mobile phones of AT&T subscribers, like those of customers of other carriers, periodically register with nearby network signal towers.[40]  AT&T uses the information generated from this registration activity to ensure the proper functioning of its network and to provide the services to which its customers subscribe.[41]  Because AT&T knows the location of its network signal towers, AT&T is able to calculate the approximate geographic location of the mobile phones communicating with its towers.  This type of location information—which is created even when the customer does not have an active established connection, such as a voice call or data usage—may at times be helpful to consumers.  For example, in emergencies, the location of a customer's mobile phone can enable first responders and law enforcement to assist.  Location information is also used for non-emergency location-based services, such as roadside assistance, delivery tracking, and fraud prevention.[42]  Other widely used forms of location-based services include real-time mapping, navigation, and local weather forecasting services, although these generally rely on GPS-based location finding rather than customer location information derived from the provision of wireless service.[43]

#### 2.       AT&T's Location-Based Services Business Model

12.       Until ▮▮▮▮▮▮▮▮▮ AT&T provided location-based service providers access to its customers' location information through a chain of contract-based business arrangements.  AT&T sold access to customer location information to companies known as "location information aggregators," who then resold access to such information to third-party location-based service providers or in some cases to intermediary companies who then resold access to such information to location-based service providers.  AT&T had arrangements with two aggregators: LocationSmart and Zumigo (the Aggregators).[44]  Each Aggregator, in turn, had arrangements with numerous location-based service providers.  The most basic form of these relationships is illustrated in Fig. 1:

---

[39] *See* AT&T Inc., 2018 Annual Report, https://investors.att.com/~/media/Files/A/ATT-IR/financial-reports/annual-reports/2018/complete-2018-annual-report.pdf.

[40] *See* FCC, Wireless Telecommunications Bureau, *Location-Based Services: An Overview of Opportunities and Other Considerations*, at 11-12 (May 2012), https://docs.fcc.gov/public/attachments/DOC-314283A1.pdf (discussing how location information is derived from communications between mobile phones and cellular base stations).

[41] Response to Initial Letter of Inquiry from AT&T, to Kristi Thompson, Chief, Telecommunications Consumers Division, FCC Enforcement Bureau, at 11-12, Response to Question 4 (Nov. 14, 2018) (on file in EB-TCD-18-00027704) (LOI Response).

[42] *Id.* at 8-11, Response to Question 3.

[43] Location information derived from the interaction between a subscriber's mobile phone and a carrier's network is distinct from the location information generated by capabilities on a subscriber's phone, which calculates a phone's location by measuring its distance to Global Positioning System (GPS) satellites and through other capabilities.  Many popular apps use device-based location functionality to provide consumers with location-based service (including mapping and navigation services) and do not rely on the location information collected by carriers.  There are a variety of location positioning methods and protocols in wireless networks that are based on mobile radio signals, and some of these radio signals are configurable and/or controlled by the network operator and not the consumer.  *See* Rohde & Schwarz, *LTE Location Based Services Technology Introduction – White Paper*, at 11, Fig. 7 – Supported positioning methods in LTE (Sept. 2013), https://cdn.rohde-schwarz.com/pws/dl_downloads/dl_common_library/dl_brochures_and_datasheets/pdf_1/LTE_LBS_White_Paper.pdf.

[44] AT&T does not contend that its customers consented to these arrangements with the Aggregators.

6



13.     AT&T apparently sold access to its customers' location information, directly or indirectly, to ▮▮ third parties, including the two Aggregators.  The following ▮ entities purchased access to AT&T customer location information from LocationSmart ▮▮▮▮▮▮▮▮ 3Cinteractive ▮▮▮▮



▮▮▮▮ SpatialPoint; ▮▮▮▮ Windstream Communications; ▮▮▮▮ [45] Three of LocationSmart's customers (3Cinteractive, SpatialPoint, and Windstream Communications) were intermediaries who resold access to AT&T customer location information to, respectively, ▮▮▮▮ [46] The following ▮ entities purchased access to AT&T customer location information from Zumigo: ▮▮▮▮ [47] Finally, AT&T asserts that it sold access to customer location information directly to the following ▮ location-based

---

[45] LOI Response at 8-10, Response to Question 3; Response to Letter of Inquiry from AT&T, to Kristi Thompson, Chief, Telecommunications Consumers Division, FCC Enforcement Bureau, LBS Chart Attachment (Feb. 21, 2020) (on file in EB-TCD-18-00027704) (Further Response).

[46] LOI Response at 10-11, Response to Question 2; Further Response, LBS Chart Attachment.

[47] LOI Response at 10, Response to Question 3; Further Response, LBS Chart Attachment.

Federal Communications Commission                           FCC 20-26

service providers|  [48]

14.     According to AT&T, it structured its location-based service program in accordance with CTIA's "Best Practices and Guidelines for Location Based Services" (CTIA Guidelines)[49] and contractually required the Aggregators and location-based service providers to comply with the CTIA Guidelines.[50]

15.     *AT&T's Contract Provisions Governing the Handling of Customer Location Information.* Pursuant to its contracts with the two Aggregators, AT&T provided the Aggregators with access to AT&T customer location information and authorized them to share it with individual location-based service providers after AT&T had reviewed a "Use Case" submitted to AT&T by the location-based service provider.[51] Each Use Case purported to describe the purposes for which the location-based service provider would use the location information, and the process it would use for getting opt-in consent from AT&T's customers to the sharing of that information with the location-based service provider.[52] According to AT&T, it only approved Use Cases for specific purposes and only when the location-based service provider committed to obtaining the affirmative, opt-in consent of the individual whose device was to be located.[53] Pursuant to the terms of AT&T's contracts with the Aggregators, the Aggregators were obligated to have contracts with their location-based service provider customers that prohibited the location-based service providers from retrieving customer location information at their discretion or disclosing it to any third parties that were not known to and approved by the Company.[54] AT&T's contracts required that its Aggregators share consent records with AT&T, and according to AT&T it reviewed such consent records on a daily basis.[55]

16.     AT&T's contracts obligated the Aggregators to monitor the practices of the location-based service providers, including compliance with the requirement that location-based service providers notify and collect affirmative customer consent for any use of location information.[56] According to AT&T, it also required the Aggregators and location-based service providers to attest that they were complying with AT&T's contractual requirements.[57] AT&T also asserts that it required the Aggregators to provide evidence daily of each of the consents received by the Aggregators from the location-based service providers.[58] A consent record consisted of an identifier associated with the customer, a date and time stamp of the customer's consent, the version of the notice presented to the customer, and other data purporting to enable AT&T to track the consent.[59] AT&T did not verify the consent before providing

---

[48] LOI Response at 11, Response to Question 3; Further Response, LBS Chart Attachment.

[49] CTIA, Best Practices and Guidelines for Location Based Services, https://www.ctia.org/the-wireless-industry/industry-commitments/best-practices-and-guidelines-for-location-based-services (last visited Feb. 5, 2020).

[50] LOI Response at 1, Introduction.

[51] *Id.* at 4, Response to Question 1.

[52] *Id.* at 4-5, Response to Question 1.

[53] *Id.*

[54] *Id.* at 6-7, Response to Question 1.

[55] *Id.* at 14, Response to Question 5.

[56] *Id.* at 6, Response to Question 1.

[57] *Id.* at 5, Response to Question 1.

[58] Response to Supplemental Letter of Inquiry from AT&T, to Kristi Thompson, Chief, Telecommunications Consumers Division, FCC Enforcement Bureau, at 11, Response to Question 9 (May 24, 2019) (on file in EB-TCD-18-00027704) (Supplemental LOI Response).

[59] Supplemental LOI Response at 11, Response to Question 9.

access to the location data; instead it claimed to verify on a daily basis that each request for information was tied to a consent record.[60] AT&T's contracts with the Aggregators also obligated the Aggregators to comply with various information security requirements, including vulnerability-scanning, encryption, data segregation, access limitation, and other requirements.[61]

17. *AT&T's Right to Suspend or Terminate Access to Location Information.*  AT&T had broad authority under its contracts with the Aggregators to quickly terminate access to customer location information.  The contracts permitted the Company to suspend the transmission of location information to any location-based service provider that it believed was not complying with its obligations.  AT&T also had the right to terminate its relationship with each Aggregator, at its discretion, if among other reasons, the Aggregator engaged in conduct that exposed AT&T to "sanctions, liability, prosecution or other adverse consequences under applicable law," breached the contract in a way that presented an "imminent risk of harm to AT&T [or] AT&T's customers," or otherwise "abuse[d] or misuse[d] AT&T's network or service."[62]  Except for the five location-based service providers with whom it contracted directly,[63] AT&T lacked a direct contractual relationship with the location-based service providers to whom it permitted the Aggregators to disclose its customers' location information.

18. *AT&T's Internal Reviews and Auditing.*  According to AT&T, between January 2016 and May 2019, it conducted five reviews or audits of its disclosure of customer location information to third parties.[64]  The Company claims that three of the five analyses are subject to attorney-client privilege, however, and submitted only the results of the two reviews that AT&T treated as non-privileged.[65]  The first non-privileged analysis, conducted from August 2017 to February 2018, involved AT&T's review of its controls over certain disclosures of customer location information for the provision of location-based services.  That audit "identified issues with: (i) consistency in the approval processes regarding the provision of subscriber data to third parties; (ii) reporting practices regarding the completeness of subscriber consents; and (iii) record retention practices regarding subscriber consents."[66]  AT&T averred that it had remediated all issues identified in the audit by June 6, 2018.[67]  The second non-privileged audit was a review of the Aggregators' compliance with AT&T information security requirements for third-party vendors, analyses conducted from July to August 2018 (in the case of LocationSmart) and July to October 2018 (in the case of Zumigo).[68]  AT&T found that LocationSmart was not in compliance with

---

[60] *Id.* at 11, Response to Question 9.

[61] LOI Response at 6-7, Response to Question 1.

[62] LOI Response at ATT-LOI-00013380, Response to Request for Documents No. 3, 2016 Master Agreement between AT&T Corp. and TechnoCom Corporation d/b/a LocationSmart, at Section 8.2 - Termination or Suspension (executed on Feb. 17, 2016 by Mario Proietti, CEO for LocationSmart and Glenn C. Girard, Assoc Dir. Customer Contracts-AT&T Services, Inc.) (AT&T-LocationSmart Agreement); LOI Response at ATT-LOI-00025859, Response to Request for Documents No. 3 2014 Master Agreement between AT&T Corp. and Zumigo, Inc., Section 8.2 – Termination or Suspension (executed on Apr. 25, 2014 by Chira Bakshi, CEO for Zumigo and Ana Castaneda, Contract Specialist for AT&T) (AT&T-Zumigo Agreement).  The contracts required the Aggregators to indemnify AT&T for various types of claims, including those arising from privacy violations, but did not provide for any other remedy—such as direct restitution to affected customers—in the event of breach.

[63] *See* LOI Response at 11, Response to Question 3 (explaining that AT&T contracted directly with ██████████ ████████████████████████████████████████████ ); Further Response, LBS Chart Attachment.

[64] LOI Response at 19-21, Response to Question 11; Supplemental LOI Response at 16, Response to Question 15.

[65] LOI Response at 20-21, Response to Question 11; Supplemental LOI Response at 16, Response to Question 15.

[66] LOI Response at 20, Response to Question 11.

[67] *Id.*

[68] *Id.*

four of the Company's information security requirements (including requirements for password/PIN expiration intervals and encryption of AT&T data in transit).[69]  AT&T also found that Zumigo was not in compliance with eight of the Company's information security requirements (including requirements for consistently remediating medium-risk vulnerabilities, having controls to safeguard against unauthorized activities[,]" and requiring privileged users to use multi-factor authentication when accessing AT&T data in the cloud).[70]  According to AT&T, LocationSmart and Zumigo adequately remediated all of the identified issues in the second audit.[71]

19.      Claiming privilege for the other three audits, AT&T did not share the findings from those reviews with the Enforcement Bureau.  Instead, AT&T identified the general topic(s) of and entities that were the subjects of the audits, and with respect to the first audit offered a one sentence description of changes the Company made in response to the audit.[72]  The first audit was a privileged compliance review of AT&T's data monitoring practices with respect to the Aggregators and location-based service providers, conducted from February 2017 to April 2018.[73]  The second privileged review, begun in May 2018, focused on Securus, LocationSmart, and 3Cinteractive (an intermediary working with Securus and LocationSmart), as well as Aggregators and location-based service providers more generally.[74]  The third privileged review, initiated in January 2019, focused on Zumigo and MicroBilt's provision of location-based service.[75]  AT&T declined to produce any other information to the Enforcement Bureau concerning those privileged reviews.

### 3.      AT&T's Actions After the Publication of Reports of Unauthorized Access to and Use of Customer Location Information

20.      On May 10, 2018, the *New York Times* reported on security breaches involving AT&T's (and other carriers') practice of selling access to customer location information.[76]  Specifically, Securus Technologies, Inc. (Securus), a provider of telecommunications services to correctional facilities throughout the United States, also operated a "location-finding service" that enabled law enforcement and corrections officials to access the location of a mobile device belonging to customers of major wireless carriers, including AT&T, *without* the device owner's knowledge or consent.[77]  According to the article, Securus required users to certify that they had the authority to perform location searches and to upload an appropriate document, such as a court order or warrant, that provided legal authorization for the location request.[78]  Securus did not, however, assess the adequacy of the purported legal authorizations submitted by users of its location-finding service.[79]

---

[69] *Id.* at 19, Response to Question 11.

[70] *Id.* at 20, Response to Question 11.

[71] LOI Response at 19-20, Response to Question 11; Supplemental LOI Response at 9, Response to Question 7.

[72] LOI Response at 21, Response to Question 11; Supplemental LOI Response at 9, Response to Question 7.

[73] LOI Response at 21, Response to Question 11.  According to AT&T, as a result of this review, it implemented revisions to the audit and monitoring plan for its identity verification services; revised the provisions of its contracts with the Aggregators and location-based service providers regarding data security, data monitoring, and auditing; and updated its own internal policy documents.  *Id.*

[74] *Id.* at 20, Response to Question 11.

[75] Supplemental LOI Response at 8-9, Response to Question 6.

[76] *See* Jennifer Valentino-DeVries, *Service Meant to Monitor Inmates' Calls Could Track You, Too*, N.Y. Times (May 10, 2018), https://www.nytimes.com/2018/05/10/technology/cellphone-tracking-law-enforcement.html.

[77] *Id.*

[78] *Id.*

[79] *Id*.

Federal Communications Commission                                         FCC 20-26

21.     The *New York Times* article described how then-Missouri Sheriff Cory Hutcheson used the Securus service, without legal authorization, to access location information about anyone he pleased.[80] Another newspaper later reported that Hutcheson submitted thousands of unauthorized location requests via the Securus service between 2014 and 2017, in some cases "upload[ing] entirely irrelevant documents including his health insurance policy, his auto insurance policy, and pages selected from Sheriff training manuals" in lieu of genuine legal process.[81] Among those apparently tracked by Hutcheson in this manner were his predecessor as Sheriff, a Missouri Circuit Judge, and at least five highway patrol officers.[82]

22.     AT&T does not deny the existence of the Securus location-finding service nor the abuse of that system by Hutcheson. Instead, AT&T asserts that the Securus location-finding service was not an AT&T-authorized Use Case. According to AT&T ████████████████████████████████████████████████████████████████████████████████[83] As described by AT&T, Securus should only have sought access to AT&T customer information if, in connection with a collect call from a correctional facility, a call recipient was informed, via a prerecorded message, that their location information would be collected, and they had pressed a button to consent to the collection of their location information to proceed with the call.[84] Based ████████████████████████ (which was transmitted from Securus to an intermediary called 3Cinteractive, then from 3Cinteractive to LocationSmart, and finally from LocationSmart to AT&T), AT&T transmitted a customer's location information to Securus, via LocationSmart and 3Cinteractive, and then to ████████[85]

23.     According to AT&T, ████████████████████████████████████████████████████████████████████[86] At the same time, AT&T concedes that ████████████████████████████████████████████████████[87] Securus continued to make this method of access available to law enforcement from at least 2014 until AT&T terminated Securus's access to AT&T customer location information in ████████ following the *New York Times* article.[88]

---

[80] *Id.*

[81] *See* Doyle Murphy, *Ex-Missouri Sheriff Cory Hutcheson Sentenced to 6 Months in Prison*, Riverfront Times (Apr. 29, 2019), https://www.riverfronttimes.com/newsblog/2019/04/29/ex-missouri-sheriff-cory-hutcheson-sentenced-to-6-months-in-prison.

[82] *See* Complaint, *William T. Cooper et al. vs. Sheriff Cory Hutcheson*, Case: 1:17-cv-00073 (E.D. Mo. May 8, 2017).

[83] LOI Response at 17, Response to Question 8.

[84] *See* Securus Technologies Location-based Services (LBS) White Paper, Feb. 21, 2018 (on file in EB-TCD-18-00027704) at 5; *see also* LOI Response at 17, Response to Question 8.

[85] Jennifer Valentino-DeVries, *Service Meant to Monitor Inmates' Calls Could Track You, Too*, N.Y. Times (May 10, 2018), https://www.nytimes.com/2018/05/10/technology/cellphone-tracking-law-enforcement.html; LOI Response at 17, Response to Question 8.

[86] LOI Response at 17, Response to Question 8.

[87] *Id.*

[88] The *New York Times* reported that Hutcheson's misuse of the Securus service began in 2014, and evidence independently obtained by the Enforcement Bureau confirms that fact. *See* Department of Justice Evidence Records (on file in EB-TCD-18-00027704).



24.     On May 10, 2018, in response to the *New York Times* report and a May 8, 2018 letter about the Securus program that Senator Ron Wyden sent to AT&T,[89] ██████████████████████████████████.[90] A few days later, on May 16, 2018, AT&T ██████████████████████ █ 3Cinteractive's █████████████████████████████████████████████.[91] According to AT&T, ██████████████████████████████████████████████████████████████████████████ ""[92] As a result, AT&T asserts ████████████████████████████████████████████████ ████████████████████████████████████████

25.     In June 2018, AT&T announced that ████████████████████████████████████ ██████████████████████████████████████████████████.[93] It did not specify how long the process would take. ████████████████████████████████████████████.[94] In November 2018, AT&T told Enforcement Bureau staff that it planned to implement "enhanced" notice and consent measures for location information-sharing in 2019,[95] but has offered no evidence that it did so.[96]

26.     ███████████████████████████████████████████████████████████████ ███████.[97]

---

[89] *See* Letter from Senator Ron Wyden to Randall L. Stephenson, President and Chief Executive Officer, AT&T Inc. (May 8, 2018), https://www.wyden.senate.gov/imo/media/doc/wyden-securus-location-tracking-letter-to-att.pdf.

[90] LOI Response at 18, Response to Question 8.  Senator Wyden's letter was dated May 8, 2018, and AT&T states ████████████████████████████████████████████████████████████████████████████████ *Id.*

[91] LOI Response at 18, Response to Question 8.

[92] *Id.* at 21, Response to Question 12.

[93] Supplemental LOI Response at 1, Introduction.

[94] Further Response, LBS Chart Attachment.  More specifically, AT&T asserts that █ ████████████████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████████████████████ █ *Id.*

[95] Specifically, AT&T stated that beginning in 2019, it would provide enhanced notice to customers who had given their consent to share location information with location-based service providers by sending them an SMS notice informing them of the sharing and explaining how they can change their consent options.  LOI Response at 15, Response to Question 6.  AT&T also stated that "[l]ater in 2019," it would provide a "second layer of consent for certain Use Cases" by requiring customers to reply to an SMS message to authorize their sharing of location information.  LOI Response at 15, Response to Question 6.

[96] In its Supplemental LOI Response, AT&T does not state whether or when it had implemented the enhanced notice and consent measures described in its LOI Response.  *See* Supplemental LOI Response at 15, Response to Question 6.

[97] Supplemental LOI Response at 13, Response to Question 10; Supplemental LOI Response at AT&T-LOI-00025696, Response to Question 10; Response to Request for Documents No. 5.

Federal Communications Commission                                          FCC 20-26

27.     On January 8, 2019, *Motherboard* published an article titled "I Gave a Bounty Hunter $300.  Then He Located Our Phone."[98]  The article alleged that access to AT&T and other telecommunications carriers' customer location information was sold and resold, with little or no oversight, within the bail bonds industry, and that this led to consumers being tracked without their knowledge or consent.[99]  To illustrate the practice, the article described how a "bounty hunter" paid by *Motherboard* used his contacts in the bail bonds industry to access the location of a T-Mobile user's mobile phone.[100]  The bounty hunter reportedly received the information from an employee of a bail bonds company that was a customer of MicroBilt.[101]  MicroBilt, in turn, was a customer of Zumigo, an Aggregator that received customer location information from AT&T and the other major wireless carriers.[102]

28.     AT&T admits



Specifically, although AT&T had

.[105]  AT&T agrees that Zumigo and

.[107]  Second, Zumigo

[108]

29.     On January 10, 2019, AT&T announced that "[i]n light of recent reports about misuse of location services, we decided to eliminate all location aggregator services—even those with clear consumer benefits" and stated that its location-based service program would end in March 2019.[109]  According to AT&T, it terminated the access to its customer location information to an additional

[110]  AT&T also claims that it sent notices of termination to the two Aggregators

[98] Joseph Cox, *I Gave a Bounty Hunter $300.  Then He Located Our Phone*, Motherboard (Jan. 8. 2019), https://motherboard.vice.com/en_us/article/nepxbz/i-gave-a-bounty-hunter-300-dollars-located-phone-MicroBilt-zumigo-tmobile.

[99] *Id.*

[100] *Id.*

[101] *Id.*

[102] *Id.*

[103] Supplemental LOI Response at 13, Response to Question 10.

[104] *Id.* at 4, Response to Question 2.

[105] *Id.* at 13, Response to Question 10.

[106] *Id.*

[107] *Id.*

[108] *Id.*

[109] *See* Alfred Ng, *AT&T is Cutting Off All Location-Data Sharing Ties in March*, CNET (Jan. 11, 2019), https://www.cnet.com/news/at-t-is-cutting-off-all-location-data-sharing-ties-by-march/.

[110] More specifically, AT&T asserts that it terminated such access for the following entities on the following dates:

on ,[111] In other words, the Company did not finally terminate its location-based service program until ,[113] or days from when the *New York Times* first reported on the Securus location-finding service, as well as the abuse of that service by Hutcheson.

30.     *Commission Investigation.* The Enforcement Bureau launched an investigation in May 2018, immediately following the *New York Times* report of unauthorized location tracking involving Securus. The Bureau issued a Letter of Inquiry to AT&T seeking information and documents regarding, among other things, its practices and procedures involving customer location information, its relationships with location information aggregators and location-based service providers, the specific allegations of unauthorized access to location information involving Securus that were detailed by the *New York Times*, and any other identified instances of unauthorized access to location information dating back to 2016.[114] The Bureau requested additional information and documents from AT&T in 2019.[115] AT&T submitted responses to the Bureau's initial and supplemental LOIs, as well as approximately 28,000 pages of responsive documents concerning its sale of access to its customer location information to third parties.[116]

### III.    DISCUSSION

31.     We find that AT&T apparently willfully and repeatedly violated section 222 of the Act and the accompanying CPNI Rules by improperly disclosing customer location information to Hutcheson without customer approval. The customer location information at issue constitutes CPNI, and it may be used only as permitted by section 222 and our CPNI Rules.

32.     We also find that the Company apparently violated section 222 of the Act and section 64.2010(a) of the CPNI Rules by failing to protect the confidentiality of its customers' CPNI and by failing to employ "reasonable measures to discover and protect against attempts to gain unauthorized access to CPNI."[117] In particular, we find that for almost a year after AT&T became aware of Securus's



Further Response, LBS Chart Attachment.

[111] Supplemental LOI Response at 2, Response to Question 1. Also, in January 2019, AT&T sent notices terminating the provision of location information to                                          *Id.*

[112] Supplemental LOI Response at 2, Response to Question 1; Further Response, LBS Chart Attachment. More specifically, AT&T asserts that it                                                                                *Id.*

[113] Supplemental LOI Response at 1-2, Introduction.

[114] Letter of Inquiry from Kristi Thompson, Chief, Telecommunications Consumers Division, FCC Enforcement Bureau, to Jeanine Poltronieri, Assistant Vice President, External Affairs, AT&T Services, Inc. (Sept. 13, 2018) (on file in EB-TCD-18-00027704) (LOI).

[115] Supplemental Letter of Inquiry from Kristi Thompson, Chief, Telecommunications Consumers Division, FCC Enforcement Bureau, to Jeanine Poltronieri, Assistant Vice President, External Affairs, AT&T Services, Inc. (Apr. 8, 2019) (on file in EB-TCD-18-00027704) (Supplemental LOI).

[116] *See* LOI Response; *see also* Supplemental LOI Response.

[117] 47 CFR § 64.2010(a).

Federal Communications Commission                                     FCC 20-26

unapproved location-finding service—and thereby had notice that the "consent records" it received through indirect arrangements with location-based service providers were not reliable indicia of customer consent—the Company's continued reliance on such attenuated consent mechanisms and ineffective monitoring tools apparently did not meet the reasonableness requirement of section 64.2010(a).

### A.   Customer Location Information Constitutes CPNI

33.   We start with a preliminary point:  Federal law protects the privacy of the customer location information at issue here.  In other words, customer location information is CPNI under the Act and our rules.

34.   The customer location information at issue falls squarely within section 222's definition of CPNI.  Section 222 defines CPNI as information relating to the "quantity, technical configuration, type, destination, *location*, and amount of use of a telecommunications service subscribed to by any customer of a telecommunications carrier, and that is made available to the carrier by the customer solely by virtue of the carrier-customer relationship."[118]  To qualify as location-related CPNI, then, section 222 requires that information meet only two criteria:  It must (1) "relate[]" to the "location . . . of a telecommunications service," and (2) it must be "made available to the carrier by the customer solely by virtue of the carrier-customer relationship."[119]

35.   The customer location information at issue here meets these two criteria.  *First*, it relates to the location of a telecommunications service, i.e., AT&T's commercial mobile service.[120]  The location data was derived from the wireless mobile devices of AT&T's customers communicating with nearby network signal towers to signal the location of those devices.  A wireless mobile device undergoes an authentication and attachment process to the carrier's network, via the closest towers.  After a mobile device is authenticated and logically attached to a wireless network, it may be (1) connected (sending/receiving data/voice) or (2) idle.  In either state, the carrier must be aware of and use the device's location in order for it to enable customers to send and receive calls.  AT&T is therefore providing telecommunications service to these customers whenever it is enabling the customer's device to send and receive calls—regardless of whether the device is actively in use for a call.  This view finds ample support in Commission precedent, including the *2013 CPNI Declaratory Ruling*, which indicates that the policy considerations remain the same throughout a consumer's use of a mobile device, including the entire process through which the device stands ready to make or receive a call.[121]

36.   *Second*, AT&T's wireless customers made this information available to AT&T because of the carrier-customer relationship embodied in their service agreements.  AT&T provides wireless telephony services to the affected customers because they have chosen AT&T to be their provider of telecommunications service—in other words, they have a carrier-customer relationship.  The customer location information to which AT&T sold access was generated by the service that AT&T provided to those customers.  In short, AT&T's customers provided their wireless location data to AT&T because of

---

[118] 47 U.S.C. § 222(h)(1)(A) (emphasis added).

[119] 47 U.S.C. § 222(h)(1)(A) (defining "customer proprietary network information").

[120] *See* 47 U.S.C. § 332(c)(1) (providing that "a person engaged in the provision of a service that is a commercial mobile service shall, insofar as such person is so engaged, be treated as a common carrier for purposes of this chapter"), (d)(1) (defining "commercial mobile service").

[121] *Implementation of the Telecommunications Act of 1996; Telecommunications Carriers' Use of Customer Proprietary Network Information and Other Customer Information*, CC Docket No. 96-115, Declaratory Ruling, 28 FCC Rcd 9609, 9616, para. 22 (2013) (*2013 CPNI Declaratory Ruling*) (discussing "telephone numbers of calls dialed and received and the location of the device at the time of the calls" and "the location of a customer's use of a telecommunications service"); *id.* at 9617, para. 25 (concluding that even locations of failed calls fall within the definition of CPNI).

their customer-carrier relationship with AT&T, so that AT&T could use that location information to provide them with a telecommunications service.  That makes the location information CPNI.

37.     Resisting this straightforward conclusion, AT&T denies that the location information was collected by the carrier "solely by virtue of the carrier-customer relationship"[122] on the ground that wireless customers receive both telecommunications services and non-common-carrier data services—and that the latter constitute the bulk of its network traffic.[123]  We disagree.  The definition of CPNI does not depend on the amount of telecommunications services relative to a carrier's other service offerings.  Although AT&T might also provide non-common-carrier services to the same customer, it has that relationship with the customer because the customer has chosen AT&T to be its provider of telecommunications service—that is, by virtue of the carrier-customer relationship.  We reject AT&T's overly narrow reading of this common-sense meaning of the statute, which would have the perverse effect of eliminating the statutory protections of the most sensitive types of CPNI contrary to the clear intent of Congress.

38.     We remain likewise unpersuaded that location information generated and collected by carriers while a phone is in standby mode (i.e., while a phone is on, but not actively in use during a call) is materially different than any other customer location information generated or collected by the Company.  The definition of CPNI does not distinguish between the location information collected by carriers from a mobile device during a telephone call and the location information generated when the device is turned on and available for calls but not engaged in transmitting a voice conversation.  In both cases, the location "relates" to the carrier's provision of telecommunications service to the customer, and the customer's location is available to the carrier solely by virtue of its carrier-customer relationship.

39.     Nor does the use of the term "call location information" elsewhere in section 222 imply that every use of the term "location" in section 222 refers only to the location of the device when actively in use during a call.  Arguably, the provision allowing sharing of "call location information" with public safety, family members, and others in emergency situations appears to contemplate allowing the sharing of a device's location outside the context of individual calls, suggesting that even that more specific term includes all location information.[124]  But even if the term "call location information" elsewhere in section 222 is limited to information about the location of voice telephone calls, there is no reason to conclude the same about the broader term "location."  Given the plain meaning of "location" and the obvious sensitivity of information that a carrier has about the location of its customers, we see no reason to interpret the statute as excluding the location of customer devices when they are not engaged in calls.

40.     AT&T nevertheless asserts that it derived location information for aggregators and location-based service providers "through means that are independent of its provision of telecommunications services," and that when it delivers telecommunications services to mobile devices, it "generates location information via a separate process for the purpose of delivering telecommunications services."[125]  In making this assertion, AT&T fails to refute the central point that the Company necessarily obtains location information by virtue of its provision of the telecommunications service when it enables the connection of a customer's device to its network for the purpose of sending and receiving calls, and the customer has no choice but to reveal that location to the carrier.  We find AT&T's

---

[122] That said, AT&T emphasized that it nevertheless collected and attempted to protect and treat location information in an essentially equivalent manner to CPNI.  The Company asserts that it obeyed the core requirements of section 222 and the CPNI Rules by (1) disclosing the information to third parties only with their customers' informed consent, and (2) protecting the data through extensive safeguards.  LOI Response at 11-12, Response to Question 4; Supplemental LOI Response at 5-6, Response to Question 3.

[123] Supplemental LOI Response at 3-4, Response to Question 2.

[124] See 47 U.S.C. § 222(d)(4)(A)-(C).

[125] LOI Response at 11-12, Response to Question 4.

Federal Communications Commission                                    FCC 20-26

arguments regarding the classification of location information unpersuasive, particularly in light of the more straightforward reading of the statutory text.

41.     Having concluded that the customer location information at issue is CPNI under section 222 of the Act, we likewise conclude that the rules governing consent to the use, disclosure, and sharing of CPNI and protection of CPNI, which incorporate the statutory definition by reference,[126] also apply to that customer location information.

### B.     AT&T Apparently Violated Section 222 and the CPNI Rules by Disclosing CPNI to a Missouri Sheriff Without Authorization

42.     AT&T apparently violated section 222(c)(1) of the Act and section 64.2007 of the Commission's rules when it disclosed customer location information to Hutcheson.  Section 222(c)(1) states that carriers shall only use, disclose, or permit access to individually identifiable CPNI with the approval of the customer.[127]  Section 64.2007 of the Commission's rules states that a telecommunications carrier may only use, disclose, or permit access to its customer's individually identifiable CPNI subject to opt-in approval.[128]

43.     The evidence reflects that Hutcheson used the Securus service to obtain the location information of AT&T customers.  AT&T shared the information with LocationSmart, which then shared it with 3Cinteractive, which then shared it with Securus,[129] which then disclosed it to Hutcheson—despite the absence of AT&T customer consent for the disclosures.  The evidence shows that between 2014 and 2017, at least 147 AT&T customers' location information was disclosed to Hutcheson, via Securus, without the customers' consent.[130]  Notwithstanding the misconduct of Hutcheson, each such disclosure constitutes a violation of section 222(c)(1) of the Act and section 64.2007 of the Commission's rules for which AT&T is responsible.

44.     AT&T does not dispute that it disclosed its customers' location information to Hutcheson without the customers' consent and in the absence of an exception that would make the consent requirement inapplicable.  Instead, AT&T argues that ███████████████████████████████████████ ███████████████████.[131]  AT&T explains that notwithstanding the contractual customer notice and authorization provisions it imposed on LocationSmart, and that LocationSmart then imposed on 3Cinteractive and Securus, ███████████████████████████████████████████████████████ █████████████████████████[132]

45.     We find these arguments unavailing.  AT&T is not absolved from liability simply because it was not directly responsible for operating the programs under which unauthorized disclosures occurred.  Rather, sections 222 and 217 of the Act make clear that ultimate responsibility for these unauthorized disclosures rests with the carrier—in this case, AT&T.  The restrictions on the use and disclosure of CPNI in section 222 of the Act expressly apply to "telecommunications carriers."[133]  Section

---

[126] 47 CFR § 64.2003(g).

[127] 47 U.S.C. § 222(c)(1).  There are exceptions in circumstances not relevant here.

[128] 47 CFR § 64.2007(b).  There are exceptions in circumstances not relevant here.

[129] LOI Response at 17; Response to Question 8.

[130] *See* Department of Justice Evidence Records (on file in EB-TCD-18-00027704).

[131] LOI Response at 16-18, Response to Question 8.

[132] *Id.*

[133] The Commission extended the applicability of its CPNI Rules to interconnected Voice over Internet Protocol providers in 2007.  *See 2007 CPNI Order*, 22 FCC Rcd at 6954-57, paras. 54-59.  Congress acknowledged this

222 broadly prohibits telecommunications carriers from using CPNI collected in connection with providing telecommunications service for any purpose other than providing such service or other services "necessary to, or used in" providing such service (for example, publishing directories).[134]  Apart from a few exceptions not relevant here,[135] section 222 allows a telecommunications carrier to use CPNI for other purposes only where "required by law or with the approval of the customer."[136]  In short, the obligation to protect CPNI falls on *telecommunications carriers*; the carrier must obtain customer approval to use, disclose, or permit someone else to access the CPNI for any purpose not strictly related to the purpose for which it was provided to the carrier.

46.     To allow a telecommunications carrier to share CPNI with an entity that is not subject to section 222 without imposing sufficient controls could deprive its customers of the statutory protections of section 222.[137]  The Commission recognized this problem in 2007, responding to the reality at that time that individuals' calling records were available for sale on numerous websites.[138]  As a result, the Commission determined that it was necessary to further limit the sharing of CPNI with others outside a customer's carrier by requiring carriers to obtain opt-in approval from a customer even before disclosing that customer's CPNI to a carrier's joint-venture partner or independent contractor.  "Opt-in approval" is defined as a method that "requires that *the carrier* obtain from the customer affirmative, express consent allowing the requested CPNI usage, disclosure, or access after the customer is provided appropriate notification of *the carrier's* request."[139]  This was necessary in part "because a carrier is no longer in a position to personally protect the CPNI once it is shared."[140]

47.     We recognize that carriers have long relied on third parties—aggregators and/or location-based service providers—to act on their behalf to obtain their customers' consent to the sharing of their CPNI.[141]  But such reliance has never meant absolution for carriers.  Instead, section 217 of the Act provides that "the act, omission, or failure of any officer, agent, or other person acting for or employed by any common carrier or user, acting within the scope of his employment, shall in every case be also deemed to be the act, omission, or failure of such carrier."[142]  In other words, a carrier cannot avoid its statutory obligations by assigning them to a third party.

48.     So it is unsurprising that the Commission has consistently held that carriers are responsible for the conduct of third parties acting on the carrier's behalf.[143]  Just as the Commission

---

extension in its 2008 amendments to section 222.  *See* Pub. L. No. 110-283, § 301, 122 Stat. 2620, 2625-26, *codified at* 47 U.S.C. § 222(d)(4), (f)(1), (g).

[134] *See* 47 U.S.C. § 222(c)(1).

[135] *See* 47 U.S.C. § 222(d) (specifying four exceptions).

[136] 47 U.S.C. § 222(c)(1).

[137] *See Implementation of the Telecommunications Act of 1996: Telecommunications Carriers' Use of Customer Proprietary Network Information and Other Customer Information*, CC Docket No. 96-115, Third Report and Order and Third Further Notice of Proposed Rulemaking, 17 FCC Rcd 14860, 14881, paras. 46-47 (2002).

[138] *2007 CPNI Order*, 22 FCC Rcd at 6928-29, para. 2.

[139] 47 CFR § 64.2003(k) (defining "opt-in approval") (emphases added).

[140] *2007 CPNI Order*, 22 FCC Rcd at 6948, para. 39.

[141] To the extent that the third parties were *not* acting on behalf of the carrier, the carrier itself would have provided those third parties with access to its customers' CPNI without obtaining for themselves the approval required by section 222(c)(1)—thus violating federal law.  AT&T does not appear to argue that situation is present here.

[142] 47 U.S.C. § 217.

[143] *See, e.g.*, *Long Distance Consol. Billing Co.*, Forfeiture Order, 34 FCC Rcd 1871, 1874-75, para. 10 (2019); *Eure Family Ltd. Partnership*, Memorandum Opinion and Order, 17 FCC Rcd 21861, 21863-64, para. 7 (2002); *Long Distance Direct, Inc.*, Memorandum Opinion and Order, 15 FCC Rcd 3297, 3300, para. 9 (2000); *Vista Services*

recently held that a carrier was "not relieved of liability [for slamming] simply because it provided its telemarketers with a policy manual and sales script and directed its telemarketers to market its service 'through lawful means,'"[144] a carrier is not relieved of its section 222 obligations simply because it contracts with third parties and relies on them to obtain the statutorily required approval—even if it imposed similar obligations by contract. Similarly, in 2012, the Commission found it unnecessary to impose on Lifeline providers an explicit obligation that they, rather than their agents or representatives, review all documentation of eligibility.[145] That was because the carriers themselves would be legally responsible for the acts and omissions of those agents: "[Carriers] may permit agents or representatives to review documentation of consumer program eligibility for Lifeline. However, the [carrier] remains liable for ensuring the agent or representative's compliance with the Lifeline program rules."[146]

49.    At bottom, AT&T may not have it both ways. If AT&T was relying on third parties to satisfy its obligations to obtain consent, then it is liable for those third parties' failures as it would be if they had been the failures of AT&T itself. If not, then AT&T effectively granted those third parties the capability to access the CPNI of its customers without customer approval.

50.    In sum, we find that AT&T apparently violated section 222(c)(1) of the Act and section 64.2007(b) of our rules in connection with its unauthorized disclosures of CPNI to Hutcheson.[147]

## C.    AT&T Apparently Failed to Take Reasonable Measures to Protect CPNI

51.    AT&T apparently violated section 222 of the Act and section 64.2010 of our rules by failing to take reasonable measures to discover and protect against attempts to gain unauthorized access to its customers' location information.[148] The May 10, 2018 *New York Times* report on the Securus and Hutcheson breaches exposed serious inadequacies with the safeguards on which AT&T relied to protect its customers' location information. Our investigation shows that AT&T failed to promptly address those inadequacies. We therefore conclude that AT&T apparently failed to take reasonable measures in a timely fashion to protect its customers' CPNI following that report.

52.    In plain terms, our rules recognize that companies cannot prevent all data breaches, but require carriers to take reasonable steps to safeguard their customers' CPNI and to discover attempts to gain access to their customers' CPNI. In the absence of an unauthorized disclosure, the Commission bears the burden of demonstrating that the methods employed by a carrier to safeguard CPNI were unreasonable. But where an unauthorized disclosure *has* occurred—as here—this burden shifts to the carrier. In that case, the Commission treats the unauthorized access to a subscriber's CPNI as *prima facie* evidence that a carrier failed to sufficiently protect the information.[149] The responsible carrier then

---

[144] *Corp.*, Order of Forfeiture, 15 FCC Rcd 20646, 20650, para. 9 (2000); *American Paging, Inc. (of Virginia)*, Memorandum Opinion and Order, 12 FCC Rcd 10417, 10420, para. 11 (1997); *Triad Broadcasting Co., Inc.*, Memorandum Opinion and Order, 96 FCC 2d 1235, 1244, para. 21 (1984); *see also Silv Communication Inc.*, Notice of Apparent Liability for Forfeiture, 25 FCC Rcd 5178, 5180, para. 5 n.18 (2010).

[144] *Long Distance Consol. Billing Co.*, 34 FCC Rcd at 1875, para. 10.

[145] *Lifeline and Link Up Reform and Modernization*, Report and Order and Further Notice of Proposed Rulemaking, 27 FCC Rcd 6656, 6708-09, para. 110 (2012).

[146] *Id.* at 6709, para. 110.

[147] 47 U.S.C. § 222(c)(1); 47 CFR § 64.2007(b).

[148] 47 CFR § 64.2010(a); *see also 2007 CPNI Order*, 22 FCC Rcd at 6959, para. 64 ("We fully expect carriers to take every reasonable precaution to protect the confidentiality of proprietary or personal customer information.").

[149] *2007 CPNI Order*, 22 FCC Rcd at 6959–60, para. 65.

shoulders the burden of proving the reasonableness of its measures to (1) detect unauthorized attempts to access CPNI and (2) protect CPNI from such attempts.[150]

53.    AT&T thus bears the burden of demonstrating that the measures it took to safeguard CPNI were reasonable both before and after the Securus and Hutcheson breaches.  To meet this burden, AT&T offers three general categories of safeguards that it claims collectively amounted to a reasonable attempt to protect customer location information.  In general, AT&T relied on the same safeguards both before and after the May 10, 2018 report of the Securus and Hutcheson breaches.

54.    *First*, AT&T asserts that it vetted and approved each Aggregator, location-based service provider, and Use Case in which location information was shared.[151]  Through its contractual requirement that customer location information be used only for approved Use Cases, AT&T attempted to limit how the location data to which it sold access would be used by the companies that purchased it and how those companies would obtain the consent to receive such data.[152]  In addition to requiring that any data it shared be used only in accordance with an approved Use Case, AT&T annually reviewed its approved Use Cases and required Aggregators and location-based service providers to attest that they were complying with AT&T's contractual requirements.[153]  Yet the Securus and Hutcheson breaches demonstrate that this contractual safeguard alone was insufficient to prevent the misuse of the customer location information to which AT&T sold access.  Notwithstanding AT&T's contract with LocationSmart, LocationSmart's contract with 3Cinteractive, and 3Cinteractive's contract with Securus ███████████████, Securus was able to set up a separate program to access and disclose customer location information and operate it *for at least four years* in a manner inconsistent with its ███████ ████████████.

55.    *Second*, AT&T required Aggregators and location-based service providers to supply notice to and obtain the consent of customers prior to sharing any location information.[154]  In so doing, AT&T emphasizes that it structured its location-based service program in accordance with the CTIA Guidelines and required the Aggregators and location-based service providers to comply with the CTIA Guidelines, which call on location-based service providers to receive notice and consent to use and sharing of location information.[155]  Those guidelines focus on best practices for notice and consent by location-based service providers.  But they do not include best practices recommendations for carriers that sell access to their customers' location information to location-based service providers.  For example, they do not offer guidance to carriers on how to assure that location-based service providers comply with a contractual obligation to access location information only after furnishing proper notice and receiving customer consent.

56.    Aggregators and location-based service providers, in turn, were required to send a record of the consent they received to AT&T.[156]  AT&T explains that "[o]n a daily basis, AT&T conduct[ed] a review to determine that each request for location information is tied to a consent record indicating that the customer consented to the disclosure of location information."[157]  However, this safeguard relied

---

[150] *Id.*

[151] LOI Response at 3-4, Response to Question 1.

[152] *Id.* at 4, Response to Question 1.

[153] *Id.* at 5, Response to Question 1.

[154] *Id.*

[155] LOI Response at 1, Introduction; *see also* CTIA, Best Practices and Guidelines for Location Based Services, https://www.ctia.org/the-wireless-industry/industry-commitments/best-practices-and-guidelines-for-location-based-services.

[156] *Id.*

[157] LOI Response at 14, Response to Question 5.

Federal Communications Commission                                    FCC 20-26

almost entirely on the unverified assertions of the Aggregators and location-based service providers to whom AT&T sold access to customer location information. Notwithstanding the contractual requirements that AT&T imposed on the Aggregators (and that the Aggregators were required to impose on the location-based service providers), AT&T did not submit evidence from its own audits or other sources to show that the Aggregators actually held location-based service providers to these obligations. And whatever the value of such review on paper, it clearly failed in practice as AT&T's "daily" practice of reviewing consent records allowed the Securus and Hutcheson breaches to continue *for at least four years* without AT&T's knowledge.

57.     *Third and finally*, AT&T imposed a variety of information security requirements on the Aggregators to whom it sold access to customer location information—for example, that they have a published privacy policy, industry-standard security controls, and that they monitor and audit compliance with their agreement with AT&T.[158]  But, as AT&T explains, AT&T generally had a direct contractual relationship only with Aggregators, who in turn were required to impose these terms on location-based service providers.[159]  In other words, these contractual requirements were largely passed down to the entities responsible for obtaining consent and that used the location information of AT&T's customers through an attenuated chain of downstream contracts.

58.     To enforce the requirements, AT&T would have needed to take steps to determine whether they were actually being followed.  AT&T has not shown that it did so.  While AT&T apparently conducted limited reviews of its policies and practices related to disclosing location information to third parties, it has largely declined to provide the results of those assessments to the Enforcement Bureau.[160]  And those that it did provide to the Bureau found vulnerabilities with both the consent mechanisms and with Aggregators' compliance with AT&T's contractual requirements.[161]  These included but were not limited to "issues with: (i) consistency in the approval processes regarding the provision of subscriber data to third parties; (ii) reporting practices regarding the completeness of subscriber consents; and (iii) record retention practices regarding subscriber consents."[162]

59.     In sum, the safeguards implemented by AT&T to protect customer location information against unauthorized use relied almost entirely on contractual agreements, passed on to location-based service providers through an attenuated chain of downstream contracts.  AT&T's efforts to ensure compliance with these agreements apparently consisted almost entirely of reviewing unverified vendor-created consent records.  What limited power AT&T had to verify these records or otherwise demand compliance, it did not seem to meaningfully exercise.  And it had almost no other visibility or apparent awareness into how the location data it sold was used or protected.  While business relationships often rely on trusting a counterparty to honor its contractual obligations, it is hard to conclude that such trust alone was a reasonable safeguard here—even in the absence of an unauthorized disclosure.  This is particularly so in light of the industry's experience with pretexting, which should have apprised AT&T of the high risk that bad actors would attempt to gain unauthorized access to AT&T's customers' CPNI, particularly by trying to find ways around any systems AT&T put in place to authenticate that its customers were actually providing consent to third parties' access to their location information.

60.     Setting aside the inadequacy of AT&T's safeguards before disclosure of the Securus and Hutcheson breaches, AT&T was on clear notice that its safeguards were inadequate after the disclosure, and so we focus on the actions that AT&T took, or failed to take, after discovery of that breach.  We find that AT&T has apparently failed to demonstrate that its safeguards were reasonable following the disclosure of Securus's unauthorized location-finding service in May 2018.  The Securus incident laid

---

[158] *Id.* at 6-7, Response to Question 1.

[159] LOI Response at 3, Response to Question 1.

[160] *Id.* at 19-21, Response to Question 11.

[161] *Id.*

[162] *Id.* at 20, Response to Question 11.



bare the fundamental weaknesses of AT&T's safeguards with respect to the third parties to which it entrusted its customers' location information. Nevertheless, for ▮▮ days after that incident came to light, AT&T continued to sell access to its customers' location information under the same system that had allowed (1) Securus to provide location information in a manner inconsistent with its ▮▮▮▮▮▮▮▮▮▮ and (2) Hutcheson to easily and improperly access AT&T customer location information. Relying on demonstrably faulty safeguards in the wake of this incident does not appear to have been reasonable.

61.      There are several commonsense measures that AT&T could have taken following the May 2018 *New York Times* article. One obvious measure would have been to identify the companies involved in the Securus breach and terminate their access until it could verify that these companies had properly safeguarded its customers' location data. AT&T did so only in part. ▮▮▮▮▮▮▮▮▮▮▮ But it did not suspend the access of LocationSmart, the Aggregator that had the contractual obligations to monitor Securus and 3Cinteractive's access to AT&T's customer data, for another ▮▮ days (▮▮▮▮▮▮▮▮).

62.      Another measure would have been to promptly ascertain the full scope and extent of the Securus breach. AT&T notes that it did conduct an "internal review of Securus, LocationSmart, and 3Cinteractive, and more generally of Location Aggregators and LBS Providers" following the May 2018 *New York Times* article.[163] But because AT&T has declined to provide the details of this audit to the Commission's Enforcement Bureau, it is impossible for us to conclude that (1) the scope of the investigation was reasonable or (2) that AT&T took reasonable steps in light of its audit findings, which AT&T has likewise refused to provide to the Bureau. Again, it is *AT&T* that bears the burden of demonstrating the reasonableness of its practices in the wake of an unauthorized disclosure.[164]

63.      What is more, the full impact of Securus's unauthorized access to CPNI apparently remains unknown to AT&T even to this day. That's because AT&T claims that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮[165] Rather than shielding AT&T from liability, that admission shows the inherent weakness of AT&T's arguments that its contract-based model provided reasonable protection of CPNI. If AT&T cannot compel Securus to cooperate with AT&T's investigation into unauthorized access to its customers' location information, it cannot say that the same contract-based system actually protects customer location information from unauthorized access by other entities. Whatever Securus's justification for denying AT&T's request, its refusal is further evidence of the fact that AT&T disclosed CPNI to a third party over which it had little or no control or authority.

64.      Another measure AT&T could have taken was to determine whether the Securus incident was an isolated occurrence or whether it was indicative of a broader vulnerability with AT&T's program. This would mean examining not only the companies involved in the Securus incident, but also taking broader efforts to audit similarly situated companies' compliance with AT&T's contractual safeguards. Yet AT&T has offered nothing more than a broad assertion to suggest that it took steps after the publication of the *New York Times* article to identify and remedy the broader security deficiencies exposed by revelations about Securus's location-finding service. AT&T has provided no evidence that it sought to determine whether there were other unauthorized programs being operated that allowed access to AT&T customer location information in ways that contravened AT&T's contracts with its Aggregators. Nor has AT&T provided evidence that it sought to determine whether there were abuses of unauthorized or authorized programs that were giving users unauthorized access to AT&T customer location information. Nor has AT&T demonstrated that the weaknesses in its oversight of access to customer

---

[163] LOI Response at 20, Response to Question 11.

[164] *2007 CPNI Order*, 22 FCC Rcd at 6959–60, para. 65.

[165] LOI Response at 21, Response to Question 12.

Federal Communications Commission                                                FCC 20-26

location information by LocationSmart, 3Cinteractive, and Securus were not present for the other ███ entities to whom AT&T sold access.

65.       Unfortunately, the apparent failure of AT&T to impose reasonable safeguards on its program to sell access to customer location information after the *New York Times* article is not merely a matter of theory.  On January 8, 2019, *Motherboard* reported on its success purchasing access to customer location information that was disclosed to MicroBilt.[166]  Although not the carrier that was the subject of the article, AT&T

███████████████████████████████████████████████████ ███[167]

Specifically, although AT&T had ████████████████████████████████████████

████████████████████████████████████████ ███[168]

MicroBilt apparently disclosed location information to its own corporate customers, which included members of the bail bonds industry.  And, as the *Motherboard* article demonstrated, purchasing access to customer location information provided by a carrier to MicroBilt was not a difficult thing to do—nor did it appear to be difficult for *Motherboard* to unearth the vulnerability.

66.       Stepping back, this means that the safeguards that AT&T had in place for the ███ days after the *New York Times* article apparently failed to discover yet another case of unauthorized access to customer location information, by a whole separate set of entities than were involved in the Securus breach.  Or to put it differently, after the Securus incident had demonstrated serious systematic flaws in AT&T's safeguards to protect CPNI, AT&T continued to rely on those same safeguards so that it could continue to sell access to more than ███ separate entities—so it is no surprise that those safeguards were subject to an almost identical security vulnerability, reflecting the Company's failure to respond appropriately to the data breaches involving Hutcheson.[169]  And AT&T apparently recognized as much on January 10, 2019, when it announced that "[i]n light of recent reports about misuse of location services, we decided to eliminate all location aggregator services."[170]  But even then, AT&T did not fully terminate its sale of access to customer location information until ███████████████—a full ███ days after the *Motherboard* article.[171]

67.       Yet another measure that AT&T could have taken was to enhance the measures it used to verify customer consent—for example, by directly confirming with customers that they have actually consented to the use of their location information.  After the Securus and Hutcheson breaches came to light, AT&T had good reason to doubt the accuracy of the consent records it received from any location-based service provider.  As AT&T itself explains, ████████████████████████████████████████

████████████████████████████████████████

---

[166] Joseph Cox, *I Gave a Bounty Hunter $300. Then He Located Our Phone*, Motherboard (Jan. 8. 2019), https://motherboard.vice.com/en_us/article/nepxbz/i-gave-a-bounty-hunter-300-dollars-located-phone-MicroBilt-zumigo-tmobile.

[167] Supplemental LOI Response at 13, Response to Question 10.

[168] *Id.*

[169] A category of the NIST Cybersecurity Framework's "Recover" Core Function is to improve based on past experience.  *See* NIST Cybersecurity Framework at 43 (improvements mean that "response activities are improved by incorporating lessons learned from current and previous detection/response activities").  *See also* NIST, Special Publication 800-137, Information Security Continuous Monitoring (ISCM) for Federal Information Systems and Organizations, at vi (Sept. 2011), https://nvlpubs.nist.gov/nistpubs/Legacy/SP/nistspecialpublication800-137.pdf (discussing "information security continuous monitoring," which involves "maintaining ongoing awareness of information security, vulnerabilities, and threats to support organizational risk management decisions," as a critical component of an organization's cyber risk management framework).

[170] *See* Alfred Ng, *AT&T is cutting off all location-data sharing ties in March*, CNET (Jan. 11, 2019), https://www.cnet.com/news/at-t-is-cutting-off-all-location-data-sharing-ties-by-march/.

[171] Supplemental LOI Response at 1-2, Introduction.



[172] Thus, the Securus and Hutcheson breaches made clear that instead of developing a consent mechanism that would allow AT&T to confirm that its customers had actually consented to the sharing of their location information, it created a system that required it to rely on the unverified representations of third-party location-based service providers that had financial incentives to access that information.

68.     Again, AT&T apparently recognized as much when it told staff in November 2018 that, beginning in 2019, it would provide enhanced notice to customers who had given their consent to share location information with location-based service providers by sending them an SMS notice informing them of the sharing and explaining how they can change their consent options.[173]  AT&T also said that "[l]ater in 2019," it would provide a "second layer of consent for certain Use Cases" by requiring customers to reply to an SMS message to authorize their sharing of location information.[174]  But there is no evidence that AT&T ever implemented any of these modifications to its consent verification process. Instead, it left in place a consent verification system that it knew to be flawed for as many as ▮ days for ▮ separate entities to access customer location information, thereby increasing the risk of further unauthorized access.

69.     Finally, the surest safeguard to protect its customers' CPNI would have been for AT&T to expeditiously terminate its location-based service program.  If AT&T could not reasonably safeguard the customer location information that it sold access to, then it should have ceased to sell access to that information.  Yet it was only after the *Motherboard* article was published—▮ days after the Securus incident was disclosed—that AT&T finally accelerated shutting down its flawed location-based service program.[175]  AT&T terminated access to customer location information for ▮ location-based service providers or intermediaries over the course of eight months between May and the end of December 2018.[176]  In contrast, AT&T terminated the access of ▮ and the remaining ▮ entities to whom it sold access to customer location information over the course of 3 months in early 2019.[177]  AT&T admits that ▮ which AT&T fully terminated on ▮ —or ▮ days after the May 2018 *New York Times* report.[178]  AT&T's contracts with the Aggregators included a provision giving AT&T the right to terminate the agreements at any time upon written notice.[179]  The time for AT&T to have exercised this provision was far earlier—shortly after the Company learned that Securus had been operating a secret location-finding service without AT&T's authorization and despite AT&T's existing safeguards.  AT&T fails to explain its inaction in the face of an obvious risk to its customers' privacy.

70.     AT&T apparently did not take any of these reasonable steps.  Nor has it presented evidence that it took other reasonable measures that might have cured the flaws exposed by the Securus

---

[172] LOI Response at 3, Introduction.

[173] *Id.* at 15, Response to Question 6.

[174] *Id.*

[175] *See* Alfred Ng, *AT&T is cutting off all location-data sharing ties in March,* CNET (Jan. 11, 2019), https://www.cnet.com/news/at-t-is-cutting-off-all-location-data-sharing-ties-by-march/; Further Response, LBS Chart Attachment.

[176] Further Response, LBS Chart Attachment.

[177] *Id.*, LBS Chart Attachment.

[178] Supplemental LOI Response at 1-2, Introduction.

[179] AT&T-LocationSmart Agreement, Section 8.2; AT&T-Zumigo Agreement, Section 8.2.

**Federal Communications Commission**                                    **FCC 20-26**

and MicroBilt breaches.  The ease with which Hutcheson accessed location information about any individual of his choosing should have alerted AT&T to its lack of visibility into how the location-based service providers were making use of the location information that it was entrusting to the Aggregators and that it needed to change its practices or terminate its location-based service program.  After learning of Hutcheson's practices, AT&T placed its customers' location information at continuing risk of unauthorized access through its failure to terminate its program or impose reasonable safeguards to protect its customers' location information.  For these reasons, we conclude that AT&T apparently failed in its obligation under section 222 and our rules to have reasonable measures in place to discover and protect against attempts to gain unauthorized access to its customers' CPNI.[180]

### D.  Proposed Forfeiture

71.    Section 503(b) of the Act authorizes the Commission to impose a forfeiture against any entity that "willfully or repeatedly fail[s] to comply with any of the provisions of [the Act] or of any rule, regulation, or order issued by the Commission . . . ."[181]  Here, section 503(b)(2)(B) of the Act authorizes us to assess a forfeiture against AT&T of up to $204,892 for each day of a continuing violation, up to a statutory maximum of $2,048,915 for a single act or failure to act.[182]  In exercising our forfeiture authority, we must consider the "nature, circumstances, extent, and gravity of the violation and, with respect to the violator, the degree of culpability, any history of prior offenses, ability to pay, and such other matters as justice may require."[183]  In addition, the Commission has established forfeiture guidelines; they establish base penalties for certain violations and identify criteria that we consider when determining the appropriate penalty in any given case.[184]  Under these guidelines, we may adjust a forfeiture upward for violations that are egregious, intentional, or repeated, or that cause substantial harm or generate substantial economic gain for the violator.[185]

72.    The Commission's forfeiture guidelines in section 1.80(b) of the Commission's rules do not establish a base forfeiture for violations of section 222(c) or the accompanying CPNI Rules.[186]  Nor has the Commission calculated forfeitures for the unauthorized disclosure of CPNI previously.  Thus, we look to the base forfeitures established or issued in analogous cases for guidance.  In 2011 and 2012, the Bureau issued Forfeiture Orders for failure to timely file the annual CPNI compliance certifications required by section 64.2009(e) of the Commission's rules (*CPNI Cases*).[187]  Similar to this case, the

---

[180] 47 CFR § 64.2010(a); *see also 2007 CPNI Order,* 22 FCC Rcd at 6959, para. 64 (stating that the Commission expects carriers to "take every reasonable precaution to protect the confidentiality of proprietary or personal customer information").

[181] 47 U.S.C. § 503(b).

[182] *See* 47 U.S.C. § 503(b)(2)(B); 47 CFR § 1.80(b)(2).  These amounts reflect inflation adjustments to the forfeitures specified in section 503(b)(2)(B) ($100,000 per violation or per day of a continuing violation and $1,000,000 per any single act or failure to act).  The Federal Civil Penalties Inflation Adjustment Act of 1990, Pub. L. No. 101-410, 104 Stat. 890, as amended by the Debt Collection Improvement Act of 1996, Pub. L. No. 104-134, Sec. 31001, 110 Stat. 1321, requires the Commission to adjust its forfeiture penalties periodically for inflation.  *See* 28 U.S.C. § 2461 note (4).  The Enforcement Bureau announced the Commission's inflation-adjusted penalty amounts for 2020 on December 27, 2019.  *See Amendment of Section 1.80(b) of the Commission's Rules, Adjustment of Civil Monetary Penalties to Reflect Inflation*, Order, DA 19-1325 (EB 2019).

[183] 47 U.S.C. § 503(b)(2)(E).

[184] 47 CFR § 1.80(b)(8), Note to paragraph (b)(8).

[185] *Id*.

[186] 47 CFR § 1.80(b).

[187] *See, e.g., Jahan Telecommunication, LLC*, Order of Forfeiture, 27 FCC Rcd 6230 (EB-TCD 2012); *Nationwide Telecom, Inc*., Order of Forfeiture, 26 FCC Rcd 2440 (EB-TCD 2011); *Diamond Phone, Inc*., Order of Forfeiture, 26 FCC Rcd 2451 (EB-TCD 2011); *USA Teleport, Inc*., Order of Forfeiture, 26 FCC Rcd 2456 (EB-TCD 2011); *88*

Federal Communications Commission                                          FCC 20-26

driving purpose behind the Commission's actions in the *CPNI Cases* was enforcing the protections that Congress established in section 222(c) for consumers' proprietary information.  In the *CPNI Cases*, the base forfeiture was between $20,000 and $29,000 for failure to file or failure to respond to a Bureau order to file certain information regarding the carriers' CPNI filings.  In 2014, the Commission issued a Notice of Apparent Liability against TerraCom, Inc. and YourTel America, Inc., for apparently violating section 222(a) of the Act.[188]  In *TerraCom*, the carriers' failure to secure their computer systems revealed detailed personal information belonging to individual Lifeline program applicants; the Commission proposed a penalty of $8,500,000 in that case.[189]

73.     Neither the *CPNI Cases* nor *TerraCom* are directly on point with the conduct in this case, but nevertheless are helpful in context.  We find that AT&T's failures to protect CPNI were much more egregious and fundamental than the failures of the carriers in the *CPNI Cases*, which involved the failure to file compliance certifications required by Commission rules.  The potential harm that flowed from failure to establish reasonable safeguards to protect customer location information from unauthorized access was significantly greater than the harm posed by a carrier's failure to file CPNI certifications in a timely manner.  Consumers carry their smartphones or wireless phones on their person or within easy reach at all times of the day or night.  The precise physical location of a wireless device is an effective proxy for the precise physical location of the person to whom that phone belongs at that moment in time.  Exposure of this kind of deeply personal information puts those individuals at significant risk of harm—physical, economic, or psychological.  For consumers who have job responsibilities in our country's military, government, or intelligence services, exposure of this kind of information can have serious national security implications.

74.     In contrast to the *CPNI Cases*, *TerraCom* addressed a situation of similarly serious threats to privacy—albeit in the context of a different part of section 222.  *TerraCom* dealt with exposure of personal information—not CPNI—and the Commission proposed penalties based on language in section 222(a) that had never been examined or codified in a Commission rulemaking.  Here, in contrast, the Commission has examined section 222(c) in multiple rulemaking and other proceedings and has promulgated rules necessary to interpret and enforce the statute.  That said, the proposed penalty in *TerraCom* was significant in light of the scope of the apparent harm.

75.     <u>Apparent Violations of Section 222 of the Act and Section 64.2010 of the Commission's Rules</u>.  The violations in this case were continuing in nature, extending each day that the Company's location-based services operated in the apparent absence of reasonable measures to protect CPNI.  We propose a base forfeiture of $40,000 for the first day of such a violation and a $2,500 forfeiture for the second day and each successive day that the violation continued.  In other contexts involving consumer protections under the Act and the Commission's rules, the Commission has applied a base forfeiture of $40,000 for a single act.[190]  We find that the base forfeiture we propose is appropriate (1) to provide a meaningful distinction between the violations in this case and those of other cases involving less egregious facts; and (2) to provide consistency with other consumer protection cases involving serious harms to consumers.  We find this base forfeiture appropriately deters wrongful conduct and reflects the increased risk consumers face when their information is not secured in a timely manner.

76.     We recognize that AT&T took one reasonable step towards improving its safeguards by terminating Securus and 3Cinteractive's ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

---

*Telecom Corporation*, Order of Forfeiture, 26 FCC Rcd 7913 (EB-TCD 2011); *DigitGlobal Communications, Inc.*, Order of Forfeiture, 26 FCC Rcd 8400 (EB-TCD 2011).

[188] *TerraCom, Inc. and YourTel America, Inc.*, Notice of Apparent Liability for Forfeiture, 29 FCC Rcd. 13325 (2014) (*TerraCom*).

[189] *TerraCom*, 29 FCC Rcd at 13343, para. 52.

[190] *See, e.g., Advantage Telecommunications Corp.*, Forfeiture Order, 32 FCC Rcd 3723 (2017); *Preferred Long Distance, Inc.*, Forfeiture Order, 30 FCC Rcd 13711 (2015).

███████████████████████████ days, respectively, after the *New York Times* report. But that step did not protect customer location information at all from the other ███ entities that had access to it. These included location-based service providers, the two Aggregators, and two intermediary aggregators—and constitute ███ separate continuing violations. We find that AT&T apparently did not take reasonable steps to safeguard that CPNI until it terminated the access of each of these ███ entities to AT&T customer location information. AT&T did so on the dates listed below, including ████████████,—a full ███ days after the *New York Times* report—for ██████████, and ███████████—a full ███ days after the *New York Times* report—for the two Aggregators and ███ other entities. Even though no carrier can be expected to fully investigate and take remedial actions on the same day it learns that its safeguards are inadequate, AT&T's failure to take reasonable steps to safeguard that information in the 30 days after discovering the breach constitutes a continuing violation of our rules. We therefore calculate each continuing violation from June 9, 2018, or 30 days after publication of the *New York Times* report, and apply a base forfeiture of $40,000 for the first day of such violation and a $2,500 forfeiture for the second day and each successive day the violation continued. These calculations are set forth in Table 1 below:



| | Table 1: Calculation of Base Forfeiture Penalty | | | |
|---|---|---|---|---|
| | Number of Entities | Date AT&T Terminated Access | Days of Continuing Violation (from June 9, 2018) | Base |
| | ███ | ████████ | ███ | $750,000 |
| | ███ | █████████ | ███ | $440,000 |
| | ███ | █████████████ | ███ | $277,500 |
| | ███ | █████████ | ███ | $660,000 |
| | ███ | ████████████ | ███ | $6,417,500 |
| | ███ | ████████████ | ███ | $1,950,000 |
| | ███ | █████████████ | ███ | $517,500 |
| | ███ | ██████████ | ███ | $560,000 |
| | ███ | ████████ | ███ | $570,000 |
| | ███ | ███████████ | ███ | $6,100,000 |
| | ███ | █████████ | ███ | $10,667,500 |
| | ███ | ████████ | ███ | $645,000 |
| | ███ | ██████████ | ███ | $1,365,000 |
| | ███ | ██████████ | ███ | $4,882,500 |
| | ███ | █████████ | ███ | $10,010,000 |
| **Total:** | ███ | | | **$45,812,500** |

Accordingly, we find that AT&T is apparently liable for a base forfeiture in the amount of $45,812,500 for its apparent violations of section 222 of the Act and section 64.2010 of our rules.

77.    Apparent Violations of Section 222(c)(1) of the Act and Section 64.2007(b) of the Commission's Rules. Although we find that AT&T apparently violated the Act and our rules for its unauthorized disclosures of CPNI to Hutcheson, the one-year statute of limitations bars any forfeiture for

those violations.[191]  We thus instead exercise our discretion to admonish AT&T for its unauthorized disclosures of CPNI to Hutcheson.[192]

78.     Unlike other federal agencies,[193] the Commission's authority to propose a monetary forfeiture for violations by a common carrier such as AT&T is statutorily limited to the one-year period before issuance of the associated notice of apparent liability.[194]  In this case, Hutcheson's unauthorized access to customer location information ceased by April 2017, when he was arrested by the FBI and state law enforcement authorities.  Thus, the statute of limitations on these violations ran out in April 2018, one month before the unauthorized disclosures even came to light in the May 2018 *New York Times* report. As the Act states and courts have affirmed, the countdown clock on the Commission's statutory deadline for action begins when a violation *occurs*, rather than when it is discovered.[195]  Accordingly, we are prohibited by statute from imposing a forfeiture penalty when the underlying violation occurred years ago, as was the case with AT&T's unauthorized disclosures to Hutcheson.

79.     <u>Upward Adjustment</u>.  Given the totality of the circumstances, and consistent with the Commission's *Forfeiture Policy Statement*,[196] we also conclude that a significant upward adjustment is warranted.  The responsibility for safeguarding the location information of its customers rested squarely on the Company, making it highly culpable.  The violations at issued occurred over an extended period of time and placed consumers at significant risk of harm.  Moreover, the harm included the potential for malicious persons to identify the exact locations of AT&T subscribers who belong to law enforcement, military, government, or other highly sensitive positions—thereby threatening national security and public safety.  In this case, the risk was not merely theoretical; Hutcheson did in fact obtain the precise location of multiple Missouri State Highway Patrol officers on numerous occasions.

---

[191] *See* 47 U.S.C. § 503(b)(6)(B).

[192] *See, e.g.*, *WDT World Discount Telecommunications Co., Inc.*, Notice of Apparent Liability for Forfeiture and Admonishment, 31 FCC Rcd 12571 (EB 2016); *Life on the Way Communications, Inc.*, Notice of Apparent Liability for Forfeiture and Admonishment, 28 FCC Rcd 1346 (EB-SED 2013); *Locus Telecommunications, Inc.*, Notice of Apparent Liability for Forfeiture and Admonishment, 26 FCC Rcd 17073 (EB 2011).

[193] In contrast to the one-year limitation on Commission investigation and action, many other federal agencies— including but not limited to the Federal Trade Commission—enjoy a five-year statute of limitations period within which to investigate and pursue civil penalties.  *See* 28 U.S.C. § 2462 (providing, in part, "Except as otherwise provided by Act of Congress, an action, suit or proceeding for the enforcement of any civil fine, penalty, or forfeiture, pecuniary or otherwise, shall not be entertained unless commenced within five years from the date when the claim first accrued. . .").

[194] *See* 47 U.S.C. § 503(b)(6)(B).  Notwithstanding the one-year statute of limitations, the Enforcement Bureau can and frequently does enter into agreements with the targets of investigations in order to pause the statute of limitations while an investigation is underway.  These agreements are commonly referred to as "tolling agreements." In this investigation, the Enforcement Bureau entered into a tolling agreement with AT&T so that we may assess penalties for conduct going as far back as May 3, 2018.

[195] *See* 47 U.S.C. § 503(b)(6)(B); *see also Gabelli v. SEC*, 568 U.S. 442, 450 (2013) (holding that "discovery rule" for delaying commencement of statute of limitations is inapplicable to civil enforcement action by Securities and Exchange Commission, and observing that "[t]here are good reasons why the fraud discovery rule has not been extended to Government enforcement actions for civil penalties").

[196] *Commission's Forfeiture Policy Statement and Amendment of Section 1.80 of the Rules to Incorporate the Forfeiture Guidelines*, Report and Order, 12 FCC Rcd 17087 (1997) (*Forfeiture Policy Statement*), *recons. denied*, Memorandum Opinion and Order, 15 FCC Rcd 303 (1999).

80.     We find that an upward adjustment of 25% above the $45,812,500 base forfeiture, or the amount of $11,453,125, is justified in these circumstances, will protect the interests of consumers, and deter entities from violating the Commission's rules in the future.[197]

81.     Therefore, after applying the *Forfeiture Policy Statement*, section 1.80 of the Commission's rules, and the statutory factors, we propose a total forfeiture of $57,265,625 for AT&T's apparent willful and repeated violations of section 222 of the Act[198] as well as section 64.2010 of the Commission's rules.[199]

## IV.     REQUESTS FOR CONFIDENTIALITY

82.     AT&T has requested that some of the materials it submitted to the Commission in this matter be withheld from public inspection, pursuant to section 0.459 of our rules.[200]  With respect to the particular information set forth in this Notice of Apparent Liability, we conclude that there is a significant public interest in revealing this information to the public by publicly releasing an unredacted version of this Notice.  We further conclude that this interest outweighs whatever competitive harms to AT&T and others might result from the disclosure of this information, and therefore partially deny AT&T's request.

83.     The Commission may publicly reveal even otherwise confidential business information if, after balancing the public and private interests at stake, it finds that it would be in the public interest to do so.[201]  At the outset, we find a strong public interest in the public knowing AT&T's practices with respect to the location-based services and customer location information at issue, including to whom the carrier provided access to such information; the steps the carrier took or failed to take to safeguard this information; and the extent to which any such information was improperly disclosed or otherwise put at risk.  This conclusion is further supported by both the sensitivity of the location data involved, the large number of customers potentially affected, and the fact that the extent of any additional improper disclosure remains unknown.  The public therefore has a strong interest in understanding the facts supporting this Notice, so that they can understand the risks, if any, that AT&T's practices posed to their location data.  We further find that the benefits of revealing the information contained in this Notice greatly outweigh whatever competitive harms to AT&T might result from its competitors or business partners knowing its policies and the actions it took regarding the disclosure of its customers' location

---

[197] *See, e.g.*, *Forfeiture Policy Statement*, 12 FCC Rcd at 17098, para. 20 (recognizing the relevance of creating the appropriate deterrent effect in choosing a forfeiture); *see also* 47 CFR § 1.80(b)(8), Note to paragraph (b)(8) (identifying upward adjustment criteria for section 503 forfeitures).

[198] 47 U.S.C. § 222.

[199] 47 CFR § 64.2010.

[200] AT&T has requested confidential treatment of its responses to the Letters of Inquiry sent to it by the Bureau, except with regard to (1) how location-based services work; (2) the names of the Aggregators and intermediary providers used by AT&T in the transmission of location-based services data and a categorical descriptions of location-based service providers with which AT&T shared location data via those entities (as listed below); (3) contract information (but not including financial information); (4) legal arguments as to whether the information allegedly provided without authorization is CPNI; (5) the fact that AT&T performed audits, including privileged audits, and descriptions of the audit findings as provided in its LOI responses; and (6) information concerning the second layer of consent AT&T developed in 2018.  Further Response.

[201] *See Establishing the Digital Opportunity Data Collection, Modernizing the FCC Form 477 Data Program*, Report and Order and Second Further Notice of Proposed Rulemaking, 34 FCC Rcd 7505, 7522-23, para. 40 & n.100 (2019) (noting long-established authority to release even otherwise confidential information after a balancing of the public and private interests at stake); *American Broadband & Telecommunications Company and Jeffrey S. Ansted*, Notice of Apparent Liability for Forfeiture and Order, 33 FCC Rcd 10308, 10366, para. 184 (2018); *Chrysler v. Brown*, 441 U.S. 281, 292-94 (1979); *Schreiber v. FCC*, 381 U.S. 279, 291-92 (1965); 47 U.S.C. § 154(j) ("The Commission may conduct its proceedings in such manner as will best conduce to the proper dispatch of business and the ends of justice."); 47 CFR § 0.461(f)(4).

**Federal Communications Commission**                    **FCC 20-26**

data.  We likewise find that the public interest greatly outweighs any private interest AT&T may have in keeping confidential the entities with whom it shared customer location data.  This is all the more true given that AT&T argues that it required these entities to obtain affirmative consent from AT&T's customers for the sharing of their location data.[202]  Thus, the identity of these entities should already be widely known and was required by AT&T to be divulged to its affected customers.  And to the extent that AT&T's customers did not provide their consent, we find that it is contrary to the public interest to allow the location-based service providers, the intermediaries, or AT&T to keep these identities hidden from, among others, the very customers whose private location information was shared for the commercial benefit of these entities.

84.     Because AT&T's requests are being ruled on by the Commission, and not the Bureau, in the first instance, we will not release the unredacted version of this Notice for 10 business days to allow AT&T or a relevant third party to file a petition for reconsideration;[203] if any avail themselves of this opportunity, we will continue to withhold the information from public inspection until we have ruled on the petition(s).[204]  If, after 10 business days, AT&T or a relevant third party has not filed a petition for reconsideration or sought a judicial stay with regard to this partial denial of AT&T's confidentiality request, the material will be made publicly available.[205]

## V.     ORDERING CLAUSES

85.     Accordingly, **IT IS ORDERED** that, pursuant to section 503(b) of the Act[206] and section 1.80 of the Commission's rules,[207] AT&T Inc. is hereby **NOTIFIED** of this **APPARENT LIABILITY FOR A FORFEITURE** in the amount of fifty-seven million, two hundred and sixty-five thousand, six hundred and twenty-five dollars ($57,265,625) for willful and repeated violations of section 222 of the Act[208] and section 64.2010 of the Commission's rules.[209]

86.     **IT IS FURTHER ORDERED** that AT&T Inc. is hereby **ADMONISHED** for its apparent violations of section 222(c) of the Act[210] and section 64.2007 of the Commission's rules.[211]

87.     **IT IS FURTHER ORDERED** that, pursuant to section 1.80 of the Commission's rules,[212] within thirty (30) calendar days of the release date of this Notice of Apparent Liability for Forfeiture, AT&T Inc. **SHALL PAY** the full amount of the proposed forfeiture or **SHALL FILE** a written statement seeking reduction or cancellation of the proposed forfeiture consistent with paragraphs 90-91 below.

88.     AT&T Inc. shall send electronic notification of payment to Michael Epshteyn and Rosemary Cabral, Enforcement Bureau, Federal Communications Commission, at

---

[202] LOI Response, Response to Question 1.

[203] The Aggregators, intermediaries, and location-based service providers, to the extent that they are third-party owners of some of the information for which AT&T has requested confidential treatment, may file a petition for reconsideration with respect to their own information.

[204] *Cf.* 47 CFR § 0.459(g).

[205] *See* 47 CFR § 0.455(g).

[206] 47 U.S.C. § 503(b).

[207] 47 CFR § 1.80.

[208] 47 U.S.C. § 222.

[209] 47 CFR § 64.2010.

[210] 47 U.S.C. § 222(c).

[211] 47 CFR § 64.2007.

[212] 47 CFR § 1.80.

michael.epshteyn@fcc.gov and rosemary.cabral@fcc.gov on the date said payment is made.  Payment of the forfeiture must be made by credit card, ACH (Automated Clearing House) debit from a bank account using the Commission's Fee Filer (the Commission's online payment system),[213] or by wire transfer.  The Commission no longer accepts forfeiture payments by check or money order.  Below are instructions that payors should follow based on the form of payment selected:[214]

- Payment by wire transfer must be made to ABA Number 021030004, receiving bank TREAS/NYC, and Account Number 27000001.  A completed Form 159 must be faxed to the Federal Communications Commission at 202-418-2843 or e-mailed to RROGWireFaxes@fcc.gov on the same business day the wire transfer is initiated.  Failure to provide all required information in Form 159 may result in payment not being recognized as having been received.  When completing FCC Form 159, enter the Account Number in block number 23A (call sign/other ID), enter the letters "FORF" in block number 24A (payment type code), and enter in block number 11 the FRN(s) captioned above (Payor FRN).[215]  For additional detail and wire transfer instructions, go to https://www.fcc.gov/licensing-databases/fees/wire-transfer.

- Payment by credit card must be made by using the Commission's Fee Filer website at https://apps.fcc.gov/FeeFiler/login.cfm.  To pay by credit card, log-in using the FRN captioned above.  If payment must be split across FRNs, complete this process for each FRN.  Next, select "Pay bills" on the Fee Filer Menu, and select the bill number associated with the NAL Account – the bill number is the NAL Account number with the first two digits excluded – and then choose the "Pay by Credit Card" option.  Please note that there is a $24,999.99 limit on credit card transactions.

- Payment by ACH must be made by using the Commission's Fee Filer website at https://apps.fcc.gov/FeeFiler/login.cfm.  To pay by ACH, log in using the FRN captioned above.  If payment must be split across FRNs, complete this process for each FRN.  Next, select "Pay bills" on the Fee Filer Menu and then select the bill number associated to the NAL Account – the bill number is the NAL Account number with the first two digits excluded – and choose the "Pay from Bank Account" option.  Please contact the appropriate financial institution to confirm the correct Routing Number and the correct account number from which payment will be made and verify with that financial institution that the designated account has authorization to accept ACH transactions.

89.     Any request for making full payment over time under an installment plan should be sent to:  Chief Financial Officer—Financial Operations, Federal Communications Commission, 445 12th Street, SW, Room 1-A625, Washington, DC 20554.[216]  Questions regarding payment procedures should be directed to the Financial Operations Group Help Desk by phone, 1-877-480-3201, or by e-mail, ARINQUIRIES@fcc.gov.

90.     The written statement seeking reduction or cancellation of the proposed forfeiture, if any, must include a detailed factual statement supported by appropriate documentation and affidavits pursuant to sections 1.16 and 1.80(f)(3) of the Commission's rules.[217]  The written statement must be mailed to the Office of the Secretary, Federal Communications Commission, 445 12th Street, SW, Washington, DC 20554, ATTN:  Enforcement Bureau – Telecommunications Consumers Division, and must include the

---

[213] Payments made using the Commission's Fee Filer system do not require the submission of an FCC Form 159.

[214] For questions regarding payment procedures, please contact the Financial Operations Group Help Desk by phone at 1-877-480-3201 (option #6), or by e-mail at ARINQUIRIES@fcc.gov.

[215] Instructions for completing the form may be obtained at http://www.fcc.gov/Forms/Form159/159.pdf.

[216] *See* 47 CFR § 1.1914.

[217] 47 CFR §§ 1.16, 1.80(f)(3).

**Federal Communications Commission**                    **FCC 20-26**

NAL/Account Number referenced in the caption.  The statement must also be e-mailed to Michael Epshteyn at michael.epshteyn@fcc.gov and Rosemary Cabral at rosemary.cabral@fcc.gov.

91.     The Commission will not consider reducing or canceling a forfeiture in response to a claim of inability to pay unless the petitioner submits:  (1) federal tax returns for the most recent three-year period; (2) financial statements prepared according to generally accepted accounting practices; or (3) some other reliable and objective documentation that accurately reflects the petitioner's current financial status.  Any claim of inability to pay must specifically identify the basis for the claim by reference to the financial documentation.

92.     **IT IS FURTHER ORDERED**, pursuant to section 0.459(g) of the Commission's rules,[218] that the Requests for Confidential Treatment filed by AT&T Services, Inc. in this proceeding **ARE DENIED IN PART**, to the extent specified herein.

93.     **IT IS FURTHER ORDERED** that a copy of this Notice of Apparent Liability for Forfeiture shall be sent by first class mail and certified mail, return receipt requested, to David R. McAtee II, Senior Executive Vice President and General Counsel, AT&T Inc., c/o Jeanine Poltronieri, Asst. Vice President – Federal Regulatory, AT&T Services, Inc., 1120 20th St. NW, Washington, DC 20036.


FEDERAL COMMUNICATIONS COMMISSION


Marlene H. Dortch
Secretary

---

[218] 47 CFR § 0.459(g).

**Federal Communications Commission** FCC 20-26

# STATEMENT OF
# CHAIRMAN AJIT PAI

Re:     *AT&T Inc.*, File No.: EB-TCD-18-00027704.

For most Americans, their wireless phone goes wherever they go.  And every phone must constantly share its—and its owner's—location with a wireless carrier in order to enable the carrier to know where to route calls.  Information about a customer's location is highly personal and sensitive.  As the U.S. Supreme Court has observed, this type of information "provides an intimate window into a person's life."[1]  This makes it critical that all telecommunications carriers protect the confidentiality of their customers' location information.  Congress has made this requirement clear in the Communications Act.  And the Commission has made this requirement clear in its implementing rules.

Today, we also make clear that we will not hesitate to vigorously enforce these statutory provisions and regulations.  After a thorough investigation, we find that all of our nation's major wireless carriers apparently failed to comply with these vitally important requirements.  In brief, long after these companies were on notice that their customers' location data had been breached, they continued to sell access to that data for many months without taking reasonable measures to protect it from unauthorized disclosure.  This FCC will not tolerate any telecommunications carrier putting American consumers' privacy at risk.  We therefore propose fines against these four carriers totaling more than $200 million.

For their diligent work on this item, I'd like to thank Rosemary Cabral, Rebecca Carino, Michael Epshteyn, Rosemary Harold, Jermaine Haynes, Erica McMahon, Ann Morgan, Shannon Lipp, Tanishia Proctor, Nakasha Ramsey, Phil Rosario, Mika Savir, Daniel Stepanicich, David Strickland, Raphael Sznajder, Kristi Thompson, David Valdez, and Shana Yates of the Enforcement Bureau; Justin Faulb, Lisa Hone, Melissa Kirkel, Kris Monteith, and Zach Ross of the Wireline Competition Bureau; Martin Doczkat, Aspasia Paroutsas, and Robert Pavlak of the Office of Engineering and Technology; Michael Carlson, Douglas Klein, Marcus Maher, Linda Oliver, Joel Rabinovitz, and Bill Richardson of the Office of General Counsel; and Virginia Metallo of the Office of Economics and Analytics.  Our Enforcement Bureau staff reviewed more than 50,000 pages of documents during the course of this complex investigation, and their painstaking efforts to uncover the details of what happened enabled us to take this strong enforcement action.  While this nitty-gritty investigative work is not glamorous and can take longer than some in the peanut gallery might like, it is indispensable to building a case that will stand up in a court of law rather than only garnering some headlines.

---

[1] *Carpenter v. United States*, 138 S. Ct. 2206, 2217 (2018).

Federal Communications Commission                                              FCC 20-26

# STATEMENT OF
# COMMISSIONER MICHAEL O'RIELLY

Re:    *AT&T Inc.*, File No.: EB-TCD-18-00027704.

The pocket-sized technology that nearly everyone carries today is capable of amazing functionality, including the ability to pinpoint exact locations, which has recognizable benefits.  Yet, this technology can be used for nefarious purposes as well.  The privacy breaches that were reported in the press related to these notices of apparent liability (NALs) are serious and warrant further investigation to determine exactly what happened, whether the parties violated current law, and if so, how such events can be prevented in the future.  There is enough evidence contained within these four documents to warrant NALs, and as such I will vote to approve.  However, it should be noted that I do so with serious reservations.  I would have expected more well-reasoned items than what is presented here, especially given the yearlong plus investigation.  Significant revisions and a more in-depth discussion of what occurred will be necessary before I will consider supporting any forfeiture.

Specifically, I am concerned that we do not have all the relevant facts before us, and that we either haven't heard or sufficiently considered counter arguments from AT&T, Sprint, T-Mobile, and Verizon.  Not only was additional information filed just days ago, but when the parties discussed these cases with my office, it was readily apparent that the record was incomplete.  It is also unclear as to whether the Commission has a firm grasp of the services that were actually being offered to consumers, when these services were offered and/or terminated, and whether many of the location-based offerings included to justify the substantial proposed fines were involved in any actual violations.  It also would have been preferable to engage the parties in conversation prior to issuing the NALs, to establish a more solid foundation from which to consider appropriate penalties.  The parties appear to have had barely any chance to discuss the potential violations and the legal basis behind the NALs with the Enforcement Bureau's investigators, which undermined their opportunity to explain their underlying practices and ultimately shed more light on the whole situation.

Equally important, I am not convinced that the location information in question was obtained as the result of a "call" or as part of a "telecommunications service," raising questions about the application of our section 222 authority.  The item seems to rely on the argument that these companies obtain location information solely to connect the device to the network for the purpose of sending and receiving voice calls.  That seems to be a major stretch, because the same connection is needed in order to send data, which is not a telecommunications service under the Commission's sound decision to declare it a Title I service.  Beyond the important jurisdictional concern relating to the breadth of our legal authority, more facts are needed to contemplate all of the various applications at issue and how the location information is obtained.

In the end, I am hopeful that these issues can be sorted out, especially when AT&T, Sprint, T-Mobile, and Verizon reply to these NALs.  I look forward to developing a fulsome record and discussing these alleged violations with the parties.  I want to be clear that I remain open minded on this entire matter.

# STATEMENT OF
# COMMISSIONER JESSICA ROSENWORCEL
# DISSENTING

Re:     *AT&T Inc.*, File No.: EB-TCD-18-00027704.

This investigation is a day late and a dollar short.  Our real-time location information is some of the most sensitive data there is about us, and it deserves the highest level of privacy protection.  It did not get that here—not from our nationwide wireless carriers and not from the Federal Communications Commission.  For this reason, I dissent.

Everywhere we go our smartphones follow.  They power the connections that we count on for so much of modern life.  But because they are always in our palms and pockets, they are collecting gobs of data about everything we are doing—and where we are doing it.

That means our phones know our location at any given moment.  This geolocation data is especially sensitive.  It's a record of where we've been and by extension, who we are.  If it winds up in the wrong hands, it could provide criminals and stalkers with the ability to locate any one of us with pinpoint accuracy.  It could be sold to domestic abusers or anyone else who wishes to do us harm.  Its collection and distribution or sale without our permission or without reasonable safeguards in place is a violation of our most basic privacy norms.  It's also a violation of the law.

But what we've learned is that it happened anyway.  In May 2018, The New York Times reported that our wireless carriers were selling our real-time location information to data aggregators.  Then in January 2019 Motherboard revealed that bounty hunters and other shady businesses had access to this highly sensitive data.  Further reporting by Vice pieced together just how this sensitive data wound up in the hands of hundreds of bounty hunters who were willing to sell it to anyone for just a few hundred dollars.  It turns out wireless carriers sold access to individual real-time location information to data aggregators, who then sold it to a skip-tracing firm, who then sold it to a bail-bond company, who then sold it to individual bounty hunters.

If that sounds like a tortured chain of data possession, it is.  And if you don't remember giving this kind of permission or signing up for the sale of your geolocation data on a black market, you're not alone.  Comb through your wireless contract, it's a good bet there is nothing in there that discloses your carrier could monetize your real-time location in this way.

It should have been simple for the FCC to take action to stop this practice under Section 222 of the Communications Act.  But that didn't happen.  Instead, for months this agency said nothing except that it was investigating.  It did not provide the public with any details, despite the ongoing risk to the security of every one of us with a smartphone.  As a result, the sale of our most sensitive location information continued for far too long under the watch of this agency.

All told, taking nearly two years to address these troubling revelations is a stain on this agency's public safety record.  It's a testament to how little it makes privacy a priority.

That's why starting last year I took on this issue on my own.  I took to television and spoke on cable and broadcast news about how a black market was developing where anyone could buy information about where we are and what we are doing based on location data from our wireless devices.  I wrote every nationwide wireless carrier and asked them to state whether they had ended their arrangements to sell location data and what steps they were taking to secure any data that had already been shared.  I made these letters public.  I also made public the responses.  In the course of doing so, I am pleased to report

Federal Communications Commission                                    FCC 20-26

that I was able to secure the first public statements from inside this agency about what carriers were doing with our location information.

I am also pleased that at my request the FCC is taking the necessary steps to remove redactions in the text of this long-awaited enforcement action that would have covered up exactly what happened with our location data. We should care more about protecting the privacy of consumers than the privacy of companies' business practices—especially when they violate the law.

However, in the end I find this enforcement action inadequate. There are more than 270 million smartphones in service in the United States and this practice put everyone using them at a safety risk. The FCC heavily discounts the fines the carriers could owe under the law and disregards the scope of the problem.

Here's why. At the outset, the FCC states that this impermissible practice should be the subject of a fine for every day that it was ongoing. But right at the outset the agency gives each carrier a thirty-day pass from this calculation. This thirty day "get-out-of-jail-free" card is plucked from thin air. You'll find it in no FCC enforcement precedent. And if you compare it to every data security law in the country, this stands as an outlier. In fact, state privacy laws generally require companies to act on discovered breaches on a much faster timetable—in some cases, less than a week. Real-time location data is some of the most sensitive information available about all of us and it deserves the highest level of privacy protection. Permitting companies to turn a blind eye for thirty days after discovering this data is at risk falls short of any reasonable standard.

Next, the FCC engages in some seriously bureaucratic math to discount the violations of our privacy laws. The agency proposes a $40,000 fine for the violation of our rules—but only on the first day. For every day after that, it imposes only a $2,500 fine for the same violation. But it offers no acceptable justification for reducing the fine in this way. Plus, given the facts here—the sheer volume of those who could have had their privacy violated—I don't think this discount is warranted.

In sum, it took too long to get here and we impose fines that are too small relative to the law and the population put at risk. But this effort is far from over. Because when the FCC releases a Notice of Apparent Liability, it is just early days. The fines are not final until after the carriers that are the subject of this action get a chance to respond. That means there is still work to do—and this agency cannot afford to wait another year to do it. If past practice is any guide, we all have reason to be concerned.

Federal Communications Commission                                    FCC 20-26

## STATEMENT OF COMMISSIONER GEOFFREY STARKS
### APPROVING IN PART AND DISSENTING IN PART

Re:    *AT&T Inc.*, File No.:  EB-TCD-18-00027704.

Taking control of our personal information is one of the defining civil rights issues of our generation.  Practically every day, we learn about new data harms: algorithmic and facial recognition bias; companies failing to protect our most sensitive information from hackers and thieves; and "pay to track" schemes that sell location information to third parties.  These practices put all Americans at risk, and they are especially insidious because they replicate and deepen existing inequalities in our society.

In recent months, consumers have become increasingly aware of how much private information trails behind them as they go about their days.  In December 2019, the New York Times opinion series *One Nation, Tracked* brought renewed focus to the issue of smartphone tracking.[1]  Their stories illustrated, sometimes in frightening detail, how much can be learned about a person from the location of their smartphone.  Using supposedly anonymous location data, the Times was able to follow the movements of identifiable Americans, from a singer who performed at President Trump's inauguration to President Trump himself.

The findings by journalists at the New York Times, Motherboard, and many other outlets unsettle us for good reason.  Your location at any time goes to the heart of personhood—where you live, who you see, where you go, and where you worship.  And tracking over time can build a picture of a life in intimate detail.  Disclosure of those coordinates and patterns isn't just creepy; it can leave us vulnerable to safety threats and intrusions never before possible on such a comprehensive scale.  And because people of color rely more heavily on smartphones for internet access than other Americans, they bear these harms disproportionately.

For those "freaked out" by their reporting, the Times offered a number of steps consumers can take to limit access to the location data, including blocking location sharing and disabling mobile advertising IDs.  Those can be good steps, but they are no defense against your wireless carrier.  Your carrier needs to know where you are to complete your calls.  Because it is simply impossible to use a mobile phone—an important part of participation in our modern economy—without giving location data to one of the carriers, our rules about how that they can use customer location data must be strict and strictly enforced.

For that reason, I am pleased that the Notices of Apparent Liability we vote on today confirm that misuse of customer location data by AT&T, Verizon, Sprint, and T-Mobile violate the Commission's rules.  These serious violations damaged Americans' faith in our telephone system, and I am pleased that we have reached bipartisan agreement that enforcement is appropriate here.  I cannot fully approve these Notices, however, because in conducting these investigations and determining the appropriate penalty, we lost track of the most important part of our case—the very consumers we are charged with protecting.  Because I strongly believe we should have determined the number of customers impacted by the abuses and based our forfeiture calculations on that data—calculations that would have been possible if we had investigated more aggressively—I must dissent in all remaining parts of the item.

---

[1] Stuart A. Thompson and Charlie Warzel, "Twelve Million Phones, One Dataset, Zero Privacy," New York Times (Dec. 19, 2019).

Federal Communications Commission                                    FCC 20-26

**Enforcement Authority**

Congress has clearly directed carriers to protect our location information, and these Notices confirm that this protection exists even when no call is in progress. Going forward, there should be no dispute about this basic legal conclusion.

This is a responsibility that can't be delegated away. Carriers are responsible for the actions of their agents and sub-contractors. This is a well-established principle, and it recognizes the special nature of the customer-carrier relationship. We trust our wireless carrier to provide high-quality service, and we don't expect that our carrier is going to monetize that relationship.

None of these carriers should be surprised that we take the protection of customer data so seriously. In 2007, the Commission addressed the problem of "pretexting," where data brokers would impersonate customers to fool carriers into disclosing confidential customer information. We revamped our rules and, for the first time, required that carriers obtain "opt-in" consent to the disclosure of customer information, rather than presenting it as an "opt-out."

Regrettably, these investigations show that carriers did not heed that warning. Despite the clear message from the FCC, these carriers did not treat the protection of their customers' data as a key responsibility. Instead, they delegated responsibility for protecting this sensitive information to aggregators and third-party location service providers. They subjected these arrangements to varying degrees of oversight, but all were ineffective and failed to prevent the problem. Significant penalties are more than justified.[2]

**Delays**

Today's action has been too long delayed. As the Notices point out, the Commission has been investigating these matters for nearly two years. And the investigations show that, even after the problems with their location data sharing programs became readily apparent, the carriers took months to shut them down. Indeed, nearly one year ago, I published an op-ed in the NY Times about the slow pace of this investigation, and the need for the FCC to "act swiftly and decisively to stop illegal and dangerous pay-to-track practices."[3] I had no idea it would be another 11 months before we finally acted.

From the beginning, it has been difficult to get the facts straight. The carriers repeatedly told the public that they were stopping their location sharing program while hiding behind evasive language and contractual terms. For example, on June 15, 2018, Verizon told Senator Ron Wyden, "[w]e are initiating a process to terminate our existing agreements for the location aggregator program."[4] But Verizon didn't terminate its aggregator agreements until November 2018, and didn't end all of its location data sharing

---

[2] In fact, just a few years ago, the Enforcement Bureau entered into multi-million-dollar consent decrees with these same carriers involving a similar problem— the unauthorized billing of customers by third-party vendors where the carriers sought to delegate their consumer protection responsibility via contract. As in the cases at issue here, the carriers claimed that they weren't responsible for unlawful billing because their contracts had requirements placing any responsibility on the downstream companies. The carriers we find liable today did a fundamental disservice to their customers when they simply "passed the buck" to these location data aggregators and service providers. Failure to supervise their agents is no defense. *See Cellco Partnership d/b/a Verizon Wireless,* Order and Consent Decree, 30 FCC Rcd 4590 (Enf. Bur. 2015) (requiring $90 million in payments and restitution to consumers to settle allegations that Verizon charged consumers for third-party products and services that the consumers did not authorize; *Sprint Corp.,* Order and Consent Decree, 30 FCC Rcd 4575 (Enf. Bur. 2015) ($68 million); *AT&T Mobility LLC,* Order and Consent Decree, 29 FCC Rcd 11803 (Enf. Bur. 2014) (($105 million); *T-Mobile USA, Inc.*, Order and Consent Decree, 29 FCC Rcd 15111 (Enf. Bur. 2014) ($90 million).

[3] Geoffrey Starks, "Why It's So Easy for a Bounty Hunter to Find You," New York Times (April 19, 2019).

[4] Letter from Karen Zacharia, Chief Privacy Officer, Verizon, to Senator Ron Wyden, dated June 15, 2018.

Federal Communications Commission                                              FCC 20-26

programs until April 2019.  With respect to the other carriers, on June 19, 2018, the Washington Post reported:

> AT&T then said in a statement Tuesday that it also will be ending its relationship with location data aggregators "as soon as practical" while ensuring that location-based services that depend on data sharing, such as emergency roadside assistance, can continue to function.  Sprint said in a statement that it cut ties with LocationSmart on May 25, and has begun cutting ties with the data brokers who received its customers' location data.

> T-Mobile chief executive John Legere tweeted: "I've personally evaluated this issue & have pledged that @tmobile will not sell customer location data to shady middlemen."[5]

Despite these statements, each of these carriers continued to sell their customers' location data for *months* afterwards.  Americans deserve better.

For its part, the FCC also failed to act with sufficient urgency.  As a former enforcement official, I recognize the challenges of reviewing the tens of thousands of pages of documents produced in these investigations, but we have conducted similarly extensive investigations much faster.  Indeed, we took less time to resolve the highly complex merger between T-Mobile and Sprint, which involved mountains of pages of materials.  Given the seriousness of the violations here, the Commission should have invested the resources necessary to get a draft to the Commission faster.  By allowing this investigation to drag on when we knew that important public safety and public policy issues were at stake, we failed to meet our responsibilities to the American people.

### Consumer Harms

I am concerned that the penalties proposed today are not properly proportioned to the consumer harms suffered because we did not conduct an adequate investigation of those harms.  The Notices make clear that, after all these months of investigation, the Commission still has no idea how many consumers' data was mishandled by each of the carriers.  I recognize that uncovering this data would have required gathering information from the third parties on which the carriers' relied.  But we should have done that via subpoenas if necessary.  We had the power—and, given the length of this investigation, the time—to compel disclosures that would help us understand the true scope of the harm done to consumers.  Instead, the Notices calculate the forfeiture based on the number of contracts between the carriers and location aggregators, as well as the number of contracts between those aggregators and third-party location-based service providers.  That is a poor and unnecessary proxy for the privacy harm caused by each carrier, each of which has tens of millions of customers that likely had their personal data abused.  Under the approach adopted today, a carrier with millions more customers, but fewer operative contracts, would get an unfairly and disproportionately lessened penalty.  That is inconsistent with our approach in other consumer protection matters and cannot stand.[6]  More importantly, basing our forfeiture on a carrier's

---

[5] Brian Fung, "Verizon, AT&T, T-Mobile and Sprint Suspended Selling of Customer Location Data After Prison Officials Were Caught Misusing It," Washington Post (June 19, 2018).

[6] *See, e.g., Scott Rhodes A.K.A. Scott David Rhodes, Scott D. Rhodes, Scott Platek, Scott P. Platek,* Notice of Apparent Liability for Forfeiture, FCC 20-9, 2020 WL 553616 (rel. Jan. 31, 2020) (spoofed robocall violations; calculates the proposed forfeiture of $12,910,000 by assessing a base forfeiture of $1,000 per each of 6,455 verified unlawful spoofed robocalls with a 100% upward adjustment); *Kenneth Moser dba Marketing Support Systems*, Notice of Apparent Liability for Forfeiture, FCC 19-135, 2019 WL 6837865 (rel. Dec. 13, 2019) (spoofed robocall violations; calculates the proposed forfeiture of  $9,997,750 by assessing a base forfeiture of $1,000 per each of 5,713 analyzed/verified calls with a 75% upward adjustment); *Long Distance Consolidated Billing Company*, Notice of Apparent Liability for Forfeiture, 30 FCC Rcd 8664 (2015) (slamming and cramming violations; calculates $2.3 million forfeiture by assessing a $40,000 forfeiture for each unlawful bill plus an upward adjustment for misrepresentation) (subsequent history omitted); *Neon Phone Service,* Notice of Apparent Liability for Forfeiture, 32 FCC Rcd 7964 (2017) (slamming and cramming violations; proposing a $3.9 million forfeiture by assessing a base forfeiture of $40,000 for each unlawful bill plus an upward adjustment for egregiousness).  *See also TerraCom,*

Federal Communications Commission                                                FCC 20-26

number of aggregator contracts cannot be squared with our core mission today – to vindicate harmed
consumers first and foremost.

Make no mistake – there are real victims who've had their privacy and security placed in harm's
way.  Each of them has a story.  As discussed in the Notices, in May 2018,  the *New York Times* reported
that then-Missouri Sherriff Cory Hutcheson had used Securus technologies, a vendor that all of these
wireless carriers allowed to access their customer location data, to conduct thousands of unauthorized
location requests, accessing the locations of multiple individuals, including his predecessor as Sherriff, a
Missouri Circuit Judge, and at least five highway patrol officers.[7]  But I've personally spoken at length
with one of those officers, retired Missouri State Highway Patrol Master Sergeant William "Bud" Cooper.

MSgt. Cooper told me that, while leading a homicide unit with the State Highway Patrol, he
would investigate cases in the Missouri county where Cory Hutcheson was Sherriff.  As they worked
together on investigations, M.Sgt. Cooper noticed Hutcheson following up on leads and locating
witnesses and suspects very quickly.  M.Sgt. Cooper initially thought Hutcheson just had a particularly
effective network of informants, but then grew suspicious and asked Hutcheson about his methods.
Hutcheson eventually told him that he was using a Securus program to "ping" phone numbers from the
investigations to uncover people's locations.

M.Sgt. Cooper suspected "something dirty" was going on.  M.Sgt. Cooper began to wonder,
based on Hutcheson's behavior towards him and his state trooper colleagues, if Hutcheson was targeting
their phones too.

When M.Sgt. Cooper's worst fears were confirmed—that he had been targeted, along with his
colleagues and a narcotics investigator—he was "shocked and angry."  "I felt violated."  This was
personal information, akin to "going into someone's home."  M.Sgt. Cooper found it "appalling" when it
turned out that Hutcheson was obtaining this information based solely on woefully insufficient supporting
documentation, including parts of an instruction manual, his vehicle maintenance records, and even an
insurance policy.  Hutcheson had personally "pinged" phones without authorization "over 2,000 times,
and nobody checked."

M.Sgt. Cooper related that the revelations of Hutcheson's spying have threatened the safety of
officers in the community and their informants.  He reported that it has become harder to convince
witnesses to trust police and talk to them, particularly in communities where witnesses fear retaliation.
He has devoted his career to upholding the honor and integrity of law enforcement, but with the
Hutcheson scandal "we all took a black eye."

M.Sgt. Cooper's story is but one single account of the harm done by the carriers; but we know
there are many—perhaps millions—of additional victims, each with their own harms.  Unfortunately,
based on the investigation the FCC conducted, we don't even know how many there were, and the
penalties we propose today do not reflect that impact.

This ignorance not only highlights a problem with today's decisions but a gap in our
policymaking.  The Commission needs to consider policy changes to protect the rights of consumers.
Specifically, we should initiate a rulemaking to require carriers to inform consumers when there has been
a breach of their confidential data, so that individual can take steps to protect themselves.

Even setting aside my concerns that our forfeitures are not pegged to the number of consumers
harmed, I would still object to the amount of the proposed forfeiture to T-Mobile.  It should be higher.  As
discussed in the Notice, T-Mobile had clear notice back in July 2017 that its contractual protections were
failing to prevent location-based service providers from misusing customer location information.  T-
Mobile knew that one of these service providers was taking customer information and selling it to "bail
bonding and similar companies"—aka, bounty hunters.  Despite T-Mobile's knowledge of the problem, it

---

*Inc. and YourTel America, Inc.,* Notice of Apparent Liability for Forfeiture, 29 FCC Rcd 13325 (2014) (in proposing
a forfeiture for Section 222 violations, citing the number of personal data records exposed by a carrier as the key
factor, ultimately resulting in a penalty figure of $8.5 million) (subsequent history omitted).

[7] *See, e.g., T-Mobile NAL* at para. 28; *AT&T NAL* at para. 21; *Verizon NAL* at para. 26; *Sprint NAL* at para. 21.

Federal Communications Commission                                              FCC 20-26

took *two months* for the carrier to contact the aggregator company about this issue, and even then, T-Mobile only inquired of the aggregator and reminded it of its contractual obligations. It was the *aggregator* that terminated the service provider's access to T-Mobile customer information soon after hearing from T-Mobile. I believe that T-Mobile was on notice about the problems with its location data protections back in July 2017 and that the proposed forfeiture amount should reflect that fact – the punishment should fit the crime. Unfortunately, although their legal justification for doing so remains a mystery, a majority of my colleagues disagreed.

**Transparency**

Our slow response has also impacted our ability to discuss the facts of this case and the Commission's credibility for future investigations. Like other federal agencies, the Commission has a process that allows parties to protect the confidentiality of certain materials submitted to the agency. In their responses to the Bureau's investigation, however, the four carriers named in today's decisions bent that process so far that it is broken. Each of them adopted such an overbroad interpretation of our confidentiality protections that the Enforcement Bureau initially circulated heavily redacted draft decisions that would have made it impossible for the public to understand the key facts in each case.

Sadly, this is not a new phenomenon. The Enforcement Bureau has long struggled with parties asserting overbroad designations of confidentiality. Some parties, including some in these cases, have claimed confidential treatment for nearly the entirety of their responses to the Bureau's Letters of Inquiry, including legal arguments, publicly available facts, and even references to Commission's rules. Both as a former Enforcement Bureau official and as a Commissioner, I have seen such tactics hamstring our ability to vindicate the public interest and deter wrongdoing.

We should have rejected these confidentiality requests—some of which are frankly laughable—as soon as the Bureau reviewed the documents. Instead, many of those assertions were taken at face value, and the original drafts had heavy redactions. It is critical that Americans, particularly the hundreds of millions who use the services of these carriers, understand what happened here. If we let unreasonable and self-serving confidentiality assertions stand, those customers will never have the full picture.

Only after Commissioner Rosenworcel and I objected did the Bureau go back to the parties to challenge the confidentiality requests and negotiate the disclosure of more information. While I am glad that some of the parties reduced their requests, much of this information still remains confidential for now. Some even designated as confidential the number of agreements they had entered with aggregators and location-based service providers. That is frivolous.

The Commission does not have not to tolerate this. Section 0.459 of the Commission's rules establishes a process for resolving confidentiality requests. That process takes time, so we must begin resolving such requests immediately upon receipt. Here, despite the extraordinary length of our investigation, we let this problem fester for too long. Now, because we waited until the orders were before the Commission and then rushed to negotiate with the parties, there is insufficient time for the Section 0.459 process to play out. Even with the reduced redactions, Americans who read these Notices and the news coverage of them today will not have all the facts to which they are entitled. So while I am glad that we are ordering the parties to explain why we should not deny their requests completely, I worry that the carriers will have succeeded in hiding key facts until the spotlight has moved on. The FCC must do better.

\* \* \*

Finally, while today's actions underscore and confirm the power of Section 222, they also highlight the need for additional actions. For example, our action today is limited to the major wireless carriers. But we know from this investigation that they are not the only wrongdoers. Securus, for one example, behaved outrageously. Though Securus holds multiple FCC authorizations, I recognize that there may be legal limitations on the Commission's ability to take enforcement against the company for its misuse of customer location data. But that is no excuse for failing to conduct a comprehensive investigation—including issuing subpoenas to Securus—of the events in question here. That information

**Federal Communications Commission**                    **FCC 20-26**

would have enriched our investigation and could have been provided to other agencies for investigation and enforcement.

Going forward, Americans must be able to place trust in their wireless carriers. I understand that operating businesses at the enormous scale of these companies means relying on third parties for certain services. But these carriers know that the services they offer create risks for users: unauthorized location tracking, SIM hijacking, and billing scams to name just few. Carriers must take responsibility for those people they allow into their operations.

I thank the staff of the Enforcement Bureau for their hard work on these important investigations.

Filing # 140121819 E-Filed 12/10/2021 12:06:37 PM

IN THE COUNTY COURT OF THE 11TH
JUDICIAL CIRCUIT IN AND FOR MIAMI-
DADE COUNTY, FLORIDA

Mario Milian,

      Plaintiff,

v.

AT&T Mobility, LLC,

      Defendant.

_____/

CASE NO.:  2020-021937-SP-26

FLA. BAR NO.: 121673

## AMENDED STATEMENT OF CLAIM

      Plaintiff, Mario Milian, by and through its undersigned counsel, hereby files this Amended Statement of Claim against Defendant, AT&T, Mobility, LLC ("AT&T MOBILITY, LLC"), and further alleges as follows:

## GENERAL ALLEGATIONS

1. This is an action against AT&T for damages for $8,000, exclusive of interest, attorney's fees, and costs.

2. Plaintiff is a customer of AT&T and provided notice of this claim prior to filing this lawsuit.

3. AT&T MOBILITY, LLC is a foreign limited liability company licensed and doing business in Miami-Dade County, Florida subject to the general and specific jurisdiction of this Court.

4. Venue is proper in Miami-Dade County, Florida.

5. Plaintiff has complied with all statutory and/or contractual conditions precedent to filing this action.

6. Plaintiff is the title holder to any claim against AT&T MOBILITY, LLC and has an interest in the subject matter of this claim.

7. According to court filings made by AT&T MOBILITY, LLC in federal court, it is a nongovernmental limited liability company that has no parent company but its members are BellSouth Mobile Data, Inc.; SBC Long Distance, LLC; and SBC Tower Holdings LLC. Those entities (and thus AT&T MOBILITY, LLC) are all indirectly wholly owned by AT&T Inc., which is the only publicly held company with a 10 percent or greater ownership stake in them.

8. AT&T, Inc. reports its consolidated business results, and breaks out selected disclosures for its major operating segments. Their segments are strategic business units that offer different products and services over various technology platforms and/or in different geographies that are managed accordingly. They analyze the operating segments based on segment contribution, which consists of operating income, excluding acquisition-related costs and other significant items, and equity in net income (loss) of affiliates for investments managed within each operating segment.

9. There are four reportable segments of AT&T, Inc.: (1) Communications, (2) Warner Media, (3) Latin America and (4) Xandr. AT&T MOBILITY, LLC is a major retailer of smartphones and provider of wireless broadband internet access service for smartphones.

10. Smartphone owners use mobile data for, including but not limited to, sending and receiving email, using GPS navigation, watching and streaming video, and browsing the internet. AT&T MOBILITY, LLC is a major retailer of smartphones and provider of wireless broadband internet access service for smartphones ("mobile data"). Smartphone owners use mobile data for, including but not limited to, sending and receiving email, using GPS navigation, watching and streaming video, and browsing the internet.

11. AT&T MOBILITY, LLC's place in AT&T Inc corporate structure can be identified as follows:



12. The Communications segment provides wireless and wireline telecom, video and broadband services to consumers located in the U.S. or in U.S. territories and businesses globally. Communications services and products are marketed under the AT&T, Cricket, AT&T PREPAID and DIRECTV brand names. The Communications segment provided approximately 84% of 2018 segment operating revenues and 84% of our 2018 total segment contribution. This segment contains the Mobility, Entertainment Group and Business Wireline business units.

13. Within Communications is the Mobility business unit that provides nationwide wireless services to consumers and wholesale and resale wireless subscribers located in the United States or U.S. territories by utilizing our network to provide voice and data services, including high-speed internet over wireless devices. They classify subscribers as either postpaid, prepaid, connected device or reseller. As of December 31, 2018, they served 153 million Mobility subscribers, including 77 million postpaid, 17 million prepaid, 8 million reseller and 51 million connected devices. Their Mobility business unit revenue includes (2) reported categories: Wireless Services, and Equipment.

14. AT&T MOBILITY, LLC offers a range of nationwide wireless voice and data communications services in a variety of pricing plans to meet the communications needs of targeted customer categories. Their wireless services also include advertising revenues generated from the subscriber relationships.  They offer plans that include unlimited features allowing for the sharing of voice, text and data across multiple devices, which attracts subscribers from other providers and minimize subscriber churn. The **churn** rate, also known as the rate of attrition or customer **churn,** is the rate at which customers stop doing business with an entity within a given time period.

15. Customers in the "connected device" category (e.g., users of session-based tablets, monitoring devices and automobile systems) generally purchase those devices from third-party suppliers that buy data access supported by our network. They also offer nationwide wireless voice and data communications to certain customers who prefer to pay in advance. These services are offered under the Cricket and AT&T PREPAID brands and are typically monthly prepaid services.

16. AT&T MOBILITY, LLC sells a wide variety of handsets, wirelessly enabled computers (e.g., tablets and notebooks) and wireless data cards manufactured by various suppliers for use with our voice and data services. They also sell accessories, such as carrying cases and hands-free devices. They sell through their own company-owned stores, agents and third-party retail stores. Like other wireless service providers, they have historically provided postpaid contract subscribers substantial equipment subsidies to initiate, renew or upgrade service.

17. In 2007, AT&T MOBILITY, LLC became the exclusive mobile data provider for the Apple iPhone.  Initially, AT&T offered iPhone customers an "unlimited" mobile data plan for $20 per month.  In 2008, when the iPhone 3G was released, AT&T MOBILITY, LLC increased the fee for the unlimited mobile data plan to $30 per month and required all iPhone 3G customers to purchase the data plan.  Since then, AT&T MOBILITY, LLC has slowly increased the price of its "unlimited data plan." As AT&T MOBILITY, LLC began offering subsequent versions of the iPhone and smartphones from competing manufacturers, it imposed a similar requirement on purchasers of those devices.

18. Since June 2010, AT&T MOBILITY, LLC has offered to grandfather these customers' unlimited mobile data plan when they purchase a new smartphone, allowing customers the opportunity to continue with their unlimited mobile data plans rather than requiring them to switch to AT&T's tiered mobile data plans.  The renewed plan continues to cost more than originally advertised per month.

19. Customers who have had their data speed throttled by AT&T MOBILITY, LLC have experienced drastically reduced service such that slow data is virtual no data at all which is in direct contravention of the term "unlimited".

20. As a result, many everyday applications, such as web browsing, GPS navigation, and streaming video, are significantly slower, and, in some cases, are severely impaired or rendered inoperable and thus no data usage.

21. AT&T MOBILITY, LLC possesses internal focus group research indicating that data throttling was inconsistent with consumer understanding of an "unlimited" data plan.  The researchers concluded that, "[a]s we'd expect, the reaction to [a proposed data throttling program] was negative; consumers felt 'unlimited should mean unlimited.'" The focus group participants thought the idea was "clearly unfair."

22. The researchers highlighted a consumer's comment that "[i]t seems a bit misleading to call it Unlimited."  The researchers observed that "[t]he more consumers talked about it the more they didn't like it."  This led the researchers to advise that "[s]aying less is more, [so] don't say too much" in marketing communications concerning such a program.

23. The speed reductions and service restrictions in effect under AT&T MOBILITY, LLC's data throttling program are not determined by real-time network congestion at a particular cellular tower.  Throttled customers are subject to this reduced speed even when using smartphones at times when AT&T MOBILITY, LLC's network has ample capacity to carry customers' data, or the use occurs in an area where the network is not congested.  Once customers have been throttled during a given billing cycle, AT&T MOBILITY, LLC caps their download speed until the end of the billing cycle, at which time AT&T MOBILITY, LLC restores the data to full speed for these customers.

24. AT&T MOBILITY, LLC's wireless customer agreements do not state that an unlimited mobile data plan customer's use of more than a specified amount of data is a prohibited activity.  Nor do the agreements provide that AT&T MOBILITY, LLC may modify, diminish,

or impair the service of unlimited mobile data plan customers engaged in permissible activities if these customers use more than a specified amount of data.

25. AT&T MOBILITY, LLC is a sophisticated company. It knew it needed to invest in enough capacity to deliver service for subscribers who used a lot of data under their unlimited plans, especially since the company had claimed its network was the "fastest" in the nation. Instead of living up to its promises, AT&T MOBILITY, LLC pulled a bait-and switch. AT&T MOBILITY, LLC prominently advertises particular flat monthly rates for its post-paid wireless service plans. Then, after customers sign up, AT&T MOBILITY, LLC actually charges higher monthly rates than the customers were promised and agreed to pay. AT&T MOBILITY, LLC covertly increases the actual price by padding all post-paid wireless customers' bills each month, including Plaintiff's bills, with a bogus so-called Administrative Fee (currently $1.99 every month for each phone line) on top of the advertised price.  AT&T MOBILITY, LLC has stated that it charges the administrative fee because it is a "standard administrative fee" across the wireless industry.  However, in 2017, T-Mobile eliminated the "administrative charges".  Moreover, prepaid carriers like MetroPCS and AT&T's subsidiary Cricket Wireless *do not charge administrative fees.*

26. The Administrative Fee is not properly disclosed to customers before or when they sign up, and in fact it is never adequately and honestly disclosed. The so-called Administrative Fee is not, in fact, a bona fide administrative fee, but rather is simply a means for AT&T MOBILITY, LLC to charge more per month for the service itself without having to advertise the higher prices as a scheme to increase revenue. AT&T Mobility, LLC's previous in court public admissions (filed by its corporate counsel, Patricia Cruz, Esq.) to the conduct alleged in this case (data throttling) via its filing of its "consent to payment for conduct for

the claims asserted or which could have been asserted" in the cases of Erin Young v. AT&T Mobility, LLC, Case No. 2019-2027-SP-26, EFiling#87601121 or Tamara Crespo v. AT&T Mobility, LLC, Case No. 2019-2026-SP26, E-Filing#87600869 both of which alleged AT&T's violation of FDUTPA for illegal data throttling and bogus administrative fee, is further evidence of AT&T Mobility, LLC's illegal, immoral and unethical conduct.

27. Making matters worse, AT&T MOBILITY, LLC deliberately hides the Administrative Fee in its billing statements. In AT&T MOBILITY, LLC's printed monthly billing statements, AT&T MOBILITY, LLC intentionally buries the Administrative Fee in a portion of the statement that: (a) makes it likely customers will not notice it; and (b) misleadingly suggests that the Administrative Fee is akin to a tax or another standard government pass-through fee, when in fact it is simply a way for AT&T MOBILITY, LLC to advertise and promise lower rates than it actually charges.

28. There is no description of the administrative fee on Plaintiff's bill.  Such a description fails to constitute an adequate disclosure of the Administrative Fee, and it serves to further AT&T MOBILITY, LLC's deceptive scheme by suggesting that the Administrative Fee is tied to certain costs associated with AT&T MOBILITY, LLC providing wireless telephone services (interconnect charges and cell site rental charges). Assuming this description was accurate, it would merely reinforce that this undisclosed fee should be included in the advertised monthly price for the service because those are basic costs of providing wireless service itself, and thus a reasonable consumer would expect those costs to be included in the advertised price for the service.

29. Moreover, the administrative fee is not, in fact, tied to the costs that AT&T MOBILITY, LLC's buried description suggests. This is corroborated by the fact that AT&T has

repeatedly increased the amount of the monthly Administrative Fee since the fee was first imposed, while during that same time period the stated "costs" for (i.e., interconnect charges and cell site rental charges) have actually *decreased* according to AT&T's own financial statements and public filings with the Securities and Exchange Commission.

30. AT&T imposed and increased the Administrative Fee that it charged, not, as AT&T MOBILITY, LLC misleadingly stated in its buried description, in response to cell site rental and maintenance costs or interconnectivity costs, which AT&T MOBILITY, LLC's financial statements show have gone down at the same time AT&T MOBILITY, LLC has significantly increased the amount of the fee.

31. Thus, by AT&T MOBILITY, LLC's own design, the printed monthly statements serve to further AT&T MOBILITY, LLC's scheme and keep customers from realizing they are being deceived and thus overcharged.  Such a deceptive practice is AT&T's misrepresentation of why a fee is being charged and where the money for the fee is being transferred to, if anywhere.  AT&T Mobility, LLC chose the descriptive terms and if they do not accurately describe what is being charged and collected, such conduct is actionable under the FDUTPA.

32. AT&T MOBILITY, LLC imposed and has increased the Administrative Fee as a covert way to increase customers' monthly rates without having to advertise such higher rates. AT&T MOBILITY, LLC increased the Administrative Fee in large part to fund unrelated corporate liabilities of its parent company AT&T Inc., including to pay down the debt incurred in connection with the acquisition of Time Warner Inc. in 2018.

33. In all events, AT&T MOBILITY, LLC should clearly disclose the Administrative Fee and should clearly and accurately state the true monthly prices and applicable costs of AT&T

MOBILITY, LLC for its post-paid wireless service plans in its price representations and advertising.

34. Since the Administrative Fee was first introduced in 2013, AT&T MOBILITY, LLC has increased the amount of the fee three times, including twice over a three-month period in 2018. The current amount that AT&T MOBILITY, LLC charges all post-paid wireless customers for this fee is $1.99 per line every month, i.e., more than 200% more than the original amount of the fee, including Plaintiff's bill.

35. AT&T MOBILITY, LLC has used this Administrative Fee scheme to improperly squeeze consumers for **hundreds of millions of dollars** in additional revenue without disclosing the actual "increased costs" in any financial filing available to any customer, including Plaintiff.

36. In essence, AT&T MOBILITY, LLC introduced the bogus Administrative Fee as a way to covertly increase the actual monthly price customers are charged for their service, and then has continued to use the Administrative Fee and unilateral increases thereto as a lever by which AT&T MOBILITY, LLC continues to ratchet up the price without the customer realizing and after the customer is already committed.

37. The Administrative Fee is part of a design to profit AT&T MOBILITY, LLC rather than pay for what it has determined is an increase in cost of AT&T MOBILITY, LLC. Thus, the practice of applying the administrative fee to Plaintiff's bill is in and of itself is unfair and deceptive.

38. This scheme has enabled, and continues to enable, AT&T MOBILITY, LLC to effectively increase its rates without having to publicly announce those higher rates, and allows AT&T MOBILITY, LLC to entice more customers by misrepresenting the costs customers

would pay both in absolute terms and relative to other wireless providers in the industry.

## <u>COUNT I - FRAUD</u>

39. Plaintiff re-alleges, restates, and incorporates the allegations contained in paragraphs one (1) through thirty-eight (38) above, and further alleges as follows:

40. By virtue of its advertisement of unlimited data to Plaintiff for a set price, AT&T MOBILITY, LLC undertook the duty to disclose material information and disclose its data management plan along with its billing practices to Plaintiff so that Plaintiff would receive unlimited data at a set price.

41. Specifically, in the advertising, sale, and renewal of mobile data plans, AT&T MOBILITY, LLC represented, directly or indirectly, expressly or by implication, to the Plaintiff, an unlimited mobile data plan customer, that the amount of data that the Plaintiff could access in any billing period would not be limited.  Plaintiff is not in possession of the mobile data contract as it under the exclusive control of AT&T MOBILITY, LLC.

42. AT&T MOBILITY, LLC specifically omitted the fact that it intended to throttle Plaintiff's data, without Plaintiff's knowledge or specific consent.  Had AT&T MOBILITY, LLC not omitted this information, Plaintiff would have not purchased specific unlimited plan.

43. Plaintiff relied on AT&T MOBILITY, LLC's representations regarding providing unlimited data, and, as a result, incurred damages and was injured as a result of the fraud by omission.

44. Moreover, AT&T MOBILITY, LLC's representations on its bills to Plaintiff and the definition Plaintiff obtained on AT&T MOBILITY, LLC's website regarding the administrative fee charged on the account were false statements of material fact.  AT&T MOBILITY, LLC's representation that the  Administrative Fee is a charge assessed by AT&T MOBILITY,

LLC that helps defray a portion of certain expenses AT&T MOBILITY, LLC incurs, including but not limited to: (a) charges AT&T MOBILITY, LLC or its agents pay to interconnect with other carriers to deliver calls from AT&T MOBILITY, LLC customers to their customers; and (b) charges associated with cell site rents and maintenance" are false.

45. AT&T MOBILITY, LLC knew or should have known that the representations all identified above were false as AT&T MOBILITY, LLC's cost in interconnect charges and cell site charges actually decreased.

46. AT&T MOBILITY, LLC intended that the representations above caused Plaintiff to continue as a customer with AT&T MOBILITY, LLC and otherwise pay the administrative fee to maintain an account with AT&T MOBILITY, LLC.

47. Plaintiff has suffered damages in justifiable reliance on the representations above including but not limited to the payment for bogus administrative fees on a monthly basis.

WHEREFORE, Plaintiff respectfully requests that this Court grant judgment in its favor and against AT&T MOBILITY, LLC for compensatory damages, nominal damages, interest, court costs, and any other relief the Court deems just and proper.

## COUNT II - DAMAGES UNDER THE FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT

48. Plaintiff re-alleges, restates, and incorporates the allegations contained in paragraphs one (1) through thirty-eight (38) above, and further alleges as follows:

49. Plaintiff, at all material times, was a consumer, as defined under the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), § 501.201, *et seq*., Fla. Stat.

50. AT&T MOBILITY, LLC, at all material times, was engaged in trade or commerce, as defined under the FDUTPA and is not otherwise exempt.

51. Upon information and belief, Plaintiff was a consumer who had an "unlimited" data plan as advertised by AT&T.  In the advertising, sale, and renewal of the unlimited mobile data plan, AT&T MOBILITY, LLC entered into a mobile data contract with Plaintiff that was advertised as providing access to unlimited mobile data and did not provide that AT&T MOBILITY, LLC could modify, diminish, or impair the services of customers who use more than a specified amount of data for permissible activities.

52. AT&T MOBILITY, LLC imposed significant data speed restrictions on Plaintiff by virtue of its use of its network which flows throughout the United States and in particular, Florida. This practice was, and is, an unfair act or a deceptive trade practice and is specifically complained of by the Federal Trade Commission.

53. In the advertising, sale, and renewal of unlimited mobile data plans, AT&T MOBILITY, LLC has represented, directly or indirectly, expressly or by implication, to unlimited mobile data plan customers that the amount of data that the customer could access in any billing period would not be limited.  Such a representation is unfair or deceptive as defined under the FDUTPA.  Plaintiff is not in possession of the actual mobile data contract between the parties, as it under the exclusive control of AT&T MOBILITY, LLC.

54. AT&T MOBILITY, LLC has failed to disclose, or has failed to disclose adequately, that it imposes significant and material data speed restrictions on **unlimited mobile data plan** customers who use more than a fixed amount of data in a given billing cycle.  AT&T MOBILITY, LLC's failure to disclose or adequately disclose this fact, in light of the representations made, was, and is, a deceptive act or practice.

55. AT&T MOBILITY, LLC specifically throttled Plaintiff's data speed, which by its own admission is an unfair or deceptive trade practice as defined under the FDUTPA.

56. These unfair or deceptive trade practices are the proximate cause of Plaintiff's actual damages.

57. Furthermore, in the advertising, sale, and renewal of mobile data and wireless plans and acceptance of payments, AT&T MOBILITY, LLC has represented, directly or indirectly, expressly or by implication, to customers that it would be charged a certain amount.  AT&T MOBILITY, LLC has since added an "Administrative Fee" to Plaintiff's bill which is unfair and deceptive as it is not what its being used for despite its definition in the wireless agreement. The administrative fee is a textbook pass through-fee. AT&T chose the descriptive terms of the administrative fee that does not accurately describe what is being charged and collected, such conduct is actionable under the FDUTPA.

58. Since the Administrative Fee was first imposed in 2013, AT&T MOBILITY, LLC has unilaterally increased the monthly amount of the fee three times. AT&T MOBILITY, LLC increased the Administrative Fee to $0.76 per month per phone line starting in June 2016. Then, in 2018, the increases because larger and more frequent (around the same time AT&T MOBILITY, LLC's parent company incurred significant debt in acquiring Time Warner Inc.).

59.  AT&T MOBILITY, LLC raised the Administrative Fee to $1.26 per month per phone line starting in April 2018, and then again to $1.99 per month per phone line starting in June 2018, which is the current monthly fee as of this filing. Thus, between March 2018 and June 2018 alone, AT&T MOBILITY, LLC increased the Administrative Fee a whopping 162% increase in just three months.

60. AT&T MOBILITY, LLC's representations on its bills to Plaintiff and it its website regarding the administrative fee charged are deceptive and in fact misrepresent the truth.  AT&T

MOBILITY, LLC's representation that the Administrative Fee is a charge assessed by AT&T MOBILITY, LLC that helps defray a portion of certain expenses AT&T MOBILITY, LLC incurs, including but not limited to: (a) charges AT&T MOBILITY, LLC or its agents pay to interconnect with other carriers to deliver calls from AT&T MOBILITY, LLC customers to their customers; and (b) charges associated with cell site rents and maintenance is false. The administrative fee is instead a scheme to funnel direct profit to AT&T MOBILITY, LLC rather than pay for any identifiable increase in costs.

61. AT&T MOBILITY, LLC knew or should have known that the representations regarding the administrative fee are false as AT&T MOBILITY, LLC's cost in interconnect charges and cell site charges actually decreased based on its own SEC federal filings. AT&T MOBILITY, LLC knew that the monthly administrative fee was inflated, and not the result of good faith financial practices but instead designed to raise profit for the company without a specific actual change in price for services. Such a practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers, including Plaintiff.

62. AT&T MOBILITY, LLC's knowingly unfair or deceptive trade practices of assessing and collecting a bogus administrative fee are the proximate cause of Plaintiff's 's actual damages.

63. AT&T MOBILITY, LLC's unfair and deceptive trade practice is not a result of a bona fide error or mistake but instead a conscious decision by AT&T MOBILITY, LLC.

64. Plaintiff has retained the undersigned to represent it in this action and pay a reasonable fee for said legal services.

WHEREFORE, Plaintiff respectfully requests that this Court grant judgment in its

favor and against AT&T MOBILITY, LLC for damages, interest, court costs, attorney's fees pursuant to §501.2105, Florida Statutes, and any other relief the Court deems just and proper.

### COUNT III – ACTION FOR DECLARATORY AND/OR INJUNCTIVE RELIEF UNDER FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT ("FDUTPA") – BOGUS ADMINISTRATIVE FEE

65. Plaintiff re-alleges, restates, and incorporates the allegations contained in paragraphs one (1) through thirty-eight (38) above, and further alleges as follows:

66. Under the FDUTPA, without regard to any other remedy or relief to which a person is entitled, anyone aggrieved by a violation of this part may bring an action to obtain a declaratory judgment that an act or practice violates this part and to enjoin a person who has violated, is violating, or is otherwise likely to violate 501.201 et. seq.  See Fla. Stat. §501.211(1).  Plaintiff is an aggrieved consumer whose rights have been, are being, or will be adversely affected, by AT&T MOBILITY, LLC.'s violation of FDUTPA--meaning an unfair or deceptive practice which is injurious to consumers, including Plaintiff.

67. Pursuant to AT&T MOBILITY, LLC's above-described acts or practices of placing a bogus administrative fee on Plaintiff's account, AT&T MOBILITY, LLC violated the FDUTPA. The Administrative Fee is part of a design to profit AT&T MOBILITY, LLC rather than pay for what it has determined is an increased in cost of AT&T MOBILITY, LLC. Thus, the practice of applying the administrative fee to Plaintiff's bill is in and of itself is unfair and deceptive.

68. Plaintiff seeks a declaratory judgment that AT&T MOBILITY, LLC's acts or practices have violated the FDUTPA and injunctive relief to prevent AT&T from committing the same improper acts.

69. Plaintiff seeks to determine whether the FDUTPA prohibits AT&T MOBILITY, LLC from continuing to apply the bogus administrative fee which is likely to occur in the future.

70. There is a bona fide dispute between the parties. Plaintiff has a justiciable question as to the existence or non-existence of some right, status, immunity, power, or privilege, or some fact upon which their claim may depend.

71. Plaintiff is in doubt as to the right of AT&T MOBILITY, LLC to continue to charge an unlawful fee which violates FDUTPA.

72. There is a bona fide, actual, and present need for the declaration.

73. Plaintiff has retained the undersigned to represent it in this action and pay a reasonable fee for said legal services.

WHEREFORE, Plaintiff respectfully requests that this Court grant declaratory judgment and/or injunctive relief in its favor and against AT&T MOBILITY, LLC, court costs, attorney's fees pursuant to Section 501.2105, Florida Statutes, and any other relief the Court deems just and proper.

## COUNT IV – BREACH OF CONTRACT – GOOD FAITH AND FAIR DEALING

74. Plaintiff re-alleges, restates, and incorporates the allegations contained in paragraphs one (1) through thirty-eight (38) above, and further alleges as follows

75. Plaintiff had a wireless agreement with AT&T MOBILITY, LLC wherein Plaintiff had a reasonable expectation of performance of the agreement with no throttling of Plaintiff's data speed so as to provide Plaintiff with unlimited data.

76. AT&T MOBILITY, LLC was required to act in a commercially reasonable manner and limiting its ability to act capriciously to contravene the reasonable expectations of the Plaintiff in the AT&T's performance wireless agreement.

77. Moreover, AT&T MOBILITY, LLC was required to act in a commercially reasonable manner in billing Plaintiff for bogus administrative costs which were not for what they claimed in the contract. AT&T's representations on its bills to Plaintiff and it its website regarding the administrative fee charged on the account were false statements of material fact.

78. AT&T MOBILITY, LLC representation that the Administrative Fee is a charge assessed by AT&T that helps defray a portion of certain expenses AT&T incurs, including but not limited to: (a) charges AT&T or its agents pay to interconnect with other carriers to deliver calls from AT&T customers to their customers; and (b) charges associated with cell site rents and maintenance are false. AT&T

79. The express terms of the wireless agreement required AT&T to provide unlimited data and true administrative costs as defined by the contract.

80. AT&T has breached the express terms of the wireless agreement by failing to provide unlimited data.

81. As a result of AT&T's breach of implied covenant of good faith and fair dealing, Plaintiff has been damaged.

WHEREFORE, Plaintiff respectfully requests that this Court grant judgment in its favor and against AT&T for compensatory damages, nominal damages, interest, court costs, and any other relief the Court deems just and proper.

## COUNT V – UNJUST ENRICHMENT

82. Plaintiff re-alleges, restates, and incorporates the allegations contained in paragraphs one (1) through thirty-eight (38) above, and further alleges as follows:

83. AT&T MOBILITY, LLC assessed improper increased charges of $1.99/month

administrative fee on Plaintiff's account.

84. AT&T MOBILITY, LLC has stated that "The Administrative Fee is a charge assessed by AT&T MOBILITY, LLC that helps defray a portion of certain expenses AT&T MOBILITY, LLC incurs, including but not limited to: (a) charges AT&T MOBILITY, LLC or its agents pay to interconnect with other carriers to deliver calls from AT&T MOBILITY, LLC customers to their customers; and (b) charges associated with cell site rents and maintenance. It is not a tax or charge which the government requires AT&T MOBILITY, LLC to collect from its customers.

85. In June of 2018, AT&T MOBILITY, LLC increased its "administrative fee" to $1.99/per, per month with no specific reason or allegation that AT&T MOBILITY, LLC's costs had changed.

86. AT&T MOBILITY, LLC knew the monthly administrative fee was inflated and not the result of good faith financial practices and instead a deceptive fee. In essence this administrative fee is a textbook pass-through fee designed to increase profits of the company without increasing the advertised price of the services to Plaintiff.

87. AT&T MOBILITY, LLC had knowledge of payments by Plaintiff and voluntarily accepted and retained the benefit conferred on it.

88. Under the circumstances, it would be inequitable for AT&T MOBILITY, LLC to retain the benefit and thus, Plaintiff has suffered damages.

WHEREFORE, Plaintiff demands judgment against AT&T MOBILITY, LLC for compensatory damages, interest, and court costs and any other relief the Court deems just and proper.

## COUNT VI – PURE BILL OF DISCOVERY

89. Plaintiff re-alleges, restates, and incorporates the allegations contained in paragraphs one (1) through thirty-eight (38) above, and further alleges as follows:

90. This is an action for pure bill of discovery.

91. A pure bill of discovery may be used to identify potential defendants and theories of liability and to obtain information necessary for meeting a condition precedent to filing suit.

92. Plaintiff seeks to obtain information regarding AT&T MOBILITY, LLC's collection of Plaintiff's geolocation data and possible unauthorized dissemination to third-parties of the geolocation data collected from its consumers, including Plaintiff.

93. This information is material to determine proper parties against whom relief will and should be sought by subsequent legal action.

94. AT&T MOBILITY, LLC has admitted that it sells customer geolocation data to third-parties, including but not limited to data aggregators, who in turn, are able to use or resell the geolocation data with little or no oversight by AT&T MOBILITY, LLC.

95. AT&T MOBILITY, LLC is obligated to protect the confidential personal information of its customers, including Plaintiff.

96. FCA § 222(a) provides that "[e]very telecommunications carrier has a duty to protect the confidentiality of proprietary information of, and relating to . . . customers . . . ." The "confidential proprietary information" referred to in FCA § 222(a) is abbreviated herein as "CPI."

97. FCA § 222(c) additionally provides that "[e]xcept as required by law or with the approval of the customer, a telecommunications carrier that receives or obtains customer

proprietary network information by virtue of its provision of a telecommunications service shall only use, disclose, or permit access to individually identifiable customer proprietary network information in its provision of (A) the telecommunications service from which such information is derived, or (B) services necessary to, or used in, the provision of such telecommunications service, including the publishing of directories." The "customer proprietary network information" referred to in FCA § 222(c) is abbreviated herein as "CPNI."

98. FCA § 222(h)(1) (emphasis added) defines CPNI as "(A) information that relates to  the quantity, technical configuration, type, destination, **<u>location</u>**, and amount of use of a telecommunications service subscribed to by any customer of a telecommunications carrier, and that is made available to the carrier by the customer solely by virtue of the carrier-customer relationship; and (B) information contained in the bills pertaining to telephone exchange  service or telephone toll service received by a customer of a carrier, except that term does not include subscriber list information."

99. The Federal Communication Commissions ("FCC") has promulgated rules to implement FCA § 222 "to ensure that telecommunications carriers establish effective safeguards to protect against unauthorized use or disclosure of CPNI." *See* 47 CFR § 64.2001, *et seq*. ("CPNI Rules"); CPNI Order, 13 FCC Rcd. at 8195 ¶ 193.

100. The CPNI Rules limit disclosure and use of CPNI without customer approval to certain limited circumstances (such as cooperation with law enforcement), none of which are applicable to the facts here. CPNI Rules § 64.2005.

101. The CPNI Rules §§ 64.2009(b), (d), and (e) require carriers to implement safeguards to protect customers' CPNI.

102.    These safeguards include: (i) training personnel "as to when they are and are not authorized to use CPNI[;]" (ii) establishing "a supervisory review process regarding carrier compliance with the rules[;]" and (iii) filing annual compliance certificates with the FCC.

103.    The CPNI Rules § 64.2010 further require carriers to implement measures to prevent the disclosure of CPNI to unauthorized individuals. For example, "carriers must take reasonable measures to discover and protect against attempts to gain unauthorized access to CPNI." CPNI Rules § 64.2010(a).

104.    AT&T MOBILITY, LLC is in sole possession of the information requested and Plaintiff has no other way to obtain the information.

105.    In its Privacy Policy ("Privacy Policy") and Code of Business Conduct ("COBC"), AT&T MOBILITY, LLC acknowledges its responsibilities to protect customers' "Personal Information" under the FCA, the CPNI Rules, and other regulations.

106.    In its Privacy Policy and COBC, AT&T MOBILITY, LLC makes binding promises and commitments to Plaintiff and its customers, that it will protect and secure their "Personal Information." The Privacy Policy defines "Personal Information" as "[i]nformation that identifies or reasonably can be used to identify you." AT&T MOBILITY, LLC states that, included in the information that it collects from and about its customers, is its customers' "wireless device location." AT&T MOBILITY, LLC also collects information relating to the use of its networks, products, and services. "Personal Information" thus includes both CPI and CPNI under FCA § 222 and the CPNI Rules.

107.    In its Privacy Policy, AT&T MOBILITY, LLC promises that it takes its responsibility "to safeguard your [i.e., the customer's] Personal Information seriously" and that it will not share its customers' Personal Information except for legitimate business purposes.

108.    AT&T MOBILITY, LLC Privacy Policy further states that "we will not sell [users']

Personal Information to anyone, for any purpose. Period."

109.    AT&T MOBILITY, LLC further promises that it has numerous safeguards in place

to protect the Personal Information of its customers in its Privacy Policy and makes the

following promises to its customers:

> We've worked hard to protect your information. And we've
> established electronic and administrative safeguards
> designed to make the information we collect secure. Some
> examples of those safeguards include:
>
> • All of our employees are subject to the AT&T MOBILITY, LLC
>   Code of Business Conduct (COBC) and certain state-
>   mandated codes of conduct. Under the COBC, all employees
>   must follow the laws, rules, regulations, court and/or
>   administrative orders that apply to our business— including,
>   specifically, the legal requirements and company policies
>   surrounding the privacy of communications and the security
>   and privacy of your records. We take this seriously, and any
>   of our employees who fail to meet the standards we've set in
>   the COBC are subject to disciplinary action. That includes
>   dismissal.
>
> • We've implemented technology and security features and
>   strict policy guidelines to safeguard the privacy of your
>   Personal information. Some examples are:
>
>   o Maintaining and protecting the security of computer
>     storage and network equipment, and using our security
>     procedures that require employee user names and
>     passwords to access sensitive data;
>   o Applying encryption or other appropriate security controls
>     to protect Personal Information when stored or transmitted
>     by us;
>   o Limiting access to Personal Information to only those with
>     jobs requiring such access; and
>   o Requiring caller/online authentication before providing
>     Account Information so that only you or someone who
>     knows your Account Information will be able to access or
>     change this information.

110.    AT&T MOBILITY, LLC's COBC also makes binding commitments to Plaintiff as an

AT&T MOBILITY, LLC customer, that it will protect their Personal Information and that it will adhere to all of its legal obligations. Those legal obligations include FCA § 222, the CPNI Rules, and other legal obligations that govern protection of confidential and private information.

111.     The COBC also specifically promises that AT&T MOBILITY, LLC will "protect the privacy of our customers' communications" because "[n]ot only do our customers demand this, but the law requires it . . . . Maintaining the confidentiality of communication is, and always has been, a crucial part of our business."

112.     AT&T MOBILITY, LLC further promises in the COBC that it "protect[s] the information about our customers that they entrust to us." *Id.* Acknowledging that "AT&T MOBILITY, LLC possesses sensitive, detailed information about our customers, who rely on AT&T MOBILITY, LLC to safeguard that information" and that "[l]aws and regulations tell us how to treat such data," AT&T MOBILITY, LLC promises Plaintiff, as AT&T MOBILITY, LLC customers, that "[a]ny inappropriate use of confidential customer information violates our customers' trust and may also violate a law or regulation. *Id.* Preserving our customers' trust by safeguarding their private data is essential to our reputation." *Id.*

113.      On May 8, 2018, Senator Ron Wyden sent a letter ("the Wyden Letter") to AT&T MOBILITY, LLC President and CEO Randall L. Stephenson. In the letter, Senator Wyden expressed, in very clear terms, great concern with AT&T MOBILITY, LLC's handling of consumer information. It had come to Senator Wyden's attention that a company called Securus Technologies, a major provider of correctional-facility telephone services, purchased real-time location information from major wireless carriers, and provided that

information, via a self-service web portal, to the government "for nothing more than the legal equivalent of a pinky promise."

114.     In the Wyden Letter, Senator Wyden detailed how Securus confirmed to him that the web portal enabled surveillance of customers of "every major U.S. wireless carrier," which, in Senator Wyden's words, "needlessly exposes millions of Americans to potential abuse and unchecked surveillance by the government."

115.     Senator Wyden also explained how wireless carriers "are prohibited from sharing certain customer information, including location data, unless the carrier either has the customer's consent or sharing is otherwise required by law." He ultimately concluded that, "the fact that Securus provide[d] this service at all suggests that AT&T MOBILITY, LLC does not sufficiently control access to [its] customers' private information."

116.     The process by which Securus obtained access to the customers' information in the first place is part of the problem. It purchased real-time location information on AT&T MOBILITY, LLC's customers "through a third party location aggregator that has a commercial relationship with the major wireless carriers . . . ."

117.     In the Wyden Letter, Senator Wyden demanded that AT&T MOBILITY, LLC "undertake a comprehensive audit of each third party" with whom AT&T MOBILITY, LLC shared its customers' personal information, and "terminate [its] data-sharing relationships with all third parties that have misrepresented customer consent or abused their access to sensitive customer data.

118.     Six months later, on January 8, 2019, Motherboard (a news outlet) ran an investigative article ("the Article") concerning major telecommunications carriers (including AT&T MOBILITY, LLC) selling access to geolocation data to third-parties

(hereinafter "The Article")

119.     In the Article, the journalist gave a bounty hunter $300 to locate a cell phone. The bounty hunter did just that using "real-time location data sold to bounty hunters that ultimately originated from the major [telecommunications carriers].

120.     The Article revealed that a company called MicroBilt was selling cell phone geolocation services with little oversight to a spread of different private industries, "ranging from car salesmen and property managers to bail bondsmen and bounty hunters . . . ." Additionally, this "spying capability is also being resold to others on the black market who are not licensed by the company to use it . . . seemingly without MicroBilt's knowledge."

121.     Motherboard's investigation revealed that "a wide variety of companies can access cell phone location data, and . . . the information trickles down from cell phone providers to a wide array of smaller players, who don't necessarily have the correct safeguards in place to protect that data."

122.     Motherboard found that some of the location aggregators were so sloppy that "anyone could geolocate nearly any phone in the United States at a click of a mouse."

123.     In response to a request for comment, AT&T MOBILITY, LLC told Motherboard that use of its customers' data by bounty hunters "would violate [its] contract and Privacy Policy."

124.     The telecommunications carriers are the beginning of a dizzying chain of data selling, where data goes from company to company, and ultimately ends up in the hands of literally anybody who is looking.

125.     The information a person could obtain included the name and address of an

individual, and the geolocation of that individual's cell phone.

126.     One of the data aggregators with whom AT&T MOBILITY, LLC contracted is called
MicroBilt.

127.     MicroBilt was engaged in the process of selling consumer data to literally anybody
who would pay for it, including the name and address of an individual, and the geolocation
of that individual's cell phone. Some of the sectors that utilized MicroBilt's services were
landlords, car salesmen, and others conducting credit checks.

128.     In essence, AT&T MOBILITY, LLC was relying on the end user of the location data
not to abuse the data, or not to obtain the data under false pretenses. In practice, the end
users exercised no oversight over the process whatsoever.

129.     On March 26, 2019, the FTC issued an order to AT&T MOBILITY, LLC, among
others, seeking information the agency will use to examine how it collects, retains, uses,
and discloses information about consumers and their devices.

130.     AT&T MOBILITY, LLC is a telecommunications common carrier engaged in
interstate commerce by wire regulated by the FCA and subject to the requirements, *inter
alia,* of §§ 206 and 222 of the FCA.

131.     FCA § 222(a) requires every telecommunications carrier to protect, among other
things, its customers' CPI.

132.     FCA § 222(c) further requires every telecommunications carrier to protect, among
other things, its customers' CPNI.

133.     Plaintiff believes the information disclosed by AT&T MOBILITY, LLC to third-
parties, including but not limited to data aggregators, without consent was CPI and CPNI
under FCA § 222 is unlawful. AT&T MOBILITY, LLC may have  failed to protect the

confidentiality of Plaintiff's CPI and CPNI including their wireless telephone numbers, account information, private communications, and location, by divulging that information to third-parties, including but not limited to data aggregators.

134.     There is no way for Plaintiff to determine whether AT&T MOBILITY, LLC violated its own privacy policy via its customer service line or any possibly application on its customer service website without filing this action.

135.     Plaintiffs seeks a pure bill of discovery to determine if AT&T MOBILITY, LLC violated either Florida or Federal law.

WHEREFORE, Plaintiff respectfully requests that this Court:

A.  Direct AT&T Mobility, LLC to produce to Plaintiff any information, but not limited to, the following:

(1) Any code of business ethics in effect when Plaintiff became a customer of AT&T MOBILITY, LLC;

(2)  Any contract or agreement between AT&T MOBILITY, LLC or its affiliates and Microbilt during Plaintiff's time as a customer;

(3) Any contract between AT&T MOBILITY, LLC or its affiliates and TechnoCom Corporation d/b/a LocationSmart in effect during Plaintiff's time as an AT&T MOBILITY, LLC customer;

(4) Any contract between AT&T MOBILITY, LLC or its affiliates and Zumigo during Plaintiff's time as an AT&T MOBILITY, LLC customer;

(5) Between January 2016 and May 2019, the five reviews or audits of its disclosure of customer location information to third parties conducted by AT&T MOBILITY, LLC or its affiliates;

(6) Any written policies and procedures in place regarding safeguarding customer proprietary network information (referred to as "CPNI"), including Plaintiff's;

 (7) Any written policies and procedures in place regarding safeguarding the confidential proprietary information," including Plaintiff's;

(8) Any specific information regarding Plaintiff's location data maintained by AT&T MOBILITY, LLC or its affiliates and whether said data was improperly sold or divulged to anyone improperly, including data aggregators;

B.  Any such further relief as the Honorable Court may deem just and proper;

## **CERTIFICATE OF SERVICE**

WE HEREBY CERTIFY that a true and correct copy of the foregoing was sent via e-portal this 10th of December, 2021 to: Manuel A. Garcia-Linares, Esquire (mgarcialinares@daypitney.com,                          brodriguez@daypitney.com, jsolorzano@daypitney.com) Andrew R. Ingalls, Esquire (aingalls@daypitney.com) Day Pitney LLP, 396 Alhambra Circle, North Tower - 14th Floor, Miami, Florida 33134.

Beighley, Myrick, Udell & Lynne, PA
Attorneys for Plaintiff
150 West Flagler Street
Suite 1800
Miami, FL 33130
(305) 349-3930 – Phone


By:     _/s/  Maury L. Udell_____
Maury L. Udell, Esquire
mudell@bmulaw.com
Fla. Bar 121673

IN THE COUNTY COURT OF THE 11TH
JUDICIAL CIRCUIT IN AND FOR MIAMI-
DADE COUNTY, FLORIDA

SHARON ORR                                   CASE NO.: 2020-008179-SP-26

      Plaintiff,                             BAR NO.: 121673

v.

AT&T Mobility, LLC,

      Defendant.

_____/

## AMENDED SMALL CLAIMS COMPLAINT

Plaintiff, Sharon Orr through her undersigned counsel, hereby files this Amended Small Claims Complaint in support of her claim against Defendant, AT&T, Mobility, LLC ("AT&T MOBILITY, LLC"), and further alleges as follows:

## GENERAL ALLEGATIONS

1. This is an action against AT&T for damages for $8,000, exclusive of interest, attorney's fees, and costs.

2. Plaintiff is a customer of AT&T with redacted account number xxxxx2009492.

3. AT&T MOBILITY, LLC is a foreign limited liability company licensed and doing business in Miami-Dade County, Florida subject to the general and specific jurisdiction of this Court.

4. Venue is proper in Miami-Dade County, Florida.

5. Plaintiff has complied with all statutory and/or contractual conditions precedent to filing this action.

6. According to court filings made by AT&T MOBILITY, LLC in federal court, it is a nongovernmental limited liability company that has no parent company but its members

are BellSouth Mobile Data, Inc.; SBC Long Distance, LLC; and SBC Tower Holdings LLC. Those entities (and thus AT&T MOBILITY, LLC) are all indirectly wholly owned by AT&T Inc., which is the only publicly held company with a 10 percent or greater ownership stake in them.

7.  AT&T, Inc. reports its consolidated business results, and breaks out selected disclosures for its major operating segments. Their segments are strategic business units that offer different products and services over various technology platforms and/or in different geographies that are managed accordingly. They analyze the operating segments based on segment contribution, which consists of operating income, excluding acquisition-related costs and other significant items, and equity in net income (loss) of affiliates for investments managed within each operating segment.

8.  There are four reportable segments of AT&T, Inc.: (1) Communications, (2) Warner Media, (3) Latin America and (4) Xandr. AT&T MOBILITY, LLC is a major retailer of smartphones and provider of wireless broadband internet access service for smartphones.

9.  Smartphone owners use mobile data for, including but not limited to, sending and receiving email, using GPS navigation, watching and streaming video, and browsing the internet. AT&T is a major retailer of smartphones and provider of wireless broadband internet access service for smartphones ("mobile data"). Smartphone owners use mobile data for, including but not limited to, sending and receiving email, using GPS navigation, watching and streaming video, and browsing the internet.

10. AT&T MOBILITY, LLC's place in AT&T Inc corporate structure can be identified as follows:



11. The Communications segment provides wireless and wireline telecom, video and broadband services to consumers located in the U.S. or in U.S. territories and businesses globally. Our Communications services and products are marketed under the AT&T, Cricket, AT&T PREPAID and DIRECTV brand names. The Communications segment provided approximately 84% of 2018 segment operating revenues and 84% of our 2018 total segment contribution. This segment contains the Mobility, Entertainment Group and Business Wireline business units.

12. Within Communications is the Mobility business unit that provides nationwide wireless

services to consumers and wholesale and resale wireless subscribers located in the United States or U.S. territories by utilizing our network to provide voice and data services, including high-speed internet over wireless devices. They classify subscribers as either postpaid, prepaid, connected device or reseller. As of December 31, 2018, they served 153 million Mobility subscribers, including 77 million postpaid, 17 million prepaid, 8 million reseller and 51 million connected devices. Their Mobility business unit revenue includes (2) reported categories: Wireless Services, and Equipment.

13. AT&T MOBILITY, LLC offers a range of nationwide wireless voice and data communications services in a variety of pricing plans to meet the communications needs of targeted customer categories. Their wireless services also include advertising revenues generated from the subscriber relationships.  They offer plans that include unlimited features allowing for the sharing of voice, text and data across multiple devices, which attracts subscribers from other providers and minimize subscriber churn. The churn rate, also known as the rate of attrition or customer churn, is the rate at which customers stop doing business with an entity within a given time period.

14. Customers in the "connected device" category (e.g., users of session-based tablets, monitoring devices and automobile systems) generally purchase those devices from third-party suppliers that buy data access supported by our network. They also offer nationwide wireless voice and data communications to certain customers who prefer to pay in advance. These services are offered under the Cricket and AT&T PREPAID brands and are typically monthly prepaid services.

15. AT&T Mobility, LLC sells a wide variety of handsets, wirelessly enabled computers (e.g., tablets and notebooks) and wireless data cards manufactured by various suppliers for

use with our voice and data services. They also sell accessories, such as carrying cases and hands-free devices. They sell through their own company-owned stores, agents and third-party retail stores. Like other wireless service providers, they have historically provided postpaid contract subscribers substantial equipment subsidies to initiate, renew or upgrade service.

16. AT&T MOBILITY, LLC prominently advertises particular flat monthly rates for its post-paid wireless service plans. Then, after customers sign up, AT&T MOBILITY, LLC actually charges higher monthly rates than the customers were promised and agreed to pay. AT&T MOBILITY, LLC covertly increases the actual price by padding all post-paid wireless customers' bills each month with a bogus so-called "Administrative Fee" (currently $1.99 every month for each phone line) on top of the advertised price.

17. The Administrative Fee is not properly disclosed to customers before or when they sign up, and in fact it is never adequately and honestly disclosed. The so-called Administrative Fee is not, in fact, a bona fide administrative fee, but rather is simply a means for AT&T MOBILITY, LLC to charge more per month for the service itself without having to advertise the higher prices as a scheme to increase revenue.

18. Making matters worse, AT&T MOBILITY, LLC deliberately hides the Administrative Fee in its billing statements. In AT&T MOBILITY, LLC's printed monthly billing statements, AT&T MOBILITY, LLC intentionally buries the Administrative Fee in a portion of the statement that: (a) makes it likely customers will not notice it; and (b) misleadingly suggests that the Administrative Fee is akin to a tax or another standard government pass-through fee, when in fact it is simply a way for AT&T MOBILITY, LLC to advertise and promise lower rates than it actually charges.

19. There is no description of the administrative fee on Plaintiff's bill.  Such a description fails to constitute an adequate disclosure of the Administrative Fee, and it serves to further AT&T MOBILITY, LLC's deceptive scheme by suggesting that the Administrative Fee is tied to certain costs associated with AT&T MOBILITY, LLC providing wireless telephone services (interconnect charges and cell site rental charges). Assuming this description was accurate, it would merely reinforce that this undisclosed fee should be included in the advertised monthly price for the service because those are basic costs of providing wireless service itself, and thus a reasonable consumer would expect those costs to be included in the advertised price for the service.

20. Moreover, the administrative fee is not, in fact, tied to the costs that AT&T MOBILITY, LLC's buried description suggests. This is corroborated by the fact that AT&T has repeatedly increased the amount of the monthly Administrative Fee since the fee was first imposed, while during that same time period the stated "costs" for (i.e., interconnect charges and cell site rental charges) have actually *decreased* according to AT&T's own financial statements and public filings with the Securities and Exchange Commission.

21. AT&T imposed and increased the Administrative Fee that it charged, not, as AT&T MOBILITY, LLC misleadingly stated in its buried description, in response to cell site rental and maintenance costs or interconnectivity costs, which AT&T MOBILITY, LLC's financial statements show have gone down at the same time AT&T MOBILITY, LLC has significantly increased the amount of the fee.

22. Thus, by AT&T MOBILITY, LLC's own design, the printed monthly statements serve to further AT&T MOBILITY, LLC's scheme and keep customers from realizing they are being deceived and thus overcharged.  Such a deceptive practice is AT&T's misrepresentation

of why a fee is being charged and where the money for the fee is being transferred to, if anywhere.  AT&T Mobility, LLC chose the descriptive terms and if they do not accurately describe what is being charged and collected, such conduct is actionable under the FDUTPA.

23. AT&T MOBILITY, LLC imposed and has increased the Administrative Fee as a covert way to increase customers' monthly rates without having to advertise such higher rates. AT&T MOBILITY, LLC increased the Administrative Fee in large part to fund unrelated corporate liabilities of its parent company AT&T Inc., including to pay down the debt incurred in connection with the acquisition of Time Warner Inc. in 2018.

24. In all events, AT&T MOBILITY, LLC should clearly disclose the Administrative Fee and should clearly and accurately state the true monthly prices for its post-paid wireless service plans in its price representations and advertising.

25. Since the Administrative Fee was first introduced in 2013, AT&T MOBILITY, LLC has increased the amount of the fee three times, including twice over a three-month period in 2018. The current amount that AT&T MOBILITY, LLC charges all post-paid wireless customers for this fee is $1.99 per line every month, i.e., more than 200% more than the original amount of the fee, including Plaintiff.

26. AT&T MOBILITY, LLC has used this Administrative Fee scheme to improperly squeeze consumers for hundreds of millions of dollars in additional revenue without disclosing the actual "increased costs" in any financial filing available to any customer, including Plaintiff.

27. In essence, AT&T MOBILITY, LLC introduced the bogus Administrative Fee as a way to covertly increase the actual monthly price customers are charged for their service, and then has continued to use the Administrative Fee and unilateral increases thereto as a

lever by which AT&T MOBILITY, LLC continues to ratchet up the price without the customer realizing and after the customer is already committed.

28. This scheme has enabled, and continues to enable, AT&T MOBILITY, LLC to effectively increase its rates without having to publicly announce those higher rates, and allows AT&T MOBILITY, LLC to entice more customers by misrepresenting the costs customers would pay both in absolute terms and relative to other wireless providers in the industry.

29. AT&T MOBILITY, LLC has stated that it charges the administrative fee because it is a "standard administrative fee" across the wireless industry.  However, in 2017, T-Mobile eliminated the "administrative charges".  Moreover, prepaid carriers like MetroPCS and AT&T's subsidiary Cricket Wireless do not charge administrative fees.

## COUNT I - FRAUD

30. Plaintiff re-alleges, restates, and incorporates the allegations contained in paragraphs one (1) through thirty-eight (38) above, and further alleges as follows:

31. By virtue of its advertisement of unlimited data to Plaintiff for a set price, AT&T MOBILITY, LLC undertook the duty to disclose material information and disclose its data management plan along with its billing practices to Plaintiff so that Plaintiff would receive unlimited data at a set price.

32. Moreover, AT&T MOBILITY, LLC's representations on its bills to Plaintiff and the definition Plaintiff obtained on AT&T MOBILITY, LLC's website regarding the administrative fee charged on the account were false statements of material fact.  AT&T MOBILITY, LLC's representation that the  Administrative Fee is a charge assessed by AT&T MOBILITY, LLC that helps defray a portion of certain expenses AT&T MOBILITY, LLC incurs, including but not limited to: (a) charges AT&T MOBILITY, LLC or its agents pay to

interconnect with other carriers to deliver calls from AT&T MOBILITY, LLC customers to their customers; and (b) charges associated with cell site rents and maintenance" are false.

33. AT&T MOBILITY, LLC knew or should have known that the representations all identified above were false as AT&T MOBILITY, LLC's cost in interconnect charges and cell site charges actually decreased.

34. AT&T MOBILITY, LLC intended that the representations above caused Plaintiff to continue as a customer with AT&T MOBILITY, LLC and otherwise pay the administrative fee to maintain an account with AT&T MOBILITY, LLC.

35. Plaintiff has suffered damages in justifiable reliance on the representations above including but not limited to the payment for bogus administrative fees on a monthly basis.

   WHEREFORE, Plaintiff respectfully requests that this Court grant judgment in its favor and against AT&T MOBILITY, LLC for compensatory damages, nominal damages, interest, court costs, and any other relief the Court deems just and proper.

## COUNT II - DAMAGES UNDER THE FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT

36. Plaintiff re-alleges, restates, and incorporates the allegations contained in paragraphs one (1) through twenty-nine (29) above, and further alleges as follows:

37. Plaintiff, at all material times, was a consumer, as defined under the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), § 501.201, *et seq*., Fla. Stat.

38. AT&T MOBILITY, LLC, at all material times, was engaged in trade or commerce, as defined under the FDUTPA and is not otherwise exempt.

39. Furthermore, in the advertising, sale, and renewal of mobile data and wireless plans and acceptance of payments, AT&T MOBILITY, LLC has represented, directly or indirectly,

expressly or by implication, to customers that it would be charged a certain amount. AT&T MOBILITY, LLC has since added an "Administrative Fee" to Plaintiff's bill which is unfair and deceptive as it is not what its being used for despite its definition in the wireless agreement. The administrative fee is a textbook pass through-fee. AT&T chose the descriptive terms of the administrative fee that does not accurately describe what is being charged and collected, such conduct is actionable under the FDUTPA.

40. Since the Administrative Fee was first imposed in 2013, AT&T MOBILITY, LLC has unilaterally increased the monthly amount of the fee three times. AT&T MOBILITY, LLC increased the Administrative Fee to $0.76 per month per phone line starting in June 2016. Then, in 2018, the increases because larger and more frequent (around the same time AT&T MOBILITY, LLC's parent company incurred significant debt in acquiring Time Warner Inc.).

41. AT&T MOBILITY, LLC raised the Administrative Fee to $1.26 per month per phone line starting in April 2018, and then again to $1.99 per month per phone line starting in June 2018, which is the current monthly fee as of this filing. Thus, between March 2018 and June 2018 alone, AT&T MOBILITY, LLC increased the Administrative Fee a whopping 162% increase in just three months.

42. AT&T MOBILITY, LLC's representations on its bills to Plaintiff and it its website regarding the administrative fee charged are deceptive and in fact misrepresent the truth.  AT&T MOBILITY, LLC's representation that the Administrative Fee is a charge assessed by AT&T MOBILITY, LLC that helps defray a portion of certain expenses AT&T MOBILITY, LLC incurs, including but not limited to: (a) charges AT&T MOBILITY, LLC or its agents pay to interconnect with other carriers to deliver calls from AT&T MOBILITY, LLC

customers to their customers; and (b) charges associated with cell site rents and maintenance is false.  The administrative fee is instead a scheme to funnel direct profit to AT&T MOBILITY, LLC rather than pay for any identifiable increase in costs.

43. AT&T MOBILITY, LLC knew or should have known that the representations regarding the administrative fee are false as AT&T MOBILITY, LLC's cost in interconnect charges and cell site charges actually decreased based on its own SEC federal filings.  AT&T MOBILITY, LLC knew that the monthly administrative fee was inflated, and not the result of good faith financial practices but instead designed to raise profit for the company without a specific actual change in price for services. Such a practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers, including Plaintiff.

44. AT&T MOBILITY, LLC's knowingly unfair or deceptive trade practices of assessing and collecting a bogus administrative fee are the proximate cause of Plaintiff's 's actual damages.

45. AT&T MOBILITY, LLC's unfair and deceptive trade practice is not a result of a bona fide error or mistake but instead a conscious decision by AT&T MOBILITY, LLC.

46. Plaintiff has retained the undersigned to represent it in this action and pay a reasonable fee for said legal services.

WHEREFORE, Plaintiff respectfully requests that this Court grant judgment in its favor and against AT&T MOBILITY, LLC for damages, interest, court costs, attorney's fees pursuant to §501.2105, Florida Statutes, and any other relief the Court deems just and proper.

**COUNT III – ACTION FOR DECLARATORY AND/OR INJUNCTIVE RELIEF
UNDER FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT
("FDUTPA") – BOGUS ADMINISTRATIVE FEE**

47. Plaintiff re-alleges, restates, and incorporates the allegations contained in paragraphs one (1) through twenty-nine (29) above, and further alleges as follows:

48. Under the FDUTPA, without regard to any other remedy or relief to which a person is entitled, anyone aggrieved by a violation of this part may bring an action to obtain a declaratory judgment that an act or practice violates this part and to enjoin a person who has violated, is violating, or is otherwise likely to violate 501.201 et. seq.  See Fla. Stat. §501.211(1).

49. Pursuant to Defendant's above described acts or practices of placing a bogus administrative fee on Plaintiff's account, Defendant violated the FDUTPA.

50. Plaintiff seeks a declaratory judgment that Defendant's acts or practices have violated the FDUTPA.

51. Plaintiff seeks to determine whether the FDUTPA prohibits Defendant from continuing to apply the bogus administrative fee which is likely to occur in the future.

52. There is a bona fide dispute between the parties. Plaintiff has a justiciable question as to the existence or non-existence of some right, status, immunity, power, or privilege, or some fact upon which their claim  may depend.

53. Plaintiff is in doubt as to the right of Defendant to continue to charge an unlawful fee which violates FDUTPA.

54. There is a bona fide, actual, and present need for the declaration.

55. Plaintiff has retained the undersigned to represent it in this action and pay a reasonable fee for said legal services.

WHEREFORE, Plaintiff  respectfully requests that this Court grant declaratory judgment and/or injunctive relief in its favor and against Defendant, court costs, attorney's fees pursuant to Section 501.2105, Florida Statutes, and any other relief the Court deems just and proper.

## COUNT IV – UNJUST ENRICHMENT

56. Plaintiff re-alleges, restates, and incorporates the allegations contained in paragraphs one (1) through twenty-nine (29) above, and further alleges as follows:

57. AT&T MOBILITY, LLC assessed improper increased charges of $1.99/month administrative fee on Plaintiff's account.

58. AT&T MOBILITY, LLC has stated that "The Administrative Fee is a charge assessed by AT&T MOBILITY, LLC that helps defray a portion of certain expenses AT&T MOBILITY, LLC incurs, including but not limited to: (a) charges AT&T MOBILITY, LLC or its agents pay to interconnect with other carriers to deliver calls from AT&T MOBILITY, LLC customers to their customers; and (b) charges associated with cell site rents and maintenance. It is not a tax or charge which the government requires AT&T MOBILITY, LLC to collect from its customers.

59. In June of 2018, AT&T MOBILITY, LLC increased its "administrative fee" to $1.99/per, per month with no specific reason or allegation that AT&T MOBILITY, LLC's costs had changed.

60. AT&T MOBILITY, LLC knew the monthly administrative fee was inflated and not the result of good faith financial practices and instead a deceptive fee.  In essence this administrative fee is a textbook pass-through fee designed to increase profits of the company without increasing the advertised price of the services to Plaintiff.

61. AT&T MOBILITY, LLC had knowledge of payments by Plaintiff and voluntarily accepted and retained the benefit conferred on it.

62. Under the circumstances, it would be inequitable for AT&T MOBILITY, LLC to retain the benefit and thus, Plaintiff has suffered damages.

WHEREFORE, Plaintiff demands judgment against AT&T MOBILITY, LLC for compensatory damages, interest, and court costs and any other relief the Court deems just and proper.

## <u>COUNT V – PURE BILL OF DISCOVERY</u>

63. Plaintiff re-alleges, restates, and incorporates the allegations contained in paragraphs one (1) through twenty-nine (29) above, and further alleges as follows:

64. This is an action for pure bill of discovery.

65. A pure bill of discovery may be used to identify potential defendants and theories of liability and to obtain information necessary for meeting a condition precedent to filing suit.

66. Plaintiff seeks to obtain information regarding AT&T MOBILITY, LLC's collection of geolocation data and the unauthorized dissemination to third-parties of the geolocation data collected from its consumers.

67. This information is material to determine proper parties against whom relief will and should be sought by subsequent legal action.

68. AT&T MOBILITY, LLC admittedly sells customer geolocation data to third-parties, including but not limited to data aggregators, who in turn, are able to use or resell the geolocation data with little or no oversight by AT&T MOBILITY, LLC.

69. AT&T MOBILITY, LLC is obligated to protect the confidential personal information of its

customers, including plaintiff.

70. FCA § 222(a) provides that "[e]very telecommunications carrier has a duty to protect the confidentiality of proprietary information of, and relating to . . . customers . . . ." The "confidential proprietary information" referred to in FCA § 222(a) is abbreviated herein as "CPI."

71. FCA § 222(c) additionally provides that "[e]xcept as required by law or with the approval of the customer, a telecommunications carrier that receives or obtains customer proprietary network information by virtue of its provision of a telecommunications service shall only use, disclose, or permit access to individually identifiable customer proprietary network information in its provision of (A) the telecommunications service from which such information is derived, or (B) services necessary to, or used in, the provision of such telecommunications service, including the publishing of directories." The "customer proprietary network information" referred to in FCA § 222(c) is abbreviated herein as "CPNI."

72. FCA § 222(h)(1) (emphasis added) defines CPNI as "(A) information that relates to  the quantity, technical configuration, type, destination, **location**, and amount of use of a telecommunications service subscribed to by any customer of a telecommunications carrier, and that is made available to the carrier by the customer solely by virtue of the carrier-customer relationship; and (B) information contained in the bills pertaining to telephone exchange  service or telephone toll service received by a customer of a carrier, except that term does not include subscriber list information."

73. The Federal Communication Commissions ("FCC") has promulgated rules to implement FCA § 222 "to ensure that telecommunications carriers establish effective safeguards to

protect against unauthorized use or disclosure of CPNI." *See* 47 CFR § 64.2001, *et seq.* ("CPNI Rules"); CPNI Order, 13 FCC Rcd. at 8195 ¶ 193.

74. The CPNI Rules limit disclosure and use of CPNI without customer approval to certain limited circumstances (such as cooperation with law enforcement), none of which are applicable to the facts here. CPNI Rules § 64.2005.

75. The CPNI Rules §§ 64.2009(b), (d), and (e) require carriers to implement safeguards to protect customers' CPNI.

76. These safeguards include: (i) training personnel "as to when they are and are not authorized to use CPNI[;]" (ii) establishing "a supervisory review process regarding carrier compliance with the rules[;]" and (iii) filing annual compliance certificates with the FCC.

77. The CPNI Rules § 64.2010 further require carriers to implement measures to prevent the disclosure of CPNI to unauthorized individuals. For example, "carriers must take reasonable measures to discover and protect against attempts to gain unauthorized access to CPNI." CPNI Rules § 64.2010(a).

78. AT&T MOBILITY, LLC is in sole possession of the information requested.

79. In its Privacy Policy ("Privacy Policy") and Code of Business Conduct ("COBC"), AT&T MOBILITY, LLC acknowledges its responsibilities to protect customers' "Personal Information" under the FCA, the CPNI Rules, and other regulations.

80. In its Privacy Policy and COBC, AT&T MOBILITY, LLC makes binding promises and commitments to Plaintiff and its customers, that it will protect and secure their "Personal Information." The Privacy Policy defines "Personal Information" as "[i]nformation that identifies or reasonably can be used to identify you." AT&T MOBILITY, LLC states that, included in the information that it collects from and about its customers, is its customers'

"wireless device location." AT&T MOBILITY, LLC also collects information relating to the use of its networks, products, and services. "Personal Information" thus includes both CPI and CPNI under FCA § 222 and the CPNI Rules.

81. In its Privacy Policy, AT&T MOBILITY, LLC promises that it takes its responsibility "to safeguard your [i.e., the customer's] Personal Information seriously" and that it will not share its customers' Personal Information except for legitimate business purposes.

82. AT&T MOBILITY, LLC Privacy Policy further states that "we will not sell [users'] Personal Information to anyone, for any purpose. Period."

83. AT&T MOBILITY, LLC further promises that it has numerous safeguards in place to protect the Personal Information of its customers in its Privacy Policy and makes the following promises to its customers:

> We've worked hard to protect your information. And we've established electronic and administrative safeguards designed to make the information we collect secure. Some examples of those safeguards include:
>
> - All of our employees are subject to the AT&T MOBILITY, LLC Code of Business Conduct (COBC) and certain state-mandated codes of conduct. Under the COBC, all employees must follow the laws, rules, regulations, court and/or administrative orders that apply to our business— including, specifically, the legal requirements and company policies surrounding the privacy of communications and the security and privacy of your records. We take this seriously, and any of our employees who fail to meet the standards we've set in the COBC are subject to disciplinary action. That includes dismissal.
>
> - We've implemented technology and security features and strict policy guidelines to safeguard the privacy of your Personal information. Some examples are:
>
>   - Maintaining and protecting the security of computer storage and network equipment, and using our security procedures that require employee user names and passwords to access sensitive data;

- o Applying encryption or other appropriate security controls to protect Personal Information when stored or transmitted by us;
- o Limiting access to Personal Information to only those with jobs requiring such access; and
- o Requiring caller/online authentication before providing Account Information so that only you or someone who knows your Account Information will be able to access or change this information.

84. AT&T MOBILITY, LLC's COBC also makes binding commitments to Plaintiff as AT&T MOBILITY, LLC customers, that it will protect their Personal Information and that it will adhere to all of its legal obligations. Those legal obligations include FCA § 222, the CPNI Rules, and other legal obligations that govern protection of confidential and private information.

85. The COBC also specifically promises that AT&T MOBILITY, LLC will "protect the privacy of our customers' communications" because "[n]ot only do our customers demand this, but the law requires it . . . . Maintaining the confidentiality of communication is, and always has been, a crucial part of our business."

86. AT&T MOBILITY, LLC further promises in the COBC that it "protect[s] the information about our customers that they entrust to us." *Id.* Acknowledging that "AT&T MOBILITY, LLC possesses sensitive, detailed information about our customers, who rely on AT&T MOBILITY, LLC to safeguard that information" and that "[l]aws and regulations tell us how to treat such data," AT&T MOBILITY, LLC promises Plaintiff, as AT&T MOBILITY, LLC customers, that "[a]ny inappropriate use of confidential customer information violates our customers' trust and may also violate a law or regulation. *Id.* Preserving our customers' trust by safeguarding their private data is essential to our reputation." *Id.*

87. On May 8, 2018, Senator Ron Wyden sent a letter ("the Wyden Letter") to AT&T

MOBILITY, LLC President and CEO Randall L. Stephenson. In the etter, Senator Wyden expressed, in very clear terms, great concern with AT&T MOBILITY, LLC's handling of consumer information. It had come to Senator Wyden's attention that a company called Securus Technologies, a major provider of correctional-facility telephone services, purchased real-time location information from major wireless carriers, and provided that information, via a self-service web portal, to the government "for nothing more than the legal equivalent of a pinky promise."

88. In the Wyden Letter, Senator Wyden detailed how Securus confirmed to him that the web portal enabled surveillance of customers of "every major U.S. wireless carrier," which, in Senator Wyden's words, "needlessly exposes millions of Americans to potential abuse and unchecked surveillance by the government."

89. Senator Wyden also explained how wireless carriers "are prohibited from sharing certain customer information, including location data, unless the carrier either has the customer's consent or sharing is otherwise required by law." He ultimately concluded that, "the fact that Securus provide[d] this service at all suggests that AT&T MOBILITY, LLC does not sufficiently control access to [its] customers' private information."

90. The process by which Securus obtained access to the customers' information in the first place is part of the problem. It purchased real-time location information on AT&T MOBILITY, LLC's customers "through a third party location aggregator that has a commercial relationship with the major wireless carriers . . . ."

91. In the Wyden Letter, Senator Wyden demanded that AT&T MOBILITY, LLC "undertake a comprehensive audit of each third party" with whom AT&T MOBILITY, LLC shared its customers' personal information, and "terminate [its] data-sharing relationships with all

third parties that have misrepresented customer consent or abused their access to sensitive customer data.

92. Six months later, on January 8, 2019, Motherboard (a news outlet) ran an investigative article ("the Article") concerning major telecommunications carriers (including AT&T MOBILITY, LLC) selling access to geolocation data to third-parties (hereinafter "The Article")

93. In the Article, the journalist gave a bounty hunter $300 to locate a cell phone. The bounty hunter did just that using "real-time location data sold to bounty hunters that ultimately originated from the major [telecommunications carriers].

94. The Article revealed that a company called MicroBilt was selling cell phone geolocation services with little oversight to a spread of different private industries, "ranging from car salesmen and property managers to bail bondsmen and bounty hunters . . . ." Additionally, this "spying capability is also being resold to others on the black market who are not licensed by the company to use it . . . seemingly without MicroBilt's knowledge."

95. Motherboard's investigation revealed that "a wide variety of companies can access cell phone location data, and . . . the information trickles down from cell phone providers to a wide array of smaller players, who don't necessarily have the correct safeguards in place to protect that data."

96. Motherboard found that some of the location aggregators were so sloppy that "anyone could geolocate nearly any phone in the United States at a click of a mouse."

97. In response to a request for comment, AT&T MOBILITY, LLC told Motherboard that use of its customers' data by bounty hunters "would violate [its] contract and Privacy Policy."

98. The telecommunications carriers are the beginning of a dizzying chain of data selling,

where data goes from company to company, and ultimately ends up in the hands of literally anybody who is looking.

99. The information a person could obtain included the name and address of an individual, and the geolocation of that individual's cell phone.

100.   One of the data aggregators with whom AT&T MOBILITY, LLC contracted is called MicroBilt.

101.   MicroBilt was engaged in the process of selling consumer data to literally anybody who would pay for it, including the name and address of an individual, and the geolocation of that individual's cell phone. Some of the sectors that utilized MicroBilt's services were landlords, car salesmen, and others conducting credit checks.

102.   In essence, AT&T MOBILITY, LLC was relying on the end user of the location data not to abuse the data, or not to obtain the data under false pretenses. In practice, the end users exercised no oversight over the process whatsoever.

103.   On March 26, 2019, the FTC issued an order to AT&T MOBILITY, LLC, among others, seeking information the agency will use to examine how it collects, retains, uses, and discloses information about consumers and their devices.

104.   AT&T MOBILITY, LLC is a telecommunications common carrier engaged in interstate commerce by wire regulated by the FCA and subject to the requirements, *inter alia,* of §§ 206 and 222 of the FCA.

105.   FCA § 222(a) requires every telecommunications carrier to protect, among other things, its customers' CPI.

106.   FCA § 222(c) further requires every telecommunications carrier to protect, among other things, its customers' CPNI.

107.     Plaintiff believes the information disclosed by AT&T MOBILITY, LLC to third-parties, including but not limited to data aggregators, without consent was CPI and CPNI under FCA § 222 is unlawful. AT&T MOBILITY, LLC may have failed to protect the confidentiality of Plaintiff's CPI and CPNI including their wireless telephone numbers, account information, private communications, and location, by divulging that information to third-parties, including but not limited to data aggregators.

108.     There is no way for Plaintiff to determine whether AT&T MOBILITY, LLC violated its own privacy policy via its customer service line or any possibly application on its customer service website.

109.     Plaintiffs seeks a pure bill of discovery to determine if AT&T MOBILITY, LLC violated either Florida or Federal law.

WHEREFORE, Plaintiff respectfully requests that this Court:

A.  Direct AT&T Mobility, LLC to produce to Plaintiff any information, but not limited to, the following: (1) Any code of business ethics in effect when Plaintiff became a customer of AT&T;(2) Any contract or agreement between AT&T and Microbilt during Plaintiff's time as a customer; (3)Any contract between AT&T and TechnoCom Corporation d/b/a LocationSmart in effect during Plaintiff's time as an AT&T customer; (4) Any contract between AT&T and Zumigo during Plaintiff's time as an AT&T customer. (5). Between January 2016 and May 2019, the five reviews or audits of its disclosure of customer location information to third parties conducted by AT&T (6). Any written policies and procedures in place regarding safeguarding customer proprietary network information (referred to as "CPNI") (7) Any written policies and procedures in place regarding safeguarding the confidential proprietary information"

(referred to as "CPI.") (8) Any specific information regarding Plaintiff's location data maintained by AT&T and whether said data was improperly sold or divulged to data aggregators;

B.  Any such further relief as the Honorable Court may deem just and proper;

## <u>CERTIFICATE OF SERVICE</u>

WE HEREBY CERTIFY that a true and correct copy of the foregoing was sent via e-portal this July 14th, 2021 to: Manuel A. Garcia-Linares, Esquire (mgarcialinares@daypitney.com, brodriguez@daypitney.com, jsolorzano@daypitney.com) Andrew R. Ingalls, Esquire (aingalls@daypitney.com) Day Pitney LLP, 396 Alhambra Circle, North Tower - 14th Floor, Miami, Florida 33134.

Beighley, Myrick, Udell & Lynne, PA
Attorneys for Plaintiff
2601 S. Bayshore Dr.
Suite 770
Miami, FL 33133
(305) 349-3930 – Phone

By:    _/s/ Maury L. Udell_____
Maury L. Udell, Esquire
mudell@bmulaw.com

IN THE COUNTY COURT OF THE 11TH
JUDICIAL CIRCUIT IN AND FOR MIAMI-
DADE COUNTY, FLORIDA

Monique Ysidron,

      Plaintiff,

v.

AT&T Mobility, LLC,

      Defendant.

_____/

CASE NO.: 2020-021932-SP-26

BAR NO.: 121673

## AMENDED SMALL CLAIMS COMPLAINT

Plaintiff, Monique Ysidron, through her undersigned counsel, hereby files this Amended Complaint in support of her claim against Defendant, AT&T, Mobility, LLC ("AT&T MOBILITY, LLC"), and further alleges as follows:

## GENERAL ALLEGATIONS

1. This is an action against AT&T for damages for $8,000, exclusive of interest, attorney's fees, and costs.

2. Plaintiff is a customer of AT&T with redacted account number xxx-xx9-1132.

3. AT&T MOBILITY, LLC is a foreign limited liability company licensed and doing business in Miami-Dade County, Florida subject to the general and specific jurisdiction of this Court.

4. Venue is proper in Miami-Dade County, Florida.

5. Plaintiff has complied with all statutory and/or contractual conditions precedent to filing this action. Plaintiff is the title holder to any claim against AT&T MOBILITY, LLC and has an interest in the subject matter of this claim.

6. According to court filings made by AT&T MOBILITY, LLC in federal court, it is a nongovernmental limited liability company that has no parent company but its members are BellSouth Mobile Data, Inc.; SBC Long Distance, LLC; and SBC Tower Holdings LLC. Those entities (and thus AT&T MOBILITY, LLC) are all indirectly wholly owned by AT&T Inc., which is the only publicly held company with a 10 percent or greater ownership stake in them.

7. AT&T, Inc. reports its consolidated business results, and breaks out selected disclosures for its major operating segments. Their segments are strategic business units that offer different products and services over various technology platforms and/or in different geographies that are managed accordingly. They analyze the operating segments based on segment contribution, which consists of operating income, excluding acquisition-related costs and other significant items, and equity in net income (loss) of affiliates for investments managed within each operating segment.

8. There are four reportable segments of AT&T, Inc.: (1) Communications, (2) Warner Media, (3) Latin America and (4) Xandr. AT&T MOBILITY, LLC is a major retailer of smartphones and provider of wireless broadband internet access service for smartphones.

9. Smartphone owners use mobile data for, including but not limited to, sending and receiving email, using GPS navigation, watching and streaming video, and browsing the internet. AT&T MOBILITY, LLC is a major retailer of smartphones and provider of wireless broadband internet access service for smartphones ("mobile data"). Smartphone owners use mobile data for, including but not limited to, sending and receiving email, using GPS navigation, watching and streaming video, and browsing the internet.

10. AT&T MOBILITY, LLC's place in AT&T Inc corporate structure can be identified as follows:



11. The Communications segment provides wireless and wireline telecom, video and broadband services to consumers located in the U.S. or in U.S. territories and businesses globally.  Communications services and products are marketed under the AT&T, Cricket, AT&T PREPAID and DIRECTV brand names. The Communications segment provided approximately 84% of 2018 segment operating revenues and 84% of our 2018 total segment contribution. This segment contains the Mobility, Entertainment Group and Business Wireline business units.

12. Within Communications is the Mobility business unit that provides nationwide wireless services to consumers and wholesale and resale wireless subscribers located in the United States or U.S. territories by utilizing our network to provide voice and data services, including high-speed internet over wireless devices. They classify subscribers as either postpaid, prepaid, connected device or reseller. As of December 31, 2018, they served 153 million Mobility subscribers, including 77 million postpaid, 17 million prepaid, 8 million reseller and 51 million connected devices. Their Mobility business unit revenue includes (2) reported categories: Wireless Services, and Equipment.

13. AT&T MOBILITY, LLC offers a range of nationwide wireless voice and data communications services in a variety of pricing plans to meet the communications needs of targeted customer categories. Their wireless services also include advertising revenues generated from the subscriber relationships.  They offer plans that include unlimited features allowing for the sharing of voice, text and data across multiple devices, which attracts subscribers from other providers and minimize subscriber churn. The churn rate, also known as the rate of attrition or customer churn, is the rate at which customers stop doing business with an entity within a given time period.

14. Customers in the "connected device" category (e.g., users of session-based tablets, monitoring devices and automobile systems) generally purchase those devices from third-party suppliers that buy data access supported by our network. They also offer nationwide wireless voice and data communications to certain customers who prefer to pay in advance. These services are offered under the Cricket and AT&T PREPAID brands and are typically monthly prepaid services.

15. AT&T MOBILITY, LLC sells a wide variety of handsets, wirelessly enabled computers (e.g., tablets and notebooks) and wireless data cards manufactured by various suppliers for use with our voice and data services. They also sell accessories, such as carrying cases and hands-free devices. They sell through their own company-owned stores, agents and third-party retail stores. Like other wireless service providers, they have historically provided postpaid contract subscribers substantial equipment subsidies to initiate, renew or upgrade service.

16. In 2007, AT&T MOBILITY, LLC became the exclusive mobile data provider for the Apple iPhone.  Initially, AT&T offered iPhone customers an "unlimited" mobile data plan for $20 per month.  In 2008, when the iPhone 3G was released, AT&T MOBILITY, LLC increased the fee for the unlimited mobile data plan to $30 per month and required all iPhone 3G customers to purchase the data plan.  Since then, AT&T MOBILITY, LLC has slowly increased the price of its "unlimited data plan." As AT&T MOBILITY, LLC began offering subsequent versions of the iPhone and smartphones from competing manufacturers, it imposed a similar requirement on purchasers of those devices.

17. Since June 2010, AT&T MOBILITY, LLC has offered to grandfather these customers' unlimited mobile data plan when they purchase a new smartphone, allowing customers the opportunity to continue with their unlimited mobile data plans rather than requiring them to switch to AT&T's tiered mobile data plans.  The renewed plan continues to cost more than originally advertised per month.

18. Customers who have had their data speed throttled by AT&T MOBILITY, LLC have experienced drastically reduced service such that slow data is virtual no data at all which is in direct contravention of the term "unlimited".

19. As a result, many everyday applications, such as web browsing, GPS navigation, and streaming video, are significantly slower, and, in some cases, are severely impaired or rendered inoperable and thus no data usage.

20. AT&T MOBILITY, LLC possesses internal focus group research indicating that data throttling was inconsistent with consumer understanding of an "unlimited" data plan.  The researchers concluded that, "[a]s we'd expect, the reaction to [a proposed data throttling program] was negative; consumers felt 'unlimited should mean unlimited.'" The focus group participants thought the idea was "clearly unfair."

21. The researchers highlighted a consumer's comment that "[i]t seems a bit misleading to call it Unlimited."  The researchers observed that "[t]he more consumers talked about it the more they didn't like it."  This led the researchers to advise that "[s]aying less is more, [so] don't say too much" in marketing communications concerning such a program.

22. The speed reductions and service restrictions in effect under AT&T MOBILITY, LLC's data throttling program are not determined by real-time network congestion at a particular cellular tower.  Throttled customers are subject to this reduced speed even when using smartphones at times when AT&T MOBILITY, LLC's network has ample capacity to carry customers' data, or the use occurs in an area where the network is not congested.  Once customers have been throttled during a given billing cycle, AT&T MOBILITY, LLC caps their download speed until the end of the billing cycle, at which time AT&T MOBILITY, LLC restores the data to full speed for these customers.

23. AT&T MOBILITY, LLC's wireless customer agreements do not state that an unlimited mobile data plan customer's use of more than a specified amount of data is a prohibited activity.  Nor do the agreements provide that AT&T MOBILITY, LLC may modify, diminish,

or impair the service of unlimited mobile data plan customers engaged in permissible activities if these customers use more than a specified amount of data.

24. AT&T MOBILITY, LLC is a sophisticated company. It knew it needed to invest in enough capacity to deliver service for subscribers who used a lot of data under their unlimited plans, especially since the company had claimed its network was the "fastest" in the nation. Instead of living up to its promises, AT&T MOBILITY, LLC pulled a bait-and switch. AT&T MOBILITY, LLC prominently advertises particular flat monthly rates for its post-paid wireless service plans. Then, after customers sign up, AT&T MOBILITY, LLC actually charges higher monthly rates than the customers were promised and agreed to pay. AT&T MOBILITY, LLC covertly increases the actual price by padding all post-paid wireless customers' bills each month, including Plaintiff's bills, with a bogus so-called Administrative Fee (currently $1.99 every month for each phone line) on top of the advertised price.  AT&T MOBILITY, LLC has stated that it charges the administrative fee because it is a "standard administrative fee" across the wireless industry.  However, in 2017, T-Mobile eliminated the "administrative charges".  Moreover, prepaid carriers like MetroPCS and AT&T's subsidiary Cricket Wireless *do not charge administrative fees.*

25. The Administrative Fee is not properly disclosed to customers before or when they sign up, and in fact it is never adequately and honestly disclosed. The so-called Administrative Fee is not, in fact, a bona fide administrative fee, but rather is simply a means for AT&T MOBILITY, LLC to charge more per month for the service itself without having to advertise the higher prices as a scheme to increase revenue.

26. Making matters worse, AT&T MOBILITY, LLC deliberately hides the Administrative Fee in its billing statements. In AT&T MOBILITY, LLC's printed monthly billing statements,

AT&T MOBILITY, LLC intentionally buries the Administrative Fee in a portion of the statement that: (a) makes it likely customers will not notice it; and (b) misleadingly suggests that the Administrative Fee is akin to a tax or another standard government pass-through fee, when in fact it is simply a way for AT&T MOBILITY, LLC to advertise and promise lower rates than it actually charges.

27. There is no description of the administrative fee on Plaintiff's bill.  Such a description fails to constitute an adequate disclosure of the Administrative Fee, and it serves to further AT&T MOBILITY, LLC's deceptive scheme by suggesting that the Administrative Fee is tied to certain costs associated with AT&T MOBILITY, LLC providing wireless telephone services (interconnect charges and cell site rental charges). Assuming this description was accurate, it would merely reinforce that this undisclosed fee should be included in the advertised monthly price for the service because those are basic costs of providing wireless service itself, and thus a reasonable consumer would expect those costs to be included in the advertised price for the service.

28. Moreover, the administrative fee is not, in fact, tied to the costs that AT&T MOBILITY, LLC's buried description suggests. This is corroborated by the fact that AT&T has repeatedly increased the amount of the monthly Administrative Fee since the fee was first imposed, while during that same time period the stated "costs" for (i.e., interconnect charges and cell site rental charges) have actually *decreased* according to AT&T's own financial statements and public filings with the Securities and Exchange Commission.

29. AT&T imposed and increased the Administrative Fee that it charged, not, as AT&T MOBILITY, LLC misleadingly stated in its buried description, in response to cell site rental and maintenance costs or interconnectivity costs, which AT&T MOBILITY, LLC's financial

statements show have gone down at the same time AT&T MOBILITY, LLC has significantly increased the amount of the fee.

30. Thus, by AT&T MOBILITY, LLC's own design, the printed monthly statements serve to further AT&T MOBILITY, LLC's scheme and keep customers from realizing they are being deceived and thus overcharged.  Such a deceptive practice is AT&T's misrepresentation of why a fee is being charged and where the money for the fee is being transferred to, if anywhere.  AT&T Mobility, LLC chose the descriptive terms and if they do not accurately describe what is being charged and collected, such conduct is actionable under the FDUTPA.

31. AT&T MOBILITY, LLC imposed and has increased the Administrative Fee as a covert way to increase customers' monthly rates without having to advertise such higher rates. AT&T MOBILITY, LLC increased the Administrative Fee in large part to fund unrelated corporate liabilities of its parent company AT&T Inc., including to pay down the debt incurred in connection with the acquisition of Time Warner Inc. in 2018.

32. In all events, AT&T MOBILITY, LLC should clearly disclose the Administrative Fee and should clearly and accurately state the true monthly prices and applicable costs of AT&T MOBILITY, LLC for its post-paid wireless service plans in its price representations and advertising.

33. Since the Administrative Fee was first introduced in 2013, AT&T MOBILITY, LLC has increased the amount of the fee three times, including twice over a three-month period in 2018. The current amount that AT&T MOBILITY, LLC charges all post-paid wireless customers for this fee is $1.99 per line every month, i.e., more than 200% more than the original amount of the fee, including Plaintiff's bill.

34. AT&T MOBILITY, LLC has used this Administrative Fee scheme to improperly squeeze consumers for **hundreds of millions of dollars** in additional revenue without disclosing the actual "increased costs" in any financial filing available to any customer, including Plaintiff.

35. In essence, AT&T MOBILITY, LLC introduced the bogus Administrative Fee as a way to covertly increase the actual monthly price customers are charged for their service, and then has continued to use the Administrative Fee and unilateral increases thereto as a lever by which AT&T MOBILITY, LLC continues to ratchet up the price without the customer realizing and after the customer is already committed.

36. The Administrative Fee is part of a design to profit AT&T MOBILITY, LLC rather than pay for what it has determined is an increase in cost of AT&T MOBILITY, LLC. Thus, the practice of applying the administrative fee to Plaintiff's bill is in and of itself is unfair and deceptive.

37. This scheme has enabled, and continues to enable, AT&T MOBILITY, LLC to effectively increase its rates without having to publicly announce those higher rates, and allows AT&T MOBILITY, LLC to entice more customers by misrepresenting the costs customers would pay both in absolute terms and relative to other wireless providers in the industry.

## <u>COUNT I - FRAUD</u>

38. Plaintiff re-alleges, restates, and incorporates the allegations contained in paragraphs one (1) through thirty-eight (38) above, and further alleges as follows:

39. By virtue of its advertisement of unlimited data to Plaintiff for a set price, AT&T MOBILITY, LLC undertook the duty to disclose material information and disclose its data

management plan along with its billing practices to Plaintiff so that Plaintiff would receive unlimited data at a set price.

40. Specifically, in the advertising, sale, and renewal of mobile data plans, AT&T MOBILITY, LLC represented, directly or indirectly, expressly or by implication, to the Plaintiff, an unlimited mobile data plan customer, that the amount of data that the Plaintiff could access in any billing period would not be limited.  Plaintiff is not in possession of the mobile data contract as it under the exclusive control of AT&T MOBILITY, LLC.

41. AT&T MOBILITY, LLC specifically omitted the fact that it intended to throttle Plaintiff's data, without Plaintiff's knowledge or specific consent.  Had AT&T MOBILITY, LLC not omitted this information, Plaintiff would have not purchased specific unlimited plan.

42. Plaintiff relied on AT&T MOBILITY, LLC's representations regarding providing unlimited data, and, as a result, incurred damages and was injured as a result of the fraud by omission.

43. Moreover, AT&T MOBILITY, LLC's representations on its bills to Plaintiff and the definition Plaintiff obtained on AT&T MOBILITY, LLC's website regarding the administrative fee charged on the account were false statements of material fact.  AT&T MOBILITY, LLC's representation that the  Administrative Fee is a charge assessed by AT&T MOBILITY, LLC that helps defray a portion of certain expenses AT&T MOBILITY, LLC incurs, including but not limited to: (a) charges AT&T MOBILITY, LLC or its agents pay to interconnect with other carriers to deliver calls from AT&T MOBILITY, LLC customers to their customers; and (b) charges associated with cell site rents and maintenance" are false.

44. AT&T MOBILITY, LLC knew or should have known that the representations all identified above were false as AT&T MOBILITY, LLC's cost in interconnect charges and cell site charges actually decreased.

45. AT&T MOBILITY, LLC intended that the representations above caused Plaintiff to continue as a customer with AT&T MOBILITY, LLC and otherwise pay the administrative fee to maintain an account with AT&T MOBILITY, LLC.

46. Plaintiff has suffered damages in justifiable reliance on the representations above including but not limited to the payment for bogus administrative fees on a monthly basis.

WHEREFORE, Plaintiff respectfully requests that this Court grant judgment in its favor and against AT&T MOBILITY, LLC for compensatory damages, nominal damages, interest, court costs, and any other relief the Court deems just and proper.

## COUNT II - DAMAGES UNDER THE FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT

47. Plaintiff re-alleges, restates, and incorporates the allegations contained in paragraphs one (1) through thirty-eight (38) above, and further alleges as follows:

48. Plaintiff, at all material times, was a consumer, as defined under the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), § 501.201, *et seq*., Fla. Stat.

49. AT&T MOBILITY, LLC, at all material times, was engaged in trade or commerce, as defined under the FDUTPA and is not otherwise exempt.

50. Upon information and belief, Plaintiff was a consumer who had an "unlimited" data plan as advertised by AT&T. In the advertising, sale, and renewal of the unlimited mobile data plan, AT&T MOBILITY, LLC entered into a mobile data contract with Plaintiff that was advertised as providing access to unlimited mobile data and did not provide that AT&T

MOBILITY, LLC could modify, diminish, or impair the services of customers who use more than a specified amount of data for permissible activities.

51. AT&T MOBILITY, LLC imposed significant data speed restrictions on Plaintiff by virtue of its use of its network which flows throughout the United States and in particular, Florida. This practice was, and is, an unfair act or a deceptive trade practice and is specifically complained of by the Federal Trade Commission.

52. In the advertising, sale, and renewal of unlimited mobile data plans, AT&T MOBILITY, LLC has represented, directly or indirectly, expressly or by implication, to unlimited mobile data plan customers that the amount of data that the customer could access in any billing period would not be limited.  Such a representation is unfair or deceptive as defined under the FDUTPA.  Plaintiff is not in possession of the actual mobile data contract between the parties, as it under the exclusive control of AT&T MOBILITY, LLC.

53. AT&T MOBILITY, LLC has failed to disclose, or has failed to disclose adequately, that it imposes significant and material data speed restrictions on **unlimited mobile data plan** customers who use more than a fixed amount of data in a given billing cycle.  AT&T MOBILITY, LLC's failure to disclose or adequately disclose this fact, in light of the representations made, was, and is, a deceptive act or practice.

54. AT&T MOBILITY, LLC specifically throttled Plaintiff's data speed, which by its own admission is an unfair or deceptive trade practice as defined under the FDUTPA.

55. These unfair or deceptive trade practices are the proximate cause of Plaintiff's actual damages.

56. Furthermore, in the advertising, sale, and renewal of mobile data and wireless plans and acceptance of payments, AT&T MOBILITY, LLC has represented, directly or indirectly,

expressly or by implication, to customers that it would be charged a certain amount. AT&T MOBILITY, LLC has since added an "Administrative Fee" to Plaintiff's bill which is unfair and deceptive as it is not what its being used for despite its definition in the wireless agreement. The administrative fee is a textbook pass through-fee. AT&T chose the descriptive terms of the administrative fee that does not accurately describe what is being charged and collected, such conduct is actionable under the FDUTPA.

57. Since the Administrative Fee was first imposed in 2013, AT&T MOBILITY, LLC has unilaterally increased the monthly amount of the fee three times. AT&T MOBILITY, LLC increased the Administrative Fee to $0.76 per month per phone line starting in June 2016. Then, in 2018, the increases because larger and more frequent (around the same time AT&T MOBILITY, LLC's parent company incurred significant debt in acquiring Time Warner Inc.).

58. AT&T MOBILITY, LLC raised the Administrative Fee to $1.26 per month per phone line starting in April 2018, and then again to $1.99 per month per phone line starting in June 2018, which is the current monthly fee as of this filing. Thus, between March 2018 and June 2018 alone, AT&T MOBILITY, LLC increased the Administrative Fee a whopping 162% increase in just three months.

59. AT&T MOBILITY, LLC's representations on its bills to Plaintiff and it its website regarding the administrative fee charged are deceptive and in fact misrepresent the truth. AT&T MOBILITY, LLC's representation that the Administrative Fee is a charge assessed by AT&T MOBILITY, LLC that helps defray a portion of certain expenses AT&T MOBILITY, LLC incurs, including but not limited to: (a) charges AT&T MOBILITY, LLC or its agents pay to interconnect with other carriers to deliver calls from AT&T MOBILITY, LLC

customers to their customers; and (b) charges associated with cell site rents and maintenance is false.  The administrative fee is instead a scheme to funnel direct profit to AT&T MOBILITY, LLC rather than pay for any identifiable increase in costs.

60. AT&T MOBILITY, LLC knew or should have known that the representations regarding the administrative fee are false as AT&T MOBILITY, LLC's cost in interconnect charges and cell site charges actually decreased based on its own SEC federal filings.  AT&T MOBILITY, LLC knew that the monthly administrative fee was inflated, and not the result of good faith financial practices but instead designed to raise profit for the company without a specific actual change in price for services. Such a practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers, including Plaintiff.

61. AT&T MOBILITY, LLC's knowingly unfair or deceptive trade practices of assessing and collecting a bogus administrative fee are the proximate cause of Plaintiff's 's actual damages.

62. AT&T MOBILITY, LLC's unfair and deceptive trade practice is not a result of a bona fide error or mistake but instead a conscious decision by AT&T MOBILITY, LLC.

63. Plaintiff has retained the undersigned to represent it in this action and pay a reasonable fee for said legal services.

WHEREFORE, Plaintiff respectfully requests that this Court grant judgment in its favor and against AT&T MOBILITY, LLC for damages, interest, court costs, attorney's fees pursuant to §501.2105, Florida Statutes, and any other relief the Court deems just and proper.

**COUNT III – ACTION FOR DECLARATORY AND/OR INJUNCTIVE RELIEF
UNDER FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT
("FDUTPA") – BOGUS ADMINISTRATIVE FEE**

64. Plaintiff re-alleges, restates, and incorporates the allegations contained in paragraphs one (1) through thirty-eight (38) above, and further alleges as follows:

65. Under the FDUTPA, without regard to any other remedy or relief to which a person is entitled, anyone aggrieved by a violation of this part may bring an action to obtain a declaratory judgment that an act or practice violates this part and to enjoin a person who has violated, is violating, or is otherwise likely to violate 501.201 et. seq.  See Fla. Stat. §501.211(1).  Plaintiff is an aggrieved consumer whose rights  have been, are being, or will be adversely affected, by AT&T MOBILITY, LLC.'s violation of FDUTPA--meaning an unfair or deceptive practice which is injurious to consumers, including Plaintiff.

66. Pursuant to AT&T MOBILITY, LLC's above-described acts or practices of placing a bogus administrative fee on Plaintiff's account, AT&T MOBILITY, LLC violated the FDUTPA. The Administrative Fee is part of a design to profit AT&T MOBILITY, LLC rather than pay for what it has determined is an increased in cost of AT&T MOBILITY, LLC. Thus, the practice of applying the administrative fee to Plaintiff's bill is in and of itself is unfair and deceptive.

67. Plaintiff seeks a declaratory judgment that AT&T MOBILITY, LLC's acts or practices have violated the FDUTPA.

68. Plaintiff seeks to determine whether the FDUTPA prohibits AT&T MOBILITY, LLC from continuing to apply the bogus administrative fee which is likely to occur in the future.

69. There is a bona fide dispute between the parties. Plaintiff has a justiciable question as to the existence or non-existence of some right, status, immunity, power, or privilege, or some fact upon which their claim  may depend.

70. Plaintiff is in doubt as to the right of AT&T MOBILITY, LLC to continue to charge an unlawful fee which violates FDUTPA.

71. There is a bona fide, actual, and present need for the declaration.

72. Plaintiff has retained the undersigned to represent it in this action and pay a reasonable fee for said legal services.

WHEREFORE, Plaintiff respectfully requests that this Court grant declaratory judgment and/or injunctive relief in its favor and against AT&T MOBILITY, LLC, court costs, attorney's fees pursuant to Section 501.2105, Florida Statutes, and any other relief the Court deems just and proper.

## COUNT IV – BREACH OF CONTRACT – GOOD FAITH AND FAIR DEALING

73. Plaintiff re-alleges, restates, and incorporates the allegations contained in paragraphs one (1) through thirty-eight (38) above, and further alleges as follows

74. Plaintiff had a wireless agreement with AT&T MOBILITY, LLC wherein Plaintiff had a reasonable expectation of performance of the agreement with no throttling of Plaintiff's data speed so as to provide Plaintiff with unlimited data.

75. AT&T MOBILITY, LLC was required to act in a commercially reasonable manner and limiting its ability to act capriciously to contravene the reasonable expectations of the Plaintiff in the AT&T's performance wireless agreement.

76. Moreover, AT&T MOBILITY, LLC was required to act in a commercially reasonable manner in billing Plaintiff for bogus administrative costs which were not for what they

claimed in the contract. AT&T's representations on its bills to Plaintiff and it its website regarding the administrative fee charged on the account were false statements of material fact.

77. AT&T MOBILITY, LLC representation that the Administrative Fee is a charge assessed by AT&T that helps defray a portion of certain expenses AT&T incurs, including but not limited to: (a) charges AT&T or its agents pay to interconnect with other carriers to deliver calls from AT&T customers to their customers; and (b) charges associated with cell site rents and maintenance are false. AT&T

78. The express terms of the wireless agreement required AT&T to provide unlimited data and true administrative costs as defined by the contract.

79. AT&T has breached the express terms of the wireless agreement by failing to provide unlimited data.

80. As a result of AT&T's breach of implied covenant of good faith and fair dealing, Plaintiff has been damaged.

WHEREFORE, Plaintiff respectfully requests that this Court grant judgment in its favor and against AT&T for compensatory damages, nominal damages, interest, court costs, and any other relief the Court deems just and proper.

## COUNT V – UNJUST ENRICHMENT

81. Plaintiff re-alleges, restates, and incorporates the allegations contained in paragraphs one (1) through thirty-eight (38) above, and further alleges as follows:

82. AT&T MOBILITY, LLC assessed improper increased charges of $1.99/month administrative fee on Plaintiff's account.

83. AT&T MOBILITY, LLC has stated that "The Administrative Fee is a charge assessed by AT&T MOBILITY, LLC that helps defray a portion of certain expenses AT&T MOBILITY, LLC incurs, including but not limited to: (a) charges AT&T MOBILITY, LLC or its agents pay to interconnect with other carriers to deliver calls from AT&T MOBILITY, LLC customers to their customers; and (b) charges associated with cell site rents and maintenance. It is not a tax or charge which the government requires AT&T MOBILITY, LLC to collect from its customers.

84. In June of 2018, AT&T MOBILITY, LLC increased its "administrative fee" to $1.99/per, per month with no specific reason or allegation that AT&T MOBILITY, LLC's costs had changed.

85. AT&T MOBILITY, LLC knew the monthly administrative fee was inflated and not the result of good faith financial practices and instead a deceptive fee.  In essence this administrative fee is a textbook pass-through fee designed to increase profits of the company without increasing the advertised price of the services to Plaintiff.

86. AT&T MOBILITY, LLC had knowledge of payments by Plaintiff and voluntarily accepted and retained the benefit conferred on it.

87. Under the circumstances, it would be inequitable for AT&T MOBILITY, LLC to retain the benefit and thus, Plaintiff has suffered damages.

WHEREFORE, Plaintiff demands judgment against AT&T MOBILITY, LLC for compensatory damages, interest, and court costs and any other relief the Court deems just and proper.

## COUNT VI – PURE BILL OF DISCOVERY

88. Plaintiff re-alleges, restates, and incorporates the allegations contained in paragraphs

one (1) through thirty-eight (38) above, and further alleges as follows:

89. This is an action for pure bill of discovery.

90. A pure bill of discovery may be used to identify potential defendants and theories of liability and to obtain information necessary for meeting a condition precedent to filing suit.

91. Plaintiff seeks to obtain information regarding AT&T MOBILITY, LLC's collection of Plaintiff's geolocation data and possible unauthorized dissemination to third-parties of the geolocation data collected from its consumers, including Plaintiff.

92. This information is material to determine proper parties against whom relief will and should be sought by subsequent legal action.

93. AT&T MOBILITY, LLC has admitted that it sells customer geolocation data to third-parties, including but not limited to data aggregators, who in turn, are able to use or resell the geolocation data with little or no oversight by AT&T MOBILITY, LLC.

94. AT&T MOBILITY, LLC is obligated to protect the confidential personal information of its customers, including Plaintiff.

95. FCA § 222(a) provides that "[e]very telecommunications carrier has a duty to protect the confidentiality of proprietary information of, and relating to . . . customers . . . ." The "confidential proprietary information" referred to in FCA § 222(a) is abbreviated herein as "CPI."

96. FCA § 222(c) additionally provides that "[e]xcept as required by law or with the approval of the customer, a telecommunications carrier that receives or obtains customer proprietary network information by virtue of its provision of a telecommunications service shall only use, disclose, or permit access to individually identifiable customer proprietary

network information in its provision of (A) the telecommunications service from which such information is derived, or (B) services necessary to, or used in, the provision of such telecommunications service, including the publishing of directories." The "customer proprietary network information" referred to in FCA § 222(c) is abbreviated herein as "CPNI."

97. FCA § 222(h)(1) (emphasis added) defines CPNI as "(A) information that relates to  the quantity, technical configuration, type, destination, **location**, and amount of use of a telecommunications service subscribed to by any customer of a telecommunications carrier, and that is made available to the carrier by the customer solely by virtue of the carrier-customer relationship; and (B) information contained in the bills pertaining to telephone exchange  service or telephone toll service received by a customer of a carrier, except that term does not include subscriber list information."

98. The Federal Communication Commissions ("FCC") has promulgated rules to implement FCA § 222 "to ensure that telecommunications carriers establish effective safeguards to protect against unauthorized use or disclosure of CPNI." *See* 47 CFR § 64.2001, *et seq*. ("CPNI Rules"); CPNI Order, 13 FCC Rcd. at 8195 ¶ 193.

99. The CPNI Rules limit disclosure and use of CPNI without customer approval to certain limited circumstances (such as cooperation with law enforcement), none of which are applicable to the facts here. CPNI Rules § 64.2005.

100.    The CPNI Rules §§ 64.2009(b), (d), and (e) require carriers to implement safeguards to protect customers' CPNI.

101.    These safeguards include: (i) training personnel "as to when they are and are not authorized to use CPNI[;]" (ii) establishing "a supervisory review process regarding carrier

compliance with the rules[;]" and (iii) filing annual compliance certificates with the FCC.

102.     The CPNI Rules § 64.2010 further require carriers to implement measures to prevent the disclosure of CPNI to unauthorized individuals. For example, "carriers must take reasonable measures to discover and protect against attempts to gain unauthorized access to CPNI." CPNI Rules § 64.2010(a).

103.     AT&T MOBILITY, LLC is in sole possession of the information requested and Plaintiff has no other way to obtain the information.

104.     In its Privacy Policy ("Privacy Policy") and Code of Business Conduct ("COBC"), AT&T MOBILITY, LLC acknowledges its responsibilities to protect customers' "Personal Information" under the FCA, the CPNI Rules, and other regulations.

105.     In its Privacy Policy and COBC, AT&T MOBILITY, LLC makes binding promises and commitments to Plaintiff and its customers, that it will protect and secure their "Personal Information." The Privacy Policy defines "Personal Information" as "[i]nformation that identifies or reasonably can be used to identify you." AT&T MOBILITY, LLC states that, included in the information that it collects from and about its customers, is its customers' "wireless device location." AT&T MOBILITY, LLC also collects information relating to the use of its networks, products, and services. "Personal Information" thus includes both CPI and CPNI under FCA § 222 and the CPNI Rules.

106.     In its Privacy Policy, AT&T MOBILITY, LLC promises that it takes its responsibility "to safeguard your [i.e., the customer's] Personal Information seriously" and that it will not share its customers' Personal Information except for legitimate business purposes.

107.     AT&T MOBILITY, LLC Privacy Policy further states that "we will not sell [users'] Personal Information to anyone, for any purpose. Period."

108.     AT&T MOBILITY, LLC further promises that it has numerous safeguards in place to protect the Personal Information of its customers in its Privacy Policy and makes the following promises to its customers:

> We've worked hard to protect your information. And we've established electronic and administrative safeguards designed to make the information we collect secure. Some examples of those safeguards include:
>
> - All of our employees are subject to the AT&T MOBILITY, LLC Code of Business Conduct (COBC) and certain state-mandated codes of conduct. Under the COBC, all employees must follow the laws, rules, regulations, court and/or administrative orders that apply to our business— including, specifically, the legal requirements and company policies surrounding the privacy of communications and the security and privacy of your records. We take this seriously, and any of our employees who fail to meet the standards we've set in the COBC are subject to disciplinary action. That includes dismissal.
>
> - We've implemented technology and security features and strict policy guidelines to safeguard the privacy of your Personal information. Some examples are:
>
>   o Maintaining and protecting the security of computer storage and network equipment, and using our security procedures that require employee user names and passwords to access sensitive data;
>   o Applying encryption or other appropriate security controls to protect Personal Information when stored or transmitted by us;
>   o Limiting access to Personal Information to only those with jobs requiring such access; and
>   o Requiring caller/online authentication before providing Account Information so that only you or someone who knows your Account Information will be able to access or change this information.

109.     AT&T MOBILITY, LLC's COBC also makes binding commitments to Plaintiff as an AT&T MOBILITY, LLC customer, that it will protect their Personal Information and that it will adhere to all of its legal obligations. Those legal obligations include FCA § 222, the

CPNI Rules, and other legal obligations that govern protection of confidential and private information.

110.     The COBC also specifically promises that AT&T MOBILITY, LLC will "protect the privacy of our customers' communications" because "[n]ot only do our customers demand this, but the law requires it . . . . Maintaining the confidentiality of communication is, and always has been, a crucial part of our business."

111.     AT&T MOBILITY, LLC further promises in the COBC that it "protect[s] the information about our customers that they entrust to us." *Id.* Acknowledging that "AT&T MOBILITY, LLC possesses sensitive, detailed information about our customers, who rely on AT&T MOBILITY, LLC to safeguard that information" and that "[l]aws and regulations tell us how to treat such data," AT&T MOBILITY, LLC promises Plaintiff, as AT&T MOBILITY, LLC customers, that "[a]ny inappropriate use of confidential customer information violates our customers' trust and may also violate a law or regulation. *Id.* Preserving our customers' trust by safeguarding their private data is essential to our reputation." *Id.*

112.     On May 8, 2018, Senator Ron Wyden sent a letter ("the Wyden Letter") to AT&T MOBILITY, LLC President and CEO Randall L. Stephenson. In the letter, Senator Wyden expressed, in very clear terms, great concern with AT&T MOBILITY, LLC's handling of consumer information. It had come to Senator Wyden's attention that a company called Securus Technologies, a major provider of correctional-facility telephone services, purchased real-time location information from major wireless carriers, and provided that information, via a self-service web portal, to the government "for nothing more than the legal equivalent of a pinky promise."

113.     In the Wyden Letter, Senator Wyden detailed how Securus confirmed to him that the web portal enabled surveillance of customers of "every major U.S. wireless carrier," which, in Senator Wyden's words, "needlessly exposes millions of Americans to potential abuse and unchecked surveillance by the government."

114.     Senator Wyden also explained how wireless carriers "are prohibited from sharing certain customer information, including location data, unless the carrier either has the customer's consent or sharing is otherwise required by law." He ultimately concluded that, "the fact that Securus provide[d] this service at all suggests that AT&T MOBILITY, LLC does not sufficiently control access to [its] customers' private information."

115.     The process by which Securus obtained access to the customers' information in the first place is part of the problem. It purchased real-time location information on AT&T MOBILITY, LLC's customers "through a third party location aggregator that has a commercial relationship with the major wireless carriers . . . ."

116.     In the Wyden Letter, Senator Wyden demanded that AT&T MOBILITY, LLC "undertake a comprehensive audit of each third party" with whom AT&T MOBILITY, LLC shared its customers' personal information, and "terminate [its] data-sharing relationships with all third parties that have misrepresented customer consent or abused their access to sensitive customer data.

117.     Six months later, on January 8, 2019, Motherboard (a news outlet) ran an investigative article ("the Article") concerning major telecommunications carriers (including AT&T MOBILITY, LLC) selling access to geolocation data to third-parties (hereinafter "The Article")

118.     In the Article, the journalist gave a bounty hunter $300 to locate a cell phone. The

bounty hunter did just that using "real-time location data sold to bounty hunters that ultimately originated from the major [telecommunications carriers].

119.     The Article revealed that a company called MicroBilt was selling cell phone geolocation services with little oversight to a spread of different private industries, "ranging from car salesmen and property managers to bail bondsmen and bounty hunters . . . ." Additionally, this "spying capability is also being resold to others on the black market who are not licensed by the company to use it . . . seemingly without MicroBilt's knowledge."

120.     Motherboard's investigation revealed that "a wide variety of companies can access cell phone location data, and . . . the information trickles down from cell phone providers to a wide array of smaller players, who don't necessarily have the correct safeguards in place to protect that data."

121.     Motherboard found that some of the location aggregators were so sloppy that "anyone could geolocate nearly any phone in the United States at a click of a mouse."

122.     In response to a request for comment, AT&T MOBILITY, LLC told Motherboard that use of its customers' data by bounty hunters "would violate [its] contract and Privacy Policy."

123.     The telecommunications carriers are the beginning of a dizzying chain of data selling, where data goes from company to company, and ultimately ends up in the hands of literally anybody who is looking.

124.     The information a person could obtain included the name and address of an individual, and the geolocation of that individual's cell phone.

125.     One of the data aggregators with whom AT&T MOBILITY, LLC contracted is called

MicroBilt.

126.    MicroBilt was engaged in the process of selling consumer data to literally anybody who would pay for it, including the name and address of an individual, and the geolocation of that individual's cell phone. Some of the sectors that utilized MicroBilt's services were landlords, car salesmen, and others conducting credit checks.

127.    In essence, AT&T MOBILITY, LLC was relying on the end user of the location data not to abuse the data, or not to obtain the data under false pretenses. In practice, the end users exercised no oversight over the process whatsoever.

128.    On March 26, 2019, the FTC issued an order to AT&T MOBILITY, LLC, among others, seeking information the agency will use to examine how it collects, retains, uses, and discloses information about consumers and their devices.

129.    AT&T MOBILITY, LLC is a telecommunications common carrier engaged in interstate commerce by wire regulated by the FCA and subject to the requirements, *inter alia,* of §§ 206 and 222 of the FCA.

130.    FCA § 222(a) requires every telecommunications carrier to protect, among other things, its customers' CPI.

131.    FCA § 222(c) further requires every telecommunications carrier to protect, among other things, its customers' CPNI.

132.    Plaintiff believes the information disclosed by AT&T MOBILITY, LLC to third-parties, including but not limited to data aggregators, without consent was CPI and CPNI under FCA § 222 is unlawful. AT&T MOBILITY, LLC may have  failed to protect the confidentiality of Plaintiff's CPI and CPNI including their wireless telephone numbers, account information, private communications, and location, by divulging that information

to third-parties, including but not limited to data aggregators.

133.     There is no way for Plaintiff to determine whether AT&T MOBILITY, LLC violated its own privacy policy via its customer service line or any possibly application on its customer service website without filing this action.

134.     Plaintiffs seeks a pure bill of discovery to determine if AT&T MOBILITY, LLC violated either Florida or Federal law.

WHEREFORE, Plaintiff respectfully requests that this Court:

A. Direct AT&T Mobility, LLC to produce to Plaintiff any information, but not limited to, the following:

(1) Any code of business ethics in effect when Plaintiff became a customer of AT&T MOBILITY, LLC;

(2)  Any contract or agreement between AT&T MOBILITY, LLC or its affiliates and Microbilt during Plaintiff's time as a customer;

(3) Any contract between AT&T MOBILITY, LLC or its affiliates and TechnoCom Corporation d/b/a LocationSmart in effect during Plaintiff's time as an AT&T MOBILITY, LLC customer;

(4) Any contract between AT&T MOBILITY, LLC or its affiliates and Zumigo during Plaintiff's time as an AT&T MOBILITY, LLC customer;

(5) Between January 2016 and May 2019, the five reviews or audits of its disclosure of customer location information to third parties conducted by AT&T MOBILITY, LLC or its affiliates;

(6) Any written policies and procedures in place regarding safeguarding customer proprietary network information (referred to as "CPNI"), including Plaintiff's;

(7) Any written policies and procedures in place regarding safeguarding the confidential proprietary information," including Plaintiffs;

(8) Any specific information regarding Plaintiff's location data maintained by AT&T MOBILITY, LLC or its affiliates and whether said data was improperly sold or divulged to anyone improperly, including data aggregators;

B. Any such further relief as the Honorable Court may deem just and proper;

## <u>CERTIFICATE OF SERVICE</u>

WE HEREBY CERTIFY that a true and correct copy of the foregoing was sent via e-portal this February 19th, 2021 to: Manuel A. Garcia-Linares, Esquire (mgarcialinares@daypitney.com, brodriguez@daypitney.com, jsolorzano@daypitney.com) Andrew R. Ingalls, Esquire (aingalls@daypitney.com) Day Pitney LLP, 396 Alhambra Circle, North Tower - 14th Floor, Miami, Florida 33134.

Beighley, Myrick, Udell & Lynne, PA
Attorneys for Plaintiff
2601 S. Bayshore Dr.
Suite 770
Miami, FL 33133
(305) 349-3930 – Phone

By:        /s/  *Maury L. Udell*
           Maury L. Udell, Esquire
           mudell@bmulaw.com

# EXHIBIT 5

IN THE DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA,
THIRD DISTRICT

_____

CASE NO. 3D23-97, 3D23-98, 3D23-99, 3D23-100, 3D23-101
(Consolidated)
_____

**SHARON L. ORR, et al.,**

Appellants,

vs.

**AT&T MOBILITY, LLC,**

Appellee.

On Appeal from the Circuit Court of the 11th Judicial Circuit in and for
Miami-Dade County, Florida, L.T. Case No. 20-8179, 20-21937, 20-21932,
20-8181, 19-11857

_____

**INITIAL BRIEF OF APPELLANTS**
_____

DAVID B. PAKULA, ESQ.
DAVID B. PAKULA, P.A.
12301 Taft Street, Suite 200
Pembroke Pines, FL 33026
Tel.: (954) 217-5123
Email: david@pakulalawfirm.com

MAURY L. UDELL, ESQ.
BEIGHLEY, MYRICK, UDELL
& LYNNE, P.A.
150 W. Flagler St., Suite 1800
Miami, FL 33130
Tel: (305) 349-3930
Email: mudell@bmulaw.com

Attorneys for Appellants

# **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES..............................................................................ii

I. STATEMENT OF THE CASE AND FACTS................................................ 1

II. SUMMARY OF ARGUMENT ................................................................. 15

III. ARGUMENT ........................................................................................ 17

    **A. Standard of Review** …………………………………………..17

    **B. The Trial Court Erred In Dismissing the Complaints Based on AT&T's Unauthenticated Hearsay Exhibits** ………...…17

    **C. The Trial Court Erred in Dismissing With Prejudice the Causes of Action for FDUTPA Violation, Fraud, and Breach of Implied Duty of Good Faith and Fair Dealing** ………..23

        **1. The Wireless Customer Agreement Does Not Negate the Data Throttling Allegations** ………………………….23

        **2. AT&T's Exhibits Do Not Negate the Allegations of a Bogus Administrative Fee** ………………………….25

        **3. The Complaints State a Cause of Action for FDUTPA Violations** …………………………………………28

        **4. The Heightened Pleading Requirements of Fla. R. Civ. P. 1.120(b) Should Not Be Applied to Causes of Action Other Than Common Law Fraud** ………..………37

        **5. The Complaints Allege Fraud With Specificity as the Circumstances Permit** …………………………..40

        **6. The Complaints State a Cause of Action for Breach of the Duty of Good Faith and Fair Dealing** ……………44

        **7. The Plaintiffs May Plead Unjust Enrichment in the**

i

**Alternative Until the Existence of a Valid Contract is Proven** ……………………………………………………46

IV. CONCLUSION ……………………………………………………………47

CERTIFICATE OF SERVICE ........................................................................ 48

CERTIFICATE OF COMPLIANCE……………………………………………48

## TABLE OF AUTHORITIES

**Page**

Altamonte Pediatric Assocs., P.A. v. Greenway Health, LLC,
   2020 U.S. Dist. LEXIS 161735 (M.D. Fla. 2020) …………….…...37-38

Bankers Mut. Capital Corp. v. United States Fid. & Guar. Co.,
   784 So. 2d 485 (Fla. 4th DCA 2001) ……………………………………41

Berry v. Budget Rent a Car Syst.,
    497 F. Supp. 2d 1361 (S.D. Fla. 2007) ………………………………..34

Bowe v. Public Storage,
   2014 U.S. Dist. LEXIS 195556 (S.D. Fla. 2014) ………………30, 45, 46

Calderon v. Sixt Rent a Car, LLC,
   2020 U.S. Dist. LEXIS 24247 (S.D. Fla. 2020) ………………………33

Cavallaro v. Stratford Homes,
   784 So. 2d 619 (Fla. 5th DCA 2001) ……………………………………44

Cedars Healthcare Group, Ltd., v. Mehta,
   16 So. 3d 914 (Fla. 3d DCA 2009) ……………………………………41

Coleman v. CubeSmart,
   328 F. Supp. 3d 1349 (S.D. Fla. 2018) …………………………………32

Costa v. Kerzner Int'l Resorts, Inc.,
   2011 U.S. Dist. LEXIS 66921 (S.D. Fla. 2011) ……………………..34, 45

Davis v. Powertel, Inc.,
   776 So. 2d 971 (Fla. 1st DCA 2000),
   rev. denied, 794 So. 2d 605 (Fla. 2001) …………………………………38

Deere Constr., LLC v. Cemex Constr. Materials, Fla., LLC,
   198 F. Supp. 3d 1332 (S.D. Fla. 2016) …………………………………34, 45

Florida v. Tenet Healthcare Corp.,
   420 F. Supp. 2d 1288 (S.D. Fla. 2005) …………………………………38

Fonte v. AT&T Wireless Servs., Inc.,
    903 So. 2d 1019 (Fla. 4th DCA),
    rev. denied, 918 So. 2d 292 (Fla. 2005) …………………………………38

Giller v. Giller,
    190 So. 3d 666 (Fla. 3d DCA 2016) …………………………………..17

Glen Garron, LLC v. Buchwald,
    210 So. 3d 229 (Fla. 5th DCA 2017) ………………………………19, 21

Guerrero v. Target Corp.,
    889 F. Supp. 2d 1348 (S.D. Fla. 2012) …………………………………38

Harris v. Nordyne, LLC,
    2014 U.S. DIst. LEXIS 189248 (S.D. Fla. 2014) …………………..38, 39

Hazen v. Cobb,
    96 Fla. 151, 117 So. 853, 857-58 (1928) ………………………………46

Hetrick v. Ideal Image Dev. Corp.,
    372 F. Appx. 985 (11th Cir. 2010) ……………………………………29-30

Hollywood Lakes Country Club, Inc. v. Community Ass'n Servs., Inc.,
    770 So. 2d 716 (Fla. 4th DCA 2000) …………………………………41-42

Houry v. Boaziz,
    196 So. 2d 383 (Fla. 3d DCA),
    rev. denied, 2016 Fla. LEXIS 2733 (Fla. 2016) ……………………40, 43

In re Tracfone Unlimited Serv. Plan Litig.,
    112 F. Supp,. 3d 993 (N.D. Calif. 2015) ………………………………31

Iniguez v. Am. Hotel Register Co.,
    820 So. 2d 953 (Fla. 3d DCA 2002),
    rev. dismissed, 838 So. 2d 558 (Fla. 2003) …………………………..25

James D. Hinson Elec. Contr. Co. v. BellSouth Telecomms., Inc.,
    796 F. Supp. 2d 1341 (M.D. Fla. 2011) ………………………………33

Intercoastal Realty, Inc. v. Tracy,
    706 F. Supp. 2d 1325 (S.D. Fla. 2010) ........................................38

Latman v. Costa Cruise Lines, N.V.,
    758 So. 2d 699 (Fla. 3d DCA 2000),
    rev. denied, 819 So. 2d 136 (Fla. 2002) ........................................33

Louie's Oyster, Inc. v. Villaggio Di Las Olas, Inc.,
    915 So. 2d 220 (Fla. 4th DCA 2005) ........................................39

Manka v. DeFranco's, Inc.,
    575 So. 2d 1357 (Fla. 1st DCA 1991) ........................................42

Maor v. Dollar Thrifty Auto. Grp., Inc.,
    303 F. Supp. 3d 1320 (S.D. Fla. 2017) ...................32, 34, 35, 36, 45

Maor v. Dollar Thrifty Auto. Grp., Inc.,
    2018 U.S. Dist. LEXIS 168664 (S.D. Fla. 2018) ...................35, 36

Martorella v. Deutsch Bank Nat'l Trust Co.,
    931 F. Supp. 2d 1218 (S.D. Fla. 2013) ........................................46

Nantell v. Lim-Wick Constr. Co.,
    228 So. 2d 634 (Fla. 4th DCA 1969) ........................................43

Northstar Mtg., LLC v. McDaniel,
    288 So. 3d 1235 (Fla. 5th DCA 2020) ........................................18

Office of A.G. Dep't of Legal Affairs,
    869 So. 2d 592 (Fla. 1st DCA 2004) ........................................38

One Call Prop. Srvs., Inc. v. Security First Ins. Co.,
    165 So. 3d 749 (Fla. 4th DCA 2015) ........................................21

Parkway Gen'l Hosp., Inc. v. Allstate Ins. Co.,
    393 So. 2d 1171 (Fla. 3d DCA 1981) ........................................20-21

Plastiquim, S.A. v. Oderbrecht Constr., Inc.,
    337 So. 3d 1270 (Fla. 3d DCA 2022) ........................................39, 41

PNR, Inc. v. Beacon Prop. Mgmt., Inc.,
842 So. 2d 773 (Fla. 2003) ……………………………………………29

Real Estate Value Co., Inc. v. Carnival Corp.,
92 So. 3d 255 (Fla. 3d DCA 2012) ………………………………………..46

Robert J. Hanople, D.C., P.A. v. State Farm Mut. Auto. Ins. Co.,
345 So. 3d 303 (Fla. 4th DCA 2022) ………………………………………..18

Rollins, Inc. v. Heller,
454 So. 2d 580 (Fla. 3d DCA 1984),
Rev. denied, 461 So. 2d 114 (Fla. 1985) ………………………………30

Safeco Ins. Co. v. Ware,
401 So. 2d 1129 (Fla. 4th DCA 1981) ……………………………….20, 21

Samuels v. King Motor Co. of Ft. Lauderdale,
782 So. 2d 489 (Fla. 4th DCA 2001) ……………………………….30, 35

Scholpler v. Smilovits,
689 So. 2d 1189 (Fla. 4th DCA 1997) ………………………………………41

Siever v. BWGaskets, Inc.,
669 F. Supp. 2d 1286 (M.D. Fla. 2009) ……………………………30, 31

Someplace New, Inc. v. Francois,
51 So. 3d 1215 (Fla. 4th DCA 2011) ………………………………………..42

Steyr Daimier Puch v. A&A Bicycle Mart, Inc.,
453 So. 2d 1148 (Fla. 4th DCA,
rev. denied, 459 So. 2d 1039 (Fla. 1984) ………………………………..39

Suris v. Gilmore Liquidating, Inc.,
651 So. 2d 1282 (Fla. 3d DCA 1995) ………………………………………..30

Tallahassee Pediatric Dentistry PLLC v. Airgas USA, LLC,
2020 U.S. Dist. LEXIS 265237 (N.D. Fla. 2020) …………………………33

Thompson v. Bank of NY,
862 So. 2d 768 (Fla. 4th DCA 2003) ……………………………….…40, 43

vi

Turner Greenberg Assocs. v. Pathman,
    885 So. 2d 1004 (Fla. 4th DCA 2004) ………………………………………33

Vorst v. TBC Retail Grp., Inc.,
    2012 U.S. Dist. LEXIS 200363 (S.D. Fla. 2012) ………………………..34

Waste Pro USA v. Vision Constr. ENT, Inc.,
    282 So. 3d 911 (Fla. 1st DCA 2019) ……………………………29, 30, 33

Williams v. Bear Stearns & Co.,
    725 So. 2d 397, 400 (Fla. 5th DCA 1998) …………………………………46

Zlotnick v. Premier Sales Group, Inc.,
    480 F. 3d 1281 (11th Cir. 2007) …………………………………………29

## Other Authorities

Fed. R. Civ. P. 9(b) ……………………….……………….…….…..37, 38, 39, 40

Fla. R. Civ. P. 1.120(b) …………………..…….….………37, 39, 40, 42, 43

Fla. R. Civ. P. 1.130(a) ……………….…………………………18, 19, 20

Fla. R. Civ. P. 1.140(e) ………………………………………………….43

§ 501.202, Fla. Stat. (2023) …………………………………………..29, 38

§ 501.204(1), Fla. Stat. (2023) …………………………………….28, 32

15 U.S.C. § 45(a)(1) ……………………………………….……..29

40 Fla. Jur. 2d Pleadings § 36 (2009) ………………………………….41

# I.

## STATEMENT OF THE CASE AND FACTS

The plaintiffs in these five consolidated appeals, Sharon L. Orr, et al., appeal from prejudicial dismissals of their complaints against AT&T Mobility, LLC (AT&T).   The complaints allege, *inter alia*, violations of the Florida Deceptive and Unfair Trade Practices Act (FDUTPA), Fraud, and Breach of the Duty of Good Faith and Fair Dealing.  In dismissing the complaints, the trial judge relied on three unauthenticated, hearsay exhibits that AT&T attached to its motion to dismiss.  The exhibits appear to be web-site or electronic document printouts, without crucial identifying, contextualizing or authenticating information.  In relying on these exhibits, the trial judge effectively converted AT&T's motion to dismiss into a summary judgment proceeding without any of the procedural or evidentiary safeguards of such proceedings.

The underlying factual allegations fall into two categories: those related to "data throttling," and those related to a bogus "administrative fee."

### The Data Throttling Allegations

AT&T Mobility offered smartphone customers including the plaintiffs "unlimited" mobile data plans for a flat monthly fee.  However, AT&T began a practice of "data throttling," which had the effect of imposing monthly data limits.  Customers who exceeded certain data levels in a given billing cycle experienced reduced download speeds and service restrictions for the

1

remainder of the cycle.   These speed reductions and service restrictions were not determined by real-time network congestion at a particular cellular tower. Throttled customers were subject to the reduced speeds when using their smartphones at times when AT&T's networks had ample capacity to carry their data and when the networks were not congested. As a result, everyday applications, such as web browsing, GPS navigation, and streaming video, were significantly slower, and, in some cases were severely impaired or inoperable. (R. 341-43; 1998-99, 2928-29, 4799-4800).[1]

AT&T's wireless customer agreements did not state that an unlimited mobile data plan customer's use of more than a specific amount of data was a prohibited activity.  Nor did the agreements provide that AT&T could modify, diminish or impair the service of unlimited mobile data plan customers engaged in permissible activities if these customers used more than a specified amount of data.  Customers were promised unlimited data service for a fixed fee and were induced to sign long-term contracts typically lasting two years, with early termination fees.  Then they were induced to switch to more expensive tiered plans with overage fees to actually receive the unlimited data they were promised (a "bait and switch"). (R. 344; 1999-2001, 2929-30, 4800-01).[2]

---

[1] "R" refers to the record on appeal.

[2] The complaint in case no. 20-8179/3D23-97 (Sharon L. Orr) does not contain data throttling allegations.

**The Allegations of a Bogus Administrative Fee**

In another bait and switch scheme, AT&T advertised flat monthly rates for its post-paid wireless service plans.  Then, after customers signed up, AT&T charged higher monthly rates than promised by adding to these customers' bills a bogus "administrative fee."  The fee was $1.99 at the time of the filing of the complaints.  (R. 344, 2000, 2930, 4801, 5585).

The administrative fee was not disclosed to customers before or when they signed up and was never adequately and honestly disclosed.  It was not, in fact, a bona fide administrative fee.  It was just a means for AT&T to charge more per month for the service itself, thereby increasing revenue, without having to advertise the higher prices. (R. 345, 2000, 2930, 4801, 5585).

AT&T deliberately hid the administrative fee in its printed and online billing statements.  In its monthly billing statements, it buried a purported description of the fee in a portion of the statement that made it unlikely that customers would notice it.  In online billing statements that the plaintiffs and other customers received in lieu of printed statements, the default view for the statement did not have a line item for the administrative fee.  The description misleadingly suggested the fee was akin to a pass-thru fee to pay certain expenses.  In fact, it was simply a way for AT&T to advertise and promise lower rates than it actually charged. (R. 345, 2001, 2930-31, 4802, 5585).

Deep within AT&T's website, there was a purported description of the

administrative fee.  It misleadingly suggested the administrative fee was tied to certain expenses paid to third parties that were associated with providing wireless service (interconnect charges and cell site rental charges).  Even assuming this description was accurate, the fee should have been included in the advertised monthly price, because interconnect charges and cell site rental charges are basic costs of providing wireless service which a reasonable consumer would expect to be included in the advertised price. (R. 345-46, 2001, 2931, 4802, 5586).

Moreover, the fee was not, in fact, tied to the costs that AT&T's buried description suggested.  This is corroborated by the fact that AT&T repeatedly increased the monthly administrative fee since it was first imposed, while during that same time period the stated costs for interconnect charges and cell site rental charges decreased, according to AT&T's financial statements and SEC filings.  In any event, AT&T should have clearly disclosed the fee and should clearly and accurately have stated the true monthly prices for its post-paid wireless service plans in its price representations and advertising. (R. 346, 2001-03, 2931-32, 4803-04, 5586-87).

Since the administrative fee was first introduced in 2013, AT&T increased the fee three times, including twice over a three-month period in 2018.  The current price at the time the complaints were filed was $1.99 per line every month, over 200% more than the original fee amount.  In the six years

4

preceding the filing of the complaints, AT&T reaped hundreds of millions of dollars in additional charges from customers by means of the administrative fee.  (R. 346, 2003, 2932-33, 4304, 5587).

AT&T used the bogus administrative fee to covertly increase the monthly prices customers were charged for their service.  It then continued to use the fee and unilateral increases to ratchet up the price without the customer realizing and after the customer was already committed.  This scheme enabled AT&T to effectively increase its rates without having to publicly announce the higher rates.  This allowed it to entice more customers by misrepresenting the price they would pay both in absolute terms and relative to other wireless providers in the industry. (R. 346-47, 2003-04, 2933, 4804, 5587-88).

## The Relevant Counts of the Complaints

**FDUTPA Damages, Injunctive and Declaratory Relief:** The plaintiffs were victims of AT&T's bait and switch data throttling and bogus administrative fee practices.  These practices are each deceptive and unfair as contemplated by the FDUTPA.   The plaintiffs suffered damages proximately caused by AT&T's knowing and deliberate, deceptive and unfair trade practices, and also meet the requirements for injunctive and declaratory relief. (R. 349-52, 2005-10, 2935-40, 4806-11, 5589-92).[3]

---

[3] The complaint in case no. 19-11857/3D23-101 (Francisco Batista) does not contain a count for FDUPTA injunctive and declaratory relief.

**Fraud:** AT&T induced the plaintiffs to enter into agreements for unlimited data plans, falsely representing in the advertising, sale, and renewal of mobile data plans that these plans would provide unlimited data. AT&T knew that it intended to throttle the plaintiffs' data and thereby provide de facto limited data plans. The plaintiffs would not have entered into the agreements for "unlimited data" if they had known the truth. The plaintiffs incurred damages as a result. (R. 347, 2004, 2933-34, 4805).

AT&T's representations on its bills and its website regarding the purported administrative fee were false statements of material fact. AT&T knew or should have known that the representations were false. It intended that the representations would induce the plaintiffs to continue as customers with AT&T. The plaintiffs suffered damages in justifiable reliance on AT&T's false representations. (R. 347-48, 2004-05, 2934-35, 4805-06, 5588-89).

**Breach of Implied Duty of Good Fair and Fair Dealing:** Plaintiffs had a reasonable expectation that they would receive unlimited data and that they would pay the advertised monthly fee and no more. AT&T was required to act in a commercially reasonable manner with regard to its promises to provide unlimited data and service for the advertised fee. The express terms of the wireless agreement required AT&T to provide unlimited data and true administrative costs as defined in the contract. AT&T breached the express terms of the wireless agreement, and as a result plaintiffs have been damaged.

6

(R. 348-49, 2010-11, 2940-41, 4811-12).4

## AT&T's Motions to Dismiss

AT&T contended that the wireless customer agreements allowed AT&T to reduce data speeds to preserve network integrity, and that they disclosed the administrative fee without limiting how it could be applied. (R. 682, 2963, 4825, 5645).  AT&T attached to its motions unauthenticated exhibits that purport to be website printouts of the Wireless Customer Agreement, an AT&T Mobility Fee Schedule, and a monthly bill of each individual plaintiff of unknown origin. (R. 698-722, 3015-43, 4900-4905, 5700-26).  AT&T argued that these documents were incorporated by reference in the complaints, and therefore were fair game for its contentions that the documents contradicted the allegations of the complaint, without the need for authentication.

AT&T's wireless customer service agreement exhibit appears to be a printout of small-print contract language from an internet website (for example it has a "print" button that is typical of website documents).  But it is undated and does not contain any identifying customer information, such as a customer name or phone number.  The exhibit also fails to contain a domain address or URL.  (R. 699-715).  Similarly, the "AT&T Mobility Fee Schedule" exhibit is undated, without a domain address or URL, and provides no information about

---

4 The complaint in case no. 20-8179/3D23-97 (Sharon L. Orr) does not contain a count for breach of a duty of good faith and fair dealing.

how or when it might have been accessed by a customer, or if it was accessible at all. (R. 717-19). The customer bill exhibits have customer information and appear to be bills relating to the individual plaintiffs. However, there is no indication of whether or when they might have been delivered to the plaintiffs or in what format (paper or electronic). (R. 721-22).

With regard to the data throttling allegations, AT&T focused on a section of the wireless customer agreement exhibit titled "What Are The Intended Uses of AT&T's Wireless Data Service?" (E.g., R. 709-10). This section provided:

> **Unlimited Data Customers.** If you are an AT&T unlimited data plan customer, you agree that "unlimited" means you pay a fixed monthly charge for wireless data service regardless of how much data you use. You further agree that "unlimited" data does <u>not</u> mean that you can use AT&T's wireless data service in any way that you choose or for any prohibited activities, and that if you use your unlimited data plan in any manner that is prohibited, AT&T can limit, restrict, suspend or terminate your data service or switch you to a tiered data plan.

A sub-section titled "prohibited activities" contained three bullet points. The first concerned using wireless data services to defeat, obstruct or penetrate AT&T's security measures. The second concerned using the services "in any manner that has the effect of excessively contributing to network congestion, hindering other customers' access to the network, or degrading network performance by maintaining a sustained or continuous wireless data service connection or active wireless internet connection." The third concerned using wireless data services "with high bandwidth applications, services and content

8

that are not optimized to work with AT&T's wireless data services…"

Another sub-section contained a provision allowing AT&T to "reduce your data throughput speeds at any time or place if your data usage exceeds an applicable, identified usage threshold during any billing cycle.  AT&T will provide you with advance notice of the usage threshold applicable to your data plan, or any changes to the applicable usage threshold either by a bill insert, email, text message or other appropriate means."

AT&T did not contend that any of the plaintiffs performed any prohibited activities.  Instead, it contended that the above quoted provisions generally gave it the right to reduce data speeds to preserve network integrity.  AT&T did not assert that there were any applicable, identified usage thresholds in effect.

With regard to the bogus administrative fee, AT&T pointed to certain provisions in its exhibits that it contended adequately disclosed the fee and did not limit its uses and applications.  The wireless customer agreement exhibit provided within a section titled "How Will I Receive My Bill? What Charges Am I Responsible for? How Much Time Do I Have to Dispute My Bill?":

> Charges include, without limitation, airtime, roaming, recurring monthly service, activation, administrative, and late payment charges; regulatory cost recovery and other surcharges; optional feature charges; toll, collect call and directory assistance charges; restoral and reactivation charges; any other charges or calls billed to your phone number; and applicable taxes and governmental fees, whether assessed directly upon you or upon AT&T.

(E.g., R. 700).

AT&T's "AT&T Mobility Fee Schedule" exhibit contains within a section titled "AT&T Fees for AT&T Mobility Post-paid Services" an item called "Administrative Fee."   In this item, the fee amount is specified to be "up to $1.99 per line per month, see att.com/additional charges."   The "general description" of the "administrative fee" states:

> A monthly fee charged to help AT&T recover a portion of certain expenses AT&T incurs, including but not limited to: (a) charges AT&T or its agents pay to interconnect with other carriers to deliver calls from AT&T customers to their customers; and (b) charges associated with cell site rents and maintenance.  This fee is not a tax or charge which the government requires AT&T to collect from its customers.

(E.g., R. 717).

The customer bill exhibits contain a section of small-print items in the back of the bill titled "Important Information," and within that heading smaller sub-headers including one titled "Surcharges and other fees."   Under this sub-header, it is stated in small print:

> AT&T imposes additional charges on a per line basis, including federal and state universal services charges, an Administrative Fee (to defray certain expenses including charges AT&T or its agents pay to interconnect with other carriers to deliver calls from AT&T customers to their customers, and charges associated with cell site rents and maintenance), and a Regulatory Cost Recovery Charge (to recover costs of compliance with certain government imposed regulatory requirements, including Wireless Number Portability and Number Pooling, and E911).  These fees are not taxes or charges that the government requires AT&T to collect from its customers.  See att.com/mobility fees for details.

(E.g., R. 722).

10

AT&T contended that these provisions adequately disclosed the administrative fee. And while the provisions gave examples of interconnect charges and cell site rents, they state that the fee "includes" these examples (but, according to AT&T, is "not limited" to these examples and hence includes limitless possibilities). Therefore, according to AT&T, customers were adequately advised of a fee of limitless possible applications and usages.

With regard to individual counts of the complaint, AT&T contended chiefly that the fraud allegations, including the FDUTPA count which according to AT&T sounded in fraud, were not alleged with the required specificity (they are the same for all plaintiffs, with no individualized details such as dates). Further, AT&T contended that the plaintiffs could not recover for alleged false misrepresentations that were adequately dealt with in the contract. AT&T contended that there is no separate duty of good faith and fair dealing separate from breach of contract. It contended that an unjust enrichment count should be dismissed because a contract governs the parties' relationship.[5] The motions also contained arguments concerning declaratory and injunctive relief claims that are no longer at issue.[6]

---

[5] The plaintiffs' counsel stated during the consolidated hearing on AT&T's motions to dismiss that the unjust enrichment count, pleaded in the alternative, would no longer be viable once AT&T introduced in evidence an authenticated contract. (R. 1925).

[6] The plaintiffs withdrew the FDUTPA injunctive and declaratory relief claims

## The Trial Court's Rulings on the Motion to Dismiss

A consolidated hearing was held on April 28, 2022 for the five cases now on appeal. (R. 1887-1941).   In subsequently entered orders granting the motions to dismiss, the trial judge dismissed all claims. (R. 1780-99, 2567-86, 4587-4606, 5387-5405, 6654-69).  The judge rejected the plaintiffs' contention that AT&T could not rely on the unauthenticated hearsay exhibits to the motions to dismiss.  The judge stated, without proof, that the undated wireless customer agreement printout exhibit was the agreement in effect at the relevant times. (R. 1781, 2568, 4588, 5388, 6655).  The judge stated that the complaints refer to, incorporate, and quote from the wireless customer agreements, billing statements and website fee schedule, and the complaints allege in part breach of contract.  In addition, the judge found that the plaintiffs had a duty to attach the wireless customer agreement to the complaint, notwithstanding the plaintiffs' allegations that the contract "is under the exclusive control of AT&T."  The judge considered the three exhibits to the motion to dismiss to be within the four corners of the complaint, and therefore could be considered without authentication.  (R. 1782, 2569, 4588-90, 5388-90, 6665-57).  The judge noted that otherwise the incorporation by reference doctrine would be meaningless, and the motions to dismiss would be

---

based on disclosure of GEO location data during the consolidated motion to dismiss hearing. (R. 1910-11).

converted into summary judgment motions. (R. 1783, 2570, 4590, 6657).

The judge found that the "data throttling" allegations were contradicted by the wireless customer agreements.  The judge found that the term "unlimited" in the agreement refers to the amount of data, not the speed.  Moreover, the agreements allow AT&T to reduce speeds to maintain network integrity and avoid congestion.  Therefore, the claims based on data throttling fail to state a cause of action. (R. 1789-91, 2576-78, 4596-98, 5396-97).

Similarly, the judge found the bogus administrative fee allegations were defeated by the exhibits attached to the motions to dismiss.  The judge stated that the fee was disclosed and defined in these exhibits.  According to the judge, the use of the term "administrative fee" does not by itself suggest AT&T will apply the fee in any particular way.  AT&T's use of examples, such as interconnect charges and cell site rentals, did not limit the possible uses of the fee.  The website definition states that the fee is to defray certain expenses, "including but not limited to" the given examples of interconnect charges and cell site rentals.  The judge stated that "no reasonable consumer could interpret the Administrative Fee, its definition, or its application as deceptive, unfair, or based on a misrepresentation."  Further, the judge noted that the administrative fee is not a "pass-through fee," as alleged.  For these reasons, the judge held that claims based on the administrative fee failed to state a valid cause of action. (R. 1784-89, 2572-75, 4592-96, 5391-96, 6658-63).

13

The judge ruled that the plaintiffs' fraud and fraud-based FDUTPA claims were not alleged with the required specificity.  The plaintiffs did not, for example, allege when their data speed was reduced, how they were harmed by the data speed reduction, when they saw the website definition of the administrative fee, or how they justifiably relied on it and were damaged. (R. 1790-93, 2578-80, 4599-4600, 5398-5400, 6664-65).

The judge ruled that the counts alleging breach of a duty of good faith and fair dealing failed to state a cause of action.  The allegations were not tied to any particular provision of the wireless customer agreement, the agreement authorizes the conduct complained of (therefore, there is no breach of the agreement), and like the fraud claims they were not alleged with sufficient specificity. (R. 1793-95, 2580-81, 4600-01, 5400-01).

The judge held that the FDUTPA claims are contradicted by terms of the wireless customer agreement which authorizes the conduct complained of.  In addition, the plaintiffs failed to adequately allege causation and "actual damages." Therefore, the conduct complained of is not unfair or deceptive, as a matter of law. (R. 1795-96, 2582-83, 4602-03, 5401-02, 6665-66).

The trial judge denied the plaintiffs' motions for rehearing.  The plaintiffs now appeal from the prejudicial dismissal of their claims.

## II.

## <u>SUMMARY OF ARGUMENT</u>

The trial judge erred in considering the unauthenticated hearsay exhibits to the motions to dismiss.  None of the causes of action were "brought upon" the customer bills or fee schedule.  With regard to the wireless customer agreement, ATT's appropriate remedy would have been to file an authenticated agreement or insist that the plaintiffs obtain one and attach it to an amended complaint.  Allowing AT&T to base its motion to dismiss on the unauthenticated exhibits effectively converted its motion into one for summary judgment, without any of the procedural and evidentiary safeguards of summary judgment proceedings.

The counts based on "data throttling" state valid causes of action.  As alleged, AT&T promised and agreed to provide unlimited data, but effectively provided data with limits.  Limiting data speed so as to make the service substantially less useful or unusable, as alleged, is tantamount to a data limitation.  The unauthenticated wireless customer agreements, even if they can be considered on a motion to dismiss, did not provide any applicable exceptions to the unlimited data promise.

The counts based on allegations of a bogus administrative fee also state valid causes of action.  AT&T is alleged to have imposed the fee as a means of padding its advertised monthly service fee without adequately and honestly

disclosing it as such.  Instead, buried deep in its website and in small print in customer bills (the degree to which AT&T hid these disclosures cannot be appreciated by merely considering AT&T's exhibits), AT&T describes the fee in a way that suggests it will be used to defray or help it recover expenses paid to third parties, such as interconnect charges and cell site rentals.  As alleged, AT&T does not use the fee for any such expenses and keeps it for itself.

The trial judge erroneously concluded that the fraud, FDUTPA, and breach of the duty of good faith and fair dealing allegations lack specificity (we dispute that counts other than common law fraud are subject to the heightened fraud pleading requirement of Fla. R. Civ. P. 1.120(b)).  Alleging fraud with specificity does not necessarily require dates, places, and other such details.  It merely requires a level of specificity, as the circumstances permit, to notify the defendant of the nature of the fraud.  Here, that was done by virtue of allegations that each plaintiff was a victim of data speed reductions after being promised unlimited data, and that each plaintiff paid a bogus administrative fee that improperly inflated the promised monthly fee and was not used for the purposes represented by AT&T.

<div align="center">

**III.**

**<u>ARGUMENT</u>**

</div>

**A.**     **<u>Standard of Review</u>.**

The standard for reviewing a trial court's ruling on a motion to dismiss is de novo.  *Giller v. Giller*, 190 So. 3d 666, 668 (Fla. 3d DCA 2016).  "The purpose of a motion to dismiss is to test the legal sufficiency of the complaint." *Id*.  "When considering a motion to dismiss, the trial court must accept the well-pled allegations of the complaint as true, and may not go beyond the four corners of the complaint in considering the legal sufficiency of the allegations." *Id*. at 669.  "Moreover, a motion to dismiss cannot be granted based on an affirmative defense unless the defense appears on the face of a pleading."  *Id*. "To that end… a motion to dismiss is not a substitute for summary judgment." *Id*. (citations omitted).

**B.**     **<u>The Trial Court Erred In Dismissing the Complaints Based on AT&T's Unauthenticated Hearsay Exhibits</u>.**

The trial judge ruled that because the plaintiffs referenced in their complaints the wireless service agreement, the web page fee schedule, and the monthly wireless service bills, AT&T was justified in attaching these unauthenticated documents to its motion to dismiss and contending that they negated key allegations of the complaints.   AT&T's wireless customer agreement exhibit is a printout of small-print contract language that is undated

<div align="center">

17

</div>

and does not provide a URL or identifying customer information, such as a name or phone number.  There is no way of knowing whether this exhibit represents the entire contract that pertains to each plaintiff and was in effect at the relevant times.  In basing prejudicial dismissals of these cases on inadmissible exhibits, the trial judge committed reversible error.

To begin with, the judge improperly applied the incorporation doctrine. Fla. R. Civ. P. 1.130(a) only requires that "documents on which an action may be brought… must be incorporated in or attached to the [complaint]."  It does not state that any document referenced in a pleading must be attached.  There are three relevant causes of action: violations of the FUDTPA, fraud, and breach of the duty of good faith and fair dealing.  AT&T's exhibits are relevant to these causes of action.  But with the possible exception of the wireless customer agreement as it relates to the alleged breach of the duty of good faith and fair dealing, none of these causes of action were "brought upon" AT&T's exhibits. *See Robert J. Hanople, D.C., P.A. v. State Farm Mut. Auto. Ins. Co.*, 345 So. 3d 303, 308 (Fla. 4th DCA 2022) (medical provider in PIP action was not required to attach to complaint assignment of benefits; the action was "brought upon" the insurance policy, not the assignment for purposes of rule 1.130); *Northstar Mtg., LLC v. McDaniel*, 288 So. 3d 1235 (Fla. 5th DCA 2020) (servicer of mortgagee was not required to attach to foreclosure complaint document supporting allegation that it was the mortgagee's servicer; action

18

was not "brought upon" the service agreement or power of attorney for purposes of rule 1.130); *Glen Garron, LLC v. Buchwald*, 210 So. 3d 229, 234 (Fla. 5th DCA 2017) (mortgage must be attached to complaint for foreclosure, but not promissory note because action is not brought upon the note; but promissory note must be attached to action on the note for damages).

The plaintiffs allege that AT&T's data throttling and bogus administrative fee constitute deceptive and unfair trade practices under the FDUTPA.  The complaints describe how AT&T misled consumers about having "unlimited data" plans that were, in fact, limited by data throttling, and how AT&T covertly increased the advertised amount of the monthly fee for wireless service by adding a bogus "administrative fee."  It is AT&T's practices that form the basis of the causes of action for purposes of rule 1.130, not AT&T's exhibits, which only constitute potential relevant evidence of whether AT&T was deceiving consumers.  In addition, the exhibits do not constitute the entire universe of possible documentary evidence relevant to AT&T's unfair and deceptive trade practices.  Advertisements and other communications could surface in discovery that are relevant to AT&T's practices.  Yet, AT&T's motion to dismiss was granted based only on the inadmissible documents it chose to present.

Likewise, the fraud cause of action is based on AT&T's material, false representations about "unlimited data" and the monthly amount for a wireless data plan that induced the plaintiffs to purchase wireless service.  Documents

in which false representations were made would be relevant.  But an action for fraud is not "brought upon" these documents within the meaning of rule 1.130, but rather on AT&T's overall fraudulent conduct.  And again, these specific documents do not constitute the entire universe of potential relevant evidence.

Even with regard to the cause of action for breach of the duty of good faith and fair dealing, the picture is not as simple as the trial judge portrayed it to be.  Arguably, this breach-of-contract-like action, is "brought upon" the wireless service agreement.  But the cause of action was not "brought upon" the customer bills and fee schedule, as contemplated by rule 1.130.  Yet the trial judge erroneously allowed AT&T to rely on these inadmissible exhibits to argue that they defeat the plaintiffs' cause of action as a matter of law.

In addition, it was error to enter a prejudicial dismissal based on the undated, unauthenticated, unidentified wireless service agreement, even if the cause of action for breach of the duty of good faith and fair dealing was arguably "brought upon" it.  Normally, when a plaintiff in a breach of contract action alleges not being in possession of the contract, the appropriate procedure is to allow the plaintiff to obtain the contract through discovery or otherwise and attach it to an amended complaint.  *See Safeco Ins. Co. v. Ware*, 401 So. 2d 1129 (Fla. 4th DCA 1981).  It would generally be an abuse of discretion to dismiss the complaint with prejudice without allowing the plaintiff an opportunity to amend. *See Parkway Gen'l Hosp., Inc. v. Allstate Ins. Co.*,

20

393 So. 2d 1171 (Fla. 3d DCA 1981); *Glen Garron, LLC*, 210 So. 3d at 236 ("failure to attach necessary documents is a remediable offense").

Of course, the defendant can raise the failure to attach the contract in a motion to dismiss. However, we are not aware of any Florida rule of procedure or precedential court decision that would allow a defendant to attach an unauthenticated contract to a motion to dismiss and base its motion on this exhibit when its authenticity is contested. *Cf. One Call Prop. Srvs., Inc. v. Security First Ins. Co.*, 165 So. 3d 749, 752 (Fla. 4th DCA 2015) (allowing insurer to attach **certified** insurance policy to a motion to dismiss in action for breach of insurance policy). The appropriate remedy would be for the defendant to present an authenticated contract, or to insist that the plaintiff attach the contract to the complaint by way of an amended complaint or suffer dismissal. *See One Call Prop. Srvs*., *supra* (certified policy attached to motion to dismiss); *Ware*, 401 So. 2d at 1130-31 (defendant insurer provided plaintiff with a certified insurance policy, then moved to require the defendant to attach the policy or suffer dismissal). Once an authenticated contract is filed, the defendant can then move to dismiss the complaint based on a conflict between the contract and the breach of contract allegations, if appropriate.

Here, the trial judge's ruling bypassed important evidentiary safeguards. The judge concluded, without proof, that the wireless customer agreement was authentic and applicable. The exhibit itself was just a raw website printout

without any means of determining its date, authenticity, admissibility, completeness, and applicability.  (The fee schedule and customer bills suffer from similar defects).  The wireless service agreement exhibit does not even reference a customer name or phone number.  It should have been a simple matter for AT&T to file or attach the agreement with an affidavit identifying and authenticating it, and establishing it is the complete agreement that was in effect at the relevant times and applies to the customer in question.

AT&T's contention that this procedure would convert its motion to dismiss into a summary judgment proceeding is without merit.  The issue that should be of concern is whether the opposite occurred, *i.e.*, whether AT&T effectively converted its motion to dismiss into a flawed summary judgment motion by relying on unauthenticated hearsay documents that, with the possible limited exception of the wireless customer agreement, at best are potentially relevant to affirmative defenses that have not yet been raised.

The notion adopted by the trial judge that any document referenced in a complaint can be subject to the incorporation doctrine and therefore may be attached in inadmissible form to a motion to dismiss as grounds for dismissal is problematic.  The plaintiffs' allegations concerning these documents were mostly raised in anticipation of possible affirmative defenses (*e.g.*, that the documents allow the complained of practices).  Using the incorporation doctrine to allow AT&T to base its motion to dismiss on these inadmissible

exhibits effectively converted it into a motion for summary judgment, without any of the procedural and evidentiary safeguards of formal summary judgment proceedings.  The trial judge's ruling in effect created a special exception to due process for AT&T's unauthenticated hearsay printouts—if they are from AT&T's internet website, they must be what AT&T's counsel says they are.

## C.  The Trial Court Erred in Dismissing With Prejudice the Causes of Action for FDUTPA Violation, Fraud, and Breach of Implied Duty of Good Faith and Fair Dealing.

### 1.  The Wireless Customer Agreement Does Not Negate the Data Throttling Allegations.

The trial judge clearly got this wrong.  The complaints allege that AT&T promised the plaintiffs "unlimited data" plans.  But it turned out the plans provided only limited data, because once the plaintiffs exceeded certain undisclosed data limits in a given billing cycle their data speeds were reduced and service restricted.  The "data throttling" rendered everyday applications, such as web browsing, GPS navigation, and streaming video, significantly slower, and, in some cases were severely impaired or inoperable.  Hence, the data throttling effectively deprived the plaintiffs of the promised unlimited data.

AT&T's wireless customer agreement exhibit actually supports the allegation that AT&T promised unlimited data.  It provides that "'unlimited' means you pay a fixed monthly charge for wireless data service regardless of how much data you use."  The only stated restriction identified in the

agreement is for certain "prohibited activities" ("if you use your unlimited data plan in any manner that is prohibited, AT&T can limit, restrict, suspend or terminate your data service or switch you to a tiered data plan.")  The prohibited activities are specified in the agreement in three bullet points: using the wireless service in contravention of AT&T's security measures; using the services in a manner that contributes to network congestion; and certain high bandwidth usages of the service.  There is no allegation or assertion that plaintiffs engaged in any of these prohibited activities.

The agreement also provides that data limitations may apply "if your data usage exceeds an applicable, identified usage threshold during any billing cycle.  AT&T will provide you with advance notice of the usage threshold applicable to your data plan, or any changes to the applicable usage threshold either by a bill insert, email, text message or other appropriate means."  It has not been alleged or asserted that AT&T provided notice of usage thresholds.

Perhaps in anticipation of AT&T's possible defenses, the complaints allege that data throttling was not accompanied by or determined by any actual network congestion.  AT&T did not assert otherwise (in any event, it would have to raise such an assertion as an affirmative defense).  Instead, AT&T contended, and the trial judge found, that the agreement gave it the discretion to engage in data throttling in order to avoid network congestion generally, even in the absence of any actual network congestion.

There is no reasonable interpretation of the wireless customer agreement that would support the trial judge's ruling.  It plainly states that unlimited data means what it says.  The only possible exceptions are for the specified prohibited activities or identified usage thresholds, none of which are applicable.  Any ambiguity in the agreement in this regard would be construed against the drafter, AT&T.  *See Iniguez v. Am. Hotel Register Co.*, 820 So. 2d 953, 956 (Fla. 3d DCA 2002), *rev. dismissed*, 838 So. 2d 558 (Fla. 2003).

The trial judge's comment that the term "unlimited" in the agreement refers to the amount of data, not the speed, is contradicted by the complaints' allegations.  It is alleged that the data throttling rendered the data substantially less usable or unusable.  Providing unusable or barely usable data after certain unannounced data limits have been reached in the billing cycle is tantamount to a data limit that violates the promise of unlimited data.

## 2. AT&T's Exhibits Do Not Negate the Allegations of a Bogus Administrative Fee.

The trial judge ruled that the "administrative fee," which the plaintiffs alleged to be bogus and a covert way of padding the advertised monthly fee for wireless service, was adequately disclosed to the plaintiffs as a generalized fee that AT&T could use for any purpose in its discretion.  The judge reached this conclusion by considering the wireless service agreement, fee schedule, and customer bill exhibits.  We respectfully submit that the judge reversibly erred.

There are two aspects of the plaintiffs' allegations regarding AT&T's failure to disclose the bogus administrative fee.  The first concerns the failure to disclose in the sense of consumers lacking reasonable access to the information.  The second deals with the content of alleged disclosures as being insufficient to apprise consumers of the nature of the fee.

The trial judge's findings do not contain any real analysis on the issue of accessibility of the information.  The judge merely concluded that the information was disclosed to consumers by virtue of the exhibits.  However, the issue of accessibility requires consideration of the overall context in which the information is made available to consumers.  This is a question of fact that cannot be appropriately resolved on a motion to dismiss.

To assess accessibility, it is insufficient merely to review the exhibits out of context.  There is no indication of how, when and in what manner and format the wireless customer agreement and other exhibits were provided to or accessible to the plaintiffs.  There is a substantial unanswered question of whether the wireless customer agreement exhibit represents the contract in effect at the relevant times with regard to each plaintiff.  There are also unanswered questions of whether AT&T's exhibits are complete in themselves and in relation to other representations such as advertisements.

There is no indication of the format in which the customer bills were delivered to plaintiffs.  The complaints allege the plaintiffs received them

26

electronically, and that the default page did not show information about the administrative fee.  It is alleged that the fee schedule webpage was buried deep within AT&T's website, so that it would not have been reasonably accessible to the plaintiffs when they signed up for wireless service.  AT&T's exhibits do not refute these allegations or even shed light on them.  They do not indicate how the plaintiffs would have accessed them, or with regard to the bills, the method of delivery, whether on paper or electronically.

On the issue of the sufficiency of the alleged disclosures' content, the wireless customer agreement exhibit merely states that the monthly bill includes monthly service, "administrative," and several other charges.  The fee schedule and customer bill exhibits represent that AT&T imposes the fee to defray or recover certain expenses AT&T pays to third parties, and they give examples of interconnect charges paid to connect with other carriers and cell site rentals.  It is true, as the trial judge noted, that both alleged disclosures use the word "including" and the fee schedule states "including but not limited to." However, a reasonable consumer would not read these alleged disclosures as giving AT&T carte blanche to keep the fee for itself.  It would be reasonable to believe the fee will be used to defray or recover expenses relating to providing wireless service that are paid to third parties.  Otherwise, why would AT&T say it intends to "defray" or "recover" these expenses and why would it give two examples that clearly involve expenses paid to third parties?  If AT&T wanted

to advise consumers that it could choose **not** to use the administrative fee to defray or recover expenses paid to third parties, it easily could have done so.

The complaints allege that AT&T did not, in fact, use the fee to defray or recover expenses paid to third parties. This allegation is corroborated by the fact that the two listed expenses actually decreased during the time period when AT&T increased the administrative fee. If AT&T wants to assert that it used the fee to defray or recover expenses paid to third parties as it represented, it should affirmatively allege this and submit supporting evidence.

AT&T's exhibits cannot reasonably be interpreted as granting it the discretion to keep the fee and use if for any purpose it chooses, including covering normal overhead or increasing revenue. Hence, the exhibits do not negate the allegations of the complaints concerning the bogus administrative fee. Dismissing the complaints on this basis was reversible error.

### 3. The Complaints State a Cause of Action for FDUTPA Violations.

The FDUTPA declares that "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful." §501.204(1), Fla. Stat. (2023). "It is the intent of the Legislature that, in construing subsection (1), due consideration and great weight shall be given to the interpretations of the Federal Trade Commission and the federal courts

relating to s. 5(a)(1) of the Federal Trade Commission Act, 15 U.S.C. s. 45(a)1)

as of July 1, 2017."  Its purpose and intended construction is stated as follows:

> **Purposes; rules of construction.**--The provisions of this part shall be construed liberally to promote the following policies:
>
> (1) To simplify, clarify, and modernize the law governing consumer protection, unfair methods of competition, and unconscionable, deceptive and unfair trade practices.
>
> (2) To protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce.
>
> (3) To make state consumer protection and enforcement consistent with established policies of federal law relating to consumer protection.

§ 501.202.

A claim for damages under FDUTPA has three elements: (1) a deceptive

act or unfair practice; (2) causation; and (3) actual damages.  *Waste Pro USA*

*v. Vision Constr. ENT, Inc.*, 282 So. 3d 911, 917 (Fla. 1st DCA 2019).

Deception occurs "if there is a representation, omission, or practice that is

likely to mislead the consumer acting reasonably in the circumstances, to the

consumer's detriment."  *Zlotnick v. Premier Sales Group, Inc.*, 480 F. 3d 1281,

1284 (11th Cir. 2007), quoting *PNR, Inc. v. Beacon Prop. Mgmt., Inc.*, 842 So.

2d 773, 777 (Fla. 2003).  An unfair practice is "one that offends established

public policy and… [one that] is immoral, unethical, oppressive, unscrupulous

or substantially injurious to consumers."  *Hetrick v. Ideal Image Dev. Corp.*,

372 F. Appx. 985, 992 (11th Cir. 2010), quoting *Samuels v. King Motor Co. of Ft. Lauderdale*, 782 So. 2d 489, 499 (Fla. 4th DCA 2001).

A party asserting a deceptive trade practice claim need not show actual reliance on the representation at issue. *Waste Pro USA*, 282 So. 3d at 917. The measure of actual damages is the difference in the market value of the product or service in the condition it was delivered according to the parties' contract. *Rollins, Inc. v. Heller*, 454 So. 2d 580, 585 (Fla. 3d DCA 1984), *rev. denied*, 461 So. 2d 114 (Fla, 1985). Where the alleged deceptive practice is the defendant's misrepresentation of why a fee is being charged, the measure of actual damages is the amount retained by the defendant instead of being used for the represented purposes. *Waste Pro USA*, 282 So. 3d at 910. To allege causation and damages in a FDUTPA claim, it is sufficient to allege that the plaintiff "paid what he presumed to be a charged being passed through Defendant to [a third party], but Defendant kept a portion of the charge." *Bowe v. Public Storage*, 2014 U.S. Dist. LEXIS 195556 (S.D. Fla. 2014).

Whether particular conduct constitutes an unfair or deceptive trade practice is a question of fact. *Siever v. BWGaskets, Inc.*, 669 F. Supp. 2d 1286, 1292 (M.D. Fla. 2009); *Suris v. Gilmore Liquidating, Inc.* 651 So. 2d 1282, 1283 (Fla. 3d DCA 1995). "[A] claim under FDUTPA is not defined by the express terms of a contract, but instead encompasses unfair and deceptive practices arising out of business relationships." *Siever*, 669 F. Supp. 2d at

1293. (rejecting defendant's claim that FDUTPA relief was inappropriate because express terms of agreements were not violated).

Here, the plaintiffs stated causes of action for FDUTPA violations based on data throttling and the bogus administrative fee.  The data throttling claims allege AT&T promised the plaintiffs unlimited data, but made their data significantly less usable or unusable by reducing data speeds after certain undisclosed data thresholds were reached during a given billing cycle.  As discussed, *supra*, there is nothing in the wireless customer agreement that allows AT&T to impose such data restrictions absent actual data congestion caused by the individual consumer's conduct, or other specific prohibited activities that did not occur in this case.  Nor does the agreement allow AT&T to generally impose data restrictions without following certain advance notification procedures to the consumer, which also did not occur in this case.  The complaints allege the plaintiffs were consequently damaged.  The allegations of FDUTPA violation based on data throttling state a valid cause of action and should not have been dismissed. *See In re Tracfone Unlimited Serv. Plan Litig*., 112 F. Supp. 3d 993 (N.D. Calif. 2015) (approving class action settlement of claims, including FDUTPA violation under Florida law, that alleged wireless carrier promised unlimited data but throttled data as alleged in the present case, the court noting that the FTC alleged that the practice in

question was deceptive,7 and further noting that "the Plaintiffs' case appears strong" despite viable defenses).

The complaints allege AT&T promised monthly service for a fixed fee, but added a bogus "administrative fee" that was not tied to actual expenses paid to third parties and was instead taken by AT&T as profit to surreptitiously pad the monthly fee.  According to AT&T's exhibits, the fee is specifically described as being used to defray or recover certain expenses paid to third parties, such as interconnect charges and cell site rentals.  Whether a reasonable consumer would believe the fee will be used for these purposes, rather than be kept by AT&T to cover normal overhead or as additional revenue, is one of fact.

"Courts have held that charges that are purported to be pass-through charges for specific expenses, but are in fact profit generating fees disguised as costs, are violations of the FDUTPA." *Maor v. Dollar Thrifty Auto. Grp., Inc.*, 303 F. Supp. 3d 1320, 1328 (S.D. Fla. 2017).  *See Maor*, 303 F. Supp. 3d at 1328-29 (denying motion to dismiss, where complaint alleged "administrative fee" described as being used to cover toll expenses was substantially higher than needed for such expenses); *Coleman v, CubeSmart*, 328 F. Supp. 3d 1349 (S.D. Fla. 2018) (denying motion to dismiss, where it was alleged space

---

7 *See* § 501.204(1), requiring the FTC's interpretations of the FDUTPA to be given "due consideration and great weight."  The complaints allege that the FTC interprets AT&T's data throttling as being deceptive and unfair. (E.g., R. 2006).

rental company represented it would use portion of contents insurance premium paid by customers for its processing expenses, but the company generated large revenues and profits from the fee); *Waste Pro USA*, 282 So. 3d at 910 (affirming order certifying class, where allegation was that defendant charged what it called an "environmental fee" that it actually kept as profit); *Turner Greenberg Assocs. v. Pathman*, 885 So. 2d 1004 (Fla. 4th DCA 2004) (affirming class certification order, where allegation was that defendant interior design firm charged a "freight/insurance" charge, which the defendant represented it was simply passing through to the customer, but actually contained a profit component); *James D. Hinson Elec. Contr. Co. v. BellSouth Telecomms., Inc.*, 796 F. Supp. 2d 1341, 1353 (M.D. Fla. 2011) (denying summary judgment where there remained a question of fact as to whether phone company's "claims processing" expense was not what it was represented to be); *Latman v. Costa Cruise Lines, N.V.*, 758 So. 2d 699 (Fla. 3d DCA 2000) (reversing denial of class certification, where it was alleged that cruise line charged passengers "port charges," a portion of which it actually kept for itself as profit), *rev. denied*, 819 So. 2d 136 (Fla. 2002); *Tallahassee Pediatric Dentistry PLLC v. Airgas USA, LLC*, 2020 U.S. Dist. LEXIS 265237 (N.D. Fla. 2020) (denying motion to dismiss, where it was alleged "fuel surcharge" was not used for that purpose); *Calderon v. Sixt Rent a Car, LLC*, 2020 U.S. Dist. LEXIS 24247 (S.D. Fla. 2020) (denying motion to dismiss,

where it was alleged defendant charged consumers bogus fees to bring in additional revenue rather than being used for the purposes represented); *Deere Constr., LLC v. Cemex Constr. Materials Fla., LLC*, 198 F. Supp. 3d 1332 (S.D. Fla. 2016) (denying motion to dismiss, where it was alleged defendant building material company charged "fuel surcharges" and "environmental charges" that were not used to cover anything related to fuel or the environment). *Compare Berry v. Budget Rent a Car Syst.*, 497 F. Supp. 2d 1361 (S.D. Fla. 2007) (dismissing FDUTPA claim alleging defendant charged a disclosed "cost recovery fee" that was not represented as defraying any particular costs); *Vorst v. TBC Retail Grp., Inc.*, 2012 US. Dist. LEXIS 200363 (S.D. Fla. 2012) (use of the name "oil disposal fee" implied to consumers that defendant would "keep the fee for itself"); *Costa v. Kerzner Int'l Resorts, Inc.*, 2011 U.S. Dist. LEXIS 66921 (S.D. Fla.- 2011) (dismissing FDUTPA claim based on allegation that a combined "mandatory housekeeping gratuity and utility service fee" was not distributed entirely to housekeeping staff).

In *Maor*, the rental car agreement disclosed an "administrative fee" that was described in other documents provided to the renter as covering the costs of processing tolls. It was alleged that the fee was substantially higher than necessary to cover the costs of toll processing. Under these circumstances, the court held that the complaint stated a cause of action for FDUTPA violation, as well as breach of contract and breach of the duty of good faith and fair

dealing.  303 F. Supp. 3d at 1325-29.

> Dollar argues that the contract terms are not deceptive nor unfair largely because the $15 administrative fee is plainly disclosed in the document signed by customers at the time of the rental. Because Dollar merely collected the disclosed fee, it argues that it cannot be violating the FDUTPA in abiding by the express terms of the agreement…. Maor… alleges that Dollar described this fee as charged to him to "cover" the costs of toll administration, and then further alleges that Dollar's costs of toll administration are only a small fraction of the fees charged to him by Dollar.  Dollar was thus purportedly profiting from a fee described as a pass-through charge to cover toll administrative expenses, a fact that Dollar kept secret from customers.  Maor therefore alleges a deceptive practice that damages consumers by charging them more than necessary under the guise of a pass-through cost for a specific purpose.  Such a practice, if true, could be viewed as "immoral, unethical, oppressive, unscrupulous [and] substantially injurious to customers."  *See Samuels*, 782 So. 2d at 499. Dollar's arguments that the Court should dismiss the FDUTPA claim thus fail.

303 F. Supp. 3d at 1328-29.

In the orders granting AT&T's motions to dismiss, the trial judge cited a later unpublished decision by Judge Martinez in the *Maor* case that granted the rental car company's motion for summary judgment.  *See Maor v. Dollar Thrifty Auto. Grp., Inc.*, 2018 U.S. Dist. LEXIS 168664 (S.D. Fla. 2018).  After denying the motion to dismiss, it was revealed through discovery that the additional documents describing the "administrative fee" as being used to cover toll expense were not provided to the renter until after the rental car was returned. Hence, the court ruled that these documents were not part of the rental contract and did not modify it.  It was in this context that Judge Martinez held

that "the words 'administrative fee,' without more, would not lead one to believe that the fee was used for any specific purpose and cannot be found to be akin to a 'pass-though charge.'   2018 U.S. Dist. LEXIS at 12.   Judge Martinez further noted that the plaintiff had the opportunity to purchase the defendant's "toll package," but chose not to, and therefore was subject to the contractual administrative fee for processing a toll violation.   *Id*.

The summary judgment ruling in *Maor*, cited by AT&T below and by the trial judge in the dismissal orders, is off point.   Here, in ruling on AT&T's motions to dismiss, the judge relied on an unauthenticated wireless customer agreement as mentioning, and therefore disclosing the administrative fee.   The judge further relied on unauthenticated exhibits describing the administrative fee as being charged to "defray" or "help AT&T recover" expenses, giving non-exclusive examples of interconnect charge and cell site rentals.   Unlike in the *Maor* summary judgment ruling, and like the prior motion to dismiss ruling, the circumstances of how, what and when information was made available to the plaintiffs have yet to be discovered.   The motions to dismiss must be evaluated by considering only the allegations within the four corners of the complaints.

At the motion to dismiss stage, there is no admissible evidence to prove AT&T's assertion that it disclosed the administrative fee.   Even if we consider AT&T's inadmissible exhibits, they describe the administrative fee as being used to defray or recover expenses paid to third parties.   According to *Maor*

36

and other cases cited, *supra*, a reasonable consumer would view the fee as a "pass through" to cover specific expenses paid to third parties.  Thus, the complaints state a valid cause of action for violation of the FDUTPA.

### 4. The Heightened Pleading Requirements of Fla. R. Civ. P. 1.120(b) Should Not Be Applied to Causes of Action Other Than Common Law Fraud.

There is no support in Florida law for the trial judge's application of the heightened pleading requirements of Fla. R. Civ. P. 1.120(b) to causes of action for violation of the FDUTPA and the duty of good faith and fair dealing.

Rule 1.120(b) provides:

**Fraud, Mistake, Condition of the Mind.**   In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with such particularity as the circumstances may permit.   Malice, intent, knowledge, mental attitude, and other conditions of mind of a person may be averred generally.

The judge relied on federal court decisions under the federal notice pleading rules and Fed. R. Civ. 9(b).  Rule 9(b) is similar to Fla. R. Civ. P. 1.120(b), but omits the qualifying phrase "as the circumstances may permit":

**Fraud or Mistake; Conditions of Mind.**   In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally.

Federal courts are split on whether the heightened pleading requirements of Fed. R. Civ. P. 9(b) apply to a fraud-like FDUTPA claim. *See e.g.*, *Altamonte Pediatric Assocs., P.A. v. Greenway Health, LLC*, 2020 U.S. Dist. LEXIS

161735 (M.D. Fla. 2020) ("Courts in this District are split as to whether a claim for relief under the FDUTPA must also meet Rule 9(b)'s heightened pleading standard"); *Harris v. Nordyne, LLC*, 2014 U.S. Dist. LEXIS 189248 (S.D. Fla. 2014) ("This Court joins several decisions in holding that the requirements of Rule 9(b) do not apply to claims under FDUTPA").

In *Harris*, the court stated the case for not applying the heightened pleading standard of Rule 9(b) to fraud-like FDUTPA claims:

> FDUTPA claims seek a remedy for conduct distinct from traditional common law torts such as fraud. As such, the uniqueness of the cause of action places it outside the ambit of Rule 9(b). "FDUTPA is a remedial statute designed to protect consumers." *Fonte v. AT&T Wireless Servs., Inc.*, 903 So. 2d 1019, 1024 (Fla. 4th DCA)[, *rev. denied*, 918 So. 2d 292 (Fla. 2005)]. FDUTPA itself instructs courts to construe its provisions "liberally." Fla. Stat. § 501.202(2); see *Intercoastal Realty, Inc. v. Tracy*, 706 F. Supp. 2d 1325, 1333 (S.D. Fla. 2010). "FDUTPA was enacted to provide remedies for conduct outside the reach of traditional common law torts such as fraud." *Guerrero v. Target Corp.*, 889 F. Supp. 2d 1348, 1355 (S.D. Fla. 2012); *Florida v. Tenet Healthcare Corp.*, 420 F. Supp. 2d 1288 (S.D. Fla. 2005), which is why a FDUTPA "plaintiff need not prove the elements of fraud to sustain an action under the statute." *Davis v. Powertel, Inc.*, 776 So. 2d 971, 974 (Fla. 1st DCA 2000)[, *rev. denied*, 794 So. 2d 605 (Fla. 2001)]. And, as Florida courts explain, "[a] deceptive or unfair trade practice constitutes a somewhat unique tortious act because, although it is similar to a claim of fraud, it is different in that, unlike fraud, a party asserting a deceptive trade practice claim need not show actual reliance on the representation or omission at issue." *Office of A.G. Dep't of Legal Affairs v. Wyndham Int'l, Inc.*, 869 So. 2d 592, 598 (Fla.1st DCA 2004). Therefore, even where a FDUTPA claim includes allegations which implicate fraudulent conduct, it need not meet the heightened pleading requirements of Rule 9(b).

*Harris*, 2014 U.S LEXIS at 11.

We have not found any Florida precedent directly addressing the question of whether the heightened pleading requirements of Fla. R. Civ. P. 1.120(b) apply to a FDUTPA claim. But there are reported decisions in which both FDUTPA and common law fraud claims were raised, and the heightened 1.120(b) pleading requirements were only applied to the fraud claim. *See Plastiquim, S.A. v. Oderbrecht Constr., Inc.*, 337 So. 3d 1270 (Fla. 3d DCA 2022); *Steyr Daimler Puch v. A&A Bicycle Mart, Inc.*, 453 So. 2d 1149 (Fla. 4th DCA), *rev. denied*, 459 So. 2d 1039 (Fla. 1984). We are not aware of any reported Florida decision applying rule 1.120(b) to a cause of action for breach of contract or breach of the duty of good faith and fair dealing.

We respectfully submit that the heightened pleading requirements of rule 1.120(b) should not be applied to the plaintiffs' causes of action for FDUTPA violations and breach of the duty of good faith and fair dealing. The elements of these causes of action are different than fraud. And, unlike federal notice pleading, Florida rules already require fact pleading. *See Louie's Oyster, Inc. v. Villaggio Di Las Olas, Inc.*, 915 So. 2d 220, 221-22(Fla. 4th DCA 2005). One wonders if some federal courts would apply rule 9(b) to fraud-like FDUTPA claims if the federal rules, like Florida rules, already required fact pleading.

Then there is the qualifying phrase "as the circumstances may permit" that appears in rule 1.120(b) but not rule 9(b). With this phrase, the Florida

rule somewhat softens the heightened pleading requirement for fraud.  Do the circumstances of a FDUTPA cause of action, including its statutory remedial purposes, necessarily require the same heightened pleading specificity as a common law fraud claim?  This question should at least give Florida courts pause before engrafting a peculiar federal court tendency to apply rule 9(b)'s heightened pleading requirements to a FDUTPA cause of action that involves fraud-like conduct allegations.

### 5. The Complaints Allege Fraud With Specificity as the Circumstances Permit.

In any event, the plaintiffs have satisfied the heightened fraud pleading requirements.  In general, rule 1.120(b) requires that fraud pleading "must not only specifically identify a misrepresentation of fact but also identify when, where, or the manner in which it was made."  *Houri v. Boaziz*, 196 So. 3d 383, 393 (Fla. 3d DCA), *rev. denied*, 2016 Fla. LEXIS 2733 (Fla. 2016).  However, the degree of the particularity required depends on the circumstances and is not judged by rigid standards.  The particularity requirement "means that a fraud claim must clearly and concisely set out the essential facts of the fraud, and not just legal conclusions."  *Thompson v. Bank of NY*, 862 So. 2d 768, 770 (Fla. 4th DCA 2003).  "The elements of fraud are required to be alleged with sufficient particularity so that the judge, in reviewing the ultimate facts alleged, may rule as a matter of law whether or not the facts alleged are sufficient as

the factual basis for the inferences the pleader seeks to draw…" *Cedars Healthcare Group, Ltd., v. Mehta*, 16 So. 3d 914, 917 (Fla. 3d DCA 2009) (quoting 40 Fla. Jur. 2d Pleadings § 36 (2009).  The heightened pleading requirement is also for the benefit of the defendant accused of fraud:

> Due process requires that the defendant know what he is accused of having misrepresented.  Indeed, the claimant is in the best position of knowing what he claims was represented, whether it later turned out to be false, and whether he reasonably relied on the representation. The claimant is not given the luxury of simply pleading "I was defrauded" and then fleshing out the claim at trial by proof as to precisely what the fraud was.

*Scholpler v. Smilovits*, 689 So. 2d 1189, 1189-90 (Fla. 4th DCA 1997).

In practice, Florida courts have not rigidly required fraud pleadings to always allege specific dates, places, etc.  *See e.g.*, *Bankers Mut. Capital Corp. v. United States Fid. & Guar. Co.*, 784 So. 2d 485, 490 (Fla. 4th DCA 2001) (fraud allegations were held to be "clear and specific," where the complaint identified the persons by and to whom the misrepresentation was made, the substance of the misrepresentation, and that the misrepresentations were made before a contract was signed); *Plastiuquim,* 337 So. 3d at 1273-74 (fraud claim met heightened pleading requirements by alleging defendants knowingly misrepresented the source of a loan to induce plaintiffs to borrow funds, and after the loan transaction was completed the individual defendant used the corporate cloak to secure illegal favors, resulting in damage to the plaintiffs after the arrangement was exposed); *Hollywood Lakes Country Club, Inc. v.*

*Community Ass'n Servs., Inc.*, 770 So. 2d 716 (Fla. 4th DCA 2000) (complaint met 1.120(b) requirements by alleging defendant misrepresented to developer/plaintiff that it was effectively doing its job and was collecting and enforcing all community assessments, including sending out appropriate assessment notices to homeowners and builders who were responsible for paying the assessments, causing developer to refrain from independently acting to collect assessments; defendant knew the representations were false, developer incurred substantial liabilities due to its responsibility for shortfalls of assessments over expenses of the association because defendant failed to collect assessments and keep accurate accounting records); *Someplace New, Inc. v. Francois*, 51 So. 3d 1215, 1217 (Fla. 4th DCA 2011) (fraud alleged with particularity where complaint outlined defendant's specific representation, and alleged the statements were made for the purpose of inducing plaintiffs to enter into lease and licensee agreement"); *Manka v. DeFranco's, Inc.*, 575 So. 2d 1357 (Fla. 1st DCA 1991) (pleading met requirements of rule 1.120(b) by alleging defendant intentionally deceived and misled plaintiff into purchasing delicatessen by agreeing to permit seller to sell, although intending to prevent the sale; by agreeing to accept payment under a new note, although intending to demand payment under the old note; and by agreeing to an assignment of the lease, although intending to refuse to permit the pl to acquire any interest in the lease; "[w]hile the pleading does not specify to whom these alleged

misrepresentations were made, the substance and effect thereof is adequately pleaded"; defendant could have sought to clarify any ambiguity by moving for a more definite statement under rule 1.140(e)); *Nantell v. Lim-Wick Constr. Co.*, 228 So. 2d 634, 637 (Fla. 4th DCA 1969) (rule 1.120(b) requirements met where complaint alleged defendant misrepresented zoning for property would be changed without difficulty by sellers with assistance of realty company so as to permit plaintiffs to operate a florist and gift shop). *Compare Thompson*, 862 So. 2d at 770 ("The only specific allegation of fraud..,. is that the seller of the underlying real estate represented to Thompson that Thompson was 'financially able to qualify and afford the subject premises"); *Houry*, 196 So. 3d at 393 (complaint failed to allege fraud with specificity where it alleged only that the defendants alleged to plaintiff "that each partner and co-venturer would make equal equity contributions to the Villaggio Project so that plaintiff would agree to take only a 1/3 interest in the project").

Here, the plaintiffs pleaded the specific representations made by AT&T to the plaintiffs to induce them to purchase a wireless plan, the fraudulent purposes and intent underlying AT&T's representations, precisely how and in what respects AT&T's representations were false, and that the plaintiffs were damaged by receiving less than what was promised. The complaints do not set forth precise dates on which each representation was made. But the plaintiffs' counsel stated that the plaintiffs alleged to the best of their ability as

43

the circumstances permitted, but could not at the time allege specific dates because they were not in possession of specific advertisements. (See e.g., R. 1694).  Nonetheless, the level of detail provided in the complaints was more than adequate to communicate the precise nature of the representations, the action they induced, their falsity, and the other elements of fraud.  Additional details will become evident during discovery.

AT&T cannot plausibly claim it does not have enough information about the nature of the alleged fraud.  Even without specific dates, the level of detail in the fraud allegations is impressive.  AT&T's grievance that the complaints all look alike, lacking individual details, can be explained by pointing out that it perpetrated its fraudulent and deceptive practices on consumers on a mass scale.  That AT&T did so does not detract from the validity of an individual consumer's cause of action.  It was reversible error to dismiss the complaints for lack of specificity.

### 6. The Complaints State a Cause of Action for Breach of the Duty of Good Faith and Fair Dealing.

The trial judge ruled that the complaints did not state a cause of action for breach of the duty of good faith and fair dealing because the allegations were not tied to a specific provision of the contract.  *See Cavallaro v. Stratford Homes*, 784 So. 2d 619, 622 (Fla. 5th DCA 2001) ("A duty of good faith must relate to the performance of an express term of the contract").  We disagree,

since the allegations are, in fact, tied to specific provisions of the contract.

With regard to the data throttling allegations, the complaints allege that AT&T breached the wireless customer agreement's promise of unlimited data. With regard to the bogus administrative fee, the complaints allege that AT&T breached its promise that the fee would be used for actual expenses. "[I]f a fee is described in a contract as for a specific purpose or based on actual costs, then not using the fee for that purpose or basing it on those costs could constitute a breach." *Maor*, 303 F. Supp. 3d at 1325, citing *Deere Constr*., 198 F. Supp. 3d at 1341 (denying motion to dismiss breach of contract claim alleging "fuel surcharges" and "environmental charges" were not used for those purposes); *Bowe v. Pub. Storage*, *supra* (denying motion to dismiss complaint that alleged defendant breached provisions of rental contract identifying insurance charges as pass-though charges that are not retained by defendant); *Costa*, 2011 U.S. Dist. LEXIS 66921 at 15 (noting that plaintiff's breach of contract claim would survive a motion to dismiss if plaintiff alleged the "mandatory housekeeping gratuity and utility service fee" was used for other purposes). In *Maor*, the court denied a motion to dismiss counts that included breach of the duty of good faith and fair dealing, where the complaint alleged an "administrative fee" was not used to cover toll expense as represented.

**7. The Plaintiffs May Plead Unjust Enrichment in the Alternative Until the Existence of a Valid Contract is Proven.**

The plaintiffs could allege the existence of a contract and simultaneously plead unjust enrichment in the alternative, pending proof of an express contract concerning the same subject matter.  *See Bowe*, 2014 U.S. Dist. LEXIS 19556 at 12 (defendant's motion to dismiss unjust enrichment count held to be premature because it is "upon a showing that an express contract exists that the unjust enrichment count fails"), quoting *Martorella v. Deutsche Bank Nat'l Trust Co.*, 931 F. Supp. 2d 1218, 1228 (S.D. Fla. 2013); *Real Estate Value Co., Inc. v. Carnival Corp.*, 92 So. 3d 255, 263 (Fla. 3d DCA 2012) ("Under Florida law, a party may simultaneously allege the existence of an express contract and alternatively plead a claim for unjust enrichment….  Of course, upon a showing that an express contract concerning the same subject matter exists, the unjust enrichment claim necessarily fails," citing *Hazen v. Cobb*, 96 Fla. 151, 117 So. 853, 857-58 (1928)); *Williams v. Bear Stearns & Co.*, 725 So. 2d 397, 400 (Fla. 5th DCA 1998) ("Until an express contract is proven, a motion to dismiss a claim for… unjust enrichment… is premature").

## IV.

## <u>CONCLUSION</u>

It is respectfully submitted that the final judgments entered below should

be reversed and the cases remanded for further proceedings.

Respectfully submitted,

DAVID B. PAKULA, P.A.
12301 Taft Street, Suite 200
Pembroke Pines, Florida 33026
Tel.: (954) 217-5123
Email: david@pakulalawfirm.com
          info@pakulalawfirm.com

MAURY L. UDELL, ESQ.
BEIGHLEY, MYRICK, UDELL
& LYNNE, P.A.
150 W. Flagler St., Suite 1800
Miami, FL 33130
Tel: (305) 349-3930
Email: mudell@bmulaw.com

By:  /s/ David B. Pakula
      DAVID B. PAKULA
      Fla. Bar No. 712851

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the foregoing was furnished by e- mail via the e-filing portal on July 24, 2023 to:  Angel L. Cortinas, Esq., angel.cortinas@dentons.com; Jonathan Kaskel, Esq., jonathan.kaskel@dentons.com; Manuel L. Garcia-Linares, Esq., mgarcialinares@daypitney.com,                    brodriguez@daypitney.com, jsolorzano@daypitney.com, edavila@daypitney.com; Andrew R. Ingalls, Esq., aingalls@daypitney.com; Maury L. Udell, Esq., mudell@bmulaw.com.

　　　　　　　　　　　　　　 /s/ David B. Pakula
　　　　　　　　　　　　　　DAVID B. PAKULA


## **CERTIFICATE OF COMPLIANCE**

The undersigned certifies, pursuant to Fla. R. App. P. 9.045(e), that this brief complies with the applicable font and word count limit requirements of the Florida Rules of Appellate Procedure.

　　　　　　　　　　　　　　 /s/ David B. Pakula
　　　　　　　　　　　　　　DAVID B. PAKULA

# EXHIBIT 6

# STATE OF FLORIDA
# THIRD DISTRICT COURT OF APPEAL

Consolidated Case Nos.  3D23-0097, 3D23-0098, 3D23-0099,
3D23-0100, 3D23-0101

Lower Tribunal Nos.  2020-8179-SP-26, 2020-21937-SP-26,
2020-21932-SP-26, 2020-8181-SP-26,
2019-11857-SP-26

---

SHARON L. ORR, et al.,

Appellants,

v.

AT&T MOBILITY LLC,

Appellee.

---

## APPELLEE'S CONSOLIDATED ANSWER BRIEF

Angel A. Cortiñas
Jonathan H Kaskel
DENTONS US LLP
1 Alhambra Plaza
Coral Gables, Florida 33134
Telephone: 305-537-0015
angel.cortinas@dentons.com
jonathan.kaskel@dentons.com
*Counsel for AT&T Mobility LLC*

## <u>TABLE OF CONTENTS</u>

TABLE OF CONTENTS ................................................................... i

TABLE OF CITATIONS.................................................................. iii

STATEMENT OF THE CASE AND FACTS........................................ 1

    I.     Introduction................................................................. 1

    II.    Statement of Facts ...................................................... 2

         A.    The parties................................................... 2

         B.    The Wireless Customer Agreement ....................... 3

         C.    Administrative fees.................................................. 6

         D.    Unlimited data plans............................................. 8

    III.    Statement of the Case ............................................... 10

         A.    Appellants' trial counsel initiated mass litigation against AT&T......................................... 10

         B.    AT&T moved to dismiss Appellants' complaints. ......................................................... 11

         C.    Appellants opposed Dismissal by requesting that the trial court ignore the Wireless Customer Agreement and Appellants' own complaint allegations.................. 12

         D.    The trial court heard argument on AT&T's motions to dismiss. .............................................. 13

         E.    The trial court dismissed Appellants' lawsuits and denied rehearing. ........................... 15

SUMMARY OF THE ARGUMENT ................................................. 21

STANDARD OF REVIEW............................................................... 24

ARGUMENT .................................................................................. 25

I.    APPELLANTS' COUNTS FAILED AS A MATTER OF LAW UNDER THE ALLEGATIONS IN THE COMPLAINTS AND THE INCORPORATED WIRELESS CUSTOMER AGREEMENT. ........................ 25

    A.    The Wireless Customer Agreement was incorporated into Appellants' complaints. ............ 25

    B.    The Wireless Customer Agreement was properly considered by the trial court................... 30

    C.    Each of Appellants' counts were defeated by the plain language of the Wireless Customer Agreement. .......................................... 33

    D.    Appellants' administrative fee claims failed as a matter of law. ..................................... 39

    E.    Appellants' data throttling claims failed as a matter of law. ............................................... 47

II.    APPELLANTS' FRAUD AND FDUTPA COUNTS FAILED AS A MATTER OF LAW BECAUSE THEY WERE NOT PLED WITH PARTICULARITY AS REQUIRED BY RULE 1.120. .................................. 52

CONCLUSION ............................................................................ 57

CERTIFICATE OF SERVICE......................................................... 58

CERTIFICATE OF COMPLIANCE .................................................. 59

## <u>TABLE OF CITATIONS</u>

**Page(s)**

**Cases**

*Air Quality Assessors of Fla. v. S.-Owners Ins. Co.*,
354 So. 3d 569 (Fla. 1st DCA 2022) ................................... 25, 29

*AT&T Mobility, LLC v. Rigney*,
No. 3D21-2261, 2023 WL 5731791 (Fla. 3d DCA Sept.
6, 2023)..................................................................... 3, 16, 36

*Bamert v. Pulte Home Corp.*,
No. 6:08-CV-2120-ORL-22, 2012 WL 3292875 (M.D.
Fla. Aug. 10, 2012).................................................................. 54

*Barrett v. City of Margate*,
743 So. 2d 1160 (Fla. 4th DCA 1999) ...................................... 53

*Berry v. Budget Rent A Car Systems Inc.*,
497 F. Supp. 2d 1361 (S.D. Fla. 2007) ......................... 43, 45, 46

*Blair v. Wachovia Mortg. Corp.*,
No. 5:11-cv-566-oc-37TBS, 2012 WL 868878 (M.D.
Fla. Mar. 14, 2012).................................................................. 53

*Cedars Healthcare Grp., Ltd. v. Mehta*,
16 So. 3d 914 (Fla. 3d DCA 2009) ......................... 53, 55, 56, 57

*Claims Holding Group, LLC v. AT&T Mobility, LLC*,
347 So. 3d 412 (Fla. 3d DCA 2022) ............................................ 3

*Day v. Sarasota Doctors Hosp., Inc.*,
No. 8:19-CV-1522-VMC-TGW, 2021 WL 288969 (M.D.
Fla. Jan. 28, 2021)................................................................... 42

*Dominguez v. Banana Republic, LLC*,
613 F. Supp. 3d 759 (S.D.N.Y. 2020), *aff'd sub nom.
Calcano v. Swarovski N. Am. Ltd.*, 36 F.4th 68 (2d Cir.
2022) ..................................................................................... 56

*Gayou v. Celebrity Cruises, Inc.*,
    No. 11-23359-CIV, 2012 WL 2049431 (S.D. Fla. June
    5, 2012).................................................................................. 56

*Ginsberg v. Lennar Fla. Holdings, Inc.*,
    645 So. 2d 490 (Fla. 3d DCA 1994) ........................................... 38

*Glen Garron, LLC v. Buchwald*,
    210 So. 3d 229 (Fla. 5th DCA 2017) ................................... 15, 46

*Grove Isle Ass'n, Inc. v. Grove Isle Assocs., LLLP*,
    137 So. 3d 1081 (Fla. 3d DCA 2014) ......................................... 25

*GVK Int'l Bus. Group, Inc. v. Levkovitz*,
    307 So. 3d 144 (Fla. 3d DCA 2020) ........................................... 34

*Hillcrest Pac. Corp. v. Yamamura*,
    727 So. 2d 1053 (Fla. 4th DCA 1999) ........................................ 35

*Ins. Concepts & Design, Inc. v. Healthplan Servs., Inc.*,
    785 So. 2d 1232 (Fla. 4th DCA 2001) ................................. 35, 36

*Island Travel & Tours, Ltd., Co. v. MYR Indep., Inc.*,
    300 So. 3d 1236 (Fla. 3d DCA 2020) ......................................... 34

*K.R. Exch. Services, Inc. v. Fuerst, Humphrey, Ittleman, PL*,
    48 So. 3d 889 (Fla. 3d DCA 2010) ............................................. 27

*Kim v. Summit and Crowne Capital Partners, LLC*,
    No. 8:18-CV-2982-T-17SPF, 2019 WL 3854782 (M.D.
    Fla. June 3, 2019) ...................................................................... 53

*Koch v. Royal Wine Merchants, Ltd.*,
    847 F. Supp. 2d 1370 (S.D. Fla. 2012) ...................................... 53

*Kopel v. Kopel*,
    229 So. 3d 812 (Fla. 2017) ........................................................ 24

*Latman v. Costa Cruise Lines, N.V.*,
    758 So. 699 (Fla. 3d DCA 2000) ............................................... 43

*Librizzi v. Ocwen Loan Servicing, LLC*,
    120 F. Supp. 3d 1368 (S.D. Fla. 2015) ..................................... 53

*Meridian Tr. Co. v. Batista*,
    No. 17-23051, 2018 WL 4760277 (S.D. Fla. Sept. 30,
    2018) .......................................................................... 56

*Myers v. Myers*,
    652 So. 2d 1214 (Fla. 5th DCA 1995) ..................................... 55

*One Call Prop. Servs. Inc. v. Sec. First Ins. Co.*,
    165 So. 3d 749 (Fla. 4th DCA 2015) ...................................... 25

*Rolle v. Cold Stone Creamery, Inc.*,
    212 So. 3d 1073 (Fla. 3d DCA 2017) ...................................... 15

*Royal Caribbean Cruises Ltd. v. Ooi*,
    No. 3D22-1100, 2023 WL 5419579 (Fla. 3d DCA Aug.
    23, 2023) ...................................................................... 41

*Skupin v. Hemisphere Media Group, Inc.*,
    314 So. 3d 353 (Fla. 3d DCA 2020) ............................... 24, 25, 26

*Sol. Z v. Alma Lasers, Inc.*,
    No. 11-cv-21396-CIV-LENARD, 2013 WL 12246356
    (S.D. Fla. Jan. 22, 2013) .................................................. 37

*Sterling Breeze Owners' Ass'n, Inc. v. New Sterling Resorts*,
    *LLC*, 255 So. 3d 434 (Fla. 1st DCA 2018), *reh'g denied*
    (Oct. 16, 2018) .............................................................. 38

*Strack v. Fred Rawn Const., Inc.*,
    908 So. 2d 563 (Fla. 4th DCA 2005) ...................................... 55

*Taylor Woodrow Homes Fla., Inc. v. 4/46-A Corp.*,
    850 So. 2d 536 (Fla. 5th DCA 2003) ................................. 34, 37

*TRG Night Hawk Ltd v. Registry Dev. Corp.*,
    17 So. 3d 782 (Fla. 2d DCA 2009) ............................... 34, 35, 37

*U.S. Bank Nat'l Ass'n as Tr. for Ramp 2006EFC2 v. Bell*,
   355 So. 3d 980 (Fla. 5th DCA 2023), *reh'g denied* (Feb.
   16, 2023).................................................................................. 33

*Un2jc Air 1, LLC v. Whittington*,
   324 So. 3d 1 (Fla. 4th DCA 2021).............................................. 34

*USA Nutraceuticals Grp., Inc. v. BPI Sports, LLC*,
   No. 15-CIV-80352, 2016 WL 4254257 (S.D. Fla. Feb.
   16, 2016)........................................................................... 53, 56

*Veal v. Voyager Prop. & Cas. Ins. Co.*,
   51 So. 3d 1246 (Fla. 2d DCA 2011) ............................. 25, 30, 31

*Von Dyck v. Gavin*,
   350 So. 3d 842 (Fla. 1st DCA 2022) ............................ 25, 28, 29

*Von Dyck v. Gavin*,
   Case No. 1D21-3401, 2022 WL 1153395 (Fla. 1st DCA
   March 3, 2022) (Brief) ............................................................. 31

*Vorst v. TBC Retail Grp., Inc.*,
   No. 12-CV-80013, 2012 WL 13026643 (S.D. Fla. Apr.
   12, 2012).................................................................................. 43

*Williams v. Burger King Corp.*,
   No. 19-24755-SINGHAL, 2020 WL 5083550 (S.D. Fla.
   July 20, 2020).................................................................... 51, 52

*Zlotnick v. Premier Sales Group, Inc.*,
   431 F. Supp. 2d 1290 (S.D. Fla. 2006), *aff'd*, 480 F.3d
   1281 (11th Cir. 2007).............................................................. 42

**Rules**

Fed. R. Civ. P. 9(b)................................................................. 53, 54

Fla. R. Civ. P. 1.120 .............................................12, 22, 52, 53, 57

Fla. R. Civ. P. 1.130 ............................................. 1, 2, 16, 30, 31, 34

## STATEMENT OF THE CASE AND FACTS

### I.  Introduction

These five cases, like hundreds of others filed by the same law firm against AT&T Mobility LLC ("AT&T"), assert claims that are defeated by the allegations in the complaints and the plain language of the parties' contracts, known as the Wireless Customer Agreement, which was incorporated into the complaints.  The cases are entirely without merit and merely threaten litigation in the hopes of obtaining a windfall in settlement.  Appellants allege two distinct theories, based upon multiple grounds: (1) that AT&T should not have charged them an administrative fee, and (2) that Appellants' unlimited data plans entitled them to unrestricted data speeds at all times, without regard to network congestion.  Each claim is negated by Appellants' contract for services with AT&T.

Black letter law required the trial court to rule on AT&T's motions to dismiss based upon the four corners of the complaints and documents they incorporated.  The express language of Florida Rule of Civil Procedure 1.130 makes the documents incorporated into a complaint part of the complaint for all purposes.  The allegations of a complaint and the documents it incorporates, however, are not

evidence and their consideration on a motion to dismiss is not subject to the Florida Evidence code. *See* Fla. R. Civ. P. 1.130. Therefore, Appellants' arguments that the trial court was precluded from considering Appellants' complaint allegations or incorporated contracts, and that, by considering them, the trial court somehow converted AT&T's motions to dismiss into motions for summary judgment, are entirely without merit.

This Court should affirm.

## II.   **Statement of Facts**

### A.  **The parties**

AT&T Mobility LLC offers a range of nationwide wireless voice and data communications services.[1] R. 1997 ¶ 14. Appellants allege that they are customers of AT&T.[2]

Appellants' cases are only five of approximately 200 virtually identical cases filed against AT&T by the same law firm. R. 41. This Court has already considered two such cases involving different

---

[1] AT&T limits the facts to the allegations pled in Appellants' complaints and incorporated Wireless Customer Agreement, which alone fully support the trial court's dismissal of the cases.

[2] *Batista* (R. 341 ¶ 2, R. 349 ¶ 47); *Barger* (R. 1994 ¶ 2, R. 2006 ¶ 51); *Ysidron* (R. 2924 ¶ 2, R. 2935 ¶ 50); *Milian* (R. 4785 ¶ 2, R. 4807 ¶ 51); *Orr* (R. 5581 ¶ 2).

plaintiffs. *Claims Holding Group, LLC v. AT&T Mobility, LLC*, 347 So. 3d 412, 413 (Fla. 3d DCA 2022) (affirming the trial court's pre-Answer grant of summary judgment in favor of AT&T on res judicata grounds); *AT&T Mobility, LLC v. Rigney*, No. 3D21-2261, 2023 WL 5731791, at *1 (Fla. 3d DCA Sept. 6, 2023) (affirming, in part, the award of sanctions against plaintiff and his counsel for filing a frivolous complaint alleging, without any factual support, that the plaintiff had an unlimited data plan).

## B.  The Wireless Customer Agreement

The Wireless Customer Agreement Appellants entered into with AT&T is central to Appellants' claims.  Throughout their complaints, Appellants admit that this agreement governed their relationship with AT&T.  In particular, Appellants admit in their complaints that:

- Appellants are customers of AT&T;[3]

- AT&T provides its service pursuant to a wireless customer agreement;[4]

- AT&T's services are offered through plans, and that

---

[3] *Batista* (R. 341 ¶ 2, R. 349 ¶ 47); *Barger* (R. 1994 ¶ 2, R. 2006 ¶ 51); *Ysidron* (R. 2924 ¶ 2, R. 2935 ¶ 50); *Milian* (R. 4785 ¶ 2, R. 4807 ¶ 51); *Orr* (R. 5581 ¶ 2).

[4] *Batista* (R. 344 ¶ 15, R. 348 ¶¶ 38-39, R. 349 ¶¶ 41-42); *Barger* (R. 1999 ¶ 24, 2010 ¶¶ 75-76, R. 2011 ¶¶ 79-80); *Ysidron* (R. 2929 ¶ 23, R. 2940 ¶¶ 74-75, R. 2941 ¶¶ 78-79); *Milian* (R. 4800 ¶ 24, R. 4811 ¶¶ 75-76, R. 4812 ¶¶ 79-80).

Appellants signed up for those plans;[5]  and

- A "mobile data contract" exists between Appellants and AT&T, but Appellants are allegedly not in possession of it.[6]

Moreover, with the exception of Appellant Orr, each of the Appellants sued AT&T for breach of the Wireless Customer Agreement.

Like the other four Appellants, Orr's original complaint / statement of claim also sued for "breach of contract."  R. 5560. However, following several dispositive rulings against Appellants' trial counsel in other cases against AT&T, Appellant Orr amended the complaint in an attempt to circumvent the governing Wireless Customer Agreement by deleting any reference to it.  Despite this, Appellant Orr concedes the existence of a contract in the amended complaint by alleging that: (i) Orr "is a customer of AT&T" [R. 5581 ¶ 2]; (ii) AT&T charged "flat monthly rates for its post-paid wireless service plans" [R. 5585 ¶ 16]; (iii) customers are required to "sign up" for those plans [R. 5585 ¶¶ 16-17]; (iv) Orr paid AT&T for its services

---

[5] *Batista* (R. 344 ¶ 18, R. 345 ¶ 20); *Barger* (R. 1997 ¶ 14, 2000 ¶¶ 25-26); *Ysidron* (R. 2927 ¶ 13, R. 2930 ¶¶ 24-25); *Milian* (R. 4798 ¶ 14, R. 4801 ¶¶ 25-26); *Orr* (R. 5585 ¶ 17).

[6] *Batista* (R. 347 ¶ 30, R. 349 ¶ 47, R. 350 ¶ 49); *Barger* (R. 2004 ¶ 41, 2006 ¶¶ 51-53); *Ysidron* (R. 2934 ¶ 40, R. 2935 ¶ 50, R. 2936 ¶ 52); *Milian* (R. 4805 ¶ 41, R. 4807 ¶¶ 51-53).

[R. 5589 ¶ 35]; and (v) customers renewed their mobile data and wireless plans. R. 5589 ¶ 39. Thus, even with the abandonment of the breach of contract claim and deletion of the words "contract" and "wireless customer agreement" from the amended complaint, Orr still pleads the elements of a contract and acknowledges and relies on the contract with AT&T in an attempt to state a cause of action.

The table below describes the counts in each Appellant's operative complaint:

| Record Page of Operative Complaint | Appellant/ Case No. | Operative Complaint Counts[7] |
|---|---|---|
| R. 341 | *Batista*<br><br>*3D23-101*<br><br>*19-11857* | (I)   Fraud<br>(II)  Breach of Contract<br>(III) FDUTPA Damages<br>(IV) Unjust Enrichment |
| R. 1994 | *Barger*<br><br>3D23-100<br><br>20-8181 | (I)   Fraud<br>(II)  FDUTPA Damages<br>(III) FDUTPA Declaratory / Injunctive Relief<br>(IV) Breach of Contract<br>(V)  Unjust Enrichment |

---

[7] Appellants Barger, Orr, Ysidron, and Milian had also asserted counts for a pure bill of discovery concerning use of geolocation data, but those counts were voluntarily dismissed. Additionally, Appellant Batista originally asserted counts for declaratory and injunctive relief, which were also voluntarily dismissed.

| Record Page of Operative Complaint | Appellant/ Case No. | Operative Complaint Counts[7] |
|---|---|---|
| R. 2924 | *Ysidron*<br><br>3D23-099<br><br>20-21932 | (I)   Fraud<br>(II)  FDUTPA Damages<br>(III) FDUTPA Declaratory / Injunctive Relief<br>(IV) Breach of Contract<br>(V)  Unjust Enrichment |
| R. 4795 | *Milian*<br><br>3D23-098<br><br>20-21937 | (I)   Fraud<br>(II)  FDUTPA Damages<br>(III) FDUTPA Declaratory / Injunctive Relief<br>(IV) Breach of Contract<br>(V)  Unjust Enrichment |
| R. 5581 | *Orr*<br><br>3D23-097<br><br>20-8179 | (I)   Fraud<br>(II)  FDUTPA Damages<br>(III) FDUTPA Declaratory / Injunctive Relief<br>(IV) Unjust Enrichment<br>[*Administrative Fee Claims Only*] |

### C. Administrative fees

AT&T charges a fee for its monthly voice, data, and text services.[8]  In addition to the monthly fee for service, it charges an administrative fee.  At its inception in 2013, the administrative fee was less than $0.76.[9]  Over the last decade, the administrative fee

---

[8] *Barger* (R. 1997 ¶ 14); *Ysidron* (R. 2927 ¶ 13); *Milian* (R. 4798 ¶ 14); *Orr* (R. 5584 ¶ 13).

[9] *Batista* (R. 350-51 ¶¶ 54-55); *Barger* (R. 2007 ¶¶ 58-59); *Ysidron* (R. 2937 ¶¶ 57-58); *Milian* (R. 4808 ¶¶ 58-59); *Orr* (R. 5590 ¶¶ 40-41).

has increased to $1.99.  *Id.*

Under the express terms of the Wireless Customer Agreement and Appellants' own complaint allegations, AT&T is authorized to (i) charge the administrative fee,[10] (ii) change the administrative fee,[11] and (iii) apply the administrative fee to defray any expense.[12] Appellants admit the amount of the administrative fee is disclosed to customers on each monthly bill, although they allege it is not conspicuous enough.[13]   Further, Appellants concede that AT&T states the administrative fee is not a government fee or tax.  R. 2012 ¶ 84 ("AT&T MOBILITY, LLC has stated that 'The Administrative Fee . . . is not a tax or charge which the government requires AT&T

---

[10] (Wireless Customer Agreement § 1.3) *Batista* (R. 700); *Barger* (R. 2085); *Ysidron* (R. 3017); *Milian* (R. 4879); *Orr* (R. 5702).

[11] *Id.*

[12] *Batista* (R. 347 ¶ 33, R. 348 ¶ 40, R. 351 ¶ 56, R. 352 ¶ 64); *Barger* (R. 2004 ¶ 44, R. 2007 ¶ 60, R. 2011 ¶ 78, R. 2012 ¶ 84); *Ysidron* (R. 2934 ¶ 43, R. 2937 ¶ 59, R. 2941 ¶ 77, R. 2942 ¶ 83); *Milian* (R. 4805 ¶ 44, R. 4808 ¶ 60, R. 4812 ¶ 78, R. 4813 ¶ 84); *Orr* (R. 5588 ¶ 32, R. 5590 ¶ 42, R. 5593 ¶ 58).

[13] *Batista* (R. ¶ 18, R. 345 ¶ 21, R. 350 ¶ 53); *Barger* (R. 2000 ¶ 25, R. 2001 ¶ 27, R. 2007 ¶ 57); *Ysidron* (R. 2930 ¶¶ 24-26, R. 2936 ¶ 56); *Milian* (R. 4801 ¶ 25, R. 4802 ¶ 27, R. 4808 ¶ 57); *Orr* (R. 5584 ¶ 18, R. 5589 ¶ 39).

MOBILITY, LLC to collect from its customers.'").[14]

Contrary to Appellants' own allegations and the terms of the Wireless Customer Agreement, Appellants allege that the administrative fee is a "bogus fee" that was not adequately disclosed or used as promised.

### D. Unlimited data plans[15]

Appellants are unsure whether they had unlimited data plans, alleging only that they had unlimited data plans "upon information and belief."[16] According to Appellants, having an unlimited data plan necessarily entitled them to unrestricted data speeds at all times.[17]

The Wireless Customer Agreement expressly governs what "unlimited data" means and how data speeds may be restricted. Under the Wireless Customer Agreement, "unlimited data" means that a customer pays one price for data regardless of the amount

---

[14] *Batista* (R. 352 ¶ 64); *Barger* (R. 2012 ¶ 84); *Ysidron* (R. 2942 ¶ 84); *Milian* (R. 4813 ¶ 84); *Orr* (R. 5593 ¶ 58).

[15] Appellant Orr dropped the unlimited data allegations from her original statement of claim. *Compare* R. 5560 *with* R. 5581.

[16] *Batista* (R. 349 ¶ 47); *Barger* (R. 2006 ¶ 51); *Ysidron* (R. 2935 ¶ 50); *Milian* (R. 4807 ¶ 51).

[17] *Batista* (R. 350 ¶ 50); *Barger* (R. 2006 ¶ 54); *Ysidron* (R. 2936 ¶ 53); *Milian* (R. 4807 ¶ 54).

used, and that disproportionate use of data may result in limitations on data usage and data speeds. Wireless Customer Agreement § 3.2, 6.2.[18] Unlimited data does not mean that a customer is entitled to unrestricted data speeds at all times. *Id.* Such restrictions are sometimes necessary because, as AT&T discloses in the Wireless Customer Agreement, "AT&T's wireless data network is a shared resource, which AT&T manages for the benefit of all of its customers." *Id.*

Despite these disclosures and unambiguous definitions, Appellants have claimed that AT&T breached the Wireless Customer Agreement, violated FDUTPA,[19] and committed a fraud by subjecting Appellants' purported unlimited data plans to a temporary reduction in data speeds.[20]

---

[18] *Batista* (R. 709-10); *Barger* (R. 2094-95); *Ysidron* (R. 3026-27); *Milian* (R.4879); *Orr* (R. 5711-12).

[19] Appellants' claims for injunctive and declaratory relief under FDUTPA and claims for unjust enrichment related to administrative fee claims only. *See* R. 2009, 2011-12.

[20] *Barger* (R. 1999 ¶ 24 (general allegations), R. 2004 ¶ 42 (fraud), R. 2006 ¶¶ 51-55 (FDUTPA), 2010 ¶ 75 (breach of contract)).

### III.   <u>Statement of the Case</u>

### A.   **Appellants' trial counsel initiated mass litigation against AT&T.**

In 2019, AT&T made the business decision to avoid the expense of litigation and settle a small claims case brought by the same law firm that filed Appellants' cases.   R. 70, R. 1671 ¶ 3 (Appellant Batista's response to motion to dismiss). [21]   Mistakenly emboldened by AT&T's business decision, Appellants' law firm filed hundreds more cases in an attempt to obtain a further windfall from additional settlements.   However, since AT&T began challenging these meritless cases, nearly all have been dismissed in whole or in part.   *See* R. 1270 (describing the dismissal orders and rulings granting judgment on the pleadings entered by numerous trial court judges).

Appellants' lawsuits are cut-and-paste complaints that rely on the same allegations against AT&T, the same agreement, and the same claims.   Any minor differences between complaints do not reveal conduct by AT&T unique to any one Appellant but are, instead, an attempt to obfuscate the fatal flaws in their claims and avoid the language of the binding and controlling contract between the parties

---

[21] *Barger* (R. 2461); *Ysidron* (R. 4484); *Milian* (R. 5284); *Orr* (R. 6544).

through general and vague pleading.[22]

Apart from identifying a partial telephone number associated with each Appellant, the complaints do not allege any facts unique to any of the Appellant.  For example, Appellants do not allege when their service started or ended with AT&T, how much they paid for their service, when they were charged an administrative fee, when or for how long their data speeds were allegedly reduced, how they were allegedly damaged by any reduction in data speeds, whether they reviewed their monthly bills, whether they viewed or were aware of the AT&T websites relied upon in their complaints, or how they were allegedly injured by the application of the plain and unambiguous terms of the Wireless Customer Agreement.

### B.  AT&T moved to dismiss Appellants' complaints.

AT&T moved to dismiss Appellants' complaints on the ground that Appellants failed to state a cause of action because their claims

---

[22] In addition to lacking detail related to each Appellant, these mass-produced complaints result in drafting errors.  For example, paragraph 30 in Appellant Orr's count I for fraud purportedly "incorporates the allegations contained in paragraphs one (1) through thirty-eight (38) above" even though no such allegations exist.  *Compare* R. 5588 ¶ 30 (Orr amended complaint, without allegations 1-38) *with* R. 4795-4805 (Milian amended complaint with allegations 1-38).

were contradicted by the plain and unambiguous language of the Wireless Customer Agreement incorporated and relied upon in the complaints as well as Appellants' own complaint allegations.[23]  AT&T attached to its motions to dismiss the publicly available Wireless Customer Agreement.[24]  AT&T also argued that Appellants' counts for fraud and FDUTPA were pled without particularity in violation of Florida Rule of Civil Procedure 1.120(b).[25]  AT&T's motions explained that, in addition to the Wireless Customer Agreement, the trial court could rely on website language quoted in Appellants' complaints.[26]

## C. Appellants opposed Dismissal by requesting that the trial court ignore the Wireless Customer Agreement and Appellants' own complaint allegations.

In responding to AT&T's motions to dismiss, Appellants asked the trial court, and ask this Court on appeal, to abdicate its responsibility to follow the law.  Appellants argued that the Wireless Customer Agreement was hearsay, even though hearsay is not an

---

[23] *Batista* (R. 682); *Barger* (R. 2024); *Ysidron* (R. 2963); *Milian* (R. 4825); *Orr* (R. 5645).

[24] *Batista* (R. 699); *Barger* (R. 2084); *Ysidron* (R. 3016); *Milian* (R. 4878); *Orr* (R. 5701).

[25] *Batista* (R. 693); *Barger* (R. 2034); *Ysidron* (R. 2972); *Milian* (R. 4834); *Orr* (R. 5652).

[26] *Batista* (R. 685 n. 6); *Barger* (R. 2028  n. 6); *Ysidron* (R. 2966 n. 6); *Milian* (R. 4828 n. 6); *Orr* (R. 5648 n. 7).

objection to considering exhibits incorporated into a complaint.[27] Appellants conceded that the trial court was permitted to consider the Wireless Customer Agreement if it was central to the complaints, but made the baseless argument that this was not the case here.[28] Appellants also wrongly argued that the trial court could not consider language in websites quoted in Appellants' own complaints. *Id.* Finally, Appellants asserted that FDUTPA counts based on unfair trade practices, rather than fraud, were not required to be pled with particularity, but ignored that Appellants based their FDUTPA counts on fraud and incorporated the same general allegations as Appellants' count for fraud.[29]

### D. The trial court heard argument on AT&T's motions to dismiss.

On April 28, 2022, the County Court judge heard argument on AT&T's motions to dismiss at a one-hour special set hearing.  R. 7054-7108.   During the hearing, AT&T relied on the Wireless Customer Agreement, which was the focal point of Appellants'

---

[27] *Batista* (R. 1672); *Barger* (R. 2462); *Ysidron* (R. 4485); *Milian* (R. 5285); *Orr* (R. 5701).

[28] *Batista* (R. 1673); *Barger* (R. 2463); *Ysidron* (R. 4486); *Milian* (R. 5285); *Orr* (R. 6545).

[29] *Batista* (R. 1675); *Barger* (R. 2465); *Ysidron* (R. 4488); *Milian* (R. 5288); *Orr* (R. 6548).

complaints, as well as the portions of AT&T's website quoted and relied upon and thereby incorporated into Appellants' complaints. *See* R. 7098.

On the administrative fee claims, AT&T pointed to Appellants' own complaint allegations establishing that AT&T disclosed the administrative fee and notified Appellants that the administrative fee could be applied to defray any expense.[30]

Based on the plain and unambiguous language of the Wireless Customer Agreement, AT&T described the fatal flaw of Appellants' administrative claim theory:

> [The Appellant] quotes from the contracts, he quotes from the website, and he incorporates the billing statements. Clearly he, not us, incorporated them by reference into the complaint. We attached them to our motion to dismiss so that Your Honor has them. They are now part of the record and they're part of the record that the Court can consider on a motion to dismiss, because you can consider the exhibits that are incorporated into a complaint as part of the four corners of the complaint in issuing your ruling.

*Batista* (R. 1930-31).[31]

---

[30] *Batista* (R. 1903, 1931); *Barger* (R. 2853, 2881); *Ysidron* (R. 4708, 4736); *Milian* (R. 5506, 5534); *Orr* (R. 7070, 7098).

[31] *Barger* (R. 2880-81); *Ysidron* (R. 4735-36); *Milian* (R. 5533-34); *Orr* (R. 7097-98).

### E. The trial court dismissed Appellants' lawsuits and denied rehearing.

The trial court granted AT&T's motions to dismiss and entered substantively identical orders in the four cases asserting both administrative fee and unlimited data plan claims.  It entered a fifth order in the Orr case making the same determinations with respect to administrative fees but omitting discussion of unlimited data, which was not at issue in that case.

The trial court's dismissal orders included a thorough and reasoned analysis of Appellants' complaints and applicable law.  The trial court recognized that it was limited to the four corners of Appellants' complaints, including the documents relied upon to state the causes of action.  *Batista* (R. 1781-82)[32] (citing *Rolle v. Cold Stone Creamery, Inc.*, 212 So. 3d 1073, 1076 (Fla. 3d DCA 2017); *Glen Garron, LLC v. Buchwald*, 210 So. 3d 229, 233 (Fla. 5th DCA 2017)).

The trial court found that because each complaint "references, incorporates, and quotes from the Wireless Customer Agreement, AT&T's website, and AT&T billing statements as the bases for Plaintiff's claims" Appellants "had the duty to attach or incorporate

---

[32] *Barger* (R. 2569); *Ysidron* (R. 4588-89); *Milian* (R. 5388-89); *Orr* (R. 6656).

the underlying Agreement, billing statements, and website language onto its complaint." *Id.* (citing Fla. R. Civ. P. 1.130(a)). The trial court rejected Appellants' theory that it was required to consider an affidavit of authenticity in ruling on a motion to dismiss.[33] Moreover, the trial court refused to allow Appellants to "base their claims on the express language of the Agreement—while precluding consideration of that same Agreement at this stage of the proceedings . . . ." *Id.* Like this Court in *Rigney*, the trial court was troubled by Appellants' specious argument that they sued on a written contract that they alleged was not in their possession.[34]   *Batista* (R. 1783) ("Thus, Plaintiff apparently filed this lawsuit alleging, among other things, that 'AT&T has breached the express terms of the wireless agreement' without knowing what the Agreement says.").

After considering the parties' briefing and argument, the trial court determined that Appellants' administrative fee and throttling claims were "ripe for dismissal because they [were] facially negated by documents relied on and incorporated into the Complaint and

---

[33] *Barger* (R. 2570); *Ysidron* (R. 4590); *Milian* (R. 5390); *Orr* (R. 6658).

[34] Batista (R. 1782); *Barger* (R. 2569); *Ysidron* (R. 4589); *Milian* (R. 5389); *Orr* (R. 6656).

contain other pleading deficiencies and errors that cannot be cured through amendment."[35]

In dismissing Appellants' administrative fee counts, the trial court relied on AT&T's statement, quoted in Appellants' complaints, that AT&T could apply the administrative fee to defray any of its expenses—and was not limited to using the fee to offset any particular expense.[36]  The administrative fee was therefore not deceptive because its uses were explained by the Wireless Customer Agreement.  *Id.*  The use of the fee was not misleading because AT&T disclosed it could be used to defray any expense.[37]  And the fee was not a pass-through fee because there was no allegation that AT&T ever represented the fee would be used to pay anyone other than AT&T or anything other than expenses incurred by AT&T.[38]

In dismissing Appellants' unlimited data plan claims, the trial court found the claims were "ripe for dismissal because they [were]

---

[35] *Batista* (R. 1784); *Barger* (R. 2571); *Ysidron* (R. 4591); *Milian* (R. 5390); *Orr* (R. 6658).

[36] *Batista* (R. 1786); *Barger* (R. 2573); *Ysidron* (R. 4593); *Milian* (R. 5392); *Orr* (R. 6660).

[37] *Batista* (R. 1787); *Barger* (R. 2574); *Ysidron* (R. 4594); *Milian* (R. 5393); *Orr* (R. 6661).

[38] *Batista* (R. 1788); *Barger* (R. 2575); *Ysidron* (R. 4595); *Milian* (R. 5394); *Orr* (R. 6662).

facially negated by the documents relied on and incorporated into the Amended Complaint . . . ."[39]  In its dismissal orders, the trial court included a chart showing, on the left, Appellants' allegations and, on the right, the language of the Wireless Customer Agreement that negated Appellants' allegations:[40]

| What Plaintiff Alleges | What the Agreement Actually says |
|---|---|
| AT&T represented, directly or indirectly, expressly or by implication, to the Plaintiff, an unlimited mobile data plan customer, that the amount of data that the Plaintiff could access in any billing period would not be limited. | Unlimited Data Customers. If you are an AT&T unlimited data plan customer, you agree that "unlimited" means you pay a fixed monthly charge for wireless data service regardless of how much data you use . . . "unlimited" does not mean that you can use AT&T's wireless data service in any way that you choose, or for any prohibited activities.<br><br>AT&T may reduce your data throughput speeds at any time or place if your data usage exceeds an applicable, identified usage threshold during any billing cycle. |
| **Am. Compl. ¶ 30** | **Motion, Ex. 1 (Agreement) § 6.2 (emphasis in orig.)** |

---

[39] *Batista* (R. 1784); *Barger* (R. 2571); *Ysidron* (R. 4591); *Milian* (R. 5390); *Orr* (R. 6658).

[40] *Batista* (R. 1790-91); *Barger* (R. 2577-78); *Ysidron* (R. 4597-98); *Milian* (R. 5396-97).

| What Plaintiff Alleges | What the Agreement Actually says |
|---|---|
| AT&T's wireless customer agreements do not state that an unlimited mobile data plan customer's use of more than a specified amount of data is a prohibited activity.<br><br><br><br>**Am. Compl. ¶ 15** | "Prohibited Activities" include, among other items, anything that: "excessively and disproportionately contributes  to network congestion," "degrades network performance," or can "cause harm to the network or other customers."<br><br>"[U]nlimited" does <u>not</u> mean that you can use AT&T's wireless data service . . . for any prohibited activities.<br><br>**Motion, Ex. 1 (Agreement)§ 6.2 (emphasis in orig.)** |
| [The] unlimited mobile data contract with Plaintiff . . . did not provide that AT&T could modify, diminish, or impair the services of who use more than a specified amount of data for permissible activities.<br><br><br><br><br><br>**Am. Compl. ¶¶ 15, 47** | AT&T may modify, without advance notice, the permitted and prohibited activities.<br><br>You agree that . . . if you use AT&T's wireless data services in any manner that is prohibited, . . . AT&T may reduce your data throughput speeds at any time or place if your data usage exceeds an applicable, identified usage threshold during any billing cycle.<br><br>**Motion, Ex. 1 (Agreement) § 6.2.** |

| What Plaintiff Alleges | What the Agreement Actually says |
|---|---|
| AT&T omitted the fact that it intended to throttle Plaintiff's data, without Plaintiff's knowledge or specific consent. | AT&T may modify, without advance notice, the permitted and prohibited activities, [and] may engage in any reasonable network management practice . . . to reduce network congestion. |
| **Am. Compl. ¶ 31** | **Motion, Ex. 1 (Agreement) § 6.2** |

Finally, the trial court dismissed Appellants' fraud and FDUTPA claims because they were not pled with particularity.[41]  Appellants filed motions for rehearing, which the trial court denied on the ground that Appellants were "simply attempting to rehash the same issues previously considered by this Court, presenting nothing new."[42]  These appeals followed.

---

[41] *Batista* (R. 1796); *Barger* (R. 2583); *Ysidron* (R. 4603); *Milian* (R. 5403); *Orr* (R. 6666).

[42] *Batista* (R. 1881); *Barger* (R. 7116); *Ysidron* (R. 4686); *Milian* (R. 5484); *Orr* (R. 7048).

## SUMMARY OF THE ARGUMENT

First, the trial court properly dismissed Appellants' cases with prejudice because Appellants' fraud, breach of contract, FDUTPA damages and injunctive relief, and unjust enrichment counts, on both administrative fee and unlimited data theories, were contradicted by Appellants' own complaint allegations and the incorporated Wireless Customer Agreement.

Administrative fees were expressly authorized under the Wireless Customer Agreement.[43]   Appellants admit that AT&T disclosed to them that the administrative fee may be applied to defray *any* of AT&T's expenses.[44]   AT&T's contractual rights to charge an administrative fee and apply the administrative fee to defray any expense are clear from the four corners of Appellants' complaints.

_____

[43] R. 700; *see Batista* (R. 341 ¶ 5, R. 343 ¶¶ 15-16, R. 347 ¶ 30, R. 348 ¶ 38, R. 349 ¶ 47); *Barger* (R. 1994 ¶ 5, 1999 ¶ 24, R. 2004 ¶ 41, R. 2006 ¶ 51, R. 2010 ¶ 75); *Ysidron* (R. 2924 ¶ 5, R. 2929 ¶ 23, R. 2934 ¶ 40, R. 2940 ¶ 74, R. 2935 ¶ 50); *Milian* (R. 4795 ¶ 5, R. 4800 ¶ 24, R. 4805 ¶ 41, R. 4807 ¶ 51, R. 4811 ¶ 75); *Orr* (R. 5581 ¶ 5, R. 5589 ¶ 39).

[44] *Batista* (R. 347 ¶ 33, R. 348 ¶ 40, R. 351 ¶ 56, R. 352 ¶ 64); *Barger* R. 2004 ¶ 44, R. 2007 ¶ 60, R. 2011 ¶¶ 77-78, R. 2012 ¶ 84); *Ysidron* (R. 2934 ¶ 43, R. 2940 ¶¶ 76-77, R. 2942 ¶ 83); *Milian* (R. 4805 ¶ 44, R. 4808 ¶ 60, R. 4812 ¶ 77-78, R. 4813 ¶ 84); *Orr* (R. 5588 ¶ 32, R. 5590 ¶ 42, R. 5593 ¶ 58).

The Wireless Customer Agreement expressly authorized AT&T to reduce data speeds for several reasons, including but not limited to network availability, transmission limitations, and capacity constraints.  Wireless Customer Agreement §§ 3.1, §4.1.[45]  Further, AT&T "has the right to take any and all actions necessary" to stop prohibited activities, which includes regulating the speed of data disproportionately contributing to network congestion, and this right expressly applies to unlimited data customers.  Wireless Customer Agreement § 6.2.[46]  Appellants' theory that "unlimited" plans entitled them to unlimited amounts of data, meaning that AT&T could never reduce speeds even to keep the network functioning properly, is contrary to the plain language of the Wireless Customer Agreement. *Id.*

Second, the trial court properly dismissed Appellants' counts for fraud and FDUTPA because they were not pled with particularity as required by Florida Rule of Civil Procedure 1.120(b).  Appellants filed copy-and-paste complaints that were virtually identical to each

---

[45] *Batista* (R. 703, 705); *Barger* (R. 2088, 2090); *Ysidron* (R. 3020, 3022); *Milian* (R. 4882, 4884); *Orr* (R. 5705, 5707).

[46] *Batista* (R. 709-10); *Barger* (R. 2094-95); *Ysidron* (R. 3026-27); *Milian* (R.4879); *Orr* (R. 5711-12).

other and to hundreds of other complaints filed by the same trial counsel against AT&T.  Under Florida law, claims sounding in fraud must be pled with particularity, which Appellants failed to do here.

## <u>STANDARD OF REVIEW</u>

"A trial court's ruling on a motion to dismiss is subject to de novo review."  *Skupin v. Hemisphere Media Group, Inc.*, 314 So. 3d 353, 355 (Fla. 3d DCA 2020) (quoting *Kopel v. Kopel*, 229 So. 3d 812, 815 (Fla. 2017)).

## ARGUMENT

**I.  APPELLANTS' COUNTS FAILED AS A MATTER OF LAW UNDER THE ALLEGATIONS IN THE COMPLAINTS AND THE INCORPORATED WIRELESS CUSTOMER AGREEMENT.**

### A.  The Wireless Customer Agreement was incorporated into Appellants' complaints.

"When ruling on a motion to dismiss, the Court 'must limit itself to the four corners of the complaint, including any attached or incorporated exhibits' . . . ." *Skupin*, 314 So. 3d at 355 (quoting *Grove Isle Ass'n, Inc. v. Grove Isle Assocs., LLLP,* 137 So. 3d 1081, 1089 (Fla. 3d DCA 2014)).

Where, as here, "the terms of a legal document are impliedly incorporated by reference into the complaint, the trial court may consider the contents of the document in ruling on a motion to dismiss." *Air Quality Assessors of Fla. v. S.-Owners Ins. Co.*, 354 So. 3d 569, 571 (Fla. 1st DCA 2022) (quoting *One Call Prop. Servs. Inc. v. Sec. First Ins. Co.*, 165 So. 3d 749, 752 (Fla. 4th DCA 2015)); *Von Dyck v. Gavin*, 350 So. 3d 842, 845 (Fla. 1st DCA 2022); *see Veal v. Voyager Prop. & Cas. Ins. Co.*, 51 So. 3d 1246, 1249 (Fla. 2d DCA 2011).  Each of Appellants' lawsuits relied on and incorporated the Wireless Customer Agreement.  The trial court properly dismissed Appellants' complaints because their claims were squarely defeated

25

by the Wireless Customer Agreement.[47]

In ruling on a motion to dismiss, all reasonable inferences must be drawn in favor of the non-moving party. *Skupin*, 314 So. 3d at 355. However, a pleader's allegations are not binding on the trial court where they are contradicted by exhibits attached to or incorporated in the complaint. *Id.* (considering information contained at hyperlinks referenced in the complaint). "It is well settled that the court must consider an exhibit attached to the complaint together with the complaint's allegations, and that the exhibit controls when its language is inconsistent with the

---

[47] The trial court also properly considered the website and billing statements, which expressly served as the factual basis for Appellants' fraud and misrepresentation claims. *See Batista* (R. 1782-83, 1798 n. 4); *Barger* (R. 2569-70, 2585 n. 4); Ysidron (R. 4589-90, 4605 n. 4); *Milian* (R. 5388-90, 5404 n. 3); *Orr* (R. 6655-57, 6668 n.3). Moreover, the websites were properly considered because, under the express terms of the Wireless Customer Agreement, the complete agreement between AT&T and Appellants included the Wireless Customer Agreement and the "terms of service for wireless products, features, applications, and services (including content and other AT&T services included with your wireless service) . . . not otherwise described herein that are posted on applicable AT&T websites or devices, and any documents expressly referred to herein or therein." R. 699. In any event, the trial court properly dismissed Appellants' complaints based on the contract alone.

complaint's allegations." *K.R. Exch. Services, Inc. v. Fuerst, Humphrey, Ittleman, PL,* 48 So. 3d 889, 894 (Fla. 3d DCA 2010).

The existence of a contract governing the business relationship between the Appellants and AT&T is admitted in the complaints and controlled the disposition of these cases. In each count, Appellants admit the existence of the "wireless customer agreement."[48] Further, Appellants expressly relied upon the Agreement in attempting to state causes of action:

- In the fraud count, Appellants alleged that, while they were "not in possession of the **mobile data contract**," the contract omitted the fact that AT&T intended to throttle Appellants' data.[49]

- In the count for breach of the implied covenant of good faith and fair dealing, Appellants admitted they "**had a wireless agreement with AT&T** wherein [Appellants] had a reasonable

---

[48] *Batista* (R. 344 ¶ 15, R. 348 ¶¶ 38-39, R. 349 ¶¶ 41-42); *Barger* (R. 1999 ¶ 24, 2010 ¶¶ 75-76, R. 2011 ¶¶ 79-80); *Ysidron* (R. 2929 ¶ 23, R. 2940 ¶¶ 74-75, R. 2941 ¶¶ 78-79); *Milian* (R. 4800 ¶ 24, R. 4811 ¶¶ 75-76, R. 4812 ¶¶ 79-80). As discussed *supra* Section II(b), Appellant Orr does not refer to the Wireless Customer Agreement by name but alleges the existence of a contract with AT&T.

[49] *Batista* (R. 347 ¶ 30.); *Barger* (R. 2004 ¶ 41); *Ysidron* (R. 2934 ¶ 40); *Milian* (R. 4805 ¶ 41) (emphasis added).

expectation of performance of the agreement with no throttling of [Appellants'] data speed . . . ."[50]

- In the count under FDUTPA, Appellants admitted "AT&T entered into a **mobile data contract** with Plaintiff . . ." that was allegedly advertised as not being subject to any data speed limitations.[51]

Thus, in the general allegations, as well as the individual counts, Appellants not only referenced, but expressly relied on the terms of the Wireless Customer Agreement.[52]  On these grounds, the trial court properly considered the Wireless Customer Agreement. *See Von Dyck*, 350 So. 3d at 844.

The First DCA considered a similar situation in *Von Dyck*, where a client sued his lawyers for legal malpractice. *Id.* at 843.  One count was based upon an asset purchase agreement. *Id.*  Although the

---

[50] *Batista* (R. 348 ¶ 38); *Barger* (R. 2010 ¶ 75); *Ysidron* (R. 2940 ¶ 74); *Milian* (R. 4811 ¶ 75) (emphasis added).

[51] *Batista* (R. 349 ¶ 47); *Barger* (R. 2006 ¶ 51); *Ysidron* (R. 2935 ¶ 50); *Milian* (R. 4807 ¶ 51) (emphasis added).

[52] Appellants' counsel conceded during the trial court's hearing on AT&T's motions to dismiss that Appellants' unjust enrichment counts are defeated by the existence of a contract between the parties.  Initial Brief at 11, R. 1925.

agreement was not attached to the plaintiff's complaint, there were numerous references to the agreement in the complaint, and the plaintiff relied on the agreement for its arguments, as Appellants did here. *Id.* Accordingly, the trial court found it was proper to consider the agreement in granting the defendant's motion to dismiss, and the First DCA affirmed. *Id.*; *see Air Quality Assessors of Fla.*, 354 So. 3d at 573 (holding legal document impliedly incorporated by reference into the amended statement of claim was properly considered by the trial court on a motion to dismiss and by appellate court on review of the trial court order dismissing the case).

On appeal, Appellants craftily stated they "are not aware of any Florida rule of procedure or *precedential* court decision that would allow a defendant to attach an unauthenticated contract to a motion to dismiss . . . ." Initial Brief at 21 (emphasis added). However, Appellants are aware of two decisions from the First DCA issued in 2022, *Von Dyck* and *Air Quality Assessors of Florida*, which held that a trial court properly considered an "unauthenticated hearsay" contract on a motion to dismiss. *Von Dyck*, 350 So. 3d at 844; *Air Quality Assessors of Fla.*, 354 So. 3d at 573.

29

Appellants also ignored the Second DCA's decision in *Veal*, 51 So. 3d at 1249, where the appellate court affirmed a trial court's dismissal with prejudice based upon consideration of a settlement agreement impliedly incorporated by reference into the complaint. In *Veal*, the appellate court held that the trial court could consider the settlement agreement on the defendants' motion to dismiss because the plaintiff referenced and based his standing on the settlement agreement. *Veal*, 51 So. 3d at 1249.

### B. The Wireless Customer Agreement was properly considered by the trial court.

Appellants argue that the trial court could not consider the Wireless Customer Agreement because it was "unauthenticated hearsay." Initial Brief at 1, 12, 15, 17, 22, 23. This is wrong for several reasons.

First, under the plain language of Rule 1.130, evidentiary rules of hearsay and authentication do not apply to a trial court's consideration of the complaint or the documents incorporated into the complaint. *See* Fla. R. Civ. P. 1.130 ("Any exhibit attached to a pleading **must be considered a part thereof for all purposes**.") (emphasis added). Rule 1.130 allows trial courts to consider

contracts incorporated by reference into complaints where they are disputed by the nonmoving party. *See Veal*, 51 So. 3d at 1249 (nonmovant argued the trial court was precluded from considering a document central to but not attached to complaint); *see Von Dyck v. Gavin*, Case No. 1D21-3401, 2022 WL 1153395, at *30 (Fla. 1st DCA March 3, 2022) (Answer Brief) (nonmovant objected to the moving party's reliance on documents impliedly incorporated by reference). According to Appellants, the "fix" for moving to dismiss where, as here, a document is relied upon but not attached to the complaint, is to submit an affidavit swearing to its authenticity. *See* R. 7104. However, this notion would impermissibly engraft an evidentiary limitation on Rule 1.130, which does not exist under the plain language of Rule 1.130, and which would swallow the Rule if adopted. As the trial court properly held, such a procedure "would not only ignore Rule l.130(a), but do away with the incorporation by reference doctrine, and turn this Motion to Dismiss into a summary judgment motion."[53]

---

[53] *Batista* (R. 1783); *Barger* (R. 2570); *Ysidron* (R. 4590); *Milian* (R. 5390); *Orr* (R. 6658).

Second, as Judge Natalie Moore held in dismissing other plaintiffs' cut-and-paste complaints, "while Plaintiff may have argued the documents have not been authenticated, Plaintiff has not made any assertions that the documents provided are inauthentic."  R. 1769.  The same is true here.  In their complaints, Appellants refer to the Wireless Customer Agreement by name, cite to it, and allege AT&T has exclusive possession of it.[54]  Despite this, in response to AT&T actually supplying the publicly available Wireless Customer Agreement, which Appellants' were required, but failed, to attach to their complaints, Appellants have not claimed they are inauthentic, only that they should be authenticated.  However, Appellants have cited no law that requires a trial court to put on blinders and ignore the contents of Appellants' complaints, particularly where there is no dispute over the authenticity of the Wireless Customer Agreement.

Finally, Appellants are wrong to argue that the Wireless Customer Agreement could not be considered because it was hearsay.  As discussed *supra* at Section III.C., in considering a motion to dismiss, it is not relevant whether complaint allegations

---

[54] *Batista* (R. 347 ¶ 30); *Barger* (R. 2004 ¶ 41); *Ysidron* (R. 2934 ¶ 40); *Milian* (R. 4805 ¶ 41).

and documents incorporated into the complaint, such as the Wireless Customer Agreement, are hearsay. Moreover, as a matter of law, the Wireless Customer Agreement was not hearsay. A contract is a verbal act and, therefore, non-hearsay. *U.S. Bank Nat'l Ass'n as Tr. for Ramp 2006EFC2 v. Bell*, 355 So. 3d 980, 982 (Fla. 5th DCA 2023), *reh'g denied* (Feb. 16, 2023) ("This court has recognized that words of a contract are not hearsay because they characterize verbal acts and thus have independent legal significance.").

The trial court properly considered Appellants' Wireless Customer Agreement in granting AT&T's motions to dismiss because Appellants' counts for fraud, breach of the covenant of good faith and fair dealing, and FDUTPA damages, as well as for declaratory and injunctive relief, expressly relied upon terms of the Wireless Customer Agreement to state their causes of action.

### C. Each of Appellants' counts were defeated by the plain language of the Wireless Customer Agreement.

Each of Appellants' counts rely on allegations that are refuted by Appellants' complaints, including the incorporated Wireless Customer Agreement.[55]

---

[55] Appellants' complaints were also contradicted by AT&T's websites and Appellants' billing statements, which the trial court was also

1.   <u>Fraud</u>

The independent tort doctrine bars torts, including fraud claims, that are not independent of the terms of a contract between the parties.  *Un2jc Air 1, LLC v. Whittington*, 324 So. 3d 1, 3 (Fla. 4th DCA 2021) (quoting *Island Travel & Tours, Ltd., Co. v. MYR Indep., Inc.*, 300 So. 3d 1236, 1240 n.7 (Fla. 3d DCA 2020)) ("As a general principle of law, 'a plaintiff may not recover in tort for a contract dispute unless the tort is independent of any breach of contract.'"); *GVK Int'l Bus. Group, Inc. v. Levkovitz*, 307 So. 3d 144, 146 (Fla. 3d DCA 2020).

In dismissing Appellants' fraud counts, the trial court properly held, consistent with controlling law, that "[i]n Florida, '[a] party cannot recover for alleged false misrepresentations that are adequately dealt with or expressly contradicted in a later written contract.'"  R. 1784 (quoting *TRG Night Hawk Ltd*, 17 So. 3d at 784); *see Taylor Woodrow Homes Fla., Inc. v. 4/46-A Corp.*, 850 So. 2d 536, 542 (Fla. 5th DCA 2003).  "To hold otherwise is to invite contracting

_____

permitted to consider because they were the expressly relied upon by Appellants in attempting to state causes of action.  Fla. R. Civ. P. 1.130(a).  Appellants' failure to attach these documents to their complaints further supported dismissal.

parties to make agreements of the kind in suit and then avoid them by simply taking the stand and swearing that they relied on some other statement." *TRG Night Hawk Ltd v. Registry Dev. Corp.*, 17 So. 3d 782, 784 (Fla. 2d DCA 2009).  This is particularly true where, as here, the Wireless Customer Agreement contained an integration clause stating that the Wireless Customer Agreement and the other plan documents are "between you and AT&T and supersede any and all prior agreements and understandings relating to the subject matter of this Agreement." R. 699;  *Hillcrest Pac. Corp. v. Yamamura*, 727 So. 2d 1053, 1056 (Fla. 4th DCA 1999).

    2.   <u>Breach of the covenant of good faith and fair dealing</u>

The covenant of good faith and fair dealing does not exist independent of the express terms of a contract, and no claim for breach of the implied covenant exists absent the allegation that an express term of a contract was also breached.  *Ins. Concepts & Design, Inc. v. Healthplan Servs., Inc.*, 785 So. 2d 1232, 1234 (Fla. 4th DCA 2001).

> First, the implied covenant of good faith should not be invoked to override the express terms of the agreement between the parties.

> Second, a claim for breach of the implied covenant of good faith and fair dealing cannot be maintained under Florida law absent an allegation that an express term of the contract has been breached.

*Id.*[56]

Here, the trial court properly dismissed Appellants' counts for breach of the implied covenant because Appellants failed to connect their claims to any express term of the Wireless Customer Agreement and failed to allege the breach of any express term. Moreover, on appeal, Appellants have failed to explain how they can maintain a breach of contract claim without the contract sued upon. *See* Initial Brief at 44-45. The trial court properly rejected Appellants' attempt to simultaneously use the contract to support a breach of contract claim and, at the same time, act as though no contract exists for every other claim.[57] *See Batista* (R. 1781-84).[58]

---

[56] *Batista* (R. 1783); *Barger* (R. 2570); *Ysidron* (R. 4590); *Milian* (R. 5390).

[57] Recently, this Court found the same allegation—of not having possession of the mobile data contract sued upon, made by the same attorneys in a virtually identical case—to be "specious." *AT&T Mobility, LLC v. Rigney*, No. 3D21-2261, 2023 WL 5731791, at *10 (Fla. 3d DCA Sept. 6, 2023).

[58] *Barger* (R. 2568-71); *Ysidron* (R. 4588-91); *Milian* (R. 5388-91); Orr (R. 6656-58).

3.   FDUTPA

Appellants' FDUTPA claims are based upon the same alleged fraudulent misrepresentations as their fraud claims and were property dismissed on the same ground.[59]  *Batista* (R. 1784) (citing *TRG Night Hawk Ltd.*, 17 So. 3d at 784); *see also Taylor Woodrow Homes Fla., Inc.*, 850 So. 2d at 542.  "Courts routinely dismiss FDUTPA claims where those claims are directly and fully rebutted by express evidence in a governing written contract."  *Sol. Z v. Alma Lasers, Inc.*, No. 11-cv-21396-CIV-LENARD, 2013 WL 12246356, at *5 (S.D. Fla. Jan. 22, 2013).

Applying well-settled Florida law, the trial court properly found that Appellants' FDUTPA claims failed as a matter of law at the pleading stage because their allegations were contradicted by the plain language of their Wireless Customer Agreement:

> And, as in this case, where a plaintiff alleges a FDUTPA action based on misrepresentation and "plaintiff relies on written statements that are expressly contradicted by a subsequent contract, the plaintiff's reliance on those statements is not reasonable as a matter of law for a FDUTPA claim." *Id.* [*Sol. Z,* 2013 WL 12246356, at *5]. At the pleading stage, "where

---

[59] *Barger* (R. 2571); *Ysidron* (R. 4591); *Milian* (R. 5390-91); *Orr* (R. 6658).

the allegations of the complaint are contradicted by the exhibits, the plain meaning of the exhibits will control." *Ginsberg v. Lennar Fla. Holdings, Inc.*, 645 So. 2d 490, 494 (Fla. 3d DCA 1994).

*Batista* (R. 1784).[60]

### 4. Unjust enrichment

A claim for unjust enrichment cannot survive a motion to dismiss where an express contract covers the same subject matter alleged in the unjust enrichment claim. *Sterling Breeze Owners' Ass'n, Inc. v. New Sterling Resorts*, LLC, 255 So. 3d 434, 437 (Fla. 1st DCA 2018), *reh'g denied* (Oct. 16, 2018) ("[A] plaintiff cannot pursue a quasi-contract claim for unjust enrichment if an express contract exists concerning the same subject matter.'") (citation omitted).

The trial court properly dismissed Appellants' unjust enrichment claims because the allegations were covered and directly contradicted by the express terms of the Wireless Customer Agreement:

Like Counts 1-3, Plaintiff's claim of unjust enrichment hinges on their assertion that the administrative fee is deceptive—an assertion that, as discussed in detail above, is directly

---

[60] *Barger* (R. 2571); *Ysidron* (R. 4591); *Milian* (R. 5390-91); *Orr* (R. 6658).

> contradicted by both the Wireless Customer Agreement and AT&T's website.

R. 1796.  *Compare* Wireless Customer Agreement §§ 1.3, 1.4 *with* R. 353 ¶ 68.

### D.  Appellants' administrative fee claims failed as a matter of law.

Appellants' counts for fraud, FDUTPA damages, as well as declaratory and injunctive relief, breach of the covenant of good faith and fair dealing, and unjust enrichment allege that AT&T charged Appellants an administrative fee that was not allowed or adequately disclosed by the Wireless Customer Agreement.   The trial court determined that Appellants' administrative fee claims were contradicted not only by the Wireless Customer Agreement, but also by Appellants' own allegations, thus rendering Appellants' claims deficient as a matter of law.[61]

### 1.  AT&T is permitted to apply the administrative fee to defray any expense.

In their complaints, Appellants concede that AT&T disclosed the administrative fee and that AT&T may use the administrative fee to

---

[61] *Batista* (R. 1785-89); *Barger* (R. 2572-76); *Ysidron* (R. 4592-96); *Milian* (R. 5391-96); *Orr* (R. 6658-6663).

defray any expense:

> The Administrative Fee is a charge assessed by AT&T that helps defray a portion of certain expenses AT&T incurs, **including but not limited to**: (a) charges AT&T or its agents pay to interconnect with other carriers to deliver calls from AT&T customers to their customers; and (b) charges associated with cell site rents and maintenance.

(emphasis added).[62]   Thus, as alleged by Appellants, AT&T: (i) is permitted to charge an administrative fee,[63] (ii) is permitted to use that fee to defray a portion of its expenses, and (iii) is not limited to defraying a particular category of expenses.

Appellants do not, and cannot, allege that the administrative fee is not charged to defray expenses incurred by AT&T.   Instead, Appellants dispute whether the administrative fee properly reflects a subset of two specific underlying expenses—interconnect fees and

---

[62] *Batista* (R. 347 ¶ 33, R. 348 ¶ 40, R. 351 ¶ 56, R. 352 ¶ 64); *Barger* (R. 2004 ¶ 44, R. 2007 ¶ 60, R. 2011 ¶ 78, R. 2012 ¶ 84); *Ysidron* (R. 2934 ¶ 43, R. 2937 ¶ 59, R. 2941 ¶ 77, R. 2942 ¶ 83); *Milian* (R. 4805 ¶ 44, R. 4808 ¶ 60, R. 4812 ¶ 78, R. 4813 ¶ 84); *Orr* (R. 5588 ¶ 32, R. 5590 ¶ 42, R. 5593 ¶ 58).

[63] *Batista* (R. 700); *Barger* (R. 2085); *Ysidron* (R. 3017); *Milian* (R. 4879); *Orr* (R. 5702).

cell site rents and maintenance.[64]   However, as Appellants admit in their complaints, AT&T may defray a portion of certain expenses "**including but not limited to**" charges for interconnection and for cell site rents and maintenance, meaning that AT&T is not limited to those two categories of expenses. *Batista* (R. 347 ¶ 33, R. 348 ¶ 40, R. 351 ¶ 56, R. 352 ¶ 64).[65]   Therefore, even if Appellants' allegations were true (and they are not), and the administrative fees exceeded charges to AT&T for interconnect fees and cell site rents and maintenance, Appellants' complaints would still fail because, under Appellants' own allegations, AT&T is not limited in how it may apply the administrative fee or in which expenses may be defrayed by it.[66]

---

[64] *Batista* (R. 348 ¶ 34, R. 351 ¶ 57); *Barger* (R. 2005 ¶ 45, R. 2008 ¶ 61); *Ysidron* (R. 2935 ¶ 44, R. 2938 ¶ 60); *Milian* (R. 4806 ¶ 45, R. 4809 ¶ 61); *Orr* (R. 5589 ¶ 33, R. 5591 ¶ 43).

[65] *Barger* (R. 2004 ¶ 44, R. 2007 ¶ 60, R. 2011 ¶ 78, R. 2012 ¶ 84); *Ysidron* (R. 2934 ¶ 43, R. 2937 ¶ 59, R. 2941 ¶ 77, R. 2942 ¶ 83); *Milian* (R. 4805 ¶ 44, R. 4808 ¶ 60, R. 4812 ¶ 78, R. 4813 ¶ 84); *Orr* (R. 5588 ¶ 32, R. 5590 ¶ 42, R. 5593 ¶ 58).

[66] On appeal, Appellants argue that a reasonable consumer would believe "including but not limited to" somehow meant "limited to." Initial Brief at 27.  Appellants cite no authority for this speculation, and none exists that would permit a customer to ignore such plain and unambiguous contract language.  Similarly, it is not a fact question how a consumer would read unambiguous language.  Initial Brief at 32.  It is a question of law properly determined by the trial court. *Royal Caribbean Cruises Ltd. v. Ooi*, No. 3D22-1100, 2023 WL 5419579, at *4 (Fla. 3d DCA Aug. 23, 2023) ("[T]he construction of

*See Zlotnick v. Premier Sales Group, Inc.*, 431 F. Supp. 2d 1290, 1295 (S.D. Fla. 2006), *aff'd*, 480 F.3d 1281 (11th Cir. 2007) (granting motion to dismiss FDUTPA claim where a purchase agreement was cancelled under the terms of a contract allowing cancelation for any reason).

Because no reasonable consumer could interpret the administrative fee as Appellants suggest, their claims failed as a matter of law and were properly dismissed.  *See Day v. Sarasota Doctors Hosp., Inc.*, No. 8:19-CV-1522-VMC-TGW, 2021 WL 288969, at *4 (M.D. Fla. Jan. 28, 2021) (finding FDUTPA claim failed where "no reasonable consumer could be deceived by the [defendant's conduct or the parties' contract] under the circumstances alleged . . . .").

       2.    <u>The administrative fee is not a pass-through fee.</u>

Appellants' allegations also establish that the administrative fee is not a "textbook pass-through fee" as Appellants allege.[67]  Florida

---

an unambiguous provision in a contract is a question of law for determination by the court.").

[67] *Batista* (R. 345 ¶ 21, R. 350 ¶ 53, R. 352 ¶ 66); *Barger* (R. 2001 ¶ 27, R. 2007 ¶ 57, R. 2012 ¶ 86); *Ysidron* (R. 2930 ¶ 26, R. 2936 ¶ 56, R. 2942 ¶ 85); *Milian* (R. 4802 ¶ 27, R. 2808 ¶ 57, R. 4813 ¶ 86); *Orr* (R. 5585 ¶ 18, R. 5589 ¶ 39, R. 5593 ¶ 60).

law is clear that an impermissible "pass-through" fee is one that purports to be collected for payment to a third party but, in reality, is kept by the company applying the fee. *See Latman v. Costa Cruise Lines, N.V.*, 758 So. 2d 699, 703 (Fla. 3d DCA 2000) (finding that use of the term "port charge" misrepresents to a reasonable consumer that it is a "pass-through" charge which the cruise line will pay to the relevant port authorities); *Berry v. Budget Rent A Car Systems Inc.*, 497 F. Supp. 2d 1361, 1367-68 (S.D. Fla. 2007) (dismissing plaintiff's complaint and holding that, as a matter of law, a "cost recovery fee" was not a deceptive pass-through fee); *see also Vorst v. TBC Retail Grp., Inc.*, No. 12-CV-80013, 2012 WL 13026643, at *2 (S.D. Fla. Apr. 12, 2012) (dismissing FDUTPA pass-through claim based on the finding that "Plaintiff's conclusory allegations that the oil disposal fee was represented as a pure pass-through expense and that Defendant retains the fee as a profit are insufficient.").

AT&T's statement on administrative fees, as expressly set forth in Appellants' complaints, unequivocally discloses that the administrative fee is <u>not</u> a pass-through fee, tax, or governmental charge: "**It is not a tax or charge which the government requires**

**AT&T to collect from its customers**."[68] (emphasis added). Thus, Appellants' meritless theory that the administrative fee was falsely represented to be a pass-through fee is contradicted by Appellants' own admissions in the complaints and was properly dismissed by the trial court.

> ### 3. The express terms of the Wireless Customer Agreement allowed AT&T to charge and increase the administrative fee.

The Wireless Customer Agreement expressly disclosed the administrative fee and AT&T's right to make changes to charges billed to customers:

> You are responsible for paying all charges for or resulting from Services provided under this Agreement, including any activation fee that may apply to each voice or data line. You will receive monthly bills that are due in full.
>
> ***
>
> **Charges include, without limitation**, airtime, roaming, recurring monthly service, activation, **administrative**, and late payment charges; regulatory cost recovery and other surcharges; optional feature charges; toll, collect call and directory assistance charges; restoral and reactivation charges; any other charges or calls billed to your phone number; and applicable

---

[68] *Batista* (R. 352); *Barger* (R. 2011); *Ysidron* (R. 2941); *Milian* (R. 4812); *Orr* (R. 5593).

> taxes and governmental fees, whether assessed
> directly upon you or upon AT&T**.**

(Wireless Customer Agreement, § 1.4) (emphasis added).[69]  AT&T also

expressly reserved the right to increase the administrative fee:

> We may change any terms, conditions, rates,
> fees, expenses, or charges regarding your
> Services at any time.

*Id.* (Wireless Customer Agreement, § 1.3).

The same claims raised by Appellants here were raised and

rejected in *Berry*, 497 F. Supp. 2d 1361, which is on all fours.  *Id.*  In

*Berry*, the plaintiff alleged that a defendant violated FDUTPA by

charging a $3.00 "cost recovery fee" in addition to the daily car rental

rate, and that the fee grossly exceeded the actual cost of vehicle

registration and licensing that was already included in the daily

rental rate.  *Id.* at 1363-64.  In dismissing the plaintiff's FDUTPA

claim with prejudice, the court first explained that "the simple fact of

the [cost recovery fee], and its itemization as a separate charge, is not

unfair or deceptive because it was clearly disclosed at the time of the

rental."  *Id.* at 1367.  The same is true here.  As in *Berry*, Appellants

---

[69] *Batista* (R. 700); *Barger* (R. 2085); *Ysidron* (R. 3017); *Milian*
(R.4879); *Orr* (R. 5702).

cannot claim to have been deceived where AT&T expressly disclosed its right to charge an administrative fee in the Wireless Customer Agreement.  *Id.*

In addition to the Wireless Customer Agreement, as Appellants' complaints readily admit, AT&T disclosed the administrative fee on its website and in its billing statements.  *See Buchwald*, 210 So. 3d at 233 ("When a party refers to a document in the complaint, the trial court may use that document to assess the nature of the claims alleged in the complaint."); *Batista* (R. 345 ¶ 21) ("In AT&T's printed monthly billing statements, AT&T intentionally buries the Administrative Fee.");[70] *see also Batista* (R. 345 ¶ 23, R. 346 ¶ 24, R. 347 ¶ 33, R. 348 ¶ 40, R. 351 ¶ 56).[71]  On appeal, Appellants argue that questions remained concerning the accessibility of the information contained in the Wireless Customer Agreement and elsewhere.  Initial Brief at 26.  These arguments ignore the bold and underlined portions of the Wireless Customer Agreement stating the

---

[70] *Barger* (R. 2001 ¶ 27); *Ysidron* (R. 2930 ¶ 26); *Milian* (R. 4802 ¶ 27); *Orr* (R. 5585 ¶ 18).

[71] *Barger* (R. 2001 ¶¶ 28-29, R. 2004 ¶ 44, R. 2007 ¶ 60); *Ysidron* (R. 2931 ¶¶ 27-28, R. 2934 ¶ 43, R. 2937 ¶ 59, R. 2940 ¶ 76); *Milian* (R. 4802 ¶¶ 28-29, R. 4805 ¶ 44, R. 4808 ¶ 60); *Orr* (R. 5586 ¶¶ 19-20, R. 5588 ¶ 32, R. 5590 ¶ 42, R. 5593 ¶ 58).

AT&T could charge and change the amount of the administrative fee. The trial court was well-positioned to consider these conspicuous disclosures.  Moreover, Appellants cannot claim AT&T's description of how the administrative fee would be applied was buried and therefore unknown to them and, at the same time, claim they were deceived by that language if they did not read and were not aware of it.

Accordingly, Appellants' administrative fee claims were properly dismissed with prejudice.

### E. Appellants' data throttling claims failed as a matter of law.

Appellants' data throttling claims were based on allegations that Appellants were "unlimited" customers and, despite that fact, AT&T reduced their data speeds after Appellants exceeded a certain amount of data usage during their billing cycles.[72]  According to Appellants, this conduct contradicted the terms of "AT&T's wireless customer agreements [as they] do not state that an unlimited mobile data plan customer's use of more than a specified amount of data is

---

[72] *Batista* (R. 343 ¶ 14, R. 344 ¶ 15); *Barger* (R. 1999 ¶¶ 23-24); *Ysidron* (R. 2929 ¶¶ 22-23); *Milian* (R. 4800 ¶¶ 23-24).

a prohibited activity." *Id.*[73]  Appellants also allege that the Wireless Customer Agreement does not allow AT&T to "modify, diminish, or impair the service of unlimited mobile data plan customers engaged in permissible activities if these customers use more than a specified amount of data." *Id.*  As with Appellants' administrative fee claims, these allegations are directly contradicted by the plain language of the Wireless Customer Agreement incorporated into the Appellants' complaints.

Section 6.2 of the Wireless Customer Agreement governs permitted and prohibited activities while using AT&T's wireless services, and explains why these requirements are necessary:

> **AT&T's wireless data network is a shared resource, which AT&T manages for the benefit of all of its customers** so that they can enjoy a consistent, high-quality mobile broadband experience and a broad range of mobile Internet services, applications and content. However, certain activities and uses of the network by an individual customer or small group of customers can negatively impact the

---

[73] These allegations are incorporated into Appellants' fraud count, FDUTPA counts, and count for breach of the implied duty of good faith and fair dealing. *Batista* (R. 347 ¶ 28, R. 348 ¶ 37, R. 349 ¶ 44, R. 352 ¶ 61); *Barger* (R. 2004 ¶ 39, R. 2005 ¶ 48, R. 2009 ¶ 65, R. 2010 ¶ 74); *Ysidron* (R. 2933 ¶ 38, R. 2935 ¶ 47, R. 2939 ¶ 64, R. 2940 ¶ 73); *Milian* (R. 4805 ¶ 39, R. 4806 ¶ 48, R. 4810 ¶ 65, R. 4811 ¶ 74); *Orr* (R. 5588 ¶ 30, R. 5589 ¶ 36, R. 5592 ¶ 47).

use and enjoyment of the network by others. Therefore, certain activities and uses of AT&T's wireless data service are permitted and others are prohibited. The terms and conditions of your use of AT&T's wireless data service are set forth below.

(Wireless Customer Agreement, § 6.2) (emphasis added).[74]

Section 6.2 goes on to provide a list of "Prohibited Activities" which includes, among other items, anything that: "excessively and disproportionately contributes to network congestion," "adversely impacts network service levels or legitimate data flows," "degrades network performance," or can "cause harm to the network or other customers." *Id.* In addition to other methods of protecting network resources, the Wireless Customer Agreement allows AT&T to prevent network congestion and preserve performance as follows:

> **AT&T may reduce your data throughput speeds at any time or place if your data usage exceeds an applicable, identified usage threshold during any billing cycle**. AT&T will provide you with advance notice of the usage threshold applicable to your data plan, or any changes to the applicable usage threshold either by a bill insert, email, text message or other appropriate means.

---

[74] *Batista* (R. 709-10); *Barger* (R. 2094-95); *Ysidron* (R. 3026-27); *Milian* (R.4879); *Orr* (R. 5711-12).

*Id.* (emphasis added).   On appeal, Appellants gloss over this paragraph, which expressly addresses limits on speed and is not tied to actual network congestion.

Section 6.2 of the Wireless Customer Agreement expressly addresses unlimited data customers and defines what "unlimited data" means, stating:

> **Unlimited Data Customers.** If you are an AT&T unlimited data plan customer, you agree that "unlimited" means you pay a fixed monthly charge for wireless data service regardless of how much data you use . . . .

*Id.* (emphasis added).  Thus, under the express terms of the Wireless Customer Agreement, unlimited data means a customer pays one price regardless of the amount of data used and not that a customer is entitled to unlimited data speeds at all times, as Appellants have claimed.

Section 6.2 also notifies customers what unlimited data does not entail:

> You further agree that "unlimited" does **not** mean that you can use AT&T's wireless data service in any way that you choose or for any prohibited activities, and that if you use your unlimited data plan in any manner that is prohibited, AT&T can limit, restrict, suspend or

> terminate your data service or switch you to a
> tiered data plan.

*Id.* (emphasis added).  It does not permit a customer to use the service in a way that "excessively and disproportionately contributes to network congestion," "adversely impacts network service levels or legitimate data flows," "degrades network performance," or can "cause [] harm to the network or other customers." *Id.* Where such prohibited conduct occurs, Appellants in the Wireless Customer Agreement that AT&T may limit, restrict, or even terminate service.

Under the Wireless Customer Agreement, unrestricted data *speed* is, as a matter of law, not an essential term of providing unlimited *data*.  In *Williams v. Burger King Corp.*, No. 19-24755-SINGHAL, 2020 WL 5083550, at *3 (S.D. Fla. July 20, 2020), the court considered a plaintiff's claims for breach of contract, FDUTPA, and other causes of action.  There, the plaintiff claimed that an essential element of Burger King's advertising and sale of the 100% plant-based "Impossible Whopper" was that the patty would be cooked on a separate surface used to cook meat-containing products. *Id.* at **1-2.  The trial court rejected the plaintiff's claims, holding that cooking the Impossible Whopper on a separate surface was not

an essential term of the contract even though it might affect whether the Impossible Whopper served was 100% plant-based. The same is true here where unrestricted data speed is not an essential term of a contract providing unlimited data. *Id.* at *3.

Accordingly, contrary to Appellants' assertion that the Wireless Customer Agreement does not limit a "customer's use of more than a specified amount of data" or allow AT&T to "modify, diminish, or impair the service of unlimited mobile data plan customers," the Wireless Customer Agreement explicitly provides AT&T with the ability to do exactly that.[75] The trial court properly dismissed Appellants' data throttling claims with prejudice because they were based upon alleged misrepresentations that were contradicted by the plain language of the parties' contract and, therefore, failed as a matter of law.

## II. APPELLANTS' FRAUD AND FDUTPA COUNTS FAILED AS A MATTER OF LAW BECAUSE THEY WERE NOT PLED WITH PARTICULARITY AS REQUIRED BY RULE 1.120.

Generally, "[t]he complaint must set out the elements and the facts that support them so that the court and the defendant can

---

[75] *Batista* (R. 344 ¶ 15); *Barger* (R. 1999 ¶ 24); *Ysidron* (R. 2929 ¶ 23); *Milian* (R. 4800 ¶ 24).

clearly determine what is being alleged." *Barrett v. City of Margate*, 743 So. 2d 1160, 1162 (Fla. 4th DCA 1999). But when fraud is alleged, Florida Rule of Civil Procedure 1.120(b) mandates that "the circumstances constituting the fraud . . . shall be stated with such particularity as the circumstances may permit."

Courts in Florida have regularly held that FDUTPA claims sound in fraud and must be pled with particularity under Rule 1.120(b) or its federal counterpart, Federal Rule of Civil Procedure 9(b). *Cedars Healthcare Grp., Ltd. v. Mehta*, 16 So. 3d 914, 917 (Fla. 3d DCA 2009); *Librizzi v. Ocwen Loan Servicing, LLC*, 120 F. Supp. 3d 1368, 1381 (S.D. Fla. 2015).[76] A claim is rooted in fraud where, as here, the plaintiff alleges that the defendant "caused damages through deception." *Librizzi*, 120 F. Supp. 3d at 1381. Claims for

---

[76] *See also Kim v. Summit and Crowne Capital Partners*, LLC, No. 8:18-CV-2982-T-17SPF, 2019 WL 3854782, at *4 (M.D. Fla. June 3, 2019) ("claims rooted in fraud, such as FDUTPA claims, must . . . be pleaded with particularity"); *USA Nutraceuticals Grp., Inc. v. BPI Sports, LLC*, No. 15-CIV-80352, 2016 WL 4254257, at *3 (S.D. Fla. Feb. 16, 2016) ("[C]ourts regularly apply Rule 9(b) to FDUTPA claims, as such claims uniquely sound in both tort and fraud."); *Koch v. Royal Wine Merchants, Ltd.*, 847 F. Supp. 2d 1370, 1381 (S.D. Fla. 2012); *Blair v. Wachovia Mortg. Corp.*, No. 5:11-cv-566-oc-37TBS, 2012 WL 868878, at *3-4 (M.D. Fla. Mar. 14, 2012) (dismissing fraud-based FDUTPA claim for lack of particularity).

declaratory and injunctive relief under FDUTPA must also be pled with particularity. *Bamert v. Pulte Home Corp.*, No. 6:08-CV-2120-ORL-22, 2012 WL 3292875, at *3 (M.D. Fla. Aug. 10, 2012) (adopting magistrate's recommendation that Rule 9(b)'s heightened pleading standards apply to plaintiff's FDUTPA declaratory and injunctive relief claims).

Appellants' causes of action are based on the same alleged conduct and all sound in fraud.[77] Appellants' complaints allege that AT&T knowingly, intentionally, and fraudulently deceived the Appellants regarding AT&T's administrative fee and purported data throttling. *See, e.g.*, *Batista* (R. 344 ¶¶ 17-21).[78] Appellants allege that (i) AT&T's unlimited plan was "a bait-and-switch scam," (ii) AT&T "covertly increases the actual price" of its services by "padding all post-paid wireless customers' bills" with a "bogus" administrative fee, (iii) the administrative fee "is never adequately and honestly disclosed," and (iv) AT&T "deliberately hides" the administrative fee. *Id.*

---

[77] Indeed, all claims incorporated the same factual bases that support Appellants' claims for fraud.

[78] *Barger* (R. 2000-01 ¶¶ 25-27); *Ysidron* (R. 2930 ¶¶ 24-26); *Milian* (R. 4801-02 ¶¶ 25-27); *Orr* (R. 5585 ¶¶ 17-18).

Based on Appellants' allegations of misrepresentation and deceit, Appellants' claims must "be pled with particularity and must specifically identify misrepresentations or omissions of fact, as well as time, place or manner in which they were made." *See Mehta*, 16 So. 3d at 917. Conclusory assertions do not meet this high standard. *See Myers v. Myers*, 652 So. 2d 1214, 1215 (Fla. 5th DCA 1995) ("Allegations contained in a pleading are insufficient if they are too general, vague or conclusory."). Failure to allege a specific element of fraud in a complaint is fatal when challenged by a motion to dismiss. *Strack v. Fred Rawn Const., Inc.*, 908 So. 2d 563, 565 (Fla. 4th DCA 2005).

Appellants generally asserted that they were AT&T customers who wrongfully had their data throttled and were deceived regarding AT&T's administrative fee and throttling practice. However, apart from a partial telephone number, Appellants' complaints do not include a single fact or allegation specific to Appellants. Indeed, there are no allegations describing any individual interactions with AT&T, or the time, place, and manner of any alleged fraudulent or deceptive conduct. There are also no particularized allegations concerning damages or causation, which are critical elements in any fraud-based

claim to show reliance on the alleged misrepresentation and existence of damage caused by such misrepresentation.  *See Mehta*, 16 So. 3d at 917; *BPI Sports, LLC*, No. 15-CIV-80352-BLOOM, 2016 WL 4254257, at *3 (finding complaints sounding in fraud must state the "who, what, when, where, and how" of the alleged misconduct); *Meridian Tr. Co. v. Batista*, No. 17-23051, 2018 WL 4760277, at *5 (S.D. Fla. Sept. 30, 2018) (holding "broad-brush characterization[s] . . . insufficient where particular reliance on particular statements or documents is required."); *Gayou v. Celebrity Cruises, Inc.*, No. 11-23359-CIV, 2012 WL 2049431, at *7 (S.D. Fla. June 5, 2012) (dismissing false advertising claim for failing to "particularly identify the timing of any of the alleged misrepresentations").

Instead, the complaints at issue in this consolidated appeal are *nearly identical* to each other and to the other amended complaints that Appellants' counsel has filed in hundreds of other cases.  Mass-produced allegations fall woefully short of the particularity and specificity required by Florida law.  *See Dominguez v. Banana Republic, LLC*, 613 F. Supp. 3d 759, 766 (S.D.N.Y. 2020), *aff'd sub nom. Calcano v. Swarovski N. Am. Ltd.*, 36 F.4th 68 (2d Cir. 2022) (commenting that the "greatest asset of copy-and-paste litigation can

also be its greatest weakness" by "failing to allege any nonconclusory facts of a real or immediate threat of injury" that would warrant relief).

The trial court properly dismissed Appellants' fraud and FDUTPA claims for failing to plead with the particularity required by Rule 1.120. *See Mehta*, 16 So. 3d at 917 (dismissing complaint where "plaintiffs broadly alleged intentional fraud, [but] failed to plead fraud with particularity.").

## **CONCLUSION**

Appellee AT&T Mobility LLC respectfully requests that the Court affirm the trial court's dismissal of Appellants' complaints.

Respectfully submitted,

*Angel A. Cortiñas*
Angel A. Cortiñas, FBN 797529
Jonathan H Kaskel, FBN 52718
DENTONS US LLP
1 Alhambra Plaza, Penthouse
Coral Gables, Florida 33134
Telephone:  305-537-0015
angel.cortinas@dentons.com
jonathan.kaskel@dentons.com
*Counsel for Appellee AT&T Mobility LLC*

## CERTIFICATE OF SERVICE

I hereby certify that on November 2, 2023, the foregoing was served via email on the following Service List:

*Angel A. Cortiñas*

## SERVICE LIST

**BEIGHLEY, MYRICK, UDELL & LYNNE, PA**
Maury L. Udell, Esquire
mudell@bmulaw.com
notice66@bmulaw.com
*Counsel for Appellant*

**DAY PITNEY**
Manuel A. Garcia-Linares, Esquire
mgarcialinares@daypitney.com
*Counsel for Appellee AT&T Mobility LLC*

**DAVID B. PAKULA, P.A.**
David B. Pakula, Esquire
david@pakulalawfirm.com
*Appellate counsel for Appellant*

58

## <u>CERTIFICATE OF COMPLIANCE</u>

The undersigned certifies that this computer-generated brief complies with the font requirements of Rule 9.045(b), as it is submitted in Bookman Old Style 14-point font.  The undersigned also certifies that this computer-generated brief complies with the word count limit set forth in Rule 9.210(a)(2)(B), in that it does not exceed 13,000 words, counted in the manner prescribed in Rule 9.045(e).

<div align="right"><i>Angel A. Cortiñas</i></div>

# EXHIBIT 7

Case 1:25-cv-20381-RAR Document 1-2 Entered on FLSD Docket 01/27/2025 Page 1308 of 1553

# IN THE DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA, THIRD DISTRICT

---

CASE NO. 3D23-97, 3D23-98, 3D23-99, 3D23-100, 3D23-101
(Consolidated)

---

## SHARON L. ORR, et al.,

Appellants,

vs.

## AT&T MOBILITY, LLC,

Appellee.

On Appeal from the Circuit Court of the 11th Judicial Circuit in and for Miami-Dade County, Florida, L.T. Case No. 20-8179, 20-21937, 20-21932, 20-8181, 19-11857

---

## REPLY BRIEF OF APPELLANTS

---

DAVID B. PAKULA, ESQ.
DAVID B. PAKULA, P.A.
12301 Taft Street, Suite 200
Pembroke Pines, FL 33026
Tel.: (954) 217-5123
Email: david@pakulalawfirm.com

MAURY L. UDELL, ESQ.
BEIGHLEY, MYRICK, UDELL
& LYNNE, P.A.
150 W. Flagler St., Suite 1800
Miami, FL 33130
Tel: (305) 349-3930
Email: mudell@bmulaw.com

Attorneys for Appellants

# **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ................................................................................ii

I. ARGUMENT ............................................................................................ 1

    **A. The Trial Court Erred In Dismissing the Complaints Based on AT&T's Unauthenticated Hearsay Exhibits** …………..…1

    **B. The Trial Court Erred in Dismissing With Prejudice the Causes of Action for FDUTPA Violation, Fraud, and Breach of Implied Duty of Good Faith and Fair Dealing** …………5

        **1. The Wireless Customer Agreement Does Not Negate the Data Throttling Allegations** …………………………..5

        **2. AT&T's Exhibits Do Not Negate the Allegations of a Bogus Administrative Fee** …………………………………7

        **3. The Complaints State Causes of Action for FDUTPA Violations, Fraud, Breach of the Duty of Good Faith and Fair Dealing, and Unjust Enrichment** ……………………14

II. CONCLUSION ………………………………………………………………15

CERTIFICATE OF SERVICE ...................................................................... 16

CERTIFICATE OF COMPLIANCE……………………………………………….16

i

## <u>TABLE OF AUTHORITIES</u>

**Page**

Advance Mold Servs. v. Universal N. Am. Ins. Co.,
    2023 Fla. App. LEXIS 8638 (Fla. 3d DCA Dec. 20, 2023) ……….10, 11

Air Quality Assessors of Fla. v. Southern-Owners Ins. Co.,
    354 So. 3d 569 (Fla. 1st DCA 2022) ……………….………………….3

AT&T Mobility, LLC v. Rigney,
    2023 Fla. App. LEXIS 6283 (Fla. 3d DCA Sept. 6, 2023) …………...4

Berry v. Budget Rent a Car Syst.,
    497 F. Supp. 2d 1361 (S.D. Fla. 2007) …………………………..11, 12

Busch v. Lennar Homes, LLC,
    219 So. 3d 93 (Fla. 5th DCA 2017) ………………………………….4

Coleman v. CubeSmart,
    328 F. Supp. 3d 1349 (S.D. Fla. 2018) ………………………………13

Deere Constr., LLC v. Cemex Constr. Materials, Fla., LLC,
    198 F. Supp. 3d 1332 (S.D. Fla. 2016) …………………….…………13

Dyck v. Gavin,
    350 So. 3d 842 (Fla. 1st DCA 2022) ……………………………...3, 4

FTC v. AT&T Mobility, LLC,
    883 F. 3d 848 (9th Cir. 2018) ………………………………………..7

Hetrick v. Ideal Image Dev. Corp.,
    372 F. Appx. 985 (11th Cir. 2010) ………………………..………9

In re Tracfone Unlimited Serv. Plan Litig.,
    112 F. Supp. 3d 993 (N.D. Calif. 2015) ……………………………..7

Iniguez v. Am. Hotel Register Co.,
    820 So. 2d 953 (Fla. 3d DCA 2002),
    rev. dismissed, 838 So. 2d 558 (Fla. 2003) …………………………..9

James D. Hinson Elec. Contr. Co. v. BellSouth Telecomms., Inc.,
    796 F. Supp. 2d 1341 (M.D. Fla. 2011) ………………………………13

Latman v. Costa Cruise Lines, N.V.,
    758 So. 2d 699 (Fla. 3d DCA 2000),
    rev. denied, 819 So. 2d 136 (Fla. 2002)  ………..……………………13

Maor v. Dollar Thrifty Auto. Grp., Inc.,
    303 F. Supp. 3d 1320 (S.D. Fla. 2017) ……………………………..…12

PNR, Inc. v. Beacon Prop. Mgmt., Inc.,
    842 So. 2d 773 (Fla. 2003) ……………………………………………9

Samuels v. King Motor Co. of Ft. Lauderdale,
    782 So. 2d 489 (Fla. 4th DCA 2001) ………………………………..…9

Siever v. BWGaskets, Inc.,
    669 F. Supp. 2d 1286 (M.D. Fla. 2009) ………………………………9-10

Suris v. Gilmore Liquidating, Inc.,
    651 So. 2d 1282 (Fla. 3d DCA 1995) …………………………………....10

Susan Fixel, Inc. v. Rosenthal & Rosenthal, Inc.,
    842 So. 2d 204 (Fla. 3d DCA 2003),
    rev. denied, 939 So. 2d 1061 (Fla. 2006) …………………………………14

Tallahassee Pediatric Dentistry PLLC v. Airgas USA, LLC,
    2020 U.S. Dist. LEXIS 265237 (N.D. Fla. 2020) ………………………13

Turner Greenberg Assocs. v. Pathman,
    885 So. 2d 1004 (Fla. 4th DCA 2004) ……………………………………13

Veal v. Voyager Prop. & Cas. Co.,
    51 So. 3d 1246 (Fla. 2d DCA 2011) …………………………………3, 4

Waste Pro USA v. Vision Constr. ENT, Inc.,
    282 So. 3d 911 (Fla. 1st DCA 2019) ……………………………..……13

Williams v. Burger King Corp,
    2020 U.S. Dist. LEXIS 158249 (S.D. Fla. 2020) …………………..……6

Zlotnick v. Premier Sales Group, Inc.,
    480 F. 3d 1281 (11th Cir. 2007) …………………………………….…………9

### Other Authorities

Fla. R. Civ. P. 1.130(a) ……….………….…………………………..……1

§ 501.204(1), Fla. Stat. (2023) …………………………………………7

## I.

## **ARGUMENT**

**A.**   **The Trial Court Erred In Dismissing the Complaints Based on AT&T's Unauthenticated Hearsay Exhibits.**

AT&T contends that the trial judge properly considered the unauthenticated wireless customer agreement exhibit because the plaintiffs incorporated it by reference and "relied on" it in the complaints, and the authenticity of this "publicly available" document is uncontested.  We disagree.

The relevant inquiry is not whether the plaintiffs referenced and relied on the agreement, but whether the plaintiffs' causes of action were "brought upon" the agreement.  Only in the latter circumstance would the agreement be required to be incorporated or attached to the complaint. *See* Fla. R. Civ. P. 1.130(a).  With the possible exception of the count for breach of the duty of good faith and fair dealing, the plaintiffs' causes of action were not "brought upon" the wireless customer agreement.  And none of the causes of action were "brought upon" the customer bill and fee schedule exhibits that the trial judge held required dismissal of the complaints.  AT&T's exhibits are potentially relevant, but do not constitute the entire universe of potentially relevant evidence regarding AT&T's unlawful practices.

In addition, there is no evidence that AT&T's wireless customer agreement and other exhibits are what they purport to be.  The express and

1

implied representations of AT&T's counsel that the wireless customer agreement exhibit is the authentic, complete, and governing agreement do not constitute evidence for purposes of establishing authenticity and admissibility.

AT&T suggests that no one including the plaintiffs can contest the authenticity of its agreement exhibit, because it purportedly is a printout of a publicly available website page.  But the plaintiffs do not now and have never conceded the authenticity of AT&T's exhibits, notwithstanding AT&T's incorrect assertion to the contrary.  The plaintiffs know they have a wireless customer agreement with AT&T and know something of its contents.  But they cannot reasonably be expected to know the precise text of the agreement.  What appears on an internet web page during a search of AT&T's website today might not reflect the terms of an agreement that was in effect in the past, as website content can change in an instant.

AT&T is in the best position to know the terms of its agreement. However, we should not be required to blindly accept that its exhibit constitutes the complete governing agreement with regard to each individual plaintiff.[1]

---

[1] AT&T's wireless customer agreement exhibit does not include any identifying information, such as a name, account or phone number, tying it to a particular customer.  Nor does it even state the dates the agreement was in effect.  We are just supposed to take AT&T's word that this is the governing agreement.  In any imaginable context, this would not pass muster for purposes of due process.  For example, an insurer surely would not be able to dismiss an insured's breach of contract action based on a policy form printout exhibit to its motion, without a declarations page or other identifying policy information.

AT&T acknowledges that its wireless customer agreement exhibit does not constitute the entire agreement, asserting that other unspecified documents and website materials are also part of the agreement. (AB, pg. 26, n. 47).

The scope and terms of the governing agreement in each case would be an appropriate subject of discovery.  At a minimum, AT&T should be required to authenticate its exhibits.  AT&T's contention that evidentiary rules do not apply in a motion to dismiss misses the point.  A defendant should not be permitted to circumvent evidentiary rules that would apply in a summary judgment proceeding by attaching inadmissible exhibits to a motion to dismiss.

AT&T has not cited any authority that would justify the prejudicial dismissals of the plaintiffs' complaints based on unauthenticated, hearsay exhibits.  *Air Quality Assessors of Fla. v. Southern-Owners Ins. Co.*, 354 So. 3d 569 (Fla. 1st DCA 2022), cited by AT&T, involved an assignee's claim for breach of an insurance contract.  The appellate court stated that the trial court properly considered the insurance contract even though it was not attached to the statement of claim.  However, the opinion does not state how the policy came to be in the record.  Perhaps the insurer filed a certified policy, or perhaps the contents and authenticity of the policy were not contested.

Similarly, in *Dyck v. Gavin*, 350 So. 3d 842 (Fla. 1st DCA 2022), and *Veal v. Voyager Prop. & Cas. Ins. Co.*, 51 So. 3d 1246 (Fla. 2d DCA 2011), cited by AT&T, the opinions do not state how the agreements that were considered on

motions to dismiss came to be in the record or that their authenticity was even contested.  These cases involved "old-fashioned" written agreements that were negotiated and signed by the parties on paper.  They did not involve an on-line virtual agreement, subject to change over time, that one party controls on its website and which may be supplemented by other unspecified and undisclosed documents and website materials.  Presumably, the parties in *Dyck* and *Veal* would have been able to determine authenticity by referring to their own copies of the written agreements in question.  Such verification is not feasible in the context of AT&T's on-line wireless customer agreement, a virtual electronic document the contents of which are so far not established.[2]

"When ruling on a motion to dismiss a complaint, the trial court must look no further than the complaint and its attachments."  *Busch v. Lennar Homes, LLC*, 219 So. 3d 93, 94 (Fla. 5th DCA 2017).  "[A] plaintiff is not required to anticipate affirmative defenses… in order to survive a motion to dismiss." *Id*.

---

[2] AT&T cites this court's decision in *AT&T Mobility, LLC v. Rigney*, 2023 Fla. App. LEXIS 6283 (Fla. 3d DCA Sept. 6, 2023), for the proposition that this court found the plaintiff's allegation of not being in possession of the contract to be specious.  However, the issue in *Rigney* was whether the plaintiff in that case frivolously alleged to be an unlimited data customer.  What this court found to be specious was that the plaintiff claimed not to have known what type of data plan he had: "[E]ven if the plaintiff accurately alleged that he did not possess his mobile data contract, he and his counsel should have known what type of data plan that the plaintiff had simply by confirming, through his own billing statements, whether he was an unlimited data plan customer…" *Id.* at 25-26.  AT&T has not asserted or offered evidence here that the plaintiffs are not unlimited data customers as alleged.  *Rigney* is off point.

**B.** **The Trial Court Erred in Dismissing With Prejudice the Causes of Action for FDUTPA Violation, Fraud, and Breach of Implied Duty of Good Faith and Fair Dealing.**

**1. The Wireless Customer Agreement Does Not Negate the Data Throttling Allegations.**

AT&T contention here seems to be that the wireless customer agreement exhibit gives it the right to limit access to wireless data to avoid network congestion, and that the speed of data is not an essential term of providing unlimited data. AT&T's contention is without merit.

AT&T's wireless customer agreement exhibit provides that "'unlimited' means you pay a fixed monthly charge for wireless data service regardless of how much data you use." The only stated restriction identified in the agreement is for certain "prohibited activities" and "if your data usage exceeds an applicable, identified usage threshold during any billing cycle." There are no allegations that the plaintiffs engaged in any "prohibited activities" or that their data usage exceeded any "applicable, identified usage threshold."

As alleged, AT&T violated the terms of its wireless service agreement by reducing data speeds during a given billing cycle, making the service unusable or significantly less usable, in the absence of any actual network congestion. Providing unusable or barely usable data after certain unannounced data limits have been reached in the billing cycle is tantamount to a data limit that violates the promise of unlimited data. There is nothing in AT&T's wireless service

agreement exhibit that allows it to limit a customer's access to data in the absence of "prohibited activities" or usage in excess of identified thresholds.

AT&T suggests that it promised unlimited data, but not unlimited speed. But the plaintiffs allege that AT&T significantly reduced data speed after certain unannounced monthly data usage limits were reached. ("Once customers have been throttled during a given billing cycle, [AT&T] caps their download speeds until the end of the billing cycle, at which time [AT&T] restores the data to full speed for these customers." R. 343, 1999, 2929, 4800).  That constitutes a data usage restriction that violates AT&T's promise of unlimited data.

This case is unlike the "impossible burger" scenario in *Williams v. Burger King Corp.*, 2020 U.S. Dist. LEXIS 158249 (S.D. Fla. 2020), cited by AT&T. There, the court there held that cooking meatless "impossible burgers" on a separate grill from the meat-containing variety was not an essential, implied term of Burger King's advertised promise to sell meatless burgers, provided the burgers themselves were composed of non-meat substances.  The court added that the plaintiffs could have "had it their way," as the advertising slogan goes, by making a special request to cook the burgers on a separate grill.

Here, placing restrictions on a customer's access to data by substantially reducing data speed after certain unannounced monthly data usage limits have been reached directly, and not merely by implication, violates the promise of unlimited data.  The aggrieved customer has no way of unlocking data access

6

at usable speeds or restoring the lost data usage.  In effect, AT&T allows its customers to "have it our way" by providing them unusable data speeds after unannounced monthly usage limits have been reached.

The FTC takes the position that AT&T's data throttling program constitutes a deceptive and unfair trade practice.  See *FTC v. AT&T Mobility, LLC*, 883 F. 3d 848 (9th Cir. 2018) (en banc, denying AT&T's motion to dismiss on grounds of FTC's common carrier exemption).[3]  *See also In re Tracfone Unlimited Serv. Plan Litig.*, 112 F. Supp. 3d 993 (N.D. Calif. 2015) (approving class action settlement of claims, including FDUTPA violation under Florida law).  *See* § 501.204(1), Fla. Stat. (2023) (requiring FTC's interpretations of the FDUTPA to be given "due consideration and great weight.")

### 2. AT&T's Exhibits Do Not Negate the Allegations of a Bogus Administrative Fee.

AT&T contends that its exhibits disclosed an administrative fee and that could be used to defray "any expense," thereby negating the allegations of a bogus administrative fee.  However, even if the administrative fee could be used for "any expense," which is not the case, there would still be a question of fact as to whether AT&T actually used the fee to pay expenses, or whether it

---

[3] The parties subsequently entered into a Stipulated Order for Permanent Injunction and Monetary Judgment, which can be found at: https://www.ftc.gov/system/files/documents/cases/doc_190_2019-11-05_proposed_stipulated_final_order.pdf.  The FTC's complaint can be found at: https://www.ftc.gov/system/files/documents/cases/141028attcmpt.pdf.

instead kept the fee for itself as alleged in the complaints.

The actual text of AT&T's exhibits suggests to consumers that the administrative fee will be used more specifically to defray or recover expenses paid to third parties in connection with providing wireless service.  The website fee schedule exhibit describes the administrative fee as "a monthly fee charged to help AT&T recover a portion of certain expenses AT&T incurs, including but not limited to: (a) charges AT&T or its agents pay to interconnect with other carriers to deliver calls from AT&T customers to their customers; and (b) charges associated with cell site rents and maintenance." (R. 717).  The customer bill exhibit describes "additional charges on a per line basis, including… an Administrative Fee (to defray certain expenses including charges AT&T or its agents pay to interconnect with other carriers to deliver calls from AT&T customers to their customers, and charges associated with cell site rents and maintenance)..." (R. 722).

The examples given of interconnect charges and cell site rentals and maintenance plainly refer to expenses paid to third parties.  In addition, AT&T's exhibits state that the administrative fee is assessed to "defray" or "recover a portion of" "certain expenses."  The specific examples are modified by the phrases "including but not limited to" and "including."  However, the overall sense of the alleged disclosures is that the administrative fee is being assessed to recover or defray expenditures that AT&T pays to third parties.

Perhaps AT&T could use the fee to pay expenses other than interconnect fees and cell site rentals and maintenance. But it represented to consumers that it would use the fee to defray or recover at least in part these specific expenses. Does "including" or "including but not limited to" give AT&T the absolute right to use the fee exclusively to pay ordinary overhead, as AT&T suggests? Or does it imply that AT&T will use the fee, in whole or in part, to defray or recover these or similar specific expenses paid to third parties? The exhibits are ambiguous, at best, in this regard, and should be construed against the drafter, AT&T. *See Iniguez v. Am. Hotel Register Co.*, 820 So. 2d 953, 956 (Fla. 3d DCA 2002), *rev. dismissed*, 838 So. 2d 558 (Fla. 2003).

For purposes of the FDUTPA, deception occurs "if there is a representation, omission, or practice that is likely to mislead the consumer acting reasonably in the circumstances, to the consumer's detriment." *Zlotnick v. Premier Sales Group, Inc.*, 480 F. 3d 1281, 1284 (11th Cir. 2007), quoting *PNR, Inc. v. Beacon Prop. Mgmt., Inc.*, 842 So. 2d 773, 777 (Fla. 2003). An unfair practice is "one that offends established public policy and… [one that] is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." *Hetrick v. Ideal Image Dev. Corp.*, 372 F. Appx. 985, 992 (11th Cir. 2010), quoting *Samuels v. King Motor Co. of Ft. Lauderdale*, 782 So. 2d 489, 499 (Fla. 4th DCA 2001). Whether particular conduct constitutes an unfair or deceptive trade practice is a question of fact. *Siever v. BWGaskets, Inc.*,

9

669 F. Supp. 2d 1286, 1292 (M.D. Fla. 2009); *Suris v. Gilmore Liquidating, Inc.* 651 So. 2d 1282, 1283 (Fla. 3d DCA 1995).

If AT&T had wanted to tell its customers that it was assessing a fee that could be used for any purpose whatsoever, it easily could have done so.  At the very least, it could have refrained from giving consumers the impression that the fee was to be used to recover or defray expenditures to third parties. As phrased, a reasonable consumer would conclude that this fee was not potentially some sort of slush fund that AT&T could use to line its pockets, or even a means of recovering normal operating overhead.

The complaints allege that AT&T kept the fee for itself, as additional revenue, and did not use it to defray expenses.  For example, it is alleged: "The so-called Administrative Fee is not, in fact, a bona fide administrative fee, but rather is simply a means for AT&T to charge more per month for the service itself without having to advertise the higher prices as a scheme to increase revenue." (R. 345, 2000, 2930, 4801, 5585).  Hence, at its core, the issue is whether, as a matter of fact, AT&T used the administrative fee to defray expenses paid to third parties, or whether it kept it for itself.

This presents a fact question that cannot be resolved on a motion to dismiss the complaints.  *See Advance Mold Servs. v. Universal N. Am. Ins. Co.*, 2023 Fla. App. LEXIS 8638 (Fla. 3d DCA Dec. 20, 2023).  In *Advance Mold Servs.*, the defendant moved to dismiss an assignee's breach of

10

insurance contract action, contending that a fee designated on an estimate as "Hazardous Waste/Mold Cleaning-Supervisory/Admin-per hour" constituted a statutorily prohibited "administrative fee."  The plaintiff asserted that the fee was used to pay a supervisor and not as a clerical fee associated with administering the contract.  This court held that a question of fact existed, precluding dismissal of complaint, as to whether the fee constituted an "administrative fee."

This court's decision in *Advance Mold Servs.* is on point.  Here, a fact question exists as to whether the administrative fee was what it was represented to be: a fee assessed to defray or recover expenses AT&T pays to third parties associated with providing wireless service.  The issue of whether AT&T uses the revenue generated from the administrative fee to defray or recover such expenses, or instead keeps it for itself, is one of fact that cannot be determined on a motion to dismiss the complaint.

*Berry v. Budget Rent a Car Syst.*, 497 F. Supp. 2d 1361 (S.D. Fla. 2007), cited by AT&T, is not on point.  The rental car company in *Berry* disclosed a line-item "cost recovery fee" of $3.00 that was charged in addition to the daily car rental charge.  The plaintiffs alleged that this fee was not used to recoup the cost of licensing and registering the company's fleet of rental vehicles as it greatly exceeded these costs.  The U.S. District Court dismissed the claim, finding that the term "cost recovery fee" disclosed to customers that the fee

would be collected as recovery of the company's costs generally.  It did not imply that the fee would be used to recoup the specific costs of licensing and registration, as alleged.  *Id*. at 1367.

Here, AT&T's exhibits describe an administrative fee that is to be used specifically to defray or recover expenses paid to third parties in connection with providing wireless service.  The plaintiffs allege that AT&T kept the fee for itself instead of using it for the specifically described purposes.  The "cost recovery fee" at issue in *Berry* was so lacking in specificity that it could have been used for just about anything.  If the disclosure in *Berry* had stated that the fee would be used to defray or recover a portion of certain expenses, including but not limited to the costs of licensing and registering the company's fleet of rental vehicles, we think the result would have been different.

The present case is like the numerous cases we cited in our initial brief, at pages 32-34, holding that "charges that are purported to be pass-through charges for specific expenses, but are in fact profit generating fees disguised as costs, are violations of the FDUTPA." *Maor v. Dollar Thrifty Auto. Grp., Inc.*, 303 F. Supp. 3d 1320, 1328 (S.D. Fla. 2017).  AT&T does not address these cases in its brief.  A review of these cases reflects that the standard of specificity required in order to qualify a disclosed fee as a "pass-though charge[] for specific expenses" is not high.  *See Maor*, 303 F. Supp. 3d at 1328-29 ("administrative fee" described as being used to cover toll expenses);

12

*Coleman v, CubeSmart*, 328 F. Supp. 3d 1349 (S.D. Fla. 2018) (space rental company represented it would use portion of contents insurance premium paid by customers for its processing expenses); *Waste Pro USA v. Vision Constr. ENT, Inc.*, 282 So. 3d at 911 (Fla. 1st DCA 2019) ("environmental fee"); *Turner Greenberg Assocs. v. Pathman*, 885 So. 2d 1004 (Fla. 4th DCA 2004) ("freight/insurance" charge); *James D. Hinson Elec. Contr. Co. v. BellSouth Telecomms., Inc.*, 796 F. Supp. 2d 1341, 1353 (M.D. Fla. 2011) ( "claims processing" expense); *Latman v. Costa Cruise Lines, N.V.*, 758 So. 2d 699 (Fla. 3d DCA 2000) ("port charges"), *rev. denied*, 819 So. 2d 136 (Fla. 2002); *Tallahassee Pediatric Dentistry PLLC v. Airgas USA, LLC*, 2020 U.S. Dist. LEXIS 265237 (N.D. Fla. 2020) ("fuel surcharge"); *Deere Constr., LLC v. Cemex Constr. Materials Fla., LLC*, 198 F. Supp. 3d 1332 (S.D. Fla. 2016) ("fuel surcharges" and "environmental charges").

In addition to misleading customers as to the nature of the fee, AT&T is alleged to have hidden the fee disclosure by its placement in the website and in electronic bills.  AT&T does not meaningfully address this aspect of the complaints' allegations.  AT&T's exhibits do not and cannot negate these allegations, which can only be assessed by considering the overall context in which the alleged fee disclosure appears online and how easy or difficult it may be for consumers to access it.

### 3. The Complaints State Causes of Action for FDUTPA Violations, Fraud, Breach of the Duty of Good Faith & Fair Dealing, and Unjust Enrichment.

We stand by the contentions in our initial brief regarding specificity of pleading. AT&T perpetrated its misdeeds in the same way against each of the plaintiffs. Therefore, similarity in the pleadings is to be expected. AT&T's inappropriate off-pleading allusions to what may or may not have occurred in cases not presently before this court constitute its attempt to poison the well and deflect attention from its own misconduct. According to the complaints' allegations, AT&T replicated its malfeasance on a massive scale. ("[AT&T's] bait and switch scam… victimized millions of Americans," R. 344; "[AT&T] has used this Administrative Fee scheme to improperly squeeze consumers for **hundreds of millions of dollars** in additional revenue," R. 2003, 2933, 4804, 5598). AT&T is not in a position to accuse us of "cutting and pasting."

AT&T contends the fraud causes of action are barred by the contract under the "independent tort" doctrine. However, the complaints alleged fraud in the inducement, which is an independent tort. *See Susan Fixel, Inc. v. Rosenthal & Rosenthal, Inc.*, 842 So. 2d 204, 209 (Fla. 3d DCA 2003), *rev. denied*, 939 So. 2d 1061 (Fla. 2006). Thus, they are not barred by contract.

We stand by our contentions and citations of authority in the initial brief regarding individual causes of action, which AT&T barely addresses in its brief.

**II.**

**<u>CONCLUSION</u>**

It is again respectfully submitted that the final judgments entered below

should be reversed and the cases remanded for further proceedings.

Respectfully submitted,

DAVID B. PAKULA, P.A.
12301 Taft Street, Suite 200
Pembroke Pines, Florida 33026
Tel.: (954) 217-5123
Email: david@pakulalawfirm.com
　　　　info@pakulalawfirm.com

MAURY L. UDELL, ESQ.
BEIGHLEY, MYRICK, UDELL
& LYNNE, P.A.
150 W. Flagler St., Suite 1800
Miami, FL 33130
Tel: (305) 349-3930
Email: mudell@bmulaw.com

By:  /s/ David B. Pakula
　　　DAVID B. PAKULA
　　　Fla. Bar No. 712851

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the foregoing was furnished by e- mail via the e-filing portal on January 10, 2024 to:  Angel L. Cortinas, Esq., angel.cortinas@dentons.com; Jonathan Kaskel, Esq., jonathan.kaskel@dentons.com; Manuel L. Garcia-Linares, Esq., mgarcialinares@daypitney.com, brodriguez@daypitney.com, jsolorzano@daypitney.com, edavila@daypitney.com; Andrew R. Ingalls, Esq., aingalls@daypitney.com; Maury L. Udell, Esq., mudell@bmulaw.com.

      /s/ David B. Pakula
      DAVID B. PAKULA


## **CERTIFICATE OF COMPLIANCE**

The undersigned certifies, pursuant to Fla. R. App. P. 9.045(e), that this brief complies with the applicable font and word count limit requirements of the Florida Rules of Appellate Procedure.

      /s/ David B. Pakula
      DAVID B. PAKULA

**IN THE COUNTY COURT OF THE ELEVENTH JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA**

**COUNTY CIVIL DIVISION**

**CASE NO.:** 2022-047421-SP-25
**SECTION:**                CG01

 **Sergio Salani**
**Plaintiff(s),**

**vs.**

 **AT&T Mobility, LLC**
**Defendant(s)**

_____/

<u>**ZOOM/VIRTUAL**</u>
<u>**NOTICE OF SPECIAL SET HEARING**</u>
**Motion to Dismiss**

   **YOU ARE HEREBY NOTIFIED** that, a Special Set hearing on the above cause is scheduled for _____**1 hr**_____ on _____**10-04-2024 at 10:30 AM**_____ in Room Virtual courtroom.

Virtual Court is held remotely on the Zoom platform. You will receive an email from the Court with the information you need to connect to your event by video or phone if you are on the E-Filing Portal service list.  If you do not receive an email, check the judge's webpage for the Zoom link to their virtual courtroom or further instructions. You may also register for text notification via link https://cmap.jud11.flcourts.org/ebench/textNotificationsRegistration.jsp.

IT IS THE RESPONSIBILITY OF THE SCHEDULER TO PROVIDE TIMELY NOTICE OF THE ZOOM MEETING DETAILS TO ANY PARTY NOT REGISTERED ON THE E-FILING SERVICE PORTAL.

<u>CERTIFICATE OF SERVICE</u>

A true and correct copy of the above notice was delivered to the parties below on _____**09-06-2024**_____.

**If you are a person with a disability who needs any accommodation in order to participate in this proceeding, you are entitled, at no cost to you, to the provision of certain assistance. Please contact Aliean Simpkins, the Eleventh Judicial Circuit Court's ADA Coordinator, Lawson E. Thomas Courthouse Center, 175 NW 1st Ave., Suite 2400, Miami, FL 33128, Telephone (305) 349-7175; TDD (305) 349-7174, Fax (305) 349-7355, Email: ADA@jud11.flcourts.org at least seven (7) days before your scheduled court appearance, or immediately upon receiving this notification if the time before the scheduled appearance is less than seven (7) days; if you are hearing or voice impaired, call 711.**

Copies Furnished to:
Electronically Served

Manuel A. Garcia-Linares, mgarcialinares@daypitney.com
Manuel A. Garcia-Linares, athomsen@daypitney.com
Andrew R. Ingalls, aingalls@daypitney.com
Andrew R. Ingalls, brodriguez@daypitney.com
Evelyn Davila, edavila@daypitney.com
Maury L. Udell, notice66@bmulaw.com
Maury L. Udell, blopez@bmulaw.com
Jessica Solorzano, jsolorzano@daypitney.com

IN THE COUNTY COURT OF THE 11TH JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA

Sergio Salani,

      Plaintiff,

v.

AT&T Mobility, LLC,

      Defendant.

_____/

CASE NO.: 2022-047421-SP-25

FLA. BAR NO.: 121673

## NOTICE OF HEARING
*Motion Calendar - Approved by Court to add-on*

PLEASE TAKE NOTICE that a hearing will be held before the **Honorable Jorge Perez Santiago**, one of the Judges of the above-styled Court, via Zoom, on **October 4, 2024 at 10:30 a.m.** or as soon thereafter as same may be heard on:

**[D.E. #206] PLAINTIFF'S MOTION FOR LEAVE TO FILE SECOND AMENDED STATEMENT OF CLAIM**

PLEASE BE GOVERNED ACCORDINGLY.

**MOVANT COUNSEL CERTIFIES THAT A BONA FIDE EFFORT TO AGREE OR TO NARROW THE ISSUES ON THE MOTIONS NOTICED HAS BEEN MADE WITH OPPOSING COUNSEL.**

**<u>CERTIFICATE OF SERVICE</u>**

WE HEREBY CERTIFY that a true and correct copy of the foregoing was served via e-mail this September 26, 2024 to: Manuel A. Garcia-Linares, Esquire (mgarcialinares@daypitney.com, jsolorzano@daypitney.com, edavila@daypitney.com) Andrew R. Ingalls, Esquire (aingalls@daypitney.com) Day Pitney LLP, 396 Alhambra Circle, North Tower - 14th Floor, Miami, Florida 33134.

**Beighley, Myrick, Udell & Lynne, PA**
*Attorneys for Plaintiff*
2601 S. Bayshore Drive, Suite 770
Miami, FL 33133
(305) 349-3930 – Phone

By:   _/s/  Maury L. Udell_____
       Maury L. Udell, Esquire
       mudell@bmulaw.com
       Fla. Bar 121673

Case 1:25-cv-20381-RAR Document 1-2 Entered on FLSD Docket 01/27/2025 Page 1334 of 1553

IN THE COUNTY COURT OF THE 11TH
JUDICIAL CIRCUIT IN AND FOR MIAMI-
DADE COUNTY, FLORIDA

Sergio Salani,

     Plaintiff,

v.

AT&T Mobility, LLC,

     Defendant.

_____/

CASE NO.: 2022-047421-SP-25

FLA. BAR NO.: 121673

## **PLAINITFF'S NOTICE OF FILING**

Plaintiff, Sergio Salani, by and through undersigned counsel, hereby gives notice of filing the following documents in support of Plaintiff's Motion for Leave to Amend Statement of Claim.

1. AT&T's response to Data Leak dated March 30, 2024

2. NPR article on AT&T Data leak dated March 30, 2024.

3. Michael Van Teeffelen v. AT&T Mobility LLC, 2020-021936-SP-26 – <u>Order on Plaintiff's Motion for Leave to File Second Amended Statement of Claim</u>

4. Alina Gonzalez v. AT&T Mobility LLC, 2020-001293-SP-24 – <u>Agreed Omnibus Order</u>

5. Steven Braverman v. AT&T Mobility LLC, 2022-047425-SP-25 – <u>Order on Plaintiff's Motion for Leave to File Second Amended Statement of Claim</u>

6. Adam Spring v. AT&T Mobility LLC, 2022-047430-SP-25 – <u>Order on Plaintiff's Motion for Leave to File Second Amended Statement of Claim</u>

## <u>CERTIFICATE OF SERVICE</u>

**WE HEREBY CERTIFY** that a true and correct copy of the foregoing was served via e-mail this October 2, 2024, to Manuel A. Garcia-Linares, Esquire (mgarcialinares@daypitney.com, jsolorzano@daypitney.com, edavila@daypitney.com) Andrew R. Ingalls, Esquire (aingalls@daypitney.com) Day Pitney LLP, 396 Alhambra Circle, North Tower - 14th Floor, Miami, Florida 33134.

> **Beighley, Myrick, Udell, Lynne & Zeichman PA**
> *Attorneys for Plaintiff*
> 2601 S. Bayshore Drive
> Suite 770
> Miami, FL 33133
> (305) 349-3930– Phone
> notice66@bmulaw.com (R 2.516 Designated E-mail)
>
> By:      /s/ *Maury L. Udell*
>           Maury L. Udell, Esquire
>           mudell@bmulaw.com
>           Fla. Bar 121673

COMPANY    WHAT WE DO    INVESTORS    NEWS

DALLAS, March 30, 2024

# AT&T Addresses Recent Data Set Released on the Dark Web

**AT&T has determined that AT&T data-specific fields were contained in a data set released on the dark web; source is still being assessed.**

share    𝕏    f    in    ✉    Download assets ▾    Subscribe to AT&T News



We use cookies to help enhance your experience on our site and for analytics. We also may use cookies for marketing purposes. You can manage your preferences and opt out of the sharing for targeted advertising and sales of cookie data.

Learn more about our approach to privacy at att.com/privacy.

Manage your preferences    Opt out    Continue without changes

AT&T of one of its vendors. With respect to the balance of the data set, which includes personal information such as social security numbers, the source of the data is still being assessed.

AT&T has launched a robust investigation supported by internal and external cybersecurity experts. Based on our preliminary analysis, the data set appears to be from 2019 or earlier, impacting approximately 7.6 million current AT&T account holders and approximately 65.4 million former account holders.

Currently, AT&T does not have evidence of unauthorized access to its systems resulting in exfiltration of the data set. The company is communicating proactively with those impacted and will be offering credit monitoring at our expense where applicable. We encourage current and former customers with questions to visit www.att.com/accountsafety for more information.

As of today, this incident has not had a material impact on AT&T's operations.

View more

Privacy Notice     Terms of Use     Accessibility     Contact Us     Shop     Subscribe to AT&T News     Your Privacy Choices

© 2024 AT&T Intellectual Property. All rights reserved.

We use cookies to help enhance your experience on our site and for analytics. We also may use cookies for marketing purposes. You can manage your preferences and opt out of the sharing for targeted advertising and sales of cookie data.

Learn more about our approach to privacy at att.com/privacy.






DONATE

TECHNOLOGY

# Millions of customers' data found on dark web in latest AT&T data breach

MARCH 30, 2024 · 5:46 PM ET

Chloe Veltman



An AT&T store in New York. The telecommunications company said Saturday that a data breach has compromised the information tied to 7.6 million current customers.

*Richard Drew/AP*

AT&T announced on Saturday it is investigating a data breach involving the personal information of more than 70 million current and former customers leaked

on the dark web.

According to information about the breach on the company's website, 7.6 million current account holders and 65.4 million former account holders have been impacted. An AT&T press release said the breach occurred about two weeks ago, and that the incident has not yet had a "material impact" on its operations.

AT&T said the information included in the compromised data set varies from person to person. It could include social security numbers, full names, email and mailing addresses, phone numbers, and dates of birth, as well as AT&T account numbers and passcodes.

**Sponsor Message**

The company has so far not identified the source of the leak, at least publicly.

"Based on our preliminary analysis, the data set appears to be from 2019 or earlier," the company said. "Currently, AT&T does not have evidence of unauthorized access to its systems resulting in theft of the data set."



**BUSINESS**

**AT&T says cell service is back after a widespread outage and some disrupted 911 calls**

The company said it is "reaching out to all 7.6 million impacted customers and have reset their passcodes," via email or letter, and that it plans to communicate with both current and former account holders with compromised sensitive personal information. It said it plans to offer "complimentary identity theft and credit monitoring services" to those affected by the breach.

External cybersecurity experts have been brought in to help investigate, it added.

NPR reached out to a few AT&T stores. The sales representatives in all cases said they were as yet unaware of the breach.

On its website, the telecommunications company encouraged customers to closely monitor their account activity and credit reports.

"Consumers impacted should prioritize changing passwords, monitor other accounts and consider freezing their credit with the three credit bureaus since social security numbers were exposed," Carmen Balber, executive director of the consumer advocacy group Consumer Watchdog, told NPR.

**Sponsor Message**

## An industry rife with data leaks

AT&T has experienced multiple data breaches over the years.

In March 2023, for instance, the company notified 9 million wireless customers that their customer information had been accessed in a breach of a third-party marketing vendor.

In August 2021 — in an incident AT&T said is not connected to the latest breach — a hacking group claimed it was selling data relating to more than 70 million AT&T customers. At the time, AT&T disputed the source of the data. It was re-leaked online earlier this month. According to a Mar. 22 TechCrunch article, a new analysis of the leaked dataset points to the AT&T customer data being authentic. "Some AT&T customers have confirmed their leaked customer data is accurate,"

TechCrunch reported. "But AT&T still hasn't said how its customers' data spilled online."

AT&T is by no means the only U.S. telecommunications provider with a history of compromised customer data. The issue is rife across the industry. A 2023 data breach affected 37 million T-Mobile customers. Just last month, a data leak at Verizon impacted more than 63,000 people, the majority of them Verizon employees.

A 2023 report from cyber intelligence firm Cyble said that U.S. telecommunications companies are a lucrative target for hackers. The study attributed the majority of recent data breaches to third-party vendors. "These third-party breaches can lead to a larger scale supply-chain attacks and a greater number of impacted users and entities globally," the report said.

## Government rules adapt

Meanwhile, last December, the Federal Communications Commission (FCC) updated its 16-year-old data breach notification rules to ensure that telecommunications providers adequately safeguard sensitive customer information. According to a press release, the rules aim to "hold phone companies accountable for protecting sensitive customer information, while enabling customers to protect themselves in the event that their data is compromised."

Sponsor Message

"What makes no sense is leaving our policies stuck in the analog era," said FCC Chairwoman Jessica Rosenworcel in a statement regarding the changes. "Our

phones now know so much about where we go and who we are, we need rules on the books that make sure carriers keep our information safe and cybersecure."

verizon     t-mobile     at&t     data breach     dark web



# Sign up for NPR's Up First newsletter.

The news you need to start your day. Nothing more, never less.

| Email address | SUBSCRIBE |

See more subscription options

By subscribing, you acknowledge and agree to NPR's Terms of Use and Privacy Policy.
NPR may share your name and email address with your NPR station. See Details.

## More Stories From NPR



MIDDLE EAST CRISIS — EXPLAINED

**Tracking the exploding pagers used in apparent Israeli attack on Hezbollah**



CONSIDER THIS FROM NPR

**A year after the strike is the UAW still winning?**



UNTANGLING DISINFORMATION

**Microsoft says Russia's election interference efforts have pivoted to Harris and Walz**



TECHNOLOGY

**Instagram makes all teen accounts private, in a highly scrutinized push for child safety**



NEWS

**TikTok argued against its U.S. ban in court today. Here's what happened**



HEALTH

**FDA approves some Apple AirPods to be used as hearing aids**

**Popular on NPR.org**



HEALTH

**NPR Exclusive: U.S. overdose deaths plummet, saving thousands of lives**



ECONOMY

**The Federal Reserve is on the verge of cutting interest rates. Here's what to know**



POLITICS

**The U.S. has had a long history of political violence, but experts see a new trend**



BUSINESS

**Tupperware, no longer a kitchen staple, files for bankruptcy**



POLITICS

**Senate Republicans block IVF bill, as Democrats elevate issue ahead of November election**



NEWSLETTER

**So many music festivals have been canceled this year. What's going on?**

## NPR Editors' Picks



ASIA

**A bookstore too controversial for China finds home in D.C.**



BOOK REVIEWS

**'Brothers and Ghosts' is a multi-generational saga of the Vietnamese diaspora**



MUSIC NEWS

**Shaboozey's hit 'A Bar Song (Tipsy)' is No. 1 again, and joins an elite club**



POP CULTURE HAPPY HOUR

**'The Substance' is imaginary, but feminine self-hatred is real in this body horror**



I'M REALLY INTO

**I played 'Survivor' in someone's backyard. Now I'm hooked on live reality games**



SPORTS

**Lael Wilcox rode around the world and then went for another bike ride**

READ & LISTEN

**Home**

**News**

**Culture**

**Music**

**Podcasts & Shows**

CONNECT

**Newsletters**

**Facebook**

**Instagram**

**Press**

**Public Editor**

**Corrections**

**Contact & Help**

ABOUT NPR

**Overview**

**Diversity**

**NPR Network**

GET INVOLVED

**Support Public Radio**

**Sponsor NPR**

**NPR Careers**

**Accessibility**

**Ethics**

**Finances**

**NPR Shop**

**NPR Events**

**NPR Extra**

terms of use

privacy

your privacy choices

text only

© 2024 npr

**IN THE COUNTY COURT OF THE ELEVENTH JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA**

CASE NO: 2020-021936-SP-26
SECTION: SD03
JUDGE: Lissette De la Rosa

**Michael Van Teeffelen**

Plaintiff(s) / Petitioner(s)

vs.

**ATT Mobility LLC**

Defendant(s) / Respondent(s)

_____/

## ORDER ON PLAINTIFF'S MOTION FOR LEAVE TO FILE SECOND AMENDED STATEMENT OF CLAIM (D.E. #78)

### Docket Index Number: 78

THIS CAUSE having come before this Court on August 20, 2024 on Plaintiff's Motion for Leave to File Second Amended Statement of Claim (D.E. #78), and the Court having heard argument of counsel and being fully advised therein, it is hereby

ORDERED AND ADJUDGED as follows:

1. Plaintiff's Motion is **GRANTED**. Plaintiff shall have ten (10) days from the date of this Order to file his second amended statement of claim.

2. Defendant shall have twenty (20) days to file a response to the second amended statement of claim.

**DONE** and **ORDERED** in Chambers at Miami-Dade County, Florida on this <u>11th day of September, 2024</u>.

<u>2020-021936-SP-26 09-11-2024 3:46 PM</u>
Hon. Lissette De la Rosa

**COUNTY COURT JUDGE**
Electronically Signed

---

No Further Judicial Action Required on **THIS MOTION**

CLERK TO **RECLOSE** CASE IF POST JUDGMENT

---

**Electronically Served:**
Andrew R. Ingalls, aingalls@daypitney.com
Andrew R. Ingalls, brodriguez@daypitney.com
Evelyn Davila, edavila@daypitney.com
Jessica Solorzano, jsolorzano@daypitney.com
Manuel A. Garcia-Linares, mgarcialinares@daypitney.com
Manuel A. Garcia-Linares, athomsen@daypitney.com
Maury L. Udell, notice66@bmulaw.com
Maury L. Udell, blopez@bmulaw.com
Rachel Kittl, rkittl@bmulaw.com


**Physically Served:**

**IN THE COUNTY COURT OF THE ELEVENTH JUDICIAL
CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA**

CASE NO: <u>2020-001293-SP-24</u>
SECTION: <u>MB01</u>
JUDGE: <u>Stephanie Silver</u>

**Alina Gonzalez**

Plaintiff(s) / Petitioner(s)

vs.

**AT&T Mobility LLC**

Defendant(s) / Respondent(s)

_____/

## <u>AGREED OMNIBUS ORDER</u>

[DE 70 – Filing # 153086372 – Efiled 07/11/2022 – *Plaintiff's Motion for Extension of Time*]

[DE 72 – Filing # 159592351 – Efiled 10/19/2022 – *Defendant AT&T Mobility LLC's Motion to Compel Discovery Responses*]

[DE 98 – Filing # 200516971 – Efiled 06/13/2024 – *Plaintiff's Motion for Leave to File Second Amended Small Claims Complaint*]

 **THIS MATTER** came before the Court on August 19, 2024 on Plaintiff's *Motion for Extension of Time* dated July 11, 2022 [DE 70]; Defendant AT&T Mobility LLC's *Motion to Compel Discovery Responses* filed October 19, 2022 [DE 72]; and, Plaintiff's *Motion for Leave to File Second Amended Small Claims Complaint* dated June 13, 2024 [DE 98], and the Court, after having reviewed the Motion and heard argument of counsel, the Court hereby finds as follows.

 1. Plaintiff's *Motion for Extension of Time* [DE 70] is **GRANTED**.

 2. Defendant's *Motion to Compel Discovery Responses* [DE 72] is **GRANTED**. Plaintiff shall respond within forty-five (45) days. No further extension will be granted.

 3. As to Plaintiff's *Motion for Leave to File Second Amended Small Claims Complaint* [DE 98], is provisionally granted in light of the fact that the amendment is not futile, the privilege has not been abused and Defendant will not be prejudiced. Plaintiff is directed to file a new proposed Complaint, removing the claims previously dismissed by this Court but including the data breach claim. However, at the request of Defendant, the Court defers entering an order until hearing a status on the multi-district litigation.

 4. The parties shall appear, via Zoom, for special hearing (1 Hour) before this Court on October 28, 2024, at 9:15 a.m., on Defendant's *Motion for Reconsideration or, in the Alternative, Motion for Judgment on the Pleadings* filed August 16, 2024 [DE

107].

**DONE** and **ORDERED** in Chambers at Miami-Dade County, Florida on this <u>24th day of August, 2024</u>.

2020-001293-SP-24 08-24-2024 11:03 AM

<u>2020-001293-SP-24 08-24-2024 11:03 AM</u>
Hon. Stephanie Silver

**COUNTY COURT JUDGE**
Electronically Signed

No Further Judicial Action Required on **THIS MOTION**

CLERK TO **RECLOSE** CASE IF POST JUDGMENT

**Electronically Served:**
Andrew R. Ingalls, aingalls@daypitney.com
Andrew R. Ingalls, brodriguez@daypitney.com
Evelyn Davila, edavila@daypitney.com
Jessica Solorzano, jsolorzano@daypitney.com
Manuel A. Garcia-Linares, mgarcialinares@daypitney.com
Manuel A. Garcia-Linares, athomsen@daypitney.com
Maury L. Udell, notice66@bmulaw.com
Maury L. Udell, blopez@bmulaw.com
Rachel Kittl, rkittl@bmulaw.com

**Physically Served:**

Case 1:25-cv-20381-RAR Document 1-2 Entered on FLSD Docket 01/27/2025 Page 1354 of 1553

**IN THE COUNTY COURT OF THE ELEVENTH JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA**

CASE NO: 2022-047425-SP-25
SECTION: CG03
JUDGE: Patricia Marino Pedraza

**Steven Braverman**

Plaintiff(s) / Petitioner(s)

vs.

**AT&T Mobility, LLC**

Defendant(s) / Respondent(s)

_____/

### ORDER ON PLAINTIFF'S MOTION FOR LEAVE TO FILE SECOND AMENDED STATEMENT OF CLAIM (D.E. #60)

**Docket Index Number: 60**

THIS CAUSE having come before this Court on August 29, 2024 on Plaintiff's Motion for Leave to File Second Amended Statement of Claim (D.E. #60), and the Court having heard argument of counsel and being fully advised therein, it is hereby

ORDERED AND ADJUDGED as follows:

1. Plaintiff's Motion is **GRANTED**.

2. Plaintiff's Amended Complaint shall be deemed filed as of the date of this order and the Defendant shall have 20 days within which to respond.

**DONE** and **ORDERED** in Chambers at Miami-Dade County, Florida on this <u>5th day of September, 2024</u>.

<u>2022-047425-SP-25 09-05-2024 10:27 AM</u>
Hon. Patricia Marino Pedraza

**COUNTY COURT JUDGE**
Electronically Signed

No Further Judicial Action Required on **THIS MOTION**

CLERK TO **RECLOSE** CASE IF POST JUDGMENT

**Electronically Served:**
Andrew R. Ingalls, aingalls@daypitney.com
Andrew R. Ingalls, brodriguez@daypitney.com
Evelyn Davila, edavila@daypitney.com
Jessica Solorzano, jsolorzano@daypitney.com
Kenneth B Schurr, kbsservice@schurrlaw.com
Manuel A. Garcia-Linares, mgarcialinares@daypitney.com
Manuel A. Garcia-Linares, athomsen@daypitney.com
Maury L. Udell, notice66@bmulaw.com
Maury L. Udell, blopez@bmulaw.com

**Physically Served:**

**IN THE COUNTY COURT OF THE ELEVENTH JUDICIAL
CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA**

CASE NO: 2022-047430-SP-25
SECTION: CG02
JUDGE: Gloria Gonzalez-Meyer

**Adam Spring**

Plaintiff(s) / Petitioner(s)

vs.

**AT&T Mobility, LLC**

Defendant(s) / Respondent(s)

_____/

<u>**ORDER ON PLAINTIFF'S MOTION FOR LEAVE TO FILE SECOND AMENDED
STATEMENT OF CLAIM (D.E. #71)**</u>

<u>**Docket Index Number: 71**</u>

THIS CAUSE having come before this Court on October 1, 2024 on Plaintiff's Motion for Leave to File Second Amended Statement of Claim (D.E. #71), and the Court having heard argument of counsel and being fully advised therein, it is hereby

ORDERED AND ADJUDGED as follows:

1. Plaintiff's Motion is hereby **GRANTED**.

2. Plaintiff's Amended Complaint shall be deemed filed as of the date of this order and Defendant shall have 20 days to file its response.

**DONE** and **ORDERED** in Chambers at Miami-Dade County, Florida on this <u>1st day of October, 2024</u>.

<u>2022-047430-SP-25 10-01-2024 2:05 PM</u>
Hon. Gloria Gonzalez-Meyer

**COUNTY COURT JUDGE**
Electronically Signed

---

No Further Judicial Action Required on **THIS MOTION**

CLERK TO **RECLOSE** CASE IF POST JUDGMENT

---

**Electronically Served:**
Andrew R. Ingalls, aingalls@daypitney.com
Andrew R. Ingalls, brodriguez@daypitney.com
Evelyn Davila, edavila@daypitney.com
Jessica Solorzano, jsolorzano@daypitney.com
Kenneth B Schurr, kbsservice@schurrlaw.com
Manuel A. Garcia-Linares, mgarcialinares@daypitney.com
Manuel A. Garcia-Linares, athomsen@daypitney.com
Maury L. Udell, notice66@bmulaw.com
Maury L. Udell, blopez@bmulaw.com


**Physically Served:**

IN THE COUNTY COURT OF THE 11TH JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA

Sergio Salani,

      Plaintiff,

v.

AT&T Mobility, LLC,

      Defendant.

_____/

CASE NO.: 2022-047421-SP-25

BAR NO.: 121673

## PLAINTIFF'S REPLY TO DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR LEAVE TO FILE SECOND AMENDED COMPLAINT

COMES NOW, the Plaintiff, by and through his undersigned counsel, and files this Reply to Defendant's Opposition to Plaintiff's Motion to File Second Amended Statement of Claim and states as follows:

1. "Refusal to allow amendment of a pleading constitutes an abuse of discretion unless it clearly appears that allowing the amendment would prejudice the other party; the privilege to amend has been abused; or amendment would be futile." *Hutson v. Plantation Open MRI, LLC*, 66 So. 3d 1042, 104445 (Fla. 4th DCA 2011) (internal citations omitted). See *Progressive Select Ins. Co. v. Imaging Ctr. Of W. Palm Beach*, 356 So. 3d 842 (Fla. 4th DCA 2023) ("Here, the county court seemingly denied Progressive's motion to amend solely on the basis that the motion was untimely in light of the length of time that the action had been pending, and without weighing the amendment in terms of prejudice to Provider's ability to prepare for the new defenses. This was error, especially considering Progressive's motion was filed before a hearing was even set on Provider's second motion for summary judgment and before the case was set for trial."); *Design Neuroscience Ctrs.*, P.L. v. Fields,

No. 3D20-1048, 2023 Fla. App. LEXIS 2289 at *4-5 (Fla. 3d DCA April 5, 2023) ("[P]rejudice based on the length of time a case has been pending does not alone justify denying a motion for leave to amend.") (citing *Sorenson v. Bank of N.Y. Mellon as Tr. for Certificate Holders CWAL T, Inc.*, 261 So. 3d 660, 663 (Fla. 2d DCA 2018); *Morgan v. Bank of N.Y. Mellon*, 200 So. 3d 792, 795 (Fla. 1st DCA 2016) ("Whether granting the proposed amendment would prejudice the opposing party is analyzed primarily in the context of the opposing party's ability to prepare for the new allegations or defenses prior to trial.")); *Laurencio v. Deutsche Bank Nat'l Trust Co.*, 65 So. 3d 1190, 1193 (Fla. 2d DCA 2011) ("Courts should be especially liberal when leave to amend is sought at or before a hearing on a motion for summary judgment.)

2. Trial in this matter has not been set, minimal discovery has taken place, and no depositions have yet been conducted and in fact, no motions for summary judgment have been filed.  Had Plaintiff known about AT&T's admitted data breach in 2022 when the lawsuit was filed, he would have brought the claim at the same time as his other claims.  It was only until March of 2024 when AT&T disclosed the data breach was Plaintiff made aware of the claim.  Given the claim occurred prior to the filing of the lawsuit having been discovered within the statute of limitations, Plaintiff should be allowed to amend his claim.

3. "In exercising its discretion to allow the amendment, the trial court should still weigh the amendment in terms of the prejudice to the opposing party in the preparation for trial." *Progressive Select Ins. Co. v. Imaging Ctr. Of W. Palm Beach*, 356 So. 3d 842 (Fla. 4th DCA 2023).  AT&T will therefore not be prejudiced by the amendment in preparation for trial which is the correct analysis of prejudice in Florida.

4. AT&T does not dispute the validity of the data breach claims in their merit or how they are plead and therefore the amendments adding the data breach claims are not futile.

5. AT&T elected to preclude class actions to resolve any disputes **by either party**, and instead limited resolute of disputes to arbitration or small claims court and therefore AT&T's attempt to rely on a pending class action where it specifically advised Plaintiff that neither it or Plaintiff could participate in class actions is text book hypocrisy.

6. AT&T's claim that because that Plaintiff's claim for data breach may be related to a *federal* Multiple District Litigation Action (MDL) involving putative **federal class actions** with AT&T and a Data Breach**,** that somehow this Court cannot allow Plaintiff to amend her state court individual claim against AT&T for her own damages which are separate and apart from any class members' damages, in the venue where AT&T agreed to be sued:  Miami-Dade small claims court.

7. The ~~federal~~ MDL does not have jurisdiction over Plaintiff's state court claim, only this Court does which involves AT&T's violation of Florida state law.  In order to be subject to a MDL the action actually must be a **federal civil action** and therefore cannot be grounds to prevent the amendment of a state court claim. If AT&T wants to try to remove the case to federal court, it certainly can attempt it, but threatened removal is not grounds for denying a motion for leave to amend with no trial date pending and no meaningful discovery completed.

8. Recently AT&T removed five (5) newly filed (2024) cases of unrelated Plaintiff's for data breach claims and then sought transfer to the MDL.  All five (5) plaintiffs sought remand and further objected to the CTO – conditional transfer orders (CTO) that the

MDL issued. Plaintiffs filed their Motion to Vacate the Conditional Transfer Orders and Remand which is pending before the MDL. The fact that other plaintiffs have filed claims is not grounds to not allow this plaintiff to seek to amend her claim in this individual state court case.

9. Nor is the possibility of inconsistent results or verdicts grounds to deny amendment as it is AT&T who by virtue of its inclusive of the class action waiver and insistence on individualized claim resolution created the possibility of inconsistent rulings, not Plaintiff.

10. Therefore, in order to follow the plain and unambiguous language of § 501.202, Fla. Stat. to liberally construe the statute, the Court cannot and should not read any language which prevents Plaintiff from amending his claim especially where the defendant has contractually barred participation in a class action. The effect of class action waivers in consumer contracts undoubtedly results in claim suppression and creates a chilling effect over individuals from pursuing their rights. As Judge Richard Posner wrote in *Carnegie v. Household Intern, Inc.*, 376

F. 3d 656 (4th Cir. 2004):

> "The realistic alternative to a class action is not 17 million individual suits, but zero individual suits, as only a lunatic or a fanatic sues for $30. But a class action has to be unwieldy indeed before it can be pronounced an inferior alternative— no matter how massive the fraud or other wrongdoing that will go unpunished if class treatment is denied—to no litigation at all." Id. at 661.

11. AT&T cannot contractually bind the customer to prevent them from filing a class action or participating in a class action, and then complain of being exposed to different results in multiple lawsuits is against "public policy" and the efficient

4

administrative of justice.

12. AT&T cites *Inphynet Contracting Servs., Inc. v. Matthews*, 196 So. 3d 449, 463 (Fla. 4th DCA 2016), for the proposition that the MDL "could preempt or conflict with any decisions by this Court." In *Inphynet Contracting,* the issue was between two competing class action lawsuits against a defendant which one of which was on already on appeal and the Fourth District Court of Appeal found that because the defendant could be exposed to inconsistent rulings by another court, it could be grounds to **stay** the case which was not appeal as *inphynet* was decided on a petition for certiorari.  In *Inphynet,* the defendant was not the cause of possible inconsistent rulings by other courts like in the instant case by AT&T which AT&T has invited by requiring plaintiffs to seek relief on an individual basis

13. AT&T required Plaintiff to execute a class action waiver and likewise agreed to not participate in a class action lawsuit itself.  Therefore AT&T itself created the paradigm of possible inconsistent rulings and therefore cannot cry foul when it could become a reality at its own hand.  AT&T has made their bed and they should lie in it and litigate with Plaintiff in the chosen venue.

14. In *In re Kitec Plumbing Sys. Prod. Liab. Litig*., No. 09-MD-2098-F, 2010 WL 11618052, at *1 (N.D. Tex. Aug. 23, 2010), the case involved products liability cases that allege defective pipe or pipe systems that are designed, manufactured, warrantied, advertised, sold or distributed by Defendants.  *Kitec* did not involve an instance where the Defendant and plaintiff contractually agreed to waive their rights to participate in class actions, like AT&T did here.

15. In another case cited by AT&T, *Simon v. Marriott Int'l, Inc.*, No. PWG-19-1792, 2019 WL 4573415, at *4 (D. Md. Sept. 20, 2019), the Court addressed whether a plaintiff could pursue a class action lawsuit in state court consisting of claims that already are included

in a CAFA suit within an existing" federal multi-district litigation but it did not address the issue of a mutual class action waiver and thus is not applicable to the facts of this case.

16. AT&T successfully litigated its waiver's viability before the U.S. Supreme Court. *See AT&T Mobility v. Concepcion,* 536 U.S. 333 (2011). "'A party is bound by, and a court is powerless to rewrite, the clear and unambiguous terms of a voluntary contract' [and] '[i]t is not the role of the courts to make an otherwise valid contract more reasonable from the standpoint of one contracting party.'" *Brooks v. Green*, 993 So. 2d 58, 61 (Fla. 1st DCA 2008) (citations omitted). "[T]his principle applies even when contractual terms bind a party to a seemingly harsh or out of the ordinary bargain[.]" *Id.* at 61.T&T has previously argued that its own contractual waiver validly contracts around Fed. R. Civ. P. 23, which broadly establishes a right to vindicate the public interest (or at least their view of the public interest). However, Rule 23 does not "establish an entitlement to class proceedings." *Am. Exp. Co. v. Italian Colors Rest.*, 570 U.S. 228, 234–35 (2013) ("reject[ing] th[e] proposition" that "federal law secures a nonwaivable opportunity to vindicate federal policies by satisfying the procedural strictures of Rule 23"); *see also Lindsay*, 2021 WL 2682566, at *3–4 (there is no "rule entitling a plaintiff to pursue a class action").

17. Similarly, there is no rule entitling a defendant to pursue a class action when previously contractually forgoing that right. Rule 23 sets forth the requirements that plaintiffs must meet in order to represent a class; it does not foreclose parties from agreeing to resolve their disputes individually. *See Cohen v. UBS Fin. Servs., Inc.*, 799 F.3d 174, 179 (2d Cir. 2015) (upholding class waiver as "a promise to forgo certain procedural mechanisms in court").

18. Several other cases upholding waivers are in the arbitration context. *See American*

6

*Express Co. v. Italian Colors Restaurant,* 570 U.S. 228 (2013); *Viking River Cruises, Inc. v. Moriana,* 596 U.S._, 142 S.Ct. 1906 (2022); *In re Titanium Dioxide Antitrust Litigation,* 962 F.Supp.2d 840 (D. Md. 2013); *County of Orange v. United States District Court,* 784 F.3d 520 (9th Cir. 2015). Here the parties agree to resolve their case in a non-judicial forum or in small claims court and thus the Federal Rules have limited applicability. There are also cases which have upheld class action waivers in a non-arbitral context. In *Crews v. Titlemax of Delaware, Inc.,* 2023 WL 2652242 (M.D. Pa. March 27, 2023), the District Court upheld a stand-alone class waiver. Similarly, in *Deluca v. Royal Caribbean Cruises, LTD,* 244 F.Supp.3d 1342 (S.D. Fla. 2017), the District Court upheld the validity of a waiver where the first paragraph of the ticket contract contains bolded language specifically directing passengers to important terms and conditions.

19. In *Adell v. Cellco Partnership*, 2022 WL 1487765 (6th Cir. 2022), the Sixth Circuit determined that litigants cannot argue class action waiver provisions in consumer contracts should be overridden because CAFA gives exclusive jurisdiction to the federal courts for class actions. There, the plaintiff complained that the district court erred in compelling her to arbitrate her breach of contract case, because there is an "inherent conflict" between CAFA and the Federal Arbitration Act ("FAA"), and her claims fell squarely within a federal court's diversity jurisdiction through CAFA. *Id.*

20. The Sixth Circuit rejected this contention, acknowledging that while there is value in a district court's ability to hear class actions, Congress has in no way indicated that CAFA was meant to preclude parties from privately contracting to adjudicate such cases through bilateral arbitration instead. *Id.* at *5. The Sixth Circuit also noted *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 511 (2018), where the U.S. Supreme Court stated

7

that "in approaching a claimed conflict, we come armed with the "stron[g] presum[ption]" that repeals by implication are "disfavored" and that "Congress will specifically address" preexisting law when it wishes to suspend its normal operations in a later statute." (citations omitted).

21. This holding was recently echoed in the Southern District of Florida. In *Mazile v. Larkin Univ. Corp. and ExamSoft Worldwide, Inc.,* 2024 WL 3495320, at *4 (S.D. Fla., July 22, 2024), an arbitration agreement was upheld because suchgreements "have been upheld consistently in Florida and are expressly supported by federal policy." That court actually cited to *AT&T Mobility v. Concepcion's* finding that the FAA preempted a state's judicial rule banning class action waivers in arbitration agreements. *Id.* at *4.

22. Therefore, AT&T having failed to overcome the basic tenets of the amendments of pleadings, Plaintiff requests the Court grant the motion to amend and any other relief the Court deems just and proper.

**WHEREFORE**, Plaintiff requests that the Court grant Plaintiff's Motion for Leave to and any other relief that Court deems just and proper.

## CERTIFICATE OF SERVICE

WE HEREBY CERTIFY that a true and correct copy of the foregoing was sent via e-portal this this October 2, 2024 to: Manuel A. Garcia-Linares, Esquire (mgarcialinares@daypitney.com, edavila@daypitney.com ) Andrew R. Ingalls, Esquire (aingalls@daypitney.com) Day Pitney LLP, 396 Alhambra Circle, North Tower - 14th Floor, Miami, Florida 33134.

**Beighley, Myrick, Udell, Lynne & Zeichman PA**
*Attorneys for Plaintiff*
2601 S. Bayshore Dr.
Suite 770
Miami, FL 33133
(305) 349-3930 – Phone

By:      /s/ *Maury L. Udell*
                Maury L. Udell, Esquire
                mudell@bmulaw.com
                Fla. Bar 121673

**IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT IN AND FOR DADE COUNTY, FLORIDA**

| DIVISION | **MEMO OF DISPOSITION** | CASE NUMBER |
|---|---|---|
| ☐ CIVIL | | 2022-047421-SP-25 |
| ☐ OTHER | | Section No.  CG01 |

| PLAINTIFF(S) | VS. DEFENDANT(S) | CLOCK-IN |
|---|---|---|
| Sergio Salani | AT&T Mobility, LLC | |

| PLAINTIFF ATTORNEY(S) | DEFENDANT ATTORNEY(S) | DATE OF HEARING | TYPE |
|---|---|---|---|
| Udell, Maury L (P) | Garcia-Linares, Manuel A., ESQ (P) | 10/04/2024 - 10:30 AM | Special Sets |

## MOTIONS

TYPE OF MOTION _to Dismiss_

COURT RULING ON MOTION:

☐ GRANTED  ☐ DENIED  ☐ WITHHELD

COMMENTS: _At least_
_granting in part_
_→ 20 days proposed_
_order_

## CALENDAR DIRECTIONS

CASE CONTINUED:
☐ NOTICE OF SERVICE PROCESS

☐ PENDING SERVICE                     ☐ PENDING SETTLEMENT

☐ SET CASE FOR _____  ESTIMATED TIME REQUIRED _____

☐ MEDIATION          ☐ NON JURY TRIAL
                              ☐ JURY TRIAL

☐ STIPULATED WAIVER FOR APPEARANCE AT PRE-TRIAL

☐ ORDER INVOKING RULES OF CIVIL PROCEDURE

☐ MOTION TO INVOKE THE RULES OF CIVIL PROCEDURE

## DISPOSITIONS

☐ DEFAULT  ☐ FINAL JUDGMENT  ☐ DEFAULT JUDGMENT  ☐ SUMMARY JUDGMENT  ☐ AGREED JUDGMENT

☐ ORDER OF DISMISSAL          AMOUNT OF JUDGMENT          JUDGMENT FOR THE PLAINTIFF

☐ WITHOUT PREJUDICE   PRINCIPAL $ _____  INTEREST $ _____  ☐ STIPULATION FOR PAYMENT AND ORDER OF DISMISSAL

☐ WITH PREJUDICE        COURT COSTS $ _____  ATTORNEY FEES $ _____

☐ VOLUNTARY DISMISSAL

## CONDITION OF DISPOSITION

☐ EXECUTION OF JUDGMENT WITHHELD     ☐ ORDER WITHHOLDING JUDGMENT     ☐ PLAINTIFF TO SUBMIT PROOF

PENDING PAYMENT BY DEFENDANT OF THE ABOVE JUDGMENT AT A RATE OF

$ _____ PER _____, COMMENCING _____
                              WEEK/MONTH                                          DATE

SWORN TESTIMONY TAKEN IN COURT: _____

JUDGMENT OR ORDER TO BE PREPARED BY:  ☐ PLAINTIFF     ☐ DEFENDANT     ☐ COURT

☐ DEFENDANT TO FILE ANSWER IN _____ DAYS

☐ A DEFAULT IS HEREBY ENTERED AGAINST _____
                              FOR FAILURE TO APPEAR AT PRETRIAL AS REQUIRED BY LAW

By: _____
          DEPUTY CLERK

**Juan Fernandez-Barquin**
**Clerk of the Court and Comptroller**

Jessica Donnelly
COURT REPORTER

_____
JUDGE

JORGE PEREZ SANTIAGO
County Court Judge

Filing # 209453308 E-Filed 10/23/2024 05:21:10 PM

IN THE COUNTY COURT OF THE
ELEVENTH JUDICIAL CIRCUIT, IN AND
FOR MIAMI-DADE COUNTY, FLORIDA

SERGIO SALANI,                                CASE NO. 2022-047421-SP-25

      Plaintiff,

v.

AT&T MOBILITY LLC,

      Defendant.

_____/

**<u>DEFENDANT AT&T MOBILITY LLC'S NOTICE OF FILING COURT ORDER</u>**

PLEASE TAKE NOTICE that Defendant, AT&T Mobility LLC, is filing a copy of the *Order*

entered on October 23, 2024 by the Third District Court of Appeal's in <u>Orr v. AT&T Mobility, LLC</u>,

No. 3D23-0097, denying both Appellants' *Motion for Rehearing* and Appellants' *Motion for Rehearing En*

*Banc*, attached hereto as Exhibit A. Specifically, this Order is being filed for the Court's consideration

in advance of ruling upon Defendant's *Motion to Dismiss Plaintiff's Second Amended Statement of Claim,*

argument for which was heard before this Court on October 4, 2024.

Dated: October 23, 2024                    Respectfully submitted,

                                    By: */s/ Manuel A. Garcia-Linares*
                                         Manuel A. Garcia-Linares, Esq.
                                         Florida Bar No. 985252
                                         mgarcialinares@daypitney.com
                                         athomsen@daypitney.com
                                         Andrew R. Ingalls, Esq.
                                         Florida Bar No. 112558
                                         aingalls@daypitney.com
                                         athomsen@daypitney.com
                                       **DAY PITNEY LLP**
                                         396 Alhambra Circle
                                         North Tower – 14th Floor
                                         Miami, Florida 33134
                                         Tel.: (305) 373-4000 / Fax: (305) 373-4099
                                         *Counsel for Defendant AT&T Mobility LLC*

## CERTIFICATE OF SERVICE

I HEREBY certify that on October 23, 2024, I electronically filed the foregoing document with the Clerk of the Court via e-portal and served: **Maury L. Udell, Esq.**, BEIGHLEY, MYRICK, UDELL, LYNNE & ZEICHMAN, P.A., 2601 South Bayshore Drive, Suite 770, Miami, Florida 33133, Emails: mudell@bmulaw.com and notice66@bmulaw.com; and, **Kenneth B. Schurr, Esq.**, 2030 South Douglas Road, Suite 105,  Coral Gables, Florida 33134, Emails: kbsservice@schurrlaw.com and counselken@schurrlaw.com. *Counsel for Plaintiff.*

By: */s/ Manuel A. Garcia-Linares*
Manuel A. Garcia-Linares, Esq.

120402002.1

# EXHIBIT A

IN THE DISTRICT COURT OF

APPEAL

OF FLORIDA

THIRD DISTRICT

October 23, 2024

Sharon L. Orr,

          Appellant(s),

v.

AT&T Mobility LLC,

          Appellee(s).

**3D2023-0097**, 3D2023-0098, 3D2023-0099, 3D2023-0100, 3D2023-0101

Trial Court Case No. 20-8179 SP, 20-21937 SP, 20-8181 SP, 20-21932 SP, 19-11857 SP

        Appellee's Notice of Supplemental Authority, filed on September 27, 2024, is noted.

        Appellee's Response to Appellants' Motion for Rehearing and Rehearing En Banc, filed on September 27, 2024, is also noted.

        Upon consideration, Appellants' Motion for Rehearing is hereby denied.

        EMAS, SCALES, and GORDO, JJ., concur.

        Appellant's Motion for Rehearing En Banc is, likewise, denied.

A True Copy
ATTEST

3D2023-0097 10/23/24



Mercedes M. Prieto, Clerk
District Court of Appeal
        Third District


CC:   Angel A. Cortiñas
Manuel Antonio Garcia-Linares
Andrew Robert Ingalls
Jonathan H Kaskel
David Brian Pakula
Maury Lorne Udell

LA

IN THE COUNTY COURT OF THE ELEVENTH JUDICIAL CIRCUIT, IN AND FOR MIAMI-DADE COUNTY, FLORIDA

CASE NO. 2022-047421-SP-25

SERGIO SALANI,

      Plaintiff,

v.

AT&T MOBILITY LLC,

      Defendant.

_____/

## DEFENDANT'S NOTICE OF FILING ORDERS ON DEFENDANT'S MOTION FOR RECONSIDERATION AND PLAINTIFF'S MOTION FOR LEAVE TO FILE THIRD AMENDED COMPLAINT

PLEASE TAKE NOTICE that Defendant, AT&T Mobility LLC, is filing a copy of the Order *Granting Defendant's Motion for Reconsideration and Order of Dismissal with Prejudice* entered on October 30, 2024 and a copy of the Court *Order Denying Plaintiff's Motion for Leave to File Third Amended Complaint* entered on October 30, 2024 in Raymond Tolmos v. AT&T Mobility LLC, Case No. 2019-017775-SP-23, currently pending before Judge Linda Singer Stein, attached hereto as Composite Exhibit A.

The attached Orders are being submitted for this Court's consideration with respect to its ruling on Defendant's *Motion to Dismiss the Second Amended Statement of Claim with Prejudice* and Plaintiff's *Motion for Leave to File Amended Statement of Claim*, argument heard before this Court on October 4, 2024.

Dated: October 31, 2024

Respectfully submitted,

By: */s/ Manuel Garcia-Linares*
       Manuel A. Garcia-Linares, Esq.
       Florida Bar No. 985252
       mgarcialinares@daypitney.com
       athomsen@daypitney.com
       Andrew R. Ingalls, Esq.
       Florida Bar No. 112558
       aingalls@daypitney.com
       athomsen@daypitney.com
       **DAY PITNEY LLP**
       396 Alhambra Circle
       North Tower – 14th Floor
       Miami, Florida 33134
       Telephone: (305) 373-4000
       Facsimile:   (305) 373-4099
       *Counsel for Defendant AT&T Mobility LLC*

## CERTIFICATE OF SERVICE

I HEREBY certify that on October 31, 2024, I electronically filed the foregoing document with the Clerk of the Court via e-portal and served: **Maury L. Udell, Esq.**, BEIGHLEY, MYRICK, UDELL, LYNNE & ZEICHMAN, P.A., 2601 South Bayshore Drive, Suite 770, Florida 33130, Emails: mudell@bmulaw.com and notice66@bmulaw.com, *Counsel for Plaintiff.*

By: */s/ Manuel A. Garcia-Linares*
       Manuel A. Garcia-Linares

-2-

# COMPOSITE EXHIBIT "A"

**IN THE COUNTY COURT OF THE ELEVENTH JUDICIAL
CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA**

CASE NO: 2019-017775-SP-23
SECTION: ND03
JUDGE: Linda Singer Stein

**Raymond Tolmos**

Plaintiff(s) / Petitioner(s)

vs.

**A T & T Mobility (LLC)**

Defendant(s) / Respondent(s)

_____/

## ORDER GRANTING DEFENDANT'S MOTION FOR RECONSIDERATION AND ORDER OF DISMISSAL WITH PREJUDICE

THIS MATTER came before the Court upon Defendant AT&T Mobility LLC's ("Defendant") Motion for Reconsideration, or in the Alternative, Motion for Judgment on the Pleadings. Having heard argument at the September 20, 2024 hearing, and after considering the submissions of the parties, reviewing the relevant pleadings, and upon careful consideration of the Third District Court of Appeal's recent binding decision in *Orr v. AT&T Mobility, LLC*, No. 3D23-0097, 2024 WL 3588350 (Fla. 3d DCA July 31, 2024, *rehearing denied*, October 23, 2024). as well as the Trial Court's Orders of Dismissal in the lower court cases that were appealed, this Court finds as follows.

## BACKGROUND

Plaintiff's Second Amended Complaint asserts claims for: (1) fraud, (2) breach of implied duty of good faith and fair dealing, (3) damages under FDUTPA, and (4) unjust enrichment. Among these claims, Plaintiff alleges two distinct theories of liability: first, that AT&T allegedly fraudulently misrepresented the "unlimited" nature of Plaintiff's data plan by "throttling" Plaintiff's data speeds, and second, that AT&T allegedly improperly charged Plaintiff a "bogus" $1.99 administrative fee without adequately disclosing its existence.

On April 9, 2021, AT&T filed its Amended Motion to Dismiss Plaintiff's Second Amended Complaint (the "Motion to Dismiss"), arguing that the Court should dismiss the entire case with prejudice. In relevant part, AT&T argued that Plaintiff's administrative fee and data "throttling" claims are defeated by the plain language of the Wireless Customer Agreement between AT&T and Plaintiff incorporated by reference into the Second Amended Complaint.

After a hearing held on May 17, 2021, the Court entered an Order on AT&T's Motion to Dismiss on June 28, 2021 (Index #110), granting in part and denying in part, Defendant's motion to dismiss. Defendant filed, and the Court granted a Motion for Reconsideration on September 14,

2021 (Index #114). In summary, the Court found that Plaintiff incorporated by reference the AT&T Wireless Customer Agreement, billing statements, and website into the Second Amended Complaint. Based on the finding that those documents incorporated into the complaint contradicted the throttling and administrative fee allegations, the Court dismissed the portions of counts 2 and 3 relating to administrative fee disclosure and Plaintiff's "pass-through" fee theory with prejudice and dismissed counts 1 and 4 with prejudice. Accordingly, the only claims that remain in the case are counts 2 and 3 regarding data throttling and whether the "Administrative Fee is in and of itself deceptive."

The Third DCA recently issued its decision in *Orr*, affirming Judge Gonzalez-Paulson's dismissal of five cases involving the same claims and allegations.[1] *See Orr*, 2024 WL 3588350, at page 1 ("The Appellants entered into wireless customer agreements with AT&T . . . which included an administrative fee charge for providing unlimited data with potential speed restrictions. The Appellants later filed claims against AT&T based on relevant sections of the wireless customer agreement, alleging deceptive administrative fee charges and data throttling."). In particular, the Third DCA ruled that the Wireless Customer Agreement was properly incorporated by reference into the complaint, and affirmed the trial court's finding that the Wireless Customer Agreement directly contradicted the plaintiffs' claims regarding both data throttling and the administrative fee. *Id.*

Judge Gonzalez-Paulson's Orders were extremely detailed and exhaustive and addressed the very same issues in this Court's case. Unlike cases in which one trial court adopts the factual holdings of another trial court, the Appellate Court in *Orr* affirmed Judge Gonzalez-Paulson's entire decision: "We affirm the other issues raised without further discussion." *Id.* at p. 3. In other words, the Third DCA clearly considered the trial court's orders and affirmed not just the question of whether a document can be considered on a motion to dismiss, but in addition, upheld all of the trial court's rulings in their entirety. This Court, therefore, is required to follow the binding appellate decision in *Orr*, which upheld Judge Gonzalez-Paulson's orders on all grounds.

After the Third DCA's opinion was rendered, in this case, AT&T filed the underlying Motion for Reconsideration, or in the Alternative, Motion for Judgment on the Pleadings on August 16, 2024 ("Motion for Reconsideration"), arguing that the Court should reconsider the portions of its June 28, 2021, and September 14, 2021, denying AT&T's Motion to Dismiss as to Plaintiff's remaining claims based on the same Wireless Customer Agreement at issue in *Orr*. Alternatively, AT&T requests the Court enter a final judgment on the pleadings.

As found by Judge Gonzalez-Paulson and affirmed by *Orr*, Plaintiff's claims in this case are similarly contradicted by the express terms of the Wireless Customer Agreement, which provides for the imposition of administrative fees and permits AT&T to reduce data speeds under certain conditions. The Court therefore grants the Motion for Reconsideration and Dismissal for the following reasons.

## LEGAL AUTHORITIES

1. *Incorporation by Reference of the Wireless Customer Agreement.*

As established in *Orr*, when "the terms of a legal document are impliedly incorporated by

reference into the complaint, the trial court may consider the contents of the document in ruling on a motion to dismiss." *Orr*, 2024 WL 3588350, at *1 (quoting *Air Quality Assessors of Fla. v. Southern-Owners Ins. Co.*, 354 So. 3d 569, 571 (Fla. 1st DCA 2022)). Here, the Second Amended Complaint expressly references the Wireless Customer Agreement and makes it central to Plaintiff's claims, as it defines the terms of Plaintiff's relationship with AT&T and the provisions governing the conduct alleged. *See, e.g.,* Sec. Am. Compl. ¶ 15 ("AT&T's wireless customer agreements do not state that an unlimited mobile data plan customer's use of more than a specified amount of data is a prohibited activity."); ¶ 41 ("The express terms of the wireless agreement required AT&T to provide unlimited data and true administrative costs as defined by the contract."). Accordingly, as was the case in *Orr*, the Wireless Customer Agreement is incorporated into the Second Amended Complaint by reference. *Orr*, 2024 WL 3588350, at *1 ("The Appellants raised the wireless customer agreement as the basis for their complaints and expressly relied upon the agreement to attempt to state causes of action. Because the allegations in the complaints incorporated the wireless customer agreement by relying on and quoting it, the trial court properly considered the agreement while ruling on AT&T's motion to dismiss the complaint with prejudice.").

Plaintiff's argument that *Nix v. Off. of the Comm'r of Baseball*, 346 So. 3d 685 (Fla. 3d DCA 2022) precludes the Court from considering the Wireless Customer Agreement in adjudicating the Motion for Reconsideration is misplaced, as that case did not involve the incorporation by reference doctrine. Specifically, the Third DCA in *Nix* reversed a judgment on the pleadings where the defendant attached documents to its answer that were not referenced or relied upon by the complaint, and the trial court relied on those documents to find that plaintiff's claims were barred by the statute of limitations, thus violating the four-corners rule. *Id.* at 685-86. Unlike *Nix*, and as was the case in *Orr*, here the Plaintiff expressly incorporates by reference and relies on the Wireless Customer Agreement into the Second Amended Complaint by reference, and as such, the Court can consider that document in deciding the Motion for Reconsideration. *Orr*, 2024 WL 3588350, at page 1.

2. *The Wireless Customer Agreement Contradicts Plaintiff's Remaining Claims.*

In *Orr*, the Third DCA affirmed the trial court's finding that the plaintiffs' claims based on the same data throttling and administrative fee theories asserted here were directly contradicted by the Wireless Customer Agreement. *Orr*, 2024 WL 3588350, at *1 n.2. Here, a careful review of the Wireless Customer Agreement that Plaintiff incorporated into the Second Amended Complaint by reference shows that it permits AT&T to manage its network, including reducing data speeds once a specified threshold is exceeded, and authorizes the imposition of an administrative fee. *See* Wireless Customer Agreement, § 1.4 (Charges include, without limitation airtime, roaming, recurring monthly service, activation, **administrative,** and late payment charges . . . whether assessed directly upon you or upon AT&T) (emphasis added); § 6.2 ("AT&T may reduce your data throughput speeds at any time or place if your data usage exceeds an applicable, identified usage threshold during any billing cycle.").

As to the administrative fee theory, Plaintiff also quotes AT&T's website and asserts that:

AT&T's representation that the Administrative Fee is a charge assessed by AT&T that helps defray a portion of certain expenses AT&T incurs, including but not

limited to: (a) charges AT&T or its agents pay to interconnect with other carriers to deliver calls from AT&T customers to their customers; and (b) charges associated with cell site rents and maintenance are false.

See Am. Compl. ¶ 56. According to Plaintiff, the administrative fee is not tied to either interconnect or cell site charges because AT&T has continuously increased the fee even though these costs have allegedly decreased. *Id.* ¶¶ 25-27. Based on this assertion, Plaintiff theorizes that the administrative fee is part of "a scheme to funnel direct profit to AT&T rather than pay for any identifiable increase in costs." *Id.* ¶ 56. But, Plaintiff admits that the administrative fee definition states that AT&T may defray a portion of certain expenses "including but not limited to" charges for interconnection and for cell site rents and maintenance. See. Am. Compl. ¶¶ 33, 40, 56 (emphasis added).

Accordingly, as stated by Judge Gonzalez-Paulson: "[T]aking Plaintiff's allegations as true, interconnect costs, cell site rents and/or maintenance charges serve as examples of and not limitations to how AT&T can apply the Administrative Fee, meaning AT&T's alleged use of the fee to offset other expenses and costs would still comply with the fee's definition and cannot be considered deceptive, unfair, false, or a violation of the parties' agreement." Dismissal Order, p. 8, *Edward Barger vs AT&T Mobility LLC*, 2020-008181-SP-26 (Miami-Dade Cty. Ct. Sept 28, 2022) ("Barger Order") (affirmed by *Orr*).

Florida law is clear that "[a] party cannot recover for alleged false misrepresentations that are adequately dealt with or expressly contradicted in a later written contract." *TRG Night Hawk Ltd. v. Registry Dev. Corp.*, 17 So. 3d 782, 784 (Fla. 2d DCA 2009). The Wireless Customer Agreement and Plaintiff's own allegations contradict the Second Amended Complaint's data throttling and administrative fee theories underlying Plaintiff's remaining claims. Therefore, as determined by Judge Gonzalez-Paulson and affirmed by the Third DCA in *Orr*, "These claims are ripe for dismissal because they are facially negated by documents relied on and incorporated into the Amended Complaint." *Barger* Order, p. 5; *Orr*, 2024 WL 3588350, at page 1 n.2.

3. *Other Bases for Reconsideration.*

Plaintiff's remaining administrative fee and data throttling claims additionally fail for the following reasons. Plaintiff asserts a claim under FDUTPA, alleging fraudulent misrepresentations by AT&T. *See, e.g.*, Am. Compl. ¶ 17 (alleging that AT&T's unlimited plan was "a bait-and-switch scam"), ¶ 19 (alleging that AT&T "covertly increases the actual price" of its services by "padding all post-paid wireless customers' bills" with a "bogus" administrative fee), ¶ 20 (alleging the administrative fee "is never adequately and honestly disclosed"), ¶ 21 (alleging that AT&T "deliberately hides" the administrative fee). However, Florida law is clear that claims sounding in fraud must be pled with particularity. *See USA Nutraceuticals Grp., Inc. v. BPI Sports, LLC*, No. 15-CIV-80352, 2016 WL 4254257, at page 3 (S.D. Fla. Feb. 16, 2016) (holding that FDUTPA claims sounding in fraud must be pled with particularity). Rule 1.120(b) requires that "[t]he circumstances constituting the fraud . . . shall be stated with such particularity as the circumstances may permit."

Plaintiff fails to make allegations with the required specificity. The allegations lack detailed information regarding any specific fraudulent or deceptive conduct by AT&T. As established in

*Cedars Healthcare Grp., Ltd. v. Mehta*, 16 So. 3d 914, 917 (Fla. 3d DCA 2009), "the factual basis for a claim of fraud must be pled with particularity and must specifically identify misrepresentations or omissions of fact, as well as the time, place, or manner in which they were made." Plaintiff does not identify any specific interactions with AT&T, nor does Plaintiff allege when, where, or how any deceptive conduct occurred. As Judge Gonzalez-Paulson noted, "There is no particularly-pled assertion explaining where, when, what, and how these alleged misrepresentations or omissions were material *to Plaintiff's* decision to do business with AT&T, that *they* relied on them, or that they proximately caused *their* damages." *Barger* Order, p. 13 (emphasis in original). Moreover, Plaintiff does not adequately allege that they suffered harm resulting from any misrepresentation or omission by AT&T. These pleading deficiencies are fatal to Plaintiff's FDUTPA claim.

Plaintiff's claim for breach of the implied duty of good faith and fair dealing is also legally insufficient. Under Florida law, this implied duty cannot be used to override or contradict the express terms of a contract. In *Insurance Concepts & Design, Inc. v. Healthplan Servs., Inc.*, 785 So. 2d 1232, 1234 (Fla. 4th DCA 2001), the Court made clear that "the implied covenant of good faith should not be invoked to override the express terms of the agreement between the parties." As discussed above, the Wireless Customer Agreement between AT&T and Plaintiff authorizes the administrative fee and the reduction of data speeds. Plaintiff's attempt to invoke the implied duty of good faith and fair dealing to contest these contractual provisions directly contradicts the express language of the agreement. As a result, Plaintiff's claim for breach of the implied duty of good faith and fair dealing cannot stand.

## CONCLUSION

For the reasons stated above and based upon the binding Third District Court of Appeal Opinion in *Orr v. AT&T Mobility, LLC.,* IT IS HEREBY ORDERED that:

- Defendant's Motion for Reconsideration is GRANTED.  This case is DISMISSED WITH PREJUDICE.

- Jurisdiction of this action is retained to enter further orders that are proper including, without limitation, to award attorney's fees and costs to AT&T.

---

[1] (i) The lower Court cases that were appealed are: *Orr v. AT&T Mobility LLC*, 2020-08179-SP-26 (3D23-097); (ii) *Milian v. AT&T Mobility LLC*, 2020-21937-SP-26 (3D23-098); (iii) *Ysidron v. AT&T Mobility LLC*, 2020-21932-SP-26 (3D23-099); (iv) *Barger v. AT&T Mobility LLC*, 2020-08181-SP-26 (3D23-100); and (v) *Batista v. AT&T Mobility LLC*, 2019-11857-SP-26 (3D23-101).

**DONE** and **ORDERED** in Chambers at Miami-Dade County, Florida on this <u>30th day of October, 2024</u>.

<u>2019-017775-SP-23 10-30-2024 9:56 PM</u>
Hon. Linda Singer Stein

**COUNTY COURT JUDGE**
Electronically Signed

<div style="border:2px solid red; color:red;">

Final Order as to All Parties SRS #: <u>**12**</u> (Other)

THE COURT DISMISSES THIS CASE AGAINST ANY PARTY NOT LISTED IN THIS FINAL ORDER OR PREVIOUS ORDER(S). THIS CASE IS CLOSED AS TO ALL PARTIES.

</div>

**Electronically Served:**
Andrew Robert Ingalls, aingalls@daypitney.com
Andrew Robert Ingalls, brodriguez@daypitney.com
Evelyn Davila, edavila@daypitney.com
Georgia A. Thompson, gthompson@daypitney.com
Georgia A. Thompson, lmiller@daypitney.com
Jessica Solorzano, jsolorzano@daypitney.com
Kenneth B Schurr, kbsservice@schurrlaw.com
Manuel A. Garcia-Linares, mgarcialinares@daypitney.com
Manuel A. Garcia-Linares, athomsen@daypitney.com
Maury L. Udell, notice66@bmulaw.com
Maury L. Udell, blopez@bmulaw.com
Rachel L Kittl, rkittl@bmulaw.com

**Physically Served:**

Case 1:25-cv-20381-RAR   Document 1-2   Entered on FLSD Docket 01/27/2025   Page 1382 of 1553

**IN THE COUNTY COURT OF THE ELEVENTH JUDICIAL
CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA**

CASE NO: 2019-017775-SP-23
SECTION: ND03
JUDGE: Linda Singer Stein

**Raymond Tolmos**

Plaintiff(s) / Petitioner(s)

vs.

**A T & T Mobility (LLC)**

Defendant(s) / Respondent(s)

_____/

## ORDER DENYING PLAINTIFF'S MOTION FOR LEAVE TO FILE THIRD AMENDED COMPLAINT

THIS CAUSE came before the Court on September 10, 2024 on Plaintiff's Motion for Leave to File Third Amended Complaint (D.E. 219). After careful consideration of the motion, response, legal authorities and presiding over a hearing, it is ORDERED as follows:

1. Plaintiff's original one-sentence small claims Statement of Claim was filed on August 12, 2019 seeking $5,000, and arose from the relationship between the parties as a consumer based on violations Florida law, fraud, breach of implead duty of good faith and Sec. 501.204, Fla. Stat. (Unfair and Deceptive Trade Practices Act) with respect to two (2) independent theories of recovery—data throttling and administrative fee. See D.E. 17.

2. AT&T's answer was filed on October 4, 2021.

3. Plaintiff filed a First Amended Complaint on October 29, 2019, again seeking $5,000.

4. On February 18, 2020, Plaintiff filed a Second Amended Complaint seeking $8,000 (Index #48). This is the current Complaint that the case has been litigated on. Plaintiff's 15-page Second Amended Complaint contains four causes of action for: (1) fraud, (2) breach of implied duty of good faith and fair dealing, (3) damages under FDUTPA, and (4) unjust enrichment. Among these claims, Plaintiff alleges two distinct theories of liability: first, that AT&T allegedly fraudulently misrepresented the "unlimited" nature of Plaintiff's data plan by "throttling" Plaintiff's data speeds, and second, that AT&T allegedly improperly charged Plaintiff a "bogus" $1.99 administrative fee without adequately disclosing its existence.

5. On April 9, 2021, AT&T filed its Amended Motion to Dismiss Plaintiff's Second Amended Complaint (the "Motion to Dismiss"), arguing that the Court should dismiss the entire case with prejudice. In relevant part, AT&T argued that Plaintiff's administrative fee and data "throttling" claims are defeated by the plain language of the Wireless Customer Agreement between AT&T and Plaintiff incorporated by reference into the Second Amended Complaint

(Index #103).

6. After a hearing held on May 17, 2021, the Court entered an Order on AT&T's Motion to Dismiss on June 28, 2021 (Index #110), granting in part and denying in part, Defendant's motion to dismiss. Defendant subsequently filed, and the Court granted, a Motion for Reconsideration on September 14, 2021 (Index #114). In summary, the Court found that Plaintiff incorporated by reference the AT&T Wireless Customer Agreement, billing statements, and website into the Second Amended Complaint. Based on the finding that those documents incorporated into the complaint contradicted the throttling and administrative fee allegations, the Court dismissed the portions of counts 2 and 3 relating to administrative fee disclosure and Plaintiff's "pass-through" fee theory with prejudice and dismissed counts 1 and 4 with prejudice. Accordingly, the only claims that remain in the case are counts 2 and 3 regarding data throttling and whether the "Administrative Fee is in and of itself deceptive."

7. On December 1, 2021, as a result of a mandate by the Florida Supreme Court requiring the trial courts to impose strict deadlines to conclude cases pursuant to Florida Rule of General Practice and Judicial Administration 2.545, this Court issued a Uniform Case Management Order Setting Pretrial Deadlines and Related Requirements. All pretrial motions were due to be filed by August 1, 2022.

8. On June 14, 2022, the Court entered an order as a result of a case management conference, granting Defendant's motion to amend the Court's Uniform Case Management Order. The Order extended the deadline for motions to be filed by October 1, 2022.

9. On September 6, 2023, the Court entered an Agreed Omnibus Order with a new deposition schedule. The parties represented to the Court that they were both trying to schedule the depositions for about 1 year during the then-almost 4 year old case.

10. AT&T sought leave to amend its Answer and Affirmative Defenses on September 7, 2023 and also on December 12, 2023, which, after a thorough hearing, the Court granted on April 4, 2024. See D.E. 192. The Amended Answer addressed the claims that were pending at that time in Plaintiff's Second Amended Complaint.

11. On January 29, 2024, the Court entered an Omnibus Order as a result of a status conference. The Court granted Plaintiff's motion for extension of time to comply with discovery. In that Order, this Court set numerous hearings on pending motions by both parties. The last scheduled hearing in that Order was set for July 23, 2024 on Defendant's motion for summary judgment.

12. AT&T filed a Motion for Reconsideration, or in the Alternative, Motion for Judgment on the Pleadings on August 16, 2024 ("Motion for Reconsideration"), arguing that the Court should reconsider the portions of its June 28, 2021, and September 14, 2021 Orders, denying AT&T's Motion to Dismiss as to Plaintiff's remaining claims based on the Wireless Customer Agreement at issue and a newly issued opinion by the Third District Court of Appeal.

13. Although the Court was ready to proceed with the July 23, 2024 hearing on Defendant's motion for summary judgment, the parties agreed for the Court to continue that hearing and consider Defendant's motion for reconsideration first and take the motion for summary

judgment off calendar until the Court ruled upon the motion for reconsideration. That hearing was held on September 20, 2024, The Defendant's motion for reconsideration, if granted, is dispositive of the entire pending claims in Plaintiff's Second Amended Complaint.

14. Meanwhile, on May 31, 2024, Plaintiff filed this motion for leave of court to file a Third Complaint, amending to include an entirely new claim for negligence and violation of 501.204, Fla. Stat. for a <u>data breach.</u> Based on the record before the Court, including a declaration by Plaintiff, he learned about an additional claim for a data breach in March of 2024 (which is alleged to have occurred in 2019) when AT&T publicly disclosed the data breach to the world.  See D.E. 257. This claim is completely new and distinct from those set forth in the current claims that have been pending since 2019.  The proposed Third Amended Complaint also realleges claims from the prior complaints that this Court dismissed or were already resolved.  Plaintiff concedes this point and has agreed he must submit a corrected pleading if his motion to amend is granted.

15. Before even filing the motion to amend alleging a separate and distinct cause of action, Plaintiff served discovery on AT&T directed at a possible data breach claim on May 8, 2024 which AT&T objected to on May 23, 2024.  See D.E. 212 and 218.  Thereafter, Plaintiff filed his motion to amend. See D.E. 219. The Court held a hearing on September 10, 2024 and reserved ruling, requesting proposed orders for review.

16. Since the original statement of claim was filed in this small claims action and throughout the life of the case, the parties, on the basis of the allegations remaining in the Second Amended Complaint, have propounded voluminous discovery requests, filed several motions to dismiss, several motions for summary judgment, discovery motions, motions for protective orders, motions for sanctions, motions to amend, motions for continuances and volumes of memoranda of law.  The Court has held many hearings, sometimes quite lengthy, some evidentiary.  The Court also spent substantial time on Plaintiff's strongly contested motion seeking the production of Defendant's corporate documents and privilege log and conducted an in-camera inspection of thousands of documents.  Plus, there were numerous and lengthy status, case management conferences and hearings for scheduling of pending matters, many of which were initiated by the Court, all in an effort to bring this very old pending case to a resolution.

17. The Court and counsel for both sides had numerous and comprehensive discussions about scheduling depositions and hearings on pending motions.  Counsel have been well aware of the deadlines that are imposed by the rules requiring cases to be resolved within a reasonable and specific period of time.  During one of the many lengthy hearings, on August 19, 2024, Defendant asked for a deposition scheduling order, both parties representing to the Court that they intended to take depositions on many occasions but did not adhere to a fixed schedule.

18. This case has been exhaustively litigated, with 261 docket entries spanning from August 12, 2019 through October 23, 2024.  In other words, over 5 years.  The Court and counsel have expended countless hours attempting to resolve all of the issues in this case so that it could reach a final conclusion.  The Court advised counsel that it was going to schedule the non-jury trial for Plaintiff's estimate of a 3-day trial period by the end of this year.  However, when counsel asked the Court to resolve Defendant's pending motion for reconsideration first, the Court held off on giving a trial date.

19. That brings us to the current state of the case and Plaintiff's motion for leave to file a Third Amended Complaint to bring an entirely new claim for data breach. There is absolutely nothing in that claim that relates to any of the issues that the parties have been litigating for 5 years. Indeed, the only similarity is the name of the Plaintiff and the name of the Defendant.

20. Despite Plaintiff's attempt to obtain discovery on the data breach claim, even before the motion to amend was filed, there has been absolutely no discovery on this issue. Should the Court grant Plaintiff's motion, it would needlessly breathe new life into this interminable litigation that is so close to finality. Opening up this case to a Third Amended Complaint on an entirely unrelated matter would result in the requirement of new, stricter deadlines and a plethora of new discovery and motions. Indeed, the data breach was just discovered in March of 2024 and, as such, the parties would be required to analyze, strategize and investigate to pursue and defend the claim.

21. It is true that "Florida courts applying rule 1.190(e) long ago established that the public policy of our state favors the liberal amendment of pleadings and that courts should resolve all doubts in favor of allowing the amendment of pleadings to allow cases to be decided on their merit." *Harrison v. Dep't of Mgmt. Servs., Div. of State Grp. Ins*., 339 So. 3d 504, 505 (Fla. 1st DCA 2022) (internal citations omitted). Any doubts the Court has should be resolved in favor of the amendment. *See Overnight Success Const., Inc. v. Pavarini Const. Co., Inc.*, 955 So. 2d 658 (Fla. 3d DCA 2007) (citing *Thompson v. Jared Kane Co., Inc.*, 872 So. 2d 356, 360 (Fla. 2d DCA 2004). Based upon the Court's above analysis, there is no doubt that the amendment should be denied.

22. A Defendant who opposes a motion to amend the complaint must show that Plaintiff (i) has abused the privilege to amend, (ii) that it would be prejudiced by the amendment, or (iii) the amendment would be futile. *Laurencio v. Deutsche Bank Nat'l Trust Co.*, 65 So. 3d 1190, 1193 (Fla. 2d DCA 2011).

23. The overwhelming history of this case demonstrates extreme prejudice to the Defendant should the amendment be granted in this case. Defendant points out that Plaintiff is not precluded from filing a separate case because nothing in the proposed Third Amended Complaint relates to this case herein. The Court agrees.

24. The rule of liberality in allowing amendments is not a license to change the issue or introduce new issues that materially vary from the grounds initially sought. See *State Farm Mut. Auto. Ins. Co. v. Cent. Therapy Ctr., Inc.*, 368 So. 3d 25, 27 (Fla. 3d DCA 2023). To allow this amendment would be tantamount to starting over from the inception of a matter that was just discovered this year, but has an original filing date in 2019. The Court's ruling today is not solely based upon the age of the case, although the fact that this is a small claims case which has far surpassed the deadlines in the multiple Court orders, is an added factor that must be considered. Under the mandatory Uniform Case Management Orders, the Court is obligated to guide the case to final resolution.

25. This Court has carefully considered the totality of the circumstances, including but not limited to, the timeliness of the motion, the procedural posture of the litigation, prejudice to the opposing party, the interests of finality, judicial economy and case management. While

"Florida encourages adjudication on the merits and liberal amendment, 'there is an equally compelling obligation on the court to see to it that the end of all litigation be finally reached.'" *Inspired Cap., LLC v. Howell*, 387 So. 3d 348, 352 (Fla. 3d DCA 2023). Importantly, although the data breach claim will not be a part of the current case, Plaintiff is not precluded from filing a separate claim.

Accordingly, Plaintiff's Motion for Leave to File Third Amended Complaint is DENIED.

**DONE** and **ORDERED** in Chambers at Miami-Dade County, Florida on this <u>30th day of October, 2024</u>.

<u>2019-017775-SP-23 10-30-2024 9:46 PM</u>
Hon. Linda Singer Stein

**COUNTY COURT JUDGE**
Electronically Signed

---

No Further Judicial Action Required on **THIS MOTION**

CLERK TO **RECLOSE** CASE IF POST JUDGMENT

---

**Electronically Served:**
Andrew Robert Ingalls, aingalls@daypitney.com
Andrew Robert Ingalls, brodriguez@daypitney.com
Evelyn Davila, edavila@daypitney.com
Georgia A. Thompson, gthompson@daypitney.com
Georgia A. Thompson, lmiller@daypitney.com
Jessica Solorzano, jsolorzano@daypitney.com
Kenneth B Schurr, kbsservice@schurrlaw.com
Manuel A. Garcia-Linares, mgarcialinares@daypitney.com
Manuel A. Garcia-Linares, athomsen@daypitney.com
Maury L. Udell, notice66@bmulaw.com
Maury L. Udell, blopez@bmulaw.com
Rachel L Kittl, rkittl@bmulaw.com

**Physically Served:**

IN THE COUNTY COURT OF THE 11TH
JUDICIAL CIRCUIT IN AND FOR MIAMI-
DADE COUNTY, FLORIDA

Sergio Salani,

      Plaintiff,

v.

AT&T Mobility, LLC,

      Defendant.

_____/

CASE NO.: 2022-047421-SP-25

FLA. BAR NO.: 121673

**PLAINTIFF'S NOTICE OF FILING SUPPLEMENTAL AUTHORITY IN SUPPORT OF
MOTION FOR LEAVE TO AMEND**

    COMES NOW, the Plaintiff, Sergio Salani, by and through her undersigned counsel, and files this Notice of Filing Supplemental Authority in Support of Motion for Leave to Amend:

1. AT&T has already admitted that the proposed data breach claims are not futile and that Plaintiff has not abused the privilege under Fla. R. Civ. P. 1.190 in this two (2) year old case. AT&T has failed to prove that it would be prejudiced in in the preparation for trial of the new claims given that there is no pending trial date and neither Plaintiff nor AT&T has been deposed.

2. Given Rule 1.910(a) unambiguous language that leave of court shall be given freely when justice so requires, under binding case law, it is reversible error to deny leave to amend, if a pleader "may be able to allege additional facts to support its cause of action **or support another cause of action under a different legal theory' [the pleader] should be allowed to amend [its] complaint.**" <u>See</u>.

<u>Howard v. Greenwich Insurance Co</u>., 307 So.3d 844 (Fla. 3d DCA 2020); <u>Obenschain v. Williams</u>, 750 So.2d 771 (2000); <u>Florida Nat. Org. for Women, Inc., v. State.</u>, 832 So. 2d 911 (2002); <u>Harper Companies, Inc. v. Scott, Royce, Harris, Bryan, Barra & Jorgensen, P.A.</u>, 656 So. 2d 627 (Fla. 4th DCA 1995); <u>Kapley v. Borchers</u>, 714 So. 2d. 1217 (Fla. 2d DCA 1998); <u>Kovach v. McLellan</u>, 564 So. 2d. 274 (Fla. 5th DCA 1990):

## <u>**CERTIFICATE OF SERVICE**</u>

**WE HEREBY CERTIFY** that a true and correct copy of the foregoing was served via email this October 31, 2024: to Manuel A. Garcia-Linares, Esquire (mgarcialinares@daypitney.com, edavila@daypitney.com) Andrew R. Ingalls, Esquire (aingalls@daypitney.com) Day Pitney LLP, 396 Alhambra Circle, North Tower – 14th Floor, Miami, Florida 33134; Kenneth B. Schurr, Esq., counselken@schurlaw.com.

> **Beighley, Myrick, Udell, Lynne & Zeichman PA**
> *Attorneys for Plaintiff*
> 2601 S. Bayshore Drive
> Suite 770
> Miami, FL 33133
> (305) 349-3930– Phone
> notice66@bmulaw.com (R 2.516 Designated E-mail)
>
> By:     */s/ Maury L. Udell, Esq._____*
>         Maury L. Udell, Esq.
>         Fla. Bar No. 121673
>         mudell@bmulaw.com

307 So.3d 844
District Court of Appeal of Florida, Third District.

Stevie HOWARD, Appellant,

v.

GREENWICH INSURANCE
COMPANY, Appellee.

No. 3D19-1922
|
Opinion filed September 9, 2020

**Synopsis**

**Background:** Pedestrian brought negligence action against retail store and store's liability insurer. Pedestrian and store reached settlement agreement. The Circuit Court, 11th Judicial Circuit, Miami-Dade County, Michael A. Hanzman, J., granted insurer's motion to dismiss and entered final judgment in favor of insurer. Pedestrian appealed.

**Holdings:** The District Court of Appeal, Hendon, J., held that:

[1] insurer was not entitled to dismissal of action, and

[2] trial court committed reversible error in treating insurer's motion to dismiss as motion for summary judgment.

Reversed and remanded.

West Headnotes (15)

**[1]** **Appeal and Error** 👉 De novo review

A trial court's ruling on a motion to dismiss is reviewed de novo because a motion to dismiss examines the legal sufficiency of the complaint, not factual determinations.

2 Cases that cite this headnote

**[2]** **Pretrial Procedure** 👉 Matters considered in general

**Summary Judgment** 👉 Motion to dismiss

Liability insurer was not entitled to dismissal of pedestrian's negligence action, even though pedestrian had made settlement agreement with retail store who was covered by policy with insurer, where settlement agreement was matter outside four corners of pedestrian's amended complaint against insurer, trial court transformed insurer's motion to dismiss into an un-articulated motion for summary judgment in considering insurer's affirmative defenses advanced in insurer's answer to complaint, complaint alleged pedestrian was entitled to coverage pursuant to medical benefits provision, and trial court did not address that issue or give pedestrian opportunity to further amend complaint in order to attach insurance policy containing provision.

**[3]** **Pretrial Procedure** 👉 Matters considered in general

In evaluating a motion to dismiss that alleges an action is barred by a previous adjudication where there is no reference in the complaint to the prior action and no stipulation that documents from the earlier claim can be considered, the court's analysis is restricted to the allegations of the complaint.

**[4]** **Pretrial Procedure** 👉 Matters considered in general

**Pretrial Procedure** 👉 Presumptions and burden of proof

**Pretrial Procedure** 👉 Well-pleaded facts

On a motion to dismiss, the trial court must confine its review to the four corners of the complaint, draw all inferences in favor of the pleader, and accept as true all well-pleaded allegations.

2 Cases that cite this headnote

**[5]** **Pretrial Procedure** 👉 Construction of pleadings

**Pretrial Procedure** 👉 Matters considered in general

On a motion to dismiss, the question for the trial court is simply whether, assuming all the allegations in the complaint to be true, the plaintiff would be entitled to the relief requested.

**[6]** **Appeal and Error** 🔑 Dismissal or nonsuit at trial

Where a motion to dismiss rests on facts outside the scope of the allegations contained in the complaint, the trial court commits reversible error in dismissing the complaint based on those extraneous matters.

**[7]** **Pretrial Procedure** 🔑 Other remedy, availability or prior use of

**Summary Judgment** 🔑 Form and Requisites

A motion to dismiss is not a substitute for a motion for summary judgment.

**[8]** **Limitation of Actions** 🔑 Motion

**Pretrial Procedure** 🔑 Particular defenses

Even a relatively straightforward affirmative defense, such as one based upon the statute of limitations, is not a basis for dismissal unless the complaint affirmatively and clearly shows the conclusive applicability of the defense.

**[9]** **Pretrial Procedure** 🔑 Affirmative Defenses, Raising by Motion to Dismiss

A motion to dismiss should not be granted on the basis of defenses unless the defenses appear on the face of the pleading.

**[10]** **Pretrial Procedure** 🔑 Affirmative Defenses, Raising by Motion to Dismiss

If the basis for an affirmative defense does not appear on the face of the complaint, those grounds cannot be determined by way of a motion to dismiss.

1 Case that cites this headnote

**[11]** **Pretrial Procedure** 🔑 Amendment or pleading over

A trial court should grant leave to amend, rather than dismiss a complaint with prejudice, unless a party has abused the privilege to amend, an amendment would prejudice the opposing party, or the complaint is clearly not amendable.

**[12]** **Pretrial Procedure** 🔑 Amendment or pleading over

If a pleader may be able to allege additional facts to supports its cause of action or support another cause of action under a different legal theory the pleader should be allowed to amend his complaint.

**[13]** **Appeal and Error** 🔑 Dismissal or nonsuit at trial

**Pretrial Procedure** 🔑 Motion and proceedings thereon

**Summary Judgment** 🔑 Motion to dismiss

Trial court committed reversible error in treating liability insurer's motion to dismiss as a motion for summary judgment in pedestrian's negligence action, where final judgment prematurely addressed merits of insurer's affirmative defenses, and by ruling on merits by way of motion to dismiss, trial court deprived pedestrian of opportunity to fully respond to insurer's affirmative defenses.

**[14]** **Pretrial Procedure** 🔑 Insufficiency in general

**Summary Judgment** 🔑 Purpose

A motion for summary judgment and a motion to dismiss have separate purposes; a motion to dismiss is customarily designed to test the legal sufficiency of a complaint to state a cause of action, not to determine issues of ultimate fact, while the function of a motion for summary judgment is to determine if the parties can offer sufficient proof to support the issues framed in their pleadings.

2 Cases that cite this headnote

[15]    **Insurance** 🔑 Persons covered

An individual can be both an omnibus insured
seeking first-party benefits under an insurance
contract and also be a third-party beneficiary
under the liability provisions of the coverage
when suing the tortfeasor; in the case of the
omnibus insured, the individual's rights are
derived directly from his status under a clause of
the insurance policy without regard to the issue
of liability, and if the individual fits within the
class he is entitled to first-party benefits.

**\*846** An Appeal from the Circuit Court for Miami-Dade
County, Michael A. Hanzman, Judge. Lower Tribunal No.
18-13796

**Attorneys and Law Firms**

Weinstein Law, P.A., and Morgan L. Weinstein (Fort
Lauderdale), for appellant.

Rissman, Barrett, Hurt, Donahue, McLain & Mangan, P.A.,
and Isaac R. Ruiz-Carus and Katherine Gannon (Tampa), for
appellee.

Before EMAS, C.J., and FERNANDEZ and HENDON, JJ.

**Opinion**

HENDON, J.

Stevie Howard ("Howard"), plaintiff below, appeals from
a final judgment in favor of Greenwich Insurance
Company ("Greenwich"). We reverse and remand for further
proceedings.

Facts

Howard was injured outside a T-Mobile/Metro PCS store
property. In April 2018 Howard filed a complaint alleging
several counts of negligence against T-Mobile USA d/
b/a MetroPCS ("T-Mobile"), and two other defendants.
T-Mobile was covered by a liability policy issued by
Greenwich. Howard filed his second amended complaint in

October 2018, adding for the first time one count against
Greenwich for breach of contract, alleging that he was a
third-party beneficiary of medical payment benefits as an
omnibus insured under the T-Mobile/Greenwich insurance
agreement.[1]

A month after filing his second amended complaint, Howard
filed a proposal for settlement with T-Mobile, which T-
Mobile accepted. In December 2018, Howard and T-
Mobile executed a release discharging T-Mobile stating that
payments for medical treatment rendered as a result of the
accident were covered in the settlement payment **\*847** made
by T-Mobile USA. Howard received payment, and in January
2019, the trial court rendered its order on a joint stipulation
dismissing the case with prejudice as to defendant T-Mobile
only.

In May 2019, Greenwich moved to dismiss count VII of
the second amended complaint, the sole count against it.
Greenwich argued in its motion to dismiss that the second
amended complaint failed to attach the insurance policy
and failed to state a cause of action by failing to allege a
duty. The trial court denied Greenwich's motion to dismiss
and ordered it to file an answer to the second amended
complaint. The court, in the same order, also required
Howard and Greenwich to file supplemental memoranda
of law discussing the medical payments provision of the
insurance policy and whether the second amended complaint
violated Florida's non-joinder statute, section 627.4136,
Florida Statutes (2019).[2]

Greenwich filed its answer, and both parties filed
supplemental legal memoranda on the issue of the
applicability of section 627.4136(1). Greenwich asserted
in its answer that Howard is not a beneficiary under the
insurance policy, and is barred from seeking recovery under
the medical payments provision of the insurance policy
because he was already compensated for his medical expenses
from the T-Mobile settlement agreement and release of
liability. Because Howard's settlement with T-Mobile did not
yet exist when Howard filed his second amended complaint,[3]
the trial court took judicial notice of those documents and
concluded that the settlement and release of all claims
against T-Mobile also extinguished Howard's claim against
Greenwich as a matter of law, relying on Rosen v. Fireman's
Fund Insurance Company, 189 So. 2d 395 (Fla. 3d DCA
1966). The trial court granted Greenwich's motion to dismiss
and entered final judgment in favor of Greenwich. Howard
appeals.

Standard of review

 **[1]** A trial court's ruling on a motion to dismiss is reviewed de novo because a motion to dismiss examines the legal sufficiency of the complaint, not factual determinations. Llanso v. WNF Law, P.L., 306 So.3d 221 (Fla. 3d DCA June 10, 2020); Brooke v. Shumaker, Loop & Kendrick, LLP, 828 So. 2d 1078, 1080 (Fla. 2d DCA 2002).

Discussion

 **[2]** **[3]** **[4]** **[5]** **[6]** Entry of the final judgment stemming from a pre-trial motion to dismiss that did not raise the issue on appeal as a basis for dismissal—let alone dismissal with prejudice—constitutes reversible error. The trial court's consideration of the settlement and release of T-Mobile was a **\*848** matter outside of the four corners of the second amended complaint, as those documents did not exist at the time the second amended complaint was filed. This court has followed the general rule that a court may not look beyond a complaint and its attachments to take judicial notice of a separate legal proceeding when ruling on a motion to dismiss. Llanso, 306 So.3d at 223 (holding the trial court was not permitted to consider or take judicial notice of matters outside of the complaint and attachments to which the motion to dismiss was directed); Papa John's Int'l, Inc. v. Cosentino, 916 So. 2d 977, 983 (Fla. 4th DCA 2005). Further, in evaluating a motion to dismiss that alleges an action is barred by a previous adjudication –or, as here, a settlement and release of claims–where there is no reference in the complaint to the prior action and no stipulation that documents from the earlier claim can be considered—the court's analysis is restricted to the allegations of the complaint. Newberry Square Fla. Laundromat, LLC v. Jim's Coin Laundry & Dry Cleaners, Inc., 296 So. 3d 584, 589 (Fla. 1st DCA 2020).[4]

 **[7]** The error was further compounded by the trial court considering Greenwich's affirmative defenses advanced in Greenwich's answer to the second amended complaint, which demanded trial by jury and raised both factual and legal issues – after the trial court had initially denied Greenwich's motion to dismiss. The court essentially transformed a motion to dismiss into an un-articulated motion for summary judgment where, as far as the appellate record shows, no motion for summary judgment had been made or argued by either Greenwich or Howard after Greenwich filed its answer. A

motion to dismiss is not a substitute for a motion for summary judgment. Consuegra v. Lloyd's Underwriters at London, 801 So. 2d 111, 112 (Fla. 2d DCA 2001); Fla. Farm Bureau Gen. Ins. Co. v. Ins. Co. of N. Am., 763 So. 2d 429, 432 (Fla. 5th DCA 2000) ("[a] motion to dismiss should not be used 'to determine issues of ultimate fact' and 'may not act as a substitute for summary judgment.' ") (citing Roberts v. Children's Med. Servs., 751 So. 2d 672, 673 (Fla. 2d DCA 2000).

 **[8]** **[9]** **[10]** As explained by the court in Newberry Square, "[e]ven a relatively straightforward affirmative defense, such as one based upon the statute of limitations, is not a basis for dismissal unless the complaint affirmatively and clearly shows the conclusive applicability of the defense." Id. (citation omitted). Or, stated differently, "[a] motion to dismiss should not be granted on the basis of ... defenses unless the ... defenses appear on the face of the pleading." Mettler, Inc. v. Ellen Tracy, Inc., 648 So. 2d 253, 255 (Fla. 2d DCA 1994) (alteration added). It follows then that if "the basis for [the affirmative defense] does not appear on the face of the complaint, those grounds cannot be determined by way of a motion to dismiss." **\*849** Garnac Grain Co. v. Mejia, 962 So. 2d 408, 410 (Fla. 4th DCA 2007); Attias v. Faroy Realty Co., 609 So. 2d 105 (Fla. 3d DCA 1992) (holding that an affirmative defense cannot be raised by a motion to dismiss if the motion requires the court to consider matters outside the four corners of the complaint); see also Williams v. Gaffin Indus. Servs., Inc., 88 So. 3d 1027, 1029 (Fla. 2d DCA 2012).

 **[11]** **[12]** In the case before us, the second amended complaint specifically alleged that the plaintiff was entitled to coverage pursuant to the medical benefits provision of the insurance contract issued by Greenwich. The trial court did not address that issue or give Howard an opportunity to further amend the complaint in order to attach the insurance policy containing the medical payment provision. As stated in Simonin v. Sims, 456 So. 2d 499, 500 (Fla. 4th DCA 1984),

> While dismissal of the complaint may have been appropriate for failure to state a cause of action due to certain unsupported allegations, we agree that the complaint should not have been dismissed with prejudice and that the appellant should have been given an opportunity to amend. The complaint need not anticipate affirmative defenses. The affirmative defense ... should not preclude the possibility of amendment of the appellant's complaint, especially in light of the liberality afforded in permitting amendments.

(emphasis added). Accordingly, "a trial court should grant leave to amend, rather than dismiss a complaint with prejudice, unless a party has abused the privilege to amend, an amendment would prejudice the opposing party, or the complaint is clearly not amendable." Fla. Nat'l Org. for Women, Inc. v. State, 832 So. 2d 911, 915 (Fla. 1st DCA 2002). If a pleader " 'may be able to allege additional facts to support its cause of action or support another cause of action under a different legal theory' [the pleader] should be allowed to amend [its] complaint." Id. (alterations added) (citation omitted).

**[13]** **[14]** **[15]** Finally, the final judgment prematurely addressed the merits, on a motion to dismiss, to conclude that the T-Mobile settlement operates to extinguish count VII against Greenwich, relying on Rosen v. Fireman's Fund Insurance Company, 189 So. 2d 395 (Fla. 3d DCA 1966). By ruling on the merits by way of a motion to dismiss, the trial court deprived Howard of the opportunity to fully respond to Greenwich's affirmative defenses.[5] It was error to treat Greenwich's motion to dismiss as one for summary judgment.[6] As explained in Behnam v. Zadeh, 132 So. 3d 951, 952 (Fla. 1st DCA 2014),

> [c]ounsel must remember that [a motion for summary judgment and a motion to dismiss have] separate

purpose[s] under our rules of civil procedure. A motion to dismiss is customarily designed to test the legal sufficiency of a complaint to **\*850** state a cause of action, not to determine issues of ultimate fact. The function of a motion for summary judgment is to determine if the parties can offer sufficient proof to support the issues framed in their pleadings.

(quoting Holland v. Anheuser Busch, Inc., 643 So.2d 621, 623–24 (Fla. 2d DCA 1994)); Baycon Indus., Inc. v. Shea, 714 So. 2d 1094, 1095 (Fla. 2d DCA 1998) (holding the trial court, by treating the proceedings as a summary judgment, both parties were deprived of traditional procedural opportunities provided by Florida Rule of Civil Procedure 1.510).

Because the trial court specifically declined to make any legal conclusions regarding applicability of the non-joinder statute, we do not address that issue. For the foregoing reasons, we reverse the trial court's final judgment and remand for further proceedings.

Reversed and remanded.

**All Citations**

307 So.3d 844, 45 Fla. L. Weekly D2108

**Footnotes**

1   See Maxwell v. S. Am. Fire Ins. Co., 235 So. 2d 768 (Fla. 3d DCA 1970) (holding that the medical payment coverage provision of a liability policy is separate and independent coverage from the bodily injury liability coverage).

2   Section 627.4136, Florida Statutes (2019), Nonjoinder of insurers, provides:

> (1) It shall be a condition precedent to the accrual or maintenance of a cause of action against a liability insurer by a person not an insured under the terms of the liability insurance contract that such person shall first obtain a settlement or verdict against a person who is an insured under the terms of such policy for a cause of action which is covered by such policy.

> (2) ... No person who is not an insured under the terms of a liability insurance policy shall have any interest in such policy, either as a third-party beneficiary or otherwise, prior to first obtaining a settlement or verdict against a person who is an insured under the terms of such policy for a cause of action which is covered by such policy.

3   Howard filed his second amended complaint on October 31, 2018. The final order of dismissal with prejudice as to Howard and MetroPCS was entered on January 22, 2019. Greenwich did not file its motion to dismiss count VII of the second amended complaint until May 3, 2019, and the trial court denied Greenwich's motion on June 5, 2019.

4   On a motion to dismiss, "the trial court must confine its review to the four corners of the complaint, draw all inferences in favor of the pleader, and accept as true all well-pleaded allegations." Sobi v. Fairfield Resorts, Inc., 846 So. 2d 1204, 1206 (Fla. 5th DCA 2003) (citation omitted). "The question for the trial court ... is simply whether, assuming all the allegations in the complaint to be true, the plaintiff would be entitled to the relief requested." Cintron v. Osmose Wood Preserving, Inc., 681 So. 2d 859, 861 (Fla. 5th DCA 1996). Thus, " '[w]here a motion to dismiss ... rests on facts outside the scope

**Howard v. Greenwich Insurance Company, 307 So.3d 844 (2020)**

45 Fla. L. Weekly D2108

of the allegations contained in the complaint, the trial court commits reversible error in dismissing the complaint based on those extraneous matters.' " Hewett-Kier Constr., Inc. v. Lemuel Ramos & Assocs., Inc., 775 So. 2d 373, 375 (Fla. 4th DCA 2000) (citation omitted).

5   As explained in State Farm Fire & Cas. Co. v. Kambara, 667 So. 2d 831, 833 (Fla. 4th DCA 1996),

An individual can be both an omnibus insured seeking first-party benefits under an insurance contract and also be a third-party beneficiary under the liability provisions of the coverage when suing the tortfeasor. In the case of the omnibus insured, the individual's rights are derived directly from his or her status under a clause of the insurance policy without regard to the issue of liability; if the individual fits within the class he or she is entitled to first-party benefits.

6   "Even if we were to treat the motion as a motion for summary judgment, the record is as yet insufficiently complete to support such a motion." Winter v. Miami Beach Healthcare Grp., Ltd., 917 So. 2d 973, 974–75 (Fla. 3d DCA 2005).

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

Obenschain v. Williams, 750 So.2d 771 (2000)

25 Fla. L. Weekly D469

750 So.2d 771
District Court of Appeal of Florida,
First District.

Jacqueline OBENSCHAIN and
Advocacy Center for Persons
With Disabilities, Inc., Appellants,

v.

Robert B. WILLIAMS, in his official capacity
as Administrator of the Florida State Hospital,
Gilbert Ferris, in his official capacity as an
employee of the State of Florida Department
of Children And Family Services, Cuong Ba
Nguyen, in his official capacity as an employee
of the State of Florida Department of Children
and Family Services, Kathleen Kearney,
in her official capacity as Secretary of the
State of Florida Department of Children and
Family Services, State of Florida Department
of Children and Family Services, Inc., and
Kenneth Kleier, in his capacity as the guardian
advocate of Jacqueline Obenschain, Appellees.

No. 1D99–1074.
|
Feb. 16, 2000.

**Synopsis**

Plaintiff filed civil rights action under § 1983 seeking declaratory and injunctive relief and petition for writ of habeas corpus. The Circuit Court, Gadsden County, Nikki Ann Clark, J., dismissed plaintiff's second amended complaint with prejudice, and plaintiff appealed. The District Court of Appeal, Browning, J., held that the circuit court abused its discretion in dismissing plaintiff's second amended complaint with prejudice.

Reversed.

**West Headnotes (6)**

**[1]** Pretrial Procedure 🔑 Insufficiency in General

Pretrial Procedure 🔑 Dismissal with or Without Prejudice

Dismissal of a complaint with prejudice is a severe sanction which should be granted only when the pleader has failed to state a cause of action, and it conclusively appears that there is no possible way to amend the complaint to state a cause of action.

7 Cases that cite this headnote

**[2]** Pleading 🔑 Amendment of Declaration, Complaint, Petition, or Statement

Pleader should be given an opportunity to amend a defective pleading.

**[3]** Pretrial Procedure 🔑 Availability of Relief Under Any State of Facts Provable

Pretrial Procedure 🔑 Dismissal with or Without Prejudice

A court should not dismiss a complaint with prejudice if it is actionable on any ground.

**[4]** Pretrial Procedure 🔑 Insufficiency in General

Pretrial Procedure 🔑 Dismissal with or Without Prejudice

Dismissal with prejudice is an abuse of discretion where a pleader may be able to allege additional facts to support its cause of action or support another cause of action under a different legal theory.

4 Cases that cite this headnote

**[5]** Pleading 🔑 Leave of Court to Amend

The opportunity to amend a complaint should be liberally given and should not be denied unless the privilege has been abused.

2 Cases that cite this headnote

[6]    **Pretrial Procedure**  👉  Insufficiency in General

**Pretrial Procedure**  👉  Dismissal with or Without Prejudice

Trial court abused its discretion in dismissing plaintiff's second amended complaint with prejudice; plaintiff's second amended complaint was the first indication that the pleaded causes of action under § 1983 and for habeas corpus relief were inadequate and facts pleaded demonstrated that plaintiff could amend her complaint to state causes of action.

2 Cases that cite this headnote

**Attorneys and Law Firms**

*773 Gordon B. Scott of Advocacy Center for Persons With Disabilities, Inc., and James Vernon Cook, Tallahassee, for Appellants.

Robert A. Butterworth, Attorney General, Jason Vail, Assistant Attorney General, Tallahassee, for Appellees.

**Opinion**

BROWNING, J.

Appellant, Jacqueline Obenschain, appeals the trial court's final order dismissing her second amended complaint with prejudice. Appellant argues the trial court erred both by holding that it lacked subject matter jurisdiction, and by dismissing her complaint with prejudice without leave to amend, for failure to state a cause of action. We agree with both arguments and reverse.

Appellant filed a civil rights action under 42 U.S.C. § 1983 seeking declaratory and injunctive relief, and a petition for writ of habeas corpus under the provisions of section 394.459(8)(b), Florida Statutes. Sections 26.012(2)(b) and 394.459(8)(b), Florida Statutes (1996), grant the trial court jurisdiction to hear Appellant's claims. Thus, the trial court erred in finding it lacked subject matter jurisdiction.

Appellant filed her complaint on August 8, 1997. Before service of the complaint on Appellees, Appellant filed an amended complaint, as a matter of right, pursuant to Florida Rule of Civil Procedure 1.190(a), in order to update factual allegations. The lower court dismissed the amended complaint without prejudice for lack of subject matter jurisdiction and failure to name a necessary party. Appellant filed a second amended complaint to include the necessary party. The trial court then dismissed Appellant's second amended complaint with prejudice and without leave to amend, for lack of subject matter jurisdiction, and for failure to state causes of action. In so doing, the trial court abused its discretion.

[1] [2] [3] [4] [5]    Dismissal of a complaint with prejudice is a severe sanction which should be granted only when the pleader has failed to state a cause of action, and it *773 conclusively appears that there is no possible way to amend the complaint to state a cause of action. *Madison County v. Foxx,* 636 So.2d 39, 51 (Fla. 1st DCA 1994); *Gowan v. Bay County,* 744 So.2d 1136 (Fla. 1st DCA 1999). Instead, the pleader should be given an opportunity to amend the defective pleading. *Gowan, supra.* A court should not dismiss a complaint with prejudice if it is actionable on any ground. *Wilson v. News–Press Publishing Co.,* 738 So.2d 1000 (Fla. 2d DCA 1999); *Dockery v. Florida Democratic Party,* 719 So.2d 9 (Fla. 2d DCA 1998). Dismissal with prejudice is an abuse of discretion where a pleader may be able to allege additional facts to support its cause of action or support another cause of action under a different legal theory. *Kapley v. Borchers,* 714 So.2d 1217 (Fla. 2d DCA 1998); *Harper Companies v. Scott, Royce, Harris, Bryan, Barra & Jorgensen, P.A.,* 656 So.2d 627 (Fla. 4th DCA 1995). The opportunity to amend a complaint should be liberally given and should not be denied unless the privilege has been abused. *Gowan, supra; Gladstone v. Smith,* 729 So.2d 1002, 1003 (Fla. 4th DCA 1999); *Gamma Dev. Corp. v. Steinberg,* 621 So.2d 718 (Fla. 4th DCA 1993).

[6]    Appellant did not abuse her privilege to amend her complaint. The dismissal of the second amended complaint with prejudice was the first indication that the pled causes of action were inadequate. Additionally, based on the facts pled in the second amended complaint, it appears Appellant could amend her complaint to state causes of action. Accordingly, the trial court abused its discretion by dismissing Appellant's second amended complaint with prejudice.

REVERSED.

**All Citations**

ALLEN and WEBSTER, JJ., CONCUR.

750 So.2d 771, 25 Fla. L. Weekly D469

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S.
Government Works.

832 So.2d 911
District Court of Appeal of Florida,
First District.

**FLORIDA NATIONAL ORGANIZATION
FOR WOMEN, INC.**; South Palm
Beach Chapter, National Organization
for Women, Inc.; Congregation L'Dor
Vador; Reverend Matthew Anderson;
and Charlotte Danciu, Esq., Appellants,

v.

**STATE** of Florida; and Fred Dickinson, in
his official capacity as Executive Director
of the Florida Department of Highway
Safety and Motor Vehicles, Appellees.

No. 1D01–4913.
|
Dec. 19, 2002.

**Synopsis**

Women's organization appealed order of the Circuit Court, Leon County, Nikki Ann Clark, J., dismissing amended complaint with prejudice in action challenging establishment of a "Choose Life" specialty automobile license plate. The District Court of Appeal, Browning, J., held that: (1) trial court abused its discretion in dismissing with prejudice counts containing multiple constitutional claims; (2) court erred in dismissing with prejudice counts failing to state a claim; and (3) court was entitled to dismiss with prejudice for failing to state a claim count alleging that act establishing "Choose Life" specialty automobile license plate violated organization's right to free speech.

Affirmed in part, reversed in part, and remanded.

West Headnotes (10)

**[1]** **Pretrial Procedure** 👈 Other actions
**Pretrial Procedure** 👈 Dismissal with or without prejudice

Trial court abused its discretion in dismissing with prejudice counts in women's organization's challenge to "Choose Life" specialty automobile license plate for containing multiple constitutional claims in violation of court's order; court failed to consider required factors to determine dismissal with prejudice was warranted, and organization offered a reasonable justification for its noncompliance, that multiple claims were included in the counts to comply with the trial court's direction to be concise. West's F.S.A. § 320.08058(30); West's F.S.A. RCP Rule 1.420(b).

4 Cases that cite this headnote

**[2]** **Appeal and Error** 👈 Discretion of lower court; abuse of discretion

The standard of review for dismissal with prejudice for failure to comply with the trial court's order, is abuse of discretion.

2 Cases that cite this headnote

**[3]** **Pretrial Procedure** 👈 Grounds in General

A trial court's dismissal of an action for failure to comport with its order is an involuntary dismissal. West's F.S.A. RCP Rule 1.420(b).

1 Case that cites this headnote

**[4]** **Pretrial Procedure** 👈 Amendment or pleading over

Trial court erred in dismissing with prejudice counts in women's organization's challenge to "Choose Life" specialty automobile license plate for failing to state a claim, without granting leave to amend; organization did not abuse privilege to amend, and there was no showing that an amendment would have prejudiced Department of Highway Safety and Motor Vehicles. West's F.S.A. RCP Rule 1.190(a).

8 Cases that cite this headnote

**[5]** **Appeal and Error** 👈 De novo review

The standard of review for dismissal for failure to state a claim is de novo.

**[6]** **Pretrial Procedure** 🔑 Amendment or
pleading over

A trial court should grant leave to amend, rather
than dismiss a complaint with prejudice, unless
a party has abused the privilege to amend, an
amendment would prejudice the opposing party,
or the complaint is clearly not amendable; even
if an amended complaint fails to state a cause of
action. West's F.S.A. RCP Rule 1.190(a).

18 Cases that cite this headnote

**[7]** **Pretrial Procedure** 🔑 Amendment or
pleading over

A party that may be able to allege additional facts
to support its cause of action or support another
cause of action under a different legal theory
should be allowed to amend a complaint. West's
F.S.A. RCP Rule 1.190(a).

3 Cases that cite this headnote

**[8]** **Pretrial Procedure** 🔑 Other actions

**Pretrial Procedure** 🔑 Amendment or
pleading over

Trial court was entitled to dismiss with prejudice
for failing to state a claim count alleging that act
establishing "Choose Life" specialty automobile
license plate violated women's organization's
right to free speech; because organization had
not applied for, and been denied, a pro-choice
plate, and had stated its intention not to do so,
organization could not amend the count to state
a viable claim as they lacked standing to do so.
U.S.C.A. Const.Amend. 1; West's F.S.A. RCP
Rule 1.190(a).

1 Case that cites this headnote

**[9]** **Pleading** 🔑 Sufficiency of amendment

Leave to amend a complaint may be denied
where the proposed amendment would be futile.

7 Cases that cite this headnote

**[10]** **Pretrial Procedure** 🔑 Insufficiency in
general

**Pretrial Procedure** 🔑 Dismissal with or
without prejudice

Dismissal of a complaint with prejudice should
only be granted when the pleader has failed to
state a cause of action and it conclusively appears
there is no possible way to amend the complaint
to state a cause of action.

7 Cases that cite this headnote

## Attorneys and Law Firms

**\*913** Barry Silver, Boca Raton, for Appellants.

James J. Dean of Messer, Caparello & Self, P.A., Tallahassee,
for Appellees.

## Opinion

BROWNING, J.

Appellants appeal a trial court order dismissing their Second
Amended Complaint with prejudice. Appellants argue that
the trial court should have permitted them an opportunity to
amend. We affirm the trial court's dismissal of Count II with
prejudice. However, we reverse as to Counts I, III, IV, and V,
and remand for the trial court to grant leave to amend.

Appellants challenge the constitutionality of one of Florida's
specialty license plates, which reads "Choose Life" across
the top and "Florida" across the bottom. § 320.08058(30),
Fla. Stat. (1999). The law creating this plate was enacted as
chapter 99–301, Laws of Florida (the Act), effective July 1,
1999. On December 6, 1999, Appellants sought a declaratory
judgment and temporary and permanent injunction alleging
that the Act creating the Choose Life plate is unconstitutional
because it violates Article I, Section 3, otherwise known as
the Establishment Clause, of the Florida Constitution.

Appellants filed an amended complaint on December 13,
1999, alleging that the Act also violates Article I, Section 23
of the Florida Constitution, which provides a right of privacy
to the citizens of Florida. Appellees filed an answer without
seeking dismissal but put forth four affirmative defenses,
including improper venue, failure to state a cause of action,

lack of ripeness, and lack of standing. Subsequently, the case was transferred to Leon County.

Appellants moved for leave to file a Second Amended Complaint the day before the injunction hearing, which was scheduled for March 1, 2001. The proposed Second Amended Complaint contained a free speech claim, among others. At the hearing, Appellants attempted to make these additional arguments as a basis for injunctive relief. The trial court denied the injunction but granted leave for Appellants to file a Second Amended Complaint. However, the court stipulated that "[t]he Second Amended Complaint shall allege the facts concisely in the statement of claim in separate, consecutively numbered paragraphs. The theories under which the plaintiffs claim relief, including the particular constitutional challenges, shall be divided into separate counts for each alleged constitutional violation of the statutes in question."

The Second Amended Complaint was filed and alleged violations of the Establishment Clause in Count I, the right to free speech in Count II, several challenges to the Act's funding mechanism in Count III, the right to privacy in Count IV, and the rights to equal protection and due process in Count V. As remedies, Appellants sought an injunction prohibiting further implementation of the Act and a mandatory injunction requiring the Department of Highway Safety and Motor Vehicles to recall all Choose Life plates already issued. Appellees moved to dismiss, and a hearing was held. The trial court granted the motion and dismissed **\*914** the entire complaint with prejudice, finding that Counts III and V contain multiple constitutional claims in violation of the requirements listed in the trial court's order. Further, the trial court found that Counts I, II, and IV fail to state a cause of action.

**[1]  [2]**  The standard of review as to Counts III and V, dismissed with prejudice for failure to comply with the trial court's order, is abuse of discretion. *Zaccaria v. Russell,* 700 So.2d 187, 187–88 (Fla. 4th DCA 1997). We hold that the trial court abused its discretion in dismissing these counts with prejudice.

**[3]**  A trial court's dismissal of an action for failure to comport with its order is an involuntary dismissal under Florida Rule of Civil Procedure 1.420(b). That rule explicitly states that

[u]nless the court in its order for dismissal otherwise specifies, a dismissal under this subdivision and any dismissal not provided for in this rule, other than a

dismissal for lack of jurisdiction or for improper venue or for lack of an indispensable party, operates as an adjudication on the merits.

Fla. R. Civ. P. 1.420(b). This indicates that such a dismissal would be with prejudice, because the merits of the issue would have been ruled upon; older case law supports this interpretation. *See, e.g., Clifford Ragsdale, Inc. v. Morganti, Inc.,* 356 So.2d 1321 (Fla. 4th DCA 1978). However, recent case law holds that a trial court should not dismiss an action with prejudice under rule 1.420(b) for failure to comply with court orders unless certain factors are met. *See, e.g., Town of Manalapan v. Florida Power & Light Co.,* 815 So.2d 670 (Fla. 4th DCA 2002).

In *Manalapan,* the court explained that not every failure to comply with a court order will justify dismissal under rule 1.420. *Id.* at 672. The Fourth District applied factors outlined in *Kozel v. Ostendorf,* 629 So.2d 817 (Fla.1993), to reverse the trial court's dismissal of the plaintiff's claim. In doing so, the court distinguished cases that would support affirmance, such as *Clifford Ragsdale,* on the ground that they were decided before *Kozel.* Therefore, the *Kozel* factors should be applied to the trial court's exercise of discretion in the instant case.

In *Kozel,* the supreme court stated that trial courts should consider the following factors in determining whether dismissal with prejudice is warranted:

1) whether the attorney's disobedience was willful, deliberate, or contumacious, rather than an act of neglect or inexperience; 2) whether the attorney has been previously sanctioned; 3) whether the client was personally involved in the act of disobedience; 4) whether the delay prejudiced the opposing party through undue expense, loss of evidence, or in some other fashion; 5) whether the attorney offered reasonable justification for noncompliance; and 6) whether the delay created significant problems of judicial administration.

*Id.* at 818. There is no indication that the trial court in this case considered these factors, as it failed to make the required findings in its order. Further, it appears that the factors are not met in the instant case. Appellants' attorney offered a reasonable justification for their noncompliance; specifically, multiple claims were included in the counts to comply with the trial court's direction to be concise. It is apparent from the record that counsel has not been previously sanctioned and the client was not personally involved in drafting the Second Amended Complaint. There is no indication in the record that Appellees or the court were prejudiced by any delay in the filing of the Second Amended Complaint. Because the

trial court failed to consider the *Kozel* factors, **\*915** and the application of these factors indicates that Counts III and V should not have been dismissed, the trial court abused its discretion in dismissing those counts.

[4]   [5]   The trial court also erred in dismissing with prejudice Counts I and IV for failure to state a claim. Although Appellee's motion to dismiss specifically alleged that Counts II and IV failed to state a cause of action, the motion did not make such an allegation as to Count I. In any event, neither Counts I or IV should have been dismissed without leave to amend. The standard of review for dismissal for failure to state a claim is *de novo. W.R. Townsend Contracting, Inc. v. Jensen Civil Constr., Inc.,* 728 So.2d 297, 300 (Fla. 1st DCA 1999).

[6]   [7]   Leave to amend a complaint "shall be given freely when justice so requires." Fla. R. Civ. P. 1.190(a). Thus, a trial court should grant leave to amend, rather than dismiss a complaint with prejudice, unless a party has abused the privilege to amend, an amendment would prejudice the opposing party, or the complaint is clearly not amendable. *E.g., Bill Williams Air Conditioning & Heating, Inc. v. Haymarket Coop. Bank,* 592 So.2d 302, 305 (Fla. 1st DCA 1991). This is true even if an amended complaint fails to state a cause of action. *Bouldin v. Okaloosa County,* 580 So.2d 205 (Fla. 1st DCA 1991). Further, a party that "may be able to allege additional facts to support its cause of action or support another cause of action under a different legal theory" should be allowed to amend a complaint. *Obenschain v. Williams,* 750 So.2d 771, 773 (Fla. 1st DCA 2000).

Appellants have not abused their privilege to amend, and there is no showing that an amendment would prejudice Appellees. The trial court gave Appellants one opportunity to amend the complaint after an answer had been filed; however, Appellants were given no opportunity to amend after the motion to dismiss had been granted. Thus, the trial court should not have dismissed with prejudice Counts I and IV.

[8]   [9]   [10]   Count II was also dismissed for failure to state a cause of action, and the above analysis would apply.

However, leave to amend may be denied "where the proposed amendment would be futile." *Marchi v. Board of Coop. Educ. Servs. of Albany,* 173 F.3d 469, 478 (2d Cir.1999). "Dismissal of a complaint with prejudice should only be granted when the pleader has failed to state a cause of action and it conclusively appears there is no possible way to amend the complaint to state a cause of action." *Undereducated Foster Children of Fla. v. Florida Senate,* 700 So.2d 66, 67 (Fla. 1st DCA 1997). Appellants allege that their right to free speech has been violated by the mere existence of the Choose Life plate. As the trial court explained in dismissing Count II, "the facts alleged do not show that any of the plaintiffs have attempted any expression and been denied access to the alleged forum for speech, or that the statutes at issue have hindered or curtailed any plaintiff's speech in any way." Because Appellants have not applied for, and been denied, a pro-choice plate, and have stated their intention not to do so, they cannot amend the count to state a viable claim as they lack standing to do so. *See* Hildreth v. Dickinson, 1999 U.S. Dist. LEXIS 22503 (M.D.Fla.1999). This justification for dismissing Count II is supported by the record, so there is no need to remand. *See Abramson v. Gonzalez,* 949 F.2d 1567, 1581 (11th Cir.1992).

The trial court did not specifically rely on the futility exception as a basis for dismissing Count II with prejudice. However, we have the power to affirm a trial court's ruling on any alternate basis. *Farrey's Wholesale Hardware Co., Inc. v.* **\*916** *Hobesound Indus. Park, Inc.,* 719 So.2d 374, 375 (Fla. 3d DCA 1998). Accordingly, we affirm the trial court's dismissal of Claim II with prejudice.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED with instructions.

ERVIN and KAHN, JJ. CONCUR.

**All Citations**

832 So.2d 911, 28 Fla. L. Weekly D21

---

**End of Document** © 2024 Thomson Reuters. No claim to original U.S. Government Works.

20 Fla. L. Weekly D1549

656 So.2d 627

District Court of Appeal of Florida, Fourth District.

HARPER COMPANIES, INC., d/b/a

Minka, a Florida corporation, and Mary

Lee Harper, Individually, Appellants,

v.

SCOTT, ROYCE, HARRIS, BRYAN,

BARRA & JORGENSEN, P.A., a Florida

Professional Association, and John M.

Jorgensen, Individually, Via Mizner Associates

Limited Partnership, a Delaware Limited

Partnership, by and through its General

Partner, Via Mizner of Worth Avenue, Inc.,

and Ian Kean, Individually, Appellees.

No. 94–1293
|
July 5, 1995.

**Synopsis**

Operators of consignment store brought action against judgment creditor, its agent, its attorney, and attorney's law firm, alleging wrongful execution and seizure of property, and intentional infliction of emotional distress. The Circuit Court, Palm Beach County, James Stewart, Jr., J., dismissed wrongful execution count with leave to amend as to judgment creditor, but dismissed count with prejudice as to other defendants, and dismissed emotional distress claim with prejudice as to both creditor and its agent. Operators appealed. The District Court of Appeal, Stevenson, J., held that: (1) activities complained of could not rise to level of being so extreme or outrageous as to permit claim for intentional infliction of emotional distress; (2) operators failed to state claim for wrongful execution and seizure; and (3) trial court abused its discretion in dismissing wrongful execution claims with prejudice.

Affirmed in part and reversed in part.

West Headnotes (4)

**[1]    Infliction of Emotional Distress** 🔑 **Debt collection practices**

Activities of judgment creditor and its agent in sending written instructions to sheriff to levy on all property found in custody of operators of consignment store and, specifically, property held at certain leased warehouse could not rise to level of being so extreme or outrageous as to permit claim for intentional infliction of emotional distress, even though operators maintained that defendants knew beforehand that property to be seized was not subject to levy or execution but was held by operators on consignment for others and was not owned by judgment debtor, and that defendants' true intentions were to harass operators and confiscate their inventory prior to beginning of "season" so that their business would be destroyed and their reputation ruined.

1 Case that cites this headnote

**[2]    Creditors' Remedies** 🔑 **Wrongful execution**

Operators of consignment store failed to state claim against judgment creditor, its agent, its attorney, and attorney's law firm for wrongful execution and seizure of property, even though operators alleged that defendant sent written instructions to sheriff to levy on all property found in their custody and, specifically, property held at certain leased warehouse, that defendants knew beforehand that property to be seized was not subject to levy or execution but was held by operators on consignment from others and was not owned by judgment debtor, and that defendants' true intentions were simply to harass operators and confiscate their inventory prior to beginning of "season" so that their business would be destroyed and their reputation ruined.

**[3]    Creditors' Remedies** 🔑 **Pleading**

Trial court abused its discretion in dismissing with prejudice claims by operators of

Harper Companies, Inc. v. Scott, Royce, Harris, Bryan, Barra..., 656 So.2d 627 (1995)

20 Fla. L. Weekly D1549

consignment store against judgment creditor's agent, creditor's attorney, and attorney's law firm for wrongful execution and seizure of property; based on allegations contained in second amended complaint, operator should have been given another opportunity to attempt to state properly cognizable cause of action.

3 Cases that cite this headnote

**[4]** **Pretrial Procedure** 👉 Dismissal with or without prejudice

When party may be able to allege additional facts to support its cause of action or even to support another cause of action based on different legal theory, dismissal with prejudice is abuse of discretion.

5 Cases that cite this headnote

**Attorneys and Law Firms**

**\*628** Brian Guralnick of David G. Eaton, P.A., West Palm Beach, for appellants.

Ronald C. Kopplow and Rebecca G. Tanner of Kopplow & Flynn, P.A., Miami, for appellees-Scott, Royce, Harris, Bryan, Barra & Jorgensen, P.A.

Jennifer S. Carroll of Metzger, Sonneborn & Rutter, P.A., West Palm Beach, for appellee-Ian Kean.

**Opinion**

STEVENSON, Judge.

This is an appeal from a final order of the trial court dismissing with prejudice appellants' second amended complaint. Because we determine that appellants should have been given at least one more opportunity to state a cause of action on one of the counts dismissed, we reverse in part and affirm in part.

Appellants, Harper Companies, Inc. and Mary Lee Harper, operate a consignment store on Worth Avenue in Palm Beach. This action arises from a sheriff's levy of personal property in appellants' custody which included contemporary and antique furnishings and accessories. The writ of execution was obtained in connection with a final judgment for eviction

and unpaid lease payments entered against Harper Galleries, Inc. (apparently, a **\*629** predecessor corporation to Harper Companies, Inc.).

In summary, appellants allege that appellees—the judgment creditor, its agent and its attorneys—acting in concert, sent written instructions to the sheriff to levy on all property found in the custody of appellants and specifically, property held at a certain leased warehouse. The complaint maintained that all of the appellees knew beforehand that the property which was going to be seized was not properly subject to levy or execution, but was held by appellants on consignment from others and was not owned by the judgment debtor, Harper Galleries, Inc. The complaint charges that the appellees' true intentions in giving the sheriff instructions to levy the property was simply to harass appellants and confiscate appellants' inventory prior to the "season" beginning in Palm Beach so that appellants' consignment store business would be destroyed and their reputation ruined.

Appellants, in count one of their second amended complaint, brought a claim for wrongful execution and seizure of property against Via Mizner Associates Limited Partnership ("Via Mizner"), the judgment creditor; Ian Kean, Via Mizner's agent; John M. Jorgensen, the attorney for Via Mizner; and Scott, Royce, Harris, Bryan, Barra & Jorgensen, P.A., (hereinafter "Scott, Royce") the law firm representing Via Mizner. In count two appellants brought a claim for intentional infliction of emotional distress against Via Mizner and Ian Kean. The trial court dismissed count one with leave to amend as to Via Mizner, but dismissed the count with prejudice as to Kean, John Jorgensen, and Scott, Royce. The trial court dismissed count two with prejudice as to both Via Mizner and Kean.

**[1]** We affirm the dismissal of count two with prejudice because we agree with the trial court that the activities complained of could not rise to the level of being so extreme or outrageous as to permit a claim for intentional infliction of emotional distress. For a general discussion concerning the tort of intentional infliction of emotional distress, as it exists in Florida, *see* Metropolitan Life Ins. Co. v. McCarson, 467 So.2d 277 (Fla.1985).

**[2]** **[3]** **[4]** We also agree that the trial court was correct in dismissing count one. However, we find that the trial court abused its discretion in dismissing the claims with prejudice. It is well-settled that where a party may be able to allege additional facts to support its cause of action or even to

Harper Companies, Inc. v. Scott, Royce, Harris, Bryan, Barra..., 656 So.2d 627 (1995)

20 Fla. L. Weekly D1549

support another cause of action based on a different legal theory, dismissal with prejudice is an abuse of discretion. *See generally, Kovach v. McLellan,* 564 So.2d 274 (Fla. 5th DCA 1990); *Delia & Wilson, Inc. v. Wilson,* 448 So.2d 621 (Fla. 4th DCA 1984). Based on the allegations contained in the second amended complaint, appellants should have been given another opportunity to attempt to state a properly cognizable cause of action. We note that appellants' factual allegations sound more in abuse of process than wrongful execution—a comment we make more for the benefit of the trial judge than appellants.

Affirmed in part and reversed in part.

WARNER and KLEIN, JJ., concur.

**All Citations**

656 So.2d 627, 20 Fla. L. Weekly D1549

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

 © 2024 Thomson Reuters. No claim to original U.S. Government Works.

714 So.2d 1217
District Court of Appeal of Florida,
Second District.

Kenneth KAPLEY, D.D.S., M.S.D., Appellant,

v.

John M. BORCHERS, individually, Appellee.

No. 97–03723.
|
Aug. 12, 1998.

**Synopsis**

Plaintiff sued corporate defendants engaged in dentistry and individual dentist in connection with contract. Defendants moved to dismiss. The Circuit Court, Sarasota County, Robert B. Bennett, Jr., J., granted dismissal against corporate defendants allowing time to amend complaint and granted individual defendant's motion to dismiss with prejudice. Plaintiff appealed. The District Court of Appeal, Campbell, Acting C.J., held that dismissal of complaint with prejudice against individual defendant was an abuse of discretion absent showing that cause of action could never be alleged against defendant individually.

Reversed and remanded.

West Headnotes (3)

**[1]**   **Pretrial Procedure** 🗝 Dismissal with or Without Prejudice

While it may have been proper to dismiss complaint against individual defendant for failure to state cause of action, trial court abused its discretion in dismissing action with prejudice as it was not clear from record that cause of action could never be alleged against the defendant individually.

17 Cases that cite this headnote

**[2]**   **Pretrial Procedure** 🗝 Amendment or Pleading Over

Dismissal with prejudice should not be ordered without giving party offering the pleading an opportunity to amend unless it appears that privilege to amend has been abused or that it is clear that pleading cannot be amended to state a cause of action.

14 Cases that cite this headnote

**[3]**   **Pretrial Procedure** 🗝 Dismissal with or Without Prejudice

Dismissal with prejudice is an abuse of discretion where party may be able to allege additional facts to support its cause of action or to support another cause of action based on a different legal theory.

10 Cases that cite this headnote

**Attorneys and Law Firms**

*1217 Susan J. Silverman, Sarasota, for Appellant.

Francis R. Lakel, Tampa, for Appellee.

**Opinion**

CAMPBELL, Acting Chief Judge.

Appellant challenges the trial court order dismissing with prejudice his complaint against appellee. Because we conclude that appellant should have been given an opportunity to amend his complaint to attempt to state a cause of action against appellee individually, we reverse.

Appellant filed a three-count complaint against five corporate defendants engaged in the practice of dentistry under the name of "Gentle Dental Care" and against appellee individually alleging that appellee controlled the Gentle Dental Care defendants and executed the contract sued upon. The Gentle Dental Care defendants, who are not parties to this appeal, filed motions to dismiss, alleging that appellant failed to state a cause of action against them because the only parties to the contract were appellant and the independent corporation, Gentle Dental Orthodontics, Inc. Appellant alleged in his complaint that Gentle Dental Orthodontics was *1218 the agent of, and interrelated with, all the corporate defendants. After a hearing which was not transcribed, the trial court granted the Gentle Dental defendants' motion to dismiss, but allowed appellant twenty days to amend his

Kapley v. Borchers, 714 So.2d 1217 (1998)

23 Fla. L. Weekly D1904

complaint against them. The trial court granted appellee's motion to dismiss with prejudice the complaint against him individually. This appeal followed.

**[1] [2] [3]** After a review of the record, we conclude that the trial court abused its discretion in dismissing the complaint with prejudice against appellee individually. A dismissal with prejudice should not be ordered without giving the party offering the pleading an opportunity to amend unless it appears that the privilege to amend has been abused or it is clear that the pleading cannot be amended to state a cause of action. *See Countryside Christian Center, Inc. v. City of Clearwater,* 542 So.2d 1037 (Fla. 2d DCA 1989); *Central Florida Inv., Inc. v. Levin,* 659 So.2d 492 (Fla. 5th DCA 1995). Where a party may be able to allege additional facts to support its cause of action or to support another cause of action based on a different legal theory, dismissal with prejudice is an abuse of discretion. *See Harper Companies v.*

*Scott, Royce, Harris, Bryan, Barra, & Jorgensen, P.A.,* 656 So.2d 627 (Fla. 4th DCA 1995); *Kovach v. McLellan,* 564 So.2d 274 (Fla. 5th DCA 1990). While it may have been proper to dismiss the complaint against appellee individually for failure to state a cause of action, we conclude it was an abuse of discretion to do so with prejudice since it was not clear from the record that a cause of action could never be alleged against appellee individually. Appellant should have therefore been given an opportunity to amend.

Reversed and remanded with directions.

FULMER and NORTHCUTT, JJ., concur.

**All Citations**

714 So.2d 1217, 23 Fla. L. Weekly D1904

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

564 So.2d 274
District Court of Appeal of Florida,
Fifth District.

Yvonne R. KOVACH, Appellant,

v.

William C. McLELLAN, et al., Appellees.

No. 89–131.
|
July 26, 1990.

**Synopsis**

Action was brought to foreclose residential mortgage. The Circuit Court, Brevard County, J. William Woodson, J., dismissed mortgagors' counterclaim and granted summary judgment for mortgagees. On appeal, the District Court of Appeal, Peterson, J., held that record was insufficient to determine whether dismissal of counterclaim with prejudice was abuse of discretion.

Judgment vacated; reversed and remanded.

W. Sharp, J., concurred in part and dissented in part and filed opinion.

West Headnotes (5)

**[1]    Pretrial Procedure**  ⚷  **Order in general**

While no rules of civil procedure require that grounds for dismissal with prejudice be stated, it is better practice to do.

1 Case that cites this headnote

**[2]    Pretrial Procedure**  ⚷  **Dismissal with or without prejudice**

Unless it appears that privilege to amend has been abused or that complaint is clearly untenable, it is abuse of discretion to dismiss complaint with prejudice; this rule continues even where opportunity to amend was previously granted.

7 Cases that cite this headnote

**[3]    Pretrial Procedure**  ⚷  **Dismissal with or without prejudice**

Where party may be able to allege additional facts, or ultimate facts alleged may support relief based upon another theory, dismissal with prejudice is abuse of discretion.

5 Cases that cite this headnote

**[4]    Appeal and Error**  ⚷  **Relief from dismissal or nonsuit**

Dismissal of amended counterclaim with prejudice would be set aside where reviewing court was unable to determine grounds for dismissal and could not determine with certainty that counterclaimant was unable to allege further facts or alternative theory.

**[5]    Fraud**  ⚷  **Duty to disclose facts**

Rule requiring seller of used home to disclose latent defects was not applicable to former seller who was not in privity with current purchaser, though purchaser gave former seller mortgage in exchange for financing, absent any fiduciary, special or long-standing relationship between purchaser and former sellers as lenders, or act of participation by former sellers in sale to current purchasers.

7 Cases that cite this headnote

**Attorneys and Law Firms**

**\*275**  Richard A. Manzo and Roy A. Praver of Manzo & Praver, P.A., Titusville, for appellant.

Stanley R. Andrews, Titusville, for appellees.

**Opinion**

PETERSON, Judge.

Yvonne R. Kovach appeals the summary final judgment of foreclosure in favor of appellees, William and Nancy

McLellan, and the dismissal with prejudice of her amended counterclaim. We vacate the summary final judgment and reverse the dismissal with prejudice of the counterclaim.

The McLellans alleged non-payment of installments and failure to insure the security as grounds for their action to foreclose a mortgage granted by Kovach. Kovach generally denied the allegations and affirmatively alleged waiver, estoppel, fraud, and failure of consideration. In her counterclaim, Kovach sought damages for fraud and to set aside the mortgage on the grounds of fraud, misrepresentation, and want or failure of consideration. Kovach alleged that she purchased a single-family residence from the McLellans' daughter and son-in-law, the Aldermans; that at the time of purchase she delivered a note and mortgage on the property in favor of the McLellans; that the McLellans had participated in improper construction of improvements on the property; that two years and three months prior to this purchase the McLellans sold the residence to the Aldermans and accepted a purchase money mortgage that was replaced by Kovach's mortgage; and that, sometime after the purchase, Kovach discovered latent defects that rendered the property uninhabitable.

**[1]**   The McLellans' motion to dismiss Kovach's first counterclaim was heard on November 3, 1988. The trial court dismissed the counterclaim, allowing Kovach until November 14, 1988, to file an amendment. The order was filed on November 22, 1988, and dated by handwritten entry that is difficult to decipher but appears to be "the 18th day of March, 1988," although, logically, it was probably dated November 18, 1988. Kovach then served an amended counterclaim and third party claim on November 30, 1988. The McLellans countered with a motion to dismiss, alleging that the amended counterclaim was tardy, failed to state a cause of action, and merely repeated the allegations contained in the first counterclaim. A hearing on this motion on December 14, 1988, resulted in an order dismissing the amended counterclaim with prejudice. This time, the order was signed and filed on December 14. The order does not state any grounds for the dismissal with prejudice.[1]

**\*276**   **[2]**   **[3]**   **[4]**   The absence of stated grounds for the dismissal with prejudice is especially critical in this case because of the confusion of dates. It appears that the first order allowing amendment was not signed or filed until after the time it allowed for filing the amended counterclaim.[2] Additionally, dismissal with prejudice is contrary to the rule of liberality in the amending of pleadings so as to reach

the merits of the case. Fla.R.Civ.P. 1.190; *and see, e.g., Downtown Investments, Ltd. v. Segall,* 551 So.2d 561 (Fla. 3d DCA 1989); *Dingess v. Fla. Aircraft Sales & Leasing, Inc.,* 442 So.2d 431 (Fla. 5th DCA 1983). Unless it appears that the privilege to amend has been abused or that the complaint is clearly untenable, it is an abuse of discretion to dismiss a complaint with prejudice. *See generally Hamide v. State Dep't of Corrections,* 548 So.2d 877 (Fla. 1st DCA 1989); *Countryside Christian Center, Inc. v. City of Clearwater,* 542 So.2d 1037 (Fla. 2d DCA 1989); *Crews v. Ellis,* 531 So.2d 1372 (Fla. 1st DCA 1988); *Delia & Wilson, Inc. v. Wilson,* 448 So.2d 621 (Fla. 4th DCA 1984). This rule continues even where an opportunity to amend was previously granted. *See, e.g., Crews, supra; Gerentine v. Coastal Security Systems,* 529 So.2d 1191 (Fla. 5th DCA 1988). Therefore, where a party may be able to allege additional facts, as in *Crews,* or where the ultimate facts alleged may support relief based upon another theory, such as in *Roger Rankin Enterprises v. Green,* 433 So.2d 1248 (Fla. 3d DCA 1983), dismissal with prejudice is an abuse of discretion. Since we are unable to determine the grounds for the dismissal with prejudice and since we cannot determine with certainty that Kovach is unable to allege further facts or an alternative theory, we must set aside the order dismissing with prejudice Kovach's amended counterclaim.

While the motion for summary judgment of foreclosure is not affected by the confusion of dates and while all procedural rules were followed, the counterclaim included a count to set aside the mortgage, and that counterclaim was improperly dismissed with prejudice. Therefore, the judgment must be vacated until resolution of the counterclaim. Because of the unique nature of the position of the McLellans as lender and former owner, we feel obliged to guide the trial court in its subsequent proceedings.

Kovach opposed the motion for summary judgment through her affirmative defenses, alleging without detail waiver, estoppel, fraud, and failure of consideration. She attempted to support those defenses through factual contentions set forth in an affidavit in opposition to the McLellans' motion for summary judgment. The affidavit indicated that the McLellans took an active role in the sale of the property; that they agreed to allow Kovach to assume a mortgage held by them on the property;[3] that the Aldermans were their daughter and son-in-law; that they knew Kovach would use the property as her residence; that when they previously owned the property they performed numerous repairs and construction on the property in a negligent and

unworkmanlike manner without compliance with applicable building codes; that the repairs and defects were of a nature which could not have been reasonably discovered by Kovach; and that the McLellans failed to disclose numerous defects. Attached to the affidavit were copies of a **\*277** September 8, 1988, notice from Brevard County to vacate the premises until the septic system was connected, and a typed letter from an individual. This individual, alleged in Kovach's affidavit to be a licensed contractor, indicated that, in his casual inspection of the premises, he had found many structural irregularities and code violations and that he was certain normal inspections such as plumbing, electrical, roofing, termite, and heating had not been done. The identity of the person who would have made these inspections and when they should have been performed are not disclosed. Also conspicuously absent from the affidavit is a detailed description of any particular latent defect, except for the septic system which, upon correction, would have eliminated the Brevard County vacate order, or any statement that the McLellans repaired or participated in the construction of the septic system requiring correction or were aware of a problem connected with it. Both of the attachments to Kovach's affidavit indicate they were obtained after the foreclosure was initiated and one year and eight months after Kovach granted the mortgage.

 **[5]** The McLellans' liability for nondisclosure of defects as individual lender and former owner of the property presents an issue that we have been unable to locate in previous appellate decisions. Kovach and the McLellans are in privity as lender and borrower, but they are not in privity in their respective capacities as buyer and remote seller. Because of the absence of privity between them as buyer and seller, the rule of law pronounced in *Johnson v. Davis,* 480 So.2d 625 (Fla.1985), does not apply. In *Johnson,* our supreme court held that, when the seller of a used home knows of defects materially affecting the value of property which are not readily observable and are not known to the buyer, the seller is under a duty to disclose them to the buyer. *Johnson* may have application to Kovach and the Aldermans as current buyer and seller who are in privity with each other, but not to Kovach and the McLellans as current purchaser/former seller. *Johnson* did not involve lender liability for failure to disclose, and we are unwilling to expand the rule established in that case in the absence of any affirmative representations of any fiduciary, special, or longstanding relationship between Kovach and the McLellans as lenders.

Also absent from Kovach's answer and affidavit is any allegation that she relied upon an affirmative representation or

expertise of the McLellans to her detriment. *S.H. Investment & Development v. Kincaid,* 495 So.2d 768 (Fla. 5th DCA 1986), *rev. denied,* 504 So.2d 767 (Fla.1987), is cited by Kovach to establish the essential elements for an action based upon fraud. The first element, which requires a false statement concerning a material fact, is absent in the instant case. *Ramel v. Chasebrook Construction,* 135 So.2d 876 (Fla. 2d DCA 1961), is cited for the rule that nondisclosure of a material fact may be deemed fraudulent where the other party does not have equal opportunity to become apprised of the fact. However, that case involved a construction company's failure to advise its buyer that the home built by the company for its customer was erected without pilings on muck when affirmative representations were made that the house was well constructed.

Kovach's affidavit opposing the motion for summary judgment shows at most that the McLellans' participation in the Aldermans' sale to Kovach was that the McLellans "agreed to allow [Kovach] to assume [the] mortgage." This allegation and the other sketchy recitations in the affidavit are not enough to support her affirmative defenses. To hold a lender responsible for damages such as these, there must be allegations of ultimate facts that would indicate active participation in the sale of the residence or the existence of a special relationship between the lender and the borrower. We are cognizant of the special relationship that exists here between the *seller* and the *lender,* but Kovach knew of this relationship at the time she purchased the house and granted the mortgage. No allegation was made that the McLellans conspired with the Aldermans to defraud her.

 **\*278** The summary final judgment in foreclosure is vacated, and the dismissal of the counterclaim with prejudice is reversed with instructions to allow an amendment to the counterclaim.

Judgment VACATED; REVERSED and REMANDED.

DANIEL, C.J., concurs.

W. SHARP, J., concurs with result, dissents in rationale with opinion.

W. SHARP, Judge, concurring in result and dissenting, as to rationale.

I respectfully disagree with the majority opinion, not only because I find the facts in this case so extreme as to "shock

my judicial conscience" (we appellate judges do have them), but also because I think it construes the thrust of *Johnson v. Davis,* 480 So.2d 625 (Fla.1985) much too narrowly. Further, I think Kovach raised a valid affirmative defense in her counterclaim of negligent construction (although not specifically so labelled), which was probably a compulsory counterclaim[1] in this mortgage foreclosure suit because the McLellans participated in the construction of the residence Kovach had the misfortune to purchase, and knew about its latent defects prior to Kovach's entering into the transactions.

The McLellans filed a mortgage foreclosure action against Kovach. Kovach pled fraud and failure of consideration due to a botched construction job performed on the house by the McLellans and their daughter and son-in-law (the Aldermans). Kovach also filed an amended counterclaim against the McLellans seeking to set aside the mortgage and claiming damages for fraud. The trial court ruled the defenses and counterclaim were legally insufficient because Kovach could neither allege she purchased the house from the McLellans, nor could she allege any affirmative misrepresentation they made to her concerning the house prior to her purchasing it from the Aldermans and executing the mortgage the McLellans. Apparently the majority opinion echos this limited view, and the result after remand will probably not alter the result in the trial court.

In my view, lack of a buyer-seller relationship with the McLellans and absence of an affirmative misrepresentation on their part are not fatal defects in this case. Kovach alleged that the McLellans sold the subject property to the Aldermans in 1984; the Aldermans and the McLellans participated in building the residence; and all four knew it had been built in violation of applicable building codes. The violations were so extreme that the residence is now uninhabitable, and it has been condemned by local authorities.

Kovach also alleged that the defects in the house were not discoverable by a reasonable inspection. For example, the kitchen sink, toilets, and bathroom sink drain into an improperly installed septic system. The bathtub drains directly into the ground. Other substantial defects were alleged to exist with regard to electrical wiring, roof installation, and the heating system. A letter from a building inspector attached to the amended counterclaim opines that $35,000 to $40,000 will be required to put the residence in acceptable condition.

The pleadings also established that in 1986 Kovach signed a contract to buy the residence from the Aldermans. She is a single parent with children and intended to use the structure as her residence. The purchase price was $69,000, but $35,000 was to be financed by the McLellans. The McLellans originally held a $38,000 purchase money mortgage from the Aldermans. In order to finance Kovach's purchase, the McLellans agreed to satisfy the Alderman mortgage and replace it with a mortgage from Kovach.

Neither the Aldermans nor the McLellans told Kovach about the serious, latent construction defects of the house before she closed the purchase and executed the mortgage in favor of the McLellans. Shortly after Kovach moved into the house, she experienced a series of problems requiring repairs.

**\*279** The extent of the house problems was eventually discovered. Kovach was financially unable to make the needed repairs and meet the mortgage payments. She was ordered out of the house, she defaulted on the mortgage, and this suit was commenced. Foreclosure was delayed for a time by Kovach's personal bankruptcy but the federal stay has now been lifted.

Although Kovach did not specifically label as one of her causes of action negligent construction, the facts pled and her request for damages disclose a viable cause of action, which make entry of final summary judgment against her erroneous. She alleged the McLellans participated in the construction of this disastrous home. Although she could be categorized as a "remote purchaser," the lack of privity is no defense in such cases. *See Simmons v. Owens,* 363 So.2d 142 (Fla. 1st DCA 1978) (remote purchaser held able to sue contractor who built home for a prior owner, for negligent construction contrary to building code); *Drexel Properties, Inc. v. Bay Colony Club Condominium, Inc.,* 406 So.2d 515 (Fla. 4th DCA 1981) (remote purchasers of condominium units allowed to sue builder for negligent construction and recover their economic losses).

As was observed by our sister court in *Parliament Towers Condominium v. Parliament House Realty, Inc.,* 377 So.2d 976 (Fla. 4th DCA 1979), the issue is not privity, but foreseeability. If a person negligently constructs a residence the fact that the identity of the person or family who eventually resides there is unknown, is no defense. It is clearly foreseeable someone will live there and will be damaged.[2]

However, a stronger and more clearly articulated defense and cause of action in this case is fraud and deceit. Without question fraud and deceit can be valid defenses in a mortgage foreclosure suit, where as here, the McLellans are not holders in due course.[3] Harper, James and Gray, *Law of Torts,* Vol. II, § 7.15 (2d ed). Recission and damages were both pled here as defenses and as grounds for seeking affirmative relief.

The trial judge, as well as the majority opinion, find Kovach's allegations legally insufficient because Kovach purchased the residence from the Aldermans rather than the McLellans. The majority holding is that under such circumstances the McLellans owed Kovach no duty to disclose the latent material defects in the house she was buying and which they were undertaking to finance. I disagree. Privity has never been required by the tort or equitable defense of fraud and deceit. Prosser, *Law of Torts* (4th ed.), p. 686. Focus on that relationship misconceives the essence of the tort as applied to failure to disclose.

Failure to disclose, like nonfeasance as opposed to misfeasance, was traditionally restricted by the courts to special situations or relationships. However, the exceptions appear to be rapidly consuming the rule.[4] One exception, which I think applies here, is the nondisclosure of a material fact by one party to a transaction "where the other party does not have equal opportunity to become apprised of the fact." 27 Fla.Jur.2d *Fraud and Deceit* § 38. I would construe the "transaction" in this case as encompassing the McLellans' financing, which was essential to enable Kovach to buy the property.

But even if the McLellans are viewed as not having privity with Kovach because they were not the sellers of the property, the lack of privity is not fatal. Kovach alleged the McLellans knew of the defects and participated in their creation, and they **\*280** stood to profit from the transaction by obtaining a fresh mortgagor to replace their kin, from whom they could receive mortgage payments for a grossly defective structure.[5]

In *Johnson,* our supreme court adopted the rule that nondisclosure of a latent material defect is an actionable fraud in a suit brought by a buyer against the seller of real estate. It said:

> The law appears to be working toward the ultimate conclusion that full disclosure of all material facts must be made when even elementary fair conduct demands it.

*Id.* at 628. Although *Johnson* involved a seller and a buyer of a residence, I do not think the court intended to limit the rule of law to those facts.

Other Florida courts have extended the rule in *Johnson* to real estate brokers. *See Young v. Johnson,* 538 So.2d 1387 (Fla. 2d DCA 1989); *Rayner v. Wise Realty Company of Tallahassee,* 504 So.2d 1361 (Fla. 1st DCA 1987). The Third District, which originally wrote the *Johnson* opinion, later affirmed by the supreme court, specifically noted that the duty to disclose might well be applicable to real estate brokers, builders, and developers beyond the immediate seller. *Johnson v. Davis,* 449 So.2d 344, 350, n. 1 (Fla. 3d DCA 1984). The same result has been reached in cases decided in other jurisdictions.[6]

In *Daniel v. Coastal Bonded Title Co.,* 539 So.2d 567 (Fla. 5th DCA 1989), we held that a cause of action in fraud had been pled against a title agent and his company for failure to disclose to a buyer easements not of record, but known to the insurer prior to the closing, when the title insurance company stood to benefit from the closing going forward. Similarly, in *Ramel v. Chasebrook Construction Co.,* 135 So.2d 876 (Fla. 2d DCA 1961), *contra other grounds, Johnson,* the court held that a *prima facie* cause of action in fraud for nondisclosure had been established by a remote purchaser against a builder under facts similar to this case. The defect in *Ramel* was the soil condition (muck) which caused the residence to settle and crack.

In *Ramel,* the defective lot was sold directly to a builder (Chasebrook Construction Company, Inc.), who built a house on it "for speculation." Chasebrook (the developer and seller of the builder) held a purchase money mortgage. When the builder sold the house to the plaintiff, the developer's mortgage was paid off out of the proceeds of the sale. The presidents of both corporations told the plaintiff the house was "well built," but neither disclosed to the plaintiff that the patio, pool and house had been built on a muck foundation, nor did they make any affirmative representations concerning the foundation.

The *Ramel* court held that under these circumstances both the developer and builder committed "affirmative," actionable fraud, despite lack of privity between the developer and home-buyer. However, the court went on to say that *these facts also constituted "actionable nondisclosure"* :

> In the absence of a fiduciary relationship, mere nondisclosure of all material facts in an arm's length

transaction is ordinarily not actionable misrepresentation unless some artifice or trick has been employed to prevent the representee from making further independent inquiry. One exception to this rule is that nondisclosure of a material fact may be deemed fraudulent where the other party does not have equal opportunity to become apprised of the fact. We think such was the situation in the instant case. [citations omitted].

135 So.2d at 882.

Banks or financiers in positions like the McClellans have also been held liable and **\*281** answerable for failure to disclose material information which was unknown to a borrower that would have dissuaded the borrower from going into the transaction. In *Barnett Bank of West Florida v. Hooper,* 498 So.2d 923 (Fla.1986), the bank suspected, but did not disclose, a check-kiting scheme engaged in by one of its depositors. In order to obtain more funds for the depositor it engaged in a 3–way conversation with the depositor and Hooper. Hooper executed a $90,000 note to the bank, and the funds were lent to the depositor. Hooper's funds were used to cover the bank's losses when the check-kite crashed. The court held the bank had a duty to disclose to Hooper its customer's precarious financial situation, which was a material fact known to the bank, but not Hooper, and since the bank stood to gain from Hooper's loan to the depositor. The situation between the McLellans and Kovach is indistinguishable from the bank and Hooper.[7]

Section 551 of the *Restatement of Torts* provides:

(1) One who fails to disclose to another a fact that he knows may justifiably induce the other to act or refrain from acting in a business transaction is subject to the same liability to the other as though he had represented the nonexistence of the matter that he failed to disclose, if,

but only if, he is under a duty to the other to exercise reasonable case to disclose the matter in question.

(2) One party to a business transaction is under a duty to exercise reasonable care to disclose to the other before the transaction is consummated.

\* \* \* \* \* \*

(e) [F]acts basic to the transaction if he knows that the other is about to enter into it under a mistake as to them, and that the other, because of the ... other objective circumstances, would reasonably expect a disclosure of the facts.

The comments to (e) indicate that in order to create the duty to disclose, the information must be "basic," "going to the essence" of the transaction, and *more* than material.

In my view, the horrendously poor, jerry-rigged construction of the home Kovach purchased meets the test of being "basic," since it went to the essence of the purpose of the transaction: obtaining a place fit for human habitation. The defects certainly were "material." The McLellans knew of the latent defects; they participated in creating the defects; they stood to benefit from the sale and acceptance of Kovach as mortgagor; their participation as mortgagees was essential to finance Kovach's purchase; and they had the opportunity to disclose the defects to Kovach prior to the closing, but did not do so. Under these alleged circumstances, I think the McLellans owed Kovach a duty to disclose and their failure to do so constituted actionable fraud and deceit. Dismissal of Kovach's defenses and counterclaim based on the pleadings was erroneous.

**All Citations**

564 So.2d 274, 15 Fla. L. Weekly D1929

Footnotes

1    While no rules of civil procedure require that grounds be stated, it is better practice to do so. *See City of Gainesville Code Enforcement Bd. v. Lewis,* 536 So.2d 1148 (Fla. 1st DCA 1988); *see also May v. Holley,* 59 So.2d 636 (Fla.1952) (when a pleading is attacked on several grounds, both on the merits and on jurisdictional or procedural grounds, dismissal without specifying the grounds relied on should be avoided, as it leaves the parties and the reviewing court entirely in the dark).

2    The confusion could have been eliminated by adoption of the procedure practiced in some trial courts whereby judicial assistants indicate on an order the day of mailing or delivery of copies rather than simply noting the names of persons to whom copies were furnished.

3    Kovach's statement that the McLellans allowed her to assume a purchase money mortgage granted by the Aldermans to the McLellans at the time of the prior purchase is misleading since Kovach actually granted to the McLellans a new

note and mortgage for approximately the remaining balance of the Alderman mortgage but with a higher interest rate and an extended term.

1    Fla.R.Civ.P. 1.170(a).

2    The privity defense in these cases reminds me of Justice Musmanno's observations in a defamation case, *Purcell v. Westinghouse Broadcasting Co.,* 411 Pa. 167, 191 A.2d 662 (Pa.1963):

The defendant strenuously argues that there could have been no exercise of malice against the plaintiff because, it points out, no one connected with the radio station knew that plaintiff. But the man who recklessly throws a chair out of the fifth story does not need to know the person whom the chair eventually hits, in order to be held liable for the damage done to him.

3    Vol. 5 UCC: Anderson § 3–101:55 (3d ed.).

4    Harper, James & Gray, *Law of Torts,* Vol. II, § 7.14 (2d ed.).

5    See Prosser *Law of Torts* (4th ed.), p. 697 and cases.

6    *See Jenkins v. McCormick,* 184 Kan. 842, 339 P.2d 8 (Kan.1959) (builder held liable for failure to disclose defective floor to remote house purchaser); *Lingsch v. Savage,* 213 Cal.App.2d 729, 29 Cal.Rptr. 201 (Cal. 1st DCA 1963) (Relator held liable for failure to disclose extensive latent defects in building purchased by plaintiffs); *Griffith v. Byers Construction Co. of Kansas, Inc.,* 212 Kan. 65, 510 P.2d 198 (Kan.1973) (developer held liable to remote home purchaser for saline condition of soil which prohibited vegetation from growing).

7    *See also Richfield Bank & Trust Co. v. Sjogren,* 309 Minn. 362, 244 N.W.2d 648 (Minn.1976) (bank held potentially liable for not disclosing to financier who borrowed money from bank to put into bank's depositor-customer's business the fact that the depositor-customer was irretrievably insolvent, and the purpose of the transaction (to buy machinery from the depositor-customer) could not be achieved).

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

 © 2024 Thomson Reuters. No claim to original U.S. Government Works.

IN THE COUNTY COURT OF THE 11TH
JUDICIAL CIRCUIT IN AND FOR MIAMI-
DADE COUNTY, FLORIDA

Sergio Salani,

       Plaintiff,

v.

AT&T Mobility, LLC,

       Defendant.

_____/

CASE NO.: 2022-047421-SP-25

BAR NO.: 121673

## **PLAINITFF'S SECOND NOTICE OF FILING SUPPLEMENTAL AUTHORITY IN SUPPORT OF MOTION FOR LEAVE TO AMEND**

Comes now, Plaintiff, Sergio Salani, and gives notice of this second supplemental authority in Support of Motion for Leave to Amend and states as follows:

This case is not set for trial and no witnesses or parties have been deposed. AT&T has admitted that Plaintiff's proposed data breach claim is not futile. Courts should be especially liberal when leave to amend is sought at or before a hearing on a motion for summary judgment." *Mishpaja Shajine, Inc. v. Granada Ins. Co.,* 319 So. 3d 762, 763 (Fla. 3d DCA. 2021); *JVN Holdings, Inc. v. Am. Constr. & Repairs, LLC*, 185 So. 3d 599, 601 (Fla. 3d DCA 2016) (quoting *Laurencio v. Deutsche Bank Nat'l Tr. Co.*, 65 So. 3d 1190, 1193 (Fla. 2d DCA 2011)). Any doubt with respect to futility should be resolved in favor of allowing the amendment, especially when leave to amend is sought at or before the summary judgment hearing. *JVN Holdings, Inc.*

It is reversible error to dismiss a complaint where a party only amended twice before and is seeking a third opportunity to present a proper pleading, *Pangea Produce*

*Distributors, Inc. v. Franco's Produce, Inc.*, 275 So. 3d 240, 242 (Fla. 3d DCA. 2019).

Refusal to allow an amendment **even after the Court enters summary judgment** is an

abuse of discretion unless it is clear that allowing the amendment would prejudice the

opposing party, the privilege to amend has been abused, or amendment would be futile.

*Laurencio at* 1193.

### <u>CERTIFICATE OF SERVICE</u>

WE HEREBY CERTIFY that a true and correct copy of the foregoing was sent via

e-portal this this November 07, 2024 to: Manuel A. Garcia-Linares, Esquire

(mgarcialinares@daypitney.com, edavila@daypitney.com ) Andrew R. Ingalls, Esquire

(aingalls@daypitney.com) Day Pitney LLP, 396 Alhambra Circle, North Tower - 14th

Floor, Miami, Florida 33134.

**Beighley, Myrick, Udell, Lynne & Zeichman PA**
*Attorneys for Plaintiff*
2601 S. Bayshore Dr.
Suite 770
Miami, FL 33133
(305) 349-3930 – Phone

By:     _/s/ Maury L. Udell_____
        Maury L. Udell, Esquire
        mudell@bmulaw.com
        Fla. Bar 121673

Case 1:25-cv-20381-RAR   Document 1-2   Entered on FLSD Docket 01/27/2025   Page 1416 of 1553
Mishpaja Shajine, Inc. v. Granada Insurance Company, 319 So.3d 762 (2021)

46 Fla. L. Weekly D1027

319 So.3d 762
District Court of Appeal of Florida, Third District.

MISHPAJA SHAJINE, INC., et al., Appellants,

v.

GRANADA INSURANCE
COMPANY, et al., Appellees.

No. 3D20-956
|
Opinion filed May 5, 2021

**Synopsis**
**Background:** Insurer brought action for declaratory judgment against corporation. The Circuit Court, 11th Judicial Circuit, Miami-Dade County, Martin Zilber, J., denied corporation's motion to amend its answer to assert an affirmative defense and granted insurer's motion for summary judgment. Corporation appealed.

**[Holding:]** The District Court of Appeal, Scales, J., held that corporation was entitled to leave to file an amended answer and affirmative defenses.

Reversed and remanded.

West Headnotes (6)

**[1]    Appeal and Error** 👉 **Answer or other responsive pleading**

Order denying defendant's motion to amend its affirmative defenses is reviewed for abuse of discretion.

**[2]    Pleading** 👉 **Condition of Cause and Time for Amendment**

Corporation was entitled to leave to file an amended answer and affirmative defenses in insurer's declaratory judgment action; corporation did not make any prior amendments to its pleading, there was no indication that

corporation made its ore tenus motion at summary judgment hearing to intentionally delay proceedings, and insurer did not argue below that it was prejudiced by corporation's motion to amend its answer.

**[3]    Pleading** 👉 **Leave of Court to Amend**

**Pleading** 👉 **After judgment or motion therefor**

**Pleading** 👉 **After verdict or judgment or motion therefor**

Courts should be especially liberal when leave to amend is sought at or before a hearing on a motion for summary judgment.

1 Case that cites this headnote

**[4]    Pleading** 👉 **Leave of Court to Amend**

**Pleading** 👉 **Form and sufficiency of amended pleading in general**

The trial court's denial of a party's motion to amend a pleading is generally an abuse of discretion, unless (1) the moving party has abused the privilege to amend, (2) the opposing party would be prejudiced by the amendment, or (3) the amendment would be futile.

1 Case that cites this headnote

**[5]    Pleading** 👉 **Leave of Court to Amend**

**Pleading** 👉 **Condition of Cause and Time for Amendment**

Any prejudice which may be deemed to have existed from a party's motion to amend its answer ordinarily should be remedied, not by denial of the amendment, but by a continuance.

2 Cases that cite this headnote

**[6]    Pleading** 👉 **Form and sufficiency of amended pleading in general**

**Pleading** 👉 **After verdict or judgment or motion therefor**

Any doubt with respect to futility of amendment to a pleading should be resolved in favor of allowing the amendment, especially when leave

to amend is sought at or before the summary judgment hearing.

**\*763** An Appeal from the Circuit Court for Miami-Dade County, Martin Zilber, Judge. Lower Tribunal No. 19-8378

**Attorneys and Law Firms**

St. Johns Law Group, and Shaun C. Saliba (St. Augustine), for appellants.

Hinshaw & Culbertson LLP, and James H. Wyman and Ronald L. Kammer, for appellees.

Before FERNANDEZ, SCALES and MILLER, JJ.

**Opinion**

SCALES, J.

**[1]** In this declaratory judgment action, the appellants Mishpaja Shajine, Inc. and Fidel Said, defendants below, appeal the trial court's final summary judgment entered in favor of the plaintiff/appellee, Granada Insurance Company ("Granada"). Because we conclude the trial court abused its discretion[1] in denying the appellants' *ore tenus* motion – made at the summary judgment hearing conducted below – to amend their answer to assert an affirmative defense, we reverse the trial court's June 9, 2020 final judgment and remand for further proceedings.

Granada moved for final summary judgment on its claim for declaratory relief, setting its motion for hearing on June 2, 2020. Several days prior to the scheduled hearing, on May 28, 2020, the appellants timely filed a notice of affidavit in opposition to Granada's summary judgment motion, attaching Mr. Said's affidavit. Granada concedes that Mr. Said's affidavit attests to facts supporting an unpled affirmative defense.

Believing that the summary judgment hearing would be cancelled,[2] the appellants did not contemporaneously file a motion to amend their answer to include the new affirmative defense addressed in the affidavit. Instead, at the June 2, 2020 summary judgment hearing, the appellants' counsel moved *ore tenus* to amend the appellants' answer to assert the affirmative defense. The trial court denied the appellants leave to amend and granted Granada's summary judgment

motion. The appellants timely appeal the trial court's June 9, 2020 final summary judgment.

**[2]** **[3]** **[4]** "Courts should be especially liberal when leave to amend is sought at or before a hearing on a motion for summary judgment." JVN Holdings, Inc. v. Am. Constr. & Repairs, LLC, 185 So. 3d 599, 601 (Fla. 3d DCA 2016) (quoting Laurencio v. Deutsche Bank Nat'l Tr. Co., 65 So. 3d 1190, 1193 (Fla. 2d DCA 2011)). The trial court's denial of a party's motion to amend a pleading is generally an abuse of discretion, *unless* (i) the moving party has abused the privilege to amend, (ii) the opposing party would be prejudiced by the amendment, or (iii) the amendment would be futile. See Fayad v. Univ. of Miami, 307 So. 3d 114, 118 (Fla. 3d DCA 2020). None of these factors are present in this case.

**[5]** **[6]** First, the appellants made no prior amendments to their pleading and there is no indication on this record that **\*764** the appellants made their *ore tenus* motion at the summary judgment hearing to intentionally delay the proceedings. See Reyes v. BAC Home Loans Servicing L.P., 226 So. 3d 354, 356-57 (Fla. 2d DCA 2017) (concluding the trial court abused its discretion in denying the defendant's motion to amend her answer and affirmative defenses where the motion was the defendant's first request to amend, noting "the bare timing of a motion to amend ... [is], at most, ancillary to the primary considerations of prejudice to the opposing party, abuse of the privilege, and futility of the proposed amended pleading"). Second, Granada did not argue below that it was prejudiced and "any prejudice which may be deemed to have existed ordinarily should be remedied, not by denial of the amendment, but by a continuance." Carib Ocean Shipping, Inc. v. Armas, 854 So. 2d 234, 236 n.2 (Fla. 3d DCA 2003). Third, "[a]ny doubt with respect to futility should be resolved in favor of allowing the amendment, especially when leave to amend is sought at or before the summary judgment hearing." RV-7 Prop., Inc. v. Stefani De La O, Inc., 187 So. 3d 915, 917 (Fla. 3d DCA 2016).[3]

For these reasons, we conclude that the trial court abused its discretion by not granting the appellants leave to file an amended answer and affirmative defenses. We therefore reverse the trial court's June 9, 2020 final judgment and remand for further proceedings.

Reversed and remanded.

Mishpaja Shajine, Inc. v. Granada Insurance Company, 319 So.3d 762 (2021)
46 Fla. L. Weekly D1027

**All Citations**

319 So.3d 762, 46 Fla. L. Weekly D1027

Footnotes

1   "An order denying a defendant's motion to amend its affirmative defenses is ... reviewed for an abuse of discretion." Am. Integrity Ins. Co. v. Estrada, 276 So. 3d 905, 910 (Fla. 3d DCA 2019).

2   The Friday before the Tuesday hearing, Granada filed a notice of cancellation of the summary judgment hearing. Granada sought to cancel the hearing so that Granada's counsel could take Mr. Said's deposition. On Monday, the day before the scheduled hearing, the parties learned that the hearing was not cancelled and would go forward.

3   We express no opinion on the viability of the appellants' affirmative defense.

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

Case 1:25-cv-20381-RAR Document 1-2 Entered on FLSD Docket 01/27/2025 Page 1419 of 1553
JVN Holdings, Inc. v. American Const. and Repairs, LLC., 185 So.3d 599 (2016)
41 Fla. L. Weekly D326

185 So.3d 599
District Court of Appeal of Florida, Third District.

JVN HOLDINGS, INC., etc., et al., Appellants,

v.

AMERICAN CONSTRUCTION
AND REPAIRS, LLC, Appellee.

No. 3D14–2611
|
Feb. 3, 2016.

**Synopsis**

**Background:** General contractor brought action against property owners seeking to foreclose on construction lien and recover damages for alleged breach of oral contract. The Circuit Court, Miami–Dade County, Stanford Blake, J., granted summary judgment in favor of contractor. Property owners appealed.

**Holdings:** The District Court of Appeal, Emas, J., held that:

[1] genuine issue of material fact existed regarding amount owed by property owners to general contractor, and

[2] grant of property owners' motion to amend was warranted.

Reversed and remanded.

West Headnotes (4)

[1]  **Mechanics' Liens**  🗝 Agreement or consent of owner and terms thereof

  **Summary Judgment**  🗝 Mechanics' liens

  Genuine issue of material fact existed regarding amount owed by property owners to general contractor for materials and third-labor, and therefore summary judgment in favor of contractor was precluded in action against property owners to foreclose on construction lien and seeking damages for breach of oral contract for construction services.

1 Case that cites this headnote

[2]  **Pleading**  🗝 New or different defense

  Grant of property owners' motion to amend their answer and affirmative defenses and to assert a counterclaim was warranted in action by general contractor seeking to foreclose on construction lien and seeking damages for alleged breach of oral contract for construction services, where motion was filed prior to summary judgment hearing, and there was no evidence that amendment would have prejudiced contractor, that property owners had abused privilege to amend, or that amendment would have been futile.

8 Cases that cite this headnote

[3]  **Pleading**  🗝 Form and sufficiency of amended pleading in general

  Refusal to allow an amendment of a pleading is an abuse of the trial court's discretion unless it clearly appears that allowing the amendment would prejudice the opposing party, the privilege to amend has been abused, or amendment would be futile.

9 Cases that cite this headnote

[4]  **Pleading**  🗝 Condition of Cause and Time for Amendment

  Courts should be especially liberal when leave to amend a pleading is sought at or before a hearing on a motion for summary judgment.

6 Cases that cite this headnote

**\*599** An Appeal from the Circuit Court for Miami–Dade County, Stanford Blake, Judge.

**Attorneys and Law Firms**

Michael A. Vandetty, for appellants.

Broad and Cassel, Gary E. Lehman and Beverly A. Pohl, Fort Lauderdale, for appellee.

JVN Holdings, Inc. v. American Const. and Repairs, LLC, 185 So.3d 599 (2016)
41 Fla. L. Weekly D326

Before SHEPHERD, LAGOA and EMAS, JJ.

**Opinion**

EMAS, J.

JVN Holdings, Inc., and Mark and Natalie Weider appeal a final summary judgment entered in favor of American Construction and Repairs, LLC ("American"). Because genuine issues of material fact remain in dispute, we vacate the final summary judgment, as well as the order denying JVN/Weiders' motion for leave to file amended answer and counterclaim, and **\*600** the order awarding attorney's fees to American.

American, a licensed general contractor, filed suit against JVN and the Weiders, seeking to foreclose on a construction lien and to recover damages arising out of, *inter alia,* the alleged breach of an oral contract for construction services on two residential properties. Under the terms of the oral contract, JVN and the Weiders agreed to pay American an hourly rate for labor and to reimburse American at cost for all materials and third party labor. When the Weiders allegedly failed to pay the final construction bill, American filed suit.

Following discovery, American moved for summary judgment, asserting it was entitled to judgment as a matter of law because JVN and the Weiders had failed to challenge the amount American alleged was due and owing under the oral contract. In support of this assertion, American attached the depositions of Mr. and Mrs. Weider.

In response to American's motion for summary judgment, JVN and the Weiders asserted there remained genuine issues of disputed fact with regard to the amounts billed by American, and in support, submitted several invoices as well as affidavits from Mr. Weider and Jeri Goodkin Dausey, a licensed general contractor, retained as an expert in this matter.

JVN and the Weiders also sought leave to file an amended answer and a counterclaim. Following a hearing, the trial court determined there were no genuine issues of material fact, and entered final summary judgment for American. The court also denied JVN/Weiders' motion for leave to file an amended answer and counterclaim, and granted American's motion for attorney's fees.

In ruling on a motion for summary judgment, the trial court (and this Court in its *de novo* review) must construe all the evidence, and draw every possible inference therefrom, in a light most favorable to the non-moving party. *Moore v. Morris,* 475 So.2d 666 (Fla.1985); *Suarez v. City of Hialeah,* 971 So.2d 948 (Fla. 3d DCA 2007); *McQueen v. Roye,* 785 So.2d 512 (Fla. 3d DCA 2000).

**[1]** The trial court erred in determining there were no genuine issues of material fact in dispute. Though not a model of clarity, the deposition testimony of Mr. Weider contains multiple instances in which he disputed the amounts (and the reasonableness of the amounts) billed by American. The existence of a genuine dispute as to these amounts was corroborated by Mr. Weider's affidavit[1] as well as the affidavit of the Weiders' expert, Ms. Dausey. Accordingly, it was error for the trial court to grant summary judgment, and we reverse and remand for further proceedings.

**[2] [3]** Because we are reversing and remanding, we address the remaining orders under review. The trial court denied JVN and the Weiders' motion to amend their answer and affirmative defenses and to assert a counterclaim, determining that the motion was untimely because it was **\*601** filed on the eve of the summary judgment hearing. This determination was erroneous. As this court has previously held:

> [R]efusal to allow an amendment is an abuse of the trial court's discretion "unless it clearly appears that allowing the amendment would prejudice the opposing party, the privilege to amend has been abused, or amendment would be futile."

*Kay's Custom Drapes, Inc. v. Garrote,* 920 So.2d 1168, 1171 (Fla. 3d DCA 2006) (quoting *Kimball v. Publix Super Markets, Inc.,* 901 So.2d 293, 296 (Fla. 2d DCA 2005)). None of these circumstances is present in the record before us. Such a policy is also reflected in Florida's rules of civil procedure. *See* Fla. R. Civ. P. 1.190(a) (providing that leave of court to amend pleadings "shall be given freely when justice so requires.")

**[4]** Further, "[c]ourts should be especially liberal when leave to amend is sought at or before a hearing on a motion for summary judgment." *Laurencio v. Deutsche Bank Nat. Trust Co.,* 65 So.3d 1190, 1193 (Fla. 2d DCA 2011) (internal quotations omitted). *See also Firestone Tire & Rubber Co. v. Thompson Aircraft Tire Corp.,* 353 So.2d 137 (Fla. 3d DCA 1977) (reversing trial court's denial of plaintiff's oral motion

to amend complaint, made at the hearing on defendant's motion for summary judgment); *Haag v. Phillips,* 333 So.2d 507 (Fla. 2d DCA 1976) (same). *See also Dausman v. Hillsborough Area Reg. Transit,* 898 So.2d 213 (Fla. 2d DCA 2005) (holding trial court abused its discretion in denying plaintiff's motion to amend complaint where motion was made after trial court orally granted summary judgment but before rendition of the final summary judgment).

We vacate the order denying the motion to amend and remand for further consideration in light of Florida's public policy which favors allowing parties to amend pleadings, and all doubts should generally be resolved in favor of permitting such amendments. *Caduceus Properties, LLC v. Graney,* 137 So.3d 987 (Fla.2014). On remand, and in the absence of

prejudice, abuse of the privilege to amend, or futility, leave should freely be given to amend the answer and affirmative defenses and to add a counterclaim.

Finally, and because we are reversing the final summary judgment, we must also vacate the order awarding attorney's fees to American.

Reversed and remanded for further proceedings consistent with this opinion.

**All Citations**

185 So.3d 599, 41 Fla. L. Weekly D326

---

Footnotes

1      We reject American's contention that affirmance is warranted under *Ellison v. Anderson,* 74 So.2d 680 (Fla.1954) and *Baker v. Airguide Mfg., LLC,* 151 So.3d 38 (Fla. 3d DCA 2014). Those cases involve a party attempting to create a genuine issue of material fact (and thereby avoid summary judgment) by submitting a witness affidavit which, without proper explanation, materially contradicted or repudiated that same witness' prior testimony. By contrast, in the instant case Mr. Weider's deposition testimony alone created a disputed issue of material fact; it was crystallized in his subsequent affidavit, and was further corroborated by his expert's affidavit.

---

**End of Document** © 2024 Thomson Reuters. No claim to original U.S. Government Works.

65 So.3d 1190
District Court of Appeal of Florida, Second District.

Pedro F. LAURENCIO; Esteves Pedro a/
k/a Adelaida Laurencio; Accredited Home
Lenders, Inc., Successor by Merger to
Aames Funding Corporation d/b/a Aames
Home Loan; City of Cape Coral; Tenant #
1 n/k/a Adalaeida Laurencio; and Tenant
# 2 n/k/a Pedro Laurencio, Appellants,

v.

DEUTSCHE BANK NATIONAL TRUST
COMPANY, as Indenture Trustee of the Aames
Mortgage Investment Trust 2005–1, Appellee.

No. 2D10–2448
|
July 27, 2011.

**Synopsis**
**Background:** Mortgagee filed foreclosure action. The Circuit Court, Lee County, Hugh E. Starnes, J., denied mortgagors' motion for leave to file an amended answer and affirmative defenses, and awarded summary judgment to mortgagee. Mortgagors appealed.

**Holdings:** The District Court of Appeal, Villanti, J., held that:

[1] triable issue existed as to whether mortgagee complied with mortgage provision requiring it to give mortgagors 30 days' notice and an opportunity to cure any default, and

[2] trial court should have allowed mortgagors to file an amended answer and affirmative defenses.

Reversed and remanded.

West Headnotes (5)

**[1]** **Mortgages and Deeds of Trust** 🔑 Questions of law or fact in general

**Summary Judgment** 🔑 Foreclosure

Genuine issue of material fact as to whether mortgagee complied with mortgage provision requiring it to give mortgagors 30 days' notice and an opportunity to cure any default before acceleration of the underlying loan and filing of a foreclosure suit precluded summary judgment in mortgagee's foreclosure action.

6 Cases that cite this headnote

**[2]** **Mortgages and Deeds of Trust** 🔑 Particular cases

Trial court in foreclosure action should have allowed mortgagors, who originally filed a pro se answer to the complaint that did not contain any affirmative defenses, to file an amended answer and affirmative defenses through counsel; there was no basis for concluding that mortgagors abused the privilege to amend or that mortgagee would be prejudiced by the amendment, and amendment would not be futile as it contained unrefuted allegations that mortgagee failed to comply with conditions precedent to filing suit. West's F.S.A. RCP Rule 1.190(a).

3 Cases that cite this headnote

**[3]** **Pleading** 🔑 Right to amend pleadings in general

**Pleading** 🔑 Leave of Court to Amend

Public policy favors the liberal amendment of pleadings, and courts should resolve all doubts in favor of allowing the amendment of pleadings to allow cases to be decided on their merit. West's F.S.A. RCP Rule 1.190(a).

10 Cases that cite this headnote

**[4]** **Pleading** 🔑 Discretion of Court

Laurencio v. Deutsche Bank Nat. Trust Co., 65 So.3d 1190 (2011)
36 Fla. L. Weekly D1600

A trial court's refusal to permit an amendment of a pleading is an abuse of discretion unless it is clear that: (1) the amendment would prejudice the opposing party; (2) the privilege to amend has been abused; or (3) the amendment would be futile. West's F.S.A. RCP Rule 1.190(a).

13 Cases that cite this headnote

**[5]**  **Pleading** 👈 After judgment or motion therefor

**Pleading** 👈 After verdict or judgment or motion therefor

Courts should be especially liberal in granting leave to amend a pleading when leave to amend is sought at or before a hearing on a motion for summary judgment. West's F.S.A. RCP Rule 1.190(a).

12 Cases that cite this headnote

**Attorneys and Law Firms**

**\*1190** Jon B. Lindeman, Jr., Carlos M. Ferreyros, Carlos D. Grande, and Jennifer N. Hernandez of Advocate Law Groups of **\*1191** Florida, P.A., Miami Lakes, for Appellants Pedro F. Laurencio and Esteves Pedro.

No appearance for remaining Appellants.

James John Spanolio and Erin M. Berger of Florida Default Law Group, P.L., Tampa, for Appellee.

**Opinion**

VILLANTI, Judge.

In this mortgage foreclosure action, Pedro F. Laurencio and Esteves Pedro[1] appeal the trial court's order granting summary judgment in favor of Deutsche Bank National Trust Company. Laurencio argues, among several things,[2] that Deutsche Bank failed to meet a condition precedent to filing the complaint and filed suit prematurely, without giving them adequate notice and an opportunity to cure the alleged default. Laurencio also argues that the trial court erred in denying the motion to amend the answer and affirmative defenses. We agree on both issues and reverse.

On December 9, 2008, Deutsche Bank's attorneys sent Laurencio a letter stating that, pursuant to the terms of the Note and Mortgage, Deutsche Bank had "accelerated all sums due and owing, which means that the entire principal balance and all other sums recoverable under the terms of the promissory Note and Mortgage are now due." The letter stated that the amount owed was $200,715.27. The letter also informed Laurencio: "This law firm is in the process of filing a Complaint on the promissory Note and Mortgage to foreclose on real estate." Two days later, the bank filed a mortgage foreclosure complaint and attached this letter to the complaint.

Paragraph 22 of Laurencio's mortgage set forth presuit requirements, including a requirement that Deutsche Bank give Laurencio thirty days' notice and an opportunity to cure the default prior to filing suit:

**Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18** [3] **unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to** *cure the default;* **(c)** *a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured;* **and (d) that failure to cure the default on or before the date specified in the notice** *may result in acceleration of the sums* **secured by this Security Instrument, foreclosure by judicial proceeding and sale of the Property. The notice shall further inform Borrower of** *the right to reinstate after acceleration* **and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and foreclosure. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may foreclose this Security Agreement by judicial proceeding. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to,** **\*1192** **all attorneys' fees and costs of title evidence.**

(Underline emphasis added.) Clearly, Deutsche Bank's letter did not comply with paragraph 22.

Laurencio filed a pro se answer on December 31, 2008, which did not assert any affirmative defenses. When Deutsche Bank filed a motion for summary judgment on March 11, 2009, Laurencio's newly retained counsel filed a response in opposition to summary judgment asserting, inter alia, that Deutsche Bank had not complied with conditions precedent before filing suit because it had not complied with paragraph 22.

Laurencio changed attorneys in November 2009. On April 14, 2010, two days before the summary judgment hearing scheduled by Deutsche Bank, Laurencio's new counsel sought leave of court to file an amended answer and affirmative defenses. Attached to the motion was a proposed amended answer and affirmative defenses which included an allegation that Deutsche Bank had improperly and prematurely accelerated the mortgage without complying with paragraph 22.[4] Laurencio also filed an affidavit specifically asserting that Deutsche Bank had not provided notice of acceleration prior to initiating the foreclosure lawsuit.

At the summary judgment hearing Laurencio's counsel raised the issue of Deutsche Bank's improper acceleration of the mortgage. Nevertheless, the trial court denied Laurencio's motion for leave to file an amended answer and affirmative defenses and granted summary judgment of foreclosure in favor of Deutsche Bank. This was error.

We review a summary judgment de novo. *Estate of Githens ex rel. Seaman v. Bon Secours–Maria Manor Nursing Care Ctr., Inc.,* 928 So.2d 1272, 1274 (Fla. 2d DCA 2006). "A movant is entitled to summary judgment 'if the pleadings, depositions, answers to interrogatories, admissions, affidavits, and other materials as would be admissible in evidence on file show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' " *Id.* (quoting Fla. R. Civ. P. 1.510(c)). The moving party bears the burden of showing conclusively the absence of any genuine issue of material fact. *Moore v. Morris,* 475 So.2d 666, 668 (Fla.1985). Because the trial court must draw every possible inference in favor of the nonmoving party, *Estate of Githens,* 928 So.2d at 1274, "summary judgment should not be granted unless the facts are so crystallized that nothing remains but questions of law," *Moore,* 475 So.2d at 668.

**[1]** In this case, Deutsche Bank failed to meet its summary judgment burden because the record before the trial court reflected a genuine issue of material fact as to whether Deutsche Bank had complied with conditions precedent to filing the foreclosure action. In a case with nearly identical facts, this court recently reversed a summary judgment of foreclosure. *See Konsulian v. Busey Bank, N.A.,* 61 So.3d 1283 (Fla. 2d DCA 2011). In *Konsulian,* we concluded that the bank was not entitled to summary judgment because it had not established that it had met the conditions precedent to filing suit. *Id.* at 1285. The record in that case did not establish that the bank had given the defendant the notice which the mortgage required. *Id.* We reach the same conclusion in this case.

**[2] [3] [4] [5]** The trial court also erred in denying Laurencio's motion for leave to file **\*1193** an amended answer and affirmative defenses. Leave of court to amend a pleading shall be given freely when justice so requires. Fla. R. Civ. P. 1.190(a). Public policy favors the liberal amendment of pleadings, and courts should resolve all doubts in favor of allowing the amendment of pleadings to allow cases to be decided on their merit. *S. Developers & Earthmoving, Inc. v. Caterpillar Fin. Servs. Corp.,* 56 So.3d 56, 62 (Fla. 2d DCA 2011). A trial court's refusal to permit an amendment of a pleading is an abuse of discretion unless it is clear that: (1) the amendment would prejudice the opposing party, (2) the privilege to amend has been abused, or (3) the amendment would be futile. *Id.* at 62–63. "Courts should be especially liberal when leave to amend 'is sought at or before a hearing on a motion for summary judgment.' " *Gate Lands Co. v. Old Ponte Vedra Beach Condo.,* 715 So.2d 1132, 1135 (Fla. 5th DCA 1998) (quoting *Bill Williams Air Conditioning & Heating, Inc. v. Haymarket Co-op. Bank,* 592 So.2d 302, 305 (Fla. 1st DCA 1991)).

Here, the record does not show that Deutsche Bank established any of the three exceptions to amendment of pleadings. There is no basis for concluding that Laurencio abused the privilege to amend or that Deutsche Bank would be prejudiced by the amendment which alleges, inter alia, the bank's failure to comply with its own documents. And the amendment clearly would not be futile considering the unrefuted allegations that Deutsche Bank failed to comply with conditions precedent to suit. *See Wayne Creasy Agency, Inc. v. Maillard,* 604 So.2d 1235, 1236 (Fla. 3d DCA 1992) ("A denial of leave to amend a pleading is an abuse of discretion where the proffered amendment indicates that a plaintiff can state a cause of action. The same holds true where a defendant demonstrates he could prevail with the assertion of a properly available defense." (citation omitted)).

Laurencio v. Deutsche Bank Nat. Trust Co., 65 So.3d 1190 (2011)

36 Fla. L. Weekly D1600

Therefore, the trial court should have granted Laurencio leave to file an amended answer and affirmative defenses.

Reversed and remanded.

DAVIS and MORRIS, JJ., Concur.

**All Citations**

65 So.3d 1190, 36 Fla. L. Weekly D1600

Footnotes

1   The appellants are a married couple. For purposes of this opinion, we will refer to them as Laurencio.

2   Because we decide this appeal based on the two issues discussed in the opinion, we do not reach the merits of Laurencio's other arguments.

3   Paragraph 18 addressed transfer or sale of the property without the lender's prior written consent and is not applicable to this case.

4   Because we decide this appeal based on the two issues discussed herein, we do not reach the merits of any of Laurencio's other affirmative defenses.

End of Document

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

Pangea Produce Distributors, Inc. v. Franco's Produce, Inc., 275 So.3d 240 (2019)

44 Fla. L. Weekly D1723

275 So.3d 240
District Court of Appeal of Florida, Third District.

PANGEA PRODUCE
DISTRIBUTORS, INC., Appellant,

v.

FRANCO'S PRODUCE,
INC., et al., Appellees.

No. 3D18-1026
|
Opinion filed July 3, 2019

**Synopsis**

**Background:** Distributors filed complaint against produce company arising out of verbal joint venture, moved twice to amend the complaint, and, after company successfully filed a motion to dismiss, moved for a third time for rehearing and to amend the complaint. The Circuit Court, Miami-Dade County, Mavel Ruiz and Antonio Marin, JJ., denied the motion for rehearing and motion to leave to amend. Distributors appealed.

**[Holding:]** The Third District Court of Appeal, Fernandez, J., held that distributors were entitled to leave to amend.

Reversed and remanded.

West Headnotes (6)

**[1]** **Appeal and Error** Complaint, petition, or other initial pleading

The standard of review for the denial of leave to amend is abuse of discretion.

4 Cases that cite this headnote

**[2]** **Courts** Florida

District Court of Appeal has jurisdiction to review final orders of trial courts not directly reviewable by the Florida Supreme Court or a circuit court. Fla. R. App. P. 9.030(b)(1)(A).

**[3]** **Pleading** Leave of Court to Amend

**Pleading** Form and sufficiency of amended pleading in general

Typically, refusal to allow amendment of a pleading constitutes an abuse of discretion unless allowing the amendment would prejudice the opposing party, the privilege to amend has been abused, or amendment would be futile.

5 Cases that cite this headnote

**[4]** **Pleading** Leave of Court to Amend

While the policy in Florida is to allow amendments to pleadings liberally, a trial judge in the exercise of sound discretion may deny further amendments where a case has progressed to a point that liberality ordinarily to be indulged has diminished. Fla. R. Civ. P. 1.190(a).

6 Cases that cite this headnote

**[5]** **Pleading** Right to amend pleadings in general

Although the number of amendments is not determinative of abuse, three ineffective attempts to state the same cause of action or defense are enough, and the liberality in permitting amendments decreases as the action progresses and as the number of amended pleading increases. Fla. R. Civ. P. 1.190(a).

2 Cases that cite this headnote

**[6]** **Pleading** After judgment or motion therefor

Distributor was entitled to leave to amend complaint a third time following grant of motion to dismiss, where there was no showing that granting the leave would prejudice the defendant or make the amendment futile, and distributor had not abused privilege to amend. Fla. R. Civ. P. 1.190(a).

5 Cases that cite this headnote

44 Fla. L. Weekly D1723

An Appeal from the Circuit Court for Miami-Dade County, Mavel Ruiz and Antonio Marin, Judges. Lower Tribunal No. 11-3323

**Attorneys and Law Firms**

Scott Alan Orth (Hollywood), Miami Shores, for appellant.

Roniel Rodriguez IV, Aventura; Alvarez | Gonzalez | Menezes, LLP and Ignacio M. Alvarez, Miami, for appellees.

Before FERNANDEZ, SCALES and HENDON, JJ.

**Opinion**

FERNANDEZ, J.

**\*241**  The plaintiff, Pangea Produce Distributors, Inc. ("Pangea"), appeals the trial court's final order denying Pangea's Motion for Leave to File a Third Amended Complaint. Following a review of the record, we find that the circuit court abused its discretion in denying Pangea leave to amend. Thus, we reverse the final order denying Pangea's Motion to Amend.

In 2011, Pangea filed a single-count complaint against Carlos Franco and his corporation, Franco's Produce, Inc. (collectively, "Franco"), alleging that the parties entered into a verbal joint venture involving the sale of produce in Miami-Dade County between April 2010 and December 2010. In August 2012, Pangea moved for leave to amend to add Perishable Agricultural Commodities Act ("PACA") claims. After the case was set for trial in August 2015, Pangea decided to drop its PACA claim and moved the Court, *ore tenus*, to amend once again. The motion was granted and, on August 24, 2015, Pangea filed its Second Amended Complaint. The Second Amended Complaint contained five counts based on the same alleged transaction, but added that the alleged verbal joint venture was for a trial period of three to six months, terminable by either party.

On August 27, 2015, Franco filed a joint Motion to Dismiss Pangea's Second Amended Complaint. Mr. Franco argued that the Second Amended Complaint was "legally insufficient" as to him individually, and Franco's Produce requested dismissal of the Complaint as to Count II (Open Account), Count III (Account Stated), and Count IV (Unjust Enrichment), based on technicalities. Franco also argued that when the Second Amended Complaint was filed, Pangea

departed from the pleadings by adding allegations of fact, namely regarding the alleged short-term trial period and termination option.

On November 3, 2015, the circuit court heard Franco's Motion to Dismiss Pangea's Second Amended Complaint. The Court entered an order granting Franco's Motion to Dismiss with prejudice. Pangea filed a Motion for Reconsideration or Clarification, arguing that it was error to dismiss the entire Complaint, as Franco's Motion to Dismiss did not articulate any proper argument in favor of dismissal of Counts I (Breach of Joint Venture/Partnership Agreement Terminable at Will) or Count V (Breach of Contract), and the court's dismissal of the Second Amended Complaint was based on the defense argument that Pangea had re-alleged and incorporated certain prior paragraphs into Counts II, III, and IV that contradicted those causes of action, but which Pangea argued could be easily cured. Contemporaneously, Pangea filed a Motion for Leave to File a Third Amended Complaint, with a proposed Third Amended Complaint to correct the minor deficiencies attached.

On March 21, 2017, the circuit court denied the Motion for Rehearing and the Motion for Leave to Amend. Believing that this was a final order, Pangea appealed. That appeal was dismissed upon a determination that the order then under review was not a final order. Subsequently, a final order was entered, and Pangea timely filed this appeal.

**\*242**  [1]   [2]   This Court has jurisdiction to review final orders of trial courts not directly reviewable by the Florida Supreme Court or a circuit court pursuant to Florida Rule of Appellate Procedure 9.030(b)(1)(A). The standard of review for the denial of leave to amend is abuse of discretion. Datwani v. Netsch, 562 So. 2d 721, 723 (Fla. 3d DCA 1990).

[3]   [4]   [5]   Florida Rule of Civil Procedure 1.190(a), provides that leave to amend "shall be given freely when justice so requires." Typically, refusal to allow amendment of a pleading constitutes an abuse of discretion unless allowing the amendment "would prejudice the opposing party, the privilege to amend has been abused, or amendment would be futile." JVN Holdings, Inc. v. Am. Constr. & Repairs, 185 So. 3d 599, 601 (Fla. 3d DCA 2016) (quoting Kay's Custom Drapes, Inc. v. Garrote, 920 So. 2d 1168, 1171 (Fla. 3d DCA 2006)). While the policy in Florida, as articulated in Rule 1.190(a), is to allow amendments to pleadings liberally, "a trial judge in the exercise of sound discretion may deny further amendments where a case has progressed to a point

that liberality ordinarily to be indulged has diminished."
Alvarez v. DeAguirre, 395 So. 2d 213, 216 (Fla. 3d DCA
1981) (explaining that in addition to the desirability of
allowing amendments to pleadings so that cases may be
concluded on their merits, there is an equally compelling
obligation on the court to see to it that the end of all litigation
be finally reached. Although the number of amendments
is not determinative of abuse, three ineffective attempts to
state the same cause of action or defense are enough, and the
liberality in permitting amendments decreases as the action
progresses and as the number of amended pleading increases.
Id. at 217.

[6] In the present case, there has been no showing that
granting leave to amend the complaint would prejudice
Franco or that the amendment would be futile. There is no
support for the notion that Pangea has abused the privilege
to amend given that Pangea has only amended twice before.
Franco cites to Alvarez for the proposition that dismissal of a
complaint after three ineffective attempts at proper pleadings
is not deemed abuse of discretion. However, in Alvarez the
plaintiff had six opportunities to present a proper pleading and
failed to do so. Unlike in Alvarez, Pangea has only amended
twice before and is only now seeking a third opportunity to
present a proper pleading. Thus, we reverse the circuit court's
order denying Pangea leave to file a third amended complaint.
In light of our conclusion, we decline to address the remaining
issues raised on appeal.

Reversed and remanded.

**All Citations**

275 So.3d 240, 44 Fla. L. Weekly D1723

---

End of Document

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

IN THE COUNTY COURT OF THE 11TH
JUDICIAL CIRCUIT IN AND FOR MIAMI-
DADE COUNTY, FLORIDA

Sergio Salani,

       Plaintiff,

v.

AT&T Mobility, LLC,

       Defendant.

_____/

CASE NO.: 2022-047421-SP-25

BAR NO.: 121673

**NOTICE OF FILING**

Plaintiff, Sergio Salani, by and through undersigned counsel, hereby gives notice
of filing the following case law in opposition to Defendant AT&T Mobility LLC's Motion to
Dismiss Plaintiff's Amended Statement of Claim.

1. *Palter v. Sunset Palm Villas Condo. Ass'n, Inc*., No. 3D24-0203, 2024 WL
   4610789, at *1 (Fla. 3d DCA 2024)(Because 'only competent evidence may be
   considered by the court in ruling upon a motion for summary judgment,' a
   document attached to a motion for summary judgment or a document attached
   to an affidavit that is not otherwise authenticated is not competent evidence."
   Hatoum v. Citizens Prop. Ins. Corp., 299 So. 3d 519, 519 (Fla. 3d DCA 2020)
   (quoting Gidwani v. Roberts, 248 So. 3d 203, 208 (Fla. 3d DCA 2018))

## CERTIFICATE OF SERVICE

WE HEREBY CERTIFY that a true and correct copy of the foregoing was sent via e-portal this this November 22, 2024 to: Manuel A. Garcia-Linares, Esquire (mgarcialinares@daypitney.com, edavila@daypitney.com ) Andrew R. Ingalls, Esquire (aingalls@daypitney.com) Day Pitney LLP, 396 Alhambra Circle, North Tower - 14th Floor, Miami, Florida 33134.

**Beighley, Myrick, Udell, Lynne & Zeichman PA**
*Attorneys for Plaintiff*
2601 S. Bayshore Dr.
Suite 770
Miami, FL 33133
(305) 349-3930 – Phone

By:      /s/ *Maury L. Udell*
         Maury L. Udell, Esquire
         mudell@bmulaw.com
         Fla. Bar 121673

2

2024 WL 4610789
Only the Westlaw citation is currently available.

NOTICE: THIS OPINION HAS NOT BEEN RELEASED FOR PUBLICATION IN THE PERMANENT LAW REPORTS. UNTIL RELEASED, IT IS SUBJECT TO REVISION OR WITHDRAWAL.

District Court of Appeal of Florida, Third District.

Jessica PALTER, etc., et al., Appellants,

v.

SUNSET PALM VILLAS CONDOMINIUM ASSOCIATION, INC., Appellee.

No. 3D24-0203
|
Opinion Filed October 30, 2024

An Appeal from the Circuit Court for Miami-Dade County, Ariana Fajardo Orshan, Judge. Lower Tribunal No. 21-10969

**Attorneys and Law Firms**

The Law Firm of Arianna M. Mendez, PLLC, and Arianna M. Mendez, for appellants.

Koss Law Firm, P.A., and Jeremy A. Koss, Sunrise, for appellee.

Before LOGUE, C.J., and EMAS and SCALES, JJ.

**Opinion**

PER CURIAM.

**\*1** "Because 'only competent evidence may be considered by the court in ruling upon a motion for summary judgment,' a document attached to a motion for summary judgment or a document attached to an affidavit that is not otherwise authenticated is not competent evidence." Hatoum v. Citizens Prop. Ins. Corp., 299 So. 3d 519, 519 (Fla. 3d DCA 2020) (quoting Gidwani v. Roberts, 248 So. 3d 203, 208 (Fla. 3d DCA 2018)). See also Fla. R. Civ. P. 1.510(c)(2) ("A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.").

Affirmed.

**All Citations**

--- So.3d ----, 2024 WL 4610789 (Mem)

---

Filing # 212282924 E-Filed 12/05/2024 04:39:16 PM

IN THE COUNTY COURT OF THE 11TH
JUDICIAL CIRCUIT IN AND FOR MIAMI-
DADE COUNTY, FLORIDA

Sergio Salani,

      Plaintiff,

v.

AT&T Mobility, LLC,

      Defendant.

_____/

CASE NO.: 2022-047421-SP-25

FLA. BAR NO.: 121673

## **PLAINTIFF'S NOTICE OF FILING**

      Plaintiff, Sergio Salani, by and through the undersigned attorney, hereby files a

copy of **UNOPPOSED ORDER GRANTING** Plaintiff's Motion for Leave to Amend

Statement of Claim to Assert Data Breach Claims for 2019 Case of FFNM, LLC. V. AT&T

Mobility, LLC, Case No. 2019-2493-SP-26.

## **CERTIFICATE OF SERVICE**

      WE HEREBY CERTIFY that a true and correct copy of the foregoing was served
via e-mail this December 4, 2024: to Manuel A. Garcia-Linares, Esquire
(mgarcialinares@daypitney.com, brodriguez@daypitney.com,
jsolorzano@daypitney.com edavila@daypitney.com) Andrew R. Ingalls, Esquire
(aingalls@daypitney.com) Day Pitney LLP, 396 Alhambra Circle, North Tower - 14th
Floor, Miami, Florida 33134.

                Beighley, Myrick, Udell, Lynne & Zeichman, PA
                Attorneys for Plaintiff
                2601 S. Bayshore Drive
                Suite 770
                Miami, FL 33133
                (305) 349-3930 – Phone

                By:     */s/   Maury L. Udell*
                      Maury L. Udell, Esquire
                      mudell@bmulaw.com
                      Fla. Bar 121673

**IN THE COUNTY COURT OF THE ELEVENTH JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA**

CASE NO: 2019-002493-SP-26
SECTION: SD03
JUDGE: Lissette De la Rosa

**FFNM, LLC**

Plaintiff(s) / Petitioner(s)

vs.

**AT&T Mobility, LLC**

Defendant(s) / Respondent(s)

_____/

## UNOPPOSED ORDER GRANTING PLAINTIFF'S MOTION FOR LEAVE TO FILE SECOND AMENDED STATEMENT OF CLAIM

**Docket Index Number: 74**

THIS CAUSE is before the Court on Plaintiff's Motion for Leave to File a Second Amended Statement of Claim, and being aware that the motion is unopposed and being otherwise duly advised in the premises, it is hereby

ORDERED and ADJUDGED that:

1. The motion is GRANTED.

2. Plaintiff's Second Amended Statement of Claim is deemed filed as of the date of this Order. AT&T shall file a response to the Second Amended Statement of Claim within 30 days.

**DONE** and **ORDERED** in Chambers at Miami-Dade County, Florida on this 3rd day of December, 2024.

2019-002493-SP-26 12-03-2024 1:20 PM

2019-002493-SP-26 12-03-2024 1:20 PM
Hon. Lissette De la Rosa

**COUNTY COURT JUDGE**
Electronically Signed

No Further Judicial Action Required on **THIS MOTION**

CLERK TO **RECLOSE** CASE IF POST JUDGMENT

**Electronically Served:**
Angel A. Cortinas, angel.cortinas@dentons.com
Angel A. Cortinas, nancy.salazar@dentons.com
Angel A. Cortinas, docket.general.lit.atl@dentons.com
Enrique Lopez, elopez@gunster.com
Jonathan H Kaskel, jkaskel@gunster.com
Jonathan H Kaskel, nsalazar@gunster.com
Maury L. Udell, mudell@bmulaw.com
Maury L. Udell, notice66@bmulaw.com
Maury L. Udell, blopez@bmulaw.com
Patricia Simone Cruz, pc515g@att.com
Patricia Simone Cruz, mg626b@att.com
Patricia Simone Cruz, aw2846@att.com

**Physically Served:**

IN THE COUNTY COURT OF THE
11TH JUDICIAL CIRCUIT IN AND FOR
MIAMI-DADE COUNTY, FLORIDA

Sergio Salani,

      Plaintiff,

v.

AT&T Mobility, LLC,

      Defendant.

_____/

CASE NO.:  2022-047421-SP-25

FLA. BAR NO.: 121673

### PLAINTIFF'S MOTION FOR DEFAULT

Plaintiff, Sergio Salani, through his undersigned counsel, hereby files this Motion for Default against Defendant, AT&T, Mobility, LLC ("AT&T MOBILITY, LLC"), and further alleges as follows:

1. On October 4, 2024, the Court orally granted Plaintiff's Motion for Leave to Amend to File Second Amended Statement of Claim.

2. The Court's Memorandum of Disposition for that day reflects the Court's ruling.

3. Generally a party has ten (10) days to file a response to an amended pleading.

4. To date, Defendant has not filed a responsive pleading to the Second Amended Statement of Claim.

5. Pursuant to Fla. R. Civ. P. 1.500(b), when a party against whom affirmative relief is sought has failed to plead or otherwise defend as provided by these rules or any applicable statute or any order of court, the court may enter a default against such party.

Wherefore, Plaintiff Sergio Salani, respectfully requests the Court enter a default

against Defendant and any other relief the Court deems just and proper.


**<u>CERTIFICATE OF SERVICE</u>**

WE HEREBY CERTIFY that a true and correct copy of the foregoing was served

via e-mail this this December 9, 2024 to all counsel of record.

> **Beighley, Myrick, Udell, Lynne & Zeichman PA**
> *Attorneys for Plaintiff*
> 2601 S. Bayshore Drive, Suite 770
> Miami, FL 33133
> (305) 349-3930 – Phone
>
> By:    /s/ *Maury L. Udell*
> Maury L. Udell, Esquire
> mudell@bmulaw.com
> Fla. Bar 121673

IN THE COUNTY COURT OF THE 11TH JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA

Sergio Salani,

       Plaintiff,

v.

AT&T Mobility, LLC,

       Defendant.

_____/

CASE NO.: 2022-047421-SP-25

FLA. BAR NO.: 121673

## **PLAINTIFF'S REQUEST FOR PRODUCTION**

**PURSUANT** to Rules 1.280 and 1.350 of the Florida Rules of Civil Procedure, Plaintiff, propounds to the Defendant AT&T Mobility, LLC this Request for Production as follows, to be answered in writing within thirty (30) days after service hereof. Plaintiff requests that Defendant produce a copy of the documents requested below in native format, within thirty (30) days from the date of service hereof, at to produce for inspection and copying the following items in accordance with the following Definitions and Instructions and in the time and manner required by the Florida Rules of Civil Procedure:

## **DEFINITIONS**

For purposes of this Request for Production, the following definitions apply:

A.     "You" and "Your" shall refer to the parties to whom this Request for Production of Documents is directed, including their predecessors, successors, employees, agents, servants, subsidiaries, parent companies, affiliated companies and other persons acting or purporting to act on their behalf.

B.     "Person" means any natural individual in any capacity whatsoever or any entity or organization, including divisions, departments, and other units herein, and shall include, but not be limited to, public or private corporations, partnerships, joint ventures, voluntary or unincorporated associations, organization, proprietorships, trusts, estates, governmental agencies, commissions, bureaus, or departments and

the agents,

> servants, and employees of same. All references to any Person includes his/her/its employees, agents, servants, subsidiaries, parent companies, affiliated companies and any other person or entity acting or purporting to act on behalf or under his/her/its control.

C.     "Materials" shall mean all "Documents," "Writings" and "Communications" as those terms are defined herein.

D.     "Documents(s)" or "Writing(s)" shall include every record of every type, and is used in the broadest sense to include any medium (including all electronically stored information) upon which intelligence or information can be recorded and further includes, but is not limited to, all originals, non-identical copies and drafts of the following items, whether printed, handwritten, typed, recorded, or stored on any electro-magnetic storage device, or reproduced by hand, including without limitation correspondence, memoranda, e-mails, including all metadata which accompanies each e-mail, invoices, receipts, records, ledger cards or other accounting records, vouchers, checks, shop orders, diaries, handwritten notes, calendars, instructions, summaries of personal conversations or interviews, minutes or records of meetings or conferences, transcripts, opinions or reports of consultants, projections, drafts, contracts, agreements, confirmations, statistical statements, studies, telegrams, telexes, books, notes, reports, logs, diaries, tape recordings, video cassettes and data compilations from which information can be obtained, charts, photographs, notebooks, drawings, plans, printed materials of any kind, charts and interoffice communications, and any other writing of whatever description, including but not limited to any information contained in any computer, or represented by a computer program, signed or unsigned, regardless of whether approved, signed, sent, received, redrafted, or executed, study, work paper, handwritten note, draft, demand, chart, paper, print, laboratory record, drawing sketch, diagram, form, graph, index, list, tape, photograph, microfilm, data sheet, data processing card, or any other written, recorded, transcribed, punched, taped, filmed, or graphic matter, however produced and reproduced. Documents include all electronic copies of the foregoing.

E.     "Documents" also includes but is not limited to any electronically stored data on magnetic or optical storage media as an "active" file or files (readily readable by one or more computer applications or forensics software); any "deleted" but recoverable electronic files on said media; any electronic file fragments (files that have been deleted and partially overwritten with new data); and slack (data fragments stored randomly from random access memory on a hard drive during the normal operation of a computer [RAM slack] or residual data left on the hard drive after new data has overwritten some but not all of previously stored data).

F.     "Communication" means any oral or written statement, dialogue, colloquy, discussion or conversation, and also means any transfer of thoughts or ideas between persons by means of documents and includes any transfer of data from one location to another by electronic or similar means, including but not limited to text (SMS) message or electronic mail.

G.     "Evidencing" means having a tendency to show, prove or disprove.

H.      The words "and" and "or" as used herein shall be construed either disjunctively or conjunctively as required by the context to bring within the scope of these Requests any answer that might be deemed outside their scope by another construction.

I.      "Control" means in your possession, custody or control or under your direction, and includes in the possession, custody or control of those under the direction of you or your employees, subordinates, counsel, accountant, consultant, expert, parent or affiliated corporation, and any person purporting to act on your behalf.

J.      "Related to" or "relating to" shall mean directly or indirectly, refer to, reflect, describe, pertain to, arise out of or in connection with, or in any way legally, logically, or factually be connected with the matter discussed.

K.      "Including" shall mean including but not limited to.

## INSTRUCTIONS

Compliance with these Requests is to be made in accordance with the following:

1.      If you at any time had possession, custody or control of a document called for under this request and if such document has been lost, destroyed, purged, or is not presently in your possession, custody or control, you shall describe the document, the date of its loss, destruction, purge, or separation from possession, custody or control and the circumstances surrounding its loss, destruction, purge, or separation from possession, custody or control.

2.      If you assert that any document called for by this request is protected against disclosure as a "work product" or by privilege of any kind whatsoever, you shall provide the following information with respect to such document:

a.      The name and capacity of the person or persons who prepared the document;

b.      The name and capacity of all addressees or recipients of the original or copies thereof;

c.      The date, if any, borne by the document

d.      A brief description of its subject matter and physical size;

e.      The source of the factual information from which such document was prepared; and

f.      The nature of the privilege claimed.

3.      All documents produced pursuant hereto are to be produced in native format, and as they are kept in the usual course of business or shall be organized and

labeled (without permanently marking the item produced) so as to correspond with the categories of each numbered request hereof.

4.          When appropriate, the singular form of a word should be interpreted in the plural as may be necessary to bring within the scope hereof any documents which might otherwise be construed to be outside the scope hereof.

## **DOCUMENTS REQUESTED**

1.      Any contract between Plaintiff's and ATT from 2019 to date.

2.      Any notes related to Plaintiff's data usage from 2017 to date.

3.      Any bills sent to Plaintiff by Defendant from 2017 to date.

4.      Any notices sent to Plaintiff related to any Data Breach.

5.      All incident reports, including but not limited to initial reports, follow-up reports, and final reports, related to the any data breach incident that occurred from 2019 to date.

6.      Copies of all internal communications (emails, memos, meeting notes, etc.) concerning any data breach incident that occurred from 2019 to date.

7.      Copies of all external communications (emails, letters, press releases, etc.) with customers, vendors, partners, regulatory agencies, and the media regarding any data breach incident that occurred from 2019 to date.

8.      All documents outlining your company's data security policies and procedures that were in place at the time of any data breach incident that occurred from 2019 to date.

9.      All risk assessments, security audits, and vulnerability assessments conducted by or for your company in the two years preceding any data breach incident that occurred from 2019 to date.

10.     Copies of all notifications to Plaintiff's assignor regarding any data breach incident that occurred from 2019 to date.

11.     All contracts, agreements, and communications with third-party vendors or service providers involved in the handling or storage of the compromised data.

12.     Documentation of any corrective actions taken in response to the data breach, including changes to security measures, training programs, or policies.

13.     Copies of all insurance policies that may provide coverage for losses or liabilities arising from any data breach incident that occurred from 2019 to date.

14.     Copies of any lawsuits, legal claims, or complaints filed against your company related to any data breach incident that occurred from 2019 to date.

15.     Any reports or analyses conducted to assess the financial impact of any data breach incident that occurred from 2019 to date on your company.


## <u>CERTIFICATE OF SERVICE</u>

WE HEREBY CERTIFY that a true and correct copy of the foregoing was served via e-mail this this December 9, 2024: all counsel of record

> **Beighley, Myrick, Udell, Lynne & Zeichman PA**
> *Attorneys for Plaintiff*
> 2601 S. Bayshore Drive, Suite 770
> Miami, FL 33133
> (305) 349-3930 – Phone
>
> By:      /s/ *Maury L. Udell*
>      Maury L. Udell, Esquire
>      mudell@bmulaw.com
>      Fla. Bar 121673

IN THE COUNTY COURT OF THE
ELEVENTH JUDICIAL CIRCUIT, IN AND
FOR MIAMI-DADE COUNTY, FLORIDA

SERGIO SALANI,                                      CASE NO.  2022-047421-SP-25

        Plaintiff,

v.

AT&T MOBILITY LLC,

        Defendant.

_____/

## DEFENDANT AT&T MOBILITY LLC'S NOTICE OF FILING COURT ORDER

PLEASE TAKE NOTICE that Defendant, AT&T Mobility LLC, is filing a copy of the *Order Denying Plaintiff's Motion for Rehearing and Renewed Motion for Leave to File Third Amended Complaint* entered on December 9, 2024 by The Honorable Linda Singer Stein in Tolmos v. AT&T Mobility LLC, Case No. 2019-017775-SP-23, attached hereto as Exhibit A.

Specifically, this Order is being submitted for this Court's consideration with respect to its ruling on AT&T's *Motion to Dismiss the Second Amended Statement of Claim With Prejudice,* dated May 13, 2024, and heard before this Court on October 4, 2024.

Dated: December 11, 2024                    Respectfully submitted,

                                            By: */s/ Manuel A. Garcia-Linares*
                                                    Manuel A. Garcia-Linares, Esq.
                                                    Florida Bar No. 985252
                                                    mgarcialinares@daypitney.com
                                                    athomsen@daypitney.com
                                                    Andrew R. Ingalls, Esq.
                                                    Florida Bar No. 112558
                                                    aingalls@daypitney.com
                                                    athomsen@daypitney.com
                                                    **DAY PITNEY LLP**
                                                    396 Alhambra Circle
                                                    North Tower – 14th Floor
                                                    Miami, Florida 33134
                                                    Tel.: (305) 373-4000 / Fax: (305) 373-4099
                                                    *Counsel for Defendant AT&T Mobility LLC*

120863930.1

## CERTIFICATE OF SERVICE

I HEREBY certify that on December 11, 2024, I electronically filed the foregoing document with the Clerk of the Court via e-portal and served: **Maury L. Udell, Esq.**, Beighley, Myrick, Udell, Lynne & Zeichman, P.A., 2601 South Bayshore Drive, Suite 770, Miami, Florida 33133, Emails: mudell@bmulaw.com and notice66@bmulaw.com, *Counsel for Plaintiff.*

By: */s/ Manuel A. Garcia-Linares*
Manuel A. Garcia-Linares, Esq.

120863930.1

# EXHIBIT A

Case 1:25-cv-20381-RAR   Document 1-2   Entered on FLSD Docket 01/27/2025   Page 1445 of 1553

**IN THE COUNTY COURT OF THE ELEVENTH JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA**

CASE NO: 2019-017775-SP-23
SECTION: ND03
JUDGE: Linda Singer Stein

**Raymond Tolmos**

Plaintiff(s) / Petitioner(s)

vs.

**A T & T Mobility (LLC)**

Defendant(s) / Respondent(s)

_____/

## ORDER DENYING PLAINTIFF'S MOTION FOR REHEARING AND RENEWED MOTION FOR LEAVE TO FILE 3RD AMENDED COMPLAINT

Docket Index Number: **268**
Or
Efiling Number: _____   Date Filed: _____
Full Name of Motion: _____

This cause came before the Court on Plaintiff's Motion for Rehearing and Renewed Motion for Leave to File 3rd Amended Complaint.  After careful consideration of the motion, it is ORDERED that the motion is DENIED.

**DONE** and **ORDERED** in Chambers at Miami-Dade County, Florida on this 9th day of December, 2024.

2019-017775-SP-23 12-09-2024 3:10 PM

2019-017775-SP-23 12-09-2024 3:10 PM
Hon. Linda Singer Stein

**COUNTY COURT JUDGE**
Electronically Signed

No Further Judicial Action Required on **THIS MOTION**

CLERK TO **RECLOSE** CASE IF POST JUDGMENT

**Electronically Served:**
Andrew Robert Ingalls, aingalls@daypitney.com
Andrew Robert Ingalls, brodriguez@daypitney.com
Evelyn Davila, edavila@daypitney.com
Georgia A. Thompson, gthompson@daypitney.com
Georgia A. Thompson, lmiller@daypitney.com
Jessica Solorzano, jsolorzano@daypitney.com
Kenneth B Schurr, kbsservice@schurrlaw.com
Manuel A. Garcia-Linares, mgarcialinares@daypitney.com
Manuel A. Garcia-Linares, athomsen@daypitney.com
Maury L. Udell, notice66@bmulaw.com
Maury L. Udell, blopez@bmulaw.com
Rachel L Kittl, rkittl@bmulaw.com

**Physically Served:**

IN THE COUNTY COURT OF THE 11TH
JUDICIAL CIRCUIT IN AND FOR MIAMI-
DADE COUNTY, FLORIDA

Sergio Salani,

      Plaintiff,

v.

AT&T Mobility, LLC,

      Defendant.

_____/

CASE NO.: 2022-047421-SP-25

FLA. BAR NO.: 121673

### PLAINTIFF'S NOTICE OF SUPPLEMENTAL AUTHORITY

COMES NOW, the Plaintiff, Sergio Salani, by and through his undersigned counsel, and files this Notice of Supplemental Authority.

AT&T's request for dismissal based on Orr v. AT&T Mobility, LLC, No. 3D23-0097, 2024 WL 3588350 (Fla. 3d DCA 2024) not supported based on the actual language of Orr which specifically stands for the proposition that a court "may rely on a document referenced in the complaint on a motion to dismiss." Orr at *1. "The word 'may' when given its ordinary meaning denotes a permissive term rather than the mandatory connotation of the word 'shall.' " See Progressive Select Ins. Co. v. Fla. Hosp. Med. Ctr., 236 So. 3d 1183, 1187 (Fla. 5th Dist. 2018), approved, 260 So. 3d 219 (Fla. 2018) Fla. Bar v. Trazenfeld, 833 So.2d 734, 738 (Fla. 2002).

Because the term "may" is permissive, even under Orr this Court is not required to consider AT&T's hearsay documents attached to a motion to dismiss. In Orr, the Third District Court of Appeal found that it was not error for the Court to consider the wireless agreement which AT&T apparently attached to its motion to dismiss. The Orr opinion

does not discuss whether the documents relied on by the trial court in <u>Orr</u> were authenticated or not.  On a motion to dismiss this Court cannot statements of counsel as argument of counsel is not evidence. <u>Blanco v. State</u>, 150 Fla. 98, 7 So. 2d 333, 337 (1942)("argument of counsel, however, is not evidence."). <u>See</u> <u>also</u>, *e.g.*, <u>Stading v. Equilease Corp</u>., 471 So. 2d 1379, 1379 (Fla. 4th DCA 1985) ("The hearing consisted solely of the arguments of opposing counsel, which is, of course, not evidence.").

Furthermore, in <u>Mucha v. Atlas Van Lines, Inc.</u>, 989 So.2d 697 (Fla. 5th DCA 2008), on a motion to dismiss context, the Fifth District Court of Appeal ruled that it is reversible error to rely on **unauthenticated hearsay attached to a motion to dismiss**. In *Mucha* the trial court dismissed the plaintiff's claim for property damage and personal injuries that occurred during the moving and storage of furniture and other contents of her home. The plaintiff brought an action against the moving company and its insurer. The trial court dismissed based on Florida's non-joinder statute, holding that the insurer was the moving company's liability insurer rather than a first-party insurer. The court reached this conclusion based on an interpretation of language in an unauthenticated document that was attached to the insurer's motion to dismiss.  The Fifth District reversed. It held that it was error to dismiss based on an unauthenticated document that purportedly contained language from which the trial court concluded that the insurer was a third-party insurer.

> In reviewing the dismissal with prejudice we look to the four corners of the complaint and accept as true all well-pled allegations… [citation omitted]. The allegations in the third amended complaint are sufficient to state a cause of action. The language in the **unauthenticated document** that formed the basis for the trial court's dismissal contained language that could be construed as directly indemnifying Mucha for any

losses sustained. We express no opinion as to whether a cause of action against Hanover can withstand summary judgment. However, dismissal with prejudice at this stage of the proceedings was error. (Emphasis added).

Id.at 698.

"[I]n the absence of interdistrict conflict, district court decisions bind all Florida trial courts." See Pardo v. State, 596 So. 2d 665, 666 (Fla. 1992) ("The proper hierarchy of decisional holdings would demand that in the event the only case on point on a district level is from a district other than the one in which the trial court is located, the trial court be required to follow that decision").  Therefore under Mucha, dismissal with prejudice is improper.

## <u>CERTIFICATE OF SERVICE</u>

WE HEREBY CERTIFY that a true and correct copy of the foregoing was sent via e-portal this this December 12, 2024 to: Manuel A. Garcia-Linares, Esquire (mgarcialinares@daypitney.com, edavila@daypitney.com ) Andrew R. Ingalls, Esquire (aingalls@daypitney.com) Day Pitney LLP, 396 Alhambra Circle, North Tower - 14th Floor, Miami, Florida 33134.

**Beighley, Myrick, Udell, Lynne & Zeichman PA**
*Attorneys for Plaintiff*
2601 S. Bayshore Dr.
Suite 770
Miami, FL 33133
(305) 349-3930 – Phone

By:      /s/ *Maury L. Udell*
         Maury L. Udell, Esquire
         mudell@bmulaw.com
         Fla. Bar 121673

989 So.2d 697
District Court of Appeal of Florida,
Fifth District.

Diana MUCHA, Appellant,

v.

ATLAS VAN LINES, INC., et al., Appellee.

No. 5D07–3205.
|
Aug. 8, 2008.

**Synopsis**

**Background:** Customer brought suit against moving company, moving van company, and moving company's insurer after she suffered property damage during moving and storage of property and bodily injury allegedly due to moving company's negligence. The Circuit Court, Seminole County, Clayton D. Simmons, J., dismissed complaint. Customer appealed.

**Holding:** The District Court of Appeal held that customer's allegations were sufficient to state a cause of action against insurer.

Reversed.

West Headnotes (1)

[1]    **Insurance**  👈  "No Action" Clause

    **Insurance**  👈  Pleading

    Customer's allegations of property damage and personal injuries due to moving company's negligence were sufficient to state a cause of action against moving company's insurer; even though statute prohibited suit against liability insurer prior to settlement with or judgment against tortfeasor, the complaint contained language that could be construed as directly indemnifying customer for any losses sustained. West's F.S.A. § 627.4136.

1 Case that cites this headnote

**Attorneys and Law Firms**

**\*697** George E. Carr, Orlando, and Jerri A. Blair of Jerri A. Blair, P.A., Tavares, for Appellant.

**\*698** Scott J. Frank and Anthony J. Russo of Butler, Pappas, Weihmuller, Katz, Craig, LLP, Tampa, for Appellee.

**Opinion**

PER CURIAM.

Diana Mucha appeals from a final order dismissing her lawsuit against Hanover Insurance Company. We reverse.

Mucha's claims arose from property damage and personal injuries that occurred during the moving and storage of the furniture and other contents of her home. She alleges that many of her possessions were lost or destroyed and that she sustained personal injury when improperly stacked shelving fell on her as a result of the moving company's negligence.

Mucha brought suit against Avatar Relocation, Inc., Atlas Van Lines, Inc., and Hanover Insurance Company. The sufficiency of the complaint vis-a-vis Atlas and Avatar are not the subject of this appeal. The trial court dismissed the complaint based upon section 627.4136, Florida Statutes (2007), Florida's non-joinder statute. The trial judge ruled that Hanover was Avatar's liability insurer, rather than a first-party insurer.

In reviewing the dismissal with prejudice we look to the four corners of the complaint and accept as true all well-pled allegations. Huet v. Mike Shad Ford, Inc., 915 So.2d 723, 725 (Fla. 5th DCA 2005). The allegations in the third amended complaint are sufficient to state a cause of action. The language in the unauthenticated document that formed the basis for the trial court's dismissal contained language that could be construed as directly indemnifying Mucha for any losses sustained. We express no opinion as to whether a cause of action against Hanover can withstand summary judgment. However, dismissal with prejudice at this stage of the proceedings was error.

REVERSED.

**Mucha v. Atlas Van Lines, Inc., 989 So.2d 697 (2008)**

33 Fla. L. Weekly D1947

ORFINGER, TORPY, and COHEN, JJ., concur.

**All Citations**

989 So.2d 697, 33 Fla. L. Weekly D1947

---

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.

IN THE COUNTY COURT OF THE ELEVENTH JUDICIAL
CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA

CASE NO: 2022-047421-SP-25
SECTION: CG01
JUDGE: Jorge A Perez Santiago

**Sergio Salani**

Plaintiff(s) / Petitioner(s)

vs.

**AT&T Mobility, LLC**

Defendant(s) / Respondent(s)

_____/

## OMNIBUS ORDER GRANTING DISMISSAL WITH PREJUDICE OF COUNTS 1-4 AND GRANTING LEAVE TO AMEND COMPLAINT TO STATE DATA BREACH CLAIMS

[DE 31 – Efiled 05/31/2024 – Filing # 199629508 – Defendant's *Motion to Dismiss the Second Amended Statement of Claim with Prejudice*]

[DE 32 – Efiled 06/17/2024 – Filing # 200716498 – Plaintiff's *Motion for Leave to File Second Amended Statement of Claim*]

On October 4, 2024, this Court heard Defendant AT&T Mobility, LLC's *Motion to Dismiss the Second Amended Statement of Claim With Prejudice* and Plaintiff Sergio Salani's *Motion for Leave to Amend to File Second [sic] Amended Statement of Claim*.[1] After considering the Motions and argument of counsel, the Court concludes as follows.

## BACKGROUND

Plaintiff's Second Amended Statement of Claim relates to AT&T's practice of charging an administrative fee on customer accounts, asserting claims for: (1) fraud, (2) damages under the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201, *et seq.* ("FDUTPA"), (3) declaratory and/or injunctive relief under FDUTPA, and (4) unjust enrichment. Each claim alleges that AT&T improperly charged Plaintiff a $1.99 administrative fee without disclosing its existence and then did not apply the administrative fee as it represented it would—*i.e.*, AT&T allegedly

said it would use the administrative fee to recoup certain costs but used it for something else instead. Sec. Am. St. Cl. ¶¶ 16-29.

AT&T filed a *Motion to Dismiss the Second Amended Statement of Claim With Prejudice* ("Motion to Dismiss") on May 31, 2024, arguing that the Court should dismiss the entire case *with prejudice* for multiple reasons:

- Plaintiff's claims are defeated by the plain language of the Consumer Service Agreement between AT&T and Plaintiff, either because (1) the operative agreement was incorporated by reference into the Second Amended Statement of Claim or, (2) in the alternative, because Plaintiff failed to attach the Consumer Service Agreement and AT&T billing statement to the Second Amended Statement of Claim as required by Florida Rule of Civil Procedure 1.130;

- Plaintiff's administrative fee claims are preempted by Section 332(c)(3)(A) of the Federal Communications Act; and,

- While the claims sound in fraud, Plaintiff fails to plead those claims with particularity under Florida Rule of Civil Procedure 1.120(b).

On June 17, 2024, Plaintiff filed a *Motion for Leave to File Second Amended Statement of Claim*. What would actually be the Third Amended Statement of Claim asserts claims for: (1) fraud, (2) damages under FDUTPA, (3) declaratory and/or injunctive relief under FDUTPA, (4) unjust enrichment, (5) negligence for data breach, and (6) violation of FDUTPA for data breach. Counts 1 through 4 again challenge the $1.99 administrative fee. Counts 5 and 6 allege, for the first time, an entirely different set of facts: that AT&T or unidentified "third party vendors" failed to safeguard Plaintiff's "PII" due to a data breach.

The Third DCA subsequently issued its decision in *Orr v. AT&T Mobility, LLC*, No. 3D23-0097, 2024 WL 3588350 (Fla. 3d DCA July 31, 2024), affirming the trial court's dismissal of five cases filed by Plaintiff's counsel involving administrative fee claims with similar factual allegations.[2] *See Orr,* 2024 WL 3588350, at *1 ("The Appellants entered into wireless customer agreements with AT&T . . . which included an administrative fee charge for providing unlimited data

with potential speed restrictions. The Appellants later filed claims against AT&T based on relevant sections of the wireless customer agreement, alleging deceptive administrative fee charges and data throttling."). In relevant part, the Third DCA ruled that the trial court properly considered the operative service contract between AT&T and the plaintiffs while ruling on AT&T's motion to dismiss the complaint with prejudice. *Id.* It explained that the plaintiffs "raised the wireless customer agreement as the basis for their complaints and expressly relied upon the agreement to attempt to state causes of action" and, thus, the allegations incorporated the "wireless customer agreement by relying on and quoting it." *Id. Orr* is now final because the Third DCA denied Appellants' Motion for Rehearing on October 23, 2024.

## LEGAL ANALYSIS

1. *Plaintiff has incorporated the Consumer Service Agreement by reference.*

It was not immediately apparent to the Court that Plaintiff's allegations in the operative pleading incorporated by reference the Consumer Service Agreement. That was so because Plaintiff edited prior versions of the pleadings from this and other similar cases to try to plead around the Consumer Service Agreement. Gone were the clear contract-based claims and express and direct references to an agreement between the plaintiff and AT&T. And gone were the transparent quotations from the terms of the wireless customer agreement. Thus, at first blush, it was not obvious to the Court that Plaintiff was relying on or quoting the terms of the agreement to try to state causes of action.

However, Plaintiff's administrative fee theories are substantively the same as those alleged in *Orr* and the supporting allegations are similar. More importantly, the allegations Defendant highlights in this action support Defendant's argument that Plaintiff incorporated the Consumer Service Agreement by reference *more* than the allegations the trial court in *Orr* concluded were sufficient to incorporate the Consumer Services Agreement by reference.

In *Orr*, the allegations the trial court concluded were sufficient to incorporate by reference the Consumer Services Agreement were paragraphs 16 and 39 of the Amended Statement of Claim. Those allegations were as follows:

> 16. AT&T MOBILITY, LLC prominently advertises particular flat monthly rates for its post-paid wireless service plans. Then, after customers sign up, AT&T MOBILITY, LLC actually charges higher monthly rates than the customers were promised and agreed to pay. AT&T MOBILITY, LLC covertly increases the actual price by padding all post-paid wireless customers' bills each month with a bogus so-called "Administrative Fee" (currently $1.99 every month for each phone line) on top of the advertised price.

> 39. Furthermore, in the advertising, sale, and renewal of mobile data and wireless plans and acceptance of payments, AT&T MOBILITY, LLC has represented, directly or indirectly, expressly or by implication, to customers that it would be charged a certain amount. AT&T MOBILITY, LLC has since added an "Administrative Fee" to Plaintiff's bill which is unfair and deceptive as it is not what its being used for despite its definition in the wireless agreement. The administrative fee is a textbook pass through-fee. AT&T chose the descriptive terms of the administrative fee that does not accurately describe what is being charged and collected, such conduct is actionable under the FDUTPA.

*See Orr v. AT&T Mobility, LLC*, Case No. 2020-008179-SP-26.

In this action AT&T first identifies paragraphs 15, 20, 32, and 42 as among the paragraphs that incorporate by reference the Consumer Service Agreement because these allegations "establish that a contract exists between AT&T and Plaintiff and allege that AT&T is supposedly liable for not honoring its terms."[3] Those paragraphs allege:

> 15. AT&T MOBILITY, LLC sells a wide variety of handsets, wirelessly enabled computers (e.g., tablets and notebooks) and wireless data cards manufactured by various suppliers for use with our voice and data services. They also sell accessories, such as carrying cases and hands-free devices. They sell through their own company-owned stores, agents and third-party retail stores. Like other wireless service providers, they have historically provided postpaid contract subscribers substantial equipment subsidies to initiate, renew or upgrade service.

19. Making matters worse, AT&T MOBILITY, LLC deliberately confuse Plaintiff and misleadingly suggests that the Administrative Fee is akin to a tax or another standard government pass-through fee, when in fact it is simply a way for AT&T MOBILITY, LLC to advertise and promise lower amounts than it actually charges.

20. The administrative fee is not, in fact, tied to the costs that AT&T MOBILITY, LLC's incurs. This is corroborated by the fact that AT&T has repeatedly increased the amount of the monthly Administrative Fee since the fee was first imposed, while during that same time period the stated "costs" for (i.e., interconnect charges and cell site rental charges) have actually decreased according to AT&T's own financial statements and public filings with the Securities and Exchange Commission.

32. AT&T MOBILITY, LLC's representations on its bills to Plaintiff regarding the administrative fee charged on the account were false statements of material fact. AT&T MOBILITY, LLC's representation that the Administrative Fee is a charge assessed by AT&T MOBILITY,LLC that helps defray a portion of certain expenses AT&T MOBILITY, LLC incurs, including but not limited to: (a) charges AT&T MOBILITY, LLC or its agents pay to interconnect with other carriers to deliver calls from AT&T MOBILITY, LLC customers to their customers; and (b) charges associated with cell site rents and maintenance" are false.

42. AT&T MOBILITY, LLC's representations to Plaintiff regarding the administrative fee charged are deceptive and in fact misrepresent the truth. AT&T MOBILITY, LLC's representation that the Administrative Fee is a charge assessed by AT&T MOBILITY, LLC that helps defray a portion of certain expenses AT&T MOBILITY, LLC incurs, including but not limited to: (a) charges AT&T MOBILITY, LLC or its agents pay to interconnect with other carriers to deliver calls from AT&T MOBILITY, LLC customers to their customers; and (b) charges associated with cell site rents and maintenance is false. The administrative fee is instead a scheme to funnel direct profit to AT&T MOBILITY, LLC rather than pay for any identifiable increase in costs

It also identifies paragraphs, 2, 16, and 17 as allegations that establish Plaintiff is an AT&T customer who is paying more than what he was "promised and agreed to pay" because the fee was not disclosed "before or when [he] signed up."[4] Those paragraphs allege:

2. At all material times, Plaintiff was a customer of AT&T, XXX-XX9-8349.

16. AT&T MOBILITY, LLC prominently advertises particular flat monthly amounts for its postpaid wireless service plans. Then, after customers sign up, AT&T MOBILITY, LLC actually charges higher monthly amount for service and for terms of usage than the customers were promised and agreed to pay. AT&T MOBILITY, LLC covertly increases the actual overall price by padding all post-paid wireless customers' bills each month, including Plaintiff's bills, with a bogus so-called Administrative Fee (currently $1.99 every month for each phone line) on top of the advertised price. AT&T MOBILITY, LLC has stated that it charges the administrative fee because it is a "standard administrative fee" across the wireless industry. However, in 2017, T-Mobile eliminated the "administrative charges". Moreover, prepaid carriers like MetroPCS and AT&T's subsidiary Cricket Wireless do not charge administrative fees.

17. The Administrative Fee is not properly disclosed to customers before or when they sign up, and in fact it is never adequately and honestly disclosed.

Just this sample of eight allegations show that the Consumer Service Agreement is central to Plaintiff's claims because it defines the terms of Plaintiff's relationship with AT&T, including the provisions governing the alleged deceptive conduct (charging more than what Plaintiff agreed to pay and failing to disclose these charges when Plaintiff "signed up"). Plaintiff also quotes terms from the contract (even if the terms are not within quotation marks). *See* Sec. Am. St. Cl. ¶¶ 32, 42. So, while Plaintiff tried taking another stab to plead around the contract following *Orr*, he failed.

Accordingly, like in *Orr*, the Court concludes the Consumer Service Agreement is incorporated into the Second Amended Complaint by reference and, thus, will be considered in deciding this motion to dismiss. *Id.* at *1 (concluding trial court "properly considered the agreement while ruling on AT&T's motion to dismiss the complaint with prejudice"). But even if it was not incorporated by reference, the

Court would dismiss this action based on AT&T's alternative arguments for the reasons discussed in sections 3 and 4 below.

2. *The Consumer Service Agreement contradicts Plaintiff's claims.*

In *Orr*, the Third DCA affirmed the trial court's finding that the plaintiffs' claims based on the same administrative fee theories asserted here were directly contradicted by the contract between AT&T and the plaintiffs. *Id.* at *1 n.2. That decision is final, and it either controls the outcome here or is persuasive.

The plain language of the Consumer Service Agreement shows that it authorizes the imposition of an administrative fee. *See* Consumer Service Agreement, § 2.15.1. Plaintiff also quotes the administrative fee definition contained within his AT&T billing statement and the Consumer Service Agreement, alleging:

> AT&T MOBILITY, LLC's representations on its bills to Plaintiff regarding the administrative fee charged on the account were false statements of material fact. AT&T MOBILITY, LLC's representation that the Administrative Fee is a charge assessed by AT&T MOBILITY, LLC that helps defray a portion of certain expenses AT&T MOBILITY, LLC incurs, including but not limited to: (a) charges AT&T MOBILITY, LLC or its agents pay to interconnect with other carriers to deliver calls from AT&T MOBILITY, LLC customers to their customers; and (b) charges associated with cell site rents and maintenance" are false.

Sec. Am. St. Cl. ¶ 32; *see also id.* ¶ 42. According to Plaintiff, the administrative fee is not tied to either interconnect or cell site charges because AT&T has continuously increased the fee even though these costs have allegedly decreased. *Id.* ¶¶ 20-22. Based on this assertion, Plaintiff theorizes that the administrative fee is part of "a scheme to funnel direct profit to AT&T rather than pay for any identifiable increase in costs." *Id.* ¶ 42. But, Plaintiff admits that the administrative fee definition states that AT&T may defray a portion of certain expenses "***including but not limited to***" charges for interconnection and for cell site rents and maintenance. Sec. Am. St. Cl. ¶¶ 32, 42 (emphasis added).

Accordingly, as stated by Judge Gonzalez-Paulson in one of the many companion cases filed by Plaintiff's counsel (affirmed without discussion by the

Third DCA): "[T]aking Plaintiff's allegations as true, interconnect costs, cell site rents and/or maintenance charges serve as examples of and not limitations to how AT&T can apply the Administrative Fee, meaning AT&T's alleged use of the fee to offset other expenses and costs would still comply with the fee's definition and cannot be considered deceptive, unfair, false, or a violation of the parties' agreement." Dismissal Order, p. 8, *Edward Barger vs AT&T Mobility LLC*, 2020-008181-SP-26 (Miami-Dade Cty. Ct. Sept 28, 2022) ("Barger Order").

Florida law is clear that "[a] party cannot recover for alleged false misrepresentations that are adequately dealt with or expressly contradicted in a later written contract." *TRG Night Hawk Ltd. v. Registry Dev. Corp.*, 17 So. 3d 782, 784 (Fla. 2d DCA 2009). The Consumer Service Agreement and Plaintiff's own allegations contradict the Second Amended Statement of Claim's administrative fee theories underlying Plaintiff's claims. Therefore, as determined by Judge Gonzalez-Paulson and affirmed by the Third DCA in *Orr*: "These claims are ripe for dismissal because they are facially negated by documents relied on and incorporated into the Amended Complaint." Barger Order, p. 5; *Orr*, 2024 WL 3588350, at *1 n.2.

3. *Additional state law grounds for dismissal.*

Claim-by-claim analysis of counts 1-4 of the operative pleading further reveals additional grounds to dismiss these claims based on Plaintiff's failure to properly plead his fraud, FDUTPA, and unjust enrichment claims.

    a. Without incorporation by reference, the Second Amended Statement of Claim fails under Rule 1.130(a).

If the Consumer Service Agreement is not properly incorporated by reference, then it must be attached as an exhibit to the Second Amended Complaint under Florida Rule of Civil Procedure 1.130(a). Rule 1.130(a) provides, in pertinent part, that "[a]ll . . . documents on which action may be brought or defense made, or a copy thereof or a copy of the portions thereof material to the pleadings, must be incorporated in or attached to the pleading." Plaintiff failed to attach the Consumer

Service Agreement and Plaintiff's bills, both of which Plaintiff alleges give rise to his causes of action because those documents were misleading or deceptive. Sec. Am. St. Cl. ¶ 32 ("AT&T MOBILITY, LLC's representations on its bills to Plaintiff regarding the administrative fee charged on the account were false statements of material fact."); ¶ 42 (quoting the Consumer Service Agreement); *see Safeco Ins. Co. of Am. v. Ware*, 401 So. 2d 1129, 1130 (Fla. 4th DCA 1981) ("In the case of a complaint based on a written instrument it does not state a cause of action until the instrument or an adequate portion thereof is attached to or incorporated in the pleading in question."). Accordingly, Plaintiff's claims would also be due to be dismissed *without prejudice* for failure to attach the Consumer Service Agreement and Plaintiff's bills.

      b. <u>Plaintiff fails to plead his fraud-based claims with particularity.</u>

It is axiomatic that claimants must plead claims sounding in fraud with particularity. Fla. R. Civ. P. 1.120(b) ("[A]ll averments of fraud . . . shall be stated with such particularity as the circumstances may permit."); *Cedars Healthcare Grp., Ltd. v. Mehta*, 16 So. 3d 914, 917 (Fla. 3d DCA 2009). This requirement exists "[b]ecause of the damage to reputations and good will which may result from a charge of fraud." *Gordon v. Etue, Wardlaw & Co., P.A.*, 511 So. 2d 384, 388 (Fla. 1st DCA 1987); *see also Plastiquim, S.A. v. Odebrecht Constr., Inc.*, 337 So. 3d 1270, 1273 (Fla. 3d DCA 2022) ("Due to the proclivity of litigants to 'loosely sling the term 'fraud' into pleadings,' Florida law requires that the tortious conduct be described with precision."); *USA Nutraceuticals Group, Inc. v. BPI Sports, LLC*, No. 15-CIV-80352, 2016 WL 4254257, at *2 (S.D. Fla. Feb. 16, 2016) (fraud must alleged with particularity to "alert defendants to the 'precise misconduct with which they are charged'") (quoting *Durham v. Bus. Mgmt. Associates*, 847 F.2d 1505, 1511 (11th Cir. 1988) (requirement also protects defendants from "spurious charges of immoral and fraudulent behavior") (cleaned up)).

AT&T argues the fraud and FDUTPA claims, which share a factual basis and both sound primarily in fraud, were insufficiently pled because they were not pled

with particularity. In response, Plaintiff contends "there's no case that says you have to plead FDUTPA with particularity." Transcript, 26:4-5. The Court finds Plaintiff's argument unpersuasive. *See USA Nutraceuticals Grp., Inc. v. BPI Sports, LLC*, No. 15-CIV-80352, 2016 WL 4254257, at *3 (S.D. Fla. Feb. 16, 2016) ("[C]ourts regularly apply Rule 9(b) to FDUTPA claims, as such claims uniquely sound in both tort and fraud.").

Although a FDUTPA claim need not be based on allegations of fraud or misrepresentations, Plaintiff chose to plead such allegations to support the common law fraud and FDUTPA claims. *See, e.g.*, Sec. Am. St. Cl. (¶ 16 ("AT&T MOBILITY, LLC covertly increases the actual overall price . . . ."), ¶ 17 (alleging the administrative fee "is never adequately and honestly disclosed"), ¶ 22 (alleging that "by AT&T MOBILITY, LLC's own design, AT&T MOBILITY, LLC's scheme is to keep customers from realizing they are being deceived . . . ."); ¶¶ 18, 43 (describing AT&T's conduct as "immoral," "unethical," "oppressive," and "unscrupulous" and alleging AT&T's representations about the administrative fee are false); ¶¶ 32, 33 (alleging representations about administrative fee were "false statements of material fact" that AT&T "knew or should have known . . . were false" because its costs in interconnect charges and cell site charges "actually decreased"); ¶¶ 39, 42, 43 (alleging AT&T represented to consumers what they would be charged for usage but AT&T added an "'Administrative Fee'" that is unfair and deceptive because "it is not what it's being used for," "[AT&T's] representations to Plaintiff regarding the administrative fee charged are ***deceptive*** and in fact ***misrepresent the truth***" and is part of a "scheme to funnel direct profit to [AT&T] rather than pay for any identifiable increase in costs," and AT&T "knew or should have known that the representations regarding the administrative fee are false") (emphasis added). It cannot be disputed that the common law fraud claim must be pled with particularity. And the FDUTPA claim rests on the same fraud-based allegations (*i.e.*, averments of fraud) that must be pled with particularity under Rule 1.120(b). *See Mehta*, 16 So. 3d at 917; *USA Nutraceuticals Grp., Inc.*, 2016 WL 4254257, at *3 (observing "courts regularly apply [a heightened pleading standard] to FDUTPA claims, as such claims

sound in both tort and fraud" and applying heightened pleading standard to the FDUTPA claim because the "allegations sound primarily in fraud"); *Librizzi v. Ocwen Loan Servicing, LLC*, 120 F. Supp. 3d 1368, 1381 (S.D. Fla. 2015) (finding FDUTPA claim alleging defendant "caused damages through deception" sounded in fraud and was required to be pleaded with particularity).

Plaintiff fails to plead his fraud and FDUTPA claims with the required specificity. The allegations lack detailed information regarding any specific fraudulent or deceptive conduct by AT&T. As established in *Mehta*, "the factual basis for a claim of fraud must be pled with particularity and must specifically identify misrepresentations or omissions of fact, as well as the time, place, or manner in which they were made." 16 So. 3d at 917. Plaintiff does not identify any specific interactions with AT&T, nor does Plaintiff allege when, where, or how any deceptive conduct occurred. As Judge Gonzalez-Paulson noted, "There is no particularly-pled assertion explaining where, when, what, and how these alleged misrepresentations or omissions were material *to Plaintiff's* decision to do business with AT&T, that *they* relied on them, or that they proximately caused *their* damages." Barger Order, p. 13 (emphasis in original). These pleading deficiencies are fatal to Plaintiff's fraud and FDUTPA claims. Thus, Plaintiff's fraud and FDUTPA claims would be due to be dismissed *without prejudice* for this additional reason.

### c. Plaintiff's unjust enrichment claim fails as a matter of law.

"The elements of a cause of action for unjust enrichment are: (1) plaintiff has conferred a benefit on the defendant, who has knowledge thereof; (2) defendant voluntarily accepts and retains the benefit conferred; and (3) the circumstances are such that it would be inequitable for the defendant to retain the benefit without first paying the value thereof to the plaintiff." *Duty Free World, Inc. v. Miami Perfume Junction, Inc.*, 253 So. 3d 689, 693 (Fla. 3d DCA 2018). "Florida law is clear that 'a plaintiff cannot pursue a quasi-contract claim for unjust enrichment if an express contract exists concerning the same subject matter.'" *Sterling Breeze Owners' Ass'n, Inc. v. New Sterling Resorts, LLC*, 255 So. 3d 434, 437 (Fla. 1st DCA 2018), *reh'g*

*denied* (Oct. 16, 2018).

Count 4 fails because Plaintiff has acknowledged the existence of a contract between the parties that governs the subject matter of this lawsuit, thus barring Plaintiff's quasi-contract claim for unjust enrichment. *New Sterling Resorts, LLC*, 255 So. 3d at 437. The fact that Plaintiff chose not to incorporate the paragraphs acknowledging the existence of the Consumer Service Agreement into the unjust enrichment count does not save the claim as this Court does not have to accept as true or even consider "internally inconsistent factual claims." *Gallego v. Wells Fargo Bank, N.A.*, 276 So. 3d 989, 990 (Fla. 3d DCA 2019). Accordingly, the unjust enrichment claim is also due to be dismissed *with prejudice* for this additional reason.

4. *The portions of Plaintiff's claims attacking the existence and application of the administrative fee are preempted by the Federal Communications Act.*

The Court discerns from Plaintiff's pleadings that it may attempt to prove its claims based on two separate, but related and intertwined, theories of liability.

First, Plaintiff contends that AT&T deceives its customers because it "prominently advertises particular flat monthly amounts for its post-paid wireless services plans" but "actually charges higher monthly amount for service and for terms of usage than the customers were promised and agreed to pay" by "padding all post-paid wireless customers' bills each month . . . with a bogus so-called Administrative Fee . . . on top of the advertised price." Sec. Am. Compl. ¶ 16; *see also* ¶ 17 ("The Administrative Fee is not properly disclosed to customers before or when they sign up, and in fact it is never adequately and honestly disclosed"). Although Plaintiff alleges the fee is "bogus," this theory of liability does not require proof that the fee itself is, in fact, bogus, unreasonable, unjust, or unconscionable.

Second, Plaintiff alleges the "bogus" administrative fee is not being used for what AT&T says it is being used. It is actually not "akin to a tax or another standard government pass-through fee" and "not, in fact, tied to the costs that [AT&T] incurs"

for "interconnect charges and cell site rental charges" leading to customers being "overcharged for the term of usage" so AT&T can "effectively increase its amounts charged" to "fund unrelated corporate liabilities of its parent company." *Id.* ¶¶ 19-29. Defendant calls this second theory of liability the heart of Plaintiff's Second Amended Statement of Claim. And because these state law allegations challenge the amount AT&T charges for its services and call for a state court to adjudicate whether the "bogus" fee is unreasonable, unjust, or otherwise inappropriate, they are a direct attack on AT&T's "rates," and are therefore preempted by Section 332(c)(3)(A) of the Federal Communications Act. *See Gilmore v. Sw. Bell Mobile Sys., Inc.*, 156 F. Supp. 2d 916, 923 (N.D. Ill. 2001).

Section 332(c)(3)(A) provides that "no State or local government shall have any authority to regulate the entry of or the rates charged by any commercial mobile service," reserving only "other terms and conditions" to the states' authority. 47 U.S.C. § 332(c)(3). While the statute itself does not define "rates" courts have interpreted the term "rates" to carry its "ordinary, contemporary, [and] common meaning" as "[t]he amount of a charge or payment…having relation to some other amount or basis of calculation," "[a]n amount paid or charged for a good or service," or "a charge per unit of a public-service commodity." *Nat'l Ass'n of State Utility Consumer Advocates v. FCC*, 457 F.3d 1238, 1254 (11th Cir.), *opinion modified on denial of reh'g*, 468 F.3d 1272 (11th Cir. 2006); *see Peck v. Cingular Wireless, LLC*, 535 F.3d 1053, 1057 (9th Cir. 2008) (a "rate" affects "how much businesses may charge for their goods or services."). Consistent with its policy of deregulation, the FCA does not specifically regulate rates for cellular telephone services. Rates are instead left to be determined by market forces, except that 47 U.S.C. § 201(b) prohibits charges that are unjust or unreasonable. *See* 47 U.S.C. § 201(b); *Gilmore*,156 F. Supp. 2d at 923; *see also* 47 U.S.C. §§ 201-08 (providing for proceedings before the FCC or in federal court).

In determining whether a plaintiff's claims are properly characterized as a challenge to a carrier's rates, and thereby subject to express preemption, "[t]he key

inquiry is 'the nature of the claims . . . and what the effect of granting the relief requested would be.'" *In re Apple iPhone 3G Prods. Liab. Litig.*, 728 F. Supp. 2d 1065, 1071 (N.D. Cal. 2010) (quoting *Bastien v. AT&T Wireless Servs., Inc.*, 205 F.3d 983, 989 (7th Cir. 2000)). A claim is preempted or subject to primary jurisdiction in the FCC if, to resolve the claim, the court must decide if the amount charged is "unreasonable, unjust, or otherwise inappropriate." *Gilmore*, 156 F. Supp. at 923; 47 U.S.C. § 201(b); 47 U.S.C. 332(c)(3).

*Gilmore* is instructive. There, a Southwestern Bell customer challenged the "Corporate Account Administration Fee," alleging breach of contract, unjust enrichment, and fraud. The plaintiff alleged that no significant administrative or other services were provided for the fee, the monthly bills did not explain what services were provided for the fee, the fee was imposed "for the sole purpose of enabling [defendant] to generate more revenue without appearing to raise its rates for cellular service," and the plaintiff was "deceived, in effect, into paying a fee at rates higher than the rates for which they contracted." *Gilmore*, 156 F. Supp. 2d at 919.

The court held that these state law claims were effectively a challenge to the sufficiency of services received for the fee, which is a rate issue that is preempted under 47 U.S.C. 332(c)(3)(A). *Id.* at 924. It held that whether an amount charged to customers "is unreasonable, unjust, or otherwise inappropriate" is an issue for the FCC or federal courts. *Id.* at 923 (stating that cases involving allegations of simple non-disclosure of a charged fee or rate (like Plaintiff's first theory of liability) and cases challenging imposition of late fees or penalties are not preempted while cases involving allegations that customers received insufficient services in return for a fee/rate are preempted); 47 U.S.C. § 201(b); 47 U.S.C. § 332(c)(3). Further, allegations that the fee was unconscionable and that the defendant did not act in good faith were allegations that the fee was unjust and/or unreasonable, and they therefore constituted a challenge to the appropriateness of the fee within the purview of 47 U.S.C. § 201(b)). *Id.* at 924. Thus, the claims, which are effectively challenging the sufficiency of services received for the fee—including the claim for unjust

enrichment—were preempted as they each fell within the purview of FCA preemption. *Id.* at 925.

Like *Gilmore*, the Plaintiff here challenges the administrative fee as "bogus" through allegations that it "not the result of good faith financial practices but instead designed to raise profit for the company . . . ." Sec. Am. St. Cl. ¶¶ 16, 18, 43. Because these allegations amount to an attack on "how much [AT&T] may charge for [its] goods or services," they are preempted by 47 U.S.C. § 332(C)(3) as a matter of law. *Peck*, 535 F.3d at 1057. While Plaintiff attempts to characterize his claims as attacking AT&T's "other terms and conditions," meaning they would not be preempted, that assertion is belied by his own allegations as well as his FDUTPA claim seeking injunctive relief preventing AT&T from charging the administrative fee. Sec. Am. St. Cl. ¶ 51 ("Plaintiff seeks to determine whether the FDUTPA prohibits AT&T MOBILITY, LLC from continuing to apply the bogus administrative fee which is likely to occur in the future."). Accordingly, the Court also dismisses the portions of the Second Amended Statement of Claim challenging the administrative fee's application or alleged "bogus" nature, or otherwise disputing AT&T's ability to charge or increase the administrative fee, *with prejudice*. *See, e.g.*, Sec. Am. St. Cl. ¶¶ 16, 18-23, 25-29.

5. *Plaintiff is granted leave to amend to assert the data breach claims.*

Pursuant to Florida Rule of Civil Procedure 1.190(a), leave to amend shall be freely given when justice so requires. The Court finds that allowing the amendment will not result in prejudice to AT&T, nor will it cause undue delay. The Court also finds that Plaintiff has sufficiently alleged facts supporting the new data breach claims, and that the amendment is not futile.

## CONCLUSION

For the reasons stated above, IT IS HEREBY ORDERED AND ADJUDGED that:

- AT&T's *Motion to Dismiss the Second Amended Statement of Claim With Prejudice* is hereby GRANTED. Counts 1-4 of the *Second Amended Statement of Claim* are DISMISSED WITH PREJUDICE.

- Plaintiff's *Motion for Leave to File Second Amended Statement of Claim* is hereby GRANTED. Plaintiff shall have ten days from the date of this Order to file an amended pleading asserting only the data breach claims.

---

[1] The Court notes that this would actually be Plaintiff's request to file a Third Amended Statement of Claim.

[2] (i) *Orr v. AT&T Mobility LLC*, 2020-08179-SP-26 (3D23-097); (ii) *Milian v. AT&T Mobility LLC*, 2020-21937-SP-26 (3D23-098); (iii) *Ysidron v. AT&T Mobility LLC*, 2020-21932-SP-26 (3D23-099); (iv) *Barger v. AT&T Mobility LLC*, 2020-08181-SP-26 (3D23-100); and (v) *Batista v. AT&T Mobility LLC*, 2019-11857-SP-26 (3D23-101).

[3] *See* Defendant's Motion to Dismiss the Second Amended Statement of Claim with Prejudice (the "Motion"), Index 31 at 2 ("[Id. ¶ 15 (referring to the parties' contractual relationship (i.e., Consumer Service Agreement)); ¶¶ 19, 20, 42 (alleging that AT&T 'misleadingly suggests' in its description of the administrative fee [found in the Consumer Service Agreement] that the administrative fee is 'tied to the costs of AT&T' for 'interconnect charges and cell site rental charges'")); *see also id.* at 4 (arguing Plaintiff's allegations about "'representations' that [AT&T] made to Plaintiff" quoted "the contract's administrative fee definition" and comparing contract provision with ¶42 of the operative pleading)).

[4] *See* Motion at 4 (arguing "Plaintiff admits that they are a customer of AT&T (Am. Compl. ¶¶ 2, 17, 26), who was offered a plan for wireless cellular and data services with specified terms (see id. ¶¶ 13, 16, 24), accepted and signed up for that plan (see id. ¶¶ 16-17), and received bills and paid for that plan (see id. ¶¶ 16, 25, 28, 32, 39" and "AT&T allegedly charged an administrative fee that was higher than customers 'were promised and agreed to pay.' Am. Compl. ¶ 16; see also id. ¶¶ 23, 29. Further, Plaintiff alleges that AT&T did not adequately describe or disclose the administrative fee. Id. ¶¶ 17, 22."). AT&T also noted that Plaintiff's counsel used the Consumer Services Agreement at the hearing to argue against Defendant's preemption argument. *See* Transcript, 20:24-21:3 ("THE COURT: You're not disputing that there is a contractual relationship between the parties. You're just saying you don't know which one governs this dispute. MR. UDELL: Correct."); 24:16-18 ("[T]heir own contract differentiates between rates and fees, so how can you say on a motion to dismiss that it's preempted?").

**DONE** and **ORDERED** in Chambers at Miami-Dade County, Florida on this <u>13th day of December, 2024</u>.

<u>2022-047421-SP-25 12-13-2024 1:05 PM</u>
Hon. Jorge A Perez Santiago

**COUNTY COURT JUDGE**
Electronically Signed

---

Final Order as to All Parties SRS #: **12** (Other)

THE COURT DISMISSES THIS CASE AGAINST ANY PARTY NOT LISTED IN THIS FINAL ORDER OR PREVIOUS ORDER(S). THIS CASE IS CLOSED AS TO ALL PARTIES.

---

**Electronically Served:**
Andrew R. Ingalls, aingalls@daypitney.com
Andrew R. Ingalls, brodriguez@daypitney.com
Evelyn Davila, edavila@daypitney.com
Jessica Solorzano, jsolorzano@daypitney.com
Manuel A. Garcia-Linares, mgarcialinares@daypitney.com
Manuel A. Garcia-Linares, athomsen@daypitney.com
Maury L. Udell, notice66@bmulaw.com
Maury L. Udell, blopez@bmulaw.com

**Physically Served:**

IN THE COUNTY COURT OF THE 11TH JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA

Sergio Salani,

      Plaintiff,

v.

AT&T Mobility, LLC,

      Defendant.

_____/

CASE NO.: 2022-047421-SP-25

BAR NO.: 121673

## NOTICE OF DEPOSITION DUCES TECUM

**PLEASE TAKE NOTICE,** pursuant to Fla. R. Civ. P. 1.310(b)6, that the undersigned attorney will take the deposition of the following:

**DEPONENT:**     AT&T Mobility, LLC

**DATE & TIME:**    January 17, 2025 at 2:00 pm

**LOCATION:**     VIA ZOOM – *please contact the undersigned to obtain meeting ID and password prior to the deposition date*.

upon oral examination before a notary public, or any other officer authorized by law to take depositions in the State of Florida.  The oral examination will continue from day to day until completed. The depositions are being taken for the purpose of discovery, for use at trial, or for such other purposes as are permitted under the applicable and governing rules.

## **AREAS OF INQUIRY**

1. The hierarchy of corporate management of AT&T Mobility, LLC.

2. The decision(s) to not pay this claim.

3. The decision to pay prior claims involving suits of the same subject matter of bogus administrative fees filed by counsel for Plaintiff.

4. The general claims handling practices of AT&T.

5. The decision to settle FTC v. AT&T Mobility, LLC federal action.

6. The decision to impose an administrative fee on customers' accounts including plaintiff's assignor.

7. The decision to increase the amount of the administrative fee customers' accounts including plaintiff's assignor.

8. AT&T internal focus group research regarding the administrative fee.

9. For the last three (3) years, interconnect charges and cell site rental charges and costs for AT&T Mobility, LLC as referenced in AT&T wireless customer agreement.

10. Any internal business memoranda which discuss the imposition of the administrative fee on plaintiff and any other customer's account;

11. Any factual basis to support any defenses, pled or unpled to Plaintiff's claim including res judicata and release.

12. Aside from any claim filed in Miami-Dade County, any other claims filed by individuals related to the allegations of the complaint for data throttling and bogus administrative fees and the locality and name of the plaintiff or plaintiff's lawyer who filed said claims.

13. Any internal data on number of arbitrations filed by customers against Defendant in the last four (4) years.

14. SEC quarterly filings since Q1 2018 related to interconnect charges and cell site rental charges and costs for AT&T Mobility, LLC.

15. Any data breach incident that occurred from 2019 to date.

16. Data security policies and procedures that were in place at the time of any data breach incident that occurred from 2019 to date.

17. Corrective actions taken in response to the data breach, including changes to security measures, training programs, or policies.

18. Any and all insurance policies that may provide coverage for losses or liabilities arising from any data breach incident that occurred from 2019

19. Risk assessments, security audits, and vulnerability assessments conducted by or for your company in the two years preceding any data breach incident that occurred from 2019.

20. Any defenses pled or unpled to Plaintiff's claim.

## **DUCES TECUM**

1. Original wireless agreement with Plaintiff's assignor.

2. Any and all documents which support any affirmative defense you have raised in this case or intend to raise in this case.

3. Any internal business memoranda which discuss the imposition of the administrative fee on plaintiff's assignor and any other customer's account;

4. The entire file, whether in paper or electronic form of Plaintiff including any data usage of Plaintiff's assignor for last five (5) years from the date of the filing of this complaint, including every correspondence and bill sent to Plaintiff's assignor.

5. The electronically stored information policy in place of AT&T for internal memoranda, legal memoranda, customer information and customer data use for the last five (5) years.

6. Any contract between Plaintiff's assignor and ATT from 2019 to date.

7. Any bills sent to Plaintiff's assignor by ATT in the last five (5) years.

8. Any notices sent to Plaintiff's assignor related to Data Breach.

9. All incident reports, including but not limited to initial reports, follow-up reports, and final reports, related to the any data breach incident that occurred from 2019 to date.

10. Copies of all internal communications (emails, memos, meeting notes, etc.) concerning any data breach incident that occurred from 2019 to date.

11. Copies of all external communications (emails, letters, press releases, etc.) with customers, vendors, partners, regulatory agencies, and the media regarding any data breach incident that occurred from 2019 to date.

12. All documents outlining your company's data security policies and procedures that were in place at the time of any data breach incident that occurred from 2019 to date.

13. All risk assessments, security audits, and vulnerability assessments conducted by or for your company in the two years preceding any data breach incident that occurred from 2019 to date.

14. Copies of all notifications to Plaintiff's assignor regarding any data breach incident that occurred from 2019 to date.

15. All contracts, agreements, and communications with third-party vendors or service providers involved in the handling or storage of the compromised data.

16. Documentation of any corrective actions taken in response to the data breach, including changes to security measures, training programs, or policies.

17. Copies of all insurance policies that may provide coverage for losses or liabilities arising from any data breach incident that occurred from 2019 to date.

18. Copies of any lawsuits, legal claims, or complaints filed against your company related to any data breach incident that occurred from 2019 to date.

19. Any reports or analyses conducted to assess the financial impact of any data breach incident that occurred from 2019 to date on your company

## **CERTIFICATE OF SERVICE**

**WE HEREBY CERTIFY** that a true and correct copy of the foregoing was served on December 13, 2024 on all counsel of record via the Florida Court's e-filing system.

**Beighley, Myrick, Udell, Lynne & Zeichman PA**
*Attorneys for Plaintiff*
2601 S. Bayshore Drive
Suite 770
Miami, FL 33133
(305) 349-3930– Phone
notice66@bmulaw.com (R 2.516 Designated E-mail)

By:    _/s/ *Maury L. Udell*_____
Maury L. Udell, Esquire
mudell@bmulaw.com
Fla. Bar 121673

IN THE COUNTY COURT OF THE 11TH JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA

Sergio Salani,

      Plaintiff,

v.

AT&T Mobility, LLC,

      Defendant.

_____/

CASE NO.: 2022-047421-SP-25

FLA. BAR NO.: 121673

## PLAINTIFF'S REQUEST FOR ADMISSIONS

Plaintiff, Sergio Salani, by and through the undersigned counsel and pursuant to Fla. R. Civ. P. 1.370 serves these requests for admission on Defendant and states as follows:

1. Please admit that Defendant agreed to not participate in class actions against Plaintiff.

2. Please admit that Plaintiff agreed to not participate in class actions with Defendant.

**<u>CERTIFICATE OF SERVICE</u>**

WE HEREBY CERTIFY that a true and correct copy of the foregoing was served via email this December 13, 2024: to Manuel A. Garcia-Linares, Esquire (mgarcialinares@daypitney.com, edavila@daypitney.com) Andrew R. Ingalls, Esquire (aingalls@daypitney.com) Day Pitney LLP, 396 Alhambra Circle, North Tower – 14th Floor, Miami, Florida 33134.

**Beighley, Myrick, Udell, Lynne & Zeichman PA**
*Attorneys for Plaintiff*
2601 S. Bayshore Dr.
Suite 770
Miami, FL 33133
(305) 349-3930 – Phone

By:    */s/ Maury L. Udell*
       Maury L. Udell, Esquire
       mudell@bmulaw.com
       Fla. Bar 121673

IN THE COUNTY COURT OF THE 11TH JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA

Sergio Salani,

      Plaintiff,

v.

AT&T Mobility, LLC,

      Defendant.

_____/

CASE NO.: 2022-047421-SP-25

BAR NO.: 121673

## PLAINITFF'S MOTION FOR EXTENSION OF TIME TO FILE AMENDED PLEADING

COMES NOW, the Plaintiff, Sergio Salani, by and through undersigned counsel, hereby files this Motion for Extension of Time to File Amended Pleading and in support states as follows:

1. On December 13, 2024, this Court entered an Order directing Plaintiff to file an amended pleading.  Due to the undersigned travel schedule, Plaintiff needs additional time to comply with the order.

2. Plaintiff therefore seeks a thirty (30) day extension to comply with the Court's order

3. This Motion is made in good faith and not for purposes of delay.

4. Defendant will not be prejudiced by the granting of this motion.

WHEREFORE, Plaintiff, Sergio Salani, respectfully requests the Court grant the motion herein and any other relief the Court deems just and proper.

## <u>CERTIFICATE OF SERVICE</u>

WE HEREBY CERTIFY that a true and correct copy of the foregoing was served via e-mail this this December 18, 2024 to Manuel A. Garcia-Linares, Esquire (mgarcialinares@daypitney.com, edavila@daypitney.com) Andrew R. Ingalls, Esquire (aingalls@daypitney.com) Day Pitney LLP, 396 Alhambra Circle, North Tower - 14th Floor, Miami, Florida 33134.

**Beighley, Myrick, Udell, Lynne & Zeichman PA**
*Attorneys for Plaintiff*
2601 S. Bayshore Drive, Suite 770
Miami, FL 33133
(305) 349-3930 – Phone

By:    _/s/ *Maury L. Udell*_____
       Maury L. Udell, Esquire
       mudell@bmulaw.com
       Fla. Bar 121673

IN THE COUNTY COURT OF THE
ELEVENTH JUDICIAL CIRCUIT, IN AND
FOR MIAMI-DADE COUNTY, FLORIDA

SERGIO SALANI,                          CASE NO.  2022-047421-SP-25

       Plaintiff,

v.

AT&T MOBILITY LLC,

       Defendant.

_____/

### DEFENDANT AT&T MOBILITY LLC'S MOTION FOR EXTENSION OF TIME TO RESPOND TO PLAINTIFF'S REQUEST FOR PRODUCTION

Defendant, AT&T Mobility LLC ("AT&T"), by and through undersigned counsel, moves this Court for the entry of an Order extending the time within which AT&T must respond to Plaintiff's *Request for Production* dated December 9, 2024 (the "Request for Production"), and, in support, states as follows:

1.      On December 9, 2024, Plaintiff served the Request for Production on AT&T.  The deadline for AT&T to respond to the Request for Production is January 8, 2025, has not expired and, therefore, this Motion is timely.

2.      On September 17, 2024, Plaintiff filed a *Motion for Leave to File Second Amended Statement of Claim* (the "Motion for Leave").  Hearing on the Motion for Leave was conducted on October 4, 2024, and, on December 13, 2024, this Court entered its *Omnibus Order Granting Plaintiff's Motion to Dismiss Counts 1 through 4 and Granting Leave to Amend the Complaint to State Data Breach Claims,* which directed Plaintiff to, "file an amended pleading asserting only the data breach claims," by December 23, 2024.

3.      Since the Request for Production on its face does not lead to the discovery of admissible evidence regarding any currently pending claims, AT&T requests that its obligation to

respond and/or object to the Request for Production be extended until after Plaintiff has filed the Third Amended Complaint and AT&T has filed its Motion to Dismiss, as if the Motion to Dismiss is granted the Request for Production will become moot.

4.      Should the Court deny AT&T's Motion to Dismiss, AT&T respectfully requests that its obligation to respond and/or object to the Request for Production be extended until 30 days after such ruling, to allow AT&T sufficient time to research, investigate and gather information needed in order to properly prepare its responses.

5.      AT&T requests this extension not only to avoid potentially unnecessary expenses and costs in the numerous other matters in which Plaintiff's counsel has served the identical discovery requests, but also due to counsel's professional obligations in other matters and multiple Court-ordered deadlines.

6.      This motion is made in good faith and not for purposes of delaying litigation and no party will be prejudiced if the extension is granted.

7.      AT&T reserves the right to assert any and all objections to the Request for Production.

**WHEREFORE**, Defendant, AT&T MOBILITY LLC, respectfully requests that this Court enter an Order: (i) granting this Motion; (ii) extending the time to respond to Plaintiff's *Request for Production Related to Data Breach* as described herein; and, (iii) granting such other relief as this Court deems just and proper.

120869152.1

Dated:  December 20, 2024

Respectfully submitted,

By:  */s/ Manuel A. Garcia-Linares*
       Manuel A. Garcia-Linares, Esq.
       Florida Bar No. 985252
       mgarcialinares@daypitney.com
       athomsen@daypitney.com
       Andrew R. Ingalls, Esq.
       Florida Bar No. 112558
       aingalls@daypitney.com
       athomsen@daypitney.com
       **DAY PITNEY LLP**
       396 Alhambra Circle
       North Tower – 14th Floor
       Miami, Florida  33134
       Telephone: (305) 373-4000
       Facsimile:   (305) 373-4099
       *Counsel for Defendant AT&T Mobility LLC*

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on December 20, 2024, I electronically filed the foregoing document with the Clerk of the Court via e-portal and served: **Maury L. Udell, Esq**., BEIGHLEY, MYRICK, UDELL, LYNNE & ZEICHMAN, P.A., 2601 South Bayshore Drive, Suite 770, Miami, Florida 33133, Emails: mudell@bmulaw.com and notice66@bmulaw.com, *Counsel for Plaintiff.*

By:  */s/ Manuel A. Garcia-Linares*
     Manuel A. Garcia-Linares, Esq.

-3-

**IN THE COUNTY COURT OF THE ELEVENTH JUDICIAL
CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA**

CASE NO: 2022-047421-SP-25
SECTION: CG01
JUDGE: Jorge A Perez Santiago

**Sergio Salani**

Plaintiff(s) / Petitioner(s)

vs.

**AT&T Mobility, LLC**

Defendant(s) / Respondent(s)

_____/

**AGREED ORDER ON PLAINTIFF'S MOTION FOR EXTENSION OF TIME TO FILE
AMENDED PLEADING**

[DE 55 - Filing # 213134625 - E-Filed 12/18/2024 – Plaintiff's *Motion for Extension of Time to
File Amended Pleading*]

**THIS MATTER** came before the Court on Plaintiff's *Motion for Extension of Time to File
Amended Pleading* dated December 18, 2024 [DE 55], and the Court, upon agreement of the parties
and after having reviewed the Motion, hereby finds as follows:

1.   Plaintiff's Motion is **GRANTED**. Plaintiff's counsel shall have thirty (30) days from
the date of entry of this Order to file a Third Amended Complaint.

**DONE** and **ORDERED** in Chambers at Miami-Dade County, Florida on this 6th day of January,
2025.

2022-047421-SP-25 01-06-2025 3:20 PM

2022-047421-SP-25 01-06-2025 3:20 PM
Hon. Jorge A Perez Santiago

**COUNTY COURT JUDGE**
Electronically Signed

No Further Judicial Action Required on **THIS MOTION**

CLERK TO **RECLOSE** CASE IF POST JUDGMENT

**Electronically Served:**
Andrew R. Ingalls, aingalls@daypitney.com
Andrew R. Ingalls, brodriguez@daypitney.com
Evelyn Davila, edavila@daypitney.com
Jessica Solorzano, jsolorzano@daypitney.com
Manuel A. Garcia-Linares, mgarcialinares@daypitney.com
Manuel A. Garcia-Linares, athomsen@daypitney.com
Maury L. Udell, notice66@bmulaw.com
Maury L. Udell, blopez@bmulaw.com

**Physically Served:**

**IN THE COUNTY COURT OF THE ELEVENTH JUDICIAL
CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA**

CASE NO: 2022-047421-SP-25
SECTION: CG01
JUDGE: Jorge A Perez Santiago

**Sergio Salani**

Plaintiff(s) / Petitioner(s)

vs.

**AT&T Mobility, LLC**

Defendant(s) / Respondent(s)

_____/

## ORDER ON DEFENDANT'S MOTION FOR EXTENSION OF TIME TO RESPOND TO PLAINTIFF'S REQUEST FOR PRODUCTION

[DE 56 - Filing # 213294656 - E-Filed 12/20/2024 – Defendant's *Motion for Extension of Time to Respond to Plaintiff's Request for Production*]

**THIS MATTER** came before the Court on Defendant's *Motion for Extension of Time to Respond to Plaintiff's Request for Production* dated December 20, 2024 [DE 56], and the Court, upon agreement of the parties and after having reviewed the Motion, hereby finds as follows:

    1.   Defendant's Motion is **GRANTED**.

    2.   Should the Court deny Defendant's Motion to Dismiss Plaintiff's Third Amended Complaint, Defendant shall have thirty (30) days from the date of entry of such order to respond and/or object to Plaintiff's *Request for Production* dated December 9, 2024.

    3.   Should the Court grant Defendant's Motion to Dismiss Plaintiff's Third Amended Complaint, Plaintiff's Request for Production will become moot.

**DONE** and **ORDERED** in Chambers at Miami-Dade County, Florida on this 6th day of January, 2025.

2022-047421-SP-25 01-06-2025 3:47 PM

Hon. Jorge A Perez Santiago

**COUNTY COURT JUDGE**
Electronically Signed

No Further Judicial Action Required on **THIS MOTION**

CLERK TO **RECLOSE** CASE IF POST JUDGMENT

**Electronically Served:**
Andrew R. Ingalls, aingalls@daypitney.com
Andrew R. Ingalls, brodriguez@daypitney.com
Evelyn Davila, edavila@daypitney.com
Jessica Solorzano, jsolorzano@daypitney.com
Manuel A. Garcia-Linares, mgarcialinares@daypitney.com
Manuel A. Garcia-Linares, athomsen@daypitney.com
Maury L. Udell, notice66@bmulaw.com
Maury L. Udell, blopez@bmulaw.com

**Physically Served:**

Case 1:25-cv-20381-RAR   Document 1-2   Entered on FLSD Docket 01/27/2025   Page 1485 of 1553

IN THE COUNTY COURT OF THE 11TH JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA

Sergio Salani,

      Plaintiff,

v.

AT&T Mobility, LLC,

      Defendant.

_____/

CASE NO.: 2022-047421-SP-25

BAR NO.: 121673

## NOTICE OF DEPOSITION DUCES TECUM

**PLEASE TAKE NOTICE,** pursuant to Fla. R. Civ. P. 1.310(b)6, that the undersigned attorney will take the deposition of the following:

**DEPONENT:**    AT&T Mobility, LLC

**DATE & TIME:**    January 24, 2025 at 2:00 p.m.

**LOCATION:**    VIA ZOOM – *please contact the undersigned to obtain meeting ID and password prior to the deposition date*.

upon oral examination before a notary public, or any other officer authorized by law to take depositions in the State of Florida.  The oral examination will continue from day to day until completed. The depositions are being taken for the purpose of discovery, for use at trial, or for such other purposes as are permitted under the applicable and governing rules.

## AREAS OF INQUIRY

1. Any data breach incident that occurred from 2019 to date.

2. Data security policies and procedures that were in place at the time of any data breach incident that occurred from 2019 to date.

3. Corrective actions taken in response to the data breach, including changes to security measures, training programs, or policies.

4. Any and all insurance policies that may provide coverage for losses or liabilities arising from any data breach incident that occurred from 2019

5. Risk assessments, security audits, and vulnerability assessments conducted by or for your company in the two years preceding any data breach incident that occurred from 2019.

6. Any defenses pled or unpled to Plaintiff's claim.

## DUCES TECUM

1. Any contract between Plaintiff and ATT from 2019 to date.

2. Any bills sent to Plaintiff by ATT in the last five (5) years.

3. Any notices sent to Plaintiff related to Data Breach.

4. All incident reports, including but not limited to initial reports, follow-up reports, and final reports, related to the any data breach incident that occurred from 2019 to date.

5. Copies of all internal communications (emails, memos, meeting notes, etc.) concerning any data breach incident that occurred from 2019 to date.

6. Copies of all external communications (emails, letters, press releases, etc.) with customers, vendors, partners, regulatory agencies, and the media regarding any data breach incident that occurred from 2019 to date.

7. All documents outlining your company's data security policies and procedures that were in place at the time of any data breach incident that occurred from 2019 to date.

8. All risk assessments, security audits, and vulnerability assessments conducted by or for your company in the two years preceding any data breach incident that occurred from 2019 to date.

9. Copies of all notifications to Plaintiff regarding any data breach incident that occurred from 2019 to date.

10. All contracts, agreements, and communications with third-party vendors or service providers involved in the handling or storage of the compromised data.

11. Documentation of any corrective actions taken in response to the data breach, including changes to security measures, training programs, or policies.

12. Copies of all insurance policies that may provide coverage for losses or liabilities arising from any data breach incident that occurred from 2019 to date.

13. Copies of any lawsuits, legal claims, or complaints filed against your company related to any data breach incident that occurred from 2019 to date.

14. Any reports or analyses conducted to assess the financial impact of any data breach incident that occurred from 2019 to date on your company

## <u>CERTIFICATE OF SERVICE</u>

**WE HEREBY CERTIFY** that a true and correct copy of the foregoing was served on January 6, 2025 on all counsel of record via the Florida Court's e-filing system.

> **Beighley, Myrick, Udell, Lynne & Zeichman PA**
> *Attorneys for Plaintiff*
> 2601 S. Bayshore Drive
> Suite 770
> Miami, FL 33133
> (305) 349-3930– Phone
> notice66@bmulaw.com (R 2.516 Designated E-mail)
>
> By:     _/s/ *Maury L. Udell*_____
>         Maury L. Udell, Esquire
>         mudell@bmulaw.com
>         Fla. Bar 121673

IN THE COUNTY COURT OF THE 11TH
JUDICIAL CIRCUIT IN AND FOR
MIAMI-DADE COUNTY, FLORIDA

Sergio Salani,

      Plaintiff,

v.

AT&T Mobility, LLC,

      Defendant.

_____/

CASE NO.: 2022-047421-SP-25

FLA. BAR NO.: 121673

## PLAINTIFF'S MOTION FOR RECONSIDERATION

COMES NOW, the Plaintiff, Sergio Salani, by and through his undersigned counsel, and files this Motion for Rehearing on Order dated December 13, 2024 and states as follows:

## INTRODUCTION

While Plaintiff appreciates the Court allowing him to amend the complaint to add previously unpled claims which was through no fault of Plaintiff but instead a result of AT&T's malfeasance, the Court's December 13, 2024 dismissing Counts 1 through 4 with prejudice improperly converted Defendant's motion to dismiss into a motion for summary judgment which is frowned upon by the Third District Court of Appeal.  See Howard v. Greenwich Ins. Co., 307 So. 3d 844, 848 (Fla.3d DCA 2020)("A motion to dismiss is not a substitute for a motion for summary judgment.); Consuegra v. Lloyd's Underwriters at London, 801 So. 2d 111, 112 (Fla. 2d DCA 2001); Fla. Farm Bureau Gen. Ins. Co. v. Ins. Co. of N. Am., 763 So. 2d 429, 432 (Fla. 5th DCA 2000) ("[a] motion to dismiss should not be used 'to determine issues of ultimate fact' and 'may not

act as a substitute for summary judgment.' ") (citing <u>Roberts v. Children's Med. Servs.</u>, 751 So. 2d 672, 673 (Fla. 2d DCA 2000).

The Court improperly relied on hearsay and other court pleadings in ruling on a motion to dismiss which is completely outside the four corners of the operative pleadings.  Even worse, the Court ignored the plain language of the operative pleadings specifically alleged AT&T's admission to statutory violations.  See paragraph 18 of the amended statement of claim. Lastly, even if it were proper to rely on a hearsay purportedly incorporated into a pleading on a motion to dismiss, that very hearsay contains contradictory statements against the Court's fact-weighing order adjudicating an unpled defense.

For the same reason that the Court found that Plaintiff cannot maintain a claim— that another Court may have ruled a certain way (Orr), the Court could have just as easily held that because AT&T settled a similarly pled case and filed public admissions related to that improper conduct with another party that it is barred from defending this claim.   Either result is reversible error when adjudicating a motion to dismiss and all reasonable inferences are to be construed in favor of the non-moving party.  For the following reasons, the Court should grant reconsideration and allow Plaintiff an additional attempt to amend counts 1-4 in line with the prevailing and binding caselaw on allowing amendment of pleadings.

## I.    <u>Standard of Review</u>

A trial court has inherent authority to reconsider and modify its interlocutory orders. <u>Bay N. Gulf, Inc. v. Anchor Seafood, Inc.</u>, 971 So. 2d 842, 843 (Fla. 3d DCA 2007); <u>see</u> <u>also</u> <u>Bettez v. City of Miami</u>, 510 So. 2d 1242 (Fla. 3d DCA 1987) (holding

that motions for reconsideration are distinct from a motion for rehearing under the Florida Rules of Civil Procedure); <u>AC Holdings 2006, Inc. v. McCarty</u>, 985 So. 2d 1123, 1125 (Fla. 3d. DCA 2008); see also <u>Monte Campbell Crane Co. v. Hancock</u>, 510 So. 2d 1104, 1105-06 (Fla. 4th DCA 1987) (holding that it is well settled that a trial court has the inherent authority to control its own nonfinal orders prior to the entry of final judgment, which permits for motions for reconsideration of such orders).

## II.   <u>The Court's Reliance on Hearsay is Improper and in Violation of Binding Precedent</u>

AT&T's request for dismissal with prejudice based on <u>Orr v. AT&T Mobility, LLC</u>, No. 3D23-0097, 2024 WL 3588350 (Fla. 3d DCA 2024) was not supported based on the actual language of <u>Orr</u> which specifically stands for the proposition that a court "may rely on a document referenced in the complaint on a motion to dismiss." <u>Orr</u> at *1. "The word 'may' when given its ordinary meaning denotes a permissive term rather than the mandatory connotation of the word 'shall.' " <u>See</u> <u>Progressive Select Ins. Co. v. Fla. Hosp. Med. Ctr.</u>, 236 So. 3d 1183, 1187 (Fla. 5th Dist. 2018), <u>approved</u>, 260 So. 3d 219 (Fla. 2018) <u>Fla. Bar v. Trazenfeld</u>, 833 So.2d 734, 738 (Fla. 2002).

Because the term "may" is permissive, even under <u>Orr</u> this Court was not required to consider AT&T's hearsay documents attached to a motion to dismiss. In <u>Orr</u>, the Third District Court of Appeal found that it was not error for the Court to consider the wireless agreement which AT&T apparently attached to its motion to dismiss. The <u>Orr</u> opinion does not discuss whether the documents relied on by the trial court in <u>Orr</u> were authenticated or not. On a motion to dismiss this Court cannot statements of counsel as argument of counsel is not evidence. <u>Blanco v. State</u>, 150 Fla. 98, 7 So. 2d 333, 337 (1942)("argument of counsel, however, is not evidence."). <u>See</u> <u>also</u>, <i>e.g.</i>, <u>Stading v.</u>

Equilease Corp., 471 So. 2d 1379, 1379 (Fla. 4th DCA 1985) ("The hearing consisted solely of the arguments of opposing counsel, which is, of course, not evidence.").

In considering a motion to dismiss, the trial court "must confine [its] review to the four corners of the complaint, draw all inferences in favor of the pleader, and accept all well-pled allegations in the complaint as true." Payne v. City of Miami, 927 So. 2d 904, 906 (Fla. 3d DCA 2005). See also, Fox v. Prof'l Wrecker Operators of Fla., 801 So. 2d 175, 178 (Fla. 5th DCA 2001). "It is not for the court to speculate whether the allegations are true or whether the pleader has the ability to prove them." Fox, 801 So. 2d at 178. (emph. added.)   Instead, the trial court's ruling is "simply whether, assuming all the allegations in the complaint to be true, the plaintiff would be entitled to the relief requested." Id. at 178 (quoting Cintron v. Osmose Wood Preserving, 681So. 2d 859, 860-861 (Fla. 5th DCA 1996)) (emph. added).   It is precisely because of this heavy burden that motions to dismiss are disfavored and granted sparingly. Oguz v. Oguz, 478 So. 2d 437, 440, n.9 (Fla. 5th DCA 1985) (Sharp, J. concurring).

A motion to dismiss is designed to test the legal sufficiency of the complaint, not to determine factual issues, and the allegations of the complaint must be taken as true and all reasonable inferences therefrom construed in favor of the nonmoving party. See, e.g., The Fla. Bar v. Greene, 926 So. 2d 1195, 1199 (Fla. 2006); Ralph v. City of Daytona Beach, 471 So.2d 1, 2 (Fla.1983) ("For the purposes of a motion to dismiss ... allegations of the complaint are assumed to be true and all reasonable inferences arising therefrom are allowed in favor of the plaintiff."). The trial court may not "rely on facts offered in depositions, affidavits, or other proofs." Minor v. Brunetti, 43 So. 3d 178, 179 (Fla. 3d DCA 2010).

A court may not look beyond a complaint and its attachments to take judicial notice of a separate legal proceeding when ruling on a motion to dismiss. See Papa John's Int'l, Inc. v. Cosentino, 916 So. 2d 977, 983 (Fla. 4th DCA 2005)  In Migliazzo v. Wells Fargo Bank, N.A., 290 So. 3d 577 (Fla. 2d DCA 2020), the Court reasoned that it was error for the trial court to consider a partial release on a motion to dismiss because, "[e]ven though it appears that the trial court was attempting to expeditiously decide the issue on the merits, the trial court was not permitted to consider or take judicial notice of matters outside of the counterclaim to which the motion to dismiss was directed."

Furthermore, in Mucha v. Atlas Van Lines, Inc., 989 So.2d 697 (Fla. 5th DCA 2008), on a motion to dismiss context, the Fifth District Court of Appeal ruled that it is reversible error to rely on **unauthenticated hearsay attached to a motion to dismiss**. In *Mucha* the trial court dismissed the plaintiff's claim for property damage and personal injuries that occurred during the moving and storage of furniture and other contents of her home. The plaintiff brought an action against the moving company and its insurer. The trial court dismissed based on Florida's non-joinder statute, holding that the insurer was the moving company's liability insurer rather than a first-party insurer. The court reached this conclusion based on an interpretation of language in an unauthenticated document that was attached to the insurer's motion to dismiss.   The Fifth District reversed. It held that it was error to dismiss based on an unauthenticated document that purportedly contained language from which the trial court concluded that the insurer was a third-party insurer.

> In reviewing the dismissal with prejudice we look to the four corners of the complaint and accept as true all well-pled allegations… [citation omitted]. The allegations in the third

amended complaint are sufficient to state a cause of action. The language in the **unauthenticated document** that formed the basis for the trial court's dismissal contained language that could be construed as directly indemnifying Mucha for any losses sustained. We express no opinion as to whether a cause of action against Hanover can withstand summary judgment. However, dismissal with prejudice at this stage of the proceedings was error. (Emphasis added).

Id.at 698.

"[I]n the absence of interdistrict conflict, district court decisions bind all Florida trial courts." See Pardo v. State, 596 So. 2d 665, 666 (Fla. 1992) ("The proper hierarchy of decisional holdings would demand that in the event the only case on point on a district level is from a district other than the one in which the trial court is located, the trial court be required to follow that decision"). Therefore under Mucha, dismissal with prejudice based on an unauthenticated document is improper.

Moreover, FDUTPA claims can be based on deceptive or unfair practices that do not involve fraud ... and need not be pled with particularity. SIG, Inc. v. AT & T Digital Life, Inc., 971 F.Supp.2d 1178, 1195 (S.D. Fla. 2013); See Perret v. Wyndham Vacation Resorts, Inc., 846 F.Supp.2d 1327, 1333 (S.D.Fla.2012); Hill v. Hoover Co., 899 F.Supp.2d 1259, 1263 (N.D.Fla. 2012)   FDUTPA was enacted to provide remedies for conduct outside the reach of traditional common law torts such as fraud; therefore, a plaintiff need not prove the elements of fraud to sustain an action under the Act. State, Office of Attorney General, Dept. of Legal Affairs v. Tenet Healthcare Corp., 420 F. Supp. 2d 1288, 1310 (S.D. Fla. 2005).

Plaintiff has alleged that AT&T violated the FDUTPA by charging its bogus administrative fee wherein sister courts found a similar plaintiff stated a cause of action, Plaintiff has rightly stated a claim upon which relief can be granted.   Paragraphs 17 –

20, specifically set forth sufficient allegations to maintain a FDUTPA claim, and taken as true, clearly state a cause of action. The Court ignored the plain language of the amended statement of claim.  Conduct considered to be a deceptive or unfair for the purposes of a FDUTPA claim may be defined by "[a]ny law, statute, rule, regulation, or ordinance which proscribes unfair methods of competition, or unfair, deceptive or unconscionable acts or practices." Fla. Stat. § 501.203(3)(c).

Because the statute is designed to protect consumers, the scope of the conduct which may constitute an "unfair or deceptive"  practice is "extremely broad." Day v. Le–Jo Enters., Inc., 521 So. 2d 175, 177 (Fla. 3d DCA 1988). A "claim under FDUTPA is not defined by the express terms of a contract, but instead encompasses unfair and deceptive practices arising out of business relationships." See Siever v. BWGaskets, Inc., 669 F.Supp.2d 1286, 1293 (M.D. Fla. 2009).   As for the first element, whether a practice is "deceptive or unfair" is determined by an objective analysis, and ordinarily is a **question of fact for the jury** to determine. See Calderon v. Sixt Rental Car, LLC, 2020 WL 700381 (S.D.Fla. 2020).  In Calderon, the plaintiff alleged that Sixt attempted to merge the two contracts *in order to* perpetuate their "systematic scheme" of charging customers fraudulent fees to bring in additional revenue.  The Court held that the complaint states a cause of action based on the allegation of an illegal profit scheme through the use of "fees"

In Deere Construction, LLC v. Cemex Construction Materials Fla., LLC, 198 F.Supp.3d 1332 (S.D.Fla., 2016), the District Court in ruling on the viability of a FDUPTA claim held that "with regard to the claimed deceptive act or unfair practice, the Amended Complaint makes abundantly clear Plaintiff's claim is not that it did not know

about the "fuel surcharge" and "environmental charge. Those fees are undoubtedly disclosed in the agreement and Defendants' invoices.  What is allegedly deceptive is that the so-called "fuel surcharges" and "environmental charges," labeled as such by Defendants, **were not in fact designed to cover anything related to fuel or the environment.** Defendants chose the two adjectives that describe the fees being assessed. ***Each adjective carries meaning***. But the messages, according to Plaintiff, are deceptive." Id. at 1338 (emphasis added).   Such allegations stated a cause of action for FDUPTA violation.

Courts have held that misrepresentations regarding similar charges support FDUTPA claims. See, e.g., James D. Hinson Elec. Contracting Co., Inc. v. Bell South Telecommunications, Inc., 796 F.Supp.2d 1341, 1353 (M.D. Fla. 2011) (inclusion of unrecoverable charges for "claims processing" in costs of damage to underground

facilities billed to excavators); Turner Greenberg Assocs., Inc. v. Pathman, 885 So.2d 1004, 1008 (Fla. 4th DCA 2004) (furniture store's collection of a freight/insurance charge in connection with financed furniture sales was a deceptive and unfair trade practice; fee was in reality a customer surcharge).

In the instant case, Plaintiff alleged that this fee and its definition are in and of themselves unfair and deceptive.  In State Farm Mut. Auto. Ins. Co. v. At Home Auto Glass LLC, No. 8:21-CV-239-TPB-AEP, 2022 WL 4625013, at *4 (M.D. Fla. Sept. 30, 2022), the Court found that State Farm's allegations of intentional concealment of inflated charges and misrepresentations to customers that the repairs would be at no cost to them and that services were being billed under an inclusive, flat rate sufficiently

alleged per se or traditional FDUTPA violations.

The conduct alleged by Plaintiff in the amended statement of claim is the essence of improper conduct subject to FDUTPA scrutiny. If in fact AT&T is not actually defraying **expenses from AT&T Mobility, LLC** but instead defraying expense for the benefit of *some **other related entities that are unrelated to what AT&T Mobility, LLC** provides to the consumer, then obviously AT&T Mobility, LLC violated the statute by "robbing Peter to pay Paul."

The Court incorrectly held that the exhibit discloses an administrative fee and that could be used to defray "any expense," thereby negating the allegations of a bogus administrative fee.  However, even if the administrative fee could be used for "any expense," which is not the case, there would still be a question of fact as to whether AT&T actually used the fee to pay expenses, or whether it instead kept the fee for itself as a profit center as alleged in the complaints.

The actual text of AT&T's exhibits suggests to consumers that the administrative fee will be used more specifically to defray or recover expenses paid to third parties in connection with providing wireless service.  The exhibit describes the administrative fee as "a monthly fee charged to help AT&T recover a portion of certain expenses AT&T incurs, including but not limited to: (a) charges AT&T or its agents pay to interconnect with other carriers to deliver calls from AT&T customers to their customers; and (b) charges associated with cell site rents and maintenance."

The examples given of interconnect charges and cell site rentals and maintenance plainly refer to expenses paid to third parties.  In addition, AT&T's exhibits state that the administrative fee is assessed to "defray" or "recover a portion of" "certain

expenses."   The specific examples are modified by the phrases "including but not limited to" and "including."   However, the overall sense of the alleged disclosures is that the administrative fee is being assessed to recover or defray expenditures that AT&T pays to third parties.   Or does it imply that AT&T will use the fee, in whole or in part, to defray or recover these or similar specific expenses paid to third parties?   The exhibits are ambiguous, at best, in this regard, and should be construed against the drafter, AT&T.   See Iniguez v. Am. Hotel Register Co., 820 So. 2d 953, 956 (Fla. 3d DCA 2002), rev. dismissed, 838 So. 2d 558 (Fla. 2003).

For purposes of the FDUTPA, deception occurs "if there is a representation, omission, or practice that is likely to mislead the consumer acting reasonably in the circumstances, to the consumer's detriment."   Zlotnick v. Premier Sales Group, Inc., 480 F. 3d 1281, 1284 (11th Cir. 2007), quoting PNR, Inc. v. Beacon Prop. Mgmt., Inc., 842 So. 2d 773, 777 (Fla. 2003).   An unfair practice is "one that offends established public policy and… [one that] is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers."   Hetrick v. Ideal Image Dev. Corp., 372 F. Appx. 985, 992 (11th Cir. 2010), quoting Samuels v. King Motor Co. of Ft. Lauderdale, 782 So. 2d 489, 499 (Fla. 4th DCA 2001).   Whether particular conduct constitutes an unfair or deceptive trade practice is a question of fact.   Siever v. BWGaskets, Inc., 669 F. Supp. 2d 1286, 1292 (M.D. Fla. 2009); Suris v. Gilmore Liquidating, Inc., 651 So. 2d 1282, 1283 (Fla. 3d DCA 1995).

If AT&T had wanted to tell Plaintiff that it was assessing a fee that could be used for any purpose whatsoever, it easily could have done so.   At the very least, it could have refrained from giving Plaintiff the impression that the fee was to be used to recover

or defray expenditures to third parties.  As phrased, a reasonable consumer would conclude that this fee was not potentially some sort of slush fund that AT&T could use to line its pockets, or even a means of recovering normal operating overhead.

The Court erred by relying on TRG v. Nighthawk Ltd. v. Registry Dev. Corp., 17 So.3d 782 (Fla. 2d DCA 2009), the Second District Court of Appeal's **reversed of a denial of motion for directed verdict** on a FDUTPA claim based on alleged misrepresentations concerning the **intended use of property** where an earlier version of the contract contained a provision guaranteeing that the property would be used in that way was replaced by a subsequent contract which "expressly removed any references to the 'Intended Use' of 218 units for the property".  This is a far cry from the situation at bar as it does not involve a subsequent contractual change which specifically eliminated the alleged misrepresentation and moreover was **not decided on the pleadings.**

In Gundel v. AV Homes, Inc., 290 So. 3d 1080 (Fla. 2d DCA 2020), the Second District Court of Appeal reiterated the law of Florida that reliance is not an element of a claim for damages under the FDUTPA.  See also  Rollins v. Butland, 951 So. 2d 860, 867-69 (Fla. 2d DCA 2006) ("[A] claim for damages under FDUTPA has three elements: (1) a deceptive act or unfair practice; (2) causation; and (3) actual damages.").  See also see also Waste Pro USA, 282 So. 3d at 91 [A] party asserting a deceptive trade practice claim need not show actual reliance on the representation or omission at issue." (quoting Carriuolo v. Gen. Motors, 823 F.3d 977, 984 (11th Cir. 2016))); Turner Greenberg Assocs. v. Pathman, 885 So. 2d 1004, 1009 (Fla. 4th DCA 2004) ("[A] demonstration of reliance by an individual consumer is not necessary in the

context of FDUTPA."); <u>State, Office of Attorney Gen., Dep't of Legal Affairs v.</u> <u>Wyndham Int'l, Inc.</u>, 869 So. 2d 592, 598 (Fla. 1st DCA 2004) ("A deceptive or unfair trade practice constitutes a somewhat unique tortious act because, although it is similar to a claim of fraud, it is different in that, unlike fraud, a party asserting a deceptive trade practice claim need not show actual reliance on the representation or omission at issue.").

Plaintiff has alleged that AT&T violated the FDUTPA by charging its bogus administrative fee wherein sister courts found a similar plaintiff stated a cause of action, Plaintiff has rightly stated a claim upon which relief can be granted. Plaintiff specifically set forth sufficient allegations to maintain a FDUTPA claim, and taken as true, clearly state a cause of action. The Court's order ignores the actual allegations of the operative pleading.

Conduct considered to be a deceptive or unfair for the purposes of a FDUTPA claim may be defined by "[a]ny law, statute, rule, regulation, or ordinance which proscribes unfair methods of competition, or unfair, deceptive or unconscionable acts or practices." Fla. Stat. § 501.203(3)(c).    Hence, at its core, the issue is whether, as a matter of fact, AT&T used the administrative fee to defray expenses paid to third parties, or whether it kept it for itself. This presents a fact question that cannot be resolved on a motion to dismiss the complaints. *See* <u>Advance Mold Servs. v. Universal N. Am. Ins.</u> <u>Co</u>., 2023 WL 8793260 (Fla. 3d DCA Dec. 20, 2023).

In <u>Advance Mold Servs</u>., the defendant moved to dismiss an assignee's breach of insurance contract action, contending that a fee designated on an estimate as "Hazardous Waste/Mold Cleaning-Supervisory/Admin-per hour" constituted a statutorily

prohibited "administrative fee."   The plaintiff asserted that the fee was used to pay a supervisor and not as a clerical fee associated with administering the contract.   This court held that a question of fact existed, precluding dismissal of complaint, as to whether the fee constituted an "administrative fee."

The Third District Court of Appeal's decision in <u>Advance Mold Servs</u>. is on point. Here, a fact question exists as to whether the administrative fee was what it was represented to be: a fee assessed to defray or recover expenses AT&T pays to third parties associated with providing wireless service.  The issue of whether AT&T uses the revenue generated from the administrative fee to defray or recover such expenses, or instead keeps it for itself, is one of the facts that cannot be determined on a motion to dismiss the complaint.

### III.   The Court Erred in Ruling Preemption Applied Even Assuming AT&T's Documents are Genuine

The Court erred in finding that AT&T's unpled defense of preemption bars any claim related to the administrative fees.    The Court ignored and contorted the actual four-corners of the complaint in a compare and contrast exercise with other pleadings from other cases which is forbidden when ruling on a motion to dismiss.  Moreover, the Court ignored the plain language of AT&T's unpled affirmative defense which specifically exempts regulation of other terms and conditions—to wit, the administrative fees:

> "(A)Notwithstanding  sections 152(b) and 221(b) of  this  title, no State or  local  government  shall  have  any  authority  to regulate the entry of or the rates charged by any commercial mobile service or any private mobile service, except that **this paragraph  shall  not  prohibit  a State from  regulating  the other   terms   and   conditions   of commercial   mobile services.** Nothing    in    this    subparagraph    shall    exempt

> providers of commercial mobile services (where such services are a substitute for land line telephone exchange service for a substantial portion of the communications within such State) from requirements imposed by a State commission on all providers of telecommunications services necessary to ensure the universal availability of telecommunications service at affordable rates. Notwithstanding the first sentence of this subparagraph, a State may petition the Commission for authority to regulate the rates for any commercial mobile service and the Commission shall grant such petition if such State demonstrates that—

In Nat'l Ass'n Of State Util. Consumer Advocs. v. F.C.C., 457 F.3d 1238, 1258 (11th Cir.), opinion modified on denial of reh'g, 468 F.3d 1272 (11th Cir. 2006), the 11th Circuit Court of Appeals held that "because the regulation of line-item billing is not rate regulation, the express language of section 332(c)(3)(A) of the Communications Act does not preempt state regulations that require or prohibit the use of line items on cellular wireless bills." In Peck v. Cingular Wireless, LLC, 535 F.3d 1053, 1058 (9th Cir. 2008) which specifically found that 332(c)(3)(A) did not preempt a Washington State consumer protection law (RCW 82.04.500):

> "The legislative history of section 332(c)(3)(A) confirms that Congress did not intend the FCA to preclude the states from adopting measures like RCW 82.04.500, but rather considered them "other terms and conditions" that are expressly excluded from section 332(c)(3)(A)'s preemption of rates."

Peck v. Cingular Wireless, LLC, 535 F.3d 1053, 1058 (9th Cir. 2008)

Even a cursory reading of Plaintiff's operative pleading reveals that Plaintiff's claims do not challenge "the rate charged" for wireless services but rather they address the other "terms and conditions" contained in the written agreement to wit, the administrative fees. It is undisputed that Plaintiff is challenging the administrative fee,

which by AT&T's own attachment, specifically identifies "rate" separate and apart from expenses and fees and thus, Plaintiff, "by definition" is not challenging the "rate charged" for services making the non-pled affirmative defense inapplicable.

Even assuming the exhibit to the motion to dismiss are authentic, AT&T's own contractual language in its attachment identifies "rates" versus "terms" and separately identifies "rates" versus "fees, expenses or charges":

**1.3** <u>Can AT&T Change My Terms And Rates?</u>

We may change any terms, conditions, rates, fees, expenses, or charges regarding your Services at any time. We will provide you with notice of material changes (other than changes to governmental fees, proportional charges for governmental mandates, roaming rates or administrative charges) either in your monthly bill or separately. You understand and agree that State and Federal Universal Service Fees and other governmentally imposed fees, whether or not assessed directly upon you, may be increased based upon the government's or our calculations.

As the Court is aware, the terms of a contract provide the best evidence of the parties' intent.  *See* McGhee Interests,Inc. v. Alexander Nat'l Bank,102 Fla. 140, 135 So. 545, 547(1931), and where the language is plain a court should not create confusion by adding hidden meanings, terms, conditions, or unexpressed intentions, See Dahl-Eimers v.Mut. of Omaha LifeIns. Co.*,* 986 F.2d 1379, 1382 (11th Cir. 1993). Moreover, in determining whether a contract is ambiguous, the words should be given their natural, ordinary meaning,  Emergency Assoc. v. Sassano, 664 So.2d 1000, 1003 (Fla. 2d DCA 1995);Continental Casualty Co. v. Borthwick,177So.2d 687, 689 (Fla. 1 DCA 1965), and ambiguity does not exist simply because a contract requires interpretation or fails to define a term, Dahl–Eimers, 986 F.2d at 138.  Lastly, an ambiguous term in a contract is to be construed against the drafter. *See* Planck v. Traders Diversified, Inc.*,* 387 So.2d 440 (Fla. 4th DCA 1980) citing City of Homestead v.

Johnson, 760 So. 2d 80, 84 (Fla. 2000).  "It is well settled that courts may not rewrite a contract or interfere with the freedom of contract or substitute their judgment for that of the parties thereto in order to relieve one of the parties from the apparent hardship of an improvident bargain."  *See* Metro Development Group, L.L.C. v. 3D–C & C, Inc., 941 So.2d 11, 14 (Fla. 2d DCA 2006), *quoting* Beach Resort Hotel Corp. v. Wieder, 79 So.2d 659, 663 (Fla.1955).

AT&T's own documents attached to its motion to dismiss **specifically exempted by AT&T's unpled defense** identify rate and charges as separate items.. The Court's order improperly attempts to change the terms of its unambiguous contract which is not allowable on a motion to dismiss which converted it into a motion for summary judgment.  Furthermore, under Florida law to the extent there is an ambiguity in the contract, it shall be construed against AT&T as the drafter of the agreement especially at the motion to dismiss stage where AT&T and the Court decided to ignore the "four corners" rule and incorporate hearsay in its rulings.  However, even considering that hearsay as part of the actual pleadings, it contradicts the Court's findings.

Several other courts have already addressed whether Section 332(c)(3)(A) completely preempts consumers' claims, and all have held that Section 332(c)(3)(A) is not a complete preemption. *See, e.g.,* TPS Utilicom Servs., Inc. v. AT&T Corp., 223 F.Supp.2d 1089, 1096 (C.D.Cal.2002); Bell Atlantic Mobile, Inc. v. Zoning Bd. of Butler Township, 138 F.Supp.2d 668, 676–77 (W.D.Pa.2001) (§ 332(c)(7) does not support complete preemption); Bryceland v. AT & T Corp., 122 F.Supp.2d 703, 706–10 (N.D. Tex. 2000) (§ 332 does not support preemption); Aronson v. Sprint Spectrum, L.P., 90 F.Supp.2d 662, 664–69 (W.D. Pa. 2000) (same); Sanderson, Thompson, Ratledge &

Zimny v. AWACS, Inc., 958 F.Supp. 947, 952–58 (D. Del.1997) (same); Russell v. Sprint Corp., 264 F.Supp.2d 955 (D. Kan. 2003). These courts point to the lack of evidence that Congress intended in any FCA provisions, including the preemptive provisions of Section 332, to **permit preemption.**

The Southern District of Alabama had a similar case. Stabler v. Contel Cellular, No. 97-0873-RV-C, 1997 U.S. Dist. LEXIS 20194, at *1 (S.D. Ala. Nov. 17, 1997). There, the plaintiff, a consumer, filed suit for breach of contract and fraud because the defendant service provider increased the rates after the consumer signed a contract for specified rates. *Id.* at *2. The Court found that section 332(c)(3) did not prevent state regulation of contract and fraud claims that stemmed from billing contracts with mobile service carriers, and because the action challenged the provider's ability to deviate from the terms of the contract, rather than the reasonableness of the rates. *Id.* at *10.

Lastly, the Court's reliance on Gilmore v. Sw. Bell Mobile Sys., Inc., 156 F. Supp. 2d 916, 924 (N.D. Ill. 2001) was completely misplaced.  Even Gilmore found that "to the extent plaintiff simply claims that defendant added the Fee while attempting to hide the increase in charges (hereinafter the "nondisclosure fraud claim"), that is a claim like the one in *Long Distance Litigation.*"  In In re Long Distance Telecommunications Litig., 831 F.2d 627, 633 (6th Cir. 1987), the Court held  that "the district court erred in holding that the state law claims for fraud and deceit, based on the defendants' failure to notify customers of the practice of charging for uncompleted calls, were preempted by the Communications Act."

**IV.     AT&T has Submitted to the Jurisdiction of Small Claims Court**

The plain language of its own agreement purportedly attached to the motion to dismiss allows a consumer to file a small claims case in Florida. It is undisputed that AT&T's wireless agreement with Plaintiff specifically gives Plaintiff the right to challenge any claim or charge in **small claims court** or arbitration ***in the state where they reside.*** Moreover, AT&T agrees and even consents to the personal jurisdiction of small claims court which is in direct contravention of any theory that any consumer's claim regarding the administrative fee violating state law is subsumed by the Federal Communications Act. More telling of the parties' intent is the fact that the U.S. District Courts do not even have a 'small claims court.'

## V.    Dismissal with Prejudice of Counts 1 through 4 was Improper

It is reversible error to dismiss a complaint where a party only amended twice before and is seeking a third opportunity to present a proper pleading, See Pangea Produce Distributors, Inc. v. Franco's Produce, Inc., 275 So. 3d 240, 242 (Fla. 3d DCA. 2019).  Furthermore, refusal to allow an amendment **even after the Court enters summary judgment** is an abuse of discretion **unless it is clear** that allowing the amendment would prejudice the opposing party, the privilege to amend has been abused, or amendment would be futile. Laurencio at 1193.(Emphasis added).

"Generally, a trial court must allow a litigant the opportunity to amend a complaint before dismissing its suit with prejudice unless it is clear that the pleading cannot be amended so as to state a cause of action." (quoting Albrecht v. Bd. of Trs. of Internal Improvement Tr. Fund, 481 So.2d 555, 556 (Fla. 2d DCA 1986)); Kapley v. Borchers, 714 So.2d 1217, 1218 (Fla. 2d DCA 1998) ("A dismissal with prejudice should not be ordered without giving the party offering the pleading an opportunity to amend unless it appears

that the privilege to amend has been abused or it is clear that the pleading cannot be amended to state a cause of action."). <u>Acquisition Tr. Co., LLC v. Laurel Pinebrook, LLC</u>, 226 So. 3d 325, 326 (Fla. 2nd DCA 2017); <u>Golden v. Jones</u>, 194 So. 3d 1060, 1063 (Fla. 4th DCA. 2016)  citing <u>Kairalla v. John D. and Catherine T. MacArthur Found</u>., 534 So.2d 774, 775 (Fla. 4th DCA 1988) ("This court has held on numerous occasions that a dismissal with prejudice should not be ordered without giving the plaintiff an opportunity to amend the defective pleading, unless it is apparent that the pleading cannot be amended to state a cause of action.")

Leave to amend should be liberally given and a dismissal with prejudice is not proper unless the privilege to amend has been abused, or it is clear that the pleading cannot be amended to state a cause of action. <u>Cooper v. Town of Jupiter</u>, 52 So. 3d 680, 682 (Fla. 4th DCA 2010) citing <u>Gamma Dev. Corp. v. Steinberg</u>, 621 So.2d 718, 719 (Fla. 4th DCA 1993). A dismissal with prejudice should not be ordered without giving the party offering the defective pleading an opportunity to amend unless it is clear that the pleading cannot be amended so as to state a cause of action. <u>Cent. Fla. Invs., Inc. v. Levin</u>, 659 So. 2d 492, 493 (Fla. 4th DCA 1995) citing <u>Delia & Wilson, Inc. v. Wilso</u>n, 448 So.2d 621 (Fla. 4th DCA 1984).

Wherefore, Plaintiff respectfully requests the Court GRANT the motion for reconsideration and allow Plaintiff leave to attempt to amend Counts 1-4 and any other relief the Court deems just and proper.

## CERTIFICATE OF SERVICE

WE HEREBY CERTIFY that a true and correct copy of the foregoing was sent via e-portal this this January 9, 2024 to: Manuel A. Garcia-Linares, Esquire (mgarcialinares@daypitney.com, edavila@daypitney.com ) Andrew R. Ingalls, Esquire (aingalls@daypitney.com) Day Pitney LLP, 396 Alhambra Circle, North Tower - 14th Floor, Miami, Florida 33134.

**Beighley, Myrick, Udell, Lynne & Zeichman PA**
*Attorneys for Plaintiff*
2601 S. Bayshore Dr.
Suite 770
Miami, FL 33133
(305) 349-3930 – Phone

By:     _/s/ Maury L. Udell_____
Maury L. Udell, Esquire
mudell@bmulaw.com
Fla. Bar 121673

IN THE COUNTY COURT OF THE
ELEVENTH JUDICIAL CIRCUIT, IN AND
FOR MIAMI-DADE COUNTY, FLORIDA

SERGIO SALANI,                                  CASE NO. 2022-047421-SP-25

       Plaintiff,

v.

AT&T MOBILITY LLC,

       Defendant.

_____/

## DEFENDANT AT&T MOBILITY LLC'S
## RESPONSE TO PLAINTIFF'S REQUEST FOR ADMISSIONS

Defendant, AT&T Mobility LLC, ("AT&T"), pursuant to Rule 1.370 of the Florida Rules of

Civil Procedures, responds to Plaintiff's *Request for Admissions* (the "Requests") served on December

13, 2024, and states:

### RESPONSES TO SPECIFIC REQUESTS

1.  Please admit that Defendant agreed to not participate in class actions against Plaintiff.

**RESPONSE:**  AT&T objects that this request seeks irrelevant information that has no
relation whatsoever to Plaintiff's claims or any of AT&T's affirmative defenses.  AT&T further objects
that Plaintiff's request calls for a purely legal conclusion to which no response is required.
Notwithstanding and subject to that objection, denied as phrased.


2.  Please admit that Plaintiff agreed to not participate in class actions with Defendant.

**RESPONSE:**   AT&T objects that this request seeks irrelevant information that has no
relation whatsoever to Plaintiff's claims or any of AT&T's affirmative defenses.  AT&T further objects
that Plaintiff's request calls for a purely legal conclusion to which no response is required.
Notwithstanding and subject to that objection, denied as phrased.

Dated:  January 14, 2025             Respectfully submitted,

By: _/s/ Manuel A. Garcia-Linares_____
       Manuel A. Garcia-Linares, Esq.
       Florida Bar No. 985252
       mgarcialinares@daypitney.com
       athomsen@daypitney.com
       Andrew R. Ingalls, Esq.
       Florida Bar No. 112558
       aingalls@daypitney.com
       athomsen@daypitney.com
       **DAY PITNEY LLP**
       396 Alhambra Circle
       North Tower – 14th Floor
       Miami, Florida  33134
       Telephone: (305) 373-4000
       Facsimile:  (305) 373-4099
       *Counsel for Defendant AT&T Mobility LLC*

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on January 14, 2025, I electronically filed the foregoing document with the Clerk of the Court via e-portal and served: **Maury L. Udell, Esq.**, Beighley, Myrick, Udell, Lynn e& Zeichman, P.A., 2601 South Bayshore Drive, Suite, 770, Miami, Florida 33133, Emails: mudell@bmulaw.com and notice66@bmulaw.com, *Counsel for Plaintiff.*

By: _/s/ Manuel A. Garcia-Linares_____
       Manuel A. Garcia-Linares, Esq.

121136024.1

**IN THE COUNTY COURT OF THE ELEVENTH JUDICIAL
CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA**

CASE NO: 2022-047421-SP-25
SECTION: CG01
JUDGE: Jorge A Perez Santiago

**Sergio Salani**

Plaintiff(s) / Petitioner(s)

vs.

**AT&T Mobility, LLC**

Defendant(s) / Respondent(s)

_____/

<u>**ORDER DENYING MOTION FOR RECONSIDERATION**</u>

This cause came before the Court on its sua sponte review of Plaintiff, Sergio Salani's, motion for reconsideration of the Court's order dismissing counts through 1 through 4 of the operative pleading. Plaintiff's motion is hereby DENIED.

**DONE** and **ORDERED** in Chambers at Miami-Dade County, Florida on this <u>15th day of January, 2025</u>.

<u>2022-047421-SP-25 01-15-2025 9:52 PM</u>
Hon. Jorge A Perez Santiago

**COUNTY COURT JUDGE**
Electronically Signed

No Further Judicial Action Required on **THIS MOTION**

CLERK TO **RECLOSE** CASE IF POST JUDGMENT

**Electronically Served:**
Andrew R. Ingalls, aingalls@daypitney.com
Andrew R. Ingalls, brodriguez@daypitney.com
Evelyn Davila, edavila@daypitney.com

Jessica Solorzano, jsolorzano@daypitney.com
Manuel A. Garcia-Linares, mgarcialinares@daypitney.com
Manuel A. Garcia-Linares, athomsen@daypitney.com
Maury L. Udell, notice66@bmulaw.com
Maury L. Udell, blopez@bmulaw.com

**Physically Served:**

IN THE COUNTY COURT OF THE
ELEVENTH JUDICIAL CIRCUIT, IN AND
FOR MIAMI-DADE COUNTY, FLORIDA

CASE NO. 2022-047421-SP-25

SERGIO SALANI,

     Plaintiff,

v.

AT&T MOBILITY LLC,

     Defendant.

_____/

### AT&T MOBILITY LLC'S MOTION FOR A PROTECTIVE ORDER REGARDING UNILATERALLY SET DEPOSITION

On December 13, 2024, Plaintiff filed a Notice of Deposition Duces Tecum unilaterally scheduling the deposition of Defendant's, AT&T Mobility LLC ("AT&T"), Rule 1.310(b)(6) Corporate Representative, without conferring on the availability of AT&T's Corporate Representative and AT&T's counsel. In this motion, AT&T requests a protective order and, in support, states as follows:

1.     On April 29, 2024, Plaintiff filed the Second Amended Statement of Claim asserting claims for: (1) fraud, (2) damages under FDUTPA, (3) declaratory relief under FDUTPA, and (4) unjust enrichment. These counts center on allegations that AT&T improperly charged Plaintiff a $1.99 administrative fee without adequately disclosing its existence and then did not apply the administrative fee as it represented it would.

2.     On September 17, 2024, Plaintiff filed a *Motion for Leave to File Second Amended Statement of Claim* (the "Motion for Leave"). Hearing on the Motion for Leave was conducted on October 4, 2024, and, on December 13, 2024, this Court entered its *Omnibus Order Granting Plaintiff's Motion to Dismiss Counts 1 through 4 and Granting Leave to Amend the Complaint to State Data Breach Claims,* which

directed Plaintiff to, "file an amended pleading asserting only the data breach claims," by December 23, 2024.

3.      On December 18, 2024, Plaintiff filed a *Motion for Extension of Time to File Amended Pleading*, upon which this Court entered ruling on January 6, 2025, granting Plaintiff's Motion and directing Plaintiff's counsel to file a Third Amended Complaint no later than February 5, 2025.

4.      On December 13, 2024 and January 6, 2025, Plaintiff served Notices of Deposition Duces Tecum of AT&T's corporate representative, unilaterally setting the depositions of AT&T's corporate representative for January 17, 2025 at 2:00 p.m. and January 24, 2025 at 2:00 p.m., respectively.  Copies of Plaintiff's Notices of Deposition are attached as **Composite Exhibit 1**.

5.      "Discovery is limited to those matters relevant to the litigation **as framed by the parties' pleadings.**" *Rousso v. Hannon*, 146 So. 3d 66, 69 (Fla. 3d DCA 2014) (emphasis in original). The dismissal of all claims in Plaintiff's Second Amended Statement of Claim means that, at present, there are no active issues before the Court to which the requested deposition could relate. Until Plaintiff files an amended pleading that complies with this Court's December 13, 2024 Order, AT&T cannot adequately prepare for the deposition, as there is no clear articulation of the claims or theories upon which discovery may proceed. *Id.* Furthermore, Plaintiff unilaterally scheduled the deposition without consulting AT&T, demonstrating a disregard for judicial economy and proportionality. *See Charlton v. Tennant*, 365 So. 2d 418, 419 (Fla. 2d DCA 1978) ("Of course, discovery of any type can be limited by protective order to protect a party from annoyance, embarrassment, oppression, or undue burden or expense.").

**WHEREFORE**, AT&T respectfully requests that this Court enter a protective order staying depositions in this matter until after Plaintiff has filed a Third Amended Statement of Claim and this Court has entered a ruling on AT&T's Motion to Dismiss, and for any further relief the Court may deem just and proper, including fees and costs incurred relating to this motion.

## CERTIFICATE OF CONFERRAL

I certify that prior to filing this motion, on January 14 and 15, 2025, Andrew Ingalls, Esq. discussed the relief requested in this motion by email with Plaintiff's counsel, Maury Udell, Esq., and Mr. Udell disagrees on the resolution of all or part of the motion.

Dated:  January 15, 2025

Respectfully submitted,

By:  */s/ Manuel A. Garcia-Linares*
      Manuel A. Garcia-Linares, Esq.
      Florida Bar No. 985252
      mgarcialinares@daypitney.com
      athomsen@daypitney.com
      Andrew R. Ingalls, Esq.
      Florida Bar No. 112558
      aingalls@daypitney.com
      athomsen@daypitney.com
      **DAY PITNEY LLP**
      396 Alhambra Circle
      North Tower – 14th Floor
      Miami, Florida  33134
      Telephone: (305) 373-4000
      Facsimile:   (305) 373-4099
      *Counsel for Defendant AT&T Mobility LLC*

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on January 15, 2025, I electronically filed the foregoing document with the Clerk of the Court via e-portal and served: **Maury L. Udell, Esq.**, BEIGHLEY, MYRICK, UDELL, LYNNE & ZEICHMAN, P.A., 2601 South Bayshore Drive, Suite 770, Miami, Florida 33133, Emails: mudell@bmulaw.com and notice@bmulaw.com, *Counsel for Plaintiff.*

By:  */s/ Manuel A. Garcia-Linares*
      Manuel A. Garcia-Linares, Esq.

# COMPOSITE EXHIBIT 1

Case 1:25-cv-20381-RAR   Document 1-2   Entered on FLSD Docket 01/27/2025   Page 1516 of 1553

IN THE COUNTY COURT OF THE 11TH JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA

Sergio Salani,

      Plaintiff,

v.

AT&T Mobility, LLC,

      Defendant.

_____/

CASE NO.: 2022-047421-SP-25

BAR NO.: 121673

## NOTICE OF DEPOSITION DUCES TECUM

**PLEASE TAKE NOTICE,** pursuant to Fla. R. Civ. P. 1.310(b)6, that the undersigned attorney will take the deposition of the following:

**DEPONENT:**    AT&T Mobility, LLC

**DATE & TIME:**    January 17, 2025 at 2:00 pm

**LOCATION:**    VIA ZOOM – *please contact the undersigned to obtain meeting ID and password prior to the deposition date*.

upon oral examination before a notary public, or any other officer authorized by law to take depositions in the State of Florida.  The oral examination will continue from day to day until completed. The depositions are being taken for the purpose of discovery, for use at trial, or for such other purposes as are permitted under the applicable and governing rules.

## <u>AREAS OF INQUIRY</u>

1. The hierarchy of corporate management of AT&T Mobility, LLC.

2. The decision(s) to not pay this claim.

3. The decision to pay prior claims involving suits of the same subject matter of bogus administrative fees filed by counsel for Plaintiff.

4. The general claims handling practices of AT&T.

5. The decision to settle FTC v. AT&T Mobility, LLC federal action.

6. The decision to impose an administrative fee on customers' accounts including plaintiff's assignor.

7. The decision to increase the amount of the administrative fee customers' accounts including plaintiff's assignor.

8. AT&T internal focus group research regarding the administrative fee.

9. For the last three (3) years, interconnect charges and cell site rental charges and costs for AT&T Mobility, LLC as referenced in AT&T wireless customer agreement.

10. Any internal business memoranda which discuss the imposition of the administrative fee on plaintiff and any other customer's account;

11. Any factual basis to support any defenses, pled or unpled to Plaintiff's claim including res judicata and release.

12. Aside from any claim filed in Miami-Dade County, any other claims filed by individuals related to the allegations of the complaint for data throttling and bogus administrative fees and the locality and name of the plaintiff or plaintiff's lawyer who filed said claims.

13. Any internal data on number of arbitrations filed by customers against Defendant in the last four (4) years.

14. SEC quarterly filings since Q1 2018 related to interconnect charges and cell site rental charges and costs for AT&T Mobility, LLC.

15. Any data breach incident that occurred from 2019 to date.

16. Data security policies and procedures that were in place at the time of any data breach incident that occurred from 2019 to date.

17. Corrective actions taken in response to the data breach, including changes to security measures, training programs, or policies.

18. Any and all insurance policies that may provide coverage for losses or liabilities arising from any data breach incident that occurred from 2019

19. Risk assessments, security audits, and vulnerability assessments conducted by or for your company in the two years preceding any data breach incident that occurred from 2019.

20. Any defenses pled or unpled to Plaintiff's claim.

## **DUCES TECUM**

1. Original wireless agreement with Plaintiff's assignor.

2. Any and all documents which support any affirmative defense you have raised in this case or intend to raise in this case.

3. Any internal business memoranda which discuss the imposition of the administrative fee on plaintiff's assignor and any other customer's account;

4. The entire file, whether in paper or electronic form of Plaintiff including any data usage of Plaintiff's assignor for last five (5) years from the date of the filing of this complaint, including every correspondence and bill sent to Plaintiff's assignor.

5. The electronically stored information policy in place of AT&T for internal memoranda, legal memoranda, customer information and customer data use for the last five (5) years.

6. Any contract between Plaintiff's assignor and ATT from 2019 to date.

7. Any bills sent to Plaintiff's assignor by ATT in the last five (5) years.

8. Any notices sent to Plaintiff's assignor related to Data Breach.

9. All incident reports, including but not limited to initial reports, follow-up reports, and final reports, related to the any data breach incident that occurred from 2019 to date.

10. Copies of all internal communications (emails, memos, meeting notes, etc.) concerning any data breach incident that occurred from 2019 to date.

11. Copies of all external communications (emails, letters, press releases, etc.) with customers, vendors, partners, regulatory agencies, and the media regarding any data breach incident that occurred from 2019 to date.

12. All documents outlining your company's data security policies and procedures that were in place at the time of any data breach incident that occurred from 2019 to date.

13. All risk assessments, security audits, and vulnerability assessments conducted by or for your company in the two years preceding any data breach incident that occurred from 2019 to date.

14. Copies of all notifications to Plaintiff's assignor regarding any data breach incident that occurred from 2019 to date.

15. All contracts, agreements, and communications with third-party vendors or service providers involved in the handling or storage of the compromised data.

16. Documentation of any corrective actions taken in response to the data breach, including changes to security measures, training programs, or policies.

17. Copies of all insurance policies that may provide coverage for losses or liabilities arising from any data breach incident that occurred from 2019 to date.

18. Copies of any lawsuits, legal claims, or complaints filed against your company related to any data breach incident that occurred from 2019 to date.

19. Any reports or analyses conducted to assess the financial impact of any data breach incident that occurred from 2019 to date on your company

### <u>CERTIFICATE OF SERVICE</u>

**WE HEREBY CERTIFY** that a true and correct copy of the foregoing was served on December 13, 2024 on all counsel of record via the Florida Court's e-filing system.

**Beighley, Myrick, Udell, Lynne & Zeichman PA**
*Attorneys for Plaintiff*
2601 S. Bayshore Drive
Suite 770
Miami, FL 33133
(305) 349-3930– Phone
notice66@bmulaw.com (R 2.516 Designated E-mail)

By:     _/s/ *Maury L. Udell*_____
Maury L. Udell, Esquire
mudell@bmulaw.com
Fla. Bar 121673

IN THE COUNTY COURT OF THE 11TH JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA

Sergio Salani,

      Plaintiff,

v.

AT&T Mobility, LLC,

      Defendant.

_____/

CASE NO.: 2022-047421-SP-25

BAR NO.: 121673

## NOTICE OF DEPOSITION DUCES TECUM

**PLEASE TAKE NOTICE,** pursuant to Fla. R. Civ. P. 1.310(b)6, that the undersigned attorney will take the deposition of the following:

**DEPONENT:**    AT&T Mobility, LLC

**DATE & TIME:**    January 24, 2025 at 2:00 p.m.

**LOCATION:**    VIA ZOOM – *please contact the undersigned to obtain meeting ID and password prior to the deposition date*.

upon oral examination before a notary public, or any other officer authorized by law to take depositions in the State of Florida. The oral examination will continue from day to day until completed. The depositions are being taken for the purpose of discovery, for use at trial, or for such other purposes as are permitted under the applicable and governing rules.

## AREAS OF INQUIRY

1. Any data breach incident that occurred from 2019 to date.
2. Data security policies and procedures that were in place at the time of any data breach incident that occurred from 2019 to date.
3. Corrective actions taken in response to the data breach, including changes to security measures, training programs, or policies.
4. Any and all insurance policies that may provide coverage for losses or liabilities arising from any data breach incident that occurred from 2019
5. Risk assessments, security audits, and vulnerability assessments conducted by or for your company in the two years preceding any data breach incident that occurred from 2019.
6. Any defenses pled or unpled to Plaintiff's claim.

## DUCES TECUM

1. Any contract between Plaintiff and ATT from 2019 to date.
2. Any bills sent to Plaintiff by ATT in the last five (5) years.
3. Any notices sent to Plaintiff related to Data Breach.
4. All incident reports, including but not limited to initial reports, follow-up reports, and final reports, related to the any data breach incident that occurred from 2019 to date.
5. Copies of all internal communications (emails, memos, meeting notes, etc.) concerning any data breach incident that occurred from 2019 to date.
6. Copies of all external communications (emails, letters, press releases, etc.) with customers, vendors, partners, regulatory agencies, and the media regarding any data breach incident that occurred from 2019 to date.
7. All documents outlining your company's data security policies and procedures that were in place at the time of any data breach incident that occurred from 2019 to date.
8. All risk assessments, security audits, and vulnerability assessments conducted by or for your company in the two years preceding any data breach incident that occurred from 2019 to date.

9. Copies of all notifications to Plaintiff regarding any data breach incident that occurred from 2019 to date.

10. All contracts, agreements, and communications with third-party vendors or service providers involved in the handling or storage of the compromised data.

11. Documentation of any corrective actions taken in response to the data breach, including changes to security measures, training programs, or policies.

12. Copies of all insurance policies that may provide coverage for losses or liabilities arising from any data breach incident that occurred from 2019 to date.

13. Copies of any lawsuits, legal claims, or complaints filed against your company related to any data breach incident that occurred from 2019 to date.

14. Any reports or analyses conducted to assess the financial impact of any data breach incident that occurred from 2019 to date on your company

## CERTIFICATE OF SERVICE

**WE HEREBY CERTIFY** that a true and correct copy of the foregoing was served on January 6, 2025 on all counsel of record via the Florida Court's e-filing system.

> **Beighley, Myrick, Udell, Lynne & Zeichman PA**
> *Attorneys for Plaintiff*
> 2601 S. Bayshore Drive
> Suite 770
> Miami, FL 33133
> (305) 349-3930– Phone
> notice66@bmulaw.com (R 2.516 Designated E-mail)
>
> By:     _/s/ *Maury L. Udell*_____
>           Maury L. Udell, Esquire
>           mudell@bmulaw.com
>           Fla. Bar 121673

IN THE COUNTY COURT OF THE 11TH JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY, FLORIDA

Sergio Salani,

      Plaintiff,

v.

AT&T Mobility, LLC,

      Defendant.

_____/

CASE NO.: 2022-047421-SP-25

BAR NO.: 121673

## SECOND AMENDED STATEMENT OF CLAIM

Plaintiff, Sergio Salani, through its undersigned counsel, hereby files this Third Amended Statement of Claim against Defendant, AT&T, Mobility, LLC ("AT&T MOBILITY, LLC"), and further alleges as follows:

## GENERAL ALLEGATIONS

1. This is an action against AT&T for damages for $8,000, exclusive of interest, attorney's fees, and costs.

2. Plaintiff is a customer of AT&T Mobility, LLC, a Florida consumer with cell number XXX-XX9-8349.

3. Plaintiff is not in possession of the specific wireless agreement with Defendant.

4. AT&T MOBILITY, LLC is a foreign limited liability company licensed and doing business in Miami-Dade County, Florida subject to the jurisdiction of this Court.

5. Venue is proper in Miami-Dade County, Florida.

6. Plaintiff has complied with all conditions precedent to filing this action or said conditions have been waived by AT&T Mobility, LLC.

7.  This claim is not preempted by any federal law or statute.

8.  This action is not a class action.

9.  According to court filings made by AT&T MOBILITY, LLC in federal court, it is a nongovernmental limited liability company that has no parent company, but its members are BellSouth Mobile Data, Inc.; SBC Long Distance, LLC; and SBC Tower Holdings LLC. Those entities (and thus AT&T MOBILITY, LLC) are all indirectly wholly owned by AT&T Inc., which is the only publicly held company with a 10 percent or greater ownership stake in them.

10. AT&T, Inc. reports its consolidated business results, and breaks out selected disclosures for its major operating segments. Their segments are strategic business units that offer different products and services over various technology platforms and/or in different geographies that are managed accordingly. They analyze the operating segments based on segment contribution, which consists of operating income, excluding acquisition-related costs and other significant items, and equity in net income (loss) of affiliates for investments managed within each operating segment.

11. There are four reportable segments of AT&T, Inc.: (1) Communications, (2) Warner Media, (3) Latin America and (4) Xandr. AT&T MOBILITY, LLC is a major retailer of smartphones and provider of wireless broadband internet access service for smartphones.

12. Smartphone owners use mobile data for, including but not limited to, sending and receiving email, using GPS navigation, watching and streaming video, and browsing the internet. AT&T MOBILITY, LLC is a major retailer of smartphones and provider of wireless broadband internet access service for smartphones ("mobile data"). Smartphone owners

use mobile data for, including but not limited to, sending and receiving email, using GPS navigation, watching and streaming video, and browsing the internet.

13. AT&T MOBILITY, LLC's place in AT&T Inc corporate structure can be identified as follows:



14. The Communications segment provides wireless and wireline telecom, video and broadband services to consumers located in the U.S. or in U.S. territories and businesses globally.  Communications services and products are marketed under the AT&T, Cricket, AT&T PREPAID and DIRECTV brand names. The Communications segment provided approximately 84% of 2018 segment operating revenues and 84% of our 2018 total segment contribution. This segment contains the Mobility, Entertainment Group and

Business Wireline business units.

15. AT&T Mobility, LLC's previous in court public admissions (filed by its corporate counsel, Patricia Cruz, Esq.) has admitted to anit-consumer behavior, see the cases of Erin Young v. AT&T Mobility, LLC, Case No. 2019-2027-SP-26, EFiling#87601121 or Tamara Crespo v. AT&T Mobility, LLC, Case No. 2019-2026-SP26, E-Filing#87600869 both of which alleged AT&T's violation of FDUTPA for illegal data throttling and bogus administrative fee, is further evidence of AT&T Mobility, LLC's illegal, immoral and unethical conduct toward consumers.

## **COUNT I - NEGLIGENCE FOR DATA BREACH**

16. Plaintiff re-alleges, restates, and incorporates the allegations contained in paragraphs one (1) through fifteen (15) as fully set forth herein.

17. AT&T learned that a well-known threat actor claimed to be selling a database containing the personal information of over 70 million AT&T customers. This information included customers' names, addresses, phone numbers, Social Security numbers, and dates of birth. But instead of investigating the source and cause of the massive breach, AT&T denied the allegations, ignored the issue, and continued with operations. AT&T told one media outlet that "the information that appeared in an internet chat room does not appear to have come from our systems." And when questioned about its vendors, AT&T chose not to speculate: "Given this information did not come from us, we can't speculate on where it came from or whether it is valid." AT&T attempted to fully wash its hands of the disaster.

18. The same customer data is no longer just for sale; it has been fully exposed on the Dark Web. And after years of denial, AT&T has changed its tune. AT&T finally admitted that

approximately 73 million former and current AT&T customers' personal and sensitive information was released onto the Dark Web (the "Data Breach"), including Plaintiff's information.

19. According to AT&T, customers' impacted information included a combination of their "full name, email address, mailing address, phone number, social security number, date of birth, and AT&T account number and passcode" (collectively, "PII"), which AT&T collected as a condition for use of its services. This recent revelation marks a concerning turn of events.

20. Equally troubling is that AT&T still appears clueless as to the source of the breach. One would hope that – in nearly three years – a telecom giant like AT&T would have conducted a "robust investigation" into the data leak to determine who was responsible, where the data originated from, which customers were impacted, how the Data Breach occurred, and other key factors. But it did not. Had it done so, the 73 million customers could have attempted to adequately protect themselves. Instead, AT&T remained willfully blind.

21. This Data Breach and resulting injuries occurred because AT&T failed to implement reasonable security procedures and practices (including failing to exercise appropriate managerial control over third-party partner's data security), failed to disclose material facts surround its deficient data security protocols, and failed to timely notify the victims of the Data Breach.

22. In connection with providing its wireless services, AT&T required Plaintiff to provide personal information, including but not limited to names, addresses, Social Security numbers, and dates of birth.

23. Given the amount and sensitive nature of the data it collects, AT&T maintains policies explaining its privacy practices handling consumers' personal information. Through these policies, AT&T represents to consumers and the public that it possesses robust security features to protect PII and it they their responsibility to protect PII seriously.

24. Given AT&T's avowed experience in its field handling highly sensitive information, it understood the need to protect consumers' PII and prioritize data security.

25. AT&T admitted that its data security was breached and acknowledged the legitimacy of the leaked customer data:

> AT&T has determined that AT&T data-specific fields were contained in a data set released on the dark web approximately two weeks ago. While AT&T has made this determination, it is not yet known whether the data in those fields originated from AT&T or one of its vendors. With respect to the balance of the data set, which includes personal information such as social security numbers, the source of the data is still being assessed.

> AT&T has launched a robust investigation supported by internal and external cybersecurity experts. Based on our preliminary analysis, the data set appears to be from 2019 or earlier, impacting approximately 7.6 million current AT&T account holders and approximately 65.4 million former account holders.

> Currently, AT&T does not have evidence of unauthorized access to its systems resulting in exfiltration of the data set. The company is communicating proactively with those impacted and will be offering credit monitoring at our expense where applicable. We encourage current and former customers with questions to visit www.att.com/accountsafety for more information.

> As of today, this incident has not had a material impact on AT&T's operations.

26. AT&T had a duty to protect Plaintiff's private information and has breached that duty.

27. But AT&T, like any company of its size that stores massive amounts of sensitive PII,

should have had robust protections in place to detect and terminate a successful intrusion long before access and exposure of customer data. AT&T also should have exercised appropriate managerial control over their third-party partners' data security when it knew these partners stored its customers' PII in the course of carry out the business of their partnership. AT&T's failure to prevent the breach is inexcusable given its knowledge that it and its affiliates are prime targets for cyberattacks.

28. In 2022, the National Security Agency (NSA), the Cybersecurity and Infrastructure Security Agency (CISA), and the Federal Bureau of Investigation (FBI) co-authored the joint Cybersecurity Advisory explicitly highlighting [t]elecommunications and network service provider targeting" by cyber actors. The Advisory explains how cyber actors exploit and access telecommunication organizations and network service providers though the use of open-source tools "that allows for the scanning of IP addresses for vulnerabilities." Once these cyber actors gain an initial foothold, they identify "critical users and infrastructure including systems critical to maintaining the security of authentication, authorization, and accounting."

29. Thus, whether the data breach occurred through AT&T's own systems or its third-party vendors, AT&T was responsible for the protection of Plaintiff's PII.

30. And AT&T recognized these risks in its own regulatory filings with the SEC.

31. If not through its own history, AT&T surely understood the risk from its competitors. Considering recent high profile data breaches at other telecommunications companies, such as Xfinity (36,000,000 impacted, announced December 2023); T-Mobile (37,000,000 impacted, announced January 2023); and US-Cellular (52,000 impacted, announced March 2023), among others, AT&T knew or should have known

that its data and consumers' PII would be, or had already been, targeted by cybercriminals.

32. To prevent unauthorized access, CISA encourages organizations to:

- Conduct regular vulnerability scanning to identify and address vulnerabilities, particularly on internet-facing devices;

- Regularly patch and update software to latest available versions, prioritizing timely patching of internet-facing servers and software processing internet data;

- Ensure devices are properly configured and that security features are enabled;

- Employ best practices for use of Remote Desktop Protocol (RDP) as threat actors often gain initial access to a network through exposed and poorly secured remote services; and

- Disable operating system network file sharing protocol known as Server Message Block (SMB) which is used by threat actors to travel through a network to spread malware or access sensitive data.

33. The CISA guidance further recommends use of a centrally managed antivirus software utilizing automatic updates that will protect all devices connected to a network (as opposed to requiring separate software on each individual device), as well as implementing a real-time intrusion detection system that will detect potentially malicious network activity that occurs prior to ransomware deployment.

34. Consequently, AT&T knew of the importance of safeguarding PII and of the foreseeable consequences that would occur if their data security system was

breached, including the significant costs that would be imposed on customers as a result of a breach.

35. But despite all of the publicly available knowledge of the continued compromises of PII and despite holding the PII of millions of customers, AT&T failed to use reasonable care in maintaining the privacy and security of the PII of Plaintiff.

36. Had AT&T implemented industry standard security measures, adequately invested in data security, and promptly investigated cybersecurity issues, unauthorized parties likely would not have been able to access AT&T's or its third- party vendors' systems and the Data Breach would have been prevented or much smaller in scope.

37. The PII of consumers, including Plaintiff, remains of high value to criminals, as evidenced by the continued sale and trade of such information on underground markets found on the "dark web"— which is a part of the internet that is intentionally hidden and inaccessible through standard web browsers

38. Data sets that include PII demand a much higher price on the black market. For example, the information likely exposed in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach, where victims can easily cancel or close credit and debit card accounts.[25] The information likely disclosed in this Data Breach is impossible to "close" and difficult, if not impossible, to change (such as Social Security numbers).

39. There is also an active and robust *legitimate* market for PII. In 2021, the data brokering industry alone was valued at $319 billion. In fact, the data marketplace is so sophisticated that consumers can actually sell their non-public information directly to a data broker who in turn aggregates the information and provides it to marketers

or app developers.  Consumers who agree to provide their web browsing history to the Nielsen Corporation can receive up to $50.00 a year.

40. Because their PII has independent value, Plaintiff must take measures to protect it including by, as AT&T's online notice instructs, placing "alerts" with credit reporting agencies, changing passcodes, and reviewing and monitoring credit reports and accounts for unauthorized activity, which may take years to discover and detect.

41. In connection with obtaining AT&T's services, Plaintiff was required to provide highly sensitive personal information, such as his contact information, date of birth, Social Security number, and so on. AT&T also prompted Plaintiff to create login credentials to access his accounts.

42. In the regular course of business, AT&T shared Plaintiff's information with several third-party partners whom AT&T was obligated to verify their data security practices because those third parties stored the information AT&T collected.

43. Plaintiff has confirmed that it was a victim of the Data Breach.

44. Because AT&T continues to store and share  PII in the regular course of its business, Plaintiff has a continuing interest in ensuring that the PII is protected and safeguarded from additional authorized access.

45. Federal agencies have issued recommendations and guidelines to help minimize the risks of a data breach for businesses holding sensitive data. For example, the Federal Trade Commission (FTC) has issued numerous guides for businesses highlighting the importance of reasonable data security practices, which should be factored into all business-related decision making.

46. The FTC's publication Protecting Personal Information: A Guide for Business sets

forth fundamental data security principles and practices for businesses to implement and follow as a means to protect sensitive data.

47. Among other things, the guidelines note that businesses should (a) protect the customer information that they collect and store; (b) properly dispose of personal information that is no longer needed; (c) encrypt information stored on their computer networks; (d) understand their network's vulnerabilities; and (e) implement policies to correct security problems. The FTC guidelines further recommend that businesses use an intrusion detection system, monitor all incoming traffic for unusual activity, monitor for large amounts of data being transmitted from their system, and have a response plan ready in the event of a breach.

48. Additionally, the FTC recommends that organizations limit access to sensitive data, require complex passwords to be used on networks, use industry- tested methods for security; monitor for suspicious activity on the network, and verify that third-party service providers have implemented reasonable security measures.

49. The FTC has brought enforcement actions against businesses for failing to reasonably protect customer information, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

50. AT&T was fully aware of its obligation to implement and use reasonable measures to protect customers' PII but failed to comply with these basic recommendations and guidelines that would have prevented this breach from occurring. AT&T's failure to

employ reasonable measures to protect against unauthorized access to customer information constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

51. Though limited detail is available on the Data Breach, how it occurred or the entity the information originated from, AT&T's failure to safeguard customers' PII suggests AT&T failed to fully comply with industry-standard cybersecurity practices, including, but not limited to, proper firewall configuration, network segmentation, secure credential storage, user-activity monitoring, data-loss prevention, encryption, intrusion detection and prevention, and exercising managerial control over third-party vendors' cybersecurity practices.

52. AT&T's failure to keep Plaintiff's PII secure has severe ramifications. Given the sensitive nature of the PII stolen in the Data Breach—names, date of birth, Social Security numbers, and potentially other sensitive information—hackers can commit identity theft, financial fraud, and other identity-related fraud against Plaintiff now and into the indefinite future

53. As a result, Plaintiff has suffered injury including as the information has already been published to the Dark Web available for any cybercriminal to misuse.

54. As discussed above, the PII likely exposed in the Data Breach is highly coveted and valuable on underground markets as it can be used to commit identity theft and fraud. Malicious actors use PII to, among other things, gain access to consumers' bank accounts, social media, and credit cards. Malicious actors can also use  PII to open new financial accounts, open new utility accounts, obtain medical treatment using victims' health insurance, file fraudulent tax returns, obtain government

benefits, obtain government IDs, or create "synthetic identities.

55. Further, malicious actors may wait months or years to use the PII obtained in data breaches, as victims often become complacent and less diligent in monitoring their accounts after a significant period has passed. These actors will also re-use stolen PII, meaning individuals can be the victims of several cybercrimes stemming from a single data breach.

56. Even in instances where an individual is reimbursed for a financial loss due to identity theft or fraud, that does not make that individual whole again as there is typically significant time and effort associated with seeking reimbursement. According to the Government Accountability Office, which conducted a study regarding data breaches: "law enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data has been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm. The unauthorized disclosure of the sensitive PII to data thieves also reduces its inherent value to its owner, which has been recognized by courts as an independent form of harm.

57. Consumers are injured every time their data is stolen and traded on underground markets, even if they have been victims of previous data breaches. Indeed, the dark web is comprised of multiple discrete repositories of stolen information that can be aggregated together or accessed by different criminal actors who intend to use it for different fraudulent purposes. Each data breach increases the likelihood that a

victim's personal information will be exposed to more individuals who are seeking to misuse it at the victim's expense. And here, Plaintiff's PII is already available to criminal actors on the dark web.

58. As the result of the wide variety of injuries that can be traced to the Data Breach, Plaintiff has and will continue to suffer harm for which it is entitled to damages, including, but not limited to, the following the unconsented disclosure of confidential information to a third party;

- losing the value of the explicit and implicit promises of data security;
- identity theft and fraud resulting from the theft of their PII;
- costs associated with the detection and prevention of identity theft and unauthorized use of their financial accounts;
- costs associated with purchasing credit monitoring, credit freezes, and identity theft protection services;
- unauthorized charges and loss of use of and access to their financial and investment account funds and costs associated with inability to obtain money from their accounts or being limited in the amount of money they were permitted to obtain from their accounts, including missed payments on bills and loans, late charges and fees, and adverse effects on their credit;
- lowered credit scores resulting from credit inquiries following fraudulent activities;
- costs associated with time spent and the loss of productivity or the enjoyment of one's life from taking time to address and attempt to mitigate and address the actual and future consequences of the Data Breach, including searching for fraudulent activity, imposing withdrawal and purchase limits on compromised accounts, and the stress, nuisance, and annoyance of dealing with the repercussions of the Data Breach; and
- the continued, imminent, and certainly impending injury flowing from potential fraud and identify theft posed by their PII being in the possession of one or many unauthorized third parties.

59. Plaintiff has a direct interest in AT&T's promises and duties to protect its PII, *i.e.,* that AT&T *not increase* their risk of identity theft and fraud. Because AT&T failed to live up to its promises and duties in this respect, Plaintiff seeks the present value of identity protection services to compensate them for the present harm and present and continuing increased risk of harm caused by AT&T's wrongful conduct.

60. Through this remedy, Plaintiff seeks to restore close to the same position as they would have occupied but for AT&T's wrongful conduct, namely their failure to adequately protect the information. Plaintiff further seeks to recover the value of the unauthorized access to their PII permitted through AT&T's wrongful conduct. This measure of damages is analogous to the remedies for unauthorized use of intellectual property. Like a technology covered by a trade secret or patent, use or access to a person's PII is non-rivalrous—the unauthorized use by another does not diminish the rights-holder's ability to practice the patented invention or use the trade-secret protected technology.

61. Nevertheless, a plaintiff may generally recover the reasonable use value of the IP—*i.e.,* a "reasonable royalty" from an infringer. This is true even though the infringer's use did not interfere with the owner's own use (as in the case of a non- practicing patentee) and even though the owner would not have otherwise licensed such IP to the infringer. A similar royalty or license measure of damages is appropriate here under common law damages principles authorizing recovery of rental or use value. This measure is appropriate because (a) Plaintiff has a protectible property interest in their PII; (b) the minimum damages measure for the unauthorized use of personal property is its rental value; and (c) rental value is established with reference to market value, i.e., evidence regarding the value of similar transactions.

62. Defendant AT&T required Plaintiff's PII as a condition to receiving AT&T's services. AT&T collected and stored this PII for commercial gain. AT&T collected, stored, and through its partnership with third- party vendors, shared the data with these vendors for providing AT&T's services as well as commercial gain.

63. AT&T owed a duty of care to Plaintiff to provide adequate data security, consistent with industry standards, to ensure that AT&T's and its vendors' systems and networks adequately protected the PII

64. AT&T owed a duty of care to Plaintiff so as to alleviate the risk of compromising Plaintiff's PII.

65. AT&T duty to use reasonable care in protecting PII arises because of the parties' relationship, as well as common law and federal law, including the FTC regulations described above and AT&T's own policies and promises regarding privacy and data security.

66. AT&T knew, or should have known, of the risks inherent in collecting and storing PII in a centralized location for the purpose of carrying out the business of the partnership, its vendors' vulnerability to network attacks, and the importance of adequate security.

67. AT&T breached its duty to Plaintiff in numerous ways, as described herein, including by:

- Failing to exercise reasonable care and implement adequate security systems, protocols, and practices sufficient to protect the PII of Plaintiff;

- Failing to ensure its vendors implemented adequate security systems, protocols, and practices sufficient to protect the PII of Plaintiff;

- Failing to supervise its vendors regarding vendors' data security systems, protocols, and practices when it knew or should have known those systems, protocols, and practices were inadequate;

- Failing to comply with industry standard data security measures for the

telecommunications industry leading up to the Data Breach;

- Failing to comply with its own privacy policies;

- Failing to comply with regulations protecting the PII at issue during the period of the Data Breach;

- Failing to adequately monitor, evaluate, and ensure the security of their vendors' network and systems;

- Failing to recognize in a timely manner that PII had been compromised; and

- Failing to timely and adequately disclose the Data Breach.

68. Plaintiff's PII would not have been compromised but for AT&T's wrongful and negligent breach of its duties

69. AT&T's failure to take proper security measures to protect the sensitive PII of Plaintiff as described herein, created conditions conducive to a foreseeable, intentional criminal act, namely the unauthorized access, copying, and exfiltrating of PII by unauthorized third parties. Given that telecommunications businesses are prime targets for hackers, of having its PII misused or disclosed if not adequately protected by AT&T.

70. It was also foreseeable that AT&T's failure to provide timely and forthright notice of the Data Breach would result in injury to Plaintiff.

71. As a direct and proximate result of AT&T's conduct, Plaintiff has suffered damages including: (i) the loss of rental or use value of their PII; (ii) the unconsented disclosure of their PII to unauthorized third parties; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, fraud, and/or unauthorized use of their PII; (iv) lost opportunity costs associated with

addressing and attempting to mitigate the actual and future consequences of the Data Breach, including, but not limited to, efforts spent researching how to prevent, detect, contest, and recover from fraud and identity theft; (v) potential time, effort, and expense associated with placing fraud alerts or freezes on credit reports; (vi) the continued risk to their PII, which remains in AT&T's possession and is subject to further unauthorized disclosures so long as AT&T fails to undertake appropriate and adequate measures to protect it; (vii) future costs in terms of time, effort and money that will be expended to prevent, detect, contest, and repair the inevitable and continuing consequences of compromised PII for the rest of their lives; and (viii) any nominal damages that may be awarded.

WHEREFORE, Plaintiff respectfully requests that this Court grant judgment in its favor and against AT&T and any other relief the Court deems just and proper including attorney's fees and costs.

## COUNT II-VIOLATION OF FDUTPA FOR DATA BREACH

72. Plaintiff re-alleges, restates, and incorporates the allegations contained in paragraphs one (1) through seventy-one (71) as fully set forth herein.

73. Defendant engaged in unfair or deceptive acts or practices in the conduct of consumer transactions in violation of FDUTPA, including but not limited to:

   a. Representing that its services were of a particular standard or quality that it knew or should have known were of another;

   b. Failing to implement and maintain reasonable security and privacy measures to protect Plaintiff's Sensitive Information, which was a direct and proximate cause of the Data Breach;

c. Failing to identify foreseeable security and privacy risks, and remediate identified security and privacy risks, which was a direct and proximate cause of the Data Breach;

d. Failing to comply with common law and statutory duties pertaining to the security and privacy of Plaintiff's Sensitive Information, including duties imposed by the FTCA, 15 U.S.C. § 45, which was a direct and proximate cause of the Cyber-Attack and data breach;

e. Misrepresenting that it would protect the privacy and confidentiality of Plaintiff's Sensitive Information, including by implementing and maintaining reasonable security measures;

f. Omitting, suppressing, and concealing the material fact that it did not reasonably or adequately secure Plaintiff's Sensitive Information; and

g. Omitting, suppressing, and concealing the material fact that it did not comply with common law and statutory duties pertaining to the security and privacy of Plaintiff's Personal Information, including duties imposed by the FTCA, 15 U.S.C. § 45, which was a direct and proximate cause of the Data Breach.

74. Defendant's representations and omissions were material because it was likely to deceive reasonable consumers about the adequacy of Defendant's data security and ability to protect the confidentiality of consumers' Sensitive Information.

75. In addition, Defendant's failure to secure consumers' PHI violated the FTCA and therefore violated FDUTPA.

76. Defendant knew or should have known that its computer systems and data security practices were inadequate to safeguard the Sensitive Information of Plaintiff, deter hackers, and detect a breach within a reasonable time, and that the risk of a data breach was highly likely.

77. The aforesaid conduct constitutes a violation of FDUTPA, Fla. Stat. § 501.204, in that it is a restraint on trade or commerce and was furthermore unconscionable, unfair and deceptive.

78. Defendant's implied and express representations that it would adequately safeguard Plaintiff's Sensitive Information constitute representations as to characteristics, uses or benefits of services that such services did not actually have, in violation of Fla. Stat. § 501.202(2).

79. Most, if not all, of the alleged misrepresentations and omissions by AT&T complained of herein that led to inadequate safety measures to protect patient information occurred within or were approved within Florida.

80. AT&T's representations that it would adequately safeguard Plaintiff's Sensitive Information constitute representations as to the particular standard, quality, or grade of services that such services did not actually have (as the data security services were of another, inferior quality), in violation of Fla. Stat. § 501.204(1)..

81. AT&T knowingly made false or misleading statements in its privacy policy regarding the use of personal information submitted by members of the public in that Defendant claims that it is committed to protecting privacy and securely maintaining personal information. Defendant did not securely maintain the personal information as represented, in violation of Fla. Stat. § 501.171.

82. These violations have caused actual damages to Plaintiff

83. Plaintiff, brings this action under the Deceptive and Unfair Trade Practices Act to seek such her actual damages incurred for violations and to recover costs of this action, including reasonable attorneys' fees and costs.

WHEREFORE, Plaintiff respectfully requests that this Court grant judgment in its favor and against AT&T for damages, interest, court costs, attorney's fees, and any other relief the Court deems just and proper.

**COUNT III - BREACH OF IMPLIED DUTY OF GOOD FAITH AND FAIR DEALING**

84. Plaintiff re-alleges, restates and incorporates the allegations contained in paragraphs one (1) through seventy-one (71) above, and further alleges as follows:

85. Plaintiff had a wireless agreement with AT&T wherein Plaintiff had a reasonable expectation of performance of the agreement by AT&T to keep  Plaintiff's PII safe

86. As part of these transactions, AT&T agreed to safeguard and protect the PII of Plaintiff. Implicit in these transactions between AT&T and Plaintiff was the obligation that AT&T would use the PII for approved business purposes only and would not make unauthorized disclosures of the information or allow unauthorized access to the information.

87. Additionally, AT&T implicitly promised to retain this PII only under conditions that kept such information secure and confidential and therefore had a duty to reasonably safeguard and protect the PII of Plaintiff from unauthorized disclosure or access.

88. Plaintiff had a  reasonable expectation that AT&T's data security practices and policies, including adequate managerial supervision of vendors' data security, were

reasonable and consistent with industry standards believed that AT&T would use part of the monies paid to AT&T to fund adequate and reasonable data security practices to protect their PII.

89.. The safeguarding of Plaintiff's PII was critical to realizing the intent of the parties.

90. AT&T breached its implied contract with Plaintiff by failing to reasonably safeguard and protect Plaintiff's PII, which was compromised as a result of the Data Breach.

91. As a direct and proximate result of AT&T's breaches, Plaintiff sustained actual losses and damages as alleged herein, including that they did not receive the benefits of the bargains for which they paid.   Alternatively, Plaintiff seeks an award of nominal damages.

92. AT&T has breached the express terms of the wireless agreement.

93. As a result of AT&T's breach of implied covenant of good faith and fair dealing, Plaintiff has been damaged.

WHEREFORE, Plaintiff respectfully requests that this Court grant judgment in its favor and against AT&T for compensatory damages, nominal damages, interest, court costs, and any other relief the Court deems just and proper.

### COUNT IV – ACTION FOR DECLARATORY RELIEF AND/OR INJUNCTIVE RELIEF UNDER FDUTPA – DATA BREACH

94. Plaintiff re-alleges, restates, and incorporates the allegations contained in paragraphs one (1) through seventy (70), above, and further alleges as follows:

95. Under the FDUTPA, without regard to any other remedy or relief to which a person is entitled, anyone aggrieved by a violation of this part may bring an action to obtain a declaratory judgment that an act or practice violates this part and to enjoin a person who has violated, is violating, or is otherwise likely to violate 501.201 et. seq. See

Fla. Stat. §501.211(1). Plaintiff is an aggrieved consumer whose rights have been, are being, or will be adversely affected, by AT&T MOBILITY, LLC.'s violation of FDUTPA--meaning an unfair or deceptive practice which is injurious to consumers, including Plaintiff.

96. Pursuant to AT&T MOBILITY, LLC's above-described acts or practices of placing a improperly safeguarding Plaintiff's account, AT&T MOBILITY, LLC violated the FDUTPA.

97. Plaintiff seeks a declaratory judgment that AT&T MOBILITY, LLC's acts or practices have violated the FDUTPA.

98. Plaintiff seeks to determine whether the FDUTPA prohibits AT&T MOBILITY, LLC from continuing to allow Plaintiff's PII to be distributed and left unsafeguarded in the future.

99. There is a bona fide dispute between the parties. Plaintiff has a justiciable question as to the existence or non-existence of some right, status, immunity, power, or privilege, or some fact upon which their claim may depend.

100. here is a bona fide, actual, and present need for the declaration.

101. Plaintiff has retained the undersigned to represent it in this action and pay a reasonable fee for said legal services.

WHEREFORE, Plaintiff respectfully requests that this Court grant declaratory judgment and/or injunctive relief in its favor and against AT&T MOBILITY, LLC, court costs, attorney's fees pursuant to Section 501.2105, Florida Statutes, and any other relief the Court deems just and proper.

## **CERTIFICATE OF SERVICE**

WE HEREBY CERTIFY that a true and correct copy of the foregoing was served

via e-mail this this this January 17, 2025 to: all counsel of record.

**Beighley, Myrick, Udell, Lynne & Zeichman PA**
*Attorneys for Plaintiff*
2601 S. Bayshore Drive, Suite 770
Miami, FL 33133
(305) 349-3930 – Phone

By:      /s/ *Maury L. Udell*
Maury L. Udell, Esquire
mudell@bmulaw.com
Fla. Bar 121673



# JUAN FERNANDEZ-BARQUIN
## CLERK OF THE COURT AND COMPTROLLER
## OF THE CIRCUIT AND COUNTY COURTS
## Miami-Dade County, Florida

**DISTRICT COURTS DIVISION**

**Re: REJECTION LETTER**

Date: **January 22, 2025**

Case #:  **2022-047421-SP-25**

Dear Mr. (Mrs.) (Ms.) Maury L. Udell, Esquire

Our office would like to provide your prompt and efficient service; however, we regret we must return your document(s) for the following reasons:

- ☐ **ENCLOSED CHECK IS NOT SIGNED**
- ☐ **NO FILING FEE ENCLOSED**
- ☐ **COMPLAINT IS NOT SIGNED**
- ☐ **INCORRECT SUMMONS**
- ☒ **ADDITIONAL FILING FEE OF $ 245.00 IS REQUIRED- PAYABLE TO: CLERK OF COURTS**
- ☐ **DOCUMENT MUST BE NOTARIZED**
- ☐ **NEED AN ORIGINAL COMPLAINT AND _____ COPIES**
- ☐ **EACH PRE-TRIAL MUST BE FILLED OUT (FRONT AND BACK)**
- ☐ **RECORDING FEE NOT PAID**
- ☒ **OTHER The filing fee for less than $8,000 is $300.00 but since you previously paid $55.00 all we need is a total of $245.00 thank you kindly.**

**TO ENSURE PROMPT HANDLING OF THIS MATTER, PLEASE MAIL THE CORRECTED DOCUMENTS TO THE ADDRESS SHOWN ABOVE AND TO THE ATTENTION OF THE UNDERSIGNED DEPUTY CLERK.**

Sincerely,

JUAN FERNANDEZ-BARQUIN,
CLERK OF THE COURT AND COMPTROLLER
CIRCUIT AND COUNTY COURTS

By: _____
Deputy Clerk

- ☐ **Joseph Caleb Center (20)**
  5400 NW 22 Avenue, Suite # 103
  Miami, Florida 33142
- ☒ **Coral Gables District Court (25)**
  3100 Ponce de Leon Blvd., Suite # 100
  Coral Gables, Florida 33134
- ☐ **Miami Beach District Court (24)**
  1130 Washington Avenue, Suite # 200
  Miami Beach, Florida 33139
- ☐ **North Dade Justice Center (23)**
  15555 Biscayne Boulevard., Suite # 100
  Miami, Florida 33160
- ☐ **Hialeah District Court (21)**
  11 E. 6th Street, Suite # 100
  Hialeah, Florida 33010
- ☐ **South Dade Justice Center (26)**
  10710 SW 211th St, Suite # 1200
  Miami, Florida 33189

Central Depository - Civil Division – Clerk of the Board – Code Enforcement – Comptroller/Auditor – County Recorder – Criminal

CLK/CT. 239 Rev. 08/14

Clerk's web address: www.miami-dadeclek.com



# JUAN FERNANDEZ-BARQUIN, ESQ.
## CLERK OF THE COURT AND COMPTROLLER
## OF MIAMI-DADE COUNTY

<u>Contact Us</u>    <u>My Account</u>    <u>My Desk</u>    

# CIVIL, FAMILY AND PROBATE COURTS ONLINE SYSTEM

**◀◀ BACK**

**SERGIO SALANI VS AT&T MOBILITY, LLC**

| | | | |
|---|---|---|---|
| Local Case Number: | 2022-047421-SP-25 | Filing Date: | 12/30/2022 |
| State Case Number: | 132022SC047421000025 | Judicial Section: | CG 01 - Coral Gables 01 - Judge Perez Santiago, Jorge |
| Consolidated Case No.: | N/A | Court Location: | 3100 Ponce de Leon Boulevard, Coral Gables, FL 33134 |
| Case Status: | OPEN | Case Type: | SP Contract and Indebtedness (Up to $5,000) |

≡ **Related Cases** — Total Of Related Cases: 0 **+**

👥 **Parties** — Total Of Parties: 2 **+**

⚒ **Hearing Details** — Total Of Hearings: 2 **+**

🔊 **Dockets** — Total Of Dockets: 67 **−**

| | Number | Date | Book/Page | Docket Entry | Event Type | Comments |
|---|---|---|---|---|---|---|
| 📄 | 65 | 01/22/2025 | | Letter of Correspondence | Event | **REJECTION LETTER** |
| 📄 | 64 | 01/17/2025 | | Amended Statement of Claim | Event | |
| 📄 | 63 | 01/15/2025 | | Motion for Protective Order | Event | |
| 📄 | 62 | 01/15/2025 | | Order Denying Motion | Event | **FOR RECONSIDERATION** |
| 📄 | 61 | 01/14/2025 | | Response to Request for Admissions | Event | |
| 📄 | 60 | 01/09/2025 | | Motion for Rehearing | Event | |
| 📄 | 59 | 01/06/2025 | | Notice of Taking Deposition | Event | |
| 📄 | 58 | 01/06/2025 | | Order: | Event | **GRANTING MOTION FOR EXTENSION OF TIME** |
| 📄 | 57 | 01/06/2025 | | Agreed Order | Event | **GRANTING PLAINTIFFS MOTION FOR EXTENSION OF TIME TO FILE AMENDED PLEADING** |
| 📄 | 56 | 12/20/2024 | | Motion for Extension of Time | Event | |

| | Number | Date | Book/Page | Docket Entry | Event Type | Comments |
|---|---|---|---|---|---|---|
| 📄 | 55 | 12/18/2024 | | Motion for Extension of Time | Event | |
| 📄 | 54 | 12/13/2024 | | Request for Admissions | Event | |
| 📄 | 53 | 12/13/2024 | | Notice of Taking Deposition | Event | |
| 📄 | 52 | 12/13/2024 | | Order: | Event | **GRANTING DISMISSAL WITH PREJUDICE OF COUNTS 1-4 AND GRANTING LEAVE TO AMEND COMPLAINT TO STATE DATA BREACH CLAIMS** |
| 📄 | 51 | 12/12/2024 | | Notice of Filing: | Event | **SUPPLEMENTAL AUTHORITY** |
| 📄 | 50 | 12/11/2024 | | Notice of Filing: | Event | **COURT ORDER** |
| 📄 | 49 | 12/09/2024 | | Request for Production | Event | |
| 📄 | 48 | 12/09/2024 | | Motion for Default | Event | |
| 📄 | 47 | 12/05/2024 | | Notice of Filing: | Event | **UNOPPOSED ORDER GRANTING PLAINTIFFS MOTION FOR LEAVE TO FILE SECOND AMENDED STATEMENT OF CLAIM** |
| 📄 | 46 | 11/22/2024 | | Notice of Filing: | Event | **CERTIFICATE OF SERVICE** |
| 📄 | 45 | 11/07/2024 | | Notice of Filing: | Event | **SUPPLEMENTAL AUTHORITY IN SUPPORT OF MOTION FOR LEAVE TO AMEND** |
| 📄 | 44 | 10/31/2024 | | Notice of Filing: | Event | **SUPPLEMENTAL AUTHORITY** |
| 📄 | 43 | 10/31/2024 | | Notice of Filing: | Event | **MOTION FOR RECONSIDERATION AND** |
| 📄 | 42 | 10/23/2024 | | Notice of Filing: | Event | **COURT ORDER** |
| 📄 | 41 | 10/04/2024 | | Memorandum of Disposition | Event | |
| | | 10/04/2024 | | Special Sets | Hearing | **MOTION TO DISMISS** |
| 📄 | 40 | 10/02/2024 | | Reply | Event | |
| 📄 | 39 | 10/02/2024 | | Notice of Filing: | Event | **PLAINTIFF'S MOTION FOR LEAVE TO AMEND** |
| 📄 | 38 | 09/26/2024 | | Notice of Hearing- | Event | |
| 📄 | 37 | 09/06/2024 | | Notice of Hearing- | Event | **10/04/2024 1030AM** |
| 📄 | 36 | 08/22/2024 | | Notice of Filing: | Event | **SUPPLEMENTAL AUTHORITY IN SUPPORT** |
| 📄 | 35 | 08/20/2024 | | Notice of Cancellation of Hearing | Event | **AUGUST 21, 2024 AT 9:30 A.M.** |
| 📄 | 34 | 08/14/2024 | | Response to Motion | Event | |

| | Number | Date | Book/Page | Docket Entry | Event Type | Comments |
|---|---|---|---|---|---|---|
| 📄 | 33 | 06/27/2024 | | Notice of Hearing- | Event | |
| 📄 | 32 | 06/17/2024 | | Motion for Leave | Event | **TO FILE SECOND AMENDED STATEMENT OF CLAIM** |
| 📄 | 31 | 05/31/2024 | | Motion to Dismiss | Event | |
| 📄 | 30 | 05/23/2024 | | Response to Request for Production | Event | |
| 📄 | 29 | 05/20/2024 | | Motion for Extension of Time | Event | |
| 📄 | 28 | 05/08/2024 | | Request for Production | Event | |
| 📄 | 27 | 05/07/2024 | | Request for Production | Event | |
| 📄 | 26 | 04/30/2024 | | Letter of Correspondence | Event | **REJECTION LETTER** |
| 📄 | 25 | 04/29/2024 | | Amended Statement of Claim | Event | |
| 📄 | 23 | 04/05/2024 | | Agreed Order | Event | **ON DEFENDANTS MOTION TO DISMISS** |
| 📄 | 22 | 02/27/2024 | | Notice of Hearing- | Event | **4/08/2024 930AM** |
| 📄 | 21 | 02/12/2024 | | Motion to Dismiss | Event | |
| 📄 | 20 | 01/31/2024 | | Amended Statement of Claim | Event | |
| 📄 | 19 | 01/12/2024 | | Notice of Filing: | Event | |
| 📄 | 18 | 01/11/2024 | | Agreed Order | Event | |
| 📄 | 17 | 01/11/2024 | | Notice of Cancellation of Hearing | Event | |
| 📄 | 16 | 12/13/2023 | | Notice of Hearing- | Event | **JANUARY 16, 2024, AT 9:30** |
| 📄 | 15 | 10/10/2023 | | Motion for Extension of Time | Event | |
| 📄 | 14 | 09/22/2023 | | Memorandum of Disposition | Event | |
| | | 09/22/2023 | | Small Claims Pre-Trial Conference | Hearing | |
| 📄 | 13 | 09/20/2023 | | Stipulated Waiver for Appearance at Pre-Trial | Event | |
| 📄 | 12 | 09/20/2023 | | Notice of Appearance | Event | |
| 📄 | 11 | 09/20/2023 | | Agreed Order | Event | **APPROVING JOINT STIPULATION AND WAIVER OF PRETRIAL CONFERENCE** |

| | Number | Date | Book/Page | Docket Entry | Event Type | Comments |
|---|---|---|---|---|---|---|
| 📄 | 10 | 08/18/2023 | | Notice: | Event | **PLAINTIFF** |
| | 9 | 08/09/2023 | | Receipt: | Event | **RECEIPT#:2530003 AMT PAID:$10.00 COMMENT: ALLOCATION CODE QUANTITY UNIT AMOUNT 2139-SUMMONS ISSUE FEE 1 $10.00 $10.00 TENDER TYPE:CHECK TENDER AMT:$40.00 RECEIPT DATE:08/09/2023 REGISTER#:253 CASHIER:STACENA** |
| | | 08/08/2023 | | SP Pre Trial Summons Issued | Service | |
| 📄 | 8 | 08/08/2023 | | Pre Trial Summons | Event | Parties: AT&T Mobility LLC |
| | 7 | 08/08/2023 | | SP Pretrial New Date | Event | Parties: AT&T Mobility LLC |
| 📄 | 6 | 07/14/2023 | | Motion for Extension of Time | Event | |
| 📄 | 5 | 07/14/2023 | | Notice of Activity | Event | |
| 📄 | 4 | 07/03/2023 | | FWOP Notice | Event | |
| | 3 | 12/31/2022 | | Receipt: | Event | **RECEIPT#:3030829 AMT PAID:$55.00 NAME:UDELL, MAURY L 2601 S. BAYSHORE DRIVE, SUITE 770 MIAMI FL 33133-5413 COMMENT: ALLOCATION CODE QUANTITY UNIT AMOUNT 2100-COUNTY FILING FEE 1 $55.00 $55.00 TENDER TYPE:EFILINGS TENDER AMT:$55.00 RECEIPT DATE:12/31/2022 REGISTER#:303 CASHIER:EFILINGUSER** |
| 📄 | 2 | 12/30/2022 | | Statement of Claim | Event | **$99.99** |
| 📄 | 1 | 12/30/2022 | | Civil Cover Sheet - Claim Amount | Event | |

◀◀ BACK

**Please be advised:**

The Clerk's Office makes every effort to ensure the accuracy of the following information; however it makes no warranties or representations whatsoever regarding the completeness, accuracy, or timeliness of such information and data. Information on this website has been posted with the intent that it be readily available for personal and public non-commercial (educational) use and to provide the public with direct online access to information in the Miami-Dade Clerk's Office information systems. Other than making limited copies of this website's content, you may not reproduce, retransmit, redistribute, upload or post any part of this website, including the contents thereof, in any form or by any means, or store it in any information storage and retrieval system, without prior written permission from the Miami-Dade Clerk's Office.

If you are interested in obtaining permission to reproduce, retransmit or store any part of this website beyond that which you may use for personal use, as defined above, visit our Web API Services. You can review the complete Miami-Dade County Disclaimer

**General**

Online Case Home

Civil / Family Courts Information

Login

**Help and Support**

Clerk's Home

Privacy Statement

ADA Notice

Disclaimer

Contact Us

https://www2.miamidadeclerk.gov/ocs/search.aspx?AspxAutoDetectCookieSupport=1

4/5



About Us

Juan Fernandez-Barquin, Esq.
Clerk of the Court and Comptroller
of Miami-Dade County

73 W. Flagler Street
Miami, Florida 33130

305-275-1155

©2025 Clerk of the Court & Comptroller of Miami-Dade County. All rights reserved.